**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone:     (858) 997-0860
Facsimile:     (858) 369-0096

*Counsel for Plaintiff Plumbers*
*& Pipefitters Local Union #295 Pension Fund*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Plumbers & Pipefitters Local Union #295 Pension Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by CareDx, Inc. ("CareDx" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on CareDx's website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons or entities who purchased CareDx common stock between February 24, 2021, and May 5, 2022, inclusive (the "Class Period") against CareDx and certain of its officers (collectively "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act").

2.      CareDx is a diagnostics company that provides services and products to the organ transplant recipient community, offering diagnostic testing services, products, and digital healthcare software for transplant patients and care providers.  The information gathered through the Company's surveillance and tests purportedly enables clinicians to make treatment decisions in the event of signs of organ rejection.

3.      During the Class Period, testing services for kidney and heart transplant recipients was by far the Company's largest segment, representing at least 85% of the Company's total revenues since the beginning of 2020.  The Company's AlloSure® blood test for transplant recipients was, and is, the Company's primary source of revenue.

4.      The Company received a higher payment for testing services from Medicare reimbursement than from commercial payers.  As a result, the number of tests for which the

Company was able to get Medicare reimbursement corresponded with the Company's reporting a higher average sales price ("ASP") for testing services.  Although the Company did not specifically report ASPs during the Class Period, investors were able to easily calculate ASP by dividing testing service revenue by the number or volume of reported tests per financial reporting period.

5.      Throughout the Class Period, CareDx reported growing revenue and strong demand in the Company's testing services segment.  On February 24, 2021, the first day of the Class Period, Defendants reported a 51% year-over-year increase in total revenue, with testing services revenue increasing from $104.6 million in 2019 to $163.5 million in 2020.  Defendants instructed investors during the Class Period that they "should be focused" on the testing services segment.  Defendants presented the testing services segment as the Company's "growth driver" for which "demand continued unabated."  Moreover, Defendants described the Company's testing services segment as having "a winning formula" that would allow the Company to capture a massive total addressable market ("TAM").

6.      Defendants also emphasized to investors the success of the Company's RemoTraC service – a remote, home-based, blood-drawing service that the Company launched in response to the Covid-19 pandemic – as part of the "winning formula."  Investors were told throughout the Class Period that the RemoTraC service was a massive success that gave the Company the ability to "drive margins" for testing services.

7.      Undisclosed to investors, however, throughout the Class Period, Defendants had engaged in a variety of improper and illegal schemes to inflate testing services revenue, including: (i) pushing protocols for surveillance of organ rejection through inaccurate marketing materials and in violation of Medicare standards; (ii) offering extravagant inducements or kickbacks to physicians and other providers; and (iii) improperly bundling expensive testing services with other blood tests as part of the RemoTraC service.  These practices, and others, subjected CareDx to an undisclosed risk of regulatory scrutiny and rendered the Company's testing services revenue and demand reported throughout the Class Period artificially inflated.  As a result, Defendants' positive

statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

8.      Investors began to learn the truth regarding Defendants' Class Period misrepresentations after the financial markets closed on October 28, 2021, when CareDx filed its quarterly report for the third quarter of 2021 on Form 10-Q with the SEC.  Under the heading "United States Department of Justice and United States Securities and Exchange Commission Investigation," Form 10-Q revealed for the first time that CareDx was the subject of *at least three* government investigations.  Specifically, the Form 10-Q reported (1) the Company had "recently received" a civil investigative demand ("CID") from the U.S. Department of Justice ("DOJ") requesting the Company produce documents in connection with the *DOJ's False Claims Act investigation*; (2) the Company received a subpoena from the *SEC* in relation to an investigation by the SEC "in respect to matters similar to those identified in the CID, as well as certain of our *accounting and public reporting practices*" and (3) the Company received an information request from an unnamed state regulatory agency (collectively "government investigations").

9.      In response to the disclosures of the government investigations, the price of CareDx shares declined more than 27% the next trading day, from a closing price of $70.34 per share on October 28, 2021, to a closing price of $51.00 per share on October 29, 2021.

10.      The Company then remained silent on the status of the government investigations for several months.  But investors learned more about the extent of the Company's misconduct and the nature of the government investigations on April 15, 2022, when the Company's former Head of Community Nephrology, Dr. Michael Olymbios, filed a complaint in California Superior Court[1] that provided extensive detail about: (1) Defendants' misconduct, including the use of RemoTraC to improperly bundle the Company's most expensive testing services, including AlloSure, with other blood tests, that led to the government investigations; (2) Defendants' knowledge of the misconduct throughout the Class Period; and (3) their attempts to conceal the

---

[1] *See Olymbios v. CareDx, Inc.*, Case No. 22-civ-01582 (Cal. Super. Ct. San Mateo Cnty.) (hereinafter, the "Olymbios Complaint").

misconduct.  In response to the revelations in the Olymbios Complaint, the price of CareDx stock fell an additional 8% to close trading the next trading day, April 18, 2022, at $32.55 per share.

11.     Investors further learned the impact of Defendants' misconduct and the resulting government investigations on CareDx's business prospects after the markets closed on May 5, 2022.  In connection with the announcement of the Company's results for the first quarter of 2022, Defendants reported testing service revenue that fell well short of analysts' expectations and yet another decline in ASP in which the Company's average price declined by approximately 4.9% versus the last quarter of 2021, or what one analyst described as "another big deterioration in price."

12.     In response to these disclosures, the price of CareDx stock declined another 18.5% the following trading day, from a closing price of $31.66 per share on May 5, 2022, to a closing price of $25.87 per share on May 6, 2022.

13.     As the market digested the disclosure of Defendants' misconduct, more than $1 billion in shareholder value was erased.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the

investing public, and the omission of material information, occurred in substantial part in this Judicial District, as CareDx is headquartered in this District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## DIVISIONAL ASSIGNMENT

19.     Pursuant to Local Rule 3-2(c) and (d), this action should be assigned to the San Francisco or Oakland Divisions of this Court, as the Company is headquartered in San Mateo County, California.

## PARTIES

20.     Plaintiff Plumbers & Pipefitters Local Union #295 Pension Fund provides pension benefits for eligible members and beneficiaries related to construction workers and others in Flagler, Volusia, and Brevard counties in Florida.  As of March 31, 2022, Plaintiff managed approximately $54 million in assets on behalf of over 600 members.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased CareDx common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Defendant CareDx is incorporated under the laws of Delaware with its principal executive offices located in South San Francisco, California.  CareDx's common stock trades on the Nasdaq Stock Market (the "NASDAQ") under the ticker symbol "CDNA."

22.     Defendant Reginald Seeto has served as CareDx's President since 2018 and CEO and member of CareDx's Board of Directors ("Board") since November 2020.

23.     Defendant Ankur Dhingra ("Dhingra") has served as CareDx's Chief Financial Officer ("CFO") since March 2021.

24.     Defendant Marcel Konrad ("Konrad") was CareDx's Interim CFO from January 2021 to March 2021, and then served as the Senior Vice President of Finance & Accounting until leaving the Company in July 2021.

25.     Defendant Peter Maag ("Maag") was CareDx's President from 2012 to 2018 and served as the CEO from 2012 to November 2020 and Chairman of the Board from January 2020 to November 2020.  Currently, Maag is the Executive Chairman of the Company's Board.

26.     Defendants Seeto, Dhingra, Konrad, and Maag (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

27.     The Company and the Individual Defendants are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Headquartered in South San Francisco, California, CareDx was founded in 1997 and began trading as a public company in July 2014.  The Company develops and commercializes diagnostic testing services and products for transplant patients.  Specifically, CareDx offers a variety of testing services for transplant patients, including: (1) AlloSure® Kidney, which is a donor-derived cell-free DNA ("dd-cfDNA") blood test for kidney transplant patients; (2) AlloMap® Heart, which is a gene expression test for heart transplant patients; and (3) AlloSure® Heart, a dd-cfDNA test for heart transplant patients.

29.     CareDx generates and reports revenue in three segments: (1) testing services; (2) products; and (3) patient and digital solutions.  In 2021, the testing services segment, which

provides diagnostic surveillance testing services for solid organ transplant patients, accounted for 87% of the Company's total revenue.

30.    Following the commercial launch of AlloSure Kidney in October 2017, the Company repeatedly touted that AlloSure Kidney "has received positive coverage decisions for reimbursement from Medicare," with a reimbursement rate of $2,841.  Indeed, the Company acknowledged that generating testing service revenue was dependent upon, among other things, the number of tests performed on transplant patients and the establishment of coverage policies by third-party insurers and government payors, such as Medicare.

31.    As the Company acknowledged throughout the Class Period, the amount CareDx could charge for testing services varied "from payer to payer," with the Company receiving its largest payments from Medicare reimbursement.  Indeed, Medicare Reimbursement continued to play an outsized role in the Company's reported revenues and growth leading up to and during the Class Period.  For example, on the first day of the Class Period, the Company reported that tests performed on patients covered by Medicare represented 48% of all CareDx tests in 2020, but due to the higher revenues from Medicare reimbursement, testing service revenue derived from Medicare reimbursement accounted for approximately 67% of all CareDx's testing service revenue in 2020.

32.    Not surprisingly, the Company reported a significant slowdown in testing services volume in the early part of the Covid-19 pandemic.  In response, in late March 2020, CareDx launched RemoTraC, a home-based blood draw solution for immune-compromised transplant patients.  By early 2022, CareDx reported more than 11,000 kidney, heart, and lung transplant patients had enrolled in RemoTraC.

**Defendants' Materially False and Misleading Statements**
**Issued During the Class Period**

33.    The Class Period begins on February 24, 2021, when CareDx announced its fourth quarter and full-year 2020 financial results.  The press release announcing the results touted "record full-year revenue of $192.2 million, an increase of 51%" from the prior year and that

testing services revenue for the quarter was $50.3 million, compared to $29.1 million in the same period of 2019.  Defendant Seeto was quoted in the press release, stating, "our record fourth-quarter result was the culmination of an extraordinary year for CareDx."  CEO Seeto further remarked, "2020 was transformational for CareDx, because we extended our leadership position in transplant centers through RemoTraC."  The press release further announced that CareDx expected revenue to be in the range of $255 million to $265 million for 2021.

34.     The same day, CareDx filed its Annual Report on Form 10-K with the SEC for the full year 2020.  The report was signed by Defendants Seeto, Maag, and Konrad.  Attached to the report were certifications pursuant to the SOX signed by Defendants Seeto and Konrad attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  The Company noted in the Form 10-K the risks of non-compliance with relevant laws and regulations that could result but affirmed its belief "that we are currently in compliance with applicable laws and regulations."

35.     The Form 10-K did not disclose any present violations or improprieties related to the federal False Claims Act, only stating:  "Our future activities relating to billing, compliance with certain regulations and Medicare reimbursement requirements, physician and other healthcare provider financial relationships and the sale and marketing of our products may be subject to scrutiny under these laws."

36.     During the conference call accompanying the release of the fourth quarter and full-year 2020 financial results, CEO Seeto stated, "2020 was an exceptional year for CareDx as demand continued unabated for our innovative first-in-class suite of high-value healthcare solutions for transplant patients and caregivers."

37.     On March 11, 2021, CareDx announced that Defendant Dhingra had been appointed as the Company's new CFO and that the appointment would be effective March 25, 2021.

38.     On May 5, 2021, the Company released its results for the first quarter of 2021 ended March 31, 2021.  The press release announcing these results heralded the "strong start to 2021"

and that the Company was "raising full-year guidance."  CareDx reported a 76% increase in total revenue compared to the same quarter of the prior year and testing services revenue of $59.3 million, compared to $31.4 million in the same period of 2020.  The press release further announced that CareDx had raised its full-year revenue guidance, which the Company now anticipated to be in the range of $270 million to $280 million for the full year of 2021.

39.     During a conference call with analysts the same day, CEO Seeto told participants he was "really excited by the testing services which is growing well above the 50% range."  Asked by Raymond James analyst Andrew Cooper about gross margins on testing services, CFO Dhingra assured investors that "on the margin side, we don't see any structural issues there."  Dhingra further explained the Company's increased 2021 revenue guidance "reflect[ed] our strong first-quarter results and continued strong demand for our solutions."

40.     That same day, CareDx filed its Quarterly Report on Form 10-Q with the SEC for the first quarter of 2021.  The report was signed by Defendants Seeto and Dhingra and provided the same financial results provided in the first-quarter 2021 press release described above. Attached to the report were certifications pursuant to the SOX signed by Defendants Seeto and Dhingra attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  The report did not discuss any such issues, changes, or disclosures.

41.     On June 1, 2021, during a Jefferies Healthcare Conference, CEO Seeto trumpeted that in "the kidney space … it's an absolute winning formula" and emphasized that of the "1,000-plus community nephrology practices, we have more than 100 now using AlloSure as part of that." As a result, CEO Seeto proclaimed, "there's just so much opportunity for us, overall testing services TAM."

42.     The following week, during a June 8, 2021, Goldman Sachs Global Healthcare Conference, CEO Seeto emphasized CareDx's approach of putting patients first, stating, "I've been in a lot of companies that talk about patient first, patient-centricity.  And what I can say is CareDx actually lives and believes it, and it[']s just incredible."

43.     On July 29, 2021, the Company released its financial results for the second quarter of 2021, which ended June 30, 2021.  The press release announcing the results again touted "77% revenue growth for second-quarter of 2021" and highlighted that the Company "increase[d] full-year revenue guidance.  Again, the Company reported impressive testing services revenues of $64.9 million, compared with $36.3 million in the same period of 2020.  Further, the press release announced the Company again raised its full-year revenue guidance, which the Company now projected to be in the range of $280 million to $290 million.

44.     Also that day, CareDx filed its Quarterly Report on Form 10-Q with the SEC for the second quarter of 2021.  The report was signed by Defendants Seeto and Dhingra and provided the same financial results provided in the second quarter 2021 press release described above.  Attached to the report were certifications pursuant to the SOX signed by Defendants Seeto and Dhingra attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.  Again, no such matters were reported.

45.     On a conference call accompanying the Company's release of its second-quarter 2021 financial results, CEO Seeto described the Company's testing services revenue as "the main driver of growing in the quarter."  Later in the call, CEO Seeto highlighted that the "core to our strategy" was the Company's efforts at "increasing the number of AlloSure testing protocols."  CFO Dhingra again justified the Company's yet again increased revenue guidance on the basis of "continued strong demand for our testing services in the United States."  Without ambiguity, Dhingra stated, "we see great demand for our services and continuation of [a] very positive response from patients."

46.     On September 9, 2021, CEO Seeto participated in the H.C. Wainwright Global Investment Conference.  During the conference, CEO Seeto described how the CareDx "financials are very strong.  Incredible growth over the prior year greater than 75% … [with] leading gross margins across the industry."  CEO Seeto went on to represent that "Q2 was a very strong quarter for us and it continues the momentum that we built over the last 12 months particularly with the

onset of Covid." CEO Seeto singled out RemotraC as a reason for these strong results, stating the program was an example of "an area where today we have more than 9.000 patients." Later in the conference call, CEO Seeto explicitly instructed investors to pay attention to the Company's testing services, stating, "And so if you look at the growth drivers and things that you should be focused on as investors, testing services continued AlloSure penetration. It's a winning formula that we have today."

47. The above statements identified in ¶¶ 33 – 46 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants mislead investors and/or failed to disclose that: (1) Defendants had engaged in a variety of improper and illegal schemes to inflate testing services revenue and demand, including pushing a surveillance protocol through inaccurate marketing materials, offering extravagant inducements or kickbacks to physicians and other providers, and improperly bundling expensive testing services with other blood tests as part of the RemoTraC service; (2) these practices, and others, subjected CareDx to an undisclosed risk of regulatory scrutiny; (3) these practices rendered the Company's testing services revenue reported throughout the Class Period artificially inflated; and (4) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Comes to Light

48. On October 28, 2021, the Company released its third-quarter 2021 results for the quarter ended September 30, 2021, and again the Company increased its full-year revenue guidance. The press release announcing the results touted that the Company "grew testing services volume 86% year-over-year." Importantly, however, the Company also reported that testing services revenue had only increased by 46%.

49. On a conference call accompanying the Company's release of the third quarter 2021 financial results, Craig-Hallum analyst Alexander Nowak ("Nowak") asked the participants to

comment on the lower ASPs for testing service revenue the Company reported during the quarter and whether Defendants had seen "any changes in Medicare billing practices?"  Rather than disclose the truth, CFO Dhingra falsely replied, "No.  No change.  We haven't observed anything on the Medicare billing practices."

50.     Approximately 20 minutes before the conference call that day, the Company filed its Quarterly Report on Form 10-Q with the SEC for the third quarter of 2021.  In this filing, on page 21, CareDx revealed that it had recently received a CID from the DOJ requesting documents for a False Claims Act investigation into certain business conduct related to the Company's kidney testing and phlebotomy services.  In addition, CareDx disclosed that it had received a subpoena from the SEC in connection with a probe into similar matters being investigated by the DOJ and certain accounting and public reporting practices and that another unnamed state regulatory agency had also sent an information request to the Company.

51.     Noting the surprising revelations in the Form 10-Q, analysts at BTIG opined in a report that "[t]he fact that [CareDx] is being investigated by three different entities, both federal and at the state level, is notable.  Based on our experience, disclosures of these sort typically bear some degree of merit."

52.     The following trading day, in response to these revelations, the price of CareDx shares declined $19.34 per share, or more than 27 percent, from a close of $70.34 per share on October 28, 2021, to a close of $51.00 per share on October 29, 2021.

53.     On November 18, 2021, Defendants Seeto and Dhingra participated in the Jefferies London Healthcare Conference.  Jefferies analyst Brandon Couillard offered Defendants Seeto and Dhingra the "chance to perhaps comment on the DOJ and SEC investigations."  Despite acknowledging the government investigations described in ¶ 50 above, CFO Dhingra continued to hide the extent of Defendants' misconduct from investors, stating "no questions have been raised about the safety, efficacy, or the quality of our tests themselves."

54.     The extent of Defendants' misconduct was further revealed to the market on April 15, 2022, when Dr. Michael Olymbios, a medical doctor and the former CareDx Head of

Community Nephrology, who reported directly to CEO Seeto, filed a complaint in the California Superior Court for San Mateo County.  The Olymbios Complaint detailed how, in June 2020, Dr. Olymbios became aware that CareDx's practices raised "serious legal and compliance concerns." The Olymbios Complaint also outlined the Company's knowing use of various forms of clinical and marketing schemes that lacked clinical support and fell outside the conditional approval for Medicare reimbursement.

55.     For example, the Olymbios Complaint stated CareDx engaged in the following practices: (1) pushing a surveillance protocol for AlloSure through inaccurate marketing materials; (2) offering extravagant inducements or kickbacks to physicians and other providers to promote AlloSure; (3) representing that CareDx did not bill patients for its tests; (4) organizing clinical studies that were funded with condition free grants; (5) bundling AlloSure with other blood tests as part of RemoTraC to induce physicians to order AlloSure; and (6) offering sham advisory boards to physicians that are little more than captive marketing presentations.

56.     Moreover, the Olymbios Complaint described how Dr. Olymbios raised his concerns about these "unlawful and improper" practices with more than ten current and former CareDx employees, including Defendants Maag and Seeto before October 2020.

57.     The Olymbios Complaint detailed how Defendants took "active measures to avoid creating a paper trail of their misconduct."  Based on his experiences with the Company, Olymbios alleged Defendant Maag "knew of that CareDx's practices and representations regarding payment for AlloSure, its primary test, were unlawful and that he needed to take steps to avoid written records of CareDx's unlawful activity."

58.     Importantly, the Olymbios Complaint made clear the Company retaliated against Dr. Olymbios after he reported "CareDx's unlawful activity to government agencies," and that "CareDx realized the ***existential threat*** Dr. Olymbios's reporting presented to the [C]ompany's continued existence."  (emphasis added).

59.     In response to this news, the following trading day the price of CareDx stock fell an additional 8%, from a closing price of $35.41 on April 14, 2022, to a closing price of $32.55 per share on April 18, 2022.

60.     Then, after the markets closed on May 5, 2022, CareDx issued a press release announcing financial results for the first quarter of 2022, the first full quarter after the Company disclosed the multiple investigations into its conduct.  Significantly, with CareDx's improper practices now under regulatory scrutiny, the Company reported a material decline in the ASP of the Company's testing services.  Indeed, CFO Dhingra was forced to concede the ongoing impact of Defendants' misconduct, stating "[t]his aggregate average price declined by about 4.9% versus the last quarter of 2021."   Analyst Nowak pointed out the Company reported "another big deterioration in price this quarter," and bluntly asked the Company's executives to explain when "the ASP declines are going to stabilize."

61.     Following the call, Raymond James analyst Andrew Cooper reported that "the key testing services bucket was nearly $5m shy of our view."  Analyst Nowak reported that the realized price per test dragged down the results in testing services.

62.     In response to this disclosure, on the following trading day, the price of CareDx stock declined another 18.5%, from a closing price of $31.66 on May 5, 2022, to a closing price of $25.87 on May 6, 2022.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased CareDx common stock between February 24, 2021, and May 5, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, CareDx common stock actively traded on NASDAQ (an open and efficient market) under the symbol "CDNA."  Millions of CareDx shares were traded publicly during the Class Period on the NASDAQ.  As of May 3, 2022, the Company had more than 53 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by CareDx or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions

65.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b.     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of CareDx;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of CareDx;

e.      whether the market price of CareDx common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

69.     The market for CareDx's common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, CareDx's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased CareDx's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to CareDx and have been damaged thereby.

70.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CareDx's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about CareDx's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market

an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchase the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

71. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

72. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding CareDx, their control over, receipt, and/or modification of CareDx's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning CareDx, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

73. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

74.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of CareDx who knew that the statement was false when made.

## LOSS CAUSATION

75.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

76.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This artificially inflated the prices of CareDx's common stock and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of CareDx's stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

77.     The market for CareDx stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, CareDx common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of CareDx common stock and market information relating to CareDx and have been damaged thereby.

78.     At all times relevant, the market for CareDx common stock was an efficient market for the following reasons, among others:

    a.     CareDx was listed and actively traded on NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer, CareDx filed periodic public reports with the SEC and/or the NASDAQ;

c.      CareDx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.      CareDx was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

79.      As a result of the foregoing, the market for CareDx common stock promptly digested current information regarding CareDx from all publicly available sources and reflected such information in CareDx's stock price.  Under these circumstances, all purchasers of CareDx stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

80.      A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**COUNTS AGAINST DEFENDANTS**

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CareDx common stock; and (iii) cause Plaintiff and other members of the Class to purchase CareDx stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

83.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CareDx common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

84.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CareDx's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CareDx's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts

necessary in order to make the statements made about CareDx and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

85. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

86. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CareDx's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless

in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

87.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of CareDx common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased CareDx common stock during the Class Period at artificially inflated prices and were damaged thereby.

88.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that CareDx was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their CareDx common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

89.     By virtue of the foregoing, CareDx and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

90.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

91.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

92.     The Individual Defendants acted as controlling persons of CareDx within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control,  directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Further, the Individual Defendants signed the Company's 2020 and 2021 Annual Reports on Form 10-K and the First, Second, and Third Quarterly Reports for 2021 on Form 10-Q.

93.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

94.     As set forth above, CareDx and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

95.     WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)     Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

96.     Plaintiff demands a trial by jury.

Dated: May 23, 2022

Respectfully submitted,

*/s/ David R. Kaplan*
David R. Kaplan

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Plaintiff Plumbers & Pipefitters Local Union #295 Pension Fund*

## CERTIFICATION AND AUTHORIZATION

I, Brett Mirsky, on behalf of Plumbers and Pipefitters Local Union #295 Pension Fund ("Local 295 Pension Fund"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint ("Complaint") prepared against CareDx, Inc. ("CareDx") alleging violations of the federal securities laws, and authorized its filing. I am authorized in my capacity as Chairman of Local 295 Pension Fund to initiate litigation and to execute this Certification on behalf of Local 295 Pension Fund.

2. Local 295 Pension Fund did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Local 295 Pension Fund is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Local 295 Pension Fund's transactions in CareDx common stock during the Class Period are set forth below:

| Date | Transaction | Shares | Price |
|------|-------------|--------|-------|
| 08/19/21 | Purchase | 363 | $70.92 |

5. Local 295 Pension Fund has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

6. Local 295 Pension Fund has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff, or the lead plaintiff decision is still pending: *None*

7. Local 295 Pension Fund will not accept any payment for serving as a representative party on behalf of the Class beyond Local 295 Pension Fund's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

1

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of May, 2022.

*Plumbers and Pipefitters Local Union #295*
*Pension Fund*

Brett Mirsky, Chairman