ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
        – and –
SPENCER A. BURKHOLZ (147029)
SEAN C. MCGUIRE (319521)
NICOLE Q. GILLILAND (335132)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
smcguire@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br>            Plaintiff, <br><br>     vs. <br><br> CAREDX, INC., et al., <br><br>            Defendants. | Case No. 3:22-cv-03023-TLT <br><br> <u>CLASS ACTION</u> <br><br> AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

1

**TABLE OF CONTENTS**

2
                                                                                                          **Page**

3   I.      NATURE OF THE ACTION ...................................................................................1

4   II.     JURISDICTION AND VENUE ...........................................................................7

5   III.    THE PARTIES.........................................................................................................8

6           A.      Lead Plaintiffs .............................................................................................8

7           B.      Defendants ...................................................................................................9

8   IV.     BACKGROUND ...................................................................................................10

9           A.      CareDx's Business Depended on Selling Its AlloSure Kidney Test to
                    Medicare Patients.......................................................................................10
10
            B.      With Its Business Model Threatened by COVID-19, CareDx Develops
11                  RemoTraC – a Home Blood Testing Program – and Purportedly Rescues
                    the Company's Growth Story .....................................................................11
12
            C.      Defendants Expressly Claimed CareDx Materially Complied with Federal
13                  and State Regulations, Including the False Claims Act, the Sunshine Act,
                    and the Anti-Kickback Statute ...................................................................14
14
            D.      In Truth, CareDx Relied on Medicare Billing Fraud and Illegal Kickback
15                  Schemes to Boost Its Testing Services Revenue .......................................16

16                  1.      A High Ranking Former CareDx Executive, Dr. Michael
                            Olymbios, Exposes Defendants' Illegal AlloSure Practices in an
17                          Extraordinary Pleading ..................................................................17

18                  2.      CareDx Improperly Bundled Its AlloSure and AlloMap Tests into
                            Its RemoTraC Home Testing Program in Order to Illegally Bill
19                          Medicare for Thousands of Unnecessary Tests .............................22

20                  3.      CareDx Paid Illegal Kickbacks to Doctors to Encourage Excessive
                            Use of AlloSure and Enroll Patients in "Studies" that Were
21                          Actually Schemes to Illegally Bill Medicare for Additional
                            AlloSure Tests................................................................................26
22
                    4.      Defendants Used a Study, the "KOAR" Study, to Improperly Bill
23                          Medicare for Tens of Thousands of Additional Tests in Violation
                            of the Anti-Kickback Law .............................................................30
24
            E.      The Truth Begins to Emerge.......................................................................34
25
                    1.      CareDx Simultaneously Announces Multiple Government
26                          Investigations and Falling ASPs but Maintains There Has Been
                            "No Change" in Its Medicare Billing Practices ...........................34
27
                    2.      Stymied by Government Scrutiny, RemoTraC Quietly and
28                          Mysteriously Recedes from the Company's Public Statements ...............36

|  |  |  |  | Page |
|---|---|---|---|---|
|  |  | 3. | CareDx Senior Executive Dr. Michael Olymbios Publicly Blows the Whistle on Defendants' Fraudulent Business Practices, and CareDx's ASP Decline Continues | 37 |
|  |  | 4. | CareDx's CFO and Chief Marketing Officer Each Suddenly Resign | 39 |
|  | F. | The Truth Is Finally Fully Revealed | | 40 |
|  | G. | Post Class-Period Events Further Confirm the Fraud | | 42 |
| V. | | FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD | | 47 |
|  | A. | CareDx's January 21, 2021 8-K | | 47 |
|  | B. | The February 18, 2021 BTIG Virtual MedTech, Digital Health, Life Sciences, and Diagnostic Tools Conference | | 49 |
|  | C. | CareDx's February 24, 2021 Fourth Quarter and Full Year 2020 Conference Call | | 50 |
|  | D. | CareDx's May 5, 2021 First Quarter 2021 Financial Results Conference | | 52 |
|  | E. | Defendants' June 8, 2021 Goldman Sachs Global Healthcare Conference | | 53 |
|  | F. | Defendants' July 29, 2021, Second Quarter 2021 Earnings Call Statements | | 54 |
|  | G. | Defendants' October 28, 2021 Third Quarter 2021 Financial Results Conference Call Statements | | 55 |
|  | H. | Defendants' February 24, 2022 Fourth Quarter 2021 and Full Year 2022 Financial Results Statements | | 57 |
|  | I. | CareDx's April 15, 2022 Form 8-K Statements | | 58 |
|  | J. | The May 5, 2022 First Quarter 2022 Financial Results Earnings Call Statements | | 60 |
| VI. | | ADDITIONAL SCIENTER ALLEGATIONS | | 61 |
|  | A. | Dr. Olymbios and Other Former Employees Reported and Discussed Defendants' Schemes with High Ranking Executives and Were Rebuffed or Ignored | | 61 |
|  | B. | Defendants' Use of Ephemeral Messaging Supports Scienter | | 64 |
|  | C. | Braveheart: Seeto, Maag, and other CareDx Executives Met Weekly to Direct CareDx's Sales and Marketing for AlloSure | | 64 |

1

2                                                                                          **Page**

3

4        D.      Defendant Maag's and Defendant Seeto's Insider Trading Profits Support

                 Scienter .................................................................................................65

5        E.      CareDx's High CFO Turnover Supports Scienter ..................................70

6        F.      AlloSure Kidney and RemoTraC Are Core Operations of the Company,
                 Created and Overseen by Defendants ......................................................70

7

8    VII.    LOSS CAUSATION...............................................................................................71

9    VIII.   CLASS ACTION ALLEGATIONS ........................................................................74

10   IX.     UNDISCLOSED ADVERSE INFORMATION .....................................................76

11   X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR ....................................76

12   XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
             MARKET DOCTRINE) .........................................................................................77

13   XII.    COUNTS AGAINST DEFENDANTS ...................................................................78

14   COUNT I ............................................................................................................................78

15   COUNT II ...........................................................................................................................81

16   XIII.   PRAYER FOR RELIEF ........................................................................................82

17   XIV.    JURY DEMAND ...................................................................................................82

18

19

20

21

22

23

24

25

26

27

28

1      Lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers

2  Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief &

3  Retirement Fund (together, "Lead Plaintiffs" or "Plaintiffs"), by and through their attorneys, allege

4  the following upon information and belief, except as to allegations concerning Lead Plaintiffs,

5  which are alleged upon personal knowledge.  Lead Plaintiffs bring this federal securities class

6  action on behalf of all persons or entities who purchased CareDx, Inc. ("CareDx" or the

7  "Company") common stock between January 21, 2021 and November 3, 2022, inclusive (the

8  "Class Period") against CareDx and certain of its officers seeking to pursue remedies under the

9  Securities Exchange Act of 1934, 15 U.S.C. §78a, *et seq.* ("Exchange Act").

10     Plaintiffs' information and belief are based upon, among other things, its counsel's

11  investigation, which includes, without limitation: (a) review and analysis of public filings made

12  by CareDx with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis

13  of press releases and other publications disseminated by Defendants (defined below) and other

14  parties; (c) review of news articles, shareholder communications, conference calls, and postings

15  on CareDx's website concerning the Company's public statements; (d) interviews with former

16  CareDx employees; (e) Plaintiff/Petitioner Michael Olymbios's Complaint and Petition for

17  Declaratory Judgement, filed April 15, 2022 in the case titled *Olymbios v. CareDx, Inc.*,

18  No. 22-civ-01582 (Cal. Sup. Ct. San Mateo Cnty.); and (f) review of other publicly available

19  information concerning the Company and the Individual Defendants (defined below).

20  **I.      NATURE OF THE ACTION**

21     1.     CareDx provides services and products designed to detect warning signs of organ

22  transplant rejection in transplant recipients.  During the Class Period, CareDx's largest segment,

23  by far, was testing services, which comprised at least 85% of the Company's total revenues.

24     2.     In particular, CareDx's single most lucrative testing product was its AlloSure

25  Kidney test, a blood test designed to detect whether a patient will reject a kidney after a transplant.

26  Significantly, Medicare reimbursed CareDx for the Company's AlloSure test at a highly lucrative

27  rate of $2,841 per test.  Importantly, however, Medicare's regulations dictated that CareDx could

28  only be reimbursed for ***medically necessary*** tests – meaning that, in the case of AlloSure, only

1    patients who had already shown "clinical suspicion of rejection" (*i.e.*, had shown other warning

2    signs of organ transplant rejection) were eligible to receive the high-priced test.

3         3.    In early 2020, as COVID-19 forced vulnerable and immunocompromised

4    transplant patients to stay home and avoid going to medical facilities for medical tests, revenue

5    from CareDx's most critical testing revenue sources was put at risk.  In response, CareDx launched

6    a home testing and mobile phlebotomy program known as RemoTraC, which was designed to

7    bring blood tests for transplant patients that were normally done at medical facilities into patients'

8    homes.  With approval from a physician, CareDx's RemoTraC program would send a third-party

9    "mobile phlebotomist" to a patient's home to draw blood, which would then be tested at CareDx's

10   facilities.  Within mere months, CareDx's senior management were touting RemoTraC as the

11   savior of CareDx's growth, and ***by mid-2020, RemoTraC accounted for 50% of the Company's***

12   ***testing services business***.    Analysts and investors heralded the program as a "***resounding***

13   ***success***."[1]

14        4.    RemoTraC's growth appeared to continue unabated through 2020 and into 2021

15   even as COVID-19 concerns became less pronounced, and Defendants repeatedly assured

16   investors that the program was here to stay.  Indeed, defendant and Chief Executive Officer

17   ("CEO") Seeto insisted that RemoTraC had become a ***"sustainable" business*** that served an

18   "unmet need" among patients.  Propelled by RemoTraC's success, Defendants in turn presented

19   the testing services segment as the Company's "growth driver," for which "demand continued

20   unabated."  Consequently, CareDx's testing services revenue soared – more than doubling from

21   $31.4 million in 1Q 2020 to $65 million in 2Q 2021.[2]  And CareDx's stock price skyrocketed ***more***

22   ***than 330%***, reaching a near-all-time high close of $95.11 per share on June 28, 2021, versus

23   roughly $22 per share at the start of the COVID-19 pandemic.  The Individual Defendants took

24

25

26   _____
     [1]    Emphasis is added throughout unless otherwise noted.

27   [2]    Specific quarters in a fiscal year are designated by the quarter number followed by the letter
28   Q.  Thus, 2Q 2021 indicates CareDx's second quarter in fiscal year 2021.

1   full advantage of this extraordinary run-up, selling over $30 million in stock during the Class

2   Period.

3        5.    Defendants' representations were false. In reality, Defendants had implemented an

4   unlawful Medicare fraud scheme built on a variety of improper and illegal tactics to obtain

5   Medicare reimbursement for AlloSure, including illegal kickbacks, improper marketing, sham

6   advisory boards, and illegal bundling of the tests with other services that were in high demand

7   because of the COVID-19 pandemic, all in violation of the False Claims Act and a host of state

8   and federal laws and regulations. Specifically, throughout the Class Period, Defendants inflated

9   the Company's testing revenues and growth by systematically billing Medicare for tests that

10   clearly were **not** medically necessary and did not meet Medicare's criteria for reimbursement.

11   Defendants achieved this end, in part, by improperly bundling their expensive AlloSure tests with

12   a slate of standard blood tests, and then fraudulently billing Medicare for the unnecessary tests,

13   deliberately obfuscating the fact that no medical necessity had been demonstrated. In furtherance

14   of this scheme, Defendants paid illegal kickbacks to the home phlebotomists who collected the

15   blood samples in order to maximize the number of illegal tests they could perform and bill for.

16   Defendants also incentivized doctors to enroll patients in AlloSure testing by treating them to

17   lavish travel, accommodations, dinners, wine tastings, and "booze cruises," and violated the

18   Sunshine Act[3] by failing to report **any** of their gifts and payments to doctors. Defendants also

19   improperly used a large-scale "study" as a pretext to enroll thousands of additional Medicare

20   patients into receiving regular AlloSure tests (for which CareDx then billed Medicare), paying

21   doctors as much as **eight times the normal fee** to enroll their patients.

22        6.    Investors began to learn the truth regarding Defendants' Class Period

23   misrepresentations after the financial markets closed on October 28, 2021. On that date, CareDx

24   filed its Form 10-Q for the third quarter of 2021, revealing for the first time that the Company was

25   the subject of **at least three** government investigations: (a) a civil investigative demand ("CID")

26   from the U.S. Department of Justice ("DOJ") requesting the Company produce documents in

27

28   [3]   Defined below. *See infra* ¶43.

connection with "**a False Claims Act investigation being conducted by the DOJ regarding certain business practices related to [CareDx's] kidney testing and phlebotomy services**"; (b) a subpoena from the SEC in relation to an investigation by the SEC "in respect of matters similar to those identified in the CID, as well as **certain of our accounting and public reporting practices**"; and (c) an information request from an unnamed state regulatory agency.

7.     The increased regulatory scrutiny on CareDx's most important operational segment had a profound impact on the Company's business.  Indeed, at the same time CareDx disclosed three separate government investigations, the Company also reported a dramatic decline in its Average Selling Price ("ASP") – essentially, the amount of money that CareDx received per test – which was an important metric of how profitable the Company would remain as it grew. Strikingly, with the regulatory spotlight now focused on CareDx's kidney testing business practices, ASPs for the Company's tests had suddenly **declined 20%** from the same quarter prior year (after remaining stable throughout 2020) – in other words, there had been a 20% decline in the amount of revenue CareDx earned per test.

8.     In response to these stunning disclosures, CareDx's stock price was decimated, plummeting more than 27% the next trading day, from a closing price of $70.34 per share on October 28, 2021 to a closing price of $51 per share on October 29, 2021.  Analysts responded in kind, with an October 29, 2021 BTIG analyst report noting: "**The fact that [CareDx] is being investigated by three different entities, both federal and at the state level, is notable.  Based on our experience, disclosures of these sort typically bear some degree of merit**. . . ."

9.     Defendants' illegal scheme was further revealed on April 15, 2022, when one of the Company's most senior officers filed an explosive complaint averring that the Company was engaging in **rampant Medicare fraud** by implementing a variety of illegal Company-wide practices in order to improperly obtain Medicare reimbursement for CareDx's AlloSure tests. Specifically, according to his complaint, Dr. Michael Olymbios ("Olymbios"), CareDx's former Head of Community Nephrology who reported **directly** to defendant Seeto, CareDx's current President and CEO, provided significant documents to federal and state law enforcement agencies evidencing "**an unlawful campaign . . . to pad [the Company's] sales**," which was "**bolstered by**

1    *illegal inducements to physicians, misleading research, and recommendations for clinically*

2    *unsupported treatment*."  Indeed, according to Dr. Olymbios, in order to "*maximize potential*

3    *revenue associated with AlloSure*, CareDx executives engaged in various forms of clinical and

4    marketing schemes in an effort to justify AlloSure's use, even when that use *lacked clinical*

5    *support and fell outside of the conditional approval extended to it*."  Dr. Olymbios's complaint

6    detailed numerous "*serious legal and compliance concerns*," including that Defendants had used

7    the Company's RemoTraC program to improperly bundle AlloSure with routine blood tests.

8    Significantly, Dr. Olymbios detailed that "[m]ultiple nephrology practices [had] expressed serious

9    reservations" about this practice, including that it constituted "*a violation of Medicare billing*

10    *requirements*," which "CareDx employees internally *flagged . . . as impermissible*."  Moreover,

11    CareDx had provided illegal kickbacks and incentives to medical providers, including

12    "unrestricted grants to physicians . . . to induce practices to place patients on an AlloSure

13    surveillance protocol, *even when doing so was not warranted or authorized under Medicare*

14    *billing guidelines*."  Olymbios further stated that CareDx had offered "*extravagant inducements*

15    *or kickbacks to physicians and other providers to promote AlloSure*," and offered "*sham*

16    *'advisory boards'* to physicians that [were] little more than captive marketing presentations."

17       10.    Dr. Olymbios's complaint made crystal clear that he had *reported the misconduct*

18    *he observed directly to CareDx's most senior executives, including then-CEO defendant Maag*

19    *and current CEO defendant Seeto*.  However, the executives "*brushed off his concerns or*

20    *berated him for raising them in the first place*."  Dr. Olymbios revealed that CareDx's most senior

21    officers, including defendant Maag "*took active measures to avoid creating a paper trail of their*

22    *misconduct*."  Indeed, defendant Maag expressly warned Dr. Olymbios that "*there were certain*

23    *things that shouldn't be put in writing*."  Meanwhile, several other employees with whom

24    Dr. Olymbios discussed the misconduct agreed CareDx was "*a bunch of crooks and frauds*," and

25    that it was only a matter of time before someone blew the whistle or a regulatory agency

26    investigated – which, ultimately, is exactly what happened.

27       11.    Numerous former employees have fully corroborated Dr. Olymbios's allegations,

28    and reaffirmed that these practices and other illegal schemes continued unabated, even after

1    Dr. Olymbios blew the whistle and left the Company.  For example, a Senior Medical Science

2    Liaison (FE-1) who reported directly to the Company's Chief Medical Officer confirmed that

3    CareDx was systematically "doing the very expensive CareDx labs on the **same cadence** of the

4    home labs," which "was ***totally unethical***," and affirmed that: "We were doing tests that cost ***at***

5    ***least 8X*** of what they should have been ***and on patients that did not need these tests***."  FE-1

6    explained that these illegal practices were pervasive as "***sales drove everything***," and it was ***sales***

7    ***personnel***, not clinical personnel, who determined "what labs should be done and how often."

8    Other former employees personally observed the Company paying kickbacks and inducements to

9    doctors to enroll their patients in AlloSure or place them in CareDx AlloSure studies – for example,

10   defendant Maag's ***longtime executive assistant*** detailed CareDx's hosting of "symposiums" and

11   "summits" that were mere pretexts to ply doctors with luxury travel, dining, and wine tasting.  And

12   still other employees described the Company paying doctors $40,000 per patient – ***eight times the***

13   ***normal fee*** – to enroll their patients in CareDx's long-term "studies," thereby allowing the

14   Company to bill Medicare for ***dozens*** of unnecessary tests for each of these study participants.

15        12.    On May 23, 2022 – only a month after the Olymbios Complaint was filed – the

16   Company unexpectedly announced Defendant CFO Ankur Dhingra's ***immediate*** resignation from

17   the Company after just 14 months on the job.  The announcement caused CareDx's stock price to

18   fall 7.5%, from a close of $25.86 per share on Friday, May 20, 2022, to a close of $23.92 per share

19   on Monday, May 23, 2022, on unusually high volume.

20        13.    Finally, on November 3, 2022, the truth of Defendants' fraudulent scheme was

21   disclosed.  On that day, the market finally learned that CareDx had been billing Medicare for tens

22   of thousands of tests that were not medically necessary, and thus could not be reimbursed.  CareDx

23   reported disastrous results for 3Q 2022, including yet another steep decline in CareDx's ASP per

24   test, as well as a ***9% decrease*** in Medicare revenue.  Significantly, CareDx finally revealed that

25   the reason its ASP was declining so precipitously was ***not*** because its test pricing had decreased,

26   but because CareDx was ***going entirely unreimbursed for an enormous and growing number of***

27   ***its tests***.  As the Company's new CFO, Abishek Jain, acknowledged under analyst questioning,

28   "when we get reimbursed, we're reimbursed at a pretty constant rate," the problem instead being

1     that "*[w]here we're not reimbursed, that's what we have to work on*." With pricing per test

2     remaining steady and Medicare revenue declining, analysts noted, that the only "*[c]onclusion*"

3     that could be drawn was that "*more tests are not being paid*."

4         14.     Indeed, during an investor conference two weeks later, CFO Jain confirmed that *as*

5     *many as 50% of the Company's tests administered and submitted for payment were being*

6     *rejected for any reimbursement at all*. In other words, an astonishing one out of two tests CareDx

7     was administering was being deemed medically unnecessary. In response to these revelations,

8     CareDx's stock price fell from a close of $18.73 per share on November 3, 2022, to $16.02 per

9     share on November 4, 2022 – a decline of more than 14% – on unusually high trading volume.

10         15.     As a result of Defendants' wrongful acts and omissions and the precipitous decline

11     in the market value of the Company's common stock when the truth was disclosed, Plaintiffs and

12     other Class members have suffered significant losses and damages.

13    **II.     JURISDICTION AND VENUE**

14         16.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15

15     U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17

16     C.F.R. §240.10b-5.

17         17.     This Court has jurisdiction over the subject matter of this action pursuant to 28

18     U.S.C. §1331, §27 of the Exchange Act, 15 U.S.C. §78aa.

19         18.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), §27 of the

20     Exchange Act, 15 U.S.C. §78aa. Substantial acts in furtherance of the alleged fraud or the effects

21     of the fraud have occurred in this judicial district. Many of the acts and omissions charged herein,

22     including the dissemination of materially false and misleading information to the investing public,

23     and the omission of material information, occurred in substantial part in this judicial district as

24     CareDx is headquartered in this District.

25         19.     In connection with the acts, transactions, and conduct alleged herein, Defendants,

26     directly and indirectly, used the means and instrumentalities of interstate commerce, including the

27     U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

28

1    **III.    THE PARTIES**

2        **A.    Lead Plaintiffs**

3        20.    Lead Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma

4    Police") provides retirement and related benefits for qualified police officers and their

5    beneficiaries in the state of Oklahoma.  As of July 2022, Oklahoma Police has more than 10,000

6    active members and retirees and more than $3 billion in assets under management.  As set forth in

7    the certification filed previously, incorporated by reference herein, Oklahoma Police purchased

8    CareDx common stock during the Class Period and suffered damages as a result of the federal

9    securities law violations and false and/or misleading statements and/or material omissions alleged

10    herein.

11        21.    Lead Plaintiff Sheet Metal Workers Local 19 Pension Fund ("Local 19") provides

12    retirement benefits to approximately 40,000 active and retired employees in Pennsylvania, New

13    Jersey, and Delaware.  As of July 2022, Local 19 has approximately $500 million in assets under

14    management.  As set forth in the certification filed previously, incorporated by reference herein,

15    Local 19 purchased CareDx common stock during the Class Period and suffered damages as a

16    result of the federal securities law violations and false and/or misleading statements and/or material

17    omissions alleged herein.

18        22.    Lead Plaintiff Local 353, I.B.E.W. Pension Fund ("Local 353") manages

19    approximately CAD $2.4 billion in assets on behalf of 13,000 active members, retirees, and

20    beneficiaries who are members of the International Brotherhood of Electrical Workers working in

21    a variety of electrical disciplines across central Ontario.  As set forth in the certification filed

22    previously, incorporated by reference herein, Local 353 purchased CareDx common stock during

23    the Class Period and suffered damages as a result of the federal securities law violations and false

24    and/or misleading statements and/or material omissions alleged herein.

25        23.    Lead Plaintiff Beaumont Firemen's Relief & Retirement Fund ("Beaumont Fire")

26    provides benefits to approximately 420 active members and their beneficiaries in Texas.  As of

27    July 2022, Beaumont Fire has approximately $120 million in assets under management.  As set

28    forth in the certification filed previously, incorporated by reference herein, Beaumont Fire

1   purchased CareDx common stock during the Class Period and suffered damages as a result of the

2   federal securities law violations and false and/or misleading statements and/or material omissions

3   alleged herein.

4       **B.     Defendants**

5       24.     Defendant CareDx, Inc. is incorporated under the laws of Delaware with its

6   principal executive offices located in Brisbane, California.  CareDx's common stock trades on the

7   Nasdaq Stock Market ("NASDAQ") under the ticker symbol "CDNA."

8       25.     Defendant Peter Maag ("Maag") was CEO of CareDx from 2012 through

9   November 2020 and Executive Chairman from November 2020 through October 2021.  Defendant

10  Maag continued to sign the Company's SEC filings in his role as Executive Chairman.

11      26.     Defendant Reginald Seeto ("Seeto") has been CEO of CareDx since

12  November 2020, when defendant Maag transitioned to Executive Chairman.

13      27.     Defendant Marcel Konrad ("Konrad") served as the Interim Chief Financial Officer

14  ("CFO") of CareDx from January 1, 2021 through March 24, 2021 and then served as Senior Vice

15  President ("VP") of Finance & Accounting until leaving the Company in July 2021.  As CFO of

16  the Company, defendant Konrad signed the Company's SEC filings, including the January 21,

17  2021 Form 8-K alleged herein as containing false and misleading statements.

18      28.     Defendant Ankur Dhingra ("Dhingra") served as CFO of CareDx from March 25,

19  2021 through his abrupt resignation in or about May 2022.  As CFO, defendant Dhingra signed

20  the Company's SEC filings, including the April 15, 2022 Form 8-K alleged herein as containing

21  false and misleading statements.

22      29.     Defendants Maag, Seeto, Konrad, and Dhingra (collectively, "Individual

23  Defendants"), because of their positions with the Company, possessed the power and authority to

24  control the contents of the Company's reports to the SEC, press releases, and investor conferences

25  and calls.  The Individual Defendants were provided with copies of the Company's reports and

26  press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

27  ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their

28  positions and access to material nonpublic information available to them, the Individual

1    Defendants knew the adverse facts specified herein had not been disclosed to, and were being

2    concealed from, the public and the positive representations being made were then materially false

3    and/or misleading.  The Individual Defendants are liable for the false statements pled herein.

4          30.    The Company and Individual Defendants are collectively referred to as

5    "Defendants."

6    **IV.    BACKGROUND**

7          **A.    CareDx's Business Depended on Selling Its AlloSure Kidney Test to**
          **Medicare Patients**

8
9          31.    CareDx is a corporation that develops and sells diagnostic tests and other products

10   and services for transplant recipients.  During the Class Period, CareDx's most important business

11   line was its testing services segment, which represented at least 85% of the Company's total

12   revenues since the beginning of 2020.  CareDx's testing services segment included multiple tests

13   aimed primarily at kidney and heart transplant patients.  However, the Company's financial

14   success relied primarily on a single blood test – AlloSure Kidney – which is designed to detect

15   signs of kidney transplant rejection by measuring levels of donor DNA in the recipient's

16   bloodstream.  As defendant Maag stated in trial testimony given in separate litigation, AlloSure

     "*was the one product, the one growth drive[r] for the company*."[4]

17         32.    CareDx's testing services business in turn relied heavily on payments from the

18   taxpayer-funded medical program Medicare, which represented as much as 70% of the Company's

19   testing services revenue, and as much as 60% of its overall revenue, during the Class Period.

20   Medicare was critical to CareDx's testing business for several reasons.  First, the vast majority of

21   kidney transplant patients receive Medicare coverage as they are generally allowed to enroll in

22   Medicare regardless of age, meaning that most of the market for CareDx's flagship AlloSure

23   Kidney test consisted of Medicare patients.    Second, Medicare generally paid a higher

24   reimbursement rate per test than private payors – for example, CareDx's AlloSure Kidney test was

25

26   ─────────────────
     [4]    Defendant Maag and other CareDx executives testified at trial in April 2022, in a litigation
27   between CareDx and Natera, Inc., *CareDx, Inc. v. Natera, Inc.*, C.A. No. 19-662 CFC (D. Del.)
     (ECFs 344-6, 367-8) ("CareDx-Natera Litigation").  The litigation primarily concerned claims and
28   counterclaims between the two companies regarding alleged false advertising.

1    reimbursed by Medicare at a contracted rate of $2,841 per test, whereas private insurers might

2    reimburse at far lower rates (if at all) on average.  And third, many private insurers did not cover

3    AlloSure Kidney at all during the Class Period, or else might be more apt to require pre-approvals,

4    or to reject reimbursement for the test if the insurer disputed that the test was medically necessary

5    in a particular instance.  Indeed, as defendant Maag himself averred (during trial testimony in the

6    CareDx-Natera Litigation), Medicare was "***the most important*** payer for this [AlloSure] patient

7    population."

8           33.    However, Medicare ostensibly only agreed to reimburse patients' AlloSure tests on

9    a "conditional" basis.   Specifically, under the applicable Centers for Medicare & Medicaid

10   Services ("CMS") regulations, CareDx's AlloSure Kidney test was ***only*** "covered to assess the

11   probability of allograft rejection in kidney transplant recipients ***with clinical suspicion of rejection***

12   and to inform clinical decision-making about the necessity of renal biopsy ***in such patients*** at least

13   2 weeks post-transplant in conjunction with standard clinical assessment."[5]   In other words,

14   Medicare would ***only*** reimburse  CareDx's flagship AlloSure Kidney test if a doctor determined

15   that a patient already had other warning signs of potential transplant rejection.  Medicare would

16   ***not*** reimburse AlloSure Kidney if it was used merely as a regular, periodic surveillance test for

17   ordinary transplant recipients that did not show other warning signs.

18        **B.    With Its Business Model Threatened by COVID-19, CareDx Develops**
     **RemoTraC – a Home Blood Testing Program – and Purportedly**
19   **Rescues the Company's Growth Story**

20          34.    As COVID-19 increasingly shut down many medical services in the United States,

21   analysts and investors grew increasingly concerned that CareDx's growth would halt.  First,

22   transplant volumes began to decline, as immunocompromised patients avoided hospitals and

23   delayed medical procedures.  Second, even patients who had already received transplants – also

24   typically immunocompromised – avoided non-essential medical tests and treatments.

25          35.    CareDx, however, reacted quickly, rushing in a mere matter of days to develop a

26   new home blood testing (or "mobile phlebotomy") program it dubbed RemoTraC.  As defendant

27   _____

28   [5]   *See* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=38355.

1  Maag would later claim in a June 2020 earnings call, RemoTraC was born "out of necessity" and

2  inspired by "a phone call at midnight from a transplant center in New York, [that] said, 'Peter,

3  how can I continue to support our transplant patients as they cannot come into Manhattan and visit

4  our transplant center?'":

> And so the CareDx team came in and said, "How can we provide mobile
> phlebotomy services to these patients that are now need their regular surveillance
> visit?" And we constructed an offering where we're not only testing AlloMap and
> AlloSure, but we are also testing all blood-based information required by that center
> and provide that back by a mobile phlebotomy or a home blood draw solution called
> RemoTraC. And within very short period of time, 150 transplant centers had the
> same issues, and we were partnering with them to provide this mobile phlebotomy
> service.

9  36.  By as early as mid-2020, RemoTraC would account for **50% of the Company's**

10 **total testing volume**, and was widely seen as a "resounding success" that not only had enabled the

11 Company to avoid any COVID-related declines in volume and revenue but had in fact become a

12 key growth driver for the Company. As a March 2020 Craig-Hallum report headlined,

13 "RemoTraC So Far A Resounding Success And Could Fast Track Holistic Remote Surveillance.

14 Continue to View CareDx as a Defensible Name Supported by Multiple Long-Term Tailwinds,

15 Reiterate BUY" noted, "CDNA is optimistic it will emerge a stronger company coming out of

16 coronavirus," as "RemoTraC, CareDx's remote patient blood draw service, is surging in popularity

17 with >100 centers signed up." Similarly, a May 2020 Raymond James report headlined,

18 "COVID-19 Changes the Base, But Not the Growth Story" cited CareDx's recovery to pre-

19 COVID-19 testing volumes, noting in particular: "With RemoTraC now accounting for more than

20 50% of daily volume vs. 10% prior, the company has shown an ability to adapt."

21 37.  Indeed, by the end of 2020, CareDx credited RemoTraC with preventing the

22 Company from experiencing any COVID-related decline whatsoever in its testing services

23 business. As the Company stated in its Form 10-K for 2020, filed February 24, 2021:

> As a response to the COVID-19 pandemic, and to enable immune-compromised
> transplant patients to continue to have their blood drawn, in late March 2020, we
> launched RemoTraC, a remote home-based blood draw solution using mobile
> phlebotomy for AlloSure and AlloMap surveillance tests, as well as for other
> standard monitoring tests. ***To date, more than 150 transplant centers can offer
> RemoTraC to their patients and over 6,000 kidney, heart and lung transplant
> patients have enrolled***. Based on existing and new relationships with partners we
> have established a nationwide network of more than 10,000 mobile phlebotomists.

1

2

3

> Following the introduction of RemoTraC and with the easing of stay-at-home restrictions and the opening up of many hospitals to non-COVID-19 patients, our testing services volumes returned to levels consistent with those experienced immediately prior to the COVID-19 pandemic, and through December 31, 2020, volumes continued to be at or above those levels since May 2020.

4

5

> In spite of the resurgence of COVID-19 infection rates, which resulted in increased stay-at-home and renewed travel restrictions, our testing services did not experience a decrease in testing services volumes.

6

38.    In fact, CareDx claimed that RemoTraC had been so successful that it was

7

becoming a permanent fixture of their business.  For example, in a February 18, 2021 BTIG

8

investor conference, defendant Seeto explained that RemoTraC was a "sustainable" business

9

model that was "going to be maintained, as 9 in 10 patients want to really keep the service," which

10

he claimed was "addressing an unmet need":

11

12

13

14

15

16

> And I think what really stood out for me [with RemoTraC] is that we were able to put together a[n] offering and put together a structure within the course of four days. And I don't think you can really do that as a company if you don't have preexisting relationships and a preexisting pool from within that transplant community.  So we were really pleased and honored to be able to then create this mobile phlebotomy service and scale it up, *such that during Q2 [2020] 40% of our testing was done through mobile*.  And so that really was sort of a new model for us.  *And that business is now something, which is sustainable* and it's going to be maintained as 9 in 10 patients want to really keep the service. . . .  So, again, I think RemoTraC was *addressing an unmet need*.  And I think what helped us is we could move very quickly to bring it to bear particularly during a time of crisis in the transplant community.

17

18

39.    During the Class Period, CareDx continued to report growth in its mobile

19

RemoTraC program, which in turn continued to be a driver of growth in the Company's testing

20

services business.  Indeed, by 4Q 2020 (reported February 24, 2021), just as CareDx claimed it

21

had enrolled 6,000 patients in RemoTraC, CareDx's quarterly test volume had grown to 25,000

22

tests performed –compared to just 15,000 in the first quarter of the year, and its testing services

23

revenue had grown to $50.3 million, compared to just $31.4 million in the first quarter of the year.

24

By 2Q 2021, CareDx claimed to have enrolled 9,000 patents, its quarterly test volume grew to

25

37,000, and its quarterly testing services revenue grew to $65 million.

26

40.    Importantly, CareDx's RemoTraC program also helped the Company to maintain

27

high average selling prices ("ASPs") for its tests – a key metric of its profitability and growth

28

potential.  ASP was a simple calculation derived by dividing the Company's testing services

1  revenue in a quarter by the number of tests it reported performing in that quarter.  High ASPs

2  meant that the Company was able to get high approval and reimbursement rates for its tests,

3  making each test more profitable.

4       41.     For example, throughout 2020, the Company's overall ASP for its tests remained

5  consistently in the $2,000-$2,100 per test range even as its testing volume rose dramatically.  This

6  consistency was important to investors because it signaled that CareDx's revenue and profitability

7  would continue to increase in line with its rapid testing volume growth.  This also bolstered

8  Defendants' narrative that RemoTraC was successfully maintaining the Company's growth story

9  even in the face of challenges from the COVID-19 pandemic.

10       42.     Propelled by RemoTraC's apparent success, CareDx's stock price skyrocketed to

11  an all-time high of $95.60 per share on June 28, 2021, ***an increase of more than 330%*** over its

12  price in the $22 per share range at the beginning of the COVID-19 pandemic.  And the Individual

13  Defendants took full advantage of the stock price inflation from their fraud, with defendants Maag

14  and Seeto selling more than $30 million worth of stock combined.

15       **C.     Defendants Expressly Claimed CareDx Materially Complied with**
          **Federal and State Regulations, Including the False Claims Act, the**
16          **Sunshine Act, and the Anti-Kickback Statute**

17       43.     As a medical testing company, CareDx was subject to numerous federal and state

18  regulations, including the civil False Claims Act (31 U.S.C. §§3729-3733), the administrative

19  False Claims Law, the Medicare and Medicaid Fraud and Abuse Statute (42 U.S.C. §1320a-7b(b))

20  (the "Anti-Kickback Statute"), and the Physician Payments Sunshine Act section of the Patient

21  Protection and Affordable Care Act of 2010, as amended by the Health Care and Education

22  Reconciliation Act of 2010 ("Sunshine Act").  These laws and regulations strictly prohibited

23  CareDx from billing Medicare for tests that were not medically necessary, and either prohibited

24  entirely CareDx from providing numerous forms of monetary and non-monetary benefits to

25  doctors, phlebotomists, or even patients that could potentially be seen as kickbacks or else required

26  reporting of such benefits to regulatory authorities.

27       44.     Defendants were not only well aware of these laws but made highly detailed public

28  representations that they were in material compliance with them and knew of "no facts" suggesting

1    otherwise.  Indeed, on January 21, 2021, the first day of the Class Period, in connection with the

2    filing of the Company's prospectus for a common stock offering, the Company filed a Form 8-K

3    with the SEC wherein the Company made highly specific representations that it was "in material

4    compliance with all health care laws applicable to the Company" and knew of "no facts or

5    circumstances that would reasonably be expected to give rise to material liability of the Company

6    under any Health Care Laws":

7           <u>Compliance with Health Care Laws</u>. ***The Company and, to the Company's
       knowledge, its directors, employees and agents (while acting in such capacity)
8       are in material compliance with, all health care laws applicable to the Company***,
       or any of its products or activities, ***including, but not limited to, the federal Anti-
9       Kickback Statute*** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law
       (42 U.S.C. Section 1320a-7a(a)(5)), ***the civil False Claims Act*** (31 U.S.C.
10      Section 3729 *et seq.*), ***the administrative False Claims Law*** (42 U.S.C.
       Section 1320a-7b(a)), the Stark law (42 U.S.C. Section 1395nn), the Health
11      Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d *et
       seq.*) as amended by the Health Information Technology for Economic and Clinical
12      Health Act (42 U.S.C. Section 17921 *et seq.*), the exclusion laws (42 U.S.C.
       Section 1320a-7), the Federal Food, Drug, and Cosmetic Act (21 U.S.C.
13      Section 301 et seq.), the Controlled Substances Act (21 U.S.C. Section 801 *et seq.*),
       the Public Health Service Act (42 U.S.C. Section 201 *et seq.*), the Clinical
14      Laboratory Improvement Amendments of 1988 (42 U.S.C. Section 263a),
       Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the
15      Social Security Act), and the ***Patient Protection and Affordable Care Act of 2010,
       as amended by the Health Care and Education Reconciliation Act of 2010***, the
16      regulations promulgated pursuant to such laws, and any other state, federal or
       foreign law, accreditation standards, regulation, memorandum, opinion letter, or
17      other issuance which imposes requirements on the manufacturing, development,
       testing, labeling, advertising, marketing or distribution of drugs and medical
18      devices (including diagnostic products), ***kickbacks***, patient or program charges,
       recordkeeping, ***claims process, documentation requirements, medical necessity***,
19      referrals, the hiring of employees or acquisition of services or supplies from those
       who have been excluded from government health care programs, quality, safety,
20      privacy, security, licensure, accreditation or any other aspect of providing health
       care, clinical laboratory or diagnostics products or services (collectively, "Health
21      Care Laws"). . . .    ***To the Company's knowledge, there are no facts or
       circumstances that would reasonably be expected to give rise to material liability
22      of the Company under any Health Care Laws***.

23          45.    CareDx further acknowledged in its SEC filings that it was "subject to the Sunshine

24   Act" and thus required to report any payments or transfers of value to physicians and other medical

25   providers to regulators, and also required public disclosure of those payments in a public database.

26   Defendants signed these SEC filings, which further indicated that AlloSure was "covered by

27   Medicare" and, therefore, was required by law "to report annually to the Secretary of the

28   Department of Health and Human Services payments or other transfers of value they make, or

direct a third party to make, to physicians and teaching hospitals or to third parties on behalf of physicians or teaching hospitals." CareDx's SEC filings further acknowledged that "[t]he payments required to be reported include the cost of meals provided to a physician, travel reimbursements and other transfers of value provided as part of contracted services such as speaker programs, advisory boards, consultation services and clinical trial services." Additionally, as CareDx's filings acknowledged, the Sunshine Act "requires the federal government to make reported information available to the public."

46. Yet, as alleged in detail below, in direct contradiction of these express representations, by the start of the Class Period, Defendants unquestionably knew CareDx *systematically and deliberately* violated these laws and regulations in pursuit of profit.

**D.    In Truth, CareDx Relied on Medicare Billing Fraud and Illegal Kickback Schemes to Boost Its Testing Services Revenue**

47. While Defendants attributed CareDx's financial success to demand for its testing services and the popularity of its RemoTraC home testing program, in reality, CareDx's testing services growth relied almost entirely on illegal schemes to bill Medicare fraudulently for unnecessary tests and pay kickbacks to phlebotomists and prescribing doctors in exchange for helping CareDx obtain blood samples for those tests. Among its many illegal and improper practices, Defendants took advantage of its RemoTraC home testing program to systematically push its expensive AlloSure tests – each of which cost Medicare $2,841 – on patients who did not need the test and did not meet Medicare's criteria for receiving them. CareDx brazenly administered and billed Medicare for these tests as often as *once a month for each patient* when many of those patients showed *no signs of organ rejection* and thus had no approved medical indication for them whatsoever – enabling CareDx to bill Medicare *tens of thousands of dollars per year* for each of these patients without any justification.

48. CareDx achieved this end in large part by bundling its AlloSure tests with a panel of routine blood tests that it would offer in-home, through mobile phlebotomists (many of whom were being paid illegal kickbacks for each blood draw they took). Defendants then engaged in obfuscatory and improper requisition and billing practices to get approval and to bill Medicare for

1   the unnecessary tests.  Further, Defendants engaged in a widespread scheme of paying kickbacks

2   to phlebotomists in exchange for blood samples, and plying doctors with lavish gifts, trips, and

3   dinners, to promote enrollment in AlloSure, meanwhile failing to report any of these payments in

4   violation of the Sunshine Act.  And further, Defendants bribed doctors to enroll their Medicare

5   patients in large scale studies that CareDx then illegally used as a pretext to bill Medicare for even

6   more unnecessary tests.

7           1.      **A High Ranking Former CareDx Executive, Dr. Michael**
                     **Olymbios, Exposes Defendants' Illegal AlloSure Practices in an**

8                        **Extraordinary Pleading**

9         49.      Defendants' illegal conduct was detailed in an explosive complaint (the "Olymbios

10  Complaint") filed in April 2022 by one of the Company's most senior executives, Dr. Michael

11  Olymbios.  Dr. Olymbios served as CareDx's Head of Community Nephrology, in which capacity

12  he supervised the team responsible for selling AlloSure Kidney, oversaw clinical studies of

13  AlloSure, and reported directly to defendant Seeto.[6]  Indeed, "because of his job duties and

14  responsibilities, ***Dr. Olymbios had direct and frequent interactions with the highest level***

15  ***executives at CareDx*.**"  Critically, the Olymbios Complaint's highly detailed and credible

16  allegations are based not only on Dr. Olymbios's firsthand recollection of interactions with

17  Defendants and other CareDx employees,[7] but also on contemporaneous records of

18  Dr. Olymbios's electronic communications while employed by CareDx.  The Olymbios Complaint

19

20  ――――――――――――――
[6]    CareDx first hired Dr. Olymbios in May 2019 as Director of Portfolio Products, after which
21  he was promoted to Head of Medical Marketing in October 2019.  As Head of Medical Marketing,
he was responsible for determining CareDx's overall marketing message and crafting marketing
22  material directed to physicians.  He also trained CareDx's field sales team and worked closely with
the medical science liaisons, patient care managers, field representatives, and Chief Marketing
23  Officer.  In May 2020, he was further promoted to the Head of Community Nephrology, in which
role he oversaw a team responsible for selling AlloSure Kidney to community nephrologists
24  working in transplant centers, community hospitals, private clinics, and healthcare systems.
Olymbios was also a member of CareDx's Business Leadership Team.  According to his
25  Complaint & Petition, Dr. Olymbios gave notice of his resignation from the Company on October
7, 2020.

26  [7]    CareDx has ***admitted*** in a filing in response to the Olymbios Complaint that Dr. Olymbios was
27  privy to a host of material nonpublic information about the Company's business activities,
"occupied a ***special position of trust and confidence***," at CareDx and was privy to "a wide range
28  of ***confidential business information***."

1   thus advances highly detailed and credible facts supported by Dr. Olymbios's own personal

2   knowledge of systematic and widespread Medicare fraud and illegal kickback schemes at CareDx.

3          50.     The Olymbios Complaint specifically stated that to "*maximize potential revenue*

4   *associated with AlloSure*, CareDx executives engaged in various forms of clinical and marketing

5   schemes in an effort to justify AlloSure's use, even when that use *lacked clinical support and fell*

6   *outside of the conditional approval extended to it*."   In other words, CareDx systematically

7   promoted the administration of AlloSure tests even where patients had not shown the "clinical

8   suspicion of rejection" required by Medicare in order to reimburse the test, and then fraudulently

9   billed Medicare for those tests.  As such, the Company engaged in "*an unlawful campaign –*

10  *bolstered by illegal inducements to physicians, misleading research, and recommendations for*

11  *clinically unsupported treatment – to pad its sales*."

12         51.     According to the Olymbios Complaint, CareDx's efforts to this end included, but

13  were not limited to: (a) "pushing a[n investigational] 'surveillance' protocol for AlloSure;" – *i.e.*,

14  promoting AlloSure's *repeated and regular* administration in patients not indicated for the test at

15  all;[8] (b) "*offering extravagant inducements or kickbacks* to physicians and other providers to

16  promote AlloSure"; (c) "representing that CareDx did not bill patients for its tests;" – a  violation

17  of the Anti-Kickback statute; (d) "organizing 'clinical studies' to push AlloSure on Medicare

18  patients that were funded with condition-free grants"; and (e) "bundling AlloSure with other blood

19  tests as part of a mobile phlebotomy services to induce physicians to order AlloSure" *without*

20  *regard to coverage guidelines*.  The highly credible and evidence-based allegations advanced by

21

22

---

23  [8]    AlloSure® Kidney is covered by Medicare "to assess the probability of allograft rejection in
    kidney transplant recipients *with clinical suspicion of rejection* and to inform clinical decision-
24  making about the necessity of renal biopsy in such patients at least 2 weeks post-transplant in
    conjunction with standard clinical assessment." The use of AlloSure for surveillance purposes is
25  thus not typically a covered use of the test.  *See, e.g.*, Blue Cross Blue Shield of North Carolina
    Corporate Medical Policy, Transplant Rejection Testing AHS – M2091 (Last Review April 2022)
26  ("[w]hen [t]ransplant [r]ejection [t]esting is not [c]overed[:] The use of peripheral blood
    microarray-based genomic test that analyzes gene expression profiles to rule out kidney transplant
27  rejection . . . in *individuals with stable renal function as an alternative to surveillance biopsies*
    *i[s] considered investigational*.").
28

1   Dr. Olymbios, which were raised and discussed directly with Defendants, unequivocally establish

2   Defendants' illegal practices.[9]

3       52.   Although Dr. Olymbios was a medical professional trained in the United Kingdom,

4   and although "*CareDx provided minimal – if any-training and information on compliance*

5   *obligations to its employees*," by no later than June of 2020, Dr. Olymbios began to fully

6   appreciate that CareDx's practices raised serious legal and compliance concerns.  Indeed, by that

7   time, according to the Olymbios Complaint, Dr. Olymbios had become aware of widespread

8   misconduct regarding what was widely considered "impermissible" Medicare reimbursement

9   practices.  For example, the Olymbios Complaint details that "[m]ultiple nephrology practices

10  expressed serious reservations about [CareDx's] practice" of improperly bundling AlloSure with

11  routine clinical screening tests, which these nephrology practices identified "as a violation of

12  Medicare billing requirements."  In fact, the impropriety of these billing practices was no secret

13  throughout the Company, as "CareDx employees internally flagged this practice as

14  impermissible."  In addition, in order to sidestep protocols to ensure that tests were medically

15  necessary, the Company "*intentionally excluded* from the test requisition form a field where a

16  physician could indicate the reason *why the test was medically necessary*."

17      53.   Furthermore, the Olymbios Complaint detailed illegal kickbacks to physicians to

18  maximize the number of patients improperly receiving the AlloSure test.  For example, "CareDx

19  offered unrestricted grants to physicians to not enroll patients in competitors' clinical trials or *to*

20  *induce practices to place patients on an AlloSure surveillance protocol, even when doing so was*

21  *not warranted or authorized under Medicare billing guidelines*."  Furthermore, CareDx

22  organized sham "advisory boards" that were "little more than marketing exercises to encourage

23  physicians to order AlloSure tests."  As the Olymbios Complaint makes clear, when CareDx

24

25

---

26  [9]  Dr. Olymbios has become a whistleblower against CareDx, and has already provided
    documents and information to the federal and state government agencies now investigating
27  CareDx.  Dr. Olymbios's action against the Company is currently pending an arbitrator's decision
    as to whether the claims he alleges in the Olymbios Complaint are subject to mandatory arbitration
28  under his employment agreement with the Company.

1    employees raised issues regarding the propriety of these activities, the Company "***repeatedly***
2    ***ignored or actively quashed any internal concerns about its activity***."

3        54.    According to the Olymbios Complaint, Dr. Olymbios was far from the only
4    employee to have misgivings about CareDx's false representations.  At multiple points during his
5    employment, Dr. Olymbios discussed his concerns with other employees who had similar
6    misgivings about the "profit at any cost" approach followed by CareDx executives.  Indeed, the
7    Olymbios Complaint catalogues a variety of serious concerns shared by multiple CareDx
8    employees.  For example, a former employee confirmed to Dr. Olymbios that "CareDx's physician
9    entertainment activity '***violated so many [health care provider] interaction rules***,'" and that this
10   "Medicare abuse" was so pervasive that the employee encouraged Dr. Olymbios to "'***[j]ust***
11   ***whistleblow it***.'"

12       55.    Similarly, the Olymbios Complaint details an August 2020 conversation between
13   Dr. Olymbios and another employee about compliance concerns, specifically regarding that "***an***
14   ***OIG investigation would probably happen***."  Dr. Olymbios then noted the variety of improper
15   practices that were the likely focus of the investigation, including: "***Registries, ad boards, billing***
16   ***practices, study funds as inducements***."  The Olymbios Complaint also details a September 2020
17   text conversation between Dr. Olymbios and another CareDx employee regarding the Company's
18   illicit practices.  Dr. Olymbios notes: "***It's insane that we have surveillance studies billing***
19   ***Medicare when that's not even allowed***."  Dr. Olymbios then provided the employee with a copy
20   of a complaint by the United States Attorney's Office for the Southern District of New York
21   against another company and stated: "We do ALL the things listed in the criminal complaints."
22   The employee responded: "This is all too much.  I also feel like CareDx is well on their way to
23   pissing [off] the wrong employee or wrong physician and theres [sic] going to be a whistle blower."

24       56.    Significantly, that same month, Dr. Olymbios had conversations with multiple
25   CareDx employees that underscored the pervasiveness of the knowledge of the Company's illicit
26   activities throughout the organization.  Specifically, in September 2020, Dr. Olymbios texted other
27   Company employees that he had participated in "***a legal call with [Defendant Seeto]***."  In

28

1    response, a CareDx employee asked "*because we are Medicare frauds*?"   Another employee

2    chimed in: '*We're a bunch of crooks and frauds*.'"

3          57.    Dr. Olymbios further explained CareDx also took active measures to avoid creating

4    a paper trail of its misconduct, including the intentional use of ephemeral messaging, *i.e.*, programs

5    like WhatsApp and Signal that can send messages without storing any record of the message.  *See*

6    §VI, *infra*.  Indeed, according to the Olymbios Complaint, defendant Maag was very sensitive

7    about putting potentially harmful information in writing.  For example, in or around July or August

8    2020, Dr. Olymbios suggested in an email to defendant Maag, CareDx VP Danielle Scelfo, and

9    others that CareDx should state in a marketing letter to a nephrology practice that CareDx never

10   billed patients-a practice that CareDx regularly touted to doctors, but that Dr. Olymbios had not

11   yet realized was a violation of the Anti-Kickback Statute.  Dr. Olymbios thought that it would be

12   convincing to highlight in the letter that patients would not have any out-of-pocket expenses, given

13   that this was a talking point that defendant Maag and other high-level executives at CareDx had

14   "*verbalized time and time again when pitching AlloSure to nephrology practices*."   To

15   Dr. Olymbios's surprise, defendant Maag called Dr. Olymbios soon after and said that *he was*

16   *calling because there were "things he couldn't be associated with as the CEO*," and that "*there*

17   *were certain things that shouldn't be put in writing, like saying that CareDx never billed*

18   *patients*."

19          58.    Dr. Olymbios relayed these concerns both during his employment at CareDx and

20   when he resigned from CareDx in October 2020, when Dr. Olymbios yet again put CareDx on

21   notice of his concerns about its unethical and unlawful activity.  Indeed, Dr. Olymbios reported

22   his concerns to "*more than ten* other current or former CareDx employees, *including Peter Maag*,

23   then the Chief Executive Officer for CareDx, *and Reg Seeto*, the current President and Chief

24   Executive Officer of CareDx."   According to Dr. Olymbios, the senior "CareDx executives

25   *brushed off his concerns or berated him for raising them in the first place*," and "*repeatedly*

26   *ignored or actively quashed any internal concerns about its activity*," until he finally resigned in

27   late 2020.

28

1

### 2. CareDx Improperly Bundled Its AlloSure and AlloMap Tests into Its RemoTraC Home Testing Program in Order to Illegally Bill Medicare for Thousands of Unnecessary Tests

2

3      59.    As the Olymbios Complaint made clear, and as other former employees confirmed,

4   Defendants systematically billed Medicare for tests that were not clinically or medically necessary,

5   and for patients who did not meet Medicare's requirement that there be "clinical suspicion of

6   rejection" to administer the test.  As Dr. Olymbios explained, CareDx "used what it represented to

7   be clinical tests to bill Medicare for the [AlloSure] tests."  According to Dr. Olymbios, CareDx

8   further increased the volume of unnecessary tests it billed for by "pushing a 'surveillance' protocol

9   for AlloSure through inaccurate marketing materials" – in other words, pushing for regular testing

10  of patients who did not even meet medical criteria for receiving *one* test.

11     60.    Dr. FE-1,[10] who worked for CareDx as a Senior Medical Science Liaison until he

12  resigned in January 2022, fully corroborated Dr. Olymbios's claims, explaining that CareDx used

13  its RemoTraC program to foist unnecessary AlloSure tests – which cost thousands of dollars each

14  – on transplant patients who had not shown any need for them, by improperly bundling the tests

15  with routine and inexpensive surveillance blood tests.  As Dr. FE-1 explained, the ostensible

16  purpose of at-home testing was to make it easy for immunocompromised transplant patients to get

17  routine blood tests without having to visit medical facilities.  However, as Dr. FE-1 explained,

18  CareDx illegally exploited this situation: "They were doing the very expensive CareDx labs on the

19  *same cadence* of the home labs," which "was *totally unethical* the way that they were doing it and

20  it was clearly wrong."  Dr. FE-1 explained that CareDx would *only* arrange a blood draw for these

21  standard-of-care tests (which were otherwise inexpensive and unprofitable for the Company) if

22  AlloSure tests were also being ordered.  Dr. FE-1 explained: "We were doing tests that cost *at*

23  *least 8X* of what they should have been *and on patients that did not need these tests*."  Indeed,

24

25  ───────────────

[10]  Dr. FE-1 worked at CareDx from May 2021 through January 2022 as a Senior Medical Science
26  Liaison.  Dr. FE-1 reported directly to the Company's Chief Medical Officer, Sham Dholakia, for
    a period of time and then indirectly through Dr. Grigoriy Shekhtman, another senior executive, to
27  Dholakia.  Dr. FE1 chose to leave CareDx because of its unethical practices.  The genders of
    certain confidential former employees discussed herein have been changed to male to protect their
28  anonymity.

1  Dr. FE-1 personally reviewed numerous patient records and discovered that expensive AlloSure

2  tests were being ordered *on a monthly basis* for patients who had *no* indications for the test, *i.e.*,

3  patients who had shown no warning signs of transplant rejection, meaning there was *no medical*

4  *reason* for the test to be performed at all, let alone monthly.

5      61.    Concerned by what he was seeing, Dr. FE-1 began asking other employees why

6  AlloSure was being ordered every month and was told that the requisitioning doctors simply

7  wanted the patients' routine kidney labs drawn, that CareDx would not allow this to happen

8  without performing the AlloSure test as well, and that many doctors were simply relieved that their

9  patients could get the routine tests at home and/or didn't fully understand that the bundled AlloSure

10  test was something markedly different from the routine tests it was bundled with.  As Dr. FE-1

11  explained: "The *nurses [drawing blood] were obligated to not only do the screening labs but our*

12  *AlloSure test*" and the "doctors [in the field] liked using [CareDx's blood-drawing] service but

13  *there was no way to use us without ordering our test as well*."  Dr. FE-1 recalled that certain

14  doctors receiving the results of the AlloSure test did not even understand what the AlloSure results

15  meant, and were ordering AlloSure only because they had to do so in order to complete the other

16  home tests.  As Dr. FE-1 put it, CareDx was "*bundling in AlloSure just to bill for it which was*

17  *totally inappropriate.  They were doing this way too many times in a patient population that it*

18  *was not validated in*."  Dr. FE-1 explained that this practice occurred because "*sales drove*

19  *everything*" at CareDx, including how often patients should get their blood drawn for labs.  "Even

20  on the clinical side, *sales pushed what labs should be done and how often*," Dr. FE-1 observed.

21      62.    Dr. FE-1 raised concerns about this scheme with his supervisor, Dr. Grigoriy

22  Shekhtman, but Dr. Shekhtman told Dr. FE-1 that CareDx needed to engage in these practices in

23  order to meet its goal of maximizing the number of AlloSure tests drawn.  Dr. Shekhtman reported

24  directly to Sham Dholakia – CareDx's Chief Medical Officer – who attended weekly "Braveheart"

25  team meetings (described further below at ¶¶175-177) with defendants Maag, Seeto, and others.

26  Dr. FE-1 also reported his concerns to the Company's top compliance attorney, Clarice McCauley

27  ("McCauley"), whom the Company hired in early 2021.  Dr. FE-1 noted McCauley "was having

28  an uphill battle *and CareDx did not want to be compliant*."  McCauley quit CareDx less than a

1   year after beginning this "uphill battle," though he had worked for his prior lab diagnostics

2   employer for more than 16 years before joining CareDx.

3       63.     Lead Clinical Research Associate FE-2[11] explained, "***the only way to make money***

4   [was] to also carry out an AlloSure test with each RemoTraC blood withdrawal patient visit," ***and***

5   ***it was known throughout CareDx that a RemoTraC blood draw would not be administered***

6   ***without an AlloSure test being conducted at the same time***.  But as explained above, and as FE-2

7   was fully aware, AlloSure is not a standard, routine blood test, and Medicare guidelines state that

8   AlloSure is medically necessary only "to assess the probability of allograft rejection in kidney

9   transplant recipients with clinical suspicion of rejection and to inform clinical decision-making

10  about the necessity of renal biopsy in such patients at least 2 weeks post-transplant in conjunction

11  with standard clinical assessment."  FE-2 ultimately left CareDx because, as FE-2 put it, "***the***

12  ***scientific quality and ethical integrity did not exist at the company's leadership positions***."

13      64.     As a former Senior Regional Clinical Research Associate FE-3[12] explained,

14  CareDx was not in the mobile blood-drawing business; rather, it was in the AlloSure business.  So

15  RemoTraC was pitched as a program where "we can do the ***standard of care*** blood tests, ***but we***

16  ***are not going to go to their homes and just do the standard of care***," but would have to include

17  AlloSure or other expensive tests as well.  FE-3 also recalled that, in spite of being in the clinical

18  side of the business, he had surprisingly frequent interactions with sales representatives at CareDx—

19  indeed more frequently than at any other company for which FE-3 had worked.  As FE-3

20  explained: "***Usually clinical operations and sales are two completely different sides of the***

21  ***business, and they should not be interacting.  This raised an eyebrow on why the clinical***

22

23

---

24  [11]  FE-2 worked as a Lead Clinical Research Associate during the second half of 2021 and is a
    registered nurse.  FE-2's responsibilities included creating, distributing, negotiating, and reviewing
25  essential regulatory documents, including informed consent forms.  To do so, FE-2 worked with
    CareDx's cross-functional legal partners on clinical trial agreement negotiations.  In addition, FE-2
26  attended weekly Zoom calls with sales teams and medical screening teams.

27  [12]  FE-3 was a Senior Regional Clinical Research Associate for CareDx from December 2019
    through October 2020.  He was responsible for reviewing and managing documents relating to the
28  Company's clinical trial agreements.

1    *operations folks are working closely with the sales folks*?"   FE-3 emphasized: "Sales and

2    marketing should have been completely separate from clinical operations."

3         65.    FE-3 explained there "were things . . . that I could tell that I was not comfortable

4    with. ***That was the reason why I and several others have left that company***."  For example, FE-3

5    recalled one of the last meetings he attended, a July 2020 remote meeting with officials from

6    Baylor University Medical Center in Texas, which Dr. Olymbios also attended.  At the meeting,

7    Baylor University personnel clearly "***raising concerns about [CareDx's] Medicare billing***."

8         66.    Reimbursement Specialist FE-4[13] further corroborated Defendants' systematic

9    Medicare misconduct in its RemoTraC program.  FE-4 understood that, when COVID-19 hit,

10   CareDx quickly moved to home testing, and FE-4 heard that AlloSure was bundled together with

11   other blood tests as part of CareDx's new mobile phlebotomy service to promote and induce

12   physicians to order AlloSure.

13        67.    Dr. Olymbios and other former employees also confirmed that CareDx enabled its

14   scheme by obfuscating its approval and billing practices to avoid scrutiny (at least until federal

15   and state regulators caught on).  For example, while CMS required a doctor to determine that tests

16   like AlloSure were "medically necessary" under CMS regulations (which required "clinical

17   suspicion of rejection" for the test to be reimbursed), Dr. Olymbios averred that CareDx

18   "***intentionally excluded from the test requisition form a field where a physician could indicate***

19   ***the reason why the test was medically necessary***," so that the Medicare personnel handling

20   reimbursement would not be immediately tipped off that medical necessity was required, and was

21   not actually extant, for the particular test.

22        68.    FE-5,[14] a former CareDx Senior Product Manager, explained how CareDx further

23   obfuscated its improper Medicare billing using an entirely paper-based claim submission system,

24

25   _____

26   [13]  FE-4 worked for CareDx in San Francisco, CA from June 2016 until June 2021 as a
     Reimbursement Specialist.  She was responsible for client billing, eligibility, and prior
     authorizations.

27   [14]  FE-5 worked for CareDx as a Senior Product Manager from August 2020 through
28   October 2021.  He reported to Amitabh Shukla, CareDx's Senior Vice President Technology.

which he said made tracing claims virtually impossible.  FE-5 was intimately familiar with these problems, because he oversaw the Company's digital transformation of its revenue cycle management – a system the Company had previously lacked.  FE-5 explained that "Medicare was our biggest payor, and they needed a trace of all the paper evidence [of claims].  If you didn't have digital evidence, you needed to provide paper evidence."   FE-5 said that any such evidence, however, was obscured in "hundreds and hundreds of boxes" of paper, and that even the Company's test orders for patients were all in paper – a "*huge red flag" for Medicare*.

### 3. CareDx Paid Illegal Kickbacks to Doctors to Encourage Excessive Use of AlloSure and Enroll Patients in "Studies" that Were Actually Schemes to Illegally Bill Medicare for Additional AlloSure Tests

69.     In order to further its scheme, CareDx also utilized an elaborate system of kickbacks, payments, inducements, and incentives paid to phlebotomists and doctors to juice the Company's AlloSure sales.   As the Olymbios Complaint explained, CareDx "*offer[ed] extravagant inducements or kickbacks to physicians and other providers to promote AlloSure*" and organized "*sham 'advisory boards'*" that were "*little more than marketing exercises to encourage physicians to order the AlloSure tests*."

70.     FE-6, who served as defendant Maag's executive assistant until July 2020,[15] fully corroborated Dr. Olymbios's claims.  For example, FE-6 described CareDx's practice of hosting "symposiums," where it paid for doctors' flights, limo services to and from the airport, hotels, and bottles of champagne in the doctors' hotel rooms.  FE-6 further explained that CareDx hosted two key opinion leader "summits" in San Francisco every year that started on Thursdays and ended on Fridays (*i.e.*, the summits lasted only about a day and a half).  In spite of the brevity of these "summits," CareDx would then pay for attending doctors to spend the weekend in Napa Valley. The doctors were taken to Napa and chauffeured around in limousines hired by CareDx, and were brought to four different vineyards – each of which hosted a $100-per-person wine tasting that CareDx paid for.  The doctors were also provided breakfast, lunch, and dinner at fine restaurants,

---

[15]  Employee FE-6 served as Senior Executive Assistant to the Chairman and CEO from December 2013 through July 2020.

1    all on CareDx's dime – in fact FE-6 directly observed these costs being placed on CareDx's

2    corporate credit cards. FE-6 explained that defendant Maag not only attended these outings, but

3    personally selected the vineyards and restaurants.

4        71.    FE-1 witnessed similar practices, and described how CareDx's sales management

5    personnel *took doctors on "booze" cruises, helicopter tours, and expensive vacations*, failing to

6    report any of these expenses as required by the Sunshine Act. As FE-1 further explained, it was

7    common knowledge within the Company that this was occurring, commenting: "The sales people

8    did stuff that would not be appropriate anywhere else in the pharma or biotech industry."

9        72.    Another key part of Defendants' scheme involved a systematic practice of paying

10    illegal kickbacks to third party phlebotomists in exchange for blood draws – essentially, paying

11    excessive fees to incentivize them to provide CareDx as many blood samples as possible, in

12    express violation of CMS regulations and the federal Anti-Kickback Statute.

13        73.    By way of background, CMS requires that phlebotomists get paid only a "nominal"

14    per-specimen fee of $3-$5, or, at most, in certain COVID-related circumstances, $23-$25 per

15    specimen.[16] Anything in excess of that nominal per specimen fee is considered an illegal kickback,

16    because it provides a financial incentive to do unnecessary blood draws in order to perform and

17    bill for unnecessary tests. However, Reimbursement Specialist FE-4 explained that, rather than

18    paying the $3 fee required by regulations, CareDx regularly and systematically paid doctor offices

19    and phlebotomists' "fees" of *$100 per specimen* to draw blood from patients. FE-4 said that he

20    often received calls routed from the accounting department "from *people looking for their check*

21    *for drawing blood*." FE-4 also saw "logs" phlebotomists used to keep track of all the patients who

22    gave them blood, and noted: "They were definitely getting paid a[n] [excessive] draw fee."

23        74.    FE-4 explained that he had previously worked for a Company called Berkeley

24    HeartLab, which he said had also engaged in a blood draw kickback scheme similar to the one

25    enacted by CareDx, and had gotten caught by the U.S. government. By way of context, Berkeley

26

27    ───────────────
     [16]  https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-

28    MLN/MLNProducts/Downloads/Clinical-Laboratory-Fee-Schedule-Fact-Sheet-ICN006818.pdf.

1    HeartLab was the subject of multiple *qui tam* actions for exactly these types of practices, which

2    actions survived a motion to dismiss in March 2016, and the U.S. government subsequently settled

3    the actions with Berkeley HeartLab for $6 million.[17]   FE-4 said that CareDx was engaging in a

4    substantively similar blood draw kickback scheme to the one conducted by Berkeley HeartLab.

5        75.    Lab Director FE-7[18] made similar claims about CareDx's illegal blood draw

6    scheme.   FE-7 explained that the phlebotomists CareDx used for its RemoTraC scheme also

7    collected blood not just for CareDx's tests but for other tests the physicians had ordered, but that

8    these other tests would not be administered by CareDx.  Instead, some of the blood samples would

9    be sent to other testing companies like Quest Diagnostics Inc. ("Quest").   FE-7 knew these facts

10   because sometimes samples intended for CareDx were sent mistakenly to Quest and vice versa.

11       76.    As Lab Director FE-7 noted, however, CareDx was not charging for the blood

12   collection itself – a practice that has been identified by the U.S. Department of Health and Human

13   Services and Office of the Inspector General as potentially violative of the Anti-Kickback

14   Statute.[19]

15       77.    As Lab Director FE-7 put it, there is "a fine line" in distinguishing whether

16   providing a service to a physician – like not charging for blood drawing – is actually an inducement

17   to the physician to order tests from CareDx.  Lab Director FE-7 thought these practices were

18   "sketchy" and discussed the practices with CareDx's Vice President of Laboratory Operations

19   Susan Scott, who dismissed his concerns.

20

---

21   [17]   https://www.justice.gov/opa/pr/blood-testing-laboratory-pay-6-million-settle-allegations-
22   kickbacks-and-unnecessary-testing.

23   [18]   FE-7 worked at CareDx as Senior Director of Laboratory Operations from June 2018 to
     March 2022.

24   [19]   As explained in the United States's complaint against Berkeley HeartLab, HHS-OIG Advisory
25   Opinion No. 05-08 made clear that payments by laboratories to physicians for blood sample
     collection could constitute improper remuneration under the Anti-Kickback Statute.  The U.S.
26   Office of the Inspector General also warned in 2018 about similar blood draw kickback schemes,
     issuing a "special fraud alert" that it was investigating various blood testing labs for "kickback
27   arrangements" in which they were paid per-specimen fees beyond the $3 regulatory amount.  *See*
     https://www.policymed.com/2014/09/oig-and-justice-department-investigating-certain-blood-
28   testing-labs-for-kickback-arrangements.html

1    78.    CareDx also engaged in other violations of the Anti-Kickback Statute in order to

2    juice its testing revenues, for example, offering to waive patient costs.  As Dr. Olymbios explained,

3    without initially realizing that the practice was illegal, he became aware that, when marketing its

4    services to nephrology practices, CareDx was using the "talking point" that it never billed its

5    patients directly for its tests, such that patients would have no out-of-pocket expenses for the tests.

6    In or around August 2020, Dr. Olymbios wrote an email directly to Peter Maag and another high-

7    level CareDx executive that CareDx should include the fact that CareDx "never bills patients" in

8    a marketing letter to a nephrology practice.  However, defendant Maag responded with a phone

9    call, in which he said that he was "*calling because there were things he couldn't be associated*

10    *with as the CEO*," and that "*there were certain things that shouldn't be put in writing*" – such as

11    never billing patients "even if that's how CareDx operated."  Promising never to bill patients is, in

12    fact, a violation of the federal Anti-Kickback Statute and other laws and regulations.[20]

13    79.    CareDx executives unquestionably knew that this behavior was occurring, because

14    Dr. Olymbios reported his concerns to the Company's most senior executives, including

15    defendants Maag and Seeto.  Indeed, as the Olymbios Complaint alleges, "Dr. Olymbios discussed

16    his concerns and those of other employees with more than ten other current or former CareDx

17    employees, including Peter Maag, then the Chief Executive Officer for CareDx."

18    80.    Moreover, defendant Maag clearly was aware of CareDx's illegal kickbacks and

19    inducements because he testified under oath in the CareDx-Natera Litigation that he personally

20

---

[20]    Federal laws, including the federal Civil Monetary Penalties Law ("CMPL") and Anti-
Kickback statutes ("AKS"), generally prohibit waiving Medicare cost-sharing absent a showing of
genuine financial hardship.  42 U.S.C. 1320a -7a(a)(5).  The CMPL prohibits offering or
transferring remuneration to federal program beneficiaries if the provider knows or should know
that the remuneration is likely to influence the beneficiary to order or receive items or services
payable by federal or state healthcare programs from a particular provider.  42 U.S.C. 1320a -
7a(a)(5).  The federal Anti-Kickback Statute prohibits knowingly and willfully offering, paying,
soliciting or receiving remuneration to any person to induce such person to order or to receive any
items or service for which payment may be made under a federal healthcare program unless the
arrangement fits within a regulatory safe harbor.  42 U.S.C. 1390a -7b(b).  Violation occurs if "one
purpose" of the remuneration is to induce federal program business.  *United States v. Greber,* 760
F.2d 68 (3d3rd Cir. 1985).  The Office of Inspector General ("OIG") has further interpreted the
federal "AKS" to apply to waiving patient co-pay amounts if "one purpose" of the waiver is to
induce the business of a federal program.  *OIG, Special Fraud Alert: Routine Waivers of
Copayments or Deductibles under Medicare Part B* (May 1991).

1    approved nearly all expenses and admitted to regularly attending CareDx's "marketing" events

2    with doctors.  He testified about "meeting conferences" where CareDx spent money marketing

3    AlloSure to kidney doctors, with Maag testifying: "I'm more or less present at many of these

4    meetings happening."  He continued: "I am engaging with the team on those.  And then I am

5    signing off on all the expenses.  For a long time in the company, I signed every check in the

6    company," and further testified that "I think my team [at CareDx] would call me being very hands-

7    on and detailed oriented, so, yes, I was very involved."

8         81.    In addition to defendant Maag's personally signing off on these expenses, Chief

9    Medical Officer Dholakia and defendant Seeto also knew about the bills.  Dholakia testified in the

10   CareDx-Natera Litigation: "Every doctor that works on a project, we have to keep very accurate

11   records of what are we paying them for, how much are we paying them, why are we paying them."

12             **4.    Defendants Used a Study, the "KOAR" Study, to Improperly
                       Bill Medicare for Tens of Thousands of Additional Tests in
13                     Violation of the Anti-Kickback Law**

14        82.    In addition to the above abuses, CareDx also enrolled thousands of patients in large

15   "studies" of its AlloSure test that were mere pretextual schemes to illegally bill Medicare for

16   thousands of additional unneeded tests.  Notably, Medicare regulations entirely prohibit billing for

17   tests administered as part of a study, yet CareDx simply obfuscated its records to escape detection

18   of the practice.  As Dr. Olymbios explained, CareDx "organiz[ed] 'clinical studies' that were

19   funded with condition-free grants," and "offered unrestricted grants to physicians" to enroll

20   patients in CareDx's studies rather than competitors' studies.  In order to increase enrollments in

21   its studies, CareDx made direct payments to doctors at as much as eight times the normal rate for

22   enrolling their patients in AlloSure, but, critically, only if their patients were on Medicare (and

23   thus could be reliably reimbursed at high rates for the tests provided in the study).

24        83.    CareDx Clinician FE-8[21] explained that CareDx paid doctors who enrolled patients

25   in an AlloSure study ***$35,000 to $40,000 per patient***, noting that "the[se] payments were ***excessive***

26

27   _____

     [21]  FE-8 worked as a Senior Clinical Trial Manager at CareDx from August 2021 through
28   November 2021.  His duties included extensive involvement with the Company's KOAR study,
     described herein.

1  *and very unusual for a simple registry study*."  As FE-8 explained, "these simple registry studies

2  usually paid the doctors a flat rate of $5,000.00 per patient."  In other words, CareDx paid doctors

3  between ***600% to 700% more than market rates*** to enroll patients in its AlloSure study.  Clinician

4  FE-8 explained doctors who take these excessive payments go from study to study to make money;

5  specifically: "these doctors go from study to study and knew they were being overpaid."  Clinician

6  FE-8 and another executive told the Company's Chief Medical Officer, Dholakia, that the budgets

7  for paying doctors were "way out of control."

8         84.  CareDx and its executives blatantly violated the False Claims Act by improperly

9  seeking reimbursement for the numerous tests provided for each participant in its massive Kidney

10  Allograft Outcomes AlloSure Registry ("KOAR") study – tests that were ***not*** medically necessary

11  under Medicare guidelines.  Further, CareDx violated the Anti-Kickback Law by preselecting only

12  Medicare patients for the KOAR study, paying exorbitant fees to doctors to enroll patients in the

13  KOAR registry study, requiring each study participant to undergo a predetermined number of

14  AlloSure tests in contravention of Medicare coverage guidelines and medical necessity, providing

15  forms that made it more difficult for the ordering physician to make an independent medical

16  necessity decision with regard to each test, and failing to collect appropriate documentation by the

17  physicians in a timely manner memorializing the physicians efforts.  Each of these facts, as

18  highlighted by the Office of the Inspector General, are hallmarks of improper kickback schemes

19  and violations of the Anti-Kickback Law.[22]

20         85.  Specifically, KOAR was a registry study commenced in 2018 that enrolled over

21  ***1,700 patients***, purportedly to explore the utility of AlloSure surveillance testing, by giving each

22  patient regular AlloSure tests ***over a three-year period***.  Significantly, surveillance testing is not a

23  covered use of AlloSure under Medicare guidelines, and thus regular "surveillance" tests were not

24  legally reimbursable by Medicare.  Nevertheless, Clinician FE-8 recalled that CareDx

25

26  _____

[22]  *See* Special Fraud Alert: Laboratory Payments to Referring Physicians, DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF THE INSPECTOR GENERAL (July 25, 2014),  https://oig.hhs.gov/documents/special-fraudalerts/866/OIG_SFA_Laboratory_Payments_0625201406252014.pdf.

27

28

1  systematically steered Medicare patients, and only, Medicare patients, into the AlloSure study.

2  FE-8 asked the Company's Chief Medical Officer, Dholakia: "***[W]hy were so many patients***

3  ***considered ineligible and rejected from the study***?"  ***Dholakia responded that CareDx rejected***

4  ***patients who lacked Medicare coverage***.  CareDx's motivation for this was clear: by enrolling

5  solely Medicare patients in its "studies," it was reliably ensured high reimbursements for each of

6  the thousands of unnecessary tests.  FE-8 noted: "***[T]here were so [many] illegal actions***" at

7  CareDx.

8         86.    FE-8's allegations are particularly troubling given unambiguous guidance on

9  precisely this type of illegal conduct by the Office of the Inspector General relating to violations

10 of the Anti-Kickback Law. Among its provisions, the Anti-Kickback Law penalizes anyone who

11 knowingly and willfully solicits, receives, offers or pays remuneration in cash or in kind to induce,

12 or in return for referring an individual to a person for the furnishing, or arranging for the furnishing,

13 of any item or service payable under the Medicare or Medicaid program, which includes AlloSure.

14 The OIG warns that registry arrangements such as KOAR "***may induce physicians to order***

15 ***medically unnecessary or duplicative tests***, including duplicative tests performed for the purpose

16 of obtaining comparative data, and to order those tests from laboratories that offer Registry

17 Arrangements in lieu of other, potentially clinically superior, laboratories."[23]

18        87.    Indeed, CareDx's KOAR study was exactly consistent with the OIG's warning

19 signs of fraud for such a registry study.  For example, the OIG warns that it is a red flag for a study

20 when: "The laboratory requires, encourages, or recommends that physicians who enter into

21 Registry Arrangements perform the tests with a stated frequency (*e.g.*, four times per year) to be

22 eligible to receive, or to not receive a reduction in, compensation."  The KOAR study did exactly

23 this, requiring testing at predetermined intervals.  The OIG also warns of studies where: "The

24 laboratory collects comparative data for the Registry from, and bills for, multiple tests that may be

25 duplicative (e.g., two or more tests performed using different methodologies that are intended to

26

27 _____

[23]  https://oig.hhs.gov/documents/special-fraud-alerts/866/OIG_SFA_Laboratory_Payments_
28 06252014.pdf.

1    provide the same clinical information) or that otherwise are not reasonable and **necessary**."  The

2    KOAR study met this criterion as well, as it required testing at predetermined intervals without

3    regard to medical necessity as required by Medicare coverage guidelines.

4        88.    The OIG further warns of situations where: "Compensation paid to physicians

5    pursuant to Registry Arrangements is not fair market value for the physicians' efforts in collecting

6    and reporting patient data."  FE-8 has affirmed that CareDx paid **many times above market value**

7    for patient enrollment – $35,000 to $40,000 per patient – seven to eight times the normal $5,000

8    fee.  The OIG also warns of situations where: "The tests associated with the Registry Arrangement

9    are presented on the offering laboratory's requisition in a manner that makes it more difficult for

10    the ordering physician to make an independent medical necessity decision with regard to each test

11    for which the laboratory will bill."   Again, CareDx's conduct fit exactly this description, as

12    according to Dr. Olymbios, CareDx "intentionally excluded from the test requisition form a field

13    where a physician could indicate the reason why the test was medically necessary," so that the

14    Medicare personnel handling reimbursement would not be immediately tipped off that medical

15    necessity was required, and was not actually extant, for the particular test.

16        89.    And finally, the OIG warns against studies where: "Compensation paid to

17    physicians pursuant to Registry Arrangements is not supported by documentation, submitted by

18    the physicians in a timely manner, memorializing the physicians' efforts."  FE-8 explained that the

19    KOAR study violated this condition as well, as there were 16,000 pages of missing/outstanding

20    documents that should have been recorded into CDNA's central data base by the 57 transplant

21    centers/sites conducting the study, meaning "the KOAR study did not have a full data set."

22    Clinician FE-8 "tried to get this study cleaned up so that management could publish the correct

23    information to the public," but the AlloSure testing centers "were not entering the data into the

24    electronic data base system."

25

26

27

28

E.      **The Truth Begins to Emerge**

1.      **CareDx Simultaneously Announces Multiple Government Investigations and Falling ASPs but Maintains There Has Been "No Change" in Its Medicare Billing Practices**

90.     The truth of Defendants' fraudulent scheme first began to emerge on October 28, 2021, after market close, when the Company reported is financial results for the third quarter of 2021 and filed its Form 10-Q for that quarter with the SEC (the "3Q 2021 10-Q").

91.     The Company's 3Q 2021 10-Q disclosed for the first time that CareDx was under investigation by no fewer than ***three separate federal and state regulators*** – the DOJ, the SEC, and an unnamed state regulatory agency – in connection with a False Claims Act investigation "regarding certain business practices relating to our kidney testing and phlebotomy services," as well as "certain of our accounting and public reporting practices."

United States Department of Justice and United States Securities and Exchange Commission Investigations

The Company recently received a civil investigative demand (CID) from the United States Department of Justice (DOJ) requesting that the Company produce certain documents in connection with ***a False Claims Act investigation being conducted by the DOJ regarding certain business practices related to our kidney testing and phlebotomy services***, *and a subpoena from the United States Securities and Exchange Commission (SEC) in relation to an investigation by the SEC in respect of matters similar to those identified in the CID, as well as certain of our accounting and public reporting practices*. *The Company also received an information request from a state regulatory agency* and may receive additional requests for information from the DOJ, SEC, or other regulatory and governmental agencies regarding similar or related subject matters.

92.     Strikingly, while the Company has still never, to date, disclosed the full details of these investigations, former employees with direct knowledge of the matter have confirmed that the investigations concern improper practices in the Company's RemoTraC program, including improperly bundling the Company's expensive AlloSure and AlloMap tests with routine screening tests; for example, FE-3 expressly confirmed that he was interviewed by the DOJ in connection with the investigation, and that most of the questions concerned CareDx's insistence on only providing mobile phlebotomy tests if AlloSure was included, regardless of whether it was medically necessary.

93.     Also on October 28, 2021-the same day CareDx reported the DOJ, SEC, and state regulatory investigations-Defendants reported dramatically disappointing financial results.   Of particular concern was that, while testing volume had grown 86% year-over-year, with approximately 40,000 AlloSure and AlloMap tests performed in the quarter, testing services revenue had grown only about half as fast, or approximately 46%.   This meant that the Company's ASP per test had actually declined substantially; indeed, simple calculations revealed that *ASP had declined a whopping 20% from the same quarter prior year*.

94.     On this news, the Company's stock price fell from a closing price of $70.34 per share on October 28, 2021 to a closing price of $51.00 per share on October 29, 2021 or *27.5% in a single day*.

95.     Analysts expressed concerns about these striking developments.   For example, during the Company's October 28, 2021 earnings call, an analyst from Craig-Hallum Capital Group asked defendants Dhingra and Seeto to "comment on the lower ASPs in the quarter," noting: "[I]f you take the testing revenue over volume, the price per test looks like it came down" and that "*the difference was pretty pronounced this quarter*."   In light of both the ongoing regulatory investigations and the stark decline in ASPs, the analyst asked: "*[A]re you seeing any changes in Medicare billing practices*?   Or what else would really influence that test price lower?"   Defendant Dhingra, however, unequivocally assured the analyst there had been "*no change*" related to Medicare billing.   Specifically, Dhingra stated: "To your specific question, *any change in the billing practices?   No, no change.   We haven't observed anything on the Medicare billing practices*."   Instead, Dhingra expressly assured that declining ASPs were due to "primarily the business mix, where the volume growth is exceptionally strong, but the mix continues to evolve away from the core Medicare business."   Defendant Seeto similarly assured that the cause of declining ASPs was a "change in the payer mix."

96.     Analysts expressed concern that the investigations could have serious implications for CareDx's business; for example, a BTIG report noted: "*The fact that [CareDx] is being investigated by three different entities, both federal and at the state level, is notable, and that "disclosures of these sort typically bear some degree of merit*."   Relatedly, analysts also

1    questioned management's official explanation for its ASP declines.  The same Craig Hallum

2    analyst who had asked if anything had changed in the Company's Medicare billing practices

3    reported: "***Rationale [for ASP decline] was higher commercial coverage, though we still***

4    ***question what changed q/q***."  A Raymond James report similarly noted that the Company had

5    cited "a shift towards commercial [payors] ***but offered little additional context***," and found that

6    "***ASP dynamics, which received major focus on the call, are admittedly a bit murky***."

                  **2.**    **Stymied by Government Scrutiny, RemoTraC Quietly and**
7                                         **Mysteriously Recedes from the Company's Public Statements**

8          97.    Before and during the Class Period, Defendants had made CareDx's RemoTraC

9    home testing program central to the Company's earnings reports and calls, touting it as a "core

10   part of [the] business" and a "sustainable" foundation of CareDx's "direct-to-patient strategy" in

11   both the short and long-term which was allowing "significant[ly] higher penetration for our tests."

12   By the second half of 2021, however, with RemoTraC under investigation by the DOJ and SEC,

13   the Company quietly pivoted away from its discussion of the program.

14         98.    The last mention of RemoTraC during Defendants' conference call presentations

15   came on February 24, 2022, during the Company's earnings call, in which Defendants limited

16   themselves to stating that: "[W]e have more than 11,000 patients who have direct access to

17   RemoTraC."  No longer was RemoTraC a key talking point that was used to convince investors

18   that the Company's rapid growth was "sustainable."

19         99.    As late as the Company's 1Q 2022 10-Q, filed on May 5, 2022, the Company still

20   briefly discussed the supposed wide reach and growth of its RemoTraC program, highlighting that,

21   "to date, more than 200 transplant and nephrology centers can offer RemoTraC to their patients

22   and over 12,000 kidney, heart and lung transplant patients have enrolled."  The Company touted

23   RemoTraC as one of the reasons "the Company has been able to maintain low levels of interruption

24   to its testing services volumes."

25         100.    However, subsequent to May 5, 2022, substantive information about the

26   RemoTraC program has simply disappeared from all of the Company's public filings and investor

27   presentations to date.  Defendants never gave any explanation as to why they simply stopped

28

1    talking about RemoTraC, after previously hyping it as an innovative program and "sustainable"

2    core foundation of the Company's business model that had salvaged the Company's growth.

3              **3.    CareDx Senior Executive Dr. Michael Olymbios Publicly**
                **Blows the Whistle on Defendants' Fraudulent Business**
4              **Practices, and CareDx's ASP Decline Continues**

5              101.    On April 15, 2022, Dr. Olymbios filed the Olymbios Complaint in California

6    Superior Court.    As described further above, Dr. Olymbios revealed Defendants' serious,

7    pervasive misconduct, including that: (a) "CareDx ***used what it represented to be clinical tests*** to

8    bill Medicare for [AlloSure].  Multiple nephrology practices expressed serious reservations about

9    this practice as ***a violation of Medicare billing requirements***, and CareDx employees internally

10   flagged this practice as impermissible"; (b) "CareDx offered unrestricted grants to physicians to

11   not enroll patients in competitors' clinical trials or to induce practices to place patients on an

12   AlloSure surveillance protocol, even when doing so was ***not warranted or authorized under***

13   ***Medicare billing guidelines***"; and (c) "CareDx ***intentionally excluded*** from the [Allosure] test

14   requisition form a field where a physician could indicate the reason ***why the test was medically***

15   ***necessary***."  Dr. Olymbios publicly blew the whistle on these practices after reporting them to

16   "***more than ten*** other current or former CareDx employees, ***including Peter Maag***, then the Chief

17   Executive Officer for CareDx, ***and Reg Seeto***, the current President and Chief Executive Officer

18   of CareDx."  The senior "***CareDx executives brushed off his concerns or berated him for raising***

19   ***them in the first place***."  They "repeatedly ignored or actively quashed any internal concerns about

20   its activity."  To cite one such instance: "In September 2020, Dr. Olymbios texted other employees

21   that he had a legal call with Reg [Seeto]" and "[a]nother employee responded, '***because we are***

22   ***Medicare frauds***?'  A different employee replied, '***We're a bunch of crooks and frauds***.'"  Upon

23   the filing of the Olymbios complaint, CareDx's common stock fell by 8.08%, to close at $32.55

24   per share on April 15, 2022.

25             102.    On May 5, 2022 – just three weeks after Dr. Olymbios filed his Complaint –

26   CareDx filed its quarterly report for the first quarter of 2022 on Form 10-Q with the SEC and

27   issued its earnings press release for the quarter, revealing the continuing fallout from the

28   Company's historic reliance on overbilling Medicare and engaging in sales and marketing

1  misconduct.  The Company's 10-Q repeated its prior revelation from October 28, 2021 that it was

2  under investigation by the DOJ, the SEC and by a state agency, showing the Company was ***still***

3  under investigation at least six months after the government demanded internal documents from

4  the Company.

5      103.    CareDx again reported disappointing financial results, and ASPs declined to just

6  $1,560 per test – a decline of nearly 5% from the previous quarter, and nearly 13% from the same

7  quarter of the prior year.

8      104.    Analysts again focused on the Company's continuing slide in ASPs.  On May 6,

9  2022 Craig-Hallum analysts reported that "***ASPs were a miss***," noting not only that the lower ASPs

10  "dragged the Testing Services down *well below our number*" but that even "accounting for the

11  lower ASPs, Testing Services sales certainly came up short this quarter."  On the same day,

12  analysts from BTIG published a similar report, observing, "Q1 testing services revs of $66M

13  (+12% Y/Y, -3% q/q) missed our $70ME, ***marking the first time testing revs were down q/q since***

14  ***Q3/17***."

15      105.    Overall testing revenues were down primarily because Medicare revenue growth

16  continued to plummet after the Company came under investigation by the DOJ, SEC, and a state

17  regulator in mid-2021, as the following chart illustrates:

18

19

20

21

22

23

24

25

26

27

28



106.    As a result of weak ASPs and testing revenue, the Company incurred a net loss of $19.7 million as compared to a loss of $687,000 for the first quarter of 2021 – the quarter when the Company launched its RemoTraC testing scheme.

107.    On these disclosures, the Company's stock price per share fell from $31.66 on May 5, 2022 to $25.78 on Friday, May 6, 2022 – a decline of *18.6%* in one day.  The Company's stock price continued to fall as trading resumed on Monday, May 9, 2022, closing at $22.46 per share for a two-day decline of 29%, and investors suffered the consequences.

108.    In its May 5, 2022 earnings call, the Company again attempted to blame its flagging testing services results and plummeting ASPs on a supposing shift in the "mix" of business, and this time also blamed a purported shift of kidney patients from standard Medicare plans to Medicare Advantage plans-commercially run, privately operated health plans that operated as Medicare health plans and under Medicare rules.  Specifically, defendant Seeto stated that ASP declines were, in part, because "*in kidney testing, we saw patients shift from Medicare to Medicare Advantage plans per the changes introduced with the CARES Act last year*."  However, as would later be revealed, the true cause of CareDx's declining ASPs was that, under greater scrutiny, it was no longer able to get away with billing for medically unnecessary tests.  Indeed, as Defendants would later admit, and as discussed further below, Medicare Advantage plans – which *had to follow the exact same coverage rules as Medicare* – were simply denying claims for CareDx's AlloSure tests.

### 4.    CareDx's CFO and Chief Marketing Officer Each Suddenly Resign

109.    On May 23, 2022, CareDx surprised investors by announcing that its CFO, defendant Ankur Dhingra, had notified the Company of his resignation.  Strikingly, the press release announcing his resignation stated that Dhingra had only notified the Company of his resignation on May 18, 2022, and that his resignation would be effective May 25, 2022 – only one week after he gave notice.  The Company went out of its way to specifically assure investors that Dhingra's resignation was "not a result of any disagreement with the Company or any matter relating to its accounting or financial policies or procedures or regulatory matters."  However, the

1    announcement caused CareDx's stock price to fall 7.5%, from a close of $25.86 per share on

2    Friday, May 20, 2022, to a close of $23.92 per share on Monday, May 23, 2022, on unusually high

3    volume.  A Jefferies analyst report noted that the resignation was "*surprising, coming barely more*

4    *than a year since he joined CDNA*," and took note that it "*comes in the midst of certain ongoing*

5    *gov't investigations*."

6         110.    Just three months later, on September 1, 2022, the Company announced that its

7    Chief Marketing Officer and Chief Commercial Officer, Sasha King, had announced her

8    resignation from the Company on August 30, 2022, effective September 16, 2022.  Just as

9    defendant Dhingra had done, King provided short notice of her resignation: a mere two weeks.  On

10   this news, CareDx's stock price fell from a close of $20.31 per share on September 1, 2022 to a

11   close of $18.33 per share on September 2, 2022 – a decline of 10% – on unusually high volume.

12        **F.    The Truth Is Finally Fully Revealed**

13        111.    On November 3, 2022, after market close, the Company reported earnings for the

14   third quarter of 2022.  The Company's financial results were ***disastrous***.  The Company's net loss

15   widened by more than 40%, from $11.9 million in 3Q 2021 to $16.9 million in 3Q 2022.  And

16   critically, in spite of 15% growth in the number of tests performed versus the same quarter prior

17   year, testing services revenue had actually ***declined*** by 3% from the same quarter prior year, from

18   $66.5 million to $64.8 million.  This meant that even as the Company foisted more and more tests

19   onto patients, its total revenue from those tests was ***shrinking***.  Indeed, based on its reported

20   volume of 46,500 tests performed versus its $64.8 million in testing services revenue, ASP had

21   declined to an all-time low of roughly $1,390 per test administered – a more than ***30% decline***

22   since 2020.

23        112.    In attempting to put a positive spin on these disastrous results, Defendants made a

24   striking admission: that test revenue and ASPs were not actually declining primarily because of

25   "payor mix" or an increase in patients with commercial insurance that reimbursed CareDx at lower

26   rates, but because ***CareDx's tests were increasingly being denied any reimbursement at all***.

27   Specifically, CareDx announced an entirely new metric – Average Selling Price per ***reimbursed***

28   test, and told investors that this number had been "consistent" since Q1 2021, with an average

reimbursement of $2,500 per reimbursed test every quarter.  Defendants touted this "consistent" number as a positive, insisting that *when CareDx was reimbursed*, its pricing per test had not actually declined.  However, critically, this meant that CareDx's declines in overall ASP were actually the result of a sharp increase in *unreimbursed* tests.  As defendant Jain made clear, CareDx's "ASP *on paid test[s]* was slightly above $2,500 in Q1 '21 and has remained above $2,500 in this most recent quarter," which was "*in contrast to our overall ASP, which includes non-covered tests*."  Indeed, as simple calculations could show, and as Jain would expressly confirm in a later investor conference call (on November 15, 2022), *CareDx was now being denied any reimbursement whatsoever for as many as 50% of all tests it administered*.

113.    Indeed, in direct response to an analyst question regarding "how should we think about the ASP trend as we model out next year in a degree of further erosion," defendant Seeto further reaffirmed: "[W]hen we get reimbursed, we're reimbursed at a pretty constant rate," whereas, "*[w]here we're not reimbursed, that's what we have to work on*."  In fact, the problem was purportedly so significant that CareDx announced it would have to redouble its efforts on "collections," and had brought in a third-party consultant to do so.

114.    Making matters worse, the Company's financial disclosures showed that its total Medicare revenue was continuing to decline as Medicare was simply rejecting more and more of CareDx's fraudulently administered tests.  Indeed, in the third quarter of 2022, CareDx's *total* revenue from Medicare – its most critical source of revenue – fell almost 9% from the same quarter prior year, from $46 million to $42 million.  Indeed, after several quarters of *explosive* growth in Medicare revenue from the Company's RemoTraC scheme, that growth had suddenly hit a wall and reversed under scrutiny from the DOJ and SEC.

115.    On this news, CareDx's stock price fell from a close of $18.73 per share on November 3, 2022, to $16.02 per share on November 4, 2022 – a decline of more than 14% – on unusually high volume.

116.    Analysts from Craig-Hallum issued a scathing report on November 4, 2022, expressing dismay at "another disappointing quarter."  The Craig-Hallum analysts noted they had expected CareDx's growth to improve as transplant volumes rose – just as management had

1  assured would happen – but that instead, the opposite was true, as "growth during this year has

2  only trickled lower."  The report lamented that "C[areDx]-wide net ***ASPs also continued their***

3  ***freefall***," and ***entirely rejected*** management's ostensible explanations that "the weakness was

4  again driven by a higher mix of commercial patients, incremental Medicare sequestration

5  headwinds and more tests from non-kidney tests (which have less coverage)."  Instead, the report

6  determined, given CareDx's own claim that its pricing on reimbursed tests had not changed, the

7  poor results reported by CareDx could only lead to one conclusion: "***more tests are not being***

8  ***paid***," (*i.e.*, reimbursed):

> Management said the weakness was again driven by a higher mix of commercial
> patients, incremental Medicare sequestration headwinds and more tests from non-
> kidney tests (which have less coverage).  Headwinds from the shift to Medicare
> Advantage were said to be abating, with the culprit being more from a pickup in
> commercial tests at community nephrology, plus heart and lung growth which all
> have higher private mixes.  ***However, our model points to kidney net ASPs***
> ***dropping $110 q/q to $1,600 and were $1,920 to start the year.  The company did***
> ***say that when tests are paid, the rate is unchanged and is >$2,500.  Conclusion***
> ***is more tests are not being paid***.

14  117.  The report warned that "no concrete timelines were given on a plateau or reversal

15  of pricing declines," and Craig-Hallum lowered its price target from $51 per share to just $32 per

16  share.

17  118.  In total, after the Company's misrepresentations propelled CareDx's stock price as

18  high as a close of $95.11 per share on June 28, 2021 – near its all-time high – CareDx's stock price

19  fell to just $16.02 per share after the Class Period, losing more than 83% of its value after

20  revelations of Defendants' fraudulent scheme, and wiping out billions of dollars in market

21  capitalization.

### G.     Post Class-Period Events Further Confirm the Fraud

23  119.  Shortly after the end of the Class Period, CareDx's main competitor, Natera,

24  reported financial results that completely eviscerated CareDx's excuses that changes in "payor

25  mix" or a shift to Medicare Advantage plans had been the causes of their declining testing services

26  business, and further confirmed the catastrophic impact that government investigations were

27  having on CareDx.  By way of background, Natera markets a substantially similar kidney test to

28  CareDx's AlloSure Kidney test known as Prospera Kidney.  Prospera Kidney relies on effectively

1   the same technology as AlloSure Kidney, and is reimbursed under the same Medicare Local

2   Coverage Decision, for the same indication (clinical suspicion of rejection) and even at the same

3   price – $2,841 per test.

4           120.    On November 8, 2022, Natera reported its own financial results for the third quarter

5   of 2022.  During its earnings call following those results, Natera's CEO affirmed that, in contrast

6   with CareDx's claims that a shift to commercial insurance and Medicare Advantage business had

7   caused its ASP woes, Natera's kidney test "*ha[dn't] been impacted by Medicare Advantage or*

8   *commercial mix shift as our peer mix has remained stable*."  Indeed, in sharp contrast to CareDx,

9   who had seen its total Medicare revenue decline by 9%, Natera made clear that "*we're seeing*

10  *Medicare consistently reimbursed*."  Indeed, commenting on Natera's earnings, the same Craig-

11  Hallum analyst who covered CareDx noted the contrast between the two companies as "*going*

12  *against [CareDx]'s commentary*": "[Natera] [m]anagement did note some pressure to ASPs from

13  these uncovered volumes *but has not seen an impact from a mix shift or the move to Medicare*

14  *Advantage, going against CDNA's commentary*." The marked contrast between CareDx's and

15  Natera's Medicare reimbursement for a near-identical test only further confirms that CareDx's

16  testing business had relied on Medicare fraud, and that it was now declining due to greater

17  government scrutiny, not market factors.

18          121.    On November 15, 2022, at the Jefferies London Healthcare Conference, CareDx

19  executives made additional admissions that further revealed that the true cause of CareDx's ASP

20  declines was that they were no longer able to get reimbursed for the medically unnecessary tests

21  they had once fraudulently billed for.  First, CFO Jain now fully acknowledged that as much as

22  "*50% of [our] tests are not being paid*."  And second, Defendants now admitted that part of the

23  reason for this enormous number of unpaid tests was that Medicare Advantage plans – which

24  operated under the same coverage rules as Medicare – were simply applying greater scrutiny to

25  CareDx's fraudulent claims for unnecessary tests.  Specifically, an analyst focused on Defendants'

26  prior claims that CareDx was working on improving collections from Medicare Advantage plans.

27  The analyst asked: "Is that a 12 month process?  *Why does it feel like we haven't seen any benefits*

28

1    *from improved M[edicare] A[dvantage] collections*?"  Strikingly, CFO Jain responded that the

2    problem was that Medicare Advantage was simply *more stringent about paying claims*.

3         122.    Specifically, CFO Jain explained: "There's a pre-submission process, there is

4    submission of the claim and then comes the appeals process.  So when we started to see the shift

5    last year from Medicare to the Medicare Advantage, now on the pre-submission side . . . *they are*

6    *requesting a lot of information around the medical records, the insurance information, and then*

7    *the prior authorization [of the test by a medical provider]*."  In other words, unlike with Medicare

8    during the pandemic, CareDx now faced intensive scrutiny of its fraudulent medical claims.

9    Indeed, as Jain complained, "even after you submit [the claim], *they will basically reject the claim*

10   *for [the] smallest of . . . reasons*."  Jain further explained that, after its claims were rejected, the

11   Company would have to go through a series of appeals, "a fairly long process" before the Company

12   could collect – if ever.   Indeed, Jain admitted that, while the Company was building

13   "infrastructure" to improve collections from Medicare Advantage plans, "this whole infrastructure

14   has to work like a well-oil[ed] machine because [if] one process . . . were to fail, *then you will not*

15   *be able to collect the money*."  Jain's excuses about purported difficulties getting claims paid by

16   Medicare Advantage plans were in stark contrast to competitor Natera's comments that it "*ha[dn't]*

17   *been impacted by Medicare Advantage*," and had "*seen Medicare consistently reimbursed*."

18   Jain's claims thus only further underscored that the real reason CareDx's ASPs and Medicare

19   revenue were declining was that it was no longer able to fraudulently bill Medicare for medically

20   unnecessary tests.

21        123.    Indeed, trends in CareDx's total Medicare revenue only further confirm that the

22   Company's decline in ASP could not have been simply due to factors like a shift from Medicare

23   to Medicare Advantage plans, as revenue from Medicare Advantage plans would still be included

24   in overall Medicare revenue.  Instead, it is clear that CareDx's Medicare revenue growth reversed

25

26

27

28

1   and then declined exactly when the Company came under scrutiny in mid-2021 for its illegal

2   practices, as the graph below makes clear.[24]



124.   Strikingly, both CareDx's Medicare revenue and its overall testing services revenue

declined even as the number of tests it performed continued to grow significantly.  This dramatic

divergence further underscores that, once it came under government scrutiny, CareDx was

increasingly unable to attain reimbursement for its medically unnecessary tests.

<hr>

[24]   CareDx has not disclosed exactly when it received the DOJ CID or was otherwise put on notice
of the DOJ, SEC, or state regulatory investigations of its practices.

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20



21  Finally, on November 16, 2022, a Medicare committee held a meeting that unequivocally

22  confirmed the real reason as many as 50% of CareDx's tests were being rejected for reimbursement

23  was that CareDx was improperly billing for tests that were not medically necessary.  Specifically,

24  the very Medicare contractors who determine Medicare coverage of CareDx's tests invited CareDx

25  to a Contractor Advisory Committee ("CAC") meeting concerning tests for rejection of kidney

26  and liver transplants.  The following day, on November 17, 2022, Craig-Hallum analysts who

27  covered the CAC meeting warned that ***Medicare had used "harsh language"*** questioning CareDx

28

on why there had apparently been "unexpected utilization" of its tests for non-covered uses. Specifically, Craig-Hallum reported:

> MolDx [Medicare's Molecular Diagnostic Services program] held a Contractor Advisory Committee (CAC) meeting yesterday to discuss a range of topics around non-invasive transplant testing. . . .  The meeting invite **included strong language perking everyone's attention** stating: MolDx "requested an internal reconsideration of [transplant diagnostic coverage] after noting **unexpected utilization patterns that are outside of expectations based on evidentiary review and manufacturer documentation." Unexpected utilization is harsh language from Medicare**.

In other words, Medicare clearly had become fully aware of CareDx's scheme to bill for tests that were **not** medically necessary and did not meet coverage requirements and was no longer allowing CareDx's scheme to continue.

## V.     FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

125.     Defendants made false and misleading statements and material omissions during the Class Period in violation of §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.   Throughout the Class Period, CareDx's press releases, investor presentations, and public SEC filings included material misstatements and/or omissions concerning the Company's business and operational practices and its AlloSure kidney testing and mobile phlebotomy services.   Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of CareDx business, operational status, profitability, future growth prospects, and compliance with applicable laws and regulations, all of which artificially inflated the price of CareDx's common stock.

### A.     CareDx's January 21, 2021 8-K

126.     On January 21, 2021, in connection with the filing of the Company's prospectus offering up to 2,211,538 shares of common stock to the investing public at $91 per share, the Company published on Form 8-K its underwriting agreement with Goldman Sachs & Co. LLC and Jeffries LLC.   Therein, the Company made extensive and specific representations that "to the Company's knowledge, its directors, employees and agents are in material compliance with all health care laws applicable to the Company," going on to name numerous specific applicable statutes and regulatory schemes.   The Form 8-K further affirmed that CareDx was aware of "no

1    facts or circumstances that would reasonably be expected to give rise to material liability of the

2    Company under any Health Care Laws":

3         <u>Compliance with Health Care Laws</u>. ***The Company and, to the Company's***
     ***knowledge, its directors, employees and agents (while acting in such capacity)***
4    ***are in material compliance with, all health care laws applicable to the Company***,
     or any of its products or activities, ***including, but not limited to, the federal Anti-***
5    ***Kickback Statute*** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law (42
     U.S.C. Section 1320a-7a(a)(5)), ***the civil False Claims Act*** (31 U.S.C. Section 3729
6    ***et seq.***), ***the administrative False Claims Law*** (42 U.S.C. Section 1320a-7b(a)), the
     Stark law (42 U.S.C. Section 1395nn), the Health Insurance Portability and
7    Accountability Act of 1996 (42 U.S.C. Section 1320d *et seq.*) as amended by the
     Health Information Technology for Economic and Clinical Health Act (42 U.S.C.
8    Section 17921 *et seq.*), the exclusion <u>laws</u> (42 U.S.C. Section 1320a-7), the Federal
     Food, Drug, and Cosmetic Act (21 U.S.C. Section 301 *et seq.*), the Controlled
9    Substances Act (21 U.S.C. Section 801 *et seq.*), the Public Health Service Act (42
     U.S.C. Section 201 *et seq.*), the Clinical Laboratory Improvement Amendments of
10   1988 (42 U.S.C. Section 263a), Medicare (Title XVIII of the Social Security Act),
     Medicaid (Title (Title XIX of the Social Security Act), and the ***Patient Protection***
11   ***and Affordable Care Act of 2010, as amended by the Health Care and Education***
     ***Reconciliation Act of 2010***, the regulations promulgated pursuant to such laws, and
12   any other state, federal or foreign law, accreditation standards, regulation,
     memorandum, opinion letter, or other issuance which imposes requirements on the
13   manufacturing, development, testing, labeling, advertising, marketing or
     distribution of drugs and medical devices (including diagnostic products),
14   ***kickbacks***, patient or program charges, recordkeeping, claims process,
     documentation requirements, ***medical necessity***, referrals, the hiring of employees
15   or acquisition of services or supplies from those who have been excluded from
     government health care programs, quality, safety, privacy, security, licensure,
16   accreditation or any other aspect of providing health care, clinical laboratory or
     diagnostics products or services (collectively, "Health Care Laws").

17

18       127.    The Company's statements and those attributed to its "directors, employees, and

19   agents" above concerning material compliance with all Health Care Laws, and specifically the

20   False Claims Act and False Claims Law, the Anti-Kickback Statute, and "medical necessity [and]

21   referrals," were false and misleading.  In reality, as Defendants knew, and as described further

22   above, the Company and its directors, employees, and agents were ***not*** in material compliance with

23   these laws and regulations but were in fact recklessly and/or intentionally violating them on a

24   systematic basis.  Indeed, Maag created – and Seeto helped execute – the RemoTraC scheme to

25   supercharge CareDx's Medicare misconduct.  As alleged further above, Defendants deliberately

26   and systematically used RemoTraC to bill Medicare for tests that were ***not*** medically necessary

27   and did ***not*** meet Medicare's requirements, in direct violation of the False Claims Act.

28

128.    Defendants' scheme further systematically violated the Anti-Kickback Statute and the Sunshine Act, as Defendants improperly paid kickbacks to phlebotomists to draw blood for their unnecessary AlloSure tests, as well as regularly provided physicians with limousine rides, expensive hotel stays, luxurious dinners, bottles of champagne, and other gifts, as well as grossly excessive direct payments for enrolling their Medicare patients in CareDx "studies" – all without disclosing those facts to the government.  In fact, the CMS data portal wherein payments and gifts are normally reported under the Sunshine Act simply states there is "No Data Available" from CareDx for the years 2017 through 2021, suggesting CareDx had not reported *any* of its payments, incentives, inducements, or gifts to physicians in any of the past five years.

**B.    The February 18, 2021 BTIG Virtual MedTech, Digital Health, Life Sciences, and Diagnostic Tools Conference**

129.    On February 18, 2021, CareDx presented at the BTIG Virtual MedTech, Digital Health, Life Sciences, and Diagnostic Tools Conference.  In response to an analyst question about the growth drivers of CareDx's "record" year, defendant Seeto represented that "what worked really, really well for us [in the kidney space] during COVID is that centers were able to ask us for help and support and *we were able to address their needs and demands*.  *And I think RemoTraC is a really good example of that*."

130.    In direct response to a follow-up question about RemoTraC's current penetration and the viability of the service after the pandemic, defendant Seeto responded that the Company's business was "sustainable" and "going to be maintained" due to the "unmet need" it addressed:

> And I think what really stood out for me is that we were able to put together a offering and put together a structure within the course of four days.  And I don't think you can really do that as a company if you don't have preexisting relationships and a preexisting pool from within that transplant community.  So we were really pleased and honored to be able to then create this mobile phlebotomy service and scale it up, such that during Q2 40% of our testing was done through mobile.  And so that really was sort of a new model for us.  *And that business is now something, which is sustainable and it's going to be maintained* as 9 in 10 patients want to really keep the service. . . .  So, again, I think RemoTraC was addressing an *unmet need*.  And I think what helped us is we could move very quickly to bring it to bear particularly during a time of crisis in the transplant community.

131.    During the same conference, an analyst asked Seeto, "you guys are reporting your full fourth quarter the year end results next week.  But could you talk about kind of as we look to

1  2021 and a little beyond that, kind of where are the key growth drivers for the company?"

2  Defendant Seeto responded: "Yeah. So we have − if you focus on testing services where . . . *we*

3  *have a great winning formula* which is adding protocols, adding new centers."

4        132.  Defendant Seeto's statements above, including those concerning the drivers of

5  CareDx's record growth in 2020, the Company's "great winning formula," the penetration of

6  RemoTraC, and the "sustainability" of the Company's new business model focused on mobile

7  phlebotomy, which was purportedly addressing an "unmet need," were false and misleading.  In

8  reality, as defendant Seeto knew, the RemoTraC scheme was entirely built on illegal schemes that

9  violated the False Claims Act, the Anti-Kickback Statute, the Sunshine Act, and other laws and

10  thus was in no way "sustainable" or a "great winning formula."  Indeed, as alleged further above,

11  Defendants deliberately and systematically used RemoTraC to bill Medicare for tests that were

12  *not* medically necessary and did *not* meet Medicare's requirements, in direct violation of the False

13  Claims Act.

14        133.  Defendants' scheme further systematically violated the Anti-Kickback Statute and

15  the Sunshine Act, including by improperly paying kickbacks to phlebotomists to draw blood for

16  their unnecessary AlloSure tests, as well as regularly providing physicians with limousine rides,

17  expensive hotel stays, luxurious dinners, bottles of champagne, and other gifts, as well as grossly

18  excessive direct payments for enrolling their Medicare patients in CareDx "studies" – all without

19  disclosing those facts to the government.  In fact, the CMS data portal wherein payments and gifts

20  are normally reported under the Sunshine Act simply states there is "No Data Available" from

21  CareDx for the years 2017 through 2021, suggesting CareDx had not reported *any* of its payments,

22  incentives, inducements, or gifts to physicians in any of the past five years.

23      **C.**    **CareDx's February 24, 2021 Fourth Quarter and Full Year 2020**
24             **Conference Call**

25        134.  On February 24, 2021, CareDx held an earnings conference call to discuss its fourth

26  quarter and full year 2020 financial results.  During the call, defendant Seeto stated:

27           2020 was an exceptional year for CareDx as we continued to build out our
         product offerings while driving robust growth in our market of products.  That
28           being said, we believe we're just getting started.  Everything we do at CareDx has
         one focus and that is to be the leading partner for transplant patients and the

transplant ecosystem. ***This focus and commitment to the transplant community are the driving forces behind our growth***. And I expect 2021 to be another exciting year for CareDx.

135.    During the same conference call, an analyst asked:

> To start off with guidance, 2020 revs came in well ahead of your initial guidance, pretty impressive feat given the backdrop last year. Part of it tied to your quick turnaround with RemoTraC, but a number of other positive growth developments as well. So as we look out to 2021, Reg, can you perhaps talk about some of the key growth drivers for this year? And where you see the greatest potential for upside as well?

Defendant Seeto responded: "So ***we actually got a really nice engine of growth and I think testing serves as the area that we have focused on***. We have really ***great winning formula*** and we'll continue to win protocols within centers and add new centers. So that's sort of ***the winning formula we established***."

136.    During the same conference call, analysts repeatedly questioned Defendants on RemoTraC and its future prospects, and Defendants again reaffirmed RemoTraC's purported sustainability as a "***core part of our business moving forward***":

> Question – Unidentified Analyst: Thanks. And then just one last quick one on RemoTraC. I think you said it was 40% of volumes here in the fourth quarter. Any thoughts on how you're thinking about that in the first quarter here or full year 2021? And then any tweaks or improvements you've made to the program as you get more data and feedback as we approach the one year launch coming up next month?

> Answer – Reginald Seeto: Yes. No, with, I think, with RemoTraC, this is something that was probably the highlight of last year what we did as an organization as we rallied around supporting patients and transplant centers. It's with such an ***unmet need*** and we were able to put it together so quickly and had such a fantastic response now more than 150 centers are using it.

> In terms of – just thinking in terms of margin, we have – 40% were used in Q2 and then in Q3 that went to about 30% and then in Q4 we went back up to the higher end of the 40%. And so, ***we expect to have RemoTraC as the core part of our business***. . . . ***So it'll be a core part of our business moving forward***.

137.    Defendant Seeto's statements above, including those concerning the driving forces behind CareDx's growth, the Company's engine of growth in testing services, its "great winning formula," and the identification of RemoTraC as a "core part of our business going forward" that addressed an "unmet need" were false and misleading. In reality, as defendant Seeto knew, the RemoTraC business was built on illegal schemes, and was thus not a sustainable "great winning

1    formula" or "engine of growth."  As alleged further above, Defendants deliberately and

2    systematically used RemoTraC to bill Medicare for tests that were ***not*** medically necessary and

3    did ***not*** meet Medicare's requirements, in direct violation of the False Claims Act.

4         138.    Defendants' illegal scheme was also unsustainable because it systematically

5    violated the Anti-Kickback Statute and the Sunshine Act, as Defendants were improperly paying

6    kickbacks to phlebotomists to draw blood for their unnecessary AlloSure tests, as well as regularly

7    providing physicians with a variety of gifts and inducements, as well as grossly excessive direct

8    payments for enrolling their Medicare patients in CareDx "studies" – all without disclosing those

9    facts to the government as required by law.

10        **D.    CareDx's May 5, 2021 First Quarter 2021 Financial Results Conference**

11        139.    On May 5, 2021, CareDx hosted an earnings conference call for the first quarter of

12   2021.  During the call, defendant Seeto stated: "For our record first quarter, total revenue was

13   $67.4 million, increasing 76% compared to a year ago quarter.  ***The driver of the quarter's growth***

14   ***was our testing services revenue***, which increased 89% to $59.3 million . . . ."

15        140.    During the earnings call, defendant Dhingra also touted RemoTraC, stating:

16        We continue to invest further in RemoTraC in our direct-to-patient part of the
         journey.  And that part reflects primarily in the testing services side of things.  So,
17        moving forward, we do expect as we build out RemoTraC, there will be some more
         investments through the year.  ***But overall, from our ability to drive margins purely***
18        ***from our testing services perspective, remains intact***.

19        141.    Analysts were keenly focused on the future of RemoTraC given its contribution to

20   the Company's revenues.  One analyst asked: "So, can we talk about RemoTraC a little bit?  You

21   guys are currently at 40% [of testing revenues for RemoTraC].  What do you think the steady-state

22   level of RemoTraC will be going forward?"  Defendant Dhingra responded:

23        Yes, I think we are at the levels that we are at now in that 40%, give or take a few
         points range.  And our expectation is that's a good run rate.  ***We don't expect***
24        ***substantial changes here in the near term.  And that's our view from the long-***
         ***term perspective as well***, is to say the size of the investment that we've made
25        substantially represents a good structure for us for the medium term here and
         ***enables us continuing improvement in the gross margins***, especially from a path
26        to 75% perspective.

27

28

142.     Defendants' statements above concerning CareDx's growth drivers, the Company's ability to "drive margins" in testing services, and the expectation of steady RemoTraC performance were false and misleading.  In reality, Defendants knew that the RemoTraC business was built on illegal schemes and thus could not possibly remain a "long-term" major component of the business that would "enable" CareDx to have "continuing improvement in the gross margins."  Indeed, as alleged further above, Defendants deliberately and systematically used RemoTraC to bill Medicare for tests that were **not** medically necessary and did **not** meet Medicare's requirements, in direct violation of the False Claims Act.  And Defendants' illegal scheme was also unsustainable because it systematically violated the Anti-Kickback Statute and the Sunshine Act, as Defendants improperly paid kickbacks to phlebotomists to draw blood for their unnecessary AlloSure tests, as well as regularly providing physicians with a variety of gifts and inducements, along with grossly excessive direct payments for enrolling their Medicare patients in CareDx "studies" – all without disclosing those facts to the government as required by law.

**E.     Defendants' June 8, 2021 Goldman Sachs Global Healthcare Conference**

143.     On June 8, 2021, CareDx presented at the Goldman Sachs Global Healthcare Conference. During the conference, analysts again questioned Defendants' about RemoTraC's purported success, asking:

> [Y]ou mentioned that RemoTraC, and I wanted to get to that, I've always been impressed by the pivot you guys made last year.  It was very impressive. . . .  How are you thinking about the investment and the cost side of RemoTraC going forward and the impact it might have on margins relative to the benefit that it's giving you in terms of connecting with the patient and an eventual – translate into eventual revenue, additional revenue?

Defendant Dhingra responded:

> I think the way we think about it, . . . ***RemoTraC is part of our structure***, right?  ***It enables certain aspects of our growth, both in the near term in terms of driving adoption with our patients, but also in terms of becoming a foundation for our direct-to-patient strategy as well***.  So what was developed as part of a response to the pandemic ***eventually drove significant higher penetration for our tests, has become a solid strategic foundation***.

144.    Defendant Dhingra's statements above concerning RemoTraC enabling growth, driving adoption, and being a solid strategic foundation were false and misleading.  As defendant Dhingra knew, RemoTraC was built on illegal Medicare billing and kickback schemes that could in no possible way serve as a "solid strategic foundation" for the Company.  Indeed, as alleged further above, Defendants deliberately and systematically used RemoTraC to bill Medicare for tests that were ***not*** medically necessary and did ***not*** meet Medicare's requirements, in direct violation of the False Claims Act.  And Defendants' illegal scheme was also unsustainable because it systematically violated the Anti-Kickback Statute and the Sunshine Act, as Defendants improperly paid kickbacks to phlebotomists to draw blood for their unnecessary AlloSure tests, as well as regularly providing physicians with a variety of gifts and inducements, along with grossly excessive direct payments for enrolling their Medicare patients in CareDx "studies" – all without disclosing those facts to the government as required by law.

**F.    Defendants' July 29, 2021, Second Quarter 2021 Earnings Call Statements**

145.    On July 29, 2021, Defendants reported financial results for the second quarter of 2021 and held a conference call to discuss the results.  During the call, defendant Seeto touted the Company's purportedly strong financial results, noting that: "For the second quarter results, total revenue was $74.2 million increasing 77% compared to the year ago quarter.  ***The main driver of growth in the quarter*** was from our testing services revenue, which increased 79% to $64.9 million."  Defendant Seeto also boasted that: "***We have also more than 9,000 patients that have signed up for RemoTraC***."

146.    During the same earnings call, in response to a question about "what types of things could we look out for that might render that growth rate unsustainable?"  Defendant Dhingra responded:

> Yes.  I think as where you're pointing, Mark, we have a fairly large and very attractive market in front of us where we're in the early stages of market penetration.  ***So the model that we are working on*** that Reg [Seeto] just described . . . on the direct to center side, where we continue to introduce and add our products into centers or continue to drive protocols and their adoptions.  ***That business model continues***.

147.    Defendants' statements above concerning the main drivers of CareDx's growth, the number of RemoTraC patients, and the continuation of the Company's business model were false and misleading.  Indeed, as alleged further above, Defendants deliberately and systematically used RemoTraC to bill Medicare for tests that were ***not*** medically necessary and did ***not*** meet Medicare's requirements, in direct violation of the False Claims Act.  And Defendants' illegal scheme was also unsustainable because it systematically violated the Anti-Kickback Statute and the Sunshine Act, as Defendants improperly paid kickbacks to phlebotomists to draw blood for their unnecessary AlloSure tests, as well as regularly providing physicians with a variety of gifts and inducements, along with grossly excessive direct payments for enrolling their Medicare patients in CareDx "studies" – all without disclosing those facts to the government as required by law.

**G.    Defendants' October 28, 2021 Third Quarter 2021 Financial Results Conference Call Statements**

148.    On October 28, 2021, during the CareDx's third quarter earnings conference call, defendant Seeto again touted the Company's financial results, stating that: "During Q3, we delivered record revenues of $75.6 million with growth of 42% over the prior year.  Notably, our Q3 testing services volumes grew 86% as compared to the year ago quarter."  Defendant Seeto elaborated that: "***The primary driver of revenue growth was from our testing services, which increased 46% to $66.5 million***.  CareDx provided approximately 40,000 AlloSure and AlloMap patient results, growing 86% from the prior-year quarter."

149.    During the same conference call, defendant Seeto also stated that:

> For kidney testing, we continue with ***our winning formula*** of protocol adoption and adding new centers.  As of the end of September, more than 70 kidney transplant centers in the United States have now adopted regular AlloSure testing and more than 320 kidney centers and community practices were using AlloSure[.] ***[A]nd mobile phlebotomy as a percent of volume maintained approximately at 40%***.

Discussing the purported shift towards non-Medicare business, Defendant Seeto stated: "We also continue to see a ***higher growth in non-Medicare business***.  Overall, ***our business model of market penetration through addition of centers and patients continues to drive strong performance of our testing services business***."

150.    In response to an analyst question about the utilization of RemoTraC during the Delta variant surge, defendant Seeto stated: "Overall RemoTraC that we see as *a core offering continues to do well*."

151.    During the same earnings call, in response to an analyst question about the factors impacting the 2022 outlook, defendant Dhingra remarked: "We expect our business model to *continue to drive adoption, both across centers as well as in case of kidney, the nephrology settings.  So that core business, we believe, can continue to drive meaningful double-digit growth*."

152.    Defendants' statements above concerning the primary drivers of CareDx's revenue growth, winning formula, and business model of market penetration were false and misleading. Indeed, as alleged further above, Defendants deliberately and systematically used RemoTraC to bill Medicare for tests that were *not* medically necessary and did *not* meet Medicare's requirements, in direct violation of the False Claims Act.  And Defendants' illegal scheme was also unsustainable because it systematically violated the Anti-Kickback Statute and the Sunshine Act, as Defendants improperly paid kickbacks to phlebotomists to draw blood for their unnecessary AlloSure tests, as well as regularly providing physicians with a variety of gifts and inducements, along with grossly excessive direct payments for enrolling their Medicare patients in CareDx "studies" – all without disclosing those facts to the government as required by law.

153.    During the same October 28, 2021 earnings call, concerned analysts also sought clarity on whether, in light of newly announced government investigations and the simultaneous sharp declines in ASPs, there had been "any changes in Medicare billing practices."  Specifically, a Craig-Hallum analyst asked:

> [c]an you comment on the lower [Average Selling Prices] in the quarter?  If you take the testing revenue over volume, the price per test looks like it came down versus Q2.  *And the difference was pretty pronounced this quarter*.  So just curious, *are you seeing any changes in Medicare billing practices?  Or what else would really influence that test price lower*?

In response, defendant Dhingra unequivocally asserted that there had been "*no change*" in the Medicare part of the business and that, rather, lower ASPs were the result of change in the "overall mix of business."  Specifically, Dhingra responded:

[S]o couple of observations there. ***One, . . . our overall mix of business, as we see higher adoption, we're seeing much higher mix of growth in the non-Medicare part of the business. And so that's the, by far, the largest impact***. A lot of that is driven by you're seeing higher attach rates, say, on the AlloSure side, where our mix of coverage is much lower than the traditional kidney business. So that's one of the big contributors.

To your specific question, any change in the billing practices? ***No, no change. We haven't observed anything on the Medicare billing practices***. It's primarily the business mix where the volume growth is exceptionally strong, but ***the mix continues to evolve away from the core Medicare business***.

154. Defendants' statements above concerning the higher mix of growth in the non-Medicare business impacting average selling prices and that nothing had changed with respect to Medicare billing practices were also false and misleading. Indeed, the true cause of Defendants' flagging Medicare growth and falling ASPs was ***not*** changes in payor mix caused by higher growth in the commercial business but the fact that, under scrutiny from the DOJ, the SEC, and a state regulator, the Company could no longer engage in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for unnecessary tests and pay illegal kickbacks to phlebotomists and prescribing doctors, in violation of Medicare rules, the False Claims Act, and the Anti-Kickback statute.

## H.     Defendants' February 24, 2022 Fourth Quarter 2021 and Full Year 2022 Financial Results Statements

155. On February 24, 2022, CareDx hosted a conference call to discuss the Company's fourth quarter and full year 2021 financial results. During the call, defendant Seeto remarked:

Q4 was another record quarter[] where we delivered revenues of $79.2 million, representing a growth of 35% over the prior year quarter. For the full year 2021, we reported revenues of $296.4 million, representing a growth of 54%. Notably, ***our record fourth quarter testing services volume*** of 41,900 tests represented a 67% year-over-year growth and led to our full year volume growth of 94% versus 2020.

defendant Seeto also touted that: "In addition, we have more than 11,000 patients who have ***direct access*** to RemoTraC." However, the Company's volume of 41,900 tests versus its testing services revenue of $68.65 million for the quarter meant that the Company's ASP had again declined, to just $1,638 per test, versus more than $2,014 per test in the same quarter of the prior year – a decline of almost 20%.

1    156.    In commenting on the decline in ASPs for the Company's tests, defendant Seeto

2    explained:

3        The amazing success of AlloSure Heart, combined **with higher growth of**
         **commercial versus Medicaid volumes in 2021 resulted in very strong volume**
4        **growth that materially outpaced our revenue growth**.

5            ***In addition, in kidney testing, we saw patients shift from Medicare to***
         ***Medicare Advantage plans for the changes introduced with the CARES Act last***
6        ***year***.

7    157.    Defendant Seeto's statements above concerning "record" testing volumes, the

8    number of patients with "direct access" to RemoTraC, and his purported explanations for the

9    Company's continuing decline in ASPs were false and misleading.    Indeed, undisclosed to

10   investors, ASPs were actually declining because Medicare – including Medicare Advantage plans

11   – was increasingly denying reimbursement for CareDx's clearly unnecessary and fraudulently

12   billed AlloSure tests, and because Defendants were quietly winding down the unsustainable

13   RemoTraC scheme under scrutiny from the DOJ, the SEC, and a state regulator.    As the Company

14   could no longer engage in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for

15   unnecessary tests and pay illegal kickbacks in exchange for blood sample collection and AlloSure

16   enrollment, Medicare revenue growth was plummeting.

17   **I.    CareDx's April 15, 2022 Form 8-K Statements**

18   158.    On April 15, 2022, in connection with the filing of the Company's prospectus

19   offering up to 200 million shares of common stock in an at the market offering, the Company

20   published on Form 8-K its underwriting agreement with Goldman Sachs & Co. LLC and

21   Jeffries LLC.    Therein, the Company represented:

22       <u>Compliance with Health Care Laws</u>.    ***The Company and, to the Company's***
         ***knowledge, its directors, employees and agents (while acting in such capacity)***
23       ***are in material compliance with, all health care laws applicable to the Company***,
         or any of its products or activities, ***including, but not limited to, the federal Anti-***
24       ***Kickback Statute*** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law
         (42 U.S.C. Section 1320a-7a(a)(5)), ***the civil False Claims Act*** (31 U.S.C.
25       Section 3729 *et seq.*), ***the administrative False Claims Law*** (42 U.S.C.
         Section 1320a-7b(a)), the Stark law (42 U.S.C. Section 1395nn), the Health
26       Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d *et*
         *seq.*) as amended by the Health Information Technology for Economic and Clinical
27       Health Act (42 U.S.C. Section 17921 *et seq.*), the exclusion laws (42 U.S.C.
         Section 1320a-7), the Federal Food, Drug, and Cosmetic Act (21 U.S.C.
28       Section 301 *et seq.*), the Controlled Substances Act (21 U.S.C. Section 801 *et seq.*),

the Public Health Service Act (42 U.S.C. Section 201 *et seq*.), the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. Section 263a), Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), and the ***Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010***, the regulations promulgated pursuant to such laws, and any other state, federal or foreign law, accreditation standards, regulation, memorandum, opinion letter, or other issuance which imposes requirements on the manufacturing, development, testing, labeling, advertising, marketing or distribution of drugs and medical devices (including diagnostic products), ***kickbacks***, patient or program charges, recordkeeping, claims process, documentation requirements, ***medical necessity***, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, licensure, accreditation or any other aspect of providing health care, clinical laboratory or diagnostics products or services (collectively, "Health Care Laws). . . . ***To the Company's knowledge, there are no facts or circumstances that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws***.

159.    The Company's statements and those attributed to its "directors, employees, and agents" above concerning material compliance with all Health Care Laws and specifically the False Claims Act, and False Claims Law, the Anti-Kickback Statute, and "medical necessity [and] referrals" were false and misleading.  In reality, as Defendants knew, and as described further above, the Company and its directors, employees, and agents were ***not*** in material compliance with these laws and regulations but were in fact recklessly and/or intentionally violating them on a systematic basis.  Indeed, Maag created – and Seeto helped him execute – the RemoTraC scheme to supercharge CareDx's Medicare misconduct.  As alleged further above, Defendants deliberately and systematically used RemoTraC to bill Medicare for tests that were ***not*** medically necessary and did ***not*** meet Medicare's requirements, in direct violation of the False Claims Act.

160.    Defendants' scheme further systematically violated the Anti-Kickback Statute and the Sunshine Act as Defendants improperly paid kickbacks to phlebotomists to draw blood for their unnecessary AlloSure tests, as well as regularly provided physicians with limousine rides, expensive hotel stays, luxurious dinners, bottles of champagne, and other gifts, as well as grossly excessive direct payments for enrolling their Medicare patients in CareDx "studies" – all without disclosing those facts to the government.  In fact, the CMS data portal wherein payments and gifts are normally reported under the Sunshine Act simply states there is "No Data Available" from

1    CareDx for the years 2017 through 2021, suggesting CareDx had not reported **any** of its payments,

2    incentives, inducements, or gifts to physicians in any of the past five years.

3    **J.    The May 5, 2022 First Quarter 2022 Financial Results Earnings Call Statements**

4

5    161.    On May 5, 2022, CareDx held a conference call to discuss the Company's first

6    quarter financial results.  During the earnings call, defendant Seeto stated that: "Now for Kidney

7    Testing Services, we continue the **winning formula** of adding AlloSure name protocols, adding

8    new centers, and expanding further into [community] nephrology."

9    162.    During the same earnings call, in an attempt to explain the continuing decline in

10   ASPs, defendant Dhingra stated:

11       Although we look at ASP by test offering, we understand some investors may look
         at revenues divided by total tests. This aggregate average price declined by about
12       4.9% versus last quarter of 2021.  This decline came from three factors: ***Higher
         growth in patients with commercial insurance*** across all organs, where we have
13       lower coverage today; changing volume mix between organs with strong success
         of AlloSure Heart and AlloSure Lung, where we have lower coverage today;
14       ***continued increase in Medicare [A]dvantage patients in our kidney Services***.

15   Defendant Dhingra elaborated:

16       Specific now to kidney.  Although the majority of patients are under
         Medicare, ***we have seen an increase in number of patients outside Medicare***,
17       which is specifically impacting AlloSure Kidney realized prices.  ***This mix shift
         has come from two areas.  First, execution of our strategic plan to focus on
18       community nephrology over the last 12 months, which has increased the number
         of patients on commercial coverage.  This is expected to continue as a core part
         of the growth strategy.***

19
         ***The second has been industry shift from Medicare to Medicare Advantage
20       plans, driven by the 21st Century Cures Act***.

21   163.    Defendant's statements above concerning the Company's "winning formula" and

22   the purported reasons for the continuing decline in ASPs were false and misleading.  Indeed,

23   undisclosed to investors, ASPs were actually declining because Medicare – ***including*** Medicare

24   Advantage plans – was increasingly denying reimbursement for CareDx's clearly unnecessary and

25   fraudulently billed AlloSure tests and because Defendants were quietly shutting down the

26   unsustainable RemoTraC scheme under scrutiny from the DOJ, the SEC, and a state regulator.

27   Indeed, as Defendants' would ultimately admit, as much as ***half*** of the Company's AlloSure

28   Kidney tests were not being approved for ***any*** payment.  As the Company could no longer engage

1    in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for unnecessary tests and

2    pay illegal kickbacks to phlebotomists and prescribing doctors in violation of Medicare's

3    "clinically necessary" condition to AlloSure reimbursement and the False Claims Act, Medicare

4    revenue growth was plummeting.

5    **VI.    ADDITIONAL SCIENTER ALLEGATIONS**

6        164.    As alleged herein, Defendants acted with scienter because they knew or recklessly

7    disregarded the public documents and statements issued or disseminated in the name of the

8    Company during the Class Period were materially false and misleading; knew or were reckless as

9    to whether such statements or documents would be issued or disseminated to the investing public;

10    and knowingly and substantially participated or acquiesced in the issuance or dissemination of

11    such statements or documents as primary violations of the federal securities laws.

12        165.    As set forth herein, the Individual Defendants, by virtue of their receipt of

13    information reflecting the truth regarding CareDx; their control over, receipt, and/or modification

14    of CareDx's allegedly materially misleading statements and omissions; and/or their positions with

15    the Company that made them privy to confidential information concerning CareDx, participated

16    in the fraudulent scheme alleged herein.

17        **A.    Dr. Olymbios and Other Former Employees Reported and Discussed**
           **Defendants' Schemes with High Ranking Executives and Were**
18        **Rebuffed or Ignored**

19        166.    Dr. Olymbios and other former employees reported and discussed CareDx's illegal

20    practices with executives.  CareDx has admitted in a filing in response to the Olymbios Complaint

21    that Dr. Olymbios was privy to a host of material nonpublic information about the Company's

22    business activities.  According to CareDx itself, Dr. Olymbios "occupied a special position of trust

23    and confidence" at CareDx and was privy to "a wide range of confidential business information."

24        167.    Dr. Olymbios set forth in his Complaint and Petition that CareDx "used what it

25    represented to be clinical tests to bill Medicare for [AlloSure]" even as "[m]ultiple nephrology

26    practices *expressed serious reservations* about this practice as a violation of Medicare billing

27    requirements, and CareDx employees *internally flagged this practice as impermissible*."

28    Dr. Olymbios reported these concerns to "*more than ten other current or former CareDx*

1    **employees, including Peter Maag**, then the Chief Executive Officer for CareDx, **and Reg Seeto**,

2    the current President and Chief Executive Officer of CareDx."  According to Dr. Olymbios, the

3    senior "CareDx executives **brushed off his concerns or berated him for raising them in the first**

4    **place**" and "**repeatedly ignored or actively quashed any internal concerns about its activity**" until

5    he finally resigned in late 2020.

6        168.    Similarly, Dr. FE-1 raised concerns about this scheme with his supervisor,

7    Dr. Grigoriy Shekhtman, but Dr. Shekhtman told Dr. FE-1 that CareDx needed to engage in these

8    practices in order to meet its goal of maximizing the number of AlloSure tests drawn.

9    Dr. Shekhtman **reported directly to CareDx Chief Medical Officer Dholakia**, who attended

10   weekly "Braveheart" team meetings (described further below at ¶¶175-177) with defendants

11   Maag, Seeto, and others.  Dr. FE-1 also reported his concerns to the Company's top compliance

12   attorney, Clarice McCauley, whom the Company hired in early 2021.  Dr. FE-1 noted McCauley

13   "was having an uphill battle and **CareDx did not want to be compliant**."

14       169.    FE-6, who served as defendant Maag's executive assistant from 2013 until

15   July 2020, corroborated Dr. Olymbios's claims of illegal payments.  For example, FE-6 described

16   CareDx's practice of hosting "symposiums," where it paid for doctors' flights, limo services to

17   and from the airport, hotels, and bottles of champagne in the doctors' hotel rooms.  FE-6 further

18   explained that CareDx hosted two key opinion leader "summits" in San Francisco every year that

19   started on Thursdays and ended on Fridays (*i.e.*, the summits lasted only about a day and a half).

20   CareDx would then pay for attending doctors to spend the weekend in Napa Valley.  The doctors

21   were taken to Napa, and chauffeured around in limousines hired by CareDx, and were brought to

22   four different vineyards, each of which hosted a $100-per-person wine tasting that

23   CareDx **paid for**.  The doctors were also provided with breakfast, lunch, and dinner at fine

24   restaurants, **all on CareDx's dime**.  Employee FE-6 explained that **defendant Maag not only**

25   **attended these outings but personally selected the vineyards and restaurants**.

26       170.    CareDx executives unquestionably knew that this behavior was occurring because

27   Dr. Olymbios **reported his concerns to the Company's most senior executives, including**

28   **defendants Maag and Seeto**, and because defendant Maag himself personally signed off on the

1    expenses. Similar, Dr. Olymbios **directly told these executives** about facts demonstrating that the

2    Company was offering improper kickbacks to medical doctors who could influence sales of

3    AlloSure. **Dr. Olymbios gave them examples of such kickbacks**. "CareDx offered **unrestricted**

4    **grants** to physicians to not enroll patients in competitors' clinical trials or to induce practices to

5    place patients on an AlloSure surveillance protocol, even when doing so was not warranted or

6    authorized under Medicare billing guidelines," as Dr. Olymbios observed. He continued: "CareDx

7    organized 'advisory boards' that were little more than marketing exercises to encourage physicians

8    to order AlloSure tests," and Dr. Olymbios averred that "**CareDx monitored advisory board**

9    **activity and how they impacted sales**."

10    171.    Admitting to complicity in these illegal kickbacks, defendant Maag testified under

11    oath in the CareDx-Natera Litigation that he **personally authorized virtually all of the**

12    **"marketing" expenses** that were at the heart of Defendants' scheme. He testified about personally

13    attending "meeting conferences" where CareDx spent money marketing AlloSure to kidney

14    doctors, as "[w]e are not a very large company." He explained: "I am engaging with the team on

15    those. And then **I am signing off on all the expenses**. For a long time in the company, I signed

16    every check in the company. . . . I think my team [at CareDx] would call me being **very hands-on**

17    **and detailed oriented**, so, yes, **I was very involved**," Maag said. In addition to Maag's personally

18    signing off on these expenses, CareDx's Chief Medical Officer Dholakia and defendant Seeto also

19    knew about the bills. Dholakia testified in the CareDx-Natera Litigation that: "every doctor that

20    works on a project, **we have to [have] very accurate records** of, what are we paying them, how

21    much are we paying them, why are we paying them."

22    172.    Defendants' knowledge of these massive and illegal kickbacks extended to securing

23    enrollment of Medicare patients in CareDx's KOAR registry study. CareDx Clinician FE-8

24    explained that CareDx paid doctors who enrolled patients in an AlloSure study **$35,000 to $40,000**

25    **per patient**. Clinician FE-8 further noted "'the payments were excessive and **very unusual for a**

26    **simple registry study**.'" Clinician FE-8 continued: "'these simple registry studies usually paid the

27    doctors a flat rate of $5,000.00 per patient.'" FE-8 asked Chief Medical Officer Dholakia "'why

28    were so many patients considered ineligible and rejected from the study?'" **Dholakia responded**

1    *that CareDx rejected patients who lacked Medicare coverage*.  FE-8 noted "'there were so [many]

2    illegal actions'" at CareDx.

3          173.    Defendants' knowledge, approval, and endorsement of these illegal activities

4    supports an inference of scienter.

5          **B.      Defendants' Use of Ephemeral Messaging Supports Scienter**

6          174.    Dr. Olymbios revealed that CareDx's most senior officers, including defendant

7    Maag, not only directed the illegal conduct but deliberately "took active measures to avoid creating

8    a paper trial of their misconduct," including using apps like WhatsApp and Signal that did not

9    leave behind records of their messages.  Indeed, defendant Maag expressly warned Dr. Olymbios

10   that "*there were certain things that shouldn't be put in writing*."   Meanwhile, several other

11   employees with whom Olymbios discussed the misconduct agreed CareDx was "'*a bunch of*

12   *crooks and frauds*,'" and that it was only a matter of time before someone blew the whistle or a

13   regulatory agency investigated – which, ultimately, is exactly what happened.     Indeed,

14   Dr. Olymbios internally reported what he viewed as Defendants' illegal practices when resigning

15   from CareDx in October of 2020.  Defendants' intentional use of ephemeral messaging services

16   and knowledge of illegality thus supports an inference of scienter.

17         **C.      Braveheart: Seeto, Maag, and other CareDx Executives Met Weekly
18                   to Direct CareDx's Sales and Marketing for AlloSure**

19         175.    According to trial testimony from top CareDx executives, key executives who were

20   privy to the misconduct that Dr. Olymbios and other former employees witnessed met on a weekly

21   basis during the Class Period.  In particular, from at least February 2019 and continuing into at

22   least March 2022, they met on a weekly basis to discuss sales and marketing issues.  They called

23   themselves the "Braveheart" team.

24         176.    The "Braveheart" team included a number of relevant executives, including Sasha

25   King, who was the Company's Chief Marketing Officer during this time, and, as alleged above,

26   later resigned on short notice.  King testified in the CareDx-Natera Litigation she, Seeto, Maag,

27   Chief Medical Officer Dholakia, and two other executives were on the Braveheart team that met

28   on a weekly basis to direct the Company's sales and marketing conduct.  For example, they "put

effort [into] creating marketing message and materials" and "sales trainings," among other things. As another example, the Braveheart team orchestrated meetings with the Company's sales team of roughly 60 to 70 people.  CareDx conducted "15 or so trainings each year," and they ***orchestrated live marketing campaigns or conferences directed at kidney doctors*** and thought leaders.

177.    Given the Braveheart weekly meetings and the fact AlloSure's marketing was a core part of the Company's strategy, all of the Braveheart executives were aware of Dr. Olymbios's concerns.  Defendants' attendance at the Braveheart meetings, and corresponding oversight over sales and marketing, and knowledge of the issues discussed at such meetings supports an inference of scienter.

**D.    Defendant Maag's and Defendant Seeto's Insider Trading Profits Support Scienter**

178.    Seeto's and Maag's fraudulent business practices allowed them to reap a combined $30,575,419 in insider trading proceeds during the Class Period, demonstrating another motive to disseminate false and/or misleading information and inflate the Company's stock price.   As demonstrated below, Seeto's and Maag's sales were unusual in both timing and amount, calculated to maximize personal benefit from the fraud and made after the dissemination of false positive statements about CareDx and its prospects.

| Insider Trading Defendant | Class Period Shares Sold | Class Period Insider Trading Proceeds |
|---|---|---|
| Peter Maag | 343,421 | $22,580,732 |
| Reginald Seeto | 100,002 | $ 7,994,721 |
| Total | 443,423 | $30,575453 |

179.    ***Defendant Maag***.  Maag was motivated to fraudulently inflate CareDx's stock price through illegal schemes to temporarily increase its revenue so he could sell over ***343,000*** CareDx shares, from which he reaped ***more than $22 million*** in proceeds:

**Sales by Defendant Maag**

| | Sale Date | Shares Sold | Sale Price | Proceeds |
|---|---|---|---|---|
| 1 | 02/05/21 | 7,983 | $89.58 | $715,084 |
| 2 | 02/05/21 | 1,316 | $90.36 | $118,914 |
| 3 | 02/05/21 | 657 | $91.53 | $60,137 |
| 4 | 02/05/21 | 44 | $92.15 | $4,055 |

| | Sale Date | Shares Sold | Sale Price | Proceeds |
|---|---|---|---|---|
| 5 | 03/05/21 | 200 | $65.18 | $13,037 |
| 6 | 03/05/21 | 300 | $66.34 | $19,901 |
| 7 | 03/05/21 | 800 | $58.71 | $46,967 |
| 8 | 03/05/21 | 900 | $64.15 | $57,736 |
| 9 | 03/05/21 | 1,200 | $57.60 | $69,120 |
| 10 | 03/05/21 | 1,300 | $63.25 | $82,230 |
| 11 | 03/05/21 | 1,644 | $60.03 | $98,682 |
| 12 | 03/05/21 | 1,800 | $62.13 | $111,839 |
| 13 | 03/05/21 | 1,856 | $61.07 | $113,341 |
| 14 | 04/05/21 | 1,500 | $71.15 | $106,719 |
| 15 | 04/05/21 | 3,800 | $72.90 | $277,013 |
| 16 | 04/05/21 | 4,700 | $72.40 | $340,283 |
| 17 | 05/03/21 | 3,048 | $77.42 | $235,964 |
| 18 | 05/03/21 | 16,952 | $76.50 | $1,296,758 |
| 19 | 05/05/21 | 2,262 | $74.31 | $168,088 |
| 20 | 05/05/21 | 3,528 | $73.53 | $259,423 |
| 21 | 05/05/21 | 4,210 | $72.61 | $305,681 |
| 22 | 05/10/21 | 317 | $68.61 | $21,750 |
| 23 | 05/10/21 | 10,284 | $66.78 | $686,786 |
| 24 | 05/10/21 | 15,692 | $70.36 | $1,104,088 |
| 25 | 05/11/21 | 29,792 | $65.83 | $1,961,133 |
| 26 | 05/11/21 | 6,365 | $68.30 | $434,717 |
| 27 | 05/11/21 | 21,985 | $67.49 | $1,483,827 |
| 28 | 05/11/21 | 28,986 | $66.35 | $1,923,123 |
| 29 | 05/25/21 | 400 | $81.08 | $32,431 |
| 30 | 05/25/21 | 9,600 | $80.57 | $773,440 |
| 31 | 06/07/21 | 6,500 | $90.01 | $585,070 |
| 32 | 06/07/21 | 20,000 | $85.03 | $1,700,682 |
| 33 | 06/08/21 | 978 | $90.05 | $88,074 |
| 34 | 06/09/21 | 2,522 | $90.00 | $226,982 |
| 35 | 06/24/21 | 9,605 | $95.30 | $915,398 |
| 36 | 06/25/21 | 395 | $95.00 | $37,525 |
| 37 | 07/06/21 | 2,100 | $89.48 | $187,909 |
| 38 | 07/06/21 | 2,400 | $90.55 | $217,309 |
| 39 | 07/06/21 | 5,500 | $91.23 | $501,784 |
| 40 | 08/05/21 | 3,096 | $82.81 | $256,393 |
| 41 | 08/05/21 | 6,904 | $83.27 | $574,920 |
| 42 | 09/07/21 | 300 | $75.31 | $22,594 |
| 43 | 09/07/21 | 900 | $74.32 | $66,889 |
| 44 | 09/07/21 | 8,800 | $73.55 | $647,280 |
| 45 | 10/05/21 | 1,163 | $65.90 | $76,645 |
| 46 | 10/05/21 | 3,612 | $64.95 | $234,587 |
| 47 | 10/05/21 | 5,225 | $64.21 | $335,502 |
| 48 | 11/05/21 | 10,000 | $49.40 | $494,000 |
| 49 | 12/06/21 | 300 | $42.61 | $12,782 |
| 50 | 12/06/21 | 3,112 | $42.20 | $131,337 |
| 51 | 12/06/21 | 6,588 | $41.30 | $272,071 |
| 52 | 01/05/22 | 1,854 | $45.13 | $83,677 |
| 53 | 01/05/22 | 8,146 | $44.29 | $360,789 |
| 54 | 02/07/22 | 5,100 | $42.32 | $215,847 |
| 55 | 02/07/22 | 4,900 | $41.80 | $204,821 |
| 56 | 03/07/22 | 1,500 | $33.75 | $50,627 |

|    | Sale Date | Shares Sold | Sale Price | Proceeds |
|----|-----------|-------------|------------|----------|
| 57 | 03/07/22  | 8,500       | $32.64     | $277,436 |
| 58 | 04/05/22  | 2,018       | $39.35     | $79,417  |
| 59 | 04/05/22  | 7,982       | $38.46     | $306,977 |
| 60 | 08/11/22  | 15,415      | $24.38     | $375,890 |
| 61 | 08/11/22  | 4,585       | $25.57     | $117,253 |
|    | **Total** | **343,421** |            | **$22,580,732** |

180.    Defendant Maag's stock sales during the Class Period were also enabled in large part by inflated Annual Incentives and Long-Term Incentives that, pursuant to the Company's Proxy statements, were calculated in part based on Total Sales, AlloSure test Volume, and/or Adjusted EBITDA, all metrics that were materially inflated by Defendants' scheme and undisclosed violations of law.

181.    The timing of Maag's Class Period sales is also suspicious and further supports scienter.  In particular, defendant Maag made several unusually large stock sales over the course of just two days in mid-2021 – just around the time period Defendants' illegal schemes began to unravel with increased scrutiny from regulators and government investigators.  Indeed, defendant Maag sold a total of ***113,421 shares over the course of just two days*** – May 10 and May 11, 2021 – for proceeds of ***$7,615,424***.  These two sales, alone, accounted for ***roughly one-third of Maag's total Class Period trading proceeds***, and significantly, these outsized and sudden sales were ***not*** made pursuant to any Rule 10b5-1 plan.

182.    Moreover, while some of defendant Maag's Class Period stock sales were made pursuant to Rule 10b5-1 plans, ***none*** of those plans were implemented prior to Maag's creation of the fraudulent RemoTraC scheme and, therefore, offer no defense to scienter.  Further, in a highly suspicious change in reporting, beginning in June 2021, defendant Maag abruptly stopped reporting the date(s) of adoption for his Rule 10b5-1 plan(s) when reporting his sales, suggesting that defendant Maag almost certainly adopted a new Rule 10b5-1 plan in the midst of the Class Period, and ***just*** as the Company was coming under scrutiny from government regulators.

183.    Moreover, defendant Maag's sales were well timed to take advantage of the high prices the Company's stock reached in the first half of the Class Period, and, strikingly, nearly halted after April 2022, when the Olymbios Complaint publicly revealed Maag's conduct.



184.    *Defendant Seeto*. Seeto capitalized on the fraud by selling ***100,002*** CareDx shares, from which he reaped ***$7,994,687*** in illegal insider trading proceeds:

### Sales by Defendant Seeto

|    | Sale Date | Shares Sold | Sale Price | Proceeds |
|----|-----------|-------------|------------|----------|
| 1  | 03/01/21  | 300         | $82.35     | $24,706  |
| 2  | 03/01/21  | 600         | $83.32     | $49,993  |
| 3  | 03/01/21  | 1,200       | $84.55     | $101,461 |
| 4  | 03/01/21  | 2,100       | $86.45     | $181,540 |
| 5  | 03/01/21  | 6,504       | $85.64     | $557,001 |
| 6  | 06/07/21  | 9,973       | $90.01     | $897,664 |
| 7  | 06/08/21  | 500         | $90.00     | $45,0001 |
| 8  | 06/09/21  | 16,718      | $90.01     | $1,504,819 |
| 9  | 06/24/21  | 10,602      | $95.31     | $1,010,514 |
| 10 | 06/25/21  | 9,210       | $95.15     | $876,318 |
| 11 | 06/28/21  | 4,690       | $96.34     | $451,841 |
| 12 | 06/28/21  | 8,522       | $95.42     | $813,150 |
| 13 | 07/08/21  | 1,400       | $86.61     | $121,250 |
| 14 | 07/08/21  | 1,880       | $84.87     | $159,564 |
| 15 | 07/08/21  | 2,714       | $85.74     | $232,689 |
| 16 | 08/27/21  | 658         | $80.00     | $52,642  |
| 17 | 01/18/22  | 1,719       | $40.07     | $68,881  |
| 18 | 01/19/22  | 3,137       | $40.05     | $125,634 |
| 19 | 02/01/22  | 814         | $42.13     | $34,294  |
| 20 | 02/02/22  | 3,182       | $41.25     | $131,258 |

|    | Sale Date | Shares Sold | Sale Price | Proceeds |
|----|-----------|-------------|------------|----------|
| 21 | 02/04/22  | 4,988       | $40.34     | $201,237 |
| 22 | 02/09/22  | 2,550       | $45.00     | $114,759 |
| 23 | 03/01/22  | 3,153       | $38.62     | $121,754 |
| 24 | 03/21/22  | 2,888       | $40.43     | $116,774 |
|    | **Total** | **100,002** |            | **$7,994,721** |

185.    In June 2021 *alone* – just as the Company was coming under scrutiny from federal and state regulators – Seeto sold 37,793 shares for total insider trading proceeds of *$3,457,977* – comprising *nearly half of defendant Seeto's Class Period sales proceeds in a single month, and at near all-time high prices*.  In other words, after Defendants' fraud had caused CareDx's stock price to reach its artificial height (roughly *$90* per share), Seeto capitalized on the momentary spike – dumping thousands of shares on unknowing shareholders and enjoying *millions* in insider trading profits.  And as with Maag, Seeto's trading entirely halted after the Olymbios Complaint publicly revealed his illegal conduct.



Shares of CareDx Inc. Sold by Defendant Seeto

186.    Defendant Seeto's stock sales during the Class Period were also enabled in large part by inflated Annual Incentives and Long-Term Incentives that, pursuant to the Company's Proxy statements, were calculated in part based on Total Sales, AlloSure test Volume, and/or

1  Adjusted EBITDA, all metrics that were materially inflated by Defendants' scheme and
2  undisclosed violations of law.

3       **E.    CareDx's High CFO Turnover Supports Scienter**

4       187.   CareDx's high rate of CFO turnover supports scienter.  Michael Bell held the
5  position of CFO from April 21, 2017 through December 31, 2020, leaving CareDx abruptly
6  approximately two quarters after the launch of RemoTraC; Marcel Konrad served as Interim CFO
7  from January 1, 2021 through March 24, 2021; Dhingra was appointed CFO effective March 25,
8  2021 and served until May 25, 2022; and Abhishek Jain has held the position from May 26, 2022
9  through the date of this writing.

10      188.   The timing of Dhingra's departure, in particular, is highly suspicious.  Dhingra
11 announced on May 23, 2022 that he was resigning from CareDx effective May 26, 2022, *i.e.*,
12 almost immediately, and had given the Company only ***one week's notice***.    Dhingra's
13 announcement came suddenly – after only one year as CareDx's CFO and just days after the
14 Company announced that its testing services revenue had fallen short.  CareDx's high rate of CFO
15 turnover and the suspicious timing of such resignations thus support an inference of scienter.

16      **F.    AlloSure Kidney and RemoTraC Are Core Operations of the**
17           **Company, Created and Overseen by Defendants**

       189.   The RemoTraC program that enabled Defendants' fraud was created and
18 implemented by defendants Seeto and Maag.  By as early as mid-2020, RemoTraC would account
19 for 50% of the Company's total testing volume and was widely seen as a "resounding success"
20 that not only had enabled the Company to avoid any COVID-related declines in volume and
21 revenue but had, in fact, become a key growth driver for the Company.  For example, in a
22 February 2021 investor conference, defendant Seeto explained that RemoTraC was a "sustainable"
23 business model that was "going to be maintained" going forward.  Similarly, Defendants
24 repeatedly touted the program as the foundation of the Company's customer outreach efforts and
25 a "foundation" of the Company's "formula for success" that would represent nearly half the
26 Company's testing revenues.  By the end of 2021, AlloSure Kidney and RemoTraC revenues
27
28

1   represented the vast majority of the Company's testing revenues, 68% of which were paid by

2   Medicare by virtue of Defendants' fraud.

3       190.   Indeed, by 4Q 2020, just as CareDx claimed it had enrolled 6,000 patients in

4   RemoTraC, CareDx's quarterly test volume had grown to 25,000 tests performed – compared to

5   just 15,000 in the first quarter of the year, and its testing services revenue had grown to

6   $50.3 million compared to just $31.4 million in the first quarter of the year.  By 2Q 2021, CareDx

7   claimed to have enrolled 9,000 patents, its quarterly test volume grew to 37,000, and its quarterly

8   testing services revenue grew to $65 million.  Importantly, CareDx's RemoTraC program also

9   helped the Company to maintain high ASPs for its tests – a key metric of its profitability and

10  growth potential.  High ASPs ostensibly meant that the Company was able to get high approval

11  and reimbursement rates for its tests, making each test more profitable.

12      191.   The fact that RemoTraC was essential to CareDx's financial success further

13  supports a strong inference of scienter, as it is implausible that Defendants would not closely

14  monitor the performance and condition of the program they created and its impact on CareDx's

15  growth.

16  **VII.   LOSS CAUSATION**

17      192.   During the Class Period, shares of CareDx's publicly traded common stock traded

18  on the NASDAQ.  The market for shares of CareDx common stock was open, well developed, and

19  efficient at all relevant times.

20      193.   Throughout the Class Period, the price of CareDx common stock was artificially

21  inflated as a result of Defendants' materially false and misleading statements and omissions and/or

22  scheme identified above.  Defendants engaged in a scheme to deceive the market, and a course of

23  conduct that operated as a fraud or deceit on Class Period purchasers of CareDx common stock,

24  by failing to disclose and misrepresenting the adverse facts detailed herein.  These material

25  misstatements and omissions had the cause and effect of creating in the market an unrealistically

26  positive assessment of the Company and its financial well-being and prospects, thus causing the

27  Company's stock price to be overvalued and artificially inflated and/or maintained at artificially

28  inflated levels at all relevant times.  Defendants' materially false and misleading statements made

1  during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing

2  the Company's stock at artificially inflated prices.

3      194.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed

4  and became apparent to the market and/or the concealed risk materialized, the price of CareDx

5  common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their

6  purchases of CareDx common stock during the Class Period, Lead Plaintiffs and the other Class

7  members suffered economic loss, *i.e.*, damages, under the federal securities laws.

8      195.    By issuing materially false and misleading statements, among other adverse facts

9  detailed herein, Defendants presented a misleading picture of CareDx's business.  Defendants'

10  false and misleading statements and/or scheme had the intended effect and caused CareDx

11  common stock to trade at artificially inflated levels throughout the Class Period.

12      196.    On October 28, 2021, after the market closed, the Company filed its quarterly report

13  with the SEC, revealing investigations by the DOJ, SEC, and a state regulator:

14      <u>United States Department of Justice and United States Securities and Exchange</u>
       <u>Commission Investigations</u>

15

16          The Company recently received a civil investigative demand (CID) from
       the United States Department of Justice (DOJ) requesting that the Company
       produce certain documents in connection with ***a False Claims Act investigation***
17      being conducted by the DOJ regarding certain business practices related to ***our***
       ***kidney testing and phlebotomy*** services, and a subpoena from the United States
18      Securities and Exchange Commission (SEC) in relation to an investigation ***by the***
       ***SEC in respect of matters similar to those*** identified in the CID, ***as well as certain***
19      ***of our accounting and public reporting practices***.  The Company also received an
       information request ***from a state regulatory agency*** and may receive additional
20      requests for information from the DOJ, SEC, or other regulatory and governmental
       agencies regarding similar or related subject matters.

21      197.    Also on October 28, 2021, Defendants reported dramatically disappointing

22  financial results.  Of particular concern was that, while testing volume had grown 86%

23  year-over-year, with approximately 40,000 AlloSure and AlloMap tests performed, testing

24  services revenue had grown only about half as fast, or approximately 46%.  On this news, the

25  Company's stock price to fell from a closing price of $70.34 per share on October 28, 2021 to a

26  closing price of $51.00 per share on October 29, 2021 or 27.5% in a single day, injuring investors.

27

28

198.    On May 5, 2022, CareDx filed its quarterly report for the first quarter of 2022 on Form 10-Q with the SEC and issued a related press release revealing the continuing fallout from the Company's historic reliance on overbilling Medicare and engaging in sales and marketing misconduct.  On these disclosures, the Company's stock price fell from $31.66 per share on May 5, 2022 to $25.78 per share on Friday, May 6, 2022 – a decline of 18.6% in one day.  The Company's stock price continued to fall as trading resumed on Monday, May 9, 2022, closing at $22.46 per share for a two-day decline of 29%, inuring investors.

199.    On May 23, 2022, CareDx surprised investors by announcing that its CFO, defendant Ankur Dhingra, had notified the Company of his resignation.  While the Company went out of its way to specifically assure investors that Dhingra's resignation was "not a result of any disagreement with the Company or any matter relating to its accounting or financial policies or procedures or regulatory matters," the announcement caused CareDx's stock price to fall 7.5%, from a close of $25.86 per share on Friday, May 20, 2022, to a close of $23.92 per share on Monday, May 23, 2022, on unusually high volume, injuring investors.

200.    Just three months later, on September 1, 2022, the Company announced that its Chief Marketing Officer and Chief Commercial Officer, Sasha King, had announced her resignation from the Company on August 30, 2022, effective September 16, 2022.  Just as defendant Dhingra had done.  On this news, CareDx's stock price fell from a close of $20.31 per share on September 1, 2022 to a close of $18.33 per share on September 2, 2022 – a decline of 10% – on unusually high volume, injuring investors.

201.    On November 3, 2022, after market close, the Company reported earnings for the third quarter of 2022.  The Company's financial results were disastrous.  The Company's net loss widened by more than 40%, from $11.9 million in 3Q 2021 to $16.9 million in 3Q 2022.  And critically, in spite of a purported 15% growth in the number of tests performed versus the same quarter prior year, testing services revenue had actually declined by 3% from the same quarter prior year, from $66.5 million to $64.8 million.  On this news, CareDx's stock price fell from a close of $18.73 per share on November 3, 2022 to $16.02 per share on November 4, 2022 – a decline of more than 14% – on unusually high volume.

202.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiffs and the Class.

203.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of CareDx's common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of CareDx's stock fell precipitously as the prior artificial inflation came out of the price.

## VIII.   CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased CareDx common stock between January 21, 2021 and November 3, 2022, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

205.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, CareDx common stock actively traded on NASDAQ (an open and efficient market) under the symbol "CDNA." Millions of CareDx shares were traded publicly during the Class Period on NASDAQ. As of May 3, 2022, the Company had more than 53 million shares outstanding. Record owners and other members of the Class may be identified from records maintained by CareDx or its transfer agent and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

206.    Plaintiffs' claims are typical of the claims of the other members of the class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

207.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with those of the Class.

208.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

(b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of CareDx;

(d)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of CareDx;

(e)    whether the market price of CareDx common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

209.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden

1  of individual litigation make it impossible for members of the Class to individually redress the

2  wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

3  **IX.    UNDISCLOSED ADVERSE INFORMATION**

4          210.    The market for CareDx's common stock was an open, well developed, and efficient

5  market at all relevant times.  As a result of the materially false and/or misleading statements and/or

6  omissions particularized in this Complaint, CareDx's common stock traded at artificially inflated

7  prices during the Class Period.  Plaintiffs and the other members of the Class purchased CareDx's

8  common stock in reliance upon the integrity of the market price of the Company's common stock

9  and market information relating to CareDx and have been damaged thereby.

10         211.    During the Class Period, Defendants materially misled the investing public, thereby

11  inflating the price of CareDx's common stock, by publicly issuing false and/or misleading

12  statements and/or omitting to disclose material facts necessary to make Defendants' statements, as

13  set forth herein, not false and/or misleading.  The statements and omissions were materially false

14  and/or misleading because they failed to disclose material adverse information and/or

15  misrepresented the truth about CareDx's business, operations, and prospects as alleged herein.

16  These material misstatements and/or omissions had the cause and effect of creating in the market

17  an unrealistically positive assessment of the Company and its business, thus causing the

18  Company's common stock to be overvalued and artificially inflated or maintained at all relevant

19  times.  Defendants' materially false and/or misleading statements during the Class Period directly

20  or proximately caused or were a substantial contributing cause of the damages sustained by

21  Plaintiffs and other members of the Class who purchased the Company's common stock at

22  artificially inflated prices and were harmed when the truth was revealed.

23  **X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR**

24         212.    The federal statutory safe harbor provided for forward-looking statements under

25  certain circumstances does not apply to any of the allegedly false statements pled in this Complaint.

26  The statements alleged to be false and misleading herein all relate to then-existing facts and

27  conditions.  In addition, to the extent certain statements alleged to be false may be characterized

28  as forward looking, they were not identified as "forward-looking statements" when made; and

1  there were no meaningful cautionary statements identifying important factors that could cause

2  actual results to differ materially from those in the purportedly forward-looking statements.

3       213.    In the alternative, to the extent the statutory safe harbor is determined to apply to

4  any forward-looking statements pled herein, Defendants are liable for those false forward-looking

5  statements because, at the time each of those forward-looking statements was made, the speaker

6  had actual knowledge the forward-looking statement was materially false or misleading and/or the

7  forward-looking statement was authorized or approved by an executive officer of CareDx who

8  knew the statement was false when made.

9  **XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)**

10

11       214.    The market for CareDx stock was open, well developed, and efficient at all relevant

12  times.  As a result of the materially false and/or misleading statements and/or failures to disclose

13  particularized in this Complaint, CareDx common stock traded at artificially inflated and/or

14  maintained prices during the Class Period.  Plaintiffs and other members of the Class purchased

15  the Company's common stock in reliance on the integrity of the market price of CareDx common

16  stock and market information relating to CareDx and have been damaged thereby.

17       215.    At all relevant times, the market for CareDx common stock was an efficient market

18  for the following reasons, among others:

19            (a)    CareDx was listed and actively traded on NASDAQ, a highly efficient and

20  automated market;

21            (b)    As a regulated issuer; CareDx filed periodic public reports with the SEC

22  and/or NASDAQ;

23            (c)    CareDx regularly communicated with public investors via established

24  market communication mechanisms, including through regular dissemination of press releases on

25  the national circuits of major newswire services and through other wide-ranging public disclosures,

26  such as communications with the financial press and other similar reporting services; and/or

27            (d)    CareDx was followed by securities analysts employed by brokerage firms

28  who wrote reports about the Company, and these reports were distributed to the sales force and

1  certain customers of their respective brokerage firms.  Each of these reports was publicly available

2  and entered the public marketplace.

3      216.    As a result of the foregoing, the market for CareDx common stock promptly

4  digested current information regarding CareDx from all publicly available sources and reflected

5  such information in CareDx's stock price.  Under these circumstances, all purchasers of CareDx

6  stock during the Class Period suffered similar injury through their purchases of stock at artificially

7  inflated prices, and a presumption of reliance applies.

8      217.    A Class-wide presumption of reliance is also appropriate in this action under the

9  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

10  because the Class' claims are, in large part, grounded in Defendants' material misstatements and/or

11  omissions.    Because this action involves Defendants' failure to disclose material adverse

12  information regarding the Company's business, operations, and prospects – information

13  Defendants were obligated to disclose during the Class Period but did not – positive proof of

14  reliance is not a prerequisite to discovery.  All that is necessary is that the facts withheld be material

15  in the sense that a reasonable investor might have considered them important in the making of

16  investment decisions.  Given the importance of the Class Period misstatements and omissions set

17  forth above, that requirement is satisfied here.

18  **XII.    COUNTS AGAINST DEFENDANTS**

19  **COUNT I**

20  **For Violations of §10(b) of the Exchange Act and<br>Rule 10b-5 Promulgated Thereunder**

21  **(Against All Defendants)**

22      218.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

23  set forth herein.

24      219.    During the Class Period, Defendants carried out a plan, scheme, and course of

25  conduct that was intended to and, throughout the Class Period, did: (a) deceive the investing

26  public, including Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and

27  maintain the market price of CareDx common stock; and (c) cause Plaintiffs and other members

28  of the Class to purchase CareDx stock at artificially inflated prices.  In furtherance of this unlawful

1    scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth

2    herein.

3         220.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made

4    untrue statements of material fact and/or omitted to state material facts necessary to make the

5    statements not misleading; and (c) engaged in acts, practices, and a course of conduct that operated

6    as a fraud and deceit on the purchasers of the Company's securities in an effort to maintain

7    artificially high market prices for CareDx common stock in violation of §10(b) of the Exchange

8    Act and Rule 10b-5 promulgated thereunder.    All Defendants are sued either as primary

9    participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged

10   below.

11        221.    Defendants, individually and in concert, directly and indirectly, by the use, means,

12   or instrumentalities of interstate commerce and/or the mails, engaged and participated in a

13   continuous course of conduct to conceal adverse material information about CareDx's business,

14   operations, and prospects, as specified herein.    Defendants employed devices, schemes, and

15   artifices to defraud while in possession of material adverse nonpublic information and engaged in

16   acts, practices, and a course of conduct as alleged herein in an effort to assure investors of

17   CareDx's business, operations, and prospects, which included the making of, or the participation

18   in the making of, untrue statements of material facts and/or omitting to state material facts

19   necessary in order to make the statements made about CareDx and its business, operations, and

20   future prospects, in light of the circumstances under which they were made, not misleading, as set

21   forth more particularly herein, and engaged in transactions, practices, and a course of conduct of

22   business that operated as a fraud and deceit on the purchasers of the Company's common stock

23   during the Class Period.

24        222.    Each of the Individual Defendants' primary liability and controlling person liability

25   arises from the following facts: (a) each of the Individual Defendants was a high level executive

26   and/or director at the Company during the Class Period and a member of the Company's

27   management team or had control thereof; (b) each of the Individual Defendants, by virtue of his

28   responsibilities and activities as a senior officer and/or director of the Company, was privy to and

1   participated in the creation, development, and reporting of the Company's business, operations,

2   and prospects; (c) each of the Individual Defendants enjoyed significant personal contact and

3   familiarity with the other Defendants and was advised of and had access to other members of the

4   Company's management team, internal reports, and other data and information about the

5   Company's financial condition and performance at all relevant times; and (d) each of the

6   Individual Defendants was aware of the Company's dissemination of information to the investing

7   public, which they knew and/or recklessly disregarded was materially false and misleading.

8        223.    Defendants had actual knowledge of the misrepresentations and/or omissions of

9   material facts set forth herein or acted with reckless disregard for the truth in that they failed to

10  ascertain and disclose such facts even though such facts were available to them.  Such Defendants'

11  material misrepresentations and/or omissions were done knowingly or recklessly and for the

12  purpose and effect of concealing CareDx's operating condition, business practices, and prospects

13  from the investing public and supporting the artificially inflated and/or maintained price of its

14  common stock.   As demonstrated by Defendants' overstatements and misstatements of the

15  Company's business, operations, and prospects throughout the Class Period, Defendants, if they

16  did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless

17  in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to

18  discover whether those statements were false or misleading.

19       224.    As a result of the dissemination of the materially false and/or misleading

20  information and/or failure to disclose material facts as set forth above, the market price of CareDx

21  common stock was artificially inflated; and relying directly or indirectly on the false and

22  misleading statements made by Defendants or on the integrity of the market in which the stock

23  trades, and/or in the absence of material adverse information known or recklessly disregarded by

24  Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs

25  and the other members of the Class purchased CareDx common stock during the Class Period at

26  artificially inflated prices and were damaged thereby.

27       225.    At the time of said misrepresentations and omissions, Plaintiffs and other members

28  of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the

1    other members of the Class and the marketplace known of the truth regarding the problems CareDx

2    was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the

3    Class would not have purchased their CareDx common stock or, if they had purchased such

4    common stock during the Class Period, would not have done so at the artificially inflated prices

5    they paid.

6        226.    By virtue of the foregoing, CareDx and the Individual Defendants each violated

7    §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

8        227.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

9    the other members of the Class suffered damages in connection with their purchases of the

10   Company's common stock during the Class Period.

11                                           **COUNT II**

12                        **For Violations of §20(a) of the Exchange Act**
                          **(Against the Individual Defendants)**

13       228.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

14   set forth herein.

15       229.    The Individual Defendants acted as controlling persons of CareDx within the

16   meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions

17   within the Company, participation in and/or awareness of the Company's operations and intimate

18   knowledge of the false statements filed by the Company with the SEC and disseminated to the

19   investing public, the Individual Defendants had the power to influence and control, and did

20   influence and control, directly or indirectly, the decision making of the Company, including the

21   content and dissemination of the various statements Plaintiffs contend are false and misleading.

22   Each of the Individual Defendants was provided with or had unlimited access to copies of the

23   Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be

24   misleading prior to and/or shortly after these statements were issued and had the ability to prevent

25   the issuance of the statements or cause the statements to be corrected.  Further, the Individual

26   Defendants signed the Company's 2020 and 2021 annual reports on Form 10-K and the first,

27   second, and third quarterly reports for 2021 on Form 10-Q.

28

1    230.    In particular, the Individual Defendants had direct and supervisory involvement in

2  the day-to-day operations of the Company and therefore had the power to control or influence the

3  particular transactions giving rise to the securities violations as alleged herein and exercised the

4  same.

5    231.    As set forth above, CareDx and the Individual Defendants each violated §10(b) and

6  Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions

7  as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange

8  Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other

9  members of the Class suffered damages in connection with their purchases of the Company's

10  common stock during the Class Period.

## XIII.    PRAYER FOR RELIEF

12    WHEREFORE, Plaintiffs, individually and on behalf of the Class, prays for relief and

13  judgment as follows:

14    A.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the

15  Federal Rules of Civil Procedure on behalf of the Class defined herein;

16    B.    Awarding Plaintiffs and the other members of the Class damages in an amount that

17  may be proven at trial, together with interest thereon;

18    C.    Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment

19  interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

20    D.    Awarding such other relief as this Court deems appropriate.

## XIV.    JURY DEMAND

22    Plaintiffs demand a trial by jury.

23   DATED: November 28, 2022              ROBBINS GELLER RUDMAN
                                             & DOWD LLP
24                                         SHAWN A. WILLIAMS
                                           JASON C. DAVIS
25

26

27                                              s/ Jason C. Davis
                                           JASON C. DAVIS
28

1

2        Post Montgomery Center
         One Montgomery Street, Suite 1800
3        San Francisco, CA  94104
         Telephone: 415/288-4545
4        415/288-4534 (fax)
         shawnw@rgrdlaw.com
5        jdavis@rgrdlaw.com

6        ROBBINS GELLER RUDMAN
           & DOWD LLP
7        SPENCER A. BURKHOLZ
         SEAN C. MCGUIRE
8        NICOLE Q. GILLILAND
         655 West Broadway, Suite 1900
9        San Diego, CA  92101
         Telephone: 619/231-1058
10       619/231-7423 (fax)
         spenceb@rgrdlaw.com
11       smcguire@rgrdlaw.com
         ngilliland@rgrdlaw.com

12       SAXENA WHITE P.A.
         DAVID R. KAPLAN
13       12750 High Bluff Drive, Suite 475
         San Diego, CA  92130
14       Telephone: 858/997-0860
         858/369-0096 (fax)
15       dkaplan@saxenawhite.com

16       SAXENA WHITE P.A.
         STEVEN B. SINGER
17       JOSHUA H. SALTZMAN
         ALEC T. COQUIN
18       10 Bank Street, 8th Floor
         White Plains, NY  10606
19       Telephone: 914/437-8551
         888/631-3611 (fax)
20       ssinger@saxenawhite.com
         jsaltzman@saxenawhite.com
21       acoquin@saxenawhite.com

22       SAXENA WHITE P.A.
         LESTER R. HOOKER
23       7777 Glades Road, Suite 300
         Boca Raton, FL  33434
24       Telephone: 561/394-3399
         561/394-3382 (fax)
25       lhooker@saxenawhite.com

26       Lead Counsel for Lead Plaintiffs

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 3:22-cv-03023-TLT                                                                    - 83 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KOSKIE MINSKY LLP
MICHAEL MAZZUCA
20 Queen Street West
Suite 900, Box 52
Toronto, Ontario M5H 3R3
Telephone: 416/977-8353
416/977-3316 (fax)
mmazzuca@kmlaw.ca

Additional Counsel for Lead Plaintiffs

1

<u>CERTIFICATE OF SERVICE</u>

2   I hereby certify under penalty of perjury that on November 28, 2022, I authorized the

3 electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

4 send notification of such filing to the email addresses on the attached Electronic Mail Notice List,

5 and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service

6 to any non-CM/ECF participants indicated on the attached Manual Notice List.

7
             s/ Jason C. Davis
             JASON C. DAVIS

8

9
             ROBBINS GELLER RUDMAN
              & DOWD LLP

10
             Post Montgomery Center
             One Montgomery Street, Suite 1800

11
             San Francisco, CA  94104
             Telephone: 415/288-4545

12
             415/288-4534 (fax)
             Email: jdavis@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:22-cv-03023-TLT Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Charles Dean Cording**
  ccording@willkie.com,mao@willkie.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Barrington E. Dyer**
  bdyer@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Laura Leigh Geist**
  lgeist@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **David R. Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Sean Christopher McGuire**
  smcguire@rgrdlaw.com

- **Erica Symone Miranda**
  emiranda@willkie.com,maosf@willkie.com,ealcantara@willkie.com,mallard@willkie.com,cwindsor@willkie.com

- **Tariq Mundiya**
  tmundiya@willkie.com,mao@willkie.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,smorris@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brady Michael Sullivan**
  bsullivan@willkie.com,CLee2@willkie.com,mao@willkie.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)