Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 848-7400
E-mail:   lgeist@willkie.com
          bdyer@willkie.com

Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
          ccording@willkie.com
          bsullivan@willkie.com

Attorneys for Defendants
*CareDx Inc., Reginald Seeto,*
*Ankur Dhingra, Marcel Konrad,*
*and Peter Maag*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>                    Defendants. | Case No.  22-cv-03023-TLT<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: May 16, 2023<br>Time: 2:00 PM<br>Courtroom: 9, 19th Floor<br>Judge: Hon. Trina L. Thompson |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on May 16, 2023 at 2:00 p.m., in the courtroom of the Honorable Trina L. Thompson of the above-entitled Court, located at San Francisco Courthouse, Courtroom 9, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants CareDx, Inc. ("CareDx" or the "Company"), Peter Maag, Reginald Seeto, Marcel Konrad, and Ankur Dhingra (collectively, the "Individual Defendants," and, with CareDx, the "Defendants") shall and hereby do move to dismiss the Amended Class Action Complaint for Violations of Federal Securities Laws (ECF No. 53). This Motion is brought pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Declaration of Charles D. Cording filed concurrently herewith, the accompanying Request for Judicial Notice and Motion to Strike, all files and records in this action, oral argument, and such additional matters as may be judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

Defendants seek dismissal of the Amended Complaint with prejudice for failure to state a claim upon which relief can be granted, pursuant to Federal Rule 12(b)(6), because Plaintiffs fail to plead violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b).

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF RELEVANT FACTS ................................................................4

       A.     Transplant Patients...................................................................................4

       B.     CareDx and the Defendants .....................................................................4

       C.     The COVID-19 Pandemic Rattles the Healthcare Industry and CareDx Responds with RemoTraC........................................................................................5

       D.     Amidst the Pandemic, a Disgruntled Employee Steals Tens of Thousands of Documents from CareDx and Immediately Moves to CareDx's Top Competitor ......7

III.   ARGUMENT..........................................................................................................8

       A.     Plaintiffs Fail to Plead Materially False Statements or Omissions...........................8

              1.     The AC Fails to Allege Any Underlying Medicare Fraud..............................9

              2.     The AC Fails to Connect the Alleged Misconduct to an Actionable False Statement........................................................................................11

              3.     The Purported False Statements Are Non-Actionable or Otherwise Deficient........................................................................................12

       B.     Plaintiffs Fail to Plead the Requisite Strong Inference of Fraudulent Intent.............20

       C.     The Complaint Does Not Adequately Allege Loss Causation...................................24

       D.     Plaintiffs' Claims for Violation of Section 20(a) of the Exchange Act Should Be Dismissed........................................................................................25

IV.    CONCLUSION......................................................................................................25

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adient plc Sec. Litig.*,
2020 WL 1644018  (S.D.N.Y. Apr. 2, 2020)..........................................................................16

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021).......................................................................21

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...............................................................................15

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ................................................................21, 22

*Fleming v. Impax Lab. Inc.*,
2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) ........................................................................24

*Glazer Capital Mgmt. LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) .........................................................................................14, 20

*Jaroslawicz v. M&T Bank Corp.*,
2017 WL 1197716 (D. Del. Mar. 30, 2017) ..........................................................................13

*Loftus v. Primero Mining Corp.*,
230 F. Supp. 3d 1209 (C.D. Cal. 2017) ............................................................................9, 16

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................................................14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......................................................................2, 8, 11, 12, 17

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020)......................................................................9, 22

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ................................................................................................24

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ....................................................................................... *passim*

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .........................................................................................8, 23

*Olymbios v. CareDx, Inc.*,
No. 22-CIV-01582 (Cal. Sup. Ct. San Mateo Cnty.)...........................................................2, 8

iii

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
 774 F.3d 598 (9th Cir. 2014) ...................................................................................8, 20

*In re Plains All American Pipeline, L.P. Sec. Litig.*,
 307 F. Supp. 3d 583 (S.D. Tex. 2018) ...................................................................13

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014) ...................................................................14, 16, 22, 23

*Prodanova v. H.C. Wainwright & Co., LLC*,
 993 F.3d 1097 (9th Cir. 2021) ...................................................................................20

*Macomb Country Emps.' Ret. Sys. v. Align Tech., Inc.*,
 39 F.4th 1092 (9th Cir. 2022) ...................................................................................16, 17

*Reese v. BP Exploration (Alaska) Inc.*,
 643 F.3d 681 (9th Cir. 2011) ...................................................................................13

*Schaffer v. Horizon Pharma PLC*,
 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...........................................................16, 17

*Scheller v. Nutanix, Inc.*,
 450 F. Supp. 3d 1024 (N.D. Cal. 2020) ...................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)...................................................................................................3

*Villare v. Abiomed, Inc.*,
 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)...........................................................15, 16

*Waterford Township Police v. Mattel, Inc.*,
 321 F. Supp. 3d 1133 (C.D. Cal. 2018) ...................................................................11, 21

*Wochos v. Tesla, Inc.*,
 985 F.3d 1180 (N.D. Cal. 2021) ...................................................................................14

*In re Zoom Sec. Litig.*,
 2022 WL 484974 (N.D. Cal. Feb. 16, 2022) ...........................................................20

*Zucco Partners v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009). ...................................................................10, 22, 23

## STATUTES AND RULES

Securities Exchange Act of 1934
     Section 10(b) ...................................................................................1, 2, 4, 8, 26
     Section 20(a)...................................................................................1, 4, 26

Private Securities Litigation Reform Act of 1995.............................................................. *passim*

Federal Rules of Civil Procedure
     Rule 9(b) ........................................................................................................... i, 8
     Rule 12(b)(6).......................................................................................................... i

**OTHER AUTHORITIES**

Suwasin Udomkarnjananun, et al., *Mortality risk factors of COVID-19 infection in kidney transplantation recipients: a systematic review and meta-analysis of cohorts and clinical registries*, Sci Rep 11, 20073 ........................................................................6

Office of Inspector General, Message from leadership on minimizing burdens on providers (Mar. 30, 2020), *available at* https://tinyurl.com/2u2vp8s9.....................................6

Office of Inspector General, Special Fraud Alert: Laboratory Payments to Referring Physicians at 5 (June 25, 2014), *available at* https://tinyurl.com/46cnc3sd............................11

Office of Inspector General, OIG Policy Statement Regarding Application of Certain Administrative Enforcement Authorities Due to Declaration of Coronavirus Disease 2019 (COVID-19) Outbreak in the United States as a National Emergency at 2 (Apr. 3, 2020), *available at* https://tinyurl.com/mthu6h7w.............................6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This is a securities class action lawsuit focused on CareDx, a leading precision medicine solutions company and clinical lab that is 100% focused on transplant patients.  Its "AlloSure Kidney" test allows kidney transplant clinicians to assess the probability the kidney is being rejected through a simple non-invasive blood test.  The test provides critical information to clinicians managing highly vulnerable transplant patients.

On January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a public health emergency resulting from the COVID-19 outbreak and, soon thereafter, HHS enacted emergency measures to provide greater flexibility to healthcare providers as they scrambled to care for their patients.  As the country faced an unprecedented public health crisis, transplant patients were particularly vulnerable.  These patients face a constant risk of organ rejection that must be managed by toxic immunosuppressants, which left them at heightened risk during the pandemic.  To meet the needs of transplant patients during the pandemic, CareDx developed the "RemoTraC" program to enable immunocompromised transplant patients to avoid the risk of exposure to COVID-19 from hospital and medical office visits.  Relying on third-party mobile phlebotomists, RemoTraC allowed clinicians ordering CareDx testing like AlloSure Kidney (run at CareDx labs and billed by CareDx) to order additional, unrelated blood draws for routine labs (run at and billed by the provider's lab of choice) at no additional cost for the blood draw.  The service was a critical tool that transplant clinicians and patients relied on during a once-in-a-century epidemic.

The crux of the Amended Complaint ("AC") is that this life-saving effort amounted to an alleged fraudulent scheme under Section 10(b) and Section 20(a) of the Exchange Act.  Plaintiffs claim that Defendants committed securities fraud solely by virtue of their discussions regarding the RemoTraC service, or, more generally, the Company's growth and prospects, during the Class Period, January 21, 2021 through November 3, 2022.[1]  Plaintiffs suggest that RemoTraC was part

---

[1] *See, e.g.*, AC ¶¶ 132–33.  Hereinafter, all citations to "¶ __" refer to the AC.

of an even broader scheme at the Company,[2] predating the Class Period, to defraud Medicare by billing it for medically unnecessary AlloSure Kidney tests or tests outside the scope of coverage, purportedly achieved through kickbacks and other improper means.

But pleading a securities fraud claim is no easy task. Both the PSLRA and Ninth Circuit law require district courts to "carefully [] evaluate securities fraud complaints" and perform a vital gatekeeper role to "ensure compliance with the [PSLRA's] elevated pleading standards." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413–14 (9th Cir. 2020). Indeed, Plaintiffs' method of pleading a securities claim here—alleging a sweeping scheme and then claiming it falsifies virtually everything the Company has said about its business and prospects during the Class Period—has been rejected by the Ninth Circuit in strikingly similar circumstances. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008).

***First***, Plaintiffs fail to plead that Defendants made any actionable false statements. At the outset, one of the Individual Defendants, Dr. Peter Maag, is not alleged to be the "maker" of any of the challenged statements, as required for a Section 10(b) claim, and hence must be dismissed. With respect to all of the Defendants, Plaintiffs have failed to plead falsity with the particularity required by the PSLRA.

Plaintiffs first attempt to premise claims of securities fraud on representations that CareDx made to securities underwriters in underwriting contracts concerning the Company's compliance with applicable healthcare law. As required by SEC regulations, CareDx publicly disclosed these contracts, subject to the ***express disclaimer*** that no one other than the underwriters—including investors—should rely on those representations. Case law makes clear that, under these circumstances, contractual representations cannot form the basis for securities fraud claims.

Plaintiffs next challenge virtually every statement made by CareDx concerning RemoTraC and the Company's testing services business more generally during the Class Period. These include:

---

[2] For the reasons stated in the concurrently filed Motion to Strike, certain portions of the AC quoting or citing the complaint Dr. Olymbios filed in *Olymbios v. CareDx, Inc.*, No. 22-CIV-01582 (Cal. Sup. Ct. San Mateo Cnty.) in support of these "schemes" should be stricken and disregarded in considering this Motion to Dismiss.

(1) statements about the success or sustainability of RemoTraC on a go-forward basis; (2) broad references to CareDx's "winning formula" and other generic claims about the Company's testing services business, which included RemoTraC; and (3) revenue data in CareDx's financial statements that reflected revenue derived from RemoTraC.  None of these challenged statements give rise to an actionable securities claim because, respectively: (1) statements about RemoTraC's future prospects are classic forward-looking statements protected by the PSLRA's "Safe Harbor" provisions; (2) statements of corporate optimism—such as those about CareDx's "winning formula"—are not actionable under the securities laws; and (3) accurately reported financial results are not rendered false or misleading by allegations that some of the revenue was improperly derived.

Plaintiffs also take issue with the explanations CareDx provided for a decline in the "average selling price" or "ASP" metrics that CareDx experienced during the Class Period, but their claims rest primarily on a gross distortion of post-Class Period statements by CareDx executives.

***Second***, Plaintiffs fail to "state with particularity facts giving rise to a strong inference that each defendant acted with" the intention to deceive investors or deliberate recklessness.  15 U.S.C. § 78u-4(b)(2).  That inference of scienter must be "compelling" as to each defendant.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

As to two of the defendants, Marcel Konrad and Ankur Dhingra, Plaintiffs offer no allegations of scienter and they must be dismissed.  As to Dr. Maag: (1) allegations of scienter against an individual, like Dr. Maag, are not imputable to the other Individual Defendants and (2) the allegations are not imputable to the Company because Dr. Maag was not the "maker" of any challenged statement, and thus his scienter is wholesale irrelevant to the case.

As to CareDx and Dr. Reginald Seeto, Plaintiffs rely heavily on allegations from: (1) a former employee and purported whistleblower, Dr. Michael Olymbios, who is currently embroiled in litigation with the Company concerning his theft of Company trade secrets; (2) certain "Former Employees"; and (3) allegations of insider trading during the Class Period.  But many of the allegations attributed to Dr. Olymbios must be stricken or are too conclusory to be credited. Likewise, the allegations from Former Employees lack substantiation, context, and plausibility, and even if credited, do not allege facts giving rise to a strong inference of scienter.  And Dr. Seeto's

3

trades do not support scienter because they were conducted pursuant to an authorized Rule 10b5-1 trading plan.

*Third*, the AC fails to allege the element of "loss causation" because there are no well-pleaded allegations that subsequent public disclosures revealed the falsity of any statements made by Defendants during the Class Period.

*Finally*, because the AC fails to allege a claim under Section 10(b), the AC's Section 20(a) claim must also be dismissed.

## II.  STATEMENT OF RELEVANT FACTS

### A.  Transplant Patients

Transplant patients are a highly vulnerable population because they face a constant risk that the transplanted organ (known as an "allograft") will be rejected by the patient's own immune system. *See* ¶¶ 3, 34. Patients must be closely monitored and managed, throughout their lives, by toxic immunosuppressants. Ex. B at 10.[3]  Monitoring the status of the transplant patient is critical both for: (1) detecting rejection and thereby preventing serious adverse outcomes, including death, loss of the transplant (and the potential need for a repeat transplant procedure), or severe immunological morbidity; and (2) clinical decision-making, including managing the toxic regime of immunosuppressants transplant patients must take, thereby reducing the risk of infection and other complications, including increased risk of cancer. *See* Ex. B at 5, 10.

### B.  CareDx and the Defendants

CareDx:  CareDx is a Brisbane, California-based diagnostics company and clinical lab. It is 100% focused on transplant patients. ¶¶ 1, 24; Ex. B at 5.

CareDx has commercialized a variety of non-invasive transplant tests, focused on different allografts: AlloMap Heart (launched in 2006), AlloSure Kidney (launched in 2017), AlloSure Heart (launched in 2020), and AlloSure Lung (launched in 2021). ¶ 31; Ex. B at 5–7. AlloSure Kidney and other CareDx tests are widely utilized by physicians. For example, currently, more than 90%

---

[3] All citations herein to "Exhibit" or "Ex. __" refer to the exhibits attached to the Request for Judicial Notice and Accompanying Declaration of Charles D. Cording.

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

of transplant centers in the United States use AlloMap Heart and more than 30,000 patients at over 150 transplant centers in the United States use AlloSure Kidney.[4]

AlloSure Kidney has been identified as a covered Medicare service since 2017.  Ex. C at 9.[5] Medicare currently reimburses for AlloSure Kidney at $2,841 per test.  ¶ 2.  During the Class Period, approximately 70% of CareDx's testing services revenue came from Medicare, while approximately 30% came from commercial payers (i.e., private insurance).  ¶ 32.  Just because a test like AlloSure Kidney is covered by Medicare does not mean that commercial payers will cover the test.  Instead, CareDx must work with individual private payers to obtain coverage and in some cases private payers reimburse only on a case-by-case basis.  ¶ 32; Ex. B at 5.

Physicians order CareDx tests, like other medical tests, when the physician deems the test "medically necessary."  ¶ 33.  CareDx then receives a blood sample and performs the tests at a CareDx lab.  Ex. B at 5.

Individual Defendants:  The Individual Defendants are Peter Maag (Chief Executive Officer from 2012 until November 2020 and former Executive Chairman from November 2020 through October 2021), Reginald Seeto (current Chief Executive Officer), Marcel Konrad (Interim Chief Financial Officer from January 2021 to March 2021), and Ankur Dhingra (Chief Financial Officer from March 2021 to May 2022).  ¶¶ 25–28, 187.

### C.    The COVID-19 Pandemic Rattles the Healthcare Industry and CareDx Responds with RemoTraC

COVID-19 had an immediate and dramatic impact on the healthcare industry, ¶¶ 3, 34, including the regulatory landscape in which companies like CareDx operated.  In January 2020, HHS declared a public health emergency.

On March 30, 2020, HHS's Office of Inspector General or "OIG" formally stated it was placing a "high priority on providing the healthcare community with the flexibility to provide

---

[4] OUR MISSION AND VALUES, CAREDX (2023), https://tinyurl.com/hxx39fax; KIDNEY TRANSPLANT SURVEILLANCE, CAREDX (2023), https://tinyurl.com/2p9hpy3y; ¶ 2.
[5] AlloMap Heart received Medicare coverage in 2006.  Ex. B at 6.  AlloSure Heart received Medicare coverage in October 2020.  Ex. B at 7.

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

needed care during this emergency."[6]  In furtherance of that priority, OIG provided assurances to healthcare providers that, in enforcing federal law prohibiting fraud, waste, abuse and mismanagement of programs like Medicare, it would account for the exigencies of the pandemic: "For any conduct during this emergency that may be subject to OIG administrative enforcement, OIG will carefully consider the context and intent of the parties when assessing whether to proceed with any enforcement action." *Id.*  And, on April 3, 2020, OIG followed up with a Policy Statement reaffirming its commitment to providing healthcare companies with "regulatory flexibility," in substance, creating a safe harbor for bona fide responses to the COVID-19 pandemic.[7]

Organ transplant patients were particularly vulnerable to COVID-19.  One study suggests that kidney transplant patients admitted for COVID-19 suffered a mortality rate of 20–40%.[8] Immunosuppressed transplant patients were asked to avoid transplant centers and caregiver visits to reduce the risk of contracting COVID-19.  ¶¶ 34, 60–61.  Thus, many transplant patients were missing their check-in appointments and routine blood draws, complicating efforts to manage their care. *Id.*

Prior to the COVID-19 pandemic, CareDx had provided a portion of its testing services through a mobile phlebotomy program, in which a phlebotomist would travel directly to the patient's home—as opposed to the patient traveling to a doctor's office or transplant center—to draw blood for one of CareDx's tests. Ex. H at 5.  In response to the COVID-19 pandemic, CareDx implemented RemoTraC, a remote home-based blood draw service that allowed clinicians ordering mobile phlebotomy for AlloSure and AlloMap tests (performed and billed by CareDx) to also receive blood draws for other routine blood tests (performed and billed by the clinician's lab of choice, not CareDx), such as metabolic panels.  *See* ¶¶ 3, 5, 35, 60, 75–76; Ex. B at 9.  RemoTraC enabled

---

[6] Office of Inspector General, Message from leadership on minimizing burdens on providers (Mar. 30, 2020), *available at* https://tinyurl.com/2u2vp8s9.

[7] Office of Inspector General, OIG Policy Statement Regarding Application of Certain Administrative Enforcement Authorities Due to Declaration of Coronavirus Disease 2019 (COVID-19) Outbreak in the United States as a National Emergency at 2 (Apr. 3, 2020), *available at* https://tinyurl.com/mthu6h7w.

[8] Suwasin Udomkarnjananun, et al., *Mortality risk factors of COVID-19 infection in kidney transplantation recipients: a systematic review and meta-analysis of cohorts and clinical registries*, SCI REP 11, 20073 at 1 (2021), *available at* https://tinyurl.com/4w22wrec.

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

immunocompromised transplant patients to continue to receive both CareDx testing and necessary routine blood draws without having to physically visit medical facilities and risk infection during the COVID-19 pandemic.  ¶¶ 3, 35, 60–61.

Thus, when a physician wanted to order a CareDx test as well as other routine blood tests without requiring the transplant patient to travel, the physician could order RemoTraC.  ¶¶ 59–61. CareDx would then enlist a mobile phlebotomist to travel to the patient's home, collect blood samples for CareDx tests as well as other routine labs ordered by the physician, and send the CareDx samples to CareDx's lab and the additional blood samples to the provider-designated labs.  ¶¶ 35, 75.  CareDx paid the mobile phlebotomist a fee for their travel, time, and labor.  ¶ 73.  CareDx did not charge the physician or the patient for the additional RemoTraC blood draw.  ¶¶ 75–77. However, CareDx did not provide or pay patients' lab processing fees when the additional draws were sent to provider-designated labs.

As COVID restrictions waned, so too did the demand for RemoTraC, though the program remained one of CareDx's offerings throughout the Class Period.  *See* Ex. D at 10–11.

**D.  Amidst the Pandemic, a Disgruntled Employee Steals Tens of Thousands of Documents from CareDx and Immediately Moves to CareDx's Top Competitor**

While CareDx was urgently responding to the COVID-19 pandemic, it became embroiled in a breach of contract and trade secrets dispute with a former employee, Dr. Michael Olymbios, who features prominently in the AC.  *E.g.*, ¶¶ 49–58.  Dr. Olymbios worked at CareDx for a year and five months, between May 2019 and October 2020. ¶ 49 n.6.  As described further in the Motion to Strike, Dr. Olymbios received a written reprimand for harassing a fellow employee and over time became disgruntled; after representing to CareDx that he intended to move to the financial services industry, Dr. Olymbios instead accepted a job with CareDx's primary competitor, Natera, Inc.  *See* Ex. U at 6.  CareDx discovered—through its own investigation and subsequently in litigation against Dr. Olymbios—that before leaving CareDx to work at Natera, Dr. Olymbios stole over 50,000 CareDx documents and emails, including confidential, competitive intelligence.  ¶ 49; Ex. U at 6.

In November 2020, CareDx asserted breach of contract and trade secrets claims against Dr. Olymbios in a confidential arbitration—per the terms of Dr. Olymbios' employment agreement.

7

Those proceedings remain ongoing. Ex. U at 9; ¶ 53 n.9. Nearly 18 months into arbitration, Dr. Olymbios filed a complaint in San Mateo County on April 15, 2022, under the ruse of a misconstrued JAMS deposit request. ¶ 49; Ex. U at 6–7. The court promptly referred Dr. Olymbios' claim back to arbitration, but not before Dr. Olymbios' "whistleblower" claims—which are vigorously disputed by CareDx—were publicized and became the basis for this lawsuit.[9]

## III.  ARGUMENT

To plead a violation of Section 10(b) or Rule 10b-5, Plaintiffs must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). The core elements of falsity, scienter, and loss causation must be plead with particularity. *Id.*; *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). "The precedents of the Supreme Court and this court teach that the PSLRA's heightened pleading requirements are meaningful ones, requiring courts carefully to evaluate securities fraud complaints to ensure compliance with the statute's elevated pleading standards." *Endologix*, 962 F.3d at 413. In addition to the PSLRA, Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." *Id.* at 414.

### A.    Plaintiffs Fail to Plead Materially False Statements or Omissions

To plead a materially false statement or omission, the PSLRA requires that the complaint "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *Id.* at 414 (quoting 15 U.S.C. § 78u-4(b)(1)). "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Corinthian Colleges*, 540 F.3d at 1061.

---

[9] ¶ 49; Minute Order, *Olymbios v. CareDx, Inc.*, No. 22-CIV-01582 (Cal. Sup. Ct. San Mateo Cnty. June 10, 2022).

Liability under Rule 10b-5 is limited to the "maker" of the allegedly false statement. *In re Nektar Therapeutics*, 2020 WL 3962004, at *10 (N.D. Cal. July 13, 2020). Because the AC fails to allege Dr. Maag made any statement, the Rule 10b-5 claim against Dr. Maag should be dismissed.[10]

### 1.    The AC Fails to Allege Any Underlying Medicare Fraud

As a threshold matter, Plaintiffs fail to plead any underlying Medicare fraud, including that RemoTraC was "entirely built on illegal schemes," which forms the foundation of the AC. *See, e.g.*, ¶¶ 132–33. The heart of Plaintiffs' attack on RemoTraC is that CareDx improperly "bundled" its tests with other standard lab tests and thereby "induce[d]" physicians to order "unnecessary" AlloSure tests. ¶¶ 60, 61, 63, 66, 72, 75. But these allegations do not withstand scrutiny.

For starters, at no point do Plaintiffs explain why drawing additional blood for routine blood panels, which would then be sent to a non-CareDx lab, tested, and billed to the patient, is in any way *improper*. ¶¶ 5, 52, 60, 92. Hence, this entirely conclusory allegation can be disregarded. *See Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1226–27 (C.D. Cal. 2017) ("broadly claiming" that defendants unlawfully obtained a tax ruling failed to establish falsity because plaintiffs "provide[d] insufficient *facts* to support their propositions"). To the contrary, RemoTraC was precisely the kind of patient-centered response to the COVID-19 pandemic invited by HHS OIG through its emergency guidance issued in early 2020. *See* Sec. II.D., *supra*. Furthermore, the only thing of value provided to the physician was the additional blood draw, which had a market value of $3–$5, according to the AC. ¶¶ 73, 76. Such de minimis value could hardly induce a physician to order unnecessary blood tests. *See Endologix*, 962 F.3d at 415 (plaintiff's "theory does not make a whole lot of sense" and "does not resonate in common experience").

In any event, Plaintiffs' "inducement" theory relies almost exclusively on the sweeping, triple hearsay claims of FE-1, who worked at CareDx for all of nine months and joined the Company over a year after RemoTraC was implemented. ¶ 60 n.10. For example, FE-1 "was told" by "other [unidentified] employees" that "many doctors . . . didn't fully understand that the bundled AlloSure

---

[10] Although Dr. Maag signed the Company's SEC filings in his role as Executive Chairman, ¶ 25, none of the SEC filings challenged in the AC were signed by Dr. Maag.

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

test was something markedly different from the routine tests it was bundled with" and that "certain doctors . . . were ordering AlloSure only because they had to do so in order to complete the" routine labs. ¶ 61. The AC does not allege who these doctors were, when these conversations took place, or how many of these doctors did not understand what tests they were ordering. This is the exact type of vague hearsay from a confidential witness that courts in this Circuit refuse to credit at the pleading stage.[11] Likewise, Plaintiffs allege that FE-1 "personally reviewed numerous patient records," which, in FE-1's personal view, showed AlloSure was being ordered for "no medical reason." ¶ 60. But the AC does not indicate whether these tests even came from RemoTraC, the number of medical records FE-1 reviewed, what the medical records contained or from what time period, or FE-1's qualifications to make this type of medical assessment.[12] Plaintiffs' other scattershot allegations of regulatory misconduct do not raise a plausible inference that RemoTraC was "entirely built on illegal schemes." ¶ 132.[13]

---

[11] *See Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 997 (9th Cir. 2009) (confidential witness statements "based on at least one level of hearsay" were "vague and unreliable" and failed to establish the requisite particularity due to their lack of personal knowledge). Other "inducement" allegations suffer from the same defects. FE-4 "heard that AlloSure was bundled together with other blood tests . . . to promote and induce physicians to order AlloSure." ¶ 66. Dr. Olymbios alluded to RemoTraC once in his complaint, alleging in conclusory fashion that CareDx "bundl[ed] AlloSure with other blood tests as part of a mobile phlebotomy service to induce physicians to order Allosure[.]" ¶ 51. Neither FE-4 nor Dr. Olymbios explain how bundling caused any inducement. These allegations are not sufficiently particularized.

[12] *See Endologix*, 962 F.3d at 416 (disregarding confidential witness allegations that "lack[ed] any detail about the supposed" wrongdoing); *Zucco*, 552 F.3d at 996 (complaint "fail[ed] to allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged.").

[13] Allegations of excessive payments to mobile phlebotomists (¶¶ 72–77) do not suggest any improper "kickbacks" because, as Plaintiffs allege, it is *the physicians—not the phlebotomists—* who order RemoTraC, ¶ 75, and therefore CareDx would not stand to benefit by overpaying a phlebotomist. Only where payments are made to the ordering physician—such as what happened in the Berkeley HeartLab case cited by Plaintiffs, ¶ 74—could overpayment potentially serve as an inducement, but that is not alleged here. Likewise, the Clinical Laboratory Fee Schedule (¶ 73) sets forth what Medicare will *reimburse* for blood draws, not what labs are permitted to *pay for* blood draws. CMS, Clinical Laboratory Fee Schedule at 3 (Dec. 2022), https://tinyurl.com/2d9uxvcy. Allegations that CareDx improperly treated physicians to lavish gifts (¶ 70) rely almost entirely on FE-6, who left CareDx in July 2020, almost half-a-year before the start of the Class Period. Other gift-related allegations are far too generalized and rely on hearsay. ¶¶ 51, 54, 71. And these allegations have no apparent connection to RemoTraC and the AC does not even allege that the

---

10

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

**2.    The AC Fails to Connect the Alleged Misconduct to an Actionable False Statement**

Ultimately, however, the Court need not resolve any questions about the permissibility of the RemoTraC offering or resolve the allegations of Medicare fraud because, even crediting Plaintiffs' allegations, none of the statements challenged by Plaintiffs are rendered false by this purported misconduct.  Aside from statements contained in underwriting agreements—which cannot form the basis of a securities fraud claim, *see* Sec. III.A.3(a), *infra*—the Defendants never made any representations about the permissibility of the RemoTraC service.  Nor, for that matter, does the AC identify any statements by Defendants implicating CareDx's payments to phlebotomists, Medicare reimbursement claims, registry studies, or compliance with law more generally.

Faced with that reality, Plaintiffs are forced to challenge a litany of statements made by Dr. Seeto and Mr. Dhingra during the Class Period broadly discussing RemoTraC's origins and future prospects, ¶¶ 129, 130, 136, 140, 141, 143, 150, or, even further afield, statements that did not even reference RemoTraC—but were somehow also rendered false because of the RemoTrac "scheme"—such as statements touting CareDx's "winning formula" and successful "business model," ¶¶ 131, 135, 146, 149, 151, 161.  As a result, the required "one-to-one connection between misleading statements and the reasons why the statements are misleading" is utterly lacking here. *Waterford Township Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018).

This tactic of pleading sweeping allegations of misconduct but then failing to connect them to the statements made by the defendants presents clear parallels to *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008).  There, plaintiffs alleged that Corinthian Colleges was "pervaded by fraudulent practices designed to maximize the amount of federal Title

physicians who received gifts also ordered AlloSure tests through RemoTraC or otherwise.  Finally, allegations concerning excessive payments in connection with the KOAR study (¶¶ 82–85) also have no connection to RemoTraC, depend on Plaintiffs' facially incorrect claim that Medicare prohibits billing for tests as part of a study (¶ 82; *see* OIG, Special Fraud Alert: Laboratory Payments to Referring Physicians at 5 (June 25, 2014), *available at* https://tinyurl.com/46cnc3sd), and rely on allegations from FE-8, who was at the Company for only *four months*, beginning their employment *three and a half years* after the start of KOAR, ¶ 85.

11

IV funding," including "schemes" to falsify enrollment data submitted to the federal government. *Id.* at 1055–56. According to the complaint, buttressed by confidential witness allegations and concurrent government investigations, "as many as 50% to 60% of the people defendants represented to the U.S. government as being qualified, attending 'students' were . . . unqualified[.]" *Id.* Similar to the AC here, plaintiffs in *Corinthian Colleges* challenged a "far-ranging collection of" purportedly false statements, including statements regarding "increasing student enrollment," statements "regarding the Company's educational services and business practices," and statements "lauding the Company's strong financial performance." *Id.* at 1056–57, 1071. Notwithstanding these sweeping allegations, the Ninth Circuit affirmed dismissal because, among other pleading deficiencies, plaintiffs "simply fail[ed] to identify with specificity how and why" any of these alleged misstatements were false. *Id.* at 1070–72. Here, as in *Corinthian Colleges*, the AC "fails to sufficiently allege facts that demonstrate the falsity of [CareDx's] characterizations of its financial health and business practices during the Class Period." *Id.* at 1070–71.

### 3. The Purported False Statements Are Non-Actionable or Otherwise Deficient

As detailed below, the alleged misrepresentations fall into three categories: (1) statements related to two underwriting agreements; (2) statements about RemoTraC, CareDx's testing services business and business model; and (3) statements about CareDx's ASP. These claims all fail.

### (a) Plaintiffs Cannot Base Securities Fraud Claims on Alleged False Representations in Private Commercial Contracts

In connection with two securities offerings, CareDx filed with the SEC the "Underwriting Agreements" entered into between CareDx and the banks that served as underwriters for the offerings, as required by SEC regulations. ¶¶ 126, 158; Exs. E and F. In both Underwriting Agreements, CareDx made to the underwriters the same broad contractual representation that the Company was in "material compliance with[] *all* health care laws." ¶¶ 126, 158.

The SEC Form-8-K filings in which CareDx described and attached the Underwriting Agreements (¶¶ 126, 158) contained express, unambiguous disclaimers warning investors that CareDx was disclosing the Underwriting Agreements ***only*** to inform investors as to the terms of the agreements and ***not*** to provide investors with factual information about the Company:

12

The **representations**, warranties and covenants contained in the Underwriting Agreement were made **only for purposes of such agreement** and as of specific dates, were **solely for the benefit of the parties to the Underwriting Agreement**, and may be subject to limitations agreed upon by the contracting parties. Accordingly, the Underwriting Agreement is incorporated herein by reference **only to provide investors with information regarding the terms of the Underwriting Agreement**, and **not to provide investors with any other factual information regarding the Company or its business**[.][14]

In substance, Plaintiffs now allege that these representations were false, but courts have repeatedly rebuffed such efforts to turn alleged breaches of contractual representations into claims for securities fraud. *In re Plains All American Pipeline, L.P. Securities Litigation*, 307 F. Supp. 3d 583 (S.D. Tex. 2018) is instructive. There, plaintiffs alleged that the defendant made false statements about its remediation of an oil spill, including representing in an underwriting agreement that the defendant was not violating any environmental laws. *Id.* at 636. The court concluded that the representations were "not . . . statements of certainty made to the investing public" based on (a) the "context of the statements in contractual agreements with underwriters," (b) "the fact that the agreements must be filed with the SEC," and (c) the surrounding cautionary language stating that the representations "were made 'solely for the benefit' of the Underwriters." *Id.* at 638.

Similarly, in *Jaroslawicz v. M&T Bank Corp.*, the District of Delaware held that a compliance-with-law representation contained in a publicly disclosed third-party contract was not actionable under Section 14(a) of the Securities Exchange Act where the proxy statement attaching the contract contained a disclaimer with language substantially similar to that of the CareDx disclaimer quoted above. 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017). The court reasoned that "[n]o reasonable shareholder would look at this disclaimer and then rely on the representations and warranties contained in [the contract] to understand the actual condition of M&T." *Id.*

Circuit precedent likewise supports dismissal of Plaintiffs' claims. In *Reese v. BP Exploration (Alaska) Inc.*, the Ninth Circuit held that an alleged breach of a contractual provision in a royalty agreement did not give rise to a claim of securities fraud. 643 F.3d 681, 692–94 (9th Cir. 2011). While one dispositive factor was that the provision at issue was forward-looking, the

---

[14] Ex. E at 2. The Form 8-K containing the April 2022 Sales Agreement contained virtually identical language. Ex. F at 2.

13

Ninth Circuit also highlighted that (a) the royalty agreement was "attached to SEC filings made to fulfill unrelated regulatory requirements" and therefore the court did "not view the public filing of the [royalty agreement] as the sort of traditional fraudulent misrepresentation of fact that could induce investors mistakenly to buy securities"; (b) the allegedly breached contract provision itself was "quite broad"; and (c) the provision was "one section of a large and detailed contract whose main purpose" had nothing to do with the alleged misconduct giving rise to securities fraud. *Id.* The compliance with law representations at issue here share all of the same characteristics.

The Ninth Circuit's decision in *Glazer Capital Management LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008), provides an illustrative contrast. There, the Ninth Circuit held that compliance-with-law representations contained in a merger agreement attached to the defendant's 10-K filing were not per se inactionable under the securities laws because the merger was a "very significant" event for the company, which "could have expected intense investor interest in the details of the merger." *Id.* at 741. But, critically, the 10-K filing in *Glazer* was *without* any of the disclaimer language set forth in CareDx's 8-K filing (or in the filings in *Jaroslawicz*). And regardless there are no allegations here that CareDx investors were "intense[ly] interest[ed]" in the details of these securities offerings—nor would any such allegation be plausible.

**(b)**     **The Alleged Misstatements Concerning RemoTraC, CareDx's Testing Services Segment, and CareDx's Overall Business Model Are Inactionable or Suffer from Other Fatal Pleading Deficiencies**

Forward-Looking Statements:  Under the PSLRA, forward-looking statements are afforded a safe harbor and "a defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (N.D. Cal. 2021).

For example, the Ninth Circuit has held that statements by a healthcare company about its expectations of continued growth were forward-looking statements subject to the Safe Harbor. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058–59 (9th Cir. 2014) (protected forward-looking statements included: "'*we continue to expect dVP* procedures to grow approximately 40%'"; "'you'll see that the addition of those procedures has required a lot of hospitals to get third and fourth systems[] [a]nd *we see that continuing*,'" "'gynecology is a big

14

player in that, and I think *will continue to be and continue to expand*'"') (emphases added).  In particular, courts have found that a statement that a business practice is "sustainable" is protected under the Safe Harbor.[15]

Here, a number of the challenged statements—listed in Appendix A-1[16]—are similar to those deemed forward-looking in *Intuitive Surgical* and other cases.  They include statements—many of which responded to questions by analysts about the Company's future outlook—about RemoTraC's sustainability and CareDx's "winning formula."  They are expressed using forward-looking phrases such as "sustainable," "going to be," "moving forward," "we do expect," and "long-term."  ¶¶ 130, 135, 136, 140, 141, 146, 151.  These mirror exactly the type of statements that courts routinely deem forward-looking and subject to the Safe Harbor when accompanied by cautionary language, or when made without actual knowledge that the statement is false or misleading.

With one exception, Defendants' forward-looking statements were accompanied by meaningful cautionary language, placing them squarely within the Safe Harbor.  15 U.S.C. § 78u–5(c)(1)(A)(i).  This is because the statements directed investors to CareDx's SEC filings for "a list and descriptions of the risks and uncertainties associated with our business"[17] and the cross-referenced SEC filings disclosed the very risks Plaintiffs allege manifested here: risks relating to Medicare, denial of coverage, and billing and reimbursement practices, and legal risks including under the "Anti-Kickback Statute."  Ex. A at 25–29, 45, 50.  These risk disclosures constitute meaningful cautionary language sufficient to trigger protection under the Safe Harbor.[18]

The sole exception—Dr. Seeto's statement in February 2021 that RemoTraC "is sustainable and it's going to be maintained as 9 in 10 patients want to really keep the services" (¶ 130)—is

---

[15] *See Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *16 (S.D.N.Y. Sept. 21, 2021) (where plaintiffs alleged that medical device company engaged in improper sales tactics and relied on questionable clinical data, statements that the company was experiencing "'sustainable growth'" were protected forward-looking statements).

[16] Appendix A catalogues the challenged statements addressed in this Section III.A.3(b).

[17] *See* Ex. I at 4 (¶¶ 135–36); Ex. J at 4 (¶¶ 140–41); Ex. K at 4 (¶ 146); Ex. L at 4 (¶ 151).

[18] *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1062 (N.D. Cal. 2012) (finding that similar disclaimers at the beginning of earnings calls accompanied by risk disclosures in SEC filings constituted meaningful cautionary language).

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

nonetheless inactionable because Plaintiffs fail to allege that Dr. Seeto had "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(i). "Actual knowledge" is "stricter" than scienter. *Villare*, 2021 WL 4311749, at *17. Plaintiffs must allege that the speaker knew that the projection was "unachievable or unrealistic." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 n.24 (S.D.N.Y. Apr. 2, 2020). The AC does not allege that Dr. Seeto was told or otherwise knew in early 2021 that RemoTraC was not sustainable.[19] *See also* Sec. III.B., *infra*.

Puffery and Statements of Corporate Optimism: "[V]ague statements of optimism" that are "not capable of objective verification" are also inactionable. *Macomb County Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098–99 (9th Cir. 2022). They "are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Intuitive Surgical*, 759 F.3d at 1060.

For example, in *Align Technology*, a case involving a manufacturer that depended heavily on sales in China, the Ninth Circuit affirmed dismissal because, although plaintiffs sufficiently alleged that defendant's growth in China had slowed, many of the challenged statements constituted puffery, including statements such as "'we still have a great business in [Asia-Pacific] from a growth standpoint overall,'" "'China is a great growth market for us,'" and "'we see tremendous growth in [Asia-Pacific], in China in particular.'" 39 F.4th at 1099. Another court held that statements by defendants "extolling their unique commercial business model" and describing the "drivers of success of its PME [Prescriptions-Made-Easy] program" were puffery, notwithstanding allegations that the PME program involved illegal sales and kickbacks. *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018).

Here, the AC relies on exactly these type of statements of optimism, listed in Appendix A-2, about RemoTraC and the Company's "winning formula" during the Class Period. ¶¶ 129, 131, 134, 135, 136, 143, 149, 150, 161. These statements, which are marked by "feel good" monikers

---

[19] *See Primero Mining*, 230 F. Supp. 3d at 1225–26 (allegations that foreign tax authorities had begun conducting audits and threatening defendant's tax position did not render false statements about expected continuation of favorable tax position where plaintiffs did not "provide facts indicating whether the [government's] actions would have led [defendant] to believe that its [favorable tax status] would not be renewed").

16

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

such as "really well," "core part of our business," "solid strategic foundation," "winning formula," and "really nice engine of growth," do not "present the kind of precise information on which investors rely when valuing corporations" and therefore "plainly fit beneath the umbrella of puffery" and should be dismissed from the case. *Align Tech.*, 39 F.4th at 1099.

Statements About RemoTraC Addressing an "Unmet Need": Plaintiffs claim that statements by Dr. Seeto that RemoTraC addressed an "unmet need" (¶¶ 129, 130, 136; *see* Appendix A-3) were false because, as part of the alleged "scheme," CareDx used RemoTraC to bill Medicare for medically unnecessary tests. ¶¶ 132, 137. But that contention is defeated by the AC. As Plaintiffs allege, during the onset of the COVID-19 pandemic, a number of transplant centers and physicians had a pressing need for mobile phlebotomy services, given that transplant patients were uniquely vulnerable to the virus and were advised to stay home. ¶¶ 3, 61, 129. Thus, irrespective of whether CareDx billed Medicare for any medically unnecessary AlloSure Kidney tests, by Plaintiffs' own allegations, Dr. Seeto's statements were true: RemoTraC addressed an "unmet need" by transplant physicians to order routine blood tests without requiring patients to leave their homes.

Historical Data About RemoTraC and Testing Services Revenue: Plaintiffs challenge CareDx's reporting of historical data and financial figures, including reports on the number of patients using RemoTraC, the percentage of testing services revenue derived from RemoTraC, and testing services revenue growth more generally. ¶¶ 139, 145, 148, 149, 155; *see* Appendix A-4.

But Plaintiffs do not allege that the purported RemoTraC "schemes" rendered this data false. It is "well established that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." *Horizon*, 2018 WL 481883, at *9. In particular, accurately reported company data and financials are not rendered misleading because of a potential undisclosed regulatory violation.[20] Accordingly, even assuming Plaintiffs' alleged RemoTraC and

---

[20] *See Corinthian Colleges*, 540 F.3d at 1056 (statements regarding "increasing student enrollment" not rendered false by allegations that college was under investigation by the government for "perva[sive] fraudulent practices" and where "as many as 50% to 60% of the people defendants represented to the U.S. government as being qualified, attending students were either no shows in class or unqualified for admission and federal funds from the outset").

17

Medicare schemes, Plaintiffs fail to allege that these statements reflecting historical data were false or misleading.

(c)      **Plaintiffs Fail to Adequately Allege that CareDx's Stated Reasons for Declining ASPs Were False or Misleading**

Lastly, Plaintiffs challenge statements made by Mr. Dhingra and Dr. Seeto explaining why CareDx's "average selling price," i.e., total testing services revenue divided by the total number of tests performed, or "ASP" was declining.  ¶¶ 153, 156, 162.

During the Class Period, CareDx repeatedly disclosed the reasons for the decline in ASP to the market:  (1) a higher volume of tests were not being reimbursed—and hence ASP was declining—because CareDx was offering more tests that were less frequently reimbursed by insurance, such as newly launched AlloSure Heart and AlloSure Lung, ¶¶ 156, 162; (2) a higher proportion of CareDx's tests were given to patients with commercial insurance, which reimbursed for CareDx tests less often than Medicare, ¶¶ 153, 156, 162; and (3) legislative changes shifted more kidney transplant patients from Medicare to Medicare Advantage, which, as CareDx explained and the market understood, takes significantly longer to reimburse than traditional Medicare, ¶¶ 156, 162; Ex. M at 7.  As Mr. Dhingra explained in October 2021, declining ASPs were not caused by "changes in Medicare billing practices."  ¶ 153.

According to Plaintiffs, these disclosures were false because the true, but undisclosed, reason for declining ASPs was that Medicare was "increasingly denying reimbursement for CareDx's clearly unnecessary and fraudulently billed AlloSure tests."  ¶ 157.  But these allegations mischaracterize what was said and, beyond that, are nothing more than unsupported speculation, which does not satisfy the requirements of the PSLRA.

The foundation for the claim are statements made by Mr. Jain at a November 15, 2022 Jefferies Healthcare Conference.  There, Mr. Jain stated:

> Now the question is, the tests that are not being paid.  And the tests . . . are not being paid because of two or three reasons.  Number one, **we've brought in AlloSure Lung**.[21]  And of course, we know that the coverage there is less than 5%.  **We've brought AlloSure Heart** last year and we know that AlloSure Heart coverage is about 25% to 30% versus the 70% that

---

[21] AlloSure Lung is not covered by Medicare.  Ex. C at 9.

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

we have on AlloSure Kidney or on the AlloMap Heart side. And then we also started to kind of **expand on the community nephrology side** in the AlloSure Kidney, right?

So, **those are the three pieces where we were able to capture the market by increasing the volumes**, but there the commercial mix is a lot more on the unpaid test side, which is basically in my mind, as a CFO, **if 40% or 50% of my tests are not being paid**, which is like 70,000 to 80,000 tests, should I look at the $200 million opportunity in revenues, or should I basically say that, I'm not going to [be] doing these tests.

Ex. O at 4–5 (emphases added); ¶ 121.

While Plaintiffs tout throughout the AC that Mr. Jain revealed at the conference that CareDx was "being denied any reimbursement for as many as 50% of all tests it administered," ¶¶ 14, 112, 121, 124, Mr. Jain clearly explained that "tests are not being paid" because of the "three pieces" that drove down ASPs, including the rollout of new tests—none of which involved Medicare applying increased scrutiny to CareDx's claims on the basis of any purported fraud. Thus, Mr. Jain's remarks were entirely consistent with the challenged statements. *See* ¶¶ 153, 156, 162.[22]

Nor did Mr. Jain "admit[]" that Medicare Advantage plans were "applying greater scrutiny to CareDx's fraudulent claims for unnecessary tests" when he described how the process for submitting claims to Medicare Advantage was more arduous than for ordinary Medicare. ¶¶ 121–22. Mr. Jain was describing, as previously disclosed, "the reality of [the] collection cycles of Medicare Advantage," which included a lengthy and detailed pre-submission, submission, and appeals process. ¶ 122; Ex. O at 4–5.[23] Again, these statements reinforce rather than undermine the challenged statements.

Beyond that, Plaintiffs offer nothing more than unsupported disagreement with the Company's explanations. While citing a Craig-Hallum analyst report from November 2022 that allegedly "rejected" CareDx's explanations for declining ASPs, ¶ 116, the report actually concluded

---

[22] Similarly, when Dr. Seeto said at the Company's November 2022 earnings call "[w]here we're not reimbursed, that's what we have to work on," ¶ 113, he was expressing that CareDx had to work on obtaining broader coverage for its tests, not that Medicare was rejecting CareDx's claims. In fact, the very next thing Dr. Seeto said was "we have to work on *how do we get coverage*, right?" Ex. N at 10 (emphasis added).

[23] As one analyst noted during the Class Period: "these [Medicare Advantage] plans contract more aggressively and are more likely to refuse payment, resulting in lower ASPs than Medicare." Ex. S at 1.

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

that "more tests are not being paid," ¶ 116, which was entirely consistent with CareDx's previous disclosures and with the challenged statements. And while Plaintiffs also point to language in the invitation for a November 16, 2022 advisory meeting hosted by MolDX—the Medicare contractor in charge of determining coverage for CareDx's tests—that MolDX was "reconsidering" coverage positions on an industry-wide basis, ¶ 124, the market perceived the meeting as *overwhelmingly positive* for CareDx and an endorsement of its AlloSure testing protocols—not what one would expect from a meeting that supposedly "confirmed . . . that CareDx was improperly billing for tests." ¶ 124.[24] Tellingly, none of the Former Employees, nor Dr. Olymbios, allege that ASP was declining because claims were being rejected by Medicare as fraudulent (or at all).

## B. Plaintiffs Fail to Plead the Requisite Strong Inference of Fraudulent Intent

The AC must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Endologix*, 962 F.3d at 414 (quoting 15 U.S.C. §78u-4(b)(2)(A)). "To support a 'strong inference' of scienter . . . a complaint must allege that the defendant made false or misleading statements with an intent to deceive, manipulate, or defraud, or with deliberate recklessness." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021). Plaintiffs must allege scienter "with respect to each of the individual defendants[.]" *Apollo*, 774 F.3d at 607. Although a corporation may be liable for the securities law violations of its executives, corporate scienter may not be pleaded based upon the scienter of an executive who did not make any of the challenged statements. *Glazer*, 549 F.3d at 745.[25] Nor can the scienter of one executive be imputed to another. *Id.*

Here, the AC fails to sufficiently allege scienter. First, there are no allegations that Mr. Konrad or Mr. Dhingra acted with scienter, so the claims against them must be dismissed. There is

---

[24] Ex. Q at 1; Ex. T at 1; Ex. R at 1.

[25] *See id.* (plaintiff was "required to plead individual scienter with respect to [defendant CEO] because [the CEO] was responsible for actually making the statements" challenged and "the fact that [plaintiff] could have shown that a *different* executive knew about the FCPA violations would do nothing to resuscitate [plaintiff's] claims"); *In re Zoom Sec. Litig.*, 2022 WL 484974, at *5 (N.D. Cal. Feb. 16, 2022) (although scienter had been adequately alleged as to defendant CEO, CEO's scienter could not be attributed to corporation with respect to certain alleged misstatements because the CEO was "not sufficiently alleged to have made" those statements).

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

not a single substantive allegation in the AC directed at Mr. Konrad.  As for Mr. Dhingra, although Plaintiffs allege that he made false statements, the AC does not raise any allegations speaking to Mr. Dhingra's state of mind.  Notably, Mr. Dhingra joined CareDx five months *after* Dr. Olymbios left.  ¶¶ 28, 49 n.6.  Nor do Plaintiffs allege any motive to defraud on the part of Mr. Dhingra.

Second, as to Dr. Maag: (1) allegations against one individual defendant cannot be imputed against another individual defendant; and (2) because Dr. Maag is not alleged to have made any false statements, *see* Sec. III.A., *supra*, any scienter allegations as to Dr. Maag (¶¶ 57, 169, 171, 174, 178–83) cannot be imputed to the Company.  These allegations are therefore completely irrelevant.[26]

Third, the AC fails to adequately allege scienter by the Company or Dr. Seeto, the only Individual Defendant alleged to have both made a statement and have scienter, and thus the only individual whose scienter may be imputed to the Company.

Stock Sales:  Plaintiffs claim that stock sales by Dr. Seeto during the Class Period create a strong inference of motive to defraud.  ¶¶ 178–86.  But every one of Dr. Seeto's sales highlighted in the AC (¶¶ 184–85) were made pursuant to a 10b5-1 trading plan, which rebuts any inference of motive.  Ex. G.  *See In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23,

---

[26] They would in any event fail.  Most of the scienter allegations related to Dr. Maag are sourced exclusively from the separate complaint of Dr. Olymbios and therefore must be stricken.  ¶¶ 57, 167, 174.  *See* Def.s' Mot. to Strike.  Even if not stricken, Dr. Olymbios' allegations are unfounded and, at best, egregiously mischaracterize Dr. Olymbios' interactions with Dr. Maag.  Further, Dr. Olymbios' allegation that Dr. Maag told him in mid-2020—six months before the Class Period—not to put in writing that CareDx "never billed patients" in order to distance himself from that practice, ¶ 57, does not contradict any of the alleged misstatements and therefore cannot possibly suggest intend to defraud.  *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *11 (S.D. Cal. Sept. 20, 2021) (scienter not alleged because no allegations that CEO "knew information that was inconsistent with the public statements that he made").  And simply using messaging applications like WhatsApp that have "ephemeral" settings (¶ 174) does not give rise to a strong inference of scienter, especially where, as here, there are no allegations that Dr. Maag (or any Individual Defendant) discussed the alleged misconduct using these applications.  As for the allegations sourced from FE-6 concerning gifts to physicians, FE-6 (Dr. Maag's executive assistant) left CareDx in July 2020, which was five months before the Class Period, ¶ 169, and therefore "could not have personal knowledge" of the allegedly false statements.  *Mattel*, 321 F. Supp. 3d at 1154.  Finally, Plaintiffs' allegation that Dr. Maag, at some point in his nine-year career at CareDx, "sign[ed] off on all the expenses," ¶ 171, does not suggest Dr. Maag had any knowledge of the alleged RemoTraC misconduct or the other alleged offenses.

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

2021) (because stock sales were all made pursuant to a 10b5-1 plan, "defendants did not have immediate control over these planned sales, so these sales, made without concern for the market, cut against a finding of scienter"); *Nektar Therapeutics*, 2020 WL 3962004, at *16 (same).

As for Dr. Maag, allegations directed at Dr. Maag's motive are wholly irrelevant to the scienter analysis for the reasons noted above. Even if they were, many of Dr. Maag's trades in question were also made pursuant to a 10b5-1 trading plan. Likewise, the AC "contains no allegations regarding [Dr. Maag's] prior trading history, which are necessary to determine whether the sales during the class period were out of line with historical practices." *Intuitive*, 759 F.3d at 1064; *see also Zucco*, 552 F.3d at 1005 ("plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period") (citing cases). Indeed, in the year prior to the Class Period, Dr. Maag sold approximately $8.7 million worth of CareDx stock. *See Fastly*, 2021 WL 5494249, at *17 (class period stock sales 2.5 times greater than prior period were not "dramatically" out of line with prior trading practices).

Olymbios Allegations: Plaintiffs source the vast majority of their scienter allegations from Dr. Olymbios' separate complaint, but make no effort to independently investigate those allegations, and therefore they must be stricken. Thus, allegations from Dr. Olymbios that he "raised concerns" to Dr. Seeto and Dr. Maag (¶ 167) must be stricken. *See* Def.s' Mot. to Strike. In any event, these allegations lack the requisite particularity. Neither Dr. Olymbios nor Plaintiffs allege what was actually said, what "concerns" were discussed (or whether they related to RemoTraC), or when. These are exactly the type of vague allegations of upward reporting that courts deem insufficient to plead a strong inference of scienter. *See Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) (scienter not pled where plaintiff alleged that "the declining pipeline was discussed with defendants" because plaintiff did "not provide any specific information about any particular meeting or the content of what was discussed"). In addition, Dr. Olymbios left CareDx months before the Class Period, ¶ 49 n.6, further rebutting any inference of scienter. *Zucco*, 552 F.3d at 996.

Anonymous Witness Allegations: None of the allegations from the Former Employees give rise to a strong inference of scienter for the simple reason that the FEs do not allege that any Individual Defendants were made aware that the challenged statements were false or misleading.

22

*See Intuitive*, 759 F.3d at 1063 (confidential witness allegations did not give rise to a strong inference of scienter because the witnesses "lack[ed] first hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health").[27]  Plaintiffs do not allege that any of the Former Employees reported to the Individual Defendants, communicated with them, or even had second-hand knowledge of what was communicated to them.

Core Operations Doctrine:   Plaintiffs attempt to invoke the so-called core operations doctrine, claiming that "[t]he fact that RemoTraC was essential to CareDx's financial success further supports a strong inference of scienter, as it is implausible that Defendants would not closely monitor the performance and condition of the program they created."  ¶ 191.  The core operations theory "infers that facts critical to a business' core operations or an important transaction are known to a company's key officers."  *NVIDIA*, 768 F.3d at 1063.  But "proof under this theory is not easy," *Intuitive*, 759 F.3d at 1062, and "absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter, the core operations inference will generally fall short of a strong inference of scienter."  *NVIDIA*, 768 F.3d at 1063.  As set forth herein, the AC contains no such allegations.  Nor have Plaintiffs "produce[d] . . . specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations."  *Intuitive*, 759 F.3d at 1062.  Plaintiffs allege only that Dr. Seeto "knew about the bills," ¶ 171, which is not particularized.  Likewise, the allegation that Dr. Seeto (and Dr. Maag) attended weekly "Braveheart" meetings "to discuss sales and marketing issues," ¶¶ 175–77, does not satisfy the particularity requirements of the PSLRA.  *See Zucco*, 552 F.3d at 1000 ("[A]llegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter (through the use of the Access databases), and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter).

---

[27] *See also NVIDIA*, 768 F.3d at 1064 ("Plaintiffs never plausibly allege that specific information was conveyed to [the CEO] or others in NVIDIA's management team. . . .  CW1 surmises that, based on his/her boss's status in HP's corporate hierarchy, he was communicating with executive personnel from NVIDIA").

23

### C.    The Complaint Does Not Adequately Allege Loss Causation

The burden of pleading loss causation—that "defendants' misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss"—is "typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and its investors to lose money." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022).    Importantly, the alleged corrective disclosure must "expose[] the falsity of the earlier" misstatement.  *Id.  See also Fleming v. Impax Lab. Inc.*, 2018 WL 4616291, at *5 (N.D. Cal. Sept. 7, 2018) (complaint must "identify a corrective disclosure . . . that is linked to . . . the alleged misstatements and omissions").    Here, Plaintiffs point to various "corrective disclosures," none of which are alleged to have exposed the falsity of the challenged statements.   ¶¶ 192–203.

Announcement of Government Investigations:   Plaintiffs first point to CareDx's October 2021 announcement of government investigations "regarding certain business practices related to [CareDx's] kidney testing and phlebotomy services" and subsequent stock price decline, ¶ 196.  This disclosure does not establish loss causation as a matter of law.  As the court in *Loos v. Immersion Corp.* observed, the "announcement of an investigation does not 'reveal' fraudulent practices to the market . . . it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct." 762 F.3d 880, 890 (9th Cir. 2014).[28]  Here, nothing more than investigations was revealed.

Executive Departures:   Plaintiffs claim that the May 2022 announcement of Mr. Dhingra's resignation, as well as the September 2022 announcement that Chief Marketing Officer Sasha King was going to resign, constitute corrective disclosures.   ¶¶ 199, 200.  But the AC does not allege that these announcements "expose[d] the falsity of" the alleged misstatements.  *Nektar Therapeutics*, 34 F.4th at 838.  To the contrary, the AC alleges that CareDx "went out of its way to specifically ensure investors that" Mr. Dhingra's departure was not related to any "regulatory matters."   ¶ 199.

---

[28] *See also Impax*, 2018 WL 4616291, at *5 (where plaintiffs alleged misstatements relating to drug price fixing, loss causation not alleged where alleged corrective disclosures included "reports that federal prosecutors might file criminal charges against Impax for unlawfully colluding to fix drug price").

24

Earnings Announcements:    Finally, Plaintiffs point to three quarterly earnings announcements—October 2021, May 2022, and November 2022 (¶¶ 197, 198, 201)—but these announcements merely revealed financial results the AC alleges were disappointing; the AC does not allege that they revealed the truth behind CareDx's alleged RemoTraC "scheme."    *See Immersion Corp.*, 762 F.3d at 887–88 ("our precedent requires a securities fraud plaintiff to allege that the market learned of and reacted to the fraud, as opposed to merely reacting to reports of the defendant's poor financial health").    To the extent Plaintiffs claim that CareDx's explanation for declining ASPs during these earnings announcements revealed CareDx was "overbilling Medicare," that theory fails for the reasons set forth in Section III.A.3(c), *supra*.    Moreover, with respect to the October 2021 and May 2022 announcements, Plaintiffs allege that Defendants made affirmative misstatements about declining ASPs in connection with those same disclosures.    ¶¶ 153, 162.    It cannot be that Defendants simultaneously lied to the market about declining ASPs and revealed the truth about declining ASPs.

### D.    Plaintiffs' Claims for Violation of Section 20(a) of the Exchange Act Should Be Dismissed

Plaintiffs' failure to plead a violation of Section 10(b) of the Exchange Act defeats Plaintiffs' Section 20(a) claims.    *Endologix*, 962 F.3d at 413.    In addition, Plaintiffs cannot plead control liability against (1) Mr. Konrad after he transitioned from interim CFO to Senior VP of Finance & Accounting in March 2021 (or certainly after he left CareDx in July 2021), ¶ 27, or (2) Mr. Dhingra before March 2021, when he joined CareDx, or after May 2022, when he resigned, ¶ 28.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: January 27, 2023                     Respectfully submitted,


By: */s/ Laura Leigh Geist*
    Laura Leigh Geist


WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
        bdyer@willkie.com


WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
       ccording@willkie.com
       bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,*
*Ankur Dhingra, Marcel Konrad,*
*and Peter Maag*

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

**Appendix A-1 – Forward-Looking Statements**

| Forward-Looking Statement | Maker of Statement | Am. Complaint[1] |
|---|---|---|
| In response to a question about future expectations:[2] "And that business is now something, which *is sustainable* and it's *going to be* maintained as 9 in 10 patients want to really keep the services." | Reginald Seeto | ¶ 130 |
| In response to a question about future expectations:[3] "And so, *we expect* to have RemoTraC as the core part of our business. . . . So *it'll be* a core part of our business *moving forward.*" (*see also* Appx. A-2) | Reginald Seeto | ¶ 136 |
| "So, *moving forward*, we do expect as we build out RemoTraC, there will be some more investments *through the year*[] [b]ut overall, from our ability to drive margins purely from our testing services perspective, remains intact." | Ankur Dhingra | ¶ 140 |
| In response to a question about future expectations:[4] "We *don't expect* substantial changes [to the percentage of testing services revenue derived from RemoTraC] here in the near term[] [a]nd that's our view from the *long-term perspective* as well, is to say the size of the investment that we've made substantially represents a good structure for us for the *medium term here* and enables us *continuing improvement* in the gross margins, especially from a *path to 75% perspective*." | Ankur Dhingra | ¶ 141 |
| In response to questions about future expectations,[5] numerous statements about CareDx's plans to carry forward its "winning formula" business model:<br><br>"So we actually got a really nice engine of growth and I think testing serves as the area that we have focused on.  We have really great winning formula and we'll continue to win protocols within centers and add new centers.  So that's sort of the winning formula | Reginald Seeto (¶ 135)<br><br>Ankur Dhingra (¶¶ 146, 151) | ¶¶ 135, 146, 151 |

---

[1] All emphases in this Appendix A have been added.

[2] Ex. P at 3 (question from analyst: "how do you see [RemoTraC] playing out beyond the pandemic in terms of percentage of the target customers or patients that you are going after?").

[3] Ex. I at 9 (question from analyst: "Any thoughts on how you're thinking about that in the first quarter here or full year '21?").

[4] Ex. J at 13 (question from analyst: "What do you think the steady state level of RemoTraC will be going forward?").

[5] Ex. I at 8 (question from analyst: "can you perhaps talk about some of the key growth drivers for this year?"); Ex. K at 15 (question from analyst: "what types of things could we look out for that might render that growth rate unsustainable?"); Ex. L at 10 (question from analyst: "as you're starting to think about the guidance going into '22, and again… how are you thinking about putting some of the puts and takes in there?").

| | | |
|---|---|---|
| we established." ¶ 135. (*see also* Appx. A-2)<br><br>"So the model that we are working on that Reg just described . . . on the direct to center side, where we continue to introduce and add our products into centers or continue to drive protocols and their adoptions.  That business model continues." ¶ 146.<br><br>"We expect our business model to continue to drive adoption, both across centers as well as in case of kidney, the nephrology settings. So that core business, we believe, can continue to drive meaningful double-digit growth." ¶ 151. | | |

**Appendix A-2 – Statements of Corporate Optimism**

| Statement of Corporate Optimism | Maker of Statement | Am. Complaint |
|---|---|---|
| "What worked *really, really well* for us [in the kidney space] during COVID is that centers were able to ask us for help and support and we were able to address their needs and demands.  And I think RemoTraC is a *really good example* of that."  (*see also* Appx. A-3) | Reginald Seeto | ¶ 129 |
| "[W]e expect to have RemoTraC as the *core part of our business. . . . So it'll be a *core part of our business* moving forward" | Reginald Seeto | ¶ 136 |
| RemoTraC "drove *significant higher penetration* for our tests" and "has become a *solid strategic foundation*" | Ankur Dhingra | ¶ 143 |
| "Overall RemoTraC that we see as a *core offering* continues to *do well*." | Reginald Seeto | ¶ 150 |
| "We have a great *winning formula* which is adding protocols, adding new centers." | Reginald Seeto | ¶ 131 |
| "This focus and commitment to the transplant community are the driving forces behind our growth.  And I expect 2021 to be another exciting year for CareDx" | Reginald Seeto | ¶ 134 |
| "So we actually got a *really nice engine of growth* and I think testing serves as the area that we have focused on.  We have *really great winning formula* and we'll continue to win protocols within centers and add new centers.  So that's sort of the *winning formula* we established." | Reginald Seeto | ¶ 135 |
| "For kidney testing, we continue with our *winning formula* of protocol adoption and adding new centers." | Reginald Seeto | ¶ 149 |
| "Overall, our business model of market penetration through addition of centers and patients continues to drive *strong performance* of our testing services business." | Reginald Seeto | ¶ 149 |
| "Now for Kidney Testing Services, we continue the *winning formula* of adding AlloSure name protocols, adding new centers, and expanding further into [community] nephrology." | Reginald Seeto | ¶ 161 |

**Appendix A-3 – Statements About RemoTraC Addressing an "Unmet Need"**

| "Unmet Need" Statement | Maker of Statement | Am. Complaint |
|---|---|---|
| "[W]hat worked really, really well for us [in the kidney space] during COVID is that centers were able to ask us for help and support and we were able to address their needs and demands. And I think RemoTraC is a really good example of that." | Reginald Seeto | ¶ 129 |
| "So, again, I think RemoTraC was addressing an unmet need. And I think what helped us is we could move very quickly to bring it to bear particularly during a time of crisis in the transplant community." | Reginald Seeto | ¶ 130 |
| "[I] think, with RemoTraC, this is something that was probably the highlight of last year what we did as an organization as we rallied around supporting patients and transplant centers. It's with such an unmet need and we were able to put it together so quickly and had such a fantastic response now more than 150 centers are using it." | Reginald Seeto | ¶ 136 |

**Appendix A-4 – Historical Data Not Alleged to Have Been False**

| Historical Data | Maker of Statement | Am. Complaint |
|---|---|---|
| "we have also more than 9,000 patients that have signed up for RemoTraC" | Reginald Seeto | ¶ 145 |
| "we have more than 11,000 patients who have direct access to RemoTraC" | Reginald Seeto | ¶ 155 |
| "mobile phlebotomy as a percent of volume maintained approximately 40%" | Reginald Seeto | ¶ 149 |
| "the driver of the quarter's growth was our testing services revenue, which increased 89% to $59.3 million" | Reginald Seeto | ¶ 139 |
| "The main driver of growth in the quarter was from our testing services revenue, which increased 79% to $64.9 million." | Reginald Seeto | ¶ 145 |
| "The primary driver of revenue growth was from our testing services, which increased 46% to $66.5 million." | Reginald Seeto | ¶ 148 |
| "Q4 was another record quarter[] where we delivered revenues of $79.2 million . . . .  Notably, our record fourth quarter testing services volume of 41,900 tests represented a 67% year-over-year growth[.]" | Reginald Seeto | ¶ 155 |