# Exhibit R



**November 17, 2022**

# CDNA – NTRA: MolDx CAC Meeting

| (Natera, Inc. - NTRA - $36.73) | Price Target: $117 |
|---|---|
| (CareDx, Inc. - CDNA - $13.64) | Price Target: $32 |

| **Alexander Nowak, CFA** | **Connor Stevenson** | **Chase Knickerbocker** |
|---|---|---|
| Senior Research Analyst | Research Analyst | Senior Research Analyst |
| 1 612-334-6347 | 1 612-334-6338 | 1 612-334-6335 |
| Alex.Nowak@craig-hallum.com | Connor.Stevenson@craig-hallum.com | Chase.Knickerbocker@craig-hallum.com |

## Initial Thoughts On MolDx CAC Meeting: KOLs Defend dd-cfDNA's Value In Transplant, But Is MolDx Questioning The Surveillance Setting?

### OUR CALL

MolDx held a Contractor Advisory Committee (CAC) meeting yesterday to discuss a range of topics around non-invasive transplant testing. To frame up the call, there will be two meetings (this one is on kidney/liver; kidney took up 99% of the call, second is heart/lung) and the purpose is to discuss evidence with KOLs throughout the transplant space to assist the MolDx Medical Director in determining coverage. The meeting invite included strong language perking everyone's attention stating: MolDx "requested an internal reconsideration of [transplant diagnostic coverage] after noting unexpected utilization patterns that are outside of expectations based on evidentiary review and manufacturer documentation." Unexpected utilization is harsh language from Medicare. We approached the CAC meeting listening between the lines to understand the rationale for Medicare's "unexpected" utilization language.

There were six KOLs on the call, all transplant surgeons from different centers throughout the country. Two individuals from Noridian (who head up MolDx) facilitated the discussion with questions around patient population, the tests' precision, clinical context and utility. We had two takeaways from the meeting:

1) dd-cfDNA is unquestionably becoming the de facto standard in transplant patient monitoring, with no questions about the tests' potential and use cases in the at-risk population to reduce biopsies and change care. CDNA's data was often considered top-tier, though Prospera was never discounted either. Some even viewed the tests as equivalent and some level of willingness to use them interchangeably by KOLs.

2) MolDx had great interest in understanding the potential use of dd-cfDNA in the surveillance setting. They wanted to know how the test is used in low-risk patients for surveillance and supporting documentation on clinical utility showing usage of repeat testing means better graft function, biopsy reduction, etc. As the discussion went on, questions frequently referred back to the frequency of testing in the surveillance setting, use of protocol surveillance biopsies and even hints around the costs of testing in the surveillance population. Again, with our specific frame of reference to uncover why MolDx wrote about unexpected utilization, surveillance was a recurring point that stood out to us.

What does this mean for transplant diagnostics? There will not be a blanket non-coverage for transplant tests; we do not see a risk to pricing; the value of multi-modality was not a question. But in the context of the meeting descriptor, it appears MolDx is trying to determine if these tests should only be performed on patients at high-risk for rejection, or should also be eligible in low-risk surveillance patients. Based on the initial meeting descriptor and our initial take on the CAC meeting live, there should be at least questions around the risk of a subtle (or even harsher) push by MolDx to review coverage of dd-cfDNA tests in the surveillance setting. Not saying we necessarily agree if MolDx goes this way because the value in immunosuppressant titration could be enormous for clinical utility. Timing is also completely unknown and could take months or years. We do know the LCD is written to potentially exclude surveillance testing already, so it could be as simple as a reminder to follow the LCD or a completely new LCD too (see discussion on the LCD in subsequent pages). With all that being said, we still need to digest the data, the expansive commentary, public comments to MolDx beyond KOLs at the CAC and potential scenarios; in short, we do have some questions on MolDx's thinking for surveillance testing, while dd-cfDNA tests in for-cause cases can continue to flourish. **See pages 2 – 5 for more specifics from the meeting discussions, look at the current LCD on surveillance coverage, background information on MolDx/LCDs.**

**CRAIG-HALLUM**
CAPITAL GROUP LLC

**November 17, 2022**

The structure of the meeting followed a discussion on seven different questions and a poll was taken on each one. At a high level the KOLs were asked to rate levels of published evidence to support a range of tests from AlloSure and AlloMap (CDNA), Prospera (NTRA), Viracor TRAC (Eurofins), QSant (NephroSant), kSORT, TruGraf and OmniGraf. Liver was also covered by this CAC meeting but was <1% of time allotted.

**Key Takeaways From KOL Discussion:** The conversation on dd-cfDNA tests broadly was excellent and completely supported the strong uptake in testing. KOLs said there was utility in the tests to rule-out biopsy and find rejection. This was all referenced as for-cause tests. We do not think there is any disagreement here. When the conversations approached surveillance there was much more debate and interjections by MolDx to ask about clinical utility in surveillance testing; specifically, is there utility in serially testing patients who are considered low risk for rejection? Are you reducing biopsy usage, extending graft survival, etc. The conversation among KOLs kept coming back to protocol surveillance biopsies, which we found peculiar considering the whole meeting is about non-invasive testing – see next paragraph for details on a potential link. But the point surgeons were trying to make is that surveillance biopsies are costly to the patient and carry a host of risks, and other surveillance techniques such as creatinine tests are unreliable (but cheap). KOLs agree that the long-term benefit to outcomes using dd-cfDNA vs. biopsy are unknown due to the infancy of the technology itself, but the simple fact that it can reduce the number of biopsies performed on a patient seemed to hold enough utility to these surgeons. In one panelist's remarks, he mentioned he sees nearly 50% of his patients have delayed graft function (DGF); he raised the point that surveilling all these patients via biopsy would equate to hundreds of biopsies and stresses a test with an NPV north of 90% clearly holds value here. There was also a debate that surveillance testing could have value in titrating immunosuppression and detecting rejections that could be missed, though CDNA's ADMIRAL study was specifically called out in that it found only a low level of rejections in surveillance. KOLs went on to say the remaining ADMIRAL patients were undergoing serial testing but did not reject – the point being there may not be as much utility in surveilling *all* patients (i.e. low-risk) via dd-cfDNA. Also a question on price ($2,800) was thrown out and while the tests have value in surveillance, is there a cost benefit to the system – a question that he states there is not enough data to answer. There was much more nuanced conversation among the two-hour runtime and parsing between the lines is critical for these government-like meetings. The frequency MolDx would ask follow-up discussion on surveillance makes it clear they are attuned to the data and makes us question why and if it related to the original meeting descriptor. The general conclusion was that more surveillance data around graft survival, reduction of biopsies and cost benefits that all follow a standardized testing frequency is needed – no one questioned the potential of these tests, but showing it in enough data was another point. And panelists also agreed that there is no evidence that a specific surveillance testing regimen should be followed; each center has its own protocol on who, when, how often and for how long a patient receives a cfDNA/GEP test.

**Should Surveillance Be Covered To Begin With?** Digging deeper into what seemed to be a hyper focus on surveillance for MolDx, we note that reimbursement for surveillance testing may already go against the existing LCD and this may be the agency's point. The piece on protocol biopsies mentioned earlier could be a potentially critical element. We are reading between the lines here – but here is our analysis: Under the non-umbrella universal LCD by MolDx, Medicare will cover AlloSure Kidney (or equivalent tests) when used to "assess the probability of allograft rejection in kidney transplant recipients *with clinical suspicion of rejection* and to inform clinical decision-making about *the necessity of renal biopsy*…[1]" (emphasis ours). Language in the umbrella/universal LCD is similar though not as clear[2]. The language seems to indicate a test is covered when the patient is at risk for rejection (high-risk) and the test would inform the use of a biopsy. But surveillance is neither of these – surveillance is monitoring a patient on a set protocol who is low-risk for rejection. If at low risk, there is no clinical suspicion of rejection at the current timepoint and no necessity for a renal biopsy and thus, by this language, should not be a covered test. We wonder if this is what MolDx is claiming is unexpected utilization of these tests.

---

[1] Medicare LCD L38355.
[2] Medicare LCD L38671 and L38568.

**Could KOAR Resolve Everything?** CareDx originally received AlloSure Kidney Medicare coverage via Coverage With Evidence Development (CED). Under CED MolDx said that AlloSure Kidney did not have clinical utility, but would cover the test initially and must complete a post-market study. This became KOAR and the protocol was defined as 7 tests first year / 4 tests each year after. The endpoints were reduction in biopsy and graft survival, among other datapoints. CED was disbanded at MolDx shortly after trial launch and we do not believe MolDx follow-up was required. KOAR was presented in a press release coinciding with the 2021 American Transplant Congress as a 1-year follow-up on 1,000 patients. Data was good with better graft survival and 64% reduction in biopsies. This study is still ongoing and data has not been published yet. Based on the KOLs' questions, the data that KOLs were asking around surveillance clinical utility may sit within this study. Another study ADMIRAL instead has been cited in MolDx' discussion, though it is smaller in size with less centers (ADMIRAL: 1,000 patients, 8 centers. KOAR: up to 4,000 patients, 72 centers[3]).

**Background On MolDx:** MolDx is an organization created by two Medicare Contractors to determine reimbursement of molecular diagnostics. Given the complexity, these two contractors decided it was better for a single entity to determine coverage and staff this organization with those knowledgeable in the art. For diagnostic labs, reimbursement via Medicare can either come from what we call Medicare National or Medicare Local. Medicare National involves CPT codes, the clinical lab fee schedule, PAMA, etc.; if you are covered by Medicare National, no matter where the lab is located in the U.S. coverage is the same. For Medicare Local, coverage and reimbursement are decided by the local Medicare Administrator Contractor (MAC). There are ~9 MACs in the U.S. and split up by geography. Relevant here are Noridian and Palmetto. Palmetto technically owns MolDx and specifically decides reimbursement for the Carolinas and select other states. Noridian decides reimbursement for California and others. The location of the lab is the key attribute to deciding which MAC is used, so CDNA gets paid by Noridian for Medicare work because the lab is in Brisbane, CA. Noridian partners with Palmetto to create and follow MolDx coverage determinations. To summarize for CDNA, MolDx creates the coverage determination, Noridian adopts it for California labs, CDNA submits claims to Noridian and gets paid. One nuance is since Noridian ultimately determines coverage for CDNA, it also has direct control over their pricing – that is unless a CPT code exists, which then bypasses all of this and pricing/coverage is on the Clinical Lab Fee Schedule.

**Local Coverage Determinations (LCDs):** MolDx makes coverage determinations via Local Coverage Determinations (LCDs). Coverage for CDNA's (and others') transplant tests are under an Umbrella Coverage Determination L38568 and L38671. The backstory here is CDNA originally got coverage for AlloSure Kidney, AlloMap Heart and AlloSure Heart (when used in conjunction with AlloMap Heart) in 2017, 2000s and 2020, respectively. This coverage rolled up into a single LCD L38355. NTRA also received coverage for Prospera Kidney via this policy. In 2021 MolDx issued an Umbrella Coverage Determination which allows for coverage of any transplant diagnostics, regardless of manufacturer, as long as it met the prespecified criteria. This opens the door for faster coverage as new tests could be "umbrellaed" under an existing LCD. It also opened the door to all organs, and AlloSure Lung, AlloMap Kidney, Prospera Heart/Lung and others have all been submitted under this Umbrella LCD, but have yet to be covered.

o   The Umbrella LCD as written allows for coverage of transplant tests when:
- "used in the evaluation and management of patients who have undergone solid organ transplantation. These tests can inform decision making along with standard clinical assessments in their evaluation of organ injury for active rejection (AR)."
- "These tests may be ordered by qualified physicians considering the diagnosis of AR affiliated with a transplant center, helping to rule in or out this condition when assessing the need for or results of a diagnostic biopsy. They should be considered along with other clinical evaluations and results and may be particularly useful in patients with significant contraindications to invasive procedures."
- "Covered tests with AV that is significantly below similar services may have coverage rescinded." AV being analytical validity.

[3] Clinicaltrials.gov

- As suggested above, the Umbrella LCD is broad and it appears MolDx is wishing to tamp down coverage, in some way, shape or form.
- For reference, the Umbrella LCD said it would provide coverage of transplant tests to assess rejection status when ALL of the following criteria are met:
  - The test must provide information about at least one of the two following clinical status determinations:
    - AR status
    - Cellular or Antibody-mediated rejection (ACR or AMR) status
  - The intended use of the test must be:
    - To assist in the evaluation of adequacy of immunosuppression, wherein a non-invasive or minimally invasive test can be used in lieu of a tissue biopsy in a patient for whom information from a tissue biopsy would be used to make a management decision regarding immunosuppression, OR
    - As a rule-out test for AR in validated populations of patients with clinical suspicion of rejection with a non-invasive or minimally invasive test to make a clinical decision regarding obtaining a biopsy, OR
    - For further evaluation of allograft status for the probability of allograft rejection after a physician-assessed pretest, OR
    - To assess rejection status in patients that have received a biopsy, but the biopsy results are inconclusive or limited by insufficient material.
    - The test demonstrates analytical validity (AV), including an analytical and clinical validation for any given measured analytes, and has demonstrated equivalence or superiority for sensitivity or specificity (depending on intended use) of detecting allograft rejection to other already-accepted tests for the same intended use measuring the same or directly comparable analytes.
    - Clinical validity (CV) of any analytes (or expression profiles) measured must be established through a study published in the peer-reviewed literature for the intended use of the test in the intended population. The degree of validity must be similar or superior to established and covered tests (see associated coverage Articles). If conducted with concordance to tissue histologic evaluation the Banff Classification for renal allografts or other accepted criteria (if existing) for other organs must be used.
    - The test is being used in a patient who is part of the population in which the test was analytically validated and has demonstrated CV.
    - For a given patient encounter, only one molecular test for assessing allograft status may be performed UNLESS a second test, meeting all the criteria established herein, is reasonable and necessary as an adjunct to the first test.
    - For minimally or non-invasive tests, the benefit to risk profile of the molecular test is considered by the ordering clinician to be more favorable than the benefit to risk profile of a tissue biopsy, or a tissue biopsy cannot be obtained. For example, this may be the case if a biopsy is considered medically contraindicated in a patient.
    - The test successfully completes a Technical Assessment that will ensure that AV, CV, and clinical utility criteria set in this policy are met to establish the test as Reasonable and Necessary.

## STOCK OPPORTUNITIES

**Natera**

Our $117 price target represents 11x 2023 EV/rev vs. its mid-cap diagnostic comps of 3x. We are above the comp median, although note that GH supports a multiple of >8x and is a proper comp for NTRA's cancer efforts.

**CareDx**

Our $32 price target is based on an EV/revenue multiple of 4x our FY23 revenue estimate of $344M.

## COMPANY RISKS

We believe an investment in each of our respective companies contain the following risks:

**Natera**

- **Reimbursement:** Natera depends on third-party insurers for reimbursement. If these insurers lower their prices, change reimbursement policies or discountinue coverage for a particular test, Natera's revenue may decline.

- **Competition:** There are multiple competitors going after the NIPT and adjacent markets. While each competitor touts their test as superior, we believe most physicians and patients view the tests as similar. Stronger competition may prevent Natera from penetrating the market and impact our estimates.

- **Government Regulation:** The healthcare industry is intensely regulated. Adjustments to current regulations or additional regulations related to Natera's products or the industry could adversely affect its business. Inability to attain or maintain reimbursement from government or other payors is also a risk.

- **Lack Of Profitability:** Natera is not profitable and we believe may need to raise additional capital to reach profitability.

**CareDx**

- **Reimbursement Risk:** Medicare reimbursement for AlloMap has faced proposals to cut reimbursement somewhat drastically. While a late 2015 CMS proposal to cut reimbursement by 77% was reversed, future negative changes to reimbursement could result in reductions in our earnings projections.

- **Product Risk:** Our price target assumes a continued ramp into the kidney transplant market which could be affected by physician behavior and adherence to testing guidelines.

- **Liquidity and Financing Risk:** We expect CareDx will become increasingly profitable over the next two years. However, slower AlloSure penetration, declines in legacy businesses and/or increased investments in product development, clinical trials and commercialization could impact CareDx's profitability and may require additional financing.

- **Government Regulation:** The healthcare industry is intensely regulated.  Material changes to current regulations or additional regulations related to its products or the industry could adversely affect CareDx's business. Similar to other labs, CareDx has received DOJ inquiries in the past, and failure to comply with regulations could impact the stock.

- **Competition:** CareDx faces competition from existing diagnostic options as well as new lab entrants. Given the evolving nature of clinical surveillance of transplantation, competition from established and new diagnostics is possible.



- **Intellectual Property Risks:** CareDx relies on patents, licenses and other intellectual property for the successful development of its business. Defense of future challenges to its IP could be costly and potentially unsuccessful.



**November 17, 2022**

## REQUIRED DISCLOSURES



| Initiate: April 9, 2018 – Rating: Buy – Price Target: $16 |
| --- |
| Update: June 28, 2018 – Rating: Buy – Price Target: $23 |
| Update: August 9, 2018 – Rating: Buy – Price Target: $30 |
| Update: November 9, 2018 – Rating: Buy – Price Target: $27 |
| Update: May 10, 2018 – Rating: Buy – Price Target: $29 |
| Update: August 8, 2018 – Rating: Buy – Price Target: $37 |
| Update: November 7, 2019 – Rating: Buy – Price Target: $49 |
| Update: July 7, 2020 – Rating: Buy – Price Target: $66 |
| Update: September 24, 2020 – Rating: Buy – Price Target: $82 |
| Update: November 6, 2020 – Rating: Buy – Price Target: $92 |
| Update: January 4, 2021 – Rating: Buy – Price Target: $118 |
| Update: February 26, 2021 – Rating: Buy – Price Target: $134 |
| Update: July 17, 2021 – Rating: Buy – Price Target: $139 |
| Update: August 6, 2021 – Rating: Buy – Price Target: $153 |
| Update: February 25, 2022 – Rating: Buy – Price Target: $117 |

*Source: FactSet*



| Initiate: September 25, 2015 – Rating: Buy – Price Target:  $13 |
| --- |
| …. |
| Analyst Change: |
| …. |
| Update: July 10, 2019 – Rating: Buy – Price Target: $48 |
| Analyst Change: |
| April 9, 2020 – Rating: Buy – Price Target: $42 |
| August 5, 2020 – Rating: Buy – Price Target: $46 |
| October 8, 2020 – Rating: Buy – Price Target: $66 |
| January 4, 2021 – Rating: Buy – Price Target: $94 |
| January 11, 2021 – Rating: Buy – Price Target: $98 |
| February 25, 2021 – Rating: Buy – Price Target: $100 |
| July 30, 2021 – Rating: Buy – Price Target: $106 |
| February 25, 2022 – Rating: Buy – Price Target: $87 |
| May 6, 2022 – Rating: Buy – Price Target: $63 |
| August 5, 2022 – Rating: Buy – Price Target: $51 |
| November 3, 2022 – Rating: Buy – Price Target: $32 |

*Source: FactSet*

**Ratings definitions:**

**Buy** rated stocks generally have twelve month price targets that are more than 20% above the current price.  **Hold** rated stocks generally have twelve month price targets near the current price.  **Sell** rated stocks generally have no price target and we would sell the stock.

**Fundamental trend definitions:**

**Improving** means growth rates of key business metrics are generally accelerating.  **Stable** means growth rates of key business metrics are generally steady.  **Mixed** means growth rates of some key business metrics are positive but others are negative. **Declining** means growth rates of key business metrics are generally decelerating.

**Ratings Distribution (9/30/2022)**

| Rating | % Of Companies Covered | % With Investment Banking Relationships |
| --- | --- | --- |
| Buy | 78% | 11% |
| Hold | 21% | 8% |
| Sell | 1% | 0% |
| Total | 100% | 10% |

**Information about valuation methods and risks can be found in the "STOCK OPPORTUNITY" and "RISKS" sections, respectively, of this report.**

CHLM makes a market in these securities.

CHLM has managed or co-managed an offering of securities for NTRA in the last 12 months. CHLM expects to receive and/or intends to seek compensation for investment banking services from the subject companies in the next three months.

---

**CDNA – NTRA: MolDx CAC Meeting**                                                                                                          **Page 7 of 8**
**Institutional Research**                                                                                **© 2022 Craig-Hallum Capital Group LLC**

Analysts receive no direct compensation in connection with the firm's investment banking business.  Analysts may be eligible for bonus compensation based on the overall profitability of the firm, which takes into account revenues from all of the firm's business, including investment banking.

## OTHER DISCLOSURES

Although the statements of fact in this report have been obtained from and are based upon recognized statistical services, issuer reports or communications, or other sources that Craig-Hallum believes to be reliable, we cannot guarantee their accuracy. All opinions and estimates included in this report constitute Craig-Hallum's judgment as of the date of this report and are subject to change without notice. Craig-Hallum may effect transactions as principal or agent in the securities mentioned herein.  The securities discussed or recommended in this report may be unsuitable for investors depending on their specific investment objectives and financial position. This report is offered for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such would be prohibited. Additional information available upon request.  Member SIPC.

## REGULATION AC CERTIFICATION

I, Alexander Nowak, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject security and issuer.  No part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views contained herein.