Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 858-7400
E-mail:  lgeist@willkie.com
         bdyer@willkie.com

Tariq Mundiya (*pro hac vice*)
Charles Cording (*pro hac vice*)
Brady Sullivan (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
         ccording@willkie.com
         bsullivan@willkie.com

Attorneys for Defendants
CareDx, Inc., Reginald Seeto,
Ankur Dhingra, Marcel Konrad,
and Peter Maag

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CAREDX, INC., et al., <br><br> Defendants. | Case No. 22-cv-03023-TLT <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS IN PLAINTIFFS' AMENDED COMPLAINT; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF** <br><br> Date: May 16, 2023 <br> Time: 2:00 PM <br> Courtroom: 9, 19th Floor <br> Judge: Hon. Trina L. Thompson |

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on May 16, 2023 at 2:00 p.m., in the courtroom of the Honorable Trina L. Thompson of the above-entitled Court, located at San Francisco Courthouse, Courtroom 9, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants CareDx, Inc. ("CareDx" or the "Company"), Peter Maag, Reginald Seeto, Marcel Konrad, and Ankur Dhingra shall and hereby do move to strike certain paragraphs in Plaintiffs' Amended Complaint ("AC," ECF No. 53) that rely exclusively on a separate complaint filed by non-party Dr. Michael Olymbios in *Olymbios v. CareDx Inc.*, No 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty. April 15, 2022). These paragraphs should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, all files and records in this action, oral argument, and such other additional matters as may be judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Controlling Ninth Circuit law and the Private Securities Litigation Reform Act of 1995 (the "PSLRA") require district courts to "carefully [] evaluate securities fraud complaints" and perform a vital gatekeeper role to "ensure compliance with the [PSLRA's] elevated pleading standards." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413–14 (9th Cir. 2020).  In connection with that stringent analysis, courts in the Ninth Circuit consistently strike allegations in securities fraud complaints derived exclusively from complaints filed in parallel proceedings.  Such "copy/paste" pleading is not permitted under Federal Rule of Civil Procedure 11, much less under the heightened pleading requirements of the PSLRA.  *See generally In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008).

In this case, nearly a dozen paragraphs in the Amended Complaint ("AC," ECF No. 53) are sourced exclusively from a separate complaint filed by a former CareDx employee, Dr. Michael Olymbios.  *See* Complaint, *Olymbios v. CareDx, Inc.*, No 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty. Apr. 15, 2022) (the "Olymbios Complaint"); AC ¶¶ 10, 56–58, 78–79, 101, 166–67, 170, 174.[1]  None of these allegations—listed in Appendix 1 attached hereto—have been adjudicated in the proceeding between Dr. Olymbios and CareDx, which remain ongoing.  Indeed, the San Mateo County action was initiated in clear breach of the arbitration provisions contained in Dr. Olymbios' employment agreement—under the ruse of a misconstrued JAMS deposit request—and then promptly sent back to arbitration by Judge Foiles, but not before the Plaintiffs here seized upon the Olymbios Complaint and adopted many of the core allegations as their own.  Fatally, Plaintiffs do not allege that they engaged in any independent investigation to corroborate these allegations.  Accordingly, these paragraphs should be stricken from the AC and excluded from the Court's assessment of the sufficiency of Plaintiffs' allegations in ruling on Defendants' Motion to Dismiss the Amended Complaint ("Motion to Dismiss"), filed simultaneously herewith.

---

[1] All citations to "¶ __" refer to the AC unless otherwise noted.

1

## II.    STATEMENT OF RELEVANT FACTS

As described further in the Motion to Dismiss, the AC asserts claims against CareDx and four current and former CareDx executives for violations of Sections 10(b) and 20(a) of the Securities Exchange Act.  Plaintiffs allege that Defendants' "RemoTraC" mobile phlebotomy program was based on "schemes" to defraud Medicare, which supposedly rendered false various statements that Defendants made to investors during the Class Period (January 21, 2021 to November 3, 2022).  *E.g.*, ¶¶ 132–33.  Plaintiffs claim that Defendants knew about these purported schemes and therefore acted with scienter.  ¶¶ 164–91.  As set forth in the Motion to Dismiss, the AC fails to adequately allege the elements of falsity, scienter, and loss causation.

As background, near the height of the COVID-19 pandemic, CareDx became embroiled in a breach of contract and trade secrets dispute with a former employee, Dr. Michael Olymbios, who worked at CareDx for a year and five months, between May 2019 and October 2020.  ¶ 49, n.6.  He held the title of Head of Community Nephrology from May 2020 until the time of his departure in October 2020.  *Id.*  In late 2019, Dr. Olymbios received a written reprimand for harassing a fellow employee and over time became disgruntled.  Then, in 2020, after representing to CareDx that he intended to move to the financial services industry, Dr. Olymbios instead accepted a job with CareDx's primary competitor, Natera, Inc.  Ex. U at 6.[2]  Natera is a molecular diagnostics company that created a copycat kidney transplant rejection test (Prospera)—based on CareDx's AlloSure Kidney test.  Since 2019, Natera and CareDx have engaged in hard-fought litigation over CareDx's claims against Natera of false advertising, trademark disparagement, unfair competition, and deceptive trade practices.  *CareDx, Inc. v. Natera, Inc.*, 19-civ-00662 (D. Del. 2019).  In August 2020, Dr. Olymbios testified as CareDx's corporate designee in the false advertising lawsuit against Natera.  Ex. U at 8.  CareDx prevailed on its claims and was awarded approximately $45 million in damages against Natera.  Unbeknownst to CareDx, however, days after the deposition, Dr. Olymbios started communicating with Natera about potential employment.  *Id.*

---

[2] All citations herein to "Exhibit" or "Ex. __" refer to the exhibits attached to the Request for Judicial Notice and Accompanying Declaration of Charles D. Cording, filed in connection with the Motion to Dismiss.

2

CareDx discovered—through its own investigation and subsequently in litigation against Dr. Olymbios—that before leaving CareDx to work at Natera, Dr. Olymbios stole over 50,000 CareDx documents and emails, including confidential, competitive intelligence relevant to Dr. Olymbios' new role at Natera. ¶ 49; Ex. U at 6. Accordingly, in November 2020, CareDx asserted breach of contract and trade secrets claims against Dr. Olymbios in arbitration—per the terms of Dr. Olymbios' employment agreement. Those proceedings remain ongoing. Ex. U at 9; ¶ 53 n.9. Dr. Olymbios attempted to justify his misappropriation by claiming that he took CareDx documents to serve as a government "whistleblower." ¶ 53 n.9. However, Dr. Olymbios only contacted the government *after* threatening CareDx that he would become a "whistleblower" if CareDx did not stand down in pursuing trade secrets claims against him. Notwithstanding, CareDx continued to demand the return of its documents. Ex. U at 9.

Nearly 18 months into arbitration, Dr. Olymbios filed the Olymbios Complaint in San Mateo County on April 15, 2022, under the false premise that the arbitration was terminated due to Dr. Olymbios' misconstruction of a JAMS deposit request. ¶ 49; Ex. U at 6–7. The Olymbios Complaint gratuitously alleged—completely unrelated to the dispute of arbitrability—that CareDx engaged in a number of improper Medicare billing practices and other purported misconduct. In particular, Dr. Olymbios claimed to have discussed his "concerns" about CareDx's Medicare billing practices and other alleged violations of health care law with various CareDx employees, including Dr. Reginald Seeto and Dr. Peter Maag, both Defendants in this action. Olymbios Complaint ¶ 32. CareDx vigorously disputes Dr. Olymbios' claims, none of which have been adjudicated by the San Mateo Court (or any court). The San Mateo Court promptly referred Dr. Olymbios' claims back to arbitration, ¶ 49; Minute Order, *Olymbios v. CareDx, Inc.*, No 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty. June 10, 2022), but not before his "whistleblower" claims were broadcast to the public, which appears to be the only real reason Dr. Olymbios filed his public complaint.

Hardly a month after the Olymbios Complaint was filed, Plumbers & Pipefitters Local Union #295 Pension Fund filed a complaint initiating this action, broadly copying the allegations from the Olymbios Complaint and repurposing them as the basis to try to state claims for securities fraud.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

*See* ECF No. 1. This Court appointed Lead Plaintiffs, which thereafter filed the AC on November 28, 2022, now the subject of the Motion to Dismiss and this Motion to Strike.

Although the AC now includes allegations from other former (anonymous) employees (termed "Former Employees"), the AC still extensively quotes from and relies upon the Olymbios Complaint. Indeed, as to the allegations listed in Appendix 1, Plaintiffs rely exclusively on the Olymbios Complaint in alleging that Dr. Seeto and Dr. Maag knew about or recklessly disregarded the alleged Medicare fraud at CareDx. For example, Plaintiffs allege repeatedly throughout the AC that "Dr. Olymbios discussed his concerns and those of other employees with more than ten other current or former CareDx employees, including Peter Maag . . . and Reg Seeto[.]" ¶¶ 58, 79, 101, 167. The AC contains no allegations that independently support this and the other allegations catalogued in Appendix 1.

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). In general, "paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013). This is because "[a]ttorneys have a non-delegable duty to make a reasonable inquiry into whether the factual contentions made in a complaint have evidentiary support." *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011). "Lifting allegations from other complaints does not constitute reasonable investigation as required by" Rule 11. *Id.* ("The Court agrees with [defendant] that Plaintiffs cannot rely on allegations from other complaints that the Plaintiffs themselves have not investigated."). Instead, Plaintiffs must undergo an "independent investigation into the facts alleged in the [other] complaint" or otherwise demonstrate that they have "additional bases for *the specific allegations*" lifted from that complaint. *Connetics*, 542 F. Supp. 2d at 1005 (granting

motion to strike allegations in securities fraud complaint derived exclusively from a related SEC complaint) (emphasis added).

Furthermore, in the context of a securities fraud claim governed by the PSLRA, Plaintiffs must corroborate the allegations derived from a third-party complaint with *particularized* allegations of their own. "When alleging violations of federal securities laws, a plaintiff must satisfy the pleading requirements pronounced in the PSLRA," meaning the complaint "must plead with particularity" the core elements of falsity, scienter, and loss causation. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (cleaned up); *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); *see also Bennett v. H&R Block Fin. Advisors, Inc.*, 2005 WL 8178042, at *4 (N.D. Cal. May 31, 2005) (striking references to separately filed complaint and holding on motion to dismiss that "citation of the unadjudicated NASD administrative complaint is not a basis for facts pleaded with particularity").

## IV.    ARGUMENT

Allegations contained in paragraphs 10, 56–58, 78–79, 101, 166–67, 170, and 174 of the AC (*see* Appendix 1) are sourced exclusively from the Olymbios Complaint and must be stricken because there is no pleading that Plaintiffs independently investigated these allegations. *Connetics*, 542 F. Supp. 2d at 1005. Those paragraphs parrot claims by Dr. Olymbios that (a) he discussed what he perceived to be Medicare violations with various CareDx employees, including Dr. Seeto and Dr. Maag, *e.g.*, ¶ 58; (b) Dr. Maag told Dr. Olymbios to not "put in writing" that CareDx never bills patients, *e.g.*, ¶ 57; and (c) Dr. Maag used "ephemeral" messaging, such as WhatsApp, to "avoid creating a paper trail" of alleged misconduct, *e.g.*, ¶ 57.[3] Appendix 1 sets forth the specific portions of these paragraphs that Defendants are moving to strike.

Plaintiffs cannot rely upon the factual assertions of a complaint in an entirely separate action as the basis for allegations in the AC without performing their own investigation—and that is exactly what they have done here. *Connetics*, 542 F. Supp. 2d at 1005. Ample precedent exists for striking

---

[3] As described in the Motion to Dismiss, Sec. III.B, allegations concerning Dr. Maag's scienter are in any event irrelevant as a matter of law because Dr. Maag was not the maker of any alleged misstatements.

these types of allegations, especially in the context of securities fraud claims governed by the heightened pleading standards of the PSLRA.

For example, in *In re Connetics Corp. Securities Litigation*, plaintiffs claimed that Connetics Corporation misstated the progress of a drug in development, and that certain individual defendants also engaged in insider trading. 542 F. Supp. 2d at 999-1000. Plaintiffs relied on an SEC complaint as the source of their insider trading allegations against the individual defendants. *Id.* at 1004. The court granted the individual defendants' motion to strike certain paragraphs of the complaint "based on information from the SEC complaint." *Id.* The court concluded that "as to the particular paragraphs that defendants ask the Court to strike, there apparently were no 'investigative efforts' to combine with plaintiffs' reliance on the SEC complaint." *Id.* at 1005. The court observed: "Although Plaintiffs contend that the SEC complaint is one of many bases for plaintiffs' complaint, they do not contend that they conducted independent investigation into the facts alleged in the SEC complaint or had any additional bases for the specific allegations pertaining to [individual defendants] Yaroshinsky and Zak. Instead, the SEC complaint appears to be *the only basis* for the allegations against defendants Yaroshinsky and Zak and certain other allegations." *Id.* After striking the paragraphs in question, the court dismissed the claims against the individual defendants. *Id.* at 1006.

Here, as in *Connetics*, it is clear from the face of the AC paragraphs in question that Plaintiffs used the Olymbios Complaint as the sole basis for these particular allegations without any independent investigation. *See id.* at 1005 ("plaintiffs make no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims against defendants Yaroshinsky and Zak"). Notably, the AC includes a number of statements from Former Employees alleging various misconduct at CareDx, but none of these Former Employees even purports to corroborate "the specific allegations" pertaining to Dr. Seeto's or Dr. Maag's alleged knowledge that Defendants seek to strike. *Id.* Indeed, Plaintiffs do not allege that any of the Former Employees reported to Dr. Seeto or Dr. Maag, communicated with them, or even had second-hand knowledge of what was communicated to them.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

*Bennett v. H&R Block Financial Advisors, Inc.*, 2005 WL 8178042 (N.D. Cal. May 31, 2005), is likewise illustrative.  In *H&R Block*, plaintiffs sued H&R Block for securities fraud as a result of statements made by H&R Block following its solicitation and sale of Enron bonds.  *Id.* at *1.  As part of the fallout from the Enron scandal, the NASD charged H&R Block with fraud in the sale of Enron bonds, and plaintiffs promptly filed a private suit.  *Id.*  Plaintiffs alleged that H&R block knew that the Enron bonds were worthless based on alleged internal valuations.  *Id.* at *4.  However, the court disregarded these allegations,[4] because "[t]o support the theory that defendant had downgraded Enron securities internally, plaintiffs only pled one basis of knowledge: the NASD disciplinary complaint and the newspaper articles reporting that complaint."  *Id.*  The complaint otherwise "lack[ed] any source of information and belief that defendant downgraded Enron Bonds[.]"  *Id.*  The court therefore concluded that "citation to the unadjudicated NASD administrative complaint is not a basis for facts pleaded with particularity."  *Id.*  Here, Plaintiffs are attempting the same tactic with respect to their allegations of knowledge by Dr. Seeto and Dr. Maag derived from the unadjudicated Olymbios Complaint.[5]

Accordingly, the allegations set forth in Appendix 1 should be stricken.

**V.    CONCLUSION**

For the reasons set forth herein, Defendants respectfully request that the Court strike those portions of paragraphs 10, 56–58, 78–79, 101, 166–67, 170, and 174 of the AC listed in Appendix 1.

---

[4] Although the defendant did not formally move to strike "the NASD-based allegations from the complaint," the court observed that the defendant "rightfully points out that some courts have stricken allegations based on unadjudicated administrative filings."  *H&R Block*, 2005 WL 8178042, at *4.

[5] *See also Fraker v. Bayer Corp.*, 2009 WL 5865687, at *4–5 (E.D. Cal. Oct. 6, 2009) (granting motion to strike paragraphs in complaint "lifted directly" from "complaint in [an] FTC proceeding" where "plaintiff d[id] not allege that . . . there was any independent verification of the contents" of the allegations) (citing *Connetics*, 542 F. Supp. 2d at 1005).

7

Dated: January 27, 2023

By: /s/ *Laura Leigh Geist*
    Laura Leigh Geist


WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 848-7400
E-mail: lgeist@willkie.com
        bdyer@willkie.com


WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
E-mail: tmundiya@willkie.com
        ccording@willkie.com
        bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,*
*Ankur Dhingra, Marcel Konrad,*
*and Peter Maag*

8
DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

**Appendix 1 – Amended Complaint Allegations Derived Exclusively
From Olymbios Complaint**

| | |
|---|---|
| ¶ 10<br>Full Paragraph | "Dr. Olymbios's complaint made crystal clear that he had reported the misconduct he observed directly to CareDx's most senior executives, including then-CEO defendant Maag and current CEO defendant Seeto.  However, the executives 'brushed off his concerns or berated him for raising them in the first place.'  Dr. Olymbios revealed that CareDx's most senior officers, including defendant Maag 'took active measures to avoid creating a paper trail of their misconduct.'  Indeed, defendant Maag expressly warned Dr. Olymbios that 'there were certain things that shouldn't be put in writing.'  Meanwhile, several other employees with whom Dr. Olymbios discussed the misconduct agreed CareDx was 'a bunch of crooks and frauds,' and that it was only a matter of time before someone blew the whistle or a regulatory agency investigated[.]" |
| ¶ 56<br>Full Paragraph | "Significantly, that same month, Dr. Olymbios has conversations with multiple CareDx employees that underscored the pervasiveness of the knowledge of the Company's illicit activities throughout the organization.  Specifically, in September 2020, Dr. Olymbios texted other Company employees that he had participated in 'a legal call with [Defendant Seeto].'  In response, a CareDx employee asked 'because we are Medicare frauds?'  Another employee chimed in: 'We're a bunch of crooks and frauds.'" |
| ¶ 57<br>Full Paragraph | "Dr. Olymbios further explained CareDx also took active measures to avoid creating a paper trail of its misconduct, including the intentional use of ephemeral messaging, *i.e.*, programs like WhatsApp and Signal that can send messages without storing any record of the message.  Indeed, according to the Olymbios Complaint, defendant Maag was very sensitive about putting potentially harmful information in writing.  For example, in or around July or August 2020, Dr. Olymbios suggested in an email to defendant Maag, CareDx VP Danielle Scelfo, and others that CareDx should state in a marketing letter to a nephrology practice that CareDx never billed patients-a practice that CareDx regularly touted to doctors, but that Dr. Olymbios had not yet realized was a violation of the Anti-Kickback Statute.  Dr. Olymbios thought that it would be convincing to highlight in the letter that patients would not have any out-of-pocket expenses, given that this was a talking point that defendant Maag and other high-level executives at CareDx had 'verbalized time and time again when pitching AlloSure to nephrology practices.'  To Dr. Olymbios's surprise, defendant Maag called Dr. Olymbios soon after and said that he was calling because there were 'things he couldn't be associated with as the CEO,' and that 'there were certain things that shouldn't be put in writing, like saying that CareDx never billed patients.'" |

| ¶ 58<br>Full paragraph | "Dr. Olymbios relayed these concerns both during his employment at CareDx and when he resigned from CareDx in October 2020, when Dr. Olymbios yet again put CareDx on notice of his concerns about its unethical and unlawful activity.  Indeed, Dr. Olymbios reported his concerns to 'more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto, the current President and Chief Executive Officer of CareDx.'  According to Dr. Olymbios, the senior 'CareDx executives brushed off his concerns or berated him for raising them in the first place,' and 'repeatedly ignored or actively quashed any internal concerns about its activity,' until he finally resigned in late 2020." |
| --- | --- |
| ¶ 78<br>Sentences 1-4 | "CareDx also engaged in other violations of the Anti-Kickback Statute in order to juice its testing revenues, for example, offering to waive patient costs.  As Dr. Olymbios explained, without initially realizing that the practice was illegal, he became aware that, when marketing its services to nephrology practices, CareDx was using the 'talking point' that it never billed its patients directly for its tests, such that patients would have no out-of-pocket expenses for the tests.  In or around August 2020, Dr. Olymbios wrote an email directly to Peter Maag and another high-level CareDx executive that CareDx should include the fact that CareDx 'never bills patients' in a marketing letter to a nephrology practice.  However, defendant Maag responded with a phone call, in which he said that he was 'calling because there were things he couldn't be associated with as the CEO,' and that 'there were certain things that shouldn't be put in writing' – such as never billing patients 'even if that's how CareDx operated.'" |
| ¶ 79<br>Full Paragraph | "CareDx executives unquestionably knew that this behavior was occurring, because Dr. Olymbios reported his concerns to the Company's most senior executives, including defendants Maag and Seeto.  Indeed, as the Olymbios Complaint alleges, 'Dr. Olymbios discussed his concerns and those of other employees with more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx.'" |
| ¶ 101<br>Sentences 4-8 | "Dr. Olymbios publicly blew the whistle on these practices after reporting them to 'more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto, the current President and Chief Executive Officer of CareDx.'  The senior 'CareDx executives brushed off his concerns or berated him for raising them in the first place.'  They 'repeatedly ignored or actively quashed any internal concerns about its activity.'  To cite one such instance: 'In September 2020, Dr. Olymbios texted other employees that he had a legal call with Reg [Seeto]' and '[a]nother employee responded, "because we are Medicare frauds?"  A different employee replied, "We're a bunch of crooks and frauds."'" |
| ¶ 166<br>Sentence 1 | "Dr. Olymbios and other former employees reported and discussed CareDx's illegal practices with executives." |

| ¶ 167 Sentences 2-3 | "Dr. Olymbios reported these concerns to 'more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto, the current President and Chief Executive Officer of CareDx.' According to Dr. Olymbios, the senior 'CareDx executives brushed off his concerns or berated him for raising them in the first place' and 'repeatedly ignored or actively quashed any internal concerns about its activity' until he finally resigned in late 2020." |
|---|---|
| ¶ 170 Full Paragraph | "CareDx executives unquestionably knew that this behavior was occurring because Dr. Olymbios reported his concerns to the Company's most senior executives, including defendants Maag and Seeto, and because defendant Maag himself personally signed off on the expenses. Similar, Dr. Olymbios directly told these executives about facts demonstrating that the Company was offering improper kickbacks to medical doctors who could influence sales of AlloSure. Dr. Olymbios gave them examples of such kickbacks. 'CareDx offered unrestricted grants to physicians to not enroll patients in competitors' clinical trial or to induce practices to place patients on an AlloSure surveillance protocol, even when doing so was not warranted or authorized under Medicare billing guidelines,' as Dr. Olymbios observed. He continued: 'CareDx organized advisory boards that were little more than marketing exercises to encourage physicians to order AlloSure tests,' and Dr. Olymbios averred that 'CareDx monitored advisory board activity and how they impacted sales.'" |
| ¶ 174 Full paragraph | "Dr. Olymbios revealed that CareDx's most senior officers, including defendant Maag, not only directed the illegal conduct but deliberately 'took active measures to avoid creating a paper trial of their misconduct,' including using apps like WhatsApp and Signal that did not leave behind records of their messages. Indeed, defendant Maag expressly warned Dr. Olymbios that 'there were certain things that shouldn't be put in writing.' Meanwhile, several other employees with whom Olymbios discussed the misconduct agreed CareDx was 'a bunch of crooks and frauds,' and that it was only a matter of time before someone blew the whistle or a regulatory agency investigated – which, ultimately, is exactly what happened. Indeed, Dr. Olymbios internally reported what he viewed as Defendants' illegal practices when resigning from CareDx in October of 2020. Defendants' intentional use of ephemeral messaging services and knowledge of illegality thus supports an inference of scienter." |