ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
          – and –
SPENCER A. BURKHOLZ (147029)
SEAN C. MCGUIRE (319521)
NICOLE Q. GILLILAND (335132)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
smcguire@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | Case No. 3:22-cv-03023-TLT |
| Plaintiff, ) | CLASS ACTION |
| ) ) | LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| vs. ) | |
| CAREDX, INC., et al., ) ) | |
| Defendants. ) ) ) | Date:        May 16, 2023<br>Time:        2:00 PM<br>Courtroom:  9, 19th Floor<br>Judge:       Hon. Trina L. Thompson |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

STATEMENT OF ISSUES TO BE DECIDED ......................................................................1

INTRODUCTION ......................................................................................................1

STATEMENT OF RELEVANT FACTS .............................................................................5

LEGAL STANDARD.................................................................................................10

ARGUMENT...........................................................................................................11

I. The Complaint Sufficiently Pleads False and Misleading Statements and Omissions Under Rule 10b-5(b) ...................................................................11

 A. Defendants Falsely Stated They Complied with All Applicable Healthcare Laws, as They Knew or Recklessly Disregarded.......................................11

 B. Defendants Misleadingly Attributed CareDx's Success to Lawful Causes While Concealing the Company's Unlawful Schemes.........................................15

 C. Materially False "Unmet Needs" Statements ...........................................17

 D. Defendants Falsely Claimed There Had Been "No Change" in Medicare Billing Practices, as They Knew or Recklessly Disregarded................................19

II. The Complaint Pleads a Strong Inference of Scienter ........................................19

 A. Dr. Olymbios' Reporting of Illegal Conduct Directly to CareDx's Top Management Supports Scienter ........................................................................20

 B. The "Core Operations" Doctrine Supports Scienter ...............................21

 C. Insider Sales Support Scienter .............................................................21

 D. Parallel SEC/DOJ Investigations, Active Concealment of any Paper Trail, and Other Facts Support Scienter ........................................................22

III. The Complaint Sufficiently Pleads Loss Causation...........................................23

IV. The Complaint Sufficiently Pleads a "Scheme" Under Rule 10b-5(a) and (c).................25

CONCLUSION..........................................................................................................25

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT

- i -

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (N.D. Cal. 2009) ..................................................................19

*Bajjuri v. Raytheon Techs. Corp.*,
2022 WL 17081317 (D. Ariz. Nov. 18, 2022) ..........................................................5

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .............................................................................18, 20

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)......................................................................21

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................................................17

*Cement & Concrete Workers Dist. Council Pension Fund v.*
*Hewlett Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013) ...................................................................25

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)...................................................................23

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ........................................................................4, 14, 15

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .....................................................17, 18

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990) ................................................................................25

*Howard v. Hui*,
2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) ........................................................25

*Huberman v. Tag-It Pac., Inc.*,
314 F. App'x 59 (9th Cir. 2009) .............................................................................24

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) .......................................................................22

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT

- ii -

**Page**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021),
   *cert. denied*,
   ___ U.S. ___, 142 S. Ct. 1227 (2022)....................................................................................20, 25

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................................................23

*In re Capstone Turbine Corp. Sec. Litig.*,
   2018 WL 836274 (C.D. Cal. Feb. 9, 2018)..........................................................................19

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ...............................................................................................21

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................................19

*In re CytRx Corp. Sec. Litig.*,
   2015 WL 5031232 (C.D. Cal. July 13, 2015) ......................................................................14

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ..........................................................................................5, 24

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ...............................................................................14, 15

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................................22

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ........................................................................................11, 24

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) .................................................................................15

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) .............................................................................................21

*In re Snap Inc. Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. June 7, 2018) ..................................................................12, 13

*In re Syncor Int'l Corp. Sec. Litig.*,
   239 F. App'x 318 (9th Cir. 2007) .................................................................................. *passim*

**Page**

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) .........................................................................8

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) ................................................................23

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...................................................................4, 18

*In re Wireless Facilities, Inc. Sec. Litig.*,
2007 WL 9667131 (S.D. Cal. May 7, 2007).................................................................8

*In re Zillow Grp., Inc. Sec. Litig.*,
2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)......................................................5, 23

*Jaroslawicz v. M&T Bank Corp.*,
2017 WL 1197716 (D. Del. Mar. 30, 2017) ...............................................................15

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .................................................................................6, 23

*Lorenzo v. SEC*,
___ U.S. ___, 139 S. Ct. 1094 (2019)......................................................................20, 25

*Mauss v. NuVasive, Inc.*,
2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ..........................................................12

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................................................................................16

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ............................................................................... *passim*

*Mirmehdi v. United States*,
689 F.3d 975 (9th Cir. 2012) ......................................................................................25

*Moradpour v. Velodyne Lidar, Inc.*,
2022 WL 2391004 (N.D. Cal. July 1, 2022)...............................................................19

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ........................................................................19

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015)...........................................................................25

**Page**

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v.*
　*Am. W. Holding Corp.*,
　320 F.3d 920 (9th Cir. 2003) ........................................................................................10, 18

*Nursing Home Pension Fund, Loc. 144 v.*
　*Oracle Corp.*,
　380 F.3d 1226 (9th Cir. 2004) .......................................................................................20, 21

*Nuveen Mun. High Income Opportunity Fund v.*
　*City of Alameda*,
　730 F.3d 1111 (9th Cir. 2013) ..............................................................................................24

*Police & Fire Ret. Sys. of City of Detroit v.*
　*Plains All Am. Pipeline, L.P.*,
　777 F. App'x 726 (5th Cir. 2019) .........................................................................................15

*Purple Mountain Tr. v. Wells Fargo & Co.*,
　432 F. Supp. 3d 1095 (N.D. Cal. 2020) ...............................................................................17

*Reese v. BP Exploration (Alaska) Inc.*,
　643 F.3d 681 (9th Cir. 2011) ...............................................................................................15

*Reese v. Malone*,
　747 F.3d 557 (9th Cir. 2014) ..........................................................................................11, 15

*Shearson/Am. Express, Inc. v. McMahon*,
　482 U.S. 220 (1987).............................................................................................................14

*South Ferry LP, No. 2 v. Killinger*,
　542 F.3d 776 (9th Cir. 2008) ...............................................................................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
　551 U.S. 308 (2007)...............................................................................................10, 19, 22

*United States ex rel. Brown v. Celgene Corp.*,
　2014 WL 3605896 (C.D. Cal. July 10, 2014)..................................................................12, 13

*United States ex rel. Everest Principles, LLC v.*
　*Abbott Lab'ys, Inc.*,
　2022 WL 3567063 (S.D. Cal. Aug. 18, 2022) ......................................................................12

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
　355 F.3d 370 (5th Cir. 2004) ...............................................................................................12

**Page**

*United States, ex rel. Solis v. Millennium Pharms., Inc.*,
    2015 WL 1469166 (E.D. Cal. Mar. 30, 2015) .................................................................12, 13

*United States v. Crescendo Bioscience, Inc.*,
    2020 WL 2614959 (N.D. Cal. May 23, 2020) ........................................................................13

*United States v. Medtronic Plc*,
    2021 WL 4816647 (C.D. Cal. Apr. 12, 2021) ..........................................................................8

*United States v. Vernon*,
    723 F.3d 1234 (11th Cir. 2013) ..............................................................................................12

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014) .........................................................................................22

*Winter ex rel. United States v.*
    *Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
    953 F.3d 1108 (9th Cir. 2020),
    *cert. denied sub nom.*
    *RollinsNelson LTC Corp. v.*
    *United States ex rel. Winters*,
    ___ U.S. ___, 121 S. Ct. 1380 (1990)......................................................................................11

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)......................................................................................23

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ......................................................................................8

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ....................................................................................................6

**STATUTES, RULES AND REGULATIONS**

42 U.S.C.
    §1320a-7a(a)(5)........................................................................................................................13
    §1320a-7b ................................................................................................................................12

15 U.S.C.
    §78............................................................................................................................................14
    §78j(b)........................................................................................................................................1
    §78t(a) ..............................................................................................................................1, 2, 25
    §78t-1 ...................................................................................................................................1, 2

**Page**

Federal Rules of Civil Procedure
    Rule 10b-5(a) ...............................................................................................1, 20, 25
    Rule 10b-5(b) ........................................................................................1, 11, 20, 25
    Rule 10b-5(c) ...................................................................................................20, 25
    Rule 10b5-1.................................................................................................................22
    Rule 12(b)(6)..............................................................................................................10
    Rule 30(b)(6)................................................................................................................3

17 C.F.R.
    §240.10b-5 ...................................................................................................................1

**LEGISLATIVE HISTORY**

False Claims Act ("FCA"),
    Pub. L. 97-258, 96 Stat. 978 (1982).................................................................. *passim*

Physician Payments Sunshine Act ("Sunshine Act"),
    Pub. L. No. 111-148, Title VI, §6002, 124 Stat. 689 (2010) .....................................13

Private Securities Litigation Reform Act of 1995 ("PSLRA"),
    Pub. L. No. 104-67, 109 Stat. 737 (1995)..................................................................12

**MEMORANDUM OF POINTS AND AUTHORITIES**

Lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief & Retirement Fund (collectively, "Plaintiffs") hereby oppose Defendants' motion to dismiss.[1]

**STATEMENT OF ISSUES TO BE DECIDED**

Whether Plaintiffs' Complaint sets forth facts that, considered holistically, adequately plead claims under §10b(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(a), (b), and/or (c) promulgated thereunder, 17 C.F.R. §240.10b-5 and §§20(a) and 20A of the Exchange Act, 15 U.S.C. §78t(a) and §78t-1.

**INTRODUCTION**

Starting in early 2020, CareDx – a medical testing company focused on organ transplant patients – exploited the COVID-19 pandemic to illegally bill Medicare for medically unnecessary tests. Specifically, under the guise of its "RemoTraC" home testing program, CareDx illegally bundled its $3,000 Allosure test – which is supposed to detect signs of kidney transplant rejection – with routine blood tests. By mid-2020, RemoTraC accounted for a staggering 50% of the Company's revenues. Eager to promote the illusion that the rapid increase in Allosure revenues was there to stay, Defendants touted RemoTraC to investors as a "sustainable" business that purportedly served an "unmet" patient need and that would be the Company's "growth driver" for years to come, all the while assuring investors that the Company was in full compliance with applicable laws. CareDx's stock price soared more than 330% on these assurances and on the ostensible blockbuster financial success of RemoTraC. Defendants profited handsomely, selling more than $30 million of their own personal holdings of CareDx stock throughout the Class Period.

---

[1]    References to "Br." are to Defendants' Notice of Motion and Motion to Dismiss Amended Class Action Complaint; Memorandum of Points and Authorities in Support Thereof (ECF 58). Exhibit references are to the Declaration of Charles D. Cording in Support of Motion to Dismiss Amended Complaint (ECF 58-1). All terms not otherwise defined herein have the same meaning as in the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 53) ("Complaint" or "AC"). All "¶_" and "¶¶_" references are to the Complaint. Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

In reality, Defendants' representations were entirely false as RemoTraC was built on an illegal and fraudulent Medicare billing scheme.  Specifically, CareDx was using RemoTraC to administer medically *unnecessary* tests in blatant violation of Medicare regulations.  Indeed, as has since been revealed in an extraordinary whistleblower complaint filed by one of CareDx's most senior officers, Dr. Michael Olymbios (the Company's Head of Community Nephrology, who supervised the AlloSure Kidney sales team and oversaw clinical studies, and who reported directly to Defendant Seeto) – and confirmed by no fewer than *eight* other former employees – CareDx was engaged in "*an unlawful campaign . . . to pad the Company's sales*" through fraudulent billing, which was "*bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment*."  ¶¶9, 50.  Specifically, CareDx systematically and improperly bundled its tests with routine blood tests in order to repeatedly administer them to patients who *did not* show any warning signs of organ rejection, and then illegally sought Medicare reimbursement for these clearly unnecessary tests, in order to "*maximize potential revenue associated with AlloSure . . . even when [its] use lacked clinical support and fell outside of the conditional [Medicare] approval extended to it*."

In furtherance of its illicit scheme, as Dr. Olymbios and other former employees have further confirmed, CareDx offered "*extravagant inducement or kickbacks to physicians and other providers to promote AlloSure*," including expensive vacations, dinners, "booze cruises," and wine tours, while offering "*sham advisory boards* that were little more than captive marketing presentations."  ¶69.  Dr. Olymbios reported this misconduct directly to CareDx's senior management – *including then-CEO Defendant Maag and current CEO Defendant Seeto*, who merely "*brushed off his concerns or berated him for raising them in the first place*," all while taking "*active measures to avoid creating a paper trail of their misconduct*."  ¶10.  Other employees agreed CareDx was "*a bunch of crooks and frauds*" and speculated eventually someone would blow the whistle or a regulator would investigate – both of which ultimately happened.  *Id.*

The truth of Defendants' fraud was revealed through a series of partial disclosures that uncovered CareDx's dependence on these illegal schemes to juice its revenues.  First, on October 28, 2021, Defendants revealed in their 3Q 2021 Form 10-Q that the U.S. Department of Justice ("DOJ")

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT

- 2 -

had initiated "*a False Claims Act investigation being conducted by the DOJ regarding certain business practices related to our kidney testing and phlebotomy services*" – *i.e.*, RemoTraC – and that the U.S. Securities and Exchange Commission ("SEC") was similarly investigating the Company. ¶91. The combination of these revelations with disappointing and "murky" financial results that were insufficiently explained caused CareDx's stock price to plummet more than 27% the next trading day – from $70.34 per share to $51 per share. ¶8.

Then, on April 15, 2022, Dr. Olymbios filed his whistleblower complaint. Only a month later, on May 23, 2022, CareDx announced Defendant Dhingra's sudden and immediate resignation as CFO – after just 14 months on the job – which was in turn followed by the equally sudden and immediate resignation of the Company's chief marketing officer just three months later.

Finally, on November 3, 2022, CareDx announced disastrous financial results that revealed to the market just how dependent CareDx's revenues had been on its illegal billing and kickback scheme. Under growing government scrutiny, CareDx became increasingly unable to bill Medicare for unnecessary tests; its Medicare revenue had *fallen sharply*, while its average selling price per test administered ("ASP") continued an ongoing and precipitous decline. Analysts concluded, and the Company's new CFO confirmed, that the problem was that "*more tests [were] not being paid*" at all – *i.e.*, that "*as many as 50% of the Company's tests were now not receiving any reimbursement whatsoever*." ¶¶13, 14. These revelations in total caused CareDx's stock price to fall from a Class Period high of $95.11 per share to just $16.02 per share after the Class Period, losing more than 83% of its value and wiping out billions of dollars in market capitalization. ¶118.

Unable to refute the Complaint's damning allegations, Defendants instead have asked the Court to strike many of them entirely. As set forth in Plaintiffs' accompanying opposition to Defendants' motion to strike, Defendants' arguments are meritless. Plaintiffs took more than sufficient steps to verify Dr. Olymbios' allegations, which are based on his personal knowledge as one of CareDx's most senior executives and are corroborated by numerous other former employees. Indeed, Dr. Olymbios is so knowledgeable of CareDx's testing business that the Company itself made Dr. Olymbios its Rule 30(b)(6) corporate designee in recent highly consequential litigation against CareDx's main competitor and has described him as a person who occupied a "*special*

*position of trust and confidence*" at the Company. ¶49 n.7. Defendants' suggestion that the Court should now ignore Dr. Olymbios' allegations defies credulity, although it is not surprising as these allegations make Defendants' illegal scheme crystal clear.

Defendants' arguments for dismissal, too, thus fail. First, Defendants argue that Plaintiffs have not alleged CareDx engaged in any illegal conduct. Defendants are clearly wrong. The Complaint is replete with highly specific allegations of blatant violations of the False Claims Act ("FCA"), the Anti-Kickback Statute ("AKS"), and other laws, as confirmed by Dr. Olymbios himself, as well as *eight* other former employees. As such, because "[d]efendants made numerous statements attributing [their] earnings to a variety of legitimate business practices, while omitting any mention of illegal" practices, their statements were actionably false and misleading. *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007). For similar reasons, Defendants' statements that RemoTraC was "sustainable" and served "unmet needs" were not mere "puffery" in the context of CareDx's illegal and *unsustainable* scheme to bill for *unnecessary* tests. *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017).

Defendants also argue their representations that they complied with applicable laws (including, specifically, the FCA and AKS) are inactionable merely because they were contained in an agreement filed with the SEC and because the agreement purportedly contained a "disclaimer." However, the law does not permit Defendants to immunize their false statements merely by stating them in an *agreement* publicly filed with the SEC, rather than another form of document, or by "disclaiming" them. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 741-42 (9th Cir. 2008).

Defendants' arguments that they lacked scienter are similarly unavailing. Dr. Olymbios himself reported the widespread misconduct he observed – including obvious Medicare billing fraud and improper kickbacks – to the Company's most senior executives, including Defendant Maag and Defendant Seeto, who "***brushed off his concerns or berated him for raising them in the first place***" and took other steps to actively conceal their conduct. ¶58. Other former employees similarly reported concerns about illegal billing and kickbacks to high-ranking executives, and Defendant Maag's former executive assistant directly observed his personal participation in the kickback

scheme.  It is extraordinarily rare at the pleading stage to have such direct evidence of scienter, and such cold, hard facts are easily sufficient to establish Defendants' scienter.

Finally, Defendants' argument that there was no loss causation merely because they never admitted to any fraudulent conduct fails, and similar arguments have been entirely rejected by the Ninth Circuit.  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

## STATEMENT OF RELEVANT FACTS

The Complaint alleges – with corroboration by no fewer than *eight* former CareDx employees, as well as damning whistleblower allegations by one of the Company's most senior executives – that Defendants systematically used RemoTraC to bill Medicare for medically unnecessary AlloSure tests while misleadingly telling the market that RemoTraC's growth was "sustainable," "going to be maintained," and driven by an "unmet need," and also averring specifically that CareDx was in full compliance with applicable laws, such as the FCA and AKS. ¶¶38, 49-68; 82-89.[2]  During the Class Period, Medicare considered AlloSure to be medically necessary *only* "to assess the probability of Allograft rejection in kidney transplant recipients *with clinical suspicion of rejection* and to inform clinical decision-making about the necessity of renal biopsy *in such patients* at least two weeks post-transplant."  ¶33.  Medicare accordingly covered AlloSure *only if* a patient had *already* shown clinical signs of rejection; it was unlawful to bill Medicare for AlloSure tests used for patients without clinical signs of rejection.  *Id.*

Defendants, however, did just that.  In his complaint, Dr. Olymbios exposed that CareDx "bundl[ed] AlloSure with other blood tests as part of . . . mobile phlebotomy services to induce physicians to order AlloSure" and "used what it represented to be clinical tests to bill Medicare for the [AlloSure] tests."  ¶¶51, 59.  He also specifically stated that to "***maximize potential revenue***

---

[2]  The "consistent and interlocking nature" of numerous confidential witnesses' statements "bolsters the evidence's reliability and credibility."  *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *5 (W.D. Wash. Apr. 19, 2019); *see also Bajjuri v. Raytheon Techs. Corp.*, 2022 WL 17081317, at *9 (D. Ariz. Nov. 18, 2022) ("Under *Daou*, the number of sources and the corroborative nature of other facts alleged (including from other sources) bolsters the reliability of these sources.").  The confidential witnesses' testimony here is also compelling because "Plaintiffs here describe the confidential witnesses with a large degree of specificity.  Plaintiffs number each witness and describe his or her job description and responsibilities.  In some instances, plaintiffs provide the witnesses' exact title and to which [CareDx] executive the witness reported."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005).

associated with AlloSure, CareDx executives engaged in various forms of clinical and marketing schemes in an effort to justify AlloSure's use, even when that use lacked clinical support and *fell outside of the conditional approval extended to it*." ¶50. Dr. Olymbios also explained that "[multiple] nephrology practices" identified CareDx's AlloSure billing practices "as a violation of Medicare billing requirements." ¶52. When Dr. Olymbios raised concerns about these unlawful billing practices, CareDx executives – including Defendants Maag and Seeto – "*brushed off his concerns or berated him for raising them in the first place*" and "*repeatedly ignored or actively quashed any internal concerns about its activity*." ¶58.

Dr. FE-1 corroborated Dr. Olymbios' allegations. As he explained, when COVID-19 hit, CareDx exploited transplant patients' need for routine blood testing by launching RemoTraC and "doing the very expensive CareDx labs on the *same cadence* of the home [routine] labs," which "was *totally unethical*" and "clearly wrong." ¶60. CareDx would not arrange a blood draw for the routine labs unless AlloSure was also ordered, as "there was no way to use us without ordering our test as well." ¶¶60-61. CareDx was "doing tests that cost *at least 8X* of what they should have been *and on patients that did not need these tests*." *Id.* Dr. FE-1 personally reviewed patient records and saw AlloSure was being ordered on a *monthly* basis for patients who did not need it. *Id.* Dr. FE-1 reported his concerns to his supervisor and CareDx's lead compliance attorney but noted the compliance attorney "was having an uphill battle *and CareDx did not want to be compliant*."[3] ¶62.

FE-2, FE-3, and FE-4 further corroborated these allegations. As FE-3 explained, CareDx was "*not going to go to their homes and just do the standard of care [routine]*" labs – they had to also bundle expensive CareDx tests with the routine tests.[4] ¶64. FE-2 further recalled: "*it was known throughout CareDx that a RemoTraC blood draw would not be administered without an*

---

[3]  Defendants attempt to distract from these allegations by characterizing Dr. FE-1's allegations as "triple hearsay." Not only is this assertion patently untrue, it also completely ignores the *bulk* of Dr. FE-1's allegations – almost all of which rely on his personal experience. Regardless, "'the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009)).

[4]  FE-3 ultimately left the Company because there "were things . . . that I could tell that I was not comfortable with. That was the reason why I and several others had left that company." ¶65.

*AlloSure test being conducted at the same time*." ¶63. FE-4 also understood AlloSure was bundled together with other blood tests as part of RemoTraC to promote and induce physicians to order AlloSure. ¶66. As a result, CareDx was able to bill Medicare for tens of thousands of dollars per year *per patient* for patients who neither needed nor qualified for AlloSure. ¶¶47, 48

These former employees further explained that CareDx got away with billing Medicare for the unnecessary tests by hiding the medical necessity requirement from doctors and by having intentionally difficult-to-trace recordkeeping and billing practices. ¶¶65-68. Dr. Olymbios recalled that CareDx "*intentionally excluded from the test requisition form a field where a physician could indicate the reason why the test was medically necessary*." ¶67. As FE-5 personally witnessed, CareDx intentionally obfuscated its Medicare billing practices by using an entirely paper-based claim submission system. ¶68. Critically, Medicare "needed a trace of all the paper evidence [of claims]." *Id.* Because CareDx kept no digital evidence of its claims to Medicare, the claims were obscured in "hundreds and hundreds of boxes" of paper, which made tracing claims virtually impossible. *Id.*[5]

The Complaint also details elaborate and improper inducements that CareDx used to encourage healthcare providers to order AlloSure – corroborated by Dr. Olymbios and *three* other former CareDx employees. ¶¶69-71. As Dr. Olymbios detailed, CareDx offered "sham advisory boards" that were "little more than marketing exercises to encourage physicians to order the AlloSure tests." ¶69. FE-6 further described CareDx's practice of hosting "symposiums," through which it would pay for doctors' flights, limousine services, hotels, and bottles of champagne. ¶70. As FE-6 observed, CareDx also held yearly key opinion leader "summits," where it would pay for doctors to spend the weekend in Napa Valley. *Id.* There, the doctors were chauffeured around in limousines; brought to four different vineyards (each with a $100-per-person wine tasting); and provided with meals at the finest restaurants – all on CareDx's dime. *Id.* FE-6 directly observed

---

[5] In their opposition, Defendants erroneously argue that RemoTraC was "precisely the kind of patient-centered response to the COVID-19 pandemic invited by HHS OIG through its emergency guidance issued in early 2020." Br. at 9. However, those regulations obviously do not permit fraudulently billing Medicare for medically unnecessary tests. *See* OIG, Message from leadership on minimizing burdens on providers (Mar. 30, 2020); https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2006053221-hi-oigpolicystatement2020.pdf.

these costs being placed on CareDx credit cards. *Id*. Dr. FE-1 corroborated Dr. Olymbios' and FE-6's recollections, recalling, for example, that CareDx's sales management personnel took doctors on "booze" cruises, helicopter tours, and expensive vacations. ¶71. According to Dr. FE-1, it was common knowledge at CareDx that these events were occurring, and "[t]he sales people did stuff that would not be appropriate anywhere else in the pharma or biotech industry." *Id*. Dr. Olymbios made clear that the purpose of these "extravagant inducements" was to "promote AlloSure."[6] ¶69.

CareDx further violated the AKS by remunerating healthcare professionals in connection with blood draws. ¶¶72-81. For example, FE-4 stated CareDx regularly paid phlebotomists a *$100 per specimen draw fee* when the market rate was between *$3 and $5*. ¶73. These kickback allegations were further corroborated by FE-7, who recalled CareDx was not charging physicians for the draws, and by Dr. Olymbios, who revealed the schemes went as far as waiving patient costs. ¶¶75-78.

Additionally, Defendants violated the FCA and AKS by paying doctors and billing Medicare for AlloSure tests ordered in conjunction with KOAR – a study commenced in 2018 that purported to test AlloSure's effectiveness by enrolling over *1,700* patients and giving each patient *regular* AlloSure tests over a *three-year period*. ¶¶82-89. Critically, by requiring medically unnecessary and potentially duplicative tests at predetermined intervals, the KOAR exhibited exactly the types of red flags of which the HHS OIG has warned as signs of fraud. ¶87.[7] Further, despite Medicare's

[6]    Defendants again misread the Complaint's allegations in their favor by arguing that the majority of the "lavish gift" kickback allegations rely "almost entirely on FE-6"; Defendants ignore that the allegations are corroborated by Dr. Olymbios and FE-1, both of whom were CareDx employees during the Class Period, and both of whom witnessed the extravagant kickbacks. Br. at 10 n.13. Further, courts in this Circuit credit allegations from former employees employed before the Class Period. *See In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 9667131 (S.D. Cal. May 7, 2007) (finding as reliable two confidential witnesses employed before the class period); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) (class period dates function only to define the class, "not to restrict the universe of relevant or actionable facts"); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1065 (N.D. Cal. 2002) (finding pre-class period allegations material to falsity). Defendants further err in arguing that there is no evidence the doctors who received the kickbacks actually ordered AlloSure. Br. at 10-11 n.13. However, "the AKS does not require proof of a *quid pro quo*, or that any . . . referral was made" – the only requirement is the *intent* to induce the referral. *United States v. Medtronic Plc*, 2021 WL 4816647, at *5 (C.D. Cal. Apr. 12, 2021).

[7]    Defendants argue that Medicare regulations permitted CareDx to bill for tests administered in their studies. Br. at 11 n.13. Defendants are wrong. Applicable Medicare regulations make clear

clear policy that AlloSure was not covered as a surveillance test, FE-8 recalled that CareDx systematically selected *only* Medicare patients for the AlloSure study.  ¶85.  CareDx also paid physicians to induce them to enroll their Medicare patients in the KOAR study, in direct violation of the AKS.  ¶¶82-89.  As Dr. Olymbios detailed and former employees corroborated, CareDx offered unrestricted grants to physicians to enroll their patients in CareDx's studies and paid physicians as much as *eight times* the normal rate to enroll their patients in KOAR – as much as *$35,000 to $40,000* per patient, which was "*excessive and very unusual for a simple registry study*," which "usually paid the doctors a flat rate of $5,000.00 per patient."  ¶¶82-83.

The truth of Defendants' fraud was revealed through a series of partial disclosures that revealed CareDx's dependence on these illegal schemes to juice its revenues.  First, on October 28, 2021, Defendants revealed in their 3Q 2021 Form 10-Q that the DOJ had served a "civil investigative demand" ("CID") in connection with "*a False Claims Act investigation being conducted by the DOJ regarding certain business practices related to our kidney testing and phlebotomy services*" – *i.e.*, RemoTraC – "and a subpoena from the [SEC] in relation to an investigation . . . in respect of matters similar to those identified in the CID, as well as certain of our accounting and public reporting practices."  ¶91.  Defendants also reported disappointing financial results, including that testing services *revenue* was only growing about half as fast as testing *volume*, and thus revenue per test ("ASP") was dramatically declining.  CareDx's stock price fell more than 27% the next trading day – from $70.34 per share to $51 per share – with analysts warning that disclosures about such government investigations "*typically bear some degree of merit*."  ¶8. Meanwhile, analysts questioned why the Company's ASPs were simultaneously declining, calling out the Company's "*murky*" explanations with "*little additional context*" and "*question[ing] what changed*" since the prior quarter.  ¶96.

that Medicare will cover only "routine costs" in certain qualifying studies (such as room and board for a hospital stay); Medicare will not pay for the test being studied unless Medicare would pay for the test even if the patient were not part of the study.  *See* https://www.medicare.gov/Pubs/pdf/ 02226-medicare-and-clinical-research-studies.pdf.  Accordingly, because AlloSure was not approved for surveillance purposes, it was unlawful to bill Medicare for a study in which AlloSure was used for surveillance purposes.  ¶85.

Then, on May 23, 2022 – one month after Dr. Olymbios filed his explosive April 2022 whistleblower complaint – Defendant CFO Dhingra suddenly announced his *immediate* resignation from the Company, and CareDx's stock price fell 7.5% – from $25.86 per share to $23.92 per share – on unusually high volume.  ¶109.  A Jefferies analyst report noted that the resignation was "***surprising, coming barely more than a year since he joined CDNA***," and took note that it "***comes in the midst of certain ongoing gov't investigations***."  *Id.*  CareDx's chief marketing officer then also announced her sudden and immediate resignation just three months later, on September 1, 2022, causing another 10% decline in CareDx's stock.  ¶110.

Finally, on November 3, 2022, CareDx released disastrous financial results – including another decrease in ASP and a ***9% decline in Medicare revenue*** (CareDx's most important revenue source) – and revealed that falling testing revenues were not due to decreasing prices but to as many as ***50% of CareDx's tests going entirely unreimbursed***.  ¶¶111-114.  Consequently, CareDx's stock price fell more than 14% – from $18.73 per share to $16.02 per share.  ¶115.

While CareDx attempted to blame its financial failings on factors such a shift to commercial insurance business and Medicare Advantage plans, CareDx's chief competitor, Natera – which sold a similar test to AlloSure – rejected these explanations, averring it "***ha[dn't] been impacted***" by such factors and was "***consistently reimbursed***" by Medicare – bolstering that CareDx's real problem was that, under government scrutiny, it could no longer enact its illegal billing scheme.  ¶¶120-122.  Further confirming this, on November 17, 2022 a Craig-Hallum analyst reported that Medicare had held a meeting to review CareDx's billing due to "***unexpected utilization patterns***" for CareDx's tests, which the analyst described as especially "***harsh language from Medicare***."  ¶124.

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court must "consider the complaint in its entirety" and, in doing so, "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).  "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact"; and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for

later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

### ARGUMENT

**I.      The Complaint Sufficiently Pleads False and Misleading Statements and Omissions Under Rule 10b-5(b)**

**A.      Defendants Falsely Stated They Complied with All Applicable Healthcare Laws, as They Knew or Recklessly Disregarded**

In common stock offering materials CareDx publicly filed with the SEC on January 21, 2021 and April 15, 2022, the Company stated that it was "in material compliance with all health care laws applicable to the Company, . . . including . . . *the federal Anti-Kickback Statute* . . . [and] the *civil False Claims Act*" and regulations requiring "*medical necessity*" in testing.  ¶¶126, 158.  These statements were materially false and misleading, as Defendants knew they were *not* in material compliance with these laws due to their rampant illegal schemes.

Ninth Circuit courts have repeatedly upheld false and misleading statements that assert compliance with the law.  *See, e.g.*, *Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014) ("Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made.").  In *Reese*, the court found statements that the issuer believed it was "in compliance in all material respects with applicable environmental laws and regulations" to be actionably false where the plaintiffs alleged facts demonstrating "pre-existing, significant violations of federal and state environmental laws." *Id.*  Here, Defendants were operating "*an unlawful campaign – bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment – to pad its sales*," in clear violation of the FCA and the AKS, as whistleblower Dr. Olymbios has made clear.  ¶50.  These and extensive corroborating allegations satisfy the falsity inquiry.

Defendants ignore the complaint in arguing that Plaintiffs have not alleged any illegal conduct.  First, Defendants' scheme to fraudulently bill Medicare for medically unnecessary AlloSure tests – which was directly confirmed by Dr. Olymbios and corroborated by multiple other former employees – clearly violated the FCA.  *See Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020), *cert. denied sub nom. RollinsNelson*

*LTC Corp. v. United States ex rel. Winters*, ___ U.S. ___, 121 S. Ct. 1380 (mem) (1990) ("Because medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary.  Claims for unnecessary treatment are false claims."); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (same); *United States ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at *4 (C.D. Cal. July 10, 2014) ("Claims for Uses That Are Not Medically Accepted are False").

Second, Defendants' kickback schemes (¶¶69-81) violated the AKS, which prohibits:

> the knowing and willful offer or payment of remuneration to any person to induce that person to: (1) refer for furnishing or arrange for furnishing any item or service for which payment may be made under a federal healthcare program; or (2) purchase, lease, order, or arrange for or recommend the purchasing, leasing, or ordering of any item for which payment may be made under a federal healthcare program.

42 U.S.C. §1320a-7b.[8]  *See United States, ex rel. Solis v. Millennium Pharms., Inc.*, 2015 WL 1469166 (E.D. Cal. Mar. 30, 2015) (grants, advisory board positions, and meals constituted remuneration under the AKS).[9]  Defendants' elaborate scheme of kickbacks, including booze cruises, vacations, expensive dinners, "sham" advisory boards, and other remunerations – which Dr. Olymbios described and other former employees corroborated – violated the AKS.  Indeed, a Court in this Circuit recently found that highly similar allegations supported falsity in an action under the Private Securities Litigation Reform Act of 1995 ("PSLRA") based on an underlying Medicare fraud scheme.  *See Mauss v. NuVasive, Inc.*, 2015 WL 10857519, at *10 (S.D. Cal. Aug. 28, 2015) (paid "vacations"; "costs of travel, lodging, and hospitality for physicians attending

---

[8]  Remuneration is "broadly defined" as "anything of value."  *United States ex rel. Everest Principles, LLC v. Abbott Lab'ys, Inc.*, 2022 WL 3567063, at *5 (S.D. Cal. Aug. 18, 2022).

[9]  The AKS forbids payments made to any individuals who were in a position to influence others to order AlloSure; there is no requirement that the kickbacks be paid only to the ultimate prescribers. *See United States v. Vernon*, 723 F.3d 1234, 1254 (11th Cir. 2013) (stating a similar argument "wholly fail[ed]" because "the plain language of the statute is not limited to payments to physicians who prescribe medication.  Rather, it speaks broadly to whoever knowingly and willfully . . . pays any remuneration to ***any*** person to induce such person . . . to refer an individual") (ellipses in original).  To the extent Defendants contest whether phlebotomists were in a position to encourage physicians to order AlloSure, that is a fact-bound argument improper at the pleading stage. *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018).

the company's [event]"; and "catered events featuring large amounts of champagne" and "supported by the observations of various [former employees]" showed falsity).[10]

Moreover, CareDx's scheme to waive patient fees constituted an additional form of illegal kickback.  Defendants argue that these fees and charge waivers are *per se* not inducement because the only thing provided to the physician is the blood draw, valued at $3-$5.  Br. at 9.  This misses the point: providing value to a ***patient*** (in the form of a waived charge) is valuable to doctors.  *See, e.g.*, *United States v. Crescendo Bioscience, Inc.*, 2020 WL 2614959, at *10 (N.D. Cal. May 23, 2020) ("if a lab waives patients' fees . . . thus allowing physicians to reassure their patients that they will not be responsible for [the fee], that is something of value to physicians and they might be induced to send more patients to that lab").[11]  Further, CareDx's AlloSure tests ordered through the KOAR study were induced by AKS violations and thus also violated the FCA.  *See Brown*, 2014 WL 3605896, at *7 ("claims that result from unlawful kickbacks are false for purposes of the FCA."); *Solis*, 2015 WL 1469166, at *6 (same).[12]

Unable to defend their illegal conduct, Defendants argue the Court should simply ignore their false public statements about their compliance with applicable laws merely because these statements appeared in ***underwriting agreements*** publicly filed with the SEC rather than another type of filing.  However, the Ninth Circuit has expressly ***rejected*** the "argument that the mere context of the statements [in an agreement filed with the SEC] is enough to render these statements inactionable as a matter of law," emphasizing that "[t]he mere fact that the company chose to communicate the

---

[10]  As such, "Plaintiff[s] [have] alleged specific details of a broad scheme that used kickbacks to induce doctors to promote and use [CareDx] products and services, which would ultimately be paid for by Medicare or Medicaid, supported by the observations of various confidential witnesses from within the company who personally observed and raised concerns about the company's activities," and such allegations are more than sufficient.  *Id.*

[11]  These arrangements were also impermissible under the Complaint (¶78 n.20; 42 U.S.C. §1320a-7a(a)(5)) and go against express guidance from the Department of Health and Human Services ("HHS") Office of the Inspector General ("OIG").  ¶76 n.19;¶78 n.20.

[12]  Defendants do not challenge the allegations that they violated the Sunshine Act by failing to report any of their payments to healthcare providers to CMS.  ¶¶5, 48, 71, 128.

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT

details of [its] merger" in a publicly filed agreement "cannot work as a *per se* bar to securities law liability." *Glazer*, 549 F.3d at 736, 741.[13]

Nor can Defendants "disclaim" compliance with their public reporting responsibilities by including generic "disclaimer language" in their public filings. Br. at 14. As an initial matter, the plain language of the Exchange Act "prohibits [contractual] waiver of the substantive obligations imposed by the Exchange Act." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 228 (1987). In addition, the *Glazer* court rejected the same disclaimer argument Defendants make here: "[Defendant] contends that because the statements appeared in the representations and warranties section of a private merger agreement directed solely to [private contract counterparty], the statements could not reasonably have been interpreted as factual communications **to investors**. To support this argument, [Defendant] refers to a passage in the merger agreement which provides that the agreement was not intended to . . . confer upon any [p]erson other than the parties hereto any rights or remedies hereunder." 549 F.3d at 741. The court "d[id] not accept" that argument. *Id.*[14]

Defendants fail to distinguish *Glazer*. Indeed, they concede that the Ninth Circuit found the compliance statements "not *per se* inactionable." Br. at 14. They point out that the investors in *Glazer* cared about the merger agreement; here, investors would have cared that the Company's core business rested on systematically violating the "Health Care Laws" that the Company claimed to obey in its stock offering documents. Indeed, Defendants told investors they were in compliance with "Health Care Laws" in the context of selling over $364 million of common stock in "public

---

[13]  While the *Glazer* falsity holding is consistent with the facts here, the scienter holding is factually inapposite. The *Glazer* court found scienter lacking for one defendant because scienter for that defendant was based **solely** on the fact that he had signed SOX certifications. *Glazer*, 549 F.3d at 743. For the second defendant, scienter allegations failed because the plaintiff did "**not ple[a]d any facts**" to demonstrate that [the defendant] was personally aware of the illegal payments or that he was actively involed in" the part of the business involved in the illegal payments. *Id.* at 745. These facts stand in stark contrast to the extensive allegations that Defendants here were personally aware of CareDx's schemes. For example, the Complaint alleges that Dr. Olymbios reported the schemes to "more than ten other current or former CareDx employees, **including Peter Maag** . . . **Reg Seeto**." ¶167. The Complaint also alleges that Defendant Maag testified that he approved nearly all of CareDx's marketing expenses and attended marketing events with doctors. ¶81. He also selected vineyards and restaurants where CareDx wined and dined healthcare providers. ¶169.

[14]  Other courts reach the same conclusion. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1179 (D. Or. 2015) (statements in underwriting agreement actionable); *see also In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232 (C.D. Cal. July 13, 2015) (same).

offering[s]" of that stock *to investors*. *See* Ex. E (over $164 million); Ex. F ("up to $200,000,000"). Defendants have not shown why the logic of *Glazer* should not apply here.[15] Their argument is meritless.[16]

### B. Defendants Misleadingly Attributed CareDx's Success to Lawful Causes While Concealing the Company's Unlawful Schemes

Defendants argue that they made no false statement about the sources of their success, but they are wrong. Br. at 11. In this case, as in *Syncor*, the Complaint alleges that "[d]efendants made numerous statements attributing [their] earnings to a variety of legitimate business practices, while omitting any mention of illegal" practices. 239 F. App'x at 320. Specifically, Defendants repeatedly credited legitimate business practices as the drivers of the Company's "record" growth while omitting their unlawful Medicare and kickback practices. *E.g.*, ¶¶129-133. For example, on February 18, 2021, Seeto told investors the Company had a "record" year because they "creat[ed] this mobile phlebotomy service" called RemoTraC and "scale[d] it up, such that during Q2 40% of our testing was done" that way; he claimed the business was "***sustainable and [was] going to be***

---

[15] Defendants' out-of-circuit cases do not change the analysis. For example, in reviewing *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583 (S.D. Tex. 2018), on appeal, the Fifth Circuit "decline[d] to hold that underwriting statements are *per se* unactionable, which is not necessary for this case." *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 732 (5th Cir. 2019). In *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716 (D. Del. Mar. 30, 2017), the "disclaimer" language stated that the representations in a merger agreement "were not intended by the parties to the merger agreement to be characterizations of the actual state of facts or condition of [the companies]." *Id.* at *5. Defendants here never represented that their compliance statements were not meant to characterize the actual state of affairs at CareDx.

[16] Defendants' reliance on *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 692-94 (9th Cir. 2011), is similarly misplaced. The court in *Reese* held: a statement contained in a private contract that was publicly filed may be actionable where "a reasonable investor would view it as a certificate of [defendant's] compliance with [a] standard." *Id.* In that case, however, defendants' statements were inactionable because there were mere generic promises that defendants would conduct their operations in a "reasonable" way ***in the future*** and thus were inactionable because these forward-looking promises [we]re "not a certification that the promisor will actually perform [those] acts" in the future. *Id.* at 691. By contrast, statements averring compliance with "all laws" were sufficient to support falsity in *Glazer*, and Defendants' statements in this case are even more precise because they explicitly named particular healthcare laws CareDx claimed to follow. *See also Galena*, 117 F. Supp. 3d at 1179 ("Unlike in *Reese*, a reasonable investor could view the representation that [defendant] had not taken [a specific unlawful action] as certification of that fact."). The facts of this case are far more similar to those before the Ninth Circuit in *Glazer*.

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT

- 15 -

*maintained*."[17]  *Id.*  As in *Syncor*, by "attributing [CareDx's] success solely to legitimate practices, [D]efendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."  239 F. App'x 318 at 320.  Here, the illegal practices contributing to Defendants' success included illegal Medicare overbilling, kickbacks, and concealing the kickbacks despite a statutory duty to publicly report them.

Defendants ignore *Syncor* and rely on *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008), to argue the Complaint in this case does not "connect" Defendants' Medicare/kickback scheme to the Company's financial success.  Br. at 11.  However, the factual allegations in *Corinthian* "consist[ed] of vague claims."  540 F.3d at 1070.  That is not so in this case.  Here, Dr. Olymbios was the Company's most knowledgeable person about its blood testing business, and he has stated that the Medicare/kickback scheme was "***an unlawful campaign – bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment – to pad its sales***."  ¶50.  That allegation connects Defendants' scheme to their statements about their success because "[w]hen corporate officers credit an illegal payment scheme for raising revenues, a reasonable inference is that the scheme *did* raise revenues." *Syncor*, 239 F. App'x at 320.  The same reasoning applies here.

Indeed, the indicia of falsity in this case go above and beyond those in *Syncor*.  The additional facts demonstrate that the Company's success in selling tests to Medicare collapsed as soon as the DOJ and SEC started to investigate the scheme (¶¶93-96; 105); Medicare started rejecting ***half*** the bills Defendants sent for reimbursement after the DOJ and SEC launched their investigation (¶¶121-124); and after the DOJ/SEC crackdown started, Medicare privately used "***harsh language***" in beginning its own inquiry into the Company's conduct.  ¶124.  These details

---

[17]  *See also* ¶¶134-138 (February 24, 2021, Seeto responding to analyst's question about the "quick turnaround with RemoTraC" that RemoTraC was part of the Company's "***nice engine of growth***"; in response to questions about RemoTraC contributing 40% of the Company's past success, Seeto said RemoTraC was "the highlight of [the] year" and "***the core part of our business***"); ¶¶139-142 (May 5, 2021, similar statements by Seeto and Dhingra attributing the Company's success solely to legitimate business practice); ¶¶143-144 (June 8, 2021, Dhingra responding to analyst's comments about the Company's "impressive" results by stating: "***RemoTraC [was] part of our structure . . . [it] enable[d] certain aspects of our growth . . . .***"); ¶¶145-147; ¶¶148-154; ¶¶161-163.

readily allege falsity under *Syncor* because Dr. Olymbios' inside view shows the Company *did* "*pad its sales*" via illegal conduct, which then became untenable under government scrutiny.  ¶50.

### C.    Materially False "Unmet Needs" Statements

Defendants falsely stated that their RemoTraC blood-drawing business addressed the "needs and demands" of patients during the Class Period when, in fact, the business was built on giving patients tests that were *not* medically necessary.[18]  These facts allege falsity.  *See, e.g.*, *Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1105 (N.D. Cal. 2020) (finding falsity adequately pled with respect to a statement contradicted by the truth).

Defendants' contrary arguments are meritless.  They contend that even if they devised and executed the RemoTraC scheme to "bill Medicare" for "*medically unnecessary*" tests (Br. at 17), their statements that RemoTraC was the "highlight" of the year in (Br. at App'x A-3) supporting patients' "*unmet need*" are all "true" because some tests other than CareDx tests were needed by the patients in addition to the unnecessary CareDx tests.  Br. at 17.  This defense fails because a "statement that is literally true can be misleading and thus actionable under the securities laws." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Here, it is misleading to tout RemoTraC as meeting unmet needs when the point of the program was to bill Medicare for medically unnecessary tests.  At a minimum, the statements "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Id.*

*Hefler v. Wells Fargo* is instructive.  There, the defendants provided unnecessary and unwanted accounts and credit products to their customers without authorization while claiming "its acclaimed cross-selling business model, in which Wells Fargo emphasized the sale of multiple Wells Fargo products to existing customers," was "the reason for its financial success." *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *2 (N.D. Cal. Feb. 27, 2018) (Order on Motion to Dismiss, quoting *Hefler* complaint, at ¶3).  In reality, of course – as was widely publicized in the media – the

---

[18]  *See, e.g.*, ¶¶38, 129-130 (February 18, 2021, Seeto stating RemoTraC was "addressing an unment need" and was a "really good example" of how the Company addressed "needs and demands"); ¶¶134, 136 (February 24, 2021, Seeto stating RemoTraC was the highlight of [the] year in addressing "an unmet need").

defendants were engaged in a scheme to juice their numbers by opening accounts in their customers' names without authorization.

There, as here, the defendants described their bogus products as meeting a "need" in the marketplace. *See Wells Fargo*, 2018 WL 1070116, at *6 ("Cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial ***needs***"; "[defendant] Tolstedt represented that the cross-sell strategy was meant to satisfy customers' ***needs*** and help them succeed financially"). As in this case, the *Wells Fargo* defendants argued the plaintiffs had not pled any false or misleading statements; the court rejected that argument, finding: "the cross-selling metrics that were reported in all quarterly and annual filings and statements in those filings regarding Wells Fargo's success at cross-selling and its risk management controls" were misleading. *Id.* at *5-*6 (quoting and adopting the Order on Motion to Dismiss in parallel derivative litigation, *Wells Fargo*, 282 F. Supp. 3d 1074, at 1094). The "needs" statements are adequately alleged to be false.

Defendants' other scattershot falsity arguments also lack merit. ***First***, Defendants' RemoTraC "needs" statements (Br. at App'x A-3) "do not constitute forward-looking statements" because they concern the "past."[19] ***Second***, statements that RemoTraC was addressing patients' "needs" (with unnecessary tests) are a far cry from puffery about the tests themselves being "great" (Br. at 16); and pervasive schemes like the one at issue in this case render otherwise optimistic statements actionable. *See Wells Fargo*, 282 F. Supp. 3d 1074 at 1096-97 (statements about serving customer "needs" not puffery in light of illegal account scheme); *Hefler*, 2018 WL 1070116, at *28 (statement about "terrific" regulatory relationship was misleading). In short, Defendants' "needs" statements "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists" (*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)) – namely, that RemoTraC's success rested on satisfying patients' needs when its true purpose was to administer medically unnecessary tests.

---

[19]     *Am. W.*, 320 F.3d at 937; ¶¶38, 136 (stating that RemoTraC "was probably the highlight of ***last*** year" in addressing supposed "unmet need"; *see also* ¶129 ("***were able to address their needs and demands***" via RemoTraC); ¶130 (***was*** addressing an unmet need")).

### D. Defendants Falsely Claimed There Had Been "No Change" in Medicare Billing Practices, as They Knew or Recklessly Disregarded

Obfuscating business changes occasioned by government investigations, on October 28, 2021, Defendant Dhingra falsely told analysts there had been "no change" in the Company's Medicare billing practices in the third quarter of 2021. ¶¶153-154. That statement is actionable.[20]

Defendants oppose by essentially denying the Complaint's allegations (Br. at 18-20), but now is not the time or place for such denial. *See, e.g.*, *Syncor*, 239 F. App'x at 320 (courts treat "plaintiffs' factual allegations as true" at the pleading stage). Defendants cannot dispute the facts that: (i) Medicare sales plummeted (¶¶93-96, 105); (ii) Medicare reimbursements plummeted *50%* (¶¶121-124); (iii) the Company's ASPs declined precipitously, quarter after quarter, after the Company came under government scrutiny; (iv) Medicare privately used "*harsh language*" in starting its inquiry into the Company's billing (¶124); and (v) the Company "*pad[ded] its sales*" (¶50) via illegal conduct that came under DOJ and SEC scrutiny. Defendants' implicit suggested inference that sales, reimbursements, and Medicare scrutiny all *coincidentally* occurred shortly after the DOJ and SEC investigations started is farfetched on the facts of this case and procedurally improper in any event because all inferences must be drawn in favor of sustaining the Complaint.

## II. The Complaint Pleads a Strong Inference of Scienter

The scienter inquiry turns on "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Where two equally compelling inferences can be drawn, a motion to dismiss must be denied. *Id*. at 324. Because the Complaint "state[s] with

---

[20] *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1019-20 (N.D. Cal. 2020) (upholding falsity as to "I'd expect some choppiness, but full year strong flows. No change."); *Moradpour v. Velodyne Lidar, Inc.*, 2022 WL 2391004 at *6, *13-*14 (N.D. Cal. July 1, 2022) (upholding falsity as to a press release claiming "there is no change in our fundamental outlook for the future" when the Executive Chairman resigned four days later); *In re Capstone Turbine Corp. Sec. Litig.*, 2018 WL 836274, at *2, *7 (C.D. Cal. Feb. 9, 2018) (finding falsity as to a CEO's claim that "we've seen really no change" in payment activity despite secretly offering a key customer extended payment terms); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1189 (N.D. Cal. 2009) (upholding falsity where defendant claimed "no change was expected" with regard to previous financial statements); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 (C.D. Cal. 2008) ("The [complaint] therefore states a claim for statements about . . . there being no change in internal controls that would affect the accuracy of financial reports . . . .").

particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness," scienter is adequately pled. *Berson*, 527 F.3d at 987. *See also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) ("[A] reckless omission of material facts satisfies the element of scienter."), *cert. denied*, ___ U.S. ___, 142 S. Ct. 1227 (mem) (2022).

### A. Dr. Olymbios' Reporting of Illegal Conduct Directly to CareDx's Top Management Supports Scienter

As the Complaint details, Dr. Olymbios – one of the Company's most senior executives and the person designated as "most knowledgeable" in high stakes litigation concerning CareDx's testing business – explicitly warned the individual defendants that the Company was engaged in unlawful Medicare overbilling and paying illegal kickbacks to doctors to pad the Company's sales. *See, e.g.*, ¶¶9-11, 58. Dr. Olymbios' own whistleblower complaint against the Company states that he reported the facts about the Company's unlawful conduct to "***more than ten*** other current or former CareDx employees, ***including Peter Maag***, then the Chief Executive Officer for CareDx, ***and Reg Seeto***, the current President and Chief Executive Officer of CareDx." ¶167; *see also* ¶¶9-10. Seeto and the rest of management brushed off his concerns, "berated" him for raising them, "***took active measures to avoid creating a paper trail***" of their misconduct, and behaved – as internal documents show – like "***a bunch of crooks and frauds***." ¶¶10, 56, 174. In short, Dr. Olymbios provided Seeto with "reports or data, available to [them], which contradict the statement" (*Oracle*, 380 F.3d at 1230) that the Company was ***not*** in compliance with healthcare laws.

Defendants have nothing of substance to argue in opposition to Dr. Olymbios' allegations. As such, Defendants instead attempt to strike Plaintiffs' references to the allegations leveled by Dr. Olymbios. That extreme tactic fails, as explained in the Response in Opposition to Defendants' Motion to Strike, filed concurrently herewith. Ample well pled facts permit a compelling inference that the individual defendants knew about the Company's pervasive, illegal conduct.[21]

---

[21]    The Complaint pleads a strong inference of scienter as to those responsible for making and disseminating the January 21, 2021 and April 15, 2022 statements assuring investors that the Company followed a particularized list of healthcare laws. Seeto and Dhingra are primarily liable under Rule 10b-5(b) for "making" the two statements because, as Defendants' exhibits admit, they signed the relevant filings (Defs' Exs. E-F); Konrad is primarily liable under Rule 10b-5(a) and (c) for "disseminating" the statements. *Id.*; *see also Lorenzo v. SEC*, ___ U.S. ___, 139 S. Ct. 1094, 1101 (2019) (discussing "statement" and "scheme" primary liability). Maag and Seeto also are

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT

- 20 -

**B.      The "Core Operations" Doctrine Supports Scienter**

Courts may infer that "facts critical to a business's core operations or important transaction[s] are known to a company's key officers." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).  Here, the Complaint details how CareDx senior executives, including Chief Medical Officer Dholakia, paid very close attention to sales of AlloSure because it was, as Maag testified: "the one product, the one growth drive[r] for the company." ¶31.  Because RemoTraC was essential in rapidly growing the number of billable AlloSure tests, it stands to reason that Defendants would have remained apprised of RemoTraC's status.  *See, e.g.*, *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261-62 (D. Nev. 2019) ("absurd to suggest that the management of any airline, much less an airline experiencing significant operational challenges, would not be aware of pervasive maintenance issues like those alleged by the plaintiffs.").  Further, the Complaint details how senior executives, including Maag, Dholakia, and Seeto, attended weekly "Braveheart" meetings to discuss "sales and marketing issues."  ¶¶175-177.  The highest executives in the Company attended these meetings throughout the class period and met regularly with the sales team to orchestrate AlloSure marketing campaigns, which were heavily buffeted by Defendants' illegal kickback scheme.  Maag's own assistant observed him orchestrating kickbacks.  ¶70.

**C.      Insider Sales Support Scienter**

Additionally, insider sales during the Class Period raise a compelling inference that Defendants Maag and Seeto deliberately dumped shares at near-record-high prices before the market learned just how ephemeral the Company's purportedly "sustainable" success would turn out to be. *See* ¶¶178-186, 189.  "Unusual *or suspicious* stock sales by corporate insiders may constitute circumstantial evidence of scienter." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017).  Small stock sales can support scienter if the proceeds are large.  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).

---

primarily liable because they were leaders of the "scheme" that resulted in the false statements. *Infra* §VI.  The Company is primarily liable for the individual defendants' conduct. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

Defendants Maag and Seeto collected a combined ***$30 million*** in insider-trading proceeds during the Class Period; Defendant Maag himself sold 113,421 shares over just two days in May 2021 for proceeds of $7,615,424 ***without*** a Rule 10b5-1 trading plan.  ¶181.  Defendant Maag began this fire sale just five days after the 1Q 2021 earnings announcement, during which the Company had boasted of a 76% year-on-year increase in total revenue and had claimed not to be expecting any "***substantial changes***" in the Company's RemoTraC billings.  ¶¶140-141.  Defendant Maag, as Executive Chairman, sold over $7 million of his Company stock into a market buoyed by Defendants' false and misleading statements.  As for Defendant Maag's Class Period sales that ***were*** made pursuant to such a plan, "***none*** of those plans were implemented prior to Maag's creation of the fraudulent RemoTraC scheme and, therefore, offer no defense to scienter."  ¶182.  Additionally, in June 2021, Maag made suspiciously changed his trading reports by refraining from disclosing ***when*** his trading plans had been adopted – indicating he had created a new Rule 10b5-1 plan just as CareDx was coming under regulatory scrutiny.  ¶182.

Defendant Seeto's class period sales give rise to a strong inference of scienter as well.  He sold nearly $1 million of stock a week after the Company's February 24, 2021 earnings call describing full-year 2020 results, during which the Company told investors that it "***expect[ed] to have RemoTraC as the core part of our business***."  ¶136.  On June 8 and 9, 2021 – ***the same day*** as the Goldman Sachs Global Healthcare Conference – he sold over 17,000 shares for proceeds of over $1.5 million, as the Company boasted of RemoTraC being the "***solid strategic foundation***" of its "***direct-to-patient strategy***" and "***drove significant higher penetration for our tests***."  ¶143.

**D.    Parallel SEC/DOJ Investigations, Active Concealment of any Paper Trail, and Other Facts Support Scienter**

Additional facts support a cogent and compelling inference of scienter.  *See Tellabs*, 551 U.S. at 322-23.  ***First***, the DOJ and the SEC have launched parallel investigations into the Company's Medicare and related misconduct.  ¶¶6, 91.  Those investigations support scienter.[22]  ***Second***, as

---

[22]    *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (government "provides additional support for finding that scienter has been adequately pleaded"); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) ("[G]overnment investigation[s] can be seen as one more piece of the puzzle . . . that add up to a strong inference of scienter."); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (same); *see also*

Dr. Olymbios noted, Defendant Maag and other senior executives "took active measures" to hide their conduct – *e.g.*, using private communication platforms for Company business that Defendants thought would leave no paper trail. ¶174. *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 517 (S.D.N.Y. 2016) (hiding paper trail "may create a strong inference of scienter"). ***Third***, there were serial CFO resignations under suspicious circumstances. *See* ¶187-188; *see also In re Acadia Pharms. Inc. Sec. Litig.*, 202 WL 2838686, at *7 (S.D. Cal. June 1, 2020) (resignations support scienter); *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) (same). ***Fourth***, there are internal communications that "a bunch of crooks and frauds" ran the Company and employee accounts and followed "unethical" business practices. ¶¶10-11.

## III.    The Complaint Sufficiently Pleads Loss Causation

The loss causation "inquiry requires no more than the familiar test for proximate cause." *First Solar*, 881 F.3d at 753. Allegations need only "provide a defendant with ***some indication*** of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. Loss causation is "satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop." *Lloyd*, 811 F.3d at 1209.

When the market learned of the DOJ's FCA investigation into the Company's practices, the related SEC investigation, and the attendant and unexplained drop in the Company's financial results, the news caused the Company's 27.5% stock drop the next day. ¶¶7-8, 96-97, 196-197. Analysts found that ***"[t]he fact that [CareDx] is being investigated . . . is notable"*** because, ***"[b]ased on our experience, disclosures of these sort typically bear some degree of merit***," as the Olymbios Complaint would further detail. ¶¶8-9. Here, the Complaint "plead[s] loss causation by alleging that defendant [public company's] fraudulent conduct led to [an investigation], and that when the market learned of the [investigation], the stock price dropped as a market reaction." *First Solar*, 881 F.3d at 753; *see also Lloyd*, 811 F.3d at 1210 (citing another case where the "operative complaint alleged five partial disclosures of the Medicare fraud, including the announcements that [the government]

---

*Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 713 n.8 (E.D. Mich. 2010) (same); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (same).

had initiated investigations into the defendant's billing practices").[23]  The Complaint thus sufficiently pleads disclosures of government investigations into Defendants' practices that were "proximately" related to Defendants' misstatements.

Next, the Complaint adequately alleges corrective financial disclosures of May 5, 2022 and November 3, 2022.  ¶¶101-108 (May 5); ¶¶111-18 (Nov. 3).  Similar to the "less-than-expected revenues" related to the company's improper pharmaceutical marketing practices following receipt of government warnings in *Gilead Scis.*, 536 F.3d at 1058, here the Complaint alleges declining revenue growth and ASPs in the wake of the three government investigations into the Company's schemes.  On November 3, for example, the Company admitted facts showing Medicare was rejecting *50%* of the bills the Company falsely claimed were medically necessary: "***Conclusion is more tests are not being paid***," as one securities analyst reported.  ¶116.  The May 5 corrective disclosure came just weeks after the Olymbios Complaint added substance to the DOJ's and the SEC's ***continuing*** investigations into the Company's overbilling scheme – and Defendants' own May 5 admissions connect the Company's declining prospects to "Medicare."  ¶¶105, 108.  The two financial corrective disclosures caused immediate stock drops of 14% and 18.6%, respectively, and are proximately related to the Company's unlawful Medicare billing/kickback schemes.  ¶¶111-118, 201 (Nov. 3); ¶¶101-108, 198 (May 5).  These facts allege loss causation.  *Gilead*, 536 F.3d at 1057; *see also Daou*, 411 F.3d at 1026 (stock drops due to poor financial statements causally related to undisclosed fraud); *Huberman v. Tag-It Pac., Inc.*, 314 F. App'x 59, 61-62 (9th Cir. 2009) (same).[24]

Surprising departures by two executives on May 23, 2022 (CFO Dinghra) and September 1, 2022 (CMO/CCO King) (¶¶198-200), who were involved in the fraudulent scheme, are among the "infinite variety of ways" (*First Solar*, 881 F.3d at 753) to allege loss causation.  Where, as here, a

---

[23]  *First Solar* rejects any suggestion (Br. at 24) that a corrective disclosure must reveal "fraud." 881 F.3d at 753 ("Disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.").  *First Solar* also limited "restrictive" authorities.  *Compare id.* at 753, *with* Br. at 24-25.

[24]  Defendants' reliance on *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013), is misplaced: "Disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id.*  Additionally, the "Notes" in that case were traded in an inefficient market, requiring a novel loss causation theory irrelevant to this efficient-market case.  ¶¶92, 205, 209-210.

complaint alleges executive departures followed by stock drops, the complaint alleges loss causation.[25]  Here, analysts noted that the CFO's resignation was "***surprising***," and they connected it to the "***ongoing gov't investigations***."  ¶109.  The CMO/CCO left under similar circumstances.  ¶110.  The market reactions were swift and negative, with the Company's stock price declining 7.5% and 10%, respectively.  ¶¶109-110.  This is sufficient to allege loss causation.

## IV.    The Complaint Sufficiently Pleads a "Scheme" Under Rule 10b-5(a) and (c)

Defendants concede that the "crux" of the Complaint alleges a "fraudulent scheme," but they err in arguing that the scheme claim does not satisfy "Section 10(b)" requirements.  Br. at 1; *see also* ¶¶220 (violations of Rule 10b-5(a) and (c)).  They argue, for example, that defendant Maag was not the "maker" of any false statements "as required for a Section 10(b) claim."  Br. at 2.  Even "persons who did not 'make' statements" under Rule 10b-5(b), however, "can be found to have violated the other parts of Rule 10b-5, subsections (a) and (c)."  *See Alphabet*, 1 F.4th at 699; *see also Lorenzo*, 139 S. Ct. at 1101 (Rule 10b-5(a) and (c) "scheme" primary liability may arise in a scheme involving false statements even where the defendant did not "make" a statement under Rule 10b-5(b)).  Here, Maag masterminded (and Seeto executed) the unlawful scheme to overbill Medicare, and Maag approved unlawful kickbacks to further a fraudulent "course of business."  Rule 10b-5(c); ¶¶11, 70, 80.  This conduct is more egregious than those before the *Lorenzo* court, where the defendant merely disseminated his boss' false email.  139 S. Ct. at 1101.  Scheme liability is alleged here.[26]

### CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.  In the alternative, Plaintiffs request leave to amend.  *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012).

---

[25]    *See, e.g.*, *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 983-85 (N.D. Cal. 2015); *see also Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1145-46 (N.D. Cal. 2013) (loss causation alleged via resignation in undisclosed fraud).

[26]    The Complaint also pleads control person liability under §20(a) of the Exchange Act, which imposes liability on persons who "exercised actual power or control over the primary violator." *Howard v. Hui*, 2001 WL 1159780, at *3 (N.D. Cal. Sept. 24, 2001).  Alleging "control" is all that matters.  *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990).

DATED: March 13, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JASON C. DAVIS

s/ Jason C. Davis
JASON C. DAVIS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
SEAN C. MCGUIRE
NICOLE Q. GILLILAND
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
smcguire@rgrdlaw.com
ngilliland@rgrdlaw.com

DATED: March 13, 2023

SAXENA WHITE P.A.
LESTER R. HOOKER

s/ Lester R. Hooker
LESTER R. HOOKER

7777 Glades Road, Suite 300
Boca Raton, FL  33434
Telephone:  561/394-3399
561/394-3382 (fax)
lhooker@saxenawhite.com

SAXENA WHITE P.A.
DAVID R. KAPLAN
12750 High Bluff Drive, Suite 475
San Diego, CA  92130
Telephone:  858/997-0860
858/369-0096 (fax)
dkaplan@saxenawhite.com

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT

- 26 -

SAXENA WHITE P.A.
STEVEN B. SINGER
RACHEL A. AVAN
JOSHUA H. SALTZMAN (admitted *pro hac vice)*
10 Bank Street, 8th Floor
White Plains, NY  10606
Telephone:  914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
ravan@saxenawhite.com
jsaltzman@saxenawhite.com

Lead Counsel for Lead Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 13, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to any non-CM/ECF participants indicated on the attached Manual Notice List.

                                    s/ Jason C. Davis
                                    JASON C. DAVIS

                                    ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                    Post Montgomery Center
                                    One Montgomery Street, Suite 1800
                                    San Francisco, CA  94104
                                    Telephone:  415/288-4545
                                    415/288-4534 (fax)
                                    Email:  jdavis@rgrdlaw.com

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS - 3:22-cv-03023-TLT                              - 28 -

# Mailing Information for a Case 3:22-cv-03023-TLT Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alec T Coquin**
  acoquin@labaton.com

- **Charles Dean Cording**
  ccording@willkie.com,mao@willkie.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Barrington E. Dyer**
  bdyer@willkie.com,CLee2@willkie.com,CCording@willkie.com,maosf1@willkie.com,BSullivan@willkie.com,cwindsor@willkie.com

- **Laura Leigh Geist**
  lgeist@willkie.com,tnocco@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **Lester Rene Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com

- **David R. Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Sean Christopher McGuire**
  smcguire@rgrdlaw.com

- **Erica Symone Miranda**
  emiranda@willkie.com,tnocco@willkie.com,maosf@willkie.com,ealcantara@willkie.com,mallard@willkie.com,cwindsor@willkie.com

- **Tariq Mundiya**
  tmundiya@willkie.com,mao@willkie.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Joshua H Saltzman**
  jsaltzman@saxenawhite.com

- **Brady Michael Sullivan**
  bsullivan@willkie.com,CLee2@willkie.com,mao@willkie.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)