Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA  94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
        bdyer@willkie.com

Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
        ccording@willkie.com
        bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,*
*Ankur Dhingra, Marcel Konrad,*
*and Peter Maag*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>Defendants. | Case No. 22-cv-03023-TLT<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE**<br><br>Date:  May 16, 2023<br>Time:  2:00 PM<br>Courtroom:  9, 19th Floor<br>Judge:  Hon. Trina L. Thompson |

**TABLE OF CONTENTS**

I.      Introduction.................................................................................................................1

II.     Argument ....................................................................................................................2

        A.      The AC Fails to Corroborate the Olymbios Management Allegations.........................2

        B.      Dr. Olymbios' Complaint Is Uniquely Unreliable...........................................................8

        C.      Plaintiffs' Request that this Court "Vitiate" a Contract Between CareDx and Dr.
                Olymbios—a Nonparty—Should Be Denied...............................................................9

III.    Conclusion ................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Apollo Grp., Inc. Sec. Litig.*,
   2011 WL 5101787 (D. Ariz. Oct. 27, 2011)...........................................................................3, 6

*Bennett v. H&R Block Financial Advisors, Inc.*,
   2005 WL 8178042 (N.D. Cal. May 31, 2005)................................................................................3

*Brado v. Vocera Commc'ns, Inc.*,
   14 F. Supp. 3d 1316 (N.D. Cal. 2014) .........................................................................................9

*In re Cisco Sys. Inc. Sec. Litig.*,
   2013 WL 1636384 (N.D. Cal. Apr. 16, 2013) ...........................................................................10

*In re Connetics Corp. Sec. Litig.*,
   2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ........................................................................5, 6

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) ..............................................................................3, 4, 5, 6

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   934 F. Supp. 2d 1219 (C.D. Cal. 2013) ....................................................................................2, 3

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) .......................................................................................7

*Elliot v. China Green Agricultures, Inc.*,
   2012 WL 5398863 (D. Nev. Nov. 2, 2012) ...................................................................................7

*Homeward Residential v. Sand Canyon Corp.*,
   298 F.R.D. 116 (S.D.N.Y. 2014) .........................................................................................6, 8, 9

*In re JDS Uniphase Corp. Sec. Litig.*,
   238 F. Supp. 2d 1127 (N.D. Cal. 2002) .....................................................................................10

*Johns v. Bayer Corp.*,
   2010 WL 2573493 (S.D. Cal. June 24, 2010)...............................................................................8

*Lako v. Loandepot, Inc.*,
   2023 WL 444151 (C.D. Cal. Jan. 24, 2023) .............................................................................3, 6

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
   2011 WL 4389689 (C.D. Cal. May 5, 2011) .............................................................................2, 3

*Mart v. Tactile Sys. Tech., Inc.*,
   595 F. Supp. 3d 788 (D. Minn. 2022)...........................................................................................8

ii

*In re Morning Song Bird Food Litig.*,
2015 WL 12791471 (S.D. Cal. Feb. 6, 2015)..................................................................10

*Olymbios v. CareDx, Inc.*,
No 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty. Apr. 15, 2022).......................................2

*Pace v. Quintanilla*,
2015 WL 652719 (C.D. Cal. Feb. 13, 2015)...................................................................6

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) .......................................................................3

*United States v. Rite Aid Corp.*,
2018 WL 4214887 (E.D. Cal. Sept. 5, 2018)...............................................................7, 8

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 .......................................................................................5, 6

**STATUTES AND RULES**

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67..................................1,7,8

Federal Rules of Civil Procedure
Rule 30(b)(6)..................................................................................................9

DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT
No. 22-cv-03023-TLT

## I.    INTRODUCTION

Defendants' Motion to Strike (ECF No. 60, "MTS") is narrow.  It primarily seeks to strike two allegations that are repeated in substance and approximately a dozen paragraphs in the Amended Complaint ("AC") about purported communications between Dr. Michael Olymbios and CareDx senior management, namely Drs. Seeto and Maag (the "Olymbios Management Allegations").[1]  These allegations are cut and pasted from a separate civil complaint filed by Dr. Olymbios and can be summarized as follows:

| Olymbios Management Allegations Derived Exclusively From Complaint | AC |
|---|---|
| Dr. Olymbios allegedly discussed "concerns" with Drs. Seeto and Maag | ¶¶ 10, 58, 79, 101 (sentences 4–6), 166 (sentence 1), 167 (sentences 2–3), 170, 174 |
| Other alleged communications between Dr. Olymbios and Dr. Maag regarding patient billing | ¶¶ 10, 57, 78, 174 |

The Olymbios Management Allegations are insufficient under the stringent pleading requirements of the PSLRA, as well as Ninth Circuit case law, which requires that these types of allegations be independently corroborated and supported by indicia of reliability, especially where plaintiffs rely on the allegations to plead a strong inference of scienter.

*First*, fatally missing from the AC is any corroboration of the Olymbios Management Allegations, either through the eight "Former Employees" ("FEs") alleged to be cooperating with Plaintiffs or otherwise.  Indeed, notwithstanding outreach to over 85 former CareDx employees, not one corroborates the Olymbios Management Allegations.  Nor does it suffice, as Plaintiffs now claim, that Dr. Olymbios' counsel provided vague reassurances of good faith, or that Dr. Olymbios sent an

---

[1] The allegations are detailed in full in Appendix 1 of Defendants' Motion to Strike.  Defendants also moved to strike allegations relating to a conversation between Dr. Olymbios and unidentified employees (other than FEs).  ¶¶ 10, 56, 101 (sentences 7–8), 174.  These allegations should also be stricken for all of the same reasons set forth herein.

1

email to Plaintiffs' counsel *after* the AC was filed.  None of this establishes that the allegations are sufficiently corroborated.

***Second***, the allegations are not supported by sufficient indicia of reliability.  Dr. Olymbios is a former CareDx employee embroiled in a contentious trade secrets arbitration with CareDx, after he was caught stealing some 50,000 competitively sensitive documents upon his departure from CareDx to join Natera, CareDx's biggest rival.  Nearly 18 months into the arbitration, Dr. Olymbios filed a complaint in San Mateo County, under the guise of a misconstrued JAMS deposit request, to publicize his allegations.  *See* Complaint, *Olymbios v. CareDx, Inc.*, No 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty. Apr. 15, 2022) (the "Olymbios Complaint").  The San Mateo County Superior Court promptly referred the dispute back to arbitration, but not before Plaintiffs copied allegations from the Olymbios Complaint—including the Olymbios Management Allegations—to form the basis of *this* securities fraud lawsuit.

***Finally***, having failed to corroborate these allegations, Plaintiffs seek the extraordinary remedy of asking this Court for an order "vitiating Dr. Olymbios' confidentiality agreement" to permit further investigative efforts.  Plfs.' Opp. to Mot. to Strike ("MTS Opp.," ECF No. 69) 13.  Plaintiffs' request seeking to set aside a binding contract for the benefit of a non-party to this litigation (Dr. Olymbios) is baseless.  By Plaintiffs' own admission, they were able to talk to over 85 former employees and Dr. Olymbios' counsel.  The request is also belated.  Plaintiffs were bound to corroborate their allegations before filing the AC; their failure to do so does not warrant reopening the pleadings.

Accordingly, Defendants respectfully submit that the Motion to Strike should be granted.

## II.    ARGUMENT

### A.    The AC Fails to Corroborate the Olymbios Management Allegations

As set forth in Defendants' Motion to Strike, Plaintiffs generally may not "rely on[] complaints in other actions that . . . [are] not resolved."  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STRIKE
No. 22-cv-03023-TLT

WL 4389689, at *21 (C.D. Cal. May 5, 2011) (striking allegations lifted from other complaints).[2]  In particular, courts are skeptical of permitting securities plaintiffs to incorporate allegations from other complaints to satisfy plaintiffs' burden to plead facts giving rise to a strong inference of scienter.[3]  Instead, plaintiffs must independently verify third party complaint allegations if they wish to use them affirmatively in a securities fraud complaint.  MTS 4–5; *Apollo*, 2011 WL 5101787, at *10 n.5; *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008); *Bennett v. H&R Block Financial Advisors, Inc.*, 2005 WL 8178042, at *4 (N.D. Cal. May 31, 2005).  Plaintiffs fail to do so here with the Olymbios Management Allegations.

*First*, none of the FEs corroborates the allegation that Dr. Olymbios discussed "concerns" with Drs. Seeto and Maag.  They instead, at most, provide generalized allegations of "unethical" behavior.

For example, Plaintiffs point to allegations by FE-1 that "'sales drove' clinical decisions and that the Company was 'totally unethical.'"  MTS Opp. 12 (citing ¶¶ 60–61).  *See also* MTS Opp. 12 n.11 (citing allegations from other FEs that "scientific quality and ethical integrity did not exist at the Company's leadership positions"; CareDx's paper records were a "huge red flag"; and "business conduct was 'way out of control'").  Indeed, FE-1 does not name Dr. Seeto or Dr. Maag at all or

---

[2] Plaintiffs cite a number of cases from the Second Circuit that they claim undermine these holdings, MTS Opp. 9–10, but they do not cite any authority from this Circuit suggesting that either of the *Countrywide* decisions is no longer good law.  Indeed, one of the cases cited by Plaintiffs from earlier this year, *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *5 (C.D. Cal. Jan. 24, 2023) (cited at MTS Opp. 9 n.8) cites favorably the holding from *Countrywide*, 2011 WL 4389689, at *20 that plaintiffs have an obligation to independently investigate allegations from complaints in other cases.  The *Loandepot* court makes no mention of *Countrywide* being "widely recognized as . . . premised on a profound misreading of Second Circuit precedent," as Plaintiffs claim.  MTS Opp. 9.  But even if this Court were to disregard the *Countrywide* holdings, ample additional authority supports Defendants' Motion to Strike, as set forth herein.

[3] *See In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011) (finding that allegations from other lawsuits, including a "recently unsealed qui tam case against Apollo in which . . . former UOP employees allege that UOP has been in continual violation of regulations prohibiting compensation of recruiters based on the number of students they enroll" were "insufficient to satisfy the pleading requirements" because "allegations from other complaints are unproven and contested" and therefore "do not amount to 'facts' sufficient to establish a strong inference of scienter"); *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1262–63 (C.D. Cal. 2015) ("It is well settled that allegations from other complaints or documents, which are unproved and are contested, may not be used to establish facts to demonstrate scienter.") (citing cases).

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STRIKE
No. 22-cv-03023-TLT

otherwise discuss interactions with them. FE-1's allegations do not identify the when, the what or the how of these so-called "concerns."

Likewise, scattershot allegations of regulatory wrongdoing—such as allegations that "the Company paid doctors improper kickbacks" or engaged in "improper Medicare overbilling," MTS Opp. 12—offer no independent support for the Olymbios Management Allegations. Even if these allegations were well pleaded (which they are not), they bear only on alleged regulatory misconduct at CareDx, not on whether any such misconduct was *discussed with senior management*. Allegations about "Medicare revenue collaps[ing]" and "SEC and DOJ investigations" are even further afield. MTS Opp. 13.[4]

In this respect, it is irrelevant whether Dr. Olymbios was "knowledgeable about the very subject that is at the heart of this litigation." MTS Opp. 4–5. The Olymbios Management Allegations concern Dr. Olymbios' purported discussions with Drs. Seeto and Maag, not his knowledge of CareDx's business generally. None of the FEs even allege that Dr. Olymbios raised his "concerns" to Dr. Seeto or Dr. Maag or to anyone else at CareDx. And it is not just the eight FEs who failed to corroborate the Olymbios Management Allegations: none of the *85 former employees*, who Plaintiffs reveal in the Opposition that they contacted, came forward with any support indicating that any of the alleged regulatory "concerns" were communicated to senior management. MTS Opp. 5.

***Second***, recognizing that the Olymbios Management Allegations stand alone, Plaintiffs suggest that as long as *some of* Dr. Olymbios' allegations are corroborated then *all of* Dr. Olymbios' allegations should be deemed corroborated. MTS Opp. 7–8. But as demonstrated in the Motion to Strike, this logic was rejected in *Connetics I.* There, the plaintiffs relied on an SEC complaint as the basis for (a) allegations that the company knew, prior to the alleged misstatements, of the results of a mouse study for the company's acne medication that allegedly suggested that the medication might

---

[4] In some instances, Plaintiffs simply misstate the AC. For example, the former compliance attorney never alleged that "senior management simply did not want to be compliant," they alleged that "CareDx did not want to be compliant." *Compare* MTS Opp. 12 *with* ¶ 62. There is a stark difference between the connection to "senior management," *i.e.*, Drs. Seeto and Maag, and a generalized allegation to CareDx as a Company. This is critical where Plaintiffs must allege scienter with respect to each individual defendant.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STRIKE
No. 22-cv-03023-TLT

cause cancer; and (b) allegations against two individual defendants relating to their knowledge of an FDA meeting at which the company allegedly discussed the mouse study with the FDA, as well as allegations of insider trading. *Connetics I*, 542 F. Supp. 2d at 1004–06, 1009; *Id.*, Amended Complaint, ECF No. 12. Notwithstanding plaintiffs' argument that the SEC complaint was "one of many bases for plaintiffs' complaint," the court struck the allegations because plaintiffs did "not contend that they conducted independent investigation into the facts alleged in the SEC complaint or had any additional bases for the specific allegations pertaining to [the two individual defendants]. Instead, the SEC complaint appears to be *the only basis* for the allegations against [the two individual defendants] and certain other allegations" relating to the company's knowledge of the test results. *Id.* at 1005 (emphasis in original). *See also Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 811–12 (where securities fraud plaintiffs argued that their reliance on allegations in an FTC complaint was proper because borrowed allegations were "corroborate[d]" by confidential witness statements, finding that "plaintiffs' argument may hold water as to the allegations of 'hidden fees' . . . because the CWs provide testimony *related to similar facts*" but "[i]n contrast, plaintiffs have provided no corroboration whatsoever for *any of the **other allegations** in the FTC Action*") (emphasis added).

Plaintiffs rely heavily on a subsequent *Connetics* decision, *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008) ("*Connetics II*") (cited at MTS Opp. 3, 7–9), where the court denied defendants' motion to strike similar allegations as in *Connetics I*. But in *Connetics II*, plaintiffs supplied the type of corroborating allegations that Plaintiffs lack here. For example, the court noted that plaintiffs' amended complaint included new confidential witness allegations that corroborated the allegations about discussions at the FDA meeting—which the complaint in *Connetics I* had sourced exclusively from the SEC complaint. *See Connetics II* at *4 ("Confidential Witness 6 was present at the April 13, 2005 FDA meeting *and has provided information corroborating the FDA's views of Velac, as alleged in the SEC complaint*") (emphasis added). Likewise, in noting that its "prior concerns regarding the stricken" allegations relating to the company's knowledge of the mouse study had been "alleviated," the court cited to allegations in the amended complaint that another confidential witness attended a meeting with the CEO, CFO, and

other senior executives at which the attendees were told about high incidences of tumors in the mouse study. *Connetics II* at *6; *id.*, Second Amended Complaint at ¶¶ 91–94, ECF No. 86. That confidential witness also stated that the CEO and CFO "absolutely would have been kept apprised of the Mouse Study results." *Connetics II*, Second Amended Complaint ¶ 92, ECF No. 86.

Here, unlike the scienter allegations in *Connetics II*, Dr. Olymbios' allegations about discussions he supposedly had with senior management regarding his "concerns" are sourced exclusively from the Olymbios Complaint and should be stricken. *See Apollo*, 2011 WL 5101787, at *10 n.5 ("allegations from other complaints are unproven and contested" and therefore "do not amount to 'facts' sufficient to establish a strong inference of scienter"). Whether or not the AC corroborates *other* allegations from the Olymbios Complaint is irrelevant. *See LendingClub*, 423 F. Supp. 3d at 811–12.

Moreover, none of Plaintiffs' other authorities suggests that they may adopt—let alone use as the basis for pleading scienter—*wholly uncorroborated allegations* from the separate complaint of a disgruntled former employee without independently corroborating those particular allegations.

- *Loandepot, Inc.*, 2023 WL 444151, at *2–3, 8 (permitting reliance on allegations copied from a separate complaint filed by a former employee stating that the CEO of the issuer knew the company was issuing loans without required documentation, because those borrowed allegations were combined with plaintiffs' independent allegations, including emails stating that the CEO was "looking to fund some loans W/O docs" and that the CEO had "asked to exclude" certain loans from a quality control review, as well as additional former employee allegations that complaints from applicants were "escalated directly to" the CEO) (MTS Opp. 9).[5]

- *Homeward Residential v. Sand Canyon Corp.*, 298 F.R.D. 116, 125–26 (S.D.N.Y. 2014) (permitting reliance on allegations borrowed from a related civil complaint that defendant loan originator "violated its standards for underwriting and appraisals," because those allegations were "combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations," including allegations from a trustee schedule that showed "appraisers failed to complete accurate evaluations") (MTS Opp. 3, 8).

- *Pace v. Quintanilla*, 2015 WL 652719, at *7 (C.D. Cal. Feb. 13, 2015) (permitting reliance on allegations borrowed from an SEC complaint where the SEC litigation had proceeded to summary judgment and therefore plaintiffs were able to "verif[y] the

---

[5] *See also id.* at *5 (observing that "in securities actions, courts have stricken or disregarded allegations which are copied from other cases") (citing *Connetics I* and other cases).

accuracy of the SEC's allegations by comparing them to the exhibits attached to the SEC's motion for summary judgment," as well as documents plaintiffs received in response to subpoenas previously served on defendants "before filing the operative complaint in this case") (MTS Opp. 8).

- In *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1082 (N.D. Cal. 2001) (MTS Opp. 8), the court was not confronted with any motion to strike by defendants or any argument that allegations borrowed from an SEC complaint should not be considered. In any case, there too the borrowed allegations were directly corroborated. The court credited an allegation from an SEC complaint that the defendant's CFO "allowed Cylink to recognize revenue" on a certain transaction even though he knew the customer had the right to cancel its order within 90 days. *Id.* But alongside that allegation, plaintiffs independently alleged that the CFO "was aware of a provision" in another transaction that allowed the customer the right to exchange the product, but the CFO "allowed the recognition of revenue anyway."[6]

Unlike in these cases, Plaintiffs here fail to offer any separate or independent support for the Olymbios Management Allegations.

**Third**, Plaintiffs cannot satisfy their duty to independently investigate the Olymbios Management Allegations by receiving assurances from attorneys for Dr. Olymbios that "Dr. Olymbios' factual allegations are sound." Hooker Decl. ¶ 5.[7] MTS Opp. at 5. A party cannot discharge its duty to investigate third-party allegations by simply contacting the lawyer for the third party and receiving a blanket assurance that the allegations are "sound," especially under the heightened pleading regime of the PSLRA. As common sense would dictate, more is required. No counsel would say they filed a complaint without a proper basis. Plaintiffs' authorities do not suggest otherwise:

- *United States v. Rite Aid Corp.*, 2018 WL 4214887, at *10 (E.D. Cal. Sept. 5, 2018) (cited at MTS Opp. 10–11) involved False Claims Act allegations by a private individual in a qui tam action. The relator incorporated by reference into his complaint a related complaint filed by the state of California. *Id.* at 9. The court permitted the relator's incorporation because *both plaintiffs*, the relator and the state of California, confirmed at a hearing that the relator had conducted an independent investigation, and that they were both conferring "throughout" the litigation. *Id.*

---

[6] *Elliot v. China Green Agricultures, Inc.*, 2012 WL 5398863 (D. Nev. Nov. 2, 2012) (MTS Opp. 8) did not involve allegations from a separate complaint, but rather allegations based on various research reports.

[7] Plaintiffs concede that three out of five of these discussions with counsel for Dr. Olymbios occurred after the AC was filed—and after Defendants' Motion to Strike was filed. Hooker Decl. ¶¶ 4–6. Plaintiffs do not state whether they obtained these assurances before or after filing the AC.

7

- In *Johns v. Bayer Corp.*, 2010 WL 2573493, at *2 (S.D. Cal. June 24, 2010) (cited at MTS Opp. 10), the court permitted plaintiffs in a false advertising case to mimic allegations from a similar complaint in another forum that defendants' vitamin product did not promote prostate health because plaintiffs' attorney "reviewed publicly available information regarding the studies mentioned in [plaintiffs' complaint] in determining that there is a factual basis for the allegations" and because the "SAC itself provides citation to the sources of Plaintiffs' information." *Id.* Although the court also acknowledged that "plaintiffs contacted the [other] attorney to discuss the basis for his claims," the other attorney had "made an appearance in th[e] case." *Id.*[8]

- In *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 807–808 (D. Minn. 2022), there were no allegations that plaintiffs' counsel spoke with counsel for a qui tam relator who filed a related complaint. Rather, the plaintiff demonstrated that it "reviewed the unsealed documents in [the qui tam] action," including tables showing doctors who allegedly received bribes from the defendant, "and conducted its own legal analysis of qui tam materials." *Id.*

**Finally**, Dr. Olymbios' email to Plaintiffs' counsel (Hooker Decl. Ex. 1) offers no corroboration. In his email, Dr. Olymbios attacks CareDx with hyperbole and name-calling, but again, his ad hominem attack says nothing about communicating "concerns" to Drs. Seeto and Maag during his employment at CareDx. In any event, the email could not have formed a part of Plaintiffs' purported investigation because it was sent in late January 2023, months *after* Plaintiffs filed the AC. It is yet another diversion from the issue here—there are no supporting allegations corroborating Dr. Olymbios' bare and biased allegations.

## B.    Dr. Olymbios' Complaint Is Uniquely Unreliable

The Olymbios Management Allegations should also be stricken because they are unreliable. As suggested by Plaintiffs' authorities, courts look to whether statements by former employees in separate complaints "contain their own indicia of reliability" in determining whether a securities fraud plaintiff may incorporate those statements. *Sand Canyon Corp.*, 298 F.R.D. at 126 (cited at MTS Opp. 3, 8). That indicia is non-extant here.

As detailed in Defendants' Motion to Strike, Dr. Olymbios has a clear axe to grind with CareDx, making the Olymbios Complaint inherently unreliable. Dr. Olymbios is alleged to have

---

[8] Moreover, neither *Rite Aid* nor *Bayer* were securities cases implicating the heightened pleading requirements of the PSLRA, so they do not support Plaintiffs' position.

8

stolen over 50,000 CareDx documents and emails—including confidential documents—to prepare for his new job at a competitor, Natera. MTS 3. He and CareDx are embroiled in a contentious breach of contract and trade secrets arbitration. *Id.* Dr. Olymbios' recent email to Plaintiffs' counsel referring to CareDx management as "despicable people with no regard for anyone" who "continue to retaliate against me personally," Hooker Decl. Ex. 1, further underscores Dr. Olymbios' strong bias. Under these circumstances, courts are naturally (and appropriately) wary of permitting securities fraud plaintiffs to copy third-party allegations from a single "*disgruntled or vindictive employee*." *Sand Canyon*, 298 F.R.D. at 126 (emphasis added).

Plaintiffs make much of the fact that CareDx selected Dr. Olymbios as its Rule 30(b)(6) representative in a false advertising lawsuit. MTS Opp. 4–5. What Plaintiffs omit is that was *before* CareDx learned Dr. Olymbios stole tens of thousands of documents from it and *before* he and CareDx became parties to a contentious arbitration. MTS 2. Furthermore, the subject matter of that false advertising lawsuit—claims that Natera made false statements about the effectiveness of its rival "Prospera" blood test—have nothing to do with the subject matter of Dr. Olymbios' purported whistleblower claims and Plaintiffs do not claim otherwise.

**C.    Plaintiffs' Request that this Court "Vitiate" a Contract Between CareDx and Dr. Olymbios—a Nonparty—Should Be Denied**

Plaintiffs' request, "in the alternative," that this Court issue an "order vitiating Dr. Olymbios' confidentiality agreement" with CareDx should be denied. MTS Opp. 13. Plaintiffs do not explain how this Court has authority—much less on this motion—to "vitiate" a binding contractual agreement between CareDx and Dr. Olymbios, a nonparty. Plaintiffs' own authorities recognize as much. *See Brado v. Vocera Commc'ns, Inc.*, 14 F. Supp. 3d 1316, 1319, 1324 (N.D. Cal. 2014) (cited at MTS Opp. 13) (denying request by securities plaintiff to "invalidat[e] [the defendant's] confidentiality agreements to the extent the agreements restrict former or current employees from voluntarily cooperating with Plaintiffs' investigation" because "enforceability of the Confidential Agreements is

not a proper issue before the Court").[9]  Plaintiffs provide no basis for why such extraordinary relief should be granted.  There is no good cause, especially, where here, Plaintiffs had access to over 85 former employees to support their claims—but failed to do so.

In addition, Plaintiffs had an obligation to corroborate the Olymbios Management Allegations *prior* to filing the AC.  *See In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1636384, at \*1 (N.D. Cal. Apr. 16, 2013) ("[U]nder Rule 11 of the Federal Rules of Civil Procedure, Plaintiffs were required to have completed their investigation *before* filing suit, not *after*.").  Accordingly, the request to interview Dr. Olymbios now is unwarranted and too late.

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the Motion to Strike.

---

[9] The court in *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1137 (N.D. Cal. 2002) (cited at MTS Opp. 13) found that the employer's confidentiality agreements were "so broad that they cover information that cannot possibly be considered confidential."  Here, Dr. Olymbios' confidentiality agreements are not before the Court, nor have Plaintiffs established that such agreements are overbroad or unenforceable.  *See In re Morning Song Bird Food Litig.*, 2015 WL 12791471, at \*3 (S.D. Cal. Feb. 6, 2015) (finding that "plaintiffs' request that the Court adjudicate the enforceability of other confidentiality agreements with former employees or contractors is not properly before the court" where plaintiffs did "not reference any provisions of the agreements it seeks to limit and d[id] not describe how any part of any agreement is overbroad or unenforceable").

10

Dated:  April 13, 2023

Respectfully submitted,

By: */s/ Laura Leigh Geist*
     Laura Leigh Geist

WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
One Front Street, 34th Floor
San Francisco, CA  94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
              bdyer@willkie.com

WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY  10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
              ccording@willkie.com
              bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,
Ankur Dhingra, Marcel Konrad,
and Peter Maag*