United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND,

Plaintiff,

v.

CAREDX, INC., et al.,

Defendants.

Case No. 22-cv-03023-TLT

**ORDER GRANTING MOTION TO DISMISS AND MOTION TO STRIKE WITH LEAVE TO AMEND**

Re: ECF Nos. 58, 60

Pending before the Court are Defendants' motion to dismiss and motion to strike portions of Plaintiffs' amended class complaint. Having considered the parties' papers, pleading, and oral arguments, for the reasons below, Defendants' motions are **GRANTED**. Plaintiffs may amend their complaint within 21 days of this Order.

## I. BACKGROUND

Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief & Retirement Fund bring this securities fraud action against Defendants CareDx, Inc., Peter Maag, Reginald Seeto, Marcel Konrad, and Ankur Dhingra. Amended Class Complaint ("Complaint"), ECF No. 53.

CareDx is a Delaware corporation with a principal place of business in Brisbane, California. Compl. ¶ 24. Maag was CEO of CareDx from 2012 to November 2020 and Executive Chairman from November 2020 to October 2021. *Id.* ¶ 25. Seeto has been CEO of CareDx since November 2020. *Id.* ¶ 26. Konrad was Interim Chief Financial Officer from January 1, 2021, to March 24, 2021, and Senior Vice President of Finance & Accounting from March 2021 to July 2021, when he resigned. *Id.* ¶ 27. Dhingra was CFO from March 25, 2021, to May 2022, when he

resigned. *Id.* ¶ 28.

CareDx "develops and sells diagnostic tests and other products and services for transplant patients." *Id.* ¶ 31. During the Class Period, from January 21, 2021, to November 3, 2022, at least 85% of CareDx's revenue came from its testing services. *Id.* CareDx's financial success depended on AlloSure Kidney, a blood test developed and sold by CareDx that detects signs of kidney transplant rejection. *Id.*

In March 2020, as the COVID-19 pandemic progressed, CareDx introduced RemoTraC, a program wherein a mobile phlebotomist would perform blood draw at a patient's home. *Id.* ¶¶ 34–35; CareDx's SEC Form 10-K for 2021 at 9, Declaration of Charles D. Cording ("Cording Decl."), Ex. B, ECF No. 58-3. As part of RemoTraC, doctors can order blood to also be drawn for routine blood tests when blood for collected for AlloSure tests. *Id.* ¶ 48. The number of tests from RemoTraC comprised a substantial proportion of CareDx's testing volume and grew during the Class Period. *Id.* ¶¶ 36–39. By June 28, 2021, CareDx's common stock reached an all-time high of $95.60 per share. *Id.* ¶ 42.

When CareDx reported its financial results in the third quarter of 2021, its Form 10-Q filing disclosed investigations by the DOJ, SEC, and an unnamed state regulatory agency. *Id.* ¶¶ 90–91. During oral argument, Defendants informed the Court that the state agency investigation has concluded without additional action. The day after the Form 10-Q filing, the stock price closed 27.5% below the price of the previous day. *Id.* ¶ 94.

On April 15, 2022, Michael Olymbios, the former Head of Community Nephrology from May 2020 until October 2020, filed a complaint ("Olymbios Complaint") in the Superior Court of California, County of San Mateo alleging that CareDx failed to pay deposits for the ongoing arbitration proceeding between Olymbios and CareDx. *Id.*; Cording Decl., Ex. U; *see also Olymbios v. CareDx, Inc.*, No. 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty. Apr. 15, 2022). In the complaint, Olymbios made several allegations regarding CareDx's improper bundling of AlloSure tests with standard blood tests in the RemoTraC program and illegal kickbacks to doctors. *Id.* ¶¶ 49–89. That proceeding has since been returned to arbitration.

On May 23, 2022, CareDx announced that its CFO, Dhingra, had notified the company of



United States District Court
Northern District of California

his resignation on May 18, 2022, to be effective on May 25, 2022. *Id.* ¶ 109. That day, CareDx's share price dropped from the close of the previous trading day of $25.86 to $23.92. *Id.* Subsequently, on September 1, 2022, CareDx announced that its Chief Marketing Officer and Chief Commercial Officer, Sasha King, notified the company of her resignation on August 30, 2022, to be effective on September 16, 2022. *Id.* ¶ 110. That day, CareDx's share price dropped from the previous close of $20.31 to $18.33. *Id.*

Subsequently on November 3, 2022, CareDx reported its earnings for the third quarter of 2022 and revealed an increased net loss despite an increase in the number of tests performed. *Id.* ¶ 111. CareDx's stock price fell from the previous close of $18.73 to $16.02. *Id.* ¶ 115.

Plaintiffs alleged that during the Class Period, CareDx relied on billing unnecessary AlloSure tests to Medicare, facilitated by illegal kickback schemes, to boost its testing services revenue. *Id.* ¶¶ 47–89. Based on alleged misrepresentations and omissions during the Class Period, Plaintiffs bring this action for (1) violation of Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 promulgated thereunder and (2) violation of Section 20(a) of the Exchange Act.

Defendants moved to dismiss and strike certain portions of the Complaint. ECF Nos. 58, 60. The Court heard oral arguments on May 16, 2023. ECF No. 74.

## II. JUDICIAL NOTICE

"The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

Defendants request judicial notice of 21 exhibits. ECF Nos. 59, 73. Plaintiffs oppose. ECF No. 70. Plaintiffs do not provide individualized arguments to each of the exhibits. *Id.*

During oral argument, Plaintiffs clarified that it opposes the facts in the exhibits to be noticed for the truth of the matter. Accordingly, the Court took judicial notice of the statements contained in these exhibits not for the truth of the matter.

Exhibits A through G are filings submitted by CareDx to the SEC. The Court finds that these regulatory filings are incorporated by reference into the Complaint, which specifically refers to statements in these filings. Accordingly, the Court takes judicial notice of the statements relied on by Plaintiffs in the Complaint. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (The Court "may consider documents referred to in the complaint or any matter subject to judicial notice, such as SEC filings.").

Exhibits H through N are transcripts from CareDx's earnings calls. "An investor call transcript submitted to the SEC generally qualifies as a 'source whose accuracy cannot reasonably be questioned.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (modification and citation omitted). Here, Exhibits I to N are quoted in the Complaint by Plaintiffs. The Court takes judicial notice of the sections containing the statements quoted in the Complaint. Exhibit H is a transcript from an earnings call in 2020. The Court takes judicial notice of the statements regarding RemoTraC.

Exhibits O and P are transcripts from conferences where Defendants gave remarks. The Complaint quotes from Defendants' statements at these conferences. As Plaintiffs do not dispute the accuracy of these statements, the Court takes judicial notice of the questions and answers that are quoted in the Complaint.

Exhibits Q through T are analyst reports about CareDx. Exhibit R is a report about a Contractor Advisory Meeting that is quoted in the Complaint. Exhibits Q and T are analyst reports regarding the same meeting. Exhibit S is an analyst report that Defendants quote for the proposition that Medicare Advantage plans are more likely to refuse payment than Medicare plans. As Plaintiffs do not dispute the accuracy of these reports, the Court takes judicial notice of these exhibits for the purpose of showing the information available to investors.

Exhibit U is CareDx's motion to compel arbitration in the *Olymbios v. CareDx* case in the San Mateo Superior Court. As the brief is one filed by CareDx in another proceeding, the Court

takes judicial notice of only the existence of this exhibit but not of the facts contained within.

## III. LEGAL STANDARD

### A. Motion to Strike

Before responding to a pleading, a party may move to strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The essential function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to the trial." *Wang v. OCZ Tech. Grp., Inc.*, 276 F.R.D. 618, 624 (N.D. Cal. Oct. 14, 2011) (quoting *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010)). Motions to strike are generally disfavored. *See Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 879 (N.D. Cal. 2011); *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). Just as with a motion to dismiss, the court should view the pleading sought to be struck in the light most favorable to the nonmoving party. *Id.*

### B. Motion to Dismiss

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007)). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo* Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) dictates that the "circumstances constituting fraud or mistake shall be stated with

particularity." Fed. R. Civ. Proc. 9(b). It is not enough for a plaintiff merely to identify an allegedly fraudulent statement made by defendants. *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Plaintiffs must allege "why the disputed statement was untrue or misleading when made." *Id.* at 1549. Moreover, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B).

The PSLRA additionally requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity. *Or. Pub. Emps.*, 774 F.3d at 605.

## IV. DISCUSSION

### A. Motion to Strike

Under Federal Rules of Civil Procedure Rule 11(b)(3), Plaintiff must certify that "the factual contentions have evidentiary support or, if specifically, so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." "Given that this responsibility cannot be delegated to another member of the attorney's firm, it would make little sense that an attorney somehow can rely on the analysis of attorneys in different actions and who are presumably from different law firms." *In re Connetics Corp. Sec. Litig. ("Connetics I")*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (citations omitted).

Defendants argue that certain allegations from the Olymbios Complaint that Plaintiffs rely upon to show scienter should be stricken. Defendants point to allegations pertaining to (1) Olymbios's discussion of concerns with Defendants Seeto and Maag, (2) communication between Olymbios and Maag regarding patient billing, and (3) conversation between Olymbios and unidentified employees. Defendants argue that these allegations lack the independent corroboration required under Rule 11.

The Court finds *Connetics I* instructive. There, the court struck several paragraphs from

the complaint because "plaintiffs did not personally investigate their claims against defendants Yaroshinsky and Zak." *Connetics I*, 542 F. Supp. 2d at 1005. In particular, "plaintiffs ma[de] no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims" and "the complaint itself [does not] indicate that any other sources were used as to these specific claims." *Id.* After plaintiffs amended their complaint, the court denied a subsequent motion to strike because "plaintiffs have explained what other sources they rely on to formulate their factual allegations and have explained how these other sources corroborate some, though not all, of the allegations from the SEC complaint." *In re Connetics Corp. Sec. Litig. ("Connetics II")*, No. 07-CV-02940-SI, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008). As an example, the court there noted that the amended complaint included an additional allegation from a confidential witness that was present at a meeting with a regulatory agency and corroborated the agency's views that were alleged in the SEC complaint. *Id.*

Here, the Complaint lifts allegations from the Olymbios Complaint without adequate independent corroboration. This is a situation more akin to that in *Connetics I* than *Connetics II*. While Plaintiffs need not corroborate every fact, Plaintiffs must provide an independent basis that goes towards corroborating the allegations such that they are reasonable. Here, the allegations at issue cite specifically to the Olymbios Complaint as the source of the information. *See, e.g.*, Compl. ¶¶ 10, 79. As the plaintiffs did in *Connetics II*, Plaintiffs could have corroborated that Olymbios had discussions with Maag or Seeto with a confidential witness that had reason to know of the discussions, such as FE-6, Maag's former executive assistant. In the alternative, Plaintiffs could have included corroboration from confidential witnesses that had brought similar concerns to Seeto or Maag.

Even taking all the allegations regarding the confidential witnesses as true, there is no independent support to suggest that Olymbios brought up concerns with Seeto and Maag, that Olymbios and Maag communicated about patient billing, or that Olymbios texted with other employees. The Court notes that it is not setting a high bar wherein Plaintiffs must independently corroborate that each conversation took place. Instead, Plaintiffs must show that it performed its

United States District Court
Northern District of California

duty to independently investigate the factual allegations in a manner that is reasonable under the circumstances.

Plaintiffs' reliance on *McKesson*, *VeriFone*, and *NVIDIA* are inapposite. In *McKesson*, the issue before the court was whether allegations that rely on an AG Complaint was appropriate. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019). The court found it appropriate because "the Ninth Circuit has relied on comparable documents when deciding motions to dismiss" but did not discuss whether allegations from the cited complaint had independent corroboration. *Id.* In *Verifone*, the court considered allegations from a SEC complaint that was incorporated into the plaintiff's complaint. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706–07 (9th Cir. 2012). The court there, however, also did not discuss the issue of independent corroboration. *Id.* In *NVIDIA*, the court found that it would be inappropriate to consider the recanting declaration from a confidential witness submitted by the defendant in a motion to strike, as that would resolve a factual dispute. *Iron Workers Loc. 580 Joint Funds v. NVIDIA Corp.*, 522 F. Supp. 3d 660, 672 (N.D. Cal. 2021). That situation is not present here.

The Court is particularly wary that Plaintiffs alleged facts based entirely on the Olymbios Complaint when Dr. Olymbios is not a party to this action. While Plaintiffs attach a declaration that they received an email from Dr. Olymbios and have spoken to his attorney, these do not provide the adequate corroboration. As to the former, Dr. Olymbios's email does not corroborate the allegations in the Complaint. Instead, it shows that he is interested in this case. *See* Declaration of Lester R. Hooker, Ex. 1 at 1, ECF No. 69-2 ("I am writing to you with interest in your amended complaint. . ."). Moreover, Dr. Olymbios's email was received after the filing of the Complaint, which relied on the Olymbios Complaint and not material received from Dr. Olymbios. *See* Compl. at 1:10–19. As to the latter, Plaintiffs cannot solely rely on investigation performed by Dr. Olymbios's counsel.

Accordingly, the Court grants Defendants' motion to strike paragraphs 10, 56–58, first four sentences of 78, 79, fourth through eighth sentences of 101, first sentence of 166, second and third sentence of 167, 170, and 174 of the Complaint. Plaintiffs may amend their complaint after

conducting an independent, reasonable investigation as to the stricken allegations.

Plaintiffs request in the alternative that the Court vitiate Dr. Olymbios's confidentiality agreement with CareDx. Plaintiffs do not cite to any authority that the Court can vitiate an agreement between CareDx and a third party that is not before the Court. In addition, as the agreement is the subject of ongoing arbitration between Dr. Olymbios and CareDx, it would be inappropriate for the Court to consider Plaintiffs' request. Accordingly, Plaintiffs' request is denied.

**B. Section 10(b) of the Exchange Act and Rule 10b-5**

"To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation and modifications omitted). Here, Defendants challenge the first, second, and sixth element.

**1. Scienter**

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). Plaintiffs must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009). "'Deliberate recklessness' is more than '*mere* recklessness or a motive to commit fraud.' It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citations omitted) (emphasis in original).

"The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (citation omitted). "[I]n determining whether the pleaded

facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

A court must first "determine whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). "If none is sufficient alone, [the court] then consider the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id.*

**a. Defendant Marcel Konrad**

Defendants argue that Konrad must be dismissed as "[t]here is not a single substantive allegation in the [Complaint] directed at Mr. Konrad, and the Opposition does not argue otherwise." Reply at 2:21–22, ECF No. 71. In the 231-paragraph Complaint, Konrad is mentioned in only three paragraphs. *See, e.g.*, Compl. ¶¶ 27 ("Defendant Marcel Konrad ('Konrad') served as the Interim Chief Financial Officer ('CFO') of CareDx from January 1, 2021 through March 24, 2021 and then served as Senior Vice President ('VP') of Finance & Accounting until leaving the Company in July 2021."), 29 ("Defendants Maag, Seeto, Konrad, and Dhingra (collectively, 'Individual Defendants'), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and investor conferences and calls."), 187 ("Marcel Konrad served as Interim CFO from January 1, 2021 through March 24, 2021"). Based on these allegations, Konrad was the CFO during the Class Period and signed the company's SEC filings.

Plaintiffs argue that "Konrad is primarily liable under Rule 10b-5(a) and (c) for 'disseminating' the statements." Opp'n at 20 n.21, ECF No. 68. However, as the Supreme Court explained, private actions under Rule 10b-5 must still meet the requirement of scienter. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Thus, even if Konrad is liable due to disseminating and not making misleading statements, Plaintiffs must allege facts



United States District Court
Northern District of California

sufficient to create a strong inference of Konrad's scienter. *See Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1104 (2019) ("Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c), § 10(b), and § 17(a)(1), even if they are secondarily liable under Rule 10b–5(b).").

Here, the scant allegations in the Complaint are not sufficient to support scienter, that Konrad disseminated false statements in CareDx's SEC filings either intentionally to defraud or with deliberate recklessness. In addition, Plaintiffs do not cite authority to support the proposition that scienter may be satisfied solely due to Konrad's position as a senior executive. Thus, viewing all of Plaintiffs' allegations, the Court finds that they are insufficient to establish scienter as to Konrad. Accordingly, Plaintiffs' claims against Konrad are dismissed, with leave to amend.

**b. Defendant Ankur Dhingra**

Defendants also argue that Dhingra must be dismissed because "the Opposition does not identify any allegations speaking to Mr. Dhingra's state of mind." Reply at 2:25–26. Upon reviewing the Complaint, while allegations exist as to statements made by Dhingra, the only allegations that may arguably go toward Dhingra's state of mind is his resignation on May 25, 2022, which he notified CareDx of on May 18, 2022. *See* Compl. ¶ 109.

Plaintiffs argue that Dhingra's resignation one month after the Olymbios Complaint was filed is indicative of scienter. However, the misleading statements that Dhingra allegedly made were on May 5, 2021 (*id.* ¶¶ 140–41), June 9, 2021 (*id.* ¶¶ 143, 146), October 28, 2021 (*id.* ¶¶ 95, 151, 153), and May 5, 2022 (*id.* ¶ 162). There are no indications that Dhingra resigned due to knowledge that his earlier statements were false or misleading. If the misleading statements were the cause of Dhingra's resignation, Plaintiffs' interpretation does not explain why Dhingra did not resign soon after October 28, 2021, when the DOJ and SEC investigations were revealed. Regardless, while the timing of resignation may go towards establishing scienter, it is not sufficient when standing alone to show that Dhingra "knew" "RemoTraC was built on illegal Medicare billing and kickback schemes that could in no possible way serve as a 'solid strategic foundation' for the Company." *Id.* ¶ 144.

Even viewing all of Plaintiffs' allegations holistically, the Court does not find that



United States District Court
Northern District of California

Plaintiffs alleged sufficient facts to allow a strong inference of scienter as to Dhingra. Accordingly, Plaintiffs' claims against Dhingra are dismissed, with leave to amend.

**c. Defendant Peter Maag**

Defendants argue that Maag is not alleged to have made any misleading statements, such that Maag's scienter is irrelevant. Plaintiffs do not dispute that there are no allegations regarding any statements made by Maag. Thus, Plaintiffs' claims directed to Maag as to misleading statements are dismissed.

Plaintiffs argue instead that they alleged scheme liability under Rule 10b-5(a) and (c). Even so, Plaintiffs must still allege facts that allow a strong inference of scienter as to Maag's misconduct. The Court addresses arguments regarding scheme liability in Section IV.B.3 below.

**d. Defendant Reginald Seeto**

Defendants argue that the allegations directed at Seeto do not give rise to a strong inference of scienter. These allegations relate to the Olymbios allegations, insider sales, core operations doctrine, messaging tool, and government investigation.

As discussed above, the Court strikes allegations regarding Olymbios's alleged discussion of concerns with Seeto, as Plaintiffs did not provide sufficient independent corroboration. Regardless, these allegations are not sufficiently particularized—they do not provide indication of when these discussions took place or the content of these discussions. As such, allegations regarding Dr. Olymbios do not support scienter as to Seeto.

Regarding insider sales, "stock sales by corporate insiders are suspicious only when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) (citation and internal quotation marks omitted). "To make this determination, [courts] look to three factors: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citation omitted).

Plaintiffs argue that Seeto's insider sales during the Class Period give rise to a compelling inference of scienter. Plaintiffs provide Seeto's trading activity during the Class Period to show

that "nearly half of defendant Seeto's Class Period sales proceeds in a single month, and at near all-time high prices" occurred in June 2021. Compl. ¶ 185. However, these trades also represented only 26% of the shares sold by Seeto during the Class Period. Thus, although Seeto "capitalized on the momentary spike" of CareDx stock, this does not support a strong inference of scienter where the bulk of Seeto's trades during the Class Period were at lower prices. In addition, although the June 2021 trades were larger in volume than in other months, the Court does not find this to be dramatically out of line with Seeto's other trading activity during the Class Period. Moreover, Plaintiffs did not allege Seeto's trading activity outside of the Class period to show possibly inconsistency. Accordingly, by themselves, Seeto's insider sales do not support scienter.

Plaintiffs also argue that the core operations doctrine supports scienter. "The core operations theory of scienter relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citations omitted). "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.*

Here, Plaintiffs argue that executives paid close attention to sales of AlloSure because it was a growth driver for the company. By extension, Plaintiffs argue that executives were apprised of RemoTraC's status because RemoTraC "was essential in rapidly growing the number of AlloSure tests." Opp'n at 21:6–8. In addition, Plaintiffs argue that senior executives attended weekly meetings to discuss sales and marketing issues.

These generalized allegations are insufficient to give rise to a strong inference of scienter. Allegations that RemoTraC was important and that executives attended regular meetings are not particularized enough to show that senior executives, including Seeto, knew that statements regarding RemoTraC were false because RemoTraC involved fraudulently billing Medicare.

In addition, Plaintiffs argue that the DOJ and SEC government investigations support scienter. However, the fact that government investigations exist are not sufficient to support scienter. For example, Plaintiffs do not allege that company executives, such as Seeto, actively

obstructed any of the investigations. Moreover, Plaintiffs did not allege that the fraudulent practice of overbilling Medicare was the subject of the investigations.

Finally, Plaintiffs also point to the use of private messaging platforms. However, the Complaint did not provide explanations of why the use of private messaging platforms is indicative of executives taking "active measures to hide their conduct." Opp'n at 23:1–2. The allegations do not indicate what content was shared over the private messaging platforms or when the platforms were used. Moreover, there are no allegations that Seeto used one of these private platforms. Accordingly, these allegations do not support scienter as to Seeto.

Considering holistically all the allegations directed at Seeto, the Court finds that they do not give rise to a strong inference of scienter regarding the misleading statements made by Seeto.

**e. Defendant CareDx**

"[A] corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.'" *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (citation omitted). "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." *Id.* (citation omitted).

As discussed above, the Court finds that Plaintiffs did not allege scienter for the misleading statements as to Konrad, Dhingra, Maag, or Seeto. Thus, there is no scienter that can be imputed to CareDx.

In addition, when all of Plaintiffs' allegations are reviewed holistically, Plaintiffs' allegations center on RemoTraC as a program for committing Medicare fraud. During oral argument, Defendants proposed an alternative inference that RemoTraC was a blood draw program for at-risk transplant patients during the COVID-19 pandemic, exactly as Defendants announced in 2020. As RemoTraC was launched well before the Class Period, Defendants' inference is more plausible than Plaintiffs'. Accordingly, considering all of Plaintiffs' allegations, the Court finds that the Complaint fails to allege scienter as to CareDx. Plaintiffs' claims directed



United States District Court
Northern District of California

United States District Court
Northern District of California

to CareDx as to the misleading statements are dismissed.

**2. Material Misrepresentation or Omission**

"The PSLRA has exacting requirements for pleading 'falsity.' The plaintiff's complaint 'shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (citing 15 U.S.C. § 78u–4(b)(1)). "[A] statement is misleading if it would give a reasonable investor 'the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citation omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler*, 540 F.3d at 1070.

Defendants argue that Plaintiffs did not plausibly allege the falsity of misleading statements.

**a. Compliance with Health Care Laws**

Plaintiffs alleged that provisions in two underwriting agreements regarding compliance with health care laws were false and misleading. *See* Compl. ¶¶ 126, 158 ("The Company and, to the Company's knowledge, its directors, employees and agents (while acting in such capacity) are in material compliance with, all health care laws applicable to the Company . . .."). In addition, Plaintiffs alleged that Defendants engaged in kickbacks and billed Medicare for tests that were not medically necessary, in violation of health care laws. At this stage, the Court must accept Plaintiffs' allegations as true.

Defendants, however, argue that the underwriting agreements where these statements appear included a disclaimer that they "were not meant to provide investors with any other factual information regarding Company." Reply at 8:23–24. The disclaimer is as follows:

> The representations, warranties and covenants contained in the Underwriting Agreement were made only for purposes of such agreement and as of specific dates, were solely for the benefit of the

> parties to the Underwriting Agreement and may be subject to limitations agreed upon by the contracting parties. Accordingly, the Underwriting Agreement is incorporated herein by reference only to provide investors with information regarding the terms of the Underwriting Agreement, and not to provide investors with any other factual information regarding the Company or its business, and should be read in conjunction with the disclosures in the Company's periodic reports and other filings with the SEC.

Form 9-K filed January 20, 2021, at 2, Cording Decl., Ex. E; *see also* Cording Decl., Ex. F at 2.

The inquiry, then, is whether the statements in the agreements may reasonably be interpreted as communications to investors.

Plaintiffs mainly rely on *Glazer*. There, the company had filed a Form 10-K and attached a merger agreement stating the company was in compliance with all laws that also included a provision that the agreement was "not intended to confer upon any person other than the parties hereto any rights remedies hereunder." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 741 (9th Cir. 2008). The Ninth Circuit found that statements in the merger agreement were actionable because the proposed merger "was a very significant event for the company" and the company "could have expected intense investor interest in the details of the merger." *Id.* at 742 (9th Cir. 2008).

Defendants instead rely on *Plains* and *M&T*. In *Plains*, the court found that representations in underwriting agreements were not actionable. *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 637–38 (S.D. Tex. 2018), *aff'd on other grounds sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019). Specifically, the court found that "[c]onsidering the context of the statements in contractual agreements with underwriters, the fact that the agreements must be filed with the SEC does not make the statements ones that warrant or guarantee facts to investors." *Id.* at 638. Thus, "[t]he context of the statements indicates that they were made as contractual representations to a counterparty, not as statements of certainty made to the investing public." *Id.* In *M&T*, the court found no reasonable shareholder would look at a disclaimer in a merger agreement and then rely on the representations within that were more than boilerplate to understand the actual conditions of the company. *Jaroslawicz v. M&T Bank Corp.*, No. 15-CV-897, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017).

United States District Court
Northern District of California

The Court finds that the situation here is more akin to that in *Plains* and *M&T*. The underwriting agreement was filed due to a regulatory requirement and the representation within of CareDx's compliance with health care laws were "made as contractual representations to a counterparty, not as statements of certainty made to the investing public." *Plains*, 307 F. Supp. 3d at 638. A reasonable investor would have viewed the disclaimer on the second page of the Form 8-K's and understood that the agreements were not meant to convey facts regarding CareDx. Moreover, the disclaimer is clear that the representations in the agreement were only for a specific date and not a guarantee of ongoing compliance. In addition, the compliance representations here, like those in *M&T*, are not boilerplate and specifically list out several laws.

Accordingly, the Court finds that Plaintiffs have not adequately pled that statements in the underwriting agreements are misleading. A different finding may result if Plaintiffs included allegations regarding the context of the underwriting agreements. For example, there are no allegations whether investors were intensely interested in CareDx's offering of the additional shares detailed in the underwriting agreements. As such, Plaintiffs may amend their complaint regarding these statements.

**b. Unmet Needs**

Plaintiffs alleged that statements regarding RemoTraC meeting an "unmet need" were false and misleading. *See, e.g.*, Compl. ¶¶ 130, 136. Plaintiffs argue that these statements were false because RemoTraC "was built on giving patients tests that were ***not*** medically necessary." Opp'n at 4–6. According to Plaintiffs, "it is misleading to tout RemoTraC as meeting unmet needs when the point of the program was to bill Medicare for medically unnecessary tests." Opp'n at 17:15–17.

Plaintiffs rely on *Hefler v. Wells Fargo*. There, plaintiffs identified statements that "Wells Fargo attributed its financial success to its cross-selling strategy" and alleged that defendants "knew or deliberately disregarded that Wells Fargo materially and artificially inflated the cross-sell metrics that it reported to investors by including millions of accounts in those metrics that Wells Fargo either fabricated completely, or created by engaging in serious, pervasive sales misconduct." *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 1070116, at *6



United States District Court
Northern District of California

(N.D. Cal. Feb. 27, 2018).

Defendants argue that the "unmet need" statements identified by Plaintiffs are about addressing the unmet need of transplant patients for mobile phlebotomy. The Court agrees. This is evident from the context of the statements, where Seeto described putting together the structure of RemoTraC in four days during the beginning of the COVID-19 pandemic. Moreover, Plaintiffs' theory is also undercut by allegations that doctors ordered RemoTraC tests that included AlloSure only for results of standard blood panel. *See, e.g.*, Compl. ¶ 61 ("Dr. FE-1 recalled that certain doctors receiving the results of the AlloSure test did not even understand what the AlloSure results meant, and were ordering AlloSure only because they had to do so in order to complete the other home tests."). This supports the need for a mobile phlebotomy service.

Plaintiffs argue that even true statements can be misleading. However, this is not one of those instances. Seeto's statements about RemoTraC addressing an "unmet need" does not "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985. The statements do not create an impression that RemoTraC was created to address an unmet need when there was none. Unlike the defendants in *Hefler* that created fake accounts, Defendants here did not artificially inflate the number of tests performed. Instead, actual tests were ordered.

Accordingly, Plaintiffs did not adequate plead falsity as to the "unmet need" statements.

**c. Medicare Reimbursements**

Defendants argue that Plaintiffs have not plausibly alleged that Dhingra's statement regarding no change to CareDx's Medicare billing practices and declining average sales price were false and misleading. *See* Compl. ¶ 153, 156, 162. The Court agrees. Plaintiffs have not sufficiently alleged particularized facts to support the inference that CareDx's explanation is false.

Plaintiffs alleged that the statements were false and misleading because "under scrutiny from the DOJ, the SEC, and a state regulator, the Company could no longer engage in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for unnecessary tests and pay illegal kickbacks to phlebotomists and prescribing doctors." *Id.* ¶ 154. In addition, Plaintiffs alleged that "the true cause of Defendants' flagging Medicare growth and falling ASPs was not

changes in payor mix caused by higher growth in the commercial business." *Id.* However, in addition to not addressing the explanations offered by Defendants in those statements, the allegations are at odds with Plaintiffs' allegations that "Defendants were quietly shutting down the unsustainable RemoTraC scheme under scrutiny from the DOJ, the SEC, and a state regulator." *Id.* ¶¶ 157, 163. For example, it is reasonable to assume that the average sales price would not decline if Defendants decreased the number of unnecessary tests. Thus, while the statements are actionable, Plaintiffs must allege additional particularized facts that goes towards falsity.

### 3. Scheme Liability

Plaintiffs argue that Maag masterminded, and Seeto executed, the scheme involving RemoTraC to overbill Medicare and provided illegal kickbacks. Defendants argue that Plaintiffs failed to allege scheme liability under Rule 10b-5(a) and (c). In addition to the elements of a Section 10(b) action, Plaintiffs must show that Maag and Seeto "employed a device, scheme, and artifice to defraud" and "engaged in an act, practice, or course of business that operated as a fraud or deceit." *Lorenzo*, 139 S. Ct. at 1101 (modifications and quotation marks omitted).

Plaintiffs argue that even though Maag was not a maker of any allegedly misleading statements, Maag can be found to have violated Rule 10b-5(a) and (c). However, as pointed out by Defendants, Plaintiffs did not adequately plead reliance. Plaintiffs did not allege that Maag's allegedly deceptive conduct were disclosed to the public. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148 (2008) ("[R]espondents' deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance."). Without knowledge of Maag's deceptive acts, Plaintiffs have not adequately alleged reliance on a scheme liability. The same is true for other defendants for which Plaintiffs plead scheme liability. Accordingly, claims regarding scheme liability are dismissed, with leave to amend. The Court do not address Defendants' remaining arguments regarding scheme liability.

### 4. Loss Causation

Defendants argue that Plaintiff did not adequately allege loss causation. Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "[T]he complaint must allege that the defendant's share price



United States District Court
Northern District of California

fell significantly after the truth became known." *Metzler*, 540 F.3d at 1062 (citation omitted).

Plaintiffs argue that they have properly alleged loss causation based on the corrective disclosure theory—where "the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop." Opp'n at 23:14–15.

"To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (citation omitted). "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures. A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* at 790 (citations omitted).

Here, Plaintiffs did not adequately allege corrective disclosures. For example, the disclosure of government investigations simply revealed ongoing investigations—it did not disclose a fraudulent RemoTraC scheme to overbill Medicare. The other allegations cited by Plaintiffs, such as the disclosure of declining average selling price and the departure of executives, are not supported by allegations that connect the disclosure of these events to fraudulent conduct.

"Even if the true facts concealed by the fraud are revealed to the market, the plaintiff must still show that the disclosure of the truth caused the company's stock price to decline." *Id.* Here, Plaintiffs did not allege that the market recognized a relationship between any of the disclosures and the fraud, thereby causing Plaintiffs' loss. As alleged, there are insufficient facts that the market reacted, resulting in a price drop, due to investors linking the disclosures with Defendants' misleading statements or the RemoTraC scheme. Moreover, Plaintiffs alleged that it is the Olymbios Complaint, filed on April 15, 2022, that revealed the RemoTraC scheme. However, the drop in share price of 8% from the filing of the Olymbios Complaint is significantly less than the decrease from other alleged events. *See* Compl. ¶ 101. Accordingly, Plaintiffs did not adequate plead loss causation.

//

**C. Section 20(a) of the Exchange Act**

"In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator . . .." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). "Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citation omitted). "Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id.* (citation omitted).

As discussed above, the Court found that Plaintiffs failed to plead a violation of Section 10(b) of the Exchange Act. Accordingly, Plaintiffs' claim under Section 20(a) also fails and is dismissed.

**V. CONCLUSION**

For the foregoing reasons, Defendants' motion to strike and motion to dismiss are **GRANTED**.

Paragraphs 10, 56–58, first four sentences of 78, 79, fourth through eighth sentences of 101, first sentence of 166, second and third sentence of 167, 170, and 174 of the Complaint are stricken, with leave to amend.

Plaintiffs' claims for violation of Sections 10(b) and 20(a) of the Exchange Act are dismissed, with leave to amend.

Plaintiffs may amend their complaint within 21 days of this Order.

This Order terminates ECF Nos. 58, 60.

**IT IS SO ORDERED.**

Dated: May 24, 2023

TRINA L. THOMPSON
United States District Judge