1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   JASON C. DAVIS (253370)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@rgrdlaw.com
6  jdavis@rgrdlaw.com
            – and –
7  SPENCER A. BURKHOLZ (147029)
   SEAN C. MCGUIRE (319521)
8  NICOLE Q. GILLILAND (335132)
   655 West Broadway, Suite 1900
9  San Diego, CA  92101
   Telephone:  619/231-1058
10 619/231-7423 (fax)
   spenceb@rgrdlaw.com
11 smcguire@rgrdlaw.com
   ngilliland@rgrdlaw.com
12
   Lead Counsel for Lead Plaintiffs
13
   [Additional counsel appear on signature page.]
14
                 UNITED STATES DISTRICT COURT
15
                 NORTHERN DISTRICT OF CALIFORNIA
16
                 SAN FRANCISCO DIVISION
17

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Case No. 3:22-cv-03023-TLT |
| Plaintiff, ) ) ) | <u>CLASS ACTION</u> |
| vs. ) ) ) | SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| CAREDX, INC., PETER MAAG, REGINALD SEETO, and ANKUR DHINGRA, ) ) ) | <u>**DEMAND FOR JURY TRIAL**</u> |
| Defendants. ) ) ) ) | |

4854-9079-2810.v1

**TABLE OF CONTENTS**

**Page**

I.  NATURE OF THE ACTION ....................................................................................1

II.  JURISDICTION AND VENUE ............................................................................10

III.  THE PARTIES......................................................................................................11

    A.  Lead Plaintiffs ..........................................................................................11

    B.  Defendants ................................................................................................12

IV.  BACKGROUND TO THE FRAUD ......................................................................13

    A.  The Importance of Whistleblowers in Securities Markets........................13

    B.  Whistleblower Dr. Olymbios Is a Highly Credentialed Medical Doctor
          Whom CareDx Recruited from One of the Top Medical Facilities in the
          World ........................................................................................................14

    C.  Defendants' "Very Hands-on and Detail-Oriented" Management Style and
          Their Praise and Rapid Promotion of Dr. Olymbios...............................15

V.  THE UNDERLYING FRAUDULENT SCHEME....................................................23

    A.  CareDx's Most Important Payor, Medicare, Placed Strict Limits on the
          AlloSure Bills for Which CareDx Could Seek Reimbursement – Only
          Those with "Clinical Suspicion" of Organ Rejection *Before* Administering
          AlloSure ....................................................................................................23

    B.  With Its Business Model Threatened by COVID-19, CareDx Develops
          RemoTraC – a Home Blood Testing "Miracle" – and Purportedly Rescues
          CareDx's Revenue Growth Story ..............................................................26

    C.  CareDx Relied on Rampant Medicare Billing Fraud and Illegal Kickback
          Schemes to Boost Its Testing Services Revenue .....................................27

          1.  CareDx Improperly Bundled Its AlloSure and AlloMap Tests into
               Its RemoTraC Home Testing Program in Order to Illegally Bill
               Medicare for Thousands of Unnecessary Tests .........................28

          2.  CareDx Paid Illegal Kickbacks to Doctors to Encourage Them to
               Order AlloSure and Enroll Patients in "Studies" that Were
               Actually Schemes to Illegally Bill Medicare for Additional
               AlloSure Tests..........................................................................39

          3.  Defendants Used the "KOAR" Study to Improperly Bill Medicare
               for Tens of Thousands of Additional Tests in Violation of the Anti-
               Kickback Statute .......................................................................44

VI.  FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD..........47

**Page**

A.  April 30, 2020: Quarterly SEC Filing on Form 10-Q and Related Quarterly Conference Call with Analysts and Investors Regarding RemoTraC ...................48

   1.  The Material Unlawful Purpose of RemoTraC.......................................48

   2.  The Hypothetical "Risks" ........................................................................49

   3.  "No Material Changes" in Hypothetical Risks .......................................54

   4.  Touting Apparently Legal Business Activity in Violation of Duty to Disclose the Impact of Unlawful Conduct – "Why Go Back to the Old Way?"..........................................................................................56

   5.  Continuing to Tout Apparently Legal Business Activity in Violation of Duty to Disclose the Impact of Unlawful Conduct ...............57

   6.  Touting Routine Blood Work in Violation of the Duty to Disclose Mandatory (and Unlawful) AlloSure Bundling to Overbill Medicare ...................................................................................................59

B.  June 9-10, 2020: Desperate for $125 Million, Maag Promises "No Material Change" in Risks and Assures Investors Full, Material "Compliance with Health Care Laws"...............................................................62

C.  June 13, 2020: Defendants Broadcast that Their Mobile Testing Does the "Standard Panel of Routine Transplant Tests" .......................................68

D.  August 4, 2020: Despite Running the Unlawful Bundling Business Since March 2020, Defendants Assure Investors "No Material Changes" in Risks Since 2019.............................................................................................70

E.  August 4, 2020: CareDx Touts a 41% Increase in Testing Revenue, Pointing to Supposed Legitimate Business Practices While Improperly Omitting Unlawful Conduct's Contribution .........................................................70

F.  October 29, 2020: Still Falsely Assuring Investors "No Material Changes" in Risks Since 2019, CareDx Continues Touting Purportedly Lawful Revenue Growth ............................................................................................70

G.  January 21, 2021: CareDx Doubles Down on Its "Compliance with Health Care Laws" Assurances to Raise Another $175 Million from the Investing Public .............................................................................................................71

H.  February 18, 2021: The BTIG Investor Conference .............................................76

I.  February 24, 2021: Fourth Quarter and Full Year 2020 Annual Report and Conference Call .......................................................................................................77

J.  May 5, 2021: First Quarter 2021 Financial Results Report and Conference Call................................................................................................................82

1
2                                                                                              **Page**
3
       K.     July 29, 2021: Second Quarter 2021 Earnings Call Statements ..........................84
4
       L.     October 28, 2021: Third Quarter 2021 Financial Results Conference Call
5             Statements ..............................................................................................................85
6      M.     February 24, 2022: Fourth Quarter 2021 and Full Year 2022 Financial
              Results Statements .................................................................................................88
7
       N.     May 5, 2022: First Quarter 2022 Financial Results Earnings Call
8             Statements ..............................................................................................................90
9      O.     April 2020-December 2021: CareDx's Fraudulent Recognition of Revenue
              Violated GAAP ......................................................................................................92
10
VII.   LOSS CAUSATION ...............................................................................................................96
11
       A.     The Six Corrective Disclosures Under the Ninth Circuit's *First Solar*
12            Proximate Causation Doctrine ...............................................................................97
13            1.     October 28, 2021: CareDx Simultaneously Announces Multiple
                     Government Investigations and Falling ASPs While Falsely
14                   Assuring There Had Been "No Change" in Its Medicare Billing .............97
15            2.     April 15, 2022: CareDx Senior Executive Dr. Olymbios Publicly
                     Blows the Whistle on Defendants' Fraudulent Business Practices ..........99
16
              3.     May 5, 2022: Testing Revenue Continues to Plummet .........................100
17
              4.     May 23, 2022: CareDx's Chief Financial Officer Suddenly Resigns......102
18
              5.     September 1, 2022: CareDx's Chief Marketing Officer Abruptly
19                   Resigns ..................................................................................................102
20            6.     November 3, 2022: 50% of Tests Are Rejected for Reimbursement ......103
21            7.     Post-Class Period Events Further Confirm that Defendants
                     Defrauded Investors and Caused Their Losses ......................................105
22
       B.     Materialization of Concealed Risks Under the Ninth Circuit's *First Solar*
23            Proximate Causation Doctrine .............................................................................108
24 VIII.  CLASS ACTION ALLEGATIONS .....................................................................................111
25 IX.    UNDISCLOSED ADVERSE INFORMATION ..................................................................112
26 X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR .................................................113
27 XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
              MARKET AND *AFFILIATED UTE* DOCTRINES) ......................................................114
28

1

2                                                                                                      **Page**

3
XII.    COUNTS AGAINST DEFENDANTS ............................................................................115

COUNT I ...............................................................................................................................115

COUNT II ..............................................................................................................................118

XIII.   PRAYER FOR RELIEF ...............................................................................................119

XIV.   JURY DEMAND ..........................................................................................................119

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1     Lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers

2  Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief &

3  Retirement Fund (together, "Lead Plaintiffs" or "Plaintiffs"), by and through their attorneys, allege

4  the following upon information and belief, except as to allegations concerning Lead Plaintiffs, which

5  are alleged upon personal knowledge.  Lead Plaintiffs bring this federal securities class action on

6  behalf of all persons or entities who purchased CareDx, Inc. ("CareDx" or the "Company") common

7  stock between April 30, 2020 and November 3, 2022, inclusive (the "Class Period"), against CareDx

8  and certain of its officers seeking to pursue remedies under the Securities Exchange Act of 1934,

9  15 U.S.C. §78a, *et seq.* ("Exchange Act").

10     Plaintiffs' information and belief are based upon, among other things, their counsel's

11  investigation, which includes, without limitation: (a) review and analysis of public filings made by

12  CareDx with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of

13  press releases and other publications disseminated by Defendants (defined below) and other parties;

14  (c) review of news articles, shareholder communications, conference calls, and postings on CareDx's

15  website concerning the Company's public statements; (d) interviews with numerous former CareDx

16  employees; (e) review of other publicly available information concerning the Company and the

17  Individual Defendants (defined below); (f) expert economic analyses; (g) expert accounting

18  analyses; (h) expert medical analyses; and (i)  independent investigation of the factual bases of

19  Plaintiff/Petitioner Michael Olymbios' ("Dr. Olymbios") Complaint and Petition for Declaratory

20  Judgement, filed April 15, 2022 in the case titled *Olymbios v. CareDx, Inc.*, No. 22-civ-01582 (Cal.

21  Super. Ct. San Mateo Cnty.) via email communication from Dr. Olymbios himself and five

22  discussions with Dr. Olymbios (via counsel) confirming that Dr. Olymbios is the source of the facts

23  set forth in this Complaint and that they are based on his personal knowledge, as further corroborated

24  by former CareDx employees and other sources.

25  **I.      NATURE OF THE ACTION**

26     1.     Lead Plaintiffs in this action are retirement funds representing the retirement savings

27  of some 40,000 firefighter, police, sheet metal, and electrical workers.  Their financial security in

28  retirement after many years of service depends, in part, on honest securities markets.  Companies

1  like CareDx continuously access the public stock markets in the United States to raise money from

2  like retirement funds and households.

3         2.     Lead Plaintiffs and thousands of other investors – households, pension and retirement

4  funds, and countless others – turned to the stock market to attain their financial goals; specifically, in

5  *this* case, they invested in CareDx. If the Company's public representations were to be believed,

6  CareDx was generating revenue lawfully by sending bills to Medicare to pay for a novel blood test

7  for kidney patients.

8         3.     In truth, the Company was a "house of cards generating revenue through illicit

9  conduct" that included paying doctors to order medically unnecessary tests and then turning around

10  and submitting the fraudulent bills to the U.S. taxpayer (via Medicare) to reimburse. Some **50%** of

11  the bills that the Company sent to Medicare were fraudulent, amounting to an estimated $117 million

12  in fraudulent bills over the course of the Class Period in this case. That is a lot of capital for a

13  Company that spent more money than it earned.

14         4.     Because the Company was a money-losing enterprise, it was important for CareDx to

15  report revenue, giving investors hope that it might turn a profit someday soon. The Company's main

16  revenue-generating product is a blood test called "AlloSure" that costs $2,841 *per* test. AlloSure is a

17  relatively novel test that aims to detect kidney rejection in kidney transplant recipients. Unlike the

18  routine, inexpensive "standard of care" blood tests for post-operative kidney patients that cost about

19  $22 per blood test, AlloSure is not a routine, "standard of care" test.

20         5.     CareDx's top payor, by far, during the relevant time was Medicare. Medicare's

21  regulations allowed CareDx to bill it for tests if – ***and only if*** – the tested patients had ***already shown***

22  "clinical suspicion of rejection" of their transplanted kidneys ***before*** any AlloSure test. In other

23  words, in order to be paid for its high-priced tests, CareDx was supposed to show Medicare that a

24  doctor had already found the patient was at serious risk of losing his or her transplanted kidney.

25         6.     Medicare's strict payment conditions made it difficult for CareDx to generate

26  significant profits. Indeed, CareDx has lived beyond its financial means since its inception, spending

27  more money on things like marketing and salaries – including tens of millions of dollars in

28

1  compensation for its senior executives – than it earns billing its high-priced flagship test to

2  Medicare.

3      7.    In February 2020, CareDx filed its 2019 annual report, which revealed the Company

4  lost $21.97 million in 2019.

5      8.    That same month, Defendant Maag wrote to a key witness – Dr. Olymbios – who was

6  on CareDx's "Business Leadership Team" and would report to the President of the Company

7  (Defendant Seeto), who was second only to Maag as CEO. Maag's message to Dr. Olymbios made

8  clear the pivotal role that Dr. Olymbios played at CareDx: "Within a few months you had a

9  ***tremendous impact*** in our organization."

10     9.    Then COVID hit in March 2020, a catastrophe for nearly everyone. But Defendants

11 Maag and Seeto reported a "miracle" to investors: a blood-testing business that sent phlebotomists

12 into patients' homes who otherwise could not leave due to COVID. They called the new business

13 "RemoTraC."

14     10.   RemoTraC was Maag's idea. On April 30, 2020, Maag touted the results of this

15 apparently lawful business. He told the investing public that the business accounted for "over 50%"

16 of the Company's testing revenue and lifted the Company's revenue back in line with its pre-COVID

17 revenue. Generating "revenue" was important to investors because it gave them hope that the

18 Company might turn a profit someday. Analysts praised the results as a "resounding success."

19     11.   Members of CareDx's top business leadership team also praised the results. On

20 May 1, 2020, Dr. Olymbios – whom the Company had recruited from a world-renowned medical

21 center – wrote to Defendant Seeto to discuss an analyst report that had praised RemoTraC's

22 "miraculous" impact on the Company's financial results:

23

24

25

26

27

28

Message

From:          'Michael Olymbios [molymbios@caredx.com]
on behalf of   Michael Olymbios <molymbios@caredx.com> [molymbios@caredx.com]
Sent:          5/1/2020 9:30:00 AM
To:            Reg Seeto [rseeto@caredx.com]
Subject:       Re: Fyi. CDNA | COVID-19 Changes the Base, but Not the Growth Story
Attachments:   43dd0d44-0e34-4408-8ece-bab2c752e01f@bluematrix.png

Congratulations Reg. At Mitsubishi, I was taught that a rising tide lifts all the boats and only during times of crisis can we differentiate top performing management teams. I feel privileged to work under you as a masterful strategist and executive. Getting us back to pre-COVID numbers within such a short space of time is miraculous.

12.     On that same day, May 1, 2020, Seeto promoted Dr. Olymbios to run sales of AlloSure – the Company's most important product – which was now largely administered via RemoTraC and billed to Medicare. Dr. Olymbios thereafter reported to Seeto directly, in accordance with Maag's desire to continue promoting Dr. Olymbios.

13.     With his RemoTraC team in place, Maag aggressively marketed his "miraculous" scheme to investors like the firefighter, police, electrical, and sheet metal workers retirement fund plaintiffs in this case. On April 30, 2020, for example, Maag told investors that RemoTraC had lawful purposes and took patients' blood for AlloSure "surveillance tests" and for "other **standard monitoring** tests." Here, Maag knowingly or recklessly misled investors; in truth, Maag's RemoTraC would administer "standard monitoring tests" (which **are** medically necessary at least monthly) **only if** patients also took the AlloSure tests at the same time (which **are not** medically necessary on a monthly basis). In other words, CareDx improperly conducted the AlloSure tests with **every** RemoTraC order – regardless of whether AlloSure was medically necessary for each patient. Numerous former CareDx executives, doctors, and other professionals explained how the scam worked.

14.     For example, a medical doctor who worked at CareDx during the relevant period as Senior Medical Science Liaison explained that Defendants used RemoTraC to complete medically necessary tests so that they could also complete unnecessary AlloSure tests and then illegally charge Medicare for the spurious tests. CareDx was systematically "doing the very expensive CareDx labs on the **same cadence** of the home labs," which "was totally unethical" – as the doctor explained – while also noting: "*[w]e were doing tests that cost at least 8X of what they should have been and*

1   *[doing them] on patients that did not need these tests*." §VI.B.  It was sales personnel, not clinical

2   personnel, who determined "what labs should be done and how often."  *Id.*  "The nurses *were*

3   *obligated* to not only do the screening labs but our AlloSure test," and the "doctors [in the field]

4   liked using [CareDx's blood-testing] service but there was *no way* to use us without ordering our test

5   as well."  *Id.*  CareDx was thus "bundling in AlloSure just to bill for it which was *totally*

6   *inappropriate*."  The Company's scheme violated the False Claims Act, 31 U.S.C. §§3729-3733, by

7   design.

8          15.    Another medical professional explained how CareDx bribed doctors to enroll their

9   patients in the Company's illegal and excessive testing program.  The Company paid medical

10  doctors $35,000 to $40,000 *per patient* to enroll the patients into the Company's excessive testing

11  program. §V.C.  These payments were part of the Company's standard kickback program: "booze"

12  cruises, helicopter tours, expensive vacations, phony advisory boards, limousines, wine tastings, and

13  Napa boondoggles.  Maag's secretary saw him pay for some of these lavish gifts and kickbacks, and

14  Maag has already admitted under oath that he signed "all" of these and other checks.  These

15  payments violated the Anti-Kickback Statute, 42 U.S.C. §1320a-7b.

16         16.    Maag's signature appears on public filings attesting to his knowledge of the substance

17  of the relevant legal duties he was obligated to follow.  These laws and regulations were not

18  complicated: no spending money on doctors in hopes of influencing their medical decisions, and no

19  submitting medically unnecessary bills to Medicare.  Maag broke these laws, as he, Defendant Seeto,

20  and Defendant Dhingra knew or should have known when making contrary statements to the

21  investing public, such as the retirement fund plaintiffs in this case.

22         17.    In spite of these systematic, illegal practices, Defendants repeatedly assured the

23  investing public that they fully complied with the Anti-Kickback Statute and False Claims Act,

24  knowingly or recklessly ignoring the fact they were already systematically violating those laws

25  through rampant illegal kickbacks to doctors and fraudulent Medicare billing.

26         18.    Defendants' practice of paying kickbacks consumed great quantities of cash.

27         19.    By June 2020, CareDx had about a year's worth of cash left before going bankrupt.

28  On June 9-10, 2020 – desperate to shore up the Company's dwindling cash and his own personal

1  holdings – Maag asked the investing public for more money – ***$125 million***.  Maag signed a number

2  of documents that he had the Company file publicly to raise the money.

3      20.    Maag made a series of important public representations to secure the $125 million.

4  Among other things the Company disseminated to the public, under Maag's control, was a "Material

5  Definitive Agreement" with the underwriters that was necessary for Maag to sell the $125 million in

6  stock to investors.  CareDx was required by SEC regulations to file the agreement publicly so

7  investors could review it in connection with their decision regarding whether to purchase CareDx

8  stock in the public offering.  Maag signed the document attesting that he, his subordinates, and the

9  Company were all in material compliance with "***all health care laws***," including the Anti-Kickback

10 Statute and the False Claims Act.  That was a material lie, and Maag knew it because he personally

11 signed checks violating the Anti-Kickback Statute to induce doctors to order CareDx's medically

12 unnecessary tests in violation of the False Claims Act.  To the doctors whom the Company could not

13 reach via bribes, Maag was "very detail-oriented" in mismarketing his Company's tests as being

14 "FULLY COVERED BY MEDICARE" when, in reality, the tests were far from "fully covered";

15 rather, a patient was covered if – and only if – ***before*** the test was ordered, the patient had already

16 failed some standard of care test indicating the patient was rejecting a kidney.  One illegality begat

17 another.

18     21.    In addition, one misrepresentation led to another.  Now sitting on another

19 $125 million in public investors' retirement savings, Maag and Seeto held Company-wide marketing

20 meetings and pushed out marketing documents on the Company's social media attesting that

21 RemoTraC drew blood for "a standard panel of routine tests" when, in reality, RemoTraC

22 simultaneously drew blood for the AlloSure test that was neither "standard" nor "routine" – rather, it

23 was a still-novel $2,800 test that Medicare refused to cover unless the patient had ***other*** tests

24 showing the patient was rejecting a kidney.

25     22.    Defendants likewise attributed expense and revenue growth to legal business

26 practices knowing full well that illegal conduct materially increased expenses (kickbacks) and

27 revenue (false claims).  These and similar statements were materially false and misleading both

28 because they failed to disclose that unlawful conduct fueled the Company's growth and,

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT                                                      - 6 -
4854-9079-2810.v1

1   independently, because the reported revenue figures violated mandatory accounting policies that

2   applied to the Company's financial statements, called Generally Accepted Accounting Principles or

3   "GAAP."   GAAP governs all public companies' financial reports.   As Plaintiffs' independent

4   investigation and analysis confirm, Defendants violated GAAP.

5           23.    Illicit conduct drove the Company's reported revenue from $31.4 million in 1Q 2020

6   to $65 million in 2Q 2021.[1]  Expert calculations, based on facts provided by former employees and

7   corroborated by public admissions by the Company itself, reveal the Company fraudulently

8   overbilled Medicare by approximately **$117 million** during the Class Period.  Given this illegitimate

9   revenue growth, hope increased that CareDx would soon turn profitable.  The Company's stock price

10  skyrocketed **more than 330%**, reaching a near-all-time high close of $95.11 per share on June 28,

11  2021 versus roughly $22 per share at the start of the COVID-19 pandemic.

12          24.    After taking the helm of CareDx's AlloSure sales, Dr. Olymbios began to observe the

13  rampant illegal conduct pervasive in the Company's business.   Accordingly, Dr. Olymbios

14  repeatedly warned CareDx's most senior executives, including Defendants Maag and Seeto, about

15  this illegal misconduct.  However, these executives "***brushed off his concerns or berated him for***

16  ***raising them in the first place***."  Indeed, Defendant Maag "***took active measures to avoid creating a***

17  ***paper trail of their misconduct***."  Maag further expressly warned Dr. Olymbios that "***there were***

18  ***certain things that shouldn't be put in writing***."  Another former CareDx employee who knew

19  Dr. Olymbios has recently corroborated that Dr. Olymbios raised these concerns.

20          25.    Government investigations ultimately shut down CareDx's scheme, forcing the

21  Company to make information public that directly related to its fraud and that caused investors'

22  losses.  On October 28, 2021, for example, the Company filed a quarterly report revealing for the

23  first time that the Company was the subject of two federal government investigations: (a) a civil

24  investigative demand ("CID") from the U.S. Department of Justice ("DOJ") requesting the Company

25  produce documents in connection with "a ***False Claims Act*** investigation being conducted by the

26  DOJ regarding certain business practices related to [CareDx's] ***kidney testing and phlebotomy***

---

27  [1]    Specific quarters in a fiscal year are designated by the quarter number followed by the letter Q.

28  Thus, 2Q 2021 indicates CareDx's second quarter in fiscal year 2021.

1    *services*"; and (b) a subpoena from the SEC in relation to an investigation by the SEC "in respect of

2    matters similar to those identified in the CID, as well as *certain of our accounting and public*

3    *reporting practices*."[2]

4         26.    In response to these disclosures, CareDx's stock price was decimated, plummeting

5    more than 27% the next trading day, from a closing price of $70.34 per share on October 28, 2021 to

6    a closing price of $51 per share on October 29, 2021.    Analysts responded in kind, with an

7    October 29, 2021 BTIG analyst report noting: "The fact that [CareDx] is being investigated by three

8    different entities, both federal and at the state level, is notable.    Based on our experience, disclosures

9    of these sort typically bear some degree of merit . . . ."    Five other disclosures related to Defendants'

10   fraud entered the market during the Class Period, likewise causing investor losses.

11        27.    Government investigations did not suddenly transform CareDx into an ethical

12   company, however.    In late 2021, Erin Tokunaga – who was in charge of clinical trials at CareDx –

13   confided in another high-ranking former employee "*that she was being bullied[,] intimidated, and*

14   *coerced to not provide information or misreport information [in] the DOJ investigation*."    This

15   other high-ranking employee ("FE-19") reported directly to Defendant Seeto and worked closely

16   with Seeto.    FE-19[3] explained how Ms. Tokunaga worked directly under the Company's Chief

17   Medical Officer, Sham Dholakia.    Ms. Tokunaga told FE-19: "*The pressure was so pervasive [from*

18   *management]*.    She said that she was going to hire her own attorney.    She mentioned this multiple

19   times to me."    FE-19 also observed: "*There was a pervasive lack of accountability and ethics at the*

20   *company in every which way*.    Overall, everything fit the pattern of not caring about how to operate

21   a business in an ethical and legal way."

22        28.    FE-19 also confirmed that Defendant Seeto was fully aware of billing practices at the

23   Company and any issues they caused.    For example, Seeto had regular meetings with the Company's

24

25   [2]    The Company received an informational request from a state agency that did not concern False
     Claims Act violations.

26   [3]    FE-19 worked closely with and reported directly to Defendant Seeto from mid-2021 through the

27   end of 2022, when he was laid off due to the Company's declining revenue as a result of difficulties
     in getting reimbursed for tests.    FE-19's responsibilities included working with the CEO in

28   managing day-to-day operations of the business and creating strategies to drive growth.

1  most senior billing executives, including its Chief Business Officer and Head of Testing Services.

2  FE-19 recalled that some of these meetings specifically concerned problems relating to getting "prior

3  authorization" from doctors for the AlloSure test, *i.e.*, getting the "medical necessity" authorization

4  that CareDx systematically failed to get.   FE-19 said Seeto "'absolutely'" knew about the

5  Company's "reimbursement and collection issues [with Medicare ***which] were pervasive***," and there

6  was "nothing" about which Seeto did not know.

7       29.    Dr. Olymbios made the Company's illicit practices publicly known in an April 2022

8  complaint filed in California state court, in which he described in detail the Company's "***unlawful***

9  ***campaign – bolstered by illegal inducements to physicians, misleading research, and***

10 ***recommendations for clinically unsupported treatment – to pad its sales***."  Dr. Olymbios further

11 described how, in order to "***maximize potential revenue associated with AlloSure***, CareDx

12 executives engaged in various forms of clinical and marketing schemes in an effort to justify

13 AlloSure's use, even when that use ***lacked clinical support and fell outside of the conditional***

14 ***approval extended to it***."  In other words, Dr. Olymbios confirmed that CareDx illegally billed

15 Medicare for unnecessary tests that were not supposed to be covered.

16      30.    Another senior executive who reported directly to a C-Suite company official (FE-11)

17 confirmed that Dr. Olymbios was "vocal" about his Medicare billing concerns while he worked for

18 the Company and said many other employees who didn't raise concerns only refrained from doing so

19 because "***we were all terrified for our jobs***."

20      31.    Dr. Olymbios has personally affirmed his own allegations to counsel for Plaintiffs in

21 this action:

22

23

24

25

26

27

28

| | |
|---|---|
| **From:** | Michael <michael.olymbios@gmail.com> |
| **Sent:** | Thursday, January 26, 2023 10:27 AM |
| **To:** | Shawn Williams; Jason Davis |
| **Subject:** | CareDx complaint |

EXTERNAL SENDER
Dear Mrs. Williams and Davis,

I am writing to you with interest in your amended complaint filed on behalf of shareholders of CareDx against the company and its executives. I am Michael Olymbios, the former employee referenced in your complaint. I was relieved to see that other former employees were willing to come forward to corroborate my observations.

I write to offer my full cooperation in your investigations and in your case. Peter Maag, Reg Seeto, Sasha King and Sham Dholakia are crooks. They are despicable people with no regard for anyone—shareholder or patient. They continue to retaliate against me personally. Seeto is burning through CareDx's cash on personal legal vendettas. The entire enterprise is a house of cards, generating revenue through illicit conduct as you have found.

I wish you the best in your case.

With best regards,
Michael Olymbios
███████████

   32.  CareDx now trades at just $8 per share – down from more than $90 per share at its

high.  The retirement funds that serve as Lead Plaintiffs in this case bring this action to recover the

retirement investments they lost as a result of Defendants' running "a house of cards" that was

"generating revenue through illicit conduct."

## II.  JURISDICTION AND VENUE

   33.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15

U.S.C. §§78j(b)  and  78t(a),  and  Rule 10b-5  promulgated  thereunder  by  the  SEC,  17

C.F.R. §240.10b-5.

   34.  This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331, §27 of the Exchange Act, 15 U.S.C. §78aa.

   35.  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), §27 of the

Exchange Act, 15 U.S.C. §78aa.  Substantial acts in furtherance of the alleged fraud or the effects of

the fraud have occurred in this judicial district.  Many of the acts and omissions charged herein,

including the dissemination of materially false and misleading information to the investing public,

1   and the omission of material information, occurred in substantial part in this judicial district as

2   CareDx is headquartered in this District.

3       36.     In connection with the acts, transactions, and conduct alleged herein, Defendants,

4   directly and indirectly, used the means and instrumentalities of interstate commerce, including the

5   U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

6   **III.    THE PARTIES**

7       **A.     Lead Plaintiffs**

8       37.     Lead Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police")

9   provides retirement and related benefits for qualified police officers and their beneficiaries in the

10  state of Oklahoma.  As of July 2022, Oklahoma Police had more than 10,000 active members and

11  retirees and more than $3 billion in assets under management.  As set forth in the certification filed

12  previously, incorporated by reference herein, Oklahoma Police purchased CareDx common stock

13  during the Class Period and suffered damages as a result of the federal securities law violations and

14  false and/or misleading statements and/or material omissions alleged herein.

15      38.     Lead Plaintiff Sheet Metal Workers Local 19 Pension Fund ("Local 19") provides

16  retirement benefits to approximately 40,000 active and retired employees in Pennsylvania, New

17  Jersey, and Delaware.  As of July 2022, Local 19 had approximately $500 million in assets under

18  management.  As set forth in the certification filed previously, incorporated by reference herein,

19  Local 19 purchased CareDx common stock during the Class Period and suffered damages as a result

20  of the federal securities laws violations and false and/or misleading statements and/or material

21  omissions alleged herein.

22      39.     Lead Plaintiff Local 353, I.B.E.W. Pension Fund ("Local 353") manages

23  approximately CAD $2.4 billion in assets on behalf of 13,000 active members, retirees, and

24  beneficiaries who are members of the International Brotherhood of Electrical Workers working in a

25  variety of electrical disciplines across central Ontario.  As set forth in the certification filed

26  previously, incorporated by reference herein, Local 353 purchased CareDx common stock during the

27  Class Period and suffered damages as a result of the federal securities law violations and false and/or

28  misleading statements and/or material omissions alleged herein.

40.     Lead Plaintiff Beaumont Firemen's Relief & Retirement Fund ("Beaumont Fire") provides benefits to approximately 420 active members and their beneficiaries in Texas.  As of July 2022, Beaumont Fire had approximately $120 million in assets under management.  As set forth in the certification filed previously, incorporated by reference herein, Beaumont Fire purchased CareDx common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.     Defendants**

41.     Defendant CareDx is incorporated under the laws of Delaware with its principal executive offices located in Brisbane, California.  CareDx's common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "CDNA."

42.     Defendant Peter Maag ("Maag") was CEO of CareDx from 2012 through November 2020 and Executive Chairman from November 2020 through October 2021.  Defendant Maag signed the Company's SEC filings in his roles as CEO and Executive Chairman.

43.     Defendant Reginald Seeto ("Seeto") has been CEO of CareDx since November 2020, when Defendant Maag transitioned to Executive Chairman.

44.     Defendant Ankur Dhingra ("Dhingra") was the Company's CFO from March 25, 2021 through his abrupt resignation on May 25, 2022.  As CFO, Defendant Dhingra signed the Company's SEC filings, including the April 15, 2022 Form 8-K alleged herein as containing false and misleading statements, and made numerous other false and misleading statements alleged herein during the Company's investor calls.

45.     Defendants Maag, Seeto, and Dhingra (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and investor conferences and calls. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew the adverse facts specified herein had not been disclosed to, and were being concealed from, the public

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 12 -

1    and the positive representations being made were then materially false and/or misleading.   The

2    Individual Defendants are liable for the false and misleading statements pled herein.

3        46.    The Company and Individual Defendants are collectively referred to as "Defendants."

4    **IV.    BACKGROUND TO THE FRAUD**

5        **A.    The Importance of Whistleblowers in Securities Markets**

6        47.    As long as governments have been paying for goods and services, sellers have been

7    defrauding them.  Because government enforcement alone cannot catch or prevent every instance of

8    fraud, the SEC has specifically emphasized that internal whistleblowers who come forward to report

9    wrongdoing are essential to protecting the interests of investors in the securities markets.

10   "Whistleblowers make a tremendous contribution to the agency's ability to detect securities law

11   violations and protect investors in the marketplace."[4]

12       48.    After a Congressional investigation during the Civil War revealed "'stupendous

13   abuses' in the sale of provisions and munitions to the War Department," Congress passed the False

14   Claims Act, which "imposes civil liability on any person who presents false or fraudulent claims for

15   payment to the Federal Government."  *United States ex rel. Polansky v. Exec. Health Res., Inc.*,

16   No. 21-1052, 599 U.S. ___, slip op. at 1-2 (June 16, 2023) (quoting H.R. Rep. No. 2, 37th Cong., 2d

17   Sess., pt. 2, p. II (1861)).  Civil plaintiffs may bring actions on behalf of the government and share in

18   the recovery of damages.  *Id*.  In addition to the False Claims Act, following the financial crisis of

19   2008-2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank")

20   created the SEC's current whistleblower program.  *See* 15 U.S.C. §78u-6.  Through the program,

21   those who come forward with information concerning violations of the securities laws are eligible to

22   receive compensation from the government in an amount between 10% and 30% of the ultimate

23   recovery or damages award the government collects as a result of the information provided by the

24   whistleblower.  *See id.*

25       Since the [whistleblower] program's inception, enforcement matters brought using
         information from meritorious whistleblowers have resulted in orders for nearly

26       $5 billion in total monetary sanctions, including more than $3.1 billion in

27   _____

     [4]   SEC Office of the Whistleblower 2021 Annual Report at 1 ("2021 Annual Report"),

28   https://www.sec.gov/files/owb-2021-annual-report.pdf.

1  disgorgement of ill-gotten gains and interest, of which more than $1.3 billion has
been, or is scheduled to be, returned to harmed investors.

2021 Annual Report at 2.

49.    Because whistleblowers may cause employers to lose ill-gotten revenue, whistleblowers face the threat of retaliation and may have trouble finding future employment in their industries.  The decision to come forward, therefore, is an extraordinarily fraught one; those who take their concerns to the government might be, in effect, ending their careers.  Incentive awards, as well as robust anti-retaliation provisions, are designed to compensate for that risk.  *See* 17 C.F.R. §240.21F-17(a) ("No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications.").  As of the end of 2021, the SEC had prosecuted four defendants for breach of its anti-retaliation rules. *See* 2021 Annual Report at 26 (so stating).

50.    Because the misconduct whistleblowers reveal is, by definition, material information not previously known publicly, whistleblowers frequently feature in subsequent securities fraud suits, in which investors seek to recoup the losses they have suffered as a result of that same misconduct.

**B.    Whistleblower Dr. Olymbios Is a Highly Credentialed Medical Doctor Whom CareDx Recruited from One of the Top Medical Facilities in the World**

51.    CareDx recruited Dr. Olymbios to join the Company on July 1, 2019.  Previously, Dr. Olymbios worked at the Heart Transplant Program of Cedars-Sinai Medical Center in Los Angeles - a world-renowned medical center and top-three heart surgery program in the United States.  Dr. Olymbios has also researched and published extensively on organ transplantation, and his work has been published in multiple highly respected medical journals, including the *American Journal of Transplantation*.  Dr. Olymbios has published 25 articles on organ transplantation, and his research has been cited in hundreds of other research works.  He also co-authored the international guidelines for the Management of Antibodies in Heart Transplant, an International Society for Heart and Lung Transplantation consensus document.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL           - 14 —
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

52.     Dr. Olymbios attended medical school in the United Kingdom at Imperial College London,[5] a highly ranked global university and a top global university for surgery.  He also trained at the Royal Brompton and Harefield Hospitals in London, which together make up the largest specialist heart and lung center in the United Kingdom.  Royal Brompton Hospital is consistently ranked among the top specialized hospitals in the world.  In short, Dr. Olymbios is a highly accomplished medical doctor with a record of success in medicine and business.

**C.     Defendants' "Very Hands-on and Detail-Oriented" Management Style and Their Praise and Rapid Promotion of Dr. Olymbios**

53.     CareDx paid Defendants Maag and Seeto millions of dollars in compensation to operate the Company's business during the relevant time.  They ran the business in a hands-on, detail-oriented manner and were involved in praising and promoting Dr. Olymbios up the corporate ladder.

54.     In connection with a lawsuit between CareDx and one of its primary competitors, Maag testified he was CEO and Chairman of the Company during the 2012-2021 period, prompting counsel to ask him: "did you **remain** heavily involved in the decision making at CareDx?"  Maag responded: "No, absolutely.  You know, I ***think it's very important, I think my team would call me being very hands-on and detail-oriented, so, yes, I was very involved.***"

55.     Maag was aware Medicare was the Company's most important revenue source.  Maag was asked a question about this point at trial in another case: "Did CareDx have to do anything to gain reimbursement for sales of AlloSure?"  Maag responded: "Yeah.  I would say that this was the pivotal study for us ***to get reimbursement from Medicare, which is the most important payer*** for this patient population."

56.     Maag also was personally involved in AlloSure marketing.  He testified at trial in another case that CareDx marketed AlloSure to "about 250, 300 transplant centers in the country" with "five to ten nephrologists per center."   Then asked: "Did ***you personally authorize the expenditures*** to educate the market on AlloSure?" Maag responded, "***Yes***.  You know, we have the

---

[5]    Natera re Olymbios PDF.

1    ***hiring of our field force and making sure that they have the materials available*** for them.  That

2    was in ***my oversight***."

3        57.    Starting at least by 2019, CareDx's executive team – led by Maag – was intensively

4    focused on marketing AlloSure.  Maag testified after Natera entered the market in early 2019, it was

5    "very important to understand that this [AlloSure marketing] was ***all hands-on deck***.  This [AlloSure

6    product] was ***the one product, the one growth driver*** for the company.  And somebody was

7    attacking our most important product."  During the trial, Maag was asked: "Did ***you*** monitor

8    AlloSure's performance in the transplant centers after [another company's] marketing campaign

9    commenced [in early 2019]?"  Maag responded: "***Yes***, absolutely.  I think ***we have a very detailed***

10   ***monitoring of the use of our product***."

11       58.    Maag stayed directly involved in marketing AlloSure during the relevant period.  As

12   Maag testified: "As I mentioned earlier, you know, this [AlloSure test] is our ***most important***

13   ***product***.  This is the ***most important activity***.  So ***I was intricately involved*** in making sure that we

14   have the resources allocated."  Further, when asked: "How did – in ***2019 through 2021***, what was

15   ***your role*** authorizing [marketing] expenditures to combat the loss of sales and information out

16   there?"  Maag responded: "As I mentioned earlier, you know, this [AlloSure test] is our ***most***

17   ***important product***.  This is the ***most important activity***.  So ***I was intricately involved*** in making

18   sure that we have the resources allocated."  And when asked: "Did ***you*** monitor AlloSure's

19   performance in the transplant centers after [another company's] marketing campaign commenced [in

20   early 2019]?" Maag responded: "***Yes***, absolutely.  I think ***we have a very detailed monitoring of the***

21   ***use of our product***."

22       59.    AlloSure accounted for ***90%*** of all sales and marketing costs, as Maag averred in

23   another case.  At trial, Maag was asked: "In terms of the percentage of the sales and marketing spend

24   that was for AlloSure as compared to the AlloMap product, did you give the breakdown?"  Maag

25   responded: "It's ***90 percent*** that we spend all of our activities on AlloSure.

26       60.    Maag and Seeto had detailed reporting available to them.  As Maag testified: "there's

27   numerous spreadsheets available for me within the company.  Like you just saw, one of the 10K that

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL        - 16 -
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

1    that is originally originated in a[n] Excel spreadsheet.  There are numerous spreadsheets available to

2    us."

3         61.    Shortly after the Company persuaded Dr. Olymbios to leave his work at Cedars-Sinai

4    Medical Center, in October 2019, senior management promoted Dr. Olymbios to a new position –

5    Head of Medical Marketing.  There, he reported to the Company's Chief Marketing Officer, Sasha

6    King.  Following his promotion, Dr. Olymbios was responsible for producing marketing materials,

7    planning and executing events, determining CareDx's marketing messaging, and producing recorded

8    materials designed to sell AlloSure to physicians.  In this role, Dr. Olymbios was also responsible for

9    training CareDx's field team, which required him to work closely with sales representatives, medical

10   science liaisons, patient care managers, and field representatives, who were responsible for engaging

11   in scientific discussions with healthcare practitioners in order to provide a deeper scientific

12   understanding of CareDx's offerings.

13        62.    Maag, Seeto, Dr. Olymbios, and other senior management were engaged in the details

14   of marketing AlloSure.  Maag testified in another case that he was involved in giving instructions to

15   the sales and marketing teams, and CareDx expended "*6 to $8 million for analysis*, planning,

16   execution, *engagement from the senior management to; direct* the field force."  Maag was also

17   asked *how* he knew so many details about the Company's sales and marketing activities during the

18   2019-2021 period.  Questioned: "In terms of these numbers that you provided, how did *you* know

19   this?" Maag responded: "You know, for example, the field force and the customer-facing activities, *I*

20   *am very clear*, they're responsible every quarter.  *We are managing the field force very detailed* call

21   planning, *where* do they go, *who* do they speak to, which transplant center do they go to.  So *I have*

22   *a very good understanding* of the resource allocation on these."

23        63.    Maag and Seeto helped create CareDx's marketing materials.  Regarding a marketing

24   document, Maag testified: "You know, this is where there are many, many people involved in

25   creation of those.  You have to think about that there's hundreds, *if not a thousand*, e-mails going

26   back and forth *between senior leadership team and the marketing team on creating such a*

27   *document*."  These and other facts show Seeto and Maag – as senior leadership overseeing

28   marketing – were ultimately responsible for the contents of the marketing materials CareDx used to

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 17 –

1  promote its products and services and whether and how to communicate those marketing materials

2  publicly.

3       64.    Maag, Seeto, and other senior executives at CareDx placed Medicare at the center of

4  their public marketing pitches.   In a two-page marketing document, for example, CareDx

5  prominently highlighted, in a bold graphic on the first page, that AlloSure was "FULLY COVERED

6  BY MEDICARE":




## 20 Years of Dedication to Transplant

The First and Only dd-cfDNA Test Developed
Specifically for Transplant Patients



PROVEN EXPERIENCE IN TRANSPLANT SPECIFIC cfDNA

**>40K** Patient Results Served

**>130** Centers Actively Using AlloSure

**14** Center Prospective Validation Trial

COMMITTED TO IMPROVING TRANSPLANT PATIENT OUTCOMES

**100%** of R&D Dedicated to Transplant Programs

**>50** Centers Participating in KOAR Registry

**>4,000** Patients Will be Included in KOAR and OKRA



FULLY COVERED BY MEDICARE



© 2019 CareDx, Inc. All service marks or trademarks are owned or licensed by CareDx, Inc. or its affiliates. All rights reserved. LK-10467 Rev 2  Effective 2019-12

26       65.    This marketing document and others like it provide a window into the way CareDx

27  senior management approached AlloSure – with "FULL[]" coverage by Medicare at the center of the

28  Company's marketing campaign.

66.     Further, in the above-mentioned legal action between CareDx and one of its main competitors, CareDx designated Dr. Olymbios to testify about the foregoing document and others like it.  In his testimony, Dr. Olymbios proved knowledgeable about the purpose of the marketing documents, their messages, and intended audiences.  With regard to a "two-page flyer" focused on AlloSure, for example, Dr. Olymbios testified:  "[t]he purpose of this flyer is to really counter some of the marketing claims that were being made around this time by [a competitor, Natera] on the [AlloSure competing test's] assay where they were saying that there were superior performance characteristics" when compared with AlloSure.  Dr. Olymbios further testified CareDx released or made the marketing document public in "January 2020."

67.     Dr. Olymbios further testified about the ways the CareDx marketing team was instructed to use the January 2020 marketing document – *i.e.*, the document touting AlloSure was "FULLY COVERED BY MEDICARE."[6]  Dr. Olymbios testified for CareDx:

> [T]his [marketing document] was instructed to – what we call not be a leave-behind, meaning that it wasn't to be left with anyone, rather used reactively in response to any discussion around Prospera with a salesperson or medical science liaison present to talk through, and really as *a visual aid for a discussion* rather than something to be left behind or distributed.

Dr. Olymbios' testimony is significant because it shows he was sufficiently senior at CareDx to know the details of Company-wide marketing strategies and practices.

68.     Maag and Seeto praised Dr. Olymbios' positive impact on the Company.  On February 19, 2020, for example, Maag praised Dr. Olymbios for the "tremendous impact" Dr. Olymbios had on the CareDx organization:

---

[6]     Dr. Olymbios' testimony focuses on the "FULLY COVERED BY MEDICARE" marketing document identified above, which CareDx marked confidential and then filed publicly.  The document was quoted at Dr. Olymbios' examination, "AlloSure Analyzes Transplant Specific SNPs Across 100% of Somatic Chromosomes," and the document itself provides at the top of the second page: "AlloSure Analyzes Transplant Specific SNPs Across 100% of Somatic Chromosomes."

**From:** Peter Maag <pmaag@caredx.com>
**Sent:** Wednesday, February 19, 2020 10:02:29 PM
**To:** Michael Olymbios <molymbios@caredx.com>
**Subject:** Reaching out

Michael,
I wanted to make sure that you know that I am fully supportive of what ever you decide to do. This goes beyond CareDx. Within a few months you had a tremendous impact in our organization. My only regret is that I have not had the chance to spend more time with you.
Go do - I have you back whatever you choose to do!
Peter

69.     The foregoing email suggests Dr. Olymbios was considering leaving CareDx at the time, and Maag wanted him to stay at CareDx.  Maag's email was well received:

**From:**     Michael Olymbios on behalf of Michael Olymbios <molymbios@caredx.com>
**To:**       Peter Maag
**Subject:**  Re: Reaching out
**Date:**     Thursday, February 20, 2020 10:10:00 AM

Dear Peter – I am humbled and touched that you would take the time to reach out. I am so proud that someone of your stature views me as valuable to the organization. I am a passionate person and I like to immerse myself in what I do. That being said, I am doubly passionate when I am able to be part of an organization that I so strongly believe in and truly share in its vision – which is very much the case at CareDx. I am in awe of what you have built in the CareDx we see today.

I have learned a great deal from you and Reg, and I too hope that I can spend more time with you as well. Of course, I understand your time is precious but I feel as though there is so much I could learn by being in your presence and in turn give back to CareDx.

█████████████████████████ I really appreciate that you have my back. I hope you also know that the same goes for me.

With best regards,
Michael

70.     Following Maag's praise of Dr. Olymbios, there are internal documents reinforcing the obvious: Dr. Olymbios was included in marketing and business strategy decisions at the highest levels.  On March 24, 2020, for example, the Company's Chief Marketing Officer, Sham Dholakia, emailed Dr. Olymbios about a draft paper the Company was developing for external marketing purposes.  Regarding the March 24, 2020 email, Dholakia was asked why he wanted Dr. "Olymbios to contribute to your strawman paper" – the "strawman paper" being an important draft marketing document focused on AlloSure – and Dholakia responded that he "wanted to share the ideas within the group about how people were feeling."  This shows Dr. Olymbios' medical views were valued at the highest levels of the Company along with his commercial expertise.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 20 -

71.     More internal communications show how senior management focused on investors' responses to the Company's marketing and AlloSure business strategy and how senior management included Dr. Olymbios in its inner circle.  Following the April 30, 2020 quarterly call, for example, Seeto internally circulated analysts' positive commentary to CareDx's Business Leadership Team, including Dr. Olymbios.   The analysts' report commented on CareDx's quarterly results: "Importantly, management called out weekly volumes nearly reaching pre-COVID levels from earlier in the year at this point, implying volume recovery has been material.  ***With RemoTraC now accounting for more than 50% of daily volume vs 10% prior, the company has shown an ability to adapt***." "***Strong Buy***."

72.     Seeto's April 30, 2020 email to Dr. Olymbios and others circulating the positive RemoTraC coverage stated: "***Congrats All***"

73.     On ***May 1, 2020***, Dr. Olymbios responded:

| | |
|---|---|
| **From:** | Michael Olymbios [molymbios@caredx.com] |
| on behalf of | Michael Olymbios <molymbios@caredx.com> [molymbios@caredx.com] |
| **Sent:** | 5/1/2020 9:30:00 AM |
| **To:** | Reg Seeto [rseeto@caredx.com] |
| **Subject:** | Re: Fyi. CDNA \| COVID-19 Changes the Base, but Not the Growth Story |
| **Attachments:** | 43dd0d44-0e34-4408-8ece-bab2c752e01f@bluematrix.png |

Congratulations Reg. At Mitsubishi, I was taught that a rising tide lifts all the boats and only during times of crisis can we differentiate top performing management teams. I feel privileged to work under you as a masterful strategist and executive. Getting us back to pre-COVID numbers within such a short space of time is miraculous.

74.     ***That very day***, – May 1, 2020 – Maag and Seeto promoted Dr. Olymbios.  They elevated Dr. Olymbios to the most important commercial position in the Company – second only to their own positions.  Specifically, they promoted Dr. Olymbios to be the Head of Community Nephrology and required Dr. Olymbios to continue his responsibilities as a member of the Business Leadership Team.  Dr. Olymbios, in his new position, oversaw the teams responsible for: (1) ***selling AlloSure*** to community nephrologists working in transplant centers, community hospitals, private clinics, and healthcare systems; and (2) overseeing the ***clinical studies of AlloSure***.

75.     The timing of the May 1, 2020 promotion to run the AlloSure sales and clinical businesses is important because, by May 1, 2020, the newly launched AlloSure delivery project,

RemoTraC, had been up and running for six weeks.  That Dr. Olymbios was trusted to run the nephrology testing business lends credence to his later statements denouncing the illegality of the RemoTraC scheme to defraud Medicare.

76.    Internal Company communications demonstrate that Defendants Maag and Seeto personally were involved in training the Company's sales and marketing personnel alongside Dr. Olymbios and that Dr. Olymbios was part of the "Leadership Team" with Maag and Seeto.

> **From:** Greg Quinn <gquinn@caredx.com>
> **Date:** Friday, October 2, 2020 at 16:07
> **To:** Michael Olymbios <molymbios@caredx.com>, Sham Dholakia <sdholakia@caredx.com>, Peter Maag <pmaag@caredx.com>, Reg Seeto <rseeto@caredx.com>, Jay Milton <jmilton@caredx.com>
> **Cc:** Ashley Harris <aharris@caredx.com>
> **Subject:** FW: Thank you!
>
> Leadership Team,
> Thanks so much for your support this week at training week...it was really impactful and meaningful to the new hires – see below.
>
> They are certainly setup for success, now it is time to execute!
>
> Thanks Ashley for coordinating a tremendous week!
>
> ----
>
> **Greg Quinn** | Senior Vice President—Testing Services
> **CareDx, Inc.** | *Your Partner in Transplant Care*
> Email: gquinn@caredx.com | Mobile: +1 925.209.0963 | Phone: +1 415.287.2542 | www.CareDx.com

77.    The Leadership Team – comprising Dr. Olymbios and Defendants Maag and Seeto – helped train the Company's marketing and sales executives ("TASs" or "Transplant Account Specialists," in Company jargon).

78.    FE-19, who worked closely with, and reported directly to, Defendant Seeto during his tenure as CEO, said Defendant Seeto had a very hands-on management style, just as Defendant Maag had.  He said Seeto was the type of person who, if he recognized any risk, would have been hands on and requested daily updates.  For example, he described weekly "Business Leadership Team" meetings Seeto and other executives attended, at which Seeto would have in-depth reasons for upticks in testing volume in a particular week, month, or quarter.  FE-19 attended these Business Leadership Team meetings himself and even ran some of them.

79.    FE-19 said Seeto also had regular meetings with the senior CareDX employees who had oversight of billing, including Elsie Garza (Senior Director of Revenue Cycle Management),

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 22 -

1  Savita Devlin (Project Manager), and Alex Johnson (Chief Business Officer and Head of Testing

2  Services).

3         80.    FE-19 also noted Defendant Dhingra was unusually involved in the Company's

4  business for a Chief Financial Officer.  He said Dhingra, like Seeto, knew what was going on in all

5  aspects of the Company's business and was involved in managing the Company's market access

6  team, even though this had nothing to do with his official duties as CFO.

7  **V.     THE UNDERLYING FRAUDULENT SCHEME**

8         81.    While CareDx and its leadership were publicly touting RemoTraC and the strength of

9  the Company's AlloSure testing business to investors in order to sell them stock, behind the scenes

10 the Company was engaged in an undisclosed scheme and fraudulent course of conduct.  Defendants

11 plied medical professionals with illegal incentives to influence them to order medically unnecessary

12 AlloSure tests costing $2,841 each, and also surreptitiously bundled medically ***unnecessary***

13 AlloSure blood draws with "standard of care" blood draws that ***were*** medically necessary and cost

14 $22 each, performed by ***other*** Companies (such as Quest) and not by CareDx.  The scheme was

15 confirmed not only by Dr. Olymbios (as described above) but by numerous other former employees

16 with relevant direct firsthand knowledge of Defendants' fraud.

17       **A.    CareDx's Most Important Payor, Medicare, Placed Strict Limits on**
             **the AlloSure Bills for Which CareDx Could Seek Reimbursement –**
18              **Only Those with "Clinical Suspicion" of Organ Rejection *Before***
             **Administering AlloSure**
19

20        82.    CareDx relied on payments from Medicare to grow revenue during the Class Period.

21        83.    CareDx made a few, non-standard blood tests that – like other, standard tests that

22 other companies made – tested transplant patients' blood for indications that the patient might be

23 rejecting an organ.  The Company's testing services business line represented at least 85% of its total

24 revenues since the beginning of 2020.  The Company's financial success in this regard relied

25 primarily on a single blood test – AlloSure Kidney – which is designed to detect signs of kidney

26 transplant rejection by measuring levels of donor DNA in the recipient's bloodstream.  As Defendant

27

28

1    Maag testified in a separate litigation, he spent 90% of the Company's marketing budget on

2    AlloSure – "*the one product, the one growth drive[r] for the company,*" as Maag put it.[7]

3    84.    CareDx's testing services business in turn relied heavily on payments from the

4    taxpayer-funded medical program Medicare, which represented as much as 70% of the Company's

5    testing services revenue, and as much as 60% of the Company's overall revenue, during the Class

6    Period.   Medicare was critical to CareDx's testing business for several reasons.   Indeed, as

7    Defendant Maag himself averred during trial testimony in the CareDx-Natera litigation, *Medicare*

8    was "*the most important* payer for this [AlloSure] patient population."

9    85.    However, Medicare ostensibly only agreed to reimburse patients' AlloSure tests on a

10   "conditional" basis.  Specifically, under the applicable Centers for Medicare & Medicaid Services

11   ("CMS") regulations, CareDx's AlloSure Kidney test was *only* "covered to assess the probability of

12   allograft rejection in kidney transplant recipients *with clinical suspicion of rejection* and to inform

13   clinical decision-making about the necessity of renal biopsy *in such patients* at least 2 weeks post-

14   transplant in conjunction with standard clinical assessment."[8]   In other words, Medicare would

15   reimburse CareDx's flagship AlloSure Kidney test *only if* a doctor had already determined that a

16   patient had other warning signs of potential transplant rejection.   Medicare would *not* reimburse for

17   the AlloSure Kidney test if it was used merely as a regular, periodic surveillance test for ordinary

18   transplant recipients who did not show other warning signs or rejection.

19   86.    Maag has given testimony that he and other senior leaders trained the Company's

20   salesforce.  He said "that you call in all of the field force, have a costs; training, and have a face-to-

21   face interaction with them, making sure that they know exactly how to use that material."  Maag

22   testified:

23       [A]ll these 25 individuals live in different places in the United States because they
         live in – close to the transplant centers; so they are scattered all over. *And when you*
24       *train them, we bring them all together.*

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [7]    Defendant Maag and other CareDx executives testified at trial in April 2022, in *CareDx, Inc. v.*
26   *Natera, Inc.*, C.A. No. 19-662 CFC, ECFs 344-6, 367-8 (D. Del.) ("CareDx-Natera Litigation").  The
     litigation primarily concerned claims and counterclaims between the two companies regarding
27   alleged false advertising.

     [8]    *See* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=38355.
28

If we do that for just one evening or a day, it'll be at a Chicago airport where everybody flies in very centrally, or when it becomes so important because this [*AlloSure test*] was – *again, I just have to stress, this was the inner making of the company.* This was our lead product, our biggest gross product.

So *we bring them in for a two-day meeting* and spend two days with them. Some of them have to fly in earlier because of the time zone, and so this becomes a significant expense for *us to train* these 25 employees.

Then in addition, *obviously*, people *from headquarters will fly into these meetings* as well. So very quickly, there's our meetings with 35, 40 people in the central location in a hotel in the United States.

87. Emails corroborate Maag's testimony about his personal role in training salespeople. On October 2, 2020, for example, a CareDx salesperson wrote about a "great week of training" wherein "the entire leadership team was present." This was uncommon in the industry:

From: Sarah James <sjames@caredx.com>
Sent: Friday, October 2, 2020 1:02 PM
To: Greg Quinn <gquinn@caredx.com>
Subject: Thank you!

Hi Greg,

Thank you for such a great week of training! I am more enthusiastic than ever about our offering and already making waves in my territory. The future is bright!
In all of my years in medical sales, I have never been to a training where the entire leadership team was present. Seriously, it was truly amazing to have you all there. It made us feel fully supported and welcomed. Thank you! I truly feel at home at CareDx and so incredibly grateful to be here!

Sarah James, RN, BSN | Transplant Account Specialist - Community Nephrology
CareDx, Inc. | *Your Partner in Transplant Care*
Email: sjames@caredx.com | 415-287-2300 x5273 or cell 415-238-9569 | www.CareDx.com

88. It is important that the "entire leadership team" was present at sales trainings – consistent with Maag's own testimony on this subject – because of the substance of the training itself. Substantively, and with regard to RemoTraC in particular, FE-2[9] observed that "if a center that I was dealing with wanted a RemoTraC, the only way [CareDx] would send out one of our groups of phlebotomists was if they also did the AlloSure." According to FE-2, this was routinely discussed during the regular *weekly regional meetings* involving the sales, research, and laboratory

---

[9]    FE-2 worked as a Lead Clinical Research Associate during the second half of 2021 and is a registered nurse. FE-2's responsibilities included creating, distributing, negotiating, and reviewing essential regulatory documents, including informed consent forms. To do so, FE-2 worked with CareDx's cross-functional legal partners on clinical trial agreement negotiations. In addition, FE-2 attended weekly Zoom calls with sales teams and medical screening teams.

teams attended by FE-2 and others. As Dr. FE-1[10] explained: "The **nurses were obligated** to not only do the screening labs but our AlloSure test" – "**sales drove everything**," the medical doctor explained. Other former employees provided similar detailed facts that sales personnel required **both** "standard of care" testing **and** AlloSure testing at the same cadence, notwithstanding the fact, as Dr. FE-1 explained, that patients were having AlloSure testing done monthly (with the standard tests) even though there was **no medical reason** for the AlloSure test to be done at all, much less monthly. "Even on the clinical side, **sales pushed** what labs should be done and how often," Dr. FE-1 observed.

89. The fact that **sales pushed AlloSure** tests that were not medically necessary "to make money" (per FE-2 and others) is significant because **Maag, Seeto and other senior leaders pushed sales**. In other words, facts link Maag, Seeto and other senior leaders to the unlawful conduct at issue: namely, pushing salespeople to push sales of medically unnecessary AlloSure tests knowing (or recklessly ignoring the fact) that the vast majority of those bills would be presented to Medicare for payment – payment to which the Company was not entitled, but collected anyway. Or, as Dr. Olymbios succinctly wrote, the Company was "generating revenue through illicit conduct." Even though Dr. Olymbios point-blank told Maag and Seeto about this illicit conduct, they "brushed off" his concerns or "berated" him for one simple reason: the illicit conduct was their idea.

**B.    With Its Business Model Threatened by COVID-19, CareDx Develops RemoTraC – a Home Blood Testing "Miracle" – and Purportedly Rescues CareDx's Revenue Growth Story**

90. As COVID-19 increasingly shut down many medical services in the United States, transplant volumes began to decline, as immunocompromised patients avoided hospitals and delayed medical procedures. Even patients who had already received transplants – also typically immunocompromised – avoided non-essential medical tests and treatments. Accordingly, analysts and investors grew increasingly concerned that CareDx's growth would correspondingly halt.

---

[10]    Dr. FE-1 worked at CareDx from May 2021 through January 2022 as a Senior Medical Science Liaison. Dr. FE-1 reported directly to the Company's Chief Medical Officer, Sham Dholakia, for a period of time and then indirectly through Dr. Grigoriy Shekhtman, another senior executive, to Dholakia. Dr. FE-1 chose to leave CareDx because of its unethical practices. The genders of certain confidential former employees discussed herein have been changed to male to protect their anonymity.

91.     In order to assuage investor concerns, CareDx reacted quickly, rushing in a mere matter of days to develop a new home blood testing (or "mobile phlebotomy") program it dubbed RemoTraC.  As Defendant Maag would later claim in a June 2020 earnings call, RemoTraC was born "out of . . . necessity" and inspired by "a phone call at midnight from a transplant center in New York, [that] said, 'Peter, how can I continue to support our transplant patients as they cannot come into Manhattan and visit our transplant center?'":

> And so the CareDx team came in and said, "How can we provide mobile phlebotomy services to these patients that are now need their regular surveillance visit?"  And we constructed an offering where we're not only testing AlloMap and AlloSure, but we are also testing all blood-based information required by that center and provide that back by a mobile phlebotomy or a home blood draw solution called RemoTraC.  And within [a] very short period of time, 150 transplant centers had the same issues, and we were partnering with them to provide this mobile phlebotomy service.

92.     As discussed below, propelled by RemoTraC's apparent success, CareDx's stock price skyrocketed to an all-time high of $95.60 per share on June 28, 2021 – *an increase of more than 330%* over its price of approximately $22 per share at the beginning of the COVID-19 pandemic.  The Individual Defendants took full advantage of the stock price inflation from their fraud, with Defendants Maag and Seeto alone selling more than $30 million worth of CareDx stock combined.

## C.     CareDx Relied on Rampant Medicare Billing Fraud and Illegal Kickback Schemes to Boost Its Testing Services Revenue

93.     While Defendants attributed CareDx's financial success to demand for its testing services and the popularity of its RemoTraC home testing program, in reality, CareDx's testing services growth relied almost entirely on illegal schemes to bill Medicare fraudulently for unnecessary tests and pay kickbacks to doctors.  Among its many illegal and improper practices, Defendants took advantage of its RemoTraC home testing program to systematically push its expensive AlloSure tests – each of which cost Medicare $2,841 – on patients who did not need the test and did not meet Medicare's criteria for receiving them.  CareDx brazenly administered and billed Medicare for these tests as often as *once a month for each patient* when most of those patients showed *no signs of organ rejection* and thus had no approved medical indication for them

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 27 –

1  whatsoever.  In so doing, CareDx was able to bill Medicare *tens of thousands of dollars per year* for

2  each of these patients without any justification.

3  94.    CareDx achieved this end in large part by bundling its AlloSure tests with a panel of

4  routine blood tests that it would offer in-home, through mobile phlebotomists (many of whom were

5  being paid illegal kickbacks for each blood draw they took).  Defendants then engaged in

6  obfuscatory and improper requisition and billing practices to get approval and to bill Medicare for

7  the unnecessary tests.

8  95.    Further, Defendants engaged in a widespread scheme of paying kickbacks to

9  phlebotomists in exchange for blood samples, and plying doctors with lavish gifts, trips, and dinners,

10  to promote enrollment in AlloSure, meanwhile failing to report any of these payments in violation of

11  the Sunshine Act.[11]  In addition, Defendants bribed doctors to enroll their Medicare patients in large

12  scale studies that CareDx then illegally used as a pretext to bill Medicare for even more unnecessary

13  tests.

14    1.    **CareDx Improperly Bundled Its AlloSure and AlloMap Tests
              into Its RemoTraC Home Testing Program in Order to**
15    **Illegally Bill Medicare for Thousands of Unnecessary Tests**

16  96.    According to CareDx, "because of his job duties and responsibilities, Dr. Olymbios

17  had direct and frequent interactions with the highest level-executives at CareDx."  One high level

18  executive (FE-11), who reported directly to a C-Suite executive from 2019-2021, has confirmed that

19  Dr. Olymbios had been "*vocal*" in voicing his observations that the Company was unlawfully billing

20  Medicare for medically unnecessary tests, including by telling FE-11 about the misconduct; but, as

21  FE-11 explained, no one took any action in response to the concerns Dr. Olymbios was expressing

22  because "*we were all terrified for our jobs*."  Another former employee, FE-[19], who reported

23  directly to CEO Seeto and worked closely with him, confirmed employees had a real reason to be

24  afraid.  He explained that, after CareDx came under government investigation in late 2021, his friend

25

26  [11]   The Physician Payments Sunshine Act section of the Patient Protection and Affordable Care Act
         of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, also known as

27  the "Sunshine Act," required CareDx to report any payments or transfers of value to physicians and
    other medical providers to regulators and also required public disclosures of those payments in a

28  public database.  CareDx systematically failed to abide by the Sunshine Act.

1   and colleague, Erin Tokunaga, confided in him "*that she was being bullied[,] intimidated, and*

2   *coerced to not provide information or misreport information on the DOJ investigation*."

3   Tokunaga was in charge of the Company's clinical trial management and reported directly to CMO

4   Dholakia.  FE-[19] said that management "put a lot of mental pressure on her" and that "*[t]he*

5   *pressure was so pervasive . . . .  She said that she was going to hire her own attorney*.  She

6   mentioned this multiple times to me."[12]

7       97.     According to Dr. Olymbios and based on his personal knowledge, CareDx "used what

8   it represented to be clinical tests to bill Medicare for [AlloSure]" even as "[m]ultiple nephrology

9   practices *expressed serious reservations* about this practice as a violation of Medicare billing

10  requirements, and CareDx employees *internally flagged this practice as impermissible*."

11  Dr. Olymbios reported these concerns to "*more than ten other current or former CareDx*

12  *employees, including Peter Maag*, then the Chief Executive Officer for CareDx, *and Reg Seeto*, the

13  current President and Chief Executive Officer of CareDx."  According to Dr. Olymbios, the senior

14  "CareDx executives *brushed off his concerns or berated him for raising them in the first place*"

15  and "*repeatedly ignored or actively quashed any internal concerns about its activity*" until he

16  finally resigned in late 2020.

17      98.     Similarly, Dr. FE-1, who worked for CareDx as a Senior Medical Science Liaison

18  until he resigned in January 2022, raised concerns about this scheme with his supervisor,

19  Dr. Grigoriy Shekhtman, but Dr. Shekhtman told Dr. FE-1 that CareDx needed to engage in these

20  practices in order to meet its goal of maximizing the number of AlloSure tests drawn.

21  Dr. Shekhtman *reported directly to CareDx Chief Medical Officer Dholakia*, who attended sales-

22  and marketing-related meetings with a team (internally called the "Braveheart" team) that included

23  Defendants Maag, Seeto, and others.  Dr. FE-1 also reported his concerns to the Company's top

24  compliance attorney, Clarice McCauley, whom the Company hired in early 2021.  Dr. FE-1 noted

25  McCauley "was having an uphill battle and *CareDx did not want to be compliant*."  McCauley quit

26

27

28  _____
    [12]   Tokunaga died in January 2022.

1  CareDx less than a year after beginning this "uphill battle," though she had worked for her prior lab

2  diagnostics employer for more than 16 years before joining CareDx.

3       99.    Dr. FE-1[13] has independently confirmed that CareDx used its RemoTraC program to

4  foist unnecessary and costly AlloSure tests on transplant patients who had not shown any need for

5  them and that CareDx effectuated the scheme by improperly bundling the tests with routine and

6  inexpensive surveillance blood tests.  As Dr. FE-1 explained, the ostensible purpose of at-home

7  testing was to make it easy for immunocompromised transplant patients to get routine blood tests

8  without having to visit medical facilities.

9       100.    However, as Dr. FE-1 explained, CareDx illegally exploited this situation: "They

10  were doing the very expensive CareDx labs on the *same cadence* of the home labs," which "was

11  *totally unethical* the way that they were doing it and it was clearly wrong."  Dr. FE-1 explained that

12  CareDx would arrange a blood draw for these standard-of-care tests (which were otherwise

13  inexpensive and unprofitable for the Company) *only if* AlloSure tests were also being ordered.

14  Dr. FE-1 explained: "We were doing tests that cost *at least 8X* of what they should have been *and*

15  *on patients that did not need these tests*."  Indeed, Dr. FE-1 personally reviewed numerous patient

16  records and discovered that expensive AlloSure tests were being ordered *on a monthly basis* for

17  patients who had *no* indications for the test – *i.e.*, patients who had shown no warning signs of

18  transplant rejection, meaning there was *no medical reason* for the test to be performed at all, let

19  alone monthly.  Dr. Olymbios personally witnessed the same conduct: he observed that CareDx

20  "used what it represented to be clinical tests to bill Medicare for the [AlloSure] tests."  Dr. Olymbios

21  personally witnessed that CareDx increased the volume of unnecessary tests for which it billed by

22  "pushing a 'surveillance' protocol for AlloSure through inaccurate marketing materials" – in other

23  words, pushing for regular testing of patients who did not even meet medical criteria for receiving

24  *one* test.

25  _____

[13]  Dr. FE-1 worked at CareDx from May 2021 to January 2022 as a Senior Medical Science

26  Liaison.  Dr. FE-1 reported directly to the Company's Chief Medical Officer, Sham Dholakia, for a period of time and then indirectly through Dr. Grigoriy Shekhtman, another senior executive, to

27  Dholakia.  Dr. FE1 chose to leave CareDx because of its unethical practices.  The genders of certain confidential former employees discussed herein have been changed to male to protect their

28  anonymity.

101.    Concerned by what he was seeing, Dr. FE-1 began asking other employees why AlloSure was being ordered every month and was told that the requisitioning doctors simply wanted the patients' routine kidney labs drawn, that CareDx would not allow this to happen without performing the AlloSure test as well, and that many doctors were simply relieved that their patients could get the routine tests at home and/or didn't fully understand that the bundled AlloSure test was something markedly different from the routine tests it was bundled with.  As Dr. FE-1 explained: "The **nurses were obligated to not only do the screening labs but our AlloSure test**" as well, and the "doctors [in the field] liked using [CareDx's blood-drawing] service but **there was no way to use us without ordering our test as well**."  Dr. FE-1 recalled that doctors receiving the results of the AlloSure test did not even understand what the AlloSure results meant and were ordering AlloSure only because they had to do so in order to complete the other home tests.

102.    CareDx got away with the scheme by deliberately obscuring from patients and doctors that the AlloSure test was being performed, instead portraying the blood testing being done as "routine" screening.  CareDx's marketing materials often described RemoTraC as providing "a standard panel of routine tests" **without even mentioning AlloSure**.  In other cases, CareDx failed to explain AlloSure's purpose or for what conditions Medicare would cover it, instead misleadingly describing it as a "routine" or "surveillance" test.  Indeed, Dr. FE-1 specifically explained how prevalent and disguised this practice was: "**I never once sat down with a physician to discuss [the patient's AlloSure results] and the doctor had actually knowingly ordered it.  CareDx flipped AlloSure in**."

103.    As Dr. FE-1 put it, CareDx was "bundling in AlloSure just to bill for it which was totally inappropriate.  They were doing this way too many times in a patient population that it was not validated in."  Dr. FE-1 explained that this practice occurred because "**sales drove everything**" at CareDx, including how often patients should get their blood drawn for labs.  "Even on the clinical side, sales pushed what labs should be done and how often," Dr. FE-1 observed.

104.    Lead Clinical Research Associate FE-2 explained, "**the only way to make money** [was] to also carry out an AlloSure test with each RemoTraC blood withdrawal patient visit."  FE-2 gave details regarding the scope and purpose of the RemoTraC program: FE-2 "knew that if a center

that I was dealing with wanted a RemoTraC, ***the only*** way [CareDx] would send out one of our groups of phlebotomists was if they also did the AlloSure." According to FE-2, this was ***routinely discussed during the regular weekly regional meetings involving the sales, research, and laboratory teams*** attended by FE-2 and others. FE-2 further explained that the internal meetings were usually led by a regional or territorial sales manager and were attended by one or two regional sales representatives, one medical science liaison, one or two laboratory representatives or managers (responsible for home-draw setups, dispatching collectors, and on-site training), and one clinical research associate. AlloSure is not a standard, routine blood test. To the contrary, Medicare guidelines state that AlloSure is medically necessary only "to assess the probability of allograft rejection in kidney transplant recipients with clinical suspicion of rejection and to inform clinical decision-making about the necessity of renal biopsy in such patients at least 2 weeks post-transplant in conjunction with standard clinical assessment." FE-2 ultimately left CareDx because of serious concerns with CareDx's widespread misconduct; as FE-2 put it, "***the scientific quality and ethical integrity did not exist at the company's leadership positions***."

105.    As a former Senior Regional Clinical Research Associate FE-3[14] explained, CareDx was not in the mobile blood-drawing business. Rather, the Company was in the AlloSure business. So RemoTraC was pitched as a program where "we can do the ***standard of care*** blood tests," but in reality, "***we are not going to go to their homes and just do the standard of care***" but would also have to include AlloSure or other expensive tests, unbeknownst to patients and often unbeknownst to doctors as well. FE-3 also recalled that, in spite of being in the clinical side of the business, he had surprisingly frequent interactions with sales representatives at CareDx-indeed more frequently than at any other company for which FE-3 had worked. As FE-3 explained: "***Usually clinical operations and sales are two completely different sides of the business, and they should not be interacting. This raised an eyebrow on why the clinical operations folks are working closely with the sales***

---

[14]    FE-3 was a Senior Regional Clinical Research Associate for CareDx from December 2019 to October 2020. He was responsible for reviewing and managing documents relating to the Company's clinical trial agreements.

1   *folks*?" FE-3 emphasized: "Sales and marketing should have been completely separate from clinical

2   operations."

3       106.    FE-3 explained there "were things . . . that I could tell that I was not comfortable

4   with.  That was the reason why I and several others have left that company."  For example, FE-3

5   recalled one of the last meetings he attended: a July 2020 remote meeting with officials from Baylor

6   University Medical Center in Texas, which Dr. Olymbios also attended.  At the meeting, Baylor

7   University personnel clearly "rais[ed] concerns about [CareDx's] Medicare billing."

8       107.    Reimbursement Specialist FE-4[15] further corroborated Defendants' systematic

9   Medicare misconduct in its RemoTraC program.  FE-4 understood that, when COVID-19 hit,

10  CareDx quickly moved to home testing, and FE-4 heard that AlloSure was bundled together with

11  other blood tests as part of CareDx's new mobile phlebotomy service to promote and induce

12  physicians to order AlloSure.

13      108.    Dr. Olymbios and other former employees also confirmed that CareDx enabled its

14  scheme by obfuscating its approval and billing practices to avoid scrutiny (at least until federal and

15  state regulators caught on).  For example, while CMS required a doctor to determine that tests like

16  AlloSure were "medically necessary" under CMS regulations (which required "clinical suspicion of

17  rejection" for the test to be reimbursed), Dr. Olymbios averred that CareDx "*intentionally excluded*

18  *from the test requisition form a field where a physician could indicate the reason why the test was*

19  *medically necessary*," so that the Medicare personnel handling reimbursement would not be

20  immediately tipped off that medical necessity was required, and was not actually extant, for the

21  particular test.

22      109.    FE-5,[16] a former CareDx Senior Product Manager, explained how CareDx further

23  obfuscated its improper Medicare billing using an entirely paper-based claim submission system,

24  which he said made tracing claims virtually impossible.  FE-5 was intimately familiar with these

25

26  _____
    [15]   FE-4 worked for CareDx in San Francisco, California from June 2016 to June 2021 as a
    Reimbursement Specialist and was responsible for client billing, eligibility, and prior authorizations.

27  [16]   FE-5 worked for CareDx as a Senior Product Manager from August 2020 to October 2021. He
28  reported to Amitabh Shukla, CareDx's Senior Vice President Technology.

problems because he oversaw the Company's digital transformation of its revenue cycle management – a system the Company had previously lacked.  FE-5 explained that "Medicare was our biggest payor, and they needed a trace of all the paper evidence [of claims].  If you didn't have digital evidence, you needed to provide paper evidence."  FE-5 said that any such evidence, however, was obscured in "hundreds and hundreds of boxes" of paper, and that even the Company's test orders for patients were all in paper – a "*huge red flag" for Medicare*.

110.    Observations by FE-10 also corroborate the Company's practice of overbilling Medicare for AlloSure tests that were not medically necessary and that the Individual Defendants knew it.[17]  FE-10 worked in medical billing and claim reimbursement for several years prior to working at CareDx.  FE-10 observed CareDx had a large number of charges that were "pending charges" for patient tests – *i.e.*, charges that had still not been reimbursed or paid.  Some of these outstanding unpaid charges were between $90,000 and $120,000 per patient – amounts he said he had never heard of in his *15 years* in the industry.  These were pending Medicare bills that Medicare had refused to pay because it did not find them to be medically necessary.  Many of these charges had been "pending" and had gone unpaid for *years*.  FE-10 reviewed these files, and they had been repeatedly deemed to be not medically necessary by Medicare, Medicaid, and insurance companies such as Blue Cross Blue Shield, United Healthcare, and others.  FE-10 explained: "The patients that I reviewed at CareDx were *getting these expensive AlloSure* and [other] tests *every other week*." FE-10 had not seen so many expensive tests done like this in his 15 years of medical billing experience.

111.    FE-10 had access to the denial reasoning for each claim by Medicare and insurance companies.  The denial was always that the AlloSure and/or AlloMap test(s) were not medically necessary and that CareDx did not provide enough evidence to support that these tests were medically necessary.  He indicated that after the claims went through physician review processes,

---

[17]    FE-10 worked as a Claim Reimbursement Specialist for CareDx at its corporate headquarters from October 2022 to March 2023 and was responsible for claim reimbursements, which involved speaking directly to patients, the Company's billing department, and outside insurance companies.  Although he joined the Company near the end of the Class Period, he was largely dealing with unpaid claims for tests done during the Class Period, many of them years old.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 34 –

1   *90% of the claims were rejected again*.  FE-10 added: "The CareDx physicians were not able to

2   back up their claims that these tests were medically necessary."  He said that he had extensive

3   experience in both pharma and medical billing and that, in his experience, claims rarely get to the

4   point where such an intensive level of physician review of claims was needed.  He had never

5   experienced this until working at CareDx.  Specifically, he commented: "*I was shocked* to see a lot

6   of cases where the physicians had to be in contact with each other.  There were three other steps

7   where a claim was denied before it was made to the physician, and they were still denied at the

8   fourth step.  *That rarely happens in medical insurance*."

9          112.    FE-10 further indicated *90% of CareDx's patients were getting tested at least every*

10  *month with their expensive tests*.  He spoke to several patients about their bills, and they expressed

11  frustration and did not understand why they had been administered so many CareDx tests and billed

12  for them.  This corroborated other former employees' and Dr. Olymbios' observations that CareDx

13  was performing unnecessary $2,800 blood tests without patients' knowledge.  FE-10 asked the

14  Director of Claims why the patients were having the tests done so frequently; the Director of Claims

15  *brushed him off* and told him to just keep doing his job.

16         113.    FE-10 also observed it was well known throughout the Company that they were

17  experiencing so many claims being denied for lacking medical necessity.  FE-10 explained the

18  Company had regular meetings on the issue, and "*[t]he CEO [Defendant Seeto] and everyone knew*

19  *about it*."  FE-10 further indicated it was well known that 50% of the tests that they administered

20  were not reimbursed.  He said the Claims Department had meetings every Friday about their

21  reimbursement rates and concerns about getting paid.  He added: "Everyone knew that they

22  [CareDx] were not getting paid on 50% of their AlloMap and AlloSure tests."  *FE-10 also observed*

23  *the Director of Claims and Seeto often talked about the 50% reimbursement rate with the tests*.

24  FE-10 explained the percentage was so high that everyone knew.

25         114.    FE-11 similarly observed facts showing the Individual Defendants' awareness that the

26  Company was billing Medicare for tests that were not medically necessary during the Class Period.

27  FE-11 worked in a marketing role from August 2019 to April 2021 and reported to a C-Suite

28  executive.  FE-11 noted: "*To be honest, [Dr. Olymbios] told me his concerns*" about CareDx's

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL        - 35 -
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

1  billing practices while both Dr. Olymbios and FE-11 had been employed at CareDx.  To that point,

2  FE-11 said **Dr. Olymbios had been "vocal about"** his concerns about the billing practices.  To

3  FE-11's knowledge, no one he knew took any action in response to Dr. Olymbios' concerns because

4  "**we were all terrified for our jobs**."  FE-11 explained that Dr. Olymbios had "know[n] it all" with

5  regard to the billing issues, adding that Dr. Olymbios had been close to Defendant Seeto and

6  CareDx's other former CEO.

7         115.  FE-19, who reported directly to Defendant Seeto and worked closely with him, also

8  confirmed that Defendant Seeto was fully aware of billing practices at the Company and any issues

9  they caused.  For example, Seeto had regular meetings with the individuals who had oversight of

10 billing, including Elsie Garza (Senior Director of Revenue Cycle Management), Savita Devlin

11 (Project Manager), and Alex Johnson (Chief Business Officer and Head of Testing Services).  FE-19

12 recalled that some of these meetings specifically concerned problems relating to getting "prior

13 authorization" from doctors for the AlloSure test, *i.e.*, getting the "medical necessity" authorization

14 that CareDx systematically failed to get.  FE-19 said Seeto "'absolutely'" knew about the

15 Company's reimbursement and collection issues with Medicare, **which were pervasive**, and there

16 was nothing about which Seeto did not know.

17        116.  FE-19 said during the weekly Business Leadership Team meetings he attended,

18 Defendant Seeto would always attribute any Company success to RemoTraC.  He said "Reg [Seeto]

19 would make disingenuous remarks about patients"; but in reality, patients were an afterthought, and

20 the sole goal was keeping up "volumes."

21        117.  FE-19 also noted Defendant Dhingra was unusually involved in the Company's

22 business for a Chief Financial Officer.  He said Dhingra, like Seeto, knew what was going on in all

23 aspects of the Company's business and was involved in managing the Company's market access

24 team, even though this had nothing to do with his official duties as CFO.  The market access team

25 was directly involved in seeking reimbursement for AlloSure tests; thus, Dhingra clearly would have

26 been aware of the Company's reimbursement issues with Medicare.

27        118.  FE-12 worked at CareDx as a Director, Market Access, from March 2021 to

28 June 2022 and had been part of CareDx's payor team that called on health plans in efforts to get

these plans to cover and reimburse CareDx's testing services.  FE-12 explained that one of the payors, United Health, was not actually paying the majority of claims for CareDx testing services that were billed to United Health and, in fact, may have only been paying about one-third of them; they were not actually being paid in full.  Other payors were also not paying the claims submitted to them or, if they did pay some of them, were not paying them in full.  The amounts actually paid were often "ridiculously low" and sometimes as little as $25.  Over time, the insurance companies were paying "less and less" of the CareDx claims because the insurance companies were getting better at identifying claims that were not actually covered.

119.    FE-13 worked for CareDx from March 2019 through March 2023 as a Senior Product Manager.  He was responsible for building integrations between molecular diagnostic laboratories and clients.  He noted that he has over 20 years' experience working for reference laboratories.  FE-13 was aware of the Company's bundling of AlloSure during its RemoTraC initiative.  He explained that RemoTraC was a program where CareDx agreed to draw other lab testing; but as part of that testing, the physicians had to order an AlloSure test.  He confirmed that AlloSure was bundled with other blood tests as part of CareDx's mobile phlebotomy service to induce physicians to order AlloSure.  He further explained that part of his job working on the integration team was to manage the development of interfaces between CareDx and client sites.  As part of that integration process, the Company allowed client sites to order RemoTraC testing.  The client sites were able to order RemoTraC testing into their Electronic Medical Record ("EMR") in order to schedule those phlebotomy episodes.  He added: "*We were told that you couldn't just have us go out and draw a kidney panel without also drawing the AlloSure*."

120.    FE-14 worked in a sales role at CareDx from late 2021 through early 2023.  FE-14 explained that RemoTraC was a service CareDx offered to keep the Company afloat and entailed CareDx drawing blood from patients for non-CareDx tests, so long as the patients were also "using our tests."  With regard to whether drawing the blood for the other services was an inducement to the physicians to order CareDx services, FE-14 said he had *wondered how they got around it and how it was not illegal* and thought maybe CareDx had been able to do so because of the pandemic.

1    However, there was never a real avenue by which to ask questions during his tenure; and ***any time***

2    ***he tried to raise issues or questions, "they shut it down*.***

3    121.    FE-15 did not work for CareDx but instead worked for Natera in a variety of roles

4    going back to February 2015, including most recently as Director, Sales Training Transplant and

5    Renal Genetics from March 2020 through June 2022. FE-15 knows Dr. Olymbios and holds him in

6    extremely high regard. FE-15 noted it was "1000%" the case that, with RemoTraC, CareDx was

7    saying it would do all of the blood drawing for a patient's labs in order to get AlloSure ordered by

8    physicians. Regarding wining and dining and lavish entertainment of physicians by CareDx, FE-15

9    heard "from the field" that CareDx would support "huge research" projects in the tens of thousands

10   of dollars to physicians, clinics, and hospitals. Natera did not have that kind of money to support its

11   own studies; instead: "we had to sell on why we are better than CareDx."

12   122.    FE-16 also did not work for CareDx but instead worked for Natera during the 2019 to

13   2022 period in a sales role. He noted that some customers had provided feedback to him indicating

14   that CareDx did "not play by the rules."

15   123.    FE-17 also did not work for CareDx but instead worked for Natera during the 2020 to

16   2022 period as an organ health specialist. FE-17 noted that CareDx is "shady" and had been

17   Natera's "number one competitor" in the geographic region where FE-17 worked. He said that that

18   particular region CareDx is "widely known for excessively paying doctors and institutions." FE-17

19   also was familiar with CareDx's RemoTrac mobile phlebotomy blood drawing service by which

20   CareDx drew blood for non-CareDx tests that a provider ordered while also drawing blood for

21   CareDx's AlloSure test. It was "always strange" to FE-17 that CareDx could provide the RemoTrac

22   blood-drawing service because it was "an incentive, a selling point" to the providers to place orders

23   for AlloSure.

24   124.    FE-18 did not work for CareDx but for Natera during the 2021 to 2022 period as a

25   medical science liaison. FE-18 was unaware that Dr. Olymbios had commenced whistleblowing

26   proceedings against CareDx because "plenty" of former CareDx personnel who went to work at

27   Natera have said CareDx would do whatever was necessary to get sales. In short, it was a commonly

28   shared sentiment "across Natera" that "they do shady" things.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT                                              - 38 -

**2.  CareDx Paid Illegal Kickbacks to Doctors to Encourage Them to Order AlloSure and Enroll Patients in "Studies" that Were Actually Schemes to Illegally Bill Medicare for Additional AlloSure Tests**

125.  In order to further its scheme, CareDx utilized an elaborate system of kickbacks, payments, inducements, and incentives paid to phlebotomists and doctors to juice the Company's AlloSure sales.  As Dr. Olymbios explained, CareDx "*offer[ed] extravagant inducements or kickbacks to physicians and other providers to promote AlloSure*" and organized "*sham 'advisory boards'*" that were "*little more than marketing exercises to encourage physicians to order AlloSure tests*."

126.  FE-6[18] corroborated Dr. Olymbios' claims.  For example, FE-6 described CareDx's practice of hosting "symposiums," where it paid for doctors' flights, limo services to and from the airport, hotels, and bottles of champagne in the doctors' hotel rooms.  FE-6 further explained that CareDx hosted two key opinion leader "summits" in San Francisco every year that started on Thursdays and ended on Fridays (*i.e.*, the summits lasted only about a day and a half).  CareDx would then pay for attending doctors to spend the weekend in Napa Valley.  The doctors were taken to Napa, chauffeured around in limousines hired by CareDx, and brought to four different vineyards – each of which hosted a $100-per-person wine tasting *paid for* by CareDx.  The doctors were also provided breakfast, lunch, and dinner at fine restaurants, *all on CareDx's dime*.  FE-6 explained that *Defendant Maag not only attended these outings but personally selected the vineyards and restaurants*.

127.  CareDx executives unquestionably knew this behavior was occurring because Dr. Olymbios *reported his concerns to the Company's most senior executives, including Defendants Maag and Seeto*, and because Defendant Maag himself personally signed off on the expenses.  Similar, Dr. Olymbios *directly told these executives* about facts demonstrating the Company was offering improper kickbacks to medical doctors who could influence sales of AlloSure.  *Dr. Olymbios gave them examples of such kickbacks*.  "CareDx offered *unrestricted*

---

[18]  Employee FE-6 served as Senior Executive Assistant to the Chairman and CEO from December 2013 to July 2020.

*grants* to physicians to not enroll patients in competitors' clinical trials or to induce practices to place patients on an AlloSure surveillance protocol, even when doing so was not warranted or authorized under Medicare billing guidelines," as Dr. Olymbios observed.  He continued: "CareDx organized 'advisory boards' that were little more than marketing exercises to encourage physicians to order AlloSure tests," and Dr. Olymbios averred: "*CareDx monitored advisory board activity and how they impacted sales*."

128.    Admitting complicity in these illegal kickbacks, Defendant Maag testified under oath in the CareDx-Natera Litigation that he *personally authorized virtually all of the "marketing" expenses* at the heart of Defendants' scheme.  He testified about personally attending "meeting conferences" where CareDx spent money marketing AlloSure to kidney doctors as "[w]e are not a very large company."  He explained:

> I am engaging with the team on those.  And then *I am signing off on all the expenses*.  For a long time in the company, I signed every check in the company. . . . I think my team [at CareDx] would call me being *very hands-on and detailed oriented*, so, yes, *I was very involved*.

129.    Defendant Maag further admitted to regularly attending CareDx's "marketing" events with doctors.  He testified about "meeting conferences" where CareDx spent money marketing AlloSure to kidney doctors, with Maag testifying: "I'm more or less present at many of these meetings happening."

130.    In addition to Maag's personally signing off on these expenses, CareDx's Chief Medical Officer Dholakia and Defendant Seeto also knew about the bills.  Dholakia testified in the CareDx-Natera Litigation: "every doctor that works on a project, *we have to [have] very accurate records* of, what are we paying them, how much are we paying them, why are we paying them."

131.    Defendants' knowledge of these massive and illegal kickbacks extended to securing enrollment of Medicare patients in CareDx's KOAR registry study.  CareDx Clinician FE-8 explained that CareDx paid doctors who enrolled patients in an AlloSure study *$35,000 to $40,000 per patient*.  Clinician FE-8 further noted: "'the payments were excessive and *very unusual for a simple registry study*.'"  Clinician FE-8 continued: "'these simple registry studies usually paid the doctors a flat rate of $5,000.00 per patient.'"  FE-8 asked Chief Medical Officer Dholakia: "'why

were so many patients considered ineligible and rejected from the study?'" *Dholakia responded that CareDx rejected patients who lacked Medicare coverage*. FE-8 noted: "'there were so [many] illegal actions'" at CareDx.

132.   FE-1 witnessed similar practices, and described how CareDx's sales management personnel *took doctors on "booze" cruises, helicopter tours, and expensive vacations*, failing to report any of these expenses as required by the Sunshine Act. As FE-1 further explained, it was common knowledge within the Company that this was occurring, commenting: "The sales people did stuff that would not be appropriate anywhere else in the pharma or biotech industry."

133.   FE-19, who reported directly to Defendant Seeto, confirmed these practices continued throughout Seeto's tenure as CEO. He said there were always some "'hush-hush'" discussions of potential conflicts of interest around having medical science liaisons enroll people in studies and then taking them out for lavish dinners. He also said that in September-October 2021, just as the Company came under investigation by the DOJ and SEC, he participated in Business Leadership Team meetings where there were suddenly discussions about how the Company should cut back on lavish expenditures, such as not ordering "shrimp towers" or $200 bottles of wine when taking doctors to dinner, now that the Company was under scrutiny.

134.   Another key part of Defendants' scheme involved a systematic practice of paying illegal kickbacks to third party phlebotomists in exchange for blood draws – essentially, paying excessive fees to incentivize them to provide CareDx as many blood samples as possible, in express violation of CMS regulations and the federal Anti-Kickback Statute.

135.   By way of background, CMS requires that phlebotomists get paid only a "nominal" per-specimen fee of $3-$5, or, at most, in certain COVID-related circumstances, $23-$25 per specimen.[19] Anything in excess of that nominal per specimen fee is considered an illegal kickback, because it provides a financial incentive to do unnecessary blood draws in order to perform and bill for unnecessary tests. However, Reimbursement Specialist FE-4 explained that, rather than paying the $3 fee required by regulations, CareDx regularly and systematically paid doctor offices and

---

[19]  https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/
MLNProducts/Downloads/Clinical-Laboratory-Fee-Schedule-Fact-Sheet-ICN006818.pdf.

1    phlebotomists' "fees" of **$100 per specimen** to draw blood from patients.  FE-4 said that he often

2    received calls routed from the accounting department "from **people looking for their check for**

3    **drawing blood**."  FE-4 also saw "logs" phlebotomists used to keep track of all the patients who gave

4    them blood, and noted: "They were definitely getting paid a[n] [excessive] draw fee."

5        136.    FE-4 explained that he had previously worked for a Company called Berkeley

6    HeartLab, which FE-4 said had also engaged in a blood draw kickback scheme similar to the one

7    enacted by CareDx, and had gotten caught by the U.S. government.  By way of context, Berkeley

8    HeartLab was the subject of multiple *qui tam* actions for exactly these types of practices, which

9    actions survived a motion to dismiss in March 2016, and the U.S. government subsequently settled

10    the actions with Berkeley HeartLab for $6 million.[20]  FE-4 said that CareDx was engaging in a

11    substantively similar blood draw kickback scheme to the one conducted by Berkeley HeartLab.

12        137.    Lab Director FE-7[21] made similar claims about CareDx's illegal blood draw scheme.

13    FE-7 explained that the phlebotomists CareDx used for its RemoTraC scheme also collected blood

14    not just for CareDx's tests but for other tests the physicians had ordered, but that these other tests

15    would not be administered by CareDx.  Instead, some of the blood samples would be sent to other

16    testing companies like Quest Diagnostics Inc. ("Quest").  FE-7 knew these facts because sometimes

17    samples intended for CareDx were sent mistakenly to Quest and vice versa.

18        138.    As Lab Director FE-7 noted, however, CareDx was not charging for the blood

19    collection itself – a practice that has been identified by the U.S. Department of Health and Human

20    Services and Office of the Inspector General as potentially violative of the Anti-Kickback Statute.[22]

---

[20]   https://www.justice.gov/opa/pr/blood-testing-laboratory-pay-6-million-settle-allegations-kickbacks-and-unnecessary-testing.

[21]   FE-7 worked at CareDx as Senior Director of Laboratory Operations from June 2018 to March 2022.

[22]   As explained in the United States' complaint against Berkeley HeartLab, HHS-OIG Advisory Opinion No. 05-08 made clear that payments by laboratories to physicians for blood sample collection could constitute improper remuneration under the Anti-Kickback Statute.  The U.S. Office of the Inspector General also warned in 2018 about similar blood draw kickback schemes, issuing a "special fraud alert" that it was investigating various blood testing labs for "kickback arrangements," in which they were paid per-specimen fees beyond the $3 regulatory amount.  *See* https://www.policymed.com/2014/09/oig-and-justice-department-investigating-certain-blood-testing-labs-for-kickback-arrangements.html.

139.    As Lab Director FE-7 put it, there is "a fine line" in distinguishing whether providing a service to a physician – like not charging for blood drawing – is actually an inducement to the physician to order tests from CareDx.  Lab Director FE-7 thought these practices were "sketchy" and discussed the practices with CareDx's Vice President of Laboratory Operations Susan Scott, who dismissed his concerns.

140.    CareDx also engaged in other violations of the Anti-Kickback Statute in order to juice its testing revenues by, for example, offering to waive patient costs.  As Dr. Olymbios explained, without initially realizing that the practice was illegal, he became aware that, when marketing its services to nephrology practices, CareDx was using the "talking point" that it never billed its patients directly for its tests, such that patients would have no out-of-pocket expenses for the tests.  In or around August 2020, Dr. Olymbios wrote an email directly to Peter Maag and another high-level CareDx executive that CareDx should include the fact that CareDx "never bills patients" in a marketing letter to a nephrology practice.  However, Defendant Maag responded with a phone call, in which he said that he was "***calling because there were things he couldn't be associated with as the CEO***," and that "***there were certain things that shouldn't be put in writing***" – such as never billing patients "even if that's how CareDx operated."  Promising never to bill patients is, in fact, a violation of the federal Anti-Kickback Statute and other laws and regulations.[23]

141.    CareDx executives knew that this behavior was occurring.  One executive who reported into the "C-Suite" observed Dr. Olymbios being very vocal about his Medicare billing

---

[23]    Federal laws, including the federal Civil Monetary Penalties Law ("CMPL") and Anti-Kickback Statute, generally prohibit waiving Medicare cost-sharing absent a showing of genuine financial hardship.  42 U.S.C. 1320a-7a(a)(5).  The CMPL prohibits offering or transferring remuneration to federal program beneficiaries if the provider knows or should know that the remuneration is likely to influence the beneficiary to order or receive items or services payable by federal or state healthcare programs from a particular provider.  42 U.S.C. 1320a-7a(a)(5).  The federal Anti-Kickback Statute prohibits knowingly and willfully offering, paying, soliciting, or receiving remuneration to any person to induce such person to order or to receive any items or service for which payment may be made under a federal healthcare program unless the arrangement fits within a regulatory safe harbor.  42 U.S.C. 1390a-7b(b).  Violation occurs if "one purpose" of the remuneration is to induce federal program business.  *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).  The Office of Inspector General ("OIG") has further interpreted the federal Anti-Kickback Statute to apply to waiving patient co-pay amounts if "one purpose" of the waiver is to induce the business of a federal program.  *OIG, Special Fraud Alert: Routine Waivers of Copayments or Deductibles under Medicare Part B* (May 1991).

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 43 –

1    concerns.  Corroborating that executive, according to Dr. Olymbios, he did, in fact report his

2    concerns to the Company's most senior executives, including Defendants Maag and Seeto; Dr.

3    Olymbios "discussed his concerns and those of other employees with more than ten other current or

4    former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and

5    Reg Seeto," according to Dr. Olymbios.

6                      **3.    Defendants Used the "KOAR" Study to Improperly Bill
                             Medicare for Tens of Thousands of Additional Tests in
7                            Violation of the Anti-Kickback Statute**

8            142.    In addition to the above abuses, CareDx also enrolled thousands of patients in large

9    "studies" of its AlloSure test that were mere pretextual schemes to illegally bill Medicare for

10   thousands of additional unneeded tests.  Notably, Medicare regulations entirely prohibit billing for

11   tests administered as part of a study, yet CareDx simply obfuscated its records to escape detection of

12   the practice.  As Dr. Olymbios explained, CareDx "organiz[ed] 'clinical studies' that were funded

13   with condition-free grants," and "offered unrestricted grants to physicians" to enroll patients in

14   CareDx's studies rather than competitors' studies.  In order to increase enrollments in its studies,

15   CareDx made direct payments to doctors at as much as eight times the normal rate for enrolling their

16   patients in its AlloSure studies, but, critically, only if their patients were on Medicare (and thus could

17   be reliably reimbursed at high rates for the tests provided in the study).

18           143.    CareDx Clinician FE-8[24] explained that CareDx paid doctors who enrolled patients in

19   its massive Kidney Allograft Outcomes AlloSure Registry ("KOAR") study at *$35,000 to $40,000

20   per patient*, noting that "the[se] payments were *excessive and very unusual for a simple registry

21   study*."  As FE-8 explained, "these simple registry studies usually paid the doctors a flat rate of

22   $5,000.00 per patient."  In other words, CareDx paid doctors between *600% to 700% more than

23   market rates* to enroll patients in its KOAR study.  Clinician FE-8 explained doctors who take these

24   excessive payments go from study to study to make money; specifically: "these doctors go from

25   study to study and knew they were being overpaid."  Clinician FE-8 and another executive told the

26

27   ───────────────
     [24]  FE-8 worked as a Senior Clinical Trial Manager at CareDx from August 2021 to
28   November 2021.  His duties included extensive involvement with the Company's KOAR study,
     described herein.

     SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL        - 44 -
     SECURITIES LAWS - 3:22-cv-03023-TLT
     4854-9079-2810.v1

1    Company's Chief Medical Officer, Dholakia, that the budgets for paying doctors were "way out of

2    control."

3        144.    CareDx and its executives blatantly violated the False Claims Act by preselecting

4    only Medicare patients for the KOAR study and improperly seeking reimbursement for the

5    numerous tests provided for each participant KOAR study – tests that were ***not*** medically necessary

6    under Medicare guidelines.    Further, CareDx violated the Anti-Kickback Statute by paying

7    exorbitant fees to doctors to enroll patients in the KOAR registry study, requiring each study

8    participant to undergo a predetermined number of AlloSure tests in contravention of Medicare

9    coverage guidelines and medical necessity, providing forms that made it more difficult for the

10   ordering physician to make an independent medical necessity decision with regard to each test, and

11   failing to collect appropriate documentation by the physicians in a timely manner memorializing the

12   physicians efforts.    Each of these facts, as highlighted by the Office of the Inspector General, are

13   hallmarks of improper kickback schemes and violations of the Anti-Kickback Statute.[25]

14       145.    KOAR was a registry study commenced in 2018 that enrolled over ***1,700 patients***,

15   purportedly to explore the utility of AlloSure surveillance testing, by giving each patient regular

16   AlloSure tests ***over a three-year period***.  Significantly, surveillance testing is not a covered use of

17   AlloSure under Medicare guidelines, and thus regular "surveillance" tests were not legally

18   reimbursable by Medicare. Nevertheless, Clinician FE-8 recalled that CareDx systematically steered

19   Medicare patients, and only, Medicare patients, into the AlloSure study.  FE-8 asked the Company's

20   Chief Medical Officer, Dholakia: "***[W]hy were so many patients considered ineligible and rejected***

21   ***from the study***?"  ***Dholakia responded that CareDx rejected patients who lacked Medicare***

22   ***coverage***.  CareDx's motivation for this was clear: by enrolling solely Medicare patients in its

23   "studies," it was reliably ensured high reimbursements for each of the thousands of unnecessary

24   tests.  FE-8 noted: "***[T]here were so [many] illegal actions***" at CareDx.

25

26   ───────────

   [25]    *See* Special Fraud Alert: Laboratory Payments to Referring Physicians, DEPARTMENT OF

27   HEALTH AND HUMAN SERVICES, OFFICE OF THE INSPECTOR GENERAL (July 25, 2014),
     https://oig.hhs.gov/documents/special-fraudalerts/866/OIG_SFA_Laboratory_Payments_

28   0625201406252014.pdf.

146.    FE-8's allegations are particularly troubling given unambiguous guidance on precisely this type of illegal conduct by the Office of the Inspector General relating to violations of the Anti-Kickback Statute.  Among its provisions, the Anti-Kickback Statute penalizes anyone who knowingly and willfully solicits, receives, offers or pays remuneration in cash or in kind to induce, or in return for referring an individual to a person for the furnishing, or arranging for the furnishing, of any item or service payable under the Medicare or Medicaid program, which includes AlloSure.  The OIG warns that registry arrangements such as KOAR "***may induce physicians to order medically unnecessary or duplicative tests***, including duplicative tests performed for the purpose of obtaining comparative data, and to order those tests from laboratories that offer Registry Arrangements in lieu of other, potentially clinically superior, laboratories."[26]

147.    Indeed, CareDx's KOAR study was exactly consistent with the OIG's warning signs of fraud for such a registry study.  For example, the OIG warns that it is a red flag for a study when: "The laboratory requires, encourages, or recommends that physicians who enter into Registry Arrangements perform the tests with a stated frequency (*e.g.*, four times per year) to be eligible to receive, or to not receive a reduction in, compensation."  The KOAR study did exactly this, requiring testing at predetermined intervals.  The OIG also warns of studies where: "The laboratory collects comparative data for the Registry from, and bills for, multiple tests that may be duplicative (e.g., two or more tests performed using different methodologies that are intended to provide the same clinical information) or that otherwise are not reasonable and ***necessary***."  The KOAR study met this criterion as well, as it required testing at predetermined intervals without regard to medical necessity as required by Medicare coverage guidelines.

148.    The OIG further warns of situations where: "Compensation paid to physicians pursuant to Registry Arrangements is not fair market value for the physicians' efforts in collecting and reporting patient data."  FE-8 has affirmed that CareDx paid ***many times above market value*** for patient enrollment – $35,000 to $40,000 per patient – seven to eight times the normal $5,000 fee, noting: "the[se] payments were ***excessive and very unusual for a simple registry study***."  As FE-8

---

[26]  https://oig.hhs.gov/documents/special-fraud-alerts/866/OIG_SFA_Laboratory_Payments_06252014.pdf.

explained: "these simple registry studies usually paid the doctors a flat rate of $5,000.00 per patient." In other words, CareDx paid doctors between **600% to 700% more than market rates** to enroll patients in its AlloSure study. Clinician FE-8 explained doctors who take these excessive payments go from study to study to make money; specifically: "these doctors go from study to study and knew they were being overpaid." Clinician FE-8 and another executive told the Company's Chief Medical Officer, Dholakia, that the budgets for paying doctors were "way out of control."

149. The OIG also warns of situations where: "The tests associated with the Registry Arrangement are presented on the offering laboratory's requisition in a manner that makes it more difficult for the ordering physician to make an independent medical necessity decision with regard to each test for which the laboratory will bill." Again, CareDx's conduct fit exactly this description, as according to Dr. Olymbios, CareDx "intentionally excluded from the test requisition form a field where a physician could indicate the reason why the test was medically necessary," so that the Medicare personnel handling reimbursement would not be immediately tipped off that medical necessity was required, and was not actually extant, for the particular test.

150. And finally, the OIG warns against studies where: "Compensation paid to physicians pursuant to Registry Arrangements is not supported by documentation, submitted by the physicians in a timely manner, memorializing the physicians' efforts." FE-8 explained that the KOAR study violated this condition as well, as there were 16,000 pages of missing/outstanding documents that should have been recorded into CDNA's central data base by the 57 transplant centers/sites conducting the study, meaning "the KOAR study did not have a full data set." Clinician FE-8 "tried to get this study cleaned up so that management could publish the correct information to the public," but the AlloSure testing centers "were not entering the data into the electronic data base system."

## VI. FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

151. Defendants made false and misleading statements and material omissions during the Class Period in violation of §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Throughout the Class Period, CareDx's press releases, investor presentations, and public SEC filings included material misstatements and/or omissions concerning the Company's business

1  and operational practices and its AlloSure kidney testing and mobile phlebotomy services.

2  Defendants' material misstatements and omissions thus created in the market an unrealistically

3  positive assessment of CareDx's business, operational status, profitability, future growth prospects,

4  and compliance with applicable laws and regulations, all of which artificially inflated the price of

5  CareDx's common stock.

6      **A.    April 30, 2020: Quarterly SEC Filing on Form 10-Q and Related
            Quarterly Conference Call with Analysts and Investors Regarding
7            RemoTraC**

8          **1.    The Material Unlawful Purpose of RemoTraC**

9      152.    On April 30, 2020, the Company filed its quarterly report on Form 10-Q with the

10 SEC.  Maag signed the report, purporting to describe the Company's RemoTraC program:

11          As a response to the COVID-19 outbreak, and ***to enable immune-
            compromised transplant patients to continue to have their blood drawn***, in late
12         March 2020 the Company launched ***RemoTraC, a remote home-based blood draw
            solution using mobile phlebotomy for AlloSure and AlloMap surveillance tests, as
13         well as for other standard monitoring tests***.[27]

14     153.    The preceding description of RemoTraC was false or misleading at the time it was

15 made because:

16          (a)    It described RemoTraC in terms that would give reasonable investors the

17 impression that it was entirely lawful, but it failed to disclose a material, unlawful RemoTraC

18 purpose – namely, it required patients to take the AlloSure test as a condition to receiving the

19 patients' standard of care tests so CareDx could submit the medically unnecessary test bills to

20 Medicare for payment, in clear violation of the False Claims Act;

21          (b)    The unneeded AlloSure tests further required patients to give more blood than

22 necessary because CareDx did not process the necessary standard of care tests, meaning CareDx had

23

---

24 [27]   The Company made substantially the same statements about RemoTraC in additional SEC
      filings, including filings on August 4, 2020 (Form 10-Q, signed by Maag); October 29, 2020
25    (Form 10-Q, signed by Maag); February 28, 2020 (Form 10-K, signed by Maag and Seeto); May 5,
      2021 (Form 10-Q, signed by Seeto); July 29, 2021 (Form 10-Q, signed by Seeto).  October 28, 2021
26    (Form 10Q, signed by Seeto); February 24, 2022 (Form 10-K, signed by Seeto and Seeto); May 5,
      2022 (Form 10-Q, signed by Seeto); August 4, 2022 (Form 10-Q, signed by Seeto); and, November
27    3, 2022 (Form 10-Q, signed by Seeto).  These statements were false or materially misleading for the
      same reasons why Maag's April 30, 2020 description of RemoTraC was false or materially
28    misleading.

to draw two separate vials of blood for shipments to two different companies.  Maag knew or should have known the foregoing statements were false or misleading at the time for the reasons set forth above.  ¶¶Vi.C.-V.; and

(c)    It stated the purpose of RemoTraC was to enable immune-compromised patients to continue to have their blood drawn at home, when RemoTraC's purpose was to allow Defendants to increase AlloSure testing by illegally bundling AlloSure with each "standard of care" order and illegally billing Medicare for the unnecessary AlloSure tests.

### 2.    The Hypothetical "Risks"

154.    In the same April 30, 2020 Report on Form 10-Q signed by Maag, the Company stated that it was subject to "risks" previously described in its annual report.  Specifically, the report for the first quarter of 2020, filed on April 30, 2020, stated: "[o]ur Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 28, 2020, Part I – Item 1A, Risk Factors, describes *important* risk factors," that related to statements "made by management" in the April 30, 2020 quarterly report, quoted below:

Below are certain *key regulations* applicable to our business.

*Federal and State Fraud and Abuse Laws*

Because of the significant federal funding involved in Medicare and Medicaid, Congress and the states have enacted, and actively enforce, a number of laws to eliminate fraud and abuse in federal healthcare programs.  ***Our business is subject to compliance with these laws***.

\*       \*       \*

*Anti-Kickback Statutes*

The federal healthcare programs' Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal healthcare program such as Medicare or Medicaid.

The definition of "remuneration" has been broadly interpreted to include anything of value, including, for example, gifts, certain discounts, the furnishing of free supplies, equipment or services, credit arrangements, payment of cash and waivers of payments.  Several courts have interpreted the statute's intent requirement to mean that ***if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered businesses, the statute has been violated***.  Penalties for violations include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other

federal healthcare programs.  In addition, ***violations of the Anti-Kickback Statute also are actionable under the federal False Claims Act.***

Many states have adopted laws similar to the Anti-Kickback Statute.  Some of these state prohibitions apply to referral of recipients for healthcare items or services reimbursed by any source, not only the Medicare and Medicaid programs.

*Federal False Claims Act*

The False Claims Act's "whistleblower" or "*qui tam*" provisions imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal healthcare program. . . .

When an entity is determined to have violated the False Claims Act, it may be required to pay up to three times the actual damages sustained by the government, plus civil penalties of between $5,500 and $11,000 for each separate instance of false claim.  There are many potential bases for liability under the False Claims Act.  Liability arises, primarily, when an entity knowingly submits or causes another to submit, a false claim for reimbursement to the federal government.  The federal government has used the False Claims Act to assert liability on the basis of causing physicians to order ***excessive or unnecessary services***, providing false documentation in support of claims, kickbacks, off-label promotion of products, Stark Law violations and other improper referrals and CLIA violations, in addition to the more predictable allegations as to misrepresentations with respect to the services rendered.  Our ***future activities relating to billing***, compliance with the CLIA and ***Medicare reimbursement*** requirements, ***physician and other healthcare provider financial relationships*** and the sale and marketing of our products ***may be subject to scrutiny under these laws***.

\*        \*        \*

***Our employees***, consultants, principal investigators and commercial partners ***may engage in misconduct or other improper activities***, ***including non-compliance with regulatory standards and requirements***.  In addition to the CLIA regulation, other federal and state healthcare laws and regulations that may affect our ability to conduct business, include, without limitation

\*        \*        \*

***the federal Anti-Kickback Statute, which constrains our marketing practices***, educational programs, pricing policies, and relationships with healthcare providers or other entities, by prohibiting, among other things, knowingly and willfully soliciting, receiving, offering or paying remuneration, ***directly or indirectly, to induce*** or reward, or in return for, either the referral of an individual or the purchase or ***recommendation of an item or service reimbursable under a federal healthcare program, such as the Medicare and Medicaid programs***

\*        \*        \*

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 50 -

1

> Because of the **breadth of these laws** and the narrowness of available statutory and regulatory exemptions, **it is possible** that some of our business activities could be subject to challenge under one or more of such laws.[28]

2

3      155.     Maag's statement, on April 30, 2020, that there had been "**no material changes**" to

4   the health care law risks facing the Company was materially false and misleading when made.  The

5   introduction of the RemoTraC scheme and the kickback scheme were not "**future**" activities that

6   were subject to scrutiny but **then-active** activities (overbilling Medicare and kickbacks) that

7   subjected the Company to scrutiny.  The statements also created an impression that non-compliance

8   was a mere "risk" when, in fact, the Company was engaged in systemic Medicare overbilling and

9   kickbacks by, among other things:

10             (a)     using RemoTraC to illegally bundle medically unnecessary AlloSure tests

11   with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary

12   AlloSure tests;

13             (b)     deliberately obscuring from patients and doctors that AlloSure was being

14   performed;

15             (c)     intentionally excluding from the AlloSure test requisition form a field where

16   the physician could indicate why the test was medically necessary so the physician and Medicare

17   personnel handling the reimbursement would not be immediately tipped off that medical necessity

18   was a prerequisite for Medicare reimbursement;

19             (d)     further obscuring the requirement for medical necessity by using an entirely

20   paper-based claims submission system, which made tracing claims virtually impossible;

21             (e)     using the KOAR study to illegally seek Medicare reimbursement for

22   medically unnecessary AlloSure tests that were performed through the KOAR study;

23
24  [28]   The Company made substantially the same statements about legal compliance and "risk" factors in additional SEC filings, including filings on August 4, 2020 (Form 10-Q, signed by Maag ("no material changes")); October 29, 2020 (Form 10-Q, signed by Maag ("no material changes")); February 24, 2021 (Form 10-K, 2020 Annual Report, signed by Maag and Seeto (repeating substantially the same substantive risk factors as stated in the Form 10-K 2019 Annual Report)); May 5, 2021 (Form 10-Q, signed by Seeto ("no material changes"); and July 29, 2021 (Form 10-Q, signed by Seeto ("no material changes")).  October 28, 2021 (Form 10-Q, signed by Seeto).  These statements were false or materially misleading for the same reasons why Maag's April 30, 2020 statement about "no material changes" to the incorporated-by-reference "risks" (set forth in the Company's prior Form 10-K 2019 Annual Report) were materially false and misleading when made.
25
26
27
28

1      (f)    offering extravagant inducements or kickbacks to physicians and others to

2  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

3  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

4  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

5  Napa Valley, where they were chauffered around in limousines and brought to vineyards and

6  restaurants, where they dined on CareDx's dime;

7      (g)    offering sham "advisory board" positions to physicians to encourage them to

8  order AlloSure tests;

9      (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

10  vacations;

11      (i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure

12  blood tests;

13      (j)    offering to waive patient costs associated with AlloSure tests; and

14      (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

15  in CareDx's KOAR study.

16      156.    Maag showed his understanding of the key applicable laws in signing the 2019

17  Annual Report; there, he admitted:

18      The federal healthcare programs' Anti-Kickback Statute prohibits persons
   from knowingly and willfully soliciting, offering, receiving or ***providing***

19  ***remuneration, directly or indirectly***, in exchange for or ***to induce*** either the referral
   of an individual, or the furnishing or arranging for a good ***or service***, ***for which***

20  ***payment may be made under a federal healthcare program such as Medicare or***
   ***Medicaid***.

21

22  Maag further stated:

23      The definition of 'remuneration' has been broadly interpreted to include
   anything of value, including, for example, gifts, certain discounts, the furnishing of
   free supplies, equipment or services, credit arrangements, payment of cash and

24  waivers of payments.  Several courts have interpreted the statute's intent requirement
   to mean that ***if any one purpose of an arrangement involving remuneration is to***

25  ***induce referrals of federal healthcare covered businesses, the statute has been***
   ***violated***. . . . In addition, violations of the Anti-Kickback Statute ***also are actionable***

26  ***under the federal False Claims Act***.

27      157.    In signing this report, Maag also certified: "I have reviewed this Annual Report,"

28  meaning the entire report – including the "key" laws portion governing the Company.  These facts

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 52 -

1  show Maag knew or should have known his assurances about mere "risk" of noncompliance – in the

2  face of actual noncompliance – were materially false and misleading because they show he

3  understood the substance of the relevant laws while he personally signed off on expenses that

4  violated the False Claims Act and Anti-Kickback Statute and created the RemoTraC Medicare

5  overbilling scheme that further violated the False Claims Act.

6          158.    The April 30, 2020 quarterly report also incorporated the following "risk" from the

7  Company's 2019 Annual Report filed by the Company on February 28, 2020.  Maag signed the

8  report, stating:

9          We receive a substantial portion of our revenues from Medicare, and the loss
        of, or a significant reduction in, reimbursement from Medicare would *severely and*
10       *adversely* affect our financial performance.

11      For the year ended December 31, 2019, revenue from Medicare for AlloMap Heart
        and AlloSure represented 66% of testing services revenue.  However, we may not be
12       able to maintain or increase our tests reimbursed by Medicare for a *variety of*
        *reasons, including* changes in reimbursement practices, general policy shifts, or
13       reductions in reimbursement amounts.

14                              *        *        *

15          If future reimbursement levels are less than the current price, our revenues
        and our ability to achieve profitability could be impaired, and the market price of our
16       common stock could decline.  We may also not be able to maintain or increase the
        portion of our tests reimbursed by Medicare *for a variety of other reasons,* including
17       changes in reimbursement practices and general policy shifts.

18          159.    The preceding statements were materially false and misleading.  In volunteering the

19  "*reasons*" reimbursement from Medicare might theoretically "severely and adversely" affect the

20  Company, Maag chose to state anodyne reasons outside the Company's control while omitting the

21  fact that the Company systematically and unlawfully overbilled Medicare.

22          160.    Maag knew or should have known the foregoing statements were false or misleading

23  at the time because the Company was then actively engaged in systematic Medicare overbilling by,

24  among other things:

25          (a)     using RemoTraC to illegally bundle medically unnecessary AlloSure tests

26  with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary

27  AlloSure tests;

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL           - 53 -
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

1          (b)     deliberately obscuring from patients and doctors that AlloSure was being

2 performed;

3          (c)     intentionally excluding from the AlloSure test requisition form a field where

4 the physician could indicate why the test was medically necessary so the physician and Medicare

5 personnel handling the reimbursement would not be immediately tipped off that medical necessity

6 was a prerequisite for Medicare reimbursement;

7          (d)     further obscuring the requirement for medical necessity by using an entirely

8 paper-based claims submission system, which made tracing claims virtually impossible; and

9          (e)     using the KOAR study to illegally seek Medicare reimbursement for

10 medically unnecessary AlloSure tests that were performed through the KOAR study.

### 3.   "No Material Changes" in Hypothetical Risks

12      161.    Importantly, in the April 30, 2020 quarterly report, Maag stated there "***have been no***

13 ***material changes***" in the risks the Company identified at the end of 2019, quoted above, and which

14 Maag told investors were "incorporated by reference" into the April 30, 2020 quarterly report.  The

15 assurance there had been no material changes was materially false and misleading, as Maag knew or

16 should have known, because the Company had embarked upon a deliberate scheme to use

17 RemoTraC to bill Medicare for inappropriate and medically unnecessary AlloSure tests to: (a) drive

18 sales; and (b) provide kickbacks to encourage healthcare providers to order AlloSure tests.

19      162.    The medically unnecessary AlloSure tests further required patients to give more blood

20 than necessary because CareDx did not process the necessary standard of care tests, meaning CareDx

21 had to draw two separate vials of blood for shipment to two different companies.  Maag knew or

22 should have known the foregoing statements were false or misleading at the time because the

23 Company was then actively engaged in systematic Medicare overbilling and kickback violations by,

24 among other things:

25          (a)     using RemoTraC to illegally bundle medically unnecessary AlloSure tests

26 with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary

27 AlloSure tests;

28

1          (b)      deliberately obscuring from patients and doctors that AlloSure was being

2    performed;

3          (c)      intentionally excluding from the AlloSure test requisition form a field where

4    the physician could indicate why the test was medically necessary so the physician and Medicare

5    personnel handling the reimbursement would not be immediately tipped off that medical necessity

6    was a prerequisite for Medicare reimbursement;

7          (d)      further obscuring the requirement for medical necessity by using an entirely

8    paper-based claims submission system, which made tracing claims virtually impossible;

9          (e)      using the KOAR study to illegally seek Medicare reimbursement for

10   medically unnecessary AlloSure tests that were performed through the KOAR study;

11         (f)      offering extravagant inducements or kickbacks to physicians and others to

12   encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

13   doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

14   key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

15   Napa Valley, where they were chauffered around in limousines and brought to vineyards and

16   restaurants, where they dined on CareDx's dime;

17         (g)      offering sham "advisory board" positions to physicians to encourage them to

18   order AlloSure tests;

19         (h)      taking physicians on "booze" cruises, helicopter tours, and expensive

20   vacations;

21         (i)      paying illegal kickbacks to physicians to encourage them to conduct AlloSure

22   blood tests;

23         (j)      offering to waive patient costs associated with AlloSure tests; and

24         (k)      paying physicians $35,000 to $40,000 in exchange for enrolling their patients

25   in CareDx's KOAR study.

26

27

28

### 4. Touting Apparently Legal Business Activity in Violation of Duty to Disclose the Impact of Unlawful Conduct – "Why Go Back to the Old Way?"

163. Also on April 30, 2020, in the section of the quarterly report titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations," Maag signed the report, stating:

> Testing services revenue increased by $9.9 million, or 46%, for the three months ended March 31, 2020 as compared to the same period in 2019. This increase is primarily due to an increase of more than 5,000 test results provided in the three months ended March 31, 2020, compared to the same period in 2019.

164. These statements were false or misleading because they attributed revenue growth to legal conduct, but illegal Medicare false claims and illegal kickbacks materially contributed to the revenue increase.

165. Maag knew or should have known the foregoing statements were false or misleading at the time because the Company was then actively engaged in systematic Medicare overbilling and kickback violations by, among other things:

(a) using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b) deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c) intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite for Medicare reimbursement;

(d) further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e) using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 56 -

1          (f)      offering extravagant inducements or kickbacks to physicians and others to

2 encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

3 doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

4 key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

5 Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

6 restaurants, where they dined on CareDx's dime;

7          (g)      offering sham "advisory board" positions to physicians to encourage them to

8 order AlloSure tests;

9          (h)      taking physicians on "booze" cruises, helicopter tours, and expensive

10 vacations;

11          (i)      paying illegal kickbacks to physicians to encourage them to conduct AlloSure

12 blood tests;

13          (j)      offering to waive patient costs associated with AlloSure tests; and

14          (k)      paying physicians $35,000 to $40,000 in exchange for enrolling their patients

15 in CareDx's KOAR study.

16        **5.**      **Continuing to Tout Apparently Legal Business Activity in**
                 **Violation of Duty to Disclose the Impact of Unlawful Conduct**

17

18      166.      Following the Company's public filing of its first quarter written reports, on April 30,

19 2020, the Company also held a public earnings call with analysts and investors.  Maag touted

RemoTraC on the call:

20

21        Considering this [COVID-19] backdrop, ***our results this quarter were***
        ***particularly strong***.  Up until the impact of COVID-19, we were well on track to
        exceed $40 million in total revenue for the first quarter.  Our pledge to support our

22        patients remains our focus.  And as part of our efforts ***on March 17, we announced***
        ***the launch of RemoTraC***, our solution for enabling home-based monitoring for

23        transplant patients.  Importantly, ***we created RemoTraC in response to hearing that***
        ***patients were missing their check-in appointments and blood draw as a result of***
        ***COVID crisis***.  This home-based blood draw solution using mobile phlebotomy

24        ***reduces the necessary visit*** to labs and hospitals for immunosuppressant transplant

25        patients. . . .

26        ***Mobile phlebotomy has increased from 10% of our daily volume 8 weeks ago, to***
        ***now comprising over 50%***.

27

28        Under the tremendous ***leadership of Reg Seeto***, our President and Chief
        Business Officer, CareDx has pivoted extremely quickly.

167.    The preceding public statements were false or misleading, as Maag knew or should have known due to the kickback/false claims scheme (§§IV.C.-V.): (a) the statements touted COVID as the driving force behind RemoTraC but omitted to disclose that RemoTraC also was a vehicle to bundle medically unnecessary AlloSure tests with medically necessary standard of care tests; and (b) the statements credited the quarter's "particularly strong" results to RemoTraC's contributing "over 50%" of testing but failed to disclose that RemoTraC generated a material amount of medically unnecessary testing in violation of Medicare and private payor reimbursement rules.  The preceding statements also support scienter because they show Maag and Seeto were familiar with the details of the RemoTraC program.  These facts permit an inference that they knew or should have known of RemoTraC's legal and illegal purposes.

168.    Further, Maag knew or should have known the foregoing statements were false or misleading at the time because the Company was then actively engaged in systematic Medicare overbilling and kickback violations by, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure was being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite for Medicare reimbursement;

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e)    using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

(f)    offering extravagant inducements or kickbacks to physicians and others to encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 58 -

1    doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

2    key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

3    Napa Valley, where they were chauffered around in limousines and brought to vineyards and

4    restaurants, where they dined on CareDx's dime;

5              (g)    offering sham "advisory board" positions to physicians to encourage them to

6    order AlloSure tests;

7              (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

8    vacations;

9              (i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure

10   blood tests;

11             (j)    offering to waive patient costs associated with AlloSure tests; and

12             (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

13   in CareDx's KOAR study.

14       **6.    Touting Routine Blood Work in Violation of the Duty to
               Disclose Mandatory (and Unlawful) AlloSure Bundling to**
15       **Overbill Medicare**

16       169.    On the April 30, 2020 call, analysts had questions about the fact that RemoTraC

17   mobile blood drawing went from accounting for zero (as a new program as of March 17, 2020) to

18   "over 50%" of the Company's testing volume:

19       [Analyst:]

20       Peter [Maag], maybe just **starting with RemoTraC. [I am] [s]urprised to
         hear it's already 50% of volumes**.  Is this just a new operating model for the
21       business now?  Why go back to the old way?  And as we think about the unit
         economics, are there some other positive offsets, spending avoidance, that you might
22       be able to realize, such as lower requirements on your back-end compliance and call
         centers, that might help you offset some of the $100 added for the mobile
23       phlebotomy?

24       Peter Maag – CareDx, Inc. – Chairman & CEO:

25       Thank you, Brandon.  Excellent question.  I think there's really 2 types of feedback.
         **One is, patients absolutely love it**.  Patients don't need to drive in for an hour or 2 or
26       maybe sometimes 3, since they live remotely, into the transplant center, then be in a
         waiting room, wait for their blood work, have then maybe sometimes only 5- to
27       10-minute interactions with the nurse, and everything is good, and then they travel
         back home.  **So patients love the mobile phlebotomy, especially for those that are**
28       **doing well.**

1    Clinicians, I would say, they're probably half-half. They love to see patients
2    face-to-face, and they think there is a significant value in having a patient visiting the
     center. But they also – half – the other half is just completely convinced that
3    telehealth is here to stay. What does that mean for RemoTraC? That I think we
     continue to be flexible. It's very clear that in a COVID crisis center like New York,
4    most of these patients are going mobile. While in other transplant centers, there
     might be a stronger mix. But what it tells me is that CareDx is actually excellent
5    prepared in order to answer to these individual solutions as we have always applied a
     center-by-center strategy. Sometimes, this is now a patient-by-patient strategy even.

6    To your point about offsetting, I think one thing that will be very true is that
7    RemoTraC allows us to have direct-to-patient communication that we have always
     been seeking and allows us to monitor and apply the surveillance schedule. You
8    might recall that we have updated, that we're losing sometimes a few surveillance
     visits on the go. And the closer we get to the patient and the more interactions we
9    have and the better we can actually help scheduling this visit, the more the
     fulfillment on the regular surveillance schedule will be true. ***So we see actually that***
10   ***there is a bit of an upside for us in terms of volume, making sure that these***
     ***patients stick to their surveillance visit and get all their blood draws***.

11       170.    Maag's preceding statements were false or misleading. In stating that patients loved

12   RemoTraC, "***especially for those that are doing well***," Maag owed investors a duty to disclose that

13   the Company required patients to give more blood than required for the standard of care tests –

14   specifically, that patients were required to take medically unnecessary tests. This applied with

15   particular force to patients who were "doing well" because they had even ***less*** reason to take the

16   medically unnecessary tests. Similarly, in touting the purported fact that RemoTraC was "***making***

17   ***sure that these patients stick to their surveillance visit***" schedule, Maag owed investors a duty to

18   disclose that a material amount of AlloSure blood tests were ***not*** on the patients' (at least monthly)

19   surveillance schedule but that RemoTraC required the patients to take the AlloSure tests anyway.

20       171.    Furthermore, Maag knew or should have known the foregoing statements were false

21   or misleading at the time because the Company was then actively using RemoTraC to engage in

22   systematic Medicare overbilling by, among other things:

23            (a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests

24   with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary

25   AlloSure tests;

26            (b)    deliberately obscuring from patients and doctors that AlloSure tests were

27   being performed;

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT                                                      - 60 -
4854-9079-2810.v1

1    (c)    intentionally excluding from the AlloSure test requisition form a field where

2    the physician could indicate why the test was medically necessary so the physician and Medicare

3    personnel handling the reimbursement would not be immediately tipped off that medical necessity

4    was a prerequisite to Medicare reimbursement; and

5    (d)    further obscuring the requirement for medical necessity by using an entirely

6    paper-based claims submission system, which made tracing claims virtually impossible.

7    172.    Analysts had even more questions about RemoTraC on the April 30, 2020 call:

8    [Analyst:]

9    Okay.  Great.  And just a follow-up question.  On **RemoTraC, do you think
transplant centers are going to integrate it into their protocols** given that

10    COVID-19 is relatively uncertain?  Again, yes, there's going to be a second wave or
every flu season, this is – we're going to go through the same thing.  Do you . . . .

11

12    Peter Maag – CareDx, Inc – Chairman & CEO

13    I'll let also, Reg Seeto, who's on the call, comment on that.  But I would see
that we will see probably flare-ups of COVID-19 in the country in different locations
over the year.  So I don't think that this will be entirely going away.  But then we

14    will have very local and regional responses to COVID-19.  So I would say we will
stay flexible, and this will be a center-by-center approach.  But maybe Reg, over to

15    you talking about RemoTraC and our ability to pivot.

16    Reginald Seeto – CareDx, Inc – President & Chief Business Officer

17    Yes.  Thanks, Peter.  I mean we've seen more than 150 centers expressed
interest in **RemoTraC**.  And with that, **we have a lot of protocols and surveillance

18    patients being used**.  So I think with RemoTraC being incorporated as part of that
with the current offering, I think in the future, we'll – as Peter mentioned, we'll start

19    seeing more of this adoption, potentially even on a protocol basis.

20    173.    More questions about RemoTraC followed, including this one on April 30, 2020:

21    [Analyst:]

22    A lot's been covered, so I'll keep them kind of quick.  But I was wondering if
maybe you could give a little bit of color on RemoTraC.  Is it – is there any level of

23    difference between kind of what patients are adopting it or whether it's the folks that
are in protocols or – and new transplant patients are more likely or anything like

24    that?  Is there any difference between who says, this is what I want to do versus not?

25    Reginald Seeto – CareDx, Inc – President & Chief Business Officer

26    Yes.  Thanks.  I mean we've seen **the majority of patients from one segment
being those on surveillance today**, that we've also seen a new segment of patients

27    who are currently on surveillance that we had – as we talked about, with the greater
need to monitor these patients where they are now being brought into RemoTraC

28    first.  So there's been 2 specific segments.

174.    Seeto's statement that the majority of RemoTraC patients were "***those on surveillance today***" triggered a duty to disclose that the Company was unlawfully bundling AlloSure tests with routine standard of care tests and billing Medicare for the medically unnecessary AlloSure tests in violation of Medicare rules.

175.    Seeto knew or should have known the foregoing statements were false or misleading at the time for these reasons and because, at the time the statements were made, CareDx was then actively using RemoTraC to engage in systematic Medicare overbilling by, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement; and

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible.

**B.    June 9-10, 2020: Desperate for $125 Million, Maag Promises "No Material Change" in Risks and Assures Investors Full, Material "Compliance with Health Care Laws"**

176.    On June 10, 2020, the Company issued a press release alerting investors that the Company wanted to raise $125 million from investors.  The press release noted:

> SOUTH SAN FRANCISCO, Calif., June 10, 2020 (GLOBE NEWSWIRE) – CareDx, Inc. (Nasdaq: CDNA) . . . today announced the pricing of an underwritten public offering of 3,906,250 shares of its common stock at a ***public offering*** price of $32.00 per share.  The gross proceeds to CareDx from this offering, before deducting underwriting discounts and commissions and offering expenses, are expected to be ***$125,000,000***. . . .  The offering is expected to close on or about June 15, 2020, subject to the satisfaction of customary closing conditions.

177.    On June 9, 2020, the Company filed a registration statement and prospectus with the SEC to raise ***$125 million*** from the public.  Maag signed that document, which stated:

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 62 –

Investing in any securities offered pursuant to this prospectus, the applicable prospectus supplement and any related free writing prospectus involves a high degree of risk.  Before making an investment decision, *you should carefully consider* the risks described under "Risk Factors" in the applicable prospectus supplement, any related free writing prospectus *and in our most recent Annual Report on Form 10-K, or any updates in our Quarterly Reports on Form 10-Q,* together with all of the other information appearing in or incorporated by reference into this prospectus, the applicable prospectus supplement and any related free writing prospectus, before deciding whether to purchase any of the securities being offered.

*    *    *

[The] . . . "Risk Factors", in our Annual Report on Form 10-K for the year ended December 31, 2019, as filed with the SEC on February 28, 2020, *and in our Quarterly Report on Form 10-Q* for the quarter ended March 31, 2020, as filed with the SEC on *April 30, 2020*, the applicable prospectus supplement and any related free-writing prospectus and elsewhere in the documents incorporated by reference into this prospectus.[29]

178.    In this way Maag repeated the "risk factors" he and other executives made in the Company's annual and quarterly reports discussed above (§VI.A.), thereby assuring investors that as of June 9, 2020, there *still* had been "*no material changes* in [the] risk" – the mere "risk" – that the Company might, theoretically violate "*key* regulations" such as the False Claims Act and Anti-Kickback Statute.  These statements were all false or misleading for the reasons set forth above and for the additional reason that more time had passed and more false claims and kickback violations continued occurring.

179.    Maag knew or should have known these statements were false or misleading at the time they were made because the Company was then actively engaged in systematic violations of the False Claims Act and the Anti-Kickback Statute by, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

---

[29]    The registration statement and base prospectus refer to these documents under the heading "IMPORTANT INFORMATION INCORPORATED BY REFERENCE."

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 63 -

1               (c)       intentionally excluding from the AlloSure test requisition form a field where

2 the physician could indicate why the test was medically necessary so the physician and Medicare

3 personnel handling the reimbursement would not be immediately tipped off that medical necessity

4 was a prerequisite to Medicare reimbursement;

5               (d)       further obscuring the requirement for medical necessity by using an entirely

6 paper-based claims submission system, which made tracing claims virtually impossible;

7               (e)       using the KOAR study to illegally seek Medicare reimbursement for

8 medically unnecessary AlloSure tests that were performed through the KOAR study;

9               (f)       offering extravagant inducements or kickbacks to physicians and others to

10 encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

11 doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

12 key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

13 Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

14 restaurants, where they dined on CareDx's dime;

15              (g)       offering sham "advisory board" positions to physicians to encourage them to

16 order AlloSure tests;

17              (h)       taking physicians on "booze" cruises, helicopter tours, and expensive

18 vacations;

19               (i)       paying illegal kickbacks to physicians to encourage them to conduct AlloSure

20 blood tests;

21              (j)       offering to waive patient costs associated with AlloSure tests; and

22              (k)       paying physicians $35,000 to $40,000 in exchange for enrolling their patients

23 in CareDx's KOAR study.

24       180.     To raise the $125 million from investors like the retirement fund Lead Plaintiffs in

25 this case, on June 11, 2020, the Company filed publicly the underwriting agreement Maag signed

26 with various investment banks; the document states:

27          ***Compliance with Health Care Laws***.  The Company and, to the Company's
28          knowledge, its directors, employees and agents (while acting in such capacity) ***are in
           material compliance with, all health care laws*** applicable to the Company, or any of

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 64 -

its products or activities, including, but not limited to, the federal **Anti-Kickback Statute** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law (42 U.S.C. Section 1320a-7a(a)(5)), the civil **False Claims Act** (31 U.S.C. Section 3729 *et seq.*), the administrative False Claims Law (42 U.S.C. Section 1320a-7b(a)), the Stark law (42 U.S.C. Section 1395nn) . . . . To the Company's knowledge, **there are no facts or circumstances** that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws.

181.    In filing these June 10, 2020 compliance assurances, the Company tacked on a cover document that *admitted* the underwriting agreement was important or "material" to investors, describing the underwriting agreement under the heading "***Entry into a Material Definitive Agreement***." There, the Company told investors to review the underwriting agreement: "the Underwriting Agreement *is incorporated* herein by reference only *to provide investors with information* regarding the terms of the Underwriting Agreement, and not to provide investors with any *other* factual information regarding the Company or its business, and should be read in conjunction with the disclosures in the Company's periodic reports and other filings with the SEC." In this way the Company invited reasonable investors to rely on the factual information in the underwriting agreement; but, as to "*other*" factual information – such as financial statements – they should review "*other*" disclosures.

182.    Furthermore, successful execution of the Underwriting Agreement was a condition to closing the $125 million funding CareDx needed to stay alive. According to the Company's financial statements of March 31, 2020 – signed by Maag – the Company had a meager $32 million in cash and cash equivalents, *down* from $38 million three months earlier. Indeed, in the Company's annual report that Maag signed and the Company filed in on February 28, 2020, Maag admitted: "As of December 31, 2019, we had cash and cash equivalents of $38.2 million and an accumulated deficit of $333.8 million." In other words, Maag was running the Company beyond its means. As CEO, during the six quarters leading up to the Company's June 2020 request that investors give the Company more money, Maag delivered the following results, showing continuous losses, measured in millions of dollars:

| Quarter Ending | Net Income |
|---|---|
| 12/31/18 | -3.75 |
| 03/31/19 | -7.53 |
| 06/30/19 | -7.85 |
| 09/30/19 | -1.81 |
| 12/31/19 | -4.78 |
| 03/31/20 | -5.82 |

183.    Running the Company in the red did not cause Maag to suffer financially. To the contrary. Among the "IMPORTANT INFORMATION INCORPORATED BY REFERENCE" into the June 9, 2020 offering documents are other documents that address Maag's compensation, including a proxy statement, which Maag himself signed on April 29, 2020. The document shows Maag had **$8.3 million** in equity awards as of the end of 2019; this fact is important because it shows Maag had a powerful motive to misrepresent the unlawful conduct that he used to run the Company – namely, that if Maag failed to raise the $125 million from investors, the Company would soon run out of money and into insolvency, rendering his personal **$8.3 million** in equity worthless.

184.    CareDx emphasized the importance of this stock offering to investors by touting it in a June 10, 2020 press release disseminated to investors via *GlobeNewswire* headlined: "CareDx Announces Pricing of Public Offering of Common Stock" and more specifically touting "the pricing of an underwritten public offering of 3,906,250 shares of its common stock at a public offering price of $32.00 per share." Five days later, on June 15, 2020, CareDx put out yet another press release announcing the closing of the same offering.

185.    Moreover, investment analysts took intense interest in the offering and breathed a sigh of relief when the Company reported that investors gave the Company more money. On June 19, 2020, analysts from H.C. Wainwright reported: "[f]inancing completed" and "the company closed a public offering of 3.9M shares at $32 per share for net proceeds of $117.1M" with additional shares sold in the offering "bringing the total shares issued to 4.5M and total net proceeds to $134.7M." The cash infusion clearly was material as the Wainwright analysts' financial models showed the Company would be essentially bankrupt by the end of 2020 in its absence; specifically, the financial models projected $29.9 million in losses for the year, which, with only $32 million cash on hand, would place the Company on the brink of bankruptcy. However, the $134 million infusion

1  – resting, in part, on the false statements that the Company was in compliance with key rules and any

2  theoretical violations were mere "risks" – kept the Company afloat.

3      186.    Additionally, as discussed further below, Defendant Seeto would later explain to

4  investors that the Company's large stock offerings gave the Company a critical "competitive

5  advantage" over its peers, which did ***not*** have such capital, leading to "very positive feedback from

6  our long-term investors."

7      187.    Seeto knew or should have known that the Company's assurances that it complied

8  with "all healthcare laws," including the False Claims Act and the Anti-Kickback Statute, were false

9  and misleading when they were made because the Company was then actively engaged in systematic

10 violations of the False Claims Act and the Anti-Kickback Statute by, among other things:

11          (a)     using RemoTraC to illegally bundle medically unnecessary AlloSure tests

12 with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary

13 AlloSure tests;

14          (b)     deliberately obscuring from patients and doctors that AlloSure tests were

15 being performed;

16          (c)     intentionally excluding from the AlloSure test requisition form a field where

17 the physician could indicate why the test was medically necessary so the physician and Medicare

18 personnel handling the reimbursement would not be immediately tipped off that medical necessity

19 was a prerequisite to Medicare reimbursement;

20          (d)     further obscuring the requirement for medical necessity by using an entirely

21 paper-based claims submission system, which made tracing claims virtually impossible;

22          (e)     using the KOAR study to illegally seek Medicare reimbursement for

23 medically unnecessary AlloSure tests that were performed through the KOAR study;

24          (f)     offering extravagant inducements or kickbacks to physicians and others to

25 encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

26 doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

27 key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL      - 67 -
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

Napa Valley, where they were chauffeured around in limousines and brought to vineyards and restaurants, where they dined on CareDx's dime;

        (g)    offering sham "advisory board" positions to physicians to encourage them to order AlloSure tests;

        (h)    taking physicians on "booze" cruises, helicopter tours, and expensive vacations;

        (i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure blood tests;

        (j)    offering to waive patient costs associated with AlloSure tests; and

        (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients in CareDx's KOAR study.

**C.    June 13, 2020: Defendants Broadcast that Their Mobile Testing Does the "Standard Panel of Routine Transplant Tests"**

188.    At the same time Maag was assuring investors that the Company complied with all healthcare laws, he and other executives stated or approved the dissemination of materially false and misleading statements about the Company's illegal test bundling program (RemoTraC); specifically, on June 13, 2020 and three other dates,[30] they stated that the Company's bundling program would run patients' "*standard panel of routine transplant tests*":

---

[30] In addition to the June 13, 2020 statement (*see* https://twitter.com/CareDx/status/1329933813036802050), the Company published substantially identical statements throughout 2020; *see, e.g.*, ***August 21, 2020*** (https://twitter.com/CareDx/status/1296826863294308362); ***October 17, 2020*** (https://twitter.com/CareDx/status/1317535615039188994); ***November 20, 2020*** (https://twitter.com/CareDx/status/1329933813036802050).



189.    These public statements were materially false and misleading at the time because the RemoTraC scheme involved a systematic practice of surreptitiously administering expensive AlloSure tests that were **not** the "standard panel of routine tests."  Indeed, Maag testified in another case that different tests used to assess kidney filtration and biopsy were the "standard of care." When asked: "Before the work that you did in this area at CareDx, how long were – these protocols **for serum creatinine and biopsy**, how long were they embedded in the medical community?" Maag responded: "Decades, decades.  **That was the standard of care**; this is what was used in order to monitor these patients."  The AlloSure tests – at over $2,800 **per** test – were far from the routine standard of care tests reimbursed by Medicare.  For example, the average per-draw cost of the serum creatinine is just **$22**.

190.    Maag knew or should have known the foregoing statements were false or misleading at the time due to, among others, the following omitted facts:

(a)     Defendants were using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

1          (b)     Defendants were illegally paying kickbacks to physicians to encourage them

2  to order AlloSure tests; and

3          (c)     Defendants were illegally paying excessive draw fees to phlebotomists, who

4  were responsible for drawing blood for the medically unnecessary AlloSure tests that were

5  administered through RemoTraC.

6      **D.**     **August 4, 2020: Despite Running the Unlawful Bundling Business**
               **Since March 2020, Defendants Assure Investors "No Material**

7               **Changes" in Risks Since 2019**

8      191.     On August 4, 2020, the Company publicly filed with the SEC its report for the second

9  financial quarter of the year.  Maag signed the report.  In it, Maag stated that there "have been no

10  material changes in the risk factors" set forth the Company's 2019 Annual Report regarding the

11  particular purportedly hypothetical "risks" that were materially false and misleading (as Maag knew

12  or should have known) for the reasons set forth above.  §§IV.C., VI.A.-C.

13      **E.**     **August 4, 2020: CareDx Touts a 41% Increase in Testing Revenue,**
               **Pointing to Supposed Legitimate Business Practices While Improperly**

14               **Omitting Unlawful Conduct's Contribution**

15      192.     Maag made more materially false and misleading statements in the August 4, 2020

16  quarterly report in the section of the report entitled "MANAGEMENT'S DISCUSSION AND

17  ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" – signed by

18  Maag – wherein Maag stated:

19          Testing services ***revenue increased*** by $10.6 million, or ***41%***, for the three
            months ended June 30, 2020 as compared to the same period in 2019.  This increase

20          is primarily ***due to*** an increase of more than 5,200 test results provided in the three
            months ended June 30, 2020, compared to the same period in 2019.

21

22      193.     These statements were false or misleading because they attributed revenue growth to

23  legal conduct, but failed to disclose that illegal Medicare false claims and illegal kickbacks

    materially contributed to the revenue increase.
24

25      **F.**     **October 29, 2020: Still Falsely Assuring Investors "No Material**
               **Changes" in Risks Since 2019, CareDx Continues Touting**

26               **Purportedly Lawful Revenue Growth**

27      194.     On October 29, 2020, the Company publicly filed with the SEC its report for the third

28  financial quarter of the year.  Maag signed the report.  In the report, Maag stated that there "have

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 70 -

been no material changes in the risk factors" set forth the Company's 2019 Annual Report regarding the particular purportedly hypothetical "risks" that were materially false and misleading (as Maag knew or should have known) for the reasons set forth above. §§IV.C., VI.A.-C.

195.    In the same quarterly report, under the heading "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS," Maag stated:

> Testing services **revenue increased by $17.3 million, or 61%**, for the three months ended September 30, 2020 as compared to the same period in 2019. This increase is primarily **due to** an increase of more than 8,500 AlloSure Kidney and AlloMap Heart patient results provided in the three months ended September 30, 2020, compared to the same period in 2019.

196.    These statements were false or misleading because they attributed revenue growth to legal conduct, but failed to disclose that illegal Medicare false claims and illegal kickbacks materially contributed to the revenue increase.

### G.    January 21, 2021: CareDx Doubles Down on Its "Compliance with Health Care Laws" Assurances to Raise Another $175 Million from the Investing Public

197.    On January 20, 2021, in connection with the filing of the Company's prospectus offering up to 2,211,538 shares of common stock to the investing public at $91 per share, the Company issued a press release. The release included the following information:

**CareDx Announces Pricing of Public Offering of Common Stock**

SOUTH SAN FRANCISCO, Calif., January 20, 2021 (GLOBE NEWSWIRE) – CareDx, Inc. (Nasdaq: CDNA), a leading precision medicine company focused on the discovery, development and commercialization of clinically differentiated, high-value healthcare solutions for transplant patients and caregivers, today announced the pricing of an underwritten public offering of 1,923,077 shares of its common stock at a public offering price of $91.00 per share. The gross proceeds to CareDx from this offering, before deducting underwriting discounts and commissions and offering expenses, are expected to be **$175,000,007**. In addition, CareDx has granted the underwriters a 30 day option to purchase up to 288,461 additional shares of its common stock offered in the public offering on the same terms and conditions. The offering is expected to close on or about January 25, 2021, **subject to the satisfaction of customary closing conditions**.

198.    On January 21, 2021, the Company filed a supplemental prospectus with the SEC pursuant to the June 9, 2020 Registration Statement that Maag signed. It incorporated the Risk Factors listed in the 2019 Form 10-K, 1Q21 Form 10-Q, 2Q20 Form 10-Q, and 3Q20 Form 10-Q,

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 71 –

which were materially false and misleading for the reasons discussed *supra* (§VI.A.1.). Maag thus repeated the "risk factors" Maag and other executives made in the Company's annual and quarterly reports discussed above (§§IV.C., VI.A.), thereby assuring investors that, as of January 21, 2021, there *still* had been "no material changes in [the] risk" – the mere "risk" – that the Company might theoretically violate "key regulations" such as the False Claims Act and Anti-Kickback Statute. These statements were all false or misleading for the reasons set forth above and for the additional reason that more time had passed and more false claims and kickback violations continued occurring.

199. Maag knew or should have known the foregoing statements were false or misleading at the time because the Company was then actively engaged in systematic violations of the False Claims Act and the Anti-Kickback Statute by, among other things:

(a) using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b) deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c) intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement;

(d) further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e) using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

(f) offering extravagant inducements or kickbacks to physicians and others to encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

1   Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

2   restaurants, where they dined on CareDx's dime;

3               (g)    offering sham "advisory board" positions to physicians to encourage them to

4   order AlloSure tests;

5               (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

6   vacations;

7               (i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure

8   blood tests;

9               (j)    offering to waive patient costs associated with AlloSure tests; and

10              (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

11  in CareDx's KOAR study.

12          200.    Also on January 21, 2021, the Company publicly filed the underwriting agreement

13  that Seeto signed with the various investment banks so CareDx could raise the $175 million that

14  Maag and Seeto wanted to raise.  There, Seeto assured investors the Company was in material

15  compliance with all healthcare laws:

16          ***Compliance with Health Care Laws***.  The Company and, to the Company's
        knowledge, its directors, employees and agents (while acting in such capacity) ***are in***
17      ***material compliance with, all health care laws*** applicable to the Company, or any of
        its products or activities, including, but not limited to, the federal Anti-Kickback
18      ***Statute*** (42 U.S.C. Section 1320a-7b(b)), Section 1320a-7a(a)(5)), the civil ***False***
        ***Claims Act*** (31 U.S.C. Section 3729 *et seq.*), the administrative False Claims Law
19      (42 U.S.C. Section 1320a-7b(a)), the Stark law (42 U.S.C. Section 1395nn) . . . .  To
        the Company's knowledge, ***there are no facts or circumstances*** that would
20      reasonably be expected to give rise to material liability of the Company under any
        Health Care Laws.

21

22  In filing these assurances, the Company admitted the underwriting agreement was important or

23  "material" to investors and described the underwriting agreement under the heading "Entry into a

24  Material Definitive Agreement."  There, the Company told investors to review the underwriting

25  agreement:  "[T]he Underwriting Agreement is incorporated herein by reference only to ***provide***

26  ***investors with information*** regarding the terms of the Underwriting Agreement, and not to provide

27  investors with any other factual information regarding the Company or its business, and ***should be***

28

1  *read* in conjunction with the disclosures in the Company's periodic reports and *other* filings with the

2  SEC."

3      201.    Seeto knew or should have known the Company's assurances that it complied with

4  "all healthcare laws," including the False Claims Act and the Anti-Kickback Statute, were false and

5  misleading when they were made because the Company was then actively engaged in systematic

6  violations of the False Claims Act and the Anti-Kickback Statute by, among other things:

7      (a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests

8  with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary

9  AlloSure tests;

10      (b)    deliberately obscuring from patients and doctors that AlloSure tests were

11  being performed;

12      (c)    intentionally excluding from the AlloSure test requisition form a field where

13  the physician could indicate why the test was medically necessary so the physician and Medicare

14  personnel handling the reimbursement would not be immediately tipped off that medical necessity

15  was a prerequisite to Medicare reimbursement;

16      (d)    further obscuring the requirement for medical necessity by using an entirely

17  paper-based claims submission system, which made tracing claims virtually impossible;

18      (e)    using the KOAR study to illegally seek Medicare reimbursement for

19  medically unnecessary AlloSure tests that were performed through the KOAR study;

20      (f)    offering extravagant inducements or kickbacks to physicians and others to

21  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

22  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

23  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

24  Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

25  restaurants, where they dined on CareDx's dime;

26      (g)    offering sham "advisory board" positions to physicians to encourage them to

27  order AlloSure tests;

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 74 -

1          (h)     taking physicians on "booze" cruises, helicopter tours, and expensive

2  vacations;

3          (i)     paying illegal kickbacks to physicians to encourage them to conduct AlloSure

4  blood tests;

5          (j)     offering to waive patient costs associated with AlloSure tests; and

6          (k)     paying physicians $35,000 to $40,000 in exchange for enrolling their patients

7  in CareDx's KOAR study.

8          202.    In this way, the Company invited reasonable investors to rely on the factual

9  information in the underwriting agreement but as to "*other*" factual statements – such as financial

10 performance – should review "*other*" disclosures.

11         203.    Furthermore, successful execution of the Underwriting Agreement was a condition to

12 closing the $175 million funding necessary to keep CareDx operating after multiple quarters

13 operating in the red, detailed above (*supra* §VI.B.).

14         204.    This stock offering was thus unquestionably of intense interest to investors as it was

15 designed to secure a large and much-needed source of funding.  Indeed, the offering was so

16 significant to the Company that it issued three separate press releases about the January 2021

17 offering (a press release announcing the offering, a second announcing pricing of the offering, and a

18 third announcing the closing of the offering).[31]  Like the Company's other stock offering, the large

19 stock offering the foregoing statements supported was of intense interest to investors.  Seeto

20 admitted as much in a retrospective commentary, reflecting that the cash it raised gave the Company

21 a "competitive advantage" over its peers, which did ***not*** have such capital, and that the funding

22 generated "very positive feedback" from investors:

23             Now on to the first topic, our excellent financial profile.  Our Board and
            Management team believe that maintaining a strong balance sheet is important to
24          CareDx's success.  You may recall that in ***Q1 of last year [first quarter of 2021]***, we
            took advantage of a favorable market condition to bolster our cash position by raising

25

26 ---

[31] https://investors.caredx.com/news/news-details/2021/CareDx-Announces-Proposed-Public-
27 Offering-of-Common-Stock-01-19-2021/default.aspx;    https://investors.caredx.com/news/news-
   details/2021/CareDx-Announces-Pricing-of-Public-Offering-of-Common-Stock-01-20-2021/
   default.aspx; https://investors.caredx.com/news/news-details/2021/CareDx-Announces-Closing-of-
28 Public-Offering-of-Common-Stock-01-25-2021/default.aspx.

1   $188 million through a public stock offering, ensuring that we can be self-funding for
    the foreseeable future.

2
            This is a competitive advantage for CareDx in the current market
3   environment, particularly as we have a clear path to profitability. ***Unlike our peers,
    we will not have a near-term need to raise capital***.  And over the longer term, we
4   have the flexibility to deploy capital in a way that we will increase the value for
    shareholders.  ***We received very positive feedback from our long-term investors on
5   this***.

6   Clearly, raising $175 million in cash ($188 million after exercising other sales rights) is of intense

7   interest to investors in the Company seeking or raising the money.  Seeto's admissions reinforce this

8   fact.

9       **H.    February 18, 2021: The BTIG Investor Conference**

10      205.    On February 18, 2021, CareDx presented at the BTIG Virtual MedTech, Digital

11  Health, Life Sciences, and Diagnostic Tools Conference.  In response to an analyst question about

12  the growth drivers of CareDx's "record" year, Defendant Seeto represented that "what worked really

13  well for us [in the kidney space] during COVID is that centers were able to ask us for help and

14  support and ***we were able to address their needs and demands and I think RemoTraC is a really***

15  ***good example of that***."

16      206.    In direct response to a follow-up question about RemoTraC, Defendant Seeto further

17  responded:

18      And I think what really stood out to me is that we were able to put together a[n]
        offering and put together a structure within the course of [four] days.  And I don't
19      think you can really do that as a company if you don't have pre-existing relationships
        and a pre-existing pool from within that transplant community.
20
            So we were really pleased and honored to be able to then create this mobile
21      phlebotomy service and scale it up, ***such that during Q2 40% of our testing was
        done through mobile***.  And so that really was sort of a new model for us and that
22      business is now something which is sustainable and it's going to be maintained as
        non-intent patients want to really keep this service. . . .  ***So, again, I think
23      RemoTraC was addressing [an] unmet need*** and I think what helped us is we could
        move very quickly to bring it to bear particularly during a time of crisis in the
24      transplant community.

25      207.    Defendant Seeto's statements that the Company's business model focused on mobile

26  phlebotomy, which purportedly "was addressing unmet need," were false and misleading.  In reality,

27  as Defendant Seeto knew, the RemoTraC scheme was built on illegal conduct that violated the False

28  Claims Act, the Anti-Kickback Statute, the Sunshine Act, and other laws; in fact, as alleged further

1  above, Defendants deliberately and systematically used RemoTraC to bill Medicare for tests that

2  were *not* medically necessary and did *not* meet Medicare's requirements, in direct violation of the

3  False Claims Act.  To the extent any reasonable investor would think Seeto's "unmet needs" focused

4  exclusively on the act of drawing blood itself, any reasonable investor would still find Seeto's

5  "unmet needs" statement materially misleading: (1) the vial of blood the patients *did* need to give for

6  their "standard of care" tests could satisfy "unmet needs"; but (2) the separate vial of blood patients

7  gave *unnecessarily* at the same time was *not needed*, and no reasonable person would give *more*

8  *blood* knowing the additional draw was unnecessary.  Moreover, because Medicare started refusing

9  *50%* of the bills CareDx sent for reimbursement after the DOJ and SEC pulled the plug on CareDx's

10 overbilling scheme, patients had "pending charges" of approximately *$90,000 to $120,000* – as

11 FE-10 explained – far from addressing any "unmet need."

12      208.    Further, Seeto knew or should have known the foregoing statements were false or

13 misleading at the time because – far from addressing an "unmet need" – Defendants were using

14 RemoTraC to:

15          (a)    illegally bundle medically unnecessary AlloSure tests with routine "standard

16 of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

17          (b)    illegally pay kickbacks to physicians to encourage them to order AlloSure

18 tests; and

19          (c)    illegally pay excessive draw fees to phlebotomists, who were responsible for

20 drawing blood for the medically unnecessary AlloSure tests that were administered through

21 RemoTraC.

22  **I.    February 24, 2021: Fourth Quarter and Full Year 2020 Annual**
         **Report and Conference Call**
23

24      209.    On February 24, 2021, the Company filed its 2020 Annual Report with the SEC on

25 Form 10-K.  Maag and Seeto signed the document.  Seeto certified as CEO that the "report does not

26 contain any untrue statement of a material fact or omit to state a material fact necessary to make the

27 statements made, in light of the circumstances under which such statements were made, not

28

misleading." Yet Maag and Seeto nonetheless stated, in describing Dr. Olymbios' whistleblower actions against CareDx:

> For example, we recently became aware that in October 2020, prior to terminating employment and joining a competitor of ours with which we are in current litigation, a *former employee* of ours *downloaded* certain of our confidential and privileged *information* without permission. After our claims against this former employee were filed, the former employee subsequently brought *various claims* against us. We are in the process of reviewing and, with the assistance of counsel, have conducted certain interviews and gathered information. We intend to vigorously pursue and defend against these matters. Although we believe we have strong claims against, and good and substantial defenses to the *claims made by, the former employee*, there is no guarantee that we will prevail in these matters.

210. As of February 24, 2021, it was not known publicly that Dr. Olymbios had "downloaded" documents to give *to the DOJ and SEC* as an official whistleblower to alert government officials of the Company's fraudulent and unlawful conduct. Neither was it publicly known that Dr. Olymbios was not any low-level "former employee"; rather, he was one of the most senior officials at the Company, reporting directly *to Seeto* himself. Nor were any details known about Dr. Olymbios' "claims" against CareDx, as he summarized in an email to Lead Plaintiff's counsel in *this* case: "The entire enterprise is a house of cards generating revenue through illicit conduct."

211. Further, Maag knew or should have known the foregoing statements were false or misleading when made because Dr. Olymbios' claims against CareDx involved substantiated allegations that CareDx systematically violated the False Claims Act and the Anti-Kickback Statute by, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare

1  personnel handling the reimbursement would not be immediately tipped off that medical necessity

2  was a prerequisite to Medicare reimbursement;

3  (d)  further obscuring the requirement for medical necessity by using an entirely

4  paper-based claims submission system, which made tracing claims virtually impossible;

5  (e)  using the KOAR study to illegally seek Medicare reimbursement for

6  medically unnecessary AlloSure tests that were performed through the KOAR study;

7  (f)  offering extravagant inducements or kickbacks to physicians and others to

8  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

9  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

10  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

11  Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

12  restaurants, where they dined on CareDx's dime;

13  (g)  offering sham "advisory board" positions to physicians to encourage them to

14  order AlloSure tests;

15  (h)  taking physicians on "booze" cruises, helicopter tours, and expensive

16  vacations;

17  (i)  paying illegal kickbacks to physicians to encourage them to conduct AlloSure

18  blood tests;

19  (j)  offering to waive patient costs associated with AlloSure tests; and

20  (k)  paying physicians $35,000 to $40,000 in exchange for enrolling their patients

21  in CareDx's KOAR study.

22  212.  On February 24, 2021, on Form 10-K, which Maag and Seeto signed, reporting

23  results for the fourth quarter and full year 2020, Maag and Seeto stated:

24  Testing services **revenue increased** by $59.1 million, or 56%, for the year
ended December 31, 2020, compared to the same period in 2019.  This increase is

25  primarily **due to** an increase of more than 29,000 AlloSure Kidney, AlloMap Heart
and AlloSure Heart patient results provided during the year ended December 31,

26  2020, compared to the year ended December 31, 2019.

27

28

213.    These statements were false or misleading because they attributed revenue growth to legal conduct, but illegal Medicare false claims and illegal kickbacks materially contributed to the revenue increase.

214.    Maag and Seeto knew or should have known the foregoing statements were false or misleading at the time because CareDx's increased revenue was materially impacted by Defendants' False Claims Act and Anti-Kickback Statute violations, which included, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement;

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e)    using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

(f)    offering extravagant inducements or kickbacks to physicians and others to encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in Napa Valley, where they were chauffeured around in limousines and brought to vineyards and restaurants, where they dined on CareDx's dime;

(g)    offering sham "advisory board" positions to physicians to encourage them to order AlloSure tests;

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 80 -

1          (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

2  vacations;

3          (i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure

4  blood tests;

5          (j)    offering to waive patient costs associated with AlloSure tests; and

6          (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

7  in CareDx's KOAR study.

8       215.    On February 24, 2021, CareDx held an earnings conference call to discuss its fourth

9  quarter and full year 2020 financial results. During the call, Defendant Seeto stated:

10     [Unidentified Analyst:]

11       And then just one last quick one on **RemoTraC**. I think you said it was ***40% of volumes here in the fourth quarter***. Any thoughts on how you're thinking about

12       that in the first quarter here or full year 2021? And then any tweaks or improvements you've made to the program as you get more data and feedback as we approach the

13       one year launch coming up next month?

14     Reginald Seeto – CareDx, Inc. – President & Chief Business Officer

15       Yes. No, with, I think, with **RemoTraC**, this is something that was probably

16       ***the highlight of last year*** what we did as an organization as we rallied around supporting patients and transplant centers. It's with such an ***unmet need*** and we were able to put it together so quickly and had such a fantastic response now more

17       than 150 centers are using it.

18       216.    That RemoTraC addressed an "unmet need" was false and misleading. In reality, as

19  Defendant Seeto knew, the RemoTraC business was built on illegal schemes: Defendants

20  deliberately and systematically used RemoTraC to bill Medicare for tests that were ***not*** medically

21  necessary and did ***not*** meet Medicare's requirements, in direct violation of the False Claims Act. To

22  the extent any reasonable investor would think Seeto's "unmet needs" focused exclusively on the act

23  of drawing blood itself, any reasonable investor would still find Seeto's "unmet needs" statement

24  materially misleading: (1) the vial of blood the patients ***did*** need to give for their "standard of care"

25  tests could satisfy "unmet needs"; but (2) the separate vial of blood patients gave ***unnecessarily*** at

26  the same time was ***not needed***, and no reasonable person would give ***more blood*** knowing the

27  additional draw was unnecessary. Moreover, because Medicare started refusing ***50%*** of the bills

28  CareDx sent for reimbursement after the DOJ and SEC pulled the plug on CareDx's overbilling

1    scheme, patients had "pending charges" of approximately ***$90,000 to $120,000*** – as FE-10 explained

2    – far from addressing any "unmet need."

3    217.    Further, Seeto knew or should have known the foregoing statements were false or

4    misleading at the time because – far from addressing an "unmet need" – Defendants were using

5    RemoTraC to:

6            (a)    illegally bundle medically unnecessary AlloSure tests with routine "standard

7    of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

8            (b)    illegally pay kickbacks to physicians to encourage them to order AlloSure

9    tests; and

10           (c)    illegally pay excessive draw fees to phlebotomists, who were responsible for

11   drawing blood for the medically unnecessary AlloSure tests that were administered through

12   RemoTrac.

13   **J.    May 5, 2021: First Quarter 2021 Financial Results Report and**
14   **Conference Call**

15   218.    On May 5, 2021, on Form 10-Q, which Seeto and Dhingra signed, reporting results

     for the first quarter of 2021, Seeto and Dhingra stated:
16

17           Testing services ***revenue increased by $27.8 million, or 89%***, for the three
             months ended March 31, 2021 compared to the same period in 2020. This increase is
18           primarily ***due to*** an increase of more than 18,000 AlloSure Kidney, AlloMap Heart
             and AlloSure Heart patient results provided in the three months ended March 31,
19           2021, compared to the same period in 2020.

20   219.    Also on May 5, 2021, CareDx hosted an earnings conference call for the first quarter

21   of 2021. During the call, Defendant Seeto stated: "For our record first quarter, ***total revenue*** was

22   $67.4 million, increasing 76% compared to a year ago quarter. ***The driver of the quarter's growth***

23   ***was our testing services revenue*** which increased 89% to $59.3 million . . . ."

24   220.    These statements about revenue growth were false or misleading because they

25   attributed revenue growth to legal conduct, but illegal Medicare false claims and illegal kickbacks

     materially contributed to the revenue increase.
26

27

28

221.    Seeto and Dhingra knew or should have known the foregoing statements were false or misleading because, at the time, CareDx's testing services revenue was driven by systematic False Claims Act and Anti-Kickback Statute violations, including, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement;

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e)    using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

(f)    offering extravagant inducements or kickbacks to physicians and others to encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in Napa Valley, where they were chauffeured around in limousines and brought to vineyards and restaurants, where they dined on CareDx's dime;

(g)    offering sham "advisory board" positions to physicians to encourage them to order AlloSure tests;

(h)    taking physicians on "booze" cruises, helicopter tours, and expensive vacations;

(i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure blood tests;

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 83 -

1    (j)    offering to waive patient costs associated with AlloSure tests; and

2    (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

3  in CareDx's KOAR study.

4    **K.    July 29, 2021: Second Quarter 2021 Earnings Call Statements**

5    222.    On July 29, 2021, Defendants reported financial results for the second quarter of 2021

6  and held a conference call to discuss the results.  In the July 29, 2021 Form 10-Q, which Seeto and

7  Dhingra signed, reporting results for the second quarter of 2021, Seeto and Dhingra stated:

8    Testing services ***revenue increased by $28.6 million, or 79%***, for the three
        months ended June 30, 2021 compared to the same period in 2020.  This increase is
9    primarily ***due to*** an increase of more than 20,000 AlloSure Kidney, AlloMap Heart
        and AlloSure Heart patient results provided in the three months ended June 30, 2021,
10    compared to the same period in 2020.

11    223.    During the July 29, 2021 call, Defendant Seeto touted the Company's purportedly

12  strong financial results, noting that: "For the second quarter results, total revenue was $74.2 million

13  increasing 77% compared to the year ago quarter.  ***The main driver of growth in the quarter*** was

14  from our testing services revenue, which increased 79% to $64.9 million."  Defendant Seeto also

15  boasted that: "***We have also more than 9,000 patients that have signed up for RemoTraC***."

16    224.    These statements about revenue growth were false or misleading because they

17  attributed revenue growth to legal conduct, but illegal Medicare false claims and illegal kickbacks

18  materially contributed to the revenue increase.

19    225.    Seeto and Dhingra knew or should have known the foregoing statements were false or

20  misleading because, at the time, CareDx's testing services revenue was driven by systematic False

21  Claims Act and Anti-Kickback Statute violations, including, among other things:

22    (a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests

23  with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary

24  AlloSure tests;

25    (b)    deliberately obscuring from patients and doctors that AlloSure tests were

26  being performed;

27    (c)    intentionally excluding from the AlloSure test requisition form a field where

28  the physician could indicate why the test was medically necessary so the physician and Medicare

1    personnel handling the reimbursement would not be immediately tipped off that medical necessity

2    was a prerequisite to Medicare reimbursement;

3            (d)    further obscuring the requirement for medical necessity by using an entirely

4    paper-based claims submission system, which made tracing claims virtually impossible;

5            (e)    using the KOAR study to illegally seek Medicare reimbursement for

6    medically unnecessary AlloSure tests that were performed through the KOAR study;

7            (f)    offering extravagant inducements or kickbacks to physicians and others to

8    encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

9    doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

10   key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

11   Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

12   restaurants, where they dined on CareDx's dime;

13           (g)    offering sham "advisory board" positions to physicians to encourage them to

14   order AlloSure tests;

15           (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

16   vacations;

17           (i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure

18   blood tests;

19           (j)    offering to waive patient costs associated with AlloSure tests; and

20           (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

21   in CareDx's KOAR study.

22      **L.    October 28, 2021: Third Quarter 2021 Financial Results Conference
                Call Statements**

23

24       226.    On October 28, 2021, on Form 10-Q, which Seeto and Dhingra signed, reporting

25   results for the third quarter of 2021, Seeto and Dhingra stated:

26           Testing services ***revenue increased by $77.4 million, or 68%***, for the nine
         months ended September 30, 2021 compared to the same period in 2020.  This
         increase is primarily ***due to*** an increase of more than 56,000 AlloSure Kidney,
27       AlloMap Heart and AlloSure Heart patient results provided in the nine months ended
         September 30, 2021, compared to the same period in 2020.

28

227.    On October 28, 2021, during the CareDx's third quarter earnings conference call, Defendant Seeto again touted the Company's financial results, stating that: "During Q3, we delivered record revenues of $75.6 million with growth of 42% over the prior year.  Notably, our Q3 testing services volumes grew 86% as compared to the year ago quarter."  Defendant Seeto elaborated that: "***The primary driver of revenue growth was from our testing services, which increased 46% to $66.5 million.***"

228.    These statements about revenue growth were false or misleading because they attributed revenue growth to legal conduct, but illegal Medicare false claims and illegal kickbacks materially contributed to the revenue increase.

229.    Seeto and Dhingra knew or should have known the foregoing statements were false or misleading because, at the time, CareDx's testing services revenue was driven by systematic False Claims Act and Anti-Kickback Statute violations, including, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement;

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e)    using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

(f)    offering extravagant inducements or kickbacks to physicians and others to encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

1    key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

2    Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

3    restaurants, where they dined on CareDx's dime;

4          (g)    offering sham "advisory board" positions to physicians to encourage them to

5    order AlloSure tests;

6          (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

7    vacations;

8          (i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure

9    blood tests;

10          (j)    offering to waive patient costs associated with AlloSure tests; and

11          (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

12    in CareDx's KOAR study.

13          230.    During the same October 28, 2021 earnings call, concerned analysts also sought

14    clarity on whether, in light of newly announced government investigations and the simultaneous

15    sharp declines in ASPs, there had been "any changes in Medicare billing practices."  Specifically, a

16    Craig-Hallum analyst asked

   can you comment on the lower [Average Selling Prices] in the quarter?  If you take
   the testing revenue over volume, the price per test looks like it came down versus
17    Q2.  *And the difference was pretty pronounced this quarter*.  So just curious, *are*
18    *you seeing any changes in Medicare billing practices?  Or what else would really*
19    *influence that test price lower*?

20    In response, Dhingra unequivocally asserted that there had been "*no change*" in the Medicare part of

21    the business and that, rather, lower ASPs were the result of change in the "overall mix of business."

22    Specifically, Dhingra responded:

23    [S]o couple of observations there.  *One, . . . our overall mix of business, as we see*
   *higher adoption, we're seeing much higher mix of growth in the non-Medicare*
24    *part of the business.  And so that's the, by far, the largest impact*.  A lot of that is
   driven by you're seeing higher attach rates, say, on the AlloSure side, where our mix
25    of coverage is much lower than the traditional kidney business, say.  So that's one of
   the big contributors.

26
   To your specific question, any change in the billing practices?  *No, no*
27    *change.  We haven't observed anything on the Medicare billing practices*.  It's
   primarily the business mix where the volume growth is exceptionally strong, but *the*
28    *mix continues to evolve away from the core Medicare business*.

231.    Defendants' statements above that: (a) higher mix of growth in the non-Medicare business was impacting average selling prices; and (b) nothing had changed with respect to Medicare billing practices were also false and misleading.  Indeed, the true cause of Defendants' flagging Medicare growth and falling ASPs was ***not*** changes in payor mix caused by higher growth in the commercial business but the fact that, under scrutiny from the DOJ, the SEC, a state regulator, and various CMS audit programs targeted at "waste, fraud, and abuse," the Company could no longer engage in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for unnecessary tests and pay illegal kickbacks to phlebotomists and prescribing doctors, in violation of Medicare rules, the False Claims Act, and the Anti-Kickback Statute.

**M.    February 24, 2022: Fourth Quarter 2021 and Full Year 2022 Financial Results Statements**

232.    On February 24, 2022, CareDx hosted a conference call to discuss the Company's fourth quarter and full year 2021 financial results.  During the call, Defendant Seeto remarked:

> Q4 was another record quarter[] where we delivered revenues of $79.2 million, representing a growth of 35% over the prior year quarter.  For the full year 2021, we reported revenues of $296.4 million, representing a growth of 54%.  Notably, ***our record fourth quarter testing services volume*** of 41,900 tests represented a 67% year-over-year growth and led to our full year volume growth of 94% versus 2020.

Defendant Seeto also touted that: "In addition, we have more than 11,000 patients who have ***direct access*** to RemoTraC."  However, the Company's volume of 41,900 tests versus its testing services revenue of $68.65 million for the quarter meant that the Company's ASP had again declined, to just $1,638 per test, down from over $2,014 per test in the same quarter the prior year – a decline of almost 20%.

233.    In commenting on the decline in ASPs for the Company's tests, Defendant Dhingra explained:

> The amazing success of AlloSure Heart, combined ***with higher growth of commercial versus Medicaid volumes in 2021 resulted in very strong volume growth that materially outpaced our revenue growth***.
>
> ***In addition, in kidney testing, we saw patients shift from Medicare to Medicare Advantage plans for the changes introduced with the CARES Act last year***.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 88 —

234.    Defendants Seeto and Dhingra's statements above concerning "record" testing volumes, the number of patients with "direct access" to RemoTraC, and his purported explanations for the Company's continuing decline in ASPs were false and misleading.  Indeed, undisclosed to investors, ASPs were actually declining because Medicare – including Medicare Advantage plans – was increasingly denying reimbursement for CareDx's clearly unnecessary and fraudulently billed AlloSure tests, and because Defendants were quietly winding down the unsustainable RemoTraC scheme under scrutiny from the DOJ, the SEC, and a state regulator.  As the Company could no longer engage in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for unnecessary tests and pay illegal kickbacks in exchange for blood sample collection and AlloSure enrollment, Medicare revenue growth was plummeting.

235.    Further, Seeto and Dhingra knew or should have known the foregoing statements were false or misleading at the time bewcause Medicare was increasingly denying CareDx's claims for reimbursement as a result of CareDx's False Claims Act and Anti-Kickback Statute violations, including, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement;

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e)    using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 89 -

(f)      offering extravagant inducements or kickbacks to physicians and others to encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in Napa Valley, where they were chauffeured around in limousines and brought to vineyards and restaurants, where they dined on CareDx's dime;

(g)      offering sham "advisory board" positions to physicians to encourage them to order AlloSure tests;

(h)      taking physicians on "booze" cruises, helicopter tours, and expensive vacations;

(i)      paying illegal kickbacks to physicians to encourage them to conduct AlloSure blood tests;

(j)      offering to waive patient costs associated with AlloSure tests; and

(k)      paying physicians $35,000 to $40,000 in exchange for enrolling their patients in CareDx's KOAR study.

**N.    May 5, 2022: First Quarter 2022 Financial Results Earnings Call Statements**

236.    On May 5, 2022, CareDx held a conference call to discuss the Company's first quarter financial results.  In an attempt to explain the continuing decline in ASPs, Dhingra stated:

> Although we look at ASP by test offering, we understand some investors may look at revenues divided by total tests.  This aggregate average price declined by about 4.9% versus last quarter of 2021.  This decline came from [three] factors: ***Higher growth in patients with commercial insurance*** across all organs, where we have lower coverage today; changing volume mix between organs with strong success of AlloSure Heart and AlloSure Lung, where we have lower coverage today; ***continued increase in Medicare [A]dvantage patients in our kidney Services***.

Dhingra elaborated:

> Specific now to kidney.  Although the majority of patients are under Medicare, ***we have seen an increase in number of patients outside Medicare***, which is specifically impacting AlloSure Kidney realized prices.  ***This mix shift has come from [two] areas.  First, execution of our strategic plan to focus on community nephrology over the last 12 months, which has increased the number of patients on commercial coverage.  This is expected to continue as a core part of the growth strategy.***

*The second has been industry shift from Medicare to Medicare Advantage plans, driven by the 21st Century Cures Act*.

237.    Defendant's statements above concerning the purported reasons for the continuing decline in ASPs were false and misleading.  Indeed, undisclosed to investors, ASPs were actually declining because Medicare – *including* Medicare Advantage plans – was increasingly denying reimbursement for CareDx's clearly unnecessary and fraudulently billed AlloSure tests and because Defendants were quietly shutting down the unsustainable RemoTraC scheme under scrutiny from the DOJ, the SEC, and a state regulator.  Indeed, as Defendants' would ultimately admit, as many as **half** of the Company's AlloSure Kidney tests were not being approved for **any** payment.  As the Company could no longer maintain its fraudulent RemoTraC and kickback schemes, its Medicare revenue growth was plummeting.

238.    Dhingra knew or should have known the foregoing statements were false or misleading at the time because Medicare was increasingly denying CareDx's claims for reimbursement as a result of CareDx's False Claims Act and Anti-Kickback Statute violations, including, among other things:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement;

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e)    using the KOAR study to illegally seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 91 -

(f)    offering extravagant inducements or kickbacks to physicians and others to encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in Napa Valley, where they were chauffeured around in limousines and brought to vineyards and restaurants, where they dined on CareDx's dime;

(g)    offering sham "advisory board" positions to physicians to encourage them to order AlloSure tests;

(h)    taking physicians on "booze" cruises, helicopter tours, and expensive vacations;

(i)    paying illegal kickbacks to physicians to encourage them to conduct AlloSure blood tests;

(j)    offering to waive patient costs associated with AlloSure tests; and

(k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients in CareDx's KOAR study.

## O.    April 2020-December 2021: CareDx's Fraudulent Recognition of Revenue Violated GAAP

239.    CareDx improperly employed illegitimate testing procedures to achieve revenue growth and consensus estimates. Most notably, CareDx recognized revenue from transactions in violation of GAAP. More specifically, Defendants recognized revenue in contradiction of established accounting rules set forth in the FASB's Accounting Standards Codification Topic 606, Revenue from Contracts with Customers ("ASC 606"). CareDx disclosed to investors that it recognized revenue in accordance with GAAP and ASC 606.

240.    The core principle of ASC 606 is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. It is axiomatic that people should not pay for something they do not want and to which they never agreed. ASC 606

explains that, in accordance with that core principle, an entity recognizes revenue by applying the following steps:

Step 1: Identify the contract(s) with a customer – A contract is an agreement between two or more parties that creates enforceable rights and obligations. The guidance in this Topic applies to each contract that has been agreed upon with a customer and meets specified criteria. In some cases, this Topic requires an entity to combine contracts and account for them as one contract. This Topic also provides requirements for the accounting for contract modifications. (*See* paragraphs 606-10-25-1 through 25-13.)

Step 2: Identify the performance obligations in the contract – A contract includes promises to transfer goods or services to a customer. If those goods or services are distinct, the promises are performance obligations and are accounted for separately. A good or service is distinct if the customer can benefit from the good or service on its own or together with other resources that are readily available to the customer and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract. (*See* paragraphs 606-10-25-14 through 25-22.)

Step 3: Determine the transaction price – The transaction price is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The transaction price can be a fixed amount of customer consideration, but it may sometimes include variable consideration or consideration in a form other than cash. The transaction price also is adjusted for the effects of the time value of money if the contract includes a significant financing component and for any consideration payable to the customer. If the consideration is variable, an entity estimates the amount of consideration to which it will be entitled in exchange for the promised goods or services. The estimated amount of variable consideration will be included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved. (*See* paragraphs 606-10-32-2 through 32-27.)

Step 4: Allocate the transaction price to the performance obligations in the contract – An entity typically allocates the transaction price to each performance obligation on the basis of the relative standalone selling prices of each distinct good or service promised in the contract. If a standalone selling price is not observable, an entity estimates it. Sometimes, the transaction price includes a discount or a variable amount of consideration that relates entirely to a part of the contract. The requirements specify when an entity allocates the discount or variable consideration to one or more, but not all, performance obligations (or distinct goods or services) in the contract. (*See* paragraphs 606-10-32-28 through 32-41.)

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation – An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. A performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). For performance obligations satisfied over time, an entity recognizes revenue over time by selecting an appropriate method for measuring the entity's

progress toward complete satisfaction of that performance obligation.   (*See* paragraphs 606-10-25-23 through 25-30.)

241.    CareDx's accounting for Medicare-sourced revenue during the Class Period did not comply with certain of these criteria but nevertheless contributed to the Company's reported revenue growth during the respective periods at issue.  Specifically, during the Class Period, Defendants inflated the Company's reported Total revenue, Testing revenue, and revenue growth by systematically billing Medicare for tests that clearly were not medically necessary and did not meet Medicare's criteria for reimbursement.  As pled herein, Defendants were able to artificially inflate their revenue by, among other things, bundling the more expensive AlloSure tests with other customary tests that concealed the fact no medical necessity had been demonstrated.

242.    Defendants represented in their SEC filings: "Revenue recognized for Medicare and other contracted payers is based on ***the agreed*** current reimbursement rate per test."  CareDx 2020 Annual Report at 66-67.  However, Medicare did ***not contractually agree*** to reimburse CareDx for unauthorized and unnecessary blood tests.  Defendants violated ASC 606 when they recognized revenue for those unauthorized and illegal blood tests because those tests did not represent "a transfer of promised . . . services . . . in an amount that reflects the consideration to which the entity expects to ***be entitled*** in exchange for those . . . services" (ASC 606-10-5-3) because the Company was ***not entitled*** to the transaction price in exchange for promised goods or services.  Furthermore, the Company violated GAAP by improperly recognizing revenue on services the recipients were never promised and to which they never agreed.  Specifically, the Company violated ASC 606 because it did not "satisf[y] a performance obligation by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service)." ASC 606-10-5-4.e.

243.    During the Class Period, Defendants improperly recognized material amounts of revenue over six quarters from 2Q20 through 4Q21.  As depicted in the chart below, Defendants caused CareDx to report at least $117.7 million in Medicare revenues from improper, unnecessary, and illegal blood tests.  Total Revenue and Testing Revenue were overstated between 9% and 31% and between 10% and 35%, respectively.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 94 -

244.    Over the course of 2020, Defendants reported testing services revenue in quarterly reports and in an annual report.  Maag signed the quarterly reports for 2020 reporting these figures and the 2020 annual report reporting annual and fourth quarter of 2020 figures, which Seeto also signed.  These revenue numbers were materially false and misleading when reported, as Defendants knew or should have known, due to the kickback/false claims scheme (§§IV.C.-V.), as the following chart illustrates:

| CareDx, Inc. | | | | | |
| --- | --- | --- | --- | --- | --- |
| Year 2020 Overstated Revenue in Violation of GAAP | | | | | |
| | 2020Q1 3/31/20 | Q2 2020 6/30/20 | Q3 2020 9/30/20 | Q4 2020 12/31/20 | Year Ended 12/31/20 |
| Revenue ($ in thousands) | | | | | |
| Reported Testing services revenue | $ 31,442 | $ 36,293 | $ 45,529 | $ 50,346 | $ 163,610 |
| Improper Medicare sourced revenue | | $ 11,704 | $ 15,477 | $ 17,423 | $ 44,605 |
| Actual Testing services revenue | | $ 24,589 | $ 30,052 | $ 32,923 | $ 87,563 |
| Percentage of Overstated Testing revenue | | 32% | 34% | 35% | 27% |
| | | | | | |
| Reported Total Revenue | $ 38,380 | $ 41,801 | $ 53,369 | $ 58,644 | $ 192,194 |
| Improper Medicare sourced revenue | | $ 11,704 | $ 15,477 | $ 17,423 | $ 44,605 |
| Actual Total Revenue | | $ 30,097 | $ 37,892 | $ 41,221 | $ 109,209 |
| Percentage of Overstated Testing revenue | | 28% | 29% | 30% | 23% |

245.    Over the course of 2021, Defendants reported testing services revenue in quarterly reports and in an annual report.  Seeto signed the quarterly reports for 2021 reporting these figures and the 2021 annual report reporting annual and fourth quarter of 2020 figures, which Maag also signed.  These revenue numbers were materially false and misleading when reported, as Defendants knew or should have known, due to the kickback/false claims scheme (§§IV.C.-V.), as the following chart illustrates:

| CareDx, Inc. | | | | | |
| --- | --- | --- | --- | --- | --- |
| Year 2021 Overstated Revenue in Violation of GAAP | | | | | |
| | Q1 2021 3/31/21 | Q2 2021 6/30/21 | Q3 2021 9/30/21 | Q4 2021 12/31/21 | Year Ended 12/31/21 |
| Revenue ($ in thousands) | | | | | |
| Reported Testing services revenue | $ 59,281 | $ 64,890 | $ 66,464 | $ 68,650 | $ 259,285 |
| Improper Medicare sourced revenue | $ 20,220 | $ 22,627 | $ 23,055 | $ 7,178 | $ 73,080 |
| Actual Testing services revenue | $ 39,061 | $ 42,263 | $ 43,409 | $ 61,472 | $ 186,205 |
| Percentage of Overstated Testing revenue | 34% | 35% | 35% | 10% | 28% |
| | | | | | |
| Reported Total Revenue | $ 67,400 | $ 74,188 | $ 75,589 | $ 79,220 | $ 296,397 |
| Improper Medicare sourced revenue | $ 20,220 | $ 22,627 | $ 23,055 | $ 7,178 | $ 73,080 |
| Actual Total Revenue | $ 47,180 | $ 51,561 | $ 52,534 | $ 72,042 | $ 223,317 |
| Percentage of Overstated Testing revenue | 30% | 31% | 31% | 9% | 25% |

246.    These failures caused the Company to artificially inflate CareDx's reported quarterly revenue growth rate from 2Q20 through 4Q21; these reported growth rates were materially false and misleading in pointing to lawful reasons for growth, while violating the duty to disclose that unlawful conduct materially contributed to the growth as well.  Moreover, these failures resulted in

1    the material misstatement of CareDx's quarterly and annual financial statements under GAAP, as

2    specified in the chart above.

3    **VII.    LOSS CAUSATION**

4        247.    During the Class Period, shares of CareDx's publicly traded common stock traded on

5    the NASDAQ.  The market for shares of CareDx common stock was open, well developed, and

6    efficient at all relevant times.

7        248.    Throughout the Class Period, the price of CareDx common stock was artificially

8    inflated as a result of Defendants' materially false and misleading statements and omissions and/or

9    scheme identified above.  Defendants engaged in a scheme to deceive the market, and a course of

10   conduct that operated as a fraud or deceit on Class Period purchasers of CareDx common stock, by

11   failing to disclose and misrepresenting the adverse facts detailed herein.   These material

12   misstatements and omissions had the cause and effect of creating in the market an unrealistically

13   positive assessment of the Company and its financial well-being and prospects, thus causing the

14   Company's stock price to be overvalued and artificially inflated and/or maintained at artificially

15   inflated levels at all relevant times.  Defendants' materially false and misleading statements made

16   during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the

17   Company's stock at artificially inflated prices.

18       249.    When information proximately related to Defendants' prior misrepresentations and

19   fraudulent conduct were disclosed and became apparent to the market and/or the concealed risk

20   materialized, the price of CareDx common stock fell precipitously as the prior artificial inflation

21   dissipated.  As a result of their purchases of CareDx common stock during the Class Period, Lead

22   Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal

23   securities laws.  By issuing materially false and misleading statements, among other adverse facts

24   detailed herein, Defendants presented a misleading picture of CareDx's business.  Defendants' false

25   and misleading statements and/or scheme had the intended effect and caused CareDx common stock

26   to trade at artificially inflated levels throughout the Class Period.

27       250.    As elaborated below, the truth behind Defendants' misleading statements and

28   omissions and behind their illegal schemes emerged through a series of partial corrective disclosures.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 96

A.     **The Six Corrective Disclosures Under the Ninth Circuit's** *First Solar* **Proximate Causation Doctrine**

1.     **October 28, 2021: CareDx Simultaneously Announces Multiple Government Investigations and Falling ASPs While Falsely Assuring There Had Been "No Change" in Its Medicare Billing**

251.    The first corrective disclosure proximately related to Defendants' fraudulent scheme occurred on October 28, 2021, after market close, when the Company reported its financial results for the third quarter of 2021 and filed its Form 10-Q for that quarter with the SEC (the "3Q 2021 10-Q").

252.    The Company's 3Q 2021 10-Q disclosed for the first time that CareDx was under investigation by no fewer than ***three separate federal and state regulators*** – the DOJ, the SEC, and an unnamed state regulatory agency – in connection with a False Claims Act investigation "regarding certain business practices relating to our kidney testing and phlebotomy services," as well as "certain of our accounting and public reporting practices."

United States Department of Justice and United States Securities and Exchange Commission Investigations

The Company recently received a civil investigative demand (CID) from the United States Department of Justice (**DOJ**) requesting that the Company produce certain documents in connection with a *False Claims Act* investigation being conducted by the DOJ regarding certain business practices related to our *kidney testing and phlebotomy services*, and a subpoena from the United States Securities and Exchange Commission (SEC) in relation to an investigation by the SEC *in respect of matters* similar to those identified in the CID, as well as certain of *our accounting and public reporting practices*. The Company also received an information request from a state regulatory agency and may receive additional requests for information from the DOJ, SEC, or other regulatory and governmental agencies regarding similar or related subject matters.

253.    Similar to a party admission, one of the most senior ranking officers of the Company would later make public details of the investigation; by then, a former official, Dr. Olymbios – who was ***the very individual*** who brought (according to CareDx) "confidential" internal documents to the DOJ and SEC showing the Company's fraud – was able to make the disclosures in a public complaint filed on April 15, 2022 confirming the nature of the DOJ and SEC investigations. Similarly, FE-3 expressly confirmed that he was interviewed by the DOJ in connection with the investigation and that most of the questions concerned CareDx's insistence on only providing mobile phlebotomy tests if AlloSure were included, regardless of whether it was medically necessary.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 97 –

254.    Also on October 28, 2021 – the same day CareDx reported the DOJ, SEC, and state regulatory investigations – Defendants reported dramatically disappointing financial results.  Of particular concern was that, while testing volume had grown 86% year over year, with approximately 40,000 AlloSure and AlloMap tests performed in the quarter, testing services revenue had grown only about half as fast, or approximately 46%.  This meant the Company's ASP per test had actually declined substantially; indeed, simple calculations revealed *ASP had declined a whopping 20% from the same quarter of the prior year*.

255.    On this news, the Company's stock price fell from a closing price of $70.34 per share on October 28, 2021 to a closing price of $51.00 per share on October 29, 2021, or *27.5% in a single day*.

256.    Analysts expressed concerns about these striking developments and, significantly, raised concerns that there were connections between the Company's unexpectedly poor financial results and the newly disclosed investigations.  For example, during the Company's October 28, 2021 earnings call, an analyst from Craig-Hallum Capital Group asked Defendants Dhingra and Seeto to "comment on the lower ASPs in the quarter," noting: "[I]f you take the testing revenue over volume, the price per test looks like it came down" and "*the difference was pretty pronounced this quarter*."  In light of both the ongoing regulatory investigations and the stark decline in ASPs, the analyst asked: "*[A]re you seeing any changes in Medicare billing practices*?  Or what else would really influence that test price lower?"  As CareDx had released no other new information that would give analysts reason to think there had been a change in Medicare billing practices, the implication was clear: analysts were concerned that the federal and state investigations disclosed that same day were hampering the Company's ability to bill for its AlloSure tests.

257.    Dhingra, however, did not disclose the full truth but instead unequivocally assured the analyst there had been "*no change*" related to Medicare billing.  Specifically, Dhingra stated: "To your specific question, *any change in the billing practices?  No, no change.  We haven't observed anything on the Medicare billing practices*."

258.    Instead, Dhingra expressly assured the analyst declining ASPs were due to "primarily the business mix, where the volume growth is exceptionally strong, but the mix continues to evolve

1    away from the core Medicare business."  Defendant Seeto similarly assured the analyst the cause of

2    declining ASPs was a "change in the payer mix."

3        259.    Analysts expressed concern that the investigations could have serious implications for

4    CareDx's business; for example, a BTIG report noted: "***The fact that [CareDx] is being investigated***

5    ***by three different entities, both federal and at the state level, is notable***," and that "***disclosures of***

6    ***these sort typically bear some degree of merit***."  Relatedly, analysts also questioned management's

7    official explanation for its ASP declines.  The same Craig-Hallum analyst who had asked if anything

8    had changed in the Company's Medicare billing practices reported: "***Rationale [for ASP decline]***

9    ***was higher commercial coverage, though we still question what changed q/q***."  A Raymond James

10   analyst report similarly noted the Company had cited "a shift towards commercial [payors] ***but***

11   ***offered little additional context***" and found "***ASP dynamics, which received major focus on the***

12   ***call, are admittedly a bit murky***," thus further emphasizing that it doubted the Company's official

13   explanations for its poor financial results.

14            **2.      April 15, 2022: CareDx Senior Executive Dr. Olymbios**
                        **Publicly Blows the Whistle on Defendants' Fraudulent**
15                      **Business Practices**

16       260.    On April 15, 2022, Dr. Olymbios filed the Olymbios Complaint in California

17   Superior Court.  As described further above, Dr. Olymbios revealed Defendants' serious, pervasive

18   misconduct, including that: (a) "CareDx ***used what it represented to be clinical tests*** to bill Medicare

19   for [AlloSure].  Multiple nephrology practices expressed serious reservations about this practice as ***a***

20   ***violation of Medicare billing requirements***, and CareDx employees internally flagged this practice

21   as impermissible"; (b) "CareDx offered unrestricted grants to physicians to not enroll patients in

22   competitors' clinical trials or to induce practices to place patients on an AlloSure surveillance

23   protocol, even when doing so was ***not warranted or authorized under Medicare billing guidelines***";

24   and (c) "CareDx ***intentionally excluded*** from the [Allosure] test requisition form a field where a

25   physician could indicate the reason ***why the test was medically necessary***."  Dr. Olymbios publicly

26   blew the whistle on these practices after reporting them to "***more than ten*** other current or former

27   CareDx employees, ***including Peter Maag***, then the Chief Executive Officer for CareDx, ***and Reg***

28   ***Seeto***, the current President and Chief Executive Officer of CareDx."  The senior "***CareDx***

1    *executives brushed off his concerns or berated him for raising them in the first place*."  They

2    "repeatedly ignored or actively quashed any internal concerns about its activity."  To cite one such

3    instance: "In September 2020, Dr. Olymbios texted other employees that he had a legal call with Reg

4    [Seeto]" and "[a]nother employee responded, '*because we are Medicare frauds*?'  A different

5    employee replied, '*We're a bunch of crooks and frauds*.'"  Upon the filing of the Olymbios

6    Complaint, CareDx's common stock fell by 8.08%, to close at $32.55 per share on April 15, 2022.

7                    **3.      May 5, 2022: Testing Revenue Continues to Plummet**

8           261.    On May 5, 2022 – just three weeks after Dr. Olymbios publicly blew the whistle on

9    CareDx – CareDx filed its quarterly report for the first quarter of 2022 on Form 10-Q with the SEC

10   and issued its earnings press release for the quarter, revealing the continuing fallout from the

11   Company's historic reliance on overbilling Medicare and engaging in sales and marketing

12   misconduct.  The Company's Form 10-Q repeated its prior revelation from October 28, 2021 that it

13   was under investigation by the DOJ, the SEC, and a state agency, showing the Company was ***still***

14   under investigation at least six months after the government demanded internal documents from the

15   Company.

16          262.    CareDx again reported disappointing financial results, and ASPs declined to just

17   $1,560 per test – a decline of nearly 5% from the previous quarter and nearly 13% from the same

18   quarter of the prior year.

19          263.    Analysts again focused on the Company's continuing slide in ASPs.  On May 6,

20   2022, Craig-Hallum analysts reported that "***ASPs were a miss***," noting not only that the lower ASPs

21   "dragged the Testing Services down ***well below our number***" but that, even "accounting for the

22   lower ASPs, Testing Services sales certainly came up short this quarter."  On the same day, analysts

23   from BTIG published a similar report, observing: "Q1 testing services revs of $66M (+12%

24   Y/Y, -3% q/q) missed our $70ME, ***marking the first time testing revs were down q/q since Q3/17***

25   . . . ."

26          264.    Overall testing revenues were down primarily because Medicare revenue growth

27   continued to plummet after the Company came under investigation by the DOJ, the SEC, and a state

28   regulator in mid-2021, as the following chart illustrates:

Medicare Revenue Growth Percent (q/q)



265.    As a result of weak ASPs and testing revenue, the Company incurred a net loss of $19.7 million as compared to a loss of $687,000 for the first quarter of 2021 – the quarter when the Company launched its RemoTraC testing scheme.  In fact, by this point, as FE-10 directly observed, senior management was acutely aware of – and worried about – the fact that perhaps as much as 50% of CareDx's AlloMap and AlloSure tests were not being reimbursed by Medicare because the tests were performed without medical necessity.  In other words, the scheme Defendants had built to overbill Medicare for AlloSure even when it was not clinically necessary was beginning to unravel. FE-10 further reported this phenomenon was widely known at the Company, Maag and Seeto were present at meetings where the 50% reimbursement rate was regularly discussed, and it was common knowledge at the Company that some patients were having expensive AlloSure tests performed *every month* without justification.  *See* §V.C.1., *supra*.

266.    On these disclosures, the Company's stock price per share fell from $31.66 on May 5, 2022 to $25.78 on Friday, May 6, 2022 – a decline of ***18.6%*** in one day.  The Company's stock price continued to fall as trading resumed on Monday, May 9, 2022, closing at $22.46 per share for a two-day decline of 29%, and investors suffered the consequences.

267.    In its February 24, 2022 earnings call, the Company again attempted to blame its flagging testing services results and plummeting ASPs on a supposing shift in the "mix" of business, and this time also blamed a purported shift of kidney patients from standard Medicare plans to Medicare Advantage plan – commercially run, privately operated health plans that operated as

Medicare health plans under Medicare rules. Specifically, Defendant Dhingra stated ASP declines were, in part, because "*in kidney testing, we saw patients shift from Medicare to Medicare Advantage plans for the changes introduced with the CARES Act last year.*" However, as would later be revealed, the true cause of CareDx's declining ASPs was that, under greater scrutiny, it was no longer able to get away with billing for medically unnecessary tests. Indeed, as Defendants would later admit, and as discussed further below, Medicare Advantage plans – which *had to follow exactly the same coverage rules as Medicare* – were simply denying claims for CareDx's AlloSure tests.

### 4. May 23, 2022: CareDx's Chief Financial Officer Suddenly Resigns

268. On May 23, 2022, CareDx surprised investors by announcing that its CFO, Defendant Dhingra, had notified the Company of his resignation. Strikingly, the press release announcing his resignation stated that Dhingra had only notified the Company of his resignation on May 18, 2022 and that his resignation would be effective May 25, 2022 – only one week after he gave notice. The Company went out of its way to specifically assure investors that Dhingra's resignation was "not a result of any disagreement with the Company or any matter relating to its accounting or financial policies or procedures or regulatory matters." However, the announcement caused CareDx's stock price to fall 7.5%, from a close of $25.86 per share on Friday, May 20, 2022 to a close of $23.92 per share on Monday, May 23, 2022 on unusually high volume. A Jefferies analyst report noted the resignation was "*surprising, coming barely more than a year since he joined CDNA*" and took note that it "*comes in the midst of certain ongoing gov't investigations.*"

### 5. September 1, 2022: CareDx's Chief Marketing Officer Abruptly Resigns

269. Just three months later, on September 1, 2022, the Company announced that its Chief Marketing Officer and Chief Commercial Officer, Sasha King, had announced her resignation from the Company on August 30, 2022, effective September 16, 2022. Just as Dhingra had done, King provided short notice of her resignation: a mere two weeks. On this news, CareDx's stock price fell from a close of $20.31 per share on September 1, 2022 to a close of $18.33 per share on September 2, 2022 – a decline of 10% – on unusually high volume.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 102 –

### 6.    November 3, 2022: 50% of Tests Are Rejected for Reimbursement

270.    On November 3, 2022, after market close, the Company reported earnings for the third quarter of 2022. The Company's financial results were *disastrous*. The Company's net loss widened by more than 40%, from $11.9 million in 3Q 2021 to $16.9 million in 3Q 2022. Critically, in spite of 15% growth in the number of tests performed versus the same quarter of the prior year, testing services revenue had actually *declined* by 3% from the same quarter of the prior year, from $66.5 million to $64.8 million. This meant that even as the Company foisted more and more tests onto patients, its total revenue from those tests was *shrinking*. Indeed, based on its reported volume of 46,500 tests performed versus its $64.8 million in testing services revenue, ASP had declined to an all-time low of roughly $1,390 per test administered – a more than *30% decline* since 2020.

271.    In attempting to put a positive spin on these disastrous results, Defendants made a striking admission: that test revenue and ASPs were not actually declining primarily because of "payor mix" or an increase in patients with commercial insurance that reimbursed CareDx at lower rates but because *CareDx's tests were increasingly being denied any reimbursement at all*. Specifically, CareDx announced an entirely new metric – Average Selling Price per *reimbursed* test – and told investors this number had been "consistent" since Q1 2021, with an average reimbursement of $2,500 per reimbursed test every quarter. Defendants touted this "consistent" number as a positive, insisting that *when CareDx was reimbursed*, its pricing per test had not actually declined. However, critically, this meant CareDx's declines in overall ASP were actually the result of a sharp increase in *unreimbursed* tests. As the Company's new CFO, Abishek Jain, made clear, CareDx's "ASP *on paid test[s]* was slightly above $2,500 in Q1 '21 and has remained above $2,500 in this most recent quarter," which was "*in contrast to our overall ASP, which includes non-covered tests*." Indeed, as simple calculations could show, and as Jain would expressly confirm in a later investor conference call (on November 15, 2022), *CareDx was now being denied any reimbursement whatsoever for as many as 50% of all tests it administered*.

272.    Indeed, in direct response to the analyst question "how should we think about the ASP trend as we model out next year in a degree of further erosion," Defendant Seeto further

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 103 -

1  reaffirmed: "[W]hen we get reimbursed, we're reimbursed at a pretty constant rate," whereas,

2  "*[w]here we're not reimbursed, that's what we have to work on*."  In fact, the problem was

3  purportedly so significant that CareDx announced it would have to redouble its efforts on

4  "collections" and had brought in a third-party consultant to do so.

5       273.    Making matters worse, the Company's financial disclosures showed its total Medicare

6  revenue was continuing to decline as Medicare was simply rejecting more and more of CareDx's

7  fraudulently administered tests.  Indeed, in the third quarter of 2022, CareDx's ***total*** revenue from

8  Medicare – its most critical revenue source – fell almost 9% from the same quarter of the prior year,

9  from $46 million to $42 million.  Indeed, after several quarters of ***explosive*** growth in Medicare

10  revenue from the Company's RemoTraC scheme, that growth had suddenly hit a wall and reversed

11  under scrutiny from the DOJ and the SEC.

12       274.    On this news, CareDx's stock price fell from a close of $18.73 per share on

13  November 3, 2022 to $16.02 per share on November 4, 2022 – a decline of more than 14% – on

14  unusually high volume.

15       275.    Analysts from Craig-Hallum issued a scathing report on November 4, 2022,

16  expressing dismay at "another disappointing quarter."  The Craig-Hallum analysts noted they had

17  expected CareDx's growth to improve as transplant volumes rose – just as management had assured

18  them would happen – but instead, the opposite was true as "growth during this year has only trickled

19  lower."  The report lamented that "C[areDx]-wide net ***ASPs also continued their freefall***" and

20  ***entirely rejected*** management's ostensible explanations that "the weakness was again driven by a

21  higher mix of commercial patients, incremental Medicare sequestration headwinds and more tests

22  from non-kidney tests (which have less coverage)."  Instead, the report determined, given CareDx's

23  own claim that its pricing on reimbursed tests had not changed, the poor results reported by CareDx

24  could only lead to one conclusion: "***more tests are not being paid***" (*i.e.*, reimbursed):

25       Management said the weakness was again driven by a higher mix of commercial
        patients, incremental Medicare sequestration headwinds and more tests from non-
26       kidney tests (which have less coverage).  Headwinds from the shift to Medicare
        Advantage were said to be abating, with the culprit being more from a pickup in
27       commercial tests at community nephrology, plus heart and lung growth which all
        have higher private mixes. ***However, our model points to kidney net ASPs dropping***
28       ***$110 q/q to $1,600 and were $1,920 to start the year.  The company did say that***

*when tests are paid, the rate is unchanged and is >$2,500.  Conclusion is more tests are not being paid*.

276.    The report warned that "no concrete timelines were given on a plateau or reversal of pricing declines," and Craig-Hallum lowered its price target from $51 per share to just $32 per share.

277.    In total, after the Company's misrepresentations propelled CareDx's stock price as high as a close of $95.11 per share on June 28, 2021 – near its all-time high – CareDx's stock price fell to just $16.02 per share after the Class Period, losing more than *83% of its value* after revelations of Defendants' fraudulent scheme and wiping out billions of dollars in market capitalization.

### 7.    Post-Class Period Events Further Confirm that Defendants Defrauded Investors and Caused Their Losses

278.    Shortly after the end of the Class Period, CareDx's main competitor, Natera, reported financial results completely eviscerating CareDx's excuses that changes in "payor mix" or a shift to Medicare Advantage plans had been the causes of their declining testing services business and further confirming the catastrophic impact government investigations were having on CareDx.  By way of background, Natera markets a substantially similar kidney test to CareDx's AlloSure Kidney test known as Prospera Kidney.  Prospera Kidney relies on effectively the same technology as AlloSure Kidney, is reimbursed under the same Medicare Local Coverage Decision for the same indication (clinical suspicion of rejection), and is even reimbursed at the same price – $2,841 per test.

279.    On November 8, 2022, Natera reported its own financial results for the third quarter of 2022.  During its earnings call following those results, Natera's CEO affirmed, in contrast with CareDx's claims that a shift to commercial insurance and Medicare Advantage business had caused its ASP woes, that Natera's kidney test "*ha[dn't] been impacted by Medicare Advantage or commercial mix shift as our peer mix has remained stable*."  Indeed, in sharp contrast to CareDx, which had seen its total Medicare revenue decline by 9%, Natera made clear that "*we're seeing Medicare consistently reimbursed*."  Indeed, commenting on Natera's earnings, the same Craig-Hallum analyst who covered CareDx again cast doubt on CareDx's official explanations, noting the contrast between the two companies as "*going against [CareDx]'s commentary*": "[Natera]

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 105 –

1  [m]anagement did note some pressure to ASPs from these uncovered volumes *but has not seen an*

2  *impact from a mix shift or the move to Medicare Advantage, going against CDNA's commentary*."

3  The marked contrast between CareDx's and Natera's Medicare reimbursements for near-identical

4  tests only further confirms CareDx's testing business had relied on Medicare fraud, and it was now

5  declining due to greater government scrutiny, not market factors.

6      280.    On November 15, 2022, at the Jefferies London Healthcare Conference, CareDx

7  executives made additional admissions further revealing the true cause of CareDx's ASP declines

8  was that CareDx was no longer able to get reimbursed for the medically unnecessary tests for which

9  it had once fraudulently billed.  First, CFO Jain now fully acknowledged that as much as "*50% of*

10  *[our] tests are not being paid*."  Second, Defendants now admitted part of the reason for this

11  enormous number of unpaid tests was that Medicare Advantage plans – which operated under the

12  same coverage rules as Medicare – were simply applying greater scrutiny to CareDx's fraudulent

13  claims for unnecessary tests.  Specifically, an analyst focused on Defendants' prior claims that

14  CareDx was working on improving collections from Medicare Advantage plans.  The analyst asked

15  "is that a 12 month process?  *Why does it feel like we haven't seen any benefits from improved*

16  *M[edicare] A[dvantage] collections*?"  Strikingly, CFO Jain responded the problem was that

17  Medicare Advantage was simply *more stringent about paying claims*.

18      281.    Specifically, CFO Jain explained:

19      There's a pre-submission [process], there is submission of the claim and then comes
        to [the] appeals process.  So when we started to see the shift last year from Medicare
20      to the Medicare Advantage, now on the pre-submission side . . . *they are requesting*
        *a lot of information around the medical records, the insurance information and*
21      *then the prior authorization [of the test by a medical provider]*.

22  In other words, unlike with Medicare during the pandemic, CareDx now faced intensive scrutiny of

23  its fraudulent medical claims.  Indeed, as Jain complained, "even after you submit [the claim], *they*

24  *will basically reject the claim for [the] smallest of . . . reasons*."  Jain further explained that, after its

25  claims were rejected, the Company would have to go through a series of appeals, "a fairly long

26  process" before the Company could collect – if ever.  Indeed, Jain admitted that, while the Company

27  was building "infrastructure" to improve collections from Medicare Advantage plans, "this whole

28  infrastructure has to work like a well-[oiled] machine because [if] one process . . . were to fail, *then*

1    *you will not be able to collect the money.*"  Jain's excuses about purported difficulties getting claims

2    paid by Medicare Advantage plans were in stark contrast to competitor Natera's comments that it

3    "***ha[dn't] been impacted by Medicare Advantage***" and had "***seen Medicare consistently***

4    ***reimbursed.***"  Jain's claims thus only further underscored the real reason CareDx's ASPs and

5    Medicare revenue were declining was that it was no longer able to fraudulently bill Medicare for

6    medically unnecessary tests.

7        282.    Indeed, trends in CareDx's total Medicare revenue only further confirm that the

8    Company's decline in ASP could not have been simply due to factors like a shift from Medicare to

9    Medicare Advantage plans as revenue from Medicare Advantage plans would still be included in

10   overall Medicare revenue.  Instead, it is clear CareDx's Medicare revenue growth reversed and then

11   declined exactly when the Company came under scrutiny in mid-2021 for its illegal practices, as the

12   graph below makes clear:[32]



**Medicare Revenue Growth Percent**
(Q/Q)

23       283.    Finally, on November 16, 2022, a Medicare committee held a meeting unequivocally

24   confirming the real reason that as many as 50% of CareDx's tests were being rejected for

25   reimbursement: CareDx was improperly billing for medically unnecessary tests.  Specifically, the

26   very Medicare contractors that determine Medicare coverage of CareDx's tests invited CareDx to a

---

[32]   CareDx has not disclosed exactly when it received the DOJ CID or was otherwise put on notice of the DOJ, SEC, or state regulatory investigations of its practices.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 107 -

Contractor Advisory Committee ("CAC") meeting concerning tests for rejection of kidney and liver transplants. The following day, on November 17, 2022, Craig-Hallum analysts who covered the CAC meeting warned that *Medicare had used "harsh language"* questioning CareDx on why there had apparently been "unexpected utilization" of its tests for non-covered uses. Specifically, Craig-Hallum reported:

> MolDx [Medicare's Molecular Diagnostic Services program] held a Contractor Advisory Committee (CAC) meeting yesterday to discuss a range of topics around non-invasive transplant testing. . . . The meeting invite *included strong language perking everyone's attention* stating: MolDx "requested an internal reconsideration of [transplant diagnostic coverage] after noting *unexpected utilization patterns that are outside of expectations based on evidentiary review and manufacturer documentation." Unexpected utilization is harsh language from Medicare*.

Indeed, the Craig-Hallum analyst expressly connected Medicare's "harsh language" about "unexpected utilization" to CareDx's fraudulent billing for medically unnecessary tests, emphasizing that it appeared the Company had been improperly administering "surveillance" tests to "low risk" patients who had "no clinical suspicion of rejection" and thus were *not* covered by Medicare for the tests:

> Under the nonumbrella universal LCD by MolDx [*i.e.* the Medicare billing regulation covering AlloSure], Medicare will cover AlloSure Kidney (or equivalent tests) when used to "assess the probability of allograft rejection in kidney transplant recipients *with clinical suspicion of rejection* and to inform clinical decision-making about the necessity of renal biopsy . . . ." *The language seems to indicate a test is covered when the patient is at risk for rejection (high-risk) and the test would inform the use of a biopsy. But surveillance is neither of these – surveillance is monitoring a patient on a set protocol who is low-risk for rejection. If at low risk, there is no clinical suspicion of rejection at the current timepoint and no necessity for a renal biopsy and thus, by this language, should not be a covered test*.

284.    In other words, Medicare clearly had become fully aware of CareDx's scheme to bill for tests that were *not* medically necessary and did not meet coverage requirements and was no longer allowing CareDx's scheme to continue.

## B.    Materialization of Concealed Risks Under the Ninth Circuit's *First Solar* Proximate Causation Doctrine

285.    A public self-confession of fraud by Defendants is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to any economic loss. There is an infinite variety of ways – such as the corrective disclosures identified

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 108 –

1  above – to allege that Defendants' illicit conduct caused Lead Plaintiffs' (and similar investors')

2  losses.

3      286.    The facts also support loss causation under the "materialization of risk" branch of

4  proximate causation because Defendants misrepresented or omitted the "very facts" that were a

5  substantial factor in causing Lead Plaintiffs' and other investors' losses in this case.

6      287.    Defendants themselves admit the relationship between investors' losses, on the one

7  hand, and Defendants' false or misleading statements about paying or misleading doctors into

8  steering their patients into excessive, medically unnecessary AlloSure testing and Defendants' forced

9  AlloSure testing via the RemoTraC scheme, on the other hand.  Maag and Seeto concealed these

10 "very facts" in all of the false or misleading statements detailed herein.  *See* §VI.

11     288.    Both Maag and Seeto acknowledged the proximate relationship between those very

12 facts – lower Medicare reimbursement rates and stock price declines.  As they stated in the

13 Company's 2020 Annual Report, filed on February 24, 2021:

14         We receive a substantial portion of our ***revenues from Medicare***, and the loss
           of, or a ***significant reduction in, reimbursement*** from Medicare ***would severely*** and
15         adversely affect our financial performance.

16         For the year ended December 31, 2020, revenue from Medicare for AlloMap Heart,
           AlloSure Kidney and AlloSure Heart represented 67% of testing services revenue.
17         However, ***we may not be able to maintain or increase our tests reimbursed*** by
           Medicare for a ***variety of reasons***, including changes in reimbursement practices,
18         general policy shifts, or reductions in reimbursement amounts.

19                                *       *       *

20         ***If future reimbursement levels are less than the current price, our revenues
           and our ability to achieve profitability could be impaired, and the market price of
21         our common stock could decline***.  We may also not be able to maintain or increase
           the portion of our tests reimbursed by Medicare for a ***variety of other reasons***,
22         including changes in reimbursement practices and general policy shifts.

23     289.    As set forth above (§VI), because Maag and Seeto freely chose to discuss the "variety

24 of reasons" and "variety of other reasons" why Medicare reimbursement rates could face a

25 significant reduction – pointing to generic changes outside Defendants' control – they freely

26 assumed a duty to disclose another "reason" Medicare revenue was at risk that was squarely within

27 Defendants' control: namely, because Defendants were sending Medicare illegal bills under their

28 "miraculous" RemoTraC scheme.  When they could no longer continue that scheme, the Company's

1    quarterly reimbursement rates faced a "significant reduction," impairing its "ability to achieve

2    profitability" and thus causing "the market price of [CareDx's] common stock [to] decline."  The

3    particulars of the reimbursement reductions are specified above and not repeated here for that reason.

4    *See* §VII.A.

5        290.    Additional data illustrate that Defendants were right to foresee how significant

6    reductions in Medicare reimbursement would (and did) impair the Company's "ability to achieve

7    profitability."  The data show the Company was close to reaching profitability under the Medicare

8    overbilling scheme and, after the DOJ and SEC pulled the plug on that scheme, the Company's path

9    to profitability was severely and adversely affected:

10

| CareDx Net Income (Losses) | | |
|---|---|---|
| Period End | Net Income/Losses | YoY % Change |
| 12/30/18 | -3.75 | * |
| 3/30/19 | -7.53 | * |
| 6/30/19 | -7.85 | * |
| 9/29/19 | -1.81 | * |
| 12/30/19 | -4.78 | -22% |
| 3/30/20 | -5.82 | 29% |
| 6/29/20 | -6.56 | 20% |
| 9/29/20 | -2.82 | -36% |
| 12/30/20 | -3.51 | 36% |
| 3/30/21 | -0.69 | 743% |
| 6/29/21 | -1.93 | 240% |
| 9/29/21 | -11.90 | -76% |
| 12/30/21 | -16.15 | -78% |
| 3/30/22 | -21.70 | -97% |
| 9/29/22 | -16.94 | -89% |
| 12/30/22 | -18.33 | -35% |
| 3/30/23 | -23.75 | -32% |

Profitability appears within reach under "miraculous" RemoTraC, but illegal billing underlies the trend

DOJ/SEC False Claims investigation

Medicare rejecting *50%* of the Company's reimbursement claims

25        291.    In short, Defendants foresaw that their failure to disclose their kickback/false claims

26    would cause investors' losses, and that is exactly what happened here.  The risk they concealed

27    (generating financial performance through illicit conduct) materialized after the government pulled

1 | the plug, and investors suffered losses as a result in the form of severe and adverse losses on their

2 | investments in the Company.

3 | **VIII.    CLASS ACTION ALLEGATIONS**

4 |      292.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the

5 | Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that

6 | purchased CareDx common stock between April 30, 2020 and November 3, 2022, inclusive, and

7 | were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and

8 | directors of the Company, at all relevant times, members of their immediate families, and their legal

9 | representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a

10 | controlling interest.

11 |      293.    The members of the Class are so numerous that joinder of all members is

12 | impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and

13 | can only be ascertained through appropriate discovery, Plaintiffs believe there are at least hundreds

14 | or thousands of members in the proposed Class.  Throughout the Class Period, CareDx common

15 | stock actively traded on NASDAQ (an open and efficient market) under the symbol "CDNA."

16 | Millions of CareDx shares were traded publicly during the Class Period on NASDAQ.  As of May 3,

17 | 2022, the Company had more than 53 million shares outstanding.  Record owners and other

18 | members of the Class may be identified from records maintained by CareDx or its transfer agent and

19 | may be notified of the pendency of this action by mail using a form of notice similar to that

20 | customarily used in securities class actions.

21 |      294.    Plaintiffs' claims are typical of the claims of the other members of the class as all

22 | members of the Class were similarly affected by Defendants' wrongful conduct in violation of

23 | federal law complained of herein.

24 |      295.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

25 | and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have

26 | no interests that conflict with those of the Class.

27 |

28 |

296.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

(b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of CareDx;

(d)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of CareDx;

(e)    whether the market price of CareDx common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

297.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## IX.    UNDISCLOSED ADVERSE INFORMATION

298.    The market for CareDx's common stock was an open, well developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, CareDx's common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and the other members of the Class purchased CareDx's

1   common stock in reliance upon the integrity of the market price of the Company's common stock
2   and market information relating to CareDx and have been damaged thereby.

3          299.    During the Class Period, Defendants materially misled the investing public, thereby
4   inflating the price of CareDx's common stock, by publicly issuing false and/or misleading
5   statements and/or omitting to disclose material facts necessary to make Defendants' statements, as
6   set forth herein, not false and/or misleading.  The statements and omissions were materially false
7   and/or misleading because they failed to disclose material adverse information and/or misrepresented
8   the truth about CareDx's business, operations, and prospects as alleged herein.  These material
9   misstatements and/or omissions had the cause and effect of creating in the market an unrealistically
10  positive assessment of the Company and its business, thus causing the Company's common stock to
11  be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially
12  false and/or misleading statements during the Class Period directly or proximately caused or were a
13  substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class
14  who purchased the Company's common stock at artificially inflated prices and were harmed when
15  the truth was revealed.

16  **X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR**

17         300.    The federal statutory safe harbor provided for forward-looking statements under
18  certain circumstances does not apply to any of the allegedly false statements pled in this Complaint.
19  The statements alleged to be false and misleading herein all relate to then-existing facts and
20  conditions.  In addition, to the extent certain statements alleged to be false may be characterized as
21  forward looking, they were not identified as "forward-looking statements" when made; and there
22  were no meaningful cautionary statements identifying important factors that could cause actual
23  results to differ materially from those in the purportedly forward-looking statements.

24         301.    In the alternative, to the extent the statutory safe harbor is determined to apply to any
25  forward-looking statements pled herein, Defendants are liable for those false forward-looking
26  statements because, at the time each of those forward-looking statements was made, the speaker had
27  actual knowledge the forward-looking statement was materially false or misleading and/or the

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL          - 113 -
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

1  forward-looking statement was authorized or approved by an executive officer of CareDx who knew

2  the statement was false when made.

3  **XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* DOCTRINES)**

4

5  302.    The market for CareDx stock was open, well developed, and efficient at all relevant

6  times.  As a result of the materially false and/or misleading statements and/or failures to disclose

7  particularized in this Complaint, CareDx common stock traded at artificially inflated and/or

8  maintained prices during the Class Period.  Plaintiffs and other members of the Class purchased the

9  Company's common stock in reliance on the integrity of the market price of CareDx common stock

10  and market information relating to CareDx and have been damaged thereby.

11  303.    At all relevant times, the market for CareDx common stock was an efficient market

12  for the following reasons, among others: (a) CareDx was listed and actively traded on NASDAQ, a

13  highly efficient and automated market; (b) As a regulated issuer; CareDx filed periodic public

14  reports with the SEC and/or NASDAQ; (c) CareDx regularly communicated with public investors

15  via established market communication mechanisms, including through regular dissemination of press

16  releases on the national circuits of major newswire services and through other wide-ranging public

17  disclosures, such as communications with the financial press and other similar reporting services;

18  and/or (d) CareDx was followed by securities analysts employed by brokerage firms who wrote

19  reports about the Company, and these reports were distributed to the sales force and certain

20  customers of their respective brokerage firms.  Each of these reports was publicly available and

21  entered the public marketplace.

22  304.    As a result of the foregoing, the market for CareDx common stock promptly digested

23  current information regarding CareDx from all publicly available sources and reflected such

24  information in CareDx's stock price.  Under these circumstances, all purchasers of CareDx stock

25  during the Class Period suffered similar injury through their purchases of stock at artificially inflated

26  prices, and a presumption of reliance applies.

27  305.    A Class-wide presumption of reliance is also appropriate in this action under the

28  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

1   because the Class' claims are, in large part, grounded in Defendants' material misstatements and/or

2   omissions.  Because this action involves Defendants' failure to disclose material adverse information

3   regarding the Company's business, operations, and prospects – information Defendants were

4   obligated to disclose during the Class Period but did not – positive proof of reliance is not a

5   prerequisite to discovery.  All that is necessary is that the facts withheld be material in the sense that

6   a reasonable investor might have considered them important in the making of investment decisions.

7   Given the importance of the Class Period misstatements and omissions set forth above, that

8   requirement is satisfied here.

9   **XII.    COUNTS AGAINST DEFENDANTS**

10                               **COUNT I**

11              **For Violations of §10(b) of the Exchange Act and**
                 **Rule 10b-5 Promulgated Thereunder**
12                          **(Against All Defendants)**

13          306.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

14   forth herein.

15          307.    Defendants violated Rule 10-b5(b) ("misstatement and omission" liability) and

16   Rule 10b-5(a) and (c) ("scheme" liability under *Lorenzo v. Sec. & Exch. Comm'n*, ___ U.S. ___, 139

17   S. Ct. 1094 (2019)).  During the Class Period, Defendants carried out a plan, scheme, and course of

18   conduct that was intended to and, throughout the Class Period, did: (a) deceive the investing public,

19   including Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain

20   the market price of CareDx common stock; and (c) cause Plaintiffs and other members of the Class

21   to purchase CareDx stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan,

22   and course of conduct, Defendants, and each of them, took the actions set forth herein.

23          308.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

24   statements of material fact and/or omitted to state material facts necessary to make the statements not

25   misleading; and (c) engaged in acts, practices, and a course of conduct that operated as a fraud and

26   deceit on the purchasers of the Company's securities in an effort to maintain artificially high market

27   prices for CareDx common stock in violation of §10(b) of the Exchange Act and Rule 10b-5

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL          - 115 –
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

1  promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and

2  illegal conduct charged herein or as controlling persons as alleged below.

3      309.    Defendants, individually and in concert, directly and indirectly, by the use, means, or

4  instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous

5  course of conduct to conceal adverse material information about CareDx's business, operations, and

6  prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud

7  while in possession of material adverse nonpublic information and engaged in acts, practices, and a

8  course of conduct as alleged herein in an effort to assure investors of CareDx's business, operations,

9  and prospects, which included the making of, or the participation in the making of, untrue statements

10 of material facts and/or omitting to state material facts necessary in order to make the statements

11 made about CareDx and its business, operations, and future prospects, in light of the circumstances

12 under which they were made, not misleading, as set forth more particularly herein, and engaged in

13 transactions, practices, and a course of conduct of business that operated as a fraud and deceit on the

14 purchasers of the Company's common stock during the Class Period.

15     310.    Each of the Individual Defendants' primary liability and controlling person liability

16 arises from the following facts: (a) each of the Individual Defendants was a high level executive

17 and/or director at the Company during the Class Period and a member of the Company's

18 management team or had control thereof; (b) each of the Individual Defendants, by virtue of his

19 responsibilities and activities as a senior officer and/or director of the Company, was privy to and

20 participated in the creation, development, and reporting of the Company's business, operations, and

21 prospects; (c) each of the Individual Defendants enjoyed significant personal contact and familiarity

22 with the other Defendants and was advised of and had access to other members of the Company's

23 management team, internal reports, and other data and information about the Company's financial

24 condition and performance at all relevant times; and (d) each of the Individual Defendants was aware

25 of the Company's dissemination of information to the investing public, which they knew and/or

26 recklessly disregarded was materially false and misleading.

27     311.    Defendants had actual knowledge of the misrepresentations and/or omissions of

28 material facts set forth herein or acted with reckless disregard for the truth in that they failed to

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 116 -

1    ascertain and disclose such facts even though such facts were available to them.  Such Defendants'

2    material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

3    and effect of concealing CareDx's operating condition, business practices, and prospects from the

4    investing public and supporting the artificially inflated and/or maintained price of its common stock.

5    As demonstrated by Defendants' overstatements and misstatements of the Company's business,

6    operations, and prospects throughout the Class Period, Defendants, if they did not have actual

7    knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain

8    such knowledge by deliberately refraining from taking those steps necessary to discover whether

9    those statements were false or misleading.

10          312.    As a result of the dissemination of the materially false and/or misleading information

11   and/or failure to disclose material facts as set forth above, the market price of CareDx common stock

12   was artificially inflated; and relying directly or indirectly on the false and misleading statements

13   made by Defendants or on the integrity of the market in which the stock trades, and/or in the absence

14   of material adverse information known or recklessly disregarded by Defendants but not disclosed in

15   public statements by Defendants during the Class Period, Plaintiffs and the other members of the

16   Class purchased CareDx common stock during the Class Period at artificially inflated prices and

17   were damaged thereby.

18          313.    At the time of said misrepresentations and omissions, Plaintiffs and other members of

19   the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other

20   members of the Class and the marketplace known of the truth regarding the problems CareDx was

21   experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class

22   would not have purchased their CareDx common stock or, if they had purchased such common stock

23   during the Class Period, would not have done so at the artificially inflated prices they paid.

24          314.    By virtue of the foregoing, CareDx and the Individual Defendants each violated

25   §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

26          315.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the

27   other members of the Class suffered damages in connection with their purchases of the Company's

28   common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### (Against the Individual Defendants)

316.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

317.     The Individual Defendants acted as controlling persons of CareDx within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions within the Company, participation in and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements Plaintiffs contend are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Further, the Individual Defendants signed the Company's 2020 and 2021 annual reports on Form 10-K and the first, second, and third quarterly reports for 2021 on Form 10-Q.

318.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

319.     As set forth above, CareDx and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

- 118 -

XIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, prays for relief and judgment as follows:

A.      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      Awarding Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

C.      Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.      Awarding such other relief as this Court deems appropriate.

XIV.   **JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  June 28, 2023                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         SHAWN A. WILLIAMS
                                         JASON C. DAVIS


                                                    s/ Jason C. Davis
                                         JASON C. DAVIS

                                         Post Montgomery Center
                                         One Montgomery Street, Suite 1800
                                         San Francisco, CA  94104
                                         Telephone:  415/288-4545
                                         415/288-4534 (fax)
                                         shawnw@rgrdlaw.com
                                         jdavis@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         SPENCER A. BURKHOLZ
                                         SEAN C. MCGUIRE
                                         NICOLE Q. GILLILAND
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         spenceb@rgrdlaw.com
                                         smcguire@rgrdlaw.com
                                         ngilliland@rgrdlaw.com

1  DATED:  June 28, 2023

2

SAXENA WHITE P.A.
LESTER R. HOOKER

3

4
                                            s/ Lester R. Hooker
                                       LESTER R. HOOKER

5
7777 Glades Road, Suite 300
6  Boca Raton, FL  33434
   Telephone:  561/394-3399
7  561/394-3382 (fax)
   lhooker@saxenawhite.com

8  SAXENA WHITE P.A.
   DAVID R. KAPLAN
9  12750 High Bluff Drive, Suite 475
   San Diego, CA  92130
10 Telephone:  858/997-0860
   858/369-0096 (fax)
11 dkaplan@saxenawhite.com

12 SAXENA WHITE P.A.
   STEVEN B. SINGER
13 RACHEL A. AVAN
   JOSHUA H. SALTZMAN (admitted *pro hac vice*)
14 10 Bank Street, 8th Floor
   White Plains, NY  10606
15 Telephone:  914/437-8551
   888/631-3611 (fax)
16 ssinger@saxenawhite.com
   ravan@saxenawhite.com
17 jsaltzman@saxenawhite.com

18 Lead Counsel for Lead Plaintiffs

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL    - 120 -
SECURITIES LAWS - 3:22-cv-03023-TLT
4854-9079-2810.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 28, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the any CM/ECF participants indicated on the attached Manual Notice List.

s/ Jason C. Davis
JASON C. DAVIS

ROBBINS GELLER RUDMAN
    & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
Email:  jdavis@rgrdlaw.com

4854-9079-2810.v1

# Mailing Information for a Case 3:22-cv-03023-TLT Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alec T Coquin**
  acoquin@labaton.com

- **Charles Dean Cording**
  ccording@willkie.com,mao@willkie.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Barrington E. Dyer**
  bdyer@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Laura Leigh Geist**
  lgeist@willkie.com,tnocco@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **Lester Rene Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com

- **David R. Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Sean Christopher McGuire**
  smcguire@rgrdlaw.com

- **Erica Symone Miranda**
  emiranda@willkie.com,tnocco@willkie.com,maosf@willkie.com,ealcantara@willkie.com,mallard@willkie.com,cwindsor@willkie.com

- **Tariq Mundiya**
  tmundiya@willkie.com,mao@willkie.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Joshua H Saltzman**
  jsaltzman@saxenawhite.com

- **Brady Michael Sullivan**
  bsullivan@willkie.com,CLee2@willkie.com,mao@willkie.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)