UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| Plumbers & Pipefitters Local Union #295 Pension Fund, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 22-cv-03023-TLT |
| Plaintiffs, | ) ) | |
| v. | ) | San Francisco, California |
| | ) | May 16, 2023 |
| CareDx, Inc., et al., | ) | 2:01 p.m. |
| | ) | |
| Defendants. | ) | |

**BEFORE:   THE HONORABLE TRINA L. THOMPSON, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

*A P P E A R A N C E S*

(Appearances via Zoom platform)

For the Plaintiffs:

    ROBBINS GELLER RUDMAN & DOWD, LLP
    By:  **Jason Cassidy Davis, Esq.**
    Post Montgomery Center
    One Montgomery Street
    Suite 1700
    San Francisco, California  94104

    SAXENA WHITE, P.A.
    By:  **Lester Rene Hooker, Esq.**
    7777 Glades Road
    Suite 300
    Boca Raton, Florida 33434

For the Defendants:

    WILLKIE FARR & GALLAGHER, LLP
    By:  **Charles Cording, Esq.**
        **Brady Sullivan, Esq.**
    787 Seventh Avenue
    New York, New York  10019-6099

    WILLKIE FARR & GALLAGHER, LLP
    By:  **Laura Leigh Geist, Esq.**
    One Front Street, 34th Floor
    San Francisco, California  94111

UNITED STATES DISTRICT COURT

***P R O C E E D I N G S***

*(The proceedings started at 2:01 p.m.)*

COURTROOM DEPUTY:  Now calling Case No. 22-cv-03023, Plumbers & Pipefitters Local Union #295 Pension Funds versus CareDx, Incorporated, et. al.

Counsel, will you please approach the podiums and state your appearances beginning with the plaintiff.

MR. DAVIS:  Good afternoon, Your Honor, Jason Davis of Robbins Geller Rudman & Dowd on behalf of the police, firefighter, electrical worker and sheet metal lead plaintiffs in this case.  Also with me today, also co-lead counsel is the Saxena White firm represented by Mr. Lester Hooker.

THE COURT:  Good afternoon.

MR. CORDING:  Good afternoon, Your Honor.  My name is Charles Cording from Willkie Farr and Gallagher on behalf of the defendants.  With me are my colleagues Laura Geist and Brady Sullivan, both from the Willkie firm, as well as Kaitlin Mulan from CareDx.

THE COURT:  All right.  Thank you, sir.

Well, I will help you out.  The first issue that I'm going to address is going to be the Motion to Strike.  I think that is the -- probably the best place for us to start.

Counsel for the defense is requesting that the Court strike the following allegations from plaintiff's amended complaint:  Namely, Paragraphs 10, 56 -- Lines 56 through 58,

79, 170 and 174 in their entirety; the first, second, third and fourth sentences of Paragraph 78; the fourth, fifth and sixth and seventh and eighth sentences of Paragraph 101; the first sentence of Paragraph 166; and the second and third sentence of Paragraph 167.

Now, that's just to get us focused on the Motion to Strike.  There are companion cases, Docket 2-cv-05379 in re CareDx, Incorporated.  Also, 23-cv-00557 and then, finally, there is a Motion to Quash that is before Judge Cisneros in Docket No. 23-mc-80017, and I believe that is to Natera, N-a-t-e-r-a, Incorporated, which is a competitor of CareDx.

Now, then, as I look through the pleadings, I note Dr. Michael Olymbios -- am I saying his name correctly?

MR. CORDING:  Yes, your Honor.

THE COURT:  -- is mentioned throughout all of the briefing, however, is not a party to this action.  So that's one of the areas that I had some concern and will have some questions about down the road, but what I'd like to do is surrender it to each of you starting with the defendant for just a succinct statement of facts.

I have read all of the pleadings, but I'd like you to succinctly bring my attention to the area you think is most important during the class period of January 21st, 2021, to November 3rd of 2022 in terms of the Motion to Strike.

Then I'll be turning my attention to counsel for the

plaintiff in terms of the areas of judicial notice.  There are a number of documents that have been attached, some of which are contained in the complaint and referred to by the complaint, others of which are not and so I'll methodically have to go through that large number of exhibits.

So, counsel, first starting with your succinct statement of facts that you'd like me to consider.

MR. CORDING:  Your Honor, with the Court's permission, I was planning to argue the Motion to Dismiss today and have my college, Mr. Sullivan, who's an associate attorney at my firm, in the interest of giving him an opportunity to argue a motion, argue the Motion to Strike, if that's okay with Your Honor?

THE COURT:  That is perfectly okay and invited, thank you.

Good afternoon.

MR. SULLIVAN:  Good afternoon, Your Honor.

Thank you, Your Honor, Brady Sullivan from Willkie Farr & Gallagher on behalf of defendants.

Turning to the Motion to Strike, Your Honor asked what are the most important allegation facts during the class period with respect to the Motion to Strike, and I think here defendants have moved to strike -- Your Honor summarized the various paragraphs and sentences of paragraphs that we're moving to strike.

It really, in our view, boils down to two key allegations, some of which pre-date the class period and some of which are potentially within the class period. The first allegation is from Dr. Olymbios' separate complaint that he quote/unquote discussed his concerns about Medicare billing issues with the individual defendants, Peter Maag and Reginald Seeto.

This allegation, Your Honor, comes from a single sentence of Dr. Olymbios' separately-filed complaint; and here we're referring to Paragraphs 10, 58, 79, 101, sentences four through six; 166, sentence one; 167, sentences two through three; and 170 and 174.

Those are the paragraphs in plaintiffs' amended complaint that draw on -- or that borrow, rather, this allegation from Dr. Olymbios that he discussed his concerns with senior management.

The second category, Your Honor, are -- these are allegations from Dr. Olymbios about an oral conversation wherein defendant Maag, Dr. Maag supposedly said to not put in writing that CareDx does not bill patients and that -- that also comes from Paragraph 10, 57, 58 and Paragraph 174 of the -- of the complaint.

With respect to Your Honor's particular question, I think it bears noting that Dr. Olymbios left CareDx in October of 2020. That's actually months before the commencement of

the class period here.  The class period runs from January --
I think it's 21st, 2021, through November 3rd, 2022.

So none of these allegations actually fall -- fall squarely within the class period, and I think my colleague is going to discuss with respect to the Motion to Dismiss why that renders some of these allegations perhaps deficient.

As a threshold issue, though, Your Honor, we're moving to strike these allegations and we're doing so because we submit that plaintiff has not independently corroborated them.

In the Ninth Circuit allegations may be sourced from a separate third-party complaint only if plaintiffs have conducted an independent investigation into the facts alleged in the borrowed complaint.

For example, the Court in *In re Connetics Securities Litigation* struck approximately 20 paragraphs from a securities fraud complaint because plaintiffs failed to allege quote "any additional bases for the specific allegations," other than what was, in that case, an SEC complaint that plaintiffs had borrowed allegations from.

THE COURT:  Now, in that case -- isn't it true that in that case that they also said that the plaintiff doesn't have to allege something for every single claim, but at least enough to support their complaint?  I could be misreading it.

MR. SULLIVAN:  No, Your Honor's -- you're not

misreading it.  A few responses with respect to the *Connetics* case, as I know it was a focus of the briefing.

In *Connetics I* -- so plaintiffs originally relied on this SEC complaint, and they relied on it to allege that defendants knew about -- so this was a case about misstatements relating to a drug that this Connetics company was putting out, and they borrowed these SEC allegations to say the defendants knew about a study that suggested that this drug might cause cancer.  The Court struck those allegations for lack of corroboration.

On the second go-around, the opinion to which Your Honor was referring, in the amended complaint what plaintiffs did was they found a confidential witness similar to the quote/unquote "FEs," as plaintiffs set forth here, who allege that senior management were -- were informed that there were high incidences of tumors in that study.

That was an allegation that didn't exist in the first complaint and, in fact, the Court cited to that paragraph as one of the reasons why it was not striking the SEC allegations.

To Your Honor's specific question about whether or not it's okay to corroborate some of the allegations but not all of the allegations, I would direct Your Honor's attention to the *Veal v. LendingClub* case.  That's 423 F.Supp. 3d 785 out of the Northern District.

In that securities fraud case, Judge Freeman parsed out defendant's borrowed allegations.  There they were sourced from a Federal Trade Commission complaint that was filed against the defendants.  The Court found that some of those allegations were corroborated, again, by confidential witness testimony independently alleged in the Complaint and so held that those allegations were properly considered.

Others, however, had quote/unquote "no corroboration whatsoever," and those allegations were disregarded by the Court, and that's from the Page 812 of that opinion.

So that's -- we would submit, Your Honor, certainly, plaintiffs here are not required to have word-for-word precise corroboration for these allegations but what they -- what they need to have and what we submit that they don't have here in their complaint are allegations that at least relate to the two categories that I -- that I started with, allegations that these purported concerns were reported to senior management, allegations about this conversation with Dr. Maag; and it's striking in this respect, Your Honor, that plaintiffs here have adduced eight former employees, eight confidential witnesses.  Not a single one of them corroborates these allegations.

In fact, not a single one of them even mentions Dr. Seeto, the CEO of CareDx to whom Dr. Olymbios was supposedly sounding alarm bells and raising concerns, and so

we think and we submit that plaintiffs have not -- have not met the obligations under the *Connetics* case and related case law to corroborate the allegations that they -- that they have borrowed here.

THE COURT: Okay. Let me turn my attention to plaintiff. On April 15th Dr. Olymbios, the former head of Community Nephrology from May 2020 to October 2020 was employed and then filed a complaint in San Mateo Superior Court April 2022 alleging that Car -- strike that, CareDx failed to pay deposits for arbitration proceedings currently under way between the doctor and CareDx.

I'm concerned when I look at this and I'm seeing a party -- party's complaint -- a person's complaint being kind of folded into this and they're not a party to this action. So I'd like you to address that.

Is there a reason why Dr. Olymbios is not a party to this action? What's the status of the San Mateo case? What's the status of arbitration, because I know it was eighteen months in before something unraveled in arbitration and then this complaint was filed in San Mateo. So he's kind of this missing person for me.

Can you shed some light in terms of the facts on that?

MR. DAVIS: Yes, Your Honor. Thank you for the opportunity to do so.

THE COURT: Uh-huh.

MR. DAVIS: In fact, Dr. Olymbios left CareDx in October of 2020, and the relationship between Dr. Olymbios in this case, to properly answer the Court's question, requires me to just take a step back and sort of orient where we are.

So the plaintiffs in this case are retirement funds who invested in CareDx through the New York Stock Exchange. The 1934 Act protects their investments from securities fraud. It protects the New York Stock Exchange, in essence.

So in these cases, in all of the securities cases, the investors have personal knowledge that they invested in the company. That's one element in the claim. All of the other information, scienter, what were the executives thinking, what they said, what was going on behind the scenes is in possession of the public companies.

Now, under the structure of the PSLRA, which was passed in 1995, the plaintiffs are not entitled to discovery before the Court decides on the Motion to Dismiss.

THE COURT: But in their complaint they still have to have specificity and be able to clearly allege certain things.

MR. DAVIS: Yes, Your Honor, that's exactly correct.

THE COURT: Uh-huh.

MR. DAVIS: So that is the context in which cases like the *McKesson* case in front of Judge Breyer, the Verizon

-- the *VeriFone* case that was decided by Her Honor Justice McEwen in the Ninth Circuit, all of these cases that we cited in our papers notice and give plaintiffs the ability to, quote, "borrow allegations from other complaints."  And if the Court were to read one case that's recent, I would recommend to the Court *Evanston Police vs. McKesson,* which is from 2019, which His Honor Justice Breyer decided; and what happened in that case is similar to this one.

The defendants brought to the Judge's attention the *Countrywide* line of cases, the first *Connetics* case, and His Honor took a look at those cases and didn't follow them. Instead, he explained that because the Ninth Circuit in -- in all of these cases relies upon external complaints in deciding upon a PSLRA Motion to Dismiss, it's appropriate to do so here and, specifically, he cited *VeriFone*, which is 694 F.3d 704; and at pincite 706-7 Judge McEwen summarizes the SEC complaint in that case and, in fact, she quotes "management was aware."

She takes that quote from the SEC complaint and considers it when determining the sufficiency of the plaintiffs' proceedings -- excuse me, of the plaintiffs' pleadings in the -- in the private action, and that is the decision, a Ninth Circuit decision, which is the only Ninth Circuit decision in the record that's -- that we argue is relevant here that answers the question -- not the question does that win the case, but the question whether it is

appropriate in a pleading to rely on those types of documents in a case like this.

Now, as to the Court's question about what is the relevance of Dr. Olymbios to the claims in this case, Dr. Olymbios is a critical witness; and the Court summarized the claims in the arbitration case, but what's really important is that Dr. Olymbios did file a petition but in the same petition he filed a complaint.

There he adduced facts based upon his personal knowledge while he was an executive at the company, and based upon documentary evidence that he had in his possession after he left the company.

THE COURT:  Now the company is claiming that he took information from them, went to a competitor and kind of wholesale used whatever he culled from his prior job.

MR. DAVIS:  Yes, and that -- that is an allegation that's not relevant to this case.  What is relevant to this case is that Dr. Olymbios shared his personal knowledge and his documents with the United States Department of Justice and the United States Securities and Exchange Commission.  Both of those government entities launched an investigation in to CareDx.

THE COURT:  Oh, next question then.  Is this an ongoing investigation?  If so, how many investigations are going?

MR. DAVIS:  According to CareDx's most recent filings, the investigations by the Department of Justice and the Securities and Exchange Commission are ongoing; and the fact that there are two parallel investigations, Department of Justice and Securities and Exchange Commission, I would submit are relevant to the Court's question how does Dr. Olymbios relate to this securities case?

He relates, because as we explained in the complaint, on October 28th, 2021, what happened is the company had to disclose that they were under investigation, and on that day the company's stock fell 30 percent.

Why does that matter to retirement funds like my clients and other investors?  It matters because they're gonna have 30 percent less value in the securities they invested in order to support their retirement later down the line, which then relates back to earlier in the class period when the complaint alleges the defendants, in this case, for example, Mr. Seeto, is discussing to the public, he's explaining to the public the reasons for the company's growth, the reasons for the company's success and, as he mentioned on February 18th, 2021, in response to an analyst question, the analyst asked, "What about RemoTraC?"

This is in a public call.  Everybody's listening. The market's listening.  This is going to affect the value of the stock.  He asked, what about this RemoTraC program?  And

defendant Seeto discussed the impact of this RemoTraC program --

THE COURT:  Once again, this is all stuff that was culled from Dr. Olymbios complaint in the San Mateo --

MR. DAVIS:  This is -- this is related to the Court's question about judicial notice.

THE COURT:  Okay.

MR. DAVIS:  So, basically, what's happening here is the defendants have filed a request for judicial notice.

THE COURT:  Uh-huh.

MR. DAVIS:  The vast majority of those exhibits are -- were filed with the Securities and Exchange Commission during the class period by the company.  They have a legal obligation to do that.  The company has a legal obligation to file documents with the Securities and Exchange Commission.

THE COURT:  Uh-huh.

MR. DAVIS:  As a matter of custom, what happens after that is the company gets on a conference call -- a public conference call that millions of investors can listen to and they explain their filings.

And so what the defendants have done in this case, as they do in many cases, is they've simply filed with the Court the documentation that they previously filed with the Securities and Exchange Commission.

Now, why those documents are relevant to this case

is when the defendants filed these materials with the Securities and Exchange Commission, the New York Stock Exchange is a very active public market.  It's an efficient market, and I'm sure the Court is aware from, you know, experience in life as soon as information gets into the market, it affects the stock price and it helps investors, based upon that price, make investment decisions.

So the information that is going into that market fundamentally is what's regulated by the 1934 Act, and it's those statements that are challenged in this case; and so when defendant Seeto started talking on February 18, 2021, about what was happening in May, June, July of 2020 and he was talking about RemoTraC, he was talking about the product, AlloSure, and the methodology for bringing it to market, RemoTraC, that Dr. Olymbios was working on while at the company.

And to the Court's question not just the front part of his complaint, but the body, the substance, the meat of his complaint explains what was going on behind closed doors that the public, that investors didn't know about.

And what happens, as soon as the market learns on October 27, 2021, information that's related to what Dr. Olymbios later reveals in further detail, the stock falls 30 percent; and the big thing that's going on here behind the scenes involves this product -- or delivery method called

RemoTraC.

Now, the company starts this in -- you know, according to --

THE COURT:  Well, let me --

MR. DAVIS:  Yes, Your Honor.

THE COURT:  -- try to ask one question that I still feel has gone unanswered.  What is the status of the proceeding between Dr. Olymbios and CareDx in San Mateo Superior Court?

MR. DAVIS:  Yes, Your Honor.  I -- I can't say for 100 percent certain, but my understanding is that those proceedings are presently stayed, and what's happening is the questions that are relevant in that case are being arbitrated. That's my understanding.

THE COURT:  So he has returned to arbitration after that hiatus where they thought there was some quarrel about whether a fee had been paid?  He has returned to arbitration?

MR. DAVIS:  That -- that's my understanding.  I don't represent Dr. Olymbios -- or excuse me -- yes, Dr. Olymbios so I can't say for certain, Your Honor.

THE COURT:  All right.  My second question was whether the investigations were ongoing?  You mentioned Department of Justice and SEC, but I believe there was also some reference to an unnamed state regulatory agency, that that also was part of an investigation and that was in some of

the pleadings that I saw.  If I'm mistaken or misread that, please correct me.

MR. DAVIS:  I'm not sure -- I'm not sure about the status of that investigation, you know.  I'd certainly invite defendants to comment on it.

THE COURT:  All right.  And they're based on misconduct, mishandling?  Do you know the basis of those investigations?

MR. DAVIS:  According to two different sources, according to what's happening in the Dr. Olymbios matter where he went and blew the whistle on this underlying Medicare fraud both to the DOJ and to the Securities Exchange Commission, it's related to RemoTraC Medicare fraud.

According to a separate witness, she was interviewed by the Department of Justice and she explained that the Department of Justice questions focused on this RemoTraC program and, specifically, whether the issue of requiring patients to take this AlloSure test at the same time that they're doing these standard of care tests.

THE COURT:  Okay.  And this is based on your independent investigation or your review of the previous-filed complaint in San Mateo Superior Court?  And then, finally, are all of these things that you've just recited on the record encompassed in your complaint?

MR. DAVIS:  The -- the question of what is under

investigation by the DOJ and the SEC is in the complaint October 27 where they -- where they say point -- where the company says, "We're under investigation for False Claims Act violation."  That's source one.

The second source is FE-3 that is in the complaint that's part of the independent investigation, and the third source is -- I'm not recalling if it's in the Olymbios complaint; but, in any event, counsel contacted the attorney for Dr. Olymbios to confirm that Dr. Olymbios -- his factual allegations were based on his personal knowledge and the documents --

THE COURT:  Focus on the complaint --

MR. DAVIS:  Yes, Your Honor.

THE COURT:  -- because that's where the Motion to Strike lands.

MR. DAVIS:  Yes.

THE COURT:  All right.  Now, then, I have some recitation of facts from both parties now and have tried to fill in a few things that I gleaned from reading all of the pleadings; and I am always open to any correction if I overlook something, but let's turn our attention now to judicial notice.

Exhibits A through G are filings submitted by CareDx to the SEC.  Do you have any objection to the Court taking judicial notice of those items, specifically since they refer

to statements in these filings; and if you have an objection, please state your grounds.

MR. DAVIS:  There's no objection to noticing the existence of the filings.  Where there's a dispute about a fact about them, that's the only objection and that's the *Khoja* case out of the Ninth Circuit.

THE COURT:  With that limitation, counsel on behalf of the defendant, do you agree?

MR. SULLIVAN:  Yes.  With the Court's indulgence, I could return to counsel's table?  I left a set of my notes.

THE COURT:  Oh, perfect, yes.

MR. SULLIVAN:  Thank you, your Honor.

THE COURT:  Absolutely.  Might be a good time for me to get some water, please.  Take your time.  Thanks.

MR. SULLIVAN:  So I think the answer to Your Honor's question is that that's correct.  We dispute that we are using these exhibits to raise factual arguments.  We saw a reference to that in plaintiff's opposition, its citing to the *Khoja* case that counsel just mentioned; but plaintiffs don't actually cite to any instances in the complaint where we are purportedly doing so, but I don't want to be long winded, Your Honor.  I think that your recitation is correct and we are in agreement.

THE COURT:  All right.  So the Court is going to take judicial notice of those items referred to in the

complaint such as SEC filings.

Exhibit H through N are transcripts from CareDx's earning calls.

MR. DAVIS:  Same position, Your Honor.

THE COURT:  All right, Judicial notice will be taken if there's no objection.

Exhibit O and P are transcripts from conferences that defendants attended.

MR. DAVIS:  Same, Your Honor.

THE COURT:  Hearing no objection, the Court will take --

MR. DAVIS:  That's right, Your Honor.

THE COURT:  -- judicial notice of the questions and answers made by defendant that are quoted in the complaint.

Exhibits Q through T are analyst reports about CareDx.

Exhibit R is quoted in the complaint.

Exhibits Q and T are analyst reports regarding the same meeting described in Exhibit R.

Exhibit S is an analyst report that defendants quote for the proposition that Medicare Advantage plans are more likely to refuse payment than Medicare plans.

MR. DAVIS:  Same -- same, Your Honor.

THE COURT:  Any objection?

The Court -- there being no objection, the Court

takes judicial notice of these exhibits for the purpose of showing the information available to the market.

Exhibit U is CareDx's Motion to Compel Arbitration in the Olymbios v. CareDx case in San Mateo Superior Court. The Court takes judicial notice only of the existence of the exhibit, but not the facts contained therein.  All right.

Returning our attention to the Motion to Strike, as we look at each of the allegations pertaining to Dr. Olymbios' discussion of concerns with defendant Seeto and Maag, M-a-a-g, communications between Dr. Olymbios and Maag regarding patient billing and the conversation between Dr. Olymbios and an unidentified employee.

Once again, this appears to all be information culled from the complaint out of San Mateo.  My question is, is there independent corroboration in the complaint regarding the allegations concerning Dr. Olymbios' discussion of concerns with defendant Seeto and Maag?  You may proceed.

MR. DAVIS:  It depends.  So, yes, there is corroboration in terms of -- let me take a step back.

The Court -- as an example, the Court mentioned a conversation between Dr. Olymbios and Dr. Maag.  So there's two people to that conversation.  The fact that the conversation occurred is, indeed -- is borrowed from Dr. Olymbios' complaint and based upon counsel's discussion with his attorney -- his attorneys who confirmed that

Dr. Olymbios is the source of that information.

Now, there's only two people in that discussion.  So the only other source of corroboration we would respectfully submit is Dr. Maag, and Dr. Maag and Dr. Seeto are presently, you know, via CareDx suing Dr. Olymbios and our understanding is they're threatening him, you know, with legal action for any kind of whistleblowing activities; and in terms of where that's in the record, we have Exhibit 2 to the Hooker declaration wherein counsel for Dr. Olymbios writes to the arbitration panel and explains how Dr. Olymbios is concerned that CareDx's activities are really designed to chill legitimate whistleblowing activity.

So we would respond, Your Honor, that allegation has been properly sourced.  It's been properly sourced under *VeriFone* in the Ninth Circuit, under *McKesson* right here in Northern District of California, 2019 decision by Justice Breyer, and the only other source is a defendant in this case.

THE COURT:  And the communication between Dr. Olymbios and Dr. Maag regarding patient billing and conversations between Dr. Olymbios and the unidentified employees, I believe there were some 85 former employees that were -- had conversations or that were conferred with.

I'm not sure if they were availing of any corroboration, and so I'm open to hear that; and was there independent corroboration that rises to the level of a private

securities litigation act under the Private Security Litigation Reform Act of 1995, which really had heightened the requirements in terms of the allegations that are made in a complaint of this nature.

So I'll let you complete any other thoughts you have on that.  Then I'm going to turn back to the defendant.

MR. DAVIS:  Well, sure.  Under one of their principal lines of cases, *Connetics II*, Judge Illston looked at the amended complaint and counsel referenced one single paragraph.  However, the Court in that case considered a motion to strike 34 paragraphs, and in that case Judge Illston cited one paragraph as a CEG.

There was an example of additional corroboration for the very precise statement that was borrowed from the other complaint and, importantly, what Her Honor made clear in that case is the prior -- the prior pleading exclusively relied on some other complaint for everything, and in the follow-up complaint they did not.

They had additional CWs.  They had additional public materials and they were clear, as we are here in the first two paragraphs of our complaint, the preamble, that the purchases of securities are based on the personal knowledge of the plaintiff.

Everything else, of course being in the possession of -- the evidence, being in the possession of the defendants,

was based upon information and belief; and under a Rule 11(b)(3) that is appropriate grounds for filing a complaint, and we would submit Judge Illston in their most important case reached that conclusion in *Connetics II*.

Now, they didn't cite that case in their opening papers. We brought that to their attention, but it's a mistake to say there was one paragraph at issue in *Connetics II*. In fact, defendants moved to strike 34, and the Court did a CEG that one of those paragraphs was corroborated in this case, the before and after in their motion to strike.

The before is you have to -- you have not corroborated anything. The after is there's a handful of phone calls. Now, importantly, what is corroborated by all of these other former employees, FEs, you know, 1 through 8, is the existence of this widespread Medicare fraud, which Dr. Olymbios talks about in his complaint, and we would respectfully submit, you know, this is like -- an analogy is coming to mind that there's a dog and, you know, the large allegations around the existence of a scheme, the presence of one during -- before and during the class period is like the dog; and being able to allege the dog allows one to infer the tail, which is that a scheme of this magnitude concerning the number one product of the company, concerning the program RemoTraC that the two individual defendants created in this case, Seeto and Maag, allows one to infer that, yeah, their

direct report -- or Seeto's direct report, Olymbios, almost certainly talked to him about it.

That's an inference, and attorneys and investors are permitted all reasonable inferences from facts; and we would submit, Your Honor, that that's additional corroboration that the existence of the phone call -- that the phone call likely occurred.

THE COURT:  All right.

All right.  Turning my attention to defense, the plaintiff is basically sharing with me that the accused party had knowledge of the falsity of these statements, that they were complicit in the conversations that took place with Dr. Olymbios and that they knew exactly what they were doing and its impact and that that's enough.  They don't need any additional information to support that allegation.

From your perspective, arguendo, if I were to strike all inferences to the San Mateo complaint, what would be left?

MR. SULLIVAN:  That -- that's a good question, Your Honor, and I think what would be left is a very large securities plus action complaint with 11 paragraphs stricken.

Now, those paragraphs certainly bear on plaintiffs' scienter claims here, in particular; but to be clear, Your Honor, it is not our position that if those allegations remain in the complaint, that that is somehow dispositive.

We think those allegations borrowed from

Dr. Olymbios are separately insufficiently pled.  They do not meet the particularization standard of the PSLRA.  That -- that is an argument, with the Court's indulgence, I would leave to my colleague on the Motion to Dismiss side.

In terms of whether or not the allegations are even properly a part of the complaint, that is where we think that Your Honor's first question to counsel is the most critical here.  What in the complaint corroborates these -- what we term the Olymbios management allegations?  And I didn't hear a response from counsel pointing to anything specifically in the complaint that suggests that these discussions occurred.

Certainly, there are more ways than one to corroborate these allegations.  Just because it was a conversation between two individuals does not mean that there are different ways to corroborate here.  The plaintiffs could have alleged, for example, that another one of these eight former employees raised some of these same quote/unquote "concerns," whatever those concerns may be, we don't know; but they could have alleged that a former employee raised the same concerns to Dr. Seeto.  That might be sufficient corroboration.

They don't even do that, Your Honor.  There are no allegations that even relate to raising of concerns to these -- to this other particular conversation with Mr. Maag, and so we submit that they're not -- they're not corroborated here.

I'd just like to respond with Your Honor's permission to a few of the other points raised by counsel?

THE COURT:  You may proceed and there's also -- I neglected to ask plaintiff about their request in the alternative that the Court vitiate Dr. Olymbios' confidentiality agreement.  I don't know that I'm in a position to do so, and I neglected to ask him about that. That was one of the last things I had on my list as it relates to the Motion to Strike.

So you can also address that, and then I'll let counsel for the plaintiff have the final word before we take a break.

MR. SULLIVAN:  Sure, Your Honor, I'm happy to do that.  So just briefly, counsel addressed, again, the *Connetics II* decision; and just to be clear, the paragraph that I provided as an example was one of numerous paragraphs that the Court cited to.  I believe at Page 6 of the *Connetics II* opinion the Court cites to Paragraph 91 through 94 as sort of easing the Court's mind that now on this amended complaint the allegations had, in fact, been corroborated.

And it wasn't just the example I gave, Your Honor. The Amended Complaint also included an allegation from a confidential witness that the CEO and CFO would have been kept apprised of the mouse study results.

That is slightly different than an allegation from

the original complaint.  It was clearly something that the plaintiffs in that case changed as a response to their allegations being stricken the first go-around.

The Court also observed the amended complaint included a new allegation from a confidential witness that quote "provided information corroborating the FDA's views" that Velac, the particular drug at issue, as alleged in the SEC complaint; and so I just wanted to respond briefly to that, Your Honor.

We think there the *Connetics II* Court observed multiple points of corroboration that were not existent on the first decision.

THE COURT:  So it's your position that plaintiff must provide an independent basis that goes towards corroborating every allegation, although they don't have to reach every single point, but at least an independent evaluation of each of the allegations and something to support each one, not just culling from the other complaint?

MR. CORDING:  I think that's exactly correct, Your Honor; and, again, this was the *Veal* case that I mentioned at the outset where Judge Freeman did engage in this exercise of saying, "Okay, well, some of these allegations are corroborated from the borrowed complaint, but some of them are not."

So we don't think it's an all-or-nothing proposition

just because, as counsel said, there may be corroboration for the existence of an alleged -- of alleged Medicare wrongdoing here.  We think that's very different than corroborating that these alleged violations or concerns were reported to senior management, in particular in the context of the PSLRA.

And then the last point Your Honor asked that I address, sort of whether or not the Court is in a position to -- I think the term plaintiffs use is "vitiate" the confidentiality agreement between Dr. Olymbios and CareDx.  We certainly don't think that the Court is in a position to do so.  Briefly, I'll just offer three reasons why we think that would not be appropriate.

One is standing.  I don't see how plaintiffs have standing here to challenge the enforceability of a contract between CareDx and one of its employees.  As Your Honor noted at the outset, Dr. Olymbios is not before this Court.

Second, Your Honor, the confidentiality agreement is not before the Court.  Plaintiffs have two sentences on this issue in the conclusion section of their brief.  They don't cite to the contract.  They don't attach it.  They don't explain why it should be quote/unquote "vitiated."

The Court would essentially, we submit respectfully, would be issuing an advisory opinion here, which would not be appropriate.

And then the third reason, even putting aside the

issue of standing, and even if the contract were properly before this Court, the contract is unambiguous that Dr. Olymbios' sole remedy is arbitration; and as counsel correctly noted earlier, these claims are actively being arbitrated right now, claims related to the enforceability of this -- of this confidentiality agreement.

If this Court were to rule or somehow invalidate that contract, we think it would risk conflicting rulings and it would certainly, we submit, interfere with the arbitration; and so with that, I just wanted to answer Your Honor's last question.

THE COURT:  All right.  And anything that you feel that I may have overlooked as it relates to the Motion to Strike?  Anything that I may have overlooked in my questions before plaintiff has the final word?

MR. CORDING:  Very briefly, Your Honor, the only thing I would add is that counsel made a few references to these -- these discussions between counsel for Dr. Olymbios and counsel for lead plaintiffs.

I would just like to point out that under the PSLRA, when plaintiffs are pleading on information and belief, which I think I just heard that they are here with respect to almost everything in this complaint, the complaint must -- and I'm quoting from the PSLRA -- "state with particularity all facts on which that belief is formed."

Plaintiffs do so here on Page 1 of their complaint. They list seven sources of their investigation.  Nowhere on that list does it mention discussions with counsel for Dr. Olymbios.  We think the existence of those discussions is not adequate for other reasons, but that is just a gating issue as a pleading deficiency that we don't think can be remedied in the opposition brief.

THE COURT:  All right, thank you.

So defense is basically indicating that the stringent pleading requirements for fraud claims, which include plaintiff must identify each specific statement alleged to be false or misleading and explain why it's misleading, plaintiff must state particular facts giving rise to a strong inference that the defendant issued the allegedly misleading statement knowing that it was false at the time it was made and that plaintiff must allege that the information is false or misleading -- in the false or misleading statement or omission of information was the cause of the actual loss the plaintiffs suffered.

So the particularity is where the rub is.  So, counsel, final word on the Motion to Strike and then we're going to take a break.

MR. DAVIS:  The final word on the Motion to Strike, Judge, is the defendants cite extensively from the *Countrywide* case, which we submit under Judge Breyer's ruling in *McKesson*

is no longer good law.  It's too strict, but even under the very strict *Countrywide* ruling what we learn is that if the defendant contacts counsel and verifies the source from the borrowed complaint, as the Hooker declaration demonstrates we have done here, then they can rely upon those allegations.

Now, we submit a long line of cases show that's a very strict interpretation of what's required to do a proper investigation, but we have done precisely what the Judge asked the parties to do in Countrywide, and there's no rule that, you know, attorneys when they're filing complaints need to list literally every single thing that has happened prior to the filing of the complaint; and these Rule 11 motions are so rare because, as the Ninth Circuit explains, it's a rare and extreme remedy.

And so we cite a number of cases, you know, *McKesson*, *VeriFone*.  We even cite Judge Gilliam's case *Nvidia,* out of Oakland, where he explains the 12(f) vehicle, which they're using here at the pleading stage, is an improper tool procedurally.  So we -- we invite the Court to consider that ruling as well.

THE COURT:  Did the Court consider any Ninth Circuit cases?

MR. DAVIS:  I'd have to refresh my recollection as to the underlying sources for the *Nvidia* case, but I do believe there is Ninth Circuit authority for the proposition

that 12(f) is a disfavored vehicle at the pleading stage, and I think our papers go into that.

So from our point of view, Judge --

THE COURT: Uh-huh.

MR. DAVIS: -- the Motion to Strike is procedurally improper at this stage. The substance of it is under -- you know, a Rule 11 guideline is rare and extreme under Ninth Circuit authority, and then even under the strictest interpretation of the guidelines, which is this *Countrywide* case, the plaintiffs have complied even with that strict standard of contacting independent counsel.

And, finally, we have a number of additional witnesses who corroborate the allegations. The last point I'll make, Your Honor, is -- a mention was made by counsel that there's no other indication that information about this Medicare scheme was reported up.

In fact, FE-1, who was a senior medical doctor at CareDx, explained how she reported Medicare misconduct to a vice president and he turned around and said, "Well, we're doing this to make money," and she also reported it to the company's top cop, Clarice McCauley, who in turn explained to her that Ms. McCauley, the top cop of the company, was having an uphill battle and CareDx simply did not want to be compliant.

Now, we submit when the top cop of the company is

having an uphill battle, the only people who are uphill are Seeto and Maag and that thoroughly independently corroborates an allegation by Dr. Olymbios, which we properly borrow, that they berated him or brushed off his concerns in the first instance, much like FE-1 who gets -- has her concerns brushed off or explained by the top cop, "CareDx just doesn't want to be compliant."

These are very analogous.  Now, of course, FE-1 isn't literally in on the phone call between Dr. Olymbios and another executive, but there's only two people to that phone call; and we've got independent corroboration through counsel and a sufficient basis to allege the existence of the call and its substance.

THE COURT:  All right.

MR. DAVIS:  Thank you, Your Honor.

THE COURT:  Thank you.  All right, that concludes the arguments with regards to Federal Rules of Civil Procedure 11(b)(3), the Motion to Strike.

We'll take a 15-minute break and resume at ten minutes after 3:00 and we will then address the Motion to Dismiss.  Some of the thunder may have been taken out of the Motion to Dismiss during these arguments, but I think everyone will have a few moments of reflection while I take care of some other court-related business.  So Court's in recess for fifteen minutes.

MR. SULLIVAN:  Thank you, Your Honor.

MR. DAVIS:  Thank you.

THE COURT:  Thank you.

(Recess taken at 2:53 p.m.)

(Back on the record at 3:10 p.m.)

THE COURT:  So at this time we're going to turn our attention to the Motion to Dismiss filed by defense counsel. We've already dealt with our judicial notice issues.  There may be some additional facts that may want to be shared by either counsel as it relates to Rule 12(b)(6) and (9)(b).

Counsel, if you'll approach the podium, those of which will be providing the argument, and this is also our Section 10b claim as well.

While you're approaching the podium, one thing that I note is that each party makes reference to the San Mateo complaint; but, curiously, no one attached it to any of their documents.  So that was just something I wanted to note for the record.

All right, counsel for the defense you may begin.

MR. CORDING:  Thank you, Your Honor.

Thank you, Your Honor.  There's one issue of fact, a question Your Honor raised during the Motion to Strike that I wanted to address now just so as not to leave it open as we're talking about it and thinking about the chronology here.

THE COURT:  All right.

MR. CORDING:  Your Honor asked about the references to an investigation by an unnamed State Department of Health and what the status of that was.

So the reference in CareDx filings was an investigation by the New York Department of Health.  That investigation, as the company has publicly disclosed, has since concluded; and it's resulted in a declination by the New York Department of Health, which means that they've looked at the matters under investigation and having completed their investigation determined not to take any action against the company or to conduct any further investigation, and I want to not overstate that.

That investigation was not co-extensive in scope as the Department of Justice or SEC investigation, but it did relate to many of or some of the same issues under investigation by the Department of Justice and so I wanted to make sure that issue was clear for the chronology.

THE COURT:  Thank you.

MR. CORDING:  If I could begin, Your Honor, on the Motion to Dismiss on the issue of scienter; and Your Honor asked during the argument around the Motion to Strike if the Motion to strike is granted, what is left of this complaint?

And we would submit, Your Honor, that if the Motion to Strike is granted, it would fatally undermine the element of scienter.  As Your Honor has pointed out, these claims as

securities class action claims under Rule 10b5 are subject to the heightened pleading standards of the Private Securities Litigation Reform Act of 1995.

Ninth Circuit law is clear that a compelling inference of scienter must pled as to each defendant. There are four individual defendants here, and the Olymbios allegations -- management allegations that we just argued touch on two of those individual defendants; but just as a matter of black letter law, in order for this -- if the compelling inference of scienter is not pled as to a particular individual defendant, that individual defendant must be dismissed from the case; and if no compelling inference of scienter is pled as to any of the four individual defendants that would be Dr. Seeto, Dr. Maag, Mr. Dhingra or Mr. Konrad, then the case must be dismissed.

So I would like just very briefly, Your Honor, to discuss the allegations as to each of those four individual defendants and explain where the Motion to Strike fits in to the defendant's position on those.

THE COURT:  All right.  Can I interrupt and give you some guidance, because I did have a question as to whether individual scienter is required for each named defendant.

So can we start with defendant Marcel Konrad?

MR. CORDING:  Yes, your Honor.

THE COURT:  Can we start whim?

MR. CORDING: Yes. So Mr. Konrad was the interim CFO of the company for only three months during the class period. There are no substantive allegations in the complaint addressed to Mr. Konrad. Indeed, by my count his name only comes up three times in this 90-page complaint where he's listed twice as a defendant and once as the former CFO.

While we were talking about previously Dr. Olymbios, Dr. Olymbios has nothing to say about Mr. Konrad, nor do any of the eight former employees who are quoted in the complaint, nor for that matter as the CFO what issues about regulatory compliance or RemoTraC be within his purview as the CFO.

So we would submit that there are no allegations of substance directed at Mr. Konrad, and as a consequence of that there would be no basis to derive a compelling inference of scienter as to him.

THE COURT: All right. And then if I did not strike, what is your position, if I did not strike the portions that you've asked me to strike --

MR. CORDING: Yes, your Honor.

THE COURT: -- for the same individual?

MR. CORDING: So to be very clear about it, Dr. Olymbios says nothing about Mr. Konrad. So we're sort of agnostic with him on the outcome of the Motion to Strike.

The same holds true for Mr. Dhingra. Mr. Dhingra was the successor CFO to Mr. Konrad. He was the CFO of the

company for a little over one year during the class period. So from approximately March 25th, 2021, through May 2022; and, really, it's more of the same. Mr. Dhingra actually joined CareDx after Dr. Olymbios left. So the two of them never interacted, and there's nothing sourced from the Olymbios' complaints about Mr. Dhingra. Nor for that matter are there any allegations from any of the eight former employees about him. There were no stock sales by Mr. Dhingra; and, again, there really are no allegations about his scienter that would implicate Mr. Dhingra in any securities fraud.

So we would submit irrespective of what happens on the Motion to Strike, Mr. Dhingra should be dismissed from the case for lack of scienter.

THE COURT: All right.

MR. CORDING: And so that, I think, comes to the core of Your Honor's questions, which is about, well, what happens for Dr. Maag and what happens for Dr. Seeto?

THE COURT: And let's start with Dr. Maag.

MR. CORDING: Okay. Yes, your Honor.

For Dr. Maag, we think, again, that he should be out on scienter grounds irrespective of what happens on the Motion to Strike; and the reason I say that is Dr. Maag did not make any of the statements during the class period that the plaintiffs challenge as false or misleading.

So the plaintiffs list out ten different statements

that individuals at CareDx made during the class period, January 21st, 2021, through November 3rd, 2022. None of those statements were made by Dr. Maag and the plaintiffs also seemingly -- and I want to be fair to their position -- agree with us that under the *Glazer* case for Dr. Maag's scienter to be relevant, he had to have been the maker of one of these statements for the reason that -- let's say, for instance, Dr. Seeto made a statement that the Court concluded was false or misleading.

It's not enough to plead in the Ninth Circuit that Dr. Maag had scienter and knew what Dr. Seeto was saying was false. The plaintiffs have to show that the same person who made the statements had knowledge or was deliberately reckless as a matter of pleading stage inference when making that statement. So there has -- you're twice tested. It has to be the speaker, and that speaker has to have scienter and we -- the case that we cite on that is the *Glazer* decision, which I think makes clear that the Ninth Circuit, broadly speaking, doesn't recognize the collective or corporate scienter doctrine.

So the rule requires linking the speaker to the individual whom scienter's pleading; and so because Dr. Maag was not a speaker, our position is that his scienter is entirely beside the point and those allegations need not be addressed by the Court in adjudicating the Motion to Dismiss

and so that would really leave --

THE COURT:  Well, let's go back to Dr. Maag.

Can CareDx impute Dr. Maag's scienter either by omission or by silence or adoptive conduct admissions by not saying anything when maybe he was in the presence of something false being said?

MR. CORDING:  It's a great question, Your Honor.

There are situations where that can happen. Dr. Maag's scienter would be imputable to CareDx if CareDx itself was the speaker from the perspective of the *Janus* case for security law.

So a typical scenario where this might happen is if CareDx had filed an unsigned prospectus with the U.S. Securities and Exchange Commission, the signatory of the person who signed would be considered the speaker; but if it's unsigned and a prospectus is issued in the name of CareDx, then CareDx is deemed to be the speaker.

And in that scenario if Dr. Maag knew that the statements in that prospectus were purely false or misleading, that is imputable to CareDx from a scienter perspective.

But the problem with that here is that all of the challenged statements were made by other named individual defendants.  It was Dr. Seeto.  It was Mr. Dhingra.  There was one statement disseminated by Mr. Konrad.  So there's no statement where anyone other than an individual is the

speaker. So there's -- you can't impute from one person to another their scienter.

If Dr. Maag knew that statements were misleading but Mr. Seeto didn't, if Mr. Seeto was the speaker, then that as a matter of Ninth Circuit law means that there is no scienter as to that statement.

THE COURT: All right, and now you can go straight on in to Dr. Seeto.

MR. CORDING: Yes, your Honor, and we would submit that the Motion to Strike is of most import to the scienter analysis of Dr. Seeto.

As my colleague pointed out, we think it's striking that of the eight former employees who are quoted in the complaint, not one of the eight have anything to say about Dr. Seeto. There are no allegations from any of those eight cooperating witnesses that Dr. Seeto was aware of any fraud at the company, whether through RemoTraC or otherwise, but there are three primary ways that the plaintiffs argue scienter here.

The first is this Olymbios management allegation where they argue that Dr. Olymbios had concerns about the company and the healthcare compliance practices at the company and raised those with Dr. Seeto.

So that is the allegation that we're moving to strike, and so we would submit without that allegation their

most critical scienter allegation as to the CEO, the last of the four remaining individual defendants, falls away and necessarily with that they haven't hit the very -- or crossed the very high hurdle of pleading a compelling inference of scienter as to Dr. Seeto; but they do have two other scienter allegations as to Dr Seeto that I want to address very briefly.

THE COURT:  Okay, and that is the insider sales?

MR. CORDING:  Exactly, Your Honor.

So they argued that Dr. Seeto sold eight million dollars of stock during the class period.  Under the Ninth Circuit's decision in the *Zucco Partners v. Digimarc Corp.* Case, Reporter 552 F.3d 981, it's a Ninth Circuit decision from 2009 that we cite in our papers, there is a three-part test for when trading allegations can give rise to a compelling inference of scienter for purposes of a securities fraud class action lawsuit.

And I think the headline here is that the trading allegations against Dr. Seeto are not developed, and even as pled they're insufficient.  The three standard -- or the three requirements under *Zucco Partners* is that the plaintiffs have to plead the amount and the percentage of stock that Dr. Seeto traded.  Here, there's no allegation about the percentage stock that Dr. Seeto traded, whether that's five percent or a hundred percent or something in between.

Second, they have to plead Dr. Seeto's trading history to support an allegation that the trades during the class period were atypical in relation to Dr. Seeto's trading history; and there are no allegations about how, if at all, Dr. Seeto traded prior to the class period.

And the final *Zucco Partners* factor is that the plaintiffs have to establish that the timing was suspicious, and here we submitted a compendium of Form 4s that I think Your Honor decided earlier today or ruled earlier today was subject to judicial notice.  That is Exhibit G at ECF 58.

That -- the compendium of Form 4s lists all of Dr. Seeto's trades during the class period, and they show that all of those trades were conducted pursuant to a Rule 10b5-1 plan, and why that matters as decisions like the *Fastly* case have pointed out is instituting a Rule 10b5-1 plan takes the timing of trades outside of the executive's control.

So it's not as though the executive's going into the market and trading actively.  What you essentially do is determine ahead of time, "I'm going to establish this plan when I'm not in possession of material non-public information and set up some rules for how I can trade stock either on a monthly basis or on a periodic basis," and so the cases have recognized that that negates any culpable inference from the trades when you trade through a Rule 10b5-1 plan.

THE COURT:  Go back.  Unless I misread something, I

thought I read that Dr. Seeto had sold 26 percent of the shares during the class period?

MR. CORDING:  If that's so, Your Honor, I apologize. Then I -- then I missed that.  Then that would -- that would -- that would suggest -- or that would indicate that the first factor is satisfied, but not his trading history.

THE COURT:  All right.  Proceed, sorry for the interruption.

MR. CORDING:  Thank you, your Honor.

Let me turn briefly now to the element -- the second element that we're challenging, which is the element of falsity, and that -- the allegations in the complaint generally track into three buckets.

Kind of the first bucket, if you will, are the underwriting agreements that the company was required to and did file with the US Securities and Exchange Commission, and those underwriting agreements had compliance of law representations in them.

Our position, Your Honor, is that those underwriting agreements are not actionable as a matter of law, and the reason for that is that the underwriting agreements were filed through an 8-K with the Securities and Exchange Commission, which are contained in Exhibits E and F; and the underwriting agreements were with these 8-Ks filed with an express warning to investors not to rely on the underwriting agreements for

the factual information contained in them.

And just to actually read the disclaimer into the record, the key sentence is, quote, "Accordingly, the underwriting agreement is incorporated herein by reference only to provide investors with information regarding the terms of the underwriting agreement and not to provide investors with any other factual information regarding the company or its business."  It's at ECF 58-6 and ECF 58-7.

Our position is that warning is dispositive, and if you look at the cases in this area of law, they track to where if the warning is included in the transmittal, the contractual representations cannot give rise to a securities claim.  So an example of that would be the *Jaroslawicz* case, as well as the *All American Claims* case, and if the -- if the contract is filed without the warning or disclaimer, then the representation can give rise to liability under the securities laws; and that's the *Glazer* case that the plaintiffs site in their opposition.

THE COURT:  Now, what is the purpose of the statement -- even given the warning, what is the purpose of the statement?

MR. CORDING:  Yes, your Honor.

The purpose of the statement is to give investors information about the terms of the contract.  So, for instance, in one of the cases what was filed was a merger

agreement.

So investors are interested in the -- what the purchase price is, what the representations are, in what circumstances the merger can be terminated. Is there a reverse termination fee? Are there ordinary course covenants?

And I think it's important to emphasize, as the cases have pointed out, that these contracts are required as material contracts to be disclosed with the US Securities and Exchange Commission; and the reason for that requirement is so investors can know what the significant business deals the company's entering into.

And so if the rule was there's no way to warn investors not to rely on the contractual representations, then public companies would be in the position of facing an obligation by the SEC to turn over or to disclose these contracts; and if there's a breach of anything in the contract, that not only gives rise to a potential lawsuit against them for breach of contract, but they've potentially committed securities fraud by publicly disclosing a contact with a false representation in it.

And we submit that's not the rule, which is why the cases have respected the warning statements and this -- as the Ninth Circuit said in the *Reese v. BP Exploration* case, in thinking about, well, when does a contractual representation give -- potentially give rise to securities liability?

They said that it's a certification of ongoing compliance, and if you're an investor and you get the underwriting agreement here with these representations -- these very broad representations about compliance with law and you see the warning up front that says, you know, "We're just telling you this so you know what the terms of the underwriting agreements are, not to say that all of the factual representations are true," we would submit that that prevents this -- these contracts from amounting to a certification of compliance under the *Reese* decision.

THE COURT:  So it's your position that the 8-K filing is sufficient such that investors would not be interested in or rely on these statements because they're just merely to show compliance with the health laws?  That's the sole purpose?

MR. CORDING:  Yes, your Honor.

I think another useful formulation that some of the cases have used is whether the underlying contractual representation is a statement of certainty, and I think when you're telling investors -- so the 8-K is the document that actually gets filed.  That is the document transmitted to the US Securities and Exchange Commission.

You're only disclosing the contract so they know what the terms of the contract are.  I think that prevents it from being a statement of certainty or a statement of a

certification of compliance, particularly given that these contracts are being filed to fulfill an unrelated regulatory requirement to file material contracts with the Commission.

THE COURT:  And so it's your position that an investor, whether a novice, a beginner or a sophisticated investor wouldn't rely on that information in any way, wouldn't be interested in that information, wouldn't impact their decision process?

MR. CORDING:  Yeah, I think -- I think it very much operates similar to the PSLRA's safe harbor for forward-looking statements.  It amounts to a warning to investors not to rely on the factual representations included in the contract.

Investors very well may be interested in the terms of the contract.  So I don't want to suggest that investors don't read these contracts or aren't interested, but our position is that the warning has legal effect in much the same way that if you give an earnings projection and identify the statement as a forward-looking statement and warn the investors, you know, how the results could differ, that that, in essence, immunizes the statement from liability under the securities laws.

We think under *Glazer* and the cases that have addressed this issue, that the warning that was in the 8-K here had the effect of preventing securities liability from

attaching to these representations.

THE COURT:  All right.  And then one other question -- I may have two final questions for you.

Reviewing the operative complaint holistically, should the Court find a strong inference of scienter as to CareDx?

MR. CORDING:  Thank your, Your Honor.

The answer to your question would be "no," and I think Your Honor is right to ask about it is clear under the Supreme Court's *Tellabs* decision, Justice Ginsburg's decision in that case, that the allegation of the complaint should be reviewed holistically and the Court should weigh and consider plausible inferences of culpable conduct as well as plausible inferences of non-culpable conduct; and as Your Honor weighs those decisions, the core allegation of the complaint is really that the company committed a fraud on Medicare through the RemoTraC program, that it was a guise to bill Medicare for medically unnecessary tests.

We would submit that the more plausible, non-culpable inference here is that the RemoTraC program was an at-home blood draw service program that was launched by the company during the worst days of the pandemic, and it was done so as a way of -- to aid very vulnerable transplant patients who were being told not to go to doctors' offices to maintain their post-transplant care, that the RemoTraC program was

never revealed to be a fraud.

And we would also submit that it's important to keep in mind as Your Honor was setting out the chronology here, the time line. RemoTraC was launched on March 17th, 2020, very early on in the pandemic.

The plaintiffs allege in Paragraph 106 of the complaint that the RemoTraC fraud began in the first quarter of 2021, so almost a year later; and all throughout 2020 CareDx was speaking to the markets about the RemoTraC program, about the launch of the program, about the rationale for the program, about the number of patients signing up for the program, about their business results.

None of those statements throughout 2020 are alleged in this case to be materially false or misleading. It's not until 2021 in the first quarter when the program's been in existence for almost a year that the RemoTraC fraud is alleged to have been launched, and we would argue that that anomaly of why the program was extended for almost a full year and the plaintiffs are not challenging anything the company said about the program for that entire period of time gives more weight to the non-culpable inference that this program was not fraudulent and it was a bona fide patient-centered response to a once-in-a-lifetime global pandemic.

THE COURT: All right. And then, finally, the red flag that seemed to initiate it -- to have initiated all of

this was the 51 percent year-over-year increase in the total revenue, which I think was reported on or about February of 2021; is that correct?

Is that the red flag that caused all of this to kind of unfold in the way that it has?

MR. CORDING:  So I -- I had understood the plaintiffs' allegation to be -- at least the first red flag was the disclosure of the Department of Justice and SEC investigation on October 28th, 2021, so later in the year.

I did not understand them to be alleging that -- something that happened in February was the red flag because that would have been only one month into the class period.

THE COURT:  All right.  All right, thank you.  Those are all the questions I had for defense counsel.

All right.  Plaintiff, you've now heard all of the arguments and my questions.  I'd like you to respond to each of the arguments hopefully in the same order, starting with Dr. Konrad, then moving to Dr. Dhingra and then to Dr. Maag and then Seeto, and then finally whether CareDx -- when looking at the complaint holistically, whether there's a strong inference of scienter; and then I may have one concluding question after, but if you could go in that order that will be very helpful to the Court.

MR. DAVIS:  Yes, Your Honor, thank you.

And I agree that *Tellabs* is the controlling

standard, and one is to read all of the allegations holistically to determine whether there is a cogent inference and ties when one inference is possible the other inference is possible, you know, if ties go to the plaintiffs under the circumstances.

So I'd like to go through the four defendants by focusing on one key theory, which is a scienter theory that was driving the *Hefler v. Wells Fargo* case.  The Court is probably familiar with that one.  It was the fake account scandal.

There was a large alleged fraud at the operations level going on in Wells Fargo, and one of the inferences that one -- that the Court was allowing the plaintiffs to draw in that case was where you have a large-scale fraud going to the core of the company's business, it's reasonable to infer that senior executives knew about it.

Now, that covers all of the -- all of the individual defendants.  Now I just want to drop that and focus on defendants Maag and Seeto before brushing up one of the arguments that counsel made around how scienter works in these cases.

THE COURT:  Well, how about the fact that counsel brings out that at least two of the defendants -- named defendants, that there's really nothing said about them in particular or showing any nexus to their role with the company

and any wrongdoing.

MR. DAVIS:  Yes, so I'll -- I'll go to the -- to the complaint itself to explain how the complaint ultimately allows for compelling inference that all of the senior executives knew or should have known recklessness is the standard of this wide-scale fraud in the RemoTraC program, which is the focus, as counsel mentioned.

Now, we start off in March of 2020 and at Paragraph 31 we have a quote from defendant Maag who says AlloSure, which was marketed through RemoTraC, was the one product, the one growth driver for the company.  So now we know we're talking about the most important product for the company.

In the next paragraph Maag explains Medicare was the most important payer for the company.  In 35 -- Paragraph 35 Mr. Maag explains that this RemoTraC program -- he got the idea for this RemoTraC program based upon a call he got from Midnight from -- from elsewhere.

Then we learn at Paragraph 38 that defendant Seeto explains how he was able to -- well, they were able to structure this RemoTraC program within a couple of days.

So the situation is defendant Maag gets a call, he has the idea for RemoTraC.  Defendant Seeto is involved in helping structure it over the course of a couple of days, and then the question becomes what is the purpose of RemoTraC that is launched in March of 2020?  We know --

THE COURT:  What about those first two defendants that I mentioned?

MR. DAVIS:  The first two defendants, we're resting on this theory that we think is viable under Wells Fargo and other authorities the core operations -- core operations -- that when there is a fraud that goes to the core operations of the company, it's reasonable to infer senior executives knew.

In addition, again, we have Dr. Olymbios, who said he reported his concerns about this widespread RemoTraC fraud to ten executives.  It's reasonable to infer that the CFOs would have been involved with those discussions.

Finally, I'll refer again to FE-3, who had conversations with the vice president, got the response, "No, we need to do this for money."  Had a conversation with the company's top cop.  Again, she said, you know -- she explained that she was having an uphill battle and that CareDx didn't want to be compliant.

The purpose of this -- this program is essential and the fact that the two -- that Seeto and Maag were involved in creating it is critical in light of both Olymbios and the corroborating allegations that we have from other witnesses.

So the purpose of this program, which was created by two of the individual defendants, is explained by FE-1, which is Paragraph 60 in the complaint; and Dr. FE-1, who's a senior medical liaison doctor said that, you know, this RemoTraC

program was -- was supposed to -- was designed to supposedly bring in, you know, these routine tests, standard tests that are supposed to occur every single month; but, in fact, CareDx used these tests to do -- to also require the patients to take this -- this expensive AlloSure test.

So the purpose of the program is important and as FE-1 also explains at Paragraph 61, she explains that sales drove everything.  Sales was deciding what was going -- how this RemoTraC program was going to be executed in a separate -- the final and additional point on this, Your Honor, is FE-2 says at Paragraph 63 it was known throughout CareDx that a RemoTraC blood draw would not be administered without an AlloSure test being conducted at the same time.

So, in other words, under this corroboration theory where there's a huge fraud that goes to the core product that Seeto and Maag created and where we have reports from Olymbios and others to senior management, it's reasonable to infer that the CFOs would have known.

THE COURT:  All right.

MR. DAVIS:  Yes, Your Honor.

THE COURT:  And I'm just looking at -- just keep in mind I'm looking at when the first two named defendants that we've been talking about earlier, Konrad and Dhingra, when they actually came into the company, the length of time that there was overlap and whether they had detailed involvement in

the company's operations and that there's enough alleged to demonstrate that they -- that the executives had actual knowledge in creating false reports or in the management, and I'm looking at Core Operations Doctrine and just asking those questions.

All right, you may proceed.

MR. DAVIS:  Yes, Your Honor, thank you.

So as is explained at Footnote 10 in the complaint, FE -- Dr. FE-1 worked at CareDx in May of 2021 to January of 2022.  So all of the allegations that she provides going to the existence of a widespread scheme are just continuing with what Dr. Olymbios provided and explained was going on in 2020.

The CFOs of the company can be presumed to know -- it is reasonable to infer they know what's going on with the most important drug, the most important methodology for getting that drug to market, RemoTraC, and that's -- and the plaintiffs are entitled to reasonable inferences.

And just to clarify, at the pleadings stage actual knowledge is definitely not the standard.  You know, known or should have known is the standard and recklessness suffice. Actual knowledge is not the standard.  This is an extremely unique case, one of the rarest in the securities markets, and these cases are upheld all the time where you actually have a C suite level employee and Dr. Olymbios who says pointblank, "I told ten people, including the CEO and the CFO."

That almost never happens in these securities cases; but, again, we have that almost never happens, and what definitely never happens is, as in the record at 69-2, Exhibit 1 to the Hooker declaration, it never happens that you have a C suite executive who reads the contents of the complaint, everything that's written here, and writes counsel -- lead counsel in this case and says, "I was relieved to see that other former employees were willing to come forward," and then he explains in an e-mail after he read the entire complaint, quote, "The entire enterprise is a house of cards generating revenue through illicit conduct as you have found," end quote.

So that's a percipient witness from the C suite inside of CareDx who reads these allegations and basically says, "This is exactly what happened." So we would offer that to the Court as an additional -- additional support for -- in favor of the cooperation's inference that this was widespread and everybody knew about it.

The other thing I just wanted to mention on the doctrine is it's true that Dr. Maag did not make a statement. However, there's very important Supreme Court authority on this. It's *Securities and Exchange Commission v. Lorenzo*, (sic) and what -- what counsel just spoke to is Rule 10b5(b) but there's three parts to Rule 10b5. There's 10b5(a), there's 10b5(b) and there's 10b5(c).

10b5(a) and (c) are about scheme liability, and in that circumstances the defendants do not have to make a statement under *Janus,* as my friend mentioned, in order to face primary liability.  In fact, all that is required is some act in furtherance of the fraud; and what happened in *Securities and Exchange Commission v. Lopez* (sic) is a relatively lower-level employee simply sent an e-mail sending false information into the market.

We would submit that what's happening here with Drs. Maag and Seeto where they're actually the architects of this RemoTraC program, which Dr. Olymbios and all of the other FE-3s aided them collectively demonstrate is a widespread fraud that's designed to overbill Medicare, we would submit clearly show the company's scienter as to -- as to -- as to Maag, excuse me, even though he did not make a statement.

The act of devising the plan is sufficient and not to get --

THE COURT:  Your position is that Maag mastermined and Seeto executed an unlawful scheme to overbill?

MR. DAVIS:  That's in Paragraphs 31, 32, 35 and, I believe, 36 that they designed this RemoTraC program and the other former employees, along with Dr. Olymbios, collectively leads to the conclusion that the true purpose of this program was to bill Medicare for medical tests that were not medically necessary, and that's not just an assumption.

FE-1, who was a doctor at the company, explained -- and we quote in the complaint she explained that what the company was doing is they were doing these expensive $2800 AlloSure tests at the same cadence as the standard test, which is every single month, and we would submit -- and in addition to that, we would submit that that is -- in totality that was not an accident.  That was by design, and that's the allegation that is rooted in all of these formers and Dr. Olymbios, which, again, Dr. Olymbios, you know, e-mails, Exhibit 1 to the Hooker declaration, that the company was revenating -- generating revenue through illicit conduct, as we have found.

So the scheme, back to *SEC v. Lopez* theory, doesn't require scienter, and then I also just want to mention there is a 20(a) claim, which is a control person claim, that's brought against the defendants; and all that's required to uphold that claim is that the individual defendants were in a position of authority and the titles were sufficient. Scienter's not required, nor is there making a statement.

So even if the Court --

THE COURT:  So I just want to be clear --

MR. DAVIS:  Yes, Your Honor.

THE COURT:  -- about what Maag's conduct is or deceptive or manipulative act in furtherance of a scheme to defraud investors as alleged in the complaint are as follows.

UNITED STATES DISTRICT COURT

MR. DAVIS:  It is the creation, being the architect, i.e., the big boss of this RemoTraC program and Justice Breyer --

THE COURT:  So that is the distilled area that you're relying on?

MR. DAVIS:  That's one area; and, of course, in terms of the kickbacks, there are detailed allegations from his prior executive assistant that he would personally -- he would personally pick, you know, the restaurants and the vineyards where they would wine and dine these executives in violation of the Anti-Kickback Statute, which, of course, would encourage these -- these doctors to order more AlloSure tests, which were not necessary or not needed, which is related to the scheme.

So there are additional acts alleged in the complaint.  I just wanted to make that clear.

THE COURT:  All right.  And then my final question, with regards to Appendix 1, 2 and 4, is it your position that these items contained therein are not misleading or false?

I didn't see any opposition to those items, and I believe that defendant's argument is that these statements are forward-looking statements, statements of corporate optimism and statements based on historical data not alleged to have been false and I didn't -- it was silent there.  So I wanted to make sure that I'm clear that you're conceding that issue

as relates to A-1, A-2 and A-4?

MR. DAVIS:  Your Honor, I don't have those indices memory -- memorized --

THE COURT:  Okay.

MR. DAVIS:  -- but I believe that there are three buckets -- I don't want to put words in counsel's mouth, but I believe that there are three buckets that they have many arguments on, but one of them is not forward-looking statements.

We're not conceding those -- those statements, Your Honor.  In the interest of staying within the 25-page limit and in the interest of providing statements that we think if the Court rules on those, the rest will get past --

THE COURT:  All right.

MR. DAVIS:  -- we focused on three buckets of statements, as counsel mentioned.

THE COURT:  All right.  But it's clear that there was no statement or response to those portions of their argument, correct?

MR. DAVIS:  Well, other than the underlying conduct that would give rise to a reasonable forecast is something that -- that should have been disclosed; but for the purpose of this motion, Judge, we're just focused on these -- these three buckets.

You know, we can't concede the other statements, but

for the purposes of briefing the motion we're really focused on these -- these three buckets.

THE COURT:  All right, thank you.

All right, then that concludes our hearing.  I appreciate each of you and the detail in which you responded to my questions.  I hope you can tell that I took a deep dive and tried to understand every aspect of this and invited you to correct me if I was wrong and to educate me if I needed more.

So thank you for your patience and diligence, and we will do another deep dive and we will have your order ready next week.  Thank you.

MR. DAVIS:  Thank you, Your Honor.

MR. CORDING:  Thank you, Your Honor.

THE COURT:  This hearing is concluded.

*(Whereupon the proceedings concluded at 3:54 p.m.)*

***REPORTER'S CERTIFICATION***

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 20th of June, 2023.

_____s/Teri Veres_____
TERI VERES, RMR, CRR

UNITED STATES DISTRICT COURT