Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 848-7400
E-mail:   lgeist@willkie.com
          bdyer@willkie.com


Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
         ccording@willkie.com
         bsullivan@willkie.com

Attorneys for Defendants
*CareDx Inc., Reginald Seeto,*
*Ankur Dhingra, and Peter Maag*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>Defendants. | Case No. 3:22-cv-03023-TLT<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: October 24, 2023<br>Time: 2:00PM<br>Courtroom: 9<br>Judge: Hon. Trina L. Thompson |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on October 24, 2023 at 2:00PM, in the courtroom of the Honorable Trina L. Thompson of the above-entitled Court, located at San Francisco Courthouse, Courtroom 9, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants CareDx, Inc. ("CareDx" or the "Company"), Peter Maag, Reginald Seeto, and Ankur Dhingra (collectively, the "Individual Defendants," and, with CareDx, the "Defendants") shall and hereby do move to dismiss the Second Amended Class Action Complaint (the "SAC") for Violations of Federal Securities Laws (ECF No. 81). This Motion is brought pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Declaration of Charles D. Cording filed concurrently herewith, the accompanying Request for Judicial Notice and Motion to Strike, the Court's opinion and order dismissing the Amended Class Action Complaint (the "FAC"), all files and records in this action, oral argument, and such additional matters as may be judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

Defendants seek dismissal of the SAC with prejudice for failure to state a claim upon which relief can be granted, pursuant to Federal Rule 12(b)(6), because Plaintiffs fail to plead violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b).

**TABLE OF CONTENTS**

I.     INTRODUCTION ...............................................................................................................1

II.    STATEMENT OF RELEVANT FACTS .........................................................................4

    A.    CareDx and Defendants .........................................................................................4

    B.    In the Face of a Global Health Crisis, CareDx Launched RemoTraC ...................5

    C.    Events that Led to the Filing of the SAC ..............................................................5

III.   ARGUMENT .....................................................................................................................6

    A.    Plaintiffs Fail to Plead a Strong Inference of Scienter .........................................7

    B.    Plaintiffs Fail to Plead Material False Statements or Omissions ..........................13

        1.    The SAC Fails to Allege Any Underlying Medicare Fraud .........................13

        2.    Like the FAC, the SAC Fails to Plead a Misstatement About Compliance with Law, RemoTraC, ASP Decline, or Testing Services Revenue ..............14

            (a)    Statements Copied Directly from the FAC Should Be Dismissed (Appendix A-1) .................................................................................14

            (b)    Statements Mirroring Those from the FAC Should Also Be Dismissed (Appendix A-2) ..................................................................17

        3.    The SAC Fails to Allege that CareDx's Risk Disclosures Were False (Appendix A-3) .................................................................................18

        4.    Plaintiffs Cannot Rely on Anonymous Expert Opinions Without Supporting Factual Detail as the Basis for False Revenue Claims ..................................20

    C.    Plaintiffs Fail to Plead Scheme Liability ...............................................................22

    D.    The Complaint Does Not Adequately Allege Loss Causation.................................22

    E.    Plaintiffs' Claims Under Section 20(a) of the Exchange Act Should Be Dismissed.25

IV.    CONCLUSION...................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ...............................................................................................19

*In re AnaptysBio, Inc.*,
   2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)....................................................................8, 11

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ............................................................................................23, 24

*Browning v. Amyris, Inc.*,
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)........................................................................12

*City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*,
   2023 WL 155861 (D. Ariz. Jan. 11, 2023) ...............................................................................8

*Crowell v. McCormick*,
   2007 WL 9735010 (N.D. Cal. Nov. 16, 2007) ...................................................................17, 18

*Di Donato v. Insys Therapeutics Inc.*,
   2017 WL 3268797 (D. Ariz. Aug. 1, 2017)........................................................................16, 17

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................................22

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ....................................................................4, 18, 19, 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)...................................................................................................................7

*Huang v. Higgins*,
   2019 WL 1245136 (N.D. Cal. Mar. 18, 2019)....................................................................24, 25

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
   2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)...............................................................8, 11, 21

*Klein v. Ellison*,
   2021 WL 2075591 (N.D. Cal. May 24, 2021).........................................................................24

*Kyung Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ..................................................................................25

*In re LifeLock, Inc. Sec. Litig.*,
   690 Fed. App'x 947 (9th Cir. 2017) ........................................................................................17

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019)...........................................................................................................22

*Ludlow v. BP, PLC*,
800 F.3d 674 (5th Cir. 2015) ...............................................................................................24

*Margo v. Freeport-McMoRan, Inc.*,
2018 WL 3725781 (D. Arizona Aug. 3, 2018)......................................................................25

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................................................................................... *passim*

*In re Netflix, Inc. Sec. Litig.*,
2005 WL 1562858 (N.D. Cal. June 28, 2005).......................................................................18

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ..........................................................................................10, 11

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ................................................................................................7

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
774 F.3d 598 (9th Cir. 2014) ..................................................................................................7

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ..............................................................................................11

*SEC v. Coldicutt*,
2022 WL 17069835 (S.D. Cal. Nov. 17, 2022).....................................................................22

*SEC v. Smith*,
2020 WL 6115077 (C.D. Cal. June 3, 2020) .........................................................................22

*Stoneridge Inv. Partners, LLC v. Sci-Atlanta*,
552 U.S. 148 (2008) ..............................................................................................................22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................................................3, 7

*In re Textainer P'ship Sec. Litig.*,
2007 WL 108320 (N.D. Cal. Jan. 10, 2007).......................................................................4, 21

*Veal v. LendingClub Corp.*,
2020 WL 3128909 (N.D. Cal. June 12, 2020).................................................................13, 19

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ......................................................................16, 17, 20

*In re Vivendi, S.A. Securities Litig.*,
838 F.3d 223 (2nd Cir. 2016)................................................................................................24

iv

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ................................................................................................7

*Yaron v. Intersect ENT, Inc.*,
    2020 WL 6750568 (N.D. Cal. June 19, 2020) .........................................................25

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................... *passim*

**STATUTES RULES AND REGULATIONS**

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67............................... *passim*

Securities Exchange Act of 1934
    Section 10(b) ...............................................................................................6, 7, 22, 25
    Section 20(a) ................................................................................................25

Federal Rules of Civil Procedure
    Rule 9(b) ...........................................................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

In March 2020, at the onset of the COVID-19 pandemic, CareDx launched an at-home blood draw service called "RemoTraC" to ensure that transplant patients—who were uniquely susceptible to severe cases of COVID—could continue receiving critical diagnostic testing, as much of the transplant ecosystem in the country shut down due to the pandemic.  RemoTraC was a success for patients and for CareDx, enabling patients to receive this important testing in the safety of their homes.

Over two years later, in April 2022, a disgruntled former employee of CareDx named Michael Olymbios filed a complaint in state court containing a myriad of unsupported and disputed allegations, including the claim that CareDx was defrauding Medicare (the "Olymbios Complaint").  At the time, Dr. Olymbios was enmeshed in a longstanding and contentious trade secrets arbitration against CareDx concerning his wrongful misappropriation of proprietary Company information upon his departure from CareDx to its competitor, Natera.  Dr. Olymbios' inappropriately filed claims were quickly sent back to arbitration, but not before securities class action plaintiffs seized the opportunity to take his allegations wholesale as their own.  Less than a month later, this securities class action lawsuit commenced.  The original complaint and the subsequently filed First Amended Complaint ("FAC," ECF No. 53) broadly parroted the Olymbios Complaint and accused CareDx of having committed a fraud on investors by deceiving them about the purpose and use of RemoTraC.

In response, on January 27, 2023, Defendants filed a motion to dismiss, arguing that the FAC failed to meet the heightened standards for pleading securities fraud under the PSLRA.  In parallel, Defendants moved to strike certain allegations in the FAC sourced exclusively from the Olymbios Complaint.  On May 24, 2023, the Court granted both motions.  As to the motion to strike, the Court concluded that "the Complaint lifts allegations from the Olymbios Complaint without adequate independent corroboration."  Slip. Op. 7.  As to the motion to dismiss, the Court found that the Plaintiffs failed to plead *every one* of the core elements of securities fraud:  falsity, scienter, and loss causation.  The Court granted leave to amend, and this SAC followed.

The key question presented is what has changed such that the SAC should not likewise be dismissed.  The short answer is very little, and certainly nothing that should alter the outcome.  While

1

Plaintiffs now define the Class Period as beginning in April 2020 (as opposed to January 2021 in the FAC), they still allege in sweeping terms that RemoTraC operated as a fraud on Medicare rendering Company statements about it materially false and misleading. They still rely heavily on Dr. Olymbios, whose core allegations remain uncorroborated and must be stricken. Notably, Plaintiffs have largely abandoned their core theories of scienter—including motive to defraud—leaving the SAC, once again, deficient on this element. They have attempted to fill in the gaps by adding 10 additional confidential witnesses, except four of those witnesses did not even work at CareDx; instead, they worked at *Natera*, CareDx's primary competitor and the company Dr. Olymbios joined following his departure from CareDx. Regardless, the new confidential witnesses do not substantiate Plaintiffs' alleged Medicare fraud, or indicate that any of the Defendants knowingly or recklessly defrauded investors. Put simply, nothing in the SAC cures the pleading defects this Court already identified in the FAC warranting dismissal in the first instance:

*No Verification of Olymbios Allegations*. In previously striking Olymbios' allegations, this Court was clear as to what constituted adequate "corroboration." Slip. Op. at 7. The SAC falls short. At most, a new confidential witness, "FE-11," claims Dr. Olymbios was "vocal" about his concerns over billing, but stops short of alleging what Dr. Olymbios said, when he said it, or to whom. ¶ 114.[1]

*No Scienter*. In amending the complaint, Plaintiffs struck the entire "Additional Scienter Allegations" section of the FAC, offering nothing to replace it. What is left in the SAC on scienter are the same Olymbios allegations that were stricken last time, the same "core operations" theory that was rejected last time, and some new confidential witness allegations that suffer from the same defects as the original confidential witness allegations. Plaintiffs' allegations are thus deficient as to each Individual Defendant[2] and therefore to CareDx as well.

- Mr. Dhingra: The SAC, again, offers virtually no substantive allegations against Mr. Dhingra, CareDx's former CFO. It alleges no motive to commit securities fraud, nor any facts he knew that were inconsistent with his public statements.

- Dr. Maag: Plaintiffs again copy claims from the Olymbios Complaint (which were previously stricken by this Court), cite to Dr. Maag's assistance in the creation of

---

[1] Unless otherwise noted, all citations to "¶ __" refer to the SAC. Citations to the FAC are denoted as "FAC ¶ __." Undefined capitalized terms have the same meanings as those stated in the SAC.

[2] CareDx's former interim CFO, Marcel Konrad, was dropped as a defendant in the SAC.

RemoTraC, and allege his involvement in ordinary business operations such as attending meetings and signing checks.

- Dr. Seeto:  Likewise, the SAC attempts to plead scienter as to Dr. Seeto by relying on the stricken Olymbios allegations, repeated or new confidential witness allegations that do not contradict Dr. Seeto's public statements, and generalized core operations allegations that Dr. Seeto attended meetings where RemoTraC was discussed.

Under *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007), the more compelling inference is nonculpable: RemoTraC was a bona fide response to a pandemic, not a guise to defraud Medicare.  Indeed, this inference is even more cogent than last time, given Plaintiffs have effectively abandoned any allegations that the Individual Defendants profited from committing securities fraud.

***No False Statements***.  Plaintiffs again fail to plead falsity with the particularity required by the PSLRA.  The predicate for Plaintiffs' theory of fraud remains that RemoTraC was a fraud on Medicare, but now with the gloss that CareDx allegedly duped patients, doctors, and investors into believing that RemoTraC involved *only* standard monitoring blood tests, and *not* CareDx's more expensive AlloSure and AlloMap blood tests.  Not only is this theory implausible, it is impossible to reconcile with CareDx's repeated public disclosures—detailed in the SAC—describing RemoTraC as a "home-based blood draw solution using mobile phlebotomy *for AlloSure and AlloMap surveillance tests, **as well as for** other standard monitoring tests*."  ¶ 152 & n.27 (emphasis added).

Beyond that, the SAC rehashes many of the same allegations found insufficient in the FAC (or variations thereof) and introduces two new theories that are equally deficient.  Appendices summarizing the alleged misstatements are included hereto for the Court's reference.

- Statements Copied from or Similar to Those in the FAC:  Plaintiffs challenge some of the same statements that this Court already found non-actionable, or for which the Court determined falsity was insufficiently pled.  In addition, Plaintiffs challenge statements very similar to those from the FAC, for example, statements describing the origins and purpose of RemoTraC in 2020.  But these statements were no more "false" in 2020 than they were in 2021 or 2022.  And Plaintiffs challenge a compliance-of-law representation in a June 2020 underwriting agreement subject to the same warning to investors previously deemed sufficient to render the representation non-actionable.

- CareDx Risk Disclosures:  Plaintiffs now allege that the Company's warnings to investors—such as statements that CareDx's business is subject to various health care laws and failure to comply with such laws could have a substantial impact on its business—were misleading because these risks had already materialized. But Plaintiffs fail to plead what Ninth Circuit law requires—that the risk had *manifested* and was

3

*impacting* CareDx's business at the time the statement was made. *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 841 (N.D. Cal. 2019).

- Overstatement of Revenue:  In another new section of the SAC, Plaintiffs allege that CareDx inflated revenue by approximately $117 million.  ¶¶ 239–46.  But this entire theory depends on the opinion of "experts" whose identities and qualifications are never disclosed.  Nor does the SAC allege "how the analysis was performed, or the data upon which the [expert] relied." *In re Textainer P'ship Sec. Litig.*, 2007 WL 108320, at *5 (N.D. Cal. Jan. 10, 2007).  Beyond that, the allegation is a variation on the previously rejected claim that revenue attributable to an undisclosed regulatory violation is a false statement under the securities laws. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1056–57, 1071 (9th Cir. 2008).

*No Loss Causation*.  The FAC alleged that CareDx's "fraud" was revealed to the market through five disclosures; the SAC now asserts that the fraud was revealed through six.  However, the sole new alleged corrective disclosure—the filing of the Olymbios Complaint—fares no better than the old corrective disclosures because, as this Court already found, the stock market decline attendant to the filing of the complaint was not significant.  Finally, Plaintiffs introduce a new "materialization of risk" theory of loss causation.  However, that theory—which has never been adopted by the Ninth Circuit and should not be recognized by this Court—fails on its terms because Plaintiffs fail to plead all the necessary predicates: (1) a misstatement, (2) concealment of a "price-volatility risk," and (3) a sufficient connection between materialization of the risk and the stock drops pled in the SAC.

## II.    STATEMENT OF RELEVANT FACTS

### A.    CareDx and Defendants

*CareDx*.  CareDx is a Brisbane, California-based diagnostics company and clinical lab.  It is 100% focused on transplant patients.  Since the beginning of 2020, testing services represented approximately 85% of CareDx's revenue.  ¶ 83.  A core component of that business is AlloSure Kidney, a novel blood test that is widely used by physicians to detect kidney transplant rejection.  ¶ 4.

*Individual Defendants*.  The Individual Defendants in this case are Peter Maag (Chief Executive Officer from 2012 until November 2020 and former Executive Chairman from November 2020 through October 2021), Reginald Seeto (current Chief Executive Officer), and Ankur Dhingra (Chief Financial Officer from March 2021 to May 2022).  ¶¶ 42–44.

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

**B.    In the Face of a Global Health Crisis, CareDx Launched RemoTraC**

As the COVID-19 pandemic was unfolding in early 2020, CareDx launched RemoTraC, a remote home-based blood draw service that allowed doctors ordering AlloSure (and other CareDx tests, such as AlloMap) to also order blood draws for standard transplant monitoring at no additional cost.  ¶¶ 9, 91, 138.  CareDx repeatedly disclosed the nature and operation of the service—including that it involved both CareDx testing and standard monitoring testing—to investors.  *See* ¶¶ 91, 152 & n.27.  RemoTraC allowed transplant patients—who were particularly vulnerable to severe cases of COVID-19—to continue receiving critical diagnostic testing from the safety of their own homes, as transplant centers and testing facilities closed due to the pandemic.  ¶¶ 90, 166, 169.  RemoTraC was a success for patients and for CareDx, constituting a substantial proportion of CareDx's testing volume during the Class Period.  ¶ 10.  Although demand for RemoTraC rose and fell with the pandemic, it remains a core offering of CareDx's testing services business to this day.

**C.    Events that Led to the Filing of the SAC**

On October 28, 2021, CareDx disclosed in its third quarter Form 10-Q that it was the subject of two federal investigations.  ¶ 25.  On April 15, 2022, the Company's former Head of Community Nephrology, Michael Olymbios, filed the Olymbios Complaint.  ¶ 260.  As discussed further in the Motion to Strike, the Olymbios Complaint was nominally prompted by CareDx's alleged non-payment of arbitrator invoices in an ongoing trade secrets arbitration between Dr. Olymbios and CareDx relating to Dr. Olymbios' misappropriation of proprietary Company materials.  But Dr. Olymbios seized the opportunity of a public forum to raise unfounded allegations regarding CareDx's marketing of AlloSure tests.  Slip Op. (ECF No. 75) at 2; ¶ 260.  On May 23 and September 1, 2022, the Company announced the resignation of its Chief Financial Officer and its Chief Marketing Officer, respectively.  ¶ 268–69.  On November 3, 2022, CareDx reported earnings for the third quarter of 2022, disclosing an increase in net loss despite an increase in tests performed.  ¶¶ 270.

During the same period, in late 2021 and 2022, CareDx repeatedly disclosed that it was experiencing declining "average sales price," or ASP.  ¶¶ 230, 232, 236.  ASP refers to CareDx's testing services revenue divided by the number of tests.  CareDx disclosed a number of reasons for declining ASPs, including that (a) CareDx was offering a greater number of tests not yet reimbursed

5

by Medicare (such as CareDx's AlloSure Lung test[3]), (b) it was submitting more claims to commercial insurers, which do not reimburse as frequently as Medicare, and (c) more patients used Medicare Advantage, which imposed a more time consuming reimbursement process than standard Medicare. ¶¶ 230, 233, 236.  On November 15, 2022, CareDx's current CFO (who is not a party) disclosed to investors that, based on these and other factors that were contributing to declining ASPs, as many as 40% to 50% of CareDx's tests were not being reimbursed.  ¶¶ 271, 280–81.

On November 28, 2022, Plaintiffs filed the FAC.  The FAC alleged that RemoTraC was a scheme to defraud Medicare, which unraveled as the Company faced multiple government investigations, thereby resulting in the decline in ASP.  On January 27, 2023, Defendants moved to dismiss and strike certain portions of the FAC lifted from the Olymbios Complaint.  ECF. Nos. 58, 60.  After hearing oral argument, this Court struck certain paragraphs of the FAC and dismissed the FAC entirely, with leave to amend.  Slip Op. 3, 21.  The Court found that Plaintiffs inadequately pled the three core elements of a Rule 10b-5 claim: scienter, falsity, and loss causation.

On June 28, 2023, Plaintiffs filed the SAC.  ECF. No. 81.  The SAC amended the "Class Period" definition to extend back nine months: it now begins on April 30, 2020 (not January 21, 2021) and again ends on November 3, 2022.  SAC at p. 1.  While the SAC remains centered on RemoTraC, ¶¶ 12–15, 96–124, it adds allegations from 10 new confidential witnesses (four of whom actually previously worked for CareDx's chief competitor, Natera, not CareDx)[4] and from several unnamed experts, ¶¶ 23, 110–24.  Furthermore, the SAC alleges new misstatements, substantially cuts back Plaintiffs' scienter allegations, and adds a new alleged corrective disclosure.  *See* ¶¶ 152–196, 260.

## III.    ARGUMENT

To plead a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

---

[3]    Earlier    this    month,    AlloSure    Lung    received    Medicare    coverage.    *See https://investors.caredx.com/news/news-details/2023/CareDxs-AlloSure-Lung-dd-cfDNA-Testing-Service-Receives-Medicare-Coverage-for-Lung-Transplant-Rejection-Monitoring/default.aspx*.

[4] The "FEs" are designated "FE-1" through "FE-19," except there is no "FE-9" in the SAC.  FE-1 through FE-8 are the same confidential witnesses who appeared in the FAC, while FE-10 through FE-19 are new to the SAC.

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). "Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the [PSLRA]." *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

### A.    Plaintiffs Fail to Plead a Strong Inference of Scienter

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs,* 551 U.S. at 319. Plaintiffs must allege that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) ("*Zucco*").

To adequately plead scienter, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u–4(b)(2); *Tellabs*, 551 U.S. at 334. The Court must first "determine whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). "If none is sufficient alone, [the court] then considers the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id.*

The SAC—which does not even have a separate section for scienter—practically abandons the FAC's allegations of scienter premised on (a) "insider" stock sales (*see* Slip Op. 12–13), (b) use of ephemeral messaging platforms (*id.* at 14), (c) the existence of SEC and DOJ investigations (*id.* at 13–14), and (d) successive resignations by CareDx executives (FAC ¶¶ 12, 28, 109, 188, 199). The absence of alleged insider stock sales, in particular, "detract[s] from a scienter finding." *Webb v. SolarCity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018); *see also Corinthian Colleges*, 540 F.3d at 1067 (absence of stock sales suggests that there was no insider information from which to benefit and therefore supports non-culpable inference).[5]

---

[5] The SAC contains a single passing reference to stock sales: "Defendants Maag and Seeto alone [sold] more than $30 million worth of CareDx stock combined." ¶ 92. However, in the Ninth Circuit,

Instead, the SAC relies heavily on allegations from FEs. But very few of the FEs even mention the Individual Defendants—omissions all the more glaring given that Plaintiffs profess to have conducted an investigation involving outreach to some 85 former CareDx employees (ECF. No. 69 at 5). *See Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936, at *10–11 (N.D. Cal. Mar. 16, 2020). Allegations from those few FEs who even mention the Individual Defendants—that is, FEs 6, 10, and 19—are (a) fatally unreliable given the FEs' positions and time period employed at CareDx, (b) insufficiently particularized, and (c) insufficiently connected to the underlying misconduct that allegedly rendered the challenged statements false. *See In re AnaptysBio, Inc.*, 2021 WL 4267413, at *11 (S.D. Cal. Sept. 20, 2021) (scienter not alleged because no allegations that CEO "knew information that was inconsistent with the public statements that he made"). Aside from these FE allegations, the SAC's theory of scienter hinges on allegations sourced exclusively from Dr. Olymbios that must be stricken and that fail to give rise to a strong inference of scienter in any event, and a repackaging of the FAC's "core operations" theory that the Court already rejected.

These deficiencies are detailed below for each Individual Defendant. As the Court held, Plaintiffs must plead scienter as to each Individual Defendant. Slip Op. 10–14. The failure to plead scienter as to any Individual Defendant results in the failure to plead scienter as to CareDx, the corporate defendant. *See id.* at 14.

**1.     Ankur Dhingra**. The SAC's allegations as to Mr. Dhingra's state of mind remain virtually nonexistent. The court already held that allegations about his resignation in May 2022 are insufficient to plead scienter. *Id.* at 11–12. Those allegations have not changed. ¶ 268.

What is new is that FE-19 claims Mr. Dhingra "was unusually involved in the Company's business for a Chief Financial Officer" and "knew what was going on in all aspects of the Company's

---

to plead motive to defraud based on insider stock sales, plaintiffs must allege much more detail, including "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Zucco* at 1005. Plaintiffs do not even attempt to allege such facts. Furthermore, the allegation that Dr. Maag was granted performance-based equity awards as part of his compensation (¶ 183)—like many public company executives—adds nothing to Plaintiffs' theory of scienter. *City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, 2023 WL 155861, at *8 (D. Ariz. Jan. 11, 2023).

8

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

business." ¶¶ 80, 117.  But it is well established that "generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter." *Zucco* at 998.  Plaintiffs also infer that Mr. Dhingra "clearly would have been aware of the Company's reimbursement issues with Medicare," based on FE-19's allegation that Mr. Dhingra attended meetings of the "market access team," which was "involved in seeking reimbursement for AlloSure." ¶ 117.  However, FE-19 is not alleged to have even attended such meetings.[6]  And the SAC does not allege that Medicare "reimbursement issues" were even discussed at these meetings, let alone that fraudulent conduct was discussed.  Thus, the SAC fails to allege facts suggesting "Dhingra knew RemoTraC was built on illegal Medicare billing and kickback schemes." Slip Op. 11.[7]

**2.** **Dr. Maag**.  The FAC did not allege that Dr. Maag was a "maker" of any challenged statements, and therefore the Court dismissed Plaintiffs' claims directed to Dr. Maag.  Slip Op. 12.  Now, having expanded the Class Period, Plaintiffs challenge certain statements by Dr. Maag in 2020.  *E.g.*, ¶¶ 152, 154, 163, 180.  However, none of the scattershot allegations of scienter directed at Dr. Maag—addressed below—give rise to a strong inference of scienter.

*First*, Plaintiffs rely heavily on unadjudicated allegations borrowed from Dr. Olymbios, including his claims that (i) he "raised concerns" to Dr. Maag, Dr. Seeto, and others (¶¶ 24, 127); and (ii) "in or around August 2020," Dr. Maag told Dr. Olymbios to not put in writing that CareDx "never bills patients" (¶ 140).  These allegations must be stricken for the reasons stated in the Motion to Strike.  But even if they are not stricken, they are insufficient because (i) they fail to detail what "concerns" Olymbios actually communicated to Dr. Maag and when those discussions took place; and (ii) Dr. Maag's alleged one-off statement about not billing patients for AlloSure tests is entirely unrelated to, and in fact contradicts, Plaintiffs' core theory of fraud, which is that CareDx improperly *billed* patients for AlloSure tests using RemoTraC, *see* ¶ 112.

---

[6] Notably, FE-12, who *did* work in Market Access, has nothing to say about Mr. Dhingra (or any of the Individual Defendants) or the alleged meetings described by FE-19.  ¶ 118.

[7] Mr. Dhingra joined CareDx in March 2021, five months *after* Dr. Olymbios left, and nearly a year after the introduction of RemoTraC.  ¶¶ 9, 44, 209.  This chronology further undermines scienter.

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

*Second*, Plaintiffs rely on the "core operations theory," alleging that Dr. Maag (i) created RemoTraC and was familiar with the program; (ii) closely "monitor[ed] AlloSure's performance" and the marketing of AlloSure; (iii) at some unspecified point during his nine-year career at CareDx, "sign[ed] off on all the expenses"[8] and was "very hands-on"; and (iv) attended sales trainings, gave "instructions to the sales and marketing teams," and "pushed sales."  ¶¶ 54, 57–58, 62, 86–89, 128–29, 167.  However, the Court already held that many of these same allegations—allegations that "executives paid close attention to sales of AlloSure," were "apprised of RemoTraC's status," and "attended weekly meetings to discuss sales and marketing issues"—were "not particularized enough to show that [the Individual Defendants] knew that statements regarding RemoTraC were false because RemoTraC involved fraudulently billing Medicare."  Slip Op. 13.  Nothing has changed to alter the Court's prior ruling.[9]  And while the SAC's allegations that Dr. Maag "pushed sales" and helped instruct and train the sales and marketing teams are new, ¶¶ 62, 89, there are no allegations to support that Dr. Maag pushed the sales team to do anything illegal or improper.  *None* of the FEs state that they were instructed or encouraged by Dr. Maag (or any of the Individual Defendants) to violate the law.

*Third*, Plaintiffs rely on FE-6 who alleges that Dr. Maag participated in biannual summits during which CareDx paid for wine and dinners for physicians.  ¶ 126.  Aside from the fact that these allegations are denied, FE-6 left CareDx in July 2020, and therefore was only employed for the first three months of the nearly two-and-a-half year Class Period.  ¶ 126, n.18.  Because "many of the statements that plaintiffs allege are false and misleading were made after [FE-6] left" CareDx, "[t]here is . . . ample basis to question aspects of [FE-6's] claimed knowledge and [their] effort to impute scienter to the defendants," *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020), especially because FE-6 does not specify when these alleged summits occurred or, critically, whether any

---

[8] Dr. Maag's testimony from unrelated litigation makes clear that he was referring to a past practice (*i.e.*, before the Class Period) of signing checks when CareDx was a much smaller company. ¶ 128.
[9] *Id.* ("'Proof under [the core operations theory] is not easy.  A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports.'") (citation omitted).

10

occurred during the Class Period.  *See Zucco* at 997 (rejecting confidential witness allegations for "lack of detail" where witness claimed that improper accounting took place "only . . . sometime in 2003" and "fail[ed] to provide" specific dates).  Indeed, FE-6's final months of employment spanned the preliminary and most critical stage of the pandemic in which travel restrictions were widespread and restaurants and wineries were closed to the public.

Even accepting FE-6's unreliable allegations, providing physicians with expensive meals does not suggest Dr. Maag "knew information that was inconsistent with the public statements he made" concerning RemoTraC or CareDx's testing services revenue.  *AnaptysBio*, 2021 WL 4267413, at *11; *see also Endologix*, 962 F.3d at 416 ("The central problem with the information attributable to CW1 is that it lacks any detail . . . that would establish a strong inference that defendants' later statements about FDA approval were intentionally false or made with deliberate recklessness.").[10]

**3.     Dr. Seeto**.  The SAC attempts to plead scienter against Dr. Seeto by relying on two new confidential witnesses (FE-10 and FE-19) and the already-rejected core operations theory.

*First*, the FE-10 allegations do not establish scienter.  FE-10 broadly proclaims that "everyone," including Dr. Seeto, knew that "many claims [were] being denied for lacking medical necessity."  ¶ 113; *see also* ¶ 132.  Courts routinely reject such broad, "common knowledge" allegations—*NVIDIA*, 2020 WL 1244936, at *11—especially where, as here, there are no particularized facts demonstrating that FE-10 "has reliable personal knowledge of [Dr. Seeto's] mental state," *Zucco* at 998.  FE-10 was a "claim reimbursement specialist," employed by CareDx for only one month of the Class Period (October 2022), who is not alleged to have "communicated with" Dr. Seeto, reported to him, or even worked with him.  *NVIDIA*, 2020 WL 1244936, at *11; *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (finding that confidential witness accounts did not establish scienter where "the witnesses lack first had knowledge regarding what the individual defendants knew or did not know").

---

[10] As for Dr. Maag's challenged statements concerning risk disclosures and compliance with healthcare laws, those statements are not actionable under the securities laws, as explained *infra*.

FE-10 also claims to have "observed the Director of Claims and Seeto often talk about the 50% reimbursement rate with the tests." ¶ 113.[11]  However, this allegation is entirely consistent with CareDx's (and Dr. Seeto's) disclosures to the public that—for reasons unrelated to the purported fraud—as many as 40% to 50% of tests were not being reimbursed.  ¶¶ 227, 233, 236, 270–71, 280–81.  It is difficult to understand how FE-10's allegation that Dr. Seeto discussed these issues internally suggests Dr. Seeto knew that the same statements made to the investing public were false.

*Second*, the FE-19 allegations are likewise deficient. As a threshold matter, Plaintiffs fail to sufficiently describe FE-19's position at CareDx.  *See Zucco* at 995 ("First, the confidential witness . . . must be described with sufficient particularity to establish their reliability and personal knowledge.").  The SAC describes FE-19 as a "high-ranking employee" who "reported directly to Defendant Seeto" from "mid-2021 through the end of 2022."  ¶ 27 & n.3.  Critically, however, Plaintiffs fail to identify such basic information as FE-19's job title (even though they allegedly reported to the CEO), the specific months of FE-19's employment, and in what office FE-19 worked.  These types of omissions call into question the reliability of confidential witnesses.[12]

Regardless, FE-19's allegations fail to give rise to a strong inference of scienter:

- FE-19's allegation that Dr. Seeto "'absolutely' knew about the Company's reimbursement and collection issues with Medicare," ¶ 115, lacks particularized facts as to the nature of those "issues."  *See Zucco* at 998 (rejecting confidential witness testimony that failed to "recount[] the particulars of the alleged transgressions").

- FE-19's claim that Dr. Seeto attended meetings with senior billing personnel where CareDx discussed attempts to receive "'prior authorization' from doctors for the AlloSure test, *i.e.*, getting the 'medical necessity' authorization that CareDx systematically failed to get," ¶ 115, is fundamentally inconsistent with Plaintiffs' theory of fraud, which is that CareDx "*obscure[ed]*" from doctors that AlloSure tests were not medically necessary, ¶ 102 (emphasis added).

- FE-19 claims that he and Dr. Seeto attended "Business Leadership Team" meetings "at which Seeto would have in-depth reasons for upticks in testing volume," "would always attribute any Company success to RemoTraC," and "would make disingenuous

---

[11] Elsewhere in the SAC, Plaintiffs allege that this 50% figure corresponded to Medicare rejecting 50% of CareDx's claims as fraudulent.  ¶¶ 3, 283.  As discussed *infra*, Sec. III.B.2(a), there are no well-pleaded allegations supporting this inference, which the Court rejected.  Slip. Op. at 18–19.

[12] *See, e.g.*, *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014) (contrasting allegations of confidential witness described as "senior scientist" with allegations providing "very specific titles" and "the witnesses' dates of employment" "to the month").

12

remarks about patients." ¶¶ 78, 116. However, Dr. Seeto's awareness of the success of RemoTraC or the reasons for CareDx's increasing testing volume—topics about which Dr. Seeto spoke publicly throughout the Class Period—do not establish a strong inference that Dr. Seeto was aware of the misconduct that Plaintiffs allege.

*Third*, for the same reasons discussed above as to Dr. Maag, Plaintiffs' "core operations" allegations that Dr. Seeto was "familiar with the details of the RemoTraC program," "pushed sales," and "helped train . . . marketing and sales executives," ¶¶ 77, 89, 167, do not establish scienter.

**4.    Holistic analysis**. Finally, courts must assess whether all of the well-pleaded allegations, reviewed holistically, give rise to a strong inference of scienter. Slip Op. 14. None of the new allegations in the SAC change this Court's prior conclusion that Defendants' "alternative inference" was "more plausible:" that "RemoTraC was a blood draw program for at-risk transplant recipients during the COVID-19 pandemic, exactly as Defendants announced in 2020." *Id.* If anything, the absence of any well-pleaded allegations that the Individual Defendants sold Company stock under suspicious circumstances lends further support to the non-culpable inference. *See Veal v. LendingClub Corp.*, 2020 WL 3128909, at *15–16 (N.D. Cal. June 12, 2020). In addition, central to Plaintiffs' new theory of the fraud is that CareDx *duped* doctors and patients into believing that RemoTraC, a CareDx product, contained no CareDx tests, only standard monitoring tests, but that claim is contradicted by the very disclosures relied on by the SAC. *See infra* Sec. III.A.

**B.    Plaintiffs Fail to Plead Material False Statements or Omissions**

"The PSLRA has exacting requirements for pleading 'falsity.'" *Corinthian Colleges, Inc.*, 540 F.3d at 1070 (citing 15 U.S.C. § 78u–4(b)(1)). Specifically, "[t]he plaintiff's complaint 'shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* Each category of challenged statement is addressed below.

**1.    The SAC Fails to Allege Any Underlying Medicare Fraud**

As an initial matter, the SAC, like the FAC, claims that RemoTraC was a scheme to defraud Medicare, but Plaintiffs still do not plausibly allege why or how. Plaintiffs repeat their conclusory allegations, founded on unreliable FE allegations, that doctors were "induce[d]" to order medically

13

unnecessary AlloSure tests through RemoTraC. ¶¶ 107, 119, 120, 139. The SAC adds a new twist on this theory: CareDx "deliberately obscure[ed] from patients and doctors" that RemoTraC bundled AlloSure tests with routine panels. ¶ 102; *see also* ¶¶ 81, 101, 105, 108–09. However, as the SAC pleads, CareDx repeatedly disclosed to the public that RemoTraC included *both* AlloSure *and* routine panels. *See, e.g.,* ¶¶ 91, 152 & n.27. It lacks coherence to allege that CareDx *publicly touted* a practice while also "*deliberately obscur[ing]*" it from doctors and patients. Plaintiffs' theory relies primarily on the same generalized hearsay statements from FE-1 that were alleged in the FAC—FE-1 "was told" by "other[s]" that "many doctors . . . didn't fully understand that the bundled AlloSure test was something markedly different from the routine tests it was bundled with." ¶ 101. However, the SAC does not allege who these doctors were, when these hearsay conversations took place, or how many of these doctors did not understand what tests they were ordering.[13]

> **2.      Like the FAC, the SAC Fails to Plead a Misstatement About Compliance with Law, RemoTraC, ASP Decline, or Testing Services Revenue**

Many of the challenged statements in the SAC are either the exact same as or closely similar to statements challenged in the FAC, but none of the new allegations alter the Court's prior decision.

> **(a)      Statements Copied Directly from the FAC Should Be Dismissed (Appendix A-1)**

*Underwriter Representations*. In the FAC, Plaintiffs challenged contractual representations concerning compliance with healthcare laws that CareDx made to underwriter banks in connection with CareDx equity offerings from January 2021 and April 2022. Slip Op. 15. CareDx specifically warned investors that the representations were "*not*" meant "*to provide investors with any other factual information regarding the Company or its business*[.]" *Id.* at 15–16. The Court concluded that "a reasonable investor would have viewed the [warning language] and understood that the agreements were not meant to convey facts regarding CareDx." *Id.* at 16.

---

[13] *See Zucco* at 997 (confidential witness statements "based on at least one level of hearsay" were "vague and unreliable"). FE-1's allegation that he "never once sat down with a physician" who "had actually knowingly ordered" AlloSure (¶ 102) suffers from the same lack of particularity, but also does not specify whether any of the physicians FE-1 "sat down with" ordered RemoTraC, as opposed to just AlloSure.

In the SAC, Plaintiffs challenge the same representations from the January 2021 offering, accompanied by the same unambiguous warnings to investors.  ¶ 200; Ex. B at PDF p.3.[14]  These statements should again be dismissed for all the same reasons articulated by the Court.

*"Unmet need" Statements*.  The Court also found that Plaintiffs failed to allege that statements describing RemoTraC as addressing an "unmet need" were false.  Slip Op. 17–18.  The Court held that these statements referred to the need for mobile phlebotomy during the pandemic, not to the medical necessity of AlloSure tests.  Slip Op. 18.  The SAC challenges the same statements on the same grounds as did the FAC, ¶¶ 205–207, 215, and so the Court's prior reasoning for dismissal still applies.  All that has changed is Plaintiffs now allege that "the separate vial of blood patients gave" for AlloSure was "not needed," ¶ 207, but this is just another way of arguing that the "unmet needs" statements were false due to the alleged lack of medical necessity for AlloSure tests.  Slip Op. 17–18.

*Reasons for ASP Decline*.  The Court already rejected Plaintiffs' claim—repeated in the SAC (¶¶ 230–31, 233–34, 236–37, 278–84)—that CareDx's statements attributing the decline in ASP to non-fraudulent factors were false because the true reason for declining ASP was that Medicare was rejecting CareDx's claims as fraudulent.  Slip Op. 18–19.  Specifically, the Court held that Plaintiffs had "not sufficiently alleged particularized facts to support the inference that CareDx's explanation [for declining ASPs] is false."  *Id.*  The SAC's allegations concerning the decline in ASP remain exactly the same, except for the vague and unreliable claims by FE-10 that he reviewed "files" showing that Medicare and private insurance companies rejected some claims as not medically necessary.  ¶¶ 110–113.  But the SAC does not allege *how many* claims FE-10 observed that had supposedly been rejected for lack of medical necessity or how many of those claims were submitted to Medicare as opposed to private insurers—an important distinction given that Plaintiffs' theory of misconduct rests on alleged *Medicare* fraud.  ¶ 93.  FE-10 also does not specify *when* those claims were made, other than "during the Class Period," or when Medicare or the private insurers supposedly rejected them.

[14] Citations to "Ex. __" refer to the exhibits attached to the Request for Judicial Notice and Accompanying Declaration of Charles D. Cording.

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

¶ 110, n.17.  In short, FE-10 adds nothing to particularize the allegation that the true reasons for declining ASPs was that Medicare was rejecting CareDx's AlloSure claims as fraudulent.[15]

**Testing Services Revenue Statements**.  Plaintiffs again challenge CareDx's reporting of increased testing services revenue.  *E.g.*, ¶ 219 ("[T]otal revenue was $67.4 million. . . .  The driver of the quarter's growth was our testing services revenue, which increased 89% to $59.3 million."); *see also* ¶¶ 223, 227, 232.  Plaintiffs claim that these statements about revenue growth were misleading "because they attributed revenue growth to legal conduct, but illegal Medicare false claims and illegal kickbacks materially contributed to the revenue increase."  ¶ 220; *see also* ¶¶ 224, 228.  However, the Ninth Circuit has held that statements about a company's growth are not rendered misleading because of alleged regulatory violations, even where the company's success is purportedly driven by the alleged misconduct.[16]  Statements that simply report testing services revenue "do not relate to" the alleged misconduct.  *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019).

---

[15] Plaintiffs repeat their misleading and inaccurate suggestion that CareDx's CFO Abhishek Jain disclosed in November 2022, after the Class Period, that "50% of the bills that the Company sent to Medicare were fraudulent."  ¶¶ 3, 280.  As the full text of Mr. Jain's statement reveals (Ex. E at 4–5), although Mr. Jain fully acknowledged that a significant number of claims were not being reimbursed (as many as 40% to 50%) and therefore ASPs were declining, he never suggested that Medicare had been rejecting claims as fraudulent.  The parties previously briefed this issue, and the Court rejected Plaintiffs' reading.  *See* Slip. Op. 18–19.  Accordingly, allegations from FE-10 (who only began working at CareDx in October 2022) that "it was well known that 50% of the tests that [CareDx] administered were not reimbursed" (¶ 113) are entirely consistent with Mr. Jain's disclosures about declining reimbursements (*see, e.g.*, Ex. E at 4–5) and do not falsify any challenged statements during the Class Period concerning the same (*e.g.*, ¶¶ 230, 233, 236).  FE-12 raises similar allegations. *Compare* ¶ 118 (some commercial insurers were "not paying the claims submitted to them") *with* ¶ 236 (May 2022 disclosure that ASPs were declining in part because of "higher growth in patients with commercial insurance across all organs, where we have lower coverage today").

[16] *See Corinthian Colleges*, 540 F.3d at 1055–56, 1070–71 (statements regarding "increasing student enrollment" not rendered false by allegations that college was under investigation by the government for "perva[sive] fraudulent practices" and where "as many as 50% to 60% of the people defendants represented to the U.S. government as being qualified, attending students were either no shows in class or unqualified for admission and federal funds"); *see also Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *2, 9 (D. Ariz. Aug. 1, 2017) (where plaintiffs alleged that defendant was engaged in widespread fraud, including paying doctors bribes and kickbacks to prescribe defendant's drug Subsys, statements such as "the increase in Subsys revenue is primarily as a result of increased prescriptions" were not false simply because "they were spoken against the backdrop of Insys's ongoing criminal fraud" because *Corinthian Colleges* "precludes that line of argument.").

16

***Historical RemoTraC Data***.   For the same reasons, Plaintiffs fail to allege how statements describing the number of patients who signed up for RemoTraC were misleading.  ¶¶ 223, 232.

          **(b)**      **Statements Mirroring Those from the FAC Should Also Be Dismissed (Appendix A-2)**

***Underwriter Representations***.   The SAC alleges that compliance-with-law representations contained in a June 2020 underwriter agreement were false.  ¶ 180.  These representations are virtually identical to those from the January 2021 underwriter agreement discussed *supra*, and they contain the same dispositive warning language.  Ex. A at PDF p.3.  They should be dismissed for the same reasons.

***RemoTraC Statements***.   Plaintiffs challenge a number of new statements concerning RemoTraC similar to those challenged in the FAC, but the SAC fails to allege falsity.[17]

- CareDx's SEC filings described RemoTraC as "a remote home-based blood draw solution using mobile phlebotomy for AlloSure and AlloMap surveillance tests, as well as for other standard monitoring tests."  ¶ 152 & n.27; *see also* ¶ 166.  Plaintiffs complain that CareDx should have disclosed that RemoTraC required "two separate vials of blood" for two tests, ¶ 153, 162, but the challenged statement clearly disclosed that RemoTraC entailed *both* AlloSure and standard tests.  Nor does this statement suggest anything about the "lawfulness" of RemoTraC.  ¶ 153.

- Plaintiffs challenge Dr. Maag's disclosures that a number of RemoTraC patients were receiving "surveillance" testing.  *E.g.*, ¶¶ 169, 172–73.  Plaintiffs contend these statements "triggered a duty to disclose that the Company was unlawfully bundling AlloSure tests with routine standard of care tests."  ¶ 174.  But these statements are "entirely unrelated to the [bundling] practices Plaintiffs complain of" and therefore did not obligate CareDx to make further disclosures about such practices.  *LendingClub*, 423 F. Supp. 3d at 808.[18]  In any event, CareDx *did disclose*, throughout the Class Period, that RemoTraC comprised multiple tests.  *See* ¶¶ 91, 152 & n.27.[19]

[17] *See Insys Therapeutics*, 2017 WL 3268797, at *9 (rejecting allegations that statements about product were false "because they were spoken against the backdrop of . . . ongoing criminal fraud"); *Crowell v. McCormick*, 2007 WL 9735010, at *3–4 (N.D. Cal. Nov. 16, 2007) (statements touting defendant's software were not false based on alleged patent infringement because challenged statements "simply do not say anything about whether Ariba's products did or did not infringe ePlus' patents").

[18] For the same reasons, Dr. Maag's statement that "mobile phlebotomy has increased from 10% of our daily volume 8 weeks ago, to now comprising over 50%" did not give rise to a duty to "disclose that RemoTraC generated a material amount of medically unnecessary testing[.]"  ¶¶ 166–67.

[19] *See also* ¶¶ 188 n.30 (challenging company Twitter posts for failure to disclose that RemoTraC included AlloSure tests).  Furthermore, these allegedly false Twitter statements are more akin to advertisements and are not actionable under the securities laws.  *See In re LifeLock, Inc. Sec. Litig.*, 690 Fed. App'x 947, 954–55 (9th Cir. 2017) (advertisements stating that defendant's identity theft product "helps proactively safeguard your credit" had no "potential to influence investors").

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

- Statements by Dr. Maag that "patients absolutely love" RemoTraC, ¶ 169, are nothing more than classic puffery. *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005).  Nor do Plaintiffs allege that the statements were inaccurate.

***Testing Services Revenue Statements***.  Plaintiffs challenge a number of additional statements in which CareDx disclosed growth in testing services revenue. *E.g.*, ¶ 163 ("Testing services increased by $9.9 million . . . .  This increase is primarily due to an increase of more than 5,000 test results[.]"); *see also* ¶¶ 166, 192, 195, 212, 218, 222, 226.  Plaintiffs allege these statements were false because CareDx "attributed growth to legal conduct" without disclosing the RemoTraC fraud. *E.g.*, ¶ 193.  For the same reasons discussed in Section III.B.2(a) *supra*, Plaintiffs fail to allege falsity.

***Olymbios Litigation Disclosures***.  The SAC fails to allege that CareDx's February 2021 disclosure concerning litigation with Dr. Olymbios was false or misleading.  ¶¶ 209–11.  CareDx was under no obligation to concede the substance of Dr. Olymbios' allegations, or his purported status as a bona fide government whistleblower, both of which CareDx vigorously disputes. *See Crowell*, 2007 WL 9735010, at *3–4 (rejecting plaintiffs' argument that litigation disclosures were misleading because defendants had no obligation to "admit[] to willful infringement of . . . patents").

### 3.    The SAC Fails to Allege that CareDx's Risk Disclosures Were False (Appendix A-3)

In the Ninth Circuit, risk disclosures are false only when Plaintiffs "allege facts indicating that [the] risk factor was already *affecting* [the company] to the extent that [D]efendants' statements were false" when made. *Facebook*, 405 F. Supp. 3d at 841.  Plaintiffs challenge two types of risk factor disclosures from CareDx's 10-K filings that were repeated or incorporated in various filings from April 30, 2020, until October 28, 2021:  (1) risks relating to violations of laws and (2) risks relating to Medicare reimbursement.  Appendix A-3; ¶¶ 154 & n.28, 155, 158, 161, 177, 191, 194, 198.[20]

---

[20] Between April 30, 2020 and July 29, 2021, CareDx repeated and incorporated by reference these risk disclosures from its 2019 10-K. *See, e.g.*, ¶ 155; Ex. C at 36 (April 30, 2020 10-Q filing stating that "there have been no material changes in the risk factors that appear in . . . our Annual Report on Form 10-K . . . other than those listed below").  Plaintiffs claim that "the assurance there had been no material change was materially false and misleading . . . because the Company had embarked upon" the alleged RemoTraC scheme.  ¶ 161.  However, this claim rests on a misreading of the statement, which, far from providing a guarantee that the Company faced no material changes in risk, simply noted that the Company's *risk disclosures* had not materially changed as compared to those listed in

*First*, Plaintiffs challenge CareDx's warnings to investors that violations of laws, including healthcare laws and rules, could result in legal "scrutiny" or "affect [CareDx's] ability to conduct business." ¶ 154 ("Our future activities related to billing . . . and Medicare reimbursement requirements . . . may be subject to scrutiny under these [healthcare] laws"); *id.* ("federal and state healthcare laws and regulations that may affect our ability to conduct business, include, without limitation: . . . the federal Anti-Kickback Statute"); *id.* ("some of our business activities could be subject to challenge under one or more of such [healthcare] laws").[21] Plaintiffs claim these risk disclosures were false because the risks they warned of had already materialized through the "then-active" RemoTraC "scheme." ¶ 155. However, the risks warned of were not that regulatory violations may occur, but that those violations may result in legal "scrutiny" or "harm [to] our business." ¶ 154; Ex. D at 50. In that respect, Plaintiffs fail to allege that, at the time those statements were made (April 30, 2020 – October 28, 2021) (1) CareDx faced "legal scrutiny" (¶ 154) or (2) CareDx's business was "affected" (*id.*), *i.e.*, it was losing revenue because of the alleged RemoTraC misconduct.

To the contrary, the SAC alleges that CareDx did not experience harm to the business through revenue loss until well *after* these statements were made (i.e., February 2022). ¶ 234. And the SAC does not allege that CareDx was facing legal "scrutiny" until October 28, 2021, the date of the final challenged risk disclosure, when CareDx *disclosed* the government investigations. ¶ 230. Thus, Plaintiffs do not allege that the purported RemoTraC scheme had "actually affected" CareDx's business at the time the statements were made and this claim fails. *See Facebook*, 405 F. Supp. 3d at 841 (plaintiffs failed to allege that the "future risks stated in the risk disclosures had 'actually affected' Facebook's reputation or stock because the risks of negative media attention or regulatory action had not yet materialized."); *LendingClub*, 2020 WL 3128909, at *8 ("Plaintiffs have failed to allege the eventualities and risks LendingClub warned of (*i.e.*, the consequences of noncompliance) had materialized"); *cf. In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 693, 696, 704–705 (9th Cir. 2021)

---

the Form 10-K, except as noted. As set forth in this section, there are no well pleaded allegations supporting Plaintiffs' theory that the risk disclosures CareDx made to investors were misleading.

[21] Plaintiffs also challenge the mere *description* of healthcare laws with which CareDx was "subject to compliance." ¶ 154. But the SAC does not allege that these statements were inaccurate.

19

("generic statements about how cybersecurity risks could affect their business" were misleading when Google's executives were "warned by its legal and policy staff that disclosure of these issues would result in immediate regulatory and governmental scrutiny").

*Second*, Plaintiffs challenge CareDx's warnings that "the loss of, or a significant reduction in, reimbursement from Medicare would severely and adversely affect our financial performance" and that "we may not be able to maintain or increase the portion of our tests reimbursed by Medicare for a variety of reasons[.]" ¶ 158. Plaintiffs claim these risk disclosures were false because CareDx "omit[ed] the fact that the Company systematically and unlawfully overbilled Medicare." ¶ 159. Once again, though, the risk warned of was that Medicare might not reimburse CareDx's tests and that doing so might impact CareDx's business. Plaintiffs do not attempt to allege that Medicare had begun rejecting AlloSure claims as a result of any fraud under their own theory until, at the earliest, February 2022, ¶ 235, which was *after* the challenged risk disclosures were made.

Nor is there any merit to Plaintiffs' contention that by "volunteering" reasons the Company may not be able to maintain its rate of reimbursement, the Company assumed a duty to disclose the alleged RemoTraC scheme. ¶ 159. In fact, CareDx disclosed the risk that violations of healthcare laws could result in "exclusion from participation in government programs, such as Medicare." Ex. D at 50. "Where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." *LendingClub*, 423 F. Supp. 3d at 809; *see also Facebook*, 405 F. Supp. 3d at 836 ("companies are not required to engage in 'self-flagellation' by disclosing unproven allegations").

### 4. Plaintiffs Cannot Rely on Anonymous Expert Opinions Without Supporting Factual Detail as the Basis for False Revenue Claims

Plaintiffs claim that CareDx improperly recognized $117 million in revenue between April 2020 and December 2021. ¶¶ 239–46. However, this allegation is premised entirely on the undisclosed analysis of anonymous economics and accounting "experts." SAC at p.1. According to the SAC: "Expert calculations, based on facts provided by former employees and corroborated by

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

public admissions by the Company itself, reveal the Company fraudulently overbilled Medicare by approximately $117 million during the Class Period." ¶ 23.

When relying on expert opinions as the basis for pleading securities fraud, plaintiffs must "allege 'with sufficient particularity' that the expert was 'in a position to know' the relevant fact claimed." *NVIDIA*, 2020 WL 1244936, at *7. In order to meet this standard, plaintiffs must "allege the factual content of the information on which [the expert] relied" in reaching their conclusion. *Textainer*, 2007 WL 108320, at *6. Accordingly, "[c]onclusory allegations as to an unspecified analysis performed by an unnamed or otherwise identified consultant, and which fail to include any information about the consultant's qualifications, how the analysis was performed, or the data upon which the consultant relied, are inadequate under the PSLRA's heightened pleading standard." *Id.* at *5.

Here, Plaintiffs allege nothing more than the experts' *conclusions* that CareDx improperly derived a certain amount of Medicare revenue, totaling $117 million. ¶ 23. The SAC fails to even identify the experts, let alone describe their qualifications (if any) to opine on Medicare reimbursement and revenue recognition. Even if Plaintiffs had done so, the SAC fails to allege the "factual content of the information" on which these experts relied in concluding that $117 million of revenue was "improper Medicare sourced revenue." *Textainer*, 2007 WL 108320, at *6. The SAC does not explain: (a) what data or information (if any) the experts relied on in calculating improper Medicare sourced revenue across seven quarters; (b) whether the data reflects *all* CareDx tests—most of which Plaintiffs do not allege were part of the "scheme," or only AlloSure; (c) where that data came from; (d) whether the experts communicated with anyone at CareDx; or (e) what analysis or methodology (if any) was used to calculate those figures. The PSLRA requires at least this level of detail.[22]

---

[22] *See NVIDIA*, 2020 WL 1244936, at *8 (particularity requirement not met where plaintiffs relied on expert to quantify the amount of NVIDIA revenue attributable to crypto related sales because, although plaintiffs identified the expert and generally explained expert's methodology, plaintiffs failed to "identify the source of the hashrate data," failed to "indicate any sort of interaction between [the expert] and former or current NVIDIA employees," and "provide[d] no allegations supporting a major assumption underlying the expert analysis" about NVIDIA's crypto market share).

Unable to rely on the experts' quantification of "improper Medicare sourced revenue," Plaintiffs offer no particularized facts demonstrating how CareDx's revenues were materially false.[23]

### C.     Plaintiffs Fail to Plead Scheme Liability

In order to plead scheme liability under Rule 10b-5(a) and (c), Plaintiffs must allege, in addition to the elements of a Section 10(b) claim, that Defendants "employ[ed] any device, scheme, or artifice to defraud" or "engage[d] in an act, practice, or course of business that operate[d] . . . as a fraud or deceit." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019). Rules 10b-5(a) and (c) implicate schemes to defraud investors, and accordingly must involve investor-facing conduct such as offering securities through sham companies, Ponzi schemes, and "pump and dump schemes."[24]

The Court previously held that the FAC failed to plead scheme liability. Notwithstanding Plaintiffs' unsupported allegations that "Maag masterminded, and Seeto executed, the scheme involving RemoTraC," Plaintiffs "did not adequately plead reliance" because Plaintiffs did not allege that any "deceptive conduct" other than the alleged misstatements was "disclosed to the public." Slip Op. 19 (citing *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148 (2008)).

The SAC is no different. The SAC fails to plead a scheme to defraud *investors*. Plaintiffs do not allege how they could have relied on, for example, Defendants' providing kickbacks, or inducing physicians to order AlloSure, in making their decision to purchase or sell CareDx securities. Plaintiffs also fail to allege loss causation based on Rule 10b-5(a) or (c), as Plaintiffs allege that their losses were caused exclusively by the challenged statements, not any separate scheme or device. ¶ 312.

### D.     The Complaint Does Not Adequately Allege Loss Causation

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). As this Court observed, "[t]o establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the

---

[23] Plaintiffs cannot rely on sweeping allegations that CareDx's business was "pervaded by fraudulent practices" as the basis for challenging "virtually every Class Period statement discussing [CareDx's] financial status." *Corinthian Colleges*, 540 F.3d at 1055–57, 1071.

[24] *See, e.g.*, *SEC v. Coldicutt*, 2022 WL 17069835, at *6 (S.D. Cal. Nov. 17, 2022); *SEC v. Smith*, 2020 WL 6115077, at *3 (C.D. Cal. June 3, 2020).

fraud-induced inflation in the stock's price to be reduced or eliminated." Slip. Op. at 20 (quoting *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020)). Typically, the truth becomes known through a "corrective disclosure," which "occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.*

In the FAC, Plaintiffs alleged five corrective disclosures: (i) the announcement of government investigations and earnings results on October 28, 2021; (ii) a Form 10-Q filed on May 5, 2022 announcing earnings results for 1Q 2022; (iii) the announcement of Mr. Dhingra's departure on May 23, 2022; (iv) the announcement of CareDx's Chief Marketing Officer's departure (Sasha King) on September 1, 2022; and (v) the announcement of earnings results for 3Q 2022 on November 3, 2022. FAC ¶¶ 196–201. All were deemed insufficient because, in each case, "there [were] insufficient facts that the market reacted, resulting in a price drop, due to investors linking the disclosures with Defendants' misleading statements or the RemoTraC scheme." Slip Op. 20.

The SAC fares no better. Plaintiffs now rely on six purported corrective disclosures: the same five from the FAC and one new claimed corrective disclosure—the filing of the Olymbios Complaint. *See* ¶¶ 251–59, 260–76. With respect to the original five, the SAC offers nothing new to establish that investors linked any of these disclosures to the revelation of Defendants' RemoTraC "scheme." Plaintiffs' sixth alleged corrective disclosure likewise fails.

First, the Court already rejected this theory in substance when it found that "[P]laintiffs alleged that it is the Olymbios Complaint, filed on April 15, 2022, that revealed the RemoTraC scheme. However, the drop in share price of 8% from the filing of the Olymbios Complaint is significantly less than the decrease from other alleged events." Slip. Op. at 20.[25] That consideration is dispositive. In order for a complaint to constitute a corrective disclosure, the plaintiff must plead that "the market treats allegations in a lawsuit as sufficiently credible to be acted upon as truth." *In re BofI Holding,*

---

[25] In fact, CareDx's stock did not drop 8% on April 15, 2022, the day the complaint was filed. The market was closed that day for Good Friday. *See* Ex. G. The stock declined by approximately 8% on opening the following Monday, April 18. *Id.* However, the stock experienced nearly the same decline of 7% between April 13 and April 14, the two trading days before the filing of the complaint, and experienced a 3.5% rebound between April 18 and April 19. *Id.* In sum, the stock price behavior during this period of volatility hardly supports that the market credited Dr. Olymbios' allegations.

*Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020).  Here, the limited magnitude of the stock drop—8%—indicates that the market did *not* find Dr. Olymbios' allegations credible.[26]  That the market deemed Dr. Olymbios' allegations "as unworthy of belief" is unsurprising given the unusual circumstances of that complaint, as explained in the accompanying Motion to Strike.  977 F.3d at 792.

Second, the Olymbios Complaint is not sufficiently linked to the alleged false disclosures.  The allegations in the Olymbios Complaint, as to the putative RemoTraC scheme, are not the sort of "specific and highly-detailed" claims such as those credited by the Ninth Circuit in *BofI* that would support loss causation.  *See Klein v. Ellison*, 2021 WL 2075591, at *7 (N.D. Cal. May 24, 2021).  Indeed, Dr. Olymbios has virtually nothing to say about RemoTraC:  it is never even specifically identified in the Olymbios Complaint, which makes one passing reference to "bundling AlloSure with the other blood tests" as part of a mobile phlebotomy service.  Ex. F at ¶ 28.  This is insufficient to reveal as false over two years of statements by the Company about RemoTraC.

In the alternative, Plaintiffs invoke the "materialization of risk" theory of loss causation, claiming that Defendants concealed risks associated with the RemoTraC "scheme," which materialized after "the government pulled the plug."  ¶¶ 285–91.  The Ninth Circuit has never embraced this theory.  *See Huang v. Higgins*, 2019 WL 1245136, at *16–17 (N.D. Cal. Mar. 18, 2019).  This Court should decline to do so here.  *See Ludlow v. BP, PLC*, 800 F.3d 674, 689–90 (5th Cir. 2015) (questioning theory because it would effectively (and inappropriately) provide "broad insurance against market losses" that are completely untethered to any false disclosure).  Regardless, invoking materialization of risk does not diminish Plaintiffs' burden of pleading loss causation.  *In re Vivendi, S.A. Securities Litig.*, 838 F.3d 223, 262 (2nd Cir. 2016) ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus.").

---

[26] *See Corinthian Colleges*, 540 F.3d at 1064–65 (10% drop was "modest" and loss causation not alleged); *cf. BofI*, 977 F.3d at 792 ("The fact that BofI's stock price plunged by ***more than 30%*** on extremely high trading volume immediately after the market learned of [whistleblower's] allegations bolsters the inference that the market regarded his allegations as credible") (emphasis added).

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

Even if the theory is viable, to make out a materialization of risk claim, a plaintiff must allege: (1) "misstatements and omissions"; (2) that "concealed [a] price-volatility risk (or some other risk)" and (3) that "materialized and played some part in diminishing the market value of a security." *Huang*, 2019 WL 1245136, at *16; *Margo v. Freeport-McMoRan, Inc.*, 2018 WL 3725781, at *9 (D. Arizona Aug. 3, 2018). Plaintiffs fail to plead each of these elements in the SAC.

Plaintiffs premise their materialization of risk theory on a February 24, 2021 *risk disclosure* from CareDx about Medicare reimbursement risks. ¶¶ 287–88. But for all the reasons stated above, that risk disclosure is not a misstatement or omission. *See supra* Sec. III.B.3. Furthermore, they fail to explain how disclosing Medicare reimbursement risks—including risks associated with false submission to Medicare—*concealed* those very risks from investors. *Cf. Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal. June 19, 2020) (rejecting materialization of risk theory to the extent risk was disclosed). Finally, Plaintiffs did not sufficiently plead that materialization of RemoTraC risks bear "a causal connection" to the stock drops cited in the SAC. *See Huang*, 2019 WL 1245136, at *16. The allegation that the stock drops were caused by the government "pulling the plug" on the scheme is again premised on the claim—falsely attributed to Mr. Jain—that 50% of tests were being rejected by Medicare because of fraud. ¶ 280–81, 290–91; *see also supra* Sec. III.B.2(a). In addition, this claim runs counter to the central thesis of the SAC—that CareDx engaged in a fraud that was revealed to the market through corrective disclosures. ¶¶ 251–77.

**E.    Plaintiffs' Claims Under Section 20(a) of the Exchange Act Should Be Dismissed**

Plaintiffs' failure to plead a violation of Section 10(b) of the Exchange Act defeats their Section 20(a) claims. *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012).[27]

**IV.    CONCLUSION**

Defendants respectfully request that the Court dismiss the SAC with prejudice.

---

[27] In addition, Plaintiffs cannot plead control liability against (1) Mr. Dhingra before March 2021, when he joined CareDx, or after May 2022, when he left, ¶ 44; (2) Dr. Maag after October 2021, when he left the Company, ¶ 42; or (3) Dr. Seeto before November 2020, when he became CEO, ¶ 43.

Dated: July 26, 2023

Respectfully submitted,

By:  */s/ Laura Leigh Geist*
　　　Laura Leigh Geist


WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 848-7400
E-mail:   lgeist@willkie.com
　　　　　bdyer@willkie.com

WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted pro hac vice)
Charles Cording (admitted pro hac vice)
Brady Sullivan (admitted pro hac vice)
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:   tmundiya@willkie.com
　　　　　ccording@willkie.com
　　　　　bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,*
*Ankur Dhingra, and Peter Maag*

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
No. 22-cv-03023-TLT

**Appendix A-1 –Statements Copied From the FAC**

| Statement | Maker of Statement | SAC |
|---|---|---|
| **Underwriter Representations** | | |
| *Compliance with Health Care Laws*. The Company and, to the Company's knowledge, its directors, employees and agents (while acting in such capacity) *are in material compliance with, all health care laws* applicable to the Company, or any of its products or activities, including, but not limited to, the federal Anti-Kickback *Statute* (42 U.S.C. Section 1320a-7b(b)), Section 1320a-7a(a)(5)), the civil *False Claims Act* (31 U.S.C. Section 3729 *et seq.*), the administrative False Claims Law (42 U.S.C. Section 1320a-7b(a)), the Stark law (42 U.S.C. Section 1395nn). . . . To the Company's knowledge, *there are no facts or circumstances* that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws. | Reginald Seeto | ¶ 200 |
| **"Unmet Needs" Statements** | | |
| [W]hat worked really well for us [in the kidney space] during COVID is that centers were able to ask us for help and support and *we were able to address their needs and demands and I think RemoTraC is a really good example of that*. | Reginald Seeto | ¶ 205 |
| *So, again, I think RemoTraC was addressing [an] unmet need* and I think what helped us is we could move very quickly to bring it to bear particularly during a time of crisis in the transplant community. | Reginald Seeto | ¶ 206 |
| [I] think, with *RemoTraC*, this is something that was probably *the highlight of last year* what we did as an organization as we rallied around supporting patients and transplant centers. It's with such an *unmet need* and we were able to put it together so quickly and had such a fantastic response now more than 150 centers are using it. | Reginald Seeto | ¶ 215 |
| **Reasons for ASP Decline** | | |
| [S]o couple of observations there. *One, . . . our overall mix of business, as we see higher adoption, we're seeing much higher mix of growth in the non-Medicare part of the business. And so that's the, by far, the largest impact.* A lot of that is driven by you're seeing higher attach rates, say, on the AlloSure side, where our mix of coverage is much lower than the traditional kidney business, say. So that's one of the big contributors. To your specific question, any change in the billing practices? *No, no change. We haven't observed anything on the Medicare billing practices*. It's primarily the business mix where the volume growth is exceptionally strong, but *the mix continues to evolve away from the core Medicare business*. | Ankur Dhingra | ¶ 230 |
| The amazing success of AlloSure Heart, combined *with higher growth of commercial versus Medicaid volumes in 2021 resulted in very strong volume growth that materially outpaced our revenue growth. In addition, in kidney testing, we saw patients shift from Medicare to Medicare Advantage plans for the changes introduced with the CARES Act last year*. | Ankur Dhingra | ¶ 233 |

| Statement | Maker of Statement | SAC |
|---|---|---|
| This decline came from [three] factors: ***Higher growth in patients with commercial insurance*** across all organs, where we have lower coverage today; changing volume mix between organs with strong success of AlloSure Heart and AlloSure Lung, where we have lower coverage today; ***continued increase in Medicare [A]dvantage patients in our kidney Services.*** . . Specific now to kidney. Although the majority of patients are under Medicare, ***we have seen an increase in number of patients outside Medicare***, which is specifically impacting AlloSure Kidney realized prices. ***This mix shift has come from [two] areas. First, execution of our strategic plan to focus on community nephrology over the last 12 months, which has increased the number of patients on commercial coverage. This is expected to continue as a core part of the growth strategy. The second has been industry shift from Medicare to Medicare Advantage plans, driven by the 21st Century Cures Act.*** | Ankur Dhingra | ¶ 236 |
| **Testing Services Revenue Statements** | | |
| ***The driver of the quarter's growth was our testing services revenue*** which increased 89% to $59.3 million[.] | Reginald Seeto | ¶ 219 |
| ***The main driver of growth in the quarter*** was from our testing services revenue, which increased 79% to $64.9 million. | Reginald Seeto | ¶ 223 |
| ***The primary driver of revenue growth was from our testing services, which increased 46% to $66.5 million***. | Reginald Seeto | ¶ 227 |
| Q4 was another record quarter[] where we delivered revenues of $79.2 million. . . Notably*, **our record fourth quarter testing services volum**e of 41,900 tests represented a 67% year-over-year growth[.] | Reginald Seeto | ¶ 232 |
| **Historical RemoTraC Statements** | | |
| ***We have also more than 9,000 patients that have signed up for RemoTraC***. | Reginald Seeto | ¶ 223 |
| In addition, we have more than 11,000 patients who have ***direct access*** to RemoTraC. | Reginald Seeto | ¶ 232 |

**Appendix A-2 – Statements Mirroring the FAC**

| Statement | Maker of Statement | SAC |
|---|---|---|
| **Underwriter Representations** | | |
| ***Compliance with Health Care Laws.*** The Company and, to the Company's knowledge, its directors, employees and agents (while acting in such capacity) ***are in material compliance with, all health care laws*** applicable to the Company, or any of its products or activities, including, but not limited to, the federal ***Anti-Kickback Statute*** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law (42 U.S.C. Section 1320a-7a(a)(5)), the civil ***False Claims Act*** (31 U.S.C. Section 3729 *et seq.*), the administrative False Claims Law (42 U.S.C. Section 1320a-7b(a)), the Stark law (42 U.S.C. Section 1395nn). . . To the Company's knowledge, ***there are no facts or circumstances*** that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws. | Peter Maag | ¶ 180 |
| **RemoTraC Statements** | | |
| As a response to the COVID-19 outbreak, and ***to enable immune-compromised transplant patients to continue to have their blood drawn***, in late March 2020 the Company launched ***RemoTraC, a remote home-based blood draw solution using mobile phlebotomy for AlloSure and AlloMap surveillance tests, as well as for other standard monitoring tests.***<br><br>(***Statement repeated between April 30, 2020 and November 3, 2022***) | Peter Maag | ¶152, n.27 |
| Considering this [COVID-19] backdrop, ***our results this quarter were particularly strong***. Up until the impact of COVID-19, we were well on track to exceed $40 million in total revenue for the first quarter. Our pledge to support our patients remains our focus. And as part of our efforts ***on March 17, we announced the launch of RemoTraC***, our solution for enabling home-based monitoring for transplant patients. Importantly, ***we created RemoTraC in response to hearing that patients were missing their check-in appointments and blood draw as a result of COVID crisis***. This home-based blood draw solution using mobile phlebotomy ***reduces the necessary visit*** to labs and hospitals for immunosuppressant transplant patients[.] | Peter Maag | ¶ 166 |
| I think there's really 2 types of feedback. ***One is, patients absolutely love it***. Patients don't need to drive in for an hour or 2 or maybe sometimes 3, since they live remotely, into the transplant center, then be in a waiting room, wait for their blood work, have then maybe sometimes only 5- to 10-minute interactions with the nurse, and everything is good, and then they travel back home. ***So patients love the mobile phlebotomy, especially for those that are doing well. . . So we see actually that there is a bit of an upside for us in terms of volume, making sure that these patients stick to their surveillance visit and get all their blood draws***. | Peter Maag | ¶ 169 |

| Statement | Maker of Statement | SAC |
|---|---|---|
| I mean we've seen more than 150 centers expressed interest in **RemoTraC**. And with that, **we have a lot of protocols and surveillance patients being used**. So I think with RemoTraC being incorporated as part of that with the current offering, I think in the future, we'll – as Peter mentioned, we'll start seeing more of this adoption, potentially even on a protocol basis. | Reginald Seeto | ¶ 172 |
| I mean we've seen **the majority of patients from one segment being those on surveillance today**, that we've also seen a new segment of patients who are currently on surveillance that we had – as we talked about, with the greater need to monitor these patients where they are now being brought into RemoTraC first. So there's been 2 specific segments. | Reginald Seeto | ¶ 173 |
| Twitter:  Are you a kidney, heart or lung transplant recipient who needs a blood draw for your routine tests? RemoTraC will come to you! A phlebotomist will come to your home for a standard panel of routine tests, limiting your exposure to COVID-19.<br><br>(*Statement repeated 3 times between August 21, 2020 and November 20, 2020*) | Peter Maag | ¶188, n.30 |
| **Testing Services Revenue Statements** | | |
| Testing services revenue increased by $9.9 million. . . . This increase is primarily due to an increase of more than 5,000 test results[.] | Peter Maag | ¶ 163 |
| Testing services **revenue increased** by $10.6 million. . . . This increase is primarily **due to** an increase of more than 5,200 test results[.] | Peter Maag | ¶ 192 |
| Testing services **revenue increased by $17.3 million**. . . . This increase is primarily **due to** an increase of more than 8,500 AlloSure Kidney and AlloMap Heart patient results[.] | Peter Maag | ¶ 195 |
| Testing services **revenue increased** by $59.1 million, or 56%. . . . This increase is primarily **due to** an increase of more than 29,000 AlloSure Kidney, AlloMap Heart and AlloSure Heart patient results[.] | Reginald Seeto & Peter Maag | ¶ 212 |
| Testing services **revenue increased by $27.8 million, or 89%**. . . . This increase is primarily **due to** an increase of more than 18,000 AlloSure Kidney, AlloMap Heart and AlloSure Heart patient results[.] | Reginald Seeto & Ankur Dhingra | ¶ 218 |
| Testing services **revenue increased by $28.6 million, or 79%**. . . . This increase is primarily **due to** an increase of more than 20,000 AlloSure Kidney, AlloMap Heart and AlloSure Heart patient results[.] | Reginald Seeto & Ankur Dhingra | ¶ 222 |
| Testing services **revenue increased by $77.4 million, or 68%**. . . . This increase is primarily **due to** an increase of more than 56,000 AlloSure Kidney, AlloMap Heart and AlloSure Heart patient results[.] | Reginald Seeto & Ankur Dhingra | ¶ 226 |

| Statement | Maker of Statement | SAC |
|---|---|---|
| **Olymbios Litigation Disclosures** | | |
| For example, we recently became aware that in October 2020, prior to terminating employment and joining a competitor of ours with which we are in current litigation, a ***former employee*** of ours ***downloaded*** certain of our confidential and privileged ***information*** without permission. After our claims against this former employee were filed, the former employee subsequently brought ***various claims*** against us. We are in the process of reviewing and, with the assistance of counsel, have conducted certain interviews and gathered information. We intend to vigorously pursue and defend against these matters. Although we believe we have strong claims against, and good and substantial defenses to the ***claims made by, the former employee***, there is no guarantee that we will prevail in these matters. | Peter Maag & Reginald Seeto | ¶ 209 |

**Appendix A-3 – Statements Contained in the Company's Risk Disclosures and Related Disclosures**

| Statement | Maker of Statement | SAC |
|---|---|---|
| Below are certain **key regulations** applicable to our business.<br><br>*Federal and State Fraud and Abuse Laws*<br>Because of the significant federal funding involved in Medicare and Medicaid, Congress and the states have enacted, and actively enforce, a number of laws to eliminate fraud and abuse in federal healthcare programs. **Our business is subject to compliance with these laws**.<br><br>*Anti-Kickback Statutes*<br>Several courts have interpreted the statute's intent requirement to mean that **if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered businesses, the statute has been violated**. Penalties for violations include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs. In addition, **violations of the Anti-Kickback Statute also are actionable under the federal False Claims Act**.<br><br>*Federal False Claims Act*<br>The False Claims Act's "whistleblower" or "*qui tam*" provisions imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal healthcare program. . . The federal government has used the False Claims Act to assert liability on the basis of causing physicians to order **excessive or unnecessary services** . . .Our **future activities relating to billing**, compliance with the CLIA and **Medicare reimbursement** requirements, **physician and other healthcare provider financial relationships** and the sale and marketing of our products **may be subject to scrutiny under these laws**. . .**Our employees**, consultants, principal investigators and commercial partners **may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements**. In addition to the CLIA regulation, other federal and state healthcare laws and regulations that may affect our ability to conduct business, include, without limitation<br><br>**the federal Anti-Kickback Statute, which constrains our marketing practices**, educational programs, pricing policies, and relationships with healthcare providers or other entities, by prohibiting, among other things, knowingly and willfully soliciting, receiving, offering or paying remuneration, **directly or indirectly, to induce** or reward, or in return for, either the referral of an individual or the purchase or **recommendation of an item or service reimbursable under a federal healthcare program, such as the Medicare and Medicaid programs**. | Peter Maag | ¶154, n.28 |

| Statement | Maker of Statement | SAC |
|---|---|---|
| Because of the **breadth of these laws** and the narrowness of available statutory and regulatory exemptions, **it is possible** that some of our business activities could be subject to challenge under one or more of such laws. | | |
| We receive a substantial portion of our revenues from Medicare, and the loss of, or a significant reduction in, reimbursement from Medicare would **severely and adversely** affect our financial performance. For the year ended December 31, 2019, revenue from Medicare for AlloMap Heart and AlloSure represented 66% of testing services revenue. However, we may not be able to maintain or increase our tests reimbursed by Medicare for a **variety of reasons, including** changes in reimbursement practices, general policy shifts, or reductions in reimbursement amounts. . . If future reimbursement levels are less than the current price, our revenues and our ability to achieve profitability could be impaired, and the market price of our common stock could decline. We may also not be able to maintain or increase the portion of our tests reimbursed by Medicare **for a variety of other reasons,** including changes in reimbursement practices and general policy shifts. | Peter Maag | ¶ 158 |
| **There have been no material changes in the risk factors**[1]  (*Statement repeated between April 30, 2020  and October 28, 2021*) | Peter Maag | ¶154, n.28, 155, 161, 191, 194 198 |
| Investing in any securities offered pursuant to this prospectus, the applicable prospectus supplement and any related free writing prospectus involves a high degree of risk. Before making an investment decision, **you should carefully consider** the risks described under "Risk Factors" in the applicable prospectus supplement, any related free writing prospectus **and in our most recent Annual Report on Form 10-K, or any updates in our Quarterly Reports on Form 10-Q**, together with all of the other | Peter Maag | ¶177 |

[1] The full text of the challenged statement is:  "Our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 28, 2020, Part I –Item 1A, Risk Factors, describes important risk factors that could cause our business, financial condition, results of operations and growth prospects to differ materially from those indicated or suggested by forward-looking statements made in this Quarterly Report on Form 10-Q or presented elsewhere by management from time to time. There have been no material changes in the risk factors that appear in Part I - Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 28, 2020, or the Form 10-K, other than those listed below. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business."  Ex. C at 36.

| Statement | Maker of Statement | SAC |
|---|---|---|
| information appearing in or incorporated by reference into this prospectus, the applicable prospectus supplement and any related free writing prospectus, before deciding whether to purchase any of the securities being offered. . . [The] . . . "Risk Factors", in our Annual Report on Form 10-K for the year ended December 31, 2019, as filed with the SEC on February 28, 2020, **and in our *Quarterly Report on Form 10-Q*** for the quarter ended March 31, 2020, as filed with the SEC on ***April 30, 2020***, the applicable prospectus supplement and any related free-writing prospectus and elsewhere in the documents incorporated by reference into this prospectus. | | |