# EXHIBIT D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number 001-36536**

# CAREDX, INC.
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **Delaware** | **94-3316839** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |

**1 Tower Place**
**South San Francisco, California 94080**
**(Address of Principal Executive Offices, Including Zip Code)**
**(415) 287-2300**
**(Registrant's Telephone Number, Including Area Code)**

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $0.001 per share | CDNA | The Nasdaq Stock Market LLC |

**Securities Registered Pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | | Smaller reporting company | ☐ |
| | | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, based on the closing price of a share of the registrant's common stock on June 30, 2020, the last business day of the registrant's most recently completed second fiscal quarter, as reported by the Nasdaq Global Market on such date was approximately $1.7 billion. Shares of the registrant's common stock held by each executive officer, director and holder of 10% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates of the registrant. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares of the registrant's Common Stock outstanding as of February 22, 2021 was 51,822,662.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Proxy Statement relating to the 2021 Annual Meeting of Stockholders, are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. Such Proxy Statement, or an amendment to this Annual Report on Form 10-K, will be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's fiscal year ended December 31, 2020.

**TABLE OF CONTENTS**

| Item No. | Page No. |
|---|---|
| **PART I** | **5** |
| Item 1. Business | 5 |
| Item 1A. Risk Factors | 25 |
| Item 1B. Unresolved Staff Comments | 59 |
| Item 2. Properties | 59 |
| Item 3. Legal Proceedings | 59 |
| Item 4. Mine Safety Disclosures | 59 |
| | |
| **PART II** | **60** |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 60 |
| Item 6. Selected Financial Data | 61 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 62 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 76 |
| Item 8. Financial Statements and Supplementary Data | 77 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 118 |
| Item 9A. Controls and Procedures | 118 |
| Item 9B. Other Information | 118 |
| | |
| **PART III** | **119** |
| Item 10. Directors, Executive Officers and Corporate Governance | 119 |
| Item 11. Executive Compensation | 119 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 119 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 119 |
| Item 14. Principal Accountant Fees and Services | 119 |
| | |
| **PART IV** | **120** |
| Item 15. Exhibits, Financial Statement Schedules | 120 |
| Item 16. Form 10-K Summary | 121 |
| Signatures | 122 |

The FDA has traditionally chosen not to exercise its authority to regulate LDTs because it regulates the primary components in most laboratory-developed tests and because it believes that laboratories certified as high complexity under the CLIA, such as ours, have demonstrated expertise and ability in test procedures and analysis. In the event the FDA changes their policy in regards to "Enforcement discretion" for LDTs, it could require us to modify our business model and incur higher costs in order to maintain compliance with this new policy. A similar situation may occur if Congress decides to enable newly proposed regulations, such as the Verifying Accurate Leading-edge IVCT Development Act of 2018. For AlloSure Kidney and other similar testing solutions, we may be required to conduct additional clinical trials to demonstrate clinical validity and utility of our test, and submit to the FDA a premarket approval application, or PMA, or 510(k) premarket notification application and obtain approval or clearance for the test subsequent to commercialization. There can be no assurance that any of our tests or additional uses of our tests for which we seek clearance or approval in the future will be cleared or approved on a timely basis, or at all, and there can be no assurance that labeling claims will be consistent with our current claims or adequate to support continued adoption of and reimbursement for our current and future tests. Moreover, any new FDA or regulatory requirements could complicate our compliance efforts.

Health Insurance Portability and Accountability Act

Under the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, the U.S. Department of Health and Human Services, or HHS, has issued regulations to protect the privacy and security of protected health information and standardize data content, codes and formats used in healthcare transactions and the standardized identifiers used by healthcare providers, such as us, and health plans.

We have developed policies and procedures to comply with these regulations. The requirements under these regulations may change periodically and could have an effect on our business operations if compliance becomes substantially more costly than under current requirements or a significant breach to protected health information, or PHI, may occur.

In addition to federal privacy regulations, there are a number of state laws governing confidentiality of health information that are applicable to our operations. New laws governing privacy may be adopted in the future as well. We have taken steps to comply with health information privacy requirements to which we are aware that we are subject.

Federal and State Self-Referral Prohibitions

We are subject to the federal self-referral prohibitions, commonly known as the Stark Law, and to similar state restrictions such as California's Physician Ownership and Referral Act, or PORA. Where applicable, these restrictions generally prohibit us from billing patients or certain governmental or private payers for clinical laboratory testing services when the physician ordering the test, or any member of such physician's immediate family, has an investment interest in, or compensation arrangement with, us, unless the arrangement meets an exception to the prohibition.

Both the Stark Law and PORA contain exceptions for compensation paid to a physician for personal services rendered by the physician, provided that certain conditions are satisfied. We have compensation arrangements with a number of physicians for personal services, such as speaking engagements and clinical advisory boards. We have structured these arrangements with terms intended to comply with the requirements of the applicable exceptions to the Stark Law, PORA and other similar state laws. However, we cannot be certain that regulators would find these arrangements to be in compliance with the Stark Law, PORA or similar state laws.

Sanctions for a violation of the Stark Law include the following:

- denial of Medicare payment for the services provided in violation of the prohibition;
- refunds of amounts collected by an entity in violation of the Stark Law;
- a civil penalty of up to $25,820 per service for submitting or causing to be submitted a claim in violation of the Stark Law and an assessment of up to three times the amount claimed;
- exclusion from federal health care programs, including the Medicare and Medicaid programs; and
- a civil penalty of up to $172,137 against parties that enter into a scheme to circumvent the Stark Law's prohibitions.

Further, a violation of PORA is a misdemeanor and could result in civil penalties and criminal fines. Finally, other states have self-referral restrictions with which we have to comply that differ from those imposed by federal and California law.

Federal and State Fraud and Abuse Laws

Because of the significant federal funding involved in Medicare and Medicaid, Congress and the states have enacted, and actively enforce, a number of laws to eliminate fraud and abuse in federal health care programs and across the healthcare system. Our business is subject to compliance with these laws.

20

In March 2010, the Patient Protection and Affordable Care Act, as amended by the Healthcare and Education Affordability Reconciliation Act, or collectively, the Affordable Care Act, was enacted in the United States. The Affordable Care Act expands the government's investigative and enforcement authority and increases the penalties for fraud and abuse, including amendments to both the Anti-Kickback Statute and the False Claims Act, to make it easier to bring suit under these statutes. The Affordable Care Act also allocates additional resources and tools for the government to police healthcare fraud, with expanded subpoena power for HHS, additional funding to investigate fraud and abuse across the healthcare system and expanded use of recovery audit contractors for enforcement.

There have previously been public announcements by members of the U.S. Congress regarding their plans to repeal and replace the Affordable Care Act, and the Biden administration has announced plans to expand the Affordable Care Act. We cannot predict whether future healthcare initiatives, including at the federal level, will be initiated or the effect such initiatives could have on our business.

*The Eliminating Kickbacks in Recovery Act of 2018*

The Eliminating Kickbacks in Recovery Act of 2018, or EKRA, prohibits payments for referrals to recovery homes, clinical treatment facilities, and laboratories. EKRA's reach extends beyond federal health care programs to include private insurance (i.e., it is an "all payer" statute). For purposes of EKRA, the term "laboratory" is defined broadly and without reference to any connection to substance use disorder treatment. EKRA is a criminal statute and violations can result in fines of up to $200,000, up to 10 years in prison, or both, per violation. The law includes a limited number of exceptions, some of which closely align with corresponding Anti-Kickback Statute exceptions and safe harbors and others that materially differ.

*Information Blocking Prohibition*

On May 1, 2020, the Office of the National Coordinator for Health Information Technology promulgated final regulations under the authority of the 21st Century Cures Act to impose new conditions to obtain and maintain certification of certified health information technology and prohibit certain covered actors —developers of certified health information technology, health information networks / health information exchanges, and health care providers (including laboratories)—from engaging in activities that are likely to interfere with the access, exchange or use of electronic health information (information blocking).

The final regulations further defined exceptions for activities that are permissible, even though they may have the effect of interfering with the access, exchange or use of electronic health information. Originally, the Office of the National Coordinator for Health Information Technology established an information blocking effective date of November 2, 2020; however, the agency subsequently issued an interim final rule to extend the effective date to April 5, 2021. Under the 21st Century Cures Act, health care providers that violate the information blocking prohibition will be subject to appropriate disincentives, which the U.S. Department of Health and Human services has yet to establish through required rulemaking. Developers of certified information technology and health information networks / health information exchanges, however, may be subject to civil monetary penalties of up to $1 million per violation. The U.S. Department of Health and Human Services Office of Inspector General has the authority to impose such penalties and on April 24, 2020 published a proposed rule to codify new authority in regulation, which the agency proposed would be effective 60 days after it issues a final rule, but in no event before November 2, 2020. The U.S. Department of Health and Human Services Office of Inspector General has not yet issued a final rule.

*Anti-Kickback Statutes*

The federal health care programs' Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual for the furnishing of or arranging for the furnishing of any good or service, for which payment may be made under a federal health care program, such as Medicare or Medicaid, or the purchasing, leasing, ordering or arranging for or recommending purchasing, leasing, or order any good, facility, services, or item payable under such programs.

The definition of "remuneration" has been broadly interpreted to include anything of value, including, for example, gifts, certain discounts, the furnishing of free supplies, equipment or services, credit arrangements, payment of cash and waivers of payments. Several courts have interpreted the statute to mean that if any one purpose of remuneration is to induce or reward referrals of federal health care program payable business, the statute has been violated. The statute contains a number of statutory exceptions and the U.S. Department of Health and Human Services has created several regulatory "safe harbors." Arrangements that meet all of the conditions of an applicable exception or safe harbor are protected from liability under the Anti-Kickback Statute. However, the failure to fit an arrangement within an exception or a safe harbor does not necessarily mean that the statute has been violated or that the arrangement will be prosecuted. Penalties for violations include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal health care programs. Violations of the Anti-Kickback Statute also are actionable under the federal False Claims Act.

Many states have adopted laws similar to the Anti-Kickback Statute. Some of these state prohibitions apply to items or services reimbursed by any third-party payer, including commercial insurers.

*Federal False Claims Act*

The federal False Claims Act, which includes "whistleblower" or "qui tam" provisions imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by the federal government. The qui tam provisions of the federal False Claims Act allow a private individual to bring actions on behalf of the federal government alleging that the defendant has violated the federal False Claims Act and to share in any monetary recovery. In recent years, the number of suits brought against healthcare providers by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the federal False Claims Act, and many of these state laws apply where a claim is submitted to any third-party payer and not merely the federal government.

When an entity is determined to have violated the False Claims Act, it may be required to pay up to three times the actual damages sustained by the government, plus civil penalties of between $11,665 and $23,331 for each false claim for penalties assessed after June 19, 2020. There are many potential bases for liability under the False Claims Act. Liability arises, primarily, when an entity knowingly submits or causes another to submit, a false claim for reimbursement to the federal government. The federal government has used the False Claims Act to assert liability on the basis of, among other things, causing physicians to order excessive or unnecessary services, providing false documentation in support of claims, kickbacks, off-label promotion of products, and Stark Law violations and other improper referrals, in addition to the more predictable allegations as to misrepresentations with respect to the services rendered. Our future activities relating to billing, compliance with certain regulations and Medicare reimbursement requirements, physician and other healthcare provider financial relationships and the sale and marketing of our products may be subject to scrutiny under these laws.

*CCPA*

The California Consumer Privacy Act, or the CCPA, was enacted in 2018 and took effect on January 1, 2020. This piece of legislation secures new privacy rights for California consumers. The CCPA grants consumers the right to:

- know the types of personal information that are collected, used, shared or sold, both as to the categories and specific pieces of personal information;

- have personal information held by businesses and, by extension, a business's service provider deleted;

- opt-out of the sale of personal information. Consumers are able to direct a business that sells personal information to stop selling that information. Children under the age of 16 must provide opt in consent, with a parent or guardian consenting for children under 13; and

- non-discrimination in terms of price or service when a consumer exercises a privacy right under the CCPA.

The CCPA applies to certain businesses and such businesses must create procedures to respond to requests from consumers to opt-out, know and delete.

For requests to opt-out, businesses must provide a "Do Not Sell My Info" link on their website or mobile app. Under the CCPA, we are required to:

- respond to requests from consumers to know, delete and opt-out within specific time frames;

- verify the identity of consumers who make requests to know and to delete, whether or not the consumer maintains a password-protected account with us;

- maintain records of requests and how we responded for 24 months in order to demonstrate our compliance;

- treat user-enabled privacy settings that signal a consumer's choice to opt-out as a validly submitted opt-out request;

- disclose financial incentives offered in exchange for the retention or sale of a consumer's personal information and explain how we calculate the value of the personal information; and

- explain how these incentives are permitted under the CCPA.

Our business or financial results may be adversely impacted by adhering to these regulatory requirements and the related costs of ensuring and maintaining compliance. In addition, we cannot predict how future regulatory conditions will affect our business and may also have an adverse impact on our results of operations or financial condition.

- the process of fully integrating acquired companies and operations and the associated potential disruptions to our business;

- future clinical trials;

- expansion of the size and geographic reach of our sales force and our marketing capabilities to commercialize our existing and future solutions;

- employment of additional clinical, quality control, scientific, customer service, laboratory, billing and reimbursement and management personnel;

- compliance with existing and changing laws, regulations and standards, including those relating to corporate governance and public disclosure and regulations implemented by the Securities and Exchange Commission, or the SEC, and The Nasdaq Stock Market LLC;

- employment of operational, financial, accounting and information systems personnel, consistent with expanding our operations and our status as a public company; and

- failure to achieve expected operating results may cause a future impairment of goodwill or other assets.

Even if we achieve significant revenues, we may not become profitable, and even if we achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become and remain consistently profitable could adversely affect the market price of our common stock and could significantly impair our ability to raise capital, expand our business or continue to pursue our growth strategy or even continue to operate. For a detailed discussion of our financial condition and results of operations, see "Management's Discussion and Analysis of Financial Condition and Results of Operations."

***We may require additional financing.***

As of December 31, 2020, we had cash, cash equivalents and marketable securities of $224.7 million and an accumulated deficit of $352.5 million. On January 25, 2021, we completed an underwritten public offering of common stock, and on February 11, 2021, we sold additional shares of common stock pursuant to the underwriters' full exercise of an overallotment option granted to the underwriters in connection with the offering. The aggregate net proceeds to us, including the shares sold pursuant to the underwriters' full exercise of the overallotment option, were approximately $188.7 million, after deducting underwriting discounts and commissions and estimated offering expenses. We may require additional financing in the future to fund working capital, pay our obligations as they come due and fund our acquisitions of complementary businesses and assets. Additional financing might include issuance of equity securities, debt, cash from collaboration agreements, or a combination of these. However, there can be no assurance that we will be successful in acquiring additional funding at levels sufficient to fund our operations or on terms favorable to us.

***We receive a substantial portion of our revenues from Medicare, and the loss of, or a significant reduction in, reimbursement from Medicare would severely and adversely affect our financial performance.***

For the year ended December 31, 2020, revenue from Medicare for AlloMap Heart, AlloSure Kidney and AlloSure Heart represented 67% of testing services revenue. However, we may not be able to maintain or increase our tests reimbursed by Medicare for a variety of reasons, including changes in reimbursement practices, general policy shifts, or reductions in reimbursement amounts. We cannot predict whether Medicare reimbursements will continue at the same payment amount or with the same breadth of coverage in the future, if at all.

The Protecting Access to Medicare Act of 2014, or PAMA, included a substantial new payment system for clinical laboratory tests under the Clinical Laboratory Fee Schedule, or CLFS. Under PAMA, laboratories that receive the majority of their Medicare revenues from payments made under the CLFS report initially and then on a subsequent three-year basis thereafter (or annually for advanced diagnostic laboratory tests, or ADLTs), private payer payment rates and volumes for their tests. The final PAMA ruling was issued June 17, 2016 and the new market based rates took effect January 1, 2018. The Centers for Medicare & Medicaid Services, or CMS, uses the rates and volumes reported by laboratories to develop Medicare payment rates for the tests equal to the volume-weighted median of the private payer payment rates for the tests. Under PAMA, the reimbursement rate for AlloMap Heart is currently $3,240 for Medicare beneficiaries.

On September 26, 2017, we announced that the Molecular Diagnostic Services, or MolDX, Program developed by Palmetto GBA, or Palmetto, has set AlloSure Kidney reimbursement at $2,841. AlloSure Kidney began to be reimbursed for kidney transplants covered by Medicare across the United States on October 9, 2017, the effective date of the Palmetto local coverage determination, or LCD.

28

Table of Contents

In October 2020, AlloSure Heart received a final Palmetto MolDx Medicare coverage decision for AlloSure Heart. In November 2020, Noridian Healthcare Solutions, our Medicare Administrative contractor, issued a parallel coverage policy granting coverage when used in conjunction with AlloMap Heart, which became effective in December 2020. The Medicare reimbursement rate for AlloSure Heart is currently $2,753.

If an AlloMap Heart, AlloSure Kidney or AlloSure Heart reimbursement rate that is significantly lower than the current rate is set by CMS or MolDx in the future, it could cause us to discontinue AlloMap Heart, AlloSure Kidney or AlloSure Heart testing for Medicare patients because providing tests at a substantially lowered reimbursement rate may not be economically viable. Given the significant portion of payments represented by Medicare, our remaining test revenue may be insufficient to sustain our operations.

If future reimbursement levels are less than the current price, our revenues and our ability to achieve profitability could be impaired, and the market price of our common stock could decline. We may also not be able to maintain or increase the portion of our tests reimbursed by Medicare for a variety of other reasons, including changes in reimbursement practices and general policy shifts.

On a five-year rotational basis, Medicare requests bids for its regional Medicare Administrative Contractors, or MAC, services. The MAC for California is currently Noridian Healthcare Solutions. Our current Medicare coverage through Noridian provides for reimbursement for tests performed for qualifying Medicare patients throughout the U.S. so long as the tests are performed in our California laboratory. We cannot predict whether Noridian or any future MAC will continue to provide reimbursement for AlloMap Heart, AlloSure Kidney or AlloSure Heart at the same payment amount or with the same breadth of coverage in the future, if at all. Additional changes in the MAC processing Medicare claims for AlloSure Kidney, AlloMap Heart or AlloSure Heart could impact the coverage or payment amount for our tests and our ability to obtain Medicare coverage for any products we may launch in the future.

Any decision by CMS or its local contractors to reduce or deny coverage for our tests would have a significant adverse effect on our revenue and results of operations and ability to operate and raise capital. Any such decision could also cause affected clinicians treating Medicare covered patients to reduce or discontinue the use of our tests.

***Our financial results currently are largely dependent on sales of AlloSure Kidney and AlloMap Heart tests and products, and we will need to generate sufficient revenues from these and other solutions and tests we develop to grow our business.***

We expect that sales of testing services and products will account for a substantial portion of our revenue for at least the next two years. If we are unable to increase sales of our testing services or products or successfully develop and commercialize other solutions, tests or enhancements, our revenues and ability to achieve profitability would be impaired, and the market price of our common stock could decline.

***We could become subject to legal proceedings that could be time consuming, result in costly litigation and settlements/judgments, require significant amounts of management attention and result in the diversion of significant operational resources, which could adversely affect our business, financial condition and results of operations.***

We have in the past been, and from time to time in the future may become, involved in lawsuits, claims and proceedings incident to the ordinary course of, or otherwise in connection with, our business. For example, in response to our false advertising suit filed against Natera Inc., or Natera, on April 10, 2019, Natera filed a counterclaim against us on February 18, 2020 in the U.S. District Court for the District of Delaware, or the Court, alleging we made false and misleading claims about the performance capabilities of AlloSure. The suit seeks injunctive relief and unspecified monetary relief. On September 30, 2020, Natera requested leave of the Court to amend its counterclaims to include additional allegations regarding purportedly false claims we made with respect to AlloSure, and the Court granted Natera's request. Trial is currently scheduled to begin on July 26, 2021.

In addition, in response to our patent infringement suit filed against Natera on March 26, 2019, Natera filed suit against us on January 13, 2020 in the Court alleging, among other things, that AlloSure infringes Natera's U.S. Patent 10,526,658. On March 25, 2020, Natera filed an amendment to the suit alleging, among other things, that AlloSure also infringes Natera's U.S. Patent 10,597,724. The suit seeks a judgment that we have infringed Natera's patents, an order preliminarily and permanently enjoining us from any further infringement of such patents and unspecified damages. We intend to defend both of these matters vigorously, and believe that we have good and substantial defenses to the claims alleged in the suits, but there is no guarantee that we will prevail.

Litigation is inherently unpredictable. It is possible that an adverse result in one or more of these possible future events could have a material adverse effect on us including increased expenses to defend, settle or resolve such litigation.

29

***We are subject to numerous fraud and abuse and other laws and regulations pertaining to our business, the violation of any one of which could harm our business.***

The clinical laboratory testing industry is highly regulated, and there can be no assurance that the regulatory environment in which we operate will not change significantly and adversely in the future. Our arrangements with customers may expose us to broadly applicable fraud and abuse and other laws and regulations that may restrict the financial arrangements and relationships through which we market, sell and distribute our products. Our employees, consultants, principal investigators and commercial partners may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements. In addition to the CLIA regulation, other federal and state healthcare laws and regulations that may affect our ability to conduct business, include, without limitation:

- federal and state laws and regulations regarding billing and claims payment applicable to clinical laboratories and/or regulatory agencies enforcing those laws and regulations;

- federal civil and criminal false claims laws and civil monetary penalty laws, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented to the government, claims for payment from Medicare, Medicaid or other third-party payers that are false or fraudulent, or making a false statement material to a false or fraudulent claim;

- the federal Anti-Kickback Statute, which constrains our marketing practices, educational programs, pricing policies, and relationships with healthcare providers or other entities, by prohibiting, among other things, knowingly and willfully soliciting, receiving, offering or paying remuneration, directly or indirectly, to induce or reward, or in return for, either the referral of an individual or the purchase or recommendation of an item or service reimbursable under a federal health care program, such as the Medicare and Medicaid programs;

- the federal physician self-referral law, commonly known as the Stark Law, which prohibits a physician from making a referral to an entity for certain designated health services, including clinical laboratory services, reimbursed by Medicare if the physician (or a member of the physician's family) has a financial relationship with the entity, and which also prohibits the submission of any claims for reimbursement for designated health services furnished pursuant to a prohibited referral;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, and its implementing regulations, which imposes certain requirements relating to the privacy, security and transmission of individually identifiable health information; HIPAA also created criminal liability for knowingly and willfully falsifying or concealing a material fact or making a materially false statement in connection with the delivery of or payment for healthcare benefits, items or services;

- state laws regarding prohibitions on fee-splitting;

- the federal health care program exclusion statute; and

- state and foreign law equivalents of each of the above federal laws and regulations, such as anti-kickback, false claims, and self-referral laws, which may apply to items or services reimbursed by any third-party payer, including commercial insurers, and state and foreign laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.

Because of the breadth of these laws and the narrowness of available statutory and regulatory exemptions, it is possible that some of our business activities could be subject to challenge under one or more of such laws. Any action brought against us for violation of these laws or regulations, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. We may be subject to private "qui tam" actions brought by individual whistleblowers on behalf of the federal or state governments, with potential liability under the federal False Claims Act, including mandatory treble damages and significant per-claim penalties. If our operations are found to be in violation of any of the federal, state and foreign laws described above or any other current or future fraud and abuse or other healthcare laws and regulations that apply to us, we may be subject to penalties, including significant criminal, civil, and administrative penalties, damages, fines, imprisonment for individuals, exclusion from participation in government programs, such as Medicare and Medicaid, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. Any of the foregoing consequences could seriously harm our business and our financial results.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CAREDX, INC.

By:          /s/ Reginald Seeto, MBBS

Reginald Seeto, MBBS
*President and Chief Executive Officer*

Date: February 24, 2021

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Reginald Seeto and Marcel Konrad, and each of them, his true and lawful attorneys-in-fact, each with full power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact or their substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons, on behalf of the registrant on the dates and the capacities indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ REGINALD SEETO, MBBS<br>Reginald Seeto, MBBS | President, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 24, 2021 |
| /s/ MARCEL KONRAD<br>Marcel Konrad | Interim Chief Financial Officer<br>*(Principal Financial and Accounting Officer)* | February 24, 2021 |
| /s/ PETER MAAG, PH.D.<br>Peter Maag, Ph.D. | Executive Chair and Director | February 24, 2021 |
| /s/ GEORGE W. BICKERSTAFF, III<br>George W. Bickerstaff, III | Director | February 24, 2021 |
| /s/ FRED E. COHEN<br>Fred E. Cohen | Director | February 24, 2021 |
| /s/ GRACE COLÓN<br>Grace Colón | Director | February 24, 2021 |
| /s/ CHRISTINE M. COURNOYER<br>Christine M. Cournoyer | Director | February 24, 2021 |
| /s/ MICHAEL D. GOLDBERG<br>Michael D. Goldberg | Director | February 24, 2021 |
| /s/ RALPH SNYDERMAN<br>Ralph Snyderman | Director | February 24, 2021 |
| /s/ WILLIAM HAGSTROM<br>William Hagstrom | Director | February 24, 2021 |