# EXHIBIT F

SEYFARTH SHAW LLP
Robert A. Fisher (*pro hac vice* application to be filed)
*rfisher@seyfarth.com*
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone:     (617) 946-4800
Facsimile:     (617) 946-4801

Alex Meier (*pro hac vice* application to be filed)
*ameier@seyfarth.com*
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA 30309
Telephone:     (404) 885-6698
Facsimile:     (404) 724-1649

Jonathan A. Braunstein (SBN 227322)
*jbraunstein@seyfarth.com*
Ian T. Long (SBN 290975)
*itlong@seyfarth.com*
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:     (415) 397-2823
Facsimile:     (415) 397-8549

*Attorneys for Plaintiff/Petitioner Michael Olymbios*

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON 4/15/2022
By _____/s/ Salote Alipate_____
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN MATEO**

| | |
|---|---|
| MICHAEL OLYMBIOS<br><br>                    Plaintiff/Petitioner,<br><br>       v.<br><br>CAREDX, Inc.,<br><br>                    Defendant/Respondent. | CIVIL ACTION NO. 22-CIV-01582<br><br>**PLAINTIFF/PETITIONER MICHAEL OLYMBIOS'S COMPLAINT AND PETITION FOR DECLARATORY JUDGMENT**<br><br>**[JURY TRIAL DEMANDED]** |

**INTRODUCTION**

1.     This is an action by Plaintiff Dr. Michael Olymbios ("Dr. Olymbios") to recover attorneys' fees and costs incurred in connection with Defendant CareDx, Inc.'s ("CareDx") failure to pay fees required to continue an arbitration it initiated against Dr. Olymbios before the Judicial Arbitration and Mediation Services ("JAMS"), to secure a judicial declaration that restrictive covenants CareDx is attempting to enforce against him are void and unenforceable, and to recover damages caused by CareDx's campaign of defamation against him.  CareDx waived its right to require the continued arbitration of the parties' disputes, and Dr. Olymbios exercised his statutory right to proceed to have the dispute heard in court rather than continue in arbitration. As a result, these claims may now be heard by this Court.

2.     The underlying dispute that had been before an arbitrator of JAMS was an attempt by CareDx to chill legitimate whistleblowing activity, primarily through the enforcement of restrictive covenants that are void and unenforceable under California law. Dr. Olymbios, now free to continue this action in court because of CareDx's waiver and material breach, now files this action to recover attorneys' fees and costs incurred during the arbitration, to confirm Dr. Olymbios's election to proceed in court, to invalidate the unlawful restrictive covenants imposed on him, and to recover any other relief the Court deems appropriate.

**THE PARTIES**

3.     Plaintiff Michael Olymbios is an individual and resident of Texas. Olymbios entered into the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Agreement") while employed by Defendant CareDx, Inc. in California. A copy of the Agreement is attached as Exhibit 1.

4.     Defendant CareDx, Inc. is a California corporation with its principal place of business at 1 Tower Place, 9th Floor, South San Francisco, California 94080. CareDx's agent for service is Leanna Burch, located at 1 Tower Place, 9th Floor, South San Francisco, California 94080.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over CareDx because CareDx is a Delaware corporation with its principal place of business in California. Accordingly, CareDx is "at home" in California and subject

1

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

to general personal jurisdiction in the State of California.

6. Venue is proper in this Court under California Code of Civil Procedure § 395.5 because CareDx is a resident in the County of San Mateo.

7. The value of the relief sought herein exceeds the jurisdictional minimum necessary to constitute an unlimited civil case.

## GENERAL ALLEGATIONS

8. This proceeding is about Plaintiff/Petitioner Dr. Michael Olymbios doing the right thing, and Defendant/Respondent CareDx, Inc. punishing him for it. Dr. Olymbios, a medical doctor and the former Head of Community Nephrology for CareDx, learned that the company was engaged in an unlawful campaign—bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment—to pad its sales. That revelation, coupled with a toxic company culture, led Dr. Olymbios to leave CareDx.

9. Dr. Olymbios retained information already in his possession, custody, or control to substantiate his allegations of misconduct and unlawful activity by CareDx. He then retained counsel and provided documents to federal and state law enforcement agencies.

10. As a form of damage control, CareDx filed an *ex parte* Motion for Temporary Restraining Order, which they failed to obtain, followed by a demand for arbitration alleging that Dr. Olymbios misappropriated documents and information to use during his employment with Natera, Inc., his current employer. The arbitration, styled *CareDx, Inc. v. Michael Olymbios*, JAMS Ref. No. 1220067171 (the "Arbitration"), was filed with JAMS and assigned to Arbitrator Deborah Crandall Saxe ("the Arbitrator").

11. In the course of the Arbitration, CareDx scoured Dr. Olymbios's electronic devices for proof that he used or distributed allegedly confidential information or trade secrets for any reason other than providing it to his counsel and to the government and came up empty.

12. Further, CareDx used the Arbitration to discover what documents and information Dr. Olymbios had disclosed to federal and state governments.

13. On January 10, 2022, JAMS issued a Notice of Hearing to the parties, a copy of which is

2

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

attached hereto at Exhibit 2. The January 10, 2022 Notice informed the parties that an invoice for hearing fees would be sent 120 days prior to the first hearing date. The Notice included a General Fee Schedule, which explained that the Arbitrator charged professional fees at a daily rate of $11,000 for each day of hearing, as well as other professional time. The General Fee Schedule stated that "[a]ll fees are due and payable in advance of services rendered and by any applicable due date as stated in the hearing confirmation letter."

14.    The Arbitrator scheduled a hearing on the merits to occur on June 27-30, July 1, July 5, July 11-12, 2022.

15.    Under Rule 31 of the JAMS Employment Arbitration Rules, "JAMS requires that the Parties deposit the fees and expenses for the Arbitration from time to time during the course of the proceedings and prior to the Hearing."

16.    In accordance with the scheduling of the hearing, on March 1, 2022, JAMS provided CareDx, through its counsel, a Notice of Rescheduled Hearing which set forth the hearing dates. The Notice included an invoice for fees and costs in the amount of $143,300. A copy of the March 1 $143,300 invoice is attached as Exhibit 3.

17.    That invoice was addressed to CareDx's counsel and provided that payment for the $143,300 invoice was "due upon receipt." The Notice of Rescheduled Hearing also stated "[a]ll fees are due upon receipt." The Notice enclosed the same General Fee Schedule as previously provided to the parties. The General Fee Schedule stated that the Arbitrator charged professional fees at a daily rate of $11,000 for each day of hearing, as well as other professional time, and that "[a]ll fees are due and payable in advance of services rendered and by any applicable due date as stated in the hearing confirmation letter." The Notice further provided that "*additional fees*" would be invoiced via a deposit request sent after the hearing. The Notice of Hearing, the invoice and the General Fee Schedule were distributed to all parties of record.

18.    CareDx failed to pay the $143,300 invoice within 30 days of receipt. Accordingly, pursuant to the California Arbitration Act, CareDx is in material breach of the Agreement, and Dr. Olymbios has the unilateral right to elect to have the issues presented in arbitration to be decided in court

3

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

and seek to recover his reasonable fees and costs by motion or separate action.

19.    On April 8, 2022, Dr. Olymbios notified the JAMS Case Administrator and CareDx's counsel that he elected to proceed in court rather than continue in the Arbitration.

20.    The parties had a prescheduled discovery conference for April 11, 2022. Dr. Olymbios's counsel attended that conference and reiterated that CareDx had materially breached the Agreement, waived its right to continue with the Arbitration, and that Dr. Olymbios elected to proceed in court.

21.    CareDx disputed that it materially breached the Agreement and, as part of its argument, asserted that CareDx did not have an obligation to pay the outstanding invoice because CareDx agreed only to pay "fees" and "costs," and CareDx argued that a hearing "deposit" did not qualify as a "fee" or "cost" that CareDx was obligated to pay.

22.    CareDx also claimed that it is not responsible for "deposits," as opposed to "fees" and "costs." CareDx therefore requires employees like Dr. Olymbios to bear the burden of paying "deposits" for arbitration hearings. That policy and decision reveals that CareDx intentionally failed to pay this invoice in an attempt to impose a massive financial burden on Dr. Olymbios.

23.    Requiring Dr. Olymbios to pay a portion of this deposit, even if it is a separate "fee" or "cost," violates California law and is an independently sufficient basis to invalidate the arbitration provision in the Agreement.

24.    The Arbitrator, over Dr. Olymbios's objection to her authority to do so, asserted that she had authority to determine whether the Agreement had been materially breached and set a briefing schedule.

25.    Dr. Olymbios is therefore proceeding with filing this Complaint and Petition, pursuant to his rights under California law, and seeks to enjoin the continued prosecution of the now defunct arbitration proceeding against him. As detailed below, Dr. Olymbios respectfully requests that the Court enter the following injunctive relief:

      a.    An order declaring that CareDx has waived its right to continue in arbitration by failing to timely pay an invoice necessary to continue arbitration, pursuant to C.C.P. § 1281.98, and directing Dr. Olymbios to file a motion for attorneys' fees and any

4

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

additional sanctions he wishes to request, in accordance with Section 1291.98(c)(1-2) and 1281.99, by a specified date.

b.   An order declaring that the arbitration provision in CareDx's Agreement with Dr. Olymbios cannot be enforced as a matter of law because, according to CareDx, it is not responsible to pay "deposits" under the language of the Agreement, thus rendering the Agreement unconscionable and unenforceable.

c.   An order declaring that the Agreement's restrictive covenants violate Section 16600 and are void as a matter of law.

d.   An order enjoining CareDx and its employees, agents, and attorneys from continuing or maintaining an arbitration proceeding against Dr. Olymbios or from enforcing any of the restrictive covenants in his Agreement.

## BACKGROUND AND OVERVIEW OF CAREDX'S UNLAWFUL CONDUCT

26.   CareDx is ostensibly a diagnostic testing company that offers tests to identify organ transplant rejection signals. CareDx's primary source of revenue is AlloSure, a blood test that allegedly evaluates certain markers in patients after kidney transplants to assess potential rejection by the organ recipient. AlloSure has been conditionally approved for Medicare reimbursement, but only when clinical suspicion of rejection exists and to inform clinical decision-making about the necessity of renal biopsy in patients.

27.   Dr. Olymbios worked for CareDx as its Head of Community Nephrology. In that role, Dr. Olymbios had direct involvement in sales management and marketing strategy, as well as some role in clinical guidance to CareDx and directly reported to Reginald Seeto, the current President and CEO of CareDx. Because of his job duties and responsibilities, Dr. Olymbios had direct and frequent interactions with the highest level executives at CareDx.

28.   To maximize potential revenue associated with AlloSure, CareDx executives engaged in various forms of clinical and marketing schemes in an effort to justify AlloSure's use, even when that use lacked clinical support and fell outside of the conditional approval extended to it. Those efforts include, but are not limited to: (a) pushing a "surveillance" protocol for AlloSure through inaccurate

5

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

marketing materials; (b) offering extravagant inducements or kickbacks to physicians and other providers to promote AlloSure; (c) representing that CareDx did not bill patients for its tests; (d) organizing "clinical studies" that were funded with condition-free grants; (e) bundling AlloSure with other blood tests as part of a mobile phlebotomy service to induce physicians to order AlloSure; and (f) offering sham "advisory boards" to physicians that are little more than captive marketing presentations.

29.    In or around June 2020, Dr. Olymbios began to fully understand that CareDx's practices raised serious legal and compliance concerns. Dr. Olymbios, as a medical professional trained in the United Kingdom, did not grasp the regulatory framework governing Medicare claims and that much of this structure depended on good conduct by market participants. CareDx provided minimal—if any—training and information on compliance obligations to its employees.

30.    CareDx's misconduct is too extensive to fully chronicle here, but the unlawful and improper activity by CareDx in connection with AlloSure includes, but is not limited to, the following:

a.    CareDx used what it represented to be clinical tests to bill Medicare for the tests. Multiple nephrology practices expressed serious reservations about this practice as a violation of Medicare billing requirements, and CareDx employees internally flagged this practice as impermissible.

b.    CareDx offered unrestricted grants to physicians to not enroll patients in competitors' clinical trials or to induce practices to place patients on an AlloSure surveillance protocol, even when doing so was not warranted or authorized under Medicare billing guidelines.

c.    CareDx intentionally excluded from the test requisition form a field where a physician could indicate the reason why the test was medically necessary.

d.    CareDx organized "advisory boards" that were little more than marketing exercises to encourage physicians to order AlloSure tests. CareDx monitored advisory board activity and how they impacted sales.

e.    CareDx repeatedly ignored or actively quashed any internal concerns about its activity.

6

31. Dr. Olymbios was far from the only employee to have misgivings about CareDx's false representations. At multiple points during his employment, Dr. Olymbios discussed his concerns with other employees who had similar misgivings about the "profit at any cost" approach followed by CareDx executives. Representative communications include the following:

  a. One former employee expressed to Dr. Olymbios that CareDx's physician entertainment activity "violated so many [health care provider] interaction rules." Dr. Olymbios responded that he had serious concerns about "Medicare abuse," and the individual responded, "Just whistleblow it."

  b. In September 2020, Dr. Olymbios texted another employee, "It's insane that we have surveillance studies billing Medicare when that's not even allowed." Dr. Olymbios then provided a copy of a complaint by the United States Attorneys Office for the Southern District of New York and said, "We do ALL the things listed in the criminal complaints." The employee responded, "This is all too much. I also feel like CareDx is well on their way to pissing odd [*sic*] the wrong employee or wrong physician and theres [*sic*] going to be a whistle blower."

  c. In August 2020, Dr. Olymbios relayed his discussion with another employee about compliance concerns and that there were concerns that "an OIG investigation would probably happen and [the employee] didn't want to be involved." Dr. Olymbios then listed the following as potential reasons for an investigation: "Registries, ad boards, billing practices, study funds as inducements."

  d. In September 2020, Dr. Olymbios texted other employees that he had a legal call with Reg. Another employee responded, "because we are Medicare frauds?" A different employee replied, "We're a bunch of crooks and frauds."

32. Dr. Olymbios discussed his concerns and those of other employees with more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto, the current President and Chief Executive Officer of CareDx.

33. CareDx executives brushed off his concerns or berated him for raising them in the first

7

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

place.

34.    CareDx also took active measures to avoid creating a paper trail of their misconduct. CareDx extensively used personal phones for company work and would save sensitive communications for text messages, such as the above text exchanges.

35.    Moreover, some CareDx executives also used text messages and other non-email forms of communication, like chat messaging services, outside of company-controlled systems for the increased privacy and belief that the messages are not recoverable. Reg Seeto, the current President and CEO of CareDx, often communicated with Peter Maag, the former CEO of CareDx, by using WhatsApp and Signal. Reg and/or Peter told Dr. Olymbios that they regularly used WhatsApp to talk about work-related issues before switching to Signal, where they continued to have what they viewed as off-the-record conversations and speak with candor about what they were actually doing. Reg and/or Peter also told Dr. Olymbios that their reason for switching from WhatsApp to Signal was because of their belief that messages sent over Signal were not retrievable.

36.    Peter Maag was also very sensitive about putting potentially harmful information in writing. For example, in or around July or August 2020, Dr. Olymbios once wrote in an email to Peter Maag, Danielle Scelfo, and potentially other CareDx employees that CareDx should put in a letter to a nephrology practice that CareDx never bills patients. At the time, Dr. Olymbios thought that it would be convincing to highlight that patients would not have any out of pocket expenses, a talking point that Maag and other high-level executives at CareDx had verbalized time and time again when pitching AlloSure to nephrology practices.

37.    To Dr. Olymbios's surprise, Maag called Dr. Olymbios soon after he sent that email and said that he was calling because there were things he couldn't be associated with as the CEO. He also told Dr. Olymbios that there were certain things that shouldn't be put in writing, like saying that CareDx never billed patients, even if that's how CareDx operated. Upon information and belief, based on this and other comments, Maag knew that CareDx's practices and representations regarding payment for AlloSure, its primary test, were unlawful and that he needed to take steps to avoid written records of CareDx's unlawful activity.

8

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

38.    Because of events like this, his mounting concerns about CareDx's regulatory misconduct and what he was being asked to do to drive revenue, and the abrasive and toxic executive team at CareDx, Dr. Olymbios began looking for a position at another company and eventually received an offer to join Natera.

39.    On October 7, 2020, Dr. Olymbios provided written notice of his resignation to Seeto. CareDx immediately cut off Dr. Olymbios's access to CareDx's computer systems.

40.    In or around this period, Dr. Olymbios began searching for information about reporting his concerns and identifying counsel to help report CareDx's unlawful activity to government agencies.

41.    At the same time, Dr. Olymbios yet again put CareDx on notice of his concerns about its unethical and unlawful activity. During his exit interview, Dr. Olymbios told Marissa Dixon, the Vice President of Human Resources at CareDx, that he had concerns about compliance with Medicare billing requirements. He also noted that he had conversations with Danielle Scelfo, Vice President of Market Access and Health Policy at CareDx, about these issues.

42.    Shortly before his last day at CareDx, Dr. Olymbios retained copies of information already in his possession to substantiate the misconduct he witnessed. CareDx had provided Dr. Olymbios with an Apple laptop. At this point, Dr. Olymbios could not access CareDx's IT systems, but could access information that was accessible on his CareDx laptop.

43.    Dr. Olymbios then made a copy of his CareDx inbox, which he had the ability to do because he already had a copy of this file stored on the CareDx laptop. Dr. Olymbios also copied files from his CareDx OneDrive folder, which he could also do because the CareDx OneDrive was configured to save local copies of these files on the local hard drive for the CareDx laptop.

44.    Dr. Olymbios did not interact with or enter any hosted file source or cloud data repository to obtain this information. To the contrary, Dr. Olymbios acquired this information in the course of and in the scope of his duties for CareDx, and he already had possession of it by means that did not involve any CareDx-hosted platform or service when the copying activity occurred.

45.    Dr. Olymbios then restored the CareDx laptop to factory settings and returned the laptop to CareDx. The day after Dr. Olymbios returned the laptop, on October 20, 2020, Dr. Olymbios

9

continued his search for potential counsel, which included a review of the website for Cohen Milstein Sellers & Toll, a well-known and accomplished firm with an active practice in whistleblower investigations and litigation.

### CAREDX RETALIATES AND SMEARS DR. OLYMBIOS

46. On October 26, 2020, Jennifer Baldocchi, a Partner at Paul Hastings and counsel for CareDx, sent Dr. Olymbios a letter regarding his alleged obligations under the Agreement. Ms. Baldocchi's letter did not include a copy of the Agreement, and she did not inquire whether Dr. Olymbios had counsel in connection with the subject of her letter.

47. The same day that Dr. Olymbios received Ms. Baldocchi's letter, Dr. Olymbios retained Cohen Milstein as counsel and soon thereafter also retained Katz, Marshall, & Banks, LLP, another law firm.

48. Ms. Baldocchi also immediately involved Jane Yoon, a Partner in Paul Hastings' litigation group who focuses on healthcare fraud, anti-kickback laws, and False Claims Act litigation.

49. CareDx realized the existential threat that Dr. Olymbios's reporting presented to the company's continued existence. Upon information and belief, CareDx then embarked on a frantic spree to smear Dr. Olymbios in a misguided and retaliatory attempt at damage control. While Dr. Olymbios is not aware of all statements made, upon information and belief, CareDx instructed employees to impugn Dr. Olymbios's professional credibility by making defamatory statements to physicians and other persons in the transplant space. Those defamatory statements include, but are not limited to:

    a. CareDx executive personnel, specifically Sham Dholakia, Head of Medical Affairs, began spreading rumors that Dr. Olymbios "stole the idea for a registry in community nephrology and sold their idea to Natera." Mr. Dholakia issued this statement at a meeting with all Medical Affairs staff.

    b. CareDx further knowingly misinformed its field staff that Dr. Olymbios "flew from Maryland to California to sneak back into the offices in the middle of the night and steal CareDx's information."

    c. Upon information and belief, Mr. Dholakia and other CareDx executives

10

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

knowingly provided other false information to field sales representatives with the aim of having field sales representatives repeat these false statements to physicians and Key Opinion Leaders.

50. CareDx promulgated these falsehoods knowing that they were false and/or made these communications with reckless disregard of the truth, as its primary reason for communicating this information to field sales representatives was, upon information and belief, a calculated effort to attack Dr. Olymbios's credibility rather than confront the fundamental truth about the unethical and unlawful way that CareDx conducts business. CareDx made these false statements with malice, in retaliation for Dr. Olymbios's reporting activities, and in retaliation for his decision to accept employment with a competitor.

51. Upon information and belief, CareDx initiated a second salvo of defamatory remarks about Dr. Olymbios in October to November 2021. On October 28, 2021, CareDx disclosed that the Department of Justice and Securities and Exchange Commission issued a civil investigatory demand and subpoena, respectively, for information relating to its kidney testing and phlebotomy services. The stock plunged more than 25% as a result of this disclosure.

52. Upon information and belief, as a form of damage control, CareDx, through its agents, repeated similar false or defamatory remarks, including by providing information to third parties to explicitly question Dr. Olymbios's motivations for retaining this information and attempting to link him as the originating source for the information that led to the governmental civil investigative demand and subpoena.

53. And, throughout this entire crusade, after his separation, CareDx *never* asked to interview Dr. Olymbios or requested information about the regulatory and compliance problems he identified. That is because CareDx is not interested in fulfilling its obligations to its shareholders to investigate and remedy credible allegations of misconduct. Rather, CareDx views Dr. Olymbios as a potential life-threatening clot to its lifeblood: continued access to Medicare reimbursements. As such, CareDx has deployed every resource it can to silence Dr. Olymbios, from personal smears, oppressive litigation, invasive forensic reviews, to the anonymity and privacy of arbitration.

11

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

**CAREDX'S UNENFORCEABLE CONTRACT WITH DR. OLYMBIOS**

54. CareDx's main tool to persecute Dr. Olymbios is a set of unenforceable restrictive covenants.

55. When Dr. Olymbios began working at CareDx, his offer letter included a statement that he would be required to execute the Agreement as a condition of employment. CareDx did not provide Dr. Olymbios with a copy of the Agreement until after he had accepted and started his employment.

56. CareDx's Agreement with Dr. Olymbios is expansive and untethered from whatever legitimate business interests it might have with respect to Dr. Olymbios's employment.

57. First, the Agreement contains an unenforceable confidentiality provision. That provision states as follows:

> I agree that during and after my employment with the Company, I will hold in the strictest confidence, and will not use (except for the benefit of the Company during my employment) or disclose to any person, film, or corporation (without written authorization of the President or the Board of Directors of the Company) any Company Confidential Information. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that "**Company Confidential Information**" means any non-public information that relates to the actual or anticipated business, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefore, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information provided, however, Company Confidential Information does not include any of the foregoing items to the extent the same have become publicly known and made generally available through no wrongful act of mine or of others.

(Agreement § 2.A (emphasis in original).)

58. The confidentiality provision is unenforceable as a matter of California law because it amounts to a restriction on competition. This restriction immediately flunks Section 16600 because it is not even limited to information that Dr. Olymbios learned *through his employment with CareDx*. Enforceable confidentiality restrictions, unlike this one, can restrict only the disclosure or use of information that an employee learns during the course of their employment. Allowing this restriction to stand would, for the rest of Dr. Olymbios's career, categorically prohibit him from using or disclosing

12

any non-public information related to CareDx in any way—even if Dr. Olymbios learned that information before or after he started working for CareDx. These restrictions go well beyond the protection of CareDx's trade secrets and are therefore void and unenforceable. *See, e.g., AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923 (Ct. App. 2018) (citing *The Retirement Group v. Galante*, 98 Cal. Rptr. 3d 585, (Cal. Ct. App. 2009), and holding that an employment agreement prohibiting use of merely "confidential" information (as opposed to trade secrets) violates § 16600 because it restrains the employee's ability to work in his chosen profession)).

59.    This provision is also inherently anti-competitive because it also prohibits Dr. Olymbios from using information that was independently developed by him prior to or after his employment with CareDx, such as information he learned during his prior employment at Cedar Sinai, or any such information that is independently developed and then provided to him.

60.    Finally, this provision is overbroad because it requires that Company Confidential Information to be both publicly available <u>and</u> generally known before removing restrictions on use.

61.    Second, the Agreement includes a similarly onerous, perpetual restriction on "Associated Third Party Confidential Information," which states as follows:

> I recognize that the Company may have received and in the future may receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**"). By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter to hold in the strictest confidence, and not to use or to disclose to any person, firm, or corporation, any Associated Third Party Confidential Information, except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. . . .

(*Id.* § 2.C (emphasis in original).)

62.    This provision is void and unenforceable for the same reasons as the Company Confidential Information restriction in Section 2.A.

13

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

63.     Third, the return of property provision is void because of its incorporation of Company Confidential Information and Associated Third Party Information, which operate to require the return of even intangible information and Dr. Olymbios's experience. As a result, the return of property provision functionally obligates Dr. Olymbios to wipe his memory of any non-public information related to CareDx, creating an impossible obligation to meet—and one that is unenforceable under Section 16600. The return of property provision provides as follows:

> Upon separation from employment with the Company or on demand by the Company during my employment, I will immediately deliver to the Company, and *will not keep in my possession, recreate, or deliver to anyone else*, any and all Company property, *including, but not limited to, Company Confidential Information*, Associated Third Party Confidential Information, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any and all of the aforementioned items that were developed by me pursuant to my employment with the Company, obtained by me in connection with my employment with the Company, or otherwise belonging to the Company, its successors, or assigns, including, without limitation, those records maintained pursuant to Section 3.C. I also consent to an exit interview to confirm my compliance with this Section 5.

(*Id.* § 5 (emphasis added).)

64.     This provision is unenforceable because of its incorporation of Company Confidential Information and Associated Third Party Confidential Information. This creates exactly the kind of memory wipe requirement that California courts have not required employees to comply with. *See Robert Half Int'l, Inc. v. Murray*, No. CV F-07-0799 LJOSMS, 2008 WL 2625857, at *6 (E.D. Cal. June 25, 2008) ("A former employee may use general knowledge, skill and experience acquired in his or her former employment in competition with a former employer; i.e., the former employee cannot be expected to "wipe his or her memory clean.") (citation omitted). The return of property requirement is not limited to tangible and electronic information. As such, it purportedly requires Dr. Olymbios to divest himself of his memories of anything related to CareDx or the industry in which it operates. Accordingly, the return of property provision is likewise unenforceable.

14

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

65.    Fourth, the employee non-solicitation provision in the Agreement is void as a matter of law. That provision provides as follows:

> I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I shall not either directly or indirectly solicit any of the Company's employees to leave their employment, or attempt to solicit employees of the Company, either for myself or for any other person or entity.

(*Id.* § 5.)

66.    Following the California Supreme Court's decision in *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008), and the California Court of Appeal's decision in *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923 (Ct. App. 2018), California courts repeatedly have held that post-termination non-solicitation of employee covenants are invalid under California law. *See Conversion Logic, Inc. v. Measured, Inc.*, 2019 WL 6828283, at *4 (C.D. Cal. Dec. 13, 2019) (citing *WeRide*, 379 F. Supp. 3d at 852) ("District courts following *AMN* have declined to follow [*Loral Corp.*].”). Thus, "California law is properly interpreted post-Edwards to invalidate employee nonsolicitation provisions." *Barker v. Insight Global, LLC* ("*Barker II*"), 2019 WL 176260 at *3 (N.D. Cal. Jan. 11, 2019); *see also WeRide*, 379 F. Supp. 3d at 852 (finding a non-solicitation of employee provision invalid under Section 16600). Indeed, the court in *Barker* reasoned that "the plain language" of Section 16600 "prevents a former employer from restraining a former employee from engaging in his or her 'lawful profession, trade, or business of any kind.'" 2019 WL 176260, at *2 (quoting *AMN*, 28 Cal. App. 5th at 938). The result should be the same here. Section 8 of the Agreement, as a restraint on employment, is invalid. *See WeRide*, 379 F. Supp. 3d at 852; *Barker*, 2019 WL 176260 at *2-3; *AMN*, 28 Cal. App. 5th at 929, 936, 239 Cal. Rptr. 3d 577.

67.    These restrictions are wholly unenforceable, and the Court should invalidate Section 2.A (Company Confidential Information), Section 2.C (Associated Third Party Information), Section 5 (Return of Property), and Section 8 (Non-Solicit of Employees).

### CAREDX'S MATERIAL BREACH DURING ARBITRATION PROCEEDINGS

68.    On November 18, 2020, CareDx filed a Demand for Arbitration against Dr. Olymbios, which it amended through an Amended Demand filed on December 13, 2021. Dr. Olymbios also filed

15

a counterclaim against CareDx, which Dr. Olymbios received authorization to file on August 3, 2021.

69. The Agreement provides that CareDx is responsible for all fees and costs incurred during the arbitration. (*See* Agreement § 12.B.) Under California law, CareDx is also obligated to cover all expenses associated with arbitration proceedings.

70. On January 10, 2022, JAMS issued a Notice of Hearing to the parties, a copy of which is attached hereto at Exhibit 2. The January 10, 2022 Notice informed the parties that an invoice for hearing fees would be sent 120 days prior to the first hearing date. The Notice included a General Fee Schedule that explained that the Arbitrator charged professional fees at a daily rate of $11,000 for each day of hearing, as well as other professional time, and that "[a]ll fees are due and payable in advance of services rendered and by any applicable due date as stated in the hearing confirmation letter."

71. The Arbitrator scheduled a hearing on the merits to occur on June 27-30, July 1, July 5, July 11-12, 2022.

72. Under Rule 31 of the JAMS Employment and Arbitration Rules, "JAMS requires that the Parties deposit the fees and expenses for the Arbitration from time to time during the course of the proceedings and prior to the Hearing."

73. In accordance with the scheduling of the hearing, on March 1, 2022, JAMS provided CareDx, through its counsel, a Notice of Rescheduled Hearing which set forth the hearing dates. The Notice included an invoice for fees and costs in the amount of $143,300. The invoice was addressed to CareDx's counsel and provided that payment for the $143,300 invoice was "due upon receipt." JAMS also noted that failure to pay the invoice "may result in delay of service or cancellation of the session." That invoice was addressed to CareDx's counsel and provided that payment for the $143,300 invoice was "due upon receipt." The Notice of Rescheduled Hearing also stated "[a]ll fees are due upon receipt." The Notice enclosed the same General Fee Schedule as previously provided to the parties. The General Fee Schedule stated that the Arbitrator charged professional fees at a daily rate of $11,000 for each day of hearing, as well as other professional time, and that "[a]ll fees are due and payable in advance of services rendered and by any applicable due date as stated in the hearing confirmation letter." The Notice further provided that "*additional fees*" would be invoiced via a deposit request sent after the hearing.

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

The Notice of Hearing, the invoice and the General Fee Schedule were distributed to all parties of record.

74. CareDx failed to pay the $143,300 invoice within 30 days of receipt. CareDx was required to pay this $143,300 invoice in order to proceed with the Arbitration, so its failure to do so constituted a material breach and waiver of the arbitration provision.

75. On April 8, 2022, Dr. Olymbios notified CareDx and JAMS that its failure to pay the $143,300 invoice constituted a material breach of the Agreement and that he elected to proceed by having these claims litigated in court rather than arbitration. Dr. Olymbios did not receive a response to this notice.

76. On April 11, 2022, at a previously scheduled discovery status conference, Dr. Olymbios's counsel directly notified the Case Manager and opposing counsel that, pursuant to his statutory rights under the California Arbitration Act, he elected to withdraw from the Arbitration and have this matter litigated in court. The Case Manager apparently did not communicate this development to the Arbitrator, so the Arbitrator was unaware of this development.

77. CareDx opposed the request on various grounds, including by claiming that it did not have to pay the $143,300 invoice because it did not qualify as a "fee" or "cost."

78. CareDx also claimed that the Arbitrator should determine whether CareDx waived its right to proceed in arbitration pursuant to C.C.P. § 1281.98. Dr. Olymbios disagreed, stating that the Arbitrator did not have the authority to make that determination.

79. Without any briefing or reasoned consideration of the issue, the Arbitrator summarily ruled that the Arbitrator had the authority to decide whether a material breach occurred, even though Dr. Olymbios provided notification of his election to withdraw from the Arbitration and set a briefing schedule.

80. The continued pendency of the Arbitration, despite Dr. Olymbios's clear election to withdraw, and the Arbitrator's split-second decision that it was within the Arbitrator's purview to determine whether Dr. Olymbios had grounds to declare material breach and withdraw from the Arbitration, represent a clear and ongoing infringement of Dr. Olymbios's statutory right to proceed in court.

17

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

**FIRST CAUSE OF ACTION – C.C.P. §§ 1281.98, .1281.99**

81.    Dr. Olymbios incorporates the preceding allegations as if fully restated herein.

82.    CareDx is the "drafting party" for the Agreement, because it included a pre-dispute arbitration provision in a contract with Dr. Olymbios, an employee. *See* C.C.P. § 1280(e).

83.    The Agreement, California law, and the JAMS Rules require CareDx to pay fees and costs during the pendency of the arbitration.

84.    On March 1, 2022, JAMS uploaded a copy of the $143,300 invoice through JAMS Access, which was automatically distributed to the parties. The $143,300 invoice was due immediately upon receipt.

85.    CareDx failed to pay the $143,300 invoice by March 31, 2022. As a result, CareDx failed to pay the $143,300 invoice within 30 days of its due date and is therefore in material breach and waived its right to continue with the Arbitration.

86.    Dr. Olymbios has the unilateral right to withdraw claims from arbitration and proceed in a court of appropriate jurisdiction. *See* C.C.P. § 1281.98(b)(1).

87.    When an employee like Dr. Olymbios elects to withdraw from arbitration and proceed in a court of appropriate jurisdiction, Dr. Olymbios has the right to file a separate action seeking to recover all attorney's fees and all costs associated with the abandoned arbitration proceeding, in addition to any appropriate sanctions available under Section 1281.99. Because CareDx materially breached the arbitration agreement, the Court *must* order the drafting party to pay the reasonable expenses, including attorney's fees and costs, incurred by the employee or consumer as a result of the material breach and in connection with the abandoned arbitration proceeding.

88.    Dr. Olymbios requests that the Court award him his reasonable expenses, including attorney's fees and costs associated with the abandoned arbitration proceeding, fees incurred in securing the determination that CareDx waived its right to continue arbitration, and any other available sanctions or relief available under Section 1281.99.

**SECOND CAUSE OF ACTION – DECLARATORY JUDGMENT (ARBITRATION)**

89.    Dr. Olymbios incorporates the preceding allegations as if fully restated herein.

18

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

90.     An actual, present, and justiciable controversy has arisen and exists between Dr. Olymbios and CareDx concerning CareDx's material breach and waiver of its right to continue the Arbitration against Dr. Olymbios. Dr. Olymbios contends that, for the reasons discussed above and others, CareDx has materially breached its Agreement and that Dr. Olymbios is entitled to unilaterally elect to proceed in court rather than continue in the Arbitration. CareDx disputes that a material breach has occurred and attempted to continue with the Arbitration despite Dr. Olymbios's election.

91.     CareDx also claimed that it is not responsible for "deposits," as opposed to "fees" and "costs." CareDx therefore requires employees like Dr. Olymbios to bear the burden of paying "deposits" for arbitration hearings. That policy and decision reveals that CareDx intentionally failed to pay this invoice in an attempt to impose a massive financial burden on Dr. Olymbios.

92.     Requiring Dr. Olymbios to pay a portion of this deposit, even if a separate "fee" or "cost" violates California law and is an independently sufficient basis to invalidate the arbitration provision in the Agreement.

93.     CareDx's attempts to continue the Arbitration proceeding in derogation of Dr. Olymbios's statutory rights and despite CareDx's material breach present an actual and ongoing controversy that requires a judicial determination. A judicial declaration and judgment is necessary and appropriate at this time, and under the present circumstances, so that Dr. Olymbios and CareDx may ascertain their respective rights, duties, and future obligations under the Non-Compete Covenants.

94.     Plaintiffs seek a judicial declaration and judgment from the Court that CareDx materially breached its Agreement and waived the right to have this matter continue in Arbitration.

**THIRD CAUSE OF ACTION – DECLARATORY JUDGMENT (COVENANTS)**

95.     Dr. Olymbios incorporates the preceding allegations as if fully restated herein.

96.     An actual, present, and justiciable controversy has arisen and exists between Dr. Olymbios and CareDx concerning the enforceability of the restrictive covenants in his Agreement. Dr. Olymbios contends that, for the reasons discussed above and others, the restrictive covenants in the Agreement constitute unlawful restraints on trade in violation of California Business & Professions Code Section 16600 and California's long-recognized and fundamental public policy against such

19

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

provisions. *See Edwards v. Arthur Andersen LLP,* 44 Cal. 4th 937, 945-46 (2008). These restrictions are therefore void and unenforceable under California law.

97.     Unless the restrictive covenants are voided, Dr. Olymbios will be unable to engage in his chosen profession and engage in competitive activity against CareDx.

98.     CareDx has attempted to enforce these restrictions against Dr. Olymbios by filing a since-abandoned *ex parte* Motion for Temporary Restraining Order and an arbitration where it asserted a claim for breach of contract based on alleged violations of the confidentiality, employee non-solicitation, and return of property covenants. CareDx has attempted to enforce this Agreement against Dr. Olymbios and is claiming that these void covenants entitle it to recover lost profits, forensic expenses, and attorneys' fees and costs.

99.     A judicial declaration and judgment is necessary and appropriate at this time, and under the present circumstances, so that Dr. Olymbios and CareDx may ascertain their respective rights, duties, and future obligations under the restrictive covenants.

100.     Plaintiffs seek a judicial declaration and judgment from the Court that invalidates Section 2.A (Company Confidential Information), Section 2.C (Associated Third Party Information), Section 5 (Return of Property), and Section 8 (Non-Solicit of Employees) because these provisions are incapable of judicial reformation and violate Section 16600.

**FOURTH CAUSE OF ACTION - UNFAIR COMPETITION LAWS UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200 *ET SEQ.***

101.     Dr. Olymbios incorporates the preceding allegations as if fully restated herein.

102.     CareDx's use of and attempts to enforce void restrictive covenants that violate California Business & Professions Code Section 16600 constitute an unlawful and unfair business act or practice in violation of California Business & Professions Code Sections 16600 and 17200 *et seq*.

103.     CareDx's use of such unlawful and unfair business practices also constitutes unlawful and unfair competition and provides an unlawful and unfair advantage to CareDx in the marketplace.

104.     Dr. Olymbios has been harmed and has lost money and property as a result of CareDx's conduct and requests an order of restitution against Defendants. Specifically, Dr. Olymbios has been

20

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

required to expend his time, money and resources to address and prevent CareDx's use and efforts to enforce the void restrictive covenants and to prevent CareDx from interfering with Dr. Olymbios's ability to practice his chosen profession and further his mobility in the California marketplace.

105.     CareDx's conduct described herein constitutes an unfair and unlawful business practice that should be restrained.  As such, CareDx seek a determination by the Court that CareDx's use and efforts to enforce the restrictive covenants against Dr. Olymbios and CareDx's other former, current, or future employees under the current language in the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement violate California Business & Professions Code Section 17200 *et seq*. Dr. Olymbios also seek preliminary and permanent injunctive relief prohibiting the same.

## **FIFTH CAUSE OF ACTION – DEFAMATION**

106.     Dr. Olymbios incorporates the preceding allegations as if fully restated herein.

107.     CareDx published false, defamatory, unprivileged statements regarding Dr. Olymbios, that relate to his profession, that have or have a natural tendency to cause injury. In particular, these statements cause assumed damages for harm to Dr. Olymbios's reputation and cause shame, mortification, and/or hurt feelings. *See* Cal. Civ. Code § 45a(d)(2).

108.     CareDx also caused special damages with its defamatory statements causing Dr. Olymbios injury to his property, business, trade, profession or occupation caused by the defamatory stain or injury to his reputation. See Cal. Civ. Code § 45a(d)(1).

109.     While Dr. Olymbios is not aware of all of the exact statements made, upon information and belief, CareDx instructed employees to impugn Dr. Olymbios's professional credibility by making defamatory statements to physicians and other persons in the transplant space. Those defamatory statements include, but are not limited to:

      a.     CareDx executive personnel, specifically Sham Dholakia, Head of Medical Affairs, began spreading rumors that Dr. Olymbios "stole the idea for a registry in community nephrology and sold their idea to Natera." Mr. Dholakia issued this statement at a meeting with all Medical Affairs staff.

21

b.   CareDx further knowingly misinformed its field staff that Dr. Olymbios "flew from Maryland to California to sneak back into the offices in the middle of the night and steal CareDx's information."

c.   Upon information and belief, Mr. Dholakia and other CareDx executives knowingly provided other false information to field sales representatives with the aim of having field sales representatives repeat these false statements to physicians and Key Opinion Leaders.

110.   CareDx promulgated these falsehoods knowing that they were false and/or made these communications with reckless disregard of the truth, as its primary reason for communicating this information to field sales representatives was, upon information and belief, a calculated effort to attack Dr. Olymbios's credibility rather than confront the fundamental truth about the unethical and unlawful way that CareDx conducts business. CareDx made these false statements with malice, in retaliation for Dr. Olymbios's reporting activities, and in retaliation for his decision to accept employment with a competitor.

111.   CareDx published these false statements maliciously and/or with reckless disregard for the truth, and in retaliation for Dr. Olymbios's whistleblowing activities and decision to seek employment with a competitor.

112.   CareDx defamatory statements caused Dr. Olymbios significant emotional and reputational harm, increasing his stress and presumably damaging his professional standing. CareDx is vicariously liable and liable under the theory of *respondeat superior* for the actions of its personnel in the scope of their employment.

113.   CareDx lacked a viable common interest in internal communications, as these communications were made not as valid communications within a company but rather, made with actual malice and/or to communicate information that the speaker knew was false for an improper purpose.

## **PRAYER**

**WHEREFORE**, Dr. Olymbios prays for judgment against CareDx as follows:

1.   A judicial declaration that CareDx materially breached its Agreement and confirming Dr.

22

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

Olymbios's election of his right to proceed in this Court;

2. A judicial declaration and judgment from this Court that the restrictive covenants in the Agreement constitute unlawful restraints on trade in violation of California Business & Professions Code Section 16600 and California's long-recognized and fundamental public policy against such provisions, and such provisions are therefore void and unenforceable;

3. A judicial declaration and judgment from this Court that CareDx are not entitled to relief, equitable or legal, to prevent Dr. Olymbios from disregarding and not complying with the restrictive covenants;

4. A determination by this Court that CareDx's use and efforts to enforce the Non-Compete Covenants violate section California Business & Professions Code Sections 17200 *et seq.*, and a preliminary and permanent injunctive relief prohibiting the same should be issued;

5. Preliminary and permanent injunctive relief enjoining CareDx and its agents, employees, attorneys, and those with actual knowledge of the order from initiating or proceeding with the Arbitration or any other arbitration proceeding against Dr. Olymbios arising out of or relating to the Agreement;

6. Preliminary and permanent injunctive relief enjoining CareDx and its agents, employees, attorneys, and those with actual knowledge of the order from attempting to enforce the restrictive covenants against Dr. Olymbios or any other employee who executed an agreement containing the same restrictive covenants;

7. All reasonable attorneys' fees and costs associated with the Arbitration;

8. All reasonable attorneys' fees and costs associated with enforcing Dr. Olymbios's contractual and statutory rights;

9. All available damages, including actual, compensatory, special, and punitive damages;

10. All costs of suit incurred herein;

11. All appropriate sanctions available under Section 1281.99;

12. Restitution for all claims for relief for which restitution is authorized; and

13. Any other relief as this Court deems just and proper.

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT

**JURY DEMAND**

Dr. Olymbios demands a jury trial on all claims for which a jury trial is available.

DATED:  April 15, 2022

Respectfully submitted,

SEYFARTH SHAW LLP

BY: _____
Robert A. Fisher
Alex Meier
Jonathan A. Braunstein
Ian T. Long

Attorneys for Plaintiff/Petitioner
MICHAEL OLYMBIOS

24

COMPLAINT FOR PETITION AND DECLARATORY JUDGMENT