Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 858-7400
E-mail:  lgeist@willkie.com
          bdyer@willkie.com

Tariq Mundiya (*pro hac vice*)
Charles Cording (*pro hac vice*)
Brady Sullivan (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
          ccording@willkie.com
          bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Peter Maag, Reginald Seeto,
and Ankur Dhingra*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>                              Defendants. | Case No. 3:22-cv-03023-TLT<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS IN PLAINTIFFS' SECOND AMENDED COMPLAINT; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: October 24, 2023<br>Time: 2:00 PM<br>Courtroom: 9, 19th Floor<br>Judge: Hon. Trina L. Thompson |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, on October 24, 2023 at 2:00 p.m., in the courtroom of the Honorable Trina L. Thompson of the above-entitled Court, located at San Francisco Courthouse, Courtroom 9, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants CareDx, Inc. ("CareDx" or the "Company"), Peter Maag, Reginald Seeto, and Ankur Dhingra shall and hereby do move to strike certain paragraphs in Plaintiffs' Second Amended Complaint ("SAC," ECF No. 81) that rely exclusively on a separate complaint filed by non-party Dr. Michael Olymbios in *Olymbios v. CareDx Inc.*, No 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty., April 15, 2022). These paragraphs should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Declaration of Charles D. Cording filed concurrently herewith, the accompanying Request for Judicial Notice and Motion to Dismiss, the Court's opinion and order dismissing the Amended Class Action Complaint (the "FAC"), all files and records in this action, oral argument, and such other additional matters as may be judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This Court previously struck allegations from the First Amended Complaint (ECF No. 53, "FAC") that Plaintiffs sourced exclusively from a separate complaint filed by Dr. Michael Olymbios (the "Olymbios Complaint," Ex. F[1]), a former CareDx employee and purported "whistleblower" who left CareDx to take a job with its primary competitor.

The borrowed (and vigorously disputed) allegations were that: (1) Dr. Olymbios "raised" unspecified "concerns" about CareDx's regulatory compliance to over 10 employees at CareDx, including Dr. Peter Maag (CareDx's former CEO and Executive Chairman) and Dr. Reginald Seeto (CareDx's current CEO); and (2) Dr. Olymbios had a discussion with Dr. Maag in which Dr. Maag asked Dr. Olymbios to not put in writing that CareDx does not bill patients for tests.  The Court rightfully concluded that these unsupported allegations (the "Olymbios Management Allegations") lacked "adequate independent corroboration" and struck them from the FAC.  Order Granting Defendants' Motion to Dismiss and Motion to Strike (Slip Op., ECF No. 75) at 6–7 (citing *In re Connectics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) ("*Connetics I*")).

While granting Plaintiffs leave to amend the FAC, the Court provided a clear directive.  If Plaintiffs wished to rely on these allegations in an amended complaint, they would need to "show that [they] performed [their] duty to independently investigate the factual allegations in a manner that is reasonable under the circumstances."  Slip Op. 7–8.  Plaintiffs failed to do so—an outcome that is unsurprising given that Defendants deny Dr. Olymbios' allegations.

The SAC again relies on the Olymbios Management Allegations, but Plaintiffs conducted virtually no additional investigation to independently verify them.  At most, the SAC adds a new allegation that FE-11, an anonymous former CareDx "executive," believed Dr. Olymbios "had been 'vocal about' his concerns about the billing process."  ¶ 114.  Critically, however, this allegation

---

[1] Citations to "Ex. __" refer to the exhibits attached to the Request for Judicial Notice and Accompanying Declaration of Charles D. Cording, filed in connection with Defendants' Motion to Dismiss the Second Amended Complaint.  Citations to "¶ __" refer to the operative Second Amended Complaint ("SAC," ECF No. 81), and citations to "FAC ¶ __" refer to the Amended Complaint (ECF No. 53).

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

does not corroborate that Dr. Olymbios discussed his "concerns' with Dr. Maag or Dr. Seeto. Indeed, nowhere does the SAC "corroborate that Olymbios had discussions with Maag or Seeto" about his supposed "concerns." Slip Op. 7. Nowhere does the SAC allege that anyone witnessed or had "reason to know of" these alleged discussions. *Id.* And nowhere does the SAC allege that anyone "brought similar concerns to Seeto or Maag." *Id.*

Because Plaintiffs again failed to provide adequate corroboration to support the Olymbios Management Allegations, they again should be stricken, with prejudice.[2]

## II.    STATEMENT OF RELEVANT FACTS

### A.    The Olymbios Complaint

Dr. Olymbios is a disgruntled former employee who worked at CareDx from July 2019 until October 2020. ¶¶ 51, 209. Dr. Olymbios left to take a job with Natera Inc. ("Natera"), CareDx's primary competitor. ¶ 209. CareDx quickly discovered that, on his way out, Dr. Olymbios stole over 50,000 CareDx documents and emails, including confidential, competitive intelligence relevant to Dr. Olymbios' new role at Natera. *See* ¶¶ 209–10. Accordingly, in November 2020, CareDx asserted breach of contract and trade secrets claims against Dr. Olymbios in arbitration—per the terms of Dr. Olymbios' employment agreement—which remains ongoing. *See* ¶ 209.

Nearly 18 months into arbitration, Dr. Olymbios filed the Olymbios Complaint in San Mateo County on April 15, 2022, wrongly claiming that CareDx waived its right to continue in arbitration based on a purported failure to pay a JAMS deposit request. *See* ¶ 260; Slip. Op. at 2. The Olymbios Complaint gratuitously alleges—completely unrelated to the issue concerning the deposit request—that during Dr. Olymbios' employment (July 2019–October 2020), CareDx used allegedly improper marketing techniques to sell its AlloSure blood test, and submitted reimbursement claims to Medicare for AlloSure tests that Dr. Olymbios believed were not medically necessary. Ex. F at ¶ 30; Slip Op. 2. Plaintiffs copied Dr. Olymbios' allegations in the FAC and they do so again in the SAC. *See, e.g.*, ¶ 260. The FAC and SAC also copied the Olymbios Management Allegations,

---

[2] Specifically, Defendants respectfully request that the following paragraphs in the SAC be stricken: ¶¶ 24 (sentences 2-5), 89 (last sentence), 97 (sentences 2-3), 127 (sentences 1-3), 140 (sentences 1-4), 141 (sentence 3), and 260 (sentences 2-6). *See* Appendix 1.

2

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

which are that (1) Dr. Olymbios claims to have "discussed his concerns and those of other employees with more than ten other current or former CareDx employees, including Peter Maag . . . and Reg Seeto," Ex. F at ¶ 32; ¶¶ 97, 141, 260; and (2) Dr. Olymbios claims that Dr. Maag "told Dr. Olymbios that there were certain things that shouldn't be put in writing, like saying that CareDx never billed patients, even if that's how CareDx operated." Ex. F at ¶ 35–37; ¶ 140.

CareDx vigorously disputes Dr. Olymbios' claims, none of which have been adjudicated.[3] The SAC's allegations on the whole give rise to a cogent, non-culpable inference (the same non-culpable inference that this Court previously drew from the FAC)—that "RemoTraC was a blood draw program for at-risk transplant recipients during the COVID-19 pandemic, exactly as Defendants announced in 2020." Slip Op. 14.

**B.    The Court's Prior Order Striking the Olymbios Management Allegations**

In granting Defendants' prior motion to strike the Olymbios Management Allegations from the FAC, the Court found that the FAC "lift[ed] allegations from the Olymbios Complaint without adequate independent corroboration." Slip Op. 7. The Court underscored that "[w]hile Plaintiffs need not corroborate every fact," they must "provide an independent basis that goes towards corroborating the allegations such that they are reasonable." *Id*. Considering the independent allegations in the FAC—and notwithstanding that Plaintiffs claimed to have spoken on five occasions with counsel for Dr. Olymbios and received an email from Dr. Olymbios calling CareDx management "crooks" and "despicable people with no regard for anyone"—the Court found that "there is no independent support to suggest that Olymbios brought up concerns with Seeto and Maag [or] that Olymbios and Maag communicated about patient billing." *Id.* at 7–8. The Court was

---

[3] The San Mateo Court promptly referred Dr. Olymbios' claims back to arbitration, Minute Order, *Olymbios v. CareDx, Inc.*, No 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty. June 10, 2022); Slip Op. 2, but not before his "whistleblower" claims were broadcast to the public, which appears to be the only real reason Dr. Olymbios filed his public complaint.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

"particularly wary that Plaintiffs alleged facts based entirely on the Olymbios Complaint when Dr. Olymbios is not a party to this action." *Id.* at 8.[4]  The Court granted leave to amend.

The SAC contains many of the same Olymbios Management Allegations that the Court previously struck. *See* Appendix 1.[5]  And, again, these allegations are uncorroborated.

**III.    ARGUMENT**

Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Courts will strike as immaterial allegations in securities fraud complaints borrowed from other complaints where plaintiffs fail to "independent[ly] corroborate" the borrowed allegations. Slip Op. 6–7; *see Connetics I* at 1005.  Plaintiffs have an obligation to "personally investigate" the borrowed allegations.  *Connetics I* at 1005.  Plaintiffs' attorneys may not satisfy this duty, which derives from Federal Rule of Civil Procedure 11(b)(3), by "rely[ing] on the analysis of attorneys in different actions[.]"  *Id.*  Furthermore, in the context of a securities fraud claim governed by the PSLRA, Plaintiffs must corroborate the allegations derived from a third-party complaint with *particularized* allegations of their own.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).[6]

The SAC fails to independently corroborate the Olymbios Management Allegations.  In granting leave to amend, the Court provided a clear roadmap for what adequate "corroboration" of

[4] The Court also squarely rejected Plaintiffs' request to vitiate Dr. Olymbios' confidentiality agreement with CareDx to allow Plaintiffs to speak with Dr. Olymbios and obtain documents from Dr. Olymbios.  Slip Op. 9.

[5] The Court also struck allegations regarding conversations between Dr. Olymbios and unidentified employees, Slip Op. 6, but Plaintiffs abandoned those allegations in the SAC.

[6] As *Connetics* and other cases make clear, just because plaintiffs independently corroborate *some* of the borrowed allegations does not mean they have satisfied their duty to independently corroborate *other* borrowed allegations.  *See Connetics I* at 1005 (plaintiffs failed to allege corroborating information for "*specific claims*") (emphasis added); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 811–12 (N.D. Cal. 2019) (where securities fraud plaintiffs argued that their reliance on allegations in an FTC complaint was proper because borrowed allegations were "corroborate[d]" by confidential witness statements, finding that "plaintiffs' argument may hold water as to the allegations of 'hidden fees' . . . because the CWs provide testimony related to similar facts" but "[i]n contrast, plaintiffs have provided no corroboration whatsoever for any of the other allegations in the FTC Action").

4

the Olymbios Management Allegations would look like. "Plaintiffs could have corroborated that Olymbios had discussions with Maag or Seeto with a confidential witness that had reason to know of the discussions," or "[i]n the alternative, Plaintiffs could have included corroboration from confidential witnesses that had brought similar concerns to Seeto or Maag." Slip Op. 7. The SAC does neither.[7]

The most Plaintiffs offer to "corroborate[] that Olymbios had discussions with Maag or Seeto" about his purported "concerns" is a vague allegation by FE-11, a "senior executive" with no specific title, that "Dr. Olymbios had been 'vocal about' his concerns about the billing practices" and that "Dr. Olymbios had been close to Defendant Seeto." ¶ 114. But, far from corroborating Dr. Olymbios' allegation that he discussed concerns with Dr. Seeto, FE-11's allegation says nothing about *who* Dr. Olymbios conveyed his "concerns" to (much less when or what Dr. Olymbios said). This is a far cry from the type of corroborating allegations that have been found to be sufficient, like "an additional [corroborative] allegation from a confidential witness that was *present at the meeting*." Slip Op. 7 (emphasis added) (citing *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008)).

As for "corroboration from confidential witnesses that had brought similar concerns to Seeto or Maag," the SAC does not even attempt to plead such facts. FE-10 and FE-19 are the only additional FEs in the SAC who even mention Dr. Seeto (none mention Dr. Maag). Their limited allegations as to Dr. Seeto's awareness—even if credited—pertain to Medicare supposedly rejecting CareDx's AlloSure reimbursement claims. ¶¶ 79, 113, 115, 116. However, those allegations cannot corroborate the allegation that Dr. Olymbios discussed his "concerns" with Dr. Seeto and Dr. Maag, because Dr. Olymbios' "concerns," as articulated in the Olymbios Complaint, had nothing to do with Medicare rejecting CareDx's reimbursement claims. Indeed, Plaintiffs do not allege that Medicare began rejecting CareDx's claims until early 2022, ¶ 234, a year and a half *after* Dr. Olymbios left CareDx. And neither FE-10 nor FE-19 were employed at the same time Dr. Olymbios

---

[7] Plaintiffs do not even attempt to corroborate Dr. Olymbios' allegation that Dr. Maag told him not to put in writing that CareDx does not bill patients.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

was—FE-10 did not start working at CareDx until October 2022, and FE-19 did not start until "mid" 2021, ¶¶ 110, n.7, 27, n.3, both well after Dr. Olymbios left CareDx in October 2020.

Beyond these insufficient FE allegations, the SAC, like the FAC, alleges that Dr. Olymbios reported to Dr. Seeto and "was sufficiently senior at CareDx to know the details of Company-wide marketing strategies." ¶ 67. *See also* ¶¶ 51–52 (Dr. Olymbios was highly credentialed); ¶¶ 68–77 (Dr. Olymbios received praise from senior management). None of this matters, though. The question is not whether Plaintiffs have independently corroborated that Dr. Olymbios was in a position to *potentially* have discussions with Dr. Seeto or Dr. Maag. The question is whether Plaintiffs have independently corroborated that Dr. Olymbios *in fact* had discussions with Dr. Seeto and Dr. Maag about his purported concerns. On the latter, the SAC fails.

Nor does the SAC offer additional "sources of information" (*Connetics I* at 1005) upon which Plaintiffs relied to corroborate the Olymbios Management Allegations. Plaintiffs continue to rely on alleged discussions with counsel for Dr. Olymbios and an email from Dr. Olymbios. SAC at p. 1. However, the Court already considered these sources and concluded they were not adequate substitutes for counsel's obligation to independently verify the allegations. Slip Op. 8.

Accordingly, the SAC offers "no independent support to suggest that Olymbios brought up concerns with Seeto and Maag, [or] that Olymbios and Maag communicated about patient billing[.]" *Id.* at 7.

**IV.    CONCLUSION**

For the reasons set forth herein, Defendants respectfully request that the Court strike the allegations set forth in Appendix 1 with prejudice.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

Dated: July 26, 2023

By: /s/ *Laura Leigh Geist*
    Laura Leigh Geist


WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
       bdyer@willkie.com


WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
       ccording@willkie.com
       bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Peter Maag, Reginald Seeto, and Ankur Dhingra*

DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE ALLEGATIONS
No. 22-cv-03023-TLT

**Appendix 1 – SAC Allegations Derived Exclusively From Olymbios Complaint ("Olymbios Management Allegations")**

| | |
|---|---|
| ¶ 24 Sentences 2–5 | "Accordingly, Dr. Olymbios repeatedly warned CareDx's most senior executives, including Defendants Maag and Seeto, about this illegal misconduct. However, these executives 'brushed off his concerns or berated him for raising them in the first place.' Indeed, Defendant Maag 'took active measures to avoid creating a paper trail of their misconduct.' Maag further expressly warned Dr. Olymbios that 'there were certain things that shouldn't be put in writing.'" |
| ¶ 89 Last Sentence | "Even though Dr. Olymbios point-blank told Maag and Seeto about this illicit conduct, they 'brushed off' his concerns or 'berated' him for one simple reason: the illicit conduct was their idea." |
| ¶ 97 Sentences 2–3 | "Dr. Olymbios reported these concerns to 'more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto, the current President and Chief Executive Officer of CareDx.' According to Dr. Olymbios, the senior 'CareDx executives brushed off his concerns or berated him for raising them in the first place' and 'repeatedly ignored or actively quashed any internal concerns about its activity' until he finally resigned in late 2020." |
| ¶ 127 Sentences 1–3 | "CareDx executives unquestionably knew this behavior was occurring because Dr. Olymbios reported his concerns to the Company's most senior executives, including Defendants Maag and Seeto, and because Defendant Maag himself personally signed off on the expenses. Similar, Dr. Olymbios directly told these executives about facts demonstrating the Company was offering improper kickbacks to medical doctors who could influence sales of AlloSure. Dr. Olymbios gave them examples of such kickbacks." |
| ¶ 140 Sentences 1–4 | "CareDx also engaged in other violations of the Anti-Kickback Statute in order to juice its testing revenues by, for example, offering to waive patient costs. As Dr. Olymbios explained, without initially realizing that the practice was illegal, he became aware that, when marketing its services to nephrology practices, CareDx was using the 'talking point' that it never billed its patients directly for its tests, such that patients would have no out-of-pocket expenses for the tests. In or around August 2020, Dr. Olymbios wrote an email directly to Peter Maag and another high-level CareDx executive that CareDx should include the fact that CareDx 'never bills patients' in a marketing letter to a nephrology practice. However, Defendant Maag responded with a phone call, in which he said that he was 'calling because there were things he couldn't be associated with as the CEO,' and that 'there were certain things that shouldn't be put in writing' – such as never billing patients 'even if that's how CareDx operated.'" |

| ¶ 141 Sentence 3 | "Corroborating that executive, according to Dr. Olymbios, he did, in fact report his concerns to the Company's most senior executives, including Defendants Maag and Seeto; Dr. Olymbios 'discussed his concerns and those of other employees with more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto,' according to Dr. Olymbios." |
|---|---|
| ¶ 260 Sentences 2–6 | "As described further above, Dr. Olymbios revealed Defendants' serious, pervasive misconduct, including that: (a) 'CareDx used what it represented to be clinical tests to bill Medicare for [AlloSure]. Multiple nephrology practices expressed serious reservations about this practice as a violation of Medicare billing requirements, and CareDx employees internally flagged this practice as impermissible'; (b) 'CareDx offered unrestricted grants to physicians to not enroll patients in competitors' clinical trials or to induce practices to place patients on an AlloSure surveillance protocol, even when doing so was not warranted or authorized under Medicare billing guidelines'; and (c) 'CareDx intentionally excluded from the [Allosure] test requisition form a field where a physician could indicate the reason why the test was medically necessary.' Dr. Olymbios publicly blew the whistle on these practices after reporting them to 'more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto, the current President and Chief Executive Officer of CareDx.' The senior 'CareDx executives brushed off his concerns or berated him for raising them in the first place.' They 'repeatedly ignored or actively quashed any internal concerns about its activity.' To cite one such instance: 'In September 2020, Dr. Olymbios texted other employees that he had a legal call with Reg [Seeto]' and '[a]nother employee responded, 'because we are Medicare frauds?' A different employee replied, 'We're a bunch of crooks and frauds.'" |