ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
        – and –
SPENCER A. BURKHOLZ (147029)
SEAN C. MCGUIRE (319521)
NICOLE Q. GILLILAND (335132)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
smcguire@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 3:22-cv-03023-TLT |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | PLAINTIFFS' MEMORANDUM OF |
| vs. | ) ) | POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION |
| CAREDX, INC., et al., | ) ) | TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT |
| Defendants. | ) ) ) | DATE:     October 31, 2023<br>TIME:     2:00 p.m.<br>DEPT:     Courtroom 9<br>JUDGE:   Honorable Trina L. Thompson |

4861-2072-6908.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   OVERVIEW OF DEFENDANTS' FRAUDULENT CONDUCT.....................................5

III.  LEGAL STANDARD...................................................................................................9

IV.   ARGUMENT.............................................................................................................10

    A.    The Complaint Sufficiently Pleads False and Misleading Statements and Omissions...............................................................................................................10

        1.    Defendants' Compliance Statements and Other Statements Were Materially False and Misleading Due to Their Illegal Conduct ................10

        2.    Defendants Cannot Tout Legitimate Practices for Revenue Growth While Omitting Any Mention of the Illegal Practices .............................13

        3.    Defendants' Statements About the Reasons for CareDx's ASP Declines Were False and Misleading.........................................................15

    B.    The Complaint Pleads a Strong Inference Of Scienter ..........................................16

    C.    The Complaint Sufficiently Pleads Loss Causation...............................................22

V.    CONCLUSION...........................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Allison v. Oak St. Health, Inc.*,
    2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ...........................................................................12

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .................................................................................10, 16, 22

*Bond v. Clover Health Invs., Corp.*,
    587 F. Supp. 3d 641 (M.D. Tenn. 2022).........................................................................12, 13

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012).....................................................................................22

*Brown v. Starbucks Corp.*,
    2019 WL 4183936 (S.D. Cal. Sept. 3, 2019).........................................................................14

*City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018) ...........................................................................20, 21

*Crews v. Rivian Auto., Inc.*,
    2023 WL 4361098 (C.D. Cal. July 3, 2023).....................................................................20, 22

*Di Donato v. Insys Therapeutics Inc.*,
    2017 WL 3268797 (D. Ariz. Aug. 1, 2017)...........................................................................16

*Ebeid ex. Rel U.S. v. Lungwitz.*,
    616 F.3d 993 (9th Cir. 2010) ..................................................................................................17

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ...................................................................................24

*Flynn v. Sientra, Inc.*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016) .........................................................................16

*Gauquie v. Albany Molecular Research, Inc.*,
    2016 WL 4007591 (E.D.N.Y. July 26, 2016)........................................................................21

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
    2023 WL 2532061 (9th Cir. 2023) .........................................................................................19

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015).............................................................................20, 22

**Page**

*Howard v. Hui*,
    2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) .......................................................................26

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2009) .....................................................................................................16

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ........................................................................................24, 25, 26

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) ................................................................................................20

*In re EQT Corp. Sec. Litig.*,
    504 F. Supp. 3d 474 (W.D. Pa. 2020)......................................................................................15

*In re Fibrogen, Inc.*,
    2022 WL 2793032 (N.D. Cal. July 15, 2022)..........................................................................22

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................................................13

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .................................................................................................10

*In re Impinj, Inc., Sec. Litig.*,
    414 F. Supp. 3d 1327 (W.D. Wash. 2019)...............................................................................23

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    237 F. Supp. 3d 943 (N.D. Cal. 2017) .....................................................................................22

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ...........................................................................22

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .........................................................................14

*In re Qualcomm Inc. Sec. Litig.*,
    2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .........................................................................21

*In re QuantumScape Sec. Class Action Litig.*,
    2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ...........................................................................15

*In re Syncor Int'l Corp. Sec. Litig.*,
    239 F. App'x 318 (9th Cir. 2007) ............................................................................................14

**Page**

*In re Verifone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ....................................................................................19, 20

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020)....................................................................22

*Inchen Huang v. Higgins*,
2019 WL 1245136 (N.D. Cal. Mar. 18, 2019).................................................................26

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ....................................................................23

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021) ..............................................................................25

*Klein v. Ellison*,
2021 WL 2075591 (N.D. Cal. May 24, 2021)..................................................................26

*Lako v. Loandepot, Inc.*,
2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ....................................................................25

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)...........................................................5, 6, 24

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019)......................................................................................................26

*Mauss v. NuVasive, Inc.*,
2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ....................................................12, 17, 18

*Mauss v. NuVasive, Inc.*,
2016 WL 3681831 (S.D. Cal. July 12, 2016) .............................................................12, 25

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................................................................................15, 16

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ................................................................................... *passim*

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ...............................................................................20

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...........................................................................................10

**Page**

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ........................................................................................20

*Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) .............................................................................................25

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014),
    *overruled on unrelated grounds*,
    *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...........................................................................11, 13, 18, 21

*S. Ferry LP #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .............................................................................................19

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .............................................................................................17

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) .........................................................................10, 22

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ...........................................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)...............................................................................................10, 17, 22

*U.S. ex rel. Brown v. Celgene Corp.*,
    2014 WL 3605896 (C.D. Cal. July 10, 2014)......................................................................11

*U.S. ex rel. Solis v. Millennium Pharms., Inc.*,
    2015 WL 1469166 (E.D. Cal. Mar. 30, 2015) .....................................................................11

*Weston v. DocuSign, Inc.*,
    2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) .....................................................................19

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
    953 F.3d 1108 (9th Cir. 2020) ...........................................................................................11

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................................................20

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78j(b)............................................................................................................................1
  §78t(a)........................................................................................................................1, 26
  §78t-1............................................................................................................................1

42 U.S.C.
  §1320a-7b.8.................................................................................................................11

Federal Rules of Civil Procedure
  Rule 12(b)(6)..............................................................................................................10

17 C.F.R.
  §240.10b-5....................................................................................................................1
  §240.10b-5(a)...............................................................................................................1
  §240.10b-5(b)...............................................................................................................1

**LEGISLATIVE HISTORY**

False Claims Act ("FCA")
  Pub. L. 97-258, 96 Stat. 978 (1982)................................................................... *passim*

Lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief & Retirement Fund (collectively, "Plaintiffs") hereby oppose Defendants' motion to dismiss.[1]

## I.    INTRODUCTION

Plaintiffs are pension funds that hold the retirement savings of thousands of firefighters, police, and union workers.  Plaintiffs seek to represent the interests of all other similarly situated investors who purchased CareDx stock between April 30, 2020 and November 3, 2022, inclusive (the "Class Period"), and lost money as a result of Defendants' fraud.

CareDx is a medical testing company that is under investigation by the DOJ for engaging in Medicare fraud and has affirmatively attempted to obstruct that investigation by "bullying" executives into lying to federal investigators.  CareDx's illegal conduct concerns the Company's "one growth driver," a novel blood test called AlloSure, which was supposed to detect kidney transplant rejection.  CareDx's business depended on providing AlloSure tests – at $2,841 each – to Medicare patients, as Medicare was CareDx's "most important payor," representing 70% of the Company's testing revenue during the Class Period.  However, CareDx could only legally give Medicare patients AlloSure tests *after* standard tests had *already* showed warning signs – it was *not* approved for Medicare coverage as a routine, standard test.

In selling its stock to investors like Plaintiffs, CareDx promised that it fully complied with the specific laws and regulations required of a medical testing company in order to receive lucrative reimbursements from Medicare.  These laws include the False Claims Act, which prohibits billing the government for medically unnecessary tests, and the Anti-Kickback Statute, which prohibits giving incentives to prescribing doctors.  CareDx further assured that its testing

---

[1]    References to "MTD" or "Motion" are to Defendants' Notice of Motion and Motion to Dismiss Second Amended Class Action Complaint; Memorandum of Points and Authorities in Support Thereof (ECF 89).  Exhibit references are to the Declaration of Charles D. Cording in Support of Motion to Dismiss Second Amended Complaint (ECF 89-1).  All terms not otherwise defined herein have the same meaning as in the Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 81) ("Complaint" or "SAC").  "FAC" refers to the First Amended Complaint in this action (ECF 53).  All "¶_" and "¶¶_" references are to the Complaint. Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

business was "sustainable" and that its revenues were "due to" legitimate business factors. On these assurances, CareDx's stock price skyrocketed to inflated prices as high as $95.11 per share.

CareDx's promises were entirely false. CareDx's success was not built on genuine demand for AlloSure tests but on a "***house of cards, generating revenue through illicit conduct***," according to one of the Company's most senior executives, Dr. Michael Olymbios, a ***direct report of Defendants Seeto and Maag***. As Dr. Olymbios explained in a scathing whistleblower complaint based on his own firsthand experience and observation, CareDx was engaged in "***an unlawful campaign . . . to pad the Company's sales***" through fraudulent billing, which was "***bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment***." Significantly, Dr. Olymbios' observations are corroborated by no less than ***14*** former CareDx employees spanning all areas of its business.

***First***, CareDx systematically and improperly bundled ***medically unnecessary*** AlloSure tests with routine blood tests in order to repeatedly administer them to patients who ***did not*** need the tests, and then illegally sought Medicare reimbursement for those unnecessary tests, in order to "maximize potential revenue associated with AlloSure . . . even when [its] use lacked clinical support and fell outside of the conditional [Medicare] approval extended to it." ***Second***, to further encourage doctors to prescribe AlloSure, CareDx offered "extravagant inducements or kickbacks to physicians and other providers to promote AlloSure," including expensive vacations, dinners, "booze cruises," and wine tours, while offering "sham advisory boards that were little more than captive marketing presentations." ***Third***, CareDx used a 1,700-patient "study" as a ruse to illegally bill Medicare for thousands of additional unnecessary tests, meanwhile paying doctors unlawful kickback "fees" of as much as $40,000 per Medicare patient to enroll their patients.

A series of partial disclosures revealed facts that are "proximately" related to the fraud and thus sufficient to establish loss causation under recent Ninth Circuit precedent. These facts included government investigations, prominent executive resignations, and declines in CareDx's business caused by government scrutiny of their illicit practices. First, on October 28, 2021, Defendants revealed the DOJ had initiated "a False Claims Act investigation . . . regarding certain business practices related to [CareDx's] kidney testing and phlebotomy services" – and that the

SEC had launched a similar investigation. Defendants also simultaneously revealed an unexpected and dramatic decline in CareDx's average sales price ("ASP") per test, which analysts found "murky." As a result, CareDx's stock price plummeted 27% the next trading day, from $70.34 per share to $51 per share.

Then, on April 15, 2022, Dr. Olymbios filed his whistleblower complaint alleging rampant violations of the law and detailing how he reported his concerns directly to the CEO and other senior officers, only to be rebuffed. Further, only one month after the Olymbios Complaint was filed, on May 23, 2022, CareDx announced Defendant Dhingra's sudden and immediate resignation as CFO – after just 14 months on the job.

Finally, on November 3, 2022, CareDx announced disastrous financial results that revealed to the market just how dependent CareDx's revenues had been on its illegal conduct. Under growing government scrutiny, CareDx became increasingly unable to bill Medicare for unnecessary tests; its Medicare revenue had *fallen sharply*, while its ASP per test administered continued an ongoing and precipitous decline. Analysts concluded – as the Company's new CFO confirmed – that, rather than a change in the "average" price for AlloSure due to lower prices from commercial insurers, the problem was "*more tests [were] not being paid*" at all – *i.e.*, that *as many as 50% of the Company's tests were now being rejected for reimbursement entirely*. These revelations in total caused CareDx's stock price to fall from a Class Period high of $95.11 per share to just $16.02 per share after the Class Period, losing more than 83% of its value and wiping out *billions of dollars* in market capitalization. CareDx's stock never recovered but continued to decline and is now worth less than $9 per share. As a result, Plaintiffs and others that bought CareDx stock during the Class Period lost untold amounts of money from their savings.

After the FAC was dismissed with leave to amend, Plaintiffs abided by the Court's instructions on how to cure the deficiencies the Court identified, adding, *inter alia*: (a) allegations confirming that the stock offerings underpinning Defendants' compliance statements were of great significance to investors; (b) further detail on the material degree to which illegal practices inflated CareDx's revenues; (c) allegations corroborating that Dr. Olymbios had raised concerns with management; and (d) extensive additional support for each of the elements of their claim – falsity,

scienter, and loss causation – including allegations from *six* additional former CareDx employees, one of whom ran Business Leadership Team meetings attended by the CEO.  Plaintiffs further verified that all allegations from the Olymbios Complaint were based directly on Dr. Olymbios' firsthand knowledge – indeed, Dr. Olymbios himself sent an email to Plaintiffs' counsel confirming the allegations in the prior complaint "***corroborate my observations***."

Nonetheless, Defendants have again moved to dismiss and, in doing so, entirely ignore or misconstrue the SAC's new allegations.  First, Defendants argue that their repeated, unequivocal assurances to investors regarding CareDx's compliance with applicable laws should be dismissed merely because they were dismissed previously.  However, Defendants ignore the Court's Order, which expressly granted leave to amend, stating: "***[a] different finding may result if Plaintiffs included allegations regarding the context of the underwriting agreements***" to show investors were "intensely interested" in the offerings.  ECF 75 ("Order") at 17.  Plaintiffs have done so, explaining in detail that the offerings were touted by Defendants as ***critical*** to CareDx, providing much-needed capital and a "***competitive advantage***," which investment analysts highlighted in recommending CareDx stock to investors.  Defendants fail even to address these allegations, and Defendants' disclaimer cannot immunize their statements.

Second, Defendants argue Plaintiffs have not actually alleged ***any*** illegal conduct. Defendants' argument is transparently absurd and simply ignores the vast majority of the SAC's highly detailed allegations, which are replete with details from Dr. Olymbios and ***14*** other former employees about the Company's illegal billing and kickback schemes.  It is difficult to imagine more detailed allegations of illegal conduct, particularly without the benefit of discovery.

Third, Defendants argue that they lack scienter because somehow CareDx's management remained blissfully unaware of the Company's pervasive illegal business practices.  This ignores the SAC's well-pled allegations.  Plaintiffs have now confirmed that Dr. Olymbios personally vouches for his accounts of how he reported his concerns ***directly*** to Defendants Maag and Seeto. Additionally, other employees, including a ***direct report of Defendant Seeto***, have confirmed the Individual Defendants' full involvement in and awareness of the illegal conduct; and Plaintiffs have added extensive allegations about the Individual Defendants' access to information showing

PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                                                                       - 4 -
4861-2072-6908.v1

their statements were false.  Moreover, Defendants' scienter is evidenced by their conduct after they came under investigation.  For example, in a fall 2021 meeting, CareDx's management – including Defendant Seeto – discussed that the Company should stop paying kickbacks to doctors in light of government scrutiny.  In addition, Eric Tokunaga, a senior employee who reported directly to CareDx's CMO, revealed she "***was being bullied[,] intimidated, and coerced to not provide information or misreport information on the DOJ investigation***."  Innocent companies do not bully their employees to lie to federal investigators in an open investigation.

Finally, Defendants argue that Plaintiffs have not pled loss causation because Defendants never ***admitted*** their fraud.  However, that is not required in this Circuit; rather, loss causation "may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).  Plaintiffs have satisfied the "proximate cause" test for loss causation by showing the relationship between the fraud and the "series of disclosures" causing the stock price drops that led to investor losses.  *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *16 (N.D. Cal. Mar. 31, 2023).

## II.     OVERVIEW OF DEFENDANTS' FRAUDULENT CONDUCT

During the Class Period, CareDx's most important product, by far, was AlloSure – an expensive blood test designed to detect rejection of a transplanted kidney.  ¶4.  CareDx's business relied heavily on its ability to bill Medicare a whopping $2,841 per test for AlloSure.  *Id.*  Defendant Maag described AlloSure as "the one product, the one growth drive[r] for the Company," and CareDx's Medicare revenue (which was primarily derived from AlloSure) accounted for 70% of the Company's testing services revenue and 60% of its overall revenue.  ¶¶57, 84.

AlloSure is not a standard or routine blood test; rather, it is only supposed to be administered when patients already have "clinical suspicion of rejection" due to other tests administered first that showed warning signs.  ¶85.  As such, CareDx was not supposed to bill Medicare for any other uses of the tests.  *Id.*  Even attempting to get Medicare to reimburse for a medically unnecessary use of the test would violate the False Claims Act ("FCA"), a federal statute designed to prevent seeking payment of fraudulent claims by the Federal Government.  ¶48.

Moreover, to the extent CareDx offered any *inducements* to doctors to prescribe the test, CareDx would be violating *both* the federal Anti-Kickback Statute ("AKS") *and* the FCA.

In statements to investors throughout the Class Period, CareDx repeatedly assured investors it was in "material compliance" with the FCA, the AKS and other laws, unequivocally claiming: "[t]o the Company's knowledge, *there are no facts or circumstances that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws*." ¶¶180, 200. CareDx also made statements throughout the Class Period creating the impressions that its revenue and profit were lawfully earned and its RemoTraC program served solely legitimate business purposes. ¶205. Yet these statements were false and materially misleading to investors. In reality, as Dr. Olymbios confirmed, CareDx was "*a house of cards, generating revenue through illicit conduct*" (¶210), underpinned by "*an unlawful campaign . . . to pad the Company's sales*" through fraudulent billing, and "*bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment*." ¶29. These observations were confirmed by no less than *14* former CareDx employees.

*First*, CareDx systemically violated the FCA by billing for tests that were *clearly medically unnecessary* and not due to "clinical suspicion of rejection." ¶108. As Dr. Olymbios[2] explained and others confirmed, CareDx sought Medicare reimbursement for these clearly unnecessary tests in order to "*maximize potential revenue associated with AlloSure . . . even when [its] use lacked clinical support and fell outside of the conditional [Medicare] approval extended to it*." ¶29.

One of the critical ways CareDx engaged in illegal billing was through its "RemoTraC" program, which sent phlebotomists directly to patients' homes to draw blood, ostensibly for routine blood tests. For example, FE-2 observed: "*the only* way [CareDx] would send out one of our groups of phlebotomists was if they also did the AlloSure," *whether or not it was medically*

---

[2]  Defendants' attempt to characterize Dr. Olymbios as a mere "disgruntled employee" is baseless. Indeed, CareDx placed trust and confidence in him right up until he began raising red flags about the Company's illegal behavior, including by promoting him to Head of Community Nephrology and placing him in charge of AlloSure sales mere months before he left. In addition, Defendant Maag personally praised Dr. Olymbios, stating: "Within a few months you had a tremendous impact in our organization." ¶8.

*necessary*.  ¶88.  According to FE-2, this was routinely discussed during the regular weekly regional meetings involving the sales, research, and laboratory teams attended by FE-2 and others.  *Id.*  Similarly, Dr. FE-1 explained: "[t]he ***nurses were obligated*** to not only do the screening labs but our AlloSure test," as "***sales drove everything***."  *Id.*  However, the goal of this "bundling" was the administration of medically unnecessary tests, for which CareDx would then illegally seek reimbursement from Medicare.  As FE-1 explained: "They were doing the very expensive CareDx labs on the same cadence of the home labs," which "was ***totally unethical the way that they were doing it and it was clearly wrong***"; yet: "we were doing tests that cost at least 8x of what they should have been ***and on patients that did not need these tests***."  ¶100.  Moreover, FE-1 said the tests were being performed as often as ***monthly*** on patients who did not need them ***at all***.  *Id*.

This illegal conduct was corroborated not only by Dr. Olymbios ("CareDx 'used what it represented to be clinical tests to bill Medicare for the [AlloSure] tests,'" *id.*) but by former Senior Regional Clinical Research Associate FE-3 ("***we are not going to go to their homes and just do the standard of care***" but would also have to include AlloSure or other expensive tests) (¶105), Claims Reimbursement Specialist FE-10 (observing ***90% of CareDx's patients had been getting AlloSure tests at least every month*** and describing the large backlog of repeatedly denied claims that accumulated once CareDx came under scrutiny) (¶112), Senior Product Manager FE-13 ("We were told that you couldn't just have us go out and draw a kidney panel without also drawing the AlloSure.") (¶119), and other reimbursement and sales personnel.  ¶¶107, 120.

***Second***, CareDx systematically violated the AKS by providing lavish gifts and incentives to doctors for enrolling their patients in AlloSure testing.  For example, Dr. Olymbios described ***extravagant inducements or kickbacks to physicians and other providers to promote AlloSure***" and CareDx's "***sham 'advisory boards'***" that were "***little more than marketing exercises to encourage physicians to order AlloSure tests***."  ¶125.  Significantly, Defendant Maag's former executive assistant, FE-6, corroborated these allegations, describing "symposiums," during which CareDx paid for doctors' flights, limousine services to and from the airport, hotels, and bottles of champagne in the doctors' hotel rooms; and opinion leader "summits" in San Francisco every year, during which CareDx would pay for attending doctors to spend the weekend in Napa Valley, where

they were chauffeured in limousines hired by CareDx and brought to wine tastings and expensive meals. ¶126. FE-1 witnessed similar practices and described how CareDx's sales management personnel *took doctors on "booze" cruises, helicopter tours, and expensive vacations* ¶132. FE-1 explained that CareDX "salespeople did stuff that would not be appropriate anywhere else" in CareDx's industry. *Id.* In addition, FE-19 described how lavish expenditures like "shrimp towers" and $200 bottles of wine were still being given to doctors right up until the Company came under DOJ and SEC scrutiny in late 2021, at which time the Business Leadership Team became more cautious. ¶133.

*Third*, CareDx used its 1,700-patient KOAR "study" as a pretext to bill Medicare for thousands of additional medically unnecessary tests. CareDx unlawfully paid additional kickbacks to doctors for enrolling their Medicare patients in this study – $35,000 to $40,000 per patient – which was *eight times the normal fee*, as confirmed by FE-8, who helped oversee the study. ¶143. The KOAR study thus violated both the FCA, because it involved billing Medicare for unnecessary tests, *and* the AKS, because it involved paying doctors unlawful kickback fees. Additionally, CareDx engaged in a variety of other kickback schemes, such as waiving blood draw fees and promising not to bill patients.[3] ¶¶134-140. Defendants further obscured their illegal conduct, including by using an impossible-to-trace paper-based claims system – a "huge red flag" for a Medicare-based business – and by omitting the medical necessity requirement on its forms. ¶¶109, 147. Indeed, some doctors did not even understand they had ordered AlloSure or what it was. As Dr. FE-1 explained: "I *never once* sat down with a physician to discuss [a patient's AlloSure results] and the doctor had actually knowingly ordered it. CareDx flipped AlloSure in." ¶102.

As described further at §IV.B., CareDx's most senior management, including the Individual Defendants, *directly oversaw* these illegal practices and thus were *abundantly aware* of them. Defendant Maag's executive assistant observed him personally arranging for and

---

[3]    The MTD misleadingly asserts that Dr. Olymbios' statement about not billing patients for tests contradicts Plaintiffs' "core theory of fraud," which they assert is: "CareDx improperly billed *patients* for AlloSure tests using RemoTrac." However, this conflates two different practices, *both* of which are illegal: Defendants billed *Medicare* **for** *unnecessary tests*, violating the FCA, and Defendants did not bill *patients* for *their portion* of medical bills, violating the AKS.

participating in the gifts, dining, and travel arranged for doctors.  ¶¶126-127.  Defendant Maag himself attested he personally oversaw every marketing expense.  ¶128.  Both Defendant Maag and Defendant Seeto were personally involved in training the Company's AlloSure sales team (¶¶88-89), who, as described above, were clearly instructed to push AlloSure for non-medically necessary uses.  Defendant Seeto also attended regular meetings both with the Business Leadership Team – at which minute details of the Company's sales were discussed – and with the Billing team – at which they discussed CareDx's problems with getting reimbursed for its tests.  ¶¶78-79.

Moreover, as Dr. Olymbios and his counsel have confirmed (SAC at 1), Dr. Olymbios reported his concerns about the illegal practices directly to Defendants Seeto and Maag.  For example, in August 2020, Dr. Olymbios wrote an email directly to Defendant Maag and another high level CareDx executive that CareDx should include the fact CareDx "never bills patients" in a marketing letter to a nephrology practice.  ¶140.  However, Defendant Maag responded by phone, saying he was "calling because there were things he couldn't be associated with as the CEO" and "there were certain things that shouldn't be put in writing" because making such promises (as Dr. Olymbios had not yet realized) would clearly violate the AKS, and Maag did not want that "in writing."  *Id.*  Dr. Olymbios also reported other concerns about illegal practices directly to Maag and Seeto, and others at CareDx corroborated Dr. Olymbios had been "vocal about" his concerns.  ¶141.  Indeed, Dr. Olymbios was not the only CareDx employee who raised red flags to management.  For example, Dr. FE-1 also reported his concerns to CareDx's top compliance attorney, Clarice McCauley, who Dr. FE-1 noted "was having an uphill battle and CareDx did not want to be compliant," and ultimately quit over her concerns.  ¶98.

## III.　LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court must "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).  The Court is "not sitting as a trier of fact"; and "so long as the plaintiff alleges facts to support a theory that is not facially

implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## IV.      ARGUMENT

### A.      The Complaint Sufficiently Pleads False and Misleading Statements and Omissions

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  "Only if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2017).

#### 1.      Defendants' Compliance Statements and Other Statements Were Materially False and Misleading Due to Their Illegal Conduct

The Ninth Circuit has made clear that "[s]tatements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made." *Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014).[4]  Defendants made exactly such actionable compliance statements when – in connection with stock offerings seeking hundreds of millions of dollars from investors – they repeatedly promised CareDx was "in material compliance with, all health care laws applicable . . . including . . . the federal Anti-Kickback Statute . . . False Claims Act," and other relevant statutes (the "Compliance Statements").  ¶¶180, 200.  Indeed, removing any doubt CareDx meant to give assurances it was truly compliant with those laws, CareDx added: "To the Company's knowledge, *there are no facts or circumstances that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws*." *Id.*

---

[4]    *Overruled on unrelated grounds, City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).  In *Reese*, the court upheld false statements that the issuer believed it was "in compliance in all material respects with applicable environmental laws and regulations" to be actionably false where the plaintiffs alleged facts demonstrating "significant violations of federal and state environmental laws." *Id.* at 577-78.

PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                                                      - 10 -
4861-2072-6908.v1

These statements were false and misleading when made.  The SAC alleges in great detail the myriad ways in which CareDx was *systematically* violating the FCA and AKS.  For example, Defendants fraudulently billed Medicare for medically unnecessary AlloSure tests (including through RemoTraC and the KOAR "study"), violating the FCA.  ¶¶93-124; *see Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020) ("Claims for unnecessary treatment are false claims.").  Defendants' kickback schemes further (¶¶125-141) violated the AKS, which prohibits "knowing and willful offer or payment of remuneration to any person to induce that person to . . . refer for furnishing or arrange for furnishing any item or service for which payment may be made under a federal healthcare program."  42 U.S.C. §1320a-7b.8; *see U.S. ex rel. Solis v. Millennium Pharms., Inc.*, 2015 WL 1469166 (E.D. Cal. Mar. 30, 2015) (grants, board positions, and meals violated the AKS); *see also U.S. ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at *7 (C.D. Cal. July 10, 2014) ("[C]laims that result from unlawful kickbacks are false for purposes of the FCA.").

Indeed, a court in this Circuit upheld remarkably similar allegations.  *Mauss v. NuVasive, Inc.,* 2016 WL 3681831, at *4 (S.D. Cal. July 12, 2016) ("*NuVasive II*").[5]  Specifically, the plaintiff in *NuVasive II* alleged: "[d]efendants engaged in illegal sales, marketing, and billing practices" that violated the FCA and AKS by: (a) providing "kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors to utilize its products and services and to encourage other doctors to do the same"; (b) conducting "purported 'educational' programs, which" (just like CareDx's "symposiums" and "sham advisory boards") "served as a thinly-disguised kickback system to reward doctors for using NuVasive's products"; and (c) "submit[ting] false or otherwise improper claims to Medicare and Medicaid" such that their "earnings and revenues were earned, in part, as a result of violations of healthcare fraud and abuse laws."  *Id.* at *4.[6]  Such allegations are sufficient here as well.

---

[5]  *NuVasive II* also reaffirmed the court's falsity findings in the same action in *Mauss v. NuVasive, Inc.*, 2015 WL 10857519, at *8 (S.D. Cal. Aug. 28, 2015) ("*Nuvasive I*").

[6]  Other courts around the country have similarly found statements claiming that a company complied with the AKS and/or FCA to be false and misleading to investors.  *See, e.g., Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *3 (N.D. Ill. Feb. 10, 2023) (false and misleading

Unable to refute these well-pled allegations, Defendants simply argue that, regardless of their conduct, the Compliance Statements "should again be dismissed for all the same reasons articulated by the Court" in its Order. MTD at 15. However, Defendants fatally ignore the Court's Order, which **did not** find the FAC failed to adequately allege CareDx's illegal **conduct**; rather, the Court found Defendants' Compliance Statements were not actionable **as alleged**, but: *"[a] different finding may result* if Plaintiffs included allegations regarding the context of the underwriting agreements," such as "allegations whether investors were intensely interested in CareDx's offering of the additional shares detailed in the underwriting agreements." Order at 17.

Plaintiffs added exactly such allegations. Specifically, Plaintiffs have alleged that, *inter alia*: CareDx needed the $125 million in funding from the offering to stay alive due to its depleting cash and continuing net losses; CareDx issued **multiple** press releases about the offering; Defendant Seeto specifically touted the offering to investors as giving the Company a "competitive advantage" over its peers, which did not have such capital, leading to "very positive feedback from our long-term investors"; and investment analysts who reported to investors about CareDx specifically highlighted the offering as important to the Company. ¶¶182-86.

While Defendants might prefer that their "disclaimer" immunize their fraud, the Court never adopted that position – nor is it the law. Instead, sustaining these statements is fully consistent with *Reese* and other cases. For example, in *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Or. 2015), like here, plaintiffs alleged a false and misleading statement found *in an underwriting agreement* filed with the SEC. Citing *Reese*, the *Galena* court explained that because (like here) "the statement contained in the Underwriting Agreement was publicly disseminated and was part of Galena's disclosures relating to its secondary offering . . . the allegedly misleading statement was actionable and was in connection with the sale of a security."

statement that company "attempt[s] to meet the Anti-Kickback Safe Harbor for Bona Fide Employment" and engages "only in arrangements that we believe do not violate the Anti-Kickback Statute or other applicable laws," where the company was violating the AKS); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 658 (M.D. Tenn. 2022) (statement in merger agreement that "[e]ach of [Clover] and its Subsidiaries . . . in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws" materially false and misleading where plaintiffs alleged widespread violations of the AKS and FCA).

*Id.* at 1179.  This was true although the underwriting agreement "contain[ed] a clause stating that the warranties and representations were made only to the underwriter." *Id.*  The court nonetheless found "it is a plausible inference that a reasonable investor would believe that the statements and representations made to the underwriter were truthful and could be relied upon." *Id.*[7]

Defendants' Compliance Statements are actionable; and Defendants barely even address the reasons they are false, offering only a one-paragraph, halfhearted argument that Plaintiffs fail to allege sufficient facts showing CareDx violated any laws.  MTD at 13-14.  However, Defendants fail to even address most of the allegations detailing the Company's illegal behavior.  Instead, Defendants cherry pick a few out-of-context quotes from the SAC, misconstrue them, and ignore the rest.  Thus, as the Motion "fails to address Plaintiff[s'] allegation[s]," it should be denied. *Brown v. Starbucks Corp.*, 2019 WL 4183936, at *6 (S.D. Cal. Sept. 3, 2019).[8]

### 2. Defendants Cannot Tout Legitimate Practices for Revenue Growth While Omitting Any Mention of the Illegal Practices

Defendants' statements about their revenue, growth and success – including that they were "primarily due to" legitimate factors like testing volume – were also false and misleading for omitting that a highly material portion of their revenue was coming from illegal practices.[9]  As such, because "*[d]efendants made numerous statements attributing [their] earnings to a variety of legitimate business practices, while omitting any mention of illegal*" practices, their

---

[7]    Similarly, the agreement containing the false compliance statement in *Clover*, like the one here, was "*accompanied by a disclaimer cautioning the reader not to rely on its claims as 'characterizations of the actual state of facts*." 587 F. Supp. at 658.  However, the *Clover* court, like the *Galena* court, rejected this argument entirely, finding: "*[c]ourts have long held that general disclaimers of accuracy do not shield sellers who knowingly make false statements*." *Id.*

[8]    Defendants further suggest RemoTraC had a lawful purpose, *i.e.*, to deliver routine blood tests to transplant patients at home during the COVID pandemic.  MTD at 13.  However, even assuming RemoTraC did *also* serve a lawful purpose, this does not change the fact it was *used* for an illegal purpose – to bill Medicare for medically unnecessary test – nor does it address Defendants' other illegal activity, such as inducing doctors to prescribe AlloSure tests and to enroll their patients in AlloSure studies by providing illegal incentives and kickbacks.

[9]    *See, e.g.*, ¶¶152-153 (touting RemoTraC's purported lawful purpose); ¶¶163-165 (touting revenue growth based on lawful practices alone); ¶¶166-168 (same); ¶¶169-171 (same); ¶¶192-193 (same); ¶¶218-221 (same); ¶¶226-229 (same); ¶¶239-246 (GAAP accounting violations).

*statements were actionally false and misleading*.[10]  *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007); *see In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *13 (N.D. Cal. Aug. 17, 2022) (statements "misleading for failure to mention the undisclosed sales practice while attributing positive revenue results to organic consumer demand and other factors," particularly given the practice made the sales "unsustainable in the long term").

Indeed, the SAC establishes a *highly material* portion of CareDx's revenue was from illegal practices.  *See, e.g.*, ¶243 ("at least $117.7 million" in illegal revenue);[11] ¶¶244-245 (further quantification).  For example, while Medicare only allows billing for *a single test* when the patient *already* shows "clinical suspicion of rejection" of the kidney, former employees confirmed CareDx would have six or more tests performed on each patient in a year, which obviously was *not* medically necessary.  *See, e.g.*, ¶112 (90% of CareDx's patients were getting tested at least every month, according to FE-10 – *i.e.*, at least 12 times a year); ¶100 (FE-1 confirming patients received monthly unnecessary tests).  Even a thousand such patients receiving monthly tests would inflate annual revenue by *$34 million* (12 tests x $2800 per test x 1,000).  Similarly, Plaintiffs alleged Defendants used the 1,700-patient KOAR study as a cover to give Medicare-covered patients *without* suspicion of rejection bi-monthly or monthly tests, then illegally billed Medicare for these medically unnecessary tests.  If each of the 1,700 participants received even *six* unnecessary tests

---

[10] Defendants' RemoTraC Statements were also false and misleading for largely the same reasons.  Contrary to Defendants' claims (MTD at 17), nothing about CareDx's disclosures made clear to investors that CareDx was *illegally* billing Medicare for multiple tests per patient that were *not medically necessary* – merely stating *some* RemoTraC visits included AlloSure tests did not alert investors to the Company's systematic illegal billing practices.  Similarly, Defendants falsely stated their RemoTraC blood-drawing business addressed the "needs and demands" of patients during the Class Period when, in fact, they later admitted 50% of the tests administered were not medically necessary and thus not addressing any "need."  ¶¶13-14, 93, 100-124.  These facts contradict Defendants' statements that RemoTraC addressed patients' "need[s]" (¶¶205-208, 215-217), and those statements were false as a result.  Statements that RemoTraC drew blood for "standard" or "routine" tests were false for similar reasons because the unnecessary AlloSure tests were neither standard nor routine.  *See, e.g.*, ¶¶188-190, 100-124.

[11] Contrary to Defendants' arguments (MTD at 20-21), courts do not require the name of an expert used at the pleading stage be disclosed in order to be credited.  *In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *9 (N.D. Cal. Jan. 14, 2022) (rejecting argument that court should not rely on unnamed expert); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 491 & n.13 (W.D. Pa. 2020) (relying on unidentified "oil and gas industry expert").

per year at $2,800 each, this *alone* would have inflated CareDx's revenues by ***$28.5 million per year***.  These amounts would unquestionably bee highly material for a company that only reported $163.6 million in testing service revenue in 2020.  ¶¶23, 244.

Moreover, that CareDx's revenues were materially inflated by illegal conduct is evidenced by the fact that, since the DOJ and SEC investigations began, CareDx's testing revenue has fallen precipitously, with its stock price falling ***90%*** in tandem.  The suggestion that such a dramatic and utter implosion of CareDx's business is merely due to "changes" in "mix of business," rather than to the unsustainability of Defendants' illegal conduct, is absurd; the Court should not accept Defendants' invitation to make such an unreasonable inference at the pleading stage.[12]

Finally, Defendants' "risk factor" statements about legal compliance were false and misleading for similar reasons.  As the Ninth Circuit has made clear, risk disclosures may be actionable "when the disclosures speak to entirely . . . as-yet-unrealized risks and contingencies" and fail to alert "that some of these risks may already have come to fruition."  *Berson*, 527 F.3d at 986; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2009); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009); *Flynn v. Sientra, Inc.,* 2016 WL 3360676, at *11 (C.D. Cal. June 9, 2016) (sustaining "risk factor" statements concerning legal compliance).

### 3.    Defendants' Statements About the Reasons for CareDx's ASP Declines Were False and Misleading

On the same day it revealed the DOJ and SEC investigations ***and*** a decline in the Company's ASPs, an analyst asked Defendants: "are you seeing any changes in Medicare billing practices?  Or what else would really influence that test price lower?"  In response, Defendant

---

[12]    *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (MTD at 16 n.16), is inapposite, as plaintiffs there gave only "vague" explanations of how "virtually every statement made by Corinthian during the Class Period related to the company's financial health or performance was, by definition, false" because they "create the false impression that defendants ran their business with proper financial reporting compliance with student enrollment and federal loan practices which were critical to the viability of the business, and that quality of education was emphasized."  *Id.*  Here, Plaintiffs point to specific violations of law that materially inflated the Company's revenue and gave a false impression of the sustainability of its business model.  In *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *12-*13 (D. Ariz. Aug. 1, 2017) (MTD at 16 n.16), the court actually ***sustained*** several of defendants' statements as false and misleading due to their undisclosed sales and marketing practices.

Dhingra unequivocally responded: "no change. We haven't observed anything on the Medicare billing practices," instead attributing declining ASPs to a "higher mix of growth in the non-Medicare part of the business." ¶230. This statement was later ***admitted*** as false and misleading as, on November 3, 2022, the Company's new CFO acknowledged ASPs were declining because ***50% of tests were not getting any reimbursement whatsoever***. ¶271. Accordingly, it was false and misleading to claim CareDx's average "price" per test was declining due to "growth" in a different part of the "business" (implying the Company was merely getting lower prices from commercial insurers) when, in reality, more claims were being ***rejected entirely*** and receiving ***no reimbursement***. Indeed, as an investment analyst covering CareDx determined: "***Conclusion is more tests are not being paid***." Similarly, the November 3, 2022 disclosure that Medicare revenue ***declined 9%*** could not be the result of "growth" in another "part of the business" – instead, it was the result of medically unnecessary tests going unreimbursed by Medicare.

Defendants nonetheless argue these statements should be dismissed because they were previously dismissed (MTD at 15), ignoring the Court's Order expressly granting leave to amend. Order at 19. Further, Defendants argue FE-10's allegations (hardly the only allegations supporting falsity of this statement) should be discounted because he did not give an ***exact number*** of claims that were rejected and did not specify "when" each claim was rejected (MTD at 15-16). However, as the *NuVasive I* court recognized: "The Ninth Circuit does not require representative examples of false claims." 2015 WL 10857519, at *9-*10 (citing *Ebeid ex. Rel U.S. v. Lungwitz.*, 616 F.3d 993, 998 (9th Cir. 2010)) (rejecting argument that plaintiff "did not identify any particular false claim that was submitted" and did not identify a specific instance of a paid kickback). Instead: "it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were submitted." *Id.* Plaintiffs have done so.

**B.    The Complaint Pleads a Strong Inference Of Scienter**

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). An inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. Instead, an inference of scienter is

"strong" when it is as likely as any other inference. *Id.*[13]   When evaluating scienter, a court must "accept all factual allegations in the complaint as true" and determine "whether all of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

Defendants' scienter is amply pled.  ***First***, the Individual Defendants themselves directly participated in the rampant Medicare fraud, orchestrating illegal kickbacks and pushing providers to administer medically unnecessary tests in violation of Medicare regulations and the FCA.  For instance, Defendant Maag testified in the CareDx-Natera Litigation that he and Defendant Seeto directly oversaw the details of marketing AlloSure, including personally training the Company's sales and marketing personnel.  ¶¶86-88.  Further demonstrating complicity in the illegal kickbacks, Defendant Maag testified he participated in "many" "meeting conferences" and "marketing" events – the same events during which CareDx bribed providers with lavish gifts and kickbacks to administer its medically unnecessary AlloSure test, and he "***personally authorized***" the "marketing" expenses at the heart of Defendants' scheme.  ¶¶128-30.  Maag "***remaine[d] heavily involved in the decision-making at CareDx***" even after Seeto took over as CEO.  ¶54.

Defendants' direct involvement in the illicit practices is corroborated by former CareDx employees, including FE-6, who detailed Defendant Maag's personal involvement in and planning of CareDx's "symposiums," during which CareDx paid for doctors' lavish travel, dining, and wine. ¶126.  All of these facts show, when he personally attested (by signing his name to the Company's June 2020 publicly filed underwriting documents) that the Company was "in material compliance" with the FCA and AKS, that Defendant Maag was clearly aware CareDx was not even close to "in material compliance" with those laws. *See NuVasive I*, 2015 WL 10857519, at *11 (scienter based on confidential witness allegations that executives participated in kickback scheme).

---

[13]   Defendants quibble Plaintiffs did not ***reallege*** every scienter fact in a separate section of the complaint.  MTD at 2, 7.  However, Plaintiffs' scienter allegations are summarized in the falsity section and throughout the Complaint. *See generally* ¶¶151-246.  Plaintiffs are aware of no requirement that a complaint have a separate "scienter" section, nor do Defendants point to one.

PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                                                    - 17 -
4861-2072-6908.v1

Defendants argue: "providing physicians with expensive meals does not suggest Dr. Maag knew information that was inconsistent with the public statements he made concerning RemoTraC or CareDx's testing services revenue." MTD at 11. However, Defendants ignore that these facts demonstrate scienter for Defendants' Compliance Statements (which they scarcely address); thus, their arguments fail. Further, given Defendants Maag and Seeto were personally involved in training the Company's AlloSure sales team (¶¶88-89), Defendants' argument they did not direct the sales team to do anything illegal (MTD at 10) falls flat. Indeed, the only cogent inference that can be drawn from these facts is Defendants either instructed CareDx's salespeople to push AlloSure tests that were medically unnecessary or recklessly disregarded the illegal conduct.

*Second*, Defendants admitted they ran the business in a hands-on, detail-oriented manner; and they "had access to information" that undermined their public statements, which was further confirmed by Dr. Olymbios and other former employees. *Reese*, 747 F.3d at 572. Defendant Maag emphasized CareDx had "***very detailed monitoring of the use of [AlloSure]***," there were "numerous spreadsheets available [to him] within the company," he was "very hands-on and detail-oriented," he was "***intricately involved***" in AlloSure – "the ***most important product***," and he "absolutely" monitored AlloSure's performance. ¶¶54, 57-58, 60, 128; *see S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (scienter where "defendants actually did monitor the data that were the subject of the allegedly false statements"); *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *20 (N.D. Cal. Apr. 18, 2023) (scienter where "executives told investors they had real-time access to, and knowledge of, sales information").

Indeed, former employees confirm Defendants had access to information undermining their statements. *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 2023 WL 2532061, at *16 (9th Cir. 2023). For instance, FE-19 emphasized Defendant Seeto had regular meetings with the Company's most senior billing executives, including its Chief Business Officer and Head of Testing Services; discussed problems concerning obtaining "prior authorization" from doctors for the AlloSure test; and "'absolutely'" knew about the Company's "reimbursement and collection issues [with Medicare, which] were pervasive." ¶¶79, 115. FE-19 explained Seeto also attended weekly meetings of the Business Leadership Team, during which Seeto would discuss in-depth

reasons for upticks in testing volume in a particular week, month, or quarter; indeed, according to FE-19, Defendant Seeto had a very hands-on management style; would have requested daily updates if he recognized risk; and, in fact, there was "nothing" about CareDx Seeto did not know. ¶¶78, 115.  FE-10 also emphasized reimbursement rates were discussed during regular meetings, including by Defendant Seeto, and explained it was common knowledge at the Company that some patients were having expensive AlloSure tests performed every month without justification. ¶¶113, 265.  FE-19 explained that Defendant Dhingra, like Defendant Seeto, was unusually involved in the Company's business for a CFO and knew what was going on in all aspects of CareDx's business, including reimbursements, as he managed the Company's market access team, which was directly involved in seeking reimbursement for AlloSure tests.[14]  ¶117; *see In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) ("[defendants] were hands-on managers with respect to operational details and financial statements").  Dr. Olymbios similarly emphasized Defendants had access to this information because "CareDx monitored advisory board activity" – which involved kickbacks – "and how they impacted sales."  ¶127.  That the FEs "corroborate one another's statements" further supports a strong inference of scienter.  *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015).[15]

---

[14]  Defendants' attempt to discredit FE-19's allegations that Defendant Dhingra knew about the reimbursement issues because FE-19 did not attend market access meetings (MTD at 9) similarly fails as the SAC alleges FE-19 was in a position to know what was discussed at those meetings given he reported directly to and worked directly with the CEO, who attended them.  ¶27 n.3, 117; *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019).

[15]  Defendants' attempt to discredit FE-19 because Plaintiffs (in order to protect anonymity given FE-19s unique position and sensitive allegations) did not allege his "specific job title," "months of employment," and "in what office FE-19 worked" (MTD at 12) fails.  The SAC establishes FE-19's reliability and knowledge by detailing his responsibilities, direct reports, and tenure, *i.e.*, that he was a "high-ranking employee," "reported directly to Defendant Seeto" from "mid-2021 through the end of 2022," "manag[ed] day-to-day operations of the business and creat[ed] strategies to drive growth," ¶27 & n.3, and detailed specific meetings he attended and ran with specific CareDx executives.  ¶¶78, 115-116.  *See, e.g.*, *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *14 (C.D. Cal. July 3, 2023) (former employee's exact title "not material," especially where "Defendants do not dispute key facts in their statements."); *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 963 (N.D. Cal. 2014) (plaintiffs who "number each witness and describe his or her job description and responsibilities" describe FEs with "sufficient particularity").  The allegations "support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

Defendants' attempts to discount Plaintiffs' former employee allegations fail. For example, while Defendants argue FE-6 should be disregarded because she left CareDx before the end of the Class Period (MTD at 10-11), there is no reason to believe Defendants' illegal kickbacks would have suddenly ended when he left; and other former employees confirm that Defendants' illegal practices continued *after* FE-6 left the Company (¶¶126, 132-133). *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971 (N.D. Cal. 2005) ("common sense" that "circumstances preceding the statements . . . would be among those knowable at the time of the statements"). Moreover, while Defendants downplay FE-10's account by claiming he did not communicate or report to Defendant Seeto (MTD at 11), FE-10 made clear his knowledge was based on: (1) his firsthand account of conversations he observed between Seeto and the Director of Claims (¶113); and (2) his own review of claims (¶¶110-13, 265). *City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1042 (N.D. Cal. 2018) (crediting FE where information "was well known internally and openly communicated at staff meetings").

*Third*, CareDx's most senior executives, including Defendants Maag and Seeto, were repeatedly warned of the rampant illegal conduct by Dr. Olymbios. ¶¶24, 89, 97, 141. However, these executives "brushed off his concerns or berated him for raising them in the first place"; and Defendant Maag even "took active measures to avoid creating a paper trail of their misconduct," warning Dr. Olymbios: "there were certain things that shouldn't be put in writing." *Id*. Since the FAC was filed, Plaintiffs have confirmed through "email communication from Dr. Olymbios himself and five discussions with Dr. Olymbios (via counsel) . . . that Dr. Olymbios is the source of the facts set forth in this Complaint and that they are based on his personal knowledge." SAC at 1; *see also* ¶31. Moreover, another former employee confirmed Dr. Olymbios was "vocal about" his concerns. ¶114. In addition, Dr. Olymbios was not the only one raising concerns; for example, FE-1 reported illegal conduct to the Company's top compliance attorney but explained McCauley "was having an uphill battle and CareDx did not want to be compliant." ¶98.

*Fourth*, Defendants made highly detailed statements on the subjects concealed by the fraud, further reinforcing scienter. For instance, in October 2021, after the Company disclosed unexpectedly dismal results and analysts questioned whether investigations were hampering

CareDx's ability to bill for its AlloSure tests, Defendant Dhingra unequivocally assured there had been "no change" related to Medicare billing and gave other specific causes instead.  ¶¶256-258. Dhingra's highly "specific denials" further support scienter.  *See In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019); *Gauquie v. Albany Molecular Research, Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("'absurd' to consider that the senior vice president did not have knowledge of information contradicting her statements when she took an active role in communicating with the press" about the matter (citing *Reese*, 747 F.3d at 576)).

*Finally*, Defendants' scienter is further confirmed by their actions after the government began investigating their illegal conduct, which actions evidence full awareness of illegal activity at the Company.  For example, after the SEC and DOJ began investigating CareDx's misconduct, management "bullied[,] intimidated, and coerced" employees "to not provide information or misreport information [in] the DOJ investigation," supporting scienter.  ¶¶27, 96; *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *12 (S.D. Cal. Aug. 1, 2006) ("employees who felt coerced by their supervisors to violate ethical standards to meet business goals provide[] circumstantial evidence of scienter"); *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 234 (S.D.N.Y. 2012) (retaliation against whistleblowers supported scienter).  Similarly, a marketing employee who reported to a C-suite executive explained: "*we were terrified for our jobs*" if they raised concerns about illegal practices.  ¶30. Moreover, in September-October 2021, just as the Company came under investigation by the SEC and DOJ, CareDx's Business Leadership Team – which included Seeto – decided to cut back on illegal kickbacks to doctors, such as "shrimp towers" or $200 bottles of wine, now that they were under regulatory scrutiny.  ¶133.[16]

---

[16]  While nothing more is necessary, myriad additional facts raise a strong inference of scienter. *First*, AlloSure was CareDx's main revenue generating product.  ¶4; *see Hatamian*, 87 F. Supp. 3d at 1162 (fraud implicated "the critical core operation" of the company).  Defendants emphasized AlloSure was "the one product, the one growth drive[r] for the company," its "most important product," and "most important activity."  ¶¶57-58, 83; *see Rivian Auto., Inc.*, 2023 WL 4361098, at *14 ("not credible" that senior executives would be unaware of pricing structure of company's flagship product).  That Defendants devoted 90% of all marketing costs to AlloSure further strengthens this inference.  ¶¶59, 62-63, 83; *see Berson*, 527 F.3d at 988.  *Second*, abrupt resignations by two C-suite executives amid ongoing investigations is highly suspicious and indicative of scienter. ¶¶268-269. *See In re Fibrogen, Inc.*, 2022 WL 2793032, at *25 (N.D. Cal.

### C.    The Complaint Sufficiently Pleads Loss Causation

The loss causation "inquiry requires no more than the familiar test for proximate cause." *First Solar*, 881 F.3d at 753. Allegations need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. At the complaint stage, Plaintiffs face a "low bar of pleading proximate cause for purposes of loss causation." *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020).

Importantly, loss causation does not require that a corrective disclosure directly revealed to the market a defendants' prior statements were ***fraudulent***. For example, the market need not specifically learn from a disclosure of poor financial results that the defendants committed fraud; rather, plaintiffs only need to allege that the underlying conduct was, in fact, a cause of the financial results that caused the stock drop. *First Solar*, 881 F.3d at 754 ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time [of the disclosure] that fraud had concealed the miss."). Indeed, loss causation "may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id.* at 753; *see also In re Impinj, Inc., Sec. Litig.*, 414 F. Supp. 3d 1327, 1337 (W.D. Wash. 2019) (loss causation does not require "a revelatory moment").

Under these standards, Plaintiffs have unquestionably adequately alleged loss causation. For example, Plaintiffs' first alleged partial corrective disclosure took place on October 28, 2021, when CareDx simultaneously made two major revelations: (1) the DOJ had commenced an FCA investigation into the Company's kidney testing and phlebotomy services, as had the SEC; and (2) just as it came under investigation, CareDx's financial performance began to dramatically worsen, with its growth slowing and its average revenue per test (ASP) declining 20%. The fact the Company's business decline coincided with these investigations created a link between these

July 15, 2022); *Twitter*, 282 F. Supp. 3d at 1148. ***Finally***, the Individual Defendants engaged in highly significant insider trading, reaping more than $30 million in proceeds from their stock sales during the Class Period. ¶92; *see In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 953 (N.D. Cal. 2017) (insider trading can be part of "holistic approach."). Plaintiffs recognize the Court previously found these allegations ***alone*** did not support scienter but respectfully submit these allegations still contribute to the "holistic" review of scienter required under *Tellabs*.

two things, *i.e.*, once CareDx's practices came under investigation, it could no longer as easily ***bill Medicare*** for medically unnecessary tests, nor could it as easily entice doctors to enroll their patients in AlloSure through illegal kickbacks.  *See, e.g., Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *17 (C.D. Cal. Jan. 17, 2020) (loss causation pled even though "neither announcement disclosed the conduct that Plaintiff contends is fraudulent" because "Plaintiff argues that both earnings reduction[s] were clearly related to the allegedly fraudulent conduct").  As a result, the Company's stock price fell from a close of $70.34 per share on October 28, 2021 to a close of $51.00 per share on October 29, 2021, or 27.5% in a single day – an enormous drop.

Indeed, investment analysts linked the investigations to the Company's flagging performance, noting: "[I]f you take the testing revenue over volume, the price per test looks like it came down," and "the difference was pretty pronounced this quarter," therefore asking: "[A]re you seeing any changes in Medicare billing practices?"  ¶256.  The same analyst later noted the Company's "[r]ationale [for ASP decline] was higher commercial coverage, ***though we still question what changed [quarter over quarter]***," while other analysts found the Company's official explanations "murky," Defendants "offered little additional context," and stated: "***The fact that [CareDx] is being investigated by three different entities, both federal and at the state level, is notable***," and "***disclosures of these sort typically bear some degree of merit***."  ¶259.  This is more than enough to plead loss causation, especially in the context of the other subsequent disclosures.  *See, e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 604 (N.D. Cal. 2019) (announcement of "government investigation into generic drug price-fixing, combined with . . . disappointing earnings" was corrective disclosure).

Plaintiffs' allegations of "a series of partial disclosures" whereby the "true facts" were "revealed over time" further support loss causation.  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).  In addition to the October 28, 2021 disclosures, these included, *inter alia*, the sudden and unexpected resignations of multiple top executives; the filing of a damning whistleblower complaint relating to the conduct under investigation; falling Medicare revenue and ASPs (due to government scrutiny); and the ultimate revelation that 50% of CareDx's claims were being denied, each of which caused substantial stock price drops.  This "series of disclosures"

PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                                                      - 23 -
4861-2072-6908.v1

further supports loss causation and is more than sufficient at the pleading stage. *See, e.g.*, *VMware*, 2023 WL 2763541, at *16 (loss causation pled through "series of disclosures regarding VMware's backlog, revenue, and [an] SEC investigation" causing stock price drops that led to economic loss, and finding Defendants' arguments about what caused the drops inappropriate at pleading stage).

Further, in the context of these partial disclosures, the April 15, 2022 filing of the Olymbios Complaint supports loss causation as it further revealed the Medicare fraud first suggested by the disclosure of the investigations.[17]  Defendants argue the Olymbios Complaint does not support loss causation because the 8% stock drop was too small.  MTD at 23-24.  However, this is not the law, especially when alleged as part of a ***series* of *partial disclosures***.  *See, e.g.*, *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *9-*10 (C.D. Cal. Jan. 24, 2023) (partial corrective disclosures causing declines of 8.45%, 8.9%, and 9% supported loss causation); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 669 (E.D. Va. 2021) (rejecting argument that "the size of the individual drops . . . cannot support allegations of loss causation").  Moreover, it is unsurprising the Olymbios Complaint – which came ***after*** the investigations – caused a smaller drop, given the investigations had already been disclosed.  In addition, analysts specifically connected Dhingra's resignation to the investigations, noting the resignation was "surprising," "barely more than a year since he joined CDNA," and "in the midst of certain ongoing gov't investigations."  ¶268.[18] Dhingra resigned on May 23, 2022, mere ***weeks*** after Olymbios filed his complaint.  *Id*.

Finally, the November 3, 2022 disclosures that ***50% of tests*** were receiving ***zero reimbursement*** and Medicare revenue ***declined* 9%** further revealed the truth, contradicting Defendants' false statements that declining ASPs were caused by changes in "payor mix" and

---

[17]  Defendants' argument the Olymbios Complaint is "not sufficiently linked to the alleged false [statements]" merely because his complaint does not use the word "RemoTraC" also fails. Olymbios' allegations concerning "mobile phlebotomy" are ***obviously*** references to RemoTraC – the only such program CareDx had.  Moreover, Plaintiffs' theory does not solely concern RemoTraC but systemic violations of the FCA and AKS, as described in the Olymbios Complaint.

[18]  The "announcement of [an executive's] resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to the investigation." *NuVasive*, 2016 WL 3681831, at *11; *see also Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322-23 (5th Cir. 2014) (resignation was partial disclosure although "nothing in the resignation announcement alone reveals the truth behind earlier misstatements").

"growth in the non-Medicare part of the business," rather than Medicare billing issues. Defendants' prior statements had given the misleading impression CareDx was merely receiving *lower prices* for its tests from commercial insurance, driving down "average sale price." However, on November 3, 2022, CareDx revealed "average sale price" was being driven down by *failure to get any reimbursement whatsoever* for half their tests. Indeed, the revelation caused a stock price decline of more than 14%. ¶274. While Defendants protest Jain didn't *admit* the rejections were "because of fraud," this is not required for loss causation. *BofI*, 977 F.3d at 790. Moreover, Jain *admitted* many claims were being denied because Medicare Advantage plans – which are subject to the same Medicare coverage rules – were carefully scrutinizing Defendants' claims and specifically "requesting a lot of information around the medical records" and "prior authorization" for medical necessity, further revealing claims were being denied for *lack of medical necessity* and ASP did *not* decline because of "changes" in "business mix."[19]

## V.    CONCLUSION[20]

Defendants' motion to dismiss should be denied in its entirety.

DATED:  August 30, 2023                      Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
SHAWN A. WILLIAMS
JASON C. DAVIS

                                             s/ Jason C. Davis
                                             JASON C. DAVIS

---

[19]  Defendants' authority does not support them. In *BofI Holding, Inc. Sec. Litig.*, the Court found loss causation on a lawsuit as part of a series of partial disclosures, with no loss causation from "blog posts" *only* because they did not reveal any new information (not the case here). *Klein v. Ellison*, 2021 WL 2075591, at *1 (N.D. Cal. May 24, 2021), is a shareholder derivative action and thus does not address loss causation. While Defendants cite *Inchen Huang v. Higgins*, 2019 WL 1245136, at *16 (N.D. Cal. Mar. 18, 2019), for the proposition that "[t]he Ninth Circuit has never embraced" materialization of risk as a loss causation theory, that case in fact notes it is "a theory of loss causation that has been accepted by district courts within this Circuit."

[20]  The SAC pleads scheme liability, as it alleges that Defendants executed an unlawful scheme to overbill Medicare and approved unlawful kickbacks to further a fraudulent "course of business." *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). And the SAC alleges control person liability under §20(a) of the Exchange Act, as Seeto, Maag and Dhingra "exercised actual power or control over the primary violator." *Howard v. Hui*, 2001 WL 1159780, at *3 (N.D. Cal. Sept. 24, 2001).

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
SEAN C. MCGUIRE
NICOLE Q. GILLILAND
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
smcguire@rgrdlaw.com
ngilliland@rgrdlaw.com

SAXENA WHITE P.A.
DAVID R. KAPLAN
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA  92075
Telephone:  858/997-0860
858/369-0096 (fax)
dkaplan@saxenawhite.com

SAXENA WHITE P.A.
STEVEN B. SINGER
RACHEL A. AVAN
JOSHUA H. SALTZMAN (admitted *pro hac vice)*
10 Bank Street, 8th Floor
White Plains, NY  10606
Telephone:  914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
ravan@saxenawhite.com
jsaltzman@saxenawhite.com

DATED:  August 30, 2023

SAXENA WHITE P.A.
LESTER R. HOOKER

s/ Lester R. Hooker
LESTER R. HOOKER

PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                                                          - 26 -
4861-2072-6908.v1

7777 Glades Road, Suite 300
Boca Raton, FL  33434
Telephone:  561/394-3399
561/394-3382 (fax)
lhooker@saxenawhite.com

Lead Counsel for Lead Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on August 30, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Jason C. Davis
JASON C. DAVIS

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
Email:  jdavis@rgrdlaw.com

4861-2072-6908.v1

# Mailing Information for a Case 3:22-cv-03023-TLT Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alec T Coquin**
  acoquin@labaton.com

- **Charles Dean Cording**
  ccording@willkie.com,mao@willkie.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Barrington E. Dyer**
  bdyer@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Laura Leigh Geist**
  lgeist@willkie.com,tnocco@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **Lester Rene Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com

- **David R. Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Sean Christopher McGuire**
  smcguire@rgrdlaw.com

- **Erica Symone Miranda**
  emiranda@willkie.com,tnocco@willkie.com,maosf@willkie.com,ealcantara@willkie.com,mallard@willkie.com,cwindsor@willkie.com

- **Tariq Mundiya**
  tmundiya@willkie.com,mao@willkie.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Joshua H Saltzman**
  jsaltzman@saxenawhite.com

- **Brady Michael Sullivan**
  bsullivan@willkie.com,CLee2@willkie.com,mao@willkie.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)