ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
        – and –
SPENCER A. BURKHOLZ (147029)
SEAN C. MCGUIRE (319521)
NICOLE Q. GILLILAND (335132)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
smcguire@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CAREDX, INC., et al., <br><br> Defendants. | Case No. 3:22-cv-03023-TLT <br><br> CLASS ACTION <br><br> PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN PLAINTIFFS' SECOND AMENDED COMPLAINT <br><br> DATE:     October 31, 2023 <br> TIME:     2:00 p.m. <br> DEPT:     Courtroom 9, 19th Floor <br> JUDGE:    Trina L. Thompson |

4873-3956-4668.v1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     STANDARDS............................................................................................................2

III.    ARGUMENT ............................................................................................................4

      A.      The SAC Alleges New Facts Showing Four Executives Attended Multiple "Meetings" with Defendant Seeto Relating to Systematic Submission of Bills to Medicare for Tests Lacking "Medical Necessity" ......................................4

      B.      The SAC Pleads New Facts Corroborating Dr. Olymbios Raised His Concerns Before Leaving The Company But Senior Executives Did Nothing in Response Because They Were All "Terrified"....................................8

      C.      The SAC Alleges New Facts Bolstering Dr. Olymbios' Credibility and Reliability and Directly Corroborating Dr. Olymbios' Allegations Are Based on His Own Personal Knowledge (Not Merely His "Attorneys' Investigation")........................................................................................................9

      D.      The SAC Pleads New Facts Corroborating Dr. Olymbios' Allegations Maag Called Dr. Olymbios to Tell Him "There Are Certain Things that Shouldn't Be Put in Writing . . . Even if that's How CareDx Operated" ..............14

      E.      The SAC Pleads Maag's Former Executive Assistant and Maag's Own Admissions Corroborate Dr. Olymbios' Allegations About Maag's Personal Oversight of Improper Kickback Expenditures .....................................15

IV.     CONCLUSION..........................................................................................................16

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ......................................................................................................13

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .........................................................................................................8

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ..........................................................................................3

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
298 F.R.D. 116 (S.D.N.Y. 2014) ...................................................................................................9

*In re Connetics Corp. Sec. Litig.*,
2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ..............................................................................3

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................................................2, 3, 12

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) ..........................................................................2, 10

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .........................................................................................................3

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .........................................................................................................9

*Lako v. Loandepot, Inc.*,
2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ...........................................................................12, 13

*Magic Leap, Inc. v. Chi Xu*,
2020 WL 3268659 (N.D. Cal. June 17, 2020) .............................................................................13

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
2011 WL 4389689 (C.D. Cal. May 5, 2011) ...........................................................................12, 13

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) ............................................................................................2, 10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).......................................................................................................................9, 10

**Page**

**STATUTES, RULES AND REGULATIONS**

State Bar of California Rules of Professional Conduct
    Rule 4.2(a)..................................................................................................................................13

17 C.F.R.
    §240.10b-5 ..........................................................................................................................10, 12

Federal Rules of Civil Procedure
    Rule 11 ...........................................................................................................................................12

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT: MEMORANDUM AND POINTS OF
AUTHORITIES IN SUPPORT THEREOF - 3:22-cv-03023-TLT - iii -
4873-3956-4668.v1

## I.    INTRODUCTION

Defendants'[1] motion to strike (ECF 91) ("MTS" or "Motion to Strike") certain facts in the SAC attributed to Dr. Michael Olymbios (the "Olymbios Management Allegations") is meritless.[2] In granting Defendants' previous motion to strike (ECF 60), the Court made clear "Plaintiffs need *not* corroborate every fact" in their complaint.  The complaint must merely "provide an independent basis that *goes towards* corroborating the allegations such that they are *reasonable*." ECF 75 ("Order") at 7.

In so finding, the Court gave an example of the type of facts that could suffice to corroborate those allegations: "Plaintiffs could have included corroboration from confidential witnesses that had brought *similar concerns* to Seeto *or* Maag." *Id.*  That is exactly what the SAC does.  To start, the SAC quotes facts from a new confidential witness (FE-19) who reported directly to and worked directly with Seeto and witnessed him attending meetings with *three* other executives who discussed the Company's practice of billing Medicare for blood tests "lacking medical necessity," which is unlawful.  Yet another witness (FE-10) observed Seeto discussing the same subject with the Company's Director of Claims.  A third witness (FE-11) observed Dr. Olymbios was very "vocal" about his concerns of Medicare billing violations – indeed, Dr. Olymbios told FE-11 directly, and others, but they did nothing about it because they were all "terrified" Seeto and Maag would fire them.  Collectively, these facts readily satisfy the Court's rulings.

Defendants largely ignore the facts provided by FE-19, FE-11, and FE-10 and incorrectly suggest the Court required one of those three witnesses to have been present when Dr. Olymbios talked about the Medicare violations with Maag and Seeto.  Not so.  The Court was clear it was

---

[1]    Unless otherwise noted, all capitalized terms used herein have the same meanings as set forth in the Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 81) ("SAC").  All "¶_" and "¶¶_" references are to the SAC unless otherwise indicated.  All emphasis is added and citations are omitted unless otherwise noted.

[2]    Specifically, Defendants seek to strike 20 sentences drawn from seven paragraphs of the SAC. *See* MTS at 2 n.2 ("Defendants respectfully request that the following paragraphs in the SAC be stricken: ¶¶24 (sentences 2-5), 89 (last sentence), 97 (sentences 2-3), 127 (sentences 1-3), 140 (sentences 1-4), 141 (sentence 3), and 260 (sentences 2-6).").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT                    - 1 -
4873-3956-4668.v1

"*not setting a high bar wherein Plaintiffs must independently corroborate that each conversation took place*" but only "Plaintiffs must show that it performed its duty to independently investigate the factual allegations in a manner that is *reasonable under the circumstances*."  Order at 7-8.

Additionally, since the filing of their first amended complaint (ECF 53) ("FAC"), Plaintiffs have not only corroborated Dr. Olymbios' allegations by confirming with his counsel that they were based on his own firsthand experiences and that he stands by them, but Plaintiffs' counsel also received an email directly from Dr. Olymbios specifically reaffirming his allegations and noting other former employees discussed in the SAC had "corroborate[d] my observations."  The SAC not only alleges these facts but numerous additional facts bolstering the reliability of Dr. Olymbios' allegations by showing, as a trusted member of the CareDx leadership team and an executive with oversight over AlloSure sales, he was clearly "'in a position to be personally knowledgeable'" of the facts alleged, particularly those describing his own direct interactions with defendants Seeto and Maag.  *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019).  Indeed, Dr. Olymbios' reliability "*exceeds that of confidential sources other courts find sufficiently reputable due to his disclosed identity, elevated position, and first-hand knowledge of many pertinent events*."  *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *8 (C.D. Cal. Jan. 26, 2021).

For these reasons and the additional reasons that follow, the Court should deny Defendants' Motion to Strike.

## II.    STANDARDS

"Motions to strike are generally disfavored."  Order at 5 (citing cases).  "Just as with a motion to dismiss, the court should view the pleading sought to be struck in the light most favorable to the nonmoving party."  *Id.*

In the Order, the Court found *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008) ("*Connetics I*") instructive.  Order at 5.  *Connetics I* ruled a private plaintiff may not rely "entirely on another complaint as the sole basis for [their] allegations."  *Connetics I* at 1005.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT                          - 2 -
4873-3956-4668.v1

The *Connetics I* court subsequently sustained an amended complaint in *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at \*16 (N.D. Cal. Aug. 14, 2008) ("*Connetics II*"). The *Connetics II* opinion noted the prior decision had "struck many paragraphs" of the prior complaint because those paragraphs relied ***exclusively*** on a complaint filed by the SEC. *Id.* at \*2 (identifying 33 such paragraphs that had previously been struck). *Id.* Nonetheless, in *Connetics II*, the court held: "Although plaintiffs continue to rely ***in part*** on the SEC complaint, plaintiffs have explained what other sources they rely on to formulate their factual allegations and have explained how these other sources corroborate some, though not all, of the allegations from the SEC complaint." *Id.* at \*4. Specifically, of the 33 paragraphs the plaintiffs borrowed from the SEC, the *Connetics II* court found part of one paragraph to be independently corroborated. *Id.* (citing ¶43(f), wherein a single confidential witness said a meeting the SEC also cited in its complaint took place). On the basis of this single corroboration of an allegation, the court denied the defendants' motion to strike ***all 33 paragraphs*** of allegations based on the SEC complaint.

Some Ninth Circuit cases postdating *Connetics I* and *Connetics II* have not even imposed such a requirement. *See, e.g., In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706-07 (9th Cir. 2012) (relying on allegations in an SEC complaint incorporated into the plaintiff's pleadings). Indeed, the court in *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019), relied on *Verifone* and other Ninth Circuit law in denying a motion to dismiss attacking allegations that relied on a U.S. Attorney General complaint. *Id.* ("The parties dispute whether the [complaint] may rely on allegations in the AG Complaint. . . . Because the Ninth Circuit has relied on comparable documents when deciding motions to dismiss Section 10(b) and antitrust claims, the court holds it is appropriate to do so here.").

Regardless, even following *Connetics I* and *Connetics II*, Defendants' Motion to Strike fails for the reasons that follow.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT                                    - 3 -
4873-3956-4668.v1

## III.    ARGUMENT

### A.    The SAC Alleges New Facts Showing Four Executives Attended Multiple "Meetings" with Defendant Seeto Relating to Systematic Submission of Bills to Medicare for Tests Lacking "Medical Necessity"

The SAC alleges new facts – including allegations from several new former employees – clearly corroborating the Olymbios Management Allegations.  As an initial matter, the SAC adds allegations from FE-19, who "worked closely with and reported directly to defendant Seeto from mid-2021 through the end of 2022" and whose responsibilities included working with the CEO in managing day-to-day operations of the business and creating strategies to drive growth." ¶27 n.3.

FE-19's accounts clearly satisfy one of the Order's proposed means of corroboration. Order at 7 ("Plaintiffs could have included corroboration from confidential witnesses that had brought *similar concerns* to Seeto *or* Maag.").  Indeed, while reporting directly to Seeto during the Class Period, FE-19 observed multiple "*meetings*" Seeto attended that *"specifically concerned problems relating to getting 'prior authorization' from doctors for the Allosure test, i.e., getting the 'medical necessity' authorization that CareDx systematically failed to get."* ¶¶28, 115.  In addition, FE-19 specifically said Seeto "absolutely" knew about the Company's reimbursement and collection issues with Medicare, which were *pervasive*.  *Id.*  FE-19 also confirmed at least three other Company executives attended the meetings with Seeto: (1) Elsie Garza (Senior Director of Revenue Cycle Management); (2) Savita Devlin (Project Manager); and (3) Alex Johnson (Chief Business Officer and Head of Testing Services).  ¶115.

Such direct observations, "standing alone" (Order at 10), establish numerous Company employees "brought similar concerns" (*id.* at 7) about unlawful Medicare bills (*e.g.*, those "clinically unsupported treatment[s]," lacking "prior authorization," or "lacking medical necessity") to either Maag or Seeto, exactly as Dr. Olymbios did.  ¶¶28-29, 97, 113.

FE-19 provided additional categories of facts corroborating Dr. Olymbios' experience.  For example, FE-19 also witnessed the fact that senior CareDx employee Erin Tokunaga (FE-19's colleague and friend) was *"coerced"* and *"bullied"* by the C-Suite to "misreport information" to the DOJ as they investigated the Medicare misconduct.  ¶¶27, 96.  FE-19 also observed meetings

in which Seeto made "disingenuous" comments about patients and considered them an "afterthought" to increasing testing numbers. ¶116. "[E]verything fit the ***pattern of not caring***" about operating the Company in "an ***ethical and legal way***." ¶27. These facts corroborate Dr. Olymbios' experience that Seeto and Maag just "brushed off" his concerns about Medicare "violation[s]" or "berated" him for raising them. ¶97.

Further, FE-19 attended Business Leadership Team meetings in which Seeto credited the illegal RemoTraC program for growing the Company; in those meetings "'[Seeto] would make ***disingenuous remarks about patients***'; but in reality, patients were an afterthought, and the sole goal was keeping up 'volumes.'" ¶116. This observation is substantially the same as Dr. Olymbios' observation that Seeto and Maag "[have] ***no regard for anyone – shareholder or patient***." ¶31. In sum, FE-19's experiences fully corroborate and confirm Dr. Olymbios' experiences.

Defendants' arguments for discounting FE-19's allegations are meritless. Defendants argue FE-19 and Dr. Olymbios did not work for Seeto at "the same time" (MTS at 5) and therefore (implicitly) contend FE-19 could not have personally observed Dr. Olymbios' conversations with Seeto or Maag. However, this is not what the Court held; to the contrary, the Court made clear it was "***not*** setting a high bar wherein Plaintiffs must independently corroborate that each conversation [with Olymbios] took place." Order at 7. The facts FE-19 provides show it is "reasonable" to credit Dr. Olymbios given FE-19 personally witnessed ***at least three*** other senior employees discussing "similar concerns" with the Individual Defendants. *See* ¶116 (describing specific meetings at which these concerns were discussed); *see also* Order at 7 (noting the Olymbios Management Allegations could be corroborated if other employees had raised "similar concerns" with Seeto or Maag).

Moreover, the fact two senior VP-level executives who both reported to the CEO of the Company observed a similar "pattern" of illegal conduct at different times during the Class Period simply strengthens the conclusion the illegal conduct was no accident. *Compare, e.g.*, ¶¶29, 89, 97 (During May 2020 through October 2020, Dr. Olymbios observed an unlawful campaign generating revenue through illicit conduct to include Medicare violations.), *with* ¶¶27 & 27 n.3

(During mid-2021 through the end of 2022, FE-19 observed: "[t]here was a pervasive lack of accountability and ethics at the company in every which way. Overall, everything fit the pattern of not caring about how to operate a business in an ethical and legal way.").[3]

Another new witness (FE-10, a Claims Reimbursement Specialist, ¶110 n.17) also corroborated the fact other employees at CareDx discussed "similar concerns" to those raised by Dr. Olymbios with defendant Seeto. Order at 7. Specifically, FE-10 "observed it was well known throughout the Company that they were experiencing so many claims being **denied** for **lacking medical necessity**." ¶113. The Company had "**regular meetings**" about that fact so Seeto and everyone else knew about it. *Id.* Medicare denied **half** of the bills for that reason. *Id.* Indeed, FE-10 made clear Seeto was fully aware of the fact half the bills the Company submitted to Medicare were being denied because they were not medically necessary: "FE-10 also observed the Director of Claims **and Seeto often talked** about the 50% reimbursement rate with the tests." *Id.* Again, these facts demonstrate the Director of Claims "had brought **similar** concerns" about the Company submitting medically unnecessary bills to "Seeto or Maag." Order at 7. FE-10 also personally reviewed claims data showing "**90%** of CareDx's patients were getting tested . . . every month" and patients, in turn, "expressed frustration and did not understand **why they had been administered so many . . . tests** and billed for them" because Medicare bounced the bills back. ¶¶110, 112. That fact led FE-10 to "ask[] the Director of Claims why the patients were having the tests done **so frequently**; the Director of Claims **brushed him off and told him to just keep doing**

---

[3]    Ironically, it was Defendants themselves who suggested facts such as these would be sufficient to corroborate Dr. Olymbios' allegations. *See* May 16, 2023 Oral Argument Transcript at 9:11-17 ("[W]e would submit, Your Honor, . . . plaintiffs here are **not required** to have word-for-word precise corroboration for these allegations but what they – what they need to have and what we submit that they don't have here in their complaint are allegations that **at least relate**" to Dr. Olymbios' allegations that "these purported concerns were reported to senior management."); *see also id*. at 27:12-21 ("Certainly, there are **more ways than one** to corroborate these allegations. Just because it was a conversation between two individuals does not mean that there are different ways to corroborate here. The plaintiffs could have alleged, for example, that another one of these eight former employees raised **some** of these same quote/unquote 'concerns,' whatever those concerns may be, we don't know; but they **could have alleged that a former employee raised the same concerns to Dr. Seeto**. That might be **sufficient corroboration**."). The Court agreed. Order at 7 ("While plaintiffs need **not** corroborate every fact, Plaintiffs must provide an independent basis that **goes toward** corroborating the allegations such that they are **reasonable**.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT                - 6 -
4873-3956-4668.v1

*his job*." ¶112. Tellingly, that is exactly the same response Dr. Olymbios received when *he* reported overbilling for medically unnecessary tests to Seeto, Maag, and other executives. ¶97.

Defendants argue these allegations from FE-10 do not corroborate Dr. Olymbios' complaint because his concerns supposedly had "nothing to do with Medicare rejecting CareDx's reimbursement claims" given Medicare had not *yet* begun rejecting claims in high volumes when Dr. Olymbios filed his complaint. MTS at 5. This argument grossly misses the point. Dr. Olymbios alleged that multiple medical practices had serious reservations about the fact that "CareDx used what it represented to be clinical tests to bill Medicare" even as "[m]ultiple nephrology practices expressed serious reservations about this practice as a violation of Medicare billing requirements, and CareDx employees internally flagged this practice as impermissible." ¶¶97, 140, 260. These illegal billing practices are exactly the illegal conduct that *later caused* so many claims to be rejected by Medicare *after* the government began scrutinizing CareDx (in part because of Dr. Olymbios' own whistleblowing). This is precisely what FE-10 witnessed Seeto and the Director of Claims discussing: "that they were experiencing so many claims being *denied* [by Medicare] for *lacking medical necessity*." ¶113. FE-10's facts have everything to do with Dr. Olymbios' "concerns" – paying doctors "improper kickbacks to . . . influence sales of AlloSure"; telling doctors Medicare paid for AlloSure tests and "never billed" patients, when, in fact, Medicare would only pay for medically necessary tests; representing AlloSure tests to be clinical in nature when they were not, in "*violation of Medicare billing requirements*" as "employees internally flagged" to be "impermissible"; intentionally excising from AlloSure order forms the fields where "physicians [should have] indicate[d] the reason why the test was medically necessary." ¶¶127, 140, 260.

When FE-11 brought his concerns about rampant illegal conduct to CareDx's Director of Claims, the Director of Claims *brushed him off* and told him *to just keep doing his job*. ¶112. That is the same treatment Dr. Olymbios received. ¶¶97, 127, 260. The Director of Claims brushed off FE-11's concerns while FE-11 reported to Seeto, and Seeto brushed off Dr. Olymbios' substantially similar concerns. ¶97. As another senior executive explained, the reason why none

of the senior managers pushed for legal operations was because "we were all terrified for our jobs." ¶114.

Importantly, the Court only required "corroboration from confidential witnesses that had brought *similar concerns* to Seeto *or* Maag." Order at 7. The "concerns" the Director of Claims discussed with Seeto are highly "similar" to those Dr. Olymbios discussed with him, contrary to Defendants' arguments. FE-11 satisfies that standard just as FE-19.

**B.    The SAC Pleads New Facts Corroborating Dr. Olymbios Raised His Concerns Before Leaving The Company But Senior Executives Did Nothing in Response Because They Were All "Terrified"**

As a direct report of C-Suite executives, FE-11 observed Dr. Olymbios was, in fact, "*vocal*" about the Company's Medicare overbilling practices.   ¶114.   "To be honest, [Dr. Olymbios] *told me*" about his Medicare overbilling concerns, as FE-11 put it – but he and other senior managers did nothing about it because "we were all terrified for our jobs." *Id.* These facts support Dr. Olymbios' claim he "repeatedly warned CareDx's most senior executives, including Defendants Maag and Seeto, about this illegal [Medicare] misconduct." ¶24. These same facts explain why Dr. Olymbios' peers – other senior executives, did nothing. They understood Seeto and Maag would fire them. ¶114. These same facts also corroborate Dr. Olymbios' claims he texted with other employees about the Medicare scam because FE-11 said Dr. Olymbios *was "vocal"* about the issue. *Id.*

Defendants mischaracterize FE-11's role at the Company. MTS at 5. FE-11 was a "high level executive . . . who reported directly to a C-Suite executive from 2019-2021." ¶96. Clearly, FE-11 was in a position to know how the C-Suite operated at the time. The facts he provides must be credited for this reason. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

FE-11's facts thus support Dr. Olymbios' claims he had conversations about the Medicare billing violations with other employees. *See* Order at 6.

**C.      The SAC Alleges New Facts Bolstering Dr. Olymbios' Credibility and Reliability and Directly Corroborating Dr. Olymbios' Allegations Are Based on His Own Personal Knowledge (Not Merely His "Attorneys' Investigation")**

New facts alleged in the SAC placing Dr. Olymbios' critical role at the Company into context further strengthen the quality of the evidence he has provided to the Retirement Funds in this case.  ¶31.

The securities laws refer to Dr. Olymbios as a special type of witness – a "whistleblower" – a critical witness who plays an important role in protecting the Retirement Funds and other investors from the damages their holdings suffer as a result of fraud.  ¶¶47-50.  This role is significant in private actions such as this case.  As Justice Ginsburg stated in describing the importance of private actions like this one: "This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an ***essential supplement*** to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).

Dr. Olymbios' unblemished record of accomplishment in the medical field shows his facts "contain their own indicia of reliability," such that the facts he provides carry extra weight.  *See, e.g.*, *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014). He has served patients at two of the most prominent medical centers in the world, including Cedars-Sinai in Los Angeles, and he has been published extensively.  ¶¶51-52.  These facts show his account is inherently reliable.

The fact Dr. Olymbios earned praise and rapid promotion within the Company ***mere months before he left the Company***[4] further contributes to the indicia of reliability underlying the evidence he provides.  While Defendants predictably cast aspersions on Dr. Olymbios as

---

[4]    Defendants' counter-allegations Dr. Olymbios was merely a "disgruntled former employee" who purportedly "stole over 50,000 CareDx documents and emails, including confidential, competitive intelligence relevant to Dr. Olymbios' new role at Natera" (MTS at 2), are not only baseless attempts to discredit a legitimate whistleblower who called out the Company for its illegal practices but are highly inappropriate at the pleading stage and should not be considered.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (Defendants are not "permitted to present their own version of the facts at the pleading stage.").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT                              - 9 -
4873-3956-4668.v1

supposedly a "disgruntled former employee," their actions tell a far different story – indeed, email evidence shows defendant Maag specifically praised Dr. Olymbios for his hard work and the "tremendous impact" he had on CareDx.  ¶68.  Documents and testimony also establish Dr. Olymbios had a lead role in the Company's sales and marketing actions.  ¶¶62-67.  Seeto and Maag promoted him on May 1, 2020 to run sales of AlloSure, the Company's number one product, with the Company's "RemoTraC" program accounting for "more than 50%" of the sales of that product.  *See* ¶¶71-75; *see also* ¶¶58-59 (quoting Maag's testimony: AlloSure was "our most important product"; "[our] most important activity"; "we have a very detailed monitoring" of its use; "***90 percent***" of the sales and marketing budget is devoted to AlloSure).  Moreover, email evidence from October 2, 2020 shows a "***Senior Vice President***" of the Company referred to Dr. Olymbios and to Seeto, Maag, and two others as the "***Leadership Team***" – meaning Dr. Olymbios was senior to the Senior Vice President and a peer to Defendants Maag and Seeto.  ¶87.  These facts make crystal clear Dr. Olymbios is a highly credible source who was "'in a position to be personally knowledgeable'" of the facts alleged, particularly those describing his own direct interactions with Defendants Seeto and Maag.  *LifeLock*, 780 F. App'x at 484 n.5.  Indeed, Dr. Olymbios' reliability "***exceeds that of confidential sources other courts find sufficiently reputable due to his disclosed identity, elevated position, and first-hand knowledge of many pertinent events.***" *Mattel*, 2021 WL 1259405, at *8 (crediting allegations from former tax director named in Rule 10b-5 complaint).

These facts place Dr. Olymbios' email in the SAC into its proper context.  While Justice Ginsburg was clear in *Tellabs*, 551 U.S. at 324, that no "'smoking-gun' genre" of facts is necessary to infer scienter in securities fraud cases like this one, the following email from Dr. Olymbios to counsel for the Retirement Funds in ***this*** case certainly falls into that genre:

**From:** Michael <michael.olymbios@gmail.com>
**Sent:** Thursday, January 26, 2023 10:27 AM
**To:** Shawn Williams; Jason Davis
**Subject:** CareDx complaint

EXTERNAL SENDER
Dear Mrs. Williams and Davis,

I am writing to you with interest in your amended complaint filed on behalf of shareholders of CareDx against the company and its executives. I am Michael Olymbios, the former employee referenced in your complaint. I was relieved to see that other former employees were willing to come forward to corroborate my observations.

I write to offer my full cooperation in your investigations and in your case. Peter Maag, Reg Seeto, Sasha King and Sham Dholakia are crooks. They are despicable people with no regard for anyone— shareholder or patient. They continue to retaliate against me personally. Seeto is burning through CareDx's cash on personal legal vendettas. The entire enterprise is a house of cards, generating revenue through illicit conduct as you have found.

I wish you the best in your case.

With best regards,
Michael Olymbios
███████████

¶31.[5]

The SAC quotes this email in full. *Id.* The illicit conduct referenced in the "amended complaint" is clear: "Plaintiffs alleged [in the amended complaint] that during the Class Period, CareDx relied on billing unnecessary AlloSure tests to Medicare, facilitated by illegal kickback schemes, to boost its testing services revenue." Order at 3. The January 26, 2023 email references the allegations in the FAC (which were realleged in the SAC) and confirms that those allegations are ***true*** ("[t]he entire enterprise is a house of cards, generating revenue through illicit conduct ***as you have found***") and that those allegations and Dr. Olymbios' own allegations ***corroborate each other*** ("I was relieved to see that other employees were willing to come forward to ***corroborate my observations***"). ¶31.

The email itself establishes Plaintiffs did not rely solely "on the analysis of attorneys in different actions," Order at 6, but Plaintiffs relied on the exact ***source*** of those allegations, namely,

_____

[5] Dr. Olymbios independently sent this email to Plaintiffs' counsel without being asked.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT          - 11 -
4873-3956-4668.v1

Dr. Olymbios himself.  Indeed, the fact that Dr. Olymbios – an extremely sophisticated medical professional and high-ranking former executive – reviewed the FAC and, on his own accord, wrote to Plaintiffs' counsel to confirm the FAC's allegations are accurate is extremely compelling evidence of their reliability.  In fact, Plaintiffs are aware of no case – and Defendants have not cited one – where a court has found *a witness' own sign-off* to be insufficient to credit that witness' allegations for Rule 11 purposes.

This Court was procedurally barred from considering the substance of Dr. Olymbios' email in its prior orders.  As the Court correctly pointed out, the email "was received" – by the attorneys for the Retirement Funds in *this* case – "*after* the filing of the" the prior amended complaint.  Order at 8.  Clearly, that email could not have been part of the corroborative process Plaintiffs undertook *before* they filed the FAC.  Now the email is properly before the Court, as it was received before and incorporated into the SAC; it is compelling evidence *all* of the fact allegations attributed to Dr. Olymbios in his third-party complaint are, in fact, completely accurate; but more importantly for present purposes, the email shows it is *reasonable* to credit those allegations for Rule 11 purposes.

Finally, Plaintiffs' counsel's discussions with Dr. Olymbios' counsel have now been alleged in the SAC as further confirmation Dr. Olymbios' allegations are entirely based on *his own personal knowledge* and experience and not merely based on "investigation performed by Dr. Olymbios's counsel." *Id.*  Indeed, even courts in this Circuit applying *Connetics I* have found where the plaintiffs' counsel discuss the allegations in a non-party's complaint with that non-party's counsel, this constitutes a satisfactory "[independent investigation] by plaintiffs' counsel" such that the allegations in the other complaint can be credited at the pleading stage.  *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *5-*6 (C.D. Cal. Jan. 24, 2023) (discussing *Connetics I* and crediting facts in a Rule 10b-5 complaint sourced another complaint because "[p]laintiffs state[d] in their opposition that Plaintiffs' counsel contacted attorneys in [the non-party former employee's] action to discuss the basis for her allegations").  In fact, one of the authorities cited by Defendants in *this* case reached the same conclusion as *Lako*.  *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) ("If [p]laintiffs wish

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT                    - 12 -
4873-3956-4668.v1

to use the allegations of other complaints, they must at least **contact the attorneys** in the other cases from which they copied the allegations **to discuss the basis for the allegations**.")

Both *Lako* and *Countrywide* have some grounding in the rules governing the kinds of information parties can access from third parties – *i.e.*, the actual **witnesses** who bring the third-party complaints and make factual statements in those documents. These witness-plaintiffs (like Dr. Olymbios) are, obviously, represented by counsel. That fact has two practical implications: (1) other attorneys cannot contact those witnesses directly; **and** (2) the attorneys representing the third-party witness plaintiff (in this case, Dr. Olymbios) **are** permitted to make certain factual representations on behalf of the client. *See* CA ST RPC Rule 4.2(a) ("[A] lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."); *see also Magic Leap, Inc. v. Chi Xu*, 2020 WL 3268659, at *11 n.1 (N.D. Cal. June 17, 2020) (adopting standards in local rules); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226-27 (9th Cir. 1988) (factual arguments by counsel may be considered "admissions of the party").

As such, it is eminently reasonable for any pre-filing investigation to place weight on practicing attorneys who explain what **the factual bases** of their client's factual statements are. In this case, there is **no dispute** Dr. Olymbios was personally in a position to witness each and every fact at issue; as Plaintiffs explain in the SAC: they held no fewer than "five discussions with Dr. Olymbios (via counsel) **confirming that Dr. Olymbios is the source of the facts** set forth in this Complaint and that they are **based on his personal knowledge**, as further corroborated by former CareDx employees and other sources." SAC at 1. That process **is** a reasonable investigation into the source of the facts alleged in Dr. Olymbios' complaint.

**D.**     **The SAC Pleads New Facts Corroborating Dr. Olymbios' Allegations Maag Called Dr. Olymbios to Tell Him "There Are Certain Things that Shouldn't Be Put in Writing . . . Even if that's How CareDx Operated"**

New documentation from the Company's files and related testimony also "go[] towards corroborating the allegations" from Dr. Olymbios' August 2020 call with Maag "such that they are reasonable." Order at 7. The SAC describes the call in detail.

Specifically, the SAC alleges CareDx also violated the Anti-Kickback Statute in order to juice its testing revenues by, for example, offering to waive patient costs. As Dr. Olymbios explained, without initially realizing the practice was illegal, he became aware that, when marketing its services to nephrology practices, CareDx was using the "***talking point***" that it never billed its patients directly for its tests, ***such that patients would have no out-of-pocket expenses for the tests***. ¶140. In or around August 2020, Dr. Olymbios wrote an email directly to defendant Maag and another high-level CareDx executive that the Company should include the fact CareDx "***never bills patients***" in a marketing letter to a nephrology practice. *Id.* However, defendant Maag responded with a phone call, in which he said he was "***calling because there were things he couldn't be associated with as the CEO***" and "***there were certain things that shouldn't be put in writing***" – such as the fact CareDx never billed patients directly for tests "***even if that's how CareDx operated***." *Id.* Promising never to bill patients is, in fact, a violation of the federal Anti-Kickback Statute and other laws and regulations. *Id.*; *see also* MTS at App'x 1 (listing ¶140 among the seven paragraphs Defendants move to strike).

The foregoing facts attributed to Dr. Olymbios have new documentary support and support from related testimony. Indeed, the SAC includes an internal Company document representing to medical doctors AlloSure was "FULLY COVERED BY MEDICARE." ¶64 (providing a screenshot of the Company's internal document). Maag testified that, in preparing such marketing materials, he and other executives would exchange "hundreds, if not a thousand e-mails" about them. ¶63. Dr. Olymbios, in turn, testified the document "wasn't [supposed] to be left with anyone . . . [but] as a visual aid for . . . discussion." ¶67. Accordingly, the document and sworn testimony corroborate the fact Dr. Olymbios and defendant Maag had direct responsibility for the Company's

AlloSure marketing materials, specifically discussed the contents and usage of those marketing materials, and were fully familiar with them.  Nothing else is required to "independently corroborate" Dr. Olymbios' allegations.

**E.    The SAC Pleads Maag's Former Executive Assistant and Maag's Own Admissions Corroborate Dr. Olymbios' Allegations About Maag's Personal Oversight of Improper Kickback Expenditures**

In its prior orders, the Court found Plaintiffs could rely on Maag's secretary as a reliable source of information when it came to Maag's business dealings.  Order at 7 ("Plaintiffs could have corroborated that Olymbios had discussions with Maag or Seeto with a confidential witness that had ***reason to know*** of the discussions, such as ***FE-6, Maag's former executive assistant***."). FE-6 ***did*** have reason to know of Maag's business dealings and she provided facts showing Maag personally was involved in illegally paying doctors kickbacks and incentives to order unnecessary tests:

> ***FE-6 [who served as Senior Executive Assistant to the Chairman and CEO from December 2013 to July 2020] corroborated Dr. Olymbios' claims***.  For example, FE-6 described CareDx's practice of hosting "symposiums," where it paid for doctors' flights, limo services to and from the airport, hotels, and bottles of champagne in the doctors' hotel rooms.  FE-6 further explained that CareDx hosted two key opinion leader "summits" in San Francisco every year that started on Thursdays and ended on Fridays (i.e., the summits lasted only about a day and a half).  CareDx would then pay for attending doctors to spend the weekend in Napa Valley.  The doctors were taken to Napa, chauffeured around in limousines hired by CareDx, and brought to four different vineyards – each of which hosted a $100-per-person wine tasting ***paid for*** by CareDx.  The doctors were also provided breakfast, lunch, and dinner at fine restaurants, ***all on CareDx's dime***.  FE-6 explained that ***Defendant Maag not only attended these outings but personally selected the vineyards and restaurants***.

¶126.

Tellingly, while Defendants ask the Court to strike the fact that "Maag himself personally signed off on the expenses" because they are "derived exclusively from Olymbios Complaint" (MTS at Appendix 1), they ignore the fact that admission comes directly from Maag himself:

> Admitting complicity in these illegal kickbacks, Defendant Maag testified under oath in the CareDx-Natera Litigation that he ***personally authorized virtually all of the "marketing" expenses*** at the heart of Defendants' scheme.  He testified about personally attending "meeting conferences" where CareDx spent money marketing AlloSure to kidney doctors as "[w]e are not a very large company."  He explained:

I am engaging with the team on those.  And then ***I am signing off on all the expenses***.  For a long time in the company, I signed every check in the company. . . .  I think my team [at CareDx] would call me being ***very hands-on and detailed oriented***, so, yes, ***I was very involved***.

Defendant Maag further admitted to regularly attending CareDx's "marketing" events with doctors.  He testified about "meeting conferences" where CareDx spent money marketing AlloSure to kidney doctors, with Maag testifying: "I'm more or less present at many of these meetings happening."  ¶¶128-129.

Plain and simple, when a Company's CEO testifies under oath he was "very hands-on and detail oriented," "very involved" in the marketing of AlloSure, and his involvement went so far that he personally "sign[ed] off on all the expenses," such extraordinary facts unquestionably corroborate Dr. Olymbios' allegations "Maag himself personally signed off on the expenses" and "CareDx executives [thus] unquestionably knew this behavior was occurring."  ¶¶54, 127-128.

Thus, the following paragraph – which Defendants moved to strike – is amply corroborated both by Maag's secretary and by Maag's own testimony:

CareDx executives unquestionably knew this behavior was occurring because Dr. Olymbios ***reported his concerns to the Company's most senior executives, including Defendants Maag and Seeto***, and because Defendant Maag himself personally signed off on the expenses.  Similar, Dr. Olymbios ***directly told these executives*** about facts demonstrating the Company was offering improper kickbacks to medical doctors who could influence sales of AlloSure. ***Dr. Olymbios gave them examples of such kickbacks***.  "CareDx offered ***unrestricted grants*** to physicians to not enroll patients in competitors' clinical trials or to induce practices to place patients on an AlloSure surveillance protocol, even when doing so was ***not warranted or authorized under Medicare billing guidelines***," as Dr. Olymbios observed.  He continued: "CareDx organized 'advisory boards' that were little more than marketing exercises to encourage physicians to order AlloSure tests," and Dr. Olymbios averred: "***CareDx monitored advisory board activity and how they impacted sales***." ¶127.

IV.    **CONCLUSION**

The Court should deny Defendants' motion to strike in full for the reasons set forth above.

DATED:  August 30, 2023                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JASON C. DAVIS

s/ Jason C. Davis
JASON C. DAVIS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
SEAN C. MCGUIRE
NICOLE Q. GILLILAND
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
smcguire@rgrdlaw.com
ngilliland@rgrdlaw.com

DATED:  August 30, 2023

SAXENA WHITE P.A.
LESTER R. HOOKER

s/ Lester R. Hooker
LESTER R. HOOKER

7777 Glades Road, Suite 300
Boca Raton, FL  33434
Telephone:  561/394-3399
561/394-3382 (fax)
lhooker@saxenawhite.com

SAXENA WHITE P.A.
DAVID R. KAPLAN
12750 High Bluff Drive, Suite 475
San Diego, CA  92130
Telephone:  858/997-0860
858/369-0096 (fax)
dkaplan@saxenawhite.com

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT                           - 17 -
4873-3956-4668.v1

SAXENA WHITE P.A.
STEVEN B. SINGER
RACHEL A. AVAN
JOSHUA H. SALTZMAN (admitted *pro hac vice)*
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: 914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
ravan@saxenawhite.com
jsaltzman@saxenawhite.com

Lead Counsel for Lead Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ALLEGATIONS IN
PLAINTIFFS' SECOND AMENDED COMPLAINT - 3:22-cv-03023-TLT
4873-3956-4668.v1

- 18 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on August 30, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Jason C. Davis
JASON C. DAVIS

ROBBINS GELLER RUDMAN
    & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
Email:  jdavis@rgrdlaw.com

4873-3956-4668.v1

# Mailing Information for a Case 3:22-cv-03023-TLT Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alec T Coquin**
  acoquin@labaton.com

- **Charles Dean Cording**
  ccording@willkie.com,mao@willkie.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Barrington E. Dyer**
  bdyer@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Laura Leigh Geist**
  lgeist@willkie.com,tnocco@willkie.com,maosf1@willkie.com,cwindsor@willkie.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **Lester Rene Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com

- **David R. Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Sean Christopher McGuire**
  smcguire@rgrdlaw.com

- **Erica Symone Miranda**
  emiranda@willkie.com,tnocco@willkie.com,maosf@willkie.com,ealcantara@willkie.com,mallard@willkie.com,cwindsor@willkie.com

- **Tariq Mundiya**
  tmundiya@willkie.com,mao@willkie.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Joshua H Saltzman**
  jsaltzman@saxenawhite.com

- **Brady Michael Sullivan**
  bsullivan@willkie.com,CLee2@willkie.com,mao@willkie.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)