Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
          ccording@willkie.com
          bsullivan@willkie.com


Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA  94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
          bdyer@willkie.com


Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,*
*Ankur Dhingra, and Peter Maag*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>        Defendants. | Case No. 22-cv-03023-TLT<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date:  October 31, 2023<br>Time:  2:00 PM<br>Courtroom:  9, 19th Floor<br>Judge:  Hon. Trina L. Thompson |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................................1

II.   ARGUMENT .................................................................................................................3

    A.    Plaintiffs Fail to Plead a Strong Inference of Scienter......................................3

        1.    The Olymbios Allegations Have Already Been Rejected.............................3

        2.    The FE Allegations Are Insufficiently Pleaded ................................3

        3.    Allegations that Dr. Maag and Dr. Seeto Paid Close Attention to AlloSure Sales and Participated in Sales Trainings Do Not Establish Scienter..............5

        4.    Allegations of Bullying and Coercion Are Not Directed to the Individual Defendants or Connected to the Alleged Fraud................................6

        5.    No Allegations of Mr. Dhingra's Scienter.......................................7

        6.    No Allegations of Motive to Defraud ..........................................7

    B.    Plaintiffs Fail to Plead Material False Statements or Omissions..................................7

        1.    Representations in Underwriter Agreements Prefaced with Express Warnings Not to Rely on Those Representations Are Not Actionable ..........................7

        2.    Plaintiffs Fail to Allege that CareDx's Risk Disclosures Were False .............9

        3.    Plaintiffs Effectively Abandon Their Allegations of False Revenue Recognition Based on Unsupported "Expert" Opinions................................9

        4.    Allegations of Regulatory Misconduct Do Not Render False Defendants' Reporting of Testing Services Revenue.........................................10

        5.    Plaintiffs Fail to Allege that Defendants' Descriptions of RemoTraC Were False ..............................................................................12

        6.    Plaintiffs Again Fail To Allege that Defendants' Stated Justifications for Declines in ASP Were False..................................................12

    C.    Plaintiffs Fail to Plead Loss Causation ...........................................................13

III.  CONCLUSION.............................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ...........................................................................9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................................9

*In re BofI, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...............................................................................................15

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)................................................................................9

*City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) .................................................................................4

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. 2019) ...................................................................................11

*Crowell v. McCormick*,
2007 WL 9735010 (N.D. Cal. Nov. 16, 2017) .....................................................................12

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017)..............................................................11, 12, 13

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) .................................................................................14

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ..........................................................................9

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ......................................................................................9

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2014) ........................................................................................13, 14

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
2023 WL 2532061 (9th Cir. 2023) .........................................................................................5

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) .............................................................................................8, 9

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) .......................................................................14

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...................................................................................14

*Mauss v. NuVasive, Inc.*,
2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ...........................................................4

*Mauss v. NuVasive, Inc.*,
2016 WL 3681831 (S.D. Cal. July 12, 2016) ...........................................................8, 9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...............................................................................11, 12

*Mortg. Elec. Registration Sys., Inc. v. Koeppel*,
2020 WL 1233925 (N.D. Cal. Mar. 13, 2020)...........................................................13

*Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*,
2023 WL 4418886 (N.D. Cal. May 24, 2023)..................................................... *passim*

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .......................................................10, 11

*In re Redback Networks Inc. Sec. Litig.*,
2007 WL 4259464 (N.D. Cal. Dec. 4, 2007)...............................................................10

*Reese v. BP Exploration (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) ..................................................................................8, 9

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .......................................................................................8

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009) .....................................................................................9

*In re Syncor Int'l Corp. Sec. Litig.*,
239 F. App'x 318 (9th Cir. 2007) ...............................................................................10

*In re Verifone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .......................................................................................6

*Weston v. DocuSign, Inc.*,
2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) .............................................................5

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......................................................................................4

## STATUTES RULES AND REGULATIONS

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67...................................1, 2

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

## I.    INTRODUCTION

Plaintiffs' opposition (ECF No. 96, "Opp." or "Opposition") confirms their inability to state a claim for securities fraud.[1]  Plaintiffs double down on arguments that this Court previously rejected and rely upon allegations cribbed from the Olymbios Complaint that the Court previously struck. Downplaying the RemoTraC allegations that were once central to their case, Plaintiffs now allege a sweeping healthcare fraud and then attempt to connect the Individual Defendants to that alleged fraud to try, in turn, to allege a securities fraud.  Plaintiffs do not succeed.  The SAC fails to plead a compelling inference of scienter as to any Defendant.  The SAC also fails to adequately allege either the underlying purported Medicare fraud or false disclosures based on it.  And the SAC fails to adequately allege loss causation.  The Court has provided Plaintiffs ample opportunity to remedy their pleadings and yet they have not done so.  The SAC should be dismissed, this time with prejudice.

In response to Defendants' Motion to Dismiss, the Opposition cedes much ground.  Plaintiffs all but abandon their allegation in the SAC, pled through various unnamed experts, that CareDx overstated revenue by $117 million during the Class Period.  They abandon their theories about RemoTraC improperly "bundling" tests, and concede that their only basis for attacking specific RemoTraC statements is that they were spoken against the backdrop of a broader Medicare fraud. They abandon their allegations challenging statements that there had been "no material change" in the Company's risk disclosures.  They essentially concede that the SAC fails to plead motive to defraud. They no longer seriously argue that this is a "scheme liability" case.  And they waive any claim that loss causation was pled through "materialization of risk."

As to what remains in dispute:

*First*, Plaintiffs fail to plead a compelling inference of scienter as to each of the three Individual Defendants as required by the PSLRA.  MTD 7–13.  The Opposition barely mentions Mr. Dhingra, much less pleads a compelling inference of scienter.  As to Dr. Seeto and Dr. Maag, the Opposition relies heavily on:  (1) allegations from the Olymbios Complaint, not only previously stricken, but also

---

[1] Unless otherwise noted, defined terms have the same meaning as they do in Defendants' Motion to Dismiss, ECF No. 89 ("MTD").

rejected as insufficiently particularized; (2) allegations from Former Employees that fail to establish any connection between Dr. Seeto and Dr. Maag and any securities fraud; and (3) allegations (also already rejected by the Court) that Defendants paid close attention to AlloSure, were "hands on," and attended marketing meetings.

*Second*, Plaintiffs fail to plead any false statements with the particularity required by the PSLRA.  MTD 13–22; *see also id.* at Appendix A-1 to Appendix A-3.

- ***Underwriting Agreement Representations***.  These representations cannot form the basis for securities claims because CareDx expressly warned investors not to rely upon them.  *See Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*, 2023 WL 4418886, at *9–11 (N.D. Cal. May 24, 2023) ("MTD Op.").  Plaintiffs, in substance, seek reconsideration of the Court's ruling (which should be denied) and then argue that, because investors were generally interested in CareDx raising money, the express warning language should be ignored.  This argument does not withstand scrutiny.

- ***Risk Disclosures***.  The Opposition fails to point to a single allegation in the SAC that CareDx's warned-of risks—that legal scrutiny could have an adverse impact on the business—had already come to fruition and impacted its business.

- ***Testing Service Revenue***.  The Opposition repeats the same arguments from the FAC that Defendants deceived investors by attributing the Company's revenue growth to testing services revenue and disclosing that RemoTraC satisfied an "unmet need," while offering nothing that would compel a different outcome this time around.

- ***Decline in ASP***.  Here, too, the Opposition relies on a theory this Court already rejected:  that CareDx misled investors about the reasons for the decline in ASP.  The only new allegation is from a Former Employee who does not actually contradict any of CareDx's ASP disclosures.

*Finally*, the Opposition argues that loss causation should be inferred because CareDx's announcement of disappointing financial results (namely, a decline in ASP) "coincided" with the announcement of government investigations in October 2021.  But the SAC lacks any well pled allegation attributing the decline in ASP to government scrutiny of CareDx's reimbursement practices.  And, pointedly, the decline in ASP also "coincided" with other corporate disclosures, such as the launch of AlloSure Lung, which CareDx acknowledged *did* contribute to the decline.  Finally, nothing in the Opposition establishes that the Olymbios Complaint—the only new corrective disclosure alleged in the SAC—was treated by the market as revealing a fraud.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

## II.    ARGUMENT

### A.    Plaintiffs Fail to Plead a Strong Inference of Scienter

Plaintiffs do not dispute that the SAC must plead a strong inference of scienter as to each Individual Defendant, and that pleading corporate scienter as to CareDx requires imputing scienter from an Individual Defendant.  MTD 8.  Plaintiffs' various theories, many of which were previously rejected when this Court dismissed the FAC, all fail to meet this heightened pleading requirement.

#### 1.    The Olymbios Allegations Have Already Been Rejected

Plaintiffs rely on the same two allegations from Dr. Olymbios that they did in the FAC:  (i) Dr. Olymbios raised unspecified "concerns" with executives, including Dr. Seeto and Dr. Maag; and (ii) Dr. Maag told Dr. Olymbios to not put in writing that CareDx does not bill patients for tests.  *See* Opp. 9, 20.  As the Court found previously, both must be stricken.  Even so, neither support scienter.

With respect to the former, Plaintiffs ignore that the Court already found "these allegations are not sufficiently particularized."  MTD Op. *7.  Fatally, the Opposition cites no allegations as to "when these discussions took place or the content of these discussions."  *Id.*

With respect to the latter, after Defendants pointed out that not billing patients was inconsistent with Plaintiffs' theory that CareDx *overbilled* for too many AlloSure tests, MTD 9—Plaintiffs now pivot and claim that "Defendants did not bill patients for *their portion* of medical bills."  Opp. 8, n.3.  But this allegation is not pleaded in the SAC (nor does the SAC explain how it relates to Plaintiffs' core theory of Medicare fraud).  This new theory also contradicts other allegations that, for example, patients were "*billed for*" "so many CareDx tests."  ¶ 112 (emphasis added).  Thus, Plaintiffs fail to advance a coherent theory as to why Dr. Maag's alleged remark supports Dr. Maag's scienter.

#### 2.    The FE Allegations Are Insufficiently Pleaded

FE-6:[2]    Plaintiffs suggest that it does not matter whether FE-6 alleges that Dr. Maag participated in physician "symposiums" *during the Class Period*, as long as Dr. Maag did so at *any point in time* before his challenged statements.  Opp. 20.  But allegations of scienter must give rise to

---

[2] Plaintiffs acknowledge that FE-6's allegations are only potentially relevant to scienter "for Defendants' Compliance Statements," Opp. 18, none of which are actionable, *see* II.B.1 and II.B.2, *infra*.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

a strong inference that the defendant was aware of facts contradicting the challenged statement *at the time the statement was made*. MTD 10–11. Here, FE-6—whose employment extended only three months into the beginning of the Class Period—cannot allege that Dr. Maag participated in symposiums during (or even close to) the time of his challenged statements.[3]

FE-10: Plaintiffs concede that FE-10's personal knowledge extends to only "(1) [FE-10's] firsthand account of conversations he observed between Seeto and the Director of Claims" in which they discussed the 50% reimbursement rate; and (2) FE-10's "own review of claims." Opp. 20. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (requiring allegations "that the witnesses in question ha[ve] personal knowledge of the events they report").

With respect to the alleged conversations between Dr. Seeto and the Director of Claims, Plaintiffs ignore that the Court previously considered and rejected Plaintiffs' claim that the "50% reimbursement rate" represented 50% of claims being denied by Medicare for lack of medical necessity, as opposed to CareDx not being reimbursed for a variety of nonculpable reasons, including a lack of private payer or Medicare coverage for certain of its tests. *See* MTD Op. *11 ("Plaintiffs have not sufficiently alleged particularized facts to support the inference that CareDx's explanation [for declining ASPs] is false."). With respect to FE-10's own alleged review of claims, this says nothing about the knowledge of others.

Plaintiffs also claim that FE-10 alleges "it was common knowledge at the Company that some patients were having expensive AlloSure tests performed every month without justification." Opp. 19. This allegation appears nowhere in the SAC. In any event, Plaintiffs put forth no authorities crediting these types of sweeping "common knowledge" allegations.[4]

---

[3] Plaintiffs cite *Mauss v. NuVasive, Inc.*, 2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ("*NuVasive I*"), as an example of "scienter based on confidential witness allegations that executives participated in [a] kickback scheme," Opp. 17, but plaintiffs in *NuVasive I* raised a number of allegations notably absent from the SAC, such as (i) the individual defendants received a written report from the board detailing that physician expenses did not comply with regulations and (ii) two confidential witnesses informed an individual defendant about the fraud. *NuVasive I*, at *3–4, *11.

[4] Plaintiffs cite *City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1042 (N.D. Cal. 2018) as "crediting FE where information 'was well known internally and

4

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

FE-19:  Plaintiffs merely repeat FE-19's allegations (Opp. 18–19) without addressing the vast majority of Defendants' arguments, which demonstrated that FE-19's allegations are not sufficiently particularized, inconsistent with Plaintiffs' other allegations, and unrelated to the purported misconduct that allegedly falsified Dr. Seeto's statements.  MTD 12–13.

### 3.    Allegations that Dr. Maag and Dr. Seeto Paid Close Attention to AlloSure Sales and Participated in Sales Trainings Do Not Establish Scienter

Other than the inadequate FE allegations, Plaintiffs recycle a number of additional scienter theories that the Court already rejected.

First, Plaintiffs rely on allegations that Dr. Maag participated in "meeting conferences" and "marketing events," authorized marketing expenses, and monitored "AlloSure's performance" in "detail."  Opp. 17–18 (citing ¶¶ 128–30).[5]  But Plaintiffs once again ignore the Court's opinion, which rejected these same arguments.  *See* MTD Op. *8 (rejecting claims that "executives paid close attention to sales of AlloSure" and "senior executives attended weekly meetings to discuss sales and marketing issues").  Nothing has changed to alter the Court's reasoning.  While Plaintiffs analogize to cases that involved allegations of monitoring the "'data that were *the subject of the allegedly false statements*,'" Opp. 18, the SAC does not allege that Defendants misstated AlloSure's performance.  Rather, the SAC alleges that CareDx billed Medicare for AlloSure tests that were not medically necessary.[6]

---

openly communicated at staff meetings.'"  Opp. 20.  But the quoted portion of the opinion concerned *falsity*, not *scienter*.

[5] Plaintiffs are incorrect that the SAC alleges CareDx "bribed providers with lavish gifts and kickbacks" at the "marketing events" allegedly attended by Dr. Maag.  Opp. 17.  The SAC alleges only that Dr. Maag attended marketing events "where CareDx spent money marketing AlloSure to kidney doctors," which is not alleged to be improper.  ¶¶ 129–30.

[6] Plaintiffs' cases illustrate this distinction.  In *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *20 (N.D. Cal. Apr. 18, 2023) (Opp. 18), defendants allegedly misrepresented the sustainability of post-COVID growth, and defendants had access to customer retention metrics that showed waning usage of the company's product.  2023 WL 3000583, at *20.  *See also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 2023 WL 2532061, at *16 (9th Cir. 2023) (defendants accessed database "that would allow Individual Defendants to learn when the company was short on its pipeline" where alleged misstatements were about strength of the pipeline).

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

Second, Plaintiffs emphasize allegations—also copied from the FAC—that Dr. Maag and Dr. Seeto were "hands on" managers, and that Dr. Maag was "detail oriented." Opp. 18–19. Such allegations—which apply to many business executives—are not sufficient to establish a strong inference of scienter in the absence of other, more compelling allegations.[7]

Third, Plaintiffs point to allegations that Dr. Maag and Dr. Seeto attended sales trainings. Opp. 18. Plaintiffs' rationale for why these allegations support scienter does not hold water. Plaintiffs allege that (a) Dr. Maag and Dr. Seeto attended sales trainings and (b) sales personnel violated regulations by "require[ing] both 'standard of care' and AlloSure testing at the same cadence." Opp. 18; ¶ 88. From these two allegations, Plaintiffs inexplicably ask the Court to deduce that the "only cogent inference that can be drawn from these facts is Defendants either instructed CareDx's salespeople to push AlloSure tests that were medically unnecessary or recklessly disregarded the illegal conduct." Opp. 18. But this is not so. The SAC suggests, at best, that Dr. Maag's involvement in sales consisted of "making sure that [field teams] have the materials available" and "making sure that we have the resources allocated."  ¶¶ 56, 58. (There are no allegations about Dr. Seeto's involvement in sales.) Accordingly, the SAC fails to establish a strong inference that Dr. Maag or Dr. Seeto instructed the sales teams to do anything, let alone to engage in misconduct.

### 4.    Allegations of Bullying and Coercion Are Not Directed to the Individual Defendants or Connected to the Alleged Fraud

Plaintiffs point to allegations that FE-19's colleague said "she was being bullied[,] intimidated, and coerced . . . to not provide information or misreport information [in] the DOJ investigation." Opp. 21. Plaintiffs suggest "management" was responsible, *id.*, but that is not what the SAC alleges, *see* ¶ 97, much less that the Individual Defendants were responsible. In any case, these allegations are not tied to the alleged fraud, as the Court already determined "Plaintiffs did not allege that the fraudulent practice of overbilling Medicare was the subject of the [DOJ/SEC] investigations." MTD Op. *8.

---

[7] *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) (Opp. 19), where plaintiffs alleged individual defendants were "hands on managers," makes clear why the circumstances here do not support a finding of scienter. There, unlike here, plaintiffs also alleged that the individual defendants *personally manipulated* the company's reported financials. *See id.* at 708–09.

Likewise, FE-11's allegation that they did not raise Medicare billing concerns because "'we were all terrified for our jobs'" (Opp. 21) in no way implicates the state of mind of the Individual Defendants.

### 5.    No Allegations of Mr. Dhingra's Scienter

The allegations as to Mr. Dhingra are even barer. The Opposition relies primarily on conclusory allegations that Mr. Dhingra "knew what was going on in all aspects of CareDx's business, including reimbursements, as he managed the Company's market access team[.]" Opp. 19. But this is just a variation of the already-rejected argument that scienter may be inferred by allegations that "senior executives attended weekly meetings to discuss sales and marketing issues." MTD Op. *8. Nor does the fact that Mr. Dhingra explained to investors why ASPs were declining establish a strong inference that he knew those explanations were false. *See* Opp. 20–21. And the predicate for this claim—ASP declined because of a 50% Medicare rejection rate—has been rejected. *Supra* at II.A.2.

### 6.    No Allegations of Motive to Defraud

The Opposition does not even acknowledge the Ninth Circuit requirements for pleading motive to defraud through insider stock sales—*see* MTD Op. *8—let alone attempt to argue that the SAC's lone reference to stock sales (¶ 92) satisfies those requirements. Opp. 22, n.16. Plaintiffs have therefore conceded that the SAC fails to allege motive to defraud, which supports a non-culpable inference (MTD 13) and tips the balance of the holistic analysis even further in favor of Defendants.

### B.    Plaintiffs Fail to Plead Material False Statements or Omissions[8]

#### 1.    Representations in Underwriter Agreements Prefaced with Express Warnings Not to Rely on Those Representations Are Not Actionable

The Court previously dismissed Plaintiffs' claims—repeated in the SAC—that compliance-with-law representations in underwriting agreements were false, because "a reasonable investor would have viewed the disclaimer on the second page of the Form 8-K's and understood that the agreements were not meant to convey facts regarding CareDx." MTD Op. *10. Plaintiffs have offered nothing to compel a different outcome.

---

[8] The SAC also fails to allege any Medicare fraud, because it relies on unreliable and implausible FE allegations. MTD 13–14. Notably, Plaintiffs have also pivoted away from their theories that RemoTraC "induced" physicians to order medically unnecessary AlloSure tests, and that CareDx "obscure[ed] from patients and doctors" RemoTraC's bundling AlloSure tests with routine panels.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

Although the Court noted that a "different finding may result" if Plaintiffs alleged "investors were intensely interested" in the underwriting agreements, *id.* at *11, no different result is warranted here. To begin with, allegations of intense investor interest here would only serve to reinforce the warning: interested investors would take note of CareDx's disclosure and the warning not to rely on the representations. Moreover, Plaintiffs have failed to allege the type of "context" around the underwriting agreements (*id.*) that might support reliance by investors *absent* warning language. Opp. 12.[9] Instead, the SAC alleges: (i) CareDx needed liquidity (¶ 182); (ii) CareDx issued routine (and mandatory) disclosures about the offerings (¶ 184); (iii) Dr. Seeto remarked, in 2022, that investors appreciated CareDx having cash on hand (¶ 204); and (iv) one analyst took note of the June 2020 offering in a report (¶ 185). These allegations establish nothing more than general investor interest in CareDx's liquidity and financing. They do not establish "context" that would show particular investor focus on CareDx's underwriting agreements, which merely memorialized the contractual relationship between CareDx and the underwriting banks. Nor do they show "intense investor interest in the *details*" of the transaction, as in *Glazer*. 549 F.3d at 741 (emphasis added).

Plaintiffs cite a number of cases where courts found that compliance with law statements were actionable, Opp. 10–13, but those cases involved compliance with law statements in periodic SEC reports, not underwriter agreements or similar private contracts subject to warnings like CareDx's warning to investors. *See Reese v. Malone*, 747 F.3d 557, 577–78 (9th Cir. 2014) (statement in BP's annual report that management believed BP was "in compliance in all material respects with applicable environmental laws and regulations" was false when BP pled guilty to numerous environmental violations from the Prudhoe Bay oil spill);[10] *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *4 (S.D.

---

[9] The Court was quoting from *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 741 (9th Cir. 2008)—the only case in the Ninth Circuit to analyze "investor interest" in determining whether statements in a private contract were actionable. There, it was a merger agreement (not an underwriting agreement like here) and the statement at issue was *not* prefaced with any warning language as here.

[10] The Opposition fails to mention that plaintiffs in *Reese* had previously tried and failed to challenge a contractual provision contained in a royalty agreement, in which BP promised to "prudently operate" the Prudhoe Bay project. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 692–94 (9th Cir. 2011). Just as this Court found with respect to CareDx's underwriting agreement, the Ninth Circuit in *Reese*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

Cal. July 12, 2016); *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *3 (N.D. Ill. Feb. 10, 2023).[11] In fact, the underwriting agreements here instructed investors to read the agreements "in conjunction with the disclosures in the Company's periodic [SEC] reports," ¶ 181, which warned investors that CareDx may ***not*** be in compliance with healthcare laws, *see, e.g.*, ¶ 154.

### 2.    Plaintiffs Fail to Allege that CareDx's Risk Disclosures Were False

The MTD explained that the risks warned of by CareDx—legal "scrutiny," impairment of the "ability to conduct business," and decreasing Medicare reimbursement—were not alleged to have materialized by the time of the challenged disclosures.  MTD 19.  The Opposition ignores this argument, and merely restates the rule that risk disclosures may be false when the risks warned of had already "come to fruition."  Opp. 15.  Plaintiffs do not cite to anything in the SAC alleging how those risks came "to fruition" by the time the challenged statements were made.[12]

### 3.    Plaintiffs Effectively Abandon Their Allegations of False Revenue Recognition Based on Unsupported "Expert" Opinions

The MTD demonstrated that Plaintiffs failed to allege any "particularized facts" underlying their supposed "expert" calculations showing $117 million in false Medicare revenue.  MTD 20–22.

---

did "not view the public filing of the [royalty agreement] as the sort of traditional fraudulent misrepresentation of fact that could induce investors mistakenly to buy securities."  *Id.* at 693.

[11] Plaintiffs also cite *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145 (D. Or. 2015), Opp. 12, which the parties already addressed in the prior motion to dismiss briefing, ECF No. 68 at 14–15; ECF No. 71 at 9, n.9.  *Galena* did not address the type of warning language present here.  *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 658 (M.D. Tenn. 2022) (Opp. 12, n.6) is not binding on the Court, and there the statements at issue were contained in a *merger agreement*, where, like in *Glazer*, investor interest was presumably greater.  *See Glazer*, 549 F.3d at 741.

[12] In each case cited by Plaintiffs, the complaint alleged that the risks warned of had in fact come to fruition.  In *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984–86 (9th Cir. 2008) (cited at Opp. 15), the challenged statement was not a "risk factor" statement.  Defendants stated that the company "may experience significant contract cancellations" without disclosing that the risk of work being cancelled had already materialized in the form of "stop work" orders.  *See also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1172, 1181 (9th Cir. 2009) (warning that "[w]e are subject to significant liability should use or consumption of our [Zicam] products cause injury, illness or death" was false when a product liability lawsuit had already been filed); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *11 (C.D. Cal. June 9, 2016) (warning that breast implant product may not be manufactured in compliance with regulatory requirements was false when regulators had banned defendant's products).

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

Plaintiffs dispute none of this, instead offering a single footnote arguing irrelevantly that some courts "do not require the name of an expert used at the pleading stage be disclosed . . . ." Opp. 14, n.11.

Having effectively abandoned their "expert" allegations, Plaintiffs invent new "false" revenue figures, relying on allegations of improper Medicare billing from FE-1 and FE-10. Opp. 12, 14–15. But allegations that revenue was *improperly obtained* are not sufficient to allege that revenue was *falsely reported. See In re Redback Networks Inc. Sec. Litig.*, 2007 WL 4259464, at *3 (N.D. Cal. Dec. 4, 2007) (revenues were not inflated based on allegations that sales were "improper" and "illegitimate" because the "sales in question, and the resulting revenues, were real," and the court found no "cases holding that accurate reporting of revenues can constitute the basis of a securities fraud claim"). And, in any case, Plaintiffs' back-of-the-envelope calculations: (1) appear nowhere in the SAC and therefore cannot be considered on this motion; and (2) are insufficiently particularized.[13]

### 4. Allegations of Regulatory Misconduct Do Not Render False Defendants' Reporting of Testing Services Revenue

Plaintiffs argue—exactly as they did with respect to the FAC—that CareDx's disclosures of quarterly testing services revenue was misleading. Opp. 13–14; *see, e.g.*, ¶ 163 ("Testing services revenue increased by $9.9 million . . . . This increase is primarily due to an increase of more than 5,000 test results provided . . . ."). The MTD demonstrated that, under Ninth Circuit law, alleged regulatory misconduct does not render statements about a company's growth misleading, even where the company's success is purportedly driven by the alleged misconduct. MTD 16.

Plaintiffs do not dispute this. They instead attempt to reargue that these statements are analogous to statements in *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *13 (N.D. Cal. Aug. 17, 2022) and *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007), where defendants "attribut[ed] [their] earnings to a variety of legitimate business practices, while omitting any mention of illegal practices." Opp. 13–14; ECF No. 68 at 15–17 (relying on *Syncor*). In these cases, the statements were misleading because they "*touted* positive revenue results" and then

---

[13] For example, the Opposition infers that CareDx improperly billed monthly AlloSure tests for 1,000 patients per year, relying on FE-1 and FE-10. Opp. 14; ¶ 100. But the SAC does not allege how many patient records FE-1 or FE-10 viewed, or that these tests were billed during the period of April 2020–December 2021, when the SAC alleges CareDx's revenues were overstated.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

attributed them to "*specific factors*," which "created the impression that such results were based on … *other factors* that did not include" the undisclosed fraud. *Plantronics*, 2022 WL 3653333, at *8–14 (emphases added). For example, in *Plantronics*, defendants attributed revenue growth to "organic consumer demand" and "synergies from the Polycom acquisition," without disclosing that "positive revenue results were a byproduct of the undisclosed sales practice[.]" *Id.* at *13.

Here, in contrast, Defendants merely reported testing services data with no attribution to specific, qualitative factors. In fact, the statements challenged here are closely similar to those in *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *5, *11–13 (N.D. Cal. 2019). There, plaintiffs alleged that Oracle engaged in fraudulent sales that generated "artificial and unsustainable" revenue in its cloud business. *Id.* at *2. Plaintiffs challenged statements such as "we sold $855 million of new . . . cloud revenue in Q4," but Judge Freeman found that "when defendants discussed Oracle's Cloud revenue growth ***generally*** and absent an affirmative representation by Defendant's regarding Oracle's allegedly coercive Sales Practices or attribution of Cloud revenue to other factors . . . they had no duty to disclose the [coercive] Sales Practices." *Id.* at *5, *12 (emphasis in original). So too here. *See also id.* at *12 (analogizing to *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) and finding that "Plaintiff's allegations of coercive Sales Practices do not render Oracle's financial reporting of its Cloud sales *per se* false or misleading"); *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *2, *9 (D. Ariz. Aug. 1, 2017).[14]

---

[14] Plaintiffs attempt to distinguish *Corinthian Colleges* by suggesting that here, unlike in that case, "Plaintiffs point to specific violations of law[.]" Opp. 15, n.12. But the complaint in *Corinthian Colleges* contained ample allegations of violations of law. *See Corinthian Colleges*, 540 F.3d at 1055–56 (alleging "schemes" to falsify enrollment data and confidential witness testimony that "as many as 50% to 60% of the people defendants represented to the U.S. government as being qualified, attending 'students' were . . . unqualified"). The problem was that the *Corinthian Colleges* plaintiffs, like Plaintiffs here, failed to show how any of those allegedly unlawful practices falsified the "company's class period statements regarding its financial well-being." *Id.* at 1070. By contrast, the few statements sustained by the court in *Insys Therapeutics* (*see* Opp. 15, n.12) directly implicated the alleged fraud. *E.g.*, 2017 WL 3268797, at *12–13 (statement that "no one at Insys wants to see anyone taking [the company's fentanyl nasal spray drug] for anything other than cancer pain" was false because plaintiffs alleged that defendants "aggressively court[ed] healthcare professionals who did not have any patients with cancer").

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

**5.    Plaintiffs Fail to Allege that Defendants' Descriptions of RemoTraC Were False**

The MTD demonstrated that alleged omissions regarding RemoTraC—namely, that RemoTraC involved routine blood tests *and* AlloSure testing—had in fact been clearly disclosed throughout the Class Period.  MTD 17–18.  Defendants explained that statements about RemoTraC cannot be rendered false merely "because they were spoken against the backdrop of . . . [an alleged] ongoing criminal fraud."  *Insys Therapeutics*, 2017 WL 3268797, at *9.

Plaintiffs do not dispute this case law and they fail to point to statements with the requisite connection to the alleged misconduct.  Instead, they make the blanket assertion that every time Defendants spoke about RemoTraC, the statement was false because it failed to disclose "that CareDx was illegally billing Medicare for multiple tests per patient that were not medically necessary."  Opp. 14, n.10.  That is exactly the type of pleading foreclosed by cases like *Corinthian Colleges*, *Insys Therapeutics*, and *Crowell v. McCormick*, 2007 WL 9735010, at *3–4 (N.D. Cal. Nov. 16, 2017).

Plaintiffs then attempt to revive their challenge to the "unmet needs" statements, claiming that AlloSure testing was "not medically necessary."  Opp. 14, n.10.  But the Court already rejected this exact argument.  MTD Op. *11.  Plaintiffs also allege that Twitter statements that RemoTraC drew blood for "standard" or "routine" tests were false because AlloSure testing was neither standard, nor routine.  Opp. 14, n.10.  But the SAC itself shows that CareDx was not describing AlloSure as "standard" or "routine."  Rather, it explicitly disclosed that, in RemoTraC, AlloSure was being offered *in addition to* standard or routine tests.  MTD 14 (citing SAC ¶¶ 91, 152 & n.27); MTD Op. *1.

**6.    Plaintiffs Again Fail To Allege that Defendants' Stated Justifications for Declines in ASP Were False**

With respect to the challenged statements about declining ASPs, the Opposition mostly repeats the same allegations the Court already considered and rejected.  Opp. 15–16; *compare* MTD Op. *12 (rejecting Plaintiffs' allegation that "'the true cause of Defendants' flagging Medicare growth and falling ASPs was not changes in payor mix caused by higher growth in the commercial business'") *with* Opp. 16 (relying on same allegations from the FAC to argue that "growth in a different part of the business [commercial]" could not have caused declining ASPs).

12

The only new allegation Plaintiffs identify is that FE-10 allegedly reviewed files showing that Medicare and private insurance rejected some unspecified number of claims as not medically necessary. Opp. 16. Plaintiffs suggest that "the Ninth Circuit does not require representative examples of false claims," *id.*, but that misses the point. Whether or not specific examples are required, at a minimum, Plaintiffs must allege that the number of claims FE-10 supposedly observed was sufficiently material to falsify CareDx's stated reasons for declining ASPs. The SAC fails to do so.

### C.    Plaintiffs Fail to Plead Loss Causation

The MTD demonstrated that the SAC fails to allege loss causation based on six alleged corrective disclosures: five repeated from the FAC and a new sixth corrective disclosure. MTD 22–25. With respect to the five original alleged corrective disclosures, Plaintiffs offer no reason to reverse this Court's prior conclusion. The alleged corrective disclosures—government investigations, earnings announcements, and executive departures—"are not supported by allegations that connect the disclosure of these events to fraudulent conduct." MTD Op. *12. And the sixth alleged corrective disclosure—the Olymbios Complaint—fails for similar reasons.

*First*, Plaintiffs fail to address and therefore waive their "materialization of risk" theory. SAC ¶¶ 285-91; MTD 24–25. The Opposition mentions this theory only once in a footnote purporting to distinguish Defendants' authority but that offers no argument why the theory should be adopted or how the SAC adequately alleges it. *See* Opp. 25 n.19. Thus, this argument is waived. *See Mortg. Elec. Registration Sys., Inc. v. Koeppel*, 2020 WL 1233925, at *3 (N.D. Cal. Mar. 13, 2020).

*Second*, Plaintiffs' effort to revive the five corrective disclosures rejected in the FAC is unavailing. Plaintiffs argue that loss causation can be inferred because the Company's announcement of the DOJ and SEC investigations on October 28, 2021 "coincided" with its announcement of a decline in ASP. Opp. 22–23. But that is insufficient as a matter of Ninth Circuit law. Instead, plaintiffs must plead the chain of causation that connects the disclosure of disappointing financial performance to their allegations of fraud. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir.

2014).[15] Here, as demonstrated, there is no causal connection alleged between the decline in ASP and any allegedly fraudulent conduct by the Defendants. MTD 23–25. That the investigation was announced the same day as a decline in ASP is not enough.[16] And while it is true some analyst reports noted both the investigations and decrease in ASP (Opp. 23), Plaintiffs do not allege that any analyst reports actually linked the decline in performance to the investigations.

Plaintiffs' authority is not to the contrary. Instead, these cases confirm that loss causation allegations must link a decline in financial performance to the alleged fraud in order to be credited. In *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *17 (C.D. Cal. Jan. 17, 2020), the plaintiffs alleged that defendants' fraud was revealed to the market through, among other things, an announcement of a 50% reduction in fiscal year 2019 revenue. But the company's announcement connected the reduction "to the termination of the exclusive relationship that Stamps had with the USPS, *which itself was the subject of the alleged false statements*." *Id.* (emphasis added). Likewise, in, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 604–05 (N.D. Cal. 2019), the defendant corporation's disappointing earnings was attributed to "slowing generic drug price inflation," which was the very subject of the alleged fraud—statements concealing a conspiracy to price fix generic drugs. Here, as the Court already found, Plaintiffs have failed to connect the disclosures of government investigations, ASP declines, or executive departures to the alleged fraud.

Finally, Plaintiffs argue that "the April 15, 2022 filing of the Olymbios Complaint supports loss causation as it further revealed the Medicare fraud first suggested by the disclosure of the investigations." Opp. 24. This argument fails for several reasons.

---

[15] In addition, because the purported corrective disclosure is the announcement of government investigations, plaintiffs must plead the inference of fraud was confirmed through "subsequent disclosure of actual wrongdoing." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209–10 (9th Cir. 2016). As described *supra*, Plaintiffs are incorrect that they did so with the Olymbios Complaint. Opp. 24.

[16] Notably, the government investigations was not the only news CareDx disclosed around this time. In October 2021, CareDx also disclosed the commercial launch of AlloSure Lung, which *did* contribute to the decline in ASP. *See* Exhibit H to the Request for Judicial Notice and Cording Declaration at 5, 12 (CareDx Oct. 28, 2021 Earnings Call: "[O]n October 12 . . . we announced the commercial launch of AlloSure Lung . . . . And then AlloSure Lung, albeit at a smaller volume than the other market will have an impact. This will start with a much lower coverage on that too. So every time we launch a new test, it will have a period until we cover up on the commercial coverage.").

14

As an initial matter, the Olymbios Complaint could only "further reveal[]" Medicare fraud if prior disclosure of the investigations "suggested" such fraud in the first place. And the Court already concluded that "Plaintiffs did not allege that the fraudulent practice of overbilling Medicare was the subject of the [government] investigations." MTD Op. *8. In addition, Ninth Circuit law requires, and the SAC lacks, allegations that "the market treat[ed] [the] allegations [of the] lawsuit as sufficiently credible to be acted upon as truth." *In re BofI, Inc. Sec. Litig.*, 977 F.3d 781, 790–92 (9th Cir. 2020). In this respect, the Court already found that the market's reaction to the Olymbios Complaint was modest. MTD Op. *13. That the market did not credit these allegations is further supported by (i) the fact that the Olymbios Complaint lacked detail substantiating a RemoTraC "fraud,"[17] and (ii) the unusual circumstances of the filing. MTD 23–24. Furthermore, nothing in the Olymbios Complaint supports that the decline in ASP reported on October 28, 2021 had anything to do with Medicare rejecting tests because of fraud.

While Plaintiffs marshal some cases purporting to show an 8% decline can be supportive of loss causation (Opp. 24), they are not dispositive. They establish no bright-line rule and case law amply supports rejecting this quantum of a stock drop. *See* MTD 23–24 (citing cases). More fundamentally, as the Court already noted (MTD Op. *13), the market reaction to the Olymbios Complaint was among the smallest of the corrective disclosures pled in the SAC, including as compared to putative corrective disclosures that came *after* the Olymbios Complaint. *See also* MTD 23 n.25. In sum, there are insufficient allegations to support that the market treated the sweeping allegations in the Olymbios Complaint as sufficiently credible to be acted upon as truth.[18]

## III.    CONCLUSION

Defendants respectfully request that the Court dismiss the SAC with prejudice.

---

[17] While Dr. Olymbios does include one generic allegation about mobile phlebotomy services in Paragraph 28 of the Olymbios Complaint (as Defendants acknowledged), that is the *only* reference to mobile phlebotomy in the entire Complaint. Opp. 24, n.17. Hence, the allegations are not "specific and highly detailed." MTD 24.

[18] Plaintiffs ignore every one of Defendants' arguments as to why the SAC fails to allege scheme liability. MTD 22; Opp. 25, n.20. Plaintiffs also concede Defendants' arguments as to the deficiencies in their control person allegations. MTD 25.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT

Dated:  September 22, 2023

Respectfully submitted,

By: /s/ Charles Cording
    Charles Cording

WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY  10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
         ccording@willkie.com
         bsullivan@willkie.com

WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
One Front Street, 34th Floor
San Francisco, CA  94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
         bdyer@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,
Ankur Dhingra, and Peter Maag*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SAC
No. 22-cv-03023-TLT