Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
         ccording@willkie.com
         bsullivan@willkie.com

Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
         bdyer@willkie.com

Attorneys for Defendants
*CareDx Inc., Reginald Seeto,*
*Ankur Dhingra, and Peter Maag*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>Defendants. | Case No. 3:22-cv-03023-TLT<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE ALLEGATIONS**<br><br>Date: October 31, 2023<br>Time: 2:00 PM<br>Courtroom: 9<br>Judge: Hon. Trina L. Thompson |

## I.    INTRODUCTION

Defendants are moving to strike only two allegations in the SAC that the Court previously struck from the FAC:  (1) allegations that Dr. Olymbios discussed his "concerns" with Dr. Seeto and Dr. Maag; and (2) allegations that Dr. Olymbios had a discussion with Dr. Maag in which Dr. Maag asked Dr. Olymbios to not put in writing that CareDx does not bill patients for tests.  These allegations (the "Olymbios Management Allegations")[1] are repeated in various forms in seven paragraphs in the 319-paragraph SAC:  ¶¶ 24 (sentences 2-5), 89 (last sentence), 97 (sentences 2-3), 127 (sentences 1-3),[2] 140 (sentences 1-4), 141 (sentence 3), and 260 (sentences 2-6).  *See* MTS Appendix 1.

The question presented on this motion is simple:   whether Plaintiffs allege "**adequate independent corroboration**" of the Olymbios Management Allegations as required by this Court and the case law in this Circuit.  *Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*, 2023 WL 4418886, at *4 (N.D. Cal. May 24, 2023) ("MTD Op."); *see also id.* ("Plaintiffs must provide an independent basis that goes towards corroborating the allegations such that they are reasonable").  Plaintiffs' Opposition only reinforces their inability to satisfy this requirement.  It depends on: (1) mischaracterizing the SAC; (2) asking the Court to reconsider legal conclusions in its prior order; and (3) advancing the improper premise that any concerns related to AlloSure that were allegedly discussed with Dr. Maag or Dr. Seeto at any time with anyone at CareDx suffices to corroborate the Olymbios Management Allegations.  Given the lack of corroboration, the Olymbios Management Allegations should be stricken.  *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) ("*Connetics I*") (requiring corroboration of "specific claims" borrowed by plaintiffs from non-parties).

---

[1] Unless otherwise noted, defined terms have the same meaning as they do in Defendants' Motion to Strike, ECF No. 91 ("MTS").

[2] The first sentence of paragraph 127 reads:  "CareDx executives unquestionably knew this behavior was occurring because Dr. Olymbios reported his concerns to the Company's most senior executives, including Defendants Maag and Seeto, and because *Defendant Maag himself personally signed off on the expenses*."  ¶ 127 (emphasis added).  Plaintiffs point out that the italicized portion is not technically sourced from Dr. Olymbios.  ECF No. 97 ("Opposition" or "Opp.") at 15–16.  Although the italicized allegation is repeated elsewhere in the SAC, for clarity, Defendants do not seek to strike the italicized portion of the first sentence of paragraph 127 of the SAC.

## II.     ARGUMENT

None of the allegations highlighted in the Opposition demonstrate adequate independent corroboration of the Olymbios Management Allegations. In its prior order on May 24, 2023, the Court explained that to satisfy their burden, Plaintiffs were required to either (i) "include[] corroboration from confidential witnesses that had brought similar concerns to Seeto or Maag," or (ii) "corroborate[] that Olymbios had discussions with Maag or Seeto with a confidential witness that had reason to know of the discussions, such as FE-6, Maag's former executive assistant." MTD Op. *4. Plaintiffs fail to do either.

### A.     Plaintiffs Fail to Independently Corroborate Dr. Olymbios' Allegation that Dr. Maag asked Dr. Olymbios To Not Put in Writing that CareDx Does Not Bill Patients For Tests (¶¶ 24, 140)

The Opposition fails to demonstrate independent corroboration of Dr. Olymbios' allegation that, in August 2020, Dr. Maag told him not to put in writing that CareDx does not bill patients for tests and that "there were things he couldn't be associated with as the CEO." *See* ¶¶ 24, 140. Plaintiffs identify only two independent allegations that they argue corroborate Dr. Olymbios' allegation. Neither does.

First, Plaintiffs point to allegations that Dr. Maag "helped create CareDx's marketing materials," such as a flyer marketing AlloSure as "fully covered by Medicare." Opp. 14–15; ¶¶ 63–67. But this does not mean that "Olymbios and Maag communicated about patient billing." MTD Op. *5. Plaintiffs, moreover, mischaracterize the SAC when they say (without any citations) that Dr. Maag "specifically discussed the contents and usage of those marketing materials" with Dr. Olymbios. Opp. 14–15. That is not alleged in the SAC. Even if it were, it would not corroborate the allegation that Dr. Maag allegedly told Dr. Olymbios not to put in writing that CareDx did not bill patients. Once again, Plaintiffs ask this Court to rely on a series of assumptions and engage in inferences that are outside the bounds of the SAC. That is not independent corroboration.

Second, Plaintiffs point to allegations from FE-6 that Dr. Maag attended symposiums at which physicians allegedly received kickbacks. Opp. 15. Aside from the fact that this allegation is vigorously denied, it cannot conceivably corroborate that "Olymbios and Maag communicated

about patient billing." MTD Op. *5. Such concerns—allegedly failing to bill patients versus allegedly bribing doctors to order tests—are not "similar" in any respect. MTD Op. *4.

**B.      Plaintiffs Fail to Independently Corroborate Dr. Olymbios' Allegation that He Discussed His "Concerns" with Dr. Maag and Dr. Seeto**

Likewise, none of the allegations highlighted in the Opposition corroborate Dr. Olymbios' allegation that he discussed his "concerns" with executives, including Dr. Maag and Dr. Seeto. Each are addressed below:

Dr. Seeto's alleged discussions about "prior authorization": Plaintiffs rely heavily on allegations from FE-19 about "meetings" at which Dr. Seeto and billing personnel discussed "problems relating to getting 'prior authorization' from doctors for the AlloSure test, *i.e.*, getting the 'medical necessity' authorization that CareDx systematically failed to get." ¶ 115. For a number of reasons, this allegation falls short of "corroboration from confidential witnesses that had brought similar concerns [as those allegedly raised by Dr. Olymbios] to Seeto or Maag." MTD Op. *4.

First, Dr. Olymbios' April 2022 complaint (the "Olymbios Complaint," ECF No. 89-7) says nothing about prior authorization or any difficulties obtaining Medicare reimbursement for AlloSure. Accordingly, as prior authorization was not one of Dr. Olymbios' "concerns," these FE-19 allegations cannot corroborate that Dr. Olymbios shared his "concerns" with Dr. Seeto or Dr. Maag. *See* Olymbios Complaint at ¶ 32 ("Dr. Olymbios discussed his concerns and those of other employees" with Dr. Maag and Dr. Seeto).

In fact, FE-19's allegation about prior authorization contradicts, rather than corroborates, Dr. Olymbios' complaint: while FE-19 alleges that Dr. Seeto discussed CareDx's difficulties in its efforts to *obtain* medical necessity authorization from physicians, ¶ 115, Dr. Olymbios alleges that CareDx tried to *deceive* physicians by "intentionally exclud[ing] from the test requisition form a field where a physician could indicate that the test was medically necessary." ECF No. 89-7 at ¶ 30(c). *See also* ¶ 102 (CareDx "obscure[d]" from physicians that AlloSure tests were not medically necessary). FE-19's allegation is also wholly at odds with the theory of the SAC that CareDx was allegedly systematically defrauding Medicare by obtaining reimbursement for tests that were not medically necessary. If prior authorization had been required for AlloSure Medicare

3

claims but not obtained, then CareDx simply would not have been paid by Medicare—a result fundamentally at odds with the alleged scheme. The Court need not credit allegations from confidential witnesses like FE-19 that are contradictory. *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012) (discrediting "CW1's conclusory statement" where it was "contradicted" by other allegations in the complaint); *id.* at 1077 ("inconsistent allegations" "undermined" inference of scienter).

Second, the SAC fails to allege that FE-19 attended the alleged "meetings" or how FE-19 otherwise has personal knowledge of the alleged "meetings." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) ("the complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report").

Third, FE-19 does not allege that anyone "brought" any concerns to Dr. Seeto's attention during these meetings. MTD Op. *4.

Ultimately, the allegation is based on a misunderstanding of the prior authorization requirement. Prior authorization is a requirement *insurers* may impose before services are rendered for the provider to receive payment. Prior authorization requires the insurer to approve the services in advance.[3] But the SAC mistakenly describes "prior authorization" as something CareDx sought to obtain *from providers*, not the insurer, here, Medicare. ¶ 115. Pointedly, Plaintiffs do not allege that Medicare required prior authorization for AlloSure (because it did not). Regardless, as noted, this was not one of Dr. Olymbios's allegations and therefore could not have been one of his "concerns."

<u>Dr. Seeto's alleged discussion of the 50% reimbursement rate</u>: Plaintiffs also rely on allegations that FE-10 observed Dr. Seeto and the Director of Claims discuss "the 50% reimbursement rate with the tests" as supposedly demonstrating that the Director of Claims "'had brought similar concerns'" to Dr. Seeto as those purportedly raised by Dr. Olymbios. Opp. 6. This argument fails.

---

[3] Centers for Medicare and Medicaid Services, "Prior Authorization and Pre-Claim Initiatives," *available at* https://www.cms.gov/data-research/monitoring-programs/medicare-fee-service-compliance-programs/prior-authorization-and-pre-claim-review-initiatives.

4

First, the Court previously considered and rejected Plaintiffs' claim (repeated in the SAC) that the "50% reimbursement rate" represented 50% of claims being denied by Medicare for lack of medical necessity, as opposed to CareDx not being reimbursed for a variety of nonculpable reasons, including a lack of private payer or Medicare coverage for certain of its tests. *See* MTD Op. *11 ("Plaintiffs have not sufficiently alleged particularized facts to support the inference that CareDx's explanation [for declining ASPs] is false."). Thus, there are no well pleaded allegations that Dr. Seeto's discussion about the 50% reimbursement rate related to any of the "concerns" about Medicare fraud supposedly raised by Dr. Olymbios.

Second, in advancing this argument, Plaintiffs misstate the SAC's allegations. Nowhere does the SAC allege, as claimed in the Opposition, that FE-10 observed Dr. Seeto and the Director of Claims discuss "that they were experiencing so many claims being denied [by Medicare] for lacking medical necessity." Opp. 7. Instead, the SAC says "FE-10 also observed the Director of Claims and Seeto often talked about the 50% reimbursement rate with the tests." ¶ 113. The SAC separately alleges: "FE-10 also observed it was well known throughout the Company that they were experiencing so many claims being denied for lacking medical necessity. FE-10 explained the Company had regular meetings on the issue, and '[t]he CEO [Defendant Seeto] and everyone knew about it.'" ¶ 113. But this vague and conclusory allegation cannot be credited because Plaintiffs concede that FE-10 has no "knowledge" of Dr. Seeto's state of mind other than through "his firsthand account of conversations he observed between Seeto and the Director of Claims," which conversations did not, on FE-10's account, involve claims being denied for lacking medical necessity. *See* ECF No. 96 (Opposition to Motion to Dismiss SAC) at 20 ("FE-10 made clear his knowledge was based on: (1) his firsthand account of conversations . . . between Seeto and the Director of Claims; and (2) his own review of claims"); *Zucco Partners*, 552 F.3d at 995 ("the complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report").

Third, even accepting Plaintiffs' improperly pleaded "50%" allegation, the Olymbios Complaint has nothing to say about Medicare rejecting CareDx's tests, and thus there is no overlap between Dr. Olymbios' alleged "concerns" and Dr. Seeto's alleged discussion about Medicare

5

rejecting claims as not medically necessary.  Indeed, there could not be.  Plaintiffs do not dispute, as Defendants argued, that there is a *sixteen month* gap between when Dr. Olymbios left CareDx (October 2020, i.e., the latest point in time when he could have raised "concerns") and when, under Plaintiffs' theory, Medicare first allegedly began rejecting claims as lacking medical necessity (February 2022).  MTS 5–6.  Indeed, Plaintiffs readily acknowledge this gap in their Opposition, arguing that the "illegal billing practices" alleged in the Olymbios Complaint "*later caused* so many claims to be rejected" by Medicare.  Opp. 7.  Plaintiffs say this is close enough, but the case law and the Court's order require corroboration of "'specific claims'" borrowed from a third-party complaint.  MTD Op. *4 (quoting *Connetics I*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008)).

Dr. Seeto's allegedly "disingenuous" comments about patients:  Plaintiffs argue that FE-19's allegation that Dr. Seeto made "'disingenuous' comments about patients and considered them an 'afterthought'" somehow "corroborate[s] Dr. Olymbios' experience that Seeto and Maag just 'brushed off' his concerns about Medicare violations or berated him for raising them."  Opp. 4–5.  Although the Court noted it was "not setting a high bar wherein Plaintiffs must independently corroborate that each conversation [between Dr. Olymbios and Dr. Seeto] took place," Opp. 5, FE-19's criticisms of Dr. Seeto simply have no relation to the Olymbios Management Allegations.[4]

Dr. Olymbios was allegedly "vocal" about certain of his complaints:  Lastly, Plaintiffs emphasize FE-11's allegations that Dr. Olymbios told FE-11 "about his Medicare overbilling concerns" and that Dr. Olymbios was "'vocal' about the Company's Medicare overbilling practices."  Opp. 8.  However, Plaintiffs concede, as they must, that these allegations demonstrate only that "Dr. Olymbios' . . . had conversations about the Medicare billing violations *with other employees*," not with Dr. Seeto or Dr. Maag.  Opp. 8 (emphasis added).  And, even if the SAC alleged that FE-11 and "other senior managers did nothing about" Dr. Olymbios' concerns because

---

[4] For the same reasons, FE-19's allegations about bullying and coercion of Erin Tokunaga do not constitute adequate independent corroboration of the Olymbios Management Allegations.  Opp. 4. Defendants address this allegation in further detail in their Motion to Dismiss the SAC, which arguments are incorporated by reference herein.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STRIKE ALLEGATIONS FROM SAC
No. 22-cv-03023-TLT

they were "terrified" that "Seeto and Maag would fire them," as claimed in the Opposition (Opp. 8)—and it does not[5]—that would <u>undercut</u> any inference that others "brought similar concerns to Seeto or Maag."  MTD Op. *4.

**C.      The Court Already Determined that Dr. Olymbios' Email to Plaintiffs' Counsel and Plaintiffs' Counsel's Discussions With Dr. Olymbios' Counsel Do Not Constitute Adequate Independent Corroboration**

Plaintiffs rely on (i) Dr. Olymbios' email to Plaintiffs' counsel and (ii) conversations that Plaintiffs' counsel supposedly had with Dr. Olymbios' counsel about the Olymbios Complaint. Opp. 10–13.  But the Court already held that these exact same allegations are insufficient to corroborate the Olymbios Management Allegations, irrespective of whether they were then properly before the Court.  *See* MTD Op. *5 ("Dr. Olymbios' email does not corroborate the allegations in the Complaint.  Instead, it shows that he is interested in this case."); *id.* ("As to the [alleged discussions with Dr. Olymbios' attorney], Plaintiffs cannot solely rely on investigation performed by Dr. Olymbios' counsel.").  Plaintiffs may not agree with the Court's holding—*see* Opp. 12–13— but that is irrelevant.[6]

**D.      Dr. Olymbios' Proximity to Senior Management, Alleged Popularity at CareDx, and Purported "Whistleblower" Status Are Irrelevant to the Question of Whether Plaintiffs Have Alleged Adequate Independent Corroboration**

Finally, Plaintiffs highlight the following allegations as supposedly bolstering Dr. Olymbios "credibility:" (i) Dr. Olymbios reported to senior management at CareDx; (ii) Dr. Olymbios

[5] The SAC in fact alleges:  "To FE-11's knowledge, no one he knew took any action in response to Dr. Olymbios' concerns because 'we were all terrified for our jobs.'  FE-11 explained that Dr. Olymbios had 'know[n] it all' with regard to the billing issues, adding that Dr. Olymbios had been close to Defendant Seeto and CareDx's other former CEO."  ¶ 114.

[6] In any case, the extent of these "discussions" was that "counsel for Dr. Olymbios confirmed that they had a sound evidentiary basis for the allegations in the Olymbios complaint and that counsel for Dr. Olymbios had complied with their own Rule 11 obligations."  ECF No. 69-1 at ¶ 6 (declaration of Plaintiffs' counsel summarizing five discussions with counsel for Dr. Olymbios); *see also* SAC page 1 (referencing the same "five discussions").  Dr. Olymbios' counsel's belief that they complied with their own Rule 11 obligations adds nothing.  No reasonable attorney would ever say otherwise.  *See also* MTD Op. *4 ("'Given that this [Rule 11] responsibility cannot be delegated to another member of the attorney's firm, it would make little sense that an attorney somehow can rely on the analysis of attorneys in different actions and who are presumably from different law firms.'") (quoting *Connetics I* at 1005).

7

considers himself a "whistleblower"; (iii) Dr. Olymbios "served patients at two of the most prominent medical centers in the world . . . and he has published extensively"; and (iv) Dr. Maag "praised Dr. Olymbios for his hard work and the 'tremendous impact' he had on CareDx," before CareDx learned that Dr. Olymbios misappropriated tens of thousands of company documents on his way to work for CareDx's primary competitor. Opp. 9–10. But Plaintiffs themselves acknowledge that these allegations, far from corroborating the Olymbios Management Allegations, merely demonstrate, at best, that Dr. Olymbios "was *in a position* to be personally knowledgeable of the facts alleged, particularly those describing his own direct interactions with Defendants Seeto and Maag." Opp. 10 (quotations omitted) (emphasis added). Thus, the SAC suggests, at most, that Dr. Olymbios was in a position to *potentially* discuss his "concerns" with senior management. That is not sufficient.[7]

Plaintiffs contend that "Dr. Olymbios' unblemished record of accomplishment in the medical field shows his facts 'contain their own indicia of reliability,'" quoting from *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014). Opp. 9. But the "indicia of reliability" referenced in *Sand Canyon* were that the borrowed third-party allegations came from "a number of different employees (*not from one possible disgruntled or vindictive employee*)." *Sand Canyon*, 298 F.R.D. at 126 (emphasis added). The SAC itself reveals that Dr. Olymbios is disgruntled. *See, e.g.*, ¶ 31 (quoting various ad hominem attacks made by Dr. Olymbios against Individual Defendants). Dr. Olymbios left CareDx to take a job with Natera, Inc., CareDx's primary competitor. ¶ 209. And CareDx remains embroiled in a breach of contracts and trade secrets dispute against Dr. Olymbios in arbitration. *See id.*

---

[7] The rule that a confidential witness relied upon in securities fraud pleadings must be "in a position to be personally knowledgeable of the facts alleged" (Opp. 10 (citing cases)) applies where plaintiffs have *actually spoken* to the witness. *See* SAC page 1 (allegations based on "interviews with numerous former CareDx employees," not including Dr. Olymbios). Thus, for example, in *In re Mattel Inc. Sec. Litig.*, 2021 WL 1259405, at *8 (C.D. Cal. Jan. 26, 2021) (cited at Opp. 2, 10), the Court assessed the credibility of third party witness allegations by looking to the witness's "first-hand knowledge" and "elevated position," when plaintiffs alleged in their complaint that they "interviewed" the witness as part of their investigation. *See id.* at ECF No. 34, ¶ 3. Here, by contrast, Plaintiffs admittedly have never spoken to Dr. Olymbios, which is why they must allege adequate independent corroboration of the Olymbios Management Allegations.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STRIKE ALLEGATIONS FROM SAC
No. 22-cv-03023-TLT

In short, none of these additional allegations about Dr. Olymbios' status independently corroborate the Olymbios Management Allegations.  And even if Dr. Olymbios were credible—which he is not—that would also not substitute for independent corroboration of the Olymbios Management Allegations.

## III.    CONCLUSION

Because Plaintiffs have once again failed to allege adequate, independent corroboration of the Olymbios Management Allegations, those allegations should be stricken with prejudice.

Dated: September 22, 2023                    Respectfully submitted,

By: */s/ Charles Cording*
      Charles Cording

WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted pro hac vice)
Charles Cording (admitted pro hac vice)
Brady Sullivan (admitted pro hac vice)
787 Seventh Avenue
New York, NY 10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
              ccording@willkie.com
              bsullivan@willkie.com

WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
Barrington Dyer (CSB No. 264762)
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com
              bdyer@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,*
*Ankur Dhingra, and Peter Maag*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO STRIKE ALLEGATIONS FROM SAC
No. 22-cv-03023-TLT