**Pages 1 - 57**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge

PLUMBERS & PIPEFITTERS LOCAL    )
UNION #295 PENSION FUND,         )
Individually and on Behalf of   )
All Others Similarly Situated,,)
                                )
          Plaintiffs,           )
                                )
   VS.                          )    **NO. C 22-03023 TLT**
                                )
CAREDX, INC., et al.,           )
                                )
          Defendants.           )
_____)
                         San Francisco, California
                         Tuesday, October 31, 2023


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    ROBBINS GELLER RUDMAN & DOWD LLP
                    One Montgomery Street - Suite 1800
                    San Francisco, California  94104
               BY:  **JASON C. DAVIS, ATTORNEY AT LAW**

                    SAXENA WHITE P.A.
                    505 Lomas Santa Fe Drive - Suite 180
                    Solana Beach, California  92075
               BY:  **EMILY R. BISHOP, ATTORNEY AT LAW**

For Defendants:
                    WILLKIE FARR & GALLAGHER LLP
                    787 Seventh Avenue
                    New York, New York  10019
               BY:  **CHARLES D. CORDING, ATTORNEY AT LAW**
                    **BRADY M. SULLIVAN, ATTORNEY AT LAW**


REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**Tuesday - November 31, 2023**                    **1:58 p.m.**

                    **P R O C E E D I N G S**

                          **---000---**

THE CLERK:  All rise.  Come to order.  Court is now in session.  The Honorable Trina Thompson now presiding.

THE COURT:  Good afternoon.  You may be seated.

THE CLERK:  Calling case number 22-CV-03023, Plumbers and Pipefitters Local Union 295 Pension Fund versus CareDX Incorporated, et al.

Counsel, please come forward to the podium and state your appearances beginning with the Plaintiff.

MR. DAVIS:  Good afternoon, Your Honor, Jason Davis of Robbins Geller Rudman & Dowd for the Plaintiffs, and with me from the Saxena firm is Emily Bishop.

THE COURT:  Good afternoon.  And I would invite whoever is giving the presentation to approach the podium with any materials that you have.  Be sure to speak into the microphone.  On behalf of the Defendant?

MR. CORDING:  Good afternoon, Your Honor, Charles Cording from Willkie Farr & Gallagher on behalf of the Defendants.  With me is my colleague Brady Sullivan.

And with Your Honor's permission, consistent with your rules of practice, we were hoping to split the argument today to give Mr. Sullivan, who is an associate attorney, an opportunity to participate.

**THE COURT:** I would definitely invite that. Thank you. Thank you for that introduction. And also there is an additional colleague that you may have overlooked or maybe I didn't --

**MR. CORDING:** Oh, no.

**THE COURT:** Thank you. All right. And whoever is giving the first presentation -- namely, with regards to the motion to strike -- should approach the podium at this time.

(Pause in the proceedings.)

**THE COURT:** Counsel for the Plaintiff.

**MR. DAVIS:** Thank you.

**THE COURT:** You may want to join this argument as well.

**MR. DAVIS:** Thank you.

**THE COURT:** All right. So, before we begin -- and it is a pleasure to see some of you a second time and others for the first -- I want to first acknowledge the request for judicial notice that I believe is uncontested.

A through D filing by CareDX to SEC as previously accepted, the Court takes judicial notice absent any objection.

E, a transcript of which the Court previously acknowledged and took judicial notice and will take judicial notice once again. As stated, uncontested.

Now, I will acknowledge that some of these designations are different than they were in the previous hearing, so that's

why I'm identifying them.

F, the Court took judicial notice at the previous hearing that, yes, the litigation exists; and that's the extent of the judicial notice.

G, historical stock prices in the month of April 2022, uncontested.  The Court takes judicial notice.

And finally, H, CareDX's earnings call from October 28th, 2021, the Court takes judicial notice.

The Court also notes that previously we acknowledged there was no issue with standing.  And when we reach the motion to dismiss, the Court will also be asking Counsel whether leave to amend would be futile; that each party shall acknowledge that.

Now then, Counsel, with regards to the motion to strike, so I don't interrupt your presentation, I want to share with you a few questions that I may have.

Plaintiffs cite -- cited to case law that suggests contracting the attorneys of the original complaint -- contacting the attorneys of the original complaint along with the witnesses is sufficient corroboration.

This was done in addition to what was -- had occurred prior to the first complaint being filed.

My questions to Plaintiff will be:  Do you have any binding authority to support your assertion that this is, in fact, sufficient investigation by contacting the attorneys along with the witnesses and having them interviewed along with

their counsel or just interviewing their counsel themselves?

Do you have any binding authority that suggests this level of investigation is not sufficient?  That's for the Defendants.

So once again to the Defendant, do you have any binding authority that suggests this level of investigation is not sufficient?

In reviewing the second amended complaint is there independent corroboration now of Dr. Olymbios, O-L-Y-M-B-I-O-S -- and please correct the spelling if I spelled it wrong -- is there independent corroboration now in the second amended complaint alleged?

Defendants, why did you not address Plaintiffs' cases in your reply?  There were cases cited by the Plaintiff in the motion to strike that went unaddressed.

All right.  You may proceed starting with the Defendant and then the Plaintiff.

**MR. SULLIVAN:**  Thank you, Your Honor.  I think I will simply address Your Honor's two questions in turn starting with question is there any binding authority that contacting attorneys for Dr. Olymbios is not sufficient here.

The -- we would submit, Your Honor, that the rule is Plaintiffs cannot satisfy their Rule 11(b)(3) duty by relying on the analysis of attorneys in different actions.

The authority for that proposition comes from the first *Connetics* decision at page 996.  It is also law of the case

here from Your Honor's prior opinion.

A few additional points on this issue of contacting counsel for -- for Dr. Olymbios.

It is important to remember -- so Plaintiffs here are -- last time they were complaining that Dr. Olymbios' confidentiality restriction should be lifted.  Now they are complaining about ethical obligations because Dr. Olymbios has counsel and sort of their inability to communicate with Dr. Olymbios.

I think it is important to remember that we are still at the pleading stage here.  This is not discovery.  The Plaintiffs have no inherent right to speak with former employees of CareDX.

Congress decided when enacting the Private Securities Litigation Reform Act, the PSLRA, that discovery was stayed pending a decision on the motion to dismiss.  Congress fully understood that meant securities Plaintiffs would be limited in forming their allegations at the pleading stage.

And so if Plaintiffs are going to borrow someone else's allegations, as they have done here of a non-party, Dr. Olymbios, they have to do an independent investigation.

If they are unable to go to the source, which they say they cannot or they don't want, they have to allege adequate independent corroboration, which is exactly what the *Connetics* case says and was the holding of this Court on the prior

motion.

We know that Plaintiffs have had every opportunity to do so. They purport to have spoken with over 85 former employees of CareDX, but they still fall short to allege adequate and then corroboration.

Finally, even if the rule were that Plaintiffs could delegate their Rule 11 responsibilities, which we emphatically submit it is not, nothing that Olymbios' counsel told Plaintiffs here would, in fact, corroborate his allegations.

What happened here was that Olymbios' counsel, quote, "confirmed they had a sound evidentiary basis for the allegations in the Olymbios' complaint and that they complied with their Rule 11 obligations."

But Dr. Olymbios' lawyer certified as much by filing a separate complaint in the other action in the first place. That is an implicit representation that an attorney makes by signing a complaint.

So, these discussions, these five discussions, that purportedly took place with Olymbios' counsel, we think, add nothing irrespective of the controlling legal rule here.

Turning to Your Honor's second question of why we did not address Plaintiffs' cases, I suppose at bottom, we believe that a number of them are simply inapplicable here.

Plaintiffs cite a number of cases for the proposition that because Dr. Olymbios is alleged to have been in a position to

potentially have these discussions with Dr. Maag and Dr. Seeto and to potentially have had a discussion with Dr. Maag about not billing patients, that because they have raised those allegations, that is sufficient to -- to get them across the line and to have our motion denied.

And there's a fundamental difference, however, between that rule of law that a confidential witness -- Plaintiffs must allege that the confidential witness has a base of knowledge for his or her allegations. That is the rule coming from the *Zucco Partners* case as for witnesses with whom Plaintiffs have actually interviewed.

And when you look at the opening paragraph of Plaintiffs' complaint here that is, in fact, what they have claimed to have done with the 18 confidential witnesses -- the so-called FE's -- set forth in the complaint here.

They have certainly not done that with respect to Dr. Olymbios, which sort of circles back to the point I was making earlier, that -- that is what invokes this -- this standard under *Connetics* to require adequate independent corroboration.

I guess I will also note in -- in closing having sort of -- now having an opportunity to speak to some of Plaintiffs' cases, a number of them are illustrative, I think, of what Plaintiffs have not done here.

What is adequate independent corroboration?  Just to take

one example, *Lako versus Loandepot*, which is cited in Plaintiffs' papers -- and to the extent we did not address that case in our reply, I will take an opportunity to address it now -- the issue there was whether Plaintiffs had alleged that the CEO of a mortgage lender knew about improper loan underwriting practices.

In that case Plaintiffs borrowed allegations from a former employee, similar to here.  That former employee alleged that the CEO had told her to underwrite loans without the required documentation.

The Court held that those allegations were, in fact, corroborated by separate independent allegations from a former employee who was present at a meeting with the CEO where people questioned these -- these allegedly shoddy underwriting procedures.

That former employee also alleged that loan applicant complaints were escalated directly to the CEO.

That is independent corroboration under the PSLRA, and we would submit stands in stark contrast to what Plaintiffs have failed to allege here.

**THE COURT:**  So it is your opinion that the -- the former employees' allegations are speculative?

**MR. SULLIVAN:**  I would think about it slightly differently, Your Honor.  Our position is that the former employee allegations here do not adequately independently

corroborate the two very specific allegations that we are moving to strike.

So, we are moving to strike two buckets of allegations. The first about a conversation where Defendant Peter Monk supposedly told Olymbios not to put in writing CareDx's practice of never billing patients.

And then the second is Olymbios' allegation that he, quote-unquote, discussed his concerns about CareDX supposedly overbilling Medicare with Defendant's Dr. Maag and Dr. Seeto.

Our position -- and I'm happy to walk through the particular FE's that Plaintiffs claim get there -- but our position is that none of the FE allegations adequately corroborate those two allegations from Dr. Olymbios that we are moving to strike.

The -- the Court on the prior motion provided clear guidance on how Plaintiffs could have done so.

The Court noted Plaintiffs could have corroborated that Olymbios had discussions with Maag or Seeto from a confidential witness that had reason to know of the discussions or in the alternative Plaintiffs could have included corroboration from a confidential witness that brought similar concerns to Dr. Seeto or Dr. Maag.

And it is -- we submit that the FE's have not done either of those.

**THE COURT:**  Thank you.  All right.  Counsel, your

response and the two questions that I previously shared with you.  Do you have any binding authority to support your assertion that this is sufficient investigation.

You have now heard from the Defendants in terms of whether they feel that your former employee/confidant has provided enough information to corroborate those statements.

And then, finally, whether you feel there is independent corroboration based upon your second amended complaint and the items that were just identified by Counsel.

**MR. DAVIS:**  Yes, Your Honor.  Thank you.  And thank you, Counsel.

Of course I will take the two questions in turn, first focus on the law and then on the facts.

On the law *Connetics* I and II have been important authorities for this Court in the prior opinion and in Counsel's presentation just now.

The *Connetics I* opinion in turn relied upon Judge Pfaelzer's decision in *Countrywide*, which was one of the authorities that was the genesis of this Rule 11 concept about the diligence required to credit allegations in another complaint.

And what Judge Pfaelzer found in that case was the Plaintiffs at least have to reach out to the third-party attorneys who are writing that third-party complaint to confirm the sources of the -- the facts alleged in the complaint.

So in this case what was missing in the prior complaint is there simply weren't the details of what Counsel had done in this case prior to following up that original complaint.

That's different now.  On the first page it details facts, we would argue are sufficient, under *Countrywide*, which is important to the *Connetics* decision.  So that's authority one.

Authority two, Judge, is the *Connetics* decision itself. An interesting question arises as to why the attorneys in *Connetics I* and *II* didn't simply reach out to the attorneys who wrote the complaint that they wanted to credit.

As it turns out, that complaint in that case was written by the U.S. Securities and Exchange Commission; and we can't know for certain, but it's possible that the Government simply wouldn't want to talk with them, and that is in the Plaintiffs' papers in that case.

And so, in that case the Court gave the Plaintiff a different avenue of verification.  And so in that case, much like in this case, the Defendants had moved to dismiss a number of paragraphs.  The specific number in *Connetics* was 33 paragraphs.

And the Court in reviewing the argument to strike all 33 of those paragraphs reviewed the fact that the Plaintiffs in that case, Connetics, on the second time around were able to corroborate one of the 33 paragraphs.  And, in fact, it is a subsection of the paragraph.

So from the Plaintiffs' point of view, the Judge reached some confidence that, okay, look, the Plaintiffs can't confirm every single detail here; but they did due diligence.  They did reach out.  They tried to get an answer from the SEC.  They were unable to get that.  They got some confirmation about one of the details.

In this case we satisfied Judge Pfaelzer's decision in *Countrywide* because we have reached out and we have gotten confirmation.

Second, now we have three additional former employees.  We have documentation and what's different in this complaint than what was -- what was missing in a prior complaint, it was -- is an e-mail, an electronic e-mail, from Dr. Olymbios himself.

Now, the form, I think, is important for what we are talking about here because what we are talking about is the procedure by which one reaches some level of reasonable confidence that it's okay to credit allegations in a third-party complaint.

Now, this third-party complaint by Dr. Olymbios, O-L-Y-M-B-I-O-S -- I hope I spelled that correctly -- are just his personal observations, facts that he personally witnessed.

And what we have in this case that is distinct from every other case that Counsel cites is an e-mail from Dr. Olymbios himself to Counsel in this case reviewing the allegations at issue which, as Your Honor very succinctly put in the Court's

prior opinion, focused on billing unnecessary AlloSure tests to Medicare facilitated by illegal kickbacks.

**THE COURT:**  A little bit louder.  Whenever I see my court reporter leaning, I know that she is trying to hear you. I can see her virtually.

**MR. DAVIS:**  My apologies, Madam Court Reporter, and anybody else who couldn't hear.

I was simply summarizing the prior complaint using the Court's very clear and succinct description of there were two things going on; billing unnecessary AlloSure tests and it's related to this kickback scheme.

So we have an e-mail from Dr. Olymbios himself who reviewed the prior complaint and he wrote to the Plaintiffs' Counsel in this case and wrote, quote (as read:) "I was relieved to see that other former employees were willing to come forward to corroborate my observations," end quote.

He references specifically quote, "your amended complaint," end quote.

He -- he based on his experience -- and we can get into Dr. Olymbios' role at the company, which, respectfully, was also absent from the prior complaint -- the Court didn't so find, but I think between the lines these were some important facts that were missing.

But in this e-mail Dr. Olymbios also writes, the entire enterprise is a house of cards generating revenue through

illicit conduct as you have found, end quote.

What is the conduct we are talking about here?  It's submitting medically unnecessary bills to Medicare and paying incentives or kickbacks to doctors.

So now we have not a complaint.  We have a percipient witness, Dr. Olymbios, who worked at the company during the class period.  He started in 2020 in the -- excuse me.  He started in the summer of 2019 as a senior executive.

Defendants promoted him twice.  By the time he left in the end of October of 2021, he was -- according to new e-mails that are in the record -- now on the executive leadership team with Defendants Seeto and Maag.

He, according to the complaint, he has an -- a sterling medical record.  He worked at Cedar Sinai Hospital.  He has published 25 articles.

My friends on the other side of the V have had all the time in the world to come up with any problems with his ability to tell the truth about what's happening here.  They haven't done so.

And he explains in his e-mail to the Plaintiffs in this case that Peter Maag, Greg Seeto are, quote, crooks.  And he explains they have no regard for anyone, shareholder or patient.

That one e-mail, whether it is factually true, whether this is what they did, is a question for another day.

The question today is not who wins or loses before a jury, before Your Honor at summary judgment; but are the facts alleged sufficient to satisfy the PSLRA.

That one e-mail, returning to the law judge is -- distinguishes this case from *Countrywide*.  It is another piece of verification that we have that wasn't in this case.  It distinguishes this case head and shoulders above *Connetics II*, which the parties didn't have in that case.

And, critically, we are making arguments today assuming the very conservative state of the law as articulated in the Court's prior opinion.

My friend said it was part of law of the case, and we are not here to dispute what the Court found.  We are here to say how we complied with it.

In response to the Court's question, however, what is the standard, we lost before the Court; but we respectfully submitted the Verizon -- excuse me -- the *VeriFone* case written by Judge McKeown, M-C-K-E-O-W-N; and we also submitted the *McKesson* case.

And both of those cases, we respectfully submit, actually best represent the state of the law for the reasons written in our prior opinion.  That's a very deep dive on where all of these doctrines come from.

The short answer is those two opinions show that attorneys can rely on third-party complaints, the facts in them, without

going through all this additional verification.

However, we are delighted to report to Your Honor that we wholeheartedly embrace the Court's invitation in the second amended complaint to -- to do -- to find additional independent corroboration; and I would like to read one of the means by which the Court offered an avenue of independent corroboration into the record.

And the Court wrote in its prior opinion in this case quote, (as read:) "Plaintiffs could have included corroboration from confidential witnesses that have brought similar concerns to Seeto or Maag," end quote.

And we respectfully submit that we have done just that in that case and in the -- in multiple forms.

The first is there is a new former employee whom we refer to as FE19; a second former employee, FE10; a third former employee, FE11; and some documentation docking Dr. Olymbios' claims up.  I'm going to focus in order.

FE19 worked directly for Defendant Seeto from the middle of 2021 through the end of 2022.  So there was a little bit of overlap -- not a lot but a little bit of overlap between FE19 and Dr. Olymbios' time at the company.

They both reported to Dr. Seeto and their experiences are very similar.  On the subject of is it reasonable to credit Dr. Olymbios' claim that he raised issues about Medicare billing with Dr. Seeto or Dr. Maag, on that one question, FE19

explains that FE19 attended meetings, plural, with Defendant Seeto and three other executives.  Their names are identified in the second amended complaint before the Court.  And these meetings concerned the company submitting bills to Medicare that lacked medical necessity.

And FE19, while working for Dr. Seeto, explained this person knew absolutely everything about these billing problems and that they were pervasive.

An interesting question -- we heard some quite harsh language from Dr. Olymbios referring to the Defendants here. He said these are folks who don't care about patients but only care about financial growth.

What FE19 reported was that Dr. Seeto at various business meetings would make disingenuous remarks about patients and valued growth above patient welfare, which is quite similar to the e-mail we got from Dr. Olymbios where he explained that the Defendants didn't care -- had disregard for patient welfare.

Also importantly on the subject of scienter that we are not talking about a mistake here, FE19 explained that Erin Tokunaga, who worked and reported to the C-suite towards the end of 2021, was both bullied and coerced by the C-suite to misreport information to the Department of Justice in their -- in the course of their investigation and to these billing problems at the company.

Again, back to FE19, very senior employee, reporting to

Seeto much like Dr. Olymbios explained that everything that fit a pattern, in quotes, a pattern of not caring about running the business in a legal or ethical way.

So this person has -- is contemporaneous with Dr. Olymbios. In terms of the subjects covered, they cover an analogous subjects. In terms of whether Dr. Seeto knew about these billing problems with Medicare, FE19, like the witness, in *Connetics II* was present at meetings where this subject was discussed; but FE19 is not the sole witness who satisfies the Court's concerns.

We tried to be as thorough and responsive as possible in responding to the Court's concerns. An additional employee, FE10, who is new to this second amended complaint, Judge --

**THE COURT:** Keep in mind this goes to the areas of which they are seeking to strike because we are kind of flirting with some of the motion to dismiss issues.

**MR. DAVIS:** The overlap of -- between Dr. Olymbios explaining what is the information he conveyed to Dr. Seeto and Maag, on the one hand substantively on a motion to dismiss and, on the other hand, on the motion to strike there's a lot of overlap. So I will do my best to be surgical about it, Judge, and brief.

So FE10 is in a position to know the case law supports crediting what this person observed. FE10 observed a director of billing at CareDX speaking with Seeto about Medicare's

50 percent reject rate of all the bills that CareDX was sending.  And FE10 explained -- I mean, that number is big, half the bills of the company -- explained that it was well known throughout the company that Medicare was rejecting these bills because they lacked medical necessity.

Now, Counsel seemed to suggest -- and, perhaps, I misheard -- that the Court was inviting in its last opinion the Plaintiffs to find a witness who actually was physically present on what we understand were likely phone calls between Dr. Olymbios and one of the Defendants.

My recollection from the past hearing -- we have quotations from the transcript -- was the Court pressed on that subject, and we learned, no, you don't actually have a person who is physically present at each one of those meetings.  In this case it is probably impossible.

And so what be understood from Counsel, frankly, was that as long as somebody else raised similar concerns, then we are going to credit Dr. Olymbios' allegations.

And that's what we have in FE19 and FE10.  Finally, in terms of new former employees, I think there was an underlying suggestion.  It wasn't explicit but an underlying suggestion that Dr. Olymbios was disgruntled and, therefore, was making everything up.

Counsel did not say that.  I don't intend to make allegations or accusations in their mouths, but I think that

was the underlying gist of this idea, he is disgruntled.  The inference, I think, my mind goes to, well, perhaps, he is not telling the truth.  Perhaps he did not raise these subjects while he was at the company.  Maybe he is making it up after he left.  That's between the lines.

What we learn from FE11, who was a direct report into the C-suite -- so just like Dr. Olymbios, just like FE19, these are very senior people, a couple hundred people at the company, very small number of vice presidents.  FE11 is one of those very senior people.

What FE11 explained was while he was at the company with Dr. Olymbios, Dr. Olymbios was, quote, "vocal," end quote, about his concerns, these billing concerns.

Not only -- not only did he explain that, FE11 also explained that Dr. Olymbios told him -- the quote is "told me" -- told FE11 about his concerns.  And then this raises an interesting question.  Well, why didn't more folks raise more issues with senior management about it?

And according to FE11 -- again, very senior executive, seasoned individual -- they were all terrified for losing their jobs.  That's directly from FE11.

We respectfully submit that, you know, the law that we are starting with here today, which is the Court's prior opinion, is very strict; and we take it very seriously and we attempted to respond very rigorously to that -- to the Court's guidance.

And we satisfied *Countrywide* by reaching out to those former attorneys.  We have a bonus e-mail on top of *Countrywide*.  We satisfied *Connetics II* because we have gone out and verified whole sections of the core allegations here, what's going on, and importantly, what they care most about is did these senior executives know.

And on top of that, there was an argument made -- and I just want to address so that the record is complete.  There was an argument made that there's no corroboration for the idea that Dr. Olymbios spoke with Dr. Maag about -- about, you know, it being a way of running -- a way of doing business that patients didn't have to pay for their tests.

This is a paraphrasing, not a quote.  But that's one of the ideas they are trying to strike.

So not only do we have everything I just described, in addition it's a very thorough, very detailed recital of e-mail documentation, testimony that came out in another case to which CareDX was a party.

And in that documentation we see a marketing document, a marketing document that says this AlloSure test is, quote, "fully covered by Medicare," end quote.

Now, the surrounding context of that document is it was never given to the doctors.  It was only spoken orally.

And we submit that only providing an oral marketing message that all the tests are fully covered by Medicare, end

quote, is very close to a more, you know, daily discussion between two executives that patients never pay for the tests. It's the same thing.  The point is Medicare pays.

So, we have multiple layers of corroboration, and we have satisfied what we believe is an overly strict -- but the Court here is the law -- what we think is overly strict but what the Court's rulings were.

THE COURT:  Thank you.

MR. DAVIS:  Yes, Your Honor.

THE COURT:  So, it is your position that sufficient and independent corroboration has occurred in the second amended complaint.

Counsel for the Defendant, anything further on this issue as to the motion to strike?

And then each side will have 15 minutes to argue their motion to dismiss.

MR. SULLIVAN:  Yes, Your Honor.

I appreciate the opportunity to respond to a few of my friend's arguments, perhaps, sort of taking them in reverse order here.

This allegation that Dr. Maag participated in a marketing brochure that said AlloSure is a hundred percent covered by Medicare is completely different from what Dr. Olymbios claims Dr. Maag told him about not billing patients.

Let me just explain this very briefly.  Plaintiffs are

alleging that Dr. Maag discussed with Dr. Olymbios the practice of -- and I'm quoting from their papers -- "offering to waive patient costs."  That's from their opposition on page 14.

That refers to the portion of an AlloSure bill, if there is any, that is not covered by insurance and that the patient has to cover out-of-pocket.

And Plaintiffs are alleging that under certain circumstances when a company like CareDX offers to waive those additional out-of-pocket costs, that can be a violation of the Anti-Kickback Statute.  That's paragraph 140, note 23 in their complaint.

So the question is whether the Plaintiffs allege independent corroboration of that practice, the practice of waiving patient costs and whether Dr. Maag discussed that practice with Dr. Olymbios.

And we don't think the second amended complaint, frankly, comes close.  There's no independent corroboration other than this allegation that CareDX waived patient costs, let alone that anyone reported or discussed that practice with Dr. Maag or Dr. Seeto.

Saying that AlloSure is fully covered by Medicare is separate.

If anything, that would suggest when AlloSure is covered by Medicare, it is fully covered so there is no separate costs for the patient -- to the patient for CareDX to potentially

waive.

Just briefly on FE19 -- and perhaps I misheard Counsel -- I thought there might have been a suggestion that FE19 overlapped with Dr. Olymbios' tenure at the company.

FE19 is alleged to have worked from mid-2021 through the end of 2022 when he was laid off.  Dr. Olymbios left CareDX in October of 2020.

Beyond that, FE19 -- FE19's prior authorization allegation, which I think was the focus of -- of Counsel's argument, that does not equate to being present at meetings where these allegations were discussed.

We are moving to strike -- as Your Honor rightly noted -- two specific allegations about -- about Dr. Olymbios raising his concerns and about Dr. Maag discussing not billing patients.

The meeting to which Counsel referred was a meeting where supposedly -- that Dr. Seeto attended where CareDX was supposedly discussing problems relating to getting prior authorization from doctors for the AlloSure test.

There's some threshold issues to this allegation putting aside what I just mentioned about FE19's tenure.  There are no allegations that FE19 had any knowledge of CareDX's billing practices or how to obtain reimbursement for Medicare, whether there was any requirement for prior authorization.

All that Plaintiffs tell us about FE19 is that they

managed day-to-day operations in the business and created strategies.

Under the *Zucco Partners* case confidential witness allegations are discounted when in that case a confidential witness was a human resources employee who had no firsthand knowledge of the working of finance or corporate department, but Plaintiffs need to allege a basis of knowledge for FE19 and they don't.

Second, Dr. Olymbios' complaint says nothing about prior authorization or difficulties obtaining Medicare reimbursement.

What FE19 says they observed being discussed simply not related to any of these concerns that Olymbios could have discussed with Dr. Seeto.

In fact, Dr. Olymbios' complaint contradicts the notion that CareDX was failing to obtain AlloSure reimbursement.  The whole premise of his claim was that CareDX was being reimbursed -- he claims improperly -- for what he alleges were excessive tests.

Finally, we detail in our papers that Medicare did not require a prior authorization for AlloSure.  This allegation is facially implausible.  Prior authorization is a requirement imposed by insurers for certain medical services, but FE19 says that CareDX was seeking prior authorization from physicians.

Moving on to FE10, I will address just briefly, FE10 is even further divorced from the time period at issue here.

FE10 is not alleged to have ever spoken to Dr. Seeto let alone reported to him.  FE10 started working at CareDX two years after Dr. Olymbios left.  It is inconceivable that anything FE10 says could possibly corroborate a discussion with Seeto and Maag from two years before this individual even joined the company.

Just to close on this issue of Dr. Olymbios' reliability or trustworthiness, which I heard Counsel argue, to be clear, we do dispute the notion that Dr. Olymbios is a reliable witness.

In fact, the case that Plaintiffs rely on *Homeward Residential versus Sand Canyon*, that case found that third-party complainants, just like Dr. Olymbios, were reliable precisely because the allegations came from a number of different employees, not from one possible disgruntled or vindictive employee.  That's from page 126 of the opinion.

Dr. Olymbios is, we would submit, indisputably a disgruntled former employee.  Plaintiffs accuse us of raising allegations outside the complaint here, but one need not look beyond the four corners of the complaint to see Dr. Olymbios is disgruntled.

For example, in his e-mail to Plaintiffs' Counsel, he refers to individuals at CareDX as being crooks and despicable people.

I think with that and the time requirements that

Your Honor alluded to earlier, I will conclude unless Your Honor has questions.

THE COURT:  Thank you.  Thank you.  At this time we will turn our attention to the motion to dismiss.  And thank you, both, Counsel, for your thorough presentation with regards to my questions.  Thank you.

MR. SULLIVAN:  Thank you, Your Honor.

MR. DAVIS:  Thank you, Your Honor.

THE COURT:  All right.  Now, turning our attention to the motion to dismiss, as you know, from the prior order, the Court is focused today on falsity, scienter as well as loss causation.

Counsel, keep in mind the Court has read all of the moving papers.  And so I'm going to start with Plaintiffs and work my way back.

For Plaintiffs, with regards to the compliance and the underwriting agreements, regarding the underwriting agreements, what level of investor interest would you consider sufficient to make this case more similar to *Glazer Capital Management LP* or in comparison to *In Re: Planes* (phonetic)?

How should the Court evaluate the underwriting agreements as they state that the agreements should be read in conjunction with the disclosures in the company's period reports and other filings with the SEC?

For example, the 10K report that talks about the financial

status and is required by the SEC warned investors that CareDX was potentially not in compliance with healthcare laws and does that impact the falsity of the underwriting agreements?

You may proceed.

**MR. DAVIS:**  Thank you, Your Honor.  And thank you for targeting the Plaintiffs' focus here.

I will take the questions in reverse order if it pleases the Court.

**THE COURT:**  Certainly.

**MR. DAVIS:**  The first is really focused on what is -- what do we do with the fact that there are risk disclosures in the periodic filings that the Defendants signed?

And we submit that the Ninth Circuit just addressed this issue in a case *Amalgamated Bank versus Facebook*.

Now, unfortunately this came out well after everybody's briefing.  It is docket 105 in this case.  It was filed on this docket on -- the Ninth Circuit issued the opinion on October 19th.  So it's a new decision.  It's not new law.

The basic gist is when Defendants are writing disk -- risk disclosures, they leave an impression in investor's mind that the subject they are talking about is hypothetical; that it's not real.

And so, what happened in the *Amalgamated Bank versus Facebook* case is the Defendant Facebook came out and said: Look, there may be a risk that some of users' data has been

leaked to a third party.  This risk disclosure came out after this sort of famous Cambridge Analytica Trump data sharing series of circumstances occurred.  So there was a question, had this occurred, hadn't it.

Facebook told the market there is a risk it occurred.  In fact, they knew it had occurred.

And the Ninth Circuit said that under those circumstances, it is misleading to investors to portray a set of circumstances as a risk when, in fact, it had already occurred.

The *Facebook* case, we would argue, is outcome determinative on what the law is on whether these risk factor statements can be actionable as a matter of law.  They are not new.  The idea is not new.

But because this *Facebook* opinion is heavily focused on those types of statements, we would argue that there is no longer any question, if there ever was one, that the Defendants' statement in this case -- that there may be a risk of noncompliance with law -- is false and misleading at the pleading stage; where as here, they are aware of facts and circumstances showing they are actually violating the law through these kickbacks and Medicare overbilling.

So -- so the risk factor statements that are read alongside these underwriting agreements strengthen the Plaintiffs' arguments in this case, that the case should go forward on falsity under *Amalgamated Bank verus Facebook* and

its -- and its underlying authorities.

As to the Court's second question, how do we know -- how do we know that these underwriting agreements are important to investors?

And the way we know in this case --

**THE COURT:**  And then I also have a question:  Am I looking at just current investors or also potential investors? You may --

**MR. DAVIS:**  The way -- the way one -- the way one could look at this set of circumstances in a case like this, where we are actually talking about fraud on the market, which essentially presupposes -- and it is established law as *Basic, Inc*. -- it is a Supreme Court case underlying all of these cases -- that we are in an efficient market.

And so the idea is that whenever material information, which is part of the Court's question, comes into the market, investors are going to rely on it through the price it -- of the stock itself.

And the Court had interesting questions about can you point to facts beyond just the price that would inform the Court that this offering, this deal is important to investors.

And the second amended complaint unlike the first amended complaint actually goes into significant detail on that subject.

So, the first part that's important to understand is that

CareDX is running out of money at the time it makes this first statement in -- in 2020.  They have approximately $32 million in cash.

And what the second amended complaint alleges -- and nobody disputes -- is that the preceding three months, they had burned through $38 million in cash leading, by my humble state school math training, to the conclusion that at that current rate, they are going to go bankrupt in short order if they don't raise this money.

And so we have the circumstances of $125 million being absolutely critical to the existence of the company or they go out of business without this cash.  That's one.

Two, we have analysts who are changing their models on the basis of this fundraising.

Three, we have the Defendants themselves pushing out press releases, basically advertising this fundraising.

And finally, what we have from Defendant Seeto is an explanation that these cash levels give them a competitive advantage against -- against their peers.

So for all of these reasons, we would argue that the facts of this case are very compelling that investors would care about this -- this fundraising because without it, they are going to go out of business.

Another question arises, fine, well, what's the relationship between the underwriting agreement itself and the

completion of the deal?

So, the Defendants are not accessing the capital markets without underwriters.  And one of the conditions to these underwriters working on the deal was an underwriting agreement with the representation that the company is in compliance -- in material compliance with all of its legal obligations.

The Court asked the question -- so I will go into more detail -- all of this is part of the underwriter's due diligence process whereby they need some assurance they are not bringing securities to market that are tainted, in this case, by very serious underlying problematic conduct.

So in summary, number one, the underwriter agreements and the representations about the law are a condition precedent to the raising of the $125 million.

Number two, the $125 million is absolutely essential to the business as a growing concern.

Number three, the buy-side investor analysts changed their models on the basis of this fundraising.

Number four, Defendant Seeto himself says the funding is important to the company's, quote, comparative -- or competitive standing in the market.

And then finally we have these press releases.  For all those reasons, Your Honor, we would argue that the Plaintiffs have satisfied the Court's prior inquiry in explaining why this particular deal is important to investors.

**THE COURT:** All right. And then for risk disclosures, could you clarify, at the time CareDX made its risk disclosures between April 30th, 2020 to October 28th, '21, why its risk disclosures were false?

When I look at paragraph 154 of the second amended complaint, CareDX was not facing legal scrutiny and its business was not affected by the alleged misconduct. Is that correct?

**MR. DAVIS:** This is a very important -- every one of the Court's questions is important obviously. This very question was one of the issues that the Ninth Circuit raised, and the argument historically sometimes has been -- and some courts have been persuaded by the argument that in this case, as an example, so the company is continuing to successfully bill -- overbill 50 percent of its revenue to Medicare.

It's still doing that successfully. So the fundamental problem that it can't do that anymore hasn't materialized. Some of the cases followed that line of thinking.

And we would argue that *Amalgamated Bank versus Facebook* and its underlying authorities say, you know, no. It's the fact of the underlying illegal conduct that renders the statements false.

What's not required is the material -- materialization of the underlying risk in order to make the underlying statements false.

Returning to the Court's first question, really what's happening here is the same set of facts that rendered the underwriting agreements false and misleading, the overbilling, the kickbacks, things like this.  It is the same set of facts that would render the risk disclosures misleading.

The underwriting statements are false.  They say they are in compliance.  They are not.  And then the risk factors statements are misleading in that they are affirmatively choosing to speak about a subject but are not disclosing the fact that they are -- they are violating the law.

So that's -- they are directly related.  The way that courts can arrive at falsity is slightly different but the underlying facts are the same, Judge.

THE COURT:  All right.  Thank you.  Counsel, on the issue of falsity and then we are going to conclude the hearing when we speak about scienter and loss causation.

But going back to falsity -- and Counsel has brought up the October 19th case, *Amalgamated versus Facebook* -- you may want to share with me in your opinion whether this case is different from that situation and that in *Glazer* or are they the same.

And then likewise, with regards to the question I just asked for risk disclosures, whether there is anything in addition you would like to share.

And finally on falsity, with regards to testing services

revenue, is this case more like *In Re: Plantronics*, *In Re: Syncor* or *City of Sunrise*?  You may proceed.

MR. CORDING:  Thank you, Your Honor.  If I could, I would like to begin with the underwriting agreements.

THE COURT:  Certainly.

MR. CORDING:  It is our position that Plaintiffs at best have pled modest investor interest in CareDX's liquidity position, not intense investor interest, which is the phraseology of the *Glazer* decision in the terms of the offering.

And let me elaborate on what I mean by that.  So, first, CareDX regularly goes to market to raise capital from investors.

And indeed between the first complaint and the second complaint, the Plaintiffs plead three securities offerings during the class period because as the complaint also pleads, CareDX was a money losing enterprise; hence, it was dependent on the capital markets.  And so going to raise capital from investors was a regular and routine occurrence.

And contrast that to some of the cases they cite in their papers such as *Bond versus Clover Health* where the contract that was at issue was a merger agreement.

Well, a merger is a singular event, typically the most important event in the life cycle of a public corporation, not a recurring one.  Hence, it follows the degree of investor

interest in a recurring event like a securities offering for CareDX would be diminished.

Second, if investors were intensely interested in CareDX's cash runway, they would have focused not on the underwriting agreements but on the prospectus and registration statement, which are separate filings referenced in paragraph 177 of the complaint.

It is the prospectus and the registration statement that has the financial data about how much money is being raised, about the company's cash position, about how that money is going to be utilized.

The underwriting agreements simply memorialize the business and legal terms between the underwriters and the company.  They don't include the information that would be of interest to investors such as how much cash does the company have, as opposing Counsel alluded to, before conceivably the company could go bankrupt.

So, in other words, our position is they are focusing on the wrong documents or agreements filed with the SEC, the underwriting agreements not the prospectus and the registration statement.

And indeed, they make reference to Dr. Seeto's statements, to analyst reports about the offerings.  Well, that statement and those analyst reports weren't about the underwriting agreements.  They were about the financial outcome and import

of the offering to the company, not about the underwriters.

And finally -- and, again, worth keeping in mind, these two underwriting agreements were filed with the SEC pursuant to 8-Ks that had the same warning language as the two underwriting agreements at issue last time, which said very clearly to investors that the agreements were being filed for their terms and, quote, "not to provide investors with any other factual information regarding the company or its business."

Our last point is that -- in a way the Plaintiffs' argument is self defeating.  If investors were intensely interested in the underwriting agreements, then they would not have missed the clear warning in the 8-K that investors shouldn't rely on the factual representations contained in the underwriting agreements.

And so for all of those reasons, we don't think -- notwithstanding the additional context that they pled -- that they come close to satisfying the intense intra-standard of *Glazer*.

**THE COURT:**  I want to withdraw one of my earlier questions.  And as I have been listening, I want to ask the following:  You state that the confidential witness, Former Employee 10, must state the number of claims Former Employee 10 observed; but you do not cite to any legal authority for this assertion.  What is your support for this statement?

And it's my understanding from the law that there's a

suggestion that a party does not need to allege specific claims to bring a False Claim Act claim.  How would you respond to that based on *Mauss versus NuVasive*?

**MR. CORDING:**  Thank you, Your Honor.  And just to contextualize it, former employee 10 speaks to the issue of whether the company lied about the reasons for the decline in average selling price or ASP during the class period.

And what -- what Former Employee 10 alleges -- and I think it's important to bear in mind that FE10 joined CareDX in October 2022, which is one month prior to the end of the class period.  So it is not somebody at the company during the relevant period.  This is somebody who joined the company at the very tail end of the relevant period.

What FE10 alleges that he did was undertook some kind of review since this was somebody who worked in -- in the claims department and was looking at claims that were being rejected.

I agree with Your Honor.  It is clear as a matter of Ninth Circuit law that the Plaintiffs need not establish a false claim to make out their theory of falsity in the sense that they don't have to plead at this stage of the case that CareDX splitted a false claim for AlloSure reimbursement to the Government.

But, nevertheless, in order to credit a confidential witness allegation about this review that supposedly took place, which is going to their point that Medicare was

rejecting a material number of claims, it is our position that -- and I think probably the best case to illustrate this would be the *Zucco Partners* and the *Endologix* decision, which are cases that address the sufficiency of confidential witness allegations.

And what under those cases they would need to explain is essentially what did FE10 do to provide a foundation that this witness has personal knowledge and a reliable basis for saying that Medicare was rejecting a substantial number of claims.

And as pled in the second amended complaint, we have no idea of how many claims this witness looked at.

Very importantly, FE10 groups together claims that are very different in kind.  He speaks to claims being rejected by Medicare, claims being rejected by Medicaid, and claims being rejected by private insurance companies like Blue Cross.

Well, this isn't a case about claims being rejected by Blue Cross.  It's a case about claims being rejected by Medicare.

And so our fundamental point is that for this to be a sufficient foundation to falsify the company's public explanations for the decline in aggregate selling price, the allegation would have needed to have been more particularized and detailed as to the foundation of what this witness does so as to establish that it is reliable.

**THE COURT:**  So you need not only know what

department -- what department knowledge this witness has but what their function and role was and access to this information?

**MR. CORDING:** Absolutely, Your Honor. And I think importantly embedded in that is timing. When were these claims purportedly rejected since this was somebody who worked principally after the class period, only joining the last month prior to the end of the class period.

**THE COURT:** All right. All right. Let's see. Going back to *Glazer* -- and I apologize. We are running a little beyond the time that I anticipated -- you argued that this case is different, meaning the Defendant, from the situation in *Glazer*; but *Glazer* did not limit itself to the merger agreement context. Would you agree?

**MR. CORDING:** Yes, Your Honor.

**THE COURT:** All right. So statements in a private contract are still actionable?

**MR. CORDING:** Yes, Your Honor. And I think what -- what's the most fundamental distinction between this case and *Glazer* is that the *Glazer* decision did not have the warning language in our 8-K about -- as cautioning investors not to rely on the factual representations. That warning was absent from the *Glazer* case and present in this case.

**THE COURT:** All right. All right. Counsel for the Plaintiff, I recited a number of cases that I asked the Defense

to indicate whether this case was more like one or the other meaning *Plantronics, Syncor* or *City of Sunrise*.  Just if you can point to the case that you feel for the testing services revenue is most akin to this case.

**MR. DAVIS:**  Yes, Your Honor.  From the Plaintiffs' point of view, this is straightforward.  The Ninth Circuit's decision in *Syncor* is directly on point.  And what happened in that case, as I recall, is the company was engaged in a kind of kickback scheme and the allegation was that the kickbacks were influencing revenue.

And so in this case, you know, the core allegation is that the Defendants are engaged in this practice of overbilling Medicare, which is quantified at 50 percent, during the class period.

And there is no question that the kickbacks and the overbilling of Medicare compare very favorably to the allegations about kickbacks in the *Syncor* case.

And then there comes -- there is a question of:  Is there an impact on revenue?  And in this case, there are multiple allegations that there's -- that there is an impact on revenue.

In fact, the Plaintiffs quantify the impact under the GAAP allegations, which is very detailed -- we don't need to go into this unless the Court wants to today -- but the allegation based on an analysis of the sum total of these overbilling is $119 million, which is highly material to CareDX.

And I didn't hear, at least today, the Defendants argue that they were moving to strike Dr. Olymbios' allegation that the reason the company was engaged in all of these practices was to pad their sales.

And we also know from FE1 -- FE1 reported up to a vice president -- asked why is the company engaged in these practices.  The response was:  We need to do this to make money.  The level and detail of allegations is replete.  We respectfully refer to the second amended complaint on those details.

What is happening from a policy point of view, Your Honor, is true.  And these kinds of statements where a company is saying, we are growing revenue very well for any number of reasons, and they are all legitimate business reasons, the Ninth Circuit fundamentally is imposing a duty to disclose on the folks who choose, exercising their own free will, to talk about the reasons for their growth and pointing only to legitimate business activities, a duty to disclose that they are also raising revenue through illegitimate business activities.

And, again, FE19 explaining everything fit a pattern of illegal or unethical business practices -- I don't want to go beyond the scope of the Court's question but in response, that's the authority -- the binding authority that we think is most relevant, the facts that are related and the underlying

policy rationale for the reasons the Ninth Circuit turns out to hold these statements actionable.

**THE COURT:**  I'm going to read to you my final list of questions, and I will indicate which party I'm hopeful will respond.

With respect to Plaintiffs, what is your best argument for scienter based on a holistic review?

Also for Plaintiffs, the second amended complaint, paragraphs 129 through 30, alleges that Dr. Maag, M-A-A-G, attended marketing events where CareDX spent money marketing AlloSure to doctors which is not alleged to be improper.  Is that correct in terms of my understanding?

Finally to Plaintiff, the Court originally found that there were insufficient facts that the market linked the disclosures with the Defendants' misleading statements.  What is your best argument that has changed since the last complaint with regards to loss causation?

For the Defendant, if Dr. Olymbios' allegations were not stricken, is there scienter for Dr. Maag and Dr. Seeto?

Also for the Defendants, why is this case not like *Evanston Police Pension Fund versus McKesson Corporation*?  Why haven't the Plaintiffs adequately pled in your opinion loss causation based on a string of events including the initial investigation and subsequent Olymbios complaint.

Beginning with the Plaintiff, please give me your best

argument with regards to scienter and my other two concluding questions.  And then we will turn to Defendant and we will conclude the hearing.

**MR. DAVIS:**  Yes, Your Honor.  So the first question regarding scienter and the Court naturally referring to the *Tellabs* holistic standard, the holistic standard really looks at the entirety of the allegations -- and I know we are over time.  The Court is extremely busy.  I will do my best to give a quick list.

We should start off with what is not actually being -- nobody is moving to strike here, and that is the existence of a widespread -- in the words of one word -- of one witness, pervasive, in another there is a pattern -- pervasive pattern of overbilling Medicare of paying doctors kickbacks throughout the class period.

The scale of the conduct alone is one piece.  We don't need to argue it is sufficient.  It is one piece of the holistic analysis.

The second piece is the fact that Defendants Maag and Seeto are -- are directly involved in training with sales folks; and we know from FEs who are working at the company at the time, that those sales folks cannot sell the test that the Quests of the world make money off of, called standard of care tests, unless they also sell the AlloSure test.

In other words, there's a -- we would argue there is a

policy at the company that they have to sell these AlloSure tests whether they are medically necessary or not.

Seeto and Maag are connected to that sales function through this extraordinary set of detail alleged in the complaint, not repeated here.

We can set all of this aside for the moment and just get straight to the point with Dr. Olymbios. Even if the Defendants are wholly ignorant of this widespread conduct occurring at a company that they say they have a very hands-on approach to managing, we have this conversation between Olymbios, Maag and Seeto. We have that conversation backed up with meetings that FE19 observes, meetings that FE10 observes.

And the Defendants are careful to parse up the chronology -- and I just want to thank my friend for correcting a factual error I made earlier. FE19 -- he is correct. FE19 did not chronologically overlap with Dr. Olymbios, but we argue in the papers, Judge, that they are seeing the same set of conduct over a broader chronological context.

So between Dr. Olymbios and FE19 observing Dr. Seeto attending meetings about these Medicare billing problems, FE10 explaining the rate of rejects is 50 percent -- my colleague was making some arguments about the level of detail surrounding those allegations, foundation and so forth -- we respectfully refer the Court to paragraphs 110 following in the complaint up to 113, I think, where a foundation is laid very well.

And what that billing specialist is reviewing is actually data from the class period, and that data shows a 50 percent reject rate. And we just don't get to that level of -- of reject without it being part of a business practice.

FE11, again, supporting Dr. Olymbios but also just -- just independent that everybody is terrified to raise concerns about these billing practices to senior management. That speaks to scienter.

Finally, without limiting the details in the complaint, we also have observations from FE19 who explained that her friend Erin Tokunaga, who reported directly to the C-suite at the end of October 2021, was, quote, bullied and coerced by the C-suite to misreport facts to the DOJ about the billing conduct going on.

There -- so we would -- drawing back the lens here, in the totality of all the circumstances that are present here, the Plaintiffs respectfully argue that there is more than enough evidence to support the conclusion that scienter is present.

*Tellabs* doesn't ask for a smoking gun, but there is a smoking gun in this case, the Plaintiffs argue, which is in the form of Dr. Olymbios' e-mail, not his complaint, his e-mail to the Plaintiffs in this case.

He is a senior executive. He's -- which is in the record.

**THE COURT:** Yes, yes. And so now then, speaking of the record, the second amended complaint alleges that Dr. Maag

attended marketing events where CareDX spent money marketing AlloSure to doctors, which is not alleged to be improper.  And I just want to make sure that that's correct.

**MR. DAVIS:**  It is the writing of the checks and -- that are part of the kickbacks with FE6.  The meetings themselves are just context and raise awareness.  Attending meetings, in and of themselves, is not improper.  We think -- if that's what the Court is asking, we would agree with that.

**THE COURT:**  All right.

**MR. DAVIS:**  The last question the Court had was around loss causation if I'm not mistaken.

**THE COURT:**  Yes.

**MR. DAVIS:**  I will attempt to go more quickly than in my holistic --

**THE COURT:**  Yes.  I need to give your colleague a chance to respond.

**MR. DAVIS:**  So we have a couple of cases in play.  And I think the way that the Court actually set up the intellectual framework of being a series of linked disclosures is very much what our argument is.

And in terms of binding authorities, we have *Amalgamated Bank versus Facebook* again.  And what happened in that case was there was not a mirror image disclosure to the market revealing a, quote, fraud.  And that's not our theory in the second amended complaint.

Our theory in the second amended complaint is not the fraud was revealed.  Our theory is there are facts proximally related to the fraud that are revealed through the partial disclosure mapped onto *Amalgamated Bank verus Facebook*; what we saw in that case was a New York Times article came out, a lot of disclosures about Cambridge Analytica working with Facebook's data.  And what that disclosure revealed to be misleading or false or was a corrected disclosure of were statements about, quote, control.

There was no mirror image between the false statement and what was revealed to the market.  They were simply proximally related.  And that's our theory here today.

The second drop in the *Facebook* case is relevant to another category of corrections in this case where the market simply is learning about deteriorating financial performance.

And so, an argument can be made in these kinds of cases that simply reporting missed earnings doesn't reveal a fraud.

Again, the Plaintiffs' theory in this case is under *First Solar*, *Facebook*, there is a proximate relationship between not being able to bill Medicare with illegal bills and the cessation of doing that with the decline in revenue.

And so for that second decline in the *Facebook* case, what happened is they simply reported they missed earnings.  The --

**THE COURT:**  So in short, you are relying upon *Syncor* and *Facebook* for the causation.

**MR. DAVIS:** And its underlying authorities.

**THE COURT:** Thank you. All right. Counsel.

**MR. CORDING:** Thank you, Your Honor. To begin with your first question regarding the Olymbios' allegation and if they are not stricken, it's the Defense position that even if those allegations remain in the complaint, they fail for lack of particularization, which is a finding Your Honor made in the decision on the first motion to dismiss.

And the reason for that is the lack of particularity around what Dr. Olymbios' purported concerns were, when they were raised, and the specifics of how and when those allegations were communicated purportedly to Dr. Maag or to Dr. Seeto.

And I think even more fundamentally if those allegations remain in the case, the theory of the fraud still fails *Tellabs*.

And the reason I say that is the theory rests, I think, fundamentally on an unresolved inconsistency.

Initially, Plaintiffs claim that for the first part of the class period, from April 2020 through October 2021, CareDX grew its revenues by billing Medicare for medically unnecessary tests principally through RemoTraC.

But then what happened in October 2021 it never clearly explained. And at times the theory seems to be that CareDX quietly wound down the scheme in the face of these Government

investigations. And that's stated in or alleged in paragraphs 35 and 234 of the complaint.

But if that were true, then there should have been a drop -- not a spike but a drop in the number of claims that were being rejected by Medicare as medically unnecessary.

And that's -- but that's not what the complaint says happened. And if what they are really saying is that the scheme continued on past October 2021, then you would have to believe that CareDX continued knowingly submitting false claims to Medicare in the face of three Government investigations looking into that very issue, which we would submit is not a plausible theory of fraud.

So we think even with the Olymbios allegations in the case, the Plaintiffs here have failed the holistic analysis under *Tellabs*.

And to answer Your Honor's final question regarding the *McKesson* case, that is a case about a price fixing conspiracy. The Defendant McKesson is a wholesaler of drugs, and it was profiting from the high price of generic drugs; and one of the issues is well why was the price of generic drugs high?

And the -- the claim alleged by the Plaintiffs in that case is that McKesson lied and claimed that the reason generic drugs were -- that the price had gone up was because of supply chain disruptions.

And the Plaintiffs allege that, no, the really reason the

price of generic drugs had gone up was because of this price fixing conspiracy that the Defendants knew about and profited from.

And so from a loss causation standpoint, what happened in that case is that there was a Government investigation, which effectively ended the price fixing conspiracy, and that brought down the price of generic drugs; and it caused McKesson's revenue to drop.

And what the Plaintiffs were able to do in that case was causally connect their theory of the fraud -- namely, that McKesson had lied about why prices were high -- with the losses suffered by investors, by showing the full chain of causation; that the real reason was this price fixing conspiracy; that it ended; that when it ended, revenue drops; and when revenue dropped, that caused the investor losses.

And it is our position that that chain of causation isn't pled here because there was never any revelation of RemoTraC -- of the RemoTraC fraud as they articulated.

**THE COURT:**  All right.  I'm pausing only because I recall the different drops in the share price at different stages because I know it started out at $70.34 dropped to 20 -- $32.55 and then plummeted down to $18.73; and somewhere in there, there was an announcement of a DOJ investigation.  So I will need to go back and just do my own timeline again.

Finally, if the Court were to agree with Defense and there

is no -- and the second amended complaint falls short in a category or two, therefore, not satisfying 10b, 10b-5, there would not be subdivision 20, subdivision A, would leave to amend in your opinion be futile?

**MR. CORDING:** Yes, Your Honor, happy to address that. It is the Defense position that leave to amend at this point would be futile.

Let me acknowledge at the outset that there are, from the standpoint of falsity, some new allegations here.

So the allegations about revenue overstatements, those are new. The allegations about the risk disclosures, those are new as well. However, the new allegations are really variations on the same theme from the first amended complaint.

The allegations about revenue being overstated by $117 million is really a quantification through an unnamed and undisclosed expert of what they were alleging in the first complaint was the false -- the revenue falsely coming from fraudulent practices.

The allegations around false risk disclosures are similar in kind to their --

**THE COURT:** Going back to the expert, if the expert were to disclose their method of calculation, would that be satisfactory -- there was a pause there -- in terms of whether leave to amend would be futile? So I'm thinking out loud as you are arguing. I'm sorry.

MR. CORDING:  Thank you, Your Honor.  I think it is important in answering that question to bear in mind that we are subject to a heightened pleading standard under the PSLRA.

THE COURT:  Uh-huh, 51 percent.

MR. CORDING:  What I think would be required, whether the expert is named or not, would be a statement of the expert's qualifications, essentially why this person is qualified to do this calculation, a description of what analysis was performed.

I think the complaint would need to address what the data was that were relied on, whether that person spoke to anyone at the company.

And I think really most critically here is in the line in the report, there's an entry improperly sourced revenue.  There is no explanation for where that comes from.

So I think there would need to be enough detail given in order to allow the Court to meaningfully assess whether that heightened pleading standard has been met.

But all of that being said, really, even if Plaintiffs were able to amplify and deepen their allegations around the expert or around risk disclosures through an amendment, we submit that there are two showstoppers here.

And the showstoppers which would make amendment futile are the scienter allegations and the loss causation allegations.

We know at this point Plaintiffs have reached out to some

85 former employees.  They cite 18 in the complaint.  And we would submit that they have not come close to linking Dr. Maag, Dr. Seeto or Mr. Genero (phonetic), the third individual Defendant, to having knowledge of the RemoTraC scheme.

And so really if we were to -- if they were to be granted leave to amend, we would simply go through this process again of, you know, either there would be a new confidential witness or there would not; but they have had now the opportunity and have availed themselves of the opportunity to make their strongest case for scienter.  And we would submit they haven't come close to doing so.

And the same holds true for loss causation where as between, you know, the first complaint and the second complaint, five of the six alleged corrective disclosures are the same.  The only new one is the Olymbios complaint.

We are -- the test, as a matter of Ninth Circuit law, is whether the market treated the allegations for the disclosure as a being truthful under the *B of I* case.  There was a modest 8 percent drop, as Your Honor observed in the prior decision.

So we don't think there is really anything they can do at this stage to amplify the loss causation allegations even if they are able to buttress the falsity allegations.

**THE COURT:**  All right.  Thank you.  And just to clarify my earlier comment, the company announced good revenue and growth in the beginning of 2021.

It was later in the year the company reported it had received a civil investigation demand from the Department of Justice, a subpoena from SEC, and an information request from an unnamed state regulatory agency.

So, just so the timing is clear in the discussion.

The Court does acknowledge that ECF 105, statement of decision, *Amalgamated*, A-M-A-L-G-A-M-A-T-E-D, *Bank versus Facebook* was lodged with the Court.

Counsel has incorporated that case in their discussion today and I appreciate that. I am going to re-visit it in light of the arguments that were made today.

The last day to amend pleading is January 26th, 2024.

Our ADR deadline is February 9th, 2024.

And our further status conference is February 22nd, 2024. That's our next CMC, I believe.

And then, finally, class certification motion filing -- should it survive the motion to dismiss and the -- and the pleadings stage in terms of making sure our pleadings are settled -- class certification motion would be filed September 13th, 2024.

Thank you so much. Each of you were immensely prepared. And thank you to the junior associate who also had an opportunity to provide argument and all Counsel who provided a great deal of support and writing in this case. So thank you.

**MR. DAVIS:** Thank you, Your Honor.

**MR. CORDING:**  Thank you, Your Honor.

(Proceedings adjourned at 3:23 p.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   November 30, 2023

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter