Laura Leigh Geist (CSB No. 180826)
WILLKIE FARR & GALLAGHER LLP
333 Bush Street
San Francisco, CA  94104
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com

Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
            ccording@willkie.com
            bsullivan@willkie.com

Attorneys for Defendants
*CareDx Inc., Reginald Seeto,
Ankur Dhingra, and Peter Maag*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAREDX, INC., REGINALD SEETO, ANKUR DHINGRA, MARCEL KONRAD, and PETER MAAG,<br><br>Defendants. | Case No. 3:22-cv-03023-TLT<br><br>**LOCAL RULE 7-3(d)(2) STATEMENT OF RECENT DECISION** |

Pursuant to Local Civil Rule 7-3(d)(2), Defendants respectfully submit this Statement of Recent Decision to alert the Court to a recent order granting certiorari by the Supreme Court of the United States in *Facebook, Inc. et al. v. Amalgamated Bank, et al.*, No. 23-980 (S. Ct. 2024) ("*Facebook*"). A copy of the Supreme Court's Order List is attached hereto as **Exhibit A**.

On October 19, 2023, Plaintiffs filed a Statement of Recent Decision notifying the Court of an opinion by a panel of the United States Court of Appeals for the Ninth Circuit reversing and affirming in part *In re Facebook, Inc. Sec. Litig.*, 2021 WL 6000058 (N.D. Cal. Dec. 20, 2021). ECF No. 105. On December 18, 2023, Plaintiffs filed a second Statement of Recent Decision, alerting the Court to a Ninth Circuit panel opinion that amended certain language in the prior *Facebook* decision. ECF No. 112.

On March 4, 2024, Facebook, Inc. filed a petition for writ of certiorari, raising as the first Question Presented: "Are risk disclosures false or misleading when they do not disclose that a risk has materialized in the past, even if that past event presents no known risk of ongoing or future business harm?" **Exhibit B** at 2. On June 10, 2024 the Supreme Court granted certiorari as to the first Question Presented in the petition.[1] The Court's decision impacts the "risk factor" arguments made by Defendants in their motion to dismiss. *See* ECF No. 89 at 18-20; *see also* ECF No. 98 at 9.

Dated: June 11, 2024                    WILLKIE FARR & GALLAGHER LLP


By: */s/ Laura Leigh Geist*
    Laura Leigh Geist


WILLKIE FARR & GALLAGHER LLP
Laura Leigh Geist (CSB No. 180826)
333 Bush Street
San Francisco, CA  94104
Telephone:  (415) 848-7400
E-mail:  lgeist@willkie.com

---

[1] In its petition for writ of certiorari, Facebook, Inc. raised a second Question Presented: "Does Federal Rule 8 or Rule 9(b) supply the proper pleading standard for loss causation in a private securities-fraud action?" **Exhibit B** at 2. The Court declined to grant certiorari for this question and limited its order "to Question 1 presented by the petition." **Exhibit A** at 2.

WILLKIE FARR & GALLAGHER LLP
Tariq Mundiya (admitted *pro hac vice*)
Charles Cording (admitted *pro hac vice*)
Brady Sullivan (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY  10019-6099
Telephone:  (212) 728-8000
E-mail:  tmundiya@willkie.com
        ccording@willkie.com
        bsullivan@willkie.com

Attorneys for Defendants
*CareDx, Inc., Reginald Seeto,*
*Ankur Dhingra, and Peter Maag*

LOCAL RULE 7-3(d)(2) STATEMENT OF RECENT DECISION
No. 3:22-cv-03023-TLT

# EXHIBIT A

(ORDER LIST: 602 U.S.)

MONDAY, JUNE 10, 2024

### CERTIORARI -- SUMMARY DISPOSITIONS

22-349      FLAGSTAR BANK V. KIVETT, WILLIAM, ET AL.

The petition for a writ of certiorari is granted.  The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of *Cantero* v. *Bank of America, N.A.*, 602 U. S. ___ (2024).

23-682      ALABAMA V. WILLIAMS, MARCUS B.

The motion of respondent for leave to proceed *in forma pauperis* is granted.  The petition for a writ of certiorari is granted.  The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Eleventh Circuit for further consideration in light of *Thornell* v. *Jones*, 602 U. S. ___ (2024).

### ORDERS IN PENDING CASES

23-914      ZILKA, DIANE V. PHILADELPHIA, TAX REVIEW BOARD

The Solicitor General is invited to file a brief in this case expressing the views of the United States.

23-947      ) SUNOCO LP, ET AL. V. HONOLULU, HI, ET AL.
            )
23-952      ) SHELL PLC, ET AL. V. HONOLULU, HI, ET AL.

The Solicitor General is invited to file a brief in these cases expressing the views of the United States.  Justice Alito took no part in the consideration of these petitions.

1

23-969      WALEN, CHARLES, ET AL. V. BURGUM, GOV. OF ND, ET AL.

> The Solicitor General is invited to file a brief in this case expressing the views of the United States.

23-7362     HARRINGTON, TESAE V. BLINKEN, SEC. OF STATE

> The motion of petitioner for leave to proceed *in forma pauperis* is denied.  Petitioner is allowed until July 1, 2024, within which to pay the docketing fee required by Rule 38(a) and to submit a petition in compliance with Rule 33.1 of the Rules of this Court.

## CERTIORARI GRANTED

23-715      ADVOCATE CHRIST MEDICAL, ET AL. V. BECERRA, SEC. OF H&HS

> The petition for a writ of certiorari is granted.

23-980      FACEBOOK, INC., ET AL. V. AMALGAMATED BANK, ET AL.

> The petition for a writ of certiorari is granted limited to Question 1 presented by the petition.

## CERTIORARI DENIED

23-456      CONSUMERS' RESEARCH, ET AL. V. FCC, ET AL.

23-687      MRP PROPERTIES CO., ET AL. V. UNITED STATES

23-743      CONSUMERS' RESEARCH, ET AL. V. FCC, ET AL.

23-757      RELISH LABS LLC, ET AL. V. GRUBHUB INC., ET AL.

23-873      ROBBERTSE, CHANTELLE C. V. GARLAND, ATT'Y GEN.

23-1014     McGRAW, DIYONNE L. V. BANKO, KHANH-LIEN, ET AL.

23-1077     WILSON, MARK V. SCHLUMBERGER TECHNOLOGY CORP.

23-1083     WAXWOMAN, SHULA V. BANK OF NY MELLON, ET AL.

23-1090     PITTA, SCOTT D. V. MEDEIROS, DINA, ET AL.

23-1097     HARTMAN, J. D., ET AL. V. SHORT, CHARLES W.

23-1103     SAWTOOTH MOUNTAIN RANCH, ET AL. V. U.S. FOREST SERVICE, ET AL.

23-1109     HANKE, DIETMAR, ET AL. V. ARIZONA, ET AL.

2

23-1110     OSTIPOW, GERALD S. V. FEDERSPIEL, WILLIAM L.

23-1133     SASSO, RICK V. HARDING, MARC

23-1157     REMMERT, ROBERT W. V. BRIAR CAPITAL WORKING, L.L.C.

23-1191     CHOKER, DRU, ET AL. V. NAT. VETERINARY ASSOC., ET AL.

23-1198     PATRA, HARISADHAN, ET UX. V. PA SYSTEM OF HIGHER ED., ET AL.

23-6469     KIMBLE, ERIC V. ANDES, ACTING WARDEN

23-6521     REEVES, SHAWN V. NEW JERSEY

23-6888     FREDERICK, DARRELL W. V. QUICK, WARDEN

23-6910     DáVILA-REYES, JEFFRI V. UNITED STATES

23-6912     FIELDS, SAMUEL V. PLAPPERT, WARDEN

23-6976     CABRERA, JUAN V. UNITED STATES

23-7090     MENDES, AMBROSE C. V. KIRSHENBAUM & KIRSHENBAUM

23-7137     REISMANN SEXTON, DIANA I. V. SEXTON, GILBERT

23-7142     RAMSEY, ELIZABETH A. V. LUMPKIN, DIR., TX DCJ

23-7148     ANCRUM, ARNOLD V. DIXON, SEC., FL DOC

23-7149     WILSON, DETERRIUS V. PHILHOURS, JUDGE, ET AL.

23-7152     BURTON, SEAN V. PENNSYLVANIA

23-7154     GREENE, ROBERT M. V. DIXON, SEC., FL DOC

23-7155     KINDRED, MARY A. V. MEMPHIS LIGHT, GAS AND WATER

23-7159     BUCK, THOMAS J. V. COMPTON, JANICE J.

23-7169     PULLEY, ROBERT G. V. PARAMO, DANIEL, ET AL.

23-7170     BROWN, EDWARD R. V. FLORIDA

23-7171     PUDERER, DARRYL V. LOUISIANA

23-7180     WARNER, GARY W. V. TEXAS

23-7188     WINDING, JACOB, ET UX. V. SUPERIOR COURT OF CA, ET AL.

23-7189     A. R. P. V. FLORIDA

23-7191     LIN, JAY V. SAYERS, AARON

23-7201     VANCE, WAYNE P. V. ENGSTROM, GLEN, ET AL.

3

23-7207      TAYLOR, DWAYNE K. V. ILLINOIS

23-7208      YIFRU, ABIY V. UNITED STATES

23-7255      HORACE, ANDREW V. MD NOW MEDICAL CENTERS, INC.

23-7329      BROWN, ALRICK V. DIXON, SEC., FL DOC

23-7333      ARNOLD, THOMAS V. FLORIDA

23-7334      FROEMMING, WILLIAM C. V. WEST ALLIS, WI, ET AL.

23-7352      JOHNSON, CHRISTOPHER R. V. WASHINGTON

23-7358      BROWN, ERIC L. V. MISSISSIPPI

23-7369      JEFFERSON, ROBERT G. V. UNITED STATES

23-7378      HERROD, FREDERICK V. MEMBERS OF THE 79TH CONGRESS

23-7385      BERMEL, JACOB P. V. UNITED STATES

23-7398      PARKER, JAMAAL V. UNITED STATES

23-7401      ROCCO, KRISTOPHER L. V. UNITED STATES

23-7402      STOVALL, DEQUON R. V. UNITED STATES

23-7406      ROUSE, BOBBY V. UNITED STATES

23-7407      LLOYD, MARIO H. V. UNITED STATES

23-7408      RIVERS, MELVIN W. V. UNITED STATES

23-7411      STEPTOE, LARRY E. V. UNITED STATES

23-7413      PERRY, ADONIS M. V. UNITED STATES

23-7416      PRATT, CHRISTOPHER J. V. UNITED STATES

23-7419      DAVIS, WARREN L. V. UNITED STATES

23-7421      STAPLES, DEMARCUS D. V. UNITED STATES

23-7425      BELL, ORLANDO V. UNITED STATES

23-7431      LANS, AVERY V. UNITED STATES

23-7432      JOHNSON, TORRIEO M. V. UNITED STATES

23-7433      KACHINA, GARY A. V. UNITED STATES

23-7438      GONZALES, ANTHONY E. V. UNITED STATES

23-7439      LOUD HAWK, BASIL V. UNITED STATES

23-7440     PUZEY, MICHAEL P. V. UNITED STATES

23-7445     KIDD, LLOYD V. UNITED STATES

23-7449     VANDYKE, JACOB V. UNITED STATES

23-7451     GALVAN, HECTOR P. V. UNITED STATES

23-7456     ROMERO-LOBATO, ERIC V. UNITED STATES

23-7461     FOX, SHANE A. V. UNITED STATES

23-7462     DAVIS, MICHAEL V. UNITED STATES

23-7464     GRADY, MICHAEL V. UNITED STATES

23-7471     BERKLIN, SHAUNTAVUS V. UNITED STATES

23-7477     PATTERSON, JOSEPH I. V. UNITED STATES

23-7480     KUMAR, SANJAY V. UNITED STATES

23-7481     WILEY, MAURICE O. V. UNITED STATES

23-7485     CHUNN, WILLIAM G. V. UNITED STATES

23-7486     VAZQUEZ, EDGAR V. UNITED STATES

          The petitions for writs of certiorari are denied.

23-6384     WESLEY, MONTERIAL V. UNITED STATES

          The petition for a writ of certiorari is denied.  Justice
Gorsuch took no part in the consideration or decision of this
petition.

23-7279     WALLACE, CHARLES K. V. LOUISIANA

          The motion of petitioner for leave to proceed *in forma
pauperis* is denied, and the petition for a writ of certiorari is
dismissed.  See Rule 39.8.  As the petitioner has repeatedly
abused this Court's process, the Clerk is directed not to accept
any further petitions in noncriminal matters from petitioner
unless the docketing fee required by Rule 38(a) is paid and the
petition is submitted in compliance with Rule 33.1.  See *Martin*

v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

23-7403     CAMPBELL, ALEX A. V. UNITED STATES

The petition for a writ of certiorari is denied.  Justice Barrett took no part in the consideration or decision of this petition.

23-7441     KAETZ, WILLIAM F. V. UNITED STATES

The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed.  See Rule 39.8.  As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

23-7455     HAMMONS, BRITT J. V. UNITED STATES

The petition for a writ of certiorari is denied.  Justice Gorsuch took no part in the consideration or decision of this petition.

### HABEAS CORPUS DENIED

23-7496     IN RE OLAMIDE O. BELLO

23-7497     IN RE OLAMIDE O. BELLO

The petitions for writs of habeas corpus are denied.

23-7489     IN RE TONYA KNOWLES

The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of habeas corpus is dismissed.  See Rule 39.8.  As the petitioner has repeatedly

abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).  The Chief Justice took no part in the consideration or decision of this motion and this petition.

## MANDAMUS DENIED

23-1185    IN RE W. A. GRIFFIN

23-7183    IN RE JOSHUA G. NOWLAND

23-7192    IN RE LIONEL DAVIS

The petitions for writs of mandamus are denied.

23-7240    IN RE PATRICK CHRISTIAN

The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of mandamus is dismissed.  See Rule 39.8.

## REHEARINGS DENIED

22-617    BYSTRON, FRANCISZEK K. V. GARLAND, ATT'Y GEN.

23-837    CAMPBELL, CASEY V. GARLAND, ATT'Y GEN., ET AL.

23-858    STEWART, MERRILEE V. SENTINEL INS. CO. LTD., ET AL.

23-1106    AKERMAN, MARTIN V. UNITED STATES

23-6290    IN RE PIETRO P. A. SGROMO

23-6291    SGROMO, PIETRO P. A. V. SCOTT, LEONARD G., ET AL.

23-6356    SHARIFI, MOHAMMAD V. ALABAMA

23-6559    JOHNSON, MARCUS V. IRWIN, SUPT., FOREST, ET AL.

23-6570    HERNANDEZ, BRYAN P. V. INSLEE, GOV. OF WA

23-6682    KELLEY, KARYN M. V. KELLEY, KEVIN M.

23-6782    R. R. V. WV DEPT. OF HEALTH, ET AL.

7

23-6824    LYNCH, JEREMIAH J. V. UNITED STATES

23-6893    RUBINI, JACOB A. V. ILLINOIS

23-7072    AKERMAN, MARTIN V. AUSTIN, SEC. OF DEFENSE, ET AL.

The petitions for rehearing are denied.

# EXHIBIT B

No.

IN THE

# Supreme Court of the United States

———————

FACEBOOK, INC., ET AL.,

*Petitioners,*

v.

AMALGAMATED BANK, ET AL.,

*Respondents.*

———————

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit**

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

BRIAN M. LUTZ
MICHAEL J. KAHN
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(415) 393-8200

RAENA FERRER CALUBAQUIB
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

JOSHUA S. LIPSHUTZ
 *Counsel of Record*
KATHERINE MORAN MEEKS
TRENTON VAN OSS
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500
JLipshutz@gibsondunn.com

*Counsel for Petitioners*

## QUESTIONS PRESENTED

This petition presents two important questions that have divided the federal courts of appeals.

*First*, the circuits have split three ways concerning what public companies must disclose in the "risk factors" section of their 10-K filings. The Sixth Circuit holds that companies need not disclose past instances when a risk has materialized. The First, Second, Third, Fifth, Tenth, and D.C. Circuits hold that companies must disclose that a risk materialized in the past if the company knows that event will harm the business. The Ninth Circuit here adopted a third, outlier position requiring companies to disclose that a risk materialized in the past even if there is no known threat of business harm.

*Second*, the circuits disagree on the proper pleading standard for the loss causation element of a private securities-fraud claim. The Fourth Circuit holds that loss causation allegations must satisfy Federal Rule 9(b)'s heightened pleading standard for fraud, while the Fifth and Sixth Circuits apply the ordinary Rule 8 standard. The Ninth Circuit here initially applied Rule 8, then substituted citations of Rule 9(b) without changing its analysis.

The questions presented are:

1.  Are risk disclosures false or misleading when they do not disclose that a risk has materialized in the past, even if that past event presents no known risk of ongoing or future business harm?

2.  Does Federal Rule 8 or Rule 9(b) supply the proper pleading standard for loss causation in a private securities-fraud action?

ii

## PARTIES TO THE PROCEEDING AND RULE 29.6 STATEMENT

1. Petitioners are Facebook, Inc., now known as Meta Platforms, Inc.; Mark Zuckerberg; Sheryl Sandberg; and David M. Wehner.  Each Petitioner was an appellee below.

Respondents are Amalgamated Bank, Lead Plaintiff; Public Employees' Retirement System of Mississippi; and James Kacouris, individually and on behalf of all others similarly situated.  Each Respondent was an appellant below.

2. Petitioner Facebook, Inc., now known as Meta Platforms, Inc., is a publicly traded corporation and has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

iii

## STATEMENT OF RELATED PROCEEDINGS

This case arises from the following proceedings:

- *In re Facebook, Inc. Sec. Litig.*, No. 22-15077 (9th Cir. Dec. 4, 2023) (amended opinion affirming in part, reversing in part, and denying rehearing).

- *In re Facebook, Inc. Sec. Litig.*, No. 5:18-cv-01725-EJD (N.D. Cal. Dec. 20, 2021) (order granting motion to dismiss).

There are no other proceedings in state or federal trial or appellate courts, or in this Court, directly related to this case within the meaning of this Court's Rule 14.1(b)(iii).

iv

## TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ......................................... i

PARTIES TO THE PROCEEDING AND RULE
    29.6 STATEMENT .................................................. ii

STATEMENT OF RELATED PROCEEDINGS ....... iii

OPINIONS BELOW ...................................................... 1

JURISDICTION ............................................................. 1

STATUTORY AND REGULATORY
    PROVISIONS INVOLVED ................................... 1

INTRODUCTION .......................................................... 1

STATEMENT ................................................................. 4

    A.  Legal Background ........................................... 4

    B.  Factual Background........................................ 6

    C.  Procedural History.......................................... 9

REASONS FOR GRANTING THE PETITION ....... 16

I.    THE COURT SHOULD GRANT REVIEW TO
    RESOLVE A SPLIT REGARDING WHAT
    COMPANIES MUST INCLUDE IN "RISK
    FACTORS" DISCLOSURES........................................ 17

    A.  Eight circuits have split three ways
        regarding what companies must include
        in "risk factors" disclosures. .......................... 18

    B.  The question presented is important,
        recurring, and squarely presented. .............. 23

    C.  The Ninth Circuit's outlier rule is wrong. ... 26

II.   THE COURT SHOULD GRANT REVIEW TO
    RESOLVE A CIRCUIT SPLIT AND CLARIFY THE
    PLEADING STANDARD FOR LOSS CAUSATION. ......... 28

v

A.  The circuits are split on the proper
    pleading standard for loss causation............ 28

B.  The question presented is important and
    recurring. ....................................................... 32

C.  The Ninth Circuit's unprecedented
    approach is wrong. ........................................ 33

CONCLUSION............................................................. 36

vi

# TABLE OF APPENDICES

Page

APPENDIX A: Amended Opinion and Order Denying Rehearing of the United States Court of Appeals for the Ninth Circuit (Dec. 4, 2023) ...........................................1a

APPENDIX B: Opinion of the United States Court of Appeals for the Ninth Circuit (Oct. 18, 2023)......................................................54a

APPENDIX C: Order Granting Motion to Dismiss Without Leave to Amend of the United States District Court for the Northern District of California (Dec. 20, 2021) ..................................................109a

APPENDIX D: Order Granting Motion to Dismiss with Leave to Amend of the United States District Court for the Northern District of California (Aug. 7, 2020).................128a

APPENDIX E: Statutory and Regulatory Provisions Involved ..........................................225a

15 U.S.C. § 78j ..................................................225a

17 C.F.R. § 240.10b–5 ......................................227a

vii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021)........................... 12, 22

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)...................................... 24, 34

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)...............................................15

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ..............................34

*Bondali* v. *Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) ........... 18, 19, 26

*Coll. Ret. Equities Fund* v. *Boeing Co.*,
    2023 WL 6065260 (N.D. Ill. Sept. 18,
    2023)....................................................................30

*Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336
    (2005) ................. 4, 5, 6, 14, 28, 32, 33, 34, 35, 36

*In re Facebook, Inc. Sec. Litig.*, 2021 WL
    6000058 (N.D. Cal. Dec. 20, 2021) .......................1

*In re Facebook, Inc. Sec. Litig.*,
    84 F.4th 844 (9th Cir. 2023).................................1

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023).................................1

*Fin. Guar. Ins. Co.* v. *Putnam Advisory Co.*,
    783 F.3d 395 (2d Cir. 2015)...............................30

*Hall* v. *Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019).........30

viii

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ...............................................6

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
    791 F.3d 90 (D.C. Cir. 2015) ..............................21

*Hogan* v. *Pilgrim's Pride Corp.*, 2023 WL
    8896324 (D. Colo. Dec. 26, 2023)........................30

*Ind. Pub. Ret. Sys.* v. *Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) .................... 20, 22

*Karth* v. *Keryx Biopharms., Inc.*,
    6 F.4th 123 (1st Cir. 2021) .......................... 19, 22

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ...............................29

*Lillard* v. *Stockton*,
    267 F. Supp. 2d 1081 (N.D. Okla. 2003)............30

*Lormand* v. *US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ........................ 21, 28

*Mass. Ret. Sys.* v. *CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013)...............................29

*Matrixx Initiatives, Inc.* v. *Siracusano*,
    563 U.S. 27 (2011) ..............................6, 24, 25, 26

*Merrill Lynch, Pierce, Fenner & Smith Inc.*
    v. *Dabit*, 547 U.S. 71 (2006) ......................... 25, 32

*Nakkhumpun* v. *Taylor*,
    782 F.3d 1142 (10th Cir. 2015).........................30

*Nw. Biotherapeutics, Inc.* v. *Canaccord
Genuity LLC*, 2023 WL 9102400
    (S.D.N.Y. Dec. 29, 2023) .....................................30

ix

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 830 F.3d 376 (6th Cir. 2016)......................................................29

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)............................................26

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598 (9th Cir. 2014) ......... 15, 30, 31

*Plymouth Cnty. Ret. Ass'n* v. *ViewRay, Inc.*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022) ........................................29

*Pub. Emps. Ret. Sys. of Miss.* v. *Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014) ......................28

*Set Capital LLC* v. *Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021)..................................21

*Singer* v. *Reali*, 883 F.3d 425 (4th Cir. 2018).........29

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .......................4, 5, 6, 16, 17, 23, 24, 27, 31, 32, 33

*Williams* v. *Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017)................................20

## Statutes

15 U.S.C. § 78j(b) .......................................................4

15 U.S.C. § 78u-4(b)............................................ 5, 32

15 U.S.C. § 78u-5(c) ..................................................27

## Other Authorities

17 C.F.R. § 229.101(a) .............................................27

17 C.F.R. § 229.105 ...................................... 10, 24, 27

x

70 Fed. Reg. 44,722, 44,830 (Aug. 3, 2005)..............10

4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* (2022) ...............................35

Cornerstone Rsch., *Securities Class Action Filings: 2022 Year in Review* (2023), http://tinyurl.com/8hdfpr2..................................25

Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (Jan. 22, 2024) ....................................................32

Evan Hill, *The Rule 10b-5 Suit: Loss Causation Pleading Standards in Private Securities Fraud Claims After* Dura Pharmaceuticals, Inc. *v.* Broudo, 78 Ford. L. Rev. 2659 (2010)...............................30

## PETITION FOR A WRIT OF CERTIORARI

Petitioners respectfully petition for a writ of certiorari to review the judgment of the United States Court of Appeals for the Ninth Circuit.

### OPINIONS BELOW

The opinion of the court of appeals is reported at *In re Facebook, Inc. Securities Litigation*, 87 F.4th 934 (9th Cir. 2023), superseding *In re Facebook, Inc. Securities Litigation*, 84 F.4th 844 (9th Cir. 2023). Pet.App.1a, 54a. The opinion of the district court is unreported but is available at 2021 WL 6000058 (N.D. Cal. Dec. 20, 2021). Pet.App.109a.

### JURISDICTION

The court of appeals entered judgment on October 18, 2023. Pet.App.54a. The court of appeals denied Petitioners' petition for panel and en banc rehearing and issued an amended opinion on December 4, 2023. Pet.App.1a. This Court has jurisdiction under 28 U.S.C. § 1254(1).

### STATUTORY AND REGULATORY PROVISIONS INVOLVED

The relevant statutory and regulatory provisions are reproduced in the appendix at Pet.App.225a.

### INTRODUCTION

This is a private securities-fraud class action arising out of Cambridge Analytica's wrongful acquisition and misuse of Facebook user data. The district court dismissed plaintiffs' claims three times for failure to plead falsity, scienter, and loss causation under Federal Rule of Civil Procedure 9(b). But the Ninth Circuit, over a partial dissent by Judge Bumatay, revived plaintiffs' claims—and, in doing so,

2

adopted extreme outlier positions that deepened two circuit splits. The Ninth Circuit's decision will light a beacon for class-action lawsuits that would be dismissed in any other circuit. This Court should grant certiorari and reverse.

*First*, over Judge Bumatay's dissent, the Ninth Circuit deepened a split among eight courts of appeals regarding what public companies must disclose in the "risk factors" section of their annual Form 10-K and quarterly Form 10-Q filings. Facebook warned investors in its 2016 10-K that if third parties improperly access or disclose user data, Facebook could suffer business harm. Plaintiffs allege these statements were false because they framed the risk as hypothetical when Cambridge Analytica had misused data in the past—even though Facebook faced no known threat of business harm from those past events, which were widely reported with no effect on Facebook's stock price. In any other circuit, those claims would have been dismissed: the Sixth Circuit does not require companies to disclose *any* past events in its risk factors, and six other circuits require disclosure only if the company knows the past events will harm the business. But here, a two-judge majority adopted an extreme, outlier rule: companies must disclose past instances when a risk materialized *even if* those events pose no known threat of business harm. That rule makes little sense, will make disclosures *less* useful to investors by drowning them in irrelevant information, and will encourage plaintiffs to plead fraud-by-hindsight by attaching significance after a stock drop to events a company had no reason to know were significant at the time of disclosure.

3

*Second*, again over a partial dissent from Judge Bumatay, the Ninth Circuit deepened another circuit split and approved an unprecedented theory of loss causation. The circuits have fractured over whether Federal Rule of Civil Procedure 8's ordinary pleading standard or Rule 9(b)'s heightened standard governs the loss causation element of private securities-fraud claims. The Fourth Circuit applies Rule 9(b), the Fifth and Sixth Circuits apply Rule 8, and other circuits have acknowledged the split but left their district courts to reach divergent results. Here, the Ninth Circuit initially applied Rule 8—then, in response to Facebook's rehearing petition, swapped Rule 8 citations for Rule 9(b) citations while leaving the analysis unchanged.

Applying Rule 9(b) in name only, the Ninth Circuit endorsed a novel and unsupportable theory of loss causation. The panel concluded plaintiffs "plausibly" alleged that a single corrective disclosure—March 2018 news reports that Cambridge Analytica had misappropriated Facebook data and used it to support the Trump campaign—somehow caused two substantial stock drops four months apart. Until this ruling, no court in *any* jurisdiction had recognized two loss events resulting from the same disclosure. The consequences of this unprecedented ruling are staggering. The second loss in July 2018 equated to roughly $100 billion, which at the time was the largest single-day stock drop in U.S. history. If permitted to stand, this untenable holding will encourage plaintiffs to flock to the Ninth Circuit in hopes of inflating their recoverable losses, to the detriment of public companies nationwide.

4

The Ninth Circuit's errant positions in this case warrant review. As this Court has recognized, Congress has sought to impose "a check against abusive litigation by private parties" in securities-fraud cases by establishing "a uniform pleading standard" that sets the bar high. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 319-20 (2007). This Court has previously intervened when lower courts "diverged" on the pleading standards in § 10(b) cases, *id.* at 322—including to reverse the Ninth Circuit's adoption of loss causation theories that "differ from those of other Circuits," *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 340 (2005). The stakes are high: these cases are often worth millions or even billions of dollars and settle for large sums if they survive a motion to dismiss.

This Court should grant the petition.

## STATEMENT

### A. Legal Background

**1.** Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). This Court has implied a private damages action from this statute whose "basic elements" include (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura*, 544 U.S. at 341-42.

5

By design, it is difficult for private litigants to state a viable claim for securities fraud. Even before the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "the sufficiency of a complaint for securities fraud was governed not by Rule 8, but by the heightened pleading standard set forth in Rule 9(b)." *Tellabs*, 551 U.S. at 319. The PSLRA created a further "check against abusive litigation by private parties" by imposing "heightened pleading requirements" of its own. *Id.* at 313, 321. Under that statute, "any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 321 (quoting 15 U.S.C. § 78u-4(b)(1)-(2)).

**2.** Private plaintiffs may not bring an action for securities fraud unless they adequately allege "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura*, 544 U.S. at 346. That can be a daunting task, because even when a purchaser suffers a loss from a stock-price drop after an alleged misrepresentation, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 343.

The standard for pleading loss causation has received little attention from this Court compared to

6

other elements of a private securities claim. In *Matrixx Initiatives, Inc.* v. *Siracusano*, for example, this Court explained the materiality standard and applied it to the facts of the case. *See* 563 U.S. 27, 37-47 (2011). Similarly, in *Tellabs*, the Court gave detailed "prescriptions" for evaluating scienter allegations. 551 U.S. at 322-26; *see also, e.g.*, *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014) (addressing reliance). But in *Dura*, the Court merely "assume[d], at least for argument's sake," that allegations of loss causation were governed by the "short and plain statement" requirement in Federal Rule 8(a)(2), because the allegations in that case failed even Rule 8's "simple test." 544 U.S. at 346. This Court has thus never decided whether "the Rules [o]r the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss," *ibid.*, nor has it explained how the heightened requirements under Rule 9(b) and the PSLRA operate for loss causation allegations in practice.

## B. Factual Background

**1.** Aleksandr Kogan, a professor and researcher at Cambridge University, developed a personality quiz app called "This is Your Digital Life" that appeared on Facebook in 2014. Pet.App.133a. Approximately 270,000 people installed it and consented to share their data, including some information about their Facebook friends if their friends' settings permitted such sharing. *Ibid.* Through his company, Global Science Research ("GSR"), Kogan used the Facebook data collected through his app to create "personality scores" that

7

could supposedly predict voter behavior. Dist. Ct. Dkt. 142, at 37-38, 68-69.

**2.** In December 2015, the *Guardian* reported that Kogan, in violation of Facebook's policies, sold the data he obtained to the political consulting firm Cambridge Analytica. Pet.App.134a; *see id.* at 133a. According to the article, Cambridge Analytica leveraged Kogan's data to create psychological profiles of U.S. voters, which it used to support Ted Cruz's presidential campaign. Pet.App.134a. Facebook conducted an investigation, deleted Kogan's app from its platform, and demanded that Kogan, GSR, Cambridge Analytica, and its parent company destroy the data. All of them certified in writing that they had purged the Facebook data from their systems. Pet.App.134a, 177a-179a; Dist. Ct. Dkt. 118, at 30; Dist. Ct. Dkt. 142, at 84-85, 153-154, 161-162, 218-219.

The news that Cambridge Analytica had obtained Facebook data and exploited it for the Cruz campaign had no effect on Facebook's stock price. Dist. Ct. Dkt. 146-10, at 2-4.

**3.** On March 17, 2018, the *Guardian* and *New York Times* reported that, contrary to its certification, Cambridge Analytica had in fact retained Facebook user data and deployed it to support the Trump campaign. Pet.App.134a; Dist. Ct. Dkt. 142, at 19, 155, 235-239; Dist. Ct. Dkt. 126-23, at 2-7. Facebook suspended Kogan, Cambridge Analytica, and its parent company from the Facebook platform and commenced a further investigation. Dist. Ct. Dkt. 142, at 153-154.

8

Although Facebook's stock price was unaffected when the market learned of Cambridge Analytica's initial data misuse in 2015 for the Cruz campaign, it fell in March 2018 when investors learned of Cambridge Analytica's continued misuse of the data for the Trump campaign. Dist. Ct. Dkt. 142, at 153-154, 268-269, 276. In the week following the March 2018 news reports, Facebook shares fell by 18%, "reflecting a loss of more than $100 billion in market capitalization." Pet.App.15a.

On April 25, 2018, following this latest round of reporting, Facebook released its earnings for the first quarter of 2018. Notwithstanding the high-profile news coverage in March 2018, Facebook's quarterly revenue, earnings, and daily and monthly active user growth all met or exceeded analyst expectations. Pet.App.135a; Dist. Ct. Dkt. 142, at 21, 165-166, 235. Facebook's stock price increased by 9.06% the next trading day. At the same time, Facebook braced investors and analysts for possible headwinds in the second quarter. Facebook projected expenses would increase, driven by investments in data security and a 48% increase in employee headcount. Pet.App.135a; Dist. Ct. Dkt. 142, at 21, 166, 235-236; Dist. Ct. Dkt. 146-1, at 8-9. Facebook also warned that an important regulatory change in Europe, the General Data Protection Regulation ("GDPR"), could shrink its user base. Pet.App.135a-136a; Dist. Ct. Dkt. 142, at 235-236; Dist. Ct. Dkt. 146-1, at 9-24.

**4.** In June 2018, news reports discussed two practices plaintiffs call "whitelisting." The media reported that Facebook (1) allowed trusted device manufacturers, like Blackberry, to access user data so they could provide Facebook features on their devices

9

and operating systems, and (2) allowed certain apps to continue accessing friend data for a limited period after Facebook phased out that option for other apps. Pet.App.220a-221a; Dist. Ct. Dkt. 142, at 140-141, 143-144. These "whitelisting" stories had no effect on Facebook's stock price. Pet.App.125a; Dist. Ct. Dkt. 142, at 274.

**5.** On July 25, 2018, Facebook announced its second-quarter 2018 earnings, reporting lower-than-expected revenue growth, profitability, and user growth. Pet.App.136a; Dist. Ct. Dkt. 142, at 173-174. Consistent with its first-quarter estimates, Facebook reported its expenses were "up 50%" year-over-year. Pet.App.137a; Dist. Ct. Dkt. 146-2, at 9. Facebook attributed the slowdown in user growth to "the GDPR rollout, consistent with the outlook we gave on the Q1 call." Pet.App.137a; Dist. Ct. Dkt. 146-2, at 8, 19. Facebook also reported a decline in revenue growth due to "currency . . . headwind[s]" and "impacts that could be ongoing from things like GDPR as well as other product options that we're providing that could have an impact on revenue growth." Pet.App.137a; Dist. Ct. Dkt. 146-2, at 9, 13. The earnings announcement did not mention Cambridge Analytica or whitelisting.

Facebook's stock price declined 18.96% the next trading day, amounting to $100 billion in shareholder value. At the time, it was "the largest single-day stock price drop in U.S. history." Pet.App.35a.

### C. Procedural History

**1.** Plaintiffs brought securities-fraud claims in the U.S. District Court for the Northern District of California on behalf of a purported class of investors

10

who purchased Facebook stock between February 3, 2017 and July 25, 2018. Pet.App.6a. As relevant here, plaintiffs' theories of fraud were based on two sets of statements.

The first were statements in the "risk factors" section of Facebook's 2016 10-K filing. By rule, a public company's annual Form 10-K must "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a); *see also* 70 Fed. Reg. 44,722, 44,830 (Aug. 3, 2005) (quarterly Form 10-Q filings must disclose "any material changes from risk factors as previously disclosed").[1] Facebook's 2016 10-K warned that "[s]ecurity breaches and improper access to or disclosure of our data or user data, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business." Dist. Ct. Dkt. 142, at 208 (emphasis omitted); *see* Pet.App.144a. Plaintiffs alleged these statements were false because they framed the risk of data misuse as merely hypothetical when Kogan had already improperly disclosed user data to Cambridge Analytica. Pet.App.187a.

The second were statements by Facebook, Mark Zuckerberg (Facebook's CEO), and Sheryl Sandberg (then Facebook's COO) that users could "control" how Facebook shared their data. For example, Facebook's terms of service informed users: "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy

---

[1] At the time of the disclosures in this case, the "risk factors" provision was located at 17 C.F.R. § 229.503(c).

11

and application settings." Pet.App.138a (emphasis omitted); *see id.* at 138a-145a. Plaintiffs alleged these statements were false because (1) Facebook allegedly overrode privacy settings and shared data with a small number of "whitelisted" device makers and apps, and (2) Facebook could no longer control data once users shared it with third parties. Pet.App.182a.

**2.** The district court dismissed three times for failure to state a claim.

**a.** With respect to the risk disclosures, the district court held plaintiffs failed to adequately allege falsity. Four of the five challenged statements, the district court concluded, warned of potential "reputation, business, or competitive harm" that could result from improper access to or disclosure of user data. The district court concluded those statements were not false because "the Cambridge Analytica scandal was [not] harming Facebook's reputation, business, or competitive position" when Facebook filed its 2016 10-K. Pet.App.189a. The district court concluded that the lone remaining statement warned of "the improper use or disclosure of user data" itself (as opposed to business harm stemming from such misuse). But the district court again concluded this statement was not false because, at the time it was made, "Kogan's and Cambridge Analytica's misuse of Facebook user data was already public knowledge," having been widely disseminated in the press. Pet.App.190a.[2]

---

[2] Plaintiffs initially alleged that certain individuals at Facebook (including Zuckerberg and Sandberg) knew Cambridge Analytica retained user data even after certifying its deletion and continued to use it for the Trump campaign. Pet.App.117a-118a.

12

**b.** With respect to the user-control statements, the district court held plaintiffs failed to adequately allege loss causation. It first concluded "the only viable theory" of falsity was that Facebook had shared user data with a limited number of "whitelist[ed]" apps and device makers. Pet.App.222a; *see id.* at 124a-125a. The district court then dismissed the claim because plaintiffs failed to show that investors suffered losses when news coverage in June 2018 brought the "whitelisting" practice to light. Pet.App.220a-222a. And the district court rejected plaintiffs' attempt to link the stock drop on July 26, 2018—one day after Facebook's disappointing second-quarter earnings report—back to the news coverage of Facebook's alleged "whitelisting" practices nearly two months earlier. Pet.App.124a-125a, 222a-223a. Without any "connection between the revelation of Facebook's whitelisting practice and a stock-drop," the district court dismissed for failure to plead loss causation. Pet.App.125a.

**3.** The Ninth Circuit affirmed in part and reversed in part.

**a.** Relying on *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687 (9th Cir. 2021), the majority held plaintiffs adequately alleged Facebook's risk

---

The district court held that plaintiffs failed to adequately allege scienter for this theory, and on appeal, plaintiffs abandoned their arguments that anyone responsible for Facebook's 2016 10-K knew about Cambridge Analytica's continued misuse. Pet.App.83a-86a. As a result, plaintiffs' only live theory of falsity for the risk disclosures is that they were false in light of Cambridge Analytica's *initial*, publicly reported misuse of data for the Cruz campaign—not any *continued* misuse for the Trump campaign—because plaintiffs abandoned their scienter allegations for the latter theory.

13

disclosures were false because "Facebook represented the risk of improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired." Pet.App.77a-78a. The panel did not conclude that anyone responsible for the 10-K knew about Cambridge Analytica's *continued* misuse of user data for the Trump campaign, as plaintiffs abandoned any such allegations on appeal. *See* n.2, *supra*. Rather, the panel held plaintiffs adequately alleged the risk disclosures were false given Cambridge Analytica's *initial* misuse of user data for the Cruz campaign, which had been prominently reported in 2015 with no alleged effect on Facebook's stock price. Pet.App.77a-78a; *see id.* at 78a-79a ("it is the fact of the breach itself, rather than the anticipation of reputational or financial harm, that caused anticipatory statements to be materially misleading").

Judge Bumatay dissented. He rejected the majority's "surprisingly broad view that it's irrelevant that Facebook did not know whether its reputation was harmed at the time of the 10-K filing." Pet.App.100a-101a (ellipsis and quotation marks omitted). The disclosures, he concluded, "warn about harm to Facebook's 'business' and 'reputation' that 'could' materialize based on improper access to Facebook users' data—not about the occurrence or non-occurrence of data breaches." Pet.App.99a. Because plaintiffs had not "sufficiently alleged that Facebook knew its reputation and business were *already* harmed at the time of the filing of the 10-K," Judge Bumatay would have affirmed. Pet.App.100a-101a.

14

Judge Bumatay further concluded this case was "nothing like" the Ninth Circuit's previous decision in *Alphabet*, on which the majority relied. Pet.App.102a-103a. In *Alphabet*, Judge Bumatay explained, the company "knew a risk had come to fruition—set out as clear as day in an internal company memo—that a data bug would cause it greater regulatory scrutiny." *Ibid.* Here, by contrast, even if Facebook was aware of past data breaches, plaintiffs "don't allege that Facebook knew that those breaches would lead to immediate harm to its business or reputation." *Ibid.*

**b.** The panel majority also held plaintiffs adequately alleged loss causation for the user-control statements. The majority first stated that "[n]either the Federal Rules of Civil Procedure nor the federal securities laws 'impose any special further requirement in respect to the pleading of proximate causation or economic loss' beyond the 'short and plain statement of the claim' required by Rule 8." Pet.App.87a (quoting *Dura*, 544 U.S. at 346). Applying this standard, the panel held plaintiffs adequately alleged "the March 2018 revelation about Cambridge Analytica was the first time Facebook investors were alerted that Facebook users did not have complete control over their own data," and that plaintiffs "plausibly" alleged loss causation for the March 2018 stock drop. Pet.App.88a-89a.

The panel further held that while a "standalone claim" based on the June 2018 whitelisting reports was not actionable because those reports were "unaccompanied by a stock price drop," plaintiffs "adequately pleaded" that the Cambridge Analytica revelations from March 2018 and the "whitelisting revelations" from June 2018, and "not any other

15

factor, caused the July 2018 stock price drop." Pet.App.88a, 92a; *see id.* at 89a-91a. The panel "emphasize[d] that this case is at the very early motion to dismiss stage, that [plaintiffs] have raised 'a reasonable expectation that discovery will reveal evidence' of loss causation, and that discovery and further proceedings are necessary to illuminate the issues surrounding loss causation." Pet.App.93a (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007)).

Judge Bumatay concurred in part and dissented in part. He agreed it was "plausible" that the whitelisting reports in June 2018 caused the stock drop in July 2018. Pet.App.104a-106a. But he did not believe the Cambridge Analytica reports in March 2018 showed the user-control statements were false, so he would have "limited Facebook's liability for the user control statements to the 'whitelisting' allegations"—*i.e.*, to the July 2018 stock drop, not the March 2018 stock drop. Pet.App.106a-108a.

**4.** Facebook filed a petition for panel rehearing and rehearing en banc. The petition raised two main issues: *first*, that the panel majority's risk-disclosures analysis deepened a circuit split and imposed unworkable disclosure requirements; and *second*, that the panel ignored circuit precedent and deepened another circuit split by applying Rule 8's plausibility standard, rather than Rule 9(b)'s heightened particularity standard, to assess loss causation. Before this case, the Ninth Circuit had squarely held that plaintiffs must satisfy Rule 9(b)'s heightened pleading standard for "all elements of a securities fraud action, *including loss causation*." *Or. Pub.*

16

*Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) (emphasis added).

Over Judge Bumatay's dissent, the panel majority denied Facebook's rehearing petition. Pet.App.5a. The panel issued an amended opinion that substituted Rule 9(b) citations for Rule 8 citations but retained the same underlying analysis. *See* Pet.App.6a-40a. The panel granted Facebook's motion to stay the mandate pending the filing and disposition of a petition for certiorari. C.A. Dkt. 53, at 1-2.

## REASONS FOR GRANTING THE PETITION

Congress has sought to "[s]et[] a uniform pleading standard for § 10(b) actions" and "curb perceived abuses of the § 10(b) private action." *Tellabs*, 551 U.S. at 320. The Ninth Circuit's decision undermines both congressional goals: it deepens circuit splits on two important and recurring questions about what plaintiffs must plead to bring a private securities-fraud action, and it invites the very litigation Congress sought to preclude when it passed the PSLRA.

*First*, the Ninth Circuit's opinion imposes expansive risk-disclosure requirements that will force public companies to inform investors of past incidents that pose no known threat to the business. These disclosure obligations exceed those in every other circuit and will make the Ninth Circuit the preferred forum for plaintiffs alleging fraud-by-hindsight after a stock drop.

*Second*, the Ninth Circuit deepened a rift among the circuits concerning the proper pleading standard for loss causation. It also generated confusion about how that standard applies in practice by substituting

17

citations of Rule 9(b) while reaching the same result, based on the same analysis, as it did in its original opinion applying Rule 8. This ruling has staggering consequences: the panel blessed a farfetched theory of loss causation in which the same corrective disclosure caused *two* stock drops, four months apart. Until this case, no federal court had *ever* blessed this double-drop, roller-coaster theory of loss causation—to the tune of $100 billion from the second stock drop alone.

This Court should grant certiorari to vindicate Congress's desire to "adequately contain[]" runaway private securities actions, *Tellabs*, 551 U.S. at 313, and impose a uniform national pleading standard for loss causation.

## I. THE COURT SHOULD GRANT REVIEW TO RESOLVE A SPLIT REGARDING WHAT COMPANIES MUST INCLUDE IN "RISK FACTORS" DISCLOSURES.

The courts of appeals are divided on the important and recurring question of whether a public company's disclosures about the risks facing its business are false or misleading when they fail to alert investors that those risks have materialized in the past. The Ninth Circuit's extreme rule in this case—which has not been adopted by any other circuit—would require companies to chronicle past instances a risk came to fruition, even if the company has no reason to suspect those events pose any risk of business harm. That outlier approach will spur lawsuits alleging fraud-by-hindsight, make compliance with 10-K disclosure requirements burdensome and unworkable, and ultimately reduce the usefulness of risk-factor disclosures by drowning investors in irrelevant

18

information.  This Court should grant certiorari and reverse.

**A. Eight circuits have split three ways regarding what companies must include in "risk factors" disclosures.**

The Ninth Circuit's decision below exacerbated a deep and mature circuit split regarding what information companies must include in the required "risk factors" section of their annual 10-K reports. Before this case, one circuit had held risk disclosures need not discuss *past* instances when a risk came to fruition, and six other circuits had concluded public companies must disclose such past events only if the company knew they had harmed or would inevitably harm the business.  The Ninth Circuit here broke ranks, holding risk disclosures must include past instances when risks came to fruition *even if* the company has no basis to believe those events will harm the business.  Left unaddressed, the decision below will light a beacon for forum-shopping plaintiffs who know their claims will be dismissed in other circuits.

**1.**  The Sixth Circuit has held that companies need not disclose *past* events because "[r]isk disclosures like the ones accompanying 10-Qs and other SEC filings are inherently *prospective* in nature." *Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015).  As a result, "cautionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." *Ibid.*  The plaintiffs in *Bondali* alleged that a company's risk disclosures about food safety issues "created a misleading impression: that it

19

was only *possible* for food safety issues to harm investment in [the company] when, in fact, food safety issues had already come to pass and were presently harming investment." *Id.* at 490. Relying on the plain meaning of the word "risk," the Sixth Circuit rejected that theory and affirmed dismissal because risk disclosures "warn an investor of what harms *may* come to their investment," and "are not meant to educate investors on what harms are currently affecting the company." *Id.* at 491. Plaintiffs' claims would have been dismissed in the Sixth Circuit.

**2.** The First, Second, Third, Fifth, Tenth, and D.C. Circuits apply a different rule: a company must disclose that a risk has materialized if the company knows that event will harm the business.

In *Karth* v. *Keryx Biopharmaceuticals, Inc.*, the First Circuit rejected a claim alleging risk disclosures were "misleading because [they] understated the true risk of solely relying upon [a single manufacturer]." 6 F.4th 123, 136 (1st Cir. 2021). The court applied "the 'Grand Canyon' metaphor, where one cannot tell a hiker that a mere ditch lies up ahead, if the speaker knows the hiker is actually approaching the precipice of the Grand Canyon." *Id.* at 137. And, the court explained, a "securities fraud defendant is at the edge of the Grand Canyon where the alleged risk had a '*near certainty*' of causing 'financial disaster' to the company." *Ibid.* (emphasis added). What is more, the company "must have understood the near certainty of the risk at the time it made the statements at issue." *Id.* at 138. This rule "does not require a company to be omniscient, even if the company looks foolish in hindsight for not properly predicting whatever harm befell it." *Ibid.*

20

The Third Circuit follows in sync. In *Williams* v. *Globus Medical, Inc.*, a company "warned that the loss of an independent distributor could have a negative impact on sales—but . . . omitted to warn investors . . . that [the company] had *in fact* lost an independent distributor." 869 F.3d 235, 241 (3d Cir. 2017). The court rejected that claim because the plaintiffs did not plead that "sales were adversely affected at the time the risk disclosures were made." *Id.* at 242; *see also id.* at 243 ("this case is unlike the materialization of risk cases cited by plaintiffs, in which the adverse effects at issue had in fact been realized"). Without allegations that the company "was already experiencing an adverse financial impact at the time of the risk disclosures" or that such an impact "was inevitable," plaintiffs' claim failed. *Id.* at 243.

Similarly, in *Indiana Public Retirement System* v. *Pluralsight, Inc.*, the Tenth Circuit affirmed dismissal of a securities-fraud claim where plaintiffs alleged a company's disclosures about its sales efforts failed to convey the company had already "fallen behind its sales ramp capacity plan and would struggle to maintain its billings growth." 45 F.4th 1236, 1255 (10th Cir. 2022). The court "assume[d]" that "risk factors could be materially misleading under certain circumstances," but held the disclosures were not actionable because "nothing in the complaint support[ed] the inference that Defendants knew [the company] was so far behind in its sales ramp capacity plan that it was virtually certain to cause harm to the business." *Id.* at 1256-57.

Applying this same rule, the Second, Fifth, and D.C. Circuits have allowed claims to go forward where plaintiffs *did* allege a realized risk was currently

21

harming (or would inevitably harm) the business.  In *Set Capital LLC* v. *Credit Suisse Group AG*, the Second Circuit concluded a plaintiff sufficiently alleged falsity where the defendants said "hedging activity 'could' or 'may' impact prices" of certain financial instruments, but in reality "knew with virtual certainty that, upon the next volatility spike, their hedging activity would significantly depress the value of [those instruments]."  996 F.3d 64, 85-86 (2d Cir. 2021).  In *Lormand* v. *US Unwired, Inc.*, the Fifth Circuit similarly found disclosures materially misleading where the defendants "omitted known risks of severe magnitude" that "would almost certainly lead towards disaster."  565 F.3d 228, 249-50 (5th Cir. 2009) (company officials "recognized signs that the dangers they privately predicted had already materialized" and "knew that disastrous effects would result").    And the D.C. Circuit has held that statements "implicitly raising the specter of obsolescence" were misleading when "they did not warn of actual obsolescence that had already manifested itself" and failed to disclose that the "business was compromised by obsolescence." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 104 (D.C. Cir. 2015); *see also id.* at 107 (company "failed to disclose" that "obsolescence was becoming a problem" and "fully materialized into a serious problem effecting [sic] Company revenues").

Plaintiffs' claims would have been dead on arrival in these circuits.  As Judge Bumatay explained, whatever Facebook knew about Cambridge Analytica's *past* data misuse, plaintiffs "don't allege that Facebook knew that those breaches would lead to immediate harm to its business or reputation."

22

Pet.App.48a.  Indeed, "the majority *concede[d]* [that] the harm from Cambridge Analytica's breach of Facebook's policies was 'unknown' at the time of the 10-K filing."  *Ibid.* (emphasis added); *see also* Pet.App.187a-189a; Dist. Ct. Dkt. 118, at 35-37.  The Ninth Circuit split from its sister circuits by allowing plaintiffs' claims to proceed *without* allegations that Facebook knew of any certainly impending harm to its business.

**3.**  The Ninth Circuit previously marched in lockstep with the First, Second, Third, Fifth, Tenth, and D.C. Circuits.  In *Alphabet*, the court "decline[d] to follow" the Sixth Circuit's holding, and held that plaintiffs adequately alleged falsity where top executives at defendant Google received an internal memorandum forecasting that disclosure of a software bug "would likely trigger 'immediate regulatory interest'" and "almost guarantee[]" that Google's CEO would have to testify before Congress. 1 F.4th at 696, 704 n.6.  Other courts read the Ninth Circuit's rule to require actual or near-certain business harm.  *See, e.g.*, *Pluralsight*, 45 F.4th at 1256 (concluding *Alphabet* was "readily distinguishable" because "disclosure of the vulnerability was virtually certain to result in the warned-of harm to [Google's] business"); *Karth*, 6 F.4th at 140 (reading prior Ninth Circuit precedent to find falsity where "company knew that revenue was already impacted at time of disclosure").  That is also how Judge Bumatay understood *Alphabet*.  Pet.App.46a-48a.

Over Judge Bumatay's dissent, however, the panel majority abandoned *Alphabet*'s limits, taking "the surprisingly broad view that it's irrelevant that 'Facebook did not know whether its reputation was

23

harmed' at the time of the 10-K filing." Pet.App.45a-46a (Bumatay, J., dissenting) (ellipsis omitted). The panel held, instead, that "Facebook's statement was plausibly materially misleading even if Facebook did not yet know the extent of the reputational harm it would suffer as a result of the breach," because—in the majority's view—"it is the fact of the breach itself, rather than the anticipation of reputational or financial harm, that caused anticipatory statements to be materially misleading." Pet.App.24a-25a.

The Ninth Circuit's outlier position creates a clear incentive for forum shopping by savvy plaintiffs who know their claims will be dismissed elsewhere, contrary to Congress's aim to "[s]et[] a uniform pleading standard for § 10(b) actions." *Tellabs*, 551 U.S. at 320. This Court should grant certiorari to resolve the split.

## B. The question presented is important, recurring, and squarely presented.

The issue presented portends consequences far beyond this case. The Ninth Circuit's rule will invite plaintiffs to scour companies' risk disclosures and plead fraud-by-hindsight anytime some unforeseen event causes a stock drop, spurring costly litigation and thwarting congressional policy. This issue warrants the Court's attention, and this case presents a clean vehicle to address it.

**1.** The panel's decision imposes an unworkable and counterproductive disclosure standard that will affect public companies nationwide.

The panel's analysis could require companies to make overly cautious risk disclosures chronicling past events—whether data misuse (as here), supply chain

24

disruptions, product quality issues, personnel changes, or any number of other matters—even if the company has no reason to suspect those events will harm its business. The panel's rule places no temporal limit on this requirement: here, the data misuse took place (and was widely reported) years earlier. So companies must list even trivial and long-past events with no foreseeable impact on the business, or else risk a securities-fraud lawsuit whenever such an event turns out to be a larger issue than reasonably anticipated.

This rule is inconsistent with the SEC's directive that public companies need only disclose "factors that make an investment . . . speculative or risky" if those factors would be "*material*" to investors. 17 C.F.R. § 229.105(a) (emphasis added). It will also encourage plaintiffs to plead fraud-by-hindsight—the very sort of "abusive litigation" Congress sought to check in the PSLRA, *Tellabs*, 551 U.S. at 313—by attaching significance after a stock drop to prior events a company had no reason to think were significant at the time of disclosure. Nor will this additional litigation be justified by any benefits from increased transparency. To the contrary, the panel's rule will make risk disclosures *less* informative for investors. By "bring[ing] an overabundance of information within its reach," the rule will require companies to "bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988).

**2.** Generally, silence is not misleading under the securities laws. *Matrixx*, 563 U.S. at 44-45. So "[e]ven with respect to information that a reasonable investor

25

might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Id.* at 45. But because risk disclosures are a mandatory component of public companies' annual and quarterly SEC filings, companies lack their usual ability to control what they must disclose in this context. Accordingly, this is not an issue companies can avoid, and it will certainly recur if the Ninth Circuit's outlier position is not reversed.

In the context of securities litigation especially, that likelihood of recurrence is a strong reason to grant review, not a reason to wait for another case. The vast majority of private securities-fraud lawsuits are either dismissed or settled.[3] If this Court denies review, the Ninth Circuit's rule will allow plaintiffs to extract "extortionate settlements" from "deep-pocket defendants," *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 81 (2006)—most of which will not be willing to continue litigating the case on the hope that this Court will ultimately grant review and correct the Ninth Circuit's error.

**3.** This case is a clean vehicle to address the question presented. Plaintiffs abandoned their allegations that anyone responsible for Facebook's 10-K knew about Cambridge Analytica's *continued* misuse of user data for the Trump campaign, *see* n.2, *supra*, so the question whether a failure to disclose

---

[3] *See* Cornerstone Rsch., *Securities Class Action Filings: 2022 Year in Review* at 22 (2023), http://tinyurl.com/8hdfpr2 ("From 1997 to 2022, 46% of core federal filings were settled, 43% were dismissed, 0.5% were remanded, and 10% are continuing. During this time, only 0.4% of core federal filings . . . reached trial.").

26

*past* misuse that poses no known business harm is cleanly presented. And the panel majority squarely held that "Facebook's statement was plausibly materially misleading even if Facebook *did not yet know* the extent of the reputational harm it would suffer as a result of the breach." Pet.App.24a (emphasis added); *see also id.* at 25a ("it is the fact of the breach itself, rather than the anticipation of reputational or financial harm, that caused anticipatory statements to be materially misleading").

### C. The Ninth Circuit's outlier rule is wrong.

On the merits, the Ninth Circuit's outlier rule is wrong, and its decision should be reversed.

**1.** Risk disclosures are about the *future*; they are not false or misleading merely because they do not address events that transpired in the past. As the Sixth Circuit explains, "[r]isk disclosures like the ones accompanying 10-Qs and other SEC filings are inherently *prospective* in nature" because they "warn an investor of what harms *may* come to their investment." *Bondali*, 620 F. App'x at 491 (analyzing dictionary definition of "risk"). They are "not meant to educate investors on what harms are currently affecting the company." *Ibid.* That analysis reflects the plain meaning of the word "risk"—and plain meaning is what counts to a "reasonable investor." *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015).

That is especially so because "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44. SEC rules prescribe certain past events

27

companies must disclose in *other* sections of their filings. *See, e.g.*, 17 C.F.R. §§ 229.101(a)(1) (changes to "business strategy"), 229.102 (information about "principal physical properties"), 229.103(a) ("material pending legal proceedings"). Such past events do not belong in the risk-disclosures section of a 10-K.

**2.** At a minimum, as other circuits have held, a risk disclosure is not misleading when it omits past events that pose no known risk of business harm. As Judge Bumatay explained, there is no "requirement that a company disclose every bad thing that ever happened to it." Pet.App.46a-47a. The Ninth Circuit's overbroad conception of falsity is inconsistent with the "[e]xacting pleading requirements . . . Congress included in the PSLRA." *Tellabs*, 551 U.S. at 313. Indeed, before the SEC began requiring risk disclosures in periodic reports in 2005, companies initially included them as "cautionary statements" to qualify under the PSLRA's safe harbor for forward-looking predictions. 15 U.S.C. § 78u-5(c)(1)(A)(i). The Ninth Circuit's rule transforms risk disclosures from a shield against liability into a sword for enterprising plaintiffs. The SEC rule requiring risk disclosures confirms this. Companies are "discouraged" from listing "generic risk[s]," instructed to be "concise," and told to "furnish this information in plain English." 17 C.F.R. § 229.105. The Ninth Circuit's rule makes that impossible: companies must identify a litany of past events, whether or not they suspect any business harm, to avoid a hindsight-inflected "gotcha" lawsuit if the unexpected happens.

The Ninth Circuit's rule reflects a misguided conception of falsity and the nature of risk, and it flies

28

in the face of Congress's efforts to rein in private securities lawsuits. This Court should grant certiorari and reverse.

## II. THE COURT SHOULD GRANT REVIEW TO RESOLVE A CIRCUIT SPLIT AND CLARIFY THE PLEADING STANDARD FOR LOSS CAUSATION.

The Court should also grant review to resolve an entrenched circuit split over the proper pleading standard for loss causation. The Ninth Circuit straddled both sides of the split in this case, holding first that Rule 8 governed and then swapping in citations of Rule 9(b) without changing its analysis. The Ninth Circuit's lax pleading standard led it to embrace an unprecedented theory of loss causation permitting the plaintiffs to chase a windfall recovery from two separate stock drops. This erroneous result, which could result in billions of dollars in damages in this case alone, underscores the urgent need for a uniform and disciplined pleading standard.

### A. The circuits are split on the proper pleading standard for loss causation.

In *Dura*, this Court left open whether the Federal Rules or the securities statutes "impose any special further requirement" for pleading loss causation beyond that provided in Rule 8. 544 U.S. at 346. The lower courts have since diverged on that question. This Court should grant review to resolve the split.

**1.** In the Fifth and Sixth Circuits, loss causation allegations need only satisfy Rule 8(a)(2)'s "short and plain statement" requirement. The Fifth Circuit reads *Dura* to compel this result. *Lormand*, 565 F.3d at 255-58; *see also Pub. Emps. Ret. Sys. of Miss.* v. *Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).

29

Citing *Dura*, the Sixth Circuit likewise holds that "[a]t the dismissal stage, it is sufficient that [allegations of loss causation] be plausible." *Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016); *see also, e.g.*, *Plymouth Cnty. Ret. Ass'n* v. *ViewRay, Inc.*, 2022 WL 3972478, at *2 (6th Cir. Sept. 1, 2022) ("Falsity and scienter must be pleaded with particularity, while loss causation need be pleaded only plausibly." (citations omitted)).

**2.**  The Fourth Circuit disagrees.  It requires plaintiffs to plead loss causation with "'sufficient specificity,' a standard largely consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity." *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011); *see also Singer* v. *Reali*, 883 F.3d 425, 444-45 (4th Cir. 2018).  The Fourth Circuit reads this Court's decision in *Tellabs* to support application of Rule 9(b) to the loss causation element, while noting that *Dura* created "[u]ncertainty" by leaving this question open. *Katyle*, 637 F.3d at 471 n.5.  The Fourth Circuit has further explained that Rule 9(b)'s heightened pleading standard demands "a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct" and forecloses theories alleging an "attenuated" connection. *Id.* at 472.

**3.**  Other circuits have acknowledged the split, *e.g.*, *Mass. Ret. Sys.* v. *CVS Caremark Corp.*, 716 F.3d 229, 239 n.6 (1st Cir. 2013), but failed to articulate a clear position, resulting in widespread confusion.

The Second Circuit disclaims any position, but other courts and commentators have read its cases to

30

apply a heightened standard. *Compare Fin. Guar. Ins. Co.* v. *Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015) ("We have not yet resolved whether allegations as to loss causation must be pleaded with the specificity required by Rule 9(b)."), *with Or. Pub. Emps. Ret. Fund*, 774 F.3d at 604 ("The Second Circuit applies a different, but heightened, two-part test for loss causation"); Evan Hill, *The Rule 10b-5 Suit: Loss Causation Pleading Standards in Private Securities Fraud Claims After* Dura Pharmaceuticals, Inc. *v.* Broudo, 78 Ford. L. Rev. 2659, 2690-94 (2010) (similar).[4]

So too in the Seventh Circuit: its caselaw does not clearly answer the question, and courts have diverged in characterizing its position. *Compare, e.g.*, *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 604 (concluding the Seventh Circuit applies "heightened pleading standards . . . to loss causation"), *and Hall* v. *Johnson & Johnson*, 2019 WL 7207491, at *26 (D.N.J. Dec. 27, 2019) (same), *with Coll. Ret. Equities Fund* v. *Boeing Co.*, 2023 WL 6065260, at *24 (N.D. Ill. Sept. 18, 2023) ("The notice pleading standard of Rule 8 governs allegations of loss causation.").

The Tenth Circuit has declined to take a position, and the district courts in that circuit have fractured. *See Nakkhumpun* v. *Taylor*, 782 F.3d 1142, 1153-54 (10th Cir. 2015) (declining to take a position); *Hogan* v. *Pilgrim's Pride Corp.*, 2023 WL 8896324, at *7 (D. Colo. Dec. 26, 2023) (applying Rule 8); *Lillard* v.

---

[4] The "prevailing practice" in the Southern District of New York—an important forum for securities litigation—is that "loss causation need not be plead with particularity." *Nw. Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, 2023 WL 9102400, at *28 (S.D.N.Y. Dec. 29, 2023).

31

*Stockton*, 267 F. Supp. 2d 1081, 1109 (N.D. Okla. 2003) (applying Rule 9(b)).

**4.**  The Ninth Circuit previously held Rule 9(b) supplies the pleading standard for loss causation. *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605.  Here, however, the panel—citing *Dura*—initially held that neither the Federal Rules nor the federal securities laws "'impose any special further requirement in respect to the pleading of proximate causation or economic loss' beyond the 'short and plain statement of the claim' required by Rule 8." Pet.App.87a.  In response to Facebook's rehearing petition, the panel issued an amended opinion substituting Rule 8 citations with Rule 9(b) citations but otherwise restating the same analysis.

The panel's cosmetic changes should not forestall review.  For one thing, the panel's identical analysis under Rule 8 and Rule 9(b) makes clear that it applied a lower pleading standard in all but name.  In any event, this Court has previously granted review where the "Courts of Appeals have diverged" on the application of pleading standards in § 10(b) cases, even where the lower courts nominally applied the same standard. *Tellabs*, 551 U.S. at 322.  Here, too, the Court should not only resolve the split on whether Rule 8 or Rule 9(b) dictates the pleading standard, but also, as in *Tellabs*, provide guidance on what that standard requires.  The Ninth Circuit's erroneous belief that it could replace one rule with another with no change in analysis makes this case an ideal vehicle for explaining how these rules should operate in practice.

32

## B. The question presented is important and recurring.

Congress set out in the PSLRA to "curb perceived abuses of the § 10(b) private action" by "[s]etting a uniform"—and heightened—"pleading standard for § 10(b) actions." *Tellabs*, 551 U.S. at 320. That effort reflects the reality that a motion to dismiss is usually the only barrier standing between a meritless lawsuit and "extortionate settlements" from "deep-pocket defendants." *Merrill Lynch*, 547 U.S. at 81. This Court's review is warranted to establish a uniform and appropriately demanding pleading standard.

The motion-to-dismiss stage is the critical turning point in most securities cases. In 2023, 190 securities cases reached resolution. Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review*, Fig. 11 (Jan. 22, 2024). Among them, 100 were dismissed, and the other 90 settled. *Ibid.* These settlements impose enormous costs on public companies: some measure in the billions, and even after adjusting for especially large outliers, the mean settlement value in 2023 was $34 million and the median was $14.4 million. *Id.* at 18-19, Figs. 17, 18. As Congress has recognized, these eye-popping sums can "injure 'the entire U.S. economy.'" *Merrill Lynch*, 547 U.S. at 81.

The proper pleading standard for loss causation is an important—and potentially dispositive—question at the motion-to-dismiss stage. *See* 15 U.S.C. § 78u-4(b)(4); *Dura,* 544 U.S. at 341-47. But unlike other elements of a securities-fraud claim, the requirements for pleading loss causation have received comparatively little attention from this Court—and, in fact, this Court's decision in *Dura* has generated conflicting standards among the circuits. This

33

patchwork thwarts congressional intent. And a too-lenient pleading standard for loss causation is inconsistent with the fundamental purpose of private securities claims: to protect investors against losses caused by a defendant's misrepresentations, not to "provide investors with broad insurance against market losses." *Dura*, 544 U.S. at 345. Blurring the line between meritorious and unmeritorious claims expands liability and inflicts unwarranted settlement pressure contrary to Congress's goals in the PSLRA.

This case is a perfect example of the mischief a lenient pleading standard can cause. The Ninth Circuit held plaintiffs "plausibly" alleged the March 2018 news reports concerning Cambridge Analytica not only caused an immediate drop in Facebook's share price, but somehow also caused a *second* drop four months later in July 2018. Pet.App.35a-36a. This second, long-delayed stock drop represented $100 billion in shareholder value—at the time, the largest single-day decline in U.S. history. Pet.App.35a. The majority's unprecedented theory of loss causation cannot survive Rule 9(b)'s heightened standard. In other instances where lower courts have "diverged on the character of the Rule 9(b) inquiry," this Court has intervened to reestablish a uniform standard. *Tellabs*, 551 U.S. at 319. It should do so again here.

### C. The Ninth Circuit's unprecedented approach is wrong.

The Ninth Circuit's unprecedented analysis itself warrants review. No other circuit has approved the double-drop theory of loss causation the Ninth Circuit adopted here, and for good reason: Rule 9(b)'s heightened pleading standard forbids it.

34

**1.** Plaintiffs typically plead loss causation by alleging that (1) they purchased securities whose price was artificially inflated by a fraudulent statement, (2) a so-called "corrective disclosure" revealed the truth to the market, and (3) this revelation caused the company's share price to fall and investors to lose money. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789-90 (9th Cir. 2020). This "corrective disclosure" approach assumes that, in efficient markets, all publicly available information is quickly incorporated into a company's share price. *See Basic*, 485 U.S. at 241, 246-48. It also explains why the Ninth Circuit's loss causation ruling makes no sense. When the media reported in March 2018 that Cambridge Analytica had misused Facebook data to support the Trump campaign, the market immediately digested that information, and Facebook's stock price fell by 18%. Pet.App.15a. Plaintiffs themselves acknowledged the market had "*already incorporated*" this information as of March 2018. Dist. Ct. Dkt. 142, at 274 (emphasis added). Yet the Ninth Circuit held plaintiffs "plausibly" alleged the March 2018 corrective disclosure somehow triggered a second, $100 billion convulsion in Facebook's market capitalization *four months later*. That theory flouts *Basic*'s efficient-markets hypothesis and cannot survive scrutiny under Rule 9(b).

Indeed, plaintiffs have never identified *any* decision from *any* jurisdiction holding that the same corrective disclosure could cause separate stock drops months apart. The Ninth Circuit's errant ruling allows plaintiffs to double-dip from two stock drops— the second of which was, at the time, "the largest single-day stock price drop in U.S. history." Pet.App.35a. Here, as in *Dura*, the "uniqueness of

35

[the Ninth Circuit's] perspective argues against the validity of its approach." 544 U.S. at 345.

**2.** The panel also erred in concluding that plaintiffs adequately alleged a causal link between the "whitelisting" reports in early June 2018 and the stock drop in late July 2018. As the panel acknowledged, the whitelisting reports were "unaccompanied by a stock price drop." Pet.App.34a. That is well-nigh dispositive: "loss causation will be extremely difficult . . . to prove" if "the price movement of the stock in question is not in sync with the plaintiff's theory of recovery." 4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12:93 (2022); *see also Dura*, 544 U.S. at 343. But the panel nevertheless found plaintiffs' allegations sufficient because, it reasoned, Facebook's second-quarter earnings report in July 2018 "allowed the public to appreciate the significance of the Cambridge Analytica and whitelisting scandals." Pet.App.38a (cleaned up).

The panel's analysis cannot be squared with the black-letter rule that a securities-fraud plaintiff must tie his loss to the revelation of defendant's alleged fraud, *see Dura*, 544 U.S. at 346—not to the purported *impact* of that fraud. Plaintiffs do not allege that Facebook's second-quarter earnings report, which never mentioned Cambridge Analytica or whitelisting, corrected any prior misstatement. To the contrary, plaintiffs allege the market had all the "essential facts" by March 2018. Dist. Ct. Dkt. 142, at 274. Section 10(b) is not meant to "provide investors with broad insurance against market losses," so a fully informed investor is not entitled to recover simply because he underestimated the earnings

36

impact of information already known to him. *Dura*, 544 U.S. at 345.

The Ninth Circuit's unprecedented expansion of the judicially implied private right of action for securities fraud is wrong, and its consequences could measure in the billions of dollars in this case alone. Nor is this the first time the Ninth Circuit has adopted an outlier theory of loss causation at odds with "the traditional elements of causation and loss." *Dura*, 544 U.S. at 346. This Court should again set the Ninth Circuit straight.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

BRIAN M. LUTZ
MICHAEL J. KAHN
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA  94111
(415) 393-8200

RAENA FERRER CALUBAQUIB
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-4000

JOSHUA S. LIPSHUTZ
  *Counsel of Record*
KATHERINE MORAN MEEKS
TRENTON VAN OSS
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500
JLipshutz@gibsondunn.com

*Counsel for Petitioners*

March 4, 2024