UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, et al., | Case No. 22-cv-03023-TLT |
| Plaintiffs, | **ORDER GRANTING-IN-PART AND DENYING-IN-PART MOTION TO STRIKE AND GRANTING-IN-PART AND DENYING-IN-PART MOTION TO DISMISS** |
| v. | |
| CAREDX, INC., et al., | |
| Defendants. | Re: ECF 89, 91 |

Before the Court is a securities fraud class action brought by the following Lead Plaintiffs: Oklahoma Police Pension and Retirement System, Sheet Metal Workers Local 19 Pension Fund, Local 353 International Brotherhood of Electrical Workers Pension Fund, and Beaumont Fireman's Relief & Retirement Fund (collectively "Plaintiffs") against CareDx, Inc. ("CareDx" or the "Company") and CareDx officers Dr. Peter Maag, Dr. Reginald Seeto, and Mr. Ankur Dhingra (collectively "Defendants"). Plaintiffs bring this action individually and on behalf of those who purchased or acquired CareDx common stock between April 30, 2020 and November 3, 2022 (the "Class Period"). *See* ECF No. 81 ("SAC") at 1.

Plaintiffs assert that Defendants have violated (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and (2) Section 20(a) of the Exchange Act. SAC ¶¶ 306-319. The primary questions as to these alleged violations concern whether Defendants' statements were false or misleading, whether Defendants made the statements knowing that the statements were false or misleading, and whether the statements caused a corrective decline in the stock price when the alleged fraud was revealed.

The Court had previously granted Defendants' motion to strike and motion to dismiss with leave to amend. *See* ECF No. 75 ("Prior Order"). Pending before the Court are two motions by

Defendants: (1) a motion to strike Plaintiff's Second Amended Class Action Complaint, ECF No. 91 ("MTS Mot."), and (2) a motion to dismiss Plaintiff's Second Amended Class Action Complaint, ECF No. 89 ("MTD Mot."). The outcome of these motions may impact related pending actions across the nation. *See In re CareDx, Inc. Derivative Litigation*, No. 3:22-cv-5379-TLT (N.D. Cal. 2022) *and Edward W. Burns IRA v. Michael D. Goldberg, et al.*, No. 2024-0282-NAC (Del. Ch. Mar. 25, 2024).

For the reasons given below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motion to strike. The Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motion to dismiss.

## I.    BACKGROUND

### A.    Factual Background

Lead Plaintiffs are pension funds that purchased CareDx common stock during the Class Period of April 30, 2020 to November 3, 2022 and suffered damages due to violations of federal securities law. SAC ¶¶ 37-40.

Defendants include CareDx, Dr. Peter Maag, Dr. Reginald Seeto, and Mr. Ankur Dhingra (collectively, "Individual Defendants"). *Id*. ¶¶ 41-44. In their SAC, Plaintiffs no longer list Marcel Konrad, CareDx's former interim CFO, as a defendant. *See generally*, *id.* CareDx is a Delaware corporation, with its principal offices in Brisbane, California. *Id*. ¶ 41. Dr. Maag was CEO of CareDx from 2012 through November 2020 and Executive Chairman from November 2020 through October 2021. *Id.* ¶ 42. Since November 2020, Dr. Seeto has been CEO of CareDx. *Id.* ¶ 43. Mr. Dhingra was CareDx's CFO from March 25, 2021 through May 25, 2022. *Id.* ¶ 44.

CareDx provides medical services and tests for transplant recipients. Prior Order at 2. Its primary revenue-generating product is a blood test, "AlloSure," which detects kidney rejection in kidney transplant recipients. *Id.* ¶ 4. AlloSure is only intended to be administered when patients already have "clinical suspicion of rejection." *Id*. ¶ 85. The SAC also identifies a second product, known as "AlloMap", which appears to be used with transplant patients and is sometimes bundled with AlloSure. *Id*. ¶¶ 91, 111. CareDx's Medicare revenue accounted for 70% of CareDx's testing services revenue and 60% of its overall revenue during the Class Period. *Id*. ¶ 84. In March 2020,

United States District Court
Northern District of California

2

and partly in response to COVID-19, CareDx introduced a new test, RemoTraC, where phlebotomists, individuals who collect blood from patients, could perform a blood draw at a patient's home. *Id*. ¶ 9.

Due in part to RemoTraC, CareDx's stock price rose to an all-time high of $95.60 per share on June 28, 2021, an increase of more than 330 percent over its price of approximately $22.00 per share at the beginning of the COVID-19 pandemic. *Id*. ¶ 92. During this period, Dr. Maag and Dr. Seeto sold more than $30 million worth of CareDx stock combined. *Id*.

On October 28, 2021, CareDx disclosed on its quarterly SEC filings that it was the subject of two federal investigations by the U.S. Department of Justice (DOJ) and the SEC. *Id*. ¶ 25. After this disclosure, CareDx's stock price dropped by more than 27 percent the next trading day, from a closing price of $70.34 per share on October 28, 2021 to a closing price of $51 per share on October 29, 2021. *Id*. ¶ 26.

On April 15, 2022, Dr. Michael Olymbios, formerly the head of CareDx's Community Nephrology group, filed a complaint ("Olymbios Complaint") in California Superior Court. *Id*. ¶ 260. In his complaint, Dr. Olymbios described Defendants' misconduct, including (a) CareDx had violated Medicare billing requirements by misrepresenting certain tests; (b) CareDx provided grants to physicians, in direct contravention of Medicare billing guidelines; and (c) CareDx had intentionally left information off medical forms, which resulted in physicians' confusion. *Id*. After the filing of the Olymbios Complaint, CareDx's share price dropped by 8.08 percent, closing at a price of $32.55 per share. *Id*.

On May 23 and September 1, 2022, CareDx announced the resignation of its CFO, Mr. Dhingra, along with its chief marketing officer and chief commercial officer, Sasha King, respectively. *Id*. ¶¶ 268-69.   Mr. Dhingra had only been CFO for slightly more than a year at the time of his resignation. *Id*. ¶ 268. Both executives only provided between one to two weeks of notice before announcing their resignations. *Id*. ¶¶ 268-69.

On November 3, 2022, CareDx reported its earnings for the third quarter of 2022, with an increase in net losses, despite an increase in tests performed. *Id*. ¶ 270. During the period of late 2021 and 2022, CareDx disclosed that it was continuing to experience a declining average sales

United States District Court
Northern District of California

3

price (ASP) for its tests. *Id*. ¶¶ 230, 232, 236. Defendants also admitted that CareDx was now being denied reimbursement for as many as 50 percent of tests that were submitted to Medicare. *Id*. ¶ 271. With this news, CareDx's stock price fell from $18.73 per share on November 3, 2022 to $16.02 per share on November 4, 2022, a decline of more than 14 percent. *Id*. ¶ 274.

Plaintiffs allege Defendants committed fraud. First, Plaintiffs allege that CareDx violated the False Claims Act ("FCA") by billing for AlloSure tests that were medically unnecessary. *Id*. ¶ 108. One of the ways CareDx engaged in illegal billing was through its RemoTraC program, where CareDx would send phlebotomists to patients' homes and would administer Allosure as well. *Id*. ¶¶ 99-100. Second, Plaintiffs allege that CareDx violated the federal Anti-Kickback Statute ("AKS") by providing gifts and incentives to doctors when they enrolled their patients in AlloSure testing. *Id*. ¶ 125. Third, Plaintiffs allege that CareDx used a 1,700-patient "study" as a pretext to bill Medicare for medically unnecessary tests and also provided additional kickbacks to doctors who enrolled their patients in the study. *Id*. ¶ 143. CareDx allegedly continued to assure investors that it was complying with the FCA, AKS and other laws, even as it was violating these laws. *Id*. ¶¶ 180, 200. CareDx also allegedly made false statements that its revenue and profits were lawfully earned and its RemoTraC program served solely a legitimate business purpose. *Id*. ¶ 207.

### B. Confidential Witnesses

The SAC provides statements from eighteen confidential witnesses ("FEs"), either former employees of CareDx or Natera, a competitor to CareDx. *Id.* ¶¶ 27-28, 66. Although the SAC appears to list 19 former employees, there is no individual defined as FE-9. *See generally*, *id.*

Former Employee 1 ("FE-1") was a Senior Medical Science Liaison at CareDx from May 2021 through January 2022. *Id*. ¶ 88 n.10. FE-1 asserted that "sales drove everything." *Id*. ¶ 88. FE-1 raised concerns regarding violations of Medicare billing requirements with his supervisor, Dr. Grigoriy Shekhtman, but Dr. Shekhtman told FE-1 that CareDx needed to engage in certain practices to maximize the number of AlloSure tests. *Id*. ¶¶ 98, 100, 103. Dr. Shekhtman reported directly to Chief Medical Officer Dholakia, who attended sales and marketing meetings with a team that included Dr. Maag and Dr. Seeto. *Id*. ¶ 98. FE-1 also notified Clarice McCauley, CareDx's top compliance attorney, about his concerns. *Id*. Besides observing Medicare billing issues, FE-1

4

observed CareDx's sales team taking doctors on "booze" cruises, helicopter tours, and expensive vacations. *Id*. ¶ 132. FE-1 resigned due to concerns with CareDX's unethical business practices. *Id*. ¶ 88 n.10.

Former Employee 2 ("FE-2") is a registered nurse and was a Lead Clinical Research Associate at CareDx during the second half of 2021. *Id*. ¶ 88 n.9. FE-2 observed that if a center wanted a RemoTraC test, CareDx would only issue the test if AlloSure was administered as well. *Id*. ¶¶ 88, 104. Further, FE-2 stated this type of practice was routinely discussed at weekly regional meetings. *Id*.

Former Employee 3 ("FE-3") was a Senior Regional Clinical Research Associate at CareDx from December 2019 to October 2020. *Id*. ¶ 105 n.14. He was responsible for reviewing and overseeing the documents related to CareDx's clinical trial agreements. *Id*. FE-3 noticed that at CareDx, sales and marketing teams often interacted with individuals that were part of the clinical groups, which FE-3 found unusual. *Id*. ¶¶ 105-106. FE-3 was also interviewed by the DOJ, with most of the questions related to CareDx's practice of only providing mobile phlebotomy tests if AlloSure was included, even though the AlloSure tests were not medically necessary. *Id*. ¶ 253.

Former Employee 4 ("FE-4") was a Reimbursement Specialist at CareDx from June 2016 to June 2021 and was responsible or client billing, eligibility, and authorizations. *Id*. ¶ 107 n.15. FE-4 heard that AlloSure was bundled with other blood tests, as part of CareDx's mobile phlebotomy service to promote and encourage doctors to order AlloSure. *Id*. ¶ 107. FE-4 also observed that CareDx regularly paid doctors' offices phlebotomists' fees of $100 per specimen, in comparison to the standard reimbursement fee of $3.00. *Id*. ¶ 135. To FE-4, CareDx's behavior was similar the behavior of FE-4's previous company to a company, Berkeley HeartLab, which the U.S. government discovered had engaged in a blood draw kickback scheme. *Id*. ¶ 136.

Former Employee 5 ("FE-5") was a Senior Product Manager at CareDx from August 2020 to October 2021. *Id*. ¶ 109 n.16. FE-5 reported to Amitabh Shukla, CareDx's Senior Vice President of Technology. *Id*. FE-5 claimed that CareDx obscured its improper Medicare billing using a paper-based claim submission system. *Id*. ¶ 109.

Former Employee 6 ("FE-6") was a Senior Executive Assistant to the Chairman and CEO of CareDx, Dr. Maag, from December 2013 to July 2020. *Id.* ¶ 126 n.18. FE-6 personally observed CareDx's practices of paying for doctors' flights, limo services, hotels, and bottles of champagne for "symposiums." *Id.* ¶ 126. FE-6 explained that Dr. Maag not only attended these events, but also personally selected some of the venues and events. *Id.*

Former Employee 7 ("FE-7") was a Senior Director of Laboratory Operations at CareDx from June 2018 to March 2022. *Id.* ¶ 137 n.21. FE-7 observed that CareDx was drawing blood illegally and potentially collecting blood for tests that were not administered by CareDx. *Id.* ¶ 137.

Former Employee 8 ("FE-8") was a Senior Clinical Trial Manager at CareDx from August 2021 to November 2021. *Id.* ¶ 143 n.24. As part of his responsibilities, he was involved with CareDx's Kidney Allograft Outcomes AlloSure Registry ("KOAR") study. *Id.* FE-8 observed that doctors who were enrolled in an AlloSure study were paid $35,000 to $40,000 per patient, which was significantly higher than standard rates of $5,000 per patient. *Id.* ¶ 131. For the KOAR study, CareDx steered only Medicare patients into the study. *Id.* ¶ 145.

Former Employee 10 ("FE-10") was a Claim Reimbursement Specialist for CareDx from October 2022 to March 2023. *Id.* ¶ 110 n.17. FE-10's job responsibilities included claim reimbursements, which also involves speaking directly to patients, CareDx's billing department, and insurance companies. *Id.* FE-10 observed CareDx had a large number of patient charges that were pending, *i.e.*, had not been reimbursed or paid by Medicare. *Id.* ¶ 110. FE-10 believed this reflected CareDx's practice of overbilling Medicare for Allosure tests that were not medically necessary. *Id.* ¶¶ 110-11. FE-10 also asserted CareDx employees were aware that the company was charging patients for unnecessary tests, including Dr. Seeto, because the company had regular meetings about this issue. *Id.* ¶ 113. FE-10 observed that CareDx's director of claims often spoke with Dr. Seeto about how CareDx was only getting paid by Medicare on 50 percent of its AlloMap and AlloSure tests. *Id.* FE-10 estimated that about 90 percent of CareDx's patients were getting tested at least every month with expensive tests; FE-10 asked CareDx's director of claims why patients were having such frequent testing and the director "brushed him off and told him to just keep doing his job. *Id.* ¶ 112.

Former Employee 11 ("FE-11") was a senior executive that worked in a marketing role from August 2019 to April 2021 and reported directly to a C-suite executive at CareDx. *Id*. ¶ 30. FE-11 confirmed that Dr. Olymbios told FE-11 about Medicare billing concerns and was also "vocal" with others at the company. *Id*. ¶¶ 30, 96, 114. FE-11 also confirmed that many employees who did not raise similar concerns held back because they were "terrified for [their] jobs." *Id*. ¶¶ 30, 96. FE-11 also observed events that he asserts reflected the individual Defendants' awareness that CareDx was billing Medicare for tests that were not medically necessary. *Id*. ¶ 114.

Former Employee 12 ("FE-12") was a Director of Market Access at CareDx from March 2021 to June 2022. *Id*. ¶ 118. FE-12 was part of CareDx's payor team, which considers health care plans to reimburse CareDx's testing services. *Id*. One of CareDx's payors, United Health, was not paying a majority of CareDx's claims. *Id*.

Former Employee 13 ("FE-13") was a Senior Product Manager at CareDx from March 2019 through March 2023. *Id*. ¶ 119. FE-13 asserted that that "AlloSure was bundled with other blood tests as part of CareDx's mobile phlebotomy service to induce physicians to order AlloSure." *Id*.

Former Employee 14 ("FE-14") worked in a sales role at CareDx from late 2021 through early 2023. *Id*. ¶ 120. FE-14 asserted that RemoTraC was offered by CareDx to "keep the Company afloat" and as part of this testing, CareDx drew blood from patients to use in non-CareDx tests. *Id*.

Former Employee 15 ("FE-15") was employed at Natera, a competitor to CareDx. *Id*. ¶¶ 66, 121. FE-15 had worked at Natera since 2015 and was most recently a Director of Sales Training Transplant and Renal Genetics from March 202 through June 2022. *Id*. ¶ 121. FE-15 knows Dr. Olymbios and holds him in high regard. *Id*. FE-15 heard from others that CareDx would support large research projects, by providing "tens of thousands" of dollars to doctors, clinics, and hospitals. *Id*. Plaintiffs appear to suggest that some of this funding may have been related to lavish entertainment and dining provided to physicians by CareDx. *Id.*

Former Employee 16 ("FE-16") was employed at Natera from 2019 to 2022 in a sales role. *Id*. ¶ 122. FE-16 heard from some customers that CareDx did "not play by the rules." *Id*.

Former Employee 17 ("FE-17") was employed at Natera from 2020 to 2022 as an organ health specialist. *Id*. ¶ 123. FE-17 asserted that CareDx was "shady" and that CareDx was "widely known for excessively paying doctors and institutions." *Id*.

Former Employee 18 ("FE-18") was employed at Natera from 2021 to 2022 as a medical science liaison. *Id*. ¶ 124. FE-18 stated "plenty" of former CareDx employees who later worked at Natera said "CareDx would do whatever was necessary to get sales." *Id*.

Former Employee 19 ("FE-19") was a former employee of CareDx and as part of his responsibilities he reported directly to Dr. Seeto from mid-2021 through 2022. *Id*. ¶ 27 n.3. In 2022, FE-19 was laid off. *Id*. FE-19 claims that Dr. Seeto was fully aware of CareDx's billing practices and the issues they caused. *Id*. ¶¶ 28, 115. For example, Dr. Seeto had meetings with CareDx's senior billing executives, and FE-19 recalled that at least in some of these meetings, there were discussions related to CareDx's failure to regularly get "medical necessity" authorization for its tests. *Id*. ¶¶ 28, 79, 115. In addition, FE-19 asserts that Dr. Seeto had a "hands-on management style" and FE-19 would attend weekly "Business Leadership Team" meetings with Dr. Seeto. *Id*. ¶ 78. Further, FE-19 confirmed that during Dr. Seeto's tenure as CEO, CareDx's sales team would take doctors out for "lavish dinners" and there were discussions at the company about a potential conflict of interest. *Id*. ¶ 133. Between September and October 2021, around the time that the DOJ and SEC were investigating CareDx, FE-19 attended Business Leadership Team meetings where they discussed how CareDx should reduce its expenditures such as "not ordering 'shrimp towers' or $200 bottle of wine when taking doctors to dinner, now that the company was under scrutiny." *Id*.

FE-19 also claims that certain officers were especially involved in the day to day operating of CareDx and that there was a toxic work culture. For instance, FE-19 contends that Mr. Dhingra has "unusually involved in the Company's business for a Chief Financial Officer." *Id*. ¶¶ 80, 117. FE-19 also heard from Erin Tokunaga, an individual in charge of clinical trials at CareDx, that she was being bullied and "[t]here was a pervasive lack of accountability and ethics at [CareDx] in every which way." *Id*. ¶¶ 27, 96.

United States District Court
Northern District of California

8

United States District Court
Northern District of California

**C.    Procedural Background**

Plaintiffs filed their complaint on May 23, 2022. *See* ECF No. 1. Plaintiffs moved for an order appointing them as lead plaintiffs in the case and to approve their selection of lead counsel for the class. *See* ECF No. 31. Defendants did not oppose and on August 25, 2022, the Court granted Plaintiffs' motion and appointed Plaintiffs as lead counsel for the case. See ECF Nos. 41, 43.

On November 28, 2022, Plaintiffs filed their first amended complaint ("FAC"). *See* ECF No. 53. On January 27, 2023, Defendants moved to dismiss and to strike certain portions of the FAC that relied on facts from the Olymbios Complaint. *See* ECF Nos. 58, 60. The parties filed oppositions and replies to both the motion to dismiss and the motion to strike. *See* ECF Nos. 68-73. On May 24, 2023, the Court struck certain paragraphs from the FAC and dismissed the FAC entirely, with leave to amend. *See* Prior Order. The Court found that Plaintiffs had failed to plead three elements of a Section 10(b) and Rule 10b-5 claim, specifically falsity, scienter, and loss causation. *See id*.

On June 28, 2023, Plaintiffs filed their second amended complaint. *See* SAC. On July 26, 2023, Defendants filed their second motion to dismiss and strike Plaintiffs' second amended complaint. *See* MTD Mot.; MTS Mot. On August 30, 2023 and September 22, 2023, the parties filed oppositions and replies to both sets of motions. *See* ECF No. 96 ("MTD Opp'n"); No. 97 ("MTS Opp'n"); No. 98 ("MTD Reply"); No. 100 ("MTS Reply").  On September 28, 2023, Defendants filed a motion for leave to file supplemental materials in support of its motion to dismiss. *See* ECF No. 101. Plaintiffs filed an opposition on October 5, 2023. *See* ECF No. 102. The Court denied Defendants' motion for leave to file supplemental materials on October 10, 2023. *See* ECF No. 103. The Court then held a hearing regarding Defendants' motion to dismiss and strike Plaintiff's second amended complaint on October 31, 2023. *See* ECF No. 107.

## II.    LEGAL STANDARD

### A.    Motion to Strike

A party may move to strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The essential function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to the trial." *Whittlestone, Inc. v. Handi-Craft Co*., 618 F.3d 970, 973 (9th Cir.

2010) (citations omitted). Motions to strike are generally disfavored and "should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc*., 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). Similar to a motion to dismiss, the court should view the pleading sought to be struck in the light most favorable to the nonmoving party. *Id*.

### B.　Motion to Dismiss 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc*., 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citations omitted).

### C.　Rule 9(b) and PSLRA

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 604 (9th Cir. 2014). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity, including "circumstances constituting fraud or mistake." *Id.* at 605; Fed. R. Civ. Proc. 9(b).

In addition, under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009), as amended (Feb. 10, 2009) (citations omitted). To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is

10

misleading, and, if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). To properly plead scienter, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u–4(b)(2). Regarding the "strong inference" standard, a complaint will survive a motion to dismiss, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007).

### D.    Leave to Amend

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Proc. 15(a)(2). But courts have discretion to deny leave to amend because of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### III.    DISCUSSION

#### A.    Judicial Notice

"The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

Defendants have filed two separate requests for incorporation by reference and judicial notice, which they filed along with their motion to dismiss and reply. *See* ECF Nos. 90 ("First RJN"), 99 ("Second RJN"). Defendants are asking for the Court to consider eight exhibits. *See* First RJN at

United States District Court
Northern District of California

11

1; Second RNJ at 2. Defendants argue that the exhibits are incorporated into the operative complaint and/or are subject to judicial notice. *See* First RJN at 1; Second RNJ at 2. Plaintiffs did not oppose either of Defendants' requests. Accordingly, the Court takes judicial notice of all eight exhibits, as discussed at the hearing and below. *See* ECF No. 107 ("Hearing").

Exhibits A through D are filings submitted by CareDx to the SEC. First RJN at 1. Defendants contend that the SAC refers to, relies on, quotes and/or bases its claims on portions of Exhibits A through F. First RJN at 2. In addition, the Court already took judicial notice of Exhibits B and D in its prior order. First RJN at 2; Prior Order at 4. The Court finds that all four exhibits are incorporated by reference and alternatively, are appropriate documents for judicial notice. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

Exhibits E is a transcript of a healthcare conference. First RJN at 1. The Court already took judicial notice of Exhibit E in its prior order. First RJN at 2; Prior Order at 4. Court will once again take judicial notice of this transcript.

Exhibit F is the Olymbios Complaint, which was filed by Dr. Michael Olymbios in the Superior Court of the State of California. First RJN at 1. The Court finds this exhibit is incorporated by into the complaint, because the SAC references the Olymbios Complaint, this complaint is central to Plaintiffs' claims, and neither party disputes its authenticity. *See Corinthian Colleges*, 655 F.3d at 999.

Exhibit G is a printout of CareDx's historical stock prices from April 11, 2022 to April 22, 2022. First RJN at 2. The Court takes judicial notice of this document, because "[i]nformation about the stock price of publicly traded companies [is] the proper subject of judicial notice." *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004).

Exhibit H is a transcript of CareDx's earnings call from October 28, 2021. The Court already took notice of this same transcript in its prior order. Second RJN at 1; Prior Order at 4. Likewise, the Court will again take notice of this transcript. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

United States District Court
Northern District of California

### B.    Motion to Strike

Defendants request that the Court strike portions of the following paragraphs from Plaintiffs' operative complaint: paragraphs 24, 89, 97, 127, 140, 141, and 260. *See* MTS Mot. at 2, n 2, App'x. 1. The sections that Defendants seek to strike fall into two broad categories: (1) allegations that Dr. Olymbios raised concerns he had regarding CareDx with Dr. Seeto and Dr. Maag ("Concern Allegations"); and (2) allegations that Dr. Olymbios had a discussion with Dr. Maag, where Dr. Maag asked Dr. Olymbios to not put in writing that CareDx does not bill patients for tests ("Paper Trail Allegations"). *See* ECF No. 100 ("Reply – MTS") at 1. Dr. Olymbios' Concern Allegations, which included topics such as CareDx's general illegal conduct, Medicare billing practices, and kickbacks, are described in paragraphs 24, 89, 97, 127, 140, 141, and 260. *See* MTS Mot., App'x. 1. Dr. Olymbios' Paper Trail Allegations are described in paragraphs 24 and 140. *Id.*

Similar to their first motion to strike, Defendants argue that certain sentences and paragraphs should be stricken because they are from the Olymbios Complaint, and Plaintiffs did not conduct an independent investigation, as required under Federal Rule of Civil Procedure 11. *Id.* at 1-2. By contrast, Plaintiffs assert that they have properly corroborated Dr. Olymbios' allegations through confidential witnesses, documents, and additional facts. *See* MTS Opp'n at 4, 6-8, 14-15. First, confidential witnesses, such as FE-10, FE-11, and FE-19 corroborate Dr. Olymbios' Concern Allegations, *e.g.,* CareDx executives were aware of Medicare issues and brushed off or berated employees that raised concerns to management. *Id.* at 4, 6-8. Likewise, Plaintiffs claim that documents and related testimony support Dr. Olymbios' Paper Trail Allegations. *Id.* at 14-15. Second, the complaint alleges new facts that bolster Dr. Olymbios' credibility. *Id.* at 9-13. Lastly, Plaintiffs' counsel had five discussions with Dr. Olymbios' counsel and confirmed that Dr. Olymbios was the source of the facts in the Olymbios Complaint. *Id.* at 13.

In reply, Defendants contend that Plaintiffs have still failed to independently corroborate either the Concern or Paper Trail Allegations. MTS Reply at 2-7. Further, Defendants note that the Court already found that Dr. Olymbios' email and Plaintiffs' discussions with Dr. Olymbios' counsel do not qualify as sufficient independent corroboration. *Id.* at 7. Defendants also argue that any facts regarding Dr. Olymbios' purported whistleblower status and "[p]roximity to senior

United States District Court
Northern District of California

management" are irrelevant to whether Plaintiffs have conducted an independent investigation. *Id.* at 7-9.

Under Federal Rule of Civil Procedure 11(b)(3), an attorney that submits a pleading "certifies that to the best of the [attorney]'s knowledge, information, and belief" that "factual contentions have evidentiary support or, if specifically, so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Essentially, prior to filing a complaint, the "attorney has a duty … to conduct a reasonable factual investigation." *Christian v. Mattel, Inc*., 286 F.3d 1118, 1127 (9th Cir. 2002). Courts have stricken pleadings that rely on facts from a third-party complaint where plaintiffs have not independently investigated the facts alleged in the third-party complaint. *See e.g.*, *In re Connetics Corp. Sec. Litig*., 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) ("*Connetics I*"); *Maine State Ret. Sys. v. Countrywide Fin. Corp*., No. 2:10-CV-0302, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011).

In their motion to strike, Defendants assert that Plaintiffs must also corroborate the Olymbios allegations with particularized allegations of their own. *See* Mot. at 4. But Defendants rely on cases that reflect the standards associated with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See id*. n.6. The Court declines to apply this standard to its motion to strike analysis.

The Court finds that Plaintiffs have conducted a reasonable factual investigation that complies with the requirements of Rule 11(b), at least as to the Concern Allegations. As part of their investigation, Plaintiffs spoke to Dr. Olymbios' counsel on five separate occasions, interviewed witnesses, and reviewed documents. SAC at 1; MTS Opp'n at 1-2. In contrast to the FAC, where Plaintiffs relied solely on conversations with Dr. Olymbios' counsel (some of which occurred after the FAC was filed) and an email from Dr. Olymbios, Plaintiffs have now conducted a reasonable inquiry as to the Concern Allegations. *See In re Connetics Corp. Sec. Litig*., No. C 07-02940, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008) ("*Connetics II*") (denying motions to strike where plaintiffs supported some allegations in SEC complaint with witness interviews); *Lako v. Loandepot, Inc*., No. 821CV01449, 2023 WL 444151, at *5–6 (C.D. Cal. Jan. 24, 2023) (finding sufficient corroboration where plaintiffs contacted attorneys from the original complaint, spoke with witnesses, and had additional documentary evidence).

14

United States District Court
Northern District of California

First, Plaintiffs have corroborated the Concern Allegations related to kickbacks and Medicare billing with confidential witnesses. For example, Dr. Olymbios raised concerns about CareDx's kickbacks to doctors and FE-6 supports Dr. Olymbios' assertions. SAC ¶¶ 127, 140. As support, Plaintiffs identified FE-6, a Senior Executive Assistant to Dr. Maag, who personally observed CareDx provide kickbacks to physicians, including paying for flights, limo services, hotels, and champagne. SAC ¶ 126.

Likewise, for Dr. Olymbios' concerns related to Medicare billing, Plaintiffs spoke to multiple confidential witnesses who corroborated Dr. Olymbios' allegations, at least for purposes of a Rule 11 analysis. For example, Dr. Olymbios alleged he had complained about these Medicare billing practices to management. Similarly, FE-11, a senior marketing executive, confirmed that Dr. Olymbios had told FE-11 about his concerns regarding CareDx's Medicare billing and FE-11 noted that Dr. Olymbios was also "vocal" with others at the company. *Id*. ¶¶ 30, 96, 114. FE-19 also asserted some of the Individual Defendants were fully aware of CareDx's billing practices and the issues they caused. *Id*. ¶¶ 28, 115. Dr. Olymbios further averred that the Company intentionally excluded a field on a form, where a doctor could indicate why a test was necessary to mislead Medicare personnel. SAC ¶ 108; Olymbios Complaint ¶ 30. As support, FE-19 stated that at company meetings, employees were aware of "prior authorization" issues, which were connected to the forms with the missing "necessary" field. SAC ¶ 115. Lastly, Dr. Olymbios asserted that he had raised these issues with management, but CareDx ignored or actively dismissed his concerns. SAC ¶ 24. FE-10, a Claim Reimbursement Specialist, experienced a comparable reaction. FE-10 claimed Dr. Seeto and other CareDx employees were aware that the Company was charging patients for unnecessary tests. *Id*. ¶ 113. When FE-10 asked CareDx's director of claims about this testing, the director "brushed him off and told him to just keep doing his job." *Id*. ¶ 112.

The Court recognizes that some of the confidential witnesses, specifically FE-10 and FE-19, worked at CareDx after Dr. Olymbios left the Company. *See* SAC ¶¶ 27 n.3, 51, 110 n.17; Olymbios Complaint ¶ 39. While these confidential witnesses may not be sufficient for pleading purposes under the PSLRA, *see Zucco*, 552 F.3d at 995, Defendants have failed to cite any legal support that

this standard applies to a Rule 11 investigation. Accordingly, the Court declines to apply this standard when evaluating Defendants' motion to strike.

The Court finds, however, that the Plaintiffs have not sufficiently corroborated the Paper Trail Allegations. To support Dr. Olymbios' assertions that he was encouraged not to "create a paper trail" of CareDx's misdeeds, Plaintiffs identified a document and sworn testimony from Dr. Maag and Dr. Olymbios. MTS Opp'n at 14-15; SAC ¶¶ 63-64, 67. The document was an internal CareDx marketing flier that stated AlloSure was "Fully Covered by Medicare." SAC ¶¶ 64-65. As for the testimony, the parties stated the following: (1) Dr. Maag testified that many individuals were involved in creating marketing documents, including senior leadership; and (2) Dr. Olymbios testified that the internal marketing document was "not intended to be left with anyone" and instead should be used as a "visual aid." *Id*. ¶¶ 63, 66-67. Further, Dr. Olymbios testified that CareDx "released or made the marketing document public in 'January 2020.'" *Id*. ¶ 66.

While aspects of Dr. Olymbios' testimony suggest that his Paper Trail Allegations are credible, *i.e*., CareDx marketed that that it did not bill its patients directly for tests, other parts of his testimony contradict the Paper Trail Allegations. Dr. Olymbios asserted he was encouraged not to create a paper trail, but CareDx made a document that explicitly stated its treatment would be fully covered by Medicare and that statement was released to the public. *See id*. ¶ 64. Further, Dr. Maag's testimony does not provide much additional support beyond the concept that CareDx management and employees worked on marketing materials together.

Besides documentary or testimonial support, Plaintiffs also contend they have satisfied their Rule 11 obligations by: (1) pleading additional facts related to Dr. Olymbios' credibility, (2) providing an email from Dr. Olymbios, and (3) speaking with Dr. Olymbios' counsel on five separate occasions. MTS Opp'n at 9-13. At this juncture, the Court finds that that these factors are inapposite or insufficient as to the Paper Trail Allegations. First, while Plaintiffs have pleaded additional facts regarding Dr. Olymbios' reliability, these facts do not qualify as independent corroboration, as requested in the Prior Order. *See* Prior Order at 7-8. Second, Plaintiffs rely on an email from Dr. Olymbios and assert that he reviewed the first amended complaint and confirmed its allegations were accurate. MTS Opp'n at 11-12. But in its last order, the Court held that this email

United States District Court
Northern District of California

16

was not sufficient corroboration. Prior Order at 8. In addition, Plaintiffs appear to have overstated Dr. Olymbios' words. Dr. Olymbios did not confirm Plaintiffs' complaint was accurate. Instead, he stated: "I am writing to you with interest in your amended complaint … I was relieved to see that other former employees were willing to come forward to corroborate my observations." *See* MTS Opp'n at 11. Lastly, while discussions with Dr. Olymbios' counsel could support a finding of a reasonable inquiry under Rule 11, Plaintiffs failed to cite to any case law where a court held the inquiry was satisfied based on conversations with counsel alone. *Cf. Lako,* 2023 WL 444151, at *5–6 (sufficient corroboration where plaintiffs contacted attorneys and witnesses from the original complaint and had supporting documentary evidence); *Johns v. Bayer Corp.*, No. 09–cv–1935, 2010 WL 2573493 (S.D. Cal. June 24, 2010) (sufficient corroboration where plaintiffs contacted counsel from original complaint and reviewed medical studies at issue).

It may be possible for Plaintiffs to satisfy their Rule 11 obligations. For example, Plaintiffs have stated that the allegations in their complaint are based "upon information and belief," suggesting additional evidence may be forthcoming after further investigation and discovery. SAC at 1; *see* Fed. R. Civ. P. 11(b)(3). Thus, if certain evidence regarding the Paper Trail Allegations is "difficult or impossible to acquire absent further discovery," then this factor, in combination with Plaintiffs' discussions with Dr. Olymbios' counsel, could be sufficient under Rule 11. *See Connetics II*, 2008 WL 3842938, at *4.

Accordingly, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motion to strike. The Court **GRANTS** the motion to strike only as to the Paper Trail Allegations, specifically paragraph 24 (sentences 4-5) and paragraph 140 (sentences 3-4). However, the Court **DENIES** Defendants' motion to strike as to paragraph 24 (sentences 2-3), paragraph 89 (last sentence), paragraph 97 (sentences 2-3), paragraph 127 (sentences 1-3), paragraphs 140 (sentences 1-2), paragraph 141 (sentence 3), and paragraph 260 (sentences 2-6). Plaintiffs may amend their complaint after conducting an independent investigation as to the stricken allegations.

United States District Court
Northern District of California

United States District Court
Northern District of California

###### C.        Motion to Dismiss

######## 1.        Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2407 (2014)). Only falsity, scienter, and loss causation are at issue here.

In their motion to dismiss, Defendants assert that Plaintiffs are unable to satisfy the first, second, and sixth elements, *i.e*., falsity, scienter, and loss causation. MTD Mot. at 7-25. The Court will discuss each element below.

######## a.        Falsity

As discussed above, to plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Statements and omissions are actionably false if they "directly contradict what the defendant knew at that time" or "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1008 (9th Cir. 2018); *Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," does not meet the falsity standard. *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., 540 F.3d 1049, 1070 (9th Cir. 2008).

As an initial point, the Court will first summarize certain concessions between the parties regarding falsity. First, Defendants note there is an inconsistency within the SAC about AlloSure and RemoTraC bundling. MTD Mot. at 14. For example, Plaintiffs claimed that CareDx "deliberately obscure[d] from patients and doctors" that RemoTraC bundled AlloSure tests with routine panels. SAC ¶¶ 81, 101-02, 105. But the SAC also states that CareDx repeatedly disclosed

to the public that RemoTraC contained both AlloSure and routine panels. *Id.* ¶¶ 91, 152 n.27. Second, Plaintiffs seem to suggest certain statements in CareDx's 2020 annual report were false as to Dr. Olymbios' whistleblower allegations, but Defendants argue that the statements are neither false nor misleading. MTD Mot. at 18; SAC ¶¶ 209-211. Plaintiffs did not address either of these arguments in their opposition and have conceded these points. *See Mortg. Elec. Registration Sys., Inc. v. Koeppel*, 2020 WL 1233925, at *3 (N.D. Cal. Mar. 13, 2020) ("When a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (cleaned up).

Defendants challenged various categories of statements in Plaintiffs' complaint, including CareDx's underwriting representations, unmet needs, ASP decline, statements regarding testing services revenue, historical RemoTraC data, risk disclosures, and expert opinions. The Court will address each of these categories below.

### i.    Underwriter Representations

Plaintiffs again contend that statements in Defendants' underwriter agreements, which claimed that the Company complied with certain healthcare laws, were false and misleading because CareDx was already engaging in systematic fraud at the time of the statements. SAC ¶¶ 180, 200. CareDx described these underwriter agreements in two SEC Form 8-Ks, one filed on June 10, 2020 and the other filed on January 20, 2021. ECF Nos. 89-1 ("Cording Decl."), 89-2 ("Ex. A") at 7, 89-3 ("Ex. B") at 7.

Similar to its last motion to dismiss, Defendants argue that these statements are not actionable because CareDx had a separate warning in the Form 8-Ks that stated representations in the underwriter agreements were not intended "to provide investors with any other factual information regarding the Company or its business." MTD Mot. at 14, 17; Cording Decl., Ex. A at 3, Ex. B at 3. In addition, Defendants argue that the statements are also not actionable because the underwriter agreements stated investors should read the agreements "in conjunction with the disclosures in the Company's periodic reports and other filings with the SEC." MTD Reply at 9; SAC ¶ 181; Cording Decl., Ex. A at 3, Ex. B at 3. And some of the SEC filings warned investors that CareDx was potentially not complying with healthcare laws. MTD Reply at 9; *see e.g.*, SAC ¶

19

154 ("Our employees … may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements.").

In its prior order, the Court held that Plaintiffs had failed to plead underwriter misrepresentations were misleading, because "[a] reasonable investor would have viewed the disclaimer on … the Form 8-K[s] and understood that the agreements were not meant to convey facts regarding CareDx." Prior Order at 17. The Court, however, noted a different finding could result if Plaintiffs asserted additional facts, such as investors' interest in the underwriting agreements. *Id.*

Plaintiffs have amended their complaint to include allegations related to investor interest. *See e.g*., SAC ¶¶ 182-86. Plaintiffs assert the agreements were important to investors because they were a condition for CareDx to receive funding that would help the Company stay in business. *Id*. ¶ 182. Investment analysts had projected $29.9 million in losses for CareDx in 2020, but the company only had $32 million cash on hand. *Id*. ¶ 185. Further, CareDx has emphasized the importance of the underwriting offering by publicly announcing it in multiple press releases. *Id*. ¶ 184.

At this stage, the inquiry is whether the statements in the underwriter agreements are actionable considering the disclaimer language found in both the Form 8-K and other SEC filings. The Court finds that in this context, the answer is yes.

As discussed in the prior order, courts have held statements in a private agreement can be actionable in securities fraud litigation. For example, *in Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 741 (9th Cir. 2008), the Ninth Circuit found that statements in a private document, such as a merger agreement, were actionable in part because the merger was a significant event for the company and the company "could have expected intense investor interest in the details of the merger." Likewise, other district courts have found statements in underwriter agreements can support a securities fraud claim. *See In re Galena Biopharma, Inc. Sec. Litig*., 117 F. Supp. 3d 1145, 1179 (D. Or. 2015) ("Although the Underwriting Agreement contains a clause stating that the warranties and representations were made only to the underwriter, at this stage it is a plausible

United States District Court
Northern District of California

20

United States District Court
Northern District of California

inference that a reasonable investor would believe that the statements and representations made to the underwriter were truthful and could be relied upon.").

District courts are somewhat mixed on whether a disclaimer can make certain statements non-actionable. For example, in *M&T*, the challenged merger agreement contained a disclaimer that the warranties and representations "were not intended by the parties to the merger agreement to be characterizations of the actual state of facts or conditions" of the merging companies. *Jaroslawicz v. M&T Bank Corp.*, No. 15-CV-897, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017). Thus, the court found no reasonable shareholder would look at a disclaimer in a merger agreement and then rely on the representations within that were more than boilerplate to understand the actual conditions of the company. *Id.*

In contrast, in *Akorn*, the challenged merger agreement also contained "disclaimers alerting the investing public that representations in the agreement were made only for purposes of the merger transaction." *Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *9 (N.D. Ill. Feb. 5, 2020). "[T]he disclaimer explained that the regulatory compliance statement's role in the merger agreement involved risk allocation, not communication of facts." *Id.* Despite these disclaimers, the court, citing to *Glazer*, found that plaintiffs' allegations regarding Akorn's merger-agreement representation of compliance with all FDA regulations" was actionable "because one could reasonably find that a reasonable investor would deem this information important to a decision to buy or sell Akorn securities." *Id.*

Here, the Court finds that with the additional factual allegations, the reasoning in *Glazer* and *Twin Master Fund* is more persuasive. Defendants cite *Glazer* to argue that a merger agreement is of greater interest than an underwriter agreement, but this argument is not persuasive since *Glazer* did not limit itself to a merger agreement. *See Glazer*, 549 F.3d at 767, 774, 777, 778 (*Glazer* also included the following statements: sales pipeline statements, sales employee statements regarding the amount of hiring and firing taking place in the Company, and channel partner statements). And, at the motion to dismiss stage, the court takes as true all well-pled allegations. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1140. The Court finds that Plaintiffs have sufficiently plead falsity as to the underwriting representations.

**ii.    Unmet Needs**

Plaintiffs assert that "statements that the Company's business model focused on mobile phlebotomy, which purportedly 'was addressing unmet need,' were false and misleading." SAC ¶ 207. In the previous order, the Court found that Plaintiffs failed to adequately plead falsity as to the "unmet need" statements. Prior Order at 18. The Court agreed with Defendants that, given the context of the statements, "the 'unmet need' statements identified by Plaintiffs are about addressing the unmet need of transplant patients for mobile phlebotomy." *Id.* The reasoning from the previous order applies here as well.

Plaintiffs continue to assert that Defendants falsely stated their RemoTraC blood-drawing business addressed the "needs and demands" of patients during the Class Period when, in fact, 50 percent of the tests administered were not medically necessary and thus not addressing any "need." SAC ¶¶ 13-14, 93, 100-124. These facts contradict Defendants' statements that RemoTraC addressed patients' "need[s]." *Id.* ¶¶ 205-08, 215-17. Statements that RemoTraC drew blood for "standard" or "routine" tests were false for similar reasons because the unnecessary AlloSure tests were neither standard nor routine. *Id.* ¶¶ 188-190, 100-124.

In reply, Defendants reiterate that CareDx was not describing AlloSure as "standard" or "routine" but rather it disclosed that in RemoTraC, AlloSure was being offered in addition to standard or routine tests. MTD Reply at 12.

In the SAC, Plaintiffs additionally allege that any reasonable investor would still find the "unmet needs" statement to be materially misleading because while "the vial of blood the patients did need to give for their 'standard of care' tests could satisfy 'unmet needs'", "the separate vial of blood patients gave unnecessarily [for AlloSure] at the same time was not needed, and no reasonable person would give more blood knowing the additional draw was unnecessary." SAC ¶ 207.

The Court finds Plaintiffs' additional arguments are largely the same argument that was rejected in the previous order. The "unmet needs" statements are about addressing the unmet need of transplant patients for mobile phlebotomy—not the lack of medical necessity for AlloSure tests. Prior Order at 18. The Court finds that Plaintiffs have not adequately alleged falsity as to the "unmet need" statements.

22

### iii.    ASP Decline

Plaintiffs allege that Defendants' statements regarding attributing the decline in ASPs to non-fraudulent factors were false and misleading. SAC ¶¶ 230–31, 233–34, 236–37, 278–84. Specifically, the parties' briefs focus on the statements that (a) higher mix of growth in the non-Medicare business was impacting ASPs and (b) nothing had changed with respect to Medicare billing practices. *Id.* ¶ 231. Plaintiffs again argue that "the true cause of Defendants' flagging Medicare growth and falling ASPs was not changes in payor mix caused by higher growth in the commercial business but the fact that . . . the Company could no longer engage in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for unnecessary tests." *Id.* In the previous order, the Court found that Plaintiffs had failed to adequately plead falsity as to the ASP decline statements. Prior Order at 19. The Court granted Plaintiffs leave to amend to include additional particularized facts to support a finding of falsity.

In the SAC, Plaintiffs allege additional allegations from FE-10 to bolster their claim. FE-10 had worked in medical billing for several years before starting at CareDx and he observed a "large" number of charges that were "pending"—charges that had not yet been reimbursed or paid. SAC ¶ 110. FE-10 asserts that many had not been paid in years and they had been repeatedly found to not be medically necessary, finding that some patients were getting AlloSure tests every other week. *Id.* Plaintiffs argue that with these allegations, in conjunction with the existing allegations, leads to a showing of falsity.

Defendants argue that FE-10's allegations should be discounted because he did not give an exact number of claims that were rejected and did not specify "when" each claim was rejected. MTD Mot. at 15-16. However, Defendants do not offer any caselaw to support this assertion. Plaintiffs argue that states a party does not need allege the specific claims related to a False Claims Act case. *Mauss v. Nuvavsive, Inc.*, No. 13CV2005 JM (JLB), 2015 WL 10857519, at *10 (S.D. Cal. Aug. 28, 2015) (*Nuvavsive I*) (citing *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). Instead, it is sufficient to allege the details of a scheme to submit false claims paired with other information to lead to a strong inference that these claims were submitted. *Id.* In *Nuvavsive I*, the court was not persuaded by defendants' argument that because the confidential witness did not

United States District Court
Northern District of California

identify any particular false claim that was submitted, the court should discount the witness's statements. *Id.* The court found that the statements from the confidential witness in conjunction with Plaintiff's particular details of a scheme, supported a finding of falsity. *Id.*

In addition to FE-10's allegations, Plaintiffs again allege that the prior ASP statements were false in light of the later CFO's acknowledgement that ASPs were declining because 50 percent of tests were not getting reimbursed. MTD Opp'n at 16; SAC ¶¶ 230, 271. Defendants again argue that CFO Abhisek Jain's statement reveals, that although Mr. Jain fully acknowledged that a significant number of claims were not being reimbursed (as many as 40% to 50%) and therefore ASPs were declining, he never suggested that Medicare had been rejecting claims as fraudulent. MTD Mot. at n.15.

The Court has already previously rejected Plaintiffs' argument and the same reasoning applies here. Prior Order at 18-19. Plaintiffs have bolstered these allegations with FE-10's claims that he reviewed files showing that Medicare and private insurance rejected claims as not medically necessary. He claims that the denial reasoning for each claim "was always that the AlloSure and/or AlloMap test(s) were not medically necessary and that CareDx did not provide enough evidence to support that these tests were medically necessary." SAC ¶ 111.

However, the Court finds these allegations to not be enough to support a finding of falsity. In *Nuvavsive I*, in addition to the confidential witness, plaintiff had also alleged "particular details of a scheme, supported by the statements of numerous confidential witnesses from within the company, in which doctors who provided Medicare and Medicaid-covered products and services were pampered, entertained, and given gifts, which were tied to the volume of business and referrals they generated." *Nuvavsive I*, 2015 WL 10857519, at *10. The Court does not find similarly particularized details alleged for the statements regarding the ASP declines. The Court finds that Plaintiffs have not alleged sufficient facts to support a finding of falsity as to statements regarding ASP declines.

//

//

### iv. Testing Services Revenue Statements and Historical RemoTraC Data

Defendants assert that Plaintiffs have failed to allege falsity for both testing service revenue and historical RemoTraC data. See MTD Mot. at 16-18. Plaintiffs counter that Defendants' statements about their revenue, growth, and success—including that they were "primarily due to" legitimate factors like testing volume—were false and misleading for omitting that a highly material portion of their revenue was coming from illegal practices. MTD Opp'n at 13. Plaintiffs cite two cases to argue that it is false to not acknowledge that part of your business growth is based on an illegal activity. *See In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) *and In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *13 (N.D. Cal. Aug. 17, 2022).

In *Syncor*, Defendants made numerous statements attributing Syncor's overseas earnings to a variety of legitimate business practices, while omitting any mention of illegal payments. *Syncor*, 239 F. App'x at 320. However, plaintiffs had alleged specific facts that indicated that illegal payments were in fact a significant reason for Syncor's overseas growth. *Id.* The court found Syncor's statements about the reasons for overseas earnings to be misleading. *Id.*

Similarly, in *Plantronics*, plaintiffs argued that defendants' statements about the Company's positive revenue results during the Class Period were misleading because of defendants failed to disclose that such results were the byproduct of the undisclosed sales practice of stuffing distributors with excess inventory. *Plantronics*, 2022 WL 3653333, at *8. "Plaintiffs allege that the statements were misleading because they touted positive revenue results and attributed them to sustainable organic customer demand and synergies achieved as a result of the Polycom acquisition when, in reality, the results were the byproduct of the undisclosed sales practice and resulting unsustainable build-up of channel inventory." *Id.* For this reason, the court found the challenged statements to be misleading. *Id.* at *10.

Defendants argue that these cases are distinguishable because Defendants merely reported testing services data with no attribution to specific, qualitative factors. MTD Reply at 11. Defendants argue that the present case is more analogous to *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195 (N.D. Cal. 2019). In *Sunrise Firefighters'*, defendant's the general

reporting was accurate, and financials were consistent with its statements related to Cloud growth and the state of affairs. *Id.* at \*12. The court found that defendant did not have a duty to disclose the allegedly misleading sales practices in part because defendant had not made an affirmative representation regarding its allegedly coercive sales practices or attribution of Cloud revenue to other factors. *Id*. Defendants also cite to *Di Donato v. Insys Therapeutics Inc.*; however, this case is distinguishable because the statements in *Di Donato* that were found to not be misleading, either because the language was too general or embedded in caveats. No. CV-16-00302-PHX-NVW, 2017 WL 3268797, at \*9 (D. Ariz. Aug. 1, 2017).

The Court also finds *E. Ohman J:or Fonder AB v. NVIDIA Corp.* to be instructive here. 81 F.4th 918 (9th Cir. 2023). In *Ohman*, plaintiffs had sufficiently alleged that a substantial part of NVIDIA's crypto-related revenue during the proposed Class Period came from sales of GeForce GPUs sold to crypto miners. *Id.* at 929. This revenue was reported in NVIDIA's Gaming segment. *Id.* However, defendants' statements failed to state or substantially understated the extent to which NVIDIA's Gaming-segment revenues were based on sales of these GeForce GPUs. *Id.* at 936. Because defendants' statements lead investors and analysts to believe that NVIDIA's crypto-related revenues were much smaller than they were, the court found these statements to be materially false or misleading. *Id.*

The Court finds *Plantronics* and *Ohman* to be more analogous to the present case. Here, unlike in *Sunrise Firefighters'*, Defendants had noted that its increase in revenue was due to certain test results, and they failed to mention that some of these tests were illegal chargebacks to Medicare. *See, e.g.*, SAC ¶ 163. The Court finds that Plaintiffs have adequately alleged falsity as to the statements regarding testing services revenue and historical RemoTraC data.

### v.   Risk Disclosures

Defendants assert that Plaintiffs fail to allege that CareDx's risk disclosures were false. MTD Mot. at 18-20. Plaintiffs challenged two types of risk factor disclosures: (1) risks relating to violations of laws and (2) risks relating to Medicare reimbursement. *Id*. at 18; SAC ¶¶ 154, n.28, 155, 158, 161, 177, 191, 194, 198. First, Defendants argue the risks warned about were not that regulatory violations may occur, but that those violations may result in legal scrutiny or harm to

United States District Court
Northern District of California

CareDx's business. MTD Mot. at 19. Plaintiffs fail to allege that at the time the statements were made (April 30, 2020 to October 28, 2021) that CareDx faced legal scrutiny or that its business was affected because of alleged misconduct. *Id*. Second, CareDx warned of risk related to reductions in Medicare reimbursements, but the alleged Medicare fraud did not occur until after the risk disclosure was made. *Id*. at 20.

Conversely, Plaintiffs argue that risk disclosures are actionable when the disclosures speak to as yet unrealized risks and fail to alert investors that some of these risks may have already occurred. MTD Opp'n at 15 (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008)). In *Berson*, defendants stated that the company "may experience significant contract cancellations" without disclosing that the risk of work being cancelled had already materialized in the form of "stop work" orders. *Berson*, 527 F.3d at 984-86.

In oral argument, Plaintiffs also cite to *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023), *cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, 144 S. Ct. 2629 (2024). In *Facebook*, Facebook's 2016 10-K included risk disclosures that represented the risk of improper access to or disclosure of Facebook user data as purely hypothetical. *Id.* at 949. However, Plaintiffs had pleaded with particularity that that Facebook was aware before the release of the risk statements that Cambridge Analytica had harvested Facebook users' data for political purposes. *Id.* Cambridge Analytica's conduct was the conduct that the risk disclosures represented as hypothetical. *Id.* at 951. The court found that plaintiffs had adequately pleaded falsity as to the risk disclosures. *Id.* at 952.

Following the logic in *Berson* and *Facebook*, the Court agrees with Plaintiffs that risk disclosures may be actionable. However, unlike in *Berson* and *Facebook*, Plaintiffs do not allege that the risks warned of by Defendants—legal "scrutiny," impairment of the "ability to conduct business," and decreasing Medicare reimbursement—came "to fruition" by the time the challenged statements were made. The SAC alleges that CareDx did not experience harm to the business through revenue loss until February 2022. SAC ¶ 234. SAC does not allege that CareDx was facing legal "scrutiny" until October 28, 2021, the date of the final challenged risk disclosure, when CareDx disclosed the government investigations. *Id.* ¶ 230. Plaintiffs further do not allege that

27

Medicare had begun rejecting AlloSure claims as a result of any fraud until, at the earliest, February 2022. *Id.* ¶ 235. The Court finds that Plaintiffs have not alleged falsity as to the risk disclosures.

### vi.    Anonymous Expert Opinions on Revenue

Defendants allege that Plaintiff's reliance on its experts for the assertion that CareDx improperly recognized $117 million in revenue between April 2020 and December 2021 is not pled with sufficient particularity. MTD Mot. at 20-22. Plaintiffs counter that courts do not require the name of an expert at the pleading stage to be credited. MTD Opp'n at 14, n.11. In response, Defendants argue that Plaintiffs now rely on allegations of improper billing from FE-1 and FE-10, but allegations that revenue was improperly obtained is not sufficient to allege that revenue was falsely reported. MTD Reply at 10.

Plaintiffs may rely on unnamed experts at the pleading stage. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022). However, when relying on expert opinions as the basis for pleading securities fraud, plaintiffs must "allege 'with sufficient particularity' that the expert was 'in a position to know' the relevant fact claimed." *Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, No. 18-CV-07669-HSG, 2020 WL 1244936, at *7 (N.D. Cal. Mar. 16, 2020) (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233–34 (9th Cir. 2004)); *see also In re Textainer P'ship Sec. Litig.*, No. C-05-0969, 2007 WL 108320, at *5 (N.D. Cal. Jan. 10, 2007). In *Textainer*, the court held that "[c]onclusory allegations as to an unspecified analysis performed by an unnamed or otherwise identified consultant, and which fail to include any information about the consultant's qualifications, how the analysis was performed, or the data upon which the consultant relied, are inadequate under the PSLRA's heightened pleading standard." *Textainer*, 2007 WL 108320, at *5.

Here, Plaintiff does not allege the "factual content of the information" on which the experts relied in concluding that $117 million of revenue was "improper Medicare sourced revenue." *Textainer*, 2007 WL 108320, at *6. Accordingly, the Court finds that Plaintiffs fail to offer particularized facts demonstrating that CareDx's revenues were false or misleading.

//

//

United States District Court
Northern District of California

### b.      Scienter

Defendants argue that Plaintiffs have failed to properly plead scienter as to any of the individual defendants and accordingly, they have failed to plead scienter as to CareDx, the corporate defendant. MTD Mot. at 8. In contrast, Plaintiffs assert they have properly pled scienter. First, the individual defendants directly participated in the Medicare fraud, by "orchestrating illegal kickbacks and pushing providers to administer medically unnecessary tests in violation of Medicare regulations and the FCA." MTD Opp'n at 17. Second, Defendants admitted they ran their business in a hands-on and detail-oriented manner and had access to the information that undermined their public statements. *Id*. at 18. Third, many of CareDx's most senior executives, including Dr. Maag and Dr. Seeto were warned of illegal conduct by Dr. Olymbios. *Id*. at 20. Fourth, Defendants made highly detailed statements on the subjects concealed by the fraud, suggesting scienter. *Id*. And lastly, Defendants' actions, such as bullying or intimidating employees, support a finding of scienter. *Id*. at 21.

As discussed above, "a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (citation omitted). The plaintiff must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991. "'Deliberate recklessness' is more than 'mere recklessness or a motive to commit fraud.' It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Nguyen v. Endologix, Inc*., 962 F.3d 405, 414 (9th Cir. 2020) (citations omitted) (emphasis in original).

A court must first "determine whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec. Litig*., 768 F.3d 1046, 1056 (9th Cir. 2014). "If none is sufficient alone, [the court] then consider the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id*.; *see also Leventhal v. Chegg, Inc.*, No. 21-CV-09953-PCP, 2024 WL 924484, at *3 (N.D. Cal. Mar. 4, 2024). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. "[T]he inference

United States District Court
Northern District of California

of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### i.    Mr. Dhingra

Defendants argue that Plaintiffs' allegations regarding Mr. Dhingra's state of mind are nonexistent and his resignation in May 2022 is not sufficient to infer scienter, based on the Court's prior order. MTD Mot. at 8. The primary new allegations are from FE-19, who claimed Mr. Dhingra was "unusually involved in the Company's business for a Chief Financial Officer" and "knew what was going on in all aspects of the Company's business. *Id.* at 8-9; SAC ¶¶ 80, 117. And FE-19 asserts Mr. Dhingra was aware of Medicare issues due to certain meetings, but FE-19 did not attend these meetings. MTD Mot. at 9. Regardless, Plaintiffs argue that FE-19 was in a position to know what was discussed at the market access meetings even if he did not attend, because he reported directly to and worked with the CEO, who did attend them. MTD Opp'n at 19, n.14. Plaintiffs argue they have properly pleaded scienter as to Mr. Dhingra, based on FE-19 and Mr. Dhingra's specific denials related to AlloSure tests. *See* MTD Opp'n at 19-21, n.14.

Plaintiff's primary new allegations are from FE-19, a confidential witness. When a complaint relies on confidential witnesses, there are two requirements: (1) the statements must be described with sufficient particularity to establish their reliability and personal knowledge, *i.e.,* whether the complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing facts reported by that witness to the witness' personal knowledge, and (2) those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter. *Zucco*, 552 F.3d at 995.

Under the first prong of the two-part confidential witness test, a complaint may rely on a confidential witness in two situations: (1) where there is confidential witnesses and other evidence, the plaintiffs do not need to name their sources, as long as the other facts provide an adequate basis for believing that the defendants' statements were false; (2) where there are only confidential

United States District Court
Northern District of California

witnesses, courts must consider the level of detail provided by the sources, corroborative nature of other facts alleged, coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia. *Id.*

In *Zucco*, under the first prong, the court found that the confidential witnesses were "not positioned to know the information alleged," with many relying on unreliable hearsay and conclusory assertions of scienter. *Id.* at 997-98. The court also found that the second prong was unmet because confidential witnesses only reflected "motive and opportunity" which without more, is not enough to establish a cogent and compelling inference of scienter. *Id.* at 998-999.

Here, FE-19 states that Mr. Dhingra was "unusually involved in the Company's business for a [CFO]" and that Dhingra "knew what was going on in all aspects of the Company's business and was involved in managing the Company's market access team." SAC ¶¶ 80, 117. These statements are conclusory and do not suggest scienter based on *Zucco*. Like the confidential witnesses in *Zucco*, FE-19 asserts on what was discussed at the market access meetings based on hearsay statements by the CEO.

Assuming FE-19 was positioned to know the information alleged, Plaintiffs argue scienter is alleged because Mr. Dhingra was "unusually involved." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) ("[defendants] were hands-on managers with respect to operational details and financial statements"). But Plaintiffs reliance on *Verifone* is misplaced. In *Verifone*, the assertion that defendants were hands-on managers was but one fact out of several that strongly suggested scienter. *Id.* at 708. For example, the court found that executives stating they relied on optimistic models/projections was implausible, considering the difficulty of a business integration and negative impact on margins. *Id.* Further, the plaintiffs also alleged that the individual defendants personally manipulated the company's reported financials. *Id.* at 708-09.

Plaintiffs next argue that they have plead scienter considering that Mr. Dhingra assured the public there was "no change" related to Medicare billing regarding the falling ASPs and instead gave other causes instead, such as "change in the payer mix." MTD Opp'n at 20-21; SAC ¶¶ 256-258. However, the fact that Mr. Dhingra explained to investors why APSs were declining does not establish a strong inference that he knew those explanations were false. Further, the underlying

31

statement has not been shown to be false. Accordingly, the Court finds that Plaintiffs have not alleged scienter as to Mr. Dhingra.

### ii.    Dr. Maag

Defendants assert Plaintiffs have failed to plead scienter as to Dr. Maag. First, Defendants argue that Plaintiffs rely on allegations from Dr. Olymbios, and they do not describe with particularity the concerns Dr. Olymbios communicated to Dr. Maag. MTD Mot. at 9. Second, Plaintiffs cannot satisfy any "core operations theory" requirements. *Id*. at 10. Third, Plaintiffs' reliance on FE-6 is misplaced because FE-6 left CareDx in July 2020 and was only employed for the first three months of the Class Period. *Id*. at 10. In addition, FE-6's allegations lack sufficient detail. *Id*. at 11.

Plaintiffs claim there is scienter for several reasons. Dr. Maag stated he trained CareDx's sales and marketing personnel. MTD Opp'n at 17. Further, Dr. Maag participated in many of the meeting conferences and marketing events, where CareDx bribed doctors and Dr. Maag personally authorized these "marketing" expenses. *Id*. Dr. Maag also was involved in the business and had access to certain data. *Id*. at 18.

The Court granted motion to strike for Paper Trail Allegations but denied motion to strike for Concern Allegations. *See infra* Section III.B. Accordingly, the Court will not consider the Paper Trial Allegations in determining whether scienter has been adequately plead for Dr. Maag.

Plaintiffs argue that Dr. Maag was repeatedly warned by Dr. Olymbios of the rampant illegal conduct. SAC ¶¶ 24, 89, 97, 141. The Court denied motion to strike for Concern Allegations. *See infra* Section III.B. However, Dr. Olymbios' Concern Allegations are not particularized enough to allege scienter as to Dr. Maag. Plaintiffs do not plead the date or the content of the communications. Instead, Plaintiff merely assert that Dr. Olymbios voiced his "concerns" to Dr. Maag.

Plaintiffs next argue, without explicitly mentioning so, that scienter is alleged under core operations theory. "The core operations theory of scienter relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citations omitted). "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more

corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* (citations omitted).

Defendants argue that the Court already dismissed aspects of the core operations theory in the previous order. MTD Mot. at 10. Defendants argue that allegations that "executives paid close attention to sales of AlloSure," were "apprised of RemoTraC's status," and "attended weekly meetings to discuss sales and marketing issues"—were "not particularized enough to show that [the Individual Defendants] knew that statements regarding RemoTraC were false because RemoTraC involved fraudulently billing Medicare." Prior Order at 13. The Court notes that this discussion in the previous order was in reference to allegations of scienter against Dr. Seeto, but, here, they also apply to Dr. Maag.

Defendants further argue that Plaintiffs, in support for their core operations theory, analogize to cases that involve allegations of monitoring the "'data that were the subject of the allegedly false statements'". *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (scienter where "defendants actually did monitor the data that were the subject of the allegedly false statements"); *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *20 (N.D. Cal. Apr. 18, 2023) (scienter where "executives told investors they had real-time access to, and knowledge of, sales information"). But the present case is distinguishable because the SAC does not allege that Defendants misstated AlloSure's performance. Rather, the SAC alleges that CareDx billed Medicare for AlloSure tests that were not medically necessary. *See* MTD Reply at 5, n.6.

The SAC contains new allegations that Dr. Maag "pushed sales" of AlloSure tests that were not medically necessary and helped instruct and train the sales and marketing teams. SAC ¶¶ 62, 89. From these allegations, Plaintiffs argue that the "only cogent inference that can be drawn from these facts is Defendants either instructed CareDx's salespeople to push AlloSure tests that were medically unnecessary or recklessly disregarded the illegal conduct." MTD Opp'n at 18. However, besides this inference, the SAC does not contain any particularized facts that Dr. Maag's trainings to sales and marketing teams included pushing medically unnecessary tests. Rather, the SAC

speculates as to the contents of the trainings. The Court finds these allegations related to training are insufficient to support a strong inference of scienter.

Plaintiffs also argue that Dr. Maag participated in "meeting conferences" and "marketing events," authorized marketing expenses, and monitored "AlloSure's performance" in "detail." MTD Opp'n at 17–18 (citing SAC ¶¶ 128–30). Plaintiffs analogize to *Mauss v. Nuvavsive, Inc.*, 2016 WL 3681831, at *4 (S.D. Cal. July 12, 2016) ("*Nuvavsive II*"). In *Nuvavsive II*, plaintiff alleges that "[d]efendants engaged in illegal sales, marketing, and billing practices" that violated the FCA and AKS by: (a) providing "kickbacks, in the form of gifts, entertainment, improper commissions and consulting fees, and other remuneration, in order to induce doctors to utilize its products and services and to encourage other doctors to do the same"; (b) conducting "purported 'educational' programs, which as a thinly-disguised kickback system to reward doctors for using [defendant]'s products"; and (c) "submit[ting] false or otherwise improper claims to Medicare and Medicaid" such that their "earnings and revenues were earned, in part, as a result of violations of healthcare fraud and abuse laws." *Id.*

However, the Court agrees with Defendants that *Nuvavsive II* is distinguishable from the present case. In addition to finding that "[d]efendants engaged in illegal sales, marketing, and billing practices", in *Nuvavsive I*, the Court also found that the individual defendants received a written report from the defendant board detailing that physician expenses did not comply with regulations and two confidential witnesses informed an individual defendant about the fraud. *Nuvavsive I*, 2015 WL 10857519, at *5, *11. Similar allegations are not present here. Further, the SAC only alleges that Dr. Maag attended marketing events "where CareDx spent money marketing AlloSure to kidney doctors," which is not alleged to be improper. SAC ¶¶ 129–30. The SAC does not allege that Dr. Maag attended "marketing meetings" in which CareDx "bribed providers with lavish gifts and kickbacks."

Finally, Defendants argue that FE-6's allegations are unreliable. FE-6 alleges that Dr. Maag participated in biannual summits during which CareDx paid for wine and dinners for physicians. *Id.* ¶ 126. However, FE-6 left CareDx in July 2020, and therefore was only employed for the first three months of the Class Period. *Id.* ¶ 126, n.18. Defendants argue that because "many of the statements

United States District Court
Northern District of California

that plaintiffs allege are false and misleading were made after [FE-6] left" CareDx, "[t]here is . . . ample basis to question aspects of [FE-6's] claimed knowledge and [their] effort to impute scienter to the defendants." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020). Plaintiffs counter that FE-1 and FE-19 confirm some of the practices FE-6 perceived continued. For example, FE-1 witnessed similar practices and described how CareDx's sales management personnel took doctors on "booze" cruises, helicopter tours, and expensive vacations SAC ¶ 132. In addition, FE-19 described how lavish expenditures still being given to doctors right up until the Company came under DOJ and SEC scrutiny in late 2021. *Id.* ¶ 133.

Regardless of the parties' contentions regarding FE-6, the Court finds that Plaintiffs have not alleged scienter as to Dr. Maag. Plaintiffs do not sufficiently plead Dr. Olymbios's Concern Allegations. Further, Plaintiffs do not allege sufficient facts to allege core operations theory as to Dr. Maag.

### iii.    Dr. Seeto

Defendants assert that Plaintiffs have failed to plead scienter as to Dr. Seeto. MTD Mot. at 11. Defendants argue that FE-10 was only employed at CareDx during one month of the Class Period and he is not alleged to have communicated with Dr. Seeto, nor reported to him or worked with him. *Id*. As for FE-10's allegations that he "observed the Director of Claims and Seeto often talk about the 50% reimbursement rate with the tests," Defendants argue that this allegation is consistent with the company's disclosures to the public that for reasons unrelated to fraud, as many as 40% to 50% of the tests were not being reimbursed. *Id*. at 12. As for FE-19, Plaintiffs have not sufficiently described FE-19s position, which calls into question FE-19's reliability, and his allegations do not give rise to a strong inference of scienter. *Id*. at 12, n.12. Third, Plaintiffs' reliance on core operations also does not apply to Dr. Seeto. *Id*. at 13.

Plaintiffs argue that their confidential witnesses provide proper support for scienter. For example, FE-19 noted that Dr. Seeto had regular meetings with CareDx's most senior billing executives and knew of CareDx's reimbursement and collection issues with Medicare. MTD Opp'n at 18-19. Plaintiffs also argue that FE-10's knowledge is from firsthand conversations he saw

United States District Court
Northern District of California

35

between Dr. Seeto and Director of claims and his own review of claims. *Id*. at 20. In addition, Dr. Seeto was warned of illegal conduct by Dr. Olymbios. *Id*.

Plaintiffs first rely on FE-10 allegations. FE-10 claimed that "everyone," including Dr. Seeto, knew that "many claims [were] being denied for lacking medical necessity." SAC ¶ 113. FE-10 also claims that reimbursement rates were discussed during regular meetings, including by Defendant Seeto. *Id.* Defendants argue that Plaintiffs allege no particularized facts demonstrating that FE-10 "has reliable personal knowledge of [Dr. Seeto's] mental state." *Zucco*, 552 F.3d at 998. FE-10 was a "claim reimbursement specialist," employed by CareDx for only one month of the Class Period (October 2022), who is not alleged to have "communicated with" Dr. Seeto, reported to him, or even worked with him. MTD Mot. at 11; *See Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, No. 18-CV-07669, 2020 WL 1244936, at *11 (N.D. Cal. Mar. 16, 2020) ("There is no allegation that FE-2 ever communicated with any Individual Defendant, and this 'common knowledge' allegation is only marginally reliable or relevant, so this witness provides no support for an inference of scienter for any Individual Defendant as to any particular statement.").

FE-10 also claimed to have "observed the Director of Claims and Seeto often talk about the 50% reimbursement rate with the tests." SAC ¶ 113. However, this allegation does not lead to a strong inference of scienter as to Dr. Seeto. CareDx had disclosed to the public that its reimbursement rates had declined due to reasons unrelated to the alleged fraud. *Id.* ¶¶ 270-71, 280-81. Dr. Seeto's internal discussions of the declining reimbursement rate does not lead to a strong inference of scienter.

Plaintiffs next rely on FE-19 allegations. As an initial matter, Defendants assert that Plaintiffs fail to sufficiently describe FE-19's position at CarDx. The SAC describes FE-19 as a "high-ranking employee" who "reported directly to Defendant Seeto" from "mid-2021 through the end of 2022." *Id.* ¶ 27 & n.3. Defendants argue that Plaintiffs' failure to identify FE-19's job title, the specific months of FE-19's employment, and what office FE-19 worked in calls into question the reliability of the confidential witness. MTD Mot. at 12. Defendants rely on *Browning v. Amyris, Inc*. In *Browning*, the court discounted a confidential witness identified as simply a "senior scientist." *Browning v. Amyris, Inc*., No. 13-CV-02209, 2014 WL 1285175, at *18 (N.D. Cal. Mar.

24, 2014). However, the Court also noted that the complaint did not allege where the witness worked, when he worked at defendant company, and what he did. *Id.* In contrast, here, Plaintiffs have alleged sufficient facts to show that a person in FE-19 position would have possessed the information alleged.

FE-19 alleges that Dr. Seeto "'absolutely' knew about the Company's reimbursement and collection issues with Medicare." SAC ¶ 115. FE-19 claims that Dr. Seeto attended meetings with senior billing personnel where CareDx discussed attempts to receive "'prior authorization' from doctors for the AlloSure test, *i.e.*, getting the 'medical necessity' authorization that CareDx systematically failed to get." *Id.* ¶ 115. FE-19 claims that he and Dr. Seeto attended "Business Leadership Team" meetings "at which Seeto would have in-depth reasons for upticks in testing volume," "would always attribute any Company success to RemoTraC," and "would make disingenuous remarks about patients." *Id.* ¶¶ 78, 116. However, none of these allegations are particularized enough lead to a strong inference that Dr. Seeto was aware of the misconduct that Plaintiffs allege.

Finally, Plaintiffs also bring the same argument regarding Dr. Olymbios's Concern Allegations. Again, the Court finds these allegations not particularized enough to allege scienter as to Dr. Seeto as Plaintiffs do not plead the date or the content of the communications. *See infra* Section III.C.1.b.ii. Plaintiffs also allege facts related to Dr. Seeto's training of the sales and marketing personnel and marketing events. For the same reasons stated above, the Court finds that these newly added allegations do not give rise to a strong inference of scienter. *Id.* The Court finds that Plaintiffs have not alleged scienter as to Dr. Seeto.

#### iv.    Holistic Review

"Ultimately, *Tellabs* requires courts to assess allegations of scienter holistically." *Chegg*, 2024 WL 924484, at *8. Plaintiffs argue there is scienter based on Defendants' general activities after the SEC and DOJ started to investigate CareDx's misconduct, including intimidation of existing employees. MTD Opp'n at 21. Plaintiffs also note other facts, including AlloSure was CareDx's primary revenue generating product and that some of its executives resigned amid ongoing federal investigations. *Id*. n.16.

37

United States District Court
Northern District of California

In reply, Defendants argue that the individual defendants are not responsible for such actions and these allegations are not tied to the alleged fraud, because as discussed in the first motion to dismiss, Plaintiffs did not allege the fraudulent practice of overbilling Medicare was the subject of the investigations. MTD Reply at 6; Prior Order at 14. Defendants also note there was a lack of a motive to defraud (e.g., insider stock sales) which suggests there was not scienter. MTD Reply at 7.

Even when viewing the allegations holistically, Plaintiffs have failed to allege scienter. As noted in the prior order, the fact that some of the executives resigned does not strongly contribute to a finding of scienter. Prior Order at 11. The Court has also found that the allegations that Dr. Maag and Dr. Seeto directly trained sales and marketing teams to push medically unnecessary tests are not particularized enough to lead to a strong inference of scienter. *See infra* Sections III.C.1.b.ii-iii. Further, the Court found that Dr. Olymbios's, FE-19's, and FE-10's allegations did not contain particularized facts such as the date or the content of the alleged communications. *Id.*

Plaintiffs argue that Defendants' activities after the SEC and DOJ investigations began lead to a strong inference of scienter. After the SEC and DOJ began investigating CareDx's misconduct, management "bullied[,] intimidated, and coerced" employees "to not provide information or misreport information [in] the DOJ investigation." SAC ¶¶ 27, 96. A marketing employee who reported to a C-suite executive explained: "we were terrified for our jobs" if they raised concerns about illegal practices. *Id.* ¶ 30. FE-19 alleges that Erin Tokunaga, an employee who was in charge of the Company's clinical trial management and reported directly to CMO Dholakia, confided in him that she was being bullied by management. *Id.* ¶ 96. However, from the SAC, it is unclear who from management was bullying, intimidating, and coercing employees. The SAC does not contain any particularized facts that describe what the alleged bullying consisted of. These allegations are conclusory and do not give rise to a strong inference of scienter.

### c. Loss Causation

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "[T]he complaint must allege that the defendant's share price fell significantly after the truth became known." *Metzler*, 540 F.3d at 1062 (citation omitted). "To establish loss causation in a fraud-on-the-market case, the plaintiff must show

38

that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (citation omitted).

"The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures. A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id*. at 790 (citations omitted). The Ninth Circuit has described three general rules for corrective disclosures:

> First, a corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency. A corrective disclosure can instead come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters. Second, a corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures. Third, to be corrective, a disclosure "need not precisely mirror the earlier misrepresentation." It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading.

*Id.* (internal citations omitted).

Defendants assert that Plaintiffs rely on six purported corrective disclosures, but Plaintiffs have not established that investors linked any of these disclosures with the discovery of RemoTraC "scheme." MTD Mot. at 23. Further, the Olymbios Complaint was not sufficiently linked to the alleged false disclosures. *Id* at 24. Plaintiffs argue they have adequately pled loss causation. MTD Opp'n at 23. Further, investment analysts linked the investigations to CareDx's declining financial performance. *Id*. And Plaintiffs assert there were also a series of partial disclosures, including the unexpected resignation of executives, filing of a whistleblower complaint, *i.e.*, Olymbios Complaint. *Id*. at 23-24.

In response, Defendants argue that there is no causal connection between the decline in financial performance to the alleged fraud, and the Court previously found that Plaintiffs had failed to connect the disclosures of government investigations, ASP declines, or executive departures to

United States District Court
Northern District of California

39

the alleged fraud. MTD Reply at 14. Defendants also argue that Plaintiffs' reliance on the Olymbios Complaint does not bolster its loss causation arguments. *Id*. at 14-15.

In the previous order, the Court noted that the disclosure of government investigations simply revealed ongoing investigation and not a fraudulent RemoTraC scheme to overbill Medicare. Prior Order at 20. However, a closer look at the disclosure reveals that the investigations were "in connection with a False Claims Act investigation 'regarding certain business practices relating to our kidney testing and phlebotomy services,' as well as 'certain of our accounting and public reporting practices.'" SAC ¶ 252. This suggests that at least some of the investigation relates to False Claims Act concerns, which are related to overbilling Medicare.

Plaintiffs cite to *Evanston Police Pension Fund v. McKesson Corp.* in support of their loss causation argument. 411 F. Supp. 3d 580 (N.D. Cal. 2019). In *Evanston*, Plaintiffs identified four corrective disclosures. *Id.* at 604. Three disclosures were announcements of disappointing financial results or projections, attributed in part to slowing generic drug price inflation. *Id.* The fourth disclosure were two news articles announcing government investigations of generic drug price-fixing. *Id.* The court found that "the government investigation into generic drug price-fixing, combined with [defendant's] disappointing earnings, is sufficient to show that investors would have understood the investigation as a revelation of the collusive activity [defendant's] fraud concealed." *Id.*

Similarly, in in *Lloyd v. CVB Fin. Corp.*, the court concluded that the SAC adequately pleaded loss causation based on a string of events. 811 F.3d 1200, 1210 (9th Cir. 2016). Defendant disclosed the receipt of an SEC subpoena, which resulted in its stock price dropping 22 percent. *Id.* About a month after it announced the SEC subpoena, defendant disclosed that it was charging off millions in loans to its largest borrower. *Id.* "Although [the largest borrower's] stock dropped over 20 percent the day after the announcement about the subpoena, the market reacted hardly at all to [defendant's] disclosure about its largest borrower, confirming that investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of the previous 'no serious doubts' statements." *Id.* The court found loss causation to be plead because "any other rule would allow a

United States District Court
Northern District of California

defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false." *Id.*

The Court finds that the present case is analogous to *Evanston* and *Lloyd*. When considering all the disclosures together, Plaintiffs have sufficiently alleged loss causation. Defendants argue that the disclosure associated with the Olymbios Complaint had a minimal impact on stock price, resulting in a decline of 8 percent in stock price. *See e.g., Corinthian*, 540 F.3d at 1065 (finding no loss causation related to a 10 percent stock decrease because a more plausible reason for the stock price decrease was the defendant's failure to hit prior earnings estimate). However, like in *Lloyd*, the Court views the disclosures together and not in isolation. While the stock price decline of 8 percent is low, Plaintiffs allege prior corrective disclosures that resulted in greater declines in stock price. *See* SAC ¶ 255. Plaintiffs have sufficiently alleged that the market recognized a relationship between any of the disclosures and the fraud.

The Court finds that Plaintiff have sufficiently alleged loss causation. The Court need not address the arguments regarding the "materialization of risk" theory of loss causation.

### 2.    Scheme Liability

Defendants argue that plaintiffs again have failed to plead scheme liability under Rule 10b-5(a) and (c). MTD Mot. at 22. Plaintiffs have failed again to properly plead reliance and they rely on losses related to the challenged statements, not any separate scheme or device. *Id.* Plaintiffs assert that they sufficiently plead scheme liability, based on the allegations that Defendants executed an unlawful scheme to overbill Medicare and approved unlawful kickbacks. MTD Opp'n at 25, n.20.

In order "to state a claim for securities fraud based on scheme liability, a plaintiff must allege: (1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the deceptive or manipulative act; (5) economic loss; and (6) loss causation." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, No. 20-CV-07835-JSW, 2024 WL 1327247, at \*13 (N.D. Cal. Mar. 27, 2024) (citing *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015)). To be individually liable, each defendant must have committed a deceptive or manipulative act in furtherance of the scheme.

United States District Court
Northern District of California

*Id.* In other words, in addition to the elements of a Section 10(b) action, Plaintiffs must show that the Defendants "employed a device, scheme, and artifice to defraud" and "engaged in an act, practice, or course of business that operated as a fraud or deceit." *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101 (2019) (modifications and quotation marks omitted).

Because Plaintiffs have failed to allege scienter, Plaintiffs' have also failed to allege scheme liability. *See infra* Section III.C.1.b. The Court need not address Defendants' other arguments against scheme liability.

### 3.      Section 20(a)

"In order to prove a prima facie case under [Section] 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator . . . ." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). "Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citation omitted). "Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id.* (citation omitted). Because the Court finds that Plaintiffs have failed to properly allege a Section 10(b) and Rule 10b-5 claim, Plaintiffs have likewise failed to allege a Section 20(a) claim.

### IV.    CONCLUSION

In their SAC, Plaintiffs assert that Defendants have violated (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and (2) Section 20(a) of the Exchange Act. The motions before the Court present several disputed legal issues including, among others: whether Plaintiffs adequately alleged falsity; whether Plaintiffs adequately alleged scienter; whether Plaintiffs adequately alleged loss causation; and whether certain allegations sourced from a separate complaint filed by Dr. Michael Olymbios should be struck from the SAC.

For the reasons stated above, and after review and consideration of the motions, oral arguments, relevant legal authority, briefings, attachments and exhibits thereto:

United States District Court
Northern District of California

1. The Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motion to strike.

    a. The Court **GRANTS-IN-PART** Defendants' motion to strike as to paragraph 24 (sentences 4-5) and paragraph 140 (sentences 3-4).

    b. The Court **DENIES-IN-PART** Defendants' motion to strike as to paragraph 24 (sentences 2-3), paragraph 89 (last sentence), paragraph 97 (sentences 2-3), paragraph 127 (sentences 1-3), paragraphs 140 (sentences 1-2), paragraph 141 (sentence 3), and paragraph 260 (sentences 2-6).

    c. Plaintiffs may amend their complaint after conducting an independent investigation as to the stricken allegations.

2. The Court **GRANTS-IN-PART** the motion to dismiss as to the Section 10(b) and Rule 10b-5 claims. The motion to dismiss challenges the elements of falsity, scienter, loss causation, and allegations of scheme liability.

    a. For the element of falsity:

        i. the Court **DENIES-IN-PART** motion to dismiss for statements regarding underwriting representations and statements regarding testing services revenue and historical RemoTraC data.

        ii. The Court **GRANTS-IN-PART** motion to dismiss for statements regarding unmet needs, ASP decline, risk disclosures, and expert opinions. Because amendment is not futile, Plaintiffs may amend their complaint to include particularized facts as to falsity of the dismissed statements.

    b. For the element of scienter, the Court **GRANTS-IN-PART** motion to dismiss for all Defendants. Because amendment is not futile, Plaintiff may amend complaint to include particularized facts regarding the contents of alleged communications and witnesses with direct or at least less attenuated knowledge of these communications.

    c. For the element of loss causation, the Court **DENIES-IN-PART** motion to dismiss. Plaintiffs have sufficiently alleged loss causation.

    d. For the allegations of scheme liability, the Court **GRANTS-IN-PART** motion to dismiss with leave to amend.

43

3. The Court **GRANTS-IN-PART** motion to dismiss on the claim of Section 20(a) with leave to amend.

Plaintiffs may amend its complaint within **14 days** of this Order: namely, no later than **October 2, 2024**.

This Order terminates ECF 89 and 91.

**IT IS SO ORDERED.**

Dated: September 18, 2024

_____

TRINA L. THOMPSON
United States District Judge