ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
ALAINA L. GILCHRIST (335807)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
agilchrist@rgrdlaw.com
        – and –
SPENCER A. BURKHOLZ (147029)
NICOLE Q. GILLILAND (335132)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Case No. 3:22-cv-03023-TLT |
| ) | CLASS ACTION |
| Plaintiff, ) ) | [CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| CAREDX, INC., PETER MAAG, and REGINALD SEETO, ) ) ) | |
| Defendants. ) ) | **DEMAND FOR JURY TRIAL** |

4885-0370-0468.v1

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ....................................................................2

II.   NATURE OF THE ACTION ......................................................................3

III.  JURISDICTION AND VENUE ..................................................................13

IV.   THE PARTIES ..........................................................................................14

      A.    Lead Plaintiffs ...............................................................................14

      B.    Defendants .....................................................................................15

V.    BACKGROUND TO THE FRAUD............................................................16

      A.    The Importance of Whistleblowers in Securities Markets....................16

      B.    Whistleblower Dr. Olymbios Is a Highly Credentialed Medical Doctor Whom CareDx Recruited from One of the Top Medical Facilities in the World ........................................................................................17

      C.    Defendants' "Very Hands-on and Detail-Oriented" Management Style and Their Praise and Rapid Promotion of Dr. Olymbios.............................18

VI.   THE UNDERLYING FRAUDULENT SCHEME........................................25

      A.    CareDx's Most Important Payor, Medicare, Placed Strict Limits on the AlloSure Bills for Which CareDx Could Seek Reimbursement – Only Those with "Clinical Suspicion" of Organ Rejection *Before* Administering AlloSure Qualified for Reimbursement .........................25

      B.    With Its Business Model Threatened by COVID-19, CareDx Develops RemoTraC – a Home Blood Testing "Miracle" – and Purportedly Rescues CareDx's Revenue Growth Story ....................................................28

      C.    CareDx Relied on Rampant Medicare Billing Fraud and Kickback Schemes to Boost Its Testing Services Revenue ...................................29

            1.    CareDx Violated Healthcare Laws by Billing Medicare for Thousands of Medically Unnecessary Tests, Including by Promoting a "Surveillance" Protocol and by Bundling Its AlloSure and AlloMap Tests into Its RemoTraC Home Testing Program .............31

            2.    CareDx Paid Unethical and Improper Kickbacks to Doctors to Encourage Them to Order AlloSure and Enroll Patients in "Studies" that Were Actually Schemes to Bill Medicare for Additional AlloSure Tests........................................................45

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4885-0370-0468.v1

- i -

**Page**

      3.   Defendants Used "Studies" to Fraudulently Bill Medicare for Tens of Thousands of Additional Tests in Violation of the False Claims Act and the Anti-Kickback Statute ...........................................................59

      4.   Dr. Olymbios and Other Employees Directly put Defendants Seeto and Maag on Notice of CareDx's Unlawful Practices, and Defendants Retaliated Against Employees Who Complained...................64

VII.    FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .........70

    A.   April 30, 2020: Quarterly SEC Filing on Form 10-Q and Related Quarterly Conference Call with Analysts and Investors Regarding RemoTraC ..................71

      1.   Continuing to Tout Apparently Legal Business Activity in Violation of Duty to Disclose the Impact of Unlawful Conduct ..............72

    B.   June 9-10, 2020: Desperate for $125 Million, Maag Promises Material "Compliance with Health Care Laws"......................................................................74

    C.   August 4, 2020: CareDx Touts a 41% Increase in Testing Revenue, Pointing to Supposed Legitimate Business Practices While Improperly Omitting Unlawful Conduct's Contribution ............................................78

    D.   October 29, 2020: CareDx Continues Touting Purportedly Lawful Revenue Growth ....................................................................................79

    E.   January 21, 2021: CareDx Doubles Down on Its "Compliance with Health Care Laws" Assurances to Raise Another $175 Million from the Investing Public ...........................................................................................79

    F.   February 18, 2021: The BTIG Investor Conference ...............................................82

    G.   February 24, 2021: CareDx Touts 56% Growth in Revenue Due to Purportedly Lawful Business Activities .....................................................83

    H.   May 5, 2021: First Quarter 2021 Financial Results Report and Conference Call.................................................................................................86

    I.   July 29, 2021: Second Quarter 2021 Quarterly Report and Earnings Call Statements .....................................................................................................88

    J.   October 28, 2021: Third Quarter 2021 Financial Results Conference Call Statements .....................................................................................................89

    K.   February 24, 2022: Fourth Quarter 2021 and Full Year 2021 Financial Results Statements ...........................................................................91

VIII.   ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER ........................................94

    A.   Holistic Overview of Scienter Allegations ............................................................94

**Page**

B.  CareDx's Unlawful Medicare Billing Practices and Kickback Schemes Were Directed by Defendants Seeto and Maag and Pervaded the Company's Entire Business .................................................................97

C.  Dr. Olymbios Directly Raised Concerns About Improper Billing Practices with Seeto, Including During Two Different Meetings in July 2020 and One in August 2020, as Well as with Other Executives and Employees ...........101

D.  Outside Institutions and Internal Presentations Also Put Defendants on Notice of the Impropriety of Their Use of "Studies" to Bill Medicare for Unnecessary Tests.................................................................................103

E.  Defendants Seeto and Maag Personally Signed SEC Filings Attesting They Understood that the Very Types of Conduct in Which They Were Engaged Violated Healthcare Laws, Including the False Claims Act, the Anti-Kickback Statute, and the Stark Law ..........................................................104

F.  Defendants' Deliberate Avoidance of Creating a Paper Trail Supports Scienter ................................................................................................106

G.  Defendants' Pattern of Retaliation Against Employees for Raising Concerns and Pressuring Employees Not to Cooperate With Investigations Supports Scienter ................................................................................107

H.  Defendants' Unlawful and Unsustainable Practices Were Central \to the Business and the "Core Operations" of the Company .........................................108

IX.  LOSS CAUSATION.................................................................................108

A.  The Six Corrective Disclosures Under the Ninth Circuit's *First Solar* Proximate Causation Doctrine ............................................................109

1.  October 28, 2021: CareDx Simultaneously Announces Multiple Government Investigations and Falling ASPs ...........................................109

2.  April 15, 2022: CareDx Senior Executive Dr. Olymbios Publicly Blows the Whistle on Defendants' Fraudulent Business Practices .........112

3.  May 5, 2022: Testing Revenue Continues to Plummet .........................112

4.  May 23, 2022: CareDx's Chief Financial Officer Suddenly Resigns......115

5.  September 1, 2022: CareDx's Chief Marketing Officer Abruptly Resigns................................................................................................115

6.  November 3, 2022: 50% of Tests Are Rejected for Reimbursement ......115

7.  Post-Class Period Events Further Confirm that Defendants Defrauded Investors and Caused Their Losses .........................................118

1

2                                                                                    **Page**

3

4        B.      Materialization of Concealed Risks Under the Ninth Circuit's *First Solar*
                 Proximate Causation Doctrine ..............................................................................121

5        C.      November 1, 2023: The Company Announces Seeto's "Stepping Down"
                 as CEO, Effective that Day ...................................................................................124

6
    X.    CLASS ACTION ALLEGATIONS ........................................................................124

7
    XI.   UNDISCLOSED ADVERSE INFORMATION ......................................................126

8
    XII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR .....................................126

9
    XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-

10        MARKET AND *AFFILIATED UTE* DOCTRINES) ........................................127

11  XIV.  COUNTS AGAINST DEFENDANTS ....................................................................128

12  COUNT I ............................................................................................................................128

13  COUNT II ..........................................................................................................................131

14  XV.   PRAYER FOR RELIEF ........................................................................................132

15  XVI.  JURY DEMAND .................................................................................................132

16  ATTESTATION PURSUANT TO LOCAL RULE 5-1(i)(3) ................................................133

17

18

19

20

21

22

23

24

25

26

27

28

1    Lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers
2    Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief &
3    Retirement Fund (together, "Lead Plaintiffs" or "Plaintiffs"), by and through their attorneys, allege
4    the following upon information and belief, except as to allegations concerning Lead Plaintiffs, which
5    are alleged upon personal knowledge.  Lead Plaintiffs bring this federal securities class action on
6    behalf of all persons or entities who purchased CareDx, Inc. ("CareDx" or the "Company") common
7    stock between April 30, 2020 and November 3, 2022, inclusive (the "Class Period"), against CareDx
8    and certain of its officers seeking to pursue remedies under the Securities Exchange Act of 1934,
9    15 U.S.C. §78a, *et seq.* ("Exchange Act").

10    Plaintiffs' information and belief are based upon, among other things, their counsel's
11    investigation, which includes, without limitation: (a) review and analysis of public filings made by
12    CareDx with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of
13    press releases and other publications disseminated by Defendants (defined below) and other parties;
14    (c) review of news articles, shareholder communications, conference calls, and postings on CareDx's
15    website concerning the Company's public statements; (d) interviews with numerous former CareDx
16    employees; (e) review of other publicly available information concerning the Company and the
17    Individual Defendants (defined below); (f) expert economic analyses; (g) expert accounting
18    analyses; (h) expert medical analyses; (i) independent investigation of the factual bases of
19    Plaintiff/Petitioner Michael Olymbios' ("Dr. Olymbios") Complaint and Petition for Declaratory
20    Judgement, filed April 15, 2022 in the case titled *Olymbios v. CareDx, Inc.*, No. 22-civ-01582 (Cal.
21    Super. Ct. San Mateo Cnty.) ("Olymbios Complaint") via email communication from Dr. Olymbios
22    himself and five discussions with Dr. Olymbios (via counsel) confirming that Dr. Olymbios is the
23    source of the facts set forth in this Complaint and that they are based on his personal knowledge, as
24    further corroborated by former CareDx employees and other sources; (j) the whistleblower
25    complaint filed under seal in the U.S. District Court for the Eastern District of New York, *U.S. v.*
26    *CareDx, Inc.*, No. 1:21-cv-0774-AMD-LKE, ECF 1 (E.D.N.Y. Feb. 12, 2021) ("Whistleblower
27    Complaint"), and recently unsealed for public viewing on October 7, 2024; and (k) a direct
28    conversation held between Dr. Olymbios, his counsel, and counsel for Lead Plaintiffs, during which

1  Dr. Olymbios expressly confirmed that numerous specified allegations herein are based on his

2  personal knowledge and are accurate.

3        Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), all discovery in this

4  action has been stayed because Defendants have pursued motions to dismiss this action since its

5  inception.  15 U.S.C. §78u-4(b)(3).  Accordingly, Lead Plaintiffs do not have access to Defendants'

6  internal documents or other information uniquely or primarily within Defendants' possession, and

7  such information is difficult or impossible to acquire absent further discovery.  Lead Plaintiffs

8  believe their factual contentions herein will likely have additional evidentiary support after a

9  reasonable opportunity for discovery.

10  **I.  PRELIMINARY STATEMENT**

11        1.  Lead Plaintiffs file this Third Amended Complaint ("TAC") to follow the Court's

12  determinations in its September 18, 2024 Order Granting in Part and Denying in Part Defendants'

13  Motion to Strike and Motion to Dismiss the Second Amended Complaint (ECF 123) (the "Order").

14  The Order determined Lead Plaintiffs had adequately established that Defendants made materially

15  false and misleading statements to investors, sustaining "statements regarding underwriting

16  representations and statements regarding testing services revenue and historical RemoTraC data."

17  Order at 43.  The Order further found that Lead Plaintiffs had "sufficiently alleged loss causation."

18  *Id.*

19        2.  However, the Court ultimately granted Defendants' motion to dismiss Lead Plaintiffs'

20  Second Amended Complaint (ECF 81) ("SAC") on scienter grounds.  *Id.*

21        3.  To address the Court's determinations in the Order, the TAC: (a) removes allegations

22  concerning certain of the statements the Court determined were not actionable on falsity grounds

23  (Order at 43); (b) removes former CFO Ankur Dhingra as a named defendant (*id.* at 30-32);

24  (c) retains allegations concerning certain of the statements the Court determined were adequately

25  alleged to be materially false and misleading (*id.* at 43); and (d) provides numerous additional facts

26  supporting a strong and compelling inference of Defendants' scienter.  Further, the TAC alleges an

27  additional statement is materially false and misleading based on information uncovered by Lead

28  Plaintiffs' investigation since the filing of the SAC.

4.      Notably, since the filing of the SAC, Lead Plaintiffs have obtained new facts from, *inter alia*, Dr. Olymbios' detailed 80-page Whistleblower Complaint filed in the U.S. District Court for the Eastern District of New York.  The Whistleblower Complaint was previously under seal by court order, and not publicly available in any form, until it was unsealed and made available to Lead Plaintiffs and the public on October 7, 2024.  To the extent the TAC relies in part on allegations from the Whistleblower Complaint, Lead Plaintiffs undertook an extensive and thorough independent investigation of each of those facts alleged herein, including, *inter alia*, directly and independently confirming each of those facts in a call between Dr. Olymbios, Dr. Olymbios' counsel, and Lead Plaintiffs, and corroborating those allegations through additional interviews with former CareDx employees and other facts learned throughout Lead Plaintiffs' investigation.

5.      As alleged further below, Lead Plaintiffs' investigation since the SAC has uncovered additional facts confirming scienter for Defendants Maag and Seeto.  These facts include specific meetings between Dr. Olymbios and Defendant Seeto, in which Dr. Olymbios informed Seeto about Dr. Olymbios' significant concerns that CareDx was improperly billing Medicare, as well as numerous other facts demonstrating that Defendants Maag and Seeto were aware of the impropriety of their billing practices, kickbacks to medical providers, and other conduct that violated applicable healthcare laws.

## II.      NATURE OF THE ACTION

6.      Lead Plaintiffs in this action are retirement funds representing the retirement savings of some 40,000 firefighter, police, sheet metal, and electrical workers.  Their financial security in retirement after many years of service depends, in part, on honest securities markets.  Companies like CareDx continuously access the public stock markets in the United States to raise money from investors like retirement funds and households.

7.      Lead Plaintiffs and thousands of other investors – households, pension and retirement funds, and countless others – turned to the stock market to attain their financial goals; specifically, in *this* case, they invested in CareDx.  If the Company's public representations were to be believed, CareDx was generating revenue lawfully by sending bills to Medicare to pay for a novel blood test for kidney patients.

8.      In truth, the Company was a "house of cards generating revenue through illicit conduct" that included paying improper kickbacks to doctors to order medically unnecessary tests, then turning around and submitting the fraudulent bills to the U.S. taxpayer (via Medicare) to reimburse.  Some *50%* of the bills that the Company sent to Medicare were fraudulent, amounting to a material amount of fraudulent bills over the course of the Class Period in this case.  That is a lot of capital for a Company that spent more money than it earned.

9.      Because the Company was a money-losing enterprise, it was important for CareDx to report revenue, giving investors hope that it might turn a profit someday soon.  The Company's main revenue-generating product is a blood test called "AlloSure" that costs *$2,841 per test*.  AlloSure is a relatively novel test that aims to detect kidney rejection in kidney transplant recipients.  Unlike the routine, inexpensive "standard of care" blood tests for post-operative kidney patients that cost about $22 per blood test, AlloSure is not a routine, "standard of care" test.

10.     CareDx's top payor, by far, during the relevant time was Medicare.  Medicare's regulations allowed CareDx to bill it for tests if – *and only if* – the tested patients had *already shown* "clinical suspicion of rejection" of their transplanted kidneys *before* any AlloSure test.  In other words, in order to be paid for its high-priced tests, CareDx was supposed to show Medicare that a doctor had already found the patient was at serious risk of losing his or her transplanted kidney.

11.     Medicare's strict payment conditions made it difficult for CareDx to generate significant profits.  Indeed, CareDx has lived beyond its financial means since its inception, spending more money on things like marketing and salaries – including tens of millions of dollars in compensation for its senior executives – than it earns billing its high-priced flagship AlloSure test to Medicare.

12.     In February 2020, CareDx filed its 2019 annual report, which revealed the Company lost $21.97 million in 2019.

13.     That same month, CareDx's CEO, Defendant Maag, wrote to a key witness, Dr. Olymbios, who was on CareDx's "Business Leadership Team" and reported to Defendant Seeto (then President and later CEO of the Company).  Maag's message to Dr. Olymbios made clear the

1   pivotal role that Dr. Olympios played at CareDx: "Within a few months you had a ***tremendous***

2   ***impact*** in our organization."

3       14.     Then COVID hit in March 2020, a catastrophe for nearly everyone.  But Defendants

4   Maag and Seeto reported a "miracle" to investors: a blood-testing business that sent phlebotomists

5   into patients' homes who otherwise could not leave due to COVID.  They called the new business

6   "RemoTraC."

7       15.     RemoTraC was Maag's idea.  On April 30, 2020, Maag touted the results of this

8   apparently lawful business.  He told the investing public that the business accounted for "over 50%"

9   of the Company's testing revenue and lifted the Company's revenue back in line with its pre-COVID

10  revenue.  Analysts praised the results as a "resounding success."

11      16.     Members of CareDx's top business leadership team also praised the results.  On

12  May 1, 2020, Dr. Olympios – whom the Company had recruited from a world-renowned medical

13  center – wrote to Defendant Seeto to discuss an analyst report that had praised RemoTraC's

14  "miraculous" impact on the Company's financial results:

15
16  **Message**

    From:             Michael Olympios [molympios@caredx.com]
16  on behalf of      Michael Olympios <molympios@caredx.com> [molympios@caredx.com]
    Sent:             5/1/2020 9:30:00 AM
17  To:               Reg Seeto [rseeto@caredx.com]
    Subject:          Re: Fyi. CDNA | COVID-19 Changes the Base, but Not the Growth Story
18  Attachments:      43dd0d44-0e34-4408-8ece-bab2c752e01f@bluematrix.png

19
    Congratulations Reg. At Mitsubishi, I was taught that a rising tide lifts all the boats and only during times of
20  crisis can we differentiate top performing management teams. I feel privileged to work under you as a masterful
    strategist and executive.  Getting us back to pre-COVID numbers within such a short space of time is
21  miraculous.

22      17.     On that same day, May 1, 2020, Seeto promoted Dr. Olympios to run sales of

23  AlloSure – the Company's most important product – which was now largely administered via

24  RemoTraC and billed to Medicare.  Dr. Olympios thereafter reported to Defendant Seeto directly, in

25  accordance with Maag's desire to continue promoting Dr. Olympios.

26      18.     With his RemoTraC team in place, Maag aggressively marketed his "miraculous"

27  scheme to investors like the firefighter, police, electrical, and sheet metal workers retirement fund

28  plaintiffs in this case – but the RemoTraC business model was a fraud.  Under RemoTraC, the

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT                                          - 5 -
4885-0370-0468.v1

1     Company would administer "standard monitoring tests" (which **are** medically necessary) **only if**

2     patients also took the AlloSure tests at the same time (which **are not** medically necessary unless a

3     patient is already showing warning signs of rejecting an organ transplant). In other words, CareDx

4     improperly conducted the AlloSure tests with **every** RemoTraC order – regardless of whether

5     AlloSure was medically necessary for each patient. Numerous former CareDx executives, doctors,

6     and other professionals explained how the scheme worked.

7         19.     For example, a medical doctor who worked at CareDx during the relevant period as

8     Senior Medical Science Liaison explained that Defendants used RemoTraC to complete medically

9     **necessary** tests so that they could also complete **unnecessary** AlloSure tests and then unlawfully

10    charge Medicare for the spurious AlloSure tests. CareDx was systematically "doing the very

11    expensive CareDx labs on the **same cadence** of the home labs," which "was totally unethical" – as

12    the doctor explained – while also noting: "***We were doing tests that cost at least 8X of what they***

13    ***should have been and [doing them] on patients that did not need these tests***." It was sales

14    personnel, not clinical personnel, who determined "what labs should be done and how often." *Id.*

15    "The nurses **were obligated** to not only do the screening labs but [also] our AlloSure test," and the

16    "doctors [in the field] liked using [CareDx's blood-testing] service but there was **no way** to use us

17    without ordering our [AlloSure] test as well." *Id.* CareDx was thus "bundling in AlloSure just to

18    bill for it, which was **totally inappropriate**." The Company's scheme violated the False Claims Act,

19    31 U.S.C. §§3729-3733, by design. As such, it was also entirely unsustainable, as once the Centers

20    for Medicare & Medicaid Services ("CMS") caught on, it would no longer continue to reimburse

21    CareDx's improper claims at the levels CareDx had previously experienced.

22         20.     Another medical professional explained how CareDx bribed doctors to enroll their

23    patients in the Company's unlawful and excessive testing program. The Company paid medical

24    doctors $35,000 to $40,000 **per patient** to enroll the patients into CareDx's testing program. These

25    payments were part of the Company's standard kickback program: "booze" cruises, helicopter tours,

26    expensive vacations, phony advisory boards, limousines, wine tastings, and Napa boondoggles.

27    Defendant Maag's own secretary saw him pay for some of these lavish gifts and kickbacks, and

28

1    Maag has already admitted under oath that he signed "all" of these and other checks.  These

2    payments violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7b.

3        21.    Defendant Maag's and Defendant Seeto's signatures appear on public filings attesting

4    to their knowledge of the substance of the relevant legal duties he was obligated to follow.  These

5    laws and regulations were not complicated: they prohibited spending money on doctors in hopes of

6    influencing their medical decisions, and they prohibited submitting medically unnecessary bills to

7    Medicare.  Defendants Maag and Seeto violated these laws, as they knew or recklessly disregarded

8    when making contrary statements to the investing public, such as the retirement fund plaintiffs in

9    this case.

10       22.    Despite these systematic, unlawful, and unsustainable practices, Defendants

11   repeatedly assured the investing public that they fully complied with the Anti-Kickback Statute, the

12   False Claims Act, and other laws, knowingly or recklessly ignoring the fact they were already

13   systematically violating those laws through rampant kickbacks to doctors and fraudulent Medicare

14   billing.

15       23.    Defendants' practice of paying kickbacks consumed great quantities of cash.  By

16   June 2020, CareDx had about a year's worth of cash left before going bankrupt.  On June 9-10, 2020

17   – desperate to shore up the Company's dwindling cash and his own personal holdings – Maag asked

18   the investing public for more money: ***$125 million*** through a public stock offering.  Maag signed a

19   number of documents that he had the Company file publicly to raise the money.

20       24.    Maag made a series of important public representations to secure the $125 million.

21   Among other documents the Company disseminated to the public under Maag's control, was a

22   "Material Definitive Agreement" with the underwriters that was necessary for Maag to sell the

23   $125 million in stock to investors.  CareDx was required by SEC regulations to file the agreement

24   publicly so investors could review it in connection with their decision regarding whether to purchase

25   CareDx stock in the public offering.  Maag signed the document attesting that he, his subordinates,

26   and the Company were all in material compliance with "***all health care laws***," including the Anti-

27   Kickback Statute and the False Claims Act.  That was a material lie, and Maag knew it because,

28

1    among other reasons, he personally signed checks violating the Anti-Kickback Statute to induce

2    doctors to order CareDx's medically unnecessary AlloSure tests in violation of the False Claims Act.

3         25.    In addition, one misrepresentation led to another.   Now sitting on another

4    $125 million in public investors' retirement savings, Defendants Maag and Seeto attributed expense

5    and revenue growth to legitimate business practices knowing full well that unlawful conduct

6    materially increased expenses (kickbacks) and revenue (false claims).  These and similar statements

7    were materially false and misleading because they failed to disclose that unlawful conduct fueled the

8    Company's growth.

9         26.    Indeed, Defendants' unlawful and unsustainable conduct materially drove the

10   Company's reported revenue.[1]  Given this illegitimate revenue growth, hope increased that CareDx

11   would soon turn profitable.  In turn, the Company's stock price skyrocketed ***more than 330%***,

12   reaching a near-all-time high close of $95.11 per share on June 28, 2021, versus roughly $22 per

13   share at the start of the COVID-19 pandemic.  As of today, CareDx's stock price is approximately

14   $24 per share, a far cry from the fraudulently inflated Class Period highs.

15        27.    After taking the helm of CareDx's AlloSure sales, Dr. Olymbios began to observe the

16   unlawful conduct pervasive in the Company's business.  Accordingly, Dr. Olymbios repeatedly

17   warned CareDx's most senior executives, including Defendants Maag and Seeto, about this

18   misconduct.  However, these executives "***brushed off his concerns or berated him for raising them***

19   ***in the first place***."  Indeed, Defendant Maag "***took active measures to avoid creating a paper trail***

20   ***of their misconduct***."  Maag further expressly warned Dr. Olymbios that "***there were certain things***

21   ***that shouldn't be put in writing***."  Notably, another former CareDx employee who personally knew

22   Dr. Olymbios recently corroborated that Dr. Olymbios raised these concerns.

23        28.    Significantly, since the filing of the SAC, striking new information has come to light

24   confirming and corroborating that Dr. Olymbios reported his concerns about unlawful and

25   unsustainable Medicare billing directly to Defendants.  Specifically, the highly detailed 80-page

26   Whistleblower Complaint – unsealed and made publicly available for the first time only on

27   ---

[1]    Specific quarters in a fiscal year are designated by the quarter number followed by the letter Q.
28   Thus, 2Q 2021 indicates CareDx's second quarter in fiscal year 2021.

1  October 7, 2024 – unequivocally confirms that Dr. Olymbios directly reported his concerns about

2  these unlawful practices to Defendant Seeto during two different specific meetings in July 2020, and

3  Dr. Olymbios has personally and independently confirmed these facts in a call with Lead Plaintiffs'

4  counsel.  First, Dr. Olymbios and Defendant Seeto held a meeting in July 2020 in New York City,

5  during which Dr. Olymbios "*placed Seeto . . . on notice that he believed CareDx was committing*

6  *fraud on the government*."  In a second meeting that same month – a "regularly scheduled one-on-

7  one meeting [between Olymbios and Seeto] by telephone in or about July 2020" – "*Dr. Olymbios*

8  *raised [those same] concerns about billing Medicare for Surveillance AlloSure*."  Dr. Olymbios

9  also reported these concerns to another high-ranking executive – Director of Reimbursement

10  Danielle Scelfo – in a July 2020 discussion, wherein Scelfo agreed with Dr. Olymbios that billing

11  Medicare for "surveillance" (*i.e.*, regular and frequent) use of AlloSure *was not medically necessary*

12  (which meant it violated the False Claims Act and other healthcare laws).

13          29.     The Whistleblower Complaint further alleged detailed facts, directly confirmed by

14  Dr. Olymbios with Lead Plaintiffs' counsel in *this* case, demonstrating CareDx's pattern of systemic

15  improper conduct and violation of healthcare laws.  Indeed, CareDx built its business on submitting

16  false claims to the Centers for Medicare and Medicaid Services ("CMS"), which: (a) lacked medical

17  necessity under the applicable Medicare rules (which approved billing *only* for "clinical suspicion of

18  rejection"); (b) were tainted by CareDx's pervasive kickbacks to medical providers – including

19  unrestricted grants, sham advisory boards, lavish dinners, luxury vacations, and other financial

20  incentives paid to providers – all of which violated federal and state anti-kickback statutes; and

21  (c) were further tainted by kickbacks in the form of free mobile phlebotomy services and waivers of

22  copayments further designed to induce physicians to continue prescribing CareDx's tests.  As facts

23  alleged in the Whistleblower Complaint (and confirmed by Dr. Olymbios) make clear, Defendants

24  not only directed these practices but recognized CareDx's business was dependent on them.  As

25  Defendant Seeto told Dr. Olymbios: "*[W]e (CareDx) would have been ruined if we did not push*

26  *surveillance (AlloSure)*."

27          30.     Further, as set forth below, numerous former employees – including multiple former

28  CareDx employees interviewed since the filing of the SAC – corroborated these allegations.  Indeed,

one newly interviewed former employee, FE-21 – who was personally involved with setting up expensive, lavish events that CareDx coordinated for doctors – has corroborated that Defendant Seeto (like Defendant Maag) **knew about, authorized, and personally attended these events**, where the Company spent hundreds or even **thousands of dollars per doctor** (plus travel expenses) to entice those doctors to prescribe CareDx's tests.  As the employee summarized, CareDx "**had a bunch of cash, and we could basically buy [the doctors'] business**."  Tellingly, Defendant Seeto **personally directed** employees to conceal the expenses by: (a) treating them as educational events and not part of the Company's sales budget, even though they were actually just sales events involving kickbacks to doctors; and (b) making the amount spent per doctor look much smaller than it really was by **pretending that the dinners were attended by five times as many people than actually attended**.  These expenditures were obvious violations of the Anti-Kickback Statute and other federal and state laws, and Defendants knew it.  At one such dinner attended by Seeto, a C-level executive stood up and boasted to the attendees: "**This is how we run meetings.  This is what we do at CareDx.  So, if you want more dinners just keep using CareDx**."

31.    In addition, another newly interviewed former employee, FE-20, described sales training meetings **attended by Defendant Seeto**, wherein sales personnel were instructed that AlloSure **always** had to be ordered as part of RemoTraC (regardless of medical necessity), a directive that came from the "**top down**."

32.    Government investigations started to bring CareDx's scheme to light, forcing the Company to make information public that directly related to its fraud and that caused investors' losses.  On October 28, 2021, for example, the Company filed a quarterly report revealing for the first time that the Company was the subject of two federal government investigations: (a) a civil investigative demand ("CID") from the U.S. Department of Justice ("DOJ") requesting the Company produce documents in connection with "a **False Claims Act** investigation being conducted by the DOJ regarding certain business practices related to [CareDx's] **kidney testing and phlebotomy services**"; and (b) a subpoena from the SEC in relation to an investigation by the SEC regarding

1  "matters *similar* to those identified in the CID, as well as certain of our accounting and *public*

2  *reporting practices*."[2]

3        33.     In response to these disclosures, CareDx's stock price was decimated, plummeting

4  more than 27% the next trading day, from a closing price of $70.34 per share on October 28, 2021 to

5  a closing price of $51 per share on October 29, 2021.  Analysts responded in kind, with an

6  October 29, 2021 BTIG analyst report noting: "The fact that [CareDx] is being investigated by three

7  different entities, both federal and at the state level, is notable.  Based on our experience, disclosures

8  of these sort typically bear some degree of merit . . . ."  Five other disclosures related to Defendants'

9  fraud entered the market during the Class Period, likewise causing investor losses.

10        34.     Government investigations did not suddenly transform CareDx into an ethical

11  company, however.  In late 2021, Erin Tokunaga – who was in charge of clinical trials at CareDx –

12  confided in another high-ranking former employee "*that she was being bullied[,] intimidated, and*

13  *coerced to not provide information or misreport information [in] the DOJ investigation*."  This

14  other high-ranking employee ("FE-19") reported directly to, and worked closely with, Defendant

15  Seeto.  FE-19[3] explained how Ms. Tokunaga worked directly under the Company's Chief Medical

16  Officer ("CMO"), Sham Dholakia.  Ms. Tokunaga told FE-19: "*The pressure was so pervasive*

17  *[from management]*.  She said that she was going to hire her own attorney.  She mentioned this

18  multiple times to me."  FE-19 further explained that much of the bullying was coming from CMO

19  Dholakia himself.  FE-19 also observed: "*There was a pervasive lack of accountability and ethics*

20  *at the company in every which way*.  Overall, everything fit the pattern of not caring about how to

21  operate a business in an ethical and legal way."

22        35.     FE-19 also confirmed that Defendant Seeto was fully aware of billing practices at the

23  Company and any issues they caused.  FE-19 said Seeto "absolutely" knew about the Company's

24

25  [2]  The Company received an informational request from a state agency that did not concern False Claims Act violations.

26  [3]  FE-19 worked closely with and reported directly to Defendant Seeto from mid-2021 through the

27  end of 2022, when he was laid off due to the Company's declining revenue as a result of difficulties in getting reimbursed for tests.  FE-19's responsibilities included working with the CEO in

28  managing day-to-day operations of the business and creating strategies to drive growth.

1    "reimbursement and collection issues [with Medicare, which] *were pervasive*," and there was

2    "nothing" about which Seeto did not know.

3        36.    Dr. Olymbios made the Company's illicit practices publicly known in an April 2022

4    complaint filed in California state court, in which he described in detail the Company's "***unlawful***

5    ***campaign – bolstered by [unlawful] inducements to physicians, misleading research, and***

6    ***recommendations for clinically unsupported treatment – to pad its sales***." Dr. Olymbios further

7    described how, in order to "***maximize potential revenue associated with AlloSure***, CareDx

8    executives engaged in various forms of clinical and marketing schemes in an effort to justify

9    AlloSure's use, even when that use ***lacked clinical support***." In other words, Dr. Olymbios

10    confirmed that CareDx improperly billed Medicare for unnecessary tests that were not supposed to

11    be covered.

12        37.    Another senior executive who reported directly to a C-Suite company official (FE-11)

13    confirmed that Dr. Olymbios was "vocal" about his Medicare billing concerns while he worked for

14    the Company and said many other employees who didn't raise concerns only refrained from doing so

15    because "***we were all terrified for our jobs***."

16        38.    Dr. Olymbios reviewed the first amended complaint filed in this case that included

17    the direct quotations from Dr. Olymbios' California state court complaint alleged herein.

18        39.    In addition to recently confirming facts alleged herein directly to Lead Plaintiffs'

19    counsel, Dr. Olymbios previously personally affirmed his allegations in an email to Lead Plaintiffs'

20    counsel:

21

22

23

24

25

26

27

28

**From:**          Michael <michael.olymbios@gmail.com>
**Sent:**          Thursday, January 26, 2023 10:27 AM
**To:**            Shawn Williams; Jason Davis
**Subject:**       CareDx complaint

EXTERNAL SENDER
Dear Mrs. Williams and Davis,

I am writing to you with interest in your amended complaint filed on behalf of shareholders of CareDx against the company and its executives. I am Michael Olymbios, the former employee referenced in your complaint. I was relieved to see that other former employees were willing to come forward to corroborate my observations.

I write to offer my full cooperation in your investigations and in your case. Peter Maag, Reg Seeto, Sasha King and Sham Dholakia are crooks. They are despicable people with no regard for anyone–shareholder or patient. They continue to retaliate against me personally. Seeto is burning through CareDx's cash on personal legal vendettas. The entire enterprise is a house of cards, generating revenue through illicit conduct as you have found.

I wish you the best in your case.

With best regards,
Michael Olymbios
███████████

       40.     The retirement funds that serve as Lead Plaintiffs in this case bring this action to recover the retirement investments they lost as a result of Defendants' running "a house of cards" that was "generating revenue through illicit conduct."

## III.   JURISDICTION AND VENUE

       41.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

       42.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the Exchange Act, 15 U.S.C. §78aa.

       43.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act, 15 U.S.C. §78aa. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public,

1    and the omission of material information, occurred in substantial part in this judicial district as

2    CareDx is headquartered in this District.

3         44.    In connection with the acts, transactions, and conduct alleged herein, Defendants,

4    directly and indirectly, used the means and instrumentalities of interstate commerce, including the

5    U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

6    **IV.    THE PARTIES**

7         **A.    Lead Plaintiffs**

8         45.    Lead Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police")

9    provides retirement and related benefits for qualified police officers and their beneficiaries in the

10   state of Oklahoma.  As of July 2022, Oklahoma Police had more than 10,000 active members and

11   retirees and more than $3 billion in assets under management.  As set forth in the certification filed

12   previously, incorporated by reference herein, Oklahoma Police purchased CareDx common stock

13   during the Class Period and suffered damages as a result of the federal securities law violations and

14   false and/or misleading statements and/or material omissions alleged herein.

15        46.    Lead Plaintiff Sheet Metal Workers Local 19 Pension Fund ("Local 19") provides

16   retirement benefits to approximately 40,000 active and retired employees in Pennsylvania, New

17   Jersey, and Delaware.  As of July 2022, Local 19 had approximately $500 million in assets under

18   management.  As set forth in the certification filed previously, incorporated by reference herein,

19   Local 19 purchased CareDx common stock during the Class Period and suffered damages as a result

20   of the federal securities law violations and false and/or misleading statements and/or material

21   omissions alleged herein.

22        47.    Lead Plaintiff Local 353, I.B.E.W. Pension Fund ("Local 353") manages

23   approximately CAD $2.4 billion in assets on behalf of 13,000 active members, retirees, and

24   beneficiaries who are members of the International Brotherhood of Electrical Workers working in a

25   variety of electrical disciplines across central Ontario.  As set forth in the certification filed

26   previously, incorporated by reference herein, Local 353 purchased CareDx common stock during the

27   Class Period and suffered damages as a result of the federal securities law violations and false and/or

28   misleading statements and/or material omissions alleged herein.

1    48.    Lead Plaintiff Beaumont Firemen's Relief & Retirement Fund ("Beaumont Fire")

2    provides benefits to approximately 420 active members and their beneficiaries in Texas.  As of July

3    2022, Beaumont Fire had approximately $120 million in assets under management.  As set forth in

4    the certification filed previously, incorporated by reference herein, Beaumont Fire purchased CareDx

5    common stock during the Class Period and suffered damages as a result of the federal securities law

6    violations and false and/or misleading statements and/or material omissions alleged herein.

7    **B.    Defendants**

8    49.    Defendant CareDx is incorporated under the laws of Delaware with its principal

9    executive offices located in Brisbane, California.  CareDx's common stock trades on the Nasdaq

10   Stock Market ("NASDAQ") under the ticker symbol "CDNA."

11   50.    Defendant Peter Maag ("Maag") was CEO of CareDx from 2012 through

12   November 2020 and Executive Chairman from November 2020 through October 2021.  Defendant

13   Maag signed the Company's SEC filings in his roles as CEO and Executive Chairman.

14   51.    Defendant Reginald Seeto ("Seeto") has been CEO of CareDx since November 2020,

15   when Defendant Maag transitioned to Executive Chairman until he transitioned to the role of Senior

16   Advisor to the Chairperson on November 1, 2023.  Defendant Seeto signed the Company's SEC

17   filings in his role as CEO.

18   52.    Defendants Maag and Seeto (together, the "Individual Defendants"), because of their

19   positions with the Company, possessed the power and authority to control the contents of the

20   Company's reports to the SEC, press releases, and investor conferences and calls.  The Individual

21   Defendants were provided with copies of the Company's reports and press releases alleged herein to

22   be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent

23   their issuance or cause them to be corrected.  Because of their positions and access to material

24   nonpublic information available to them, the Individual Defendants knew the adverse facts specified

25   herein had not been disclosed to, and were being concealed from, the public and the positive

26   representations being made were then materially false and/or misleading.  The Individual Defendants

27   are liable for the false and misleading statements pled herein.

28   53.    The Company and Individual Defendants are collectively referred to as "Defendants."

1    **V.    BACKGROUND TO THE FRAUD**

2        **A.    The Importance of Whistleblowers in Securities Markets**

3        54.    As long as governments have been paying for goods and services, sellers have been

4    defrauding them.  Because government enforcement alone cannot catch or prevent every instance of

5    fraud, the SEC has specifically emphasized that internal whistleblowers who come forward to report

6    wrongdoing are essential to protecting the interests of investors in the securities markets.

7    "Whistleblowers make a tremendous contribution to the agency's ability to detect securities law

8    violations and protect investors in the marketplace."[4]

9        55.    After a Congressional investigation during the Civil War revealed "'stupendous

10   abuses' in the sale of provisions and munitions to the War Department," Congress passed the False

11   Claims Act, which "imposes civil liability on any person who presents false or fraudulent claims for

12   payment to the Federal Government."  *United States ex rel. Polansky v. Exec. Health Res., Inc.*,

13   No. 21-1052, 599 U.S. 419, slip op. at 1-2 (June 16, 2023) (quoting H.R. Rep. No. 2, 37th Cong., 2d

14   Sess., pt. 2, p. II (1861)).  Civil plaintiffs may bring actions on behalf of the government and share in

15   the recovery of damages.  *Id.*  In addition to the False Claims Act, following the financial crisis of

16   2008-2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank")

17   created the SEC's current whistleblower program.  *See* 15 U.S.C. §78u-6.  Through the program,

18   those who come forward with information concerning violations of the securities laws are eligible to

19   receive compensation from the government in an amount between 10% and 30% of the ultimate

20   recovery or damages award the government collects as a result of the information provided by the

21   whistleblower.  *See id.*

22           Since the [whistleblower] program's inception, enforcement matters brought using
             information from meritorious whistleblowers have resulted in orders for nearly
23           $5 billion in total monetary sanctions, including more than $3.1 billion in
             disgorgement of ill-gotten gains and interest, of which more than $1.3 billion has
24           been, or is scheduled to be, returned to harmed investors.

25   2021 Annual Report at 2.

26

27   ---
     [4]   SEC Office of the Whistleblower 2021 Annual Report at 1 ("2021 Annual Report"),
28   https://www.sec.gov/files/owb-2021-annual-report.pdf.

1    56.    Because whistleblowers may cause employers to lose ill-gotten revenue,

2    whistleblowers face the threat of retaliation and may have trouble finding future employment in their

3    industries.  The decision to come forward, therefore, is an extraordinarily fraught one; those who

4    take their concerns to the government might be, in effect, ending their careers.  Incentive awards, as

5    well as robust anti-retaliation provisions, are designed to compensate for that risk.  *See* 17 C.F.R.

6    §240.21F-17(a) ("No person may take any action to impede an individual from communicating

7    directly with the Commission staff about a possible securities law violation, including enforcing, or

8    threatening to enforce, a confidentiality agreement . . . with respect to such communications.").  As

9    of the end of 2021, the SEC had prosecuted four defendants for breach of its anti-retaliation rules.

10   *See* 2021 Annual Report at 26 (so stating).

11   57.    Because the misconduct whistleblowers reveal is, by definition, material information

12   not previously known publicly, whistleblowers frequently feature in subsequent securities fraud

13   suits, in which investors seek to recoup the losses they have suffered as a result of that same

14   misconduct.

15   **B.    Whistleblower Dr. Olymbios Is a Highly Credentialed Medical Doctor**
     **Whom CareDx Recruited from One of the Top Medical Facilities in**
16   **the World**

17   58.    CareDx recruited Dr. Olymbios to join the Company on July 1, 2019.  Previously,

18   Dr. Olymbios worked at the Heart Transplant Program of Cedars-Sinai Medical Center in Los

19   Angeles - a world-renowned medical center and top-three heart surgery program in the United

20   States.  Dr. Olymbios has also researched and published extensively on organ transplantation, and

21   his work has been published in multiple highly respected medical journals, including the *American*

22   *Journal of Transplantation*.  Dr. Olymbios has published 25 articles on organ transplantation, and

23   his research has been cited in hundreds of other research works.  He also co-authored the

24   international guidelines for the Management of Antibodies in Heart Transplant, an International

25   Society for Heart and Lung Transplantation consensus document.

26

27

28

59.     Dr. Olymbios attended medical school in the United Kingdom at Imperial College London,[5] a highly ranked global university and a top global university for surgery.  He also trained at the Royal Brompton and Harefield Hospitals in London, which together make up the largest specialist heart and lung center in the United Kingdom.  Royal Brompton Hospital is consistently ranked among the top specialized hospitals in the world.  In short, Dr. Olymbios is a highly accomplished medical doctor with a record of success in medicine and business.

**C.     Defendants' "Very Hands-on and Detail-Oriented" Management Style and Their Praise and Rapid Promotion of Dr. Olymbios**

60.     CareDx paid Defendants Maag and Seeto millions of dollars in compensation to operate the Company's business during the relevant time.  They ran the business in a hands-on, detail-oriented manner and were involved in praising and promoting Dr. Olymbios up the corporate ladder.

61.     In connection with a lawsuit between CareDx and one of its primary competitors, Maag testified he was CEO and Chairman of the Company during the 2012-2021 period, prompting counsel to ask him: "did you *remain* heavily involved in the decision making at CareDx?"  Maag responded: "No, absolutely.  You know, *I think it's very important, I think my team would call me being very hands-on and detail-oriented, so, yes, I was very involved.*"

62.     Maag was aware Medicare was the Company's most important revenue source.  Maag was asked a question about this point at trial in another case: "Did CareDx have to do anything to gain reimbursement for sales of AlloSure?"  Maag responded: "Yeah.  I would say that this was the pivotal study for us *to get reimbursement from Medicare, which is the most important payer* for this patient population."

63.     Maag also was personally involved in AlloSure marketing.  He testified at trial in another case that CareDx marketed AlloSure to "about 250, 300 transplant centers in the country" with "five to ten nephrologists per center."  During the trial, Maag was asked: "Did *you personally authorize the expenditures* to educate the market on AlloSure?" In response, Maag stated: "*Yes.*

---

[5]    Natera re Olymbios PDF.

1    You know, we have the **hiring of our field force and making sure that they have the materials**

2    **available** for them.  That was in **my oversight**."

3           64.    Starting at least by 2019, CareDx's executive team – led by Maag – was intensively

4    focused on marketing AlloSure.  Maag testified after its main competitor (Natera) entered the market

5    in early 2019, it was "very important to understand that this [AlloSure marketing] was **all hands-on**

6    **deck**.  This [AlloSure product] was **the one product, the one growth driver** for the company.  And

7    somebody was attacking our most important product."  During the trial, Maag was asked: "Did **you**

8    **monitor** AlloSure's performance in the transplant centers after [another company's] marketing

9    campaign commenced [in early 2019]?"  Maag responded: "**Yes**, absolutely.  I think **we have a very**

10   **detailed monitoring of the use of our product**."

11          65.    Maag stayed directly involved in marketing AlloSure during the relevant period.  As

12   Maag testified: "As I mentioned earlier, you know, this [AlloSure test] is our **most important**

13   **product**.  This is the **most important activity**.  So **I was intricately involved** in making sure that we

14   have the resources allocated."  Further, when asked: "How did – in **2019 through 2021**, what was

15   **your role** authorizing [marketing] expenditures to combat the loss of sales and information out

16   there?"  Maag responded: "As I mentioned earlier, you know, this [AlloSure test] is our **most**

17   **important product**.  This is the **most important activity**.  So **I was intricately involved** in making

18   sure that we have the resources allocated."

19          66.    AlloSure accounted for **90%** of all sales and marketing costs, as Maag averred in

20   another case.  At trial, Maag was asked: "In terms of the percentage of the sales and marketing spend

21   that was for AlloSure as compared to the AlloMap product, did you give the breakdown?"  Maag

22   responded: "It's **90 percent** that we spend all of our activities on AlloSure."

23          67.    Defendants Maag and Seeto also had detailed reporting available to them.  As Maag

24   testified: "there's numerous spreadsheets available for me within the company.  Like you just saw,

25   one of the 10K that that is originally originated in a[n] Excel spreadsheet.  There are numerous

26   spreadsheets available to us."

27          68.    Shortly after CareDx persuaded Dr. Olymbios to leave his work at Cedars-Sinai

28   Medical Center to join the Company, in October 2019, senior management promoted Dr. Olymbios

to a new position – Head of Medical Marketing.  There, he reported to the Company's Chief Marketing Officer, Sasha King.  Following his promotion, Dr. Olymbios was responsible for producing marketing materials, planning and executing events, determining CareDx's marketing messaging, and producing recorded materials designed to sell AlloSure to physicians.  In this role, Dr. Olymbios was also responsible for training CareDx's field team, which required him to work closely with sales representatives, medical science liaisons, patient care managers, and field representatives, who were responsible for engaging in scientific discussions with healthcare practitioners to provide a deeper scientific understanding of CareDx's offerings.

69.    Maag, Seeto, Dr. Olymbios, and other senior management were engaged in the details of marketing AlloSure.  Maag testified in another case that he was involved in giving instructions to the sales and marketing teams, and CareDx expended "*6 to $8 million for analysis*, planning, execution, *engagement from the senior management to; direct* the field force."  Maag was also asked *how* he knew so many details about the Company's sales and marketing activities during the 2019-2021 period.  When questioned: "In terms of these numbers that you provided, how did *you* know this?" Maag responded: "You know, for example, the field force and the customer-facing activities, *I am very clear*, they're responsible every quarter.  *We are managing the field force very detailed* call planning, *where* do they go, *who* do they speak to, which transplant center do they go to.  So *I have a very good understanding* of the resource allocation on these."

70.    Maag and Seeto helped create CareDx's marketing materials.  Regarding a marketing document, Maag testified: "You know, this is where there are many, many people involved in creation of those.  You have to think about that there's hundreds, *if not a thousand*, e-mails going back and forth *between senior leadership team and the marketing team on creating such a document*."  These and other facts show Seeto and Maag – as senior leadership overseeing marketing – were ultimately responsible for the contents of the marketing materials CareDx used to promote its products and services and whether and how to communicate those marketing materials publicly.

71.    Further, in the above-mentioned legal action between CareDx and one of its main competitors, CareDx designated Dr. Olymbios to testify about the foregoing document and others

1   like it.  In his testimony, Dr. Olymbios proved knowledgeable about the purpose of the marketing

2   documents, their messages, and intended audiences.  With regard to a "two-page flyer" focused on

3   AlloSure, for example, Dr. Olymbios testified: "The purpose of this flyer is to really counter some of

4   the marketing claims that were being made around this time by [a competitor, Natera] on the

5   [AlloSure competing test's] assay where they were saying that there were superior performance

6   characteristics" when compared with AlloSure.  Dr. Olymbios further testified CareDx released or

7   made the marketing document public in "January 2020."

8          72.    Dr. Olymbios further testified about the ways the CareDx marketing team was

9   instructed to use the January 2020 marketing document – *i.e.*, the document touting AlloSure was

10  "FULLY COVERED BY MEDICARE."[6]  Dr. Olymbios testified for CareDx:

11         [T]his [marketing document] was instructed to – what we call not be a leave-behind,
           meaning that it wasn't to be left with anyone, rather used reactively in response to
12         any discussion around Prospera with a salesperson or medical science liaison present
           to talk through, and really as *a visual aid for a discussion* rather than something to
13         be left behind or distributed.

14  Dr. Olymbios' testimony is significant because it shows he was sufficiently senior at CareDx to

15  know the details of Company-wide marketing strategies and practices.

16         73.    Defendants Maag and Seeto praised Dr. Olymbios' positive impact on the Company.

17  On February 19, 2020, for example, Maag praised Dr. Olymbios for the "tremendous impact"

18  Dr. Olymbios had on the CareDx organization:

19

20

21

22

23

24

25

26  _____
    [6]   Dr. Olymbios' testimony focuses on the "FULLY COVERED BY MEDICARE" marketing
    document identified above, which CareDx marked confidential and then filed publicly.  The
27  document was quoted at Dr. Olymbios' examination, "AlloSure Analyzes Transplant Specific SNPs
    Across 100% of Somatic Chromosomes," and the document itself provides at the top of the second
28  page: "AlloSure Analyzes Transplant Specific SNPs Across 100% of Somatic Chromosomes."

**From:** Peter Maag <pmaag@caredx.com>
**Sent:** Wednesday, February 19, 2020 10:02:29 PM
**To:** Michael Olymbios <molymbios@caredx.com>
**Subject:** Reaching out

Michael,
I wanted to make sure that you know that I am fully supportive of what ever you decide to do. This goes beyond CareDx. Within a few months you had a tremendous impact in our organization. My only regret is that I have not had the chance to spend more time with you.
Go do - I have you back whatever you choose to do!
Peter

74.    The foregoing email suggests Dr. Olymbios was considering leaving CareDx at the time, and Defendant Maag wanted him to stay at CareDx.  Maag's email was well received:

**From:**      Michael Olymbios on behalf of Michael Olymbios <molymbios@caredx.com>
**To:**        Peter Maag
**Subject:**   Re: Reaching out
**Date:**      Thursday, February 20, 2020 10:10:00 AM

Dear Peter – I am humbled and touched that you would take the time to reach out. I am so proud that someone of your stature views me as valuable to the organization. I am a passionate person and I like to immerse myself in what I do. That being said, I am doubly passionate when I am able to be part of an organization that I so strongly believe in and truly share in its vision – which is very much the case at CareDx. I am in awe of what you have built in the CareDx we see today.

I have learned a great deal from you and Reg, and I too hope that I can spend more time with you as well. Of course, I understand your time is precious but I feel as though there is so much I could learn by being in your presence and in turn give back to CareDx.

█████████████████████████████ I really appreciate that you have my back. I hope you also know that the same goes for me.

With best regards,
Michael

75.    Following Maag's praise of Dr. Olymbios, there are internal documents reinforcing the obvious: Dr. Olymbios was included in marketing and business strategy decisions at the highest levels.  On March 24, 2020, for example, the Company's Chief Marketing Officer, Sham Dholakia, emailed Dr. Olymbios about a draft paper the Company was developing for external marketing purposes.  Regarding the March 24, 2020 email, Dholakia was asked why he wanted Dr. "Olymbios to contribute to your strawman paper" – the "strawman paper" being an important draft marketing document focused on AlloSure.  Dholakia responded that he "wanted to share the ideas within the group about how people were feeling."  This shows Dr. Olymbios' medical views were valued at the highest levels of the Company along with his commercial expertise.

1    76.    More internal communications show how senior management focused on investors'

2    responses to the Company's marketing and AlloSure business strategy and how senior management

3    included Dr. Olymbios in its inner circle.  Following the April 30, 2020 quarterly call, for example,

4    Defendant Seeto internally circulated analysts' positive commentary to CareDx's Business

5    Leadership Team, including Dr. Olymbios.  The analysts' report commented on CareDx's quarterly

6    results: "Importantly, management called out weekly volumes nearly reaching pre-COVID levels

7    from earlier in the year at this point, implying volume recovery has been material.  **With RemoTraC**

8    **now accounting for more than 50% of daily volume vs 10% prior, the company has shown an**

9    **ability to adapt**."  "**Strong Buy**."

10    77.    Seeto's April 30, 2020 email to Dr. Olymbios and others circulating the positive

11    RemoTraC coverage stated: "**Congrats All**"

12    78.    On **May 1, 2020**, Dr. Olymbios responded:

13    From:          Michael Olymbios [molymbios@caredx.com]
     on behalf of    Michael Olymbios <molymbios@caredx.com> [molymbios@caredx.com]
14    Sent:          5/1/2020 9:30:00 AM
     To:            Reg Seeto [rseeto@caredx.com]
15    Subject:       Re; Fyi. CDNA | COVID-19 Changes the Base, but Not the Growth Story
     Attachments:   43dd0d44-0e34-4408-8ece-bab2c752e01f@bluematrix.png

16

17    Congratulations Reg. At Mitsubishi, I was taught that a rising tide lifts all the boats and only during times of
     crisis can we differentiate top performing management teams. I feel privileged to work under you as a masterful
18    strategist and executive. Getting us back to pre-COVID numbers within such a short space of time is

19    miraculous.

20    79.    **That very day** – May 1, 2020 – Defendants Maag and Seeto promoted Dr. Olymbios.

21    They elevated Dr. Olymbios to the most important commercial position in the Company – second

22    only to their own positions.  Specifically, they promoted Dr. Olymbios to be the Head of Community

23    Nephrology and required Dr. Olymbios to continue his responsibilities as a member of the Business

24    Leadership Team.  Dr. Olymbios, in his new position, oversaw the teams responsible for: (1) **selling**

25    **AlloSure** to community nephrologists working in transplant centers, community hospitals, private

26    clinics, and healthcare systems; and (2) overseeing the **clinical studies of AlloSure**.

27    80.    The timing of Dr. Olymbios' May 1, 2020 promotion to run the AlloSure sales and

28    clinical businesses is important because, by May 1, 2020, the newly launched AlloSure delivery

1   project, RemoTraC, had been up and running for six weeks.  That Dr. Olymbios was trusted to run

2   the nephrology testing business lends credence to his later statements denouncing the unethical and

3   improper RemoTraC scheme to defraud Medicare.

4          81.     Internal Company communications demonstrate that Defendants Maag and Seeto

5   personally were involved in training the Company's sales and marketing personnel alongside

6   Dr. Olymbios and that Dr. Olymbios was part of the "Leadership Team" with Maag and Seeto, as

7   demonstrated in the following email on October 2, 2020:

> **From:** Greg Quinn <gquinn@caredx.com>
> **Date:** Friday, October 2, 2020 at 16:07
> **To:** Michael Olymbios <molymbios@caredx.com>, Sham Dholakia <sdholakia@caredx.com>, Peter Maag
> <pmaag@caredx.com>, Reg Seeto <rseeto@caredx.com>, Jay Milton <jmilton@caredx.com>
> **Cc:** Ashley Harris <aharris@caredx.com>
> **Subject:** FW: Thank you!
>
> Leadership Team,
> Thanks so much for your support this week at training week…it was really impactful and meaningful to the new hires –
> see below.
>
> They are certainly setup for success, now it is time to execute!
>
> Thanks Ashley for coordinating a tremendous week!
>
> ---
>
> **Greg Quinn | Senior Vice President – Testing Services**
> **CareDx, Inc. |** *Your Partner in Transplant Care*
> Email: gquinn@caredx.com | Mobile: +1 925.209.0963 | Phone: +1 415.287.2542 | www.CareDx.com

8

9

10

11

12

13

14

15

16          82.     The Leadership Team – comprised of Dr. Olymbios and Defendants Maag and Seeto

17   – helped train the Company's marketing and sales executives ("TASs" or "Transplant Account

18   Specialists," in Company jargon).

19          83.     FE-19, who worked closely with, and reported directly to, Defendant Seeto during

20   Seeto's tenure as CEO, said Defendant Seeto had a very hands-on management style, just as

21   Defendant Maag had.  He said Seeto was the type of person who, if he recognized any risk, would

22   have been hands on and requested daily updates.  For example, he described weekly "Business

23   Leadership Team" meetings Seeto and other executives attended, at which Seeto would have in-

24   depth reasons for upticks in testing volume in a particular week, month, or quarter.  FE-19 attended

25   these Business Leadership Team meetings himself and even ran some of them.

26          84.     FE-19 said Seeto also had regular meetings with the senior CareDX employees who

27   had oversight of billing, including Elsie Garza (Senior Director of Revenue Cycle Management),

28

1  Savita Devlin (Project Manager), and Alex Johnson (Chief Business Officer and Head of Testing
2  Services).

3      85.    FE-19 also noted Ankur Dhingra ("Dhingra"), who served as the Company's Chief
4  Financial Officer ("CFO") at the time, was unusually involved in the Company's business for a
5  Chief Financial Officer.  He said Dhingra, like Seeto, knew what was going on in all aspects of the
6  Company's business and was involved in managing the Company's market access team, even though
7  this had nothing to do with his official duties as CFO.

8  **VI.    THE UNDERLYING FRAUDULENT SCHEME**

9      86.    While CareDx and its leadership were publicly touting RemoTraC and the strength of
10  the Company's AlloSure testing business to investors in order to sell them stock, behind the scenes
11  the Company was engaged in an undisclosed scheme and fraudulent course of conduct.  Defendants
12  plied medical professionals with improper incentives to influence them to order medically
13  unnecessary AlloSure tests costing $2,841 each, and also surreptitiously bundled medically
14  ***unnecessary*** AlloSure blood draws with "standard of care" blood draws that ***were*** medically
15  necessary and cost $22 each, performed by ***other*** Companies (such as Quest) and not by CareDx.
16  The scheme was confirmed not only by Dr. Olymbios (as described above) but by numerous other
17  former employees with relevant direct firsthand knowledge of Defendants' fraud.

18      **A.    CareDx's Most Important Payor, Medicare, Placed Strict Limits on
            the AlloSure Bills for Which CareDx Could Seek Reimbursement –
19            Only Those with "Clinical Suspicion" of Organ Rejection *Before*
            Administering AlloSure Qualified for Reimbursement**
20
21      87.    CareDx relied on payments from Medicare to grow revenue during the Class Period.

22      88.    CareDx made a few, non-standard blood tests that – like other, standard tests that
23  other companies made – tested transplant patients' blood for indications that the patient might be
24  rejecting an organ.  The Company's testing services business line represented at least 85% of its total
25  revenues since the beginning of 2020.  The Company's financial success in this regard relied
26  primarily on a single blood test – AlloSure Kidney – which is designed to detect signs of kidney
27  transplant rejection by measuring levels of donor DNA in the recipient's bloodstream.  As Defendant
28

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT                                    - 25 -
4885-0370-0468.v1

1    Maag testified in a separate litigation, he spent 90% of the Company's marketing budget on

2    AlloSure – "***the one product, the one growth drive[r] for the company,***" as Maag put it.[7]

3         89.    CareDx's testing services business in turn relied heavily on payments from the

4    taxpayer-funded medical program Medicare, which represented as much as 70% of the Company's

5    testing services revenue, and as much as 60% of the Company's overall revenue, during the Class

6    Period.    Medicare was critical to CareDx's testing business for several reasons.    Indeed, as

7    Defendant Maag himself averred during trial testimony in the CareDx-Natera litigation, ***Medicare***

8    was "***the most important*** payer for this [AlloSure] patient population."

9         90.    However, Medicare ostensibly only agreed to reimburse patients' AlloSure tests on a

10   "conditional" basis.  Specifically, under the applicable CMS regulations, CareDx's AlloSure Kidney

11   test was ***only*** "covered to assess the probability of allograft rejection in kidney transplant recipients

12   ***with clinical suspicion of rejection*** and to inform clinical decision-making about the necessity of

13   renal biopsy ***in such patients*** at least 2 weeks post-transplant in conjunction with standard clinical

14   assessment."[8]  In other words, Medicare would reimburse CareDx's flagship AlloSure Kidney test

15   ***only if*** a doctor had already determined that a patient had other warning signs of potential transplant

16   rejection.  Medicare would ***not*** reimburse for the AlloSure Kidney test if it was used merely as a

17   regular, periodic surveillance test for ordinary transplant recipients who did not show other warning

18   signs or rejection.

19        91.    Maag has testified that he and other senior CareDx leaders trained the Company's

20   salesforce.  He said "that you call in all of the field force, have a costs; training, and have a face-to-

21   face interaction with them, making sure that they know exactly how to use that material."  Maag

22   testified:

23            [A]ll these 25 individuals live in different places in the United States because they
             live in – close to the transplant centers; so they are scattered all over.  ***And when you***
24           ***train them, we bring them all together.***

25   ──────────────
     [7]    Defendant Maag and other CareDx executives testified at trial in April 2022, in *CareDx, Inc. v.*
26   *Natera, Inc.*, C.A. No. 19-662 CFC, ECFs 344-6, 367-8 (D. Del.) ("CareDx-Natera Litigation").  The
     litigation primarily concerned claims and counterclaims between the two companies regarding
27   alleged false advertising.

28   [8]    *See* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=38355.

If we do that for just one evening or a day, it'll be at a Chicago airport where everybody flies in very centrally, or when it becomes so important because this [*AlloSure test*] was – *again, I just have to stress, this was the inner making of the company.* This was our lead product, our biggest gross product.

So *we bring them in for a two-day meeting* and spend two days with them. Some of them have to fly in earlier because of the time zone, and so this becomes a significant expense for *us to train* these 25 employees.

Then in addition, *obviously*, people *from headquarters will fly into these meetings* as well. So very quickly, there's our meetings with 35, 40 people in the central location in a hotel in the United States.

92.    Emails corroborate Maag's testimony about his personal role in training salespeople. On October 2, 2020, for example, a CareDx salesperson wrote about a "great week of training" wherein "the entire leadership team was present." This was uncommon in the industry:

**From:** Sarah James <sjames@caredx.com>
**Sent:** Friday, October 2, 2020 1:02 PM
**To:** Greg Quinn <gquinn@caredx.com>
**Subject:** Thank you!

Hi Greg,

Thank you for such a great week of training! I am more enthusiastic than ever about our offering and already making waves in my territory. The future is bright!
In all of my years in medical sales, I have never been to a training where the entire leadership team was present. Seriously, it was truly amazing to have you all there. It made us feel fully supported and welcomed. Thank you! I truly feel at home at CareDx and so incredibly grateful to be here!

**Sarah James, RN, BSN** | Transplant Account Specialist - Community Nephrology
**CareDx, Inc.** | *Your Partner in Transplant Care*
Email: sjames@caredx.com | 415-287-2300 x5273 or cell 415-238-9569 | www.CareDx.com

93.    It was important that the "entire leadership team" was present at sales trainings – consistent with Maag's own testimony on this subject – because of the substance of the training itself. Substantively, and with regard to RemoTraC in particular, FE-2[9] observed that "if a center that I was dealing with wanted a RemoTraC, the only way [CareDx] would send out one of our groups of phlebotomists was if they also did the AlloSure." According to FE-2, this was routinely discussed during the regular *weekly regional meetings* involving the sales, research, and laboratory

---

[9]    FE-2 worked as a Lead Clinical Research Associate during the second half of 2021 and is a registered nurse. FE-2's responsibilities included creating, distributing, negotiating, and reviewing essential regulatory documents, including informed consent forms. To do so, FE-2 worked with CareDx's cross-functional legal partners on clinical trial agreement negotiations. In addition, FE-2 attended weekly Zoom calls with sales teams and medical screening teams.

teams attended by FE-2 and others.  As Dr. FE-1[10] explained: "The **nurses were obligated** to not only do the screening labs but our AlloSure test" – "**sales drove everything**," the medical doctor explained.  Other former employees provided similar detailed facts that sales personnel required **both** "standard of care" testing **and** AlloSure testing at the same cadence, notwithstanding the fact, as Dr. FE-1 explained, that patients were having AlloSure testing done monthly (with the standard tests) even though there was **no medical reason** for the AlloSure test to be done at all, much less monthly.  "Even on the clinical side, **sales pushed** what labs should be done and how often," Dr. FE-1 observed.

94.    The fact that **sales pushed AlloSure** tests that were not medically necessary "to make money" (per FE-2 and others) is significant because **Maag, Seeto and other senior leaders pushed sales**.  In other words, facts link Maag, Seeto and other senior leaders to the unlawful conduct at issue: namely, pushing salespeople to push sales of medically unnecessary AlloSure tests knowing (or recklessly ignoring the fact) that the vast majority of those bills would be presented to Medicare for payment – payment to which the Company was not entitled, but collected anyway.  Or, as Dr. Olymbios succinctly wrote, the Company was "generating revenue through illicit conduct." Even though Dr. Olymbios point-blank told Maag and Seeto about this illicit conduct, they "brushed off" his concerns or "berated" him for one simple reason: the illicit conduct was their idea.

**B.    With Its Business Model Threatened by COVID-19, CareDx Develops RemoTraC – a Home Blood Testing "Miracle" – and Purportedly Rescues CareDx's Revenue Growth Story**

95.    As COVID-19 increasingly shut down many medical services in the United States, transplant volumes began to decline, as immunocompromised patients avoided hospitals and delayed medical procedures.  Even patients who had already received transplants – also typically immunocompromised – avoided non-essential medical tests and treatments.  Accordingly, analysts and investors grew increasingly concerned that CareDx's growth would correspondingly halt.

---

[10]    Dr. FE-1 worked at CareDx from May 2021 through January 2022 as a Senior Medical Science Liaison. Dr. FE-1 reported directly to the Company's Chief Medical Officer, Sham Dholakia, for a period of time and then indirectly through Dr. Grigoriy Shekhtman, another senior executive, to Dholakia.  Dr. FE-1 chose to leave CareDx because of its unethical practices. The genders of certain confidential former employees discussed herein have been changed to male to protect their anonymity.

96.     In order to assuage investor concerns, CareDx reacted quickly, rushing in a mere matter of days to develop a new home blood testing (or "mobile phlebotomy") program it dubbed RemoTraC.  As Defendant Maag would later claim in a June 2020 earnings call, RemoTraC was born "out of . . . necessity" and inspired by "a phone call at midnight from a transplant center in New York, [that] said, 'Peter, how can I continue to support our transplant patients as they cannot come into Manhattan and visit our transplant center?'":

> And so the CareDx team came in and said, "How can we provide mobile phlebotomy services to these patients that are now need their regular surveillance visit?"  And we constructed an offering where we're not only testing AlloMap and AlloSure, but we are also testing all blood-based information required by that center and provide that back by a mobile phlebotomy or a home blood draw solution called RemoTraC.  And within [a] very short period of time, 150 transplant centers had the same issues, and we were partnering with them to provide this mobile phlebotomy service.

97.     As discussed below, propelled by RemoTraC's apparent success, CareDx's stock price skyrocketed to an all-time high of $95.60 per share on June 28, 2021 – *an increase of more than 330%* over its price of approximately $22 per share at the beginning of the COVID-19 pandemic.  The Individual Defendants took full advantage of the stock price inflation from their fraud, with Defendants Maag and Seeto alone selling more than $30 million worth of CareDx stock combined.

**C.     CareDx Relied on Rampant Medicare Billing Fraud and Kickback Schemes to Boost Its Testing Services Revenue**

98.     While Defendants attributed CareDx's financial success to demand for its testing services and the popularity of its RemoTraC home testing program, in reality, CareDx's testing services growth relied almost entirely on unethical and improper schemes to bill Medicare fraudulently for unnecessary tests and pay kickbacks to doctors.  Among its many unlawful and improper practices, Defendants took advantage of its RemoTraC home testing program to systematically push its expensive AlloSure tests – each of which cost Medicare $2,841 – on patients who did not need the test and did not meet Medicare's criteria for receiving them.  CareDx brazenly administered and billed Medicare for these tests as often as *once a month for each patient* when most of those patients showed *no signs of organ rejection* and thus had no approved medical

1    indication for them whatsoever. In so doing, CareDx was able to bill Medicare **tens of thousands of**

2    **dollars per year** for each of these patients without any justification.

3        99.    CareDx achieved this end in large part by bundling its AlloSure tests with a panel of

4    routine blood tests that it would offer in-home, through mobile phlebotomists (many of whom were

5    being paid illegal kickbacks for each blood draw they took). Defendants then engaged in

6    obfuscatory and improper requisition and billing practices to get approval and to bill Medicare for

7    the unnecessary tests.

8        100.    Further, Defendants engaged in a widespread scheme of paying kickbacks to

9    phlebotomists in exchange for blood samples, and plying doctors with lavish gifts, trips, and dinners,

10   to promote enrollment in AlloSure, meanwhile failing to report any of these payments in violation of

11   the Sunshine Act.[11] In addition, Defendants bribed doctors to enroll their Medicare patients in large

12   scale studies that CareDx then used as a pretext to bill Medicare for even more unnecessary tests.

13   Indeed, as demonstrated by facts independently confirmed by Dr. Olymbios, CareDx engaged in a

14   pattern of systemic violation of healthcare laws by submitting false claims to CMS that, *inter alia*:

15   (a) lacked medical necessity under the applicable Medicare rules (which approved billing **only** for

16   "clinical suspicion of rejection"); (b) were tainted by CareDx's pervasive kickbacks to medical

17   providers – including unrestricted grants, sham advisory boards, lavish dinners, luxury vacations,

18   and other financial incentives paid to providers – all of which violated federal and state anti-

19   kickback statutes; and (c) were further tainted by kickbacks in the form of free mobile phlebotomy

20   services and waivers of copayments further designed to induce physicians to continue prescribing

21   CareDx's tests.

22       101.    Significantly, as described further below, the Company's most senior officers,

23   including Defendants Seeto and Maag: (a) knew about CareDx's extensive use of so-called

24   "surveillance" testing, whereby CareDx routinely tested patients with no medical necessity

25

26   [11]   The Physician Payments Sunshine Act section of the Patient Protection and Affordable Care Act
     of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, also known as
27   the "Sunshine Act," required CareDx to report any payments or transfers of value to physicians and
     other medical providers to regulators and also required public disclosures of those payments in a
28   public database. CareDx systematically failed to abide by the Sunshine Act.

1   whatsoever; (b) actually directed the use of such testing; and (c) **knew the Company's financial**

2   **results depended on "surveillance" testing**, which was improper under Medicare's coverage rules.

3   Indeed, as Dr. Olymbios himself confirmed in **this** case, Defendant Maag once confided in

4   Dr. Olymbios, during a July 2020 business meeting in New York City, that "**we (CareDx) would**

5   **have been ruined if we did not push surveillance (AlloSure)**."

6       102.    Moreover, as further detailed below, numerous former employees, including

7   Dr. Olymbios himself, have independently corroborated these facts.  Indeed, Lead Plaintiffs'

8   investigation has already confirmed that numerous other CareDx employees – including

9   Dr. Olymbios and other high-ranking executives – raised concerns directly to the Individual

10  Defendants and other senior CareDx executives that the Company's Medicare billing practices and

11  kickback schemes violated healthcare laws.  Several of these employees described a pattern of

12  retaliation, harassment, and intimidation toward anyone who either complained about the improper

13  practices or even sought to cooperate with government investigations.  In addition, outside doctors

14  and medical institutions similarly raised concerns directly to Defendants Seeto and Maag, only to be

15  rebuffed or ignored.  The amount of corroboration of these facts is already overwhelming and highly

16  exceptional for a case still at the pleading stage where no discovery has taken place due to the

17  PSLRA discovery stay.  Discovery will undoubtedly further support these allegations.

18          **1.    CareDx Violated Healthcare Laws by Billing Medicare for**
                **Thousands of Medically Unnecessary Tests, Including by**
19              **Promoting a "Surveillance" Protocol and by Bundling Its**
                **AlloSure and AlloMap Tests into Its RemoTraC Home Testing**
20              **Program**

21      103.    Billing Medicare for medically unnecessary tests is, by definition, prohibited under

22  the False Claims Act, which imposes liability on any person who, *inter alia*:

23      (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for
               payment or approval;
24
        (B)    knowingly makes, uses, or causes to be made or used, a false record or
25             statement material to a false or fraudulent claim; [or]

26                              *        *        *

27      (G)    knowingly makes, uses, or causes to be made or used, a false record or
               statement material to an obligation to pay or transmit money or property to the
28

Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. §3729(a)(1)(A)-(B), (G).

104.    Defendants' Medicare billing practices violated the False Claims Act. Defendants were fully aware of and directed those practices, as described further below. Indeed, AlloSure was never covered by Medicare during the Class Period when patients had no clinical suspicion of rejection. Yet, fully aware of this medical necessity requirement, CareDx nonetheless submitted claims for payment to Medicare for hundreds of thousands of medically unnecessary AlloSure tests at $2,841 per test.

105.    Dr. Olymbios has further confirmed detailed facts in this case showing CareDx's systematic, Company-wide promotion of so-called "surveillance" use of AlloSure, which meant administering the test numerous times every year to patients with no specific signs of organ rejection – a practice corroborated by numerous former employees, as alleged further below. This automatic, repeated use of AlloSure was the exact opposite of the medical necessity requirement under Medicare coverage, which stated the test should only be prescribed when there were specific signs pointing to "clinical suspicion of rejection."

106.    Newly discovered facts, which Dr. Olymbios has directly confirmed with Lead Plaintiffs in this case, further detail CareDx's rampant marketing of improper "surveillance" use of AlloSure to doctors, including during lavish marketing dinners disguised as educational events. CareDx marketing presentations dating as far back as November 11, 2019 (and continuing throughout the Class Period) claimed to be "educating" providers on using AlloSure for "surveillance" testing. Tellingly, although AlloSure was only approved for reimbursement when there existed actual clinical suspicion of kidney transplant rejection, CareDx's marketing materials never mentioned this requirement.

107.    Indeed, as Dr. Olymbios witnessed and has confirmed in this case, CareDx marketing employees were directed to use a PowerPoint presentation dated March 19, 2020, which asked doctors to list the factors that would prevent them from using AlloSure to monitor (*i.e.*, surveil) their

1  transplant patients.  CareDx rewarded salespersons who signed up transplant centers to use AlloSure

2  on a "surveillance" protocol with bonuses as high as $20,000.

3      108.    Dr. Olymbios further detailed the specific ways the Company used the RemoTraC

4  mobile phlebotomy program to systematically administer medically unnecessary tests and then

5  fraudulently bill Medicare for those tests.  Specifically, the Whistleblower Complaint revealed the

6  following facts, which Dr. Olymbios has confirmed in this case: "The RemoTraC blood work panel

7  order ("panel"), as set up by the [CareDx Patient Care Managers], contains blood tests in addition to

8  AlloSure."

9      109.    Dr. Olymbios further confirmed in this case that these facts are accurate:

10     CareDx, through RemoTraC, contract[ed] with mobile phlebotomy services
       throughout the United States to draw AlloSure blood work for patients, and, while
11     the phlebotomist [wa]s at the patient's home, draw the rest of the patient's other
       routine bloodwork requested by the patient's physician . . . .  CareDx sen[t] each
12     patient a RemoTraC service box containing a blood tube for the phlebotomist to draw
       the AlloSure sample, and enough tubes for the other samples a nephrologist or
13     transplant surgeon may [have] requested.  CareDx [Patient Care Managers] schedule
       patients for the RemoTraC service.  The RemoTraC offering contain[ed] blood tests
14     ***in addition to AlloSure, designed to entice physicians to order the panel knowing
       their patients cannot afford mobile phlebotomy and are reluctant to attend a lab
15     for a draw because of COVID***.

16     110.    The newly discovered facts in this case, confirmed by Dr. Olymbios in this case,

17  further illustrate that CareDx used unlawful enticements and kickbacks to get doctors to order the

18  RemoTraC "panel" that included the AlloSure test.  These facts show: "CareDx d[id] not charge any

19  patients for the use of RemoTraC, ***which costs [CareDx] in excess of $100 per service***," and "***[t]his***

20  ***kickback to patients is significant, as patients receive[d] up to 15 Surveillance AlloSure tests***

21  during their three-year post transplantation participation in the [surveillance] protocol."  Indeed,

22  "***[CareDx's] only justification for providing this [free assistance] [wa]s to facilitate the patients'***

23  ***continued use of Surveillance AlloSure***" in order to "continue the steady flow of Surveillance

24  AlloSure testing and to ***bill Medicare and Medicaid for such tests***."  Additionally, CareDx, through

25  RemoTraC, provided "blood draws for the providers' other requested bloodwork, thus currying favor

26  with the providers, who w[ould] likely encourage their patients to receive RemoTraC's services."

27  All of these practices constituted improper kickbacks under the AKS.

28

111.    Accordingly, CareDx induced doctors and patients to order these tests and then improperly billed Medicare for the tests – practices prohibited by the False Claims Act for two different reasons.  **First**, the AlloSure tests were medically unnecessary as they were being automatically bundled with routine tests instead of administered only when there was "clinical suspicion of rejection."  **Second**, the testing was being induced by unlawful kickbacks.

112.    As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, §6402(f)(1), 124 Stat. 759, codified at 42 U.S.C. §1320a-7b(g): "***a claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of [the Federal FCA]***."  As stated in the legislative history of the PPACA, the purpose of this amendment was to clarify "***that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil action[s] under the [Federal FCA]***."  155 Cong. Rec. S10854.

113.    Defendants unquestionably knew CareDx's business was dependent on this improper "surveillance" use of AlloSure that involved billing Medicare for thousands of medically unnecessary tests.  In fact, Defendants intensively promoted those improper tests and even carefully tracked their growth and usage.  Indeed, as independently confirmed by Dr. Olymbios to Lead Plaintiffs' counsel in ***this*** case:

> By early April 2020, ***CareDx was tracking the use of RemoTraC by day, by territory, by region, by number of patients whose consent had been obtained (including consent for future surveillance testing), and by the number of samples obtained.  CareDx began planning on ways to increase the use of RemoTraC, and therefore Surveillance AlloSure, by, among other things, requiring employees to report daily on the number of patients who consented and were scheduled each day***.  By the week beginning June 15, 2020, total AlloSure samples had increased to above pre-Covid levels, with over 1,100 AlloSure samples obtained per week via RemoTraC, as compared to a low of 548 total AlloSure tests obtained during the week beginning March 30, 2020.  By mid-June, ***over 300 patients per week had been scheduled for RemoTraC appointments***.

114.    The facts set forth by Dr. Olymbios were corroborated by numerous former employees of the Company.  Dr. FE-1[12] has independently confirmed that CareDx used its

---

[12]   Dr. FE-1 worked at CareDx from May 2021 to January 2022 as a Senior Medical Science Liaison.  Dr. FE-1 reported directly to the Company's Chief Medical Officer, Sham Dholakia, for a period of time and then indirectly through Dr. Grigoriy Shekhtman, another senior executive, to Dholakia.  Dr. FE1 chose to leave CareDx because of its unethical practices.  The genders of certain

1    RemoTraC program to foist unnecessary and costly AlloSure tests on transplant patients who had not

2    shown any need for them and that CareDx effectuated the scheme by improperly bundling the tests

3    with routine and inexpensive surveillance blood tests.  As Dr. FE-1 explained, the ostensible purpose

4    of at-home testing was to make it easy for immunocompromised transplant patients to get routine

5    blood tests without having to visit medical facilities.

6        115.    However, as Dr. FE-1 explained, CareDx unlawfully exploited this situation: "They

7    were doing the very expensive CareDx labs on the *same cadence* of the home labs," which "was

8    *totally unethical* the way that they were doing it and it was clearly wrong."  Dr. FE-1 explained that

9    CareDx would arrange a blood draw for these standard-of-care tests (which were otherwise

10   inexpensive and unprofitable for the Company) *only if* AlloSure tests were also being ordered.

11   Dr. FE-1 explained: "We were doing tests that cost *at least 8X* of what they should have been *and*

12   *on patients that did not need these tests*."  Indeed, Dr. FE-1 personally reviewed numerous patient

13   records and discovered that expensive AlloSure tests were being ordered *on a monthly basis* for

14   patients who had *no* indications for the test – *i.e.*, patients who had shown no warning signs of

15   transplant rejection, meaning there was *no medical reason* for the test to be performed at all, let

16   alone monthly.  As Dr. Olymbios confirmed, he personally witnessed the same conduct: he observed

17   that CareDx "used what it represented to be clinical tests to bill Medicare for the [AlloSure] tests."

18   Dr. Olymbios personally witnessed that CareDx increased the volume of unnecessary tests for which

19   it billed by "pushing a 'surveillance' protocol for AlloSure through inaccurate marketing materials"

20   – in other words, pushing for regular testing of patients who did not even meet medical criteria for

21   receiving *one* test.

22       116.    Concerned by what he was seeing, Dr. FE-1 began asking other employees why

23   AlloSure was being ordered every month and was told that the requisitioning doctors simply wanted

24   the patients' routine kidney labs drawn, that CareDx would not allow this to happen without

25   performing the AlloSure test as well, and that many doctors were simply relieved that their patients

26   could get the routine tests at home and/or didn't fully understand that the bundled AlloSure test was

27

28   confidential former employees discussed herein have been changed to male to protect their
     anonymity.

1   something markedly different from the routine tests it was bundled with.  As Dr. FE-1 explained:

2   "The **nurses were obligated to not only do the screening labs but our AlloSure test**" as well, and

3   the "doctors [in the field] liked using [CareDx's blood-drawing] service but **there was no way to use**

4   **us without ordering our test as well**."  Dr. FE-1 recalled that doctors receiving the results of the

5   AlloSure test did not even understand what the AlloSure results meant and were ordering AlloSure

6   only because they had to do so to complete the other home tests.

7          117.    In this manner, Defendants furthered their scheme by deliberately obscuring from

8   patients and doctors that the AlloSure test was even being performed, instead portraying the blood

9   testing being done as "routine" screening.  CareDx's marketing materials often described RemoTraC

10  as providing "a standard panel of routine tests" **without even mentioning that AlloSure was in no**

11  **way "routine" and cost thousands of dollars more than standard testing**.  In other cases, CareDx

12  failed to explain AlloSure's purpose or for what conditions Medicare would cover it, instead

13  misleadingly describing it as a "routine" or "surveillance" test.  Indeed, Dr. FE-1 specifically

14  explained how prevalent and disguised this practice was: "**I never once sat down with a physician to**

15  **discuss [the patient's AlloSure results] and the doctor had actually knowingly ordered it.  CareDx**

16  **flipped AlloSure in**."

17         118.    As Dr. FE-1 put it, CareDx was "bundling in AlloSure just to bill for it which was

18  totally inappropriate.  They were doing this way too many times in a patient population that it was

19  not validated in."  Dr. FE-1 explained that this practice occurred because "**sales drove everything**" at

20  CareDx, including how often patients should get their blood drawn for labs.  "Even on the clinical

21  side, sales pushed what labs should be done and how often," Dr. FE-1 observed.

22         119.    Lead Clinical Research Associate FE-2 explained, "**the only way to make money**

23  [was] to also carry out an AlloSure test **with each** RemoTraC blood withdrawal patient visit."  FE-2

24  gave details regarding the scope and purpose of the RemoTraC program: FE-2 "knew that if a center

25  that I was dealing with wanted a RemoTraC, **the only** way [CareDx] would send out one of our

26  groups of phlebotomists was if they also did the AlloSure."  According to FE-2, this was **routinely**

27  **discussed during the regular weekly regional meetings involving the sales, research, and**

28  **laboratory teams** attended by FE-2 and others.  FE-2 further explained that the internal meetings

1  were usually led by a regional or territorial sales manager and were attended by one or two regional

2  sales representatives, one medical science liaison, one or two laboratory representatives or managers

3  (responsible for home-draw setups, dispatching collectors, and on-site training), and one clinical

4  research associate.  FE-2 ultimately left CareDx because of serious concerns with CareDx's

5  widespread misconduct; as FE-2 put it, "*the scientific quality and ethical integrity did not exist at*

6  *the company's leadership positions*."

7       120.    FE-20 corroborated FE-1's and FE-2's observations and the facts that Dr. Olymbios

8  has independently confirmed in this case.  FE-20 worked at CareDx in sales roles[13] and explained the

9  directive that AlloSure *always* had to be ordered as part of RemoTraC (and not just routine labs)

10  came from the "*top down*" and executives based in California.  He explained there were monthly

11  Company-wide *all-hands* conference calls where this topic was discussed, *i.e.*, that AlloSure should

12  always be included in RemoTraC.  He said *Seeto attended these calls* along with other senior

13  executives, including the COO and CFO of CareDx.[14]

14       121.    Others similarly confirmed the RemoTraC scheme required AlloSure blood tests

15  every time CareDx also drew blood for standard-of-care tests.  As a former Senior Regional Clinical

16  Research Associate FE-3[15] explained, CareDx was not in the mobile blood-drawing business.

17  Rather, the Company was in the AlloSure business.  So RemoTraC was pitched as a program where

18  "we can do the *standard of care* blood tests," but in reality, "*we are not going to go to their homes*

19  *and just do the standard of care*" but would also have to include AlloSure or other expensive tests,

20  unbeknownst to patients and often unbeknownst to doctors as well.  FE-3 also recalled that, in spite

21

22  [13]  FE-20 started working at CareDx in January 2022 as a Transplant Account Specialist and was
    promoted later to the Transplant Account Manager role, serving in that role into the first half of
23  2023.  Among other things, FE-20's responsibilities included calling on transplant centers and
    (sometimes) nephrologists to promote AlloSure.

24  [14]  FE-20 also noted that Seeto was a "micromanager," and he observed Seeto was unusually
25  involved with minor details of running the Company.  FE-20 recalled that once, when a Patient Care
    Manager ("PCM") was promoted to a sales role, Seeto got involved with the salary negotiations for
26  this individual, who was about "six levels below" the CEO.

27  [15]  FE-3 was a Senior Regional Clinical Research Associate for CareDx from December 2019 to
    October 2020.  He was responsible for reviewing and managing documents relating to the
28  Company's clinical trial agreements.

1    of being in the clinical side of the business, he had surprisingly frequent interactions with sales

2    representatives at CareDx-indeed more frequently than at any other company for which FE-3 had

3    worked.  As FE-3 explained: "*Usually clinical operations and sales are two completely different*

4    *sides of the business, and they should not be interacting.  This raised an eyebrow on why the*

5    *clinical operations folks are working closely with the sales folks*?"  FE-3 emphasized: "Sales and

6    marketing should have been completely separate from clinical operations."

7          122.    FE-3 explained there "were things . . . that I could tell that I was not comfortable

8    with.  That was the reason why I and several others have left that company."  For example, FE-3

9    recalled one of the last meetings he attended: a July 2020 remote meeting with officials from Baylor

10    University Medical Center in Texas, which *Dr. Olymbios also attended*.  At the meeting, Baylor

11    University personnel clearly "*rais[ed] concerns about [CareDx's] Medicare billing*."  Dr. Olymbios

12    personally confirmed FE-3's recollection, stating Baylor University personnel raised concerns during

13    this meeting, after which Dr. Olymbios took these concerns to several other CareDx executives.

14    Dr. Olymbios further confirmed that he discussed this very issue with Danielle Scelfo, CareDx's

15    Director of Reimbursement, *who agreed CareDx's Medicare billing practices were improper*.

16          123.    Reimbursement Specialist FE-4[16] further corroborated Defendants' systematic

17    Medicare misconduct in its RemoTraC program, which was consistent with the facts described by

18    Dr. Olymbios and other former employees.  FE-4 understood that, when COVID-19 hit, CareDx

19    quickly moved to home testing, and FE-4 heard that AlloSure was bundled together with other blood

20    tests as part of CareDx's new mobile phlebotomy service to promote and induce physicians to order

21    AlloSure.

22          124.    Dr. Olymbios and other former employees also confirmed that CareDx enabled its

23    scheme by obfuscating its approval and billing practices to avoid scrutiny (at least until federal and

24    state regulators caught on).  For example, while CMS required a doctor to determine that tests like

25    AlloSure were "medically necessary" under CMS regulations (which required "clinical suspicion of

26    rejection" for the test to be reimbursed), Dr. Olymbios has confirmed in this case that CareDx

27      ─────────────
     [16]  FE-4 worked for CareDx in San Francisco, California from June 2016 to June 2021 as a

28    Reimbursement Specialist and was responsible for client billing, eligibility, and prior authorizations.

1   "*intentionally excluded from the test requisition form a field where a physician could indicate the*

2   *reason why the test was medically necessary,*" so that the Medicare personnel handling

3   reimbursement would not be immediately tipped off that medical necessity was required, and was

4   not actually extant, for the particular test.  Dr. Olymbios confirmed in this case (and reflected in the

5   Whistleblower Complaint): "the form created by CareDx for providers to use when ordering

6   AlloSure for their patients *did not contain any indicator that the provider was ordering AlloSure*

7   *for 'clinical suspicion of rejection.'"*  In the same manner, Dr. Olymbios has explained: "Once it

8   had obtained a signed order form from a provider, CareDx performed the AlloSure test, then

9   submitted its claims for payment to Medicare, *never indicating that the testing had been performed*

10  *for surveillance purposes only*."

11          125.    CareDx also avoided the medical necessity requirement through a practice known as

12  "standing orders" to make sure transplant center patients would automatically receive regular

13  AlloSure testing without any physician determination of whether it was medically necessary.  As

14  Dr. Olymbios independently confirmed in this case and similarly noted in the Whistleblower

15  Complaint:

16          CareDx encourage[d] its participating facilities and providers to enter standing
        orders, *i.e.*, an automatically entered doctor's order for Surveillance AlloSure that
17      would populate each new transplant patient's chart, in order to ensure that all patients
        receive AlloSure testing.  CareDx track[ed] the centers with expiring standing orders
18      for Surveillance AlloSure, then direct[ed] sales personnel to contact the centers and
        obtain a "standing order" renewal.  Of course, *the automatic presence of a standing*
19      *order means the absence of any individualized consideration of whether the use of*
        *the AlloSure test at any given time makes medical sense*.

20          126.    Deliberately avoiding the medical necessity requirement in submitting these claims

21  was clear evidence Defendants knew they were submitting false claims.  Moreover, Dr. Olymbios

22  confirmed that he directly raised his concerns about these improper forms to Director of

23  Reimbursement Danielle Scelfo in July 2020.  In that discussion, Scelfo agreed with Dr. Olymbios

24  that the form was "deficient" and "*CareDx should never bill Medicare for Surveillance AlloSure*

25  *testing*."

26

27

28

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT                                              - 39 -
4885-0370-0468.v1

127.    FE-5,[17] a former CareDx Senior Product Manager, explained how CareDx further obfuscated its improper Medicare billing using an entirely paper-based claim submission system, which he said made tracing claims virtually impossible.  FE-5 was intimately familiar with these problems because he oversaw the Company's digital transformation of its revenue cycle management – a system the Company had previously lacked.  FE-5 explained that "Medicare was our biggest payor, and they needed a trace of all the paper evidence [of claims].  If you didn't have digital evidence, you needed to provide paper evidence."  FE-5 said that any such evidence, however, was obscured in "hundreds and hundreds of boxes" of paper, and that even the Company's test orders for patients were all in paper – a "*huge red flag" for Medicare*.

128.    Observations by FE-10 also corroborated the Company's practice of overbilling Medicare for AlloSure tests that were not medically necessary and that the Individual Defendants knew it.[18]  FE-10 worked in medical billing and claim reimbursement for several years prior to working at CareDx.  FE-10 observed CareDx had a large number of charges that were "pending charges" for patient tests – *i.e.*, charges that had still not been reimbursed or paid.  Some of these outstanding unpaid charges were between $90,000 and $120,000 per patient – amounts he said he had never heard of in his *15 years* in the industry.  These were pending Medicare bills that Medicare had refused to pay because it did not find them to be medically necessary.  Many of these charges had been "pending" and had gone unpaid for *years*.  FE-10 reviewed these files, and they had been repeatedly deemed to be not medically necessary by Medicare, Medicaid, and insurance companies such as Blue Cross Blue Shield, United Healthcare, and others.  FE-10 explained: "The patients that I reviewed at CareDx were *getting these expensive AlloSure* and [other] tests *every other week*."  FE-10 had not seen so many expensive tests done like this in his 15 years of medical billing experience.

---

[17]   FE-5 worked for CareDx as a Senior Product Manager from August 2020 to October 2021.  He reported to Amitabh Shukla, CareDx's Senior Vice President Technology.

[18]   FE-10 worked as a Claim Reimbursement Specialist for CareDx at its corporate headquarters from October 2022 to March 2023 and was responsible for claim reimbursements, which involved speaking directly to patients, the Company's billing department, and outside insurance companies. Although he joined the Company near the end of the Class Period, he was largely dealing with unpaid claims for tests done during the Class Period, many of them years old.

129.    FE-10 had access to the denial reasoning for each claim by Medicare and insurance companies.  The denial was always that the AlloSure and/or AlloMap test(s) were not medically necessary and that CareDx did not provide enough evidence to support that these tests were medically necessary.  He indicated that after the claims went through physician review processes, *90% of the claims were rejected again*.  FE-10 added: "The CareDx physicians were not able to back up their claims that these tests were medically necessary."  He said that he had extensive experience in both pharma and medical billing and that, in his experience, claims rarely get to the point where such an intensive level of physician review of claims was needed.  He had never experienced this until working at CareDx.  Specifically, he commented: "*I was shocked* to see a lot of cases where the physicians had to be in contact with each other.  There were three other steps where a claim was denied before it was made to the physician, and they were still denied at the fourth step.  *That rarely happens in medical insurance*."

130.    FE-10 further indicated *90% of CareDx's patients were getting tested at least every month with their expensive tests*.  He spoke to several patients about their bills, and they expressed frustration and did not understand why they had been administered so many CareDx tests and billed for them.  This corroborated other former employees' and Dr. Olymbios' observations that CareDx was performing unnecessary $2,800 blood tests without patients' knowledge.  FE-10 asked the Director of Claims why the patients were having the tests done so frequently; the Director of Claims *brushed him off* and told him to just keep doing his job.

131.    FE-11 similarly observed facts showing the Individual Defendants' awareness that the Company was billing Medicare for tests that were not medically necessary during the Class Period. FE-11 worked in a marketing role from August 2019 to April 2021 and reported to a C-Suite executive.  FE-11 noted: "*To be honest, [Dr. Olymbios] told me his concerns*" about CareDx's billing practices while both Dr. Olymbios and FE-11 had been employed at CareDx.  To that point, FE-11 said *Dr. Olymbios had been "vocal about*" his concerns about the billing practices.  To FE-11's knowledge, no one he knew took any action in response to Dr. Olymbios' concerns because "*we were all terrified for our jobs*."  FE-11 explained that Dr. Olymbios had "know[n] it all" with

1   regard to the billing issues, adding that Dr. Olymbios had been close to Defendant Seeto and

2   CareDx's other former CEO.

3       132.   FE-19, who reported directly to Defendant Seeto and worked closely with him, also

4   confirmed that Defendant Seeto was fully aware of billing practices at the Company and any issues

5   they caused.  For example, ***Seeto had regular meetings*** with the individuals who had oversight of

6   billing, including Elsie Garza (Senior Director of Revenue Cycle Management), Savita Devlin

7   (Project Manager), and Alex Johnson (Chief Business Officer and Head of Testing Services).  FE-19

8   recalled that some of these meetings specifically concerned problems relating to getting "prior

9   authorization" from doctors for the AlloSure test, *i.e.*, getting the "medical necessity" authorization

10  that CareDx systematically failed to get.  FE-19 said Seeto "absolutely" knew about the Company's

11  reimbursement and collection issues with Medicare, ***which were pervasive***, and there was nothing

12  about which Seeto did not know.

13      133.   FE-19 said during the weekly Business Leadership Team meetings he attended,

14  Defendant Seeto would always attribute any Company success to RemoTraC.  He said "Reg [Seeto]

15  would make disingenuous remarks about patients"; but in reality, patients were an afterthought, and

16  the sole goal was keeping up "volumes."

17      134.   FE-12 worked at CareDx as a Director, Market Access, from March 2021 to

18  June 2022 and had been part of CareDx's payor team that called on health plans in efforts to get

19  these plans to cover and reimburse CareDx's testing services.  FE-12 explained that one of the

20  payors, United Health, was not actually paying the majority of claims for CareDx testing services

21  that were billed to United Health and, in fact, may have only been paying about one-third of them;

22  they were not actually being paid in full.  Other payors were also not paying the claims submitted to

23  them or, if they did pay some of them, were not paying them in full.  The amounts actually paid were

24  often "ridiculously low" and sometimes as little as $25.  Over time, the insurance companies were

25  paying "less and less" of the CareDx claims because the insurance companies were getting better at

26  identifying claims that were not actually covered.

27      135.   FE-13 worked for CareDx from March 2019 through March 2023 as a Senior Product

28  Manager.  He was responsible for building integrations between molecular diagnostic laboratories

1   and clients. He noted that he has over 20 years' experience working for reference laboratories.

2   FE-13 was aware of the Company's bundling of AlloSure during its RemoTraC initiative. He

3   explained that RemoTraC was a program where CareDx agreed to draw other lab testing; but as part

4   of that testing, the physicians *had to order* an AlloSure test. He confirmed that AlloSure was

5   bundled with other blood tests as part of CareDx's mobile phlebotomy service to induce physicians

6   to order AlloSure. He further explained that part of his job working on the integration team was to

7   manage the development of interfaces between CareDx and client sites. As part of that integration

8   process, the Company allowed client sites to order RemoTraC testing. The client sites were able to

9   order RemoTraC testing into their Electronic Medical Record ("EMR") in order to schedule those

10  phlebotomy episodes. He added: "*We were told that you couldn't just have us go out and draw a*

11  *kidney panel without also drawing the AlloSure*."

12      136.    FE-14 worked in a sales role at CareDx from late 2021 through early 2023. FE-14

13  explained that RemoTraC was a service CareDx offered to keep the Company afloat and entailed

14  CareDx drawing blood from patients for non-CareDx tests, so long as the patients were also "using

15  our tests." With regard to whether drawing the blood for the other services was an inducement to the

16  physicians to order CareDx services, FE-14 said he had *wondered how they got around it and how*

17  *it was not illegal* and thought maybe CareDx had been able to do so because of the pandemic.

18  However, there was never a real avenue by which to ask questions during his tenure; and *any time*

19  *he tried to raise issues or questions, "they shut it down*."

20      137.    FE-15 did not work for CareDx but instead worked for Natera in a variety of roles

21  going back to February 2015, including most recently as Director, Sales Training Transplant and

22  Renal Genetics from March 2020 through June 2022. FE-15 personally knows Dr. Olymbios and

23  holds him in extremely high regard. FE-15 noted it was "1000%" the case that, with RemoTraC,

24  CareDx was saying it would do all of the blood drawing for a patient's labs in order to get AlloSure

25  ordered by physicians. Regarding wining and dining and lavish entertainment of physicians by

26  CareDx, FE-15 heard "from the field" that CareDx would support "huge research" projects in the

27  tens of thousands of dollars to physicians, clinics, and hospitals. Natera did not have that kind of

28  money to support its own studies; instead: "we had to sell on why we are better than CareDx."

138.     FE-16 also did not work for CareDx but instead worked for Natera during the 2019 to 2022 period in a sales role.  He noted that some customers had provided feedback to him indicating that CareDx did "not play by the rules."

139.     FE-17 also did not work for CareDx but instead worked for Natera during the 2020 to 2022 period as an organ health specialist.  FE-17 noted that CareDx is "shady" and had been Natera's "number one competitor" in the geographic region where FE-17 worked.  He said that that particular region CareDx is "widely known for excessively paying doctors and institutions."  FE-17 also was familiar with CareDx's RemoTrac mobile phlebotomy blood-drawing service by which CareDx drew blood for non-CareDx tests that a provider ordered while also drawing blood for CareDx's AlloSure test.  It was "always strange" to FE-17 that CareDx could provide the RemoTrac blood-drawing service because it was "an incentive, a selling point" to the providers to place orders for AlloSure.

140.     FE-18 did not work for CareDx but for Natera during the 2021 to 2022 period as a medical science liaison.  FE-18 was unaware that Dr. Olymbios had commenced whistleblowing proceedings against CareDx because "plenty" of former CareDx personnel who went to work at Natera have said CareDx would do whatever was necessary to get sales.  In short, it was a commonly shared sentiment "across Natera" that "they do shady" things.

141.     FE-21 worked for CareDx in a sales role[19] and further confirmed the profound impact the scheme had on CareDx's business, stating once CMS began scrutinizing and auditing CareDx's billing for AlloSure, CareDx's Medicare revenue began declining dramatically as it became much harder to receive payment for medically unnecessary tests.  This is consistent with the fact that CareDx did, in fact, report declining Medicare revenue in 4Q 2021 – once the DOJ began

---

[19]     FE-21 worked for CareDx in the Portland, Oregon area from April 2021 until September 2022 as a Transplant Account Manager.  He reported to SVP of Sales Greg Quinn and subsequently to Regional Director San Salimbangon.  FE-21 indicated that he was let go in September 2022 after he raised concerns about the Company's marketing sales practices.  In his role, FE-21 was frequently involved in arranging "advisory boards," dinners, and other events for doctors that were used to pay kickbacks to them for prescribing AlloSure.  Such events were handled by sales personnel like FE-21 but then disguised as educational events and not billed to the sales budget to avoid raising red flags.

1    investigating the Company's practices – and continued to report sharply declining Medicare revenue

2    in 2022.

3         142.    FE-10 similarly observed it was well known throughout the Company that, once CMS

4    caught on to CareDx's improper practices, many of the Company's claims were promptly denied for

5    lacking medical necessity.  FE-10 explained that CareDx convened regular meetings regarding the

6    issue, and "*[t]he CEO [Defendant Seeto] and everyone knew about it*."  FE-10 further indicated it

7    was well known that 50% of the tests they administered were not reimbursed.  He said the Claims

8    Department had meetings every Friday about their reimbursement rates and concerns about getting

9    paid.  FE-10 added: "Everyone knew that they [CareDx] were not getting paid on 50% of their

10   AlloMap and AlloSure tests."  *FE-10 also observed the Director of Claims and Seeto often talked*

11   *about the 50% reimbursement rate with the tests* and explained that the denial percentage was so

12   high that everyone at the Company knew.

13            **2.    CareDx Paid Unethical and Improper Kickbacks to Doctors to**
                **Encourage Them to Order AlloSure and Enroll Patients in**
14              **"Studies" that Were Actually Schemes to Bill Medicare for**
                **Additional AlloSure Tests**
15

16        143.    In order to further its scheme, CareDx utilized an elaborate system of kickbacks,

17   payments, inducements, and incentives paid to phlebotomists and doctors to juice the Company's

18   AlloSure sales.  As Dr. Olymbios witnessed and confirmed in this case, CareDx "*offer[ed]*

19   *extravagant inducements or kickbacks to physicians and other providers to promote AlloSure*" and

20   organized "*sham 'advisory boards'*" that were "*little more than marketing exercises to encourage*

21   *physicians to order AlloSure tests*."

22        144.    Dr. Olymbios confirmed in this case, in detail, how these "advisory boards" and

23   similar events for doctors worked and how they were a mere façade to pay exorbitant kickbacks to

24   doctors to induce them to order AlloSure tests.  For example, CareDx would pay doctors *$500 per*

25   *hour*, and community nephrologists *$300 to $500 per hour*, just to attend online "Advisory Board"

26   meetings.  Dr. Olymbios explained that, in the industry, an advisory board meeting is supposed to be

27   an educational meeting with external scientific advisors that informed doctors about the scientific

28   basis for products in development or on the market, as well as potential use cases.  However,

1 CareDx's "advisory boards" were "in reality mere sales pitches for AlloSure, delivered by sales and

2 marketing personnel and sprinkled with a few marketing pitches posed as questions for the

3 physicians, such as 'What factors would prevent you from using dd-cfDNA (*i.e.*, AlloSure) to

4 monitor your kidney transplant patients?  If you are not using AlloSure, do you plan to in the

5 future?'"  Dr. Olymbios confirmed in this case that these meetings often occurred multiple times

6 every week and often multiple times a day during his tenure at CareDx.[20]  Indeed, Dr. Olymbios

7 described an incident relayed to him by a sales representative that one doctor attended so many

8 advisory boards, he was able to pay for a new roof from the fees he received.  Dr. Olymbios

9 confirmed that he regularly participated in these meetings, as did executive management, including

10 Maag, Seeto, and others.  Defendants not only organized the events but, as Dr. Olymbios has

11 confirmed in this case: "***CareDx monitored advisory board activity and how [it] impacted sales***"

12 and even "maintained spreadsheets showing the amounts of honoraria paid based on the types of

13 attendees at the meetings (transplant doctor, community nephrologist, administrator)."

14       145.    The exorbitant fees paid to doctors to attend these "advisory boards" were clearly not

15 compensation for any "service" provided by the doctors but merely unlawful kickbacks to induce

16 physicians to prescribe AlloSure, a blatant violation of the AKS and the Stark Law and, by

17 extension, also a violation of the FCA once the Company billed for tests prescribed by those

18 physicians.  Internal documents confirm the transactional nature of CareDx's scheme.

19       146.    Dr. Olymbios further witnessed the exorbitant and extravagant lengths to which

20 CareDx resorted to entice physicians to cooperate in Defendants' fraudulent scheme (as

21 Dr. Olymbios confirmed directly in this case and separately explains in the Whistleblower

22 Complaint):

23         Some physicians [we]re invited to longer, more elaborate meetings that last
approximately four to five hours and include at least one meal at an expensive
24 restaurant.  ***For those meetings, physicians are paid between $3,000 to $5,000 plus
expenses, including airfare and hotel costs***.  Before the Covid-19 pandemic, when
25 CareDx was planning to attend the National Kidney Foundation's conference in New
Orleans, LA, ***it offered physicians $3,000, plus one night's hotel stay, two meals,***
26

27 [20]   As one example, according to the Whistleblower Complaint and Dr. Olymbios: "an email of
August 4, 2020 offered a community nephrology doctor $500 to attend an Advisory Board meeting
28 and even requested that the doctor recommend other doctors who would attend."

*and airfare to attend a four-hour meeting as part of the conference*.  These longer meetings, just like their one-hour counterparts, *were in reality sales presentations*.  For example, an April 2020 presentation contained 20 slides, the vast majority of which promoted Surveillance AlloSure use.  Only two of them contained questions, and those questions related to how well the attendees had digested CareDx's sales pitch for Surveillance AlloSure, and whether the attendees would be receptive to using CareDx's services to reach their homebound patients.  *The overriding goal was to generate a receptive audience for the Surveillance AlloSure promotion*.

147.    Dr. Olymbios recalled other specific examples of such events.  For example, Dr. Olymbios recalled an all-expenses-paid trip in summer 2019 to reward doctors who regularly prescribed AlloSure.  The doctors were given luxury hotel rooms and meals and could even bring spouses or significant others.  Dr. Olymbios stated that the event was held at the luxurious Cavallo Point Lodge in Marin County, California, which, as described further below, was corroborated by another former employee as a venue where CareDx held similar events during the Class Period.  Dr. Olymbios confirmed that both Maag and Seeto attended this event.

148.    Dr. Olymbios also recalled a "grandiose" party for doctors in New York City in winter 2019 – which the Company tried to disguise as an "advisory event" – again, attended by Seeto and Maag.  In addition, Dr. Olymbios recalled an event at the January 2020 American Society of Transplant Surgeons conference in Miami Beach, which he believed was at the SLS South Beach hotel.  Dr. Olymbios said the Company held a poolside party with an open bar for roughly 100 medical professionals.  Defendants Maag and Seeto attended this event as well.  Dr. Olymbios confirmed that similar events occurred regularly throughout his time at CareDx.

149.    Further, Dr. Olymbios recalled the Company regularly flew in doctors for what were billed as "tours" of the CareDx offices but were really just another excuse for CareDx to pay for fancy dinners, drinks, and hotels for doctors.  Defendants Maag and Seeto would also attend these events.  As one example, Dr. Olymbios recalled that after a brief "tour," Defendants Maag and Seeto took a group of physicians from Yale out on a boat the Company had chartered on San Francisco Bay and "drank all day."  Such activity was common, according to Dr. Olymbios.

150.    In or about July 2020, Dr. Olymbios provided to CareDx VP of Sales, Greg Quinn, a copy of a DOJ complaint against another company in the medical testing business (Progenity) charging the Company for improperly wining and dining physicians in violation of the AKS and

1    FCA.  One of the facts in that DOJ complaint was that a sales executive at Progenity spent over

2    $60,000 on entertaining doctors in one year.  Dr. Olymbios was concerned that CareDx was doing

3    the same thing, which is why he sent the document to Quinn.  Yet Quinn joked in response to

4    Dr. Olymbios' message that one of Quinn's sales representatives, Melinda Primeaux, spent that

5    much money on entertainment on doctors in a single week or month – an exaggeration, but not much

6    of one, as Dr. Olymbios noted the particular sales representative spent an "obscene" amount of

7    money entertaining doctors.[21]

8         151.    In sum, Dr. Olymbios said such events were a regular practice and part of the way

9    CareDx did business – wining and dining doctors to induce them to prescribe CareDx tests.

10   Needless to say, such arrangements were blatantly prohibited by the AKS and, by extension, the

11   FCA, since the Company billed for tests prescribed by the attending physicians.

12        152.    As set forth further below, several former employees independently fully

13   corroborated these allegations.  Indeed, these former employees explained that similar practices to

14   those described by Dr. Olymbios continued throughout the Class Period and confirmed the

15   Individual Defendants themselves organized and attended these blatantly improper events, as well as

16   taking pains to disguise the exorbitant payments to doctors so they would not raise red flags in an

17   audit or investigation.

18        153.    For example, FE-6[22] corroborated Dr. Olymbios' claims and described CareDx's

19   practice of hosting "symposiums," where it paid for doctors' flights, limo services to and from the

20   airport, hotels, and bottles of champagne in the doctors' hotel rooms.  FE-6 further explained that

21   CareDx hosted two key opinion leader "summits" in San Francisco every year that started on

22   Thursdays and ended on Fridays (*i.e.*, the summits lasted only about a day and a half).  CareDx

23   would then pay for attending doctors to spend the weekend in Napa Valley.  The doctors were taken

24   to Napa, chauffeured around in limousines hired by CareDx, and brought to four different vineyards

25   ———————————————
     [21]   Notably, FE-21 also mentioned Melinda Primeaux as a sales representative known during the
26   Class Period for constantly spending exorbitant amounts of CareDx's money on wining and dining
     doctors – an openly known practice at the Company that was not only not reined in but encouraged.
27
     [22]   Employee FE-6 served as Senior Executive Assistant to the Chairman and CEO from
28   December 2013 to July 2020.

     [CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
     FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT                                          - 48 -
     4885-0370-0468.v1

1   – each of which hosted a $100-per-person wine tasting *paid for* by CareDx.  The doctors were also

2   provided breakfast, lunch, and dinner at fine restaurants, *all on CareDx's dime*.  FE-6 explained that

3   *Defendant Maag not only attended these outings but personally selected the vineyards and*

4   *restaurants*.

5        154.    FE-21 – who served as a Transplant Account Manager in the Portland, Oregon area

6   from April 2021 through September 2022 – further corroborated these facts and went into even

7   greater detail, recalling specific meetings at specific times that Defendants themselves attended and

8   explaining how the Company would disguise the improper expenses for the meetings.  FE-21

9   explained that, shortly after he joined CareDx, his manager, Regional Director Dan Salimbangon,

10  effectively educated him on unofficial but standard practices at CareDx to get around expense limits

11  while avoiding raising red flags for auditors or investigators.  For example, FE-21 was told to use the

12  invitation list for an event as a guest list, and to include everyone on that list as though they had

13  actually attended the dinner, so that the amount spent per doctor looked much smaller than it actually

14  was.  Using this trick, he explained that if CareDx invited 100 doctors to attend a dinner, they could

15  get away with spending $15,000 ($150 per invitation) even if they knew only 20 doctors were

16  actually attending.  FE-21 said the Company would go so far as to invite people they knew would

17  never show up for its events, such as non-doctor staff, just to inflate the invitation list and make the

18  expenditures look smaller per person.

19       155.    FE-21 corroborated other former employees' statements that Defendant Seeto

20  attended and approved all such events, which he described as "gross overuse of funds to entertain

21  doctors" and induce them to prescribe CareDx tests.  He explained: "*We had a bunch of cash, and*

22  *we could basically buy [the doctors'] business*."  As an example, he described a July 2021 event for

23  doctors held at an extravagant resort called the Cavallo Point Lodge in Marin County, California,

24  near the Golden Gate Bridge.  Doctors were provided hotel rooms that cost over $1,200 per night on

25  the Company's dime.  The doctors then attended a supposedly "educational" dinner (with lavish food

26  and drinks).  However, FE-21 explained: "This clearly wasn't about the doctors learning more about

27  our products, *it was an inducement to do business with us*."  When asked if the C-suite Defendants

28  were aware of this, FE-21 explained that they obviously were because any expense over $1,500 had

1  to be approved by Chief Commercial Officer Alex Johnson, and any expense over $2,500 had to be

2  approved by CEO Reg Seeto.  He added that dinners like this were commonplace and approved by

3  Johnson and Seeto.

4       156.    FE-21 also learned about a particularly infamous June 2022 dinner at Mastro's Ocean

5  Club in downtown Los Angeles.  The dinner was for Cedars-Sinai Medical Center.  Defendant

6  Seeto, Chief Business Officer Alex Johnson, and Salimbangon attended, along with 50 medical

7  professionals.  FE-21 spoke with the sales representative, "Kim," who set up this meeting.  Kim told

8  FE-21 that Defendant Seeto and Chief Business Officer Johnson had personally pushed this dinner.

9  The dinner cost $15,000.  Salimbangon, who was also at the dinner, told FE-21 that, during the

10  dinner, Johnson stood up and boasted to the attendees: "***This is how we run meetings.  This is what***

11  ***we do at CareDx.  So, if you want more dinners just keep using CareDx***."  He said that this was

12  meant to tell the doctors to stick with CareDx because this is what they offered.

13       157.    FE-21 also gave examples of how he was personally instructed to disguise expenses

14  in order to avoid raising red flags about kickbacks.  For example, he was involved in organizing a

15  smaller "local" event in June or July 2021 at a Marriott Hotel in Portland, Oregon, at which the

16  Company spent thousands of dollars on a dinner for only seven doctors.  He explained that the

17  dinner required a sign-in sheet for the doctor attendees.  However, because the expense per doctor

18  was going to look too high with only seven doctors, his manager, Salimbangon, told FE-21 to omit

19  the sign-in sheet from their records so they could make it look like there were more attendees and

20  thus more reasonable expenses per doctor.  Salimbangon confirmed this request in a June 30, 2021

21  text exchange in which, in response to questions from FE-21, Salimbangon instructed: "***[S]kip the***

22  ***sign in sheet***."   In another message the same day, Salimbangon texted: "***Call me any time***

23  ***re:expenses***," which FE-21 explained was a coded way of reminding him not to discuss such things

24  via text message or in writing, a directive Salimbangon also gave in a phone call the same day and

25  on numerous other occasions.

26       158.    FE-21 recalled that these extravagant meals and events were a regular part of

27  CareDx's business and that Defendant Seeto and other C-level executives regularly approved such

28  expenditures.  For example, at another event attended by Seeto in September 2021, held at the

1   luxurious Four Seasons Hotel in Seattle, CareDx provided an extraordinarily expensive dinner

2   costing over $8,000 for only 12 attendees (or almost $670 per person). FE-21 asked a colleague how

3   they were going to approve this expense, and the colleague said Johnson (CareDx's Chief Business

4   Officer) had already approved it, and it was also going to Defendant Seeto himself for approval.

5        159.    FE-21 also heard from Salimbangon about an extraordinarily expensive luncheon for

6   UCLA doctors held at The Ivy restaurant in Los Angeles. The Company spent $12,000 on a lunch

7   that had only 30 attendees – roughly $400 per person.

8        160.    As yet another example, FE-21 described an event in spring 2022 in Boston,

9   Massachusetts, at which the expenditures went well above the $150-per-person "limit" for such

10  dinners (although the Company rarely actually adhered to that limit). When he found out the bill for

11  the event had not been paid, FE-21, who was in the sales department, used his own corporate credit

12  card to pay. However, the next day, when the marketing department learned of this, they "freaked

13  out" because sales expenses were far more likely to be scrutinized than marketing expenses, and the

14  Company's unofficial policy was to hide expenses in marketing budgets (and thus avoid itemizing

15  the expenses).

16       161.    Another tactic CareDx would use was to create fake budget items as part of the event.

17  For example, CareDx would have a hotel or restaurant bill CareDx $1,000 for a purported audio-

18  visual setup and thereafter deduct that $1,000 expense from the food bill so it looked as though

19  money was being spent on "educating" the doctors instead of wining and dining them. FE-21 added:

20  "*There were many ways to get around the impropriety of having a ridiculous dinner for the*

21  *doctors*." FE-21 also described tactics such as splitting up bills into different categories to lower

22  expenses, having dinners described as buffet style so that the per-person food bill was obscured, and

23  bringing additional wine bottles to events as "gifts" to doctors so as to keep the wine bill lower.

24  FE-21 said such practices were routine and pervasive, and all such expenses were approved by

25  Johnson and/or Defendant Seeto.

26       162.    FE-21 also described the use of "speaking contracts" as kickbacks to prescribing

27  nephrologists, explaining CareDx hired numerous community nephrologists who wanted to be on

28  speaking contracts, and some of these nephrologists were paid $1,000 a month just to speak at their

1  own office.  He added: "Most nephrologists would prefer CareDx over the competition if CareDx

2  had a more handsome speaking fee.  They were able to project earnings based on the number of their

3  speaking engagements."  FE-21 explained CareDx was able to capture a lot of the market by offering

4  nephrologists these speaking contracts, and "everyone was on a speaking contract whether they were

5  speaking or not."

6      163.    FE-21 said he made multiple attempts to report these concerning and seemingly

7  unlawful practices, but he was shut down or even retaliated against for doing so.  In one particularly

8  striking incident, FE-21 recalled that a compliance "town hall" call took place on March 11, 2022

9  with the Company's top compliance attorney, Clarice McCauley (who, according to another former

10  employee, later herself resigned over the Company's refusal to be legally compliant).  The call was

11  attended by Defendant Seeto, as well as SVP Greg Quinn and Chief Business Officer Alex Johnson,

12  and was held in response to the fact the DOJ was investigating the Company's practices.  FE-21 said

13  that during the call, McCauley reiterated that expenditures per doctor at events should not go above

14  $100.  She also explained a change in the expense approval structure so that Alex Johnson and

15  Defendant Seeto would now approve every expense over $700.  After McCauley left the call, FE-21

16  recalled that other employees – who had been accustomed to CareDx's widespread kickback

17  practices – expressed panic and asked: "Oh great, now what?"  However, management assuaged the

18  representatives by saying they would figure things out and continue to do what they do, *i.e.*, spend

19  money on doctors.

20      164.    FE-21 explained that, during the same call, he raised concerns about the Company's

21  potentially unlawful kickback practices, but he was shut down.  He later discovered records of his

22  concerns ***were deliberately erased*** from the Company's systems.  Specifically, toward the end of the

23  March 2022 compliance "town hall" call, FE-21 said he had concerns about CareDx's potential

24  violations of the Sunshine Act and other laws and raised the example of the Cavallo Point Lodge

25  event at which the Company had rented doctors $1,200-per-night hotel rooms.  FE-21 said everyone

26  on the call went silent.  After the call, Salimbangon called him and ***warned him to keep such***

27  ***discussions "offline."***  Later, FE-21 tried to retrieve a recording of the call – since these calls were

28

1    always recorded and made available to employees – but discovered **the recording of the call had**
2    **been "scrubbed," i.e., erased from the Company's systems**.

3    165.    Even after the March 2022 compliance call, the Company continued its improper
4    kickbacks and simply redoubled its efforts to hide the expenditures.  For example, in addition to the
5    above-described dinners that post-dated the March 2022 compliance call, FE-21 recalled a specific
6    CareDx dinner in Los Angeles in April 2022 **attended by Seeto** that was way over budget (and thus
7    raised red flags about kickbacks to doctors).  However, Seeto and Chief Business Officer Alex
8    Johnson **directed** FE-21's manager to submit the bill to a marketing budget and not the sales budget
9    so it would superficially appear as though the sales team did not sponsor this event (even though it
10    had).  In doing so, "**[t]hey tried to make it appear that it was an educational dinner when it was**
11    **pure sales**."    Similarly, on or about May 13, 2022 in San Francisco during the American
12    Transplantation Society conference, CareDx spent $20,000 on a dinner for only 15 doctors (over
13    $1,300 per doctor).  When he asked another employee involved in the dinner how it was going to be
14    documented, the employee responded: "These all get approved[,] usually it's Alex [Johnson] and **[it]**
15    **is going to have to go up to Reg but we don't have to put in sign in sheets or attach[] names so it**
16    **doesn't matter what we spend**."  With respect to a May 24, 2022 dinner in Portland, Oregon, during
17    which the Company spent $3,700 on 12 attendees (over $300 per doctor), FE-21 raised concerns to
18    his manager about the amount of spending.  His manager responded that as long as the **invitations**
19    were documented, it didn't matter how many people attended in reality.  FE-21 responded that he
20    "wasn't comfortable with documenting people that weren't there or never opened the e-mailed
21    invite," but his manager responded: "**that's what we all do**."  His manager further said he was "**given**
22    **a directive**" from higher-level management that this was the way things had to be done.

23    166.    FE-21 said he was placed on a Performance Improvement Plan in retaliation for his
24    multiple attempts to raise concerns about the Company's practices and was later terminated for the
25    same reason without severance.  FE-21 said he asked Salimbangon if Salimbangon thought FE-21
26    was the victim of retaliation and that Salimbangon responded "definitely" and also told him: "**the**
27    **directive from everyone above me – Alex [Johnson], Reg [Seeto], Greg [Quinn] – they are all very**
28    **familiar with what is happening with you, they've all heard the comments**."  FE-21 also recalled

1  discussing his termination with another sales representative, Melinda Primeaux, who told him she

2  believed "quite a few" other sales representatives had been terminated in retaliation for raising such

3  concerns as well.

4        167.    FE-21 nonetheless continued to raise concerns about unlawful and unethical practices

5  even in his exit interview on or about August 18, 2022 with Carol Wisecarver, Senior Director of

6  HR.  For example, during the exit interview, Wisecarver asked what, specifically, FE-21 thought was

7  unethical at the Company.  FE-21 gave detailed examples in response, such as a Boston dinner,

8  during which $2,700 was spent on eight doctors, and the May 18, 2022 dinner in Portland, Oregon,

9  during which $3,700 was spent on 12 attendees.  He further told Wisecarver about various ways he

10 had been instructed to disguise expenses, including getting rid of guest lists.  Following his

11 departure, on November 12, 2021, FE-1 had a telephone meeting with Jennifer Barbre, CareDx's VP

12 Head of Healthcare Compliance, during which he again explained in detail his concerns about the

13 ways he had been instructed and "coached" to falsify expense reports, and duringwhich he told her

14 he had discussed these practices with senior executives and employees, including Greg Quinn, Alex

15 Johnson, and Dan Salimbangon.

16        168.    FE-1 witnessed similar practices and described how CareDx's sales management

17 personnel **took doctors on "booze" cruises, helicopter tours, and expensive vacations**, failing to

18 report any of these expenses as required by the Sunshine Act.  As FE-1 further explained, it was

19 common knowledge within the Company that this was occurring, commenting: "The sales people

20 did stuff that would not be appropriate anywhere else in the pharma or biotech industry."

21        169.    FE-19, who reported directly to Defendant Seeto, confirmed these practices continued

22 throughout Seeto's tenure as CEO.  He said there were always some "hush-hush" discussions of

23 potential conflicts of interest around having medical science liaisons enroll people in studies and

24 then taking them out for lavish dinners.  He also said that in September-October 2021, just as the

25 Company came under investigation by the DOJ and SEC, he participated in Business Leadership

26 Team meetings where there were suddenly discussions about how the Company should consider

27 cutting back on lavish expenditures, such as not ordering "shrimp towers" or $200 bottles of wine

28 when taking doctors to dinner, now that the Company was under scrutiny.

170.    FE-21 described yet another way CareDx would systematically pay kickbacks to prescribing doctors – by funding doctors' "pet projects" and "research." FE-21 described how CMO Dholakia himself would meet with up to 20 doctors a day who each pitched a pet project to him. Dholakia then told those doctors CareDx had the budget for their research projects and would provide the funding. Dholakia would then personally aid those doctors in writing their study prospectives, which CareDx would then "magically" approve. FE-21 explained: "These were all approved by CareDx because they were written by CareDx." FE-21 said Chief Business Officer Alex Johnson was also directing this process, and CareDx wanted every single doctor within the CareDx family to have a study going.

171.    Practically admitting complicity in these kickbacks, Defendant Maag testified under oath in the CareDx-Natera Litigation that he ***personally authorized virtually all of the "marketing" expenses*** at the heart of Defendants' scheme. He testified about personally attending "meeting conferences" where CareDx spent money marketing AlloSure to kidney doctors as "[w]e are not a very large company." He explained:

> I am engaging with the team on those. And then ***I am signing off on all the expenses***. For a long time in the company, I signed every check in the company. . . . I think my team [at CareDx] would call me being ***very hands-on and detailed oriented***, so, yes, ***I was very involved***.

172.    Defendant Maag further admitted to regularly attending CareDx's "marketing" events with doctors. He testified about "meeting conferences" where CareDx spent money marketing AlloSure to kidney doctors, with Maag testifying: "I'm more or less present at many of these meetings happening."

173.    In addition to Maag's personally signing off on these expenses, CareDx's Chief Medical Officer Dholakia and Defendant Seeto also knew about the bills. Dholakia testified in the CareDx-Natera Litigation: "every doctor that works on a project, ***we have to [have] very accurate records*** of, what are we paying them, how much are we paying them, why are we paying them."

174.    Defendants' knowledge of these kickback schemes extended to securing enrollment of Medicare patients in CareDx's KOAR registry study. CareDx Clinician FE-8 explained that CareDx paid doctors who enrolled patients in an AlloSure study ***$35,000 to $40,000 per patient***.

1    Clinician FE-8 further noted: "the payments were excessive and ***very unusual for a simple registry***

2    ***study***."  Clinician FE-8 continued: "these simple registry studies usually paid the doctors a flat rate

3    of $5,000.00 per patient."  FE-8 asked Chief Medical Officer Dholakia: "why were so many patients

4    considered ineligible and rejected from the study?"  ***Dholakia responded that CareDx rejected***

5    ***patients who lacked Medicare coverage***.  FE-8 noted: "there were so [many] illegal actions" at

6    CareDx.

7        175.    FE-9, who worked in a sales role at CareDx, also observed strange practices relating

8    to the way CareDx used clinical studies as sales vehicles.[23]  CareDx paid FE-9 bonuses to get

9    patients enrolled in AlloSure studies, which was not the case for the pharmaceutical companies for

10   which he had worked for in the past, and he thought CareDx's bonus payments were strange.  FE-9

11   further said a lot of doctors would "push back" regarding the studies because they did not believe

12   AlloSure should be the standard of care.  FE-9 said the sales team was not technically supposed to be

13   involved with the studies, but the sales team (including FE-9) was involved anyway.  FE-9 also

14   explained that a CareDx colleague (a Medical Science Liaison and medical doctor) was also

15   concerned about some of CareDx's practices.

16       176.    Another key part of Defendants' scheme involved a systematic practice of paying

17   kickbacks to third party phlebotomists in exchange for blood draws – essentially, paying excessive

18   fees to incentivize them to provide CareDx as many blood samples as possible, in express violation

19   of CMS regulations and the federal Anti-Kickback Statute.

20       177.    By way of background, CMS requires that phlebotomists get paid only a "nominal"

21   per-specimen fee of $3-$5, or, at most, in certain COVID-related circumstances, $23-$25 per

22   specimen.[24]  Anything in excess of that nominal per specimen fee is considered an illegal kickback,

23   because it provides a financial incentive to do unnecessary blood draws in order to perform and bill

24   for unnecessary tests.  However, Reimbursement Specialist FE-4 explained that, rather than paying

25

26   [23]    FE-9 worked at CareDx as a Transplant Account Manager – Kidney, Liver and Pancreas
     Specialist from January 2022 to October 2022.

27   [24]    https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/
28   MLNProducts/Downloads/Clinical-Laboratory-Fee-Schedule-Fact-Sheet-ICN006818.pdf.

1  the $3 fee required by regulations, CareDx regularly and systematically paid doctor offices and

2  phlebotomists' "fees" of ***$100 per specimen*** to draw blood from patients.  FE-4 said that he often

3  received calls routed from the accounting department "from ***people looking for their check for***

4  ***drawing blood***."  FE-4 also saw "logs" phlebotomists used to keep track of all the patients who gave

5  them blood, and noted: "They were definitely getting paid a[n] [excessive] draw fee."

6          178.    FE-4 explained that he had previously worked for a Company called Berkeley

7  HeartLab, which FE-4 said had also engaged in a blood draw kickback scheme similar to the one

8  enacted by CareDx, and had gotten caught by the U.S. government.  By way of context, Berkeley

9  HeartLab was the subject of multiple *qui tam* actions for exactly these types of practices, which

10  actions survived a motion to dismiss in March 2016, and the U.S. government subsequently settled

11  the actions with Berkeley HeartLab for $6 million.[25]  FE-4 said that CareDx was engaging in a

12  substantively similar blood draw kickback scheme to the one conducted by Berkeley HeartLab.

13          179.    Lab Director FE-7[26] made similar claims about CareDx's improper blood draw

14  scheme.  FE-7 explained that the phlebotomists CareDx used for its RemoTraC scheme also

15  collected blood not just for CareDx's tests but for other tests the physicians had ordered, but that

16  these other tests would not be administered by CareDx.  Instead, some of the blood samples would

17  be sent to other testing companies like Quest Diagnostics Inc. ("Quest").  FE-7 knew these facts

18  because sometimes samples intended for CareDx were sent mistakenly to Quest and vice versa.

19          180.    As Lab Director FE-7 noted, however, CareDx was not charging for the blood

20  collection itself – a practice that has been identified by the U.S. Department of Health and Human

21  Services and Office of the Inspector General as potentially violative of the Anti-Kickback Statute.[27]

22

---

23  [25]  https://www.justice.gov/opa/pr/blood-testing-laboratory-pay-6-million-settle-allegations-kickbacks-and-unnecessary-testing.

24  [26]  FE-7 worked at CareDx as Senior Director of Laboratory Operations from June 2018 to

25  March 2022.

26  [27]  As explained in the United States' complaint against Berkeley HeartLab, HHS-OIG Advisory

27  Opinion No. 05-08 made clear that payments by laboratories to physicians for blood sample collection could constitute improper remuneration under the Anti-Kickback Statute.  The U.S. Office of the Inspector General also warned in 2018 about similar blood draw kickback schemes, issuing a "special fraud alert" that it was investigating various blood testing labs for "kickback arrangements,"

28  in which they were paid per-specimen fees beyond the $3 regulatory amount.  *See*

181.    As Lab Director FE-7 put it, there is "a fine line" in distinguishing whether providing a service to a physician – like not charging for blood drawing – is actually an inducement to the physician to order tests from CareDx.  Lab Director FE-7 thought these practices were "sketchy" and discussed the practices with CareDx's Vice President of Laboratory Operations Susan Scott, who dismissed his concerns.

182.    CareDx also engaged in other violations of the Anti-Kickback Statute in order to juice its testing revenues by, for example, offering to waive patient costs.  As Dr. Olymbios explained, without initially realizing that the practice violated applicable laws and regulations, he became aware that, when marketing its services to nephrology practices, CareDx was using the "talking point" that it never billed its patients directly for its tests, such that patients would have no out-of-pocket expenses for the tests.  In or around August 2020, Dr. Olymbios confirmed that he wrote an email to Peter Maag and another high-level CareDx executive that CareDx should include the fact that CareDx "never bills patients" in a marketing letter to a nephrology practice.  However, as Dr. Olymbios confirmed, Defendant Maag responded with a phone call, in which he said that he was "***calling because there were things he couldn't be associated with as the CEO***," and that "***there were certain things that shouldn't be put in writing***" – such as never billing patients "even if that's how CareDx operated."  Maag used his cell phone to make this call to Dr. Olymbios' cell phone (they alone were on the call).  As Dr. Olymbios further explained: "I think he was wanting to avoid putting this in writing," such as promising never to bill patients.  Promising doctors that CareDx would never bill their patients is, in fact, a violation of the federal Anti-Kickback Statute and other laws and regulations.[28]

---

https://www.policymed.com/2014/09/oig-and-justice-department-investigating-certain-blood-testing-labs-for-kickback-arrangements.html.

[28]    Federal laws, including the federal Civil Monetary Penalties Law ("CMPL") and Anti-Kickback Statute, generally prohibit waiving Medicare cost-sharing absent a showing of genuine financial hardship.  42 U.S.C. 1320a-7a(a)(5).  The CMPL prohibits offering or transferring remuneration to federal program beneficiaries if the provider knows or should know that the remuneration is likely to influence the beneficiary to order or receive items or services payable by federal or state healthcare programs from a particular provider.  42 U.S.C. 1320a-7a(a)(5).  The federal Anti-Kickback Statute prohibits knowingly and willfully offering, paying, soliciting, or receiving remuneration to any person to induce such person to order or to receive any items or service for which payment may be made under a federal healthcare program unless the arrangement fits within a regulatory safe harbor.

183.     Notably, FE-21 similarly corroborated that CareCx instructed employees to avoid putting things about potentially improper practices in writing or in emails.  Indeed, FE-21 expressly recalled he and other employees were regularly instructed to instead use telephone calls and WhatsApp messaging because the Company was concerned that emails and text messages were subject to subpoenas and because WhatsApp could be configured to delete records of messages. FE-21 gave two different examples where his manager told him this – once on June 30, 2021 during an exchange about a lavish dinner for doctors in Portland and once following a March 2022 compliance call, during which FE-21 had raised concerns about excessive expenditures at a Marin County, California retreat for doctors.

184.     CareDx executives knew about all of the improper behavior that was occurring.  As Dr. Olymbios succinctly put it, Maag and Seeto wanted to be "font and center" of the entertainment events – such as the Cavallo Point Lodge, the Seattle Four Seasons, New York, and Miami Beach sales events, the advisory board meetings that were just sales events CareDx paid doctors to attend, and similar activities – which "happened all the time," as Dr. Olymbios explained and numerous other witnesses corroborate.

**3.     Defendants Used "Studies" to Fraudulently Bill Medicare for Tens of Thousands of Additional Tests in Violation of the False Claims Act and the Anti-Kickback Statute**

185.     In addition to the above abuses, CareDx also enrolled thousands of patients in large "studies" of its AlloSure test that were mere pretextual schemes to unlawfully bill Medicare for thousands of additional unneeded tests.  Notably, Medicare regulations entirely prohibit billing for tests administered as part of a study (unless they meet the same medical necessity requirements as in any other scenario).  Yet CareDx simply obfuscated its records to escape detection of the practice. As Dr. Olymbios explained, CareDx "organiz[ed] 'clinical studies' that were funded with condition-free grants," and "offered unrestricted grants to physicians" to enroll patients in CareDx's studies

---

42 U.S.C. 1390a-7b(b).  Violation occurs if "one purpose" of the remuneration is to induce federal program business.  *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).  The Office of Inspector General ("OIG") has further interpreted the federal Anti-Kickback Statute to apply to waiving patient co-pay amounts if "one purpose" of the waiver is to induce the business of a federal program. *OIG, Special Fraud Alert: Routine Waivers of Copayments or Deductibles under Medicare Part B* (May 1991).

1    rather than competitors' studies.  In order to increase enrollments in its studies, CareDx made direct

2    payments to doctors at as much as eight times the normal rate for enrolling their patients in its

3    AlloSure studies, but, critically, only if their patients were on Medicare (and thus could be reliably

4    reimbursed at high rates for the tests provided in the study).

5          186.    CareDx Clinician FE-8[29] explained that CareDx paid doctors who enrolled patients in

6    its massive Kidney Allograft Outcomes AlloSure Registry ("KOAR") study at ***$35,000 to $40,000***

7    ***per patient***, noting that "the[se] payments were ***excessive and very unusual for a simple registry***

8    ***study***."  As FE-8 explained, "these simple registry studies usually paid the doctors a flat rate of

9    $5,000.00 per patient."  In other words, CareDx paid doctors between ***600% to 700% more than***

10    ***market rates*** to enroll patients in its KOAR study.  Clinician FE-8 explained doctors who take these

11    excessive payments go from study to study to make money; specifically: "these doctors go from

12    study to study and knew they were being overpaid."  Clinician FE-8 and another executive told the

13    Company's Chief Medical Officer, Dholakia, that the budgets for paying doctors were "way out of

14    control."

15          187.    As Dr. Olymbios confirmed in this case (and separately detailed in the Whistleblower

16    Complaint), CareDx provided large grants and financial funding for Investigator Initiated Trials

17    ("IITs") – clinical trials in which the investigator is supposed to conceive the research, develop the

18    protocol, and serve as the sponsor investigator.  However, CareDx's studies "were not true IITs, as

19    CareDx developed the protocol and sponsored the investigators."  Instead: "***The sole purpose of***

20    ***enticing these organizations with IIT monies was to recruit patients and orders for Surveillance***

21    ***AlloSure***."  By April 2020 – the start of the Class Period in this case – CareDx had 51 grants either

22    approved for funding or actively funded, and 29 IITs either approved for funding or actively funded,

23    which amounted to total grant and IIT funding of $8,958,000.  These grants were "***in truth***

24    ***kickbacks***" – *i.e.*, "remuneration paid to medical centers or physician practices in exchange for their

25    willingness to order Surveillance AlloSure on their transplant patients and to provide the results of

26

27    <sub></sub>[29]  FE-8 worked as a Senior Clinical Trial Manager at CareDx from August 2021 to

28    November 2021.  His duties included extensive involvement with the Company's KOAR study,
    described herein.

1   the surveillance to CareDx."  Further evidencing the unlawful nature of this conduct, CareDx "d[id]

2   not monitor or account for the use of funds provided as IITs or grants, nor require that the payments

3   be based on the fair market value of the providers' services," nor did CareDx "restrict the use of the

4   grant or IIT money in any way," as it was required to do.  Indeed, "*[t]hese IITs and grants [we]re,*

5   *in fact, sham payments to physicians and medical centers in order for CareDx to obtain data so*

6   *that it can justify a test – Surveillance AlloSure – that it [was] already billing to Medicare*."[30]

7        188.    By providing these unrestricted grants in exchange for enrolling patients in "studies"

8   (that were really just excuses to perform excessive medically unnecessary tests and bill Medicare),

9   CareDx violated applicable healthcare laws.  As one example, CareDx and its executives blatantly

10  violated the False Claims Act by preselecting only Medicare patients for the KOAR study and

11  improperly seeking reimbursement for the numerous tests provided for each participant KOAR study

12  – tests that were ***not*** medically necessary under Medicare guidelines.  Further, CareDx violated the

13  Anti-Kickback Statute by paying exorbitant fees to doctors to enroll patients in the KOAR registry

14  study, requiring each study participant to undergo a predetermined number of AlloSure tests in

15  contravention of Medicare coverage guidelines and medical necessity, providing forms that made it

16  more difficult for the ordering physician to make an independent medical necessity decision with

17  regard to each test, and failing to collect appropriate documentation by the physicians in a timely

18  manner memorializing the physicians efforts.  Each of these facts, as highlighted by the Office of the

19  Inspector General, are hallmarks of improper kickback schemes and violations of the Anti-Kickback

20  Statute.[31]

21       189.    KOAR was a registry study commenced in 2018 that enrolled over ***1,700 patients***,

22  purportedly to explore the utility of AlloSure surveillance testing, by giving each patient regular

23  AlloSure tests ***over a three-year period***.  Significantly, surveillance testing was not a covered use of

---

24  [30]  The Whistleblower Complaint also noted that CareDx would pitch RemoTraC to the centers to

25  which it provided these grants and successfully signed up a number of them to participate in
    RemoTraC as a result of these inducements.

26  [31]  *See* Special Fraud Alert: Laboratory Payments to Referring Physicians, DEPARTMENT OF

27  HEALTH AND HUMAN SERVICES, OFFICE OF THE INSPECTOR GENERAL (July 25, 2014),
    https://oig.hhs.gov/documents/special-fraud-alerts/866/OIG_SFA_Laboratory_Payments_

28  06252014.pdf.

1   AlloSure under Medicare rules at any point during the Class Period, and thus regular "surveillance"
2   tests were not legally reimbursable by Medicare. Nevertheless, Clinician FE-8 recalled that CareDx
3   systematically steered Medicare patients, and only, Medicare patients, into the AlloSure study. FE-8
4   asked the Company's Chief Medical Officer, Dholakia: "***Why were so many patients considered***
5   ***ineligible and rejected from the study***?" ***Dholakia responded that CareDx rejected patients who***
6   ***lacked Medicare coverage***. CareDx's motivation for this was clear: by enrolling solely Medicare
7   patients in its "studies," it was reliably ensured high reimbursements for each of the thousands of
8   unnecessary tests. Dr. Olymbios corroborated (and directly confirmed in this case) that CareDx
9   improperly enrolled only Medicare patients in its "studies," explaining: "Patients eligible for the
10  study [we]re required to be Medicare Part B beneficiaries, a limitation for which there is no scientific
11  justification."

12          190.    FE-8 noted: "***[T]here were so [many] illegal actions***" at CareDx. FE-8's allegations
13  are particularly troubling given unambiguous guidance on precisely this type of conduct by the
14  Office of the Inspector General relating to violations of the Anti-Kickback Statute. Among its
15  provisions, the Anti-Kickback Statute penalizes anyone who knowingly and willfully solicits,
16  receives, offers or pays remuneration in cash or in kind to induce, or in return for referring an
17  individual to a person for the furnishing, or arranging for the furnishing, of any item or service
18  payable under the Medicare or Medicaid program, which includes AlloSure. The OIG warns that
19  registry arrangements such as KOAR "***may induce physicians to order medically unnecessary or***
20  ***duplicative tests***, including duplicative tests performed for the purpose of obtaining comparative
21  data, and to order those tests from laboratories that offer Registry Arrangements in lieu of other,
22  potentially clinically superior, laboratories."[32]

23          191.    Indeed, CareDx's KOAR study was exactly consistent with the OIG's warning signs
24  of fraud for such a registry study. For example, the OIG warns that it is a red flag for a study when:
25  "The laboratory requires, encourages, or recommends that physicians who enter into Registry
26  Arrangements perform the tests with a stated frequency (*e.g.*, four times per year) to be eligible to

---

27  [32]   https://oig.hhs.gov/documents/special-fraud-alerts/866/OIG_SFA_Laboratory_Payments_
28  06252014.pdf.

1   receive, or to not receive a reduction in, compensation." The KOAR study did exactly this, requiring

2   testing at predetermined intervals. The OIG also warns of studies where: "The laboratory collects

3   comparative data for the Registry from, and bills for, multiple tests that may be duplicative (e.g., two

4   or more tests performed using different methodologies that are intended to provide the same clinical

5   information) or that otherwise are not reasonable and *necessary*." The KOAR study met this

6   criterion as well, as it required testing at predetermined intervals without regard to medical necessity

7   as required by Medicare coverage guidelines.

8       192.   The OIG further warns of situations where: "Compensation paid to physicians

9   pursuant to Registry Arrangements is not fair market value for the physicians' efforts in collecting

10  and reporting patient data." FE-8 has affirmed that CareDx paid *many times above market value* for

11  patient enrollment – $35,000 to $40,000 per patient – seven to eight times the normal $5,000 fee,

12  noting: "the[se] payments were *excessive and very unusual for a simple registry study*." As FE-8

13  explained: "these simple registry studies usually paid the doctors a flat rate of $5,000.00 per patient."

14  In other words, CareDx paid doctors between *600% to 700% more than market rates* to enroll

15  patients in its AlloSure study. Clinician FE-8 explained doctors who take these excessive payments

16  go from study to study to make money; specifically: "these doctors go from study to study and knew

17  they were being overpaid." Clinician FE-8 and another executive told the Company's Chief Medical

18  Officer, Dholakia, that the budgets for paying doctors were "way out of control."

19      193.   The OIG also warns of situations where: "The tests associated with the Registry

20  Arrangement are presented on the offering laboratory's requisition in a manner that makes it more

21  difficult for the ordering physician to make an independent medical necessity decision with regard to

22  each test for which the laboratory will bill." Again, CareDx's conduct fit exactly this description, as

23  according to Dr. Olymbios, CareDx "intentionally excluded from the test requisition form a field

24  where a physician could indicate the reason why the test was medically necessary," so that the

25  Medicare personnel handling reimbursement would not be immediately tipped off that medical

26  necessity was required, and was not actually extant, for the particular test.

27      194.   Finally, the OIG warns against studies where: "Compensation paid to physicians

28  pursuant to Registry Arrangements is not supported by documentation, submitted by the physicians

1    in a timely manner, memorializing the physicians' efforts." FE-8 explained that the KOAR study

2    violated this condition as well, as there were 16,000 pages of missing/outstanding documents that

3    should have been recorded into CDNA's central data base by the 57 transplant centers/sites

4    conducting the study, meaning "the KOAR study did not have a full data set." Clinician FE-8 "tried

5    to get this study cleaned up so that management could publish the correct information to the public,"

6    but the AlloSure testing centers "were not entering the data into the electronic data base system."

      **4.**      **Dr. Olymbios and Other Employees Directly put Defendants**
7                        **Seeto and Maag on Notice of CareDx's Unlawful Practices, and**
8                        **Defendants Retaliated Against Employees Who Complained**

9          195.      The fact that Dr. Olymbios directly reported the Company's improper practices to

10    management, including the Individual Defendants, is corroborated by a number of independent

11    sources. Indeed, as Dr. Olymbios witnessed and confirmed in this case: "***Beginning in July 2020,***

12    ***while employed at CareDx, Dr. Olymbios complained on multiple occasions about fraud and***

13    ***improprieties he witnessed at CareDx***," and "***[Dr. Olymbios] raised these concerns to, among***

14    ***others, Director of Reimbursement Scelfo and [Defendant] Seeto***," as Dr. Olymbios also noted

15    separately in the recently unsealed Whistleblower Complaint.

16          196.      Significantly, during a July 2020 meeting in New York City between Dr. Olymbios

17    and Defendant Seeto, Dr. Olymbios "***placed Seeto . . . on notice that he believed CareDx was***

18    ***committing fraud on the government***" such that Seeto was unquestionably "***aware of his***

19    ***complaints about fraud on the Medicare program***." In addition, Dr. Olymbios described a ***second***

20    time during July 2020 in which he ***again*** placed Defendant Seeto on notice of his concerns about

21    fraud on Medicare – specifically, a "regularly scheduled one-on-one meeting [between Olymbios

22    and Seeto] by telephone in or about July 2020," during which "***Dr. Olymbios raised [those]***

23    ***concerns about billing Medicare for Surveillance AlloSure***." Dr. Olymbios confirmed the concern

24    he expressed to Seeto in these meetings was that CareDx was improperly billing Medicare for uses

25    of AlloSure that were not covered by the applicable local coverage determination.

26          197.      Dr. Olymbios also reported these same concerns to another high-ranking executive,

27    Director of Reimbursement Danielle Scelfo. Specifically, in a July 2020 discussion, Scelfo agreed

28

1  with Dr. Olymbios that billing Medicare for "surveillance" use of AlloSure **was not medically**

2  **necessary** – which meant it violated the False Claims Act and other healthcare laws.

3      198.    These accounts of separate instances of Dr. Olymbios raising these concerns to

4  CareDx management are consistent with and corroborated by other independent sources.  Indeed,

5  CareDx itself has corroborated that Dr. Olymbios was uniquely positioned to know this information,

6  stating: "because of his job duties and responsibilities, Dr. Olymbios had direct and frequent

7  interactions with the highest level-executives at CareDx."  One high level executive (FE-11) – who

8  reported directly to a C-Suite executive from 2019 to 2021 – confirmed Dr. Olymbios had been

9  "**vocal**" in voicing his observations that the Company was unlawfully billing Medicare for medically

10  unnecessary tests, including by telling FE-11 about the misconduct.

11      199.    Moreover, Dr. Olymbios witnessed (and confirmed in this case) that some doctors

12  pushed back on the "surveillance" use of AlloSure at Advisory Board meetings where Defendants

13  Maag and Seeto were present.  Specifically, as Dr. Olymbios observed (and confirmed in this case):

14  "Some physicians complained during advisory board meetings [where Maag, Seeto, King, and

15  Dholakia were present] that their patient did not need the AlloSure test each time they ordered

16  RemoTraC for routine blood work panels."  Yet "**Maag, Seeto, King and Dholakia told the doctors**

17  **at advisory board meetings that doctors could not remove the AlloSure testing from the panel**,"

18  and "the company would not modify the panel testing supplied by RemoTraC.  **CareDx refused to**

19  **modify the panel because the AlloSure component was highly lucrative for CareDx**."

20      200.    Dr. Olymbios further corroborated that Defendant Seeto knew CareDx was engaging

21  in this improper "surveillance" use of AlloSure (and thus improperly billing Medicare) because

22  Defendant Seeto and other C-level executives specifically discussed billing Medicare for

23  "surveillance" testing during Business Leadership Team meetings.

24      201.    Dr. Olymbios also observed (and confirmed in this case) that CareDx "used what it

25  represented to be clinical tests to bill Medicare for [AlloSure]" even as "[m]ultiple nephrology

26  practices **expressed serious reservations** about this practice as a **violation of Medicare billing**

27  requirements, and CareDx employees **internally flagged this practice as impermissible**."

28  Dr. Olymbios specifically cited Dallas Nephrology Associates as one practice that had raised these

1  concerns.  Dr. Olymbios reported these concerns to "**more than ten other current or former CareDx**

2  **employees, including Peter Maag**, then the Chief Executive Officer for CareDx, **and Reg Seeto**, the

3  current President and Chief Executive Officer of CareDx."  According to Dr. Olymbios, the senior

4  "CareDx executives **brushed off his concerns or berated him for raising them in the first place**"

5  and "**repeatedly ignored or actively quashed any internal concerns about its activity**" until he

6  finally resigned in late 2020.

7         202.  Similarly, Dr. FE-1, who worked for CareDx as a Senior Medical Science Liaison

8  until he resigned in January 2022, raised concerns about this scheme with his supervisor,

9  Dr. Grigoriy Shekhtman.  However, Dr. Shekhtman told Dr. FE-1 that CareDx needed to engage in

10  these practices in order to meet its goal of maximizing the number of AlloSure tests drawn.

11  Dr. Shekhtman **reported directly to CareDx Chief Medical Officer Dholakia**, who attended sales-

12  and marketing-related meetings with a team (internally called the "Braveheart" team) that included

13  Defendants Maag, Seeto, and others.  Dr. FE-1 also reported his concerns to the Company's top

14  compliance attorney, Clarice McCauley, whom the Company hired in early 2021.  Dr. FE-1 noted

15  McCauley "was having an uphill battle and **CareDx did not want to be compliant**."  McCauley quit

16  CareDx less than a year after beginning this "uphill battle," though she had worked for her prior lab

17  diagnostics employer for more than 16 years before joining CareDx.

18         203.  FE-11 explained that no one took any further action in response to the concerns

19  Dr. Olymbios was expressing because "**we were all terrified for our jobs**."

20         204.  Notably, other former employees confirmed Defendants retaliated against those who

21  raised concerns.  For example, FE-19, who reported directly to CEO Seeto and worked closely with

22  him, explained that, after CareDx came under government investigation in late 2021, his friend and

23  colleague, Erin Tokunaga, confided in him "**that she was being bullied[,] intimidated, and coerced**

24  **to not provide information or misreport information on the DOJ investigation**."  Tokunaga was in

25  charge of the Company's clinical trial management and reported directly to CMO Dholakia.  FE-19

26  said management "put a lot of mental pressure on her," and "**[t]he pressure was so pervasive . . . .**

27  **She said that she was going to hire her own attorney**.  She mentioned this multiple times to me."

28  FE-19 has further confirmed it was senior management – including, specifically, Tokunaga's boss,

1  Chief Medical Officer Dholakia – who were the ones bullying her not to cooperate with the DOJ

2  investigation, and this was happening in roughly October through December 2021, just after the

3  Company reported the DOJ had begun investigating.[33]

4       205.    FE-21 similarly corroborated that there was retaliation against employees for

5  reporting on unlawful and unethical conduct.  For example, FE-21 recalled raising concerns about

6  CareDx hiding its remuneration to doctors by pretending it had invited 40 people to a dinner that

7  only 10 people attended (to disguise the exorbitant amount of money being spent on each doctor as a

8  kickback), and warned they could be found liable if the Office of the Inspector General audited

9  them.  Consequently, FE-21 was immediately placed on a Performance Improvement Plan in

10  retaliation shortly after raising those concerns.  FE-21 said he was ultimately terminated for raising

11  similar concerns.  FE-21 said he asked Salimbangon if Salimbangon thought FE-21 was the victim

12  of retaliation and that Salimbangon responded "definitely" and also told him: "***the directive from***

13  ***everyone above me – Alex [Johnson], Reg [Seeto], Greg [Quinn] – they are all very familiar with***

14  ***what is happening with you, they've all heard the comments***."  FE-21 also recalled discussing his

15  termination with another sales representative, Melinda Primeaux, who told him she believed "quite a

16  few" other sales representatives had been terminated in retaliation for raising such concerns as well.

17       206.    Defendants Maag and Seeto were also unquestionably on notice that their use of

18  "studies" to bill Medicare for medically unnecessary tests violated healthcare laws.  For example, as

19  Dr. Olymbios confirmed in this case, a Business Leadership Team PowerPoint presentation dated

20  July 28, 2020 titled "BLT Master Deck" contained a slide (slide 50) informing executive

21  management that tests performed as part of a study could only be billed to Medicare in

22  circumstances where they were otherwise medically necessary and otherwise met the Medicare LCD

23  requirements – in other words, only when there was "clinical suspicion of rejection."  Specifically,

24  the slide explained that the Medicare Clinical Trial Policy (CTP), which is a national coverage

25  determination ("NCD"), allows payment of investigational items or services (such as AlloSure for

26  "surveillance" use) only if it is normally covered outside of the trial and meets medical necessity

27

28    [33]   Tokunaga died in January 2022.

1   requirements. Leaving no doubt, the slide stated: "coverage [for the services] under [the] Medicare

2   LCD needs to be consistent with the LCD and medically necessary." However, the LCD *only*

3   covered testing where there was "clinical suspicion of rejection" – it most definitely did *not* cover

4   CareDx's conduct, in which the Company gave the same patient AlloSure tests over and over again.

5        207.    Defendant Seeto was a member of the Business Leadership Team and thus received

6   the July 28, 2020 presentation.

7        208.    Moreover, even institutions participating in the studies questioned the legality of

8   CareDx's billing practices – specifically, a Dr. Olymbios confirmed in this case (and detailed in the

9   Whistleblower Complaint): "several facilities, including Baylor [University Medical Center], began

10   to question CareDx as to whether billing Medicare for AlloSure performed as part of the study was

11   appropriate." FE-3 corroborated that Baylor University Medical Center raised these exact concerns

12   in July 2020 at a remote meeting – a meeting which, as FE-3 expressly confirmed, *Dr. Olymbios*

13   *also attended*. At the meeting, Baylor University personnel "*rais[ed] concerns about [CareDx's]*

14   *Medicare billing*." Dr. Olymbios raised this concern in an email to several CareDx employees on

15   July 22, 2020 and was told to direct his concerns to Danielle Scelfo, CareDx's head of

16   reimbursement. Scelfo in turn later told Olymbios that CareDx should not be billing Medicare for

17   AlloSure as part of any study of its use for surveillance.

18        209.    Similarly, the Renal Disease Research Institute ("RDRI") in Dallas, Texas, entirely

19   refused to participate in CareDx's "surveillance" testing study over similar concerns. Indeed, the

20   President of RDRI wrote directly to Defendant Maag on June 22, 2020 that RDRI had decided not to

21   proceed because payors, including the government (*i.e.*, Medicare) could raise concerns over the

22   unusual fact that they were being charged for the costs of testing.

23        210.    Moreover, there is no doubt that Defendants Maag and Seeto understood their billing

24   and kickback practices violated healthcare laws. Defendants Seeto and Maag each personally signed

25   SEC filings attesting to their understanding of the types of practices that violated the False Claims

26   Act, the Anti-Kickback Statute, and the Stark Law, including *multiple* Forms 10-K filed with the

27   SEC that affirmed: "The False Claims Act's 'whistleblower' or '*qui tam*' provisions imposes

28   liability on any person or entity that, among other things, knowingly presents, or causes to be

presented, a false or fraudulent claim for payment by [a federal healthcare program].”[34]    These

Defendants further attested they understood: “Liability arises, primarily, when an entity knowingly

submits or causes another to submit, a false claim for reimbursement to the federal government,”

which can include “***causing physicians to order excessive or unnecessary services [and] providing***

***false documentation in support of claims [or] kickbacks***,” just as was routinely done with AlloSure.

These SEC filings signed by Seeto and Maag further affirmed their understanding that:

> The federal healthcare programs’ Anti-Kickback Statute ***prohibits persons***
> ***from knowingly and willfully soliciting, offering, receiving or providing***
> ***remuneration, directly or indirectly, in exchange for or to induce either the referral***
> ***of an individual, or the furnishing or arranging for a good or service, for which***
> ***payment may be made under a federal healthcare program such as Medicare or***
> ***Medicaid***.

CareDx’s SEC filings also affirmed Defendant Seeto and Maag’s understanding that “remuneration”

would include provision of free tests to their patients, as well as many of the other kickbacks

described further herein (such as the sham “advisory boards,” dinners, luxury trips, and “speaking

fees,” as well as provision of free blood tests and waivers of copays) as “***[t]he definition of***

***‘remuneration’ has been broadly interpreted*** to include anything of value, including, for example,

***gifts, certain discounts, the furnishing of free supplies, equipment or services, credit***

***arrangements, payment of cash and waivers of payments***.”

      211.    Moreover, these SEC filings attest to Seeto’s and Maag’s understanding that billing

for RemoTraC testing could violate these laws even if they claimed that it ***also*** served a lawful

purpose (*e.g.*, to provide mobile testing services, to purportedly “educate” doctors, etc.) as “[s]everal

courts have interpreted the statute[’s] [intent requirement] to mean that ***if any one purpose of [an***

***arrangement involving] remuneration is to induce . . . referrals of federal healthcare [covered]***

***business[es], the statute has been violated***.”    Finally, Seeto and Maag’s signed SEC filings

reaffirmed: “Violations of the Anti-Kickback Statute also are actionable under the federal False

Claims Act.”

---

[34]    Defendant Maag signed the Company’s Forms 10-K dated February 27, 2020 and February 24, 2022, respectively.  Defendant Seeto signed the Company’s Forms 10-K dated February 24, 2021 and February 24, 2022, respectively.  Each of these Forms 10-K contained representations substantially similar to those described in ¶¶210-212.

212.    Additionally, the Forms 10-K signed by Maag and Seeto each attested to Maag's and Seeto's understanding that the Company was subject to prohibitions on billing *any* payors (either commercial or Medicare) for tests prescribed by doctors who were receiving fees, benefits, or other kickbacks from CareDx.  Specifically, the SEC filings each explained:

> We are subject to the federal self-referral prohibitions, commonly known as the Stark Law, and to similar state restrictions such as California's Physician Ownership and Referral Act, or PORA.  Where applicable, ***these restrictions generally prohibit us from billing patients or certain governmental or private payers for clinical laboratory testing services when the physician ordering the test[] . . . has . . . [any] compensation arrangement with [CareDx]*** unless the arrangement meets an exception to the prohibition.

213.    More specifically, the Stark Law, 42 U.S.C. §1395nn ("Limitation on certain physician referrals") dictates, in relevant part, that where a physician has a "compensation arrangement" with a medical testing company like CareDx, the physician may not refer patients to the company for services, and the company may not submit claims resulting from those referrals for payment by third-party payors such as Medicare or private insurance.  A "compensation agreement" under the Stark Law is "***any arrangement involving any remuneration between a physician . . . and an entity" like CareDx*** and thus clearly includes the many types of kickbacks described above, such as excessive speaking fees, expensive dinners and trips, exorbitant fees for enrollment of patients in studies, and even provision of free blood tests.  42 U.S.C. §1395nn(h)(1)(A).  Moreover, the "exceptions" to the Stark Law primarily involve payment of "fair market value" to physicians for limited categories of service.  However, those exceptions clearly did not apply here as CareDx schemed to pay physicians far above any conceivable "market value" for any services the physicians might have provided to CareDx and often gave them exorbitant and lavish kickbacks in exchange for nothing at all (other than committing to prescribe AlloSure).

## VII.    FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

214.    Defendants made false and misleading statements and material omissions during the Class Period in violation of §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, CareDx's press releases, investor presentations, and public SEC filings included material misstatements and/or omissions concerning the Company's business

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4885-0370-0468.v1

- 70 -

1   and operational practices and its AlloSure kidney testing and mobile phlebotomy services.

2   Defendants' material misstatements and omissions thus created in the market an unrealistically

3   positive assessment of CareDx's business, operational status, profitability, future growth prospects,

4   and compliance with applicable laws and regulations, all of which artificially inflated the price of

5   CareDx's common stock.

6       **A.    April 30, 2020: Quarterly SEC Filing on Form 10-Q and Related
            Quarterly Conference Call with Analysts and Investors Regarding
7            RemoTraC**

8       215.    On April 30, 2020, the Company filed its quarterly report on Form 10-Q with the

9   SEC.  Maag signed the report.  In the section of the quarterly report titled, "Management's

10  Discussion and Analysis of Financial Condition and Results of Operations," Maag stated:

11          Testing services revenue increased by $9.9 million, or 46%, for the three
            months ended March 31, 2020 as compared to the same period in 2019.  This
12          increase is ***primarily due to*** an increase of more than 5,000 test results provided in
            the three months ended March 31, 2020, compared to the same period in 2019.

13
        216.    These statements were false or misleading because they attributed revenue growth to
14
    legal conduct.  However, as set forth herein, CareDx's revenue increase was in fact attributable in
15
    large part to the Company's pervasive, unlawful, and unsustainable false claims submitted to
16
    Medicare and improper kickbacks to doctors.
17
        217.    Maag knew or should have known the foregoing statements were false or misleading
18
    at the time because the Company was then actively engaged in systematic Medicare overbilling and
19
    kickback violations.  These activities are detailed extensively herein and include, but are not limited
20
    to, these activities:
21
            (a)    using RemoTraC to improperly bundle medically unnecessary AlloSure tests
22
    with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary
23
    AlloSure tests;
24
            (b)    deliberately obscuring from patients and doctors that AlloSure tests were
25
    being performed;
26
            (c)    intentionally excluding from the AlloSure test requisition form a field where
27
    the physician could indicate why the test was medically necessary so the physician and Medicare
28

1  personnel handling the reimbursement would not be immediately tipped off that medical necessity

2  was a prerequisite for Medicare reimbursement;

3          (d)     further obscuring the requirement for medical necessity by using an entirely

4  paper-based claims submission system, which made tracing claims virtually impossible;

5          (e)     using the KOAR study to unlawfully seek Medicare reimbursement for

6  medically unnecessary AlloSure tests performed through the KOAR study;

7          (f)     offering extravagant inducements or kickbacks to physicians and others to

8  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

9  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

10  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

11  Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

12  restaurants, where they dined on CareDx's dime;

13          (g)     offering sham "advisory board" positions to physicians to encourage them to

14  order AlloSure tests;

15          (h)     taking physicians on "booze" cruises, helicopter tours, and expensive

16  vacations;

17          (i)     paying kickbacks to physicians to encourage them to conduct AlloSure blood

18  tests in violation of healthcare laws;

19          (j)     offering to waive patient costs associated with AlloSure tests; and

20          (k)     paying physicians $35,000 to $40,000 in exchange for enrolling their patients

21  in CareDx's KOAR study.

22          **1.      Continuing to Tout Apparently Legal Business Activity in
                      Violation of Duty to Disclose the Impact of Unlawful Conduct**

23

24          218.    Following the Company's public filing of its first quarter written reports, on April 30,

25  2020, the Company also held a public earnings call with analysts and investors.  Maag touted

    RemoTraC on the call:

26

27          Considering this [COVID-19] backdrop, ***our results this quarter were
           particularly strong***.  Up until the impact of COVID-19, we were well on track to
           exceed $40 million in total revenue for the first quarter.  Our pledge to support our
28         patients remains our focus.  And as part of our efforts ***on March 17, we announced***

***the launch of RemoTraC***, our solution for enabling home-based monitoring for transplant patients.  Importantly, we created RemoTraC in response to hearing that patients were missing their check-in appointments and blood draw as a result of COVID crisis.  This home-based blood draw solution using mobile phlebotomy reduces the necessary visit to labs and hospitals for immunosuppressant transplant patients. . . .

***Mobile phlebotomy has increased from 10% of our daily volume 8 weeks ago, to now comprising over 50%***.

Under the tremendous leadership of Reg Seeto, our President and Chief Business Officer, CareDx has pivoted extremely quickly.

219.   The preceding public statements were false or misleading, as Maag knew or should have known due to the kickback/false claims scheme: (a) the statements touted COVID as the driving force behind RemoTraC but omitted to disclose that RemoTraC also was a vehicle to bundle medically unnecessary AlloSure tests with medically necessary standard of care tests; and (b) the statements credited the quarter's "particularly strong" results to RemoTraC's contributing "over 50%" of testing but failed to disclose that RemoTraC generated a material amount of medically unnecessary testing in violation of Medicare and private payor reimbursement rules.  The preceding statements also support scienter because they show Maag and Seeto were familiar with the details of the RemoTraC program.  These facts permit an inference that they knew or should have known of RemoTraC's legal and unlawful purposes.

220.   Further, Maag knew or should have known the foregoing statements were false or misleading at the time because the Company was then actively engaged in systematic Medicare overbilling and kickback violations.  These activities are detailed extensively herein and include, but are not limited to, these activities:

(a)   using RemoTraC to improperly bundle medically unnecessary AlloSure tests with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary AlloSure tests;

(b)   deliberately obscuring from patients and doctors that AlloSure was being performed;

(c)   intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare

1  personnel handling the reimbursement would not be immediately tipped off that medical necessity

2  was a prerequisite for Medicare reimbursement;

3      (d)    further obscuring the requirement for medical necessity by using an entirely

4  paper-based claims submission system, which made tracing claims virtually impossible;

5      (e)    using the KOAR study to improperly seek Medicare reimbursement for

6  medically unnecessary AlloSure tests that were performed through the KOAR study;

7      (f)    offering extravagant inducements or kickbacks to physicians and others to

8  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

9  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

10  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

11  Napa Valley, where they were chauffered around in limousines and brought to vineyards and

12  restaurants, where they dined on CareDx's dime;

13      (g)    offering sham "advisory board" positions to physicians to encourage them to

14  order AlloSure tests;

15      (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

16  vacations;

17      (i)    paying unlawful and unethical kickbacks to physicians to encourage them to

18  conduct AlloSure blood tests;

19      (j)    offering to waive patient costs associated with AlloSure tests; and

20      (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

21  in CareDx's KOAR study.

**B.    June 9-10, 2020: Desperate for $125 Million, Maag Promises Material "Compliance with Health Care Laws"**

221.    On June 10, 2020, the Company issued a press release alerting investors that the

Company wanted to raise $125 million from investors.  The press release noted:

SOUTH SAN FRANCISCO, Calif., June 10, 2020 (GLOBE NEWSWIRE) – CareDx, Inc. (Nasdaq: CDNA) . . . today announced the pricing of an underwritten public offering of 3,906,250 shares of its common stock at a ***public offering*** price of $32.00 per share.  The gross proceeds to CareDx from this offering, before deducting underwriting discounts and commissions and offering expenses, are expected to be

1   *$125,000,000*. . . .   The offering is expected to close on or about June 15, 2020,
2   subject to the satisfaction of customary closing conditions.

3   222.    To raise the $125 million from investors like the retirement fund Lead Plaintiffs in

this case, on June 11, 2020, the Company filed publicly the underwriting agreement Maag signed

4   with various investment banks; the document states:

5           ***Compliance with Health Care Laws***.   The Company and, to the Company's
6   knowledge, its directors, employees and agents (while acting in such capacity) ***are in***
    ***material compliance with, all health care laws*** applicable to the Company, or any of
7   its products or activities, including, but not limited to, the federal ***Anti-Kickback***
    ***Statute*** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law (42 U.S.C.
8   Section 1320a-7a(a)(5)), the civil ***False Claims Act*** (31 U.S.C. Section 3729 *et seq.*),
    the administrative False Claims Law (42 U.S.C. Section 1320a-7b(a)), the Stark law
9   (42 U.S.C. Section 1395nn) . . . .  To the Company's knowledge, ***there are no facts***
    ***or circumstances*** that would reasonably be expected to give rise to material liability
10  of the Company under any Health Care Laws.

11  223.    In filing these June 10, 2020 compliance assurances, the Company tacked on a cover

12  document that ***admitted*** the underwriting agreement was important or "material" to investors,

13  describing the underwriting agreement under the heading "***Entry into a Material Definitive***

14  ***Agreement***."    There, the Company told investors to review the underwriting agreement: "the

15  Underwriting Agreement ***is incorporated*** herein by reference only ***to provide investors with***

16  ***information*** regarding the terms of the Underwriting Agreement, and not to provide investors with

17  any ***other*** factual information regarding the Company or its business, and should be read in

18  conjunction with the disclosures in the Company's periodic reports and other filings with the SEC."

19  In this way the Company invited reasonable investors to rely on the factual information in the

20  underwriting agreement; but, as to "***other***" factual information – such as financial statements – they

21  should review "***other***" disclosures.

22  224.    Furthermore, successful execution of the Underwriting Agreement was a condition to

23  closing the $125 million funding CareDx needed to stay alive.   According to the Company's

24  financial statements of March 31, 2020 – signed by Maag – the Company had a meager $32 million

25  in cash and cash equivalents, ***down*** from $38 million three months earlier.   Indeed, in the Company's

26  annual report that Maag signed and the Company filed in on February 28, 2020, Maag admitted: "As

27  of December 31, 2019, we had cash and cash equivalents of $38.2 million and an accumulated

28  deficit of $333.8 million."   In other words, Maag was running the Company beyond its means.   As

CEO, during the six quarters leading up to the Company's June 2020 request that investors give the Company more money, Maag delivered the following results, showing continuous losses, measured in millions of dollars:

| Quarter Ending | Net Income |
|---|---|
| 12/31/18 | -3.75 |
| 03/31/19 | -7.53 |
| 06/30/19 | -7.85 |
| 09/30/19 | -1.81 |
| 12/31/19 | -4.78 |
| 03/31/20 | -5.82 |

225.    Running the Company in the red did not cause Maag to suffer financially.  To the contrary.  Among the "IMPORTANT INFORMATION INCORPORATED BY REFERENCE" into the June 9, 2020 offering documents are other documents that address Maag's compensation, including a proxy statement, which Maag himself signed on April 29, 2020.  The document shows Maag had *$8.3 million* in equity awards as of the end of 2019; this fact is important because it shows Maag had a powerful motive to misrepresent the unlawful conduct that he used to run the Company – namely, that if Maag failed to raise the $125 million from investors, the Company would soon run out of money and into insolvency, rendering his personal *$8.3 million* in equity worthless.

226.    CareDx emphasized the importance of this stock offering to investors by touting it in a June 10, 2020 press release disseminated to investors via *GlobeNewswire* headlined: "CareDx Announces Pricing of Public Offering of Common Stock" and more specifically touting "the pricing of an underwritten public offering of 3,906,250 shares of its common stock at a public offering price of $32.00 per share."  Five days later, on June 15, 2020, CareDx put out yet another press release announcing the closing of the same offering.

227.    Moreover, investment analysts took intense interest in the offering and breathed a sigh of relief when the Company reported that investors gave the Company more money.  On June 19, 2020, analysts from H.C. Wainwright reported: "Financing completed" and "the company closed a public offering of 3.9M shares at $32 per share for net proceeds of $117.1M" with additional shares sold in the offering "bringing the total shares issued to 4.5M and total net proceeds to $134.7M."  The cash infusion clearly was material as the Wainwright analysts' financial models

1    showed the Company would be essentially bankrupt by the end of 2020 in its absence; specifically,

2    the financial models projected $29.9 million in losses for the year, which, with only $32 million cash

3    on hand, would place the Company on the brink of bankruptcy. However, the $134 million infusion

4    – resting, in part, on the false statements that the Company was in compliance with key rules kept

5    the Company afloat.

6        228.    Additionally, as discussed further below, Defendant Seeto would later explain to

7    investors that the Company's large stock offerings gave the Company a critical "competitive

8    advantage" over its peers, which did ***not*** have such capital, leading to "very positive feedback from

9    our long-term investors."

10        229.    Maag knew or should have known that the Company's assurances that it complied

11    with "all healthcare laws," including the False Claims Act and the Anti-Kickback Statute, were false

12    and misleading when they were made because the Company was then actively engaged in systematic

13    violations of the False Claims Act and the Anti-Kickback Statute. These activities are detailed

14    extensively herein and include, but are not limited to, these activities:

15        (a)    using RemoTraC to improperly bundle medically unnecessary AlloSure tests

16    with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary

17    AlloSure tests;

18        (b)    deliberately obscuring from patients and doctors that AlloSure tests were

19    being performed;

20        (c)    intentionally excluding from the AlloSure test requisition form a field where

21    the physician could indicate why the test was medically necessary so the physician and Medicare

22    personnel handling the reimbursement would not be immediately tipped off that medical necessity

23    was a prerequisite to Medicare reimbursement;

24        (d)    further obscuring the requirement for medical necessity by using an entirely

25    paper-based claims submission system, which made tracing claims virtually impossible;

26        (e)    using the KOAR study to improperly seek Medicare reimbursement for

27    medically unnecessary AlloSure tests that were performed through the KOAR study;

28

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT                                    - 77 -

1      (f)     offering extravagant inducements or kickbacks to physicians and others to

2 encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

3 doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

4 key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

5 Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

6 restaurants, where they dined on CareDx's dime;

7      (g)     offering sham "advisory board" positions to physicians to encourage them to

8 order AlloSure tests;

9      (h)     taking physicians on "booze" cruises, helicopter tours, and expensive

10 vacations;

11      (i)     paying unlawful and unethical kickbacks to physicians to encourage them to

12 conduct AlloSure blood tests;

13      (j)     offering to waive patient costs associated with AlloSure tests; and

14      (k)     paying physicians $35,000 to $40,000 in exchange for enrolling their patients

15 in CareDx's KOAR study.

16    **C.**    **August 4, 2020: CareDx Touts a 41% Increase in Testing Revenue,**
**Pointing to Supposed Legitimate Business Practices While Improperly**

17            **Omitting Unlawful Conduct's Contribution**

18    230.    Maag made more materially false and misleading statements in the August 4, 2020

19 quarterly report in the section of the report entitled "MANAGEMENT'S DISCUSSION AND

20 ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" – signed by

21 Maag – wherein Maag stated:

22    Testing services ***revenue increased*** by $10.6 million, or ***41%***, for the three
months ended June 30, 2020 as compared to the same period in 2019. This increase

23    is ***primarily due to*** an increase of more than 5,200 test results provided in the three
months ended June 30, 2020, compared to the same period in 2019.

24

25    231.    These statements were false or misleading because they attributed revenue growth to

legal conduct. However, as set forth herein, CareDx's revenue increase was in fact attributable in

26 large part to the Company's pervavsive, unlawful, and unsustainable false claims and improper

27 kickbacks to doctors.

28

**D.    October 29, 2020: CareDx Continues Touting Purportedly Lawful Revenue Growth**

232.    On October 29, 2020, the Company publicly filed with the SEC its report for the third financial quarter of the year.    Maag signed the report.    In the report, under the heading "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS," Maag stated:

> Testing services ***revenue increased by $17.3 million, or 61%***, for the three months ended September 30, 2020 as compared to the same period in 2019.    This increase is ***primarily due to*** an increase of more than 8,500 AlloSure Kidney and AlloMap Heart patient results provided in the three months ended September 30, 2020, compared to the same period in 2019.

233.    These statements were false or misleading because they attributed revenue growth to legal conduct.    However, as set forth herein, CareDx's revenue increase was in fact attributed in large part to the Company's pervasive, unlawful, and unsustainable false claims and improper kickbacks to doctors.

**E.    January 21, 2021: CareDx Doubles Down on Its "Compliance with Health Care Laws" Assurances to Raise Another $175 Million from the Investing Public**

234.    On January 20, 2021, in connection with the filing of the Company's prospectus offering up to 2,211,538 shares of common stock to the investing public at $91 per share, the Company issued a press release.    The release included the following information:

**CareDx Announces Pricing of Public Offering of Common Stock**

SOUTH SAN FRANCISCO, Calif., January 20, 2021 (GLOBE NEWSWIRE) – CareDx, Inc. (Nasdaq: CDNA), a leading precision medicine company focused on the discovery, development and commercialization of clinically differentiated, high-value healthcare solutions for transplant patients and caregivers, today announced the pricing of an underwritten public offering of 1,923,077 shares of its common stock at a public offering price of $91.00 per share.    The gross proceeds to CareDx from this offering, before deducting underwriting discounts and commissions and offering expenses, are expected to be ***$175,000,007***.    In addition, CareDx has granted the underwriters a 30 day option to purchase up to 288,461 additional shares of its common stock offered in the public offering on the same terms and conditions.    The offering is expected to close on or about January 25, 2021, ***subject to the satisfaction of customary closing conditions***.

235.    Also on January 21, 2021, the Company publicly filed the underwriting agreement that Seeto signed with the various investment banks so CareDx could raise the $175 million that

Maag and Seeto wanted to raise.  There, Seeto assured investors the Company was in material compliance with all healthcare laws:

> **Compliance with Health Care Laws**.  The Company and, to the Company's knowledge, its directors, employees and agents (while acting in such capacity) **are in material compliance with, all health care laws** applicable to the Company, or any of its products or activities, including, but not limited to, the federal Anti-Kickback **Statute** (42 U.S.C. Section 1320a-7b(b)), Section 1320a-7a(a)(5)), the civil **False Claims Act** (31 U.S.C. Section 3729 *et seq.*), the administrative False Claims Law (42 U.S.C. Section 1320a-7b(a)), the Stark law (42 U.S.C. Section 1395nn) . . . . To the Company's knowledge, **there are no facts or circumstances** that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws.

In filing these assurances, the Company admitted the underwriting agreement was important or "material" to investors and described the underwriting agreement under the heading "Entry into a Material Definitive Agreement."  There, the Company told investors to review the underwriting agreement:  "[T]he Underwriting Agreement is incorporated herein by reference only to **provide investors with information** regarding the terms of the Underwriting Agreement, and not to provide investors with any other factual information regarding the Company or its business, and **should be read** in conjunction with the disclosures in the Company's periodic reports and **other** filings with the SEC."

236.    Seeto knew or should have known the Company's assurances that it complied with "all healthcare laws," including the False Claims Act and the Anti-Kickback Statute, were false and misleading when they were made because the Company was then actively engaged in systematic violations of the False Claims Act and the Anti-Kickback Statute.  These activities are detailed extensively herein and include, but are not limited to, these activities:

(a)    using RemoTraC to illegally bundle medically unnecessary AlloSure tests with routine "standard of care" tests and illegally billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare

1    personnel handling the reimbursement would not be immediately tipped off that medical necessity

2    was a prerequisite to Medicare reimbursement;

3         (d)    further obscuring the requirement for medical necessity by using an entirely

4    paper-based claims submission system, which made tracing claims virtually impossible;

5         (e)    using the KOAR study to improperly seek Medicare reimbursement for

6    medically unnecessary AlloSure tests that were performed through the KOAR study;

7         (f)    offering extravagant inducements or kickbacks to physicians and others to

8    encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

9    doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

10   key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

11   Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

12   restaurants, where they dined on CareDx's dime;

13        (g)    offering sham "advisory board" positions to physicians to encourage them to

14   order AlloSure tests;

15        (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

16   vacations;

17        (i)    paying unlawful and unethical kickbacks to physicians to encourage them to

18   conduct AlloSure blood tests;

19        (j)    offering to waive patient costs associated with AlloSure tests; and

20        (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

21   in CareDx's KOAR study.

22   237.    In this way, the Company invited reasonable investors to rely on the factual

23   information in the underwriting agreement but as to "*other*" factual statements – such as financial

24   performance – should review "*other*" disclosures.

25   238.    Furthermore, successful execution of the Underwriting Agreement was a condition to

26   closing the $175 million funding necessary to keep CareDx operating after multiple quarters

27   operating in the red, detailed above.

28

239.     This stock offering was thus unquestionably of intense interest to investors as it was designed to secure a large and much-needed source of funding.  Indeed, the offering was so significant to the Company that it issued three separate press releases about the January 2021 offering (a press release announcing the offering, a second announcing pricing of the offering, and a third announcing the closing of the offering).[35]  Like the Company's other stock offering, the large stock offering the foregoing statements supported was of intense interest to investors.  Seeto admitted as much in a retrospective commentary, reflecting that the cash it raised gave the Company a "competitive advantage" over its peers, which did ***not*** have such capital, and that the funding generated "very positive feedback" from investors:

> Now on to the first topic, our excellent financial profile.  Our Board and Management team believe that maintaining a strong balance sheet is important to CareDx's success.  You may recall that in ***Q1 of last year [first quarter of 2021]***, we took advantage of a favorable market condition to bolster our cash position by raising $188 million through a public stock offering, ensuring that we can be self-funding for the foreseeable future.
>
> This is a competitive advantage for CareDx in the current market environment, particularly as we have a clear path to profitability.  ***Unlike our peers, we will not have a near-term need to raise capital***.  And over the longer term, we have the flexibility to deploy capital in a way that we will increase the value for shareholders.  ***We received very positive feedback from our long-term investors on this***.

Clearly, raising $175 million in cash ($188 million after exercising other sales rights) is of intense interest to investors in the Company seeking or raising the money.  Seeto's admissions reinforce this fact.

### F.     February 18, 2021: The BTIG Investor Conference

240.     On February 18, 2021, CareDx presented at the BTIG Virtual MedTech, Digital Health, Life Sciences, and Diagnostic Tools Conference.  In response to an analyst question about the growth drivers of CareDx's "record" year, Defendant Seeto represented that "what worked really well for us [in the kidney space] during COVID is that centers were able to ask us for help and

---

[35]  https://investors.caredx.com/news/news-details/2021/CareDx-Announces-Proposed-Public-Offering-of-Common-Stock-01-19-2021/default.aspx;    https://investors.caredx.com/news/news-details/2021/CareDx-Announces-Pricing-of-Public-Offering-of-Common-Stock-01-20-2021/default.aspx; https://investors.caredx.com/news/news-details/2021/CareDx-Announces-Closing-of-Public-Offering-of-Common-Stock-01-25-2021/default.aspx.

1  support and we were able to address their needs and demands and I think RemoTraC is a really good

2  example of that."

3      241.    In direct response to a follow-up question about RemoTraC, Defendant Seeto further

4  responded:

> And I think what really stood out to me is that we were able to put together a[n] offering and put together a structure within the course of [four] days.  And I don't think you can really do that as a company if you don't have pre-existing relationships and a pre-existing pool from within that transplant community.
>
> So we were really pleased and honored to be able to then create this mobile phlebotomy service and scale it up, ***such that during Q2 40% of our testing was done through mobile***.  And so that really was sort of a ***new model*** for us and that business is now something ***which is sustainable*** and it's going to be maintained as non-intent patients want to really keep this service. . . . So, again, I think RemoTraC was addressing [an] unmet need and I think what helped us is we could move very quickly to bring it to bear particularly during a time of crisis in the transplant community.

12      242.    Defendant Seeto's statements that 40% of the Company's testing was done through a

13  "sustainable" mobile blood-drawing business model were false and misleading.  In reality, as

14  Defendant Seeto knew, that business model (the RemoTraC scheme) was built on unlawful conduct

15  that violated the False Claims Act, the Anti-Kickback Statute, the Sunshine Act, and other laws; in

16  fact, as alleged further above, Defendants deliberately and systematically used RemoTraC to bill

17  Medicare for tests that were ***not*** medically necessary and did ***not*** meet Medicare's requirements, in

18  direct violation of the False Claims Act.

19      **G.    February 24, 2021: CareDx Touts 56% Growth in Revenue Due to Purportedly Lawful Business Activities**

20

21      243.    On February 24, 2021, in its annual report filed with the SEC on Form 10-K, which

22  Maag and Seeto signed, reporting results for the fourth quarter and full year 2020, Maag and Seeto

23  stated:

> Testing services ***revenue increased*** by $59.1 million, or ***56%, for the year*** ended December 31, 2020, compared to the same period in 2019.  This increase is ***primarily due to*** an increase of more than 29,000 AlloSure Kidney, AlloMap Heart and AlloSure Heart patient results provided during the year ended December 31, 2020, compared to the year ended December 31, 2019.

26      244.    These statements were false or misleading because they attributed revenue growth to

27  legal conduct.  However, as set forth herein, CareDx's revenue increase was in fact attributable in

28

1  large part to the Company's pervasive, unlawful, and unsustainable false claims and improper

2  kickbacks to doctors.

3          245.    Maag and Seeto knew or should have known the foregoing statements were false or

4  misleading at the time because CareDx's increased revenue was materially impacted by Defendants'

5  False Claims Act and Anti-Kickback Statute violations.  These activities are detailed extensively

6  herein and include, but are not limited to, these activities:

7                  (a)    using RemoTraC to improperly bundle medically unnecessary AlloSure tests

8  with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary

9  AlloSure tests;

10                 (b)    deliberately obscuring from patients and doctors that AlloSure tests were

11  being performed;

12                 (c)    intentionally excluding from the AlloSure test requisition form a field where

13  the physician could indicate why the test was medically necessary so the physician and Medicare

14  personnel handling the reimbursement would not be immediately tipped off that medical necessity

15  was a prerequisite to Medicare reimbursement;

16                 (d)    further obscuring the requirement for medical necessity by using an entirely

17  paper-based claims submission system, which made tracing claims virtually impossible;

18                 (e)    using the KOAR study to improperly seek Medicare reimbursement for

19  medically unnecessary AlloSure tests that were performed through the KOAR study;

20                 (f)    offering extravagant inducements or kickbacks to physicians and others to

21  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

22  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

23  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

24  Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

25  restaurants, where they dined on CareDx's dime;

26                 (g)    offering sham "advisory board" positions to physicians to encourage them to

27  order AlloSure tests;

28

1               (h)      taking physicians on "booze" cruises, helicopter tours, and expensive

2  vacations;

3               (i)       paying unlawful and unethical kickbacks to physicians to encourage them to

4  conduct AlloSure blood tests;

5               (j)       offering to waive patient costs associated with AlloSure tests; and

6               (k)      paying physicians $35,000 to $40,000 in exchange for enrolling their patients

7  in CareDx's KOAR study.

8        246.    Also in the February 24, 2021 Form 10-K, CareDx claimed it had designed its

9  marketing programs to comply with laws prohibiting referrals from doctors with whom the Company

10  had "compensation arrangements," such as the Stark Law.  Specifically, the Form 10-K stated:

11        <u>Federal and State Self-Referral Prohibitions</u> We are subject to the federal self-referral prohibitions, commonly known as the Stark Law, and to similar state

12        restrictions such as California's Physician Ownership and Referral Act, or PORA. Where applicable, ***these restrictions generally prohibit us from billing patients or***

13        ***certain governmental or private payers for clinical laboratory testing services when the physician ordering the test . . . has . . . [a] compensation arrangement with, us***,

14        unless the arrangement meets an exception to the prohibition.

15        Both the Stark Law and PORA contain exceptions for compensation paid to a physician for personal services rendered by the physician, provided that certain

16        conditions are satisfied.  We have compensation arrangements with a number of physicians for personal services, such as speaking engagements and clinical advisory

17        boards.  ***We have structured these arrangements with terms intended to comply with the requirements of the applicable exceptions to the Stark Law, PORA and***

18        ***other similar state laws***.  However, we cannot be certain that regulators would find these arrangements to be in compliance with the Stark Law, PORA or similar state

19        laws.

20        247.    These statements were materially false and misleading.  Defendants did ***not***

21  "structure[] these arrangements with terms intended to comply with" the exceptions to the Stark Law

22  and other laws.  Instead, the opposite was true: Defendants deliberately structured their arrangements

23  with physicians to ***disguise the fact that they were paying them exorbitant and unlawful kickbacks***

24  ***for prescribing AlloSure***, even going so far as to falsify the numbers of doctors attending lavish

25  marketing dinners to make it look like the Company was only spending a small amount per doctor.

26  Indeed, Defendants improperly compensated doctors as detailed extensively herein.  The improper

27  compensation included, among other things: (a) symposiums where CareDx paid for doctors' flights,

28  limousine services, and bottles of champagne in their hotel rooms; (b) key opinion leader summits,

1    after which CareDx would pay for physicians to spend the weekend in Napa Valley, where the

2    Company chauffeured doctors around in limousines and paid for vineyard tours and lavish dinners;

3    (c) lucrative "speaking contracts" for $1,000 per month; (d) paying physicians $300 to $500 per

4    hour just to attend online sales presentations; and (e) paying physicians $35,000 to $40,000 in

5    exchange for enrolling their patients in CareDx's studies.  Additional examples are detailed herein.

6    **H.    May 5, 2021: First Quarter 2021 Financial Results Report and
         Conference Call**

7    248.    On May 5, 2021, on Form 10-Q, which Seeto signed, reporting results for the first

8    quarter of 2021, Seeto stated:

9
10           Testing services ***revenue increased by $27.8 million, or 89%***, for the three
             months ended March 31, 2021 compared to the same period in 2020.  This increase is
11           ***primarily due to*** an increase of more than 18,000 AlloSure Kidney, AlloMap Heart
             and AlloSure Heart patient results provided in the three months ended March 31,
12           2021, compared to the same period in 2020.

13    249.    Also on May 5, 2021, CareDx hosted an earnings conference call for the first quarter

14    of 2021.  During the call, Defendant Seeto stated: "For our record first quarter, ***total revenue*** was

15    $67.4 million, increasing 76% compared to a year ago quarter.  ***The driver of the quarter's growth
      was our testing services revenue*** which increased 89% to $59.3 million . . . ."

16    250.    These statements about revenue growth were false or misleading because they

17    attributed revenue growth to legal conduct.  However, as set forth herein, CareDx's revenue increase

18    was in fact attributable in large part to the Company's pervasive, unlawful, and unsustainable false

19    claims and improper kickbacks to doctors.

20    251.    Seeto knew or should have known the foregoing statements were false or misleading

21    because, at the time, CareDx's testing services revenue was driven by systematic False Claims Act

22    and Anti-Kickback Statute violations.  These activities are detailed extensively herein and include,

23    but are not limited to, these activities:

24           (a)    using RemoTraC to improperly bundle medically unnecessary AlloSure tests

25    with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary

26    AlloSure tests;

27

28

1          (b)      deliberately obscuring from patients and doctors that AlloSure tests were

2    being performed;

3          (c)      intentionally excluding from the AlloSure test requisition form a field where

4    the physician could indicate why the test was medically necessary so the physician and Medicare

5    personnel handling the reimbursement would not be immediately tipped off that medical necessity

6    was a prerequisite to Medicare reimbursement;

7          (d)      further obscuring the requirement for medical necessity by using an entirely

8    paper-based claims submission system, which made tracing claims virtually impossible;

9          (e)      using the KOAR study to improperly seek Medicare reimbursement for

10    medically unnecessary AlloSure tests that were performed through the KOAR study;

11          (f)      offering extravagant inducements or kickbacks to physicians and others to

12    encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

13    doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

14    key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

15    Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

16    restaurants, where they dined on CareDx's dime;

17          (g)      offering sham "advisory board" positions to physicians to encourage them to

18    order AlloSure tests;

19          (h)      taking physicians on "booze" cruises, helicopter tours, and expensive

20    vacations;

21          (i)      paying unlawful and unethical kickbacks to physicians to encourage them to

22    conduct AlloSure blood tests;

23          (j)      offering to waive patient costs associated with AlloSure tests; and

24          (k)      paying physicians $35,000 to $40,000 in exchange for enrolling their patients

25    in CareDx's KOAR study.

26

27

28

I.    **July 29, 2021: Second Quarter 2021 Quarterly Report and Earnings Call Statements**

252.    On July 29, 2021, Defendants reported financial results for the second quarter of 2021 and held a conference call to discuss the results. In the July 29, 2021 Form 10-Q, which Seeto signed, reporting results for the second quarter of 2021, Seeto stated:

> Testing services **revenue increased by $28.6 million, or 79%**, for the three months ended June 30, 2021 compared to the same period in 2020. This increase is **primarily due to** an increase of more than 20,000 AlloSure Kidney, AlloMap Heart and AlloSure Heart patient results provided in the three months ended June 30, 2021, compared to the same period in 2020.

253.    During the July 29, 2021 call, Defendant Seeto touted the Company's purportedly strong financial results, noting that: "For the second quarter results, total **revenue was $74.2 million increasing 77%** compared to the year ago quarter. **The main driver of growth in the quarter** was from our testing services revenue, which increased 79% to $64.9 million." Defendant Seeto also boasted that: "**We have also more than 9,000 patients that have signed up for RemoTraC**."

254.    These statements about revenue growth were false or misleading because they attributed revenue growth to legal conduct. However, as set forth herein, CareDx's reevnue increase was in fact attributable in large part to the Company's pervasive, unlawful, and unsustainable false claims and improper kickbacks to doctors.

255.    Seeto knew or should have known the foregoing statements were false or misleading because, at the time, CareDx's testing services revenue was driven by systematic False Claims Act and Anti-Kickback Statute violations. These activities are detailed extensively herein and include, but are not limited to, these activities:

(a)    using RemoTraC to improperly bundle medically unnecessary AlloSure tests with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare

1    personnel handling the reimbursement would not be immediately tipped off that medical necessity

2    was a prerequisite to Medicare reimbursement;

3                 (d)    further obscuring the requirement for medical necessity by using an entirely

4    paper-based claims submission system, which made tracing claims virtually impossible;

5                 (e)    using the KOAR study to improperly seek Medicare reimbursement for

6    medically unnecessary AlloSure tests that were performed through the KOAR study;

7                 (f)    offering extravagant inducements or kickbacks to physicians and others to

8    encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

9    doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

10   key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

11   Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

12   restaurants, where they dined on CareDx's dime;

13                (g)    offering sham "advisory board" positions to physicians to encourage them to

14   order AlloSure tests;

15                (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

16   vacations;

17                (i)    paying unlawful and unethical kickbacks to physicians to encourage them to

18   conduct AlloSure blood tests;

19                (j)    offering to waive patient costs associated with AlloSure tests; and

20                (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

21   in CareDx's KOAR study.

22   **J.    October 28, 2021: Third Quarter 2021 Financial Results Conference
         Call Statements**

23

24   256.    On October 28, 2021, CareDx filed its quarterly report with the SEC on Form 10-Q,

     which Seeto signed.  In the report, Seeto stated:
25

26            Testing services ***revenue increased by $77.4 million, or 68%***, for the nine
         months ended September 30, 2021 compared to the same period in 2020.  This
         increase is ***primarily due to*** an increase of more than 56,000 AlloSure Kidney,
27       AlloMap Heart and AlloSure Heart patient results provided in the nine months ended
         September 30, 2021, compared to the same period in 2020.

28

257.    On October 28, 2021, during the CareDx's third quarter earnings conference call, Defendant Seeto again touted the Company's financial results, stating that: "During Q3, we delivered record revenues of $75.6 million with growth of 42% over the prior year.  Notably, our Q3 testing services volumes grew 86% as compared to the year ago quarter."   Defendant Seeto elaborated that: "***The primary driver of revenue growth was from our testing services, which increased 46% to $66.5 million***."

258.    These statements about revenue growth were false or misleading because they attributed revenue growth to legal conduct.  However, as set forth herein, CareDx's revenue increase was in fact attributable in large part to the Company's pervasive, unlawful, and unsustainable false claims and improper kickbacks to doctors.

259.    Seeto knew or should have known the foregoing statements were false or misleading because, at the time, CareDx's testing services revenue was driven by systematic False Claims Act and Anti-Kickback Statute violations.  These activities are detailed extensively herein and include, but are not limited to, these activities:

(a)    using RemoTraC to improperly bundle medically unnecessary AlloSure tests with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary AlloSure tests;

(b)    deliberately obscuring from patients and doctors that AlloSure tests were being performed;

(c)    intentionally excluding from the AlloSure test requisition form a field where the physician could indicate why the test was medically necessary so the physician and Medicare personnel handling the reimbursement would not be immediately tipped off that medical necessity was a prerequisite to Medicare reimbursement;

(d)    further obscuring the requirement for medical necessity by using an entirely paper-based claims submission system, which made tracing claims virtually impossible;

(e)    using the KOAR study to improperly seek Medicare reimbursement for medically unnecessary AlloSure tests that were performed through the KOAR study;

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4885-0370-0468.v1

- 90 -

1    (f)    offering extravagant inducements or kickbacks to physicians and others to

2  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

3  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

4  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

5  Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

6  restaurants, where they dined on CareDx's dime;

7    (g)    offering sham "advisory board" positions to physicians to encourage them to

8  order AlloSure tests;

9    (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

10  vacations;

11    (i)    paying unlawful and unethical kickbacks to physicians to encourage them to

12  conduct AlloSure blood tests;

13    (j)    offering to waive patient costs associated with AlloSure tests; and

14    (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

15  in CareDx's KOAR study.

16  **K.    February 24, 2022: Fourth Quarter 2021 and Full Year 2021**
   **Financial Results Statements**

17

18  260.    On February 24, 2022, CareDx filed its 2021 annual report with the SEC on

19  Form 10-K.  Defendants Seeto and Maag signed the report.  In that report, they stated:

20    Testing services *revenue increased by $95.7 million, or 58%, for the year*
   ended December 31, 2021, compared to the same period in 2020.  This increase *is*

21  *primarily due* to an increase of more than 74,000 AlloSure Kidney, AlloMap Heart
   and AlloSure Heart patient results provided during the year ended December 31,

22  2021, compared to the year ended December 31, 2020.

23  261.    Similarly, on February 24, 2022, CareDx hosted a conference call to discuss the

24  Company's fourth quarter and full year 2021 financial results.  During the call, Defendant Seeto

   remarked:

25

26    Q4 was another *record* quarter[] where we delivered *revenues of $79.2 million,*
   *representing a growth of 35%* over the prior year quarter.  For the full year 2021, we
   reported *revenues of $296.4 million, representing a growth of 54%*.  Notably, *our*

27  *record fourth quarter testing services volume* of 41,900 tests represented a *67%*
   *year-over-year growth* and led to our full year *volume growth of 94%* versus 2020.

28

1  Defendant Seeto also touted that: "In addition, we have more than 11,000 patients who have **direct**

2  **access** to RemoTraC."

3      262.    These statements about the purported reasons for revenue growth were false or

4  misleading because they attributed revenue growth to legal conduct.  However, as set forth herein,

5  CareDx's revenue increase was in fact attributable in large part to the Company's pervasive,

6  unlawful, and unsustainable false claims and improper kickbacks to doctors.

7      263.    Further, Maag and Seeto knew or should have known the foregoing statements were

8  false or misleading at the time because Medicare was increasingly denying CareDx's claims for

9  reimbursement as a result of CareDx's False Claims Act and Anti-Kickback Statute violations.

10  These activities are detailed extensively herein and include, but are not limited to, these activities:

11      (a)    using RemoTraC to improperly bundle medically unnecessary AlloSure tests

12  with routine "standard of care" tests and unlawfully billing Medicare for the medically unnecessary

13  AlloSure tests;

14      (b)    deliberately obscuring from patients and doctors that AlloSure tests were

15  being performed;

16      (c)    intentionally excluding from the AlloSure test requisition form a field where

17  the physician could indicate why the test was medically necessary so the physician and Medicare

18  personnel handling the reimbursement would not be immediately tipped off that medical necessity

19  was a prerequisite to Medicare reimbursement;

20      (d)    further obscuring the requirement for medical necessity by using an entirely

21  paper-based claims submission system, which made tracing claims virtually impossible;

22      (e)    using the KOAR study to unlawfully seek Medicare reimbursement for

23  medically unnecessary AlloSure tests that were performed through the KOAR study;

24      (f)    offering extravagant inducements or kickbacks to physicians and others to

25  encourage them to order AlloSure tests, including: (i) hosting symposiums where CareDx paid for

26  doctors' flights, limousine services, and bottles of champagne in their hotel rooms; and (ii) hosting

27  key opinion leader summits, after which CareDx would pay for physicians to spend the weekend in

28

1    Napa Valley, where they were chauffeured around in limousines and brought to vineyards and

2    restaurants, where they dined on CareDx's dime;

3                    (g)    offering sham "advisory board" positions to physicians to encourage them to

4    order AlloSure tests;

5                    (h)    taking physicians on "booze" cruises, helicopter tours, and expensive

6    vacations;

7                    (i)    paying unlawful and unethical kickbacks to physicians to encourage them to

8    conduct AlloSure blood tests;

9                    (j)    offering to waive patient costs associated with AlloSure tests; and

10                   (k)    paying physicians $35,000 to $40,000 in exchange for enrolling their patients

11   in CareDx's KOAR study.

12        264.    Also in the February 24, 2022 Form 10-K, CareDx claimed it had designed its

13   marketing programs to comply with laws prohibiting referrals from doctors with whom the Company

14   had "compensation arrangements," such as the Stark Law.  Specifically, the Form 10-K stated:

15        <u>Federal and State Self-Referral Prohibitions</u> We are subject to the federal
     self-referral prohibitions, commonly known as the Stark Law, and to similar state
16        restrictions such as California's Physician Ownership and Referral Act, or PORA.
     Where applicable, ***these restrictions generally prohibit us from billing patients or
17   certain governmental or private payers for clinical laboratory testing services when
     the physician ordering the test . . . has . . . [a] compensation arrangement with, us***,
18        unless the arrangement meets an exception to the prohibition.

19        Both the Stark Law and PORA contain exceptions for compensation paid to a
     physician for personal services rendered by the physician, provided that certain
20   conditions are satisfied.  We have compensation arrangements with a number of
     physicians for personal services, such as speaking engagements and clinical advisory
21   boards.  ***We have structured these arrangements with terms intended to comply
     with the requirements of the applicable exceptions to the Stark Law, PORA and
22   other similar state laws***.  However, we cannot be certain that regulators would find
     these arrangements to be in compliance with the Stark Law, PORA or similar state
23   laws.

24        265.    These statements were materially false and misleading.  Defendants clearly did ***not***

25   "structure[] these arrangements with terms intended to comply with" the exceptions to the Stark Law

26   and other laws.  Instead, the opposite was true: Defendants deliberately structured their arrangements

27   with physicians to ***disguise the fact that they were paying them exorbitant and unlawful kickbacks***

28   ***for prescribing AlloSure***, even going so far as to falsify the numbers of doctors attending lavish

1    marketing dinners to make it look like the Company was only spending a small amount per doctor.

2    Indeed, Defendants improperly compensated doctors with, among other things: (a) symposiums

3    where CareDx paid for doctors' flights, limousine services, and bottles of champagne in their hotel

4    rooms; (b) key opinion leader summits, after which CareDx would pay for physicians to spend the

5    weekend in Napa Valley, where the Company chauffeured doctors around in limousines and paid for

6    vineyard tours and lavish dinners; (c) lucrative "speaking contracts" for $1,000 per month;

7    (d) paying physicians $300 to $500 per hour just to attend online sales presentations; and (e) paying

8    physicians $35,000 to $40,000 in exchange for enrolling their patients in CareDx's studies.

9    **VIII.  ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER**

10        266.    The allegations in this section are intended to be a summary of certain key facts

11   alleged throughout this complaint that are probative of scienter for the Individual Defendants.  This

12   summary is not intended to be exhaustive, and further facts supporting scienter are alleged

13   throughout this complaint.  Additionally, the scienter facts alleged in this complaint should be

14   viewed holistically (*i.e.*, taken together and collectively) in accordance with Supreme Court and

15   Ninth Circuit law on scienter.

16        **A.     Holistic Overview of Scienter Allegations**

17        267.    The facts alleged herein present overwhelming evidence of scienter, both

18   independently and when viewed holistically.  Defendants Seeto and Maag were indisputably aware

19   of the Company's practice of billing Medicare for improper "surveillance" use of AlloSure that was

20   not medically necessary (and thus violated the False Claims Act) because they directed the practice,

21   pushed for it, discussed it in meetings, and even admitted the business' dependence on it. Defendants

22   also personally directed the Company's kickback schemes, which included lavish marketing events,

23   trips, dinners, "booze cruises," "speaking contracts," $500 per hour "advisory boards," and more.

24   Significantly, Defendants Seeto and Maag not only attended the Company's lavish events for doctors

25   and approved the expenses but directed other employees to obfuscate the high amount the Company

26   was spending per doctor so as to avoid raising red flags.  Dr. Olymbios and numerous other former

27   employees described these practices as regular and systemic for the Company.   This is

28   overwhelming evidence of Defendants' scienter.

268.    Moreover, Defendants were confronted by the improper nature of their practices on multiple fronts.  Indeed, not only Dr. Olymbios but numerous other CareDx employees raised concerns about these practices, including its Director of Reimbursement and its top compliance attorney.  In addition, prominent outside medical institutions and doctors similarly pushed back on Defendants' billing practices, only to be ignored.  Further, numerous employees have reported a pattern of retaliation, harassment, and intimidation for reporting concerns and/or cooperating with government investigations.

269.    Further, Defendants unquestionably understood their practices violated the False Claimsm Act, the Anti-Kickback Statute, the Sunshine Act, and the Stark Law.  Defendants Seeto and Maag not only personally signed SEC filings containing detailed attestations concerning these laws and how they applied to CareDx but received presentations explaining why certain practices in which CareDx was engaged (such as billing Medicare for non-medically necessary tests performed during "studies") would violate the law.  Seeto and Maag were directly placed on notice of concerns about legal violations by Dr. Olymbios and other senior employees and executives, as well as by outside doctors and institutions.

270.    Indeed, the TAC sets forth a plethora of specific dates, contents, participants, and/or locations of communications, meetings, conversations, emails, and text messages involving the Individual Defendants and other senior executives and employees showing the Individual Defendants were directly involved in, and in fact directed, CareDx's unlawful practices and were specifically informed on numerous occasions that their conduct was unlawful and improper.

271.    Significantly, these facts include: (a) two July 2020 meetings between Dr. Olymbios and Defendant Seeto, in which Dr. Olymbios specifically raised concerns to Defendant Seeto that CareDx was improperly billing Medicare for surveillance use of AlloSure; (b) a July 2020 discussion between Dr. Olymbios and Director of Reimbursement Danielle Scelfo, in which Scelfo agreed that billing for surveillance use of AlloSure was improper; (c) a June 22, 2020 message sent directly to Defendant Maag from the president of RDRI, stating RDRI would not participate in a study specifically because of RDRI's concerns that CareDx was improperly billing the government for tests performed as part of the study; (d) a July 22, 2020 call, during which Baylor

1    University Medical Center representatives raised similar concerns about CareDx's practice of billing

2    Medicare for tests performed as part of a study; (e) a July 28, 2020 "BLT Master Deck" presentation

3    sent directly to Defendant Seeto and other executives specifically outlining why CareDx could not

4    bill Medicare for the tests it was administering as part of studies; (f) a summer 2019 all-expenses-

5    paid retreat for medical professionals at Cavallo Point Lodge in Marin County, California, followed

6    by a weekend trip to Napa Valley, California, attended by Maag and Seeto; (g) a January 2020

7    Miami South Beach poolside open-bar party for roughly 100 medical professionals at a transplant

8    surgeons' conference, attended by Defendants Seeto and Maag; (h) a July 2021 all-expenses-paid

9    retreat for doctors at the same Cavallo Point Lodge in Marin County, California, attended and

10   approved by Defendant Seeto, at which the Company spent $1,200 per night on hotel rooms for

11   doctors; (i) text messages from June 30, 2021, in which a manager instructed a transplant account

12   manager who had arranged a dinner for doctors in Portland, Oregon, to destroy the sign in sheet for

13   the dinner so there would be no record of how many doctors had attended (and thus the Company

14   could conceal the true exorbitant expense per doctor for the dinner); (j) a call to FE-21 from his

15   manager following those texts, during which the manager made clear that FE-21 was prohibited from

16   discussing such matters by text or in writing; (k) a March 2022 compliance "town hall" call, during

17   which the Company's chief compliance attorney, Clarice McCauley, told employees that all

18   expenses above $700 would now be approved by Defendant Seeto himself (meaning this included all

19   of the Company's events for doctors, which typically ran well above this $700 threshold); (l) a

20   discussion during the same March 2022 call, during which FE-21 specifically raised legal concerns

21   about the Cavallo Point Lodge junket; (m) a call from FE-21's manager immediately following the

22   compliance call telling him to keep any discussions of such expenses "offline"; (n) a

23   September 2021 dinner at the Four Seasons Hotel in Seattle, at which CareDx spent nearly $700 per

24   doctor, approved by both Chief Business Officer Alex Johnson and Defendant Seeto; (o) an

25   April 2022 dinner in Los Angeles that went over budget, pursuant to which Seeto and Chief

26   Business Officer Alex Johnson directed FE-21's manager to submit the bill to the marketing budget

27   and not the sales budget so the Company could disguise the dinner as an "educational" event instead

28   of a sales event; (p) a May 13, 2022 event in San Francisco during the American Transplantation

Society conference, wherein CareDx spent $20,000 on a dinner for only 15 doctors (over $1,300 per doctor), about which another employee told FE 21: "These all get approved[,] usually it's Alex [Johnson] and *it is going to have to go up to Reg but we don't have to put in sign in sheets or attach[] names so it doesn't matter what we spend*"; (q) a May 24, 2022 dinner in Portland, Oregon, during which the Company spent $3,700 on 12 attendees (over $300 per doctor); (r) a June 2022 dinner for doctors at Mastro's Ocean Club in downtown Los Angeles, attended by Defendant Seeto and other top executives, at which the Company spent a total of $15,000 on just 50 doctors ($300 per doctor), and at which Chief Business Officer Alex Johnson stood up and announced to the attendees: "*This is how we run meetings.  This is what we do at CareDx.  So, if you want more dinners just keep using CareDx.*"; (s) an August 18, 2022 "exit interview" between FE-21 and Carol Wisecarver, Senior Director of HR, during which FE-21 gave detailed examples of dinners at which expensive kickbacks and inducements had been given to doctors, as well as explained the ways in which he was specifically coached by management to disguise expenses; and (t) a November 12, 2021 telephone meeting between FE-21 and Jennifer Barbre, CareDx's VP Head of Healthcare Compliance, during which he again explained in detail his concerns about the ways he had been instructed and "coached" to falsify expense reports, and during which he told her he had discussed these practices with senior executives and employees, including Greg Quinn, Alex Johnson, and Dan Salimbangon.

### B.    CareDx's Unlawful Medicare Billing Practices and Kickback Schemes Were Directed by Defendants Seeto and Maag and Pervaded the Company's Entire Business

272.    As detailed further above, the Individual Defendants personally directed the Company's improper and unlawful practices.  Defendants Seeto and Maag regularly pushed the billing of Medicare for "surveillance" AlloSure testing (which was not medically necessary and thus violated the False Claims Act).  The Individual Defendants openly discussed these practices at regular Business Leadership Team meetings, and the Company systematically tracked them, including "the use of RemoTraC by day, by territory, by region, by number of patients whose consent had been obtained (including consent for future surveillance testing), and by the number of samples obtained," as well as "requiring employees to report daily on the number of patients who

1   consented and were scheduled each day."  Indeed, Maag once confided in Dr. Olymbios, during a
2   business meeting in New York City: "*[W]e (CareDx) would have been ruined if we did not push*
3   *surveillance (AlloSure)*" – *i.e.*, routine and unnecessary administration of AlloSure tests.
4   Improperly bundling unnecessary AlloSure tests with a routine blood test panel was part of the very
5   design of the RemoTraC program, and the Company's marketing materials expressly pushed
6   medically unnecessary uses of AlloSure.  Similarly, with respect to improperly billing Medicare for
7   tests performed as part of a "study," CMO Dholakia himself ordered employees to make sure the
8   Company only enrolled Medicare patients for this very purpose.

9         273.   Defendants also directed the Company's practice of hosting lavish kickback dinners,
10  marketing events, trips, and providing other improper inducements and kickbacks to encourage
11  doctors to prescribe AlloSure.  Defendants Maag and Seeto personally organized, attended, and
12  approved expenses for such events.  For example, FE-6, Defendant Maag's former executive
13  assistant, described "symposiums" where CareDx paid for doctors' flights, limousine services to and
14  from the airport, hotels, and bottles of champagne in the doctors' hotel rooms.  FE-6 further
15  explained that CareDx hosted two key opinion leader "summits" in San Francisco every year that
16  started on Thursdays and ended on Fridays (*i.e.*, the summits lasted only about a day and a half).
17  CareDx would then pay for attending doctors to spend the weekend in Napa Valley.  The doctors
18  were taken to Napa, chauffeured around in limousines hired by CareDx, and brought to four different
19  vineyards – each of which hosted a $100-per-person wine tasting *paid for* by CareDx.  The doctors
20  were also provided breakfast, lunch, and dinner at fine restaurants, *all on CareDx's dime*.  FE-6
21  explained that *Defendant Maag not only attended these outings but personally selected the*
22  *vineyards and restaurants*.

23        274.   FE-21 similarly confirmed that Defendant Seeto attended and approved all such
24  events, which he described as "*gross overuse of funds to entertain doctors*."  He explained: "*We*
25  *had a bunch of cash, and we could basically buy [the doctors'] business*."  As an example, he
26  described a July 2021 event for doctors held in at an extravagant resort called the Cavallo Point
27  Lodge in Marin County, California, near the Golden Gate Bridge.  Doctors were provided hotel
28  rooms that cost over $1,200 per night on the Company's dime.  The doctors then attended a

1    supposedly "educational" dinner.  However, FE-21 explained: "This clearly wasn't about the doctors

2    learning more about our products, *it was an inducement to do business with us*."  When asked if the

3    C-suite Defendants were aware of this, FE-21 explained that they obviously were because any

4    expense over $1,500 had to be approved by Chief Commercial Officer Alex Johnson, and any

5    expense over $2,500 had to be approved by CEO Reg Seeto.  He added that dinners like this were

6    commonplace and approved by Johnson and Defendant Seeto.

7         275.    FE-21 also described numerous other such events, including a smaller "local" event in

8    roughly June or July 2021 at a Marriott Hotel in Portland, Oregon, at which the Company

9    nonetheless spent thousands of dollars on a dinner for only seven doctors and for which he was

10   instructed to "skip the sign in sheet" so they could make it look like there were more attendees and

11   thus more reasonable expenses per doctor.

12        276.    FE-21 also recalled a specific CareDx dinner in Los Angeles in April 2022 attended

13   by Seeto that was way over budget (and thus raised red flags about kickbacks to doctors), but Seeto

14   and Chief Business Officer Alex Johnson directed FE-21's manager to submit the bill to a marketing

15   budget and not the sales budget so it would superficially appear that the sales team did not sponsor

16   this event (even though it had).  In doing so, "*[t]hey tried to make it appear that it was an*

17   *educational dinner when it was pure sales*," a regular practice at CareDx to avoid raising red flags

18   about kickbacks with large sales expenses.  At another such event attended by Seeto in

19   September 2021, held at the luxurious Four Seasons Hotel in Seattle, CareDx provided an

20   extraordinarily expensive dinner costing over $8,000 for only 12 attendees (or almost $670 per

21   person).  FE-21 asked a colleague how they were going to approve this expense, and the colleague

22   said Chief Business Officer Johnson had already approved it, and it was also going to Defendant

23   Seeto himself for approval.

24        277.    FE-21 also learned about a particularly infamous June 2022 dinner at Mastro's Ocean

25   Club in downtown Los Angeles.  The dinner was for Cedars-Sinai Medical Center.  Defendant

26   Seeto, Chief Business Officer Alex Johnson, and Salimbangon attended, along with 50 medical

27   professionals.  FE-21 spoke with the sales representative, "Kim," who set up this meeting.  Kim told

28   FE-21 that Defendant Seeto and Chief Business Officer Johnson had personally pushed this dinner.

1   The dinner cost $15,000.  Salimbangon, who was also at the dinner, told FE-21 that, during the

2   dinner, ***Johnson stood up and boasted to the attendees: "This is how we run meetings.  This is***

3   ***what we do at CareDx.  So, if you want more dinners just keep using CareDx***."  He said that this

4   was meant to tell the doctors to stick with CareDx because this is what they offered.

5          278.    Salimbangon also told FE-21 about an extraordinarily expensive luncheon for UCLA

6   doctors held at The Ivy restaurant in Los Angeles.  The Company spent $12,000 on a lunch that had

7   only 30 attendees – roughly $400 per person.

8          279.    As yet another example, FE-21 described an event in spring 2022 in Boston,

9   Massachusetts, at which the expenditures went well above the $150-per-person "limit" for such

10  dinners (although the Company rarely actually adhered to that limit).  When he found out the bill for

11  the event had not been paid, FE-21, who was in the sales department, used his own corporate credit

12  card to pay.  However, the next day, when the marketing department learned of this, they "freaked

13  out" because sales expenses were far more likely to be scrutinized than marketing expenses, and the

14  Company's unofficial policy was to hide expenses in marketing budgets (and thus avoid itemizing

15  the expenses).

16         280.    Other employees similarly corroborated that these practices were regular and

17  systematic in the Company, further making clear Defendants were aware of them.  For example,

18  FE-1 described how CareDx's sales management personnel ***took doctors on "booze" cruises,***

19  ***helicopter tours, and expensive vacations***, failing to report any of these expenses as required by the

20  Sunshine Act.  As FE-1 further explained, it was common knowledge within the Company that this

21  was occurring, commenting: "The sales people did stuff that would not be appropriate anywhere else

22  in the pharma or biotech industry."

23         281.    FE-19, who reported directly to Defendant Seeto, confirmed these practices continued

24  throughout Seeto's tenure as CEO.  Indeed, FE-19 confirmed that in September-October 2021 – just

25  as the Company came under investigation by the DOJ and SEC – FE-19 participated in Business

26  Leadership Team meetings (along with Seeto) where there were discussions about how the Company

27  should cut back on lavish expenditures, such as not ordering "shrimp towers" or $200 bottles of wine

28  when taking doctors to dinner, now that the Company was under scrutiny.

282.    Defendant Maag also testified under oath that he personally approved these expenses as "[w]e are not a very large company." He explained:

I am engaging with the team on those. And then *I am signing off on all the expenses*. For a long time in the company, I signed every check in the company.

\*        \*        \*

I think my team [at CareDx] would call me being *very hands-on and detailed oriented*, so, yes, *I was very involved*.

283.    Defendant Maag further admitted to regularly attending CareDx's "marketing" events with doctors. He testified about "meeting conferences" where CareDx spent money marketing AlloSure to kidney doctors, with Maag testifying: "I'm more or less present at many of these meetings happening." If Defendant Maag was both approving the expenses and attending the meetings, then Defendant Maag necessarily knew that CareDx was providing unlawful kickbacks to doctors.

**C.    Dr. Olymbios Directly Raised Concerns About Improper Billing Practices with Seeto, Including During Two Different Meetings in July 2020 and One in August 2020, as Well as with Other Executives and Employees**

284.    As described further, *supra*, Dr. Olymbios had two different July 2020 meetings with Defendant Seeto, during which he directly raised concerns with Seeto that CareDx was fraudulently billing Medicare for excessive and medically unnecessary tests. Indeed, during a specific July 2020 meeting in New York City between Dr. Olymbios and Defendant Seeto, Dr. Olymbios "*placed Seeto . . . on notice that he believed CareDx was committing fraud on the government*." In addition, during another meeting – a "regularly scheduled one-on-one meeting [between Olymbios and Seeto] by telephone in or about July 2020" – "*Dr. Olymbios raised [those] concerns about billing Medicare for Surveillance AlloSure*." Dr. Olymbios also reported these same concerns to another high-ranking executive, Director of Reimbursement Danielle Scelfo. Specifically, in a July 2020 discussion, Scelfo agreed with Dr. Olymbios that billing Medicare for "surveillance" use of AlloSure was not medically necessary – which meant it violated healthcare laws, including the False Claims Act. Dr. Olymbios also shared the same concerns about fraudulent billing with Director of

1   Reimbursement Danielle Scelfo that same month, in July 2020, and Scelfo agreed with Dr. Olymbios
2   that CareDx's billing of Medicare for regular "surveillance" tests was improper.

3       285.    Further, in July 2020 – as Dr. Olymbios explained and confirmed in this case – Scelfo
4   (CareDx's Director of Reimbursement) was concerned about CareDx's billing practices.  Scelfo was
5   concerned that the practice of billing Medicare just for surveillance testing was not appropriate under
6   the LCDs in place at the time.

7       286.    CareDx itself has corroborated that Dr. Olymbios was in a position to make these
8   reports, stating: "because of his job duties and responsibilities, Dr. Olymbios had direct and frequent
9   interactions with the highest level-executives at CareDx."  One high level executive (FE-11) – who
10  reported directly to a C-Suite executive from 2019 to 2021 – confirmed Dr. Olymbios had been
11  "*vocal*" in voicing his observations that the Company was unlawfully billing Medicare for medically
12  unnecessary tests, including by telling FE-11 about the misconduct.

13      287.    Moreover, as Dr. Olymbios independently confirmed in this case, doctors specifically
14  pushed back on the "surveillance" use of AlloSure at Advisory Board meetings where Defendants
15  Maag and Seeto were present.  Specifically: "Some physicians complained during advisory board
16  meetings [where Maag, Seeto, King, and Dholakia were present] that their patient did not need the
17  AlloSure test each time they ordered RemoTraC for routine blood work panels."  Yet "*Maag, Seeto,*
18  *King and Dholakia told the doctors at advisory board meetings that doctors could not remove the*
19  *AlloSure testing from the panel*," and "the company would not modify the panel testing supplied by
20  RemoTraC.  CareDx refused to modify the panel because the AlloSure component was highly
21  lucrative for CareDx."

22      288.    Dr. Olymbios confirmed that Defendant Seeto knew CareDx was engaging in this
23  improper "surveillance" use of AlloSure because Defendant Seeto and other C-level executives
24  specifically discussed billing Medicare for "surveillance" testing during Business Leadership Team
25  meetings.

26      289.    Dr. Olymbios also asserted similar claims in the Olymbios Complaint, which was
27  based on his personal knowledge, and which he subsequently independently confirmed.  For
28  example, Dr. Olymbios recalled CareDx "used what it represented to be clinical tests to bill

1    Medicare for [AlloSure]" even as "[m]ultiple nephrology practices *expressed serious reservations*

2    about this practice as a *violation of Medicare billing* requirements, and CareDx employees

3    *internally flagged this practice as impermissible*." Dr. Olymbios reported these concerns to "*more*

4    *than ten other current or former CareDx employees, including Peter Maag*, then the Chief

5    Executive Officer for CareDx, *and Reg Seeto*, the current President and Chief Executive Officer of

6    CareDx." According to Dr. Olymbios, the senior "CareDx executives *brushed off his concerns or*

7    *berated him for raising them in the first place*" and "*repeatedly ignored or actively quashed any*

8    *internal concerns about its activity*" until he finally resigned in late 2020.

9         **D.**     **Outside Institutions and Internal Presentations Also Put Defendants**

10                **on Notice of the Impropriety of Their Use of "Studies" to Bill**
                **Medicare for Unnecessary Tests**

11       290.     Defendants were further put on notice of the unlawfulness of the use of studies by

12    "several facilities, including Baylor [University Medical Center]," which "began to question CareDx

13    as to whether billing Medicare for AlloSure performed as part of the study was appropriate." FE-3

14    corroborated that Baylor University Medical Center raised these exact concerns in July 2020 at a

15    remote meeting, which he confirmed *Dr. Olymbios also attended*. At the meeting, Baylor

16    University personnel clearly "*rais[ed] concerns about [CareDx's] Medicare billing*." Dr. Olymbios

17    raised exactly this concern in an email to several CareDx employees on July 22, 2020 and was told

18    to direct his concerns to Danielle Scelfo, CareDx's head of reimbursement. Scelfo in turn later told

19    Dr. Olymbios that CareDx should not be billing Medicare for AlloSure as part of any study of its use

20    for surveillance.

21       291.     Similarly, another research institute, the Renal Disease Research Institute ("RDRI")

22    in Dallas, Texas, entirely refused to participate in CareDx's "surveillance" testing study over similar

23    concerns. Indeed, the President of RDRI wrote directly to Defendant Maag on June 22, 2020, that

24    RDRI had decided not to proceed because payors, including the government (*i.e.*, Medicare) could

25    raise concerns over the unusual fact that they were being charged for the costs of testing.

26       292.     Defendant Seeto and other members of the Business Leadership Team also received a

27    slide presentation dated July 28, 2020 and titled "BLT Master Deck," which made clear that the use

28    of studies to bill Medicare for otherwise unnecessary tests violated the FCA. The presentation

specifically contained a slide explaining to executive management that tests performed as part of a study could only be billed to Medicare in circumstances where they were otherwise medically necessary and otherwise met the Medicare LCD requirements – in other words, only when there was "clinical suspicion of rejection."

**E.     Defendants Seeto and Maag Personally Signed SEC Filings Attesting They Understood that the Very Types of Conduct in Which They Were Engaged Violated Healthcare Laws, Including the False Claims Act, the Anti-Kickback Statute, and the Stark Law**

293.     As set forth further above, Defendants Seeto and Maag each personally signed multiple SEC filings during the Class Period that attested to their detailed understanding as to the type of conduct prohibited by the applicable healthcare laws.  For example, each of them personally signed *multiple* Forms 10-K filed with the SEC that affirmed: "The False Claims Act's 'whistleblower' or 'qui tam' provisions imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a [federal healthcare program]."  Seeto and Maag thus further understood: "Liability arises, primarily, when an entity knowingly submits or causes another to submit, a false claim for reimbursement to the federal government," which can include "***causing physicians to order excessive or unnecessary services [and] providing false documentation in support of claims [or] kickbacks***," just as was routinely done with AlloSure.

294.     CareDx's SEC filings signed by Seeto and Maag further affirmed their understanding that:

> The federal healthcare programs' Anti-Kickback Statute ***prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal healthcare program such as Medicare or Medicaid***.

Defendants Seeto's and Maag's SEC filings also affirmed their understanding that "remuneration" would include provision of free tests to their patients, as well as many of the other kickbacks described further herein (such as the sham "advisory boards," dinners, luxury trips, and "speaking fees," as well as the provision of free blood tests and waivers of copays), as "***[t]he definition of 'remuneration' has been broadly interpreted*** to include anything of value, including, for example,

1  *gifts, certain discounts, the furnishing of free supplies, equipment or services, credit*

2  *arrangements, payment of cash and waivers of payments*."

3      295.     Moreover, CareDx's SEC filings affirmed Seeto's and Maag's understanding that

4  CareDx's practices could violate the applicable healthcare laws even if they claimed they **also** served

5  a lawful purpose (*e.g.*, to provide mobile testing services, to purportedly "educate" doctors, etc.) as

6  "[s]everal courts have interpreted the statute['s] [intent requirement] to mean that **if any one purpose**

7  **of [an arrangement involving] remuneration is to induce . . . referrals of federal healthcare**

8  **[covered] business[es], the statute has been violated**."  Finally, Seeto's and Maag's signed SEC

9  filings reaffirmed that "violations of the Anti-Kickback Statute also are actionable under the federal

10  False Claims Act."

11      296.     Additionally, the Forms 10-K signed by Maag and Seeto each attested to Maag's and

12  Seeto's understanding that the Company was subject to prohibitions on billing **any** payors (either

13  commercial or Medicare) for tests prescribed by doctors who were receiving fees, benefits, or other

14  kickbacks from CareDx.  Specifically, the SEC filings each explained:

15          We are subject to the federal self-referral prohibitions, commonly known as
        the Stark Law, and to similar state restrictions such as California's Physician
16      Ownership and Referral Act, or PORA.  Where applicable, ***these restrictions
        generally prohibit us from billing patients or certain governmental or private***
17      ***payers for clinical laboratory testing services when the physician ordering the test
        . . . has . . . [any] compensation arrangement with [CareDx]*** unless the arrangement
18      meets an exception to the prohibition.

19      297.     More specifically, the Stark Law, 42 U.S.C. §1395nn ("Limitation on certain

20  physician referrals") dictates, in relevant part, that where a physician has a "compensation

21  arrangement" with a medical testing company like CareDx, the physician may not refer patients to

22  the company for services, and the company may not submit claims resulting from those referrals for

23  payment by third-party payors such as Medicare or private insurance.  A "compensation agreement"

24  under the Stark Law is "***any arrangement involving any remuneration between a physician . . . and***

25  ***an entity" like CareDx*** and thus clearly includes the many types of kickbacks described above, such

26  as excessive speaking fees, expensive dinners and trips, exorbitant fees for enrollment of patients in

27  studies, and even provision of free blood tests.  42 U.S.C. §1395nn(h)(1)(A).  Moreover, the

28  "exceptions" to the Stark Law primarily involve payment of "fair market value" to physicians for

1    limited categories of service.  However, those exceptions clearly did not apply here as CareDx

2    schemed to pay physicians far above any conceivable "market value" for any services the physicians

3    might have provided to CareDx and often gave them exorbitant and lavish kickbacks in exchange for

4    nothing at all (other than committing to prescribe AlloSure).

5        **F.    Defendants' Deliberate Avoidance of Creating a Paper Trail Supports
                  Scienter**

6

7        298.    As alleged further above, Defendants' efforts to avoid creating a paper trail of their

8    unlawful conduct also supports scienter as they evidence a guilty state of mind.  For example, in

9    August 2020, Dr. Olymbios wrote an email directly to Maag that CareDx should include the fact that

10   CareDx "never bills patients" in a marketing letter to a nephrology practice.  However, such a

11   promise was barred by applicable healthcare laws.  Thus, as Dr. Olymbios explained, Defendant

12   Maag responded with a phone call, in which he said he was "***calling because there were things he***

13   ***couldn't be associated with as the CEO***," and "***there were certain things that shouldn't be put in***

14   ***writing***" – such as never billing patients "even if that's how CareDx operated."  Maag used his cell

15   phone to make this call to Dr. Olymbios' cell phone (they alone were on the call), and, as

16   Dr. Olymbios further explained: "I think he was wanting to avoid putting things in writing," such as

17   promising never to bill patients.

18       299.    FE-21 had similar experiences with being instructed to avoid creating a paper trail

19   relating to potentially improper practices.  For example, on June 30, 2021, FE-21's manager, Dan

20   Salimbangon, told him to "***skip the sign in sheet***" for a Portland, Oregon, doctor dinner so there

21   would be no record of the facts that only seven doctors attended and an exorbitant amount was spent

22   per doctor.  FE-21's manager also texted him to: "***Call me any time re:expenses***," which he

23   explained was a coded way of reminding him not to ask about such things in text messages.  The

24   same day, Salimbangon also called FE-21 to remind him not to text or put things in writing.  In

25   another instance, during a March 2022 compliance "town hall" call, FE-21 raised concerns about an

26   extraordinarily expensive event for doctors at the Cavallo Point Lodge in Marin County, California.

27   Salimbangon ***immediately called FE-21 afterward to remind him to keep such discussions offline***,

28

1    and FE-21 later discovered that ***the recording of the compliance call had been "scrubbed" from the***

2    ***Company's systems***.

3         300.    The fact that multiple senior employees of CareDx confirmed they were told not to

4    put things in writing and to otherwise conceal and disguise evidence of the Company's improper

5    practices is further extraordinarily compelling support for scienter.

6         **G.    Defendants' Pattern of Retaliation Against Employees for Raising**
            **Concerns and Pressuring Employees Not to Cooperate With**
7            **Investigations Supports Scienter**

8         301.    Defendants' pattern of retaliating against employees who spoke up about their

9    unlawful practices also supports scienter.

10        302.    First, FE-11 confirmed that while Dr. Olymbios was "vocal" about his Medicare

11   billing concerns while he worked for the Company, many other employees who did not raise

12   concerns only refrained from doing so because "***we were all terrified for our jobs***" – *i.e.*, these

13   employees believed the Company would retaliate against them if they raised any similar concerns.

14        303.    Second, FE-21 reported he was immediately placed on a Performance Improvement

15   Plan in retaliation for warning higher-ups that CareDx could be found liable for its improper

16   expenditures if the Office of the Inspector General audited them.   FE-21 further stated he

17   complained to HR and management about a number of different improper practices on many

18   occasions and said he was ultimately terminated for blowing the whistle.   FE-19 stated that, after

19   CareDx came under government investigation in late 2021, his friend and colleague, Erin Tokunaga,

20   confided in him "***that she was being bullied[,] intimidated, and coerced to not provide information***

21   ***or misreport information on the DOJ investigation***."   FE-19 said management "put a lot of mental

22   pressure on her," and "***[t]he pressure was so pervasive . . . .   She said that she was going to hire her***

23   ***own attorney***.   She mentioned this multiple times to me."

24        304.    These independent and consistent accounts confirming Defendants' pattern of

25   intimidation and retaliation against employees for raising concerns regarding Defendants' fraudulent

26   scheme is powerful evidence of Defendants Seeto and Maag's scienter.

27

28

**H.    Defendants' Unlawful and Unsustainable Practices Were Central \to the Business and the "Core Operations" of the Company**

305.    Defendants' unlawful and unsustainable Medicare billing practices and kickback schemes were not mere incidental practices by low-level employees in a minor segment of the business; they were rampant, systematic, and at the very heart of the Company's business.  Indeed, CareDx's most important business line was its testing services segment, which represented at least 85% of the Company's total revenues since the beginning of 2020, and the Company's financial success relied primarily on AlloSure.  As Defendant Maag stated in trial testimony given in separate litigation, AlloSure "*was the one product, the one growth drive[r] for the company*."  Second, CareDx's testing services business in turn relied heavily on payments from the taxpayer-funded medical program Medicare, which represented as much as 70% of the Company's testing services revenue, and as much as 60% of its overall revenue, during the Class Period.  Third, RemoTraC was also central to the Company's business during much of the Class Period, with Maag telling the investing public that RemoTraC at one point accounted for "over 50%" of the Company's testing revenue and lifted the Company's revenue back in line with its pre-COVID revenue.

**IX.    LOSS CAUSATION**

306.    During the Class Period, shares of CareDx's publicly traded common stock traded on the NASDAQ.  The market for shares of CareDx common stock was open, well developed, and efficient at all relevant times.

307.    Throughout the Class Period, the price of CareDx common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions and/or scheme identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of CareDx common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times.  Defendants' materially false and misleading statements made

1    during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the

2    Company's stock at artificially inflated prices.

3        308.    When information proximately related to Defendants' prior misrepresentations and

4    fraudulent conduct were disclosed and became apparent to the market and/or the concealed risk

5    materialized, the price of CareDx common stock fell precipitously as the prior artificial inflation

6    dissipated.  As a result of their purchases of CareDx common stock during the Class Period, Lead

7    Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal

8    securities laws.  By issuing materially false and misleading statements, among other adverse facts

9    detailed herein, Defendants presented a misleading picture of CareDx's business.  Defendants' false

10    and misleading statements and/or scheme had the intended effect and caused CareDx common stock

11    to trade at artificially inflated levels throughout the Class Period.

12        309.    As elaborated below, the truth behind Defendants' misleading statements and

13    omissions and behind their unlawful schemes emerged through a series of partial corrective

14    disclosures.

15    **A.    The Six Corrective Disclosures Under the Ninth Circuit's *First Solar*
          Proximate Causation Doctrine**

16

17        **1.    October 28, 2021: CareDx Simultaneously Announces Multiple
                Government Investigations and Falling ASPs**

18        310.    The first corrective disclosure proximately related to Defendants' fraudulent scheme

19    occurred on October 28, 2021, after market close, when the Company reported its financial results

20    for the third quarter of 2021 and filed its Form 10-Q for that quarter with the SEC (the

21    "3Q 2021 10-Q").

22        311.    The Company's 3Q 2021 10-Q disclosed for the first time that CareDx was under

23    investigation by no fewer than ***three separate federal and state regulators*** – the DOJ, the SEC, and

24    an unnamed state regulatory agency – in connection with a False Claims Act investigation

25    "regarding certain business practices relating to our kidney testing and phlebotomy services," as well

26    as "certain of our accounting and public reporting practices."

27

28

1

2

### United States Department of Justice and United States Securities and Exchange Commission Investigations

The Company recently received a civil investigative demand (CID) from the United States Department of Justice (**DOJ**) requesting that the Company produce certain documents in connection with a **False Claims Act** investigation being conducted by the DOJ regarding certain business practices related to our **kidney testing and phlebotomy services**, and a subpoena from the United States Securities and Exchange Commission (SEC) in relation to an investigation by the SEC **in respect of matters** similar to those identified in the CID, as well as certain of **our accounting and public reporting practices**.  The Company also received an information request from a state regulatory agency and may receive additional requests for information from the DOJ, SEC, or other regulatory and governmental agencies regarding similar or related subject matters.

312.    Similar to a party admission, one of the most senior ranking officers of the Company would later make public details of the investigation; by then, a former official, Dr. Olymbios – who was **the very individual** who brought (according to CareDx) "confidential" internal documents to the DOJ and SEC showing the Company's fraud – was able to make the disclosures in a public complaint filed on April 15, 2022 confirming the nature of the DOJ and SEC investigations.  Similarly, FE-3 expressly confirmed that he was interviewed by the DOJ in connection with the investigation and that most of the questions concerned CareDx's insistence on only providing mobile phlebotomy tests if AlloSure were included, regardless of whether it was medically necessary.

313.    Also on October 28, 2021 – the same day CareDx reported the DOJ, SEC, and state regulatory investigations – Defendants reported dramatically disappointing financial results.  Of particular concern was that, while testing volume had grown 86% year over year, with approximately 40,000 AlloSure and AlloMap tests performed in the quarter, testing services revenue had grown only about half as fast, or approximately 46%.  This meant the Company's ASP per test had actually declined substantially; indeed, simple calculations revealed **ASP had declined a whopping 20% from the same quarter of the prior year**.

314.    On this news, the Company's stock price fell from a closing price of $70.34 per share on October 28, 2021 to a closing price of $51.00 per share on October 29, 2021, or **27.5% in a single day**.

315.    Analysts expressed concerns about these striking developments and, significantly, raised concerns that there were connections between the Company's unexpectedly poor financial

[CORRECTED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:22-cv-03023-TLT
4885-0370-0468.v1

- 110 -

1    results and the newly disclosed investigations.  For example, during the Company's October 28,

2    2021 earnings call, an analyst from Craig-Hallum Capital Group asked CFO Dhingra and Defendant

3    Seeto to "comment on the lower ASPs in the quarter," noting: "[I]f you take the testing revenue over

4    volume, the price per test looks like it came down" and "*the difference was pretty pronounced this*

5    *quarter*."  In light of both the ongoing regulatory investigations and the stark decline in ASPs, the

6    analyst asked: "*[A]re you seeing any changes in Medicare billing practices*?  Or what else would

7    really influence that test price lower?"  As CareDx had released no other new information that would

8    give analysts reason to think there had been a change in Medicare billing practices, the implication

9    was clear: analysts were concerned that the federal and state investigations disclosed that same day

10   were hampering the Company's ability to bill for its AlloSure tests.

11          316.   Dhingra, however, did not disclose the full truth but instead unequivocally assured the

12   analyst there had been "*no change*" related to Medicare billing.  Specifically, CFO Dhingra stated:

13   "To your specific question, *any change in the billing practices?  No, no change.  We haven't*

14   *observed anything on the Medicare billing practices*."

15          317.   Instead, as CFO, Dhingra expressly assured the analyst declining ASPs were due to

16   "primarily the business mix, where the volume growth is exceptionally strong, but the mix continues

17   to evolve away from the core Medicare business."  Defendant Seeto similarly assured the analyst the

18   cause of declining ASPs was a "change in the payer mix."

19          318.   Analysts expressed concern that the investigations could have serious implications for

20   CareDx's business; for example, a BTIG report noted: "*The fact that [CareDx] is being investigated*

21   *by three different entities, both federal and at the state level, is notable*," and that "*disclosures of*

22   *these sort typically bear some degree of merit*."  Relatedly, analysts also questioned management's

23   official explanation for its ASP declines.  The same Craig-Hallum analyst who had asked if anything

24   had changed in the Company's Medicare billing practices reported: "*Rationale [for ASP decline]*

25   *was higher commercial coverage, though we still question what changed q/q*."  A Raymond James

26   analyst report similarly noted the Company had cited "a shift towards commercial [payors] *but*

27   *offered little additional context*" and found "*ASP dynamics, which received major focus on the*

28

1  *call, are admittedly a bit murky*," thus further emphasizing that it doubted the Company's official
2  explanations for its poor financial results.

3           **2.    April 15, 2022: CareDx Senior Executive Dr. Olymbios
               Publicly Blows the Whistle on Defendants' Fraudulent
4              Business Practices**

5           319.   On April 15, 2022, Dr. Olymbios filed the Olymbios Complaint in California
6  Superior Court.  As described further above, Dr. Olymbios revealed Defendants' serious, pervasive
7  misconduct, including that: (a) "CareDx ***used what it represented to be clinical tests*** to bill Medicare
8  for [AlloSure].  Multiple nephrology practices expressed serious reservations about this practice as ***a***
9  ***violation of Medicare billing requirements***, and CareDx employees internally flagged this practice
10  as impermissible"; (b) "CareDx offered unrestricted grants to physicians to not enroll patients in
11  competitors' clinical trials or to induce practices to place patients on an AlloSure surveillance
12  protocol, even when doing so was ***not warranted***"; and (c) "CareDx ***intentionally excluded*** from the
13  [Allosure] test requisition form a field where a physician could indicate the reason ***why the test was***
14  ***medically necessary***."  Dr. Olymbios publicly blew the whistle on these practices after reporting
15  them to "***more than ten*** other current or former CareDx employees, ***including Peter Maag***, then the
16  Chief Executive Officer for CareDx, ***and Reg Seeto***, the current President and Chief Executive
17  Officer of CareDx."  The senior "***CareDx executives brushed off his concerns or berated him for***
18  ***raising them in the first place***."  They "repeatedly ignored or actively quashed any internal concerns
19  about its activity."   To cite one such instance: "In September 2020, Dr. Olymbios texted other
20  employees that he had a legal call with Reg [Seeto]" and "[a]nother employee responded, '***because***
21  ***we are Medicare frauds***?'  A different employee replied, '***We're a bunch of crooks and frauds***.'"
22  Upon the filing of the Olymbios Complaint, CareDx's common stock fell by 8.08%, to close at
23  $32.55 per share on April 15, 2022.

24           **3.    May 5, 2022: Testing Revenue Continues to Plummet**

25           320.   On May 5, 2022 – just three weeks after Dr. Olymbios publicly blew the whistle on
26  CareDx – CareDx filed its quarterly report for the first quarter of 2022 on Form 10-Q with the SEC
27  and issued its earnings press release for the quarter, revealing the continuing fallout from the
28  Company's historic reliance on overbilling Medicare and engaging in sales and marketing

1  misconduct.  The Company's Form 10-Q repeated its prior revelation from October 28, 2021 that it

2  was under investigation by the DOJ, the SEC, and a state agency, showing the Company was *still*

3  under investigation at least six months after the government demanded internal documents from the

4  Company.

5      321.    CareDx again reported disappointing financial results, and ASPs declined to just

6  $1,560 per test – a decline of nearly 5% from the previous quarter and nearly 13% from the same

7  quarter of the prior year.

8      322.    Analysts again focused on the Company's continuing slide in ASPs.  On May 6,

9  2022, Craig-Hallum analysts reported that "***ASPs were a miss***," noting not only that the lower ASPs

10  "dragged the Testing Services down ***well below our number***" but that, even "accounting for the

11  lower ASPs, Testing Services sales certainly came up short this quarter."  On the same day, analysts

12  from BTIG published a similar report, observing: "Q1 testing services revs of $66M (+12%

13  Y/Y, -3% q/q) missed our $70ME, ***marking the first time testing revs were down q/q since Q3/17***

14  . . . ."

15      323.    Overall testing revenues were down primarily because Medicare revenue growth

16  continued to plummet after the Company came under investigation by the DOJ, the SEC, and a state

17  regulator in mid-2021, as the following chart illustrates:



27      324.    As a result of weak ASPs and testing revenue, the Company incurred a net loss of

28  $19.7 million as compared to a loss of $687,000 for the first quarter of 2021 – the quarter when the

1    Company launched its RemoTraC testing scheme.  In fact, by this point, as FE-10 directly observed,

2    senior management was acutely aware of – and worried about – the fact that perhaps as much as

3    50% of CareDx's AlloMap and AlloSure tests were not being reimbursed by Medicare because the

4    tests were performed without medical necessity.  In other words, the scheme Defendants had built to

5    overbill Medicare for AlloSure even when it was not clinically necessary was beginning to unravel.

6    FE-10 further reported this phenomenon was widely known at the Company, Maag and Seeto were

7    present at meetings where the 50% reimbursement rate was regularly discussed, and it was common

8    knowledge at the Company that some patients were having expensive AlloSure tests performed

9    *every month* without justification.

10         325.    On these disclosures, the Company's stock price per share fell from $31.66 on May 5,

11   2022 to $25.78 on Friday, May 6, 2022 – a decline of *18.6%* in one day.  The Company's stock price

12   continued to fall as trading resumed on Monday, May 9, 2022, closing at $22.46 per share for a two-

13   day decline of 29%, and investors suffered the consequences.

14         326.    In its February 24, 2022 earnings call, the Company again attempted to blame its

15   flagging testing services results and plummeting ASPs on a supposing shift in the "mix" of business,

16   and this time also blamed a purported shift of kidney patients from standard Medicare plans to

17   Medicare Advantage plan – commercially run, privately operated health plans that operated as

18   Medicare health plans under Medicare rules.  Specifically, Dhingra – as the Company's CFO –

19   stated ASP declines were, in part, because "*in kidney testing, we saw patients shift from Medicare*

20   *to Medicare Advantage plans for the changes introduced with the CARES Act last year*."

21   However, as would later be revealed, the true cause of CareDx's declining ASPs was that, under

22   greater scrutiny, it was no longer able to get away with billing for medically unnecessary tests.

23   Indeed, as Defendants would later admit, and as discussed further below, Medicare Advantage plans

24   – which *had to follow exactly the same coverage rules as Medicare* – were simply denying claims

25   for CareDx's AlloSure tests.

26

27

28

**4.    May 23, 2022: CareDx's Chief Financial Officer Suddenly Resigns**

327.    On May 23, 2022, CareDx surprised investors by announcing that its CFO, Dhingra, had notified the Company of his resignation.  Strikingly, the press release announcing his resignation stated that Dhingra had only notified the Company of his resignation on May 18, 2022 and that his resignation would be effective May 25, 2022 – only one week after he gave notice.  The Company went out of its way to specifically assure investors that Dhingra's resignation was "not a result of any disagreement with the Company or any matter relating to its accounting or financial policies or procedures or regulatory matters."  However, the announcement caused CareDx's stock price to fall 7.5%, from a close of $25.86 per share on Friday, May 20, 2022 to a close of $23.92 per share on Monday, May 23, 2022 on unusually high volume.  A Jefferies analyst report noted the resignation was "***surprising, coming barely more than a year since he joined CDNA***" and took note that it "***comes in the midst of certain ongoing gov't investigations***."

**5.    September 1, 2022: CareDx's Chief Marketing Officer Abruptly Resigns**

328.    Just three months later, on September 1, 2022, the Company announced that its Chief Marketing Officer and Chief Commercial Officer, Sasha King, had announced her resignation from the Company on August 30, 2022, effective September 16, 2022.  Just as Dhingra had done, King provided short notice of her resignation: a mere two weeks.  On this news, CareDx's stock price fell from a close of $20.31 per share on September 1, 2022 to a close of $18.33 per share on September 2, 2022 – a decline of 10% – on unusually high volume.

**6.    November 3, 2022: 50% of Tests Are Rejected for Reimbursement**

329.    On November 3, 2022, after market close, the Company reported earnings for the third quarter of 2022.  The Company's financial results were ***disastrous***.  The Company's net loss widened by more than 40%, from $11.9 million in 3Q 2021 to $16.9 million in 3Q 2022.  Critically, in spite of 15% growth in the number of tests performed versus the same quarter of the prior year, testing services revenue had actually ***declined*** by 3% from the same quarter of the prior year, from $66.5 million to $64.8 million.  This meant that even as the Company foisted more and more tests

1    onto patients, its total revenue from those tests was ***shrinking***. Indeed, based on its reported volume

2    of 46,500 tests performed versus its $64.8 million in testing services revenue, ASP had declined to

3    an all-time low of roughly $1,390 per test administered – a more than ***30% decline*** since 2020.

4    330.    In attempting to put a positive spin on these disastrous results, Defendants made a

5    striking admission: that test revenue and ASPs were not actually declining primarily because of

6    "payor mix" or an increase in patients with commercial insurance that reimbursed CareDx at lower

7    rates but because ***CareDx's tests were increasingly being denied any reimbursement at all***.

8    Specifically, CareDx announced an entirely new metric – Average Selling Price per ***reimbursed*** test

9    – and told investors this number had been "consistent" since Q1 2021, with an average

10    reimbursement of $2,500 per reimbursed test every quarter. Defendants touted this "consistent"

11    number as a positive, insisting that ***when CareDx was reimbursed***, its pricing per test had not

12    actually declined. However, critically, this meant CareDx's declines in overall ASP were actually

13    the result of a sharp increase in ***unreimbursed*** tests. As the Company's new CFO, Abishek Jain,

14    made clear, CareDx's "ASP ***on paid test[s]*** was slightly above $2,500 in Q1 '21 and has remained

15    above $2,500 in this most recent quarter," which was "***in contrast to our overall ASP, which***

16    ***includes non-covered tests***." Indeed, as simple calculations could show, and as Jain would expressly

17    confirm in a later investor conference call (on November 15, 2022), ***CareDx was now being denied***

18    ***any reimbursement whatsoever for as many as 50% of all tests it administered***.

19    331.    Indeed, in direct response to the analyst question "how should we think about the

20    ASP trend as we model out next year in a degree of further erosion," Defendant Seeto further

21    reaffirmed: "[W]hen we get reimbursed, we're reimbursed at a pretty constant rate," whereas,

22    "***[w]here we're not reimbursed, that's what we have to work on***." In fact, the problem was

23    purportedly so significant that CareDx announced it would have to redouble its efforts on

24    "collections" and had brought in a third-party consultant to do so.

25    332.    Making matters worse, the Company's financial disclosures showed its total Medicare

26    revenue was continuing to decline as Medicare was simply rejecting more and more of CareDx's

27    fraudulently administered tests. Indeed, in the third quarter of 2022, CareDx's ***total*** revenue from

28    Medicare – its most critical revenue source – fell almost 9% from the same quarter of the prior year,

1   from $46 million to $42 million.  Indeed, after several quarters of ***explosive*** growth in Medicare

2   revenue from the Company's RemoTraC scheme, that growth had suddenly hit a wall and reversed

3   under scrutiny from the DOJ and the SEC.

4       333.   On this news, CareDx's stock price fell from a close of $18.73 per share on

5   November 3, 2022 to $16.02 per share on November 4, 2022 – a decline of more than 14% – on

6   unusually high volume.

7       334.   Analysts from Craig-Hallum issued a scathing report on November 4, 2022,

8   expressing dismay at "another disappointing quarter."  The Craig-Hallum analysts noted they had

9   expected CareDx's growth to improve as transplant volumes rose – just as management had assured

10  them would happen – but instead, the opposite was true as "growth during this year has only trickled

11  lower."  The report lamented that "C[areDx]-wide net ***ASPs also continued their freefall***" and

12  ***entirely rejected*** management's ostensible explanations that "the weakness was again driven by a

13  higher mix of commercial patients, incremental Medicare sequestration headwinds and more tests

14  from non-kidney tests (which have less coverage)."  Instead, the report determined, given CareDx's

15  own claim that its pricing on reimbursed tests had not changed, the poor results reported by CareDx

16  could only lead to one conclusion: "***more tests are not being paid***" (*i.e.*, reimbursed):

17          Management said the weakness was again driven by a higher mix of commercial
            patients, incremental Medicare sequestration headwinds and more tests from non-
18          kidney tests (which have less coverage).  Headwinds from the shift to Medicare
            Advantage were said to be abating, with the culprit being more from a pickup in
19          commercial tests at community nephrology, plus heart and lung growth which all
            have higher private mixes. ***However, our model points to kidney net ASPs dropping***
20          ***$110 q/q to $1,600 and were $1,920 to start the year.  The company did say that***
            ***when tests are paid, the rate is unchanged and is >$2,500.  Conclusion is more***
21          ***tests are not being paid***.

22      335.   The report warned that "no concrete timelines were given on a plateau or reversal of

23  pricing declines," and Craig-Hallum lowered its price target from $51 per share to just $32 per share.

24      336.   In total, after the Company's misrepresentations propelled CareDx's stock price as

25  high as a close of $95.11 per share on June 28, 2021 – near its all-time high – CareDx's stock price

26  fell to just $16.02 per share after the Class Period, losing more than ***83% of its value*** after

27  revelations of Defendants' fraudulent scheme and wiping out billions of dollars in market

28  capitalization.

**7.     Post-Class Period Events Further Confirm that Defendants Defrauded Investors and Caused Their Losses**

337.     Shortly after the end of the Class Period, CareDx's main competitor, Natera, reported financial results completely eviscerating CareDx's excuses that changes in "payor mix" or a shift to Medicare Advantage plans had been the causes of their declining testing services business and further confirming the catastrophic impact government investigations were having on CareDx. By way of background, Natera markets a substantially similar kidney test to CareDx's AlloSure Kidney test known as Prospera Kidney. Prospera Kidney relies on effectively the same technology as AlloSure Kidney, is reimbursed under the same Medicare Local Coverage Decision for the same indication (clinical suspicion of rejection), and is even reimbursed at the same price – $2,841 per test.

338.     On November 8, 2022, Natera reported its own financial results for the third quarter of 2022. During its earnings call following those results, Natera's CEO affirmed, in contrast with CareDx's claims that a shift to commercial insurance and Medicare Advantage business had caused its ASP woes, that Natera's kidney test "*ha[dn't] been impacted by Medicare Advantage or commercial mix shift as our peer mix has remained stable*." Indeed, in sharp contrast to CareDx, which had seen its total Medicare revenue decline by 9%, Natera made clear that "*we're seeing Medicare consistently reimbursed*." Indeed, commenting on Natera's earnings, the same Craig-Hallum analyst who covered CareDx again cast doubt on CareDx's official explanations, noting the contrast between the two companies as "*going against [CareDx]'s commentary*": "[Natera] [m]anagement did note some pressure to ASPs from these uncovered volumes *but has not seen an impact from a mix shift or the move to Medicare Advantage, going against CDNA's commentary*." The marked contrast between CareDx's and Natera's Medicare reimbursements for near-identical tests only further confirms CareDx's testing business had relied on Medicare fraud, and it was now declining due to greater government scrutiny, not market factors.

339.     On November 15, 2022, at the Jefferies London Healthcare Conference, CareDx executives made additional admissions further revealing the true cause of CareDx's ASP declines was that CareDx was no longer able to get reimbursed for the medically unnecessary tests for which

it had once fraudulently billed. First, CFO Jain now fully acknowledged that as much as "*50% of [our] tests are not being paid*." Second, Defendants now admitted part of the reason for this enormous number of unpaid tests was that Medicare Advantage plans – which operated under the same coverage rules as Medicare – were simply applying greater scrutiny to CareDx's fraudulent claims for unnecessary tests. Specifically, an analyst focused on Defendants' prior claims that CareDx was working on improving collections from Medicare Advantage plans. The analyst asked "is that a 12 month process? *Why does it feel like we haven't seen any benefits from improved M[edicare] A[dvantage] collections*?" Strikingly, CFO Jain responded the problem was that Medicare Advantage was simply *more stringent about paying claims*.

340.    Specifically, CFO Jain explained:

> There's a pre-submission [process], there is submission of the claim and then comes to [the] appeals process. So when we started to see the shift last year from Medicare to the Medicare Advantage, now on the pre-submission side . . . *they are requesting a lot of information around the medical records, the insurance information and then the prior authorization [of the test by a medical provider]*.

In other words, unlike with Medicare during the pandemic, CareDx now faced intensive scrutiny of its fraudulent medical claims. Indeed, as Jain complained, "even after you submit [the claim], *they will basically reject the claim for [the] smallest of . . . reasons*." Jain further explained that, after its claims were rejected, the Company would have to go through a series of appeals, "a fairly long process" before the Company could collect – if ever. Indeed, Jain admitted that, while the Company was building "infrastructure" to improve collections from Medicare Advantage plans, "this whole infrastructure has to work like a well-[oiled] machine because [if] one process . . . were to fail, *then you will not be able to collect the money*." Jain's excuses about purported difficulties getting claims paid by Medicare Advantage plans were in stark contrast to competitor Natera's comments that it "*ha[dn't] been impacted by Medicare Advantage*" and had "*seen Medicare consistently reimbursed*." Jain's claims thus only further underscored the real reason CareDx's ASPs and Medicare revenue were declining was that it was no longer able to fraudulently bill Medicare for medically unnecessary tests.

341.    Indeed, trends in CareDx's total Medicare revenue only further confirm that the Company's decline in ASP could not have been simply due to factors like a shift from Medicare to

Medicare Advantage plans as revenue from Medicare Advantage plans would still be included in overall Medicare revenue. Instead, it is clear CareDx's Medicare revenue growth reversed and then declined exactly when the Company came under scrutiny in mid-2021 for its improper practices, as the graph below makes clear:[36]



342. On November 16, 2022, a Medicare committee held a meeting unequivocally confirming the real reason that as many as 50% of CareDx's tests were being rejected for reimbursement: CareDx was improperly billing for medically unnecessary tests. Specifically, the very Medicare contractors that determine Medicare coverage of CareDx's tests invited CareDx to a Contractor Advisory Committee ("CAC") meeting concerning tests for rejection of kidney and liver transplants. The following day, on November 17, 2022, Craig-Hallum analysts who covered the CAC meeting warned that *Medicare had used "harsh language"* questioning CareDx on why there had apparently been "unexpected utilization" of its tests for non-covered uses. Specifically, Craig-Hallum reported:

> MolDx [Medicare's Molecular Diagnostic Services program] held a Contractor Advisory Committee (CAC) meeting yesterday to discuss a range of topics around non-invasive transplant testing. . . . The meeting invite *included strong language perking everyone's attention* stating: MolDx "requested an internal reconsideration of [transplant diagnostic coverage] after noting *unexpected utilization patterns that*

---

[36] CareDx has not disclosed exactly when it received the DOJ CID or was otherwise put on notice of the DOJ, SEC, or state regulatory investigations of its practices.

*are outside of expectations based on evidentiary review and manufacturer documentation." Unexpected utilization is harsh language from Medicare.*

Indeed, the Craig-Hallum analyst expressly connected Medicare's "harsh language" about "unexpected utilization" to CareDx's fraudulent billing for medically unnecessary tests, emphasizing that it appeared the Company had been improperly administering "surveillance" tests to "low risk" patients who had "no clinical suspicion of rejection" and thus were ***not*** covered by Medicare for the tests:

> Under the nonumbrella universal LCD by MolDx [*i.e.* the Medicare billing regulation covering AlloSure], Medicare will cover AlloSure Kidney (or equivalent tests) when used to "assess the probability of allograft rejection in kidney transplant recipients *with clinical suspicion of rejection* and to inform clinical decision-making about the necessity of renal biopsy . . . ." *The language seems to indicate a test is covered when the patient is at risk for rejection (high-risk) and the test would inform the use of a biopsy. But surveillance is neither of these – surveillance is monitoring a patient on a set protocol who is low-risk for rejection. If at low risk, there is no clinical suspicion of rejection at the current timepoint and no necessity for a renal biopsy and thus, by this language, should not be a covered test.*

343.    In other words, Medicare clearly had become fully aware of CareDx's scheme to bill for tests that were ***not*** medically necessary and did not meet coverage requirements and was no longer allowing CareDx's scheme to continue.

344.    Finally, a September 2023 statement put out by the federal government's Center for Medicare and Medicaid Services – which administers Medicare – further confirmed Medicare and its contractors had cracked down on fraudulent billing for medically unnecessary tests. Specifically, the statement described how, leading up to the above-described November 2022 meeting, CMS' contractors "became aware of improper billing and overutilization of these tests," *i.e.*, the Solid Allograft Organ Rejection tests sold by CareDx.

**B.    Materialization of Concealed Risks Under the Ninth Circuit's *First Solar* Proximate Causation Doctrine**

345.    A public self-confession of fraud by Defendants is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to any economic loss. There is an infinite variety of ways – such as the corrective disclosures identified above – to allege that Defendants' illicit conduct caused Lead Plaintiffs' (and similar investors') losses.

346.    The facts also support loss causation under the "materialization of risk" branch of proximate causation because Defendants misrepresented or omitted the "very facts" that were a substantial factor in causing Lead Plaintiffs' and other investors' losses in this case.

347.    Defendants themselves admit the relationship between investors' losses, on the one hand, and Defendants' false or misleading statements about paying or misleading doctors into steering their patients into excessive, medically unnecessary AlloSure testing and Defendants' forced AlloSure testing via the RemoTraC scheme, on the other hand.  Maag and Seeto concealed these "very facts" in all of the false or misleading statements detailed herein.

348.    Both Maag and Seeto acknowledged the proximate relationship between those very facts – lower Medicare reimbursement rates and stock price declines.  As they stated in the Company's 2020 Annual Report, filed on February 24, 2021:

> We receive a substantial portion of our ***revenues from Medicare***, and the loss of, or a ***significant reduction in, reimbursement*** from Medicare ***would severely*** and adversely affect our financial performance.
>
> For the year ended December 31, 2020, revenue from Medicare for AlloMap Heart, AlloSure Kidney and AlloSure Heart represented 67% of testing services revenue. However, ***we may not be able to maintain or increase our tests reimbursed*** by Medicare for a ***variety of reasons***, including changes in reimbursement practices, general policy shifts, or reductions in reimbursement amounts.
>
> *            *            *
>
> ***If future reimbursement levels are less than the current price, our revenues and our ability to achieve profitability could be impaired, and the market price of our common stock could decline***.  We may also not be able to maintain or increase the portion of our tests reimbursed by Medicare for a ***variety of other reasons***, including changes in reimbursement practices and general policy shifts.

349.    As set forth above, because Maag and Seeto freely chose to discuss the "variety of reasons" and "variety of other reasons" why Medicare reimbursement rates could face a significant reduction – pointing to generic changes outside Defendants' control – they freely assumed a duty to disclose another "reason" Medicare revenue was at risk that was squarely within Defendants' control: namely, because Defendants were sending Medicare false claims under their "miraculous" RemoTraC scheme.  When they could no longer continue that scheme, the Company's quarterly reimbursement rates faced a "significant reduction," impairing its "ability to achieve profitability"

and thus causing "the market price of [CareDx's] common stock [to] decline." The particulars of the reimbursement reductions are specified above and not repeated here for that reason.

350.    Additional data illustrate that Defendants were right to foresee how significant reductions in Medicare reimbursement would (and did) impair the Company's "ability to achieve profitability." The data show the Company was close to reaching profitability under the Medicare overbilling scheme and, after the DOJ and SEC pulled the plug on that scheme, the Company's path to profitability was severely and adversely affected:

| CareDx Net Income (Losses) | | |
|---|---|---|
| **Period End** | **Net Income/Losses** | **YoY % Change** |
| 12/30/18 | -3.75 | * |
| 3/30/19 | -7.53 | * |
| 6/30/19 | -7.85 | * |
| 9/29/19 | -1.81 | * |
| 12/30/19 | -4.78 | -22% |
| 3/30/20 | -5.82 | 29% |
| 6/29/20 | -6.56 | 20% |
| 9/29/20 | -2.82 | -36% |
| 12/30/20 | -3.51 | 36% |
| 3/30/21 | -0.69 | 743% |
| 6/29/21 | -1.93 | 240% |
| 9/29/21 | -11.90 | -76% |
| 12/30/21 | -16.15 | -78% |
| 3/30/22 | -21.70 | -97% |
| 9/29/22 | -16.94 | -89% |
| 12/30/22 | -18.33 | -35% |
| 3/30/23 | -23.75 | -32% |

Profitability appears within reach under "miraculous" RemoTraC, but illegal billing underlies the trend

DOJ/SEC False Claims investigation

Medicare rejecting *50%* of the Company's reimbursement claims

351.    In short, Defendants foresaw that their failure to disclose their kickback/false claims would cause investors' losses, and that is exactly what happened here. The risk they concealed (generating financial performance through illicit conduct) materialized after the government pulled the plug, and investors suffered losses as a result in the form of severe and adverse losses on their investments in the Company.

1

2

### C.    November 1, 2023: The Company Announces Seeto's "Stepping Down" as CEO, Effective that Day

352.    In a press release dated November 1, 2023, the Company "announced today that Dr. Reginald Seeto will be stepping down from his position as Chief Executive Officer and President and resigning as a Director of the Board effective ***November 1, 2023***, and will transition to the role of Senior Advisor to the Chairperson."  The press release further stated: "CareDx will establish an Office of the CEO consisting of Board Chairperson Michael Goldberg, Chief Financial Officer Abhishek Jain and President of Patient and Testing Services Alexander Johnson.  The Board of Directors ***has initiated a search for a permanent CEO*** and is considering both internal and external candidates."  The Company's announcement did not state why Seeto was "stepping down" without any permanent replacement.

## X.    CLASS ACTION ALLEGATIONS

353.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased CareDx common stock between April 30, 2020 and November 3, 2022, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

354.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, CareDx common stock actively traded on NASDAQ (an open and efficient market) under the symbol "CDNA."  Millions of CareDx shares were traded publicly during the Class Period on NASDAQ.  As of May 3, 2022, the Company had more than 53 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by CareDx or its transfer agent and

1    may be notified of the pendency of this action by mail using a form of notice similar to that

2    customarily used in securities class actions.

3        355.    Plaintiffs' claims are typical of the claims of the other members of the class as all

4    members of the Class were similarly affected by Defendants' wrongful conduct in violation of

5    federal law complained of herein.

6        356.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

7    and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have

8    no interests that conflict with those of the Class.

9        357.    Common questions of law and fact exist as to all members of the Class and

10    predominate over any questions solely affecting individual members of the Class.  Among the

11    questions of law and fact common to the Class are:

12            (a)    whether Defendants violated the Exchange Act by the acts and omissions as

13    alleged herein;

14            (b)    whether Defendants knew or recklessly disregarded that their statements

15    and/or omissions were false and misleading;

16            (c)    whether documents, press releases, and other statements disseminated to the

17    investing public and the Company's shareholders during the Class Period misrepresented material

18    facts about the business, operations, and prospects of CareDx;

19            (d)    whether statements made by Defendants to the investing public during the

20    Class Period misrepresented and/or omitted to disclose material facts about the business, operations,

21    and prospects of CareDx;

22            (e)    whether the market price of CareDx common stock during the Class Period

23    was artificially inflated due to the material misrepresentations and failures to correct the material

24    misrepresentations complained of herein; and

25            (f)    the extent to which the members of the Class have sustained damages and the

26    proper measure of damages.

27        358.    A class action is superior to all other available methods for the fair and efficient

28    adjudication of this controversy since joinder of all members is impracticable.  Further, as the

1   damages suffered by individual Class members may be relatively small, the expense and burden of

2   individual litigation make it impossible for members of the Class to individually redress the wrongs

3   done to them.  There will be no difficulty in the management of this suit as a class action.

4   **XI.     UNDISCLOSED ADVERSE INFORMATION**

5        359.     The market for CareDx's common stock was an open, well developed, and efficient

6   market at all relevant times.  As a result of the materially false and/or misleading statements and/or

7   omissions particularized in this Complaint, CareDx's common stock traded at artificially inflated

8   prices during the Class Period.  Plaintiffs and the other members of the Class purchased CareDx's

9   common stock in reliance upon the integrity of the market price of the Company's common stock

10   and market information relating to CareDx and have been damaged thereby.

11        360.     During the Class Period, Defendants materially misled the investing public, thereby

12   inflating the price of CareDx's common stock, by publicly issuing false and/or misleading

13   statements and/or omitting to disclose material facts necessary to make Defendants' statements, as

14   set forth herein, not false and/or misleading.  The statements and omissions were materially false

15   and/or misleading because they failed to disclose material adverse information and/or misrepresented

16   the truth about CareDx's business, operations, and prospects as alleged herein.  These material

17   misstatements and/or omissions had the cause and effect of creating in the market an unrealistically

18   positive assessment of the Company and its business, thus causing the Company's common stock to

19   be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially

20   false and/or misleading statements during the Class Period directly or proximately caused or were a

21   substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class

22   who purchased the Company's common stock at artificially inflated prices and were harmed when

23   the truth was revealed.

24   **XII.     INAPPLICABILITY OF STATUTORY SAFE HARBOR**

25        361.     The federal statutory safe harbor provided for forward-looking statements under

26   certain circumstances does not apply to any of the allegedly false statements pled in this Complaint.

27   The statements alleged to be false and misleading herein all relate to then-existing facts and

28   conditions.  In addition, to the extent certain statements alleged to be false may be characterized as

forward looking, they were not identified as "forward-looking statements" when made; and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

362.    In the alternative, to the extent the statutory safe harbor is determined to apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker had actual knowledge the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of CareDx who knew the statement was false when made.

### XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* DOCTRINES)

363.    The market for CareDx stock was open, well developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, CareDx common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiffs and other members of the Class purchased the Company's common stock in reliance on the integrity of the market price of CareDx common stock and market information relating to CareDx and have been damaged thereby.

364.    At all relevant times, the market for CareDx common stock was an efficient market for the following reasons, among others: (a) CareDx was listed and actively traded on NASDAQ, a highly efficient and automated market; (b) As a regulated issuer; CareDx filed periodic public reports with the SEC and/or NASDAQ; (c) CareDx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or (d) CareDx was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

1      365.    As a result of the foregoing, the market for CareDx common stock promptly digested

2  current information regarding CareDx from all publicly available sources and reflected such

3  information in CareDx's stock price.  Under these circumstances, all purchasers of CareDx stock

4  during the Class Period suffered similar injury through their purchases of stock at artificially inflated

5  prices, and a presumption of reliance applies.

6      366.    A Class-wide presumption of reliance is also appropriate in this action under the

7  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

8  because the Class' claims are, in large part, grounded in Defendants' material misstatements and/or

9  omissions.  Because this action involves Defendants' failure to disclose material adverse information

10  regarding the Company's business, operations, and prospects – information Defendants were

11  obligated to disclose during the Class Period but did not – positive proof of reliance is not a

12  prerequisite to discovery.  All that is necessary is that the facts withheld be material in the sense that

13  a reasonable investor might have considered them important in the making of investment decisions.

14  Given the importance of the Class Period misstatements and omissions set forth above, that

15  requirement is satisfied here.

16  **XIV.    COUNTS AGAINST DEFENDANTS**

17                              **COUNT I**

18              **For Violations of §10(b) of the Exchange Act and**
                    **Rule 10b-5 Promulgated Thereunder**
19                        **(Against All Defendants)**

20      367.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

21  forth herein.

22      368.    Defendants violated Rule 10-b5(b) ("misstatement and omission" liability) and

23  Rule 10b-5(a) and (c) ("scheme" liability under *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71

24  (2019)).  During the Class Period, Defendants carried out a plan, scheme, and course of conduct that

25  was intended to and, throughout the Class Period, did: (a) deceive the investing public, including

26  Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market

27  price of CareDx common stock; and (c) cause Plaintiffs and other members of the Class to purchase

28

1    CareDx stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course

2    of conduct, Defendants, and each of them, took the actions set forth herein.

3           369.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

4    statements of material fact and/or omitted to state material facts necessary to make the statements not

5    misleading; and (c) engaged in acts, practices, and a course of conduct that operated as a fraud and

6    deceit on the purchasers of the Company's securities in an effort to maintain artificially high market

7    prices for CareDx common stock in violation of §10(b) of the Exchange Act and Rule 10b-5

8    promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and

9    illegal conduct charged herein or as controlling persons as alleged below.

10          370.    Defendants, individually and in concert, directly and indirectly, by the use, means, or

11   instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous

12   course of conduct to conceal adverse material information about CareDx's business, operations, and

13   prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud

14   while in possession of material adverse nonpublic information and engaged in acts, practices, and a

15   course of conduct as alleged herein in an effort to assure investors of CareDx's business, operations,

16   and prospects, which included the making of, or the participation in the making of, untrue statements

17   of material facts and/or omitting to state material facts necessary in order to make the statements

18   made about CareDx and its business, operations, and future prospects, in light of the circumstances

19   under which they were made, not misleading, as set forth more particularly herein, and engaged in

20   transactions, practices, and a course of conduct of business that operated as a fraud and deceit on the

21   purchasers of the Company's common stock during the Class Period.

22          371.    Each of the Individual Defendants' primary liability and controlling person liability

23   arises from the following facts: (a) each of the Individual Defendants was a high level executive

24   and/or director at the Company during the Class Period and a member of the Company's

25   management team or had control thereof; (b) each of the Individual Defendants, by virtue of his

26   responsibilities and activities as a senior officer and/or director of the Company, was privy to and

27   participated in the creation, development, and reporting of the Company's business, operations, and

28   prospects; (c) each of the Individual Defendants enjoyed significant personal contact and familiarity

1 | with the other Defendants and was advised of and had access to other members of the Company's

2 | management team, internal reports, and other data and information about the Company's financial

3 | condition and performance at all relevant times; and (d) each of the Individual Defendants was aware

4 | of the Company's dissemination of information to the investing public, which they knew and/or

5 | recklessly disregarded was materially false and misleading.

6 |    372. Defendants had actual knowledge of the misrepresentations and/or omissions of

7 | material facts set forth herein or acted with reckless disregard for the truth in that they failed to

8 | ascertain and disclose such facts even though such facts were available to them. Such Defendants'

9 | material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

10 | and effect of concealing CareDx's operating condition, business practices, and prospects from the

11 | investing public and supporting the artificially inflated and/or maintained price of its common stock.

12 | As demonstrated by Defendants' overstatements and misstatements of the Company's business,

13 | operations, and prospects throughout the Class Period, Defendants, if they did not have actual

14 | knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain

15 | such knowledge by deliberately refraining from taking those steps necessary to discover whether

16 | those statements were false or misleading.

17 |    373. As a result of the dissemination of the materially false and/or misleading information

18 | and/or failure to disclose material facts as set forth above, the market price of CareDx common stock

19 | was artificially inflated; and relying directly or indirectly on the false and misleading statements

20 | made by Defendants or on the integrity of the market in which the stock trades, and/or in the absence

21 | of material adverse information known or recklessly disregarded by Defendants but not disclosed in

22 | public statements by Defendants during the Class Period, Plaintiffs and the other members of the

23 | Class purchased CareDx common stock during the Class Period at artificially inflated prices and

24 | were damaged thereby.

25 |    374. At the time of said misrepresentations and omissions, Plaintiffs and other members of

26 | the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other

27 | members of the Class and the marketplace known of the truth regarding the problems CareDx was

28 | experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class

1  would not have purchased their CareDx common stock or, if they had purchased such common stock

2  during the Class Period, would not have done so at the artificially inflated prices they paid.

3       375.    By virtue of the foregoing, CareDx and the Individual Defendants each violated

4  §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

5       376.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the

6  other members of the Class suffered damages in connection with their purchases of the Company's

7  common stock during the Class Period.

8  **COUNT II**

9  **For Violations of §20(a) of the Exchange Act**
   **(Against the Individual Defendants)**

10

11       377.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

12  forth herein.

13       378.    The Individual Defendants acted as controlling persons of CareDx within the meaning

14  of §20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions within the

15  Company, participation in and/or awareness of the Company's operations and intimate knowledge of

16  the false statements filed by the Company with the SEC and disseminated to the investing public, the

17  Individual Defendants had the power to influence and control, and did influence and control, directly

18  or indirectly, the decision making of the Company, including the content and dissemination of the

19  various statements Plaintiffs contend are false and misleading.  Each of the Individual Defendants

20  was provided with or had unlimited access to copies of the Company's reports, press releases, public

21  filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these

22  statements were issued and had the ability to prevent the issuance of the statements or cause the

23  statements to be corrected.  Further, the Individual Defendants signed the Company's annual and

24  quarterly reports as detailed herein.

25       379.    In particular, the Individual Defendants had direct and supervisory involvement in the

26  day-to-day operations of the Company and therefore had the power to control or influence the

27  particular transactions giving rise to the securities violations as alleged herein and exercised the

28  same.

380.    As set forth above, CareDx and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, prays for relief and judgment as follows:

A.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

C.    Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.    Awarding such other relief as this Court deems appropriate.

## XVI.    JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  November 1, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JASON C. DAVIS
ALAINA L. GILCHRIST


                              s/ Jason C. Davis
                            JASON C. DAVIS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
agilchrist@rgrdlaw.com

1

2  ROBBINS GELLER RUDMAN
   & DOWD LLP

3  SPENCER A. BURKHOLZ
NICOLE Q. GILLILAND

4  655 West Broadway, Suite 1900
San Diego, CA  92101

5  Telephone:  619/231-1058
619/231-7423 (fax)

6  spenceb@rgrdlaw.com
ngilliland@rgrdlaw.com

DATED:  November 1, 2024

7  SAXENA WHITE P.A.
LESTER R. HOOKER

8

9

        s/ Lester R. Hooker

10  LESTER R. HOOKER

11  7777 Glades Road, Suite 300
Boca Raton, FL  33434

12  Telephone:  561/394-3399
561/394-3382 (fax)

13  lhooker@saxenawhite.com

14  SAXENA WHITE P.A.
DAVID R. KAPLAN

15  505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA  92075

16  Telephone:  858/997-0860
858/369-0096 (fax)

17  dkaplan@saxenawhite.com

18  SAXENA WHITE P.A.
STEVEN B. SINGER

19  RACHEL A. AVAN
JOSHUA H. SALTZMAN (admitted *pro hac vice*)

20  10 Bank Street, 8th Floor
White Plains, NY  10606

21  Telephone:  914/437-8551
888/631-3611 (fax)

22  ssinger@saxenawhite.com
ravan@saxenawhite.com

23  jsaltzman@saxenawhite.com

24  Lead Counsel for Lead Plaintiffs

25  **ATTESTATION PURSUANT TO LOCAL RULE 5-1(i)(3)**

26      I, Jason C. Davis, am the ECF user whose identification and password are being used to file

27  the [Corrected] Third Amended Class Action Complaint for Violations of the Federal Securities

28

1    Laws.  Pursuant to Local Rule 5-1(i)(3) and in compliance with General Order No. 45 X.B., I hereby

2    attest that Lester R. Hooker has concurred in this filing.

3    DATED:  November 1, 2024

4

5                                                                                    s/ Jason C. Davis
                                                                            JASON C. DAVIS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28