ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
ALAINA L. GILCHRIST (335807)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
agilchrist@rgrdlaw.com
        – and –
SPENCER A. BURKHOLZ (147029)
NICOLE Q. GILLILAND (335132)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>CAREDX, INC., et al., )<br><br>Defendants. ) | Case No. 3:22-cv-03023-TLT<br><br>CLASS ACTION<br><br>LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT<br><br>DATE:      January 28, 2025<br>TIME:       2:00 p.m.<br>DEPT:       10<br>JUDGE:     Honorable Trina L. Thompson |

4928-3303-5525.v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...........................................................................................................1

II. OVERVIEW OF DEFENDANTS' FRAUDULENT CONDUCT....................................5

    A. CareDx's Schemes to Unlawfully Bill Medicare for Medically Unnecessary AlloSure Tests and to Unlawfully Induce Doctors to Prescribe AlloSure .........................................................................................................5

    B. Dr. Olymbios Confronts Defendants About Unlawful Conduct and Becomes a Whistleblower, Causing Defendants' Fraud to Be Revealed ...............8

III. ARGUMENT.................................................................................................................8

    A. The TAC Adequately Alleges Scienter................................................................8

        1. Dr. Olymbios and Others Confronted Defendants About CareDx's Unlawful Billing on Specific Dates ............................................................9

        2. Maag and Seeto Directed, Participated in, and Approved AKS and Stark Law Violations ...............................................................................10

        3. A Holistic Review of the Above Facts, Plus Other Factors, Demonstrates Scienter .............................................................................13

        4. Defendants Cannot Defeat Scienter with Disputed Facts and Documents Outside the Complaint..........................................................14

            a. The August 2024 CMS Press Release Cannot Be Used to Negate Scienter .......................................................................15

            b. The DOJ Notice and the Form 8-K Reporting the SEC'S Letter Cannot Be Used to Negate Scienter ...................................16

    B. The Court Should Not Reverse Itself on Falsity or Loss Causation .....................18

        1. The Court Already Found Falsity for Statements Concerning CareDx's Testing Services Revenue........................................................18

        2. The Court Already Found that Falsity of the Compliance Statements in CareDx's Underwriting Agreements Were Sufficiently Pled.......................................................................................20

        3. The Newly Alleged Stark Law Statements Are Substantively Similar to Statements that the Court Already Upheld .............................22

        4. The Court Already Found Loss Causation...............................................23

IV. CONCLUSION.............................................................................................................25

LEAD PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT
4928-3303-5525.v1

- i -

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bagley v. United States*,
963 F. Supp. 2d 982 (C.D. Cal. 2013) ...................................................................................17

*Balko v. Senior Home Care, Inc.*,
2017 WL 11037320 (M.D. Fla. Jan. 3, 2017)........................................................................17

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................................23

*Carroll v. Myriad Genetics, Inc.*,
2022 WL 16860013 (N.D. Cal. Nov. 9, 2022) .......................................................3, 15, 16, 19

*Chew v. Moneygram Int'l, Inc.*
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) .......................................................................19

*City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*,
2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024)........................................................................23

*Dura Pharms, Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................................24

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ................................................................................................18

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ..................................................................................24

*Fire & Police Ass'n of Colo. v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015)................................................................................................18

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) .........................................................................23

*Glazer Capital Management, LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ...............................................................................................21

*Habelt v. iRhythm Techs., Inc.*,
2022 WL 971580 (N.D. Cal. Mar. 31, 2022)...........................................................................9

*Helo v. Sema4 Holdings Corp.*,
2024 WL 3593677 (D. Conn. July 31, 2024) ........................................................................19

**Page**

*In re Accellion, Inc. Data Breach Litig.*,
    2024 WL 4592367 (N.D. Cal. Oct. 28, 2024)........................................................................19

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ................................................................................................25

*In re Bos. Sci. Corp. Sec. Litig.*,
    646 F. Supp. 3d 249 (D. Mass. 2022) ..................................................................................18

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ................................................................................................22

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) .....................................................................................21

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ........................................................................13

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) ................................................................................................14

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
    307 F. Supp. 3d 583 (S.D. Tex. 2018) .......................................................................3, 9, 21, 22

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................................11

*In re Zillow Grp., Inc. Sec. Litig.*,
    2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)...................................................................23

*Inchen Huang v. Higgins*,
    2019 WL 1245136 (N.D. Cal. Mar. 18, 2019).......................................................................25

*Jaroslawicz v. M&T Bank Corp.*,
    2017 WL 1197716 (D. Del. Mar. 30, 2017) ..........................................................................21

*Kessman v. Myriad Genetics, Inc.*,
    2019 WL 1330363 (D. Utah Mar. 25, 2019) ........................................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................................................................16

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ..............................................................................................24

**Page**

*Luna v. Marvell Tech. Grp. Ltd*,
    2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)............................................................................25

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024)..................................................................................................................19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ....................................................................................................9

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
    881 F.3d 750 (9th Cir. 2018) ....................................................................................................25

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................................14

*NVIDIA Corp. v. E. Ohman J:or Fonder AB*,
    2024 WL 5058572 (U.S. Dec. 11, 2024) ..................................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................................19, 23

*Ortiz v. Todres & Co., LLP*,
    2018 WL 1626140 (S.D.N.Y. Mar. 30, 2018) ..........................................................................16

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ....................................................................................................21

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ....................................................................................................20

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
    360 F. Supp. 3d 1039 (S.D. Cal. 2019)............................................................................ *passim*

*Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*,
    2022 WL 20286688 (N.D. Cal. Feb. 24, 2022) ..................................................................20, 24

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
    2024 WL 3579322 (N.D. Cal. July 29, 2024)......................................................................14, 23

*Sneed v. AcelRx Pharms. Inc.*,
    2024 WL 2059121 (N.D. Cal. May 7, 2024) ..............................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................................8, 9

**Page**

*U.S. ex rel., Roberts v. Sunrise Senior Living, Inc.*,
   2009 WL 499764 (D. Ariz. 2009)...........................................................................................16

*U.S. ex rel. Walle v. Martin Marietta Corp.*,
   1996 WL 748456 (E.D. La. Dec. 30, 1996)............................................................................17

*United States v. CareDx, Inc.*,
   No. 1:21-cv-0774-AMD-LKE (E.D.N.Y.)...............................................................................1

*United States v. Cigna Corp.*,
   2022 WL 3051010 (M.D. Tenn. Aug. 2, 2022) ......................................................................17

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §77..................................................................................................................................17, 18

31 U.S.C.
   §3730(b)(1) ........................................................................................................................4, 16

42 U.S.C.
   §1395nn..................................................................................................................................22
   §1395nn(e)(3) ........................................................................................................................22

False Claims Act
   Pub. L. 97-258, 96 Sta. 978 (1982)................................................................................20, 24

17 C.F.R.
   §240.10b-5(b)..........................................................................................................................19

Lead Plaintiffs hereby oppose Defendants' motion to dismiss.[1]

## I.    INTRODUCTION

Throughout the Class Period, CareDx perpetrated a scheme to improperly bill Medicare for hundreds of thousands of medically unnecessary blood tests.  In furtherance of this scheme, Defendants unlawfully induced doctors to prescribe those tests using extravagant luxury dinners, hotels, and wine tastings, as well as paying them exorbitant fees for participating in sham "advisory boards" and enrolling patients in "studies" that were pretexts to bill Medicare for even more unnecessary tests.  These practices violated federal law, including the FCA, AKS, and Stark Law.

Despite these unlawful practices – which were directed by the Company's senior-most officers, including its CEO – Defendants assured CareDx's investors that the Company's conduct was above board and in full compliance with healthcare laws, and that the sources of their revenue were legitimate.  Once CareDx came under government scrutiny, however, Defendants could no longer sustain their schemes, and CareDx's critical Medicare revenue plummeted as a result.  As the truth was revealed through a series of corrective disclosures, CareDx's stock price cratered, and its investors lost billions of dollars in market value.  CareDx's stock price has never recovered from Defendants' fraud.

On September 18, 2024, this Court issued an order that granted in part ***and denied in part*** Defendants' motion to dismiss the SAC. ECF 123 ("Order").  Specifically, the Court held that "[f]or the element of falsity: . . . the Court **DENIES-IN-PART** motion to dismiss for statements regarding underwriting representations and statements regarding testing services revenue and historical RemoTraC data," and that "the Court **DENIES-IN-PART** motion to dismiss" as "Plaintiffs have

---

[1]    References to "MTD" or "Motion" are to Defendants' Notice of Motion and Motion to Dismiss Third Amended Class Action Complaint; Memorandum of Points and Authorities in Support Thereof (ECF 136).  Exhibit (or "Ex.") references are to the Declaration of Charles D. Cording in Support of Motion to Dismiss Third Amended Class Action Complaint (ECF 136-1).  All terms not otherwise defined herein have the same meaning as in the Third Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 133) ("Complaint" or "TAC").  "FAC" refers to the First Amended Complaint in this action (ECF 53).  "SAC" refers to the Second Amended Complaint in this action (ECF 81).  All "¶_" and "¶¶_" references are to the Complaint. "Whistleblower Action" refers to *United States v. CareDx, Inc.*, No. 1:21-cv-0774-AMD-LKE, (E.D.N.Y.).  "Whistleblower Complaint" refers to the complaint filed in that action on February 12, 2021 (ECF 1), and unsealed for the first time on October 7, 2024.  Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

sufficiently alleged loss causation." *Id.* at 43. The Court partially granted dismissal *only* with respect to other alleged false statements, scheme liability, and scienter. *Id.*

With respect to scienter, the Court expressly granted Plaintiffs leave to amend, explaining that "[b]ecause amendment is not futile, Plaintiffs may amend their complaint to include particularized facts regarding the contents of alleged communications and witnesses with direct or at least less attenuated knowledge of these communications." *Id.*

Following the Court's Order, Plaintiffs diligently investigated additional facts supporting scienter and filed the TAC. The TAC more than satisfies the Court's instructions. First, the TAC alleges facts not only supported by the newly unsealed Whistleblower Complaint, but *personally confirmed to Plaintiffs' counsel by Dr. Olymbios himself*. These facts provide *exactly* what the Court stated was missing from the SAC, namely "the contents of alleged communications" and a "witness[] with direct . . . knowledge of these communications" – *i.e.*, Dr. Olymbios. Order at 43. Indeed, Dr. Olymbios described specific conversations he had with Defendant Seeto in July 2020, in which he explained to Dr. Seeto that CareDx's Medicare billing practices for AlloSure were fraudulent, a view also confirmed by CareDx's own Director of Reimbursement.

While these facts, alone, satisfy the Court's Order, Plaintiffs have provided far more. Indeed, the TAC alleges a bevy of new facts, providing extensive, particularized details of unlawful inducements – including their locations, dates, attendees, and expenditures – that violated the AKS and Stark Law. As one former employee explained: "*We had a bunch of cash, and we could basically buy [the doctors'] business*." ¶155. The TAC now provides specific details of at least a dozen different lavish hotel, dinner, or drinking events throughout the Class Period that were used to induce doctors to prescribe medically unnecessary tests. Events of this sort were standard operating procedure at the Company – as the Chief Business Officer told doctors at one such event (and in Seeto's presence): "*This is how we run meetings. This is what we do at CareDx. So, if you want more dinners just keep using CareDx*." ¶156. Significantly, these detailed allegations come both from Dr. Olymbios himself and from a new confidential witness, FE-21, who attended and helped to organize these events. And both Dr. Olymbios and FE-21 confirmed that Seeto and Maag personally attended and approved them.

LEAD PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THIRD AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                                    - 2 -
4928-3303-5525.v1

The TAC provides details of numerous other unlawful inducements to prescribing doctors, such as CareDx paying doctors $500 an hour to attend sham "advisory board" meetings that were solely designed to induce doctors to prescribe AlloSure. Dr. Olymbios, who attended the meetings, said that Defendants Maag and Seeto not only organized and attended these "advisory boards," they kept spreadsheets of the amounts paid to doctors and the impact on sales.

In sum, the TAC's scienter allegations provide a remarkable level of particularity rarely seen at the pleading stage in a federal securities lawsuit. As such, unable to refute that these new allegations overwhelmingly meet the standard for scienter, Defendants moved the goalposts and completely changed their argument. Specifically, Defendants now, *for the first time*, ask the Court to conclude, as a matter of law, at the pleading stage, that their patently unlawful practices were actually lawful and appropriate all along. This the Court cannot do.

In support of this claim, Defendants have attached to their Motion a series of ambiguous and, in many cases, non-judicially noticeable documents that they found on the internet. However, it is black-letter law that Defendants cannot establish, at this stage, let alone through extraneous, disputed, and dubious evidence, that their conduct was entirely proper. *See generally* Opposition to Defendants' Request for Judicial Notice ("RJN Opp."), filed concurrently herewith; *Carroll v. Myriad Genetics, Inc.*, 2022 WL 16860013, at *2 (N.D. Cal. Nov. 9, 2022) ("[D]efendant's motion relies heavily, and at times entirely, on disputed facts from noticed documents. The Court cannot and does not consider those alleged facts in its analysis.").

Even if the Court were to consider Defendants' disputed and extraneous "facts," they do not help Defendants. For example, Defendants claim that an *August 2024* CMS *press release* retroactively makes their April 30, 2020-November 3, 2022 Class Period conduct legal. They insist the Court should "interpret" the document to mean that any "surveillance" use of AlloSure – no matter whether it was medically necessary and no matter whether it was induced by kickbacks – to be lawful. Defendants' argument is absurd. The press release expressly states that even so-called "surveillance" testing *requires a "physician-assessed pretest" to demonstrate medical necessity*, and the TAC specifically alleges that CareDx was *not* obtaining any "physician-assessed pretests" to determine medical necessity – in fact, Defendants bundled AlloSure with *all* of its RemoTraC blood

testing, regardless of medical necessity.  Indeed, at the same "advisory boards" CareDx paid doctors $500 per hour to attend, Maag and Seeto expressly told the doctors they were *required to include AlloSure regardless of medical necessity*.  Moreover, the press release has no legal force, and nothing in it addresses what was permitted *two to four years earlier*, during the Class Period.

In further service of their misleading argument, Defendants also mischaracterize the DOJ's notice of non-intervention filed in the Whistleblower Action as showing there had been "no finding of wrongdoing." MTD at 24.  But the notice expressly states that the Whistleblower Action *should continue on behalf of the government*: "Although the United States declines to intervene, we respectfully refer the Court to 31 U.S.C. §3730(b)(1), which *allows the relator to maintain the action in the name of the United States*[.]"  Whistleblower Action, ECF 15 at 1.  Moreover, the notice expressly states that the government may still intervene, *i.e.*, that "*[t]he United States reserves the right . . . to intervene in this action, for good cause, at a later date*[.]"  *Id.*  And Defendants' reliance on a purported letter from the SEC to CareDx is equally misleading.  The regulation the letter was issued under states that it is "*clearly inappropriate and improper*" to use such a letter "as a purported defense in any action that might subsequently be brought against the party, either civilly or criminally."  And the Court has already *denied* Defendants' prior requests to notice this same document.

Without these improper documents and "facts" – which are well outside the pleadings and disputed (at best) as to their meaning – Defendants are entirely unable to refute scienter.

Defendants' remaining attacks are even weaker, as they ask this Court to *reverse itself* on falsity and loss causation, without citing to any intervening change in law or fact.  Relying on arguments that this Court has already expressly rejected, Defendants again argue that their statements about the lawfulness of their conduct and the sources of their revenue are inactionable, and that their disclosures did not cause investors' losses.  However, the TAC amply pleads falsity and loss causation for the same reasons that this Court found that the SAC did – indeed, the TAC only strengthens Plaintiffs' claims.

Defendants have offered no valid basis for the Court to now reach a different result.  Indeed, Defendants' only "new" arguments on falsity and loss causation suffer the same fatal flaw as their

arguments on scienter – they improperly rely on non-judicially noticeable and/or misconstrued documents to try to prove, at the pleading stage, that their Class Period conduct was lawful.  Once this faulty plank of Defendants' Motion is removed, its entire structure collapses.

Finally, the only "new" statements in the TAC – *i.e.*, statements that were not alleged in the SAC – are two substantively identical false and misleading statements concerning Defendants' compliance with the Stark Law, which prohibits improper compensation to doctors to prescribe CareDx's tests.  But these statements are similar to the compliance statements the Court already upheld.  And Defendants cannot claim that they truly "intended to comply" with the Stark Law through their $40,000 referral fees, $500-per-hour sham advisory board, and extravagant luxury dinners and trips for doctors that so obviously violated that law.

Plaintiffs have overwhelmingly satisfied the PSLRA's pleading standards.  Defendants' Motion should be denied in full.

## II.    OVERVIEW OF DEFENDANTS' FRAUDULENT CONDUCT

### A.    CareDx's Schemes to Unlawfully Bill Medicare for Medically Unnecessary AlloSure Tests and to Unlawfully Induce Doctors to Prescribe AlloSure

CareDx is a medical testing company whose blood tests are designed to detect when a transplant patient is rejecting their transplanted organ.  ¶88.  During the Class Period, CareDx's top product was a blood test called AlloSure, which was supposed to detect kidney transplant rejection.  *Id.*  But unlike the routine blood tests normally given to post-transplant patients at $22 each, AlloSure was neither routine nor inexpensive.  Instead, AlloSure cost $2,841 per test.  ¶86.

Medicare was CareDx's largest payor, accounting for 60% of CareDx's revenue. ¶89.  Given the high price of the AlloSure test, Medicare imposed strict payment conditions on covering AlloSure, requiring evidence that the test was medically necessary.  Specifically, in order to cover the test, Medicare required "clinical suspicion of rejection" – an indication from a doctor, based on testing or evaluation – that the patient was already at risk of rejecting their transplant.  ¶90.

To create the appearance of revenue growth, Defendants hatched a scheme to unlawfully bill Medicare for thousands upon thousands of medically unnecessary tests where there was no "clinical suspicion of rejection." ¶90.  Specifically, seizing upon the opportunity presented by the COVID-19

pandemic, Defendants created "RemoTraC," a "mobile phlebotomy" service that, ostensibly, was designed to make sure homebound transplant patients could still get their routine, standard-of-care blood tests at home. ¶86. However, Defendants used RemoTraC as a pretext to also administer medically *unnecessary* AlloSure tests and bill Medicare nearly $3,000 per test. ¶98.

The scheme was simple: CareDx would make sure that every single time a patient received routine blood tests at home through the RemoTraC program, the patient received an AlloSure test as well, regardless of medical necessity. ¶¶95-142. This could be repeated monthly or even weekly, ensuring tens or even hundreds of thousands of dollars in revenue per patient.

However, Defendants' scheme violated the very laws that Defendants claimed, in their public filings, to comply with. Specifically, the FCA prohibits billing Medicare for tests when they do not meet specified medical necessity requirements. ¶¶103-104. Indeed, all such tests required a doctor's prior medical determination of "clinical suspicion of rejection" of the transplanted organ to be covered by Medicare. But Defendants were billing Medicare for hundreds of thousands of tests administered *automatically* alongside *routine bloodwork* and *without* any physician determination of medical necessity or "clinical suspicion of rejection." ¶¶95-142.

Strikingly, these improper Medicare billing practices were confirmed by at least a dozen former CareDx employees at all levels of the Company – senior executives (who reported directly to C-suite executives), senior medical science liaisons, lead clinical research associates, reimbursement specialists, product managers, lab directors, clinicians, sales personnel, and a market access director. All of these witnesses confirmed the same fact pattern: CareDx was systematically "doing the very expensive CareDx labs on the *same cadence* of the home labs," which "was totally unethical," as it meant "*doing tests that cost at least 8X of what they should have been and [doing them] on patients that did not need these tests*." ¶115. Indeed, employees were "told that you couldn't just have us go out and draw a kidney panel *without also drawing the AlloSure*" (¶135), and learned that "*90% of CareDx's patients were getting tested at least every month with their expensive tests*." ¶130.

Defendants euphemistically referred to this practice as "surveillance" testing. ¶105. But billing *Medicare* for AlloSure tests required a medical necessity determination regardless of what it

was called.[2] RemoTraC, however, circumvented medical necessity; in fact, Defendants deliberately removed the medical necessity requirement from its forms (¶124), and used "standing orders" to automatically order AlloSure tests without any medical necessity determination. ¶125.

In addition to RemoTraC, Defendants schemed to use "studies" to improperly bill Medicare for medically unnecessary tests. These, too, violated the FCA, and Defendants' exorbitant bribes ("referral fees") paid to physicians to enroll their patients in the studies – *as much as $40,000 per patient (8x the standard fee)* – also violated the AKS and the Stark Law. ¶174.

Moreover, to ensure that physicians *always* prescribed AlloSure along with every single routine blood test, without any medical necessity, Defendants also engaged in rampant payment of kickbacks and inducements to physicians. Indeed, leading up to and throughout the Class Period, CareDx made a pattern and practice of plying doctors with lavish marketing events, trips, dinners, "booze cruises," "speaking contracts," $500 per hour "advisory boards," and more, in order to induce them to prescribe AlloSure. As set forth below, the TAC alleges these inducements in exacting detail, based on new facts from both Dr. Olymbios and another newly interviewed former CareDx employee who was directly involved in organizing and attending numerous exorbitant dinners and other ostentatious events designed to induce physicians to prescribe the tests. Strikingly, the TAC also confirms that each and every one of these events was both attended and approved by Maag and Seeto, who also signed off on the expenses for the events.

In spite of this unlawful conduct, Defendants nonetheless misleadingly assured investors, throughout the Class Period, that CareDx was in "*material compliance*" with the FCA, the AKS and other laws, and that their arrangements with doctors were "structured" in a way that was designed to "comply" with the Stark Law – the same laws Defendants were, in reality, systematically violating. ¶¶222, 246. Further, Defendants represented the sources of their revenue as legitimate while omitting disclosure of their reliance on these fraudulent, unlawful schemes.

---

[2] Defendants claim that some of their public materials contained the word "surveillance" in connection with AlloSure, or that they discussed multi-test "protocols." MTD at 2, 4, 11. However, this is irrelevant. *Defendants' public materials did not discuss the fact that CareDx was improperly bundling AlloSure with every single routine blood test administered, without even considering medical necessity*.

**B.    Dr. Olymbios Confronts Defendants About Unlawful Conduct and Becomes a Whistleblower, Causing Defendants' Fraud to Be Revealed**

Prior to leaving the Company, Dr. Olymbios – a highly credentialed doctor who was one of CareDx's highest-ranking executives and who regularly received Defendants' praises – confronted Defendants Maag and Seeto about the Company's unlawful practices.  Most significantly, during two different conversations with Seeto in July 2020 – an in-person meeting and a regularly scheduled one-on-one telephone call – Dr. Olymbios specifically told Seeto that CareDx's billing Medicare for medically ***unnecessary*** "surveillance" testing was "fraud on the government," a view also shared by CareDx's own Director of Reimbursement, Danielle Scelfo.  ¶284.  Dr. Olymbios also raised the same concerns to "more than ten other current or former CareDx employees, including [Defendant] Maag."  ¶289.  However, according to Dr. Olymbios, "CareDx executives brushed off his concerns or berated him for raising them in the first place" and "repeatedly ignored or actively quashed any internal concerns about its activity" until he finally resigned.  *Id.*

Due to his serious concerns about CareDx's unlawful practices, Dr. Olymbios became a whistleblower and filed the Whistleblower Complaint on February 12, 2021.  While the Whistleblower Complaint was kept entirely confidential, it led to the DOJ's and SEC's investigations of the Company's improper practices.  CareDx finally disclosed these investigations on October 28, 2021, and, the same day, revealed plummeting Medicare revenue and ASPs (which were a direct result of CareDx's inability to continue its improper billing under government scrutiny).  CareDx's stock price was decimated as a result of the news, plummeting 27%.  ¶33.

Defendants' fraud was further revealed through a series of partial corrective disclosures that confirmed, *inter alia*, that, as a result of the investigations, Defendants' Medicare revenue and ASPs were continuing to plummet.  In total, Defendants' fraud caused CareDx's stock to fall more than *83%* from its Class Period high, wiping out billions of dollars in investor value.  ¶336.

## III.    ARGUMENT

### A.    The TAC Adequately Alleges Scienter

An inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

324 (2007). Instead, an inference of scienter is "strong" when it is as likely as any other inference. *Id.* at 325. When evaluating scienter, a court must "accept all factual allegations in the complaint as true" and determine "whether **all** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (first emphasis in original).

### 1.    Dr. Olymbios and Others Confronted Defendants About CareDx's Unlawful Billing on Specific Dates

As directed by the Order, the TAC alleges with particularity that Dr. Olymbios raised his concerns about CareDx's billing practices directly to Defendants. Indeed, Dr. Olymbios has personally confirmed two different meetings he had with Defendant Seeto in July 2020, during each of which he raised his concerns that CareDx's practice of billing Medicare for "surveillance" AlloSure tests for patients with no demonstrated medical necessity constituted "fraud on the government."[3] ¶¶28, 196, 284. These concerns were not merely Dr. Olymbios' own speculation – Dr. Olymbios had directly confirmed with the Company's own Director of Reimbursement, Danielle Scelfo, that she, too, believed these practices to be unlawful.[4] These allegations are more than sufficient, as they allege "particularized facts regarding the contents of alleged communications and witnesses with direct or at least less attenuated knowledge of these communications."[5] Order at 43.[6]

---

[3]    The situation here is nothing like that in *Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1069 (9th Cir. 2008) (MTD at 10), in which the "most persuasive allegation of scienter" was that one of the defendants stated that company practices were in "the gray area." Similarly, in *Sneed v. AcelRx Pharms. Inc.*, 2024 WL 2059121, at *11 (N.D. Cal. May 7, 2024) (MTD at 10), an employee merely told defendants that he believed a slogan was potentially problematic and "put the company at risk of an FDA warning letter." This is hardly equivalent to Dr. Olymbios directly warning Defendant Seeto that the Company's systematic billing of Medicare for medically unnecessary tests was fraudulent. And in *Habelt v. iRhythm Techs., Inc.*, 2022 WL 971580, at *18 (N.D. Cal. Mar. 31, 2022) (MTD at 10), an expert merely warned defendants that CMS ***could*** potentially change its reimbursement rates ***sometime in the future***. This is nothing like the present case, where Dr. Olymbios warned Defendants that their conduct was unlawful under existing law.

[4]    For this reason, Defendants' claim that Dr. Olymbios was "not an expert in Medicare reimbursement" is irrelevant. MTD at 10. Not only was Dr. Olymbios one of CareDx's most senior officers, who obviously was familiar with those regulations, but CareDx's Director of Reimbursement (Scelfo) ***was*** an expert in Medicare reimbursement, and she confirmed that CareDx's Medicare billing practices ***were improper***.

[5]    Moreover, Dr. Olymbios corroborated these allegations with highly specific facts about multiple major medical institutes raising concerns over CareDx's Medicare billing practices during the same timeframe. For example, Dr. Olymbios described a June 22, 2020 message sent directly to

### 2. Maag and Seeto Directed, Participated in, and Approved AKS and Stark Law Violations

The TAC's allegations about CareDx's kickbacks and inducements to physicians to prescribe AlloSure also strongly support scienter and satisfy the Order. First, Dr. Olymbios described with exacting detail several lavish marketing events he attended that were designed to induce doctors to prescribe AlloSure by plying them with hotel rooms, expensive dinners and wine – complete with timeframes and locations, as well as details of the kickbacks, which were blatant violations of the AKS and Stark Law. *See, e.g.*, ¶146 ("[f]or those [longer] meetings, physicians [we]re paid between $3,000 to $5,000 plus expenses, including airfare and hotel costs").

FE-21, who organized and attended such events himself, stated that "Defendant Seeto attended and approved all such events," which he described as "gross overuse of funds to entertain doctors" and induce them to prescribe CareDx tests. ¶155. FE-21 described the timeframe, location, and details of these events with great specificity. For example, the TAC described a July 2021 event attended by Seeto and held at the luxurious Cavallo Point Lodge in Marin County, CA, wherein doctors were provided $1,200 per night hotel rooms on the Company's dime, and at which the doctors then attended a supposedly "educational" dinner (with expensive food and drinks). *Id.* As FE-21 stated, in reality, "[t]his clearly wasn't about the doctors learning more about our products, ***it was an inducement to do business with us***." *Id.* FE-21 confirmed that Seeto himself approved the expenses for this event (as he did with all such events)[7] in addition to attending it, and thus obviously

---

Defendant Maag by the President of Renal Disease Research Institute ("RDRI") stating that RDRI would not participate in a study ***specifically because of RDRI's concerns that CareDx was improperly billing the government for tests performed as part of the study***. ¶¶209, 271, 291. Contrary to Defendants' claim, this was not an "entirely separate question" from the propriety of Defendants' Medicare billing practices. MTD at 11. The TAC alleges that billing for tests through "studies" was one of the ways CareDx billed Medicare for non-medically necessary tests.

[6]    Defendants' argument that their "position regarding surveillance testing" was "public" (MTD at 11) is simply wrong. Nowhere in any of Defendants' documents (many of which are not even judicially noticeable) did they publicly disclose that they were using RemoTraC, the KOAR study, and various illegal kickbacks to induce the regular and frequent use of AlloSure testing ***without any medical necessity whatsoever***, nor did Defendants disclose that they were regularly unlawfully billing Medicare for those medically unnecessary tests.

[7]    In addition to FE-21 and others averring that Defendants Seeto and Maag signed off on these extravagant events and their expenses, ¶¶30, 281-282, Defendant Maag himself testified under oath that he personally approved all "marketing" expenses, which necessarily included these events.

LEAD PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THIRD AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                    - 10 -
4928-3303-5525.v1

was aware of the improper inducements to physicians. FE-21 described numerous similar events with particularity, including a September 2021 event (attended by Seeto) held at the Four Seasons Hotel in Seattle, wherein CareDx spent $8,000 on dinner for 12 attendees (¶158), and other similar events in 2021 and 2022, all alleged with particularity as to dates, locations, and expenditures, and all attended by Defendants and other executives. ¶¶159-167.

Defendants also knew that these practices violated the AKS and the Stark Law – in fact, they personally signed SEC filings averring that they understood that this was exactly the type of conduct that violated these laws. ¶¶293-297. Further, Defendants were aware that their conduct violated the AKS and the Stark Law because they took deliberate steps to hide these expenses (¶¶298-300). Moreover, Seeto personally participated in "Business Leadership Team" meetings in late 2021, wherein the team discussed keeping a lower profile about CareDx's lavish expenditures now that the Company was under government scrutiny. ¶281.

In response to these damning facts, Defendants say that scienter is still inadequately pled. But it is difficult to imagine what more could be required. Indeed, it is more than sufficient that Defendants Seeto and Maag attended the events and approved their obviously improper expenses, and that they knew that this was exactly the type of conduct that violated applicable laws. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1099-100 (N.D. Cal. 2017) ("given the extent of the alleged fraud and the number of red flags, it is implausible that Wells Fargo's senior management. . .was unaware of the alleged fraud").

Defendants also argue that the timing of *some* of the allegations in the Complaint does not support scienter for *some* of the false statements. For example, Defendants argue that FE-21's alleged dinners did not occur until after the January 21, 2021 false statement. MTD at 12. But this is irrelevant, as other witnesses, including Dr. Olymbios himself, described similar improper inducement events taking place *before* that statement (¶¶146-151). Similarly, Defendants complain that *some* of the events described by FE-21 happened after the latest alleged false statement, which was made on February 24, 2022. MTD at 13 n.12. But this argument fails. FE-21 described with

¶¶171-172 ("I am engaging with the team on those [events and expenses]. And then *I am signing off on all the expenses*. . . . I signed every check in the company.").

particularity at least three different extravagant and obviously improper events to induce doctors to prescribe CareDx tests that took place in June, July, and September 2021 (and were attended and approved by Seeto and Maag). All of these events predate Defendants' February 24, 2022 statement about Stark Law compliance, and all of them predate at least one of Defendants' other statements about the sources of their revenue (which the Court has *already* upheld). Moreover, FE-21 stated that these illegal inducement dinners were pervasive and routine throughout his time at CareDx. As such, the several similar events he alleged that took place in March, April, May, and June 2022 only serve as further evidence – in combination with the earlier events described by himself, Dr. Olymbios, and other witnesses – that this was an ongoing practice that Defendants knew about and directed throughout the Class Period. Indeed, as Chief Business Officer Alex Johnson put it at one such dinner (where Seeto was present): "*[t]his is how we run meetings. This is what we do at CareDx. So, if you want more dinners just keep using CareDx*." ¶271.[8]

Additionally, Defendants falsely claim, with respect to a January 2020 CareDx event in Miami attended by Seeto and Maag, that Dr. Olymbios "does not allege that it was intended to induce physicians to prescribe AlloSure, and therefore violate the Anti-Kickback Statute." MTD at 12-13. In fact, the TAC expressly alleges that the January 2020 Miami event was one of many events designed "to entice physicians to cooperate in Defendants' fraudulent scheme" involving AlloSure. ¶¶146-148 ("Dr. Olymbios recalled other specific examples of *such events* . . ." including the Miami event).[9] In sum, Seeto and Maag's orchestration of and attendance at these events – which were unlawful under the AKS and the Stark law – establish scienter.

---

[8]    Indeed, one event described by Dr. Olymbios—an "all-expenses-paid trip in summer 2019 to reward doctors who regularly prescribed AlloSure" was substantively similar to one held in 2021 described by FE-21 – including being held at the exact same Marin County luxury hotel at the same time of year – suggesting that this was likely an annual event. ¶¶147, 155.

[9]    Defendants' claim that Dr. Olymbios "does not allege CareDx even attended" a New Orleans conference is similarly misleading. MTD at 13. Obviously, by stating that "when CareDx was planning to attend" that conference, "it offered physicians $3,000, plus one night's hotel stay, two meals, and airfare to attend a four-hour meeting as part of the conference." Dr. Olymbios meant that CareDx attended the event. ¶146. Otherwise, his statement would be nonsensical.

### 3. A Holistic Review of the Above Facts, Plus Other Factors, Demonstrates Scienter

While the above facts, alone, establish scienter, they are further strengthened by a "holistic" review in which the TAC's other scienter allegations are considered together with those facts.

*First*, Maag's August 2020 warning to Dr. Olymbios not to put improper practices in writing supports scienter. While the Court previously struck the SAC's "paper trail allegations" (Order at 17), *those allegations have now been confirmed by Dr. Olymbios himself*, and Defendants have not re-moved to strike them. Specifically, in August 2020, after an email from Dr. Olymbios, Maag called Dr. Olymbios to warn him not to put the Company's practice of never billing patients in writing because "***there were things he couldn't be associated with as the CEO***," and that "***there were certain things that shouldn't be put in writing***." ¶182. As waiving bills for patients violates the AKS, Maag's instruction demonstrates his scienter.

Moreover, the TAC's other allegations corroborate this practice of avoiding any paper trail of unlawful conduct. *See, e.g.*, ¶164 (a compliance call concerning kickbacks was atypically "scrubbed" (erased) from CareDx's systems); *id.* (FE-21 warned to keep his concerns "offline,"); ¶¶157, 165 (FE-21 given detailed instructions on how to hide event expenses, including "skip[ping]" a doctor sign in sheet so the per-doctor expenditure could be concealed).

*Second*, Defendants' pattern of retaliation against employees who raised concerns about unlawful conduct supports scienter. This pattern was corroborated by Dr. Olymbios; FE-21 (who was terminated for internal whistleblowing on CareDx's practices (¶303)); FE-19 (who said that CMO Sham Dholakia and others "bullied, intimidated, and coerced" his friend Erin Tokunaga not to cooperate with the DOJ investigation (*id.*)); and FE-11 (a senior executive who reported directly to a C-suite executive and said that he and colleagues did not report misconduct because "we were all terrified for our jobs." (¶302)). *See, e.g.*, *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *12 (S.D. Cal. Aug. 1, 2006) ("employees who felt coerced by their supervisors to violate ethical standards to meet business goals provide[] circumstantial evidence of scienter").

*Third*, the pattern of suspicious resignations at CareDx supports scienter. A "resignation can support an inference of scienter" where it is "uncharacteristic [of] typical hiring and termination

patterns or . . . accompanied by suspicious circumstances." *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2024 WL 3579322, at \*13 (N.D. Cal. July 29, 2024) (Thompson, J.).  Here, the TAC sets forth a pattern of suspicious resignations in the wake of government investigations of CareDx, including CFO Dhingra's, and Chief Marketing Officer King's resignations, each with *no notice*.  ¶¶327-328. Moreover, the TAC alleges numerous other employees resigning specifically over concerns about CareDx's improper conduct – *e.g.*, "the Company's top compliance attorney, Clarice McCauley . . . resigned over the Company's refusal to be legally compliant" (¶163), and Dr. Olymbios resigned in late 2020 over his own concerns about Defendants' conduct.

*Finally*, the fact that CareDx's unlawful conduct was central to the "core operations" of the Company further supports scienter under a holistic analysis.  ¶305.  The fraud concerned CareDx's most important business segment (testing services, which represented at least 85% of total revenues), its "*one product, the one growth drive[r] for the company*" (AlloSure), its largest payor (Medicare, accounting for 60% of its overall revenue during the Class Period) and the RemoTraC program, which was similarly central to the Company's business during the Class Period.  "[G]iven the importance" of these lines of business and the centrality and pervasiveness of Defendants' unlawful schemes, "it is a logical, and strong, inference that the defendants were aware of" the schemes. *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014).

### 4. Defendants Cannot Defeat Scienter with Disputed Facts and Documents Outside the Complaint

Most of Defendants' arguments against scienter rely on documents outside the TAC to make a patently false assertion that "Medicare itself has authoritatively and definitively stated" that Defendants' improper billing practices were "always . . . permissible under CareDx's LCD."  MTD at 9.  *But no such thing has happened*, and Defendants' alternative version of the facts relies on disputed documents outside the TAC.[10]  Indeed, many of Defendants' claims about these documents outright misrepresent their contents and meaning.  The Court should reject Defendants' tactics.  *See*

---

[10]  *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 422 (2d Cir. 2023) (MTD at 9), is inapposite, as there the FDA "endorse[d] . . . Defendants' interpretation of the clinical-studies data." No agency has "endorsed" CareDx's medically unnecessary uses of AlloSure – instead, CMS stated it had "*bec[o]me aware of improper billing and overutilization of these tests*."  ¶344.

*generally* RJN Opp.; *Myriad Genetics*, 2022 WL 16860013, at *2 ("[D]efendant's motion relies heavily, and at times entirely, on disputed facts from noticed documents. The Court cannot and does not consider those alleged facts in its analysis.").

**a.      The August 2024 CMS Press Release Cannot Be Used to Negate Scienter**

Defendants cite a CMS *press release* issued on *August 16, 2024 – two years after the end of the Class Period* – and ask the Court to conclude as a matter of law that their billing practices *during the Class Period* were in fact 100% proper and lawful all along. Ex. P. But this fails.

*First*, as set forth in the RJN Opposition, this document is outside the TAC, disputed, and not judicially noticeable for the truth of its assertions. *See* RJN Opp. *Second*, even if the Court considers the press release, its significance is unclear at best. The press release is not a legal document or a coverage determination. Moreover, the CMS press release was issued in August 2024, and does not say anything about applicability to the Class Period (2020-2022).[11]

*Third*, although the press release contemplates so-called "surveillance" testing *in specific, narrow circumstances*, Defendants' billing practices did not meet these criteria. Specifically, the press release discusses the use of tests "*[a]fter a physician-assessed pretest*, including for surveillance testing." Ex. P. But Defendants' RemoTraC program did *not* involve getting "physician-assessed pretests" for AlloSure – instead, CareDx would automatically have AlloSure bundled in *every single time a patient received routine bloodwork*, without any "pretest." *See, e.g.*, ¶116 (FE-1 describing systematic use of AlloSure without a medical necessity determination); ¶119 (FE-2 corroborating same); ¶¶121-123 (FE-3 and FE-4 corroborating same); ¶¶135-136 (FE-13 and FE-14 corroborating same). Indeed, FE-10, who reviewed denied claims, explained that many patients were getting AlloSure as often as "*every other week*" (¶128) and that "*90% of CareDx's*

---

[11]    Defendants also cite the press release's language that "neither CMS nor the MACs have changed coverage for these blood tests that monitor for organ transplantation rejection when ordered by their physicians in medically appropriate circumstances." MTD at 6-7; Ex. P. Nothing about this language suggests that Defendants were permitted to bill for medically unnecessary tests.

*patients were getting tested at least every month with their expensive tests*" (¶130), which is far more than allowed by any so-called surveillance "protocol." MTD at 4-5.[12]

### b. The DOJ Notice and the Form 8-K Reporting the SEC'S Letter Cannot Be Used to Negate Scienter

Defendants also rely on the U.S. Government's "Notice of Election to Decline Intervention" filed in the Whistleblower Action (Ex. T), which they mischaracterize as being "closed" with "no finding of wrongdoing." MTD at 24. But the notice expressly states that the Whistleblower Action *can continue on behalf of the government*. Specifically, the notice states: "Although the United States declines to intervene, we respectfully refer the Court to 31 U.S.C. § 3730(b)(1), which *allows the relator to maintain the action in the name of the United States*." Ex. T. *See also Ortiz v. Todres & Co., LLP*, 2018 WL 1626140, at *3 (S.D.N.Y. Mar. 30, 2018) ("A *qui tam* [*i.e.*, whistleblower] action does not terminate in defendant's favor when the government declines to intervene."). Moreover, *the notice expressly contemplates intervening at a later time*, stating that all filings in the action be served upon the United States so that the government may continue to follow the progress of the whistleblower lawsuit, and that "*[t]he United States reserves the right . . . to intervene in this action, for good cause, at a later date*[.]" Ex. T. And, in fact, the court in the Whistleblower Action *expressly ordered that the United States "is entitled to intervene in this action, for good cause, at any time."*[13] Whistleblower Action, ECF 21 (Oct. 7, 2024); *see also U.S.*

---

[12] Defendants' other documents are even less persuasive. For example, Defendants attach a handful of ambiguous comments from a CMS website. Exs. B-D. Such documents were not referenced in any way in the TAC and are not properly the subject of judicial notice, as the meaning of these documents "is subject to varying interpretations, and there is a reasonable dispute as to what the[y] establish[]." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018). And even if the Court considers these documents, they are irrelevant. For example, one of the documents appears to contain comments from 2017 – *three years before the Class Period* (*see* Ex. B) – and merely contains discussions, not conclusions, about "guidelines" for testing. Moreover, these discussions support the TAC's allegation that AlloSure requires "clinical suspicion of rejection." *See id.* at 2-3 (guidelines recommend tests "*informed by individualized clinical suspicion of rejection*"); *id.* at 3 (AlloSure "used to inform on the probability of rejection *at the time of clinical suspicion*.") Another exhibit relays comments about tests made by a *different Company* (EuroFins). *See* Ex. C at 22 cmt. 10.

[13] By contrast, in *Kessman v. Myriad Genetics, Inc.,* 2019 WL 1330363 (D. Utah Mar. 25, 2019) (MTD at 9-10), the plaintiffs merely alleged that, at the end of the class period, the company disclosed government investigations of their practices. Unlike here, the plaintiffs in *Kessman* did not allege that the investigations led to a sharp reduction in the company's Medicare billing revenue or otherwise put an end to unsustainable business practices.

*ex rel., Roberts v. Sunrise Senior Living, Inc.*, 2009 WL 499764, at \*1 (D. Ariz. 2009) ("***even when the United States does not intervene . . . , a district court may 'permit the government to intervene at a later date upon a showing of good cause'***").  This is because when whistleblowers maintain a *qui tam* action, they may act as a "private prosecutor" on behalf of the government.  *See, e.g.*, *Bagley v. United States*, 963 F. Supp. 2d 982, 991 (C.D. Cal. 2013).[14]  As such, the government's present non-intervention in the Whistleblower Action does not help to negate Defendants' scienter.

The same is true of the SEC's letter to Defendants – it has no bearing on Defendants' wrongdoing.  Notably, the Court ***already*** declined to judicially notice this document in a prior round of briefing because it was "***not central to the Complaint***."  ECF 103.  The document is similarly not central to the TAC – in fact, it is not even mentioned in the TAC (nor have Defendants filed the letter with the Court).  Moreover, the Form 8-K is not judicially noticeable for the truth of the matter asserted – *i.e.*, for Defendants' misleading claims about the SEC's letter.  Indeed, as the Form 8-K admits, the SEC's letter "was provided under the guidelines set out in the final paragraph of Securities Act Release No. 5310."  Ex. O.[15]  Significantly – and tellingly – Defendants omit Release No. 5310's admonition that the SEC's letter "***must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation of that particular matter***."  In fact, the SEC warns that Defendants' "attempted use of such a communication as a purported defense in any action that might subsequently be brought against the party . . . ***would be clearly inappropriate and improper*** since such a communication, at the most, can mean that, as of its date, [the SEC staff] does not regard enforcement action as called for based upon whatever information it then has."  *Id.*  The SEC further explains that "this conclusion may be

_____

[14]  Indeed, the government regularly intervenes in *qui tam* actions months or even years after filing a notice of non-intervention.  *See, e.g.*, *United States v. Cigna Corp.*, 2022 WL 3051010, at \*3 (M.D. Tenn. Aug. 2, 2022) (U.S. government intervened more than two years after electing not to intervene and more than four years after action was initiated); *Balko v. Senior Home Care, Inc.*, 2017 WL 11037320 (M.D. Fla. Jan. 3, 2017) (U.S. government intervened in false claims act case two years after filing a notice of declining to intervene).  Further, the fact that the government asked to continue to have all pleadings in the Whistleblower Action served on it suggests that it ***is still considering intervention at a later date***.  *See, e.g.*, *U.S. ex rel. Walle v. Martin Marietta Corp.*, 1996 WL 748456, at \*1 (E.D. La. Dec. 30, 1996) ("The purpose of the service requirement . . . is to ***enable the government to monitor the action and exercise its right to intervene***.").

[15]  *See* n.2, *supra*.

based upon various reasons, some of which . . . are ***clearly irrelevant to the merits of any subsequent action***." *Id.* In sum, the SEC's non-action cannot be used to negate scienter. *See also In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 273 n.28 (D. Mass. 2022) ("[t]he SEC's letter explains that it '***must in no way be construed as indicating that [defendant] has been exonerated or that no action may ultimately result from the . . . investigation***'").[16]

### B.    The Court Should Not Reverse Itself on Falsity or Loss Causation

#### 1.    The Court Already Found Falsity for Statements Concerning CareDx's Testing Services Revenue

This Court has already upheld statements regarding testing services revenue and historical RemoTraC data. *See* Order at 26 ("Plaintiffs have adequately alleged falsity as to the statements regarding testing services revenue and historical RemoTraC data" because "Defendants . . . noted that [CareDx's] increase in revenue was due to certain test results, and they failed to mention that some of these tests were illegal chargebacks to Medicare."). In so finding, this Court relied on *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023) (Order at 26), which remains the law in this Circuit. *See NVIDIA Corp. v. E. Ohman J:or Fonder AB*, 2024 WL 5058572 (U.S. Dec. 11, 2024) (dismissing *certiorari* as improvidently granted).

The relevant allegations in the TAC are substantially similar to the upheld SAC allegations, and Defendants have offered no persuasive reason for the Court to abandon its prior holding. Accordingly, Defendants' challenges to these statements should again be rejected. *See San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039, 1046 (S.D. Cal. 2019) (relying on reasoning in a prior order because the court had already "conducted a careful and detailed analysis" and the relevant allegations were substantially the same). Indeed, the only additional facts Plaintiffs allege ***further support*** the allegations that the Court already upheld. The "differences between the [SAC] and [TAC] are [therefore] no basis for the Court to abandon its prior

---

[16] By contrast, in *Fire & Police Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015) (MTD at 9-10), the FDA expressly stated that it had closed its investigation because "[defendants'] corrective actions undertaken in response to the . . . Warning Letter had adequately addressed the FDA's concerns." Moreover, unlike here, in *Abiomed* the defendants had made extensive disclosures about their correspondence with the FDA and their work to correct the problems.

reasoning." *In re Accellion, Inc. Data Breach Litig.,* 2024 WL 4592367, at *3 (N.D. Cal. Oct. 28, 2024) (differences not of the sort "that renders the Court's prior reasoning inapt").

Faced with allegations that the Court has already upheld, Defendants improperly attempt to manufacture a factual dispute using extraneous and mischaracterized documents. MTD at 19; *see generally* RJN Opp. However, this fails for the same reasons Defendants' scienter arguments fail (*see supra* at §III.A.): the documents are disputed, are not proper for judicial notice, and do not actually demonstrate that Defendants' Class Period conduct was lawful. *See generally* RJN Opp.; *see also Myriad Genetics*, 2022 WL 16860013, at *2.[17]

Defendants also argue that the statements attributing increased revenue to increased testing were literally true. MTD at 20-21. But "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one [true] thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).[18] This Court already implicitly rejected this argument, holding it was misleading for Defendants to say "increase in revenue was due to certain test results, [but] fail[] to mention that some of these tests were illegal chargebacks to Medicare." Order at 26.

---

[17]  Defendants' out-of-circuit cases are inapposite. In *Chew v. Moneygram Int'l, Inc.* 2024 WL 4346522 (N.D. Ill. Sept. 30, 2024), the Court found that statements regarding "general financial outlook and performance metrics" were inactionable because they were not sufficiently connected to alleged noncompliance with an FTC order. *See id.* at *7. The court reasoned that statements about general financial results were insufficient "to impose a duty to disclose ***any and all risks***." *Id.* Here, on the other hand, the revenue statements are sufficiently connected to the underlying FCA violations because they attributed revenue to specific tests that the Complaint alleges were the result of rampant FCA violations. *See, e.g.*, ¶¶216, 217, 219, 231, 242, 254. Similarly, in *Helo v. Sema4 Holdings Corp.*, 2024 WL 3593677 (D. Conn. July 31, 2024), the statements at issue were immaterial puffery. *Id.* at *9. The *Helo* defendants also merely reported financial results without attributing the results to any factors impacted by the underlying fraud. *Id.* at *7. Here, Defendants concede that the vast majority of their statements attribute financial results to specific tests that were the result of the underlying FCA violations. MTD at 20.

[18]  Defendants' reliance on *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024) is misplaced. *Macquarie* held that "pure omissions" – "when a speaker says nothing" – are not actionable under Rule 10b-5(b). *Id.* at 258. Here, the TAC does not allege "pure omissions"—it alleges that Defendants' affirmative statements were misleading by their failure to disclose that CareDx's revenue was impacted by the false claims and kickbacks. *See, e.g.*, ¶¶216, 217, 219, 231, 242, 254. This is the exact type of "half-truth" that Macquarie ***endorsed***. *See Macquarie*, 601 U.S. at 266 ("private parties remain free to bring" half-truth claims under 10b-5).

LEAD PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THIRD AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                                                     - 19 -
4928-3303-5525.v1

**2.    The Court Already Found that Falsity of the Compliance Statements in CareDx's Underwriting Agreements Were Sufficiently Pled**

This Court has already upheld the compliance statements in CareDx's underwriting agreements. *See* Order at 21 ("Plaintiffs have sufficiently plead falsity as to the underwriting representations."). In upholding these statements, the Court credited Plaintiffs' allegations that Defendants falsely represented CareDx was "in material compliance with, all health care laws applicable . . . including . . . the federal Anti-Kickback Statute . . . [and the] False Claims Act," while failing to disclose the Company was actively engaged in systematic violations of the FCA and AKS. MTD at 20-21 & App'x C; *see also Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014) ("Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made.").

Facing allegations this Court already upheld, Defendants recycle arguments this Court already rejected. Because the TAC's allegations are substantially the same as those the Court upheld, and Defendants have offered no new reason to dismiss them, their challenge should again be rejected. *See Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 2022 WL 20286688, at *6 (N.D. Cal. Feb. 24, 2022) ("[Defendant] raises no new arguments regarding these [allegations], and the factual allegations remain the same" and there was thus "no reason to depart from [the court's] prior conclusions."); *San Diego Cnty. Credit Union*, 360 F. Supp. 3d at 1046-47.

Indeed, while Defendants argue that their statements are inactionable because they appeared in an underwriting agreement, and because so-called "disclaimer" language immunizes them from liability here (MTD at 21-22), the Court has already explicitly rejected these arguments, explaining: "At this stage, the inquiry is whether the statements in the underwriter agreements are actionable considering the disclaimer language found in both the Form 8-K and other SEC filings. The Court finds that in this context, ***the answer is yes***." Order at 20.

In the Court's recent Order, context was key: the underwriting agreements were connected to public offerings of hundreds of millions of dollars' worth of CareDx securities ***to investors***. Order at 20; ¶¶23-24, 224, 226-228. The public offerings were also critical to CareDx's continued operations: at the time, CareDx had only enough cash to operate for one more year, so the Company

needed the cash from the public offerings to avoid going bankrupt.  Order at 20; ¶¶23-24, 224, 227.  Defendants also "emphasized the importance of the underwriting offering by publicly announcing it in multiple press releases."  Order at 20; *see also* ¶¶23-24, 226, 228.  And securities analysts noted that the public offerings were important to CareDx.  ¶227.

Accordingly, the Court found the SAC (which contains the same relevant allegations as the TAC) adequately alleged the "intense investor interest" necessary to uphold statements contained in the underwriting agreements.  Order at 20.  The Court also found that, given the intense investor interest, these statements were akin to statements in private agreements that the Ninth Circuit upheld in *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 741 (9th Cir. 2008).  There, like here, the private agreement was made in connection with a "significant event for the company and the company 'could have expected intense investor interest in the details of the *merger*.'"  Order at 20 (citing *Glazer*, 549 F.3d at 741) (emphasis in original).  The court also noted that "other district courts have found statements in underwriter agreements can support a securities fraud claim."  *Id.* (citing *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1179 (D. Or. 2015)).[19] Plaintiffs allege the same statements and the same facts regarding investor interest, and Defendants have offered no reason to depart from the Court's prior reasoning.

Finally, Defendants argue that "this claim fails because the representations have *proven true*: CareDx has faced no liability for violating any health care laws."  MTD at 21.  But as explained further in the RJN Opp. and *supra*, Defendants misrepresent the facts.[20]  No government agency has

---

[19]  Defendants' argument that "Plaintiffs' allegation that investors were paying close attention to the Company's equity offerings, [means] they would have been keenly aware of the limitations of the representations and not taken them as certificate[s] of compliance" is illogical, lacks any factual explanation, and is unsurprisingly unsupported by caselaw.  MTD at 22.  It also defies this Courts previous findings that intense investor interest *would and did* support falsity here.

[20]  Defendants' reliance on *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 692-93 (9th Cir. 2011) is misplaced.  There, the statements concerned "a contractual promise of specific future conduct" and thus not a misrepresentation of present fact.  *Id.* at 683-84.  Here, by contrast, CareDx made statements of "current compliance" with healthcare laws.  ¶235; *see also Reese*, 643 F.3d at 691 (a statement in a contract "is an actionable misstatement if a reasonable investor would view it as a certificate of [the company's] compliance").  Defendants' out-of-circuit cases are similarly inapplicable.  This Court already found that *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017) was unpersuasive.  Order at 21.  In *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583 (S.D. Tex. 2018), statements in underwriting agreements were "potentially actionable" but not under the specific facts of that case because "the plaintiffs had not

determined that CareDx's conduct was lawful, and Defendants' "evidence" for this claim is dubious and inappropriate for judicial notice. Defendants' argument fails. *Id.*[21]

### 3. The Newly Alleged Stark Law Statements Are Substantively Similar to Statements that the Court Already Upheld

In February 2021 and February 2022, Defendants assured investors that CareDx's "compensation arrangements" with physicians who prescribe CareDx's tests were "structured" such that they are "intended to comply with . . . the Stark Law[.]" ¶¶246, 264. These statements are similar to statements the Court already upheld, *i.e.*, statements that CareDx was in "material compliance" with the Stark Law (among other healthcare laws). Order at 19-21; ¶¶222-229, 235-239, 246-247, 264-265. Thus, they were materially false and misleading for the same reasons as the upheld statements: Defendants were ***not*** trying to "comply" with the Stark Law, but were systematically violating it.[22] Indeed, Defendants' "compensation" to doctors – luxury dinners and travel events to induce doctors to prescribe AlloSure, $500 an hour to attend sham "advisory boards," and ***$40,000*** (***8x the normal fee***) to enroll patients in "studies" – were clearly not

identified with particularity what specific regulatory violations existed when these statements were made." *Id.* at 636-37. Here, Plaintiffs do detail the specific regulatory violations. ¶¶86-213.

[21] Defendants also argue that CareDx told investors to read the agreements "'in conjunction with the disclosures in the Company's periodic reports,' which, in turn, warned that CareDx ***may*** not be in compliance with the same healthcare laws." MTD at 21-22 (emphasis in original). Defendants' argument fails. Defendants do not identify specific warnings; any such warnings are not alleged in the TAC; and, in any case, it is misleading to phrase a risk as a hypothetical when that risk has already materialized. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (Defendants improperly "represented the risk . . . as purely hypothetical when that exact risk had already transpired. A reasonable investor . . . would have understood the risk . . . to be merely conjectural.").

[22] The Stark Law (42 U.S.C. §1395nn) prohibited CareDx from having "any arrangement involving any remuneration" with a physician if that physician refers patients to CareDx, and prohibited CareDx from submitting such claims to Medicare. ¶213. There are very limited, narrow (and inapplicable) exceptions to the Stark Law, such as a "personal service arrangement" where a physician is paid, pursuant to a written agreement, the ***fair market value*** for those ***services***. *Id.*; *see* 42 U.S.C. §1395nn(e)(3). Here, contrary to Defendants' argument, it is obvious from the TAC's allegations that Defendants were not paying "fair market value" for any "services." Eight times the normal fee is not "market value" under any measure, and physicians were not providing any "services" whatsoever in attending the "advisory boards" – instead, they were merely being bribed to prescribe AlloSure. ¶¶124-127, 143-184, 270-283. Similarly, Defendants are simply incorrect that the Complaint fails to allege that any of these inducements actually led to physicians referring patients or Defendants filing false claims, given that the Complaint alleges CareDx bribed doctors to enroll its patients in the KOAR study, which it then used to bill Medicare for AlloSure tests, and similarly paid phony "grants" to centers for prescribing AlloSure. ¶¶174-175, 186-194.

"structured" or "intended" to comply with the Stark Law, as they violated it to a degree that it was obvious to employees throughout the Company. ¶¶163-170, 174, 190-194, 202-212. *See Wells Fargo*, 2024 WL 3579322, at *9 ("Defendants implemented these policies in a manner that did not align with this goal."). Seeto and Maag personally directed and approved these inducements. ¶¶155, 158, 161, 165. And Defendants deliberately hid their improper expenses, further emphasizing that they had no "inten[t] to comply" with the Stark Law. ¶¶124-127, 182-188, 270-283.

Defendants contend these statements are inactionable statements of opinion. MTD at 18 (citing *Omnicare,* 575 U.S. at 184-90). But this is wrong. Defendants' statements effectively asserted that they were "taking affirmative action to ensure compliance," while, in reality, Defendants were "structuring" their arrangements with doctors in ways that they knew blatantly and obviously ***violated*** the Stark Law. *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *13 (W.D. Wash. Apr. 19, 2019) (rejecting defendants' *Omnicare* "opinion" argument because "the omitted facts tend to suggest [defendant] did not actually intend or endeavor to comply with laws and regulations"). Similarly, Defendants' argument that they cautioned that they might not be in compliance is wrong. MTD at 18-19. Defendants were not free to describe mere "as-yet-unrealized risks" while failing to warn investors "that some of these risks . . . already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008).[23]

### 4.    The Court Already Found Loss Causation

This Court has already held Plaintiffs adequately alleged loss causation. *See* Order at 41 ("When considering all the disclosures together, Plaintiffs have sufficiently alleged loss causation."). In both their SAC and TAC, Plaintiffs alleged the same corrective disclosures, including disclosures relating to the government investigations and Dr. Olymbios' complaint, poor financial results tied to the fraud, and resignations of key CareDx executives. ¶¶306-336.

---

[23] *See also Flynn v. Sientra, Inc.,* 2016 WL 3360676, at *11 (C.D. Cal. June 9, 2016) (sustaining "risk factor" statements concerning legal compliance). Unlike in *City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, 2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024) (MTD at 17), the TAC "allege[s] with sufficient particularity that Defendants violated the law, [and] that they had done so when the risk statements were made."

In upholding Plaintiffs' allegations, this Court found that the government-investigation disclosures were sufficient because "the investigations were in connection with a False Claims Act investigation regarding certain business practices relating to [CareDx's] kidney testing and phlebotomy services, as well as certain of [CareDx's] accounting and public reporting practices. This suggests that at least some of the investigation relates to False Claims Act concerns, which are related to overbilling Medicare." Order at 40.[24]

Because the TAC's loss causation allegations are near-identical to those the Court already upheld in the SAC, the Court should again find loss causation adequately alleged. *See Scilex*, 2022 WL 20286688, at *6; *San Diego Cnty. Credit Union* 360 F. Supp. 3d at 1046-47.[25]

Defendants offer no reason to depart from this Court's well-reasoned Order – no change in law or fact that would suggest a different result. Instead, Defendants complain that "there has never been a corrective disclosure revealing wrongdoing." MTD at 23. But as this Court recognized, a disclosure "need not ***reveal the full scope*** of the defendant's fraud in one fell swoop" and "need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." Order at 39. Instead, allegations need only provide "***some indication*** of the loss and the ***causal connection*** that the plaintiff has in mind," which the Court already found here. *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Defendants also inaccurately state that the corrective disclosures reveal no wrongdoing but "only accusations of wrongdoing ultimately sourced to Dr. Olymbios." MTD at 23. This argument

---

[24] Defendants incorrectly state that this "Court reasoned that the government investigations could be viewed as a corrective disclosure insofar as it was consistent with Dr. Olymbios' subsequent allegations of overbilling Medicare." MTD at 23-24. Not true. The Court found that the investigations supported loss causation because they were connected to the underlying fraud – not solely to Dr. Olymbios' allegations. Order at 40. Further, the Court found the investigations were corrective in context of other disclosures, such as earnings misses. *Id.* at 40-41.

[25] This Court also likened Plaintiffs' allegations to those upheld in *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 604 (N.D. Cal. 2019) (wherein "the government investigation . . . , combined with [defendant's] disappointing earnings, [wa]s sufficient to show that investors would have understood the investigation as a revelation of the collusive activity [defendant's] fraud concealed"), and *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (where loss causation was alleged through a string of events, including the Company's receipt of an SEC subpoena). Defendants' reliance on *Lloyd* is misplaced, given that the Court already found Plaintiffs' allegations were similar to the allegations *Lloyd* **upheld**. Order at 40.

fails.[26] ***First***, the fact that government agencies declined to intervene ***at this time*** is not equivalent to a finding of no wrongdoing. ***Second***, the documents Defendants cited as evidence that CareDx's billing practices were proper fail to demonstrate any such thing and are not judicially noticeable.

Moreover, Defendants ignore that the disclosures include poor financial results (including declining Medicare revenue) tied to their fraud and to growing scrutiny of CareDx's billing. *See* ¶¶313, 315, 318, 320-326, 329-332, 334-335.[27] Where financial results are connected to the fraud, they suffice to plead loss causation. *See Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) (loss causation adequately pled where "the stock price fell upon the revelation of an earnings miss").[28] Further, this Court has already found that CareDx executives' suspicious resignations (¶¶327-328) supported loss causation. Order at 41 ("considering ***all the disclosures together***" in finding loss causation).

## IV.    CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.

DATED:  December 13, 2024                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JASON C. DAVIS
ALAINA L. GILCHRIST


                      s/ Jason C. Davis
                     JASON C. DAVIS

---

[26]  Defendants' authorities are inapposite. *See Inchen Huang v. Higgins*, 2019 WL 1245136, at *17-*18 (N.D. Cal. Mar. 18, 2019) (no necessity that government investigations ultimately find "actual wrongdoing," but "additional disclosures as to the general state of affairs in the opioid industry" were insufficient to support loss causation when combined with investigations); *Luna v. Marvell Tech. Grp. Ltd*, 2016 WL 5930655, at *9 (N.D. Cal. Oct. 12, 2016) (same).

[27]  A September 2023 CMS statement further confirmed that CareDx lost Medicare revenue because CMS "***became aware of improper billing and overutilization of these tests***." ¶344.

[28]  Defendants incorrectly argue that CareDx's results are not connected to the fraud because Plaintiffs no longer allege false statements about declining ASPs. MTD at 24 n.22. But this is wrong. Plaintiffs allege that the financial results were all connected to the underlying fraud, as this Court has previously recognized. Order at 40-41. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) ("a disclosure need not precisely mirror the earlier misrepresentation").

LEAD PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THIRD AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                    - 25 -
4928-3303-5525.v1

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
agilchrist@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
NICOLE Q. GILLILAND
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
ngilliland@rgrdlaw.com

SAXENA WHITE P.A.
LESTER R. HOOKER


                      s/ Lester R. Hooker
                    LESTER R. HOOKER

7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: 561/394-3399
561/394-3382 (fax)
lhooker@saxenawhite.com

SAXENA WHITE P.A.
DAVID R. KAPLAN
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: 858/997-0860
858/369-0096 (fax)
dkaplan@saxenawhite.com

LEAD PLAINTIFFS' MEM OF P&A IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THIRD AMENDED CLASS ACTION COMPLAINT - 3:22-cv-03023-TLT                    - 26 -
4928-3303-5525.v1

SAXENA WHITE P.A.
STEVEN B. SINGER
RACHEL A. AVAN
JOSHUA H. SALTZMAN (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: 914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
ravan@saxenawhite.com
jsaltzman@saxenawhite.com

Lead Counsel for Lead Plaintiffs

## ATTESTATION PURSUANT TO LOCAL RULE 5-1(i)(3)

I, Jason C. Davis, am the ECF user whose identification and password are being used to file Lead Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss Third Amended Class Action Complaint. Pursuant to Local Rule 5-1(i)(3) and in compliance with General Order No. 45 X.B., I hereby attest that Lester R. Hooker has concurred in this filing.

s/ Jason C. Davis
JASON C. DAVIS