UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, et al.,

Plaintiffs,

v.

CAREDX, INC., et al.,

Defendants.

Case No. 22-cv-03023-TLT

**ORDER DENYING MOTION TO DISMISS**

Re: Dkt. No. 136

After a series of motions to dismiss, lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief & Retirement Fund (collectively, "Plaintiffs") filed a third amended class action complaint against CareDx, Inc. ("CareDx" or the "Company") and CareDx officers Dr. Peter Maag and Dr. Reginald Seeto (collectively, "Defendants"). ECF 133. Plaintiffs bring this action individually and on behalf of those who purchased or acquired CareDx common stock between April 30, 2020 and November 3, 2022 (the "Class Period"). *See id.* at 1. Plaintiffs assert that Defendants have violated (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and (2) Section 20(a) of the Exchange Act. *Id.* ¶¶ 367–80.

Plaintiffs' third amended complaint (a) removes allegations concerning certain statements the Court determined were not actionable on falsity grounds (ECF 123, at 43); (b) removes former Chief Financial Officer ("CFO") Ankur Dhingra as a named defendant (*id.* at 30-32); (c) retains allegations concerning certain of the statements the Court determined were adequately alleged to be materially false and misleading (*id.* at 43); and (d) provides additional facts in support of Defendants' scienter. ECF 133, ¶ 3.

Pending before the Court is Defendants' motion to dismiss the third amended complaint. ECF 136. After review and consideration of motion, briefings, attachments and exhibits thereto, Defendant's motion to dismiss is **DENIED**.

## I. BACKGROUND

### A. Procedural History

On May 23, 2022, Plaintiffs filed a class action complaint. ECF 1. Plaintiffs then moved for an order appointing them as lead plaintiffs in the case and approving their selection of lead counsel for the class. ECF 31. The Court subsequently granted Plaintiffs' motion and appointed Plaintiffs as lead counsel for the case. ECF 43.

On November 28, 2022, Plaintiffs filed their first amended complaint ("FAC"). ECF 53. Defendants moved to dismiss and to strike portions of the FAC. ECF 58, 60. The Court struck some paragraphs from the FAC and dismissed the FAC entirely, with leave to amend. ECF 75.

On June 26, 2023, Plaintiffs filed their second amended complaint ("SAC"). ECF 81. Defendants again moved to dismiss and to strike portions of the FAC. ECF 89, 91. The Court again struck certain paragraphs from the SAC and dismissed the SAC entirely, with leave to amend. ECF 75. However, the Court found that for their Section 10(b) and Rule 10b-5 claim, Plaintiffs had sufficiently alleged falsity as to statements regarding underwriting representations and statements regarding testing services revenue and historical RemoTraC data. *Id.* at 43. The Court also found that Plaintiffs had sufficiently alleged loss causation. *Id.*

On November 1, 2024, Plaintiffs filed their third amended complaint ("TAC"). ECF 133. Plaintiffs assert that Defendants CareDx, Dr. Maag, and Dr. Seeto have violated (1) Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and (2) Section 20(a) of the Exchange Act. *Id.* ¶¶ 367–80. Defendants subsequently moved to dismiss the complaint. ECF 136. Plaintiffs timely filed an opposition, and Defendants timely filed a reply. ECF 138, 144. Along with the motion to dismiss, the parties dispute Defendants' many requests for judicial notice. ECF 137, 139, 144, 145, 146, 147. The Court heard oral argument on January 28, 2025. ECF 150.

**B. Factual History**

**1. The Parties**

Lead Plaintiffs are pension funds that purchased CareDx common stock during the Class Period of April 30, 2020 to November 3, 2022 and suffered damages due to violations of federal securities law. TAC ¶¶ 45–48.

Defendants in this action are CareDx, Dr. Peter Maag, and Dr. Reginald Seeto. *Id.* ¶¶ 49–51. In the TAC, Plaintiffs no longer list Ankur Dhingra, CareDx's former CFO, as a defendant. *See generally, id.* CareDx is a Delaware corporation, with its principal offices in Brisbane, California. *Id.* ¶ 49. Dr. Maag was CEO of CareDx from 2012 through November 2020 and Executive Chairman from November 2020 through October 2021. *Id.* ¶ 50. Dr. Seeto has been CEO of CareDx since November 2020. *Id.* ¶ 51.

In addition to confidential witnesses, Plaintiffs rely on the allegations of Dr. Michael Olymbios. Dr. Olymbios is the former head of CareDx's Community Nephrology group, who filed a complaint on April 12, 2022, in California Superior Court, alleging much of the same misconduct alleged in this action. TAC ¶ 319; *Olymbios v. CareDx, Inc.*, No. 22-civ-01582 (Cal. Super. Ct. San Mateo Cnty.). Dr. Olymbios also filed a whistleblower complaint in the U.S. District Court for the Eastern District of New York. TAC ¶ 4; *U.S. v. CareDx, Inc.*, No. 1:21-cv-0774-AMD-LKE, ECF 1 (E.D.N.Y. Feb. 12, 2021). Dr. Olymbios's whistleblower complaint was unsealed on October 7, 2024, which allowed Plaintiffs to obtain new facts in support of their TAC. TAC ¶ 4. Plaintiffs also allege three new confidential witnesses and two additional materially false and misleading statements in the TAC. *Id.*

The Court will assume familiarity with the facts of the case. *See* ECF 123, at 2–8 (factual background). However, the Court will address facts added to the TAC since the issuance of the Court's order on the prior motion to dismiss.

**2. The False and Misleading Statements**

The Court previously found that Plaintiffs had sufficiently alleged falsity as to statements regarding underwriting representations and statements regarding testing services revenue and historical RemoTraC data. ECF 123, at 43; TAC ¶¶ 214–65.

In their TAC, Plaintiffs have included new allegations, asserting falsity as to two of Defendants' statements regarding compliance with the Stark Law. TAC ¶¶ 246, 264. The Stark Law, 42 U.S.C. §1395nn ("Limitation on certain physician referrals") states, in relevant part, that where a physician has a "compensation arrangement" with a medical testing company like CareDx, the physician may not refer patients to the company for services, and the company may not submit claims resulting from those referrals for payment by third-party payors such as Medicare or private insurance. *Id.* ¶ 213. Plaintiffs assert that Defendants violated the Stark Law through illegal kickbacks to induce physicians to prescribe AlloSure. *Id.* ¶¶ 145, 210.

Plaintiffs assert that in SEC Form 10-ks signed by Dr. Seeto on February 24, 2021 and February 24, 2022, Defendants made materially false and misleading statements regarding their compliance with the Stark Law. *Id.* ¶¶ 247, 265. The Form 10-ks state:

> Federal and State Self-Referral Prohibitions We are subject to the federal self-referral prohibitions, commonly known as the Stark Law, and to similar state restrictions such as California's Physician Ownership and Referral Act, or PORA. Where applicable, **these restrictions generally prohibit us from billing patients or certain governmental or private payers for clinical laboratory testing services when the physician ordering the test . . . has . . . [a] compensation arrangement with, us,** unless the arrangement meets an exception to the prohibition.
>
> Both the Stark Law and PORA contain exceptions for compensation paid to a physician for personal services rendered by the physician, provided that certain conditions are satisfied. We have compensation arrangements with a number of physicians for personal services, such as speaking engagements and clinical advisory boards. **We have structured these arrangements with terms intended to comply with the requirements of the applicable exceptions to the Stark Law, PORA and other similar state laws.** However, we cannot be certain that regulators would find these arrangements to be in compliance with the Stark Law, PORA or similar state laws.

*Id.* ¶¶ 246, 264 (emphasis in TAC). Plaintiffs contend that Defendants did not "structure[] these arrangements with terms intended to comply with" the exceptions to the Stark Law and other laws. *Id.* ¶¶ 247, 265.

**3. The Confidential Witnesses**

Plaintiffs' TAC relies on the statements of 21 confidential witnesses, ("FEs"), either former employees of CareDx or Natera, a competitor of CareDx. *Id.* ¶¶ 103–213; *see also* ECF

123, 4–8 (describing 18 confidential witnesses). The TAC relies on three new confidential witnesses to corroborate its allegations. *Id.* ¶¶ 30–31, 175.

Former Employee 9 ("FE-9") was not relied upon in the SAC, but his statements are included in the TAC. *Compare* ECF 81 *with* TAC. FE-9 worked in a sales role at CareDx and was paid bonuses to get patients to enroll in AlloSure studies. TAC ¶ 175. FE-9 stated that the bonus payments were unusual and not typical for the pharmaceutical companies he has worked for in the past. *Id.* FE-9 said that many physicians would "push back" regarding the studies because they did not believe AlloSure should be the standard of care. *Id.*

Former Employee 20 ("FE-20") worked at CareDx in January 2022 as a Transplant Account Specialist and was later promoted to the Transplant Account Manager role, serving in that role into the first half of 2023. *Id.* ¶ 120 n.13. FE-20 explained that the directive that AlloSure always had to be ordered as part of RemoTraC (and not only routine labs) came from the "top down" and executives based in California. *Id.* ¶ 120. He explained there were monthly Company-wide all-hands conference calls where this topic was discussed, i.e., that AlloSure should always be included in RemoTraC. *Id.* He said Dr. Seeto attended these calls along with other senior executives, including the COO and CFO of CareDx. *Id.*

The new allegations in the TAC come primarily from Former Employee 21 ("FE-21"). FE-21 worked for CareDx in the Portland, Oregon area from April 2021 until September 2022 as a Transplant Account Manager. *Id.* ¶ 141 n.19. He indicated that he was let go in September 2022 after he raised concerns about the Company's marketing sales practices. *Id.*; *see id.* ¶¶ 164, 166–67, 205. FE-21 stated that when Centers for Medicare & Medicaid Services ("CMS") began scrutinizing and auditing CareDx's billing for AlloSure, CareDx's Medicare revenue began declining dramatically as it became much harder to receive payment for medically unnecessary tests. *Id.* ¶ 141.

FE-21 further corroborated expensive, lavish events that CareDx coordinated for physicians, giving specific examples of dinners. *Id.* ¶¶ 154, 156–60, 165. FE-21 stated that CareDx would invite individuals they knew would not attend, such as non-physician staff, to inflate the invitation list and make the expenditures per person look smaller. *Id.* He also



United States District Court
Northern District of California

corroborated that Dr. Seeto attended and approved all such events, which were intended to induce physicians to do business with the company. *Id.* ¶ 155. Additionally, FE-21 was personally instructed to disguise expenses in order to avoid raising red flags about kickbacks. *Id.* ¶ 157.

FE-21 also describes how CareDx would provide kickbacks by funding physicians' personal projects and research. *Id.* ¶ 170. Chief Medical Officer ("CMO") Sham Dholakia would meet with up to 20 physicians a day who each pitched a personal project to him. *Id.* Dholakia would then personally aid those physicians in writing their study prospectives, which CareDx would then approve. *Id.*

FE-21 recalled he and other employees were regularly instructed to use telephone calls and WhatsApp messaging because the Company was concerned that emails and text messages were subject to subpoenas and because WhatsApp could be configured to delete records of messages. *Id.* ¶ 183. He also recalled retaliation against employees for reporting on unlawful and unethical conduct. *Id.* ¶ 205.

## II. LEGAL STANDARD

### A. Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citations omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

**B. Rule 9(b) and PSLRA**

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity, including "circumstances constituting fraud or mistake." *Id.* at 605; Fed. R. Civ. P. 9(b).

In addition, under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (citations omitted). To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). To properly plead scienter, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). Regarding the "strong inference" standard, a complaint will survive a motion to dismiss, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007).

## III. DISCUSSION

**A. Judicial Notice**

"The [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document."

*United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011). The Ninth Circuit has cautioned against the "unscrupulous use of extrinsic documents" under these exceptions, which "risks premature dismissals of plausible claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).

The doctrine of judicial notice is an "explicitly limited doctrine," and, here, Defendants repeatedly test its limits. *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1280 (C.D. Cal. 2016). Defendants request judicial notice of 24 exhibits in conjunction to their motion to dismiss and their reply in support of the motion. *See* ECF 137 (Exhibits A–T), 144 (Exhibits U–X). Plaintiffs do not contest that the Court may notice the existence of Defendants' Exhibits E, I, J, L, M, R, and S, but oppose noticing the documents for the truth of any matter asserted therein. ECF 139, at 2. Plaintiffs oppose the request for judicial notice for Exhibits A, B, C, D, F, G, H, N, O, P, Q, and T. *Id.* Plaintiffs also oppose Defendants' second request for judicial notice for Exhibits U, V, W, and X. ECF 146.

**1. Exhibits E, I, J, L, M, R, and S**

Exhibit E is CareDx's SEC Form 10-K for the year 2020, filed February 24, 2021. Exhibit I is a transcript of CareDx's earnings call from May 5, 2021. Exhibit J is a transcript of CareDx's earnings call from October 28, 2021. Exhibit L is CareDx's SEC Form 10-K for the year 2021, filed February 24, 2022. Exhibit M is a transcript of CareDx's earnings call from April 30, 2020. Both parties do not dispute incorporation by reference and that the Court may take notice of the existence of these exhibits to establish information disclosed to investors. ECF 139, at 16; ECF 145, at 4; *see also Khoja*, 899 F.3d at 1014 ("Although incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents, we reiterate that it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."). The Court **GRANTS** the request, finding that Exhibits E, I, J, L, and M are incorporated by reference. *See* TAC ¶¶ 76, 218, 243, 246, 249, 257, 260, 264, 315. However, the Court will only consider these Exhibits as to their existence and not for the truth of the matters asserted therein.

Exhibit R is CareDx's SEC Form 8-K, filed June 11, 2020. Exhibit S is CareDx's SEC Form 8-K, filed January 21, 2021. Plaintiffs do not oppose judicial notice only for their existence of these documents. Defendants seek judicial notice of these documents to establish what information was disclosed to the public. *See Pardi v. Tricida, Inc.*, 2024 WL 1056013, at *4 (N.D. Cal. Mar. 11, 2024) (taking judicial notice of SEC filings "for the purpose of considering what was disclosed to the market"). The Court **GRANTS** request for judicial notice only as to the existence of Exhibits R and S and not for the truth of the matters asserted therein.

**2. Exhibits A, D, F, G, H, and K**

Exhibit A is an analyst report covering CareDx titled, "CareDx (CDNA, Buy, $115 PT)," dated July 20, 2021. Defendants seek judicial notice of Exhibit A to establish the fact that investors were aware of the Local Coverage Determination ("LCD") for AlloSure during the class period. ECF 136, at 3. LCD authorized Medicare reimbursement for AlloSure tests administered under specified circumstances. *Id.* Defendants contend that, although not referenced in the complaint, the Court may take judicial notice for the purpose of determining what information was available to the market. ECF 137, at 3; *see In re Century Aluminum Co. Sec. Litig.*, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011) ("courts routinely take judicial notice of analyst reports . . . in order to determine what may or may not have been disclosed to the public"). Plaintiffs argue that the request is irrelevant because Plaintiffs do not allege that investors were unaware of the LCD itself. Rather, Plaintiffs allege that investors were unaware that Defendants were violating the LCD through conduct that was not permitted by the LCD.

Exhibit D is a CareDx webpage titled, "CareDx - Your Partner in Transplant Care," captured as it existed on June 14, 2020. Exhibit F is a transcript of CareDx's earnings call from August 9, 2018. Exhibit G is a transcript of CareDx's earnings call from February 24, 2021. Exhibit H is a transcript of CareDx's earnings call from October 29, 2020. Exhibit K is a transcript of CareDx's earnings call from May 5, 2022. Like Exhibit A, Defendants seek judicial notice only as to the existence of these documents for the fact that investors were aware of the information therein.

United States District Court
Northern District of California

Similar to Exhibit A, Plaintiffs argue that these Exhibits are irrelevant because none of these Exhibits discloses that CareDx billed Medicare for surveillance testing that was illegal due both (a) to the kickback scheme; and (b) due to the Company's scheme to automatically require additional AlloSure blood draws in order for patients to get their standard of care test blood draws, without a physician determination of medical necessity. Plaintiffs argue that any statement that surveillance testing was part of CareDx's strategy generally is irrelevant because it does not show CareDx improperly billed Medicare for illegal surveillance testing under the illegal kickback and RemoTraC schemes.

Defendants contend that investors' awareness of the LCD and surveillance testing is relevant because it goes to the allegation that CareDx failed to disclose that surveillance testing violated the LCD. Defendants seek judicial notice of these documents to establish that "CareDx was fully transparent with Plaintiffs and other investors that AlloSure was used for surveillance testing when ordering physicians deemed such tests necessary and that, in fact, much of CareDx's financial success depended on transplant centers adopting surveillance testing protocols." ECF 136, at 4. However, the Court finds that these Exhibits do not go to the allegations that CareDx failed to disclose that surveillance testing violated the LCD. The relevance of these Exhibits is unclear when they simply show that investors were aware surveillance testing was part of CareDx's strategy generally.

The Court **DENIES** request for judicial notice of Exhibits A, D, F, G, H, and K. *See Blye v. California Supreme Court*, No. 11-cv-5046-DWM, 2014 WL 295022, at *1 (N.D. Cal. Jan. 21, 2014) ("Although the Rules of Evidence do not expressly require a fact to be relevant for it to be judicially noticed, an irrelevant fact is one not of consequence in determining the action, *see* Fed. R. Evid. 401(b), and therefore cannot be classified as an adjudicative fact."); *see also* Fed. R. Evid. 201(a) ("This rule governs judicial notice of an adjudicative fact only, not a legislative fact.").

**3. Exhibits N, O, Q, and T**

Exhibit N is CareDx's SEC Form 10-K for the year 2022, filed February 27, 2023, announcing that the state regulatory agency completed its review of CareDx's business practices

and determined that no further information or action was required. Exhibit O is CareDx's SEC Form 8-K, filed September 25, 2023, disclosing that CareDx was notified by the staff of the SEC that it concluded its investigation as to CareDx and did not intend to recommend an enforcement action. Exhibit Q is CareDx's SEC Form 8-K, filed October 8, 2024, disclosing that the U.S. Department of Justice declined to intervene in the qui tam action filed by Dr. Olymbios. Exhibit T is Notice of Election to Decline Intervention filed by the United States on July 12, 2024 in *United States of America, ex. rel. Olymbios v. CareDx, Inc.*, No. 21-CV-00774 (E.D.N.Y. July 12, 2024).

Defendants cite to numerous cases establishing that Courts routinely take judicial notice of the outcome of government investigations, especially when the complaint relies on the investigations in support of scienter allegations. *See* ECF 145, at 7 (collecting cases). Here, the TAC does not explicitly rely on the government investigations when outlining scienter allegations; however, the TAC does imply some reliance. *See* TAC ¶¶ 267–305, 266 (" . . . further facts supporting scienter are alleged throughout this complaint."). Plaintiffs argue that Defendants cannot seek judicial notice of these statements to establish that regulators have not found any wrongdoing by Defendants. Plaintiffs argue that regulators declining to intervene or not recommending an enforcement action are not indicators that Defendants did no wrongdoing. Defendants contend that the significance of the filings go to the merits of the arguments, not whether the Court can take judicial notice of the Exhibits.

None of these exhibits are mentioned in the complaint. The Court agrees with Plaintiffs that these Exhibits cannot establish that Defendants did no wrongdoing. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency decision not to enforce often involves a complicated balancing of a number of factors."). However, this argument goes to the merits of Defendant's argument. Accordingly, the Court **GRANTS** request for judicial notice of Exhibits N, O, Q, and T only as to their existence which establish the events regarding regulatory review outlined above. The Court declines to take judicial notice that such documents establish that Defendants did no wrongdoing.

**4. Exhibits B and C**

Exhibit B is a Medicare Coverage Database document titled, "Article - Response to Comments: MolDX: AlloSure Donor-Derived Cell-Free DNA Test (A55760)," effective as of December 11, 2017. Exhibit C is excerpts from Medicare Coverage Database document titled, "Article - Response to Comments: MolDX: Molecular Testing for Solid Organ Allograft Rejection (A58778)," effective as of July 4, 2021.

Defendants seek judicial notice of Exhibits B and C as "public statements for the fact that CMS and Medicare Contractors said what they said about the scope of the AlloSure LCD and surveillance testing." ECF 137, at 4. Defendants seek to use these documents to establish Medicare Administrative Contractors ("MAC") have publicly endorsed coverage for surveillance testing. Defendants assert that these policy articles are matters of public record and not reasonably subject to dispute. Plaintiffs heavily dispute the facts asserted in these documents, arguing that Medicare still required a pretest raising suspicion of rejection before it would pay for AlloSure. Because parties dispute the truth of the matter asserted within the documents, the Court **GRANTS** request for judicial notice only as to the existence of the Exhibits B and C.

**5. Exhibit P**

Exhibit P is a press release from the Centers for Medicare & Medicaid Services ("CMS") titled, "MolDx Local Coverage Determination Statement," dated August 16, 2024. Defendants seek judicial notice of Exhibit P for the same reasons as Exhibits B and C. ECF 137, at 4. The parties highly contest judicial notice of Exhibit P.

Exhibit P states that coverage for the "existing" LCD—which had been in place since July 2021 and, prior to that, was substantively unchanged—has not "changed" and still covers AlloSure "after a physician assessed pretest, including for surveillance testing." ECF 136-17, Ex. P at 1. Plaintiffs contend that the press release is irrelevant because the press release discusses the use of tests "[a]fter a physician assessed pretest, including for surveillance testing." *Id.* But Defendants' RemoTraC program did not involve getting "physician-assessed pretests" for AlloSure—rather, Plaintiffs allege that CareDx would automatically have AlloSure bundled in every single time a patient received routine bloodwork, without any "pretest." *See, e.g.*, TAC ¶ 116 (FE-1 describing systematic use of AlloSure without a medical necessity determination); ¶ 119 (FE-2 corroborating

same); ¶¶ 121–23 (FE-3 and FE-4 corroborating same); ¶¶ 135–36 (FE-13 and FE-14 corroborating same).

The Court finds Plaintiffs arguments to be persuasive. It is unclear what the relevance of Exhibit P in light of the allegations in the TAC. The Court **DENIES** request for judicial notice of Exhibit P. *See Blye*, 2014 WL 295022, at *1.

**6. Exhibits U, V, W, and X**

After requesting judicial notice of 20 exhibits in their motion, Defendants request judicial notice of an additional four exhibits in their reply brief. Exhibit U is the Letter Motion to Continue to Serve the Complaint on Defendants filed by Michael Olymbios on December 9, 2024, in *United States of America, ex. rel. Olymbios v. CareDx, Inc.*, No. 21-CV-00774 (E.D.N.Y. July 12, 2024). Exhibit V is the Letter Motion for Reconsideration regarding the Order on Motion to Continue filed by CareDx, Inc. on December 16, 2024, in *United States of America, ex. rel. Olymbios v. CareDx, Inc.*, No. 21-CV-00774 (E.D.N.Y. July 12, 2024). Exhibit W is the response in opposition to CareDx's Letter Motion for Reconsideration filed by Michael Olymbios on December 20, 2024, in *United States of America, ex. rel. Olymbios v. CareDx, Inc.*, No. 21-CV-00774 (E.D.N.Y. July 12, 2024). Exhibit X is the press release from the Centers for Medicare & Medicaid Services ("CMS") titled, "CMS Statement on Current Status of Blood Tests for Organ Transplant Rejection," dated September 25, 2023.

The Ninth Circuit has established that the "district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Defendants' request is untimely, with Defendants' reply in support coming a mere four days before the Court's hearing on the instant motion. *See* ECF 147. The Court **DENIES** request for judicial notice of Exhibits U, V, W, and X.

**B. Section 10(b) and Rule 10b-5**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re*

*Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2407 (2014)).

In their motion to dismiss, Defendants assert that Plaintiffs are unable to satisfy scienter, falsity, and loss causation elements. ECF 136, at 7–25. In its previous order, the Court found that Plaintiffs had sufficiently alleged falsity as to statements regarding underwriting representations and statements regarding testing services revenue and historical RemoTraC data. ECF 123, at 43. Further, the Court found that Plaintiffs had sufficiently alleged loss causation. *Id.* The Court need not address Defendants' arguments challenging to the Court's prior rulings. These arguments are better suited for a motion for summary judgment. Accordingly, the Court will first address falsity as to statements regarding compliance with Stark Law, and then the Court will address scienter.

**1. Falsity**

To plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Statements and omissions are actionably false if they "directly contradict what the defendant knew at that time" or "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Khoja*, 899 F.3d at 1008; *Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," does not meet the falsity standard. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

The Court found that Plaintiffs had sufficiently alleged falsity as to statements regarding underwriting representations and statements regarding testing services revenue and historical RemoTraC data. ECF 123, at 43. The Court now turns to Plaintiffs' new allegations.

**a. Compliance with Stark Law**

Plaintiffs bring forth new allegations, asserting falsity as to two of Defendants' statements regarding compliance with the Stark Law. TAC ¶¶ 246, 264. Plaintiffs assert that in SEC Form 10-ks signed by Dr. Seeto on February 24, 2021 and February 24, 2022, Defendants made

materially false and misleading statements. *Id.* ¶¶ 247, 265. Specifically, Defendants did not "structure[] these arrangements with terms intended to comply with" the exceptions to the Stark Law and other laws. *Id.*

The Stark Law, 42 U.S.C. §1395nn, prohibited CareDx from having "any arrangement involving any remuneration" with a physician if that physician refers patients to CareDx, and prohibited CareDx from submitting such claims to Medicare. *Id.* ¶ 213. There are limited exceptions to the Stark Law, such as a "personal service arrangement" where a physician is paid, pursuant to a written agreement, the fair market value for those services. *Id.*; *see* 42 U.S.C. §1395nn(e)(3). The challenged statements give examples of activities that fall within their ambit including, but not limited to, "speaking engagements" and "clinical advisory boards." TAC ¶¶ 246, 264.

Plaintiffs argue that Defendants were not trying to comply with the Stark Law but were systemically violating it. Defendants' compensation to physicians—luxury dinners and travel events to induce doctors to prescribe AlloSure, $500 an hour to attend sham "advisory boards," and $40,000 (8 times the normal fee) to enroll patients in "studies"—were not structured nor intended to comply with the Stark Law. TAC ¶¶ 163–70, 174, 190–94, 202–12. Dr. Seeto and Dr. Maag personally directed and approved these inducements. *Id.* ¶¶ 155, 158, 161, 165. Further, Defendants deliberately hid their improper expenses, further emphasizing that they had no "inten[t] to comply" with the Stark Law. *Id.* ¶¶ 124–27, 182–88, 270–83.

Defendants provide four arguments against the falsity of the statements. First, Defendants argue that the challenged statements refer only to compensation arrangements with physicians for "personal services" and the Company's intention to structure them to comply with exceptions to the Stark Law. ECF 136, at 17. Defendants argue that the activities such as dinners, summits, and events outlined by the TAC do not fall within the ambit of the statements. ECF 144, at 9. The Court agrees with Defendants. Dinners, summits, and events are distinct from personal services such as "speaking engagements" and "clinical advisory boards", as they do not require a service in return. Thus, the Court finds that the scope of the challenged statements does not include these activities.

Second, Defendants argue that, while speaking contracts, advisory boards, and study sponsorships may be within the statements' scope, Plaintiff fail to plead that (1) the physicians and CareDx did not engage on a fair market value basis; or (2) the physicians referred patients to CareDx, and that CareDx, in turn, submitted claims from those referrals to Medicare. ECF 136, at 17.

However, the Court disagrees with Defendants on these assertions. The TAC alleges that CareDx bribed physicians to enroll its patients in the Kidney Allograft Outcomes AlloSure Registry ("KOAR") study, which it then used to bill Medicare for AlloSure tests, and similarly paid phony "grants" to centers for prescribing AlloSure. TAC ¶¶ 174–75, 186–94. Plaintiffs contend that eight times the normal fee is not "market value" under any measure. Further, as for the sham advisory board allegations, physicians did not provide any "services" in attending the "advisory boards"—instead, Plaintiffs allege that physicians were being bribed to prescribe AlloSure. *Id.* ¶¶ 124–27, 143–84, 270–83.

Third, Defendants argue that the challenged statements are inactionable statements of opinion. In *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, the Supreme Court held that a statement of opinion is actionable, in relevant part, if (1) the speaker does not "actually hold the stated belief" or (2) the statement omits "material facts about the issuer's inquiry into or knowledge concerning" the statement, "and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–90 (2015).

Defendants contend that, for the first *Omnicare* prong, Plaintiffs do not allege subjective disbelief on the part of the maker of the statements, Dr. Seeto. For example, the TAC does not plead that Dr. Seeto questioned whether CareDx's personal services arrangements with physicians qualified for Stark Law exceptions. Further, for the second *Omnicare* prong, Defendants argue Plaintiffs fail to allege that the challenged statements "omit[] material facts about [CareDx's] inquiry into or knowledge concerning" the statements and that "those facts conflict with what a reasonable investor would take from the statement[s]" themselves. *Id.* at 189.

Plaintiffs focus on the second *Omnicare* prong. Plaintiffs argue that Defendants' statements asserted that they were "taking affirmative action to ensure compliance," while, in reality, Defendants were "structuring" their arrangements with physicians in ways that they knew violated the Stark Law. Plaintiffs allege that the statements omit the fact that Dr. Seeto knew that the structuring of the arrangements did not comply with the Stark Act. The Court agrees with Plaintiffs that, as alleged, the statements of opinion are actionable.

Finally, Defendants argue that the challenged statements did not certify compliance with the Stark Law, but rather, the statements indicated that CareDx intended certain compensation arrangements to comply with the Stark Law. ECF 136, at 18–19. Further, Defendants argue that the statements included warnings of non-compliance.

Defendants cite to *City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, No. 23 CIV. 1769 (LGS), 2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024). In *Cognyte*, the challenged statements conveyed that defendant's business was "focused on assisting government and corporate security organizations in preventing cyber-attacks, intrusions, and other wrongdoing by bad actors." *Id.* at *6. However, in reality, defendant "was indiscriminately selling intrusive software tools and surveillance services to customers who used them to target people including journalists and politicians." *Id.* (cleaned up). The Court found these statements to be inactionable because defendant included "risk warnings that it could sell 'certain types of solutions' to 'countries or customers that are considered disfavored by the media or by certain political or privacy organizations.'" *Id.* Thus, the Court held that the statements were not misleading in light of these risk warnings. *Id.*

The Court finds the instant case to be distinguishable. In *Cognyte*, the court dealt with two additional issues with the actionability of the statement: (1) the subjective identification of "bad actors" and (2) that defendant did not know how their products would be used. *Id.* In contrast, these issues are not prevalent here. Defendants' statement implies affirmative steps towards compliance, notwithstanding Defendants' warning of potential noncompliance. However, Plaintiffs have alleged that, in reality, Defendant did not take affirmative steps toward structuring their service arrangements to comply with the Stark Law. At the motion to dismiss stage, the

Court takes as true all well-pled allegations. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1140. The Court finds that Plaintiffs have sufficiently pled falsity as to statements regarding compliance with the Stark Law.

**2. Scienter**

Defendants argue that Plaintiffs have again failed to allege scienter as to any Defendant. Defendants contend that much of the TAC rehashes previously rejected scienter allegations and none of the new allegations support scienter. ECF 136, at 8. In response, Plaintiffs argue that their new allegations are sufficient to establish scienter for all Defendants. ECF 138, at 9–14.

As an initial matter, Defendants repeatedly assert that the Court has rejected many of Plaintiffs' allegations in prior orders and should blanketly reject them here as well. ECF 136, at 2, 8, 14, 15; ECF 144, at 1, 3, 5, 8, 10, 15. However, this assertion is unpersuasive. Under a holistic review, the Court considers each of the allegations in the context of the amended complaint. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).

As discussed above, "a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (citation omitted). The plaintiff must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991. "'Deliberate recklessness' is more than 'mere recklessness or a motive to commit fraud.' It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citations omitted) (emphasis in original).

A court must first "determine whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter." *NVIDIA*, 768 F.3d at 1056. "If none is sufficient alone, [the court] then consider[s] the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id.*; *see also Leventhal v. Chegg, Inc.*, No. 21-CV-09953-PCP, 2024 WL 924484, at *3 (N.D. Cal. Mar. 4, 2024). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account



United States District Court
Northern District of California

plausible opposing inferences." *Tellabs*, 551 U.S. at 323. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In its previous order, the Court found that many of the allegations were insufficient to create a strong inference of scienter in part because the allegations did not contain particularized facts such as the date or the content of alleged communications. ECF 123, 30–37. Here, Plaintiffs have included specific dates and content of communications throughout their complaint. The Court will assess each of the allegations standing alone but will primarily turn its focus to whether the allegations holistically create a strong inference of scienter.

**a. Surveillance Testing Allegations**

Plaintiffs allege that Dr. Olymbios has personally confirmed two different meetings he had with Dr. Seeto in July 2020. TAC ¶¶ 28, 196, 284. In each meeting, Dr. Olymbios raised concerns that CareDx's practice of billing Medicare for "surveillance" AlloSure tests for patients with no demonstrated medical necessity constituted "fraud on the government." *Id.* Dr. Olymbios also reported these same concerns to another high-ranking executive, Director of Reimbursement Danielle Scelfo. *Id.* ¶ 284. In a July 2020 discussion, Scelfo agreed with Dr. Olymbios that billing Medicare for "surveillance" use of AlloSure was not medically necessary. *Id.*

Defendants bring forth four arguments in opposition. ECF 136, at 9–11. First, Defendants argue that billing Medicare for surveillance tests was expressly authorized. Citing Exhibit P, Defendants assert that Medicare itself stated that surveillance testing is and always was permissible under CareDx's LCD. ECF 136-17, Ex. P. Exhibit P is a press release which states that coverage for the "existing" LCD has not "changed" and still covers AlloSure "after a physician assessed pretest, including for surveillance testing." *Id.* However, the Court declined to take judicial notice of Exhibit P because the TAC does not allege that Defendants' RemoTraC program did not involve getting "physician-assessed pretests"—but rather, the TAC challenges the RemoTraC program's bundling of AlloSure when medically unnecessary. *See supra* Section

III.A.4. Considering the allegations, Exhibit P is irrelevant. *Id.* Accordingly, the Court rejects Defendants first argument.

Second, Defendants contend that Dr. Olymbios's subjective disapproval of surveillance test billing is an insufficient basis to plead scienter. Defendants assert that there are no allegations that Defendants adopted the opinion of Dr. Olymbios, who is not an expert in Medicare reimbursement. ECF 136, at 10. Plaintiffs counter that Dr. Olymbios's opinion was shared by Scelfo, CareDx's Director of Reimbursement, who was an expert in Medicare reimbursement. TAC ¶ 123. Further, the President of Renal Disease Research Institute ("RDRI") also sent an email to Dr. Maag stating that RDRI would not participate in a study specifically because of RDRI's concerns that CareDx was improperly billing the government for tests performed as part of the study. *Id.* ¶¶ 209, 271, 291. The RDRI allegations do not go directly to surveillance testing but fall in the same category of improper billing practices, of which Defendants were made aware . In the context of these allegations, the Court finds Defendant's argument of Dr. Olymbios's subjective disapproval to be unpersuasive.

Third, Defendants argue that TAC's allegations regarding external parties fail because they do not support the claim that billing of surveillance testing was improper. ECF 136, at 10–11. The TAC alleges that "doctors specifically pushed back on the 'surveillance' use of AlloSure"; however, Defendants argue that it fails to particularize what the physicians stated. *Id.* For example, in Advisory Board meetings, some physicians complained that "their patient did not need the AlloSure test each time they ordered RemoTraC for routine blood work panels." TAC ¶ 287. Defendants argue that this allegation is "no more than a complaint about how the service was structured." ECF 136, at 10. However, Defendants' argument fails when considering the actual language of the allegations. Physicians told Defendants that AlloSure testing as structured was medically unnecessary, and Defendants acknowledged this yet refused to alter their practices. The Court finds Defendants' argument to be unpersuasive.

Finally, Defendants contend that the public nature of both the LCD and CareDx's position regarding surveillance testing defeats any claim of scienter. ECF 136, at 11. Defendants cite to exhibits which the Court has denied judicial notice due to the exhibits being irrelevant. *See supra*

United States District Court
Northern District of California

Section III.A.2. The fact that investors were aware surveillance testing was part of CareDx's strategy generally does not defeat an inference that Defendants intended to deceive investors.

The Court finds Defendants' arguments regarding surveillance testing to be largely unpersuasive in light of the new allegations in the TAC. The Court finds that the surveillance testing allegations create an inference of scienter.

**b. Kickback Allegations**

Plaintiffs add a series of new allegations that Dr. Seeto and Dr. Maag attended and approved expenses for certain CareDx-sponsored dinners and other "lavish" outings with physicians and thus were aware of or participated in violations of healthcare laws. TAC ¶¶ 267, 271, 273–83. In the TAC, Dr. Olymbios described several marketing events he attended that were allegedly designed to induce physicians to prescribe AlloSure with hotel rooms, expensive dinners, and wine. *See, e.g.*, *id.* ¶ 146 ("[f]or those [longer] meetings, physicians [we]re paid between $3,000 to $5,000 plus expenses, including airfare and hotel costs").

Plaintiffs also bring new allegations from FE-21. FE-21, who organized and attended such events himself, stated that Dr. Seeto "attended and approved all such events," which he described as "gross overuse of funds to entertain doctors" and induce them to prescribe CareDx tests. *Id.* ¶ 155. FE-21 described the timeframe, location, and details of these events. *Id.* ¶¶ 154, 156–60, 165. Plaintiffs also assert that Dr. Maag himself testified under oath that he personally approved all "marketing" expenses, which necessarily included these events. *Id.* ¶¶ 171–72 ("I am engaging with the team on those [events and expenses]. And then I am signing off on all the expenses . . . . I signed every check in the company.").

Defendants provide three arguments in opposition. First, Defendants contend that Plaintiffs' allegations fail to show scienter as to the underwriter representations in June 2020 and January 2021. Defendants argue that all events described by FE-21 took place after the final alleged underwriter representation statement, as FE-21 did not join CareDx until April 2021. TAC ¶ 154. Further, FE-21 is not alleged to have communicated with Dr. Seeto, reported to him, or worked with him. ECF 136, at 12. However, Defendants omit that FE-21 states witnessing Dr. Seeto at these events. TAC ¶ 155. Further, FE-21's allegations are supported by Dr. Olymbios,

who alleges similar events that occurred prior to January 21, 2021. *Id.* ¶¶ 144–50. Dr. Olymbios's statements are further corroborated by FE-1, FE-6, and FE 20. *Id.* ¶¶ 153, 168–69. Defendants complain that Dr. Olymbios does not provide sufficient detail for these events—arguing, without citing to caselaw, that specific dates, expenses, and the number of attendees for each event need to be alleged. ECF 136, at 12–13. The Court does not find this argument to be persuasive.

Second, Defendants argue that the kickback allegations also fail to allege scienter for statements regarding Stark Law compliance and revenue reporting. Defendants contend that the allegations broadly do not implicate the Stark Law and, when they do, they do not support awareness of Stark Law violations. ECF 136, at 13. The Court disagrees. The KOAR allegations and the sham advisory board allegations were sufficient to allege falsity as to the Stark Law compliance statements. *See supra* Section III.B.1.a. The TAC also alleges that Dr. Seeto and Dr. Maag regularly participated in these events. TAC ¶ 145. Thus, contrary to Defendants' assertions, these allegations support awareness of Stark Law violations.

Third, for the statements on testing services revenue, Defendants also argue that the alleged kickbacks are too far removed from the subject of testing services revenue. Defendants cite to *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019). In *Veal*, a confidential witness reported that the defendant company trained its support representatives to ensure consumer confusion. *Id.* at 800. For example, the company told staff to devote no more than four minutes and thirty seconds to each call, which was insufficient time to answer potential borrowers' questions about the loan process. *Id.* The confidential witness stated that company management knew of these tactics. *Id.* However, when assessing scienter, the court found that this allegation was too far removed from the alleged statement's subject of hidden origination fees. *Id.* at 815. Furthermore, plaintiffs had not alleged that defendants knew of customer complaints regarding hidden origination fees. *Id.*

The Court previously found that Plaintiffs had sufficiently alleged falsity as to testing services revenue because Defendants noted their increase in revenue was due to certain test results but failed to mention that some of these tests were illegal chargebacks to Medicare. ECF 123, at

26. The Court finds that *Veal* is distinguishable. Unlike in *Veal*, the TAC alleges that Defendants knew that the kickbacks boosted the testing services revenue. TAC ¶¶ 100–01. The Court finds that the kickback allegations create an inference of scienter.

**c. Paper Trail Allegations**

Plaintiffs reassert their paper trail allegations—allegations that former employees were "told not to put things in writing." TAC ¶¶ 298–300. The Court previously struck Plaintiffs' paper trail allegations finding that Plaintiffs had not conducted a reasonable inquiry under Federal Rule of Evidence 11. ECF 123, at 17. Here, Plaintiffs allege that they undertook an extensive and thorough independent investigation of each of these facts, directly and independently confirming them in a call between Dr. Olymbios and Dr. Olymbios' counsel and corroborating them with confidential witnesses. TAC ¶ 4.

Defendants do not challenge the reasserted paper trail allegations that are credited to Dr. Olymbios and corroborated by FE-21. *See, e.g.*, TAC ¶ 164 (a compliance call concerning kickbacks was atypically "scrubbed" from CareDx's systems); *id.* (FE-21 warned to keep his concerns "offline"); *id.* ¶¶ 157, 165 (FE-21 given detailed instructions on how to hide event expenses, including "skip[ping]" a physician sign in sheet so the per- physician expenditure could be concealed). However, FE-21's allegations do not implicate Dr. Maag or Dr. Seeto, as FE-21 was told by his manager to avoid leaving a paper trail. *Id.* ¶ 183. For this reason, the Court does not give much weight to FE-21's allegations.

As for Dr. Olymbios, Plaintiffs allege that in August 2020, after an email from Dr. Olymbios, Dr. Maag called Dr. Olymbios to warn him not to put the Company's practice of never billing patients in writing because "there were things he couldn't be associated with as the CEO," and that "there were certain things that shouldn't be put in writing." TAC ¶ 182. Dr. Olymbios's paper trail allegations create an inference of scienter.

**d. Retaliation Allegations**

Plaintiffs allege a pattern of retaliation against employees who raised concerns about unlawful conduct supports scienter. The Court previously rejected allegations from FE-11 and FE-19 to be sufficient by themselves to allege scienter. *See* ECF 123, at 38.

Here, Plaintiffs corroborate their allegations with further allegations from FE-21. *See* TAC ¶¶ 166, 303. FE-21 reported he was immediately placed on a Performance Improvement Plan in retaliation for warning higher-ups that CareDx could be found liable for its improper expenditures if the Office of the Inspector General audited them. *Id.* ¶ 303. FE-21 further stated he complained to HR and management about a number of different improper practices on many occasions and said he was ultimately terminated for blowing the whistle. *Id.*

Defendants argue that the Court should not give weight to FE-21's allegations when assessing scienter as there is no indication that Dr. Maag or Dr. Seeto played a role in the termination. ECF 136, at 14. Taken alone, these allegations do not create a strong inference of scienter. However, the Court will consider these allegations in its holistic review.

**e. Resignation Allegations**

A "resignation can support an inference of scienter" where it is "uncharacteristic [of] typical hiring and termination patterns or . . . accompanied by suspicious circumstances." *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2024 WL 3579322, at *13 (N.D. Cal. July 29, 2024). Plaintiffs argue that the TAC sets forth a pattern of suspicious resignations in the wake of government investigations of CareDx, including CFO Dhingra's, and Chief Marketing Officer King's resignations, each with no notice. TAC ¶¶ 327–28. Further, the TAC alleges that other employees resigned over concerns about CareDx's alleged improper conduct. *Id.* ¶ 163. Taken alone, these allegations do not create a strong inference of scienter. However, the Court will consider these allegations in its holistic review.

**f. Core Operations Allegations**

Plaintiffs also reassert their core operations theory. "The core operations theory of scienter relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citations omitted). "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys. of St. Louis*, 759



United States District Court
Northern District of California

F.3d at 1062 (9th Cir. 2014) (citations omitted). However, in "rare circumstances," allegations regarding management's role "may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014), *overruled by on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Plaintiffs argue that CareDx's unlawful conduct was central to the "core operations" of the Company, which further supports scienter under a holistic analysis. *Id.* ¶ 305. Specifically, CareDx's most important business line was its testing services segment, which represented at least 85 percent of the Company's total revenues since the beginning of 2020. *Id.* CareDx's testing services business relied on payments from Medicare, which represented as much as 70 percent of the Company's testing services revenue, and as much as 60 percent of its overall revenue, during the Class Period. *Id.* Finally, RemoTraC was also central to the Company's business during much of the Class Period, with Dr. Maag telling the investing public that RemoTraC at one point accounted for "over 50 [percent]" of the Company's testing revenue. *Id.*

Plaintiffs cite to *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014). In *Mulligan*, plaintiffs relied on core operations theory to plead scienter for key officer defendants. *Id.* at 969. The Court found it was "'absurd' to think that that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company whose main business is manufacturing pharmaceuticals for public consumption." *Id.* It was even more unlikely in light of repeated "Form 483s and the Warning Letter from the FDA." *Id.*

The Court also finds *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008). In *Berson*, plaintiffs alleged that defendants—the CEO and CFO—made materially false statements regarding the company's revenue by including in the company's "backlog" report various contracts for which the government had issued "stop-work orders." *Id.* at 985. The Ninth Circuit acknowledged that "plaintiffs allege no particular facts indicating that [defendants] actually knew about the stop-work orders." *Id.* at 987. However, the court still accepted the



United States District Court
Northern District of California

inference that the "high-level managers must have known about the orders because of their devastating effect on the corporation's revenue." *Id.*

The Court previously rejected Plaintiffs' core operations theory because Plaintiffs' allegations were not particularized enough to show that the Defendants knew that statements regarding RemoTraC were false. ECF 123, at 33. Here, Plaintiffs alter their core operations theory allegations to be based on Dr. Seeto's and Dr. Maag's role in the Company's central business line. Like in *Mulligan* and *Berson*, the Court finds that these allegations create an inference of scienter.

**g. Holistic Review**

"Ultimately, *Tellabs* requires courts to assess allegations of scienter holistically." *Chegg*, 2024 WL 924484, at *8. In addition to the arguments above, Defendants argue that Plaintiffs have not alleged any motive as to why Dr. Maag and Dr. Seeto would commit a fraud on the Company's investors. ECF 136, at 8. Specifically, Defendants contend that the lack of allegations that Dr. Maag or Dr. Seeto engaged in any unusual stock sales during the Class Period or had any other personal motive based on an executive compensation plan cuts against a finding of scienter. *Id.* Defendants cite to *Metzler* to stand for the proposition that a lack of stock sales "suggest[s] that there was no insider information from which to benefit." 540 F.3d at 1067. Plaintiffs contend that *Metzler* is distinguishable because in that case, the "most persuasive allegation of scienter" was that one of the defendants stated that company practices were in "the gray area." *Id.* at 1069. Further, in oral argument, Defendants conceded that a motive is not required to allege scienter. Here, the Court finds that the lack of motive alleged slightly cuts against a finding of scienter.

Regardless of the lack of motive, the Court finds that, when considering the allegations holistically, Plaintiffs have sufficiently alleged scienter as to Dr. Seeto and Dr. Maag. When taken together, the allegations regarding surveillance testing, kickbacks, paper trails, retaliation, resignations, and core operations all "create a strong inference of scienter." *NVIDIA*, 768 F.3d at 1056. The inference of scienter here is "cogent and compelling." *Tellabs*, 551 U.S. at 324. Accordingly, the Court **DENIES** Defendants' motion to dismiss as to Plaintiffs' Section 10(b) and Rule 10b-5 claim.

United States District Court
Northern District of California

**C. Section 20(a)**

"In order to prove a prima facie case under [Section] 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator . . . ." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). "Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012) (citation omitted). "Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same." *Id.* (citation omitted).

Defendants argue that the Plaintiffs' failure to plead a violation of Section 10(b) of the Exchange Act defeats their Section 20(a) claims. ECF 136, at 25. This is Defendants' sole argument against Plaintiffs' Section 20(a) claim. Because the Court finds that Plaintiffs have sufficiently alleged their Section 10(b) claim, the Court **DENIES** the motion to dismiss as to the Section 20(a) claim.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' motion to dismiss. Despite Defendants' arguments, the Court declines to revisit its rulings in its previous order. Here, Plaintiffs have sufficient alleged falsity as to their new Stark law allegations. Further, Plaintiffs have sufficiently alleged scienter as to Dr. Seeto and Dr. Maag.

This Order resolves ECF 136.

**IT IS SO ORDERED.**

Dated: February 18, 2025

TRINA L. THOMPSON
United States District Judge