Pages 1 - 45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE TRINA L. THOMPSON

PLUMBERS & PIPEFITTERS LOCAL UNION )
#295, Individually and on Behalf of)
All Others Similarly Situated,      )
                                    )
              Plaintiffs,           )
   vs.                              ) No. C 22-3023 TLT
                                    )
CAREDX, INC., PETER MAAG, and       )
REGINALD SEETO,                     )
                                    )  San Francisco, California
              Defendants.           )  Tuesday
                                    )  January 28, 2025
                                    )  2:00 p.m.
_____

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**           ROBBINS GELLER RUDMAN & DOWD, LLP
                              Post Montgomery Center
                              One Montgomery Street
                              Suite 1800
                              San Francisco, California 94104
                          BY: **JASON C. DAVIS, ESQ.**

                              ROBBINS GELLER RUDMAN & DOWD, LLP
                              655 West Broadway
                              Suite 1900
                              San Diego, California 92101
                          BY: **NICOLE Q. GILLILAND, ESQ.**

                              SAXENA WHITE, P.A.
                              10 Bank Street
                              8th Floor
                              White Plains, New York 10606
                          BY: **JOSHUA H. SALTZMAN, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

Debra L. Pas, CSR, RPR, RMR, CRR
Official Reporter - U.S. District Court - San Francisco, California

**APPEARANCES:   (CONTINUED)**

**For Defendants:**            WILLKIE FARR AND GALLAGHER, LLP
                              787 Seventh Avenue
                              New York, New York 10019
                      BY:  **CHARLES D. CORDING, ESQ.**
                           **BRADY M. SULLIVAN, ESQ.**


                              WILLKIE FARR AND GALLAGHER, LLP
                              333 Bush Street
                              San Francisco, California 94104
                      BY:  **LAURA L. GEIST, ESQ.**

                              —   —   —

**Tuesday - January 28, 2025**                                  **3:09 p.m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  Calling Case No. 22-CV-3023, Plumbers and Pipefitters Local Union No. 295 Pension Fund versus CareDX, Incorporated, et al.

Counsel, if you would state your appearances, beginning with the plaintiff.

MR. DAVIS:  Good afternoon, Your Honor.  Jason Davis of Robbins, Geller, Rudman and Dowd for the plaintiffs.

With me also from Robbins, Geller, Rudman and Dowd is my colleague Nicole Gilliland and my colleague Michael Torres, who is supporting us with technical help today.

In addition, Mr. Joshua Saltzman from the Saxena White firm, also co-lead counsel for the plaintiffs, is present today, Your Honor.

THE COURT:  All right.  Will any of your colleagues be addressing the Court for any portion of the argument?

MR. DAVIS:  Just myself unfortunately, Your Honor.

THE COURT:  All right.

Counsel.

MR. CORDING:  Good afternoon Your Honor.  Charles Cording from Willkie, Farr and Gallagher, LLP for the defendants.

With me are my colleagues from Willkie, Laura Geist and

Brady Sullivan.

THE COURT: All right. And same question, will any of your colleagues be providing argument for any portion?

MR. CORDING: I don't anticipate so, Your Honor.

THE COURT: All right. Don't be surprised if I cold call on someone. I have been known to do that, especially if I figure out who may have written that part of the briefing.

With regards to the judicial notice, there were some concerns about some of the requests, and I think you could glean that from my questions.

So I'm going to indicate to you, mainly because of the alphabet that we went through -- I think we went through every alphabet but maybe two.

So I'm going to indicate to you which ones are tentatively denied and allow you to have any final word with regards to the same.

So rather than reciting all that are granted, the following Requests for Judicial Notice pursuant to 201(b) of the Evidence Code are hereby denied subject to any additional argument counsel wish to make.

Counsel will begin by addressing the judicial notice portion. You have about five minutes to do that. And then you have 25 minutes each for the arguments that should center on scienter and falsity.

The exhibits that are being denied are A, D as in dog,

F as in Frank, G, H and K, and also P as in Paul, U, V as in Victor, W and X.  Those are the documents of which the Court, upon review, cannot take judicial notice.  All others will be given judicial notice.

And keep in mind that judicial notice is a very limited doctrine and the only thing I can take judicial notice of is their existence, but in terms of the truth of the content of each of those documents, particularly if they are in dispute, the Court cannot take judicial notice of the same.

I will give the parties leave, if you would like to argue, for the Court to reconsider its denial of A, D, F, G, H, K, P, U, V, W and X.  And please indicate which, if any, you would like to address.

So starting with defense counsel, since it is defense motion, and then we'll turn to plaintiff.

MR. CORDING:  Thank you, Your Honor.

So I would like to begin by addressing judicial notice with respect to Exhibit P, which is the August 2024 statement by Medicare regarding the scope of surveillance coverage.

And really the -- the only fact for which we are asking the Court to take judicial notice as to Exhibit P is the statement that was made by Medicare; that Medicare covers tests for AlloSure after a physician-assessed pretest.

And so the -- the fact that that was a public pronouncement by Medicare is something that we think is not

reasonably in dispute.  While, to be sure, plaintiffs dispute the legal consequences of that statement by Medicare, the fact of that statement is not truly disputed.

And just four points on that.

So the first is that this was an official pronouncement by MolDX, which the plaintiffs recognize are the -- is the entity that has responsibility for determining the scope of coverage of AlloSure.  And there is an allegation to that effect in Paragraph 342 of the Complaint.  So this is the government entity that has the authority and the responsibility to make these determinations.

Two, this is an official pronouncement by Medicare, and it's doing two important things.

One, it is withdrawing a LCD that had been proposed by Medicare.  And in so doing it is specifying to CareDX and to the market the circumstances in which CareDX's test could be paid by Medicare.  And it is that statement that we believe as a public pronouncement from a competent regulator can be judicially noticed by the Court.

Third, there purports to be a factual dispute as to the retroactivity or the scope of where that statement applies.

But we think it is clear on the face of Exhibit P that Medicare is stating here that it has not changed its coverage for these blood tests.  And it actually links back, and there's a hyperlink in Exhibit P to the LCD.  And that LCD is the one

in dispute in this case, which makes clear the nexus that this is a statement by the regulator defining the scope of coverage under the LCD at issue.

And then, finally, there is a lot in the papers about the pretest requirement where in Exhibit P Medicare says that coverage is provided after a physician-assessed pretest, including for surveillance testing.

And we think the plaintiffs are certainly free to argue as to the merits of their Complaint as to whether that pretest, physician-assessed pretest, was followed or not followed in defense of their pleading.

However, their allegations in that regard don't undermine the fundamental point, which Medicare has now publicly stated, contrary to Olymbios's allegation that surveillance testing is never covered, that it is covered after a physician pretest.

So appreciating the limited scope of what we're seeking judicial notice on, we believe that the Court is well within its rights.

The FDA -- I'm sorry.  The *Phillip Morris* case that we cited in our papers is an example of that, where there is a dispute regarding the FDA approval and the Court took judicial notice of the FDA's approval of a drug.

There's also the Khoja case that we cite, which was another dispute about a developmental drug, where what was at issue was the EMA requiring additional tests, and the Court

took judicial notice of the EMA's statements regarding --

THE COURT: Let me interrupt you. You do admit there is a dispute between the parties with regards to both the relevance of this item and its contents; would that be fair?

MR. CORDING: Yes, Your Honor.

THE COURT: And its retroactivity?

MR. CORDING: Yes.

THE COURT: All right. Any other exhibit of which I've recited that you would like the Court to reconsider? And you have about two more minutes.

MR. CORDING: Yes, Your Honor. With regard to Exhibits A, D, F, G, H and K, these are exhibits we are offering for a very limited and narrow purpose, which is not to raise any fact arguments or to dispute any of the factual allegations in the Third Amended Complaint, but to show what kind of information was available to the market.

And why those exhibits are relevant is that they show that the defendants in this case repeatedly disclosed to investors that surveillance testing, which is a core part of what claim -- a core theory as to how plaintiff's claim investors were deceived here was disclosed to the market; that the defendants splashed across the web page that surveillance testing -- that there actually was a surveillance product; that they routinely updated investors as to the number of sites that had signed up to their surveillance protocol.

And we're not saying -- we're not seeking a factual determination where they said, for instance, we've signed up 50 sites, that that is a fact that the Court should find.

We are simply presenting that as information that was available to the market that negates scienter.  And then the reason it negates scienter is they need to plead that the defendants here, Dr. Maag and Dr. Seeto, knew that surveillance testing was wrongful.

And if Dr. Maag and Dr. Seeto truly believed that, there's no reason they would have repeatedly gone to investors on these monthly, quarterly earnings calls, have told them that they were engaging in surveillance testing.

The public disclosure, and nothing more than that, negates any inference of an intent to deceive investors, and it shows what investors knew about the business, which is a common basis upon which Courts grant judicial notice in securities class actions lawsuits.

Thank you, Your Honor.

**THE COURT:**  Thank you.

Counsel for the plaintiff, if you can just address any of the exhibits which the Court has now indicated will be denied that you would like the Court to reconsider.

**MR. DAVIS:**  The Court is exactly right.  Under the Ninth Circuit authority in *Khoja*, which is 899 F.3d, pin cite 1000, the Ninth Circuit would permit the Court, as the Court

has indicated, to take notice of the existence of the documents and nothing else.

And on that we rest on the papers and hopefully save the Court some time.

**THE COURT:** All right. Thank you.

All right. Now, then, counsel for the defense, you may proceed. You have remaining 25 minutes. You can use them as you choose, by either presenting your entire argument, knowing the focus of the Court based on the Court's questions. And then if you'd like, let me know if you're surrounding five minutes to be able to respond.

**MR. CORDING:** Thank you, Your Honor.

I'd like to begin my remarks around Your Honor's remaining questions. So beginning with your question regarding the Stark Law.

So that, again, is the only new category of statements that are alleged in the Third Amended Complaint. And the -- the first important point as to those statements is that they really are not representations of compliance with the Stark Law.

Quite the opposite. They are warnings to investors that the company may not be in compliance with the Stark Law, and regulators may take a different view as to whether their conduct, within the limited domains of the statements, comports with the exceptions to the Stark Law.

And so we believe under the -- under the decision of the Southern District of New York cited in our papers, the *Cognyte* case, that that -- that those statements are not actionable as guarantees of compliance.  They would only be actionable to the limited extent that the plaintiffs had pled that any regulator at the time those statements were made -- and both those statements were made by Dr. Seeto in February 2021 and February 2022 -- had found any violations of the Stark Law. And having no allegations to that effect, neither statement is actionable.

Even so, I think as Your Honor's question rightly noted, the domain of those statements is exceedingly limited.  They were limited in scope to first a personal service arrangements with physicians, and the -- the statements then went on to define and explain what Dr. Seeto meant by that.  What he said those were were speaking engagements and clinical advisory boards.

And virtually all of the statements or all of the events and conduct that plaintiffs are relying on as evidencing Stark Law violations, such as lavish dinners and events, aren't speaking engagements or clinical advisory boards that fall within the domain of those statements.

In the response that plaintiffs submitted this morning, they argue the fact that defendants did not actually provide personal services at these meetings is exactly the point.

However, that gets it exactly wrong.

There is never a statement made by Dr. Seeto representing or guaranteeing that CareDX was in compliance with the Stark Law writ large or overall.

All he was simply saying was that as to these limited personal service arrangements, the company intended them to comply with applicable exceptions to the Stark Law.  So we continue to believe that the allegations that they are seeking to use, hotel meetings, dinners and expenses, are simply out of the scope of the -- of those statements and can't give rise to any -- can't falsify those statements or give rise to an actionable securities claim.

Then as to the -- the limited allegations that actually fall within the domain of those statements, that is the KOAR study, which Your Honor noted in your questions and advisory boards.

As to the KOAR study, those allegations are contained principally in Paragraphs 185 to 194 of the Complaint.  None of those allegations are linked in any way to Dr. Seeto, the speaker of those statements.

And why that's important is that these statements are two statements of opinion that are false or can be false only within the parameters of the Supreme Court's decision in the *Omnicare* case since they are subjective statements and statements of intention.

And so in order to establish or plead under *Omnicare* that these two statements are false, they would need to show that at the time that these statements were made, Dr. Seeto was aware of contrary facts showing knowledge of a Stark Law violation.

But as to the KOAR study, there are no allegations linked in any way to Dr. Seeto.  They don't mention Dr. Seeto at all.

And you can actually see, I think the tell here is in their letter.  They reference in the last sentence:

"These practices were independently" --

(Court reporter clarification.)

The tell is in the final sentence of that section of their letter, which says:

"These practices were independently corroborated by multiple former employees and directly discussed by CareDX's chief medical officer."

Well, CareDX's chief medical officer is not a defendant in this case.  CareDX's chief medical officer is not Dr. Seeto. There is no allegations that anyone brought to Dr. Seeto's attention any concerns that physicians were being given above-market payments for enrolling patients in the KOAR study. And there's, thus, nothing that links Dr. Seeto to any of the underlying theories of these Stark Law violation here.

The other allegation or set of allegations that are arguably within the domain of the statement are those involving advisory boards.

And those allegations are contained principally in Paragraphs 144 and 145 of the Complaint, and they are sourced to Dr. Olymbios.

The difficulty there is those allegations are not particularized. And, in particular, what's missing in those allegations, which would be essential to establish a Stark Law violation, is that any of these advisory boards resulted in any referrals of tests to Medicare. There is no Medicare nexus pled.

And even beyond that, these two paragraphs in the Complaint don't give any details as to when these advisory boards took place, whether these -- what physicians attended, whether these physicians had Medicare patients or had patients that were subject to private insurance.

And, again, there's nothing -- even if you accept the claim that CareDX was paying above-market rate -- and, again, nothing about the physician's qualifications were pled to enable any baseline as to what would be an appropriate way to be paid here, but if these -- if this was a physician who attended whose clients or patients had Blue Cross/Blue Shield and referred business to CareDX, that would not give rise to a Stark Law violation since the claim referral to Medicare is the essence of the violation.

So turning now briefly to scienter and the holistic analysis. And appreciating Your Honor's ruling on the judicial

notice issues, we think that as to scienter, irrespective of whether you consider Exhibit P or not or statements that were made to the market, the Complaint here is missing allegations that Dr. Seeto or Dr. Maag ever believed Dr. Olymbios was right in his views regarding the limited scope of the LCD.  To the contrary, they repeatedly told him that surveillance testing was the foundation of CareDX's business.

Even -- even, again, assuming that -- or even giving effect to the judicial notice ruling, there are no allegations in the Third Amended Complaint, within its four corners, that Medicare ever took any adverse action against CareDX for submitting what they allege to be hundreds of thousands of tests that violated the terms of the LCD.  Nor are there allegations that Medicare ever reversed a single claim, warned CareDX that the surveillance tests were in any way improper.

All they are really relying on in that regard are Dr. Olymbios' statements to Dr. Seeto in July 2020.

However, this is very similar to the -- to the *Myriad Genetics* case, which we cite in our papers, that involved very similar allegations of overbilling, where the claim there was that the -- the subject company was doubling billing for tests which Medicare said could not be billed together.  And the Court in that case dismissed for lack of scienter, founding that if that were really true, you would expect, given that the companies submitted thousands and thousands and thousands of

tests to Medicare using this double billing platform, that at some point Medicare would have objected to that practice or warned them that what they were doing was violative of the rules.

And because there was nothing like that, there was no warning, there was no pushback from Medicare, the much more compelling inference was that the defendants in that case believed that their billing practices were perfectly lawful.

And so putting all the allegations of scienter here, and just to respond to a few of the -- a few of the specifics that plaintiffs raise in their letter.  So they -- they cite to these kickbacks to doctors and lavish events --

THE COURT:  You might want to slow down on that one and just give me your best argument on the kickback.

MR. CORDING:  Yeah.  So I think the best argument on the kickbacks, Your Honor, is, one, almost all of the allegations are sourced to their new confidential witness, FE21.  FE21 joined CareDX in April 2021.  That is after the relevant compliance with law statements were made by Dr. Maag and Seeto.

In other words, he's talking about stuff that happened after the representations were made in the two underlying agreements.

And plaintiffs cite no cases or any principle that says you can impute after the fact conduct to give rise to an

inference of scienter at the time the two statements that are at issue were -- were actually made.

Moreover, as I explained or attempted to explain, a -- an event for a doctor, a dinner for a doctor is not a per se violation of any law.  The only -- the instance where that can become a potential compliance issue is if it results in a referral of a claim to Medicare.

And as to none of the underlying dozens of events that they cite in the Third Amended Complaint, do they pull it through and show that any of those events resulted in referrals of tests to Medicare?

The -- their town hall allegations happened in -- cited in Paragraph 163 of the Complaint happened in March 2022, which, again, is -- in that instance it happened after all of the relevant statements were made.

So, again, there's no basis as to whatever was reportedly described during this town hall; that that could give rise to any inference that Dr. Seeto or Dr. Maag knew of compliance violations when they made earlier statements.

Nor for that matter are there any allegations connecting Ms. MacCauley, the employee who resigned, to Dr. Maag or Dr. Seeto or that she expressed any concerns about potential compliance issues or they had any role in their departure.

And then as to the paper trail allegations, plaintiffs claim that Dr. Maag directed Dr. Olymbios not to put certain

things in writing.  In particular, that CareDX never billed patients for its tests.

However, if you look -- and this was something Your Honor pointed out in Your Honor's prior decision in the Second Amended Complaint.

The Complaints actually are contradictory on this point, because it actually pleads that CareDX did put that fact in writing; that there were presentations and slides that CareDX prepared that expressly stated that the -- that the tests were 100 percent covered by Medicare, which is a -- which is exactly what Dr. Olymbios said he was told not to put in writing.  And that's -- that's this Paragraph 72 of the Third Amended Complaint, where you can see how that fact was committed to writing.

And then putting it all together, on the facts of the Third Amended Complaint we continue to believe, as Your Honor found with respect to the last two Complaints, that the more compelling and cogent inference is the non-culpable one. Namely, that RemoTraC was a bona fide response to a public health crisis that allowed vulnerable transplant patients to continue receiving necessary testing at home when they were at risk for receiving -- they were at risk of contracting COVID should they go into community centers to continue receiving testing.  That in the midst of all of that, CareDX got into a dispute with an employee, which resulted in that employee,

Dr. Olymbios, making public allegations against the company of potential Medicare fraud.

The Third Amended Complaint -- again, limited to its four corners, does not plead that there was ever a moment in time when any of those investigations ever resulted in any findings of wrongdoing, resulted in any charges, resulted in any claims being reversed, resulted in any revenue being reversed.

And that putting it all together, particularly as plaintiffs again plead no motive, such as stock sales or committing a security fraud --

**THE COURT:**  And is it your position that motive is required?

**MR. CORDING:**  No, Your Honor.  I think the Ninth Circuit law is clear on that.  Motive is not required.

However, cases have often found that the lack of motive is probative of a lack of scienter, as in why would Dr. Seeto and Dr. Maag mislead investors regarding the company's compliance with law or the sources of its revenue if they would have nothing to gain from such a scheme.

And thus, again, we pointed out in our response last night, there's no clear articulation of when the fraud supposedly began, when it supposedly ended.  And there are a variety of contrary claims underlying the theory.

Simply put, the pieces here from a *Tellabs* perspective don't fit together and form a coherent perspective as to how

this company was engaging in fraud, and we think that further supports granting the motion on scienter grounds.

I will reserve any of my remaining time for rebuttal. Thank you, Your Honor.

**THE COURT:** Thank you. You have six minutes in reserve.

All right, counsel. You have a PowerPoint I understand?

**MR. DAVIS:** If it pleases the Court, yes, Your Honor.

**THE COURT:** You may begin.

**MR. DAVIS:** Thank you.

My clients, the Electrical, Sheet Metal, Police and Firefighter Pension Funds, who lost a lot of their retirement savings in CareDX, thank the Court for the Court's September 18, 2024 order, which is very detailed, and it narrows the issues in this case substantially.

And my client further thanks the Court for its questions of yesterday.

And as the Court directed earlier today, I'll proceed to focus on one the questions, scienter. Discuss the Stark Law concept within that and tie up, hopefully, well within the time allotted, Your Honor.

**THE COURT:** Thank you.

**MR. DAVIS:** So the Court had a very good question, of course, around how to frame -- what is the appropriate analytical framework for evaluating the scienter question in

this case.  And the Court focused on *Tellabs*, of course, which is Justice Ginsberg's decision, where the Court laid out that the Courts consider all of the facts alleged taken collectively.

And the question is whether they give rise to a strong inference of scienter, not whether an individual allegation scrutinized in isolation, which we respectfully submit the defendants have done, does.

And in summary, *Tellabs* explained that the reviewing Court must ask, when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

And embedded in that idea, Your Honor, is that ties will go to the plaintiff.  And as the Court in *Tellabs* explains, the Courts are not looking for a smoking gun inference, but a collective inference that is cogent.

And we start the -- the argument, Your Honor, with the Court's September 18, 2024 order and specifically what the Court found was missing from the prior Complaint.

For example, the Court determined that the prior Complaint didn't allege particularized facts; that any of the individual defendants, now Maag or Seeto, pushed medically unnecessary tests while executing this RemoTrac program or any other program.

The Court's question was:  Can you give me specific facts

that either Maag or Seeto knowingly pushed medically necessary tests.  The Court was not comfortable drawing that inference from the facts that were available at the time.

And I'd like to report -- a good report to Your Honor is that after the SAC, after Dr. Olymbios untangled himself from a legal knot with CareDX, he was able to talk with us directly. And what we learned from that discussion and additional investigations is, indeed, there were direct discussions involving Seeto and Maag where they pushed medically unnecessary tests.

And where did this happen?  This happened at something that CareDX called weekly advisory board meetings. Dr. Olymbios personally attended those meetings.  He personally attended those meetings when he was there.  He attended those meetings when the company was executing RemoTrac.  Lining those two points up, that's between April 2020 and when Dr. Olymbios departed in October of 2020.

So what's happening at these advisory board meetings is doctors are explaining to Drs. Maag and Seeto that their patients do not need the AlloSure test each time that they ordered RemoTrac for routine blood work.

And this is a very important complaint.  The treating physicians are essentially saying:  Yes, our patients need monthly standard tests.  Every single month these are the standard of care tests.

But what these doctors, the treating physicians, are explaining is it's not necessary, and they are complaining it's not appropriate, to require our patients to also take the AlloSure test.  An argument has been made that RemoTrac was a favorable response to COVID.  Perhaps they will prove that in discovery.

What we have here today under the *Tellabs* analysis, which requires us to assume the complaint's allegations are true, is -- is senior executives at a company who turn around and tell these treating physicians that the doctors could not remove the AlloSure testing from RemoTrac, could not remove those tests even if they were unnecessary.

So in the context of COVID, what's happening is the only way that these patients can get their standard of care tests is with a phlebotomist who will come into their home.

So these physicians who are faced with -- you know, the possibility of getting these tests done via RemoTrac, faces a very difficult dilemma.

They can allow CareDX to do the standard of care blood tests and allow them to do AlloSure, but the problem is -- but they have to do AlloSure, which is not necessary, in order to get their standard of care advertise.

In other words, what's going on here is Maag and Seeto are basically forcing physicians to accept these AlloSure tests even though, in the physician's professional medical judgment,

they determined they are not necessary.

And what is the reason why Maag and Seeto are doing this? According to Dr. Olymbios, who was at the meetings, the reason was these -- this AlloSure testing model, where they were forcing the AlloSure test along with the standard test, was highly lucrative.

Additional people were at these meetings, including the chief medical officer of the company, Dholakia, and the chief marketing officer of the company, King.  These facts demonstrate that the company, at the highest levels, was pushing medically unnecessary tests on -- on patients who didn't need them.  And we submit that this is responsive.  It's not the only new fact, but it's responsive to the Court's questions.

Seeto learns that these tests are inappropriate at Business Leadership Team meetings that Dr. Olymbios attends. As Dr. Olymbios explains, and the Complaint alleges, Seeto knew that CareDX was engaging in improper surveillance use of AlloSure.  They talked about billing these automatic robotic AlloSure tests to Medicare at these business leadership team meetings.

Again, for context, when we get into the state of mind, a complete different former employee explained that at these very same Business Leadership Team meetings Seeto would make disingenuous remarks about patients and his sole focus was on

getting volumes up.

Why is that legally relevant?  It's legally relevant because it demonstrates that what's driving the senior executives here is not getting medically necessary AlloSure tests to patients, but to get AlloSure tests to patients simply to drive up volumes and to make money.

**THE COURT:**  And would you say that that addresses the motive question?

**MR. DAVIS:**  The motive question does -- it does directly address -- it does address the motive question, Judge, and allow me to explain why.

When the -- the executives came out to the market and they were making these statements that the primary purpose -- or that our testing revenue services growth was primarily attributed to legal factors, they were giving double digit numbers.  And this drove the stock price -- the stock price higher.  And, of course, the executives are compensated in stock, and so they do have a financial motive to drive that stock price higher.

There is a particular motive as to Defendant Maag however.  As the Complaint explains, before Maag made the statements in the summer of 2000 that the company was in compliance with all of these False Claims Act rules and, in addition, the Anti-Kickback Statute, what was going on was the company was running out of money.  And so they needed to raise the

100 million-plus dollars to stay in business.

If they had gone out of business, Dr. Maag would have lost approximately $8 million of his personal wealth in company stock.

So the Court is correct. I infer the Court was asking about whether a motive is required. And as the *Tellabs* case itself explains, motive isn't required. It can be part of the holistic analysis. It's not required. Here we do have motive, Your Honor.

In addition, just in terms of whether there's an awareness by Seeto and Maag that billing Medicare for these unnecessary -- medically unnecessary tests is proper under the relevant -- under the relevant laws, they both sign annual reports that are given to shareholders that explains Medicare prohibits CareDX from causing physicians to order excessive or unnecessary services.

And yet, Your Honor, that's precisely what Maag and Seeto were doing at these advisory board meetings, which we now know, thanks to Dr. Olymbios, who was at those meetings.

In addition, Your Honor, there is -- there are facts from a medical doctor who worked at CareDX. And this medical doctor, FE1, had access to the company's records. And what this medical doctor explained is in reviewing the records, this AlloSure testing was done monthly and, importantly, for no medical reason at all, much less a medical reason for doing it

monthly.

Dr. FE1, independent of Dr. Olymbios, explained that sales pushed what labs should be done and how often.  That's the opposite of how it's supposed to work.

The way it's supposed to work is the treating physicians are determining how much.  In this case sales are pushing how much and how often.

Again, the medical doctor explains these tests were done way too many times.  She explained that she never sat down with a doctor, but actually knowingly ordered AlloSure, which is another point I'll get into.

And in terms of this argument that bundling is always appropriate, that's simply not true.  It's not -- it's not in accordance with the Medicare rules or medical necessity to bundle unnecessary tests and bill -- and bill Medicare for it.  That's simply wrong.  And as the medical doctor explains, it was totally unethical the way that they were doing it and clearly wrong.

Additionally, an argument has been made that there was no backlash from Medicare for -- to summarize the argument.  As I understand it, that's mistaken, Your Honor.  In fact, another former employee, FE10, reviewed the reasons why Medicare was rejecting a lot of the claims CareDX submitted later in the class period, and what FE10 explained was two things.

First, was that 90 percent of CareDX patients were getting

tests every single month.  And equally importantly, perhaps more importantly, the physicians were not able to show that the tests were medically necessary.

So that's happening contemporaneous with, as cited at Paragraph 344 of the Complaint, Medicare explains that it did, in fact, become aware of improper billing and over utilization of these tests.  And one would expect the numbers to back the qualitative information up, and it clearly does.

At Paragraph 350 of the Complaint there is a chart that lays out how -- how CareDX's year-over-year income changed during the period when this RemoTrac fraud was ongoing, and it shows double digit, triple digit growth, up to 743 percent, showing the impact of all of these unnecessary tests on the way up.

And then on the way down, after the -- the DOJ and SEC investigation started, what you see is negative growth; negative 76 percent, negative 89 percent.  It goes on.  And this -- this is contemporaneous with information in the Complaint that Medicare was rejecting 50 percent or more of the claims.

So there --

**THE COURT:**  When medicare would reject 50 percent of the claims, who absorbed that cost?  Was it the patient?  Was it -- where it -- where did that billing go?

**MR. DAVIS:**  The -- the facts that we presently have --

and, of course, we don't have discovery yet -- suggest that there were a lot of outstanding bills that were presented to patients who -- who were surprised to get them after the fact and couldn't -- couldn't afford to pay them.

And the Court's question actually ties back to another argument that was made around why was it important -- what was the significance of the phone call that we -- that we've now provided the details for that I believe the Court was seeking between Dr. Maag and Dr. Olymbios, where Dr. Maag sent an email -- excuse me, Dr. Olymbios sent an email to Dr. Maag saying: You know, we always -- in essence, we often market to physicians the fact that we never bill patients.

And Dr. Maag picked up the phone and said: There's some things I can't be associated with, SCEO, and you can't put these things in writing, even if that's how CareDX operated.

And this -- that fact goes to the Court's question. Because what we see here in the fact pattern is CareDX using a -- a carrot and sort of stick approach to getting these AlloSure tests done.

On the carrot side, what's happening is they are offering these inducements, but also, as Dr. Olymbios mentioned, telling these physicians that: Look, just order these tests. Your patients will never be billed.

Now, that -- that suggests that the company is appropriately sending those bills to Medicare when those tests

were medically unnecessary, but that's simply not true.

And we would argue, Your Honor, that this relates to the question that the Court just posed. And, also, as another piece, it doesn't answer the scienter puzzle, the scienter argument under *Tellabs*, but it's another piece of the puzzle.

In addition, Your Honor, there is a July 28, 2020 Business Leadership Team deck that Dr. Olymbios describes, and what the deck shows is that Dr. Seeto learned it was improper to bill Medicare for AlloSure tests unless consistent with the LCD and medically necessary.

Again, you have Seeto pushing these tests on physicians who say their patients don't need them, and we have presentations internal explaining that that's not appropriate. They have to be both medically necessary and the physician who is ordering them has to reach a conclusion that she has suspicion of rejection.

Then there's another very direct series of facts, Your Honor, that answer the Court's scienter question. Specifically in the prior -- the prior Motion to Dismiss, the Court did not credit conversations that Dr. Seeto -- Dr. Olymbios had with Dr. Seeto during July 2020 because the prior Complaint simply didn't provide the date or the content of the conversations.

Now, Dr. Olymbios has since clarified that there were, in fact, two conversations in July of 2020 wherein Dr. Olymbios informed Seeto that CareDX was committing fraud by improperly

billing Medicare for uses of AlloSure that were not covered by the applicable local coverage determination, which, again, requires medical necessity and clinical suspicion of rejection.

As support for the quality of this information, there is an allegation, a detailed allegation, that Dr. Olymbios also raised his concern with the company's number one expert on reimbursement. That's Ms. Scelfo, who is the reimbursement department head. And she agreed with Dr. Olymbios that such billing was, in fact, improper.

But that's not the only internal expert at the company who agreed. In fact, as the Court will recall, we just discussed Dr. FE1, who had concerns about rampant overbilling of Medicare and the company's issuing tests that were unethical because patients did not need them. She, too, brought her concerns to a company in-house expert; namely the company's top compliance lawyer, MacCauley. And what FE1 explained was that MacCauley was having an uphill battle and CareDX did not want to be compliant.

So with the new facts where we have Seeto and Maag at these advisory board meetings, pushing medically unnecessary sales on physicians, we would ask the Court to place additional weight on this fact and infer that the company's top lawyer is getting push-back from the only people who are above her, which are these senior executives. And that's an additional fact that supports scienter.

We already discussed the paper trail discussion between Dr. Olymbios and Maag.

In addition, there has been an argument around these KOAR studies, K-O-A-R, and what happens in these studies, Your Honor, involves both the kickback and the Stark Law and the medically unnecessary test allegations.

In a nutshell, CareDX pays individual physicians up to $40,000 to refer patients to be studied and take these regular AlloSure tests, what the defendants are calling surveillance.

The problem with this conduct, of course, is that $40,000 per patient is eight times the norm of what would be expected in a normal market transaction.  And the deviation from the market norm to what we are actually paying does demonstrate both inducement and that it violates the state law.

Then there's the question of whether Maag and Seeto actually know that this is going on, and there are several facts supporting that conclusion, Your Honor.

The first is that in Maag's own testimony he previously explained that he approves all expenses of the company.  So he's seeing these $40,000 checks go out the door.

Similarly, there's new facts from FE21, who explains that Seeto approved all expenses over 2.5K.  So he sees these $40,000 checks go out the door as well.

But then there's the question of:  Are they on notice that the conduct is wrongful?  In answer to that question, there's a

June 22, 2020 email from the president of a research institute who writes directly to Maag, refuses to participate in this study or the unusual fact that the company, CareDX, is turning around and billing Medicare for these regular AlloSure tests when they are not medically necessary.

In addition, there's this July 28, 2020 pitch deck that we discussed earlier, where Dr. Seeto is reminded that the medically necessary requirement and the suspicion of rejection requirement also applies to studies, just as it does everything else.

Switching directions a little bit, Your Honor.  Some physicians did not want to prescribe the AlloSure test, as we discussed earlier.  And the company engaged in practices that were -- that had the effect of obfuscating whether the test was actually being ordered.

So, for example, when a RemoTrac request was made on the form, according to Dr. Olymbios, the required "suspicion of rejection" field was simply omitted.

In addition, there were -- aside from obfuscating the AlloSure tests, there were also incentives or inducements offered to physicians, and these are extensive.

To start, Dr. Olymbios discusses all expenses paid trips to this lavish Cavallo Point Resort Hotel, just over the Golden Gate Bridge.  This is in the summer of 2019.  The doctors are flown out.  They are wined and dined.  And we have in

July 2021, from a completely different witness, the -- substantially the same event occurring.

And FE21, who was a new -- a new witness explained that we had a bunch of cash and we could basically buy the doctor's business.  It was an inducement to do business with us.

And a question has been raised whether Drs. Seeto and Maag were familiar with this -- these practices.  And as Dr. Olymbios explained, they both wanted to be front and center and, in fact, personally attended a lot of these events, and he gave extensive examples.

For example, there was a -- you know, a party in Miami where there was an open bar at the SLS hotel in Miami and Defendants Maag and Seeto were present.  It was clear this was a sales -- sales event.

There were grandiose events in New York City toward the end of 2020 where the same things were going on.

And the examples go on and on and on.  I won't belabor it. They are in the Complaint, but just to cite one before moving on.

According to Dr. Olymbios, there were regular business trips where physicians were flown out to the company's offices in the San Francisco Bay Area, all expenses paid, for an office tour.  And what ended up happening is Seeto and Maag would rents -- charter a boat and go out on the San Francisco Bay and, quote, drink all day.  What people do on their personal --

**THE COURT:**  You're at the two-minute warning towards your 20 minutes.

**MR. DAVIS:**  Yes, Your Honor.

**THE COURT:**  If you want to use all of your time, you have seven minutes remaining.

**MR. DAVIS:**  Thank you, Your Honor.

What folks want to do on their personal time is just fine. There's nothing wrong with that.

The problem here, Your Honor, is that there was tracking, quid pro quo tracking, if you please, regarding these inducements on the one hand and sales on the other.

With regard to advisory boards, in particular, for example, the company kept track of all of the physicians who showed up at $500 an hour and measured the impact that those meetings had on sales.

And there are examples, extensive examples, similar examples in the Complaint.

I just want to address a couple of more paper trail points very quickly, Your Honor.

There was a town hall meeting in 2022 where the top attorney at the company for compliance reiterated that there was a hundred dollar expense limit.  Dr. Seeto was in attendance.  After she reiterated the hundred dollar limit, she exited the call.

The next thing that happened is FE21, who was in a sales

role, raised a question about the potential violations for these Cavallo Point lavish vacations, essentially, that CareDX treated physicians to. At that point the call went silent and nobody had any more questions to ask.

After the call, what we learned from FE21 is that the company recorded these town hall meetings so people could go back and listen to them if they missed them, but what happened in this case is that the tape was scrubbed.

What happened after -- what happened shortly later is the witness who raised the concerns was fired. And what he learned from his boss is that he was fired because the comments he made and that Seeto was behind it; that Seeto definitely was familiar with the comments that FE21 made. This supports scienter.

Shortly thereafter, the company's top attorney, compliance attorney, MacCauley quit. A noisy withdrawal at the end.

That is an overall summary, Your Honor, of the points that we believe support the holistic scienter analysis.

And I'll reserve the remainder of my time.

**THE COURT:** All right. Thank you.

Mr. Cording, five minutes.

**MR. CORDING:** Thank you, Your Honor.

So I would like to focus my remaining remarks on scienter. So first, if I understood Your Honor's ruling on the Request for Judicial Notice, Your Honor is granting judicial notice for

Exhibits O, Q and T, which are the exhibits that establish that the SEC, after completing its investigation, declined to bring charges against CareDX; that the DOJ completed its investigation and likewise determined not to charge anyone with misconduct, and likewise the state regulator did the same.

And why that's significant from an overall *Tellabs* perspective is the plaintiffs acknowledge that those three investigations were prompted by Dr. Olymbios' allegations, the very same allegations that form the basis for their securities fraud claims.

Those allegations by Dr. Olymbios were investigated by multiple agencies over the course of multiple years and nevertheless resulted in declinations across the board, which undermine any inference that those allegations have merit from a *Tellabs* perspective.

And we cited several cases in our papers to that effect, including the *Universal Health Services* case, which deals with *qui tam* actions, and the *IntelliGroup* case, which deals with SEC declinations.

Again, in thinking through whether there was a coherent theory of the fraud here, the Government across the board has considered those -- considered that very issue and nobody has decided to pursue charges notwithstanding Olymbios's allegations.

Second, plaintiffs say that they added in the detail that

was missing from the Second Amended Complaint in the form of details around these two conversations between Dr. Olymbios and Dr. Seeto in July 2020 where Dr. Olymbios purportedly said that he believed that the company was defrauding the government; that surveillance testing was not permissible under the LCD.

Well, the case law is clear.  It is not sufficient for them to plead that Dr. Seeto expressed concerns -- sorry, Dr. Olymbios expressed concerns.  Rather, they have to plead a compelling inference; that Dr. Seeto believed that those concerns were valid.  That the LCD, in fact, did not cover this kind of testing.

And we cite in our case -- in our papers the *iRhythmn* case, which involved a similar internal warning by an expert that Medicare was likely to not grant -- or likely to bring down rates, where the Court found that that purported warning didn't give rise to a compelling inference of scienter because the executive to whom the warning was directed never accepted or agreed or acted upon that warning as truth.  And we think that's exactly what happened here.

Throughout opposing counsel's presentation on scienter, he referenced back to scienter allegations, which really have been in the case from day one.

FE10's allegations around reimbursement issues, to be very clear, are not new allegations.  Those allegations were previously rejected as insufficient to establish a compelling

inference of scienter, with good reason.  And that is because FE10 joined CareDX one month before the end of the class period and, thus, wasn't there to witness the relevant events that were at issue in the case.

FE10, which opposing counsel picked up on or emphasized, cited that 90 percent of CareDX's clients were receiving monthly testing.  Well, there's nothing in the Amended Complaints or any Amended Complaint that describes where that number comes from, what patient population that applies to, whether it's all of CareDX's patients or not.  It lacks particularization.

And, in addition, or likewise as to FE1, those allegations regarding concerns about the RemoTrac bundling and the possibility of there being medically unnecessary tests, again, are not new and date back to the First Amended Complaint.

Importantly, as to FE1, there are no allegations that connect FE1 and his concerns to any of the individual defendants.  He does not name, for instance, Dr. Maag or Dr. Seeto in any of those allegations.

And, again, this was subject to multiple rounds of prior briefing.  FE1 is alleging that he undertook a review of patient records for patients in RemoTrac and found that some of the tests that were ordered were not medically necessary.

Well, the Complaint doesn't plead or add any new detail as to what that review of patient records included, how many

patients were included, what the basis were for the conclusion that those tests were medically unnecessary.  Which brings this case four square to the Ninth Circuit's decision in the *Endologix* case, where the plaintiffs also tried to rely on a confidential witness's review of records, but didn't provide the necessary specifics to allow the Court to credit that confidential witness's bottom line conclusions.

The allegations around motive are all generalized allegations of motive that served CareDX's investors' interest as much as they served the interests of Dr. Maag or Dr. Seeto.  In other words, they are not particularized or individualized motives that apply to Dr. Seeto or Dr. Maag, such as stock sales.

CareDX was a start-up that was regularly, like most start-ups, in the business of going to the market to finance itself through securities offerings.  That happened, as the Complaint pleads, at least three times during the class period.  That alone is an insufficient motive as to why the company would have defrauded investors.

And then, finally, there were allegations around the KOAR study that Dr. Seeto and Dr. Maag must have known about those payments because of various allegations around their approval of expenses.

Well, the allegations that plaintiff cite to as to Dr. Seeto were allegations that as of a point in time in 2021

or 2022, as the company came under investigation by the Department of Justice, at some point there was a policy instituted where Dr. Seeto had to approve certain expenses.

But the KOAR study, as the Complaint pleads in Paragraph 189, began in 2018. That was before this policy was purportedly instituted.

And, likewise, the testimony that they cited to to Dr. Maag was that he approved marketing expenses. This is a scientific study that the company was sponsoring. There aren't allegations that the KOAR study was in the ambit of the expenses that Dr. Maag was specifically approving. Nor, for that matter, did plaintiffs allege or argue in the opposition brief, or even in the letter they put in this morning, that these specific expenses that they are claiming were wrongful as to KOAR were actually approved by Dr. Maag or Dr. Seeto.

Thank you, Your Honor.

**THE COURT:** Thank you. Final word.

**MR. DAVIS:** The final word. Thank you, Your Honor.

In terms of authorities, I would just direct the Court's attention to an authority that Your Honor cited in the September 18, 2024 order with respect to the falsity analysis, and that was the *Omar versus NVDIA* decision recently handed down by the Ninth Circuit, and with particular attention to how the Ninth Circuit addressed statements provided by FE2, who was a witness in that case and had direct knowledge going to the

individual defendant's knowledge about an issue that was at the heart of that case.  As the Court referenced, it was the amount of sales they were making to cryptominers in that case.  That was the heart of the issue in this case.

Similar here, what we have is statements from a former employee, Dr. Olymbios, who provides statements directly linking Dr. Maag and Dr. Seeto to the Complaint that is at the -- the issue that is at the heart of this case; namely, whether during the class period CareDX was pushing sales of medically unnecessary tests and then billing Medicaid for them.

Just tie up a couple of small points, Your Honor.  Mention was made of FE10, that he had joined later in the class period.  And the question, I think, that's implied is how could he know about why Medicare was rejecting patients toward the end of the class period.  I think that was the argument.  FE10 was reviewing records toward the end of the class period that were backward looking.  That's how.  That's how he was able to figure that out.

In terms of the details that defendants are seeking, there are additional details that both Seeto and Maag were very hands-on, very detailed oriented.  It doesn't carry the day, but it's a piece of the scienter puzzle that we ask the Court to consider when it's evaluating whether a reasonable person could conclude on a 50/50 basis that Maag or Seeto knew about this scheme to allegedly bill Medicare for medically

unnecessary tests, Your Honor.

As far as the DOJ goes, we do cite -- we cite authorities in our papers, Your Honor, where the Ninth Circuit advises us not to -- that these actions by government officials should not be used to discredit scienter. And there and the Supreme Court give a number of reasons why that's the case.

The truth is, we don't know why the DOJ did not continue. What we do -- what we believe we can prove today, and granted these are allegations, is that when Medicare learned about the problems, it did cut back and stop funding these medically unnecessary tests. So Medicare mitigated the harm there.

In addition, what we know is the Court will recall the advisory board meetings, the chief medical officer, Dholakia, is gone. The chief marketing officer, Sasha King, is gone. Dr. Seeto himself, a week after oral argument last year in this case stepped down from CEO position. I can't say more on that, but he's no longer in a leadership position.

And it could be possible that the DOJ is weighing these factors in allowing the -- Dr. Olymbios to pursue litigation on behalf of and in the name of the United States against CareDX for violating the False Claims Act and engaging in these inducements.

So it's not a clean bill of health, Your Honor, that the defendants would argue and the Ninth Circuit and the Supreme Court provide guidance on why that's the case.

And with that, unless the Court has additional questions, I would rest.

THE COURT:  Thank you.

Thank you both for being always exceptionally prepared, and the PowerPoint is helpful, and for answering my direct questions.

As you know, I let you argue almost exclusively without interruption, so thank you.

I anticipate that the order will be available to you within the next 7 to 14 days.  I wanted to take a look at our next court date, if you give me a moment.

(Brief pause.)

THE COURT:  Let's see.  Robert.

(Discussion held off the record between the Court and the Courtroom Deputy.)

THE COURT:  All right.  April 10th is hereby maintained and, as you know, your class certification briefing will start April 4th.

All right.  This is the -- as you know, the Third Amended Complaint is the last amendment that the Court is allowing. And so the order within 7 to 14 days will be clear enough for us to begin with regards to the next phase of the case.

So thank you.

MR. DAVIS:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. CORDING:  Thank you, Your Honor.

THE CLERK:  Thank you all.  That concludes the calendar and court is now adjourned.  Thank you.

(Proceedings adjourned.)

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, February 24, 2025