ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
        – and –
SPENCER A. BURKHOLZ (147029)
THEODORE J. PINTAR (131372)
HEATHER G. GEIGER (322937)
NICOLE Q. GILLILAND (335132)
EVELYN SANCHEZ GONZALEZ (360232)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
tedp@rgrdlaw.com
hgeiger@rgrdlaw.com
ngilliland@rgrdlaw.com
egonzalez@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL UNION #295 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CAREDX, INC., et al., <br><br> Defendants. | Case No. 3:22-cv-03023-TLT (Securities Case) <br><br> <u>CLASS ACTION</u> <br><br> JOINT DECLARATION OF JASON C. DAVIS AND JOSHUA H. SALTZMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF PLAN OF ALLOCATION; AN AWARD OF ATTORNEYS' FEES AND EXPENSES; AND AWARDS TO LEAD PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4) <br><br> DATE:    December 2, 2025 <br> TIME:    2:00 p.m. <br> DEPT:    Courtroom 9, 19th Floor <br> JUDGE:   Honorable Trina L. Thompson |

JOINT DECL. OF JASON C. DAVIS & JOSHUA H. SALTZMAN
CASE NO.: 3:22-CV-03023-TLT
4907-9428-9772.v2

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ........................................................................................2

II.     SUMMARY OF LEAD PLAINTIFFS' CLAIMS .............................................................7

III.    RELEVANT PROCEDURAL HISTORY ........................................................................7

        A.      Commencement of the Action and Appointment of Lead Plaintiffs .....................7

        B.      Lead Counsel's Thorough Investigation Undertaken for Filing the
                Amended Complaints...........................................................................................8

        C.      Defendants' Repeated Challenges to the Complaints...........................................8

        D.      Lead Plaintiffs' Discovery and Class Certification Efforts .................................10

IV.     MEDIATION AND SETTLEMENT ...............................................................................11

V.      RISKS FACED BY LEAD PLAINTIFFS IN THE ACTION CONFIRM THE
        SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ....................................11

        A.      Risks Relating to Class Certification ...................................................................12

        B.      Risks Concerning Falsity, Scienter, and Loss Causation/Damages......................12

        C.      The Settlement Is Reasonable in Light of the Potential Recovery in the
                Action................................................................................................................14

VI.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER......................................................................................................15

VII.    PLAN OF ALLOCATION ..............................................................................................17

VIII.   LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS'
        FEES AND LITIGATION EXPENSES............................................................................18

        A.      The Requested Attorneys' Fees Are Reasonable..................................................18

                1.      The Exceptional Outcome Is the Result of Significant Time and
                        Labor that Lead Counsel Devoted to the Action .......................................18

                2.      Lead Plaintiffs Support the Fee Application..............................................20

                3.      The Unique Complexities of the Litigation ...............................................21

                4.      Standing and Expertise of Lead Counsel....................................................22

        B.      Request for Litigation Expenses ..........................................................................23

        C.      Lead Plaintiffs Should Receive Awards Pursuant to the PSLRA..........................23

        D.      The Reaction to Date of the Class to the Fee and Expense Application...............24

IX.     COUNCIL OF INSTITUTIONAL INVESTORS .............................................................25

X.        CONCLUSION.................................................................................................................25

**EXHIBIT LIST**

| Exhibit | Description |
| --- | --- |
| A | Declaration of Ginger Sigler Filed on Behalf of Oklahoma Police Pension and Retirement System in Support of (I) Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) |
| B | Declaration of Tom Klingenberg Filed on Behalf of Sheet Metal Workers Local 19 Pension Fund in Support of (I) Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) |
| C | Declaration of Kim MacPherson in Support of Plaintiffs' Motion for Final Approval of Settlement |
| D | Declaration of Luke Skelton in Support of Plaintiffs' Motion for Final Approval of Settlement |
| E | Declaration of Kathleen Brauns Regarding: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; (C) Establishment of Settlement Website and Call Center Services; and (D) Report on Exclusions and Objections |
| F | Cornerstone Research, *Securities Class Action Settlements: 2024 Review & Analysis* (2025) |

We, Jason C. Davis and Joshua H. Saltzman, hereby declare as follows:

1.    Jason C. Davis is a Partner in the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and is an attorney duly licensed to practice in this District and before all courts of the State of California.  Joshua H. Saltzman is a Director in the law firm of Saxena White P.A. ("Saxena White") and is an attorney duly licensed to practice before all courts of the State of New York and has been admitted *pro hac vice* in this Action.[1]  Together, Robbins Geller and Saxena White have been appointed as Lead Counsel for Lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief & Retirement Fund (together, "Lead Plaintiffs" or "Plaintiffs") and the Class.  We have been actively involved in the prosecution and resolution of this Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein based on our active participation in and supervision of all material aspects of the Action.

2.    We respectfully submit this declaration in support of: (i) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (the "Final Approval Motion" or "Final Approval Memorandum"); and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee Motion" or "Fee Memorandum"), both filed contemporaneously herewith.

3.    As set forth in the Final Approval Memorandum, Lead Plaintiffs seek final approval of the $20,250,000 Settlement for the benefit of the Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Class Members.

4.    As set forth in the Fee Memorandum, Lead Counsel seek an award of attorneys' fees in the amount of 25% of the Settlement Fund (*i.e.*, $5,062,500, plus interest earned at the same rate as the Settlement Fund), an award of Lead Counsel's litigation expenses in the total amount of $368,880.02 (plus interest accrued thereon), and $20,640 to Lead Plaintiffs pursuant to the

---

[1] All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation of Settlement (ECF 177-2) (the "Stipulation").  Unless otherwise noted, all emphasis is added, and citations are omitted.  All references to "Ex. ___" are to the exhibits hereto.

Private Securities Litigation Reform Act of 1995 ("PSLRA") in connection with their representation of the Class.

5.	On July 23, 2025, the Court granted preliminary approval of the Settlement and directed notice of the Settlement to be disseminated to the Class.  ECF 185 (the "Preliminary Approval Order").

6.	Since then, the Court-approved Claims Administrator, A.B. Data, Ltd. ("A.B. Data" or the "Claims Administrator"), has directly notified potential Class Members of the Settlement by mail and email in accordance with the Preliminary Approval Order.  *See* Ex. E hereto (Declaration of Kathleen Brauns Regarding: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; (C) Establishment of Settlement Website and Call Center Services; and (D) Report on Exclusions and Objections ("Brauns Decl."), ¶¶4-12).  Summary Notice was also published in *The Wall Street Journal* and transmitted over the *PR Newswire*.  *Id.*, ¶13.  Notice was also provided via an official website for the Settlement maintained by A.B. Data at www.CareDxSecuritiesLitigation.com (the "Settlement Website").  *Id.*, ¶14.

7.	Pursuant to the Stipulation, Defendants caused the $20,250,000 Settlement Amount to be deposited in an escrow account for the benefit of the Class.  At Lead Counsel's instruction, the funds deposited in the escrow account have been invested in instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, are earning interest, and will be ready and available for distribution to the Class upon the Court's approval of the Final Approval Motion and the Claims Administrator's completion of claims processing.

8.	This declaration provides the Court with a detailed procedural history of the Action, highlights of the events leading to the Settlement, and the basis upon which Lead Counsel and Lead Plaintiffs recommend the approval of the $20,250,000 Settlement, as well as the approval of the request for attorneys' fees and litigation expenses.

## I.	PRELIMINARY STATEMENT

9.	Following three years of extensive investigation and litigation efforts, Lead Plaintiffs and Lead Counsel secured an outstanding recovery of $20,250,000 on behalf of a class

consisting of all persons or entities who purchased CareDx, Inc. common stock between May 1, 2020 and November 3, 2022, inclusive ("Class Period"), and were damaged thereby (the "Class"). The Settlement is an extraordinary result for the Class, which faced the risk of a much smaller recovery – or no recovery at all – had the case continued through class certification, summary judgment, trial, and inevitable appeals.  Indeed, the Settlement is a particularly strong result when considering CareDx's rapidly wasting insurance policies, diminishing financial condition, which made a larger recovery improbable even if Lead Plaintiffs prevailed at trial and any subsequent appeal.  Notably, the Settlement Amount represents more than Defendants' remaining available insurance funds, which may have been consumed by defense costs and expenses had the Action been further litigated, and includes a meaningful cash contribution from the Company.

10.    The $20,250,000 Settlement Amount greatly exceeds the median settlement amount in securities class action settlements.  If approved, the Settlement will exceed by 40% the $14 million median settlement amount for securities class actions in 2024.  Cornerstone Research, *Securities Class Action Settlements: 2024 Review & Analysis* (2025) at 19.  *See* Ex. F.  It is also 80% higher than the $11.3 million median settlement amount for federal securities class actions from 2015-2023, and more than double the median settlement amount for securities class actions in the Ninth Circuit from 2015-2024.  *Id*. at 1, 20.

11.    This outstanding benefit for the Class was the product of extensive work by Lead Plaintiffs and Lead Counsel.  Indeed, before agreeing to settle this Action, Lead Plaintiffs and Lead Counsel undertook extensive efforts to advance the Class's claims and ensure that Lead Plaintiffs were well-positioned to maximize the Class's recovery.  Lead Plaintiffs' and Lead Counsel's litigation efforts included, among other things, conducting a comprehensive investigation into the events underlying the Class's claims, including: (i) an exhaustive investigation of the relevant claims, including interviews of dozens of former CareDx employees (among them a critical federal whistleblower); (ii) the filing of three detailed amended complaints; (iii) defeating Defendants' motion to dismiss the third amended complaint ("TAC"); (iv) extensive review of documents from Defendants and third parties; (v) consultation with multiple financial and industry experts; (vi) moving for class certification; (vii) exchanging comprehensive mediation statements with

Defendants setting forth the Parties' positions on highly disputed issues in the case; and (viii) engaging in an in-person mediation session assisted by the Hon. Gary A. Feess (Ret.) of Phillips ADR Enterprises, and several subsequent email exchanges and telephone conferences, before the Parties accepted his mediator's recommendation.

12. Lead Plaintiffs undertook these diligent and extensive efforts against a background of significant risks, both legal and practical. From a legal standpoint, while Lead Plaintiffs believe they had credible responses to Defendants' arguments relating to falsity, scienter, loss causation, and damages, the risk remained that Defendants' arguments could have been accepted by the Court on class certification, summary judgment, or by a jury at trial, which could have reduced or entirely eliminated the Class's potential recovery. Moreover, Lead Plaintiffs' case faced additional risks due to the fact that investigations into CareDx's conduct by multiple government agencies all concluded with no finding of wrongdoing, no civil penalties, and no settlements. In September 2023, the SEC formally closed its investigation, declining to pursue any charges. In late 2024, the Department of Justice declined to intervene in Dr. Olymbios's *qui tam* action against CareDx and closed its investigation with no finding of wrongdoing or settlement paid. Lead Plaintiffs further faced a daunting burden in potentially having to prove knowing or reckless underlying Medicare fraud, violations of the False Claims Act ("FCA"), Stark Law, and the Anti-Kickback Statute ("AKS") in order to prove Defendants' statements were false and misleading and made with the requisite scienter. Furthermore, even if Lead Plaintiffs could establish material violations of the FCA, AKS, or Stark Law, any favorable jury verdict would have been subjected to inevitable appeals, the results of which would have been uncertain and lengthy.

13. In addition, from a practical standpoint, at the time of Settlement, CareDx had limited and rapidly wasting available insurance funds, diminished financial condition, and limited cash on hand. As of March 31, 2025, right before the April 1, 2025 mediation, CareDx had just $88 million in cash and cash equivalents – a 23% decline from December 31, 2024. Additionally, the Company has suffered net losses in nearly every quarter for the past five years. Under these circumstances, even if Plaintiffs prevailed at trial and any subsequent appeals, there is a significant

risk that CareDx ultimately would have been unable to pay any resulting judgment while also staying in business as a going concern.

14. As set forth in their moving papers, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement represents an outstanding recovery for the Class that is supported by each of the factors that the Ninth Circuit advises courts to consider in the final approval process, as set forth in Rule 23(e)(2) of the Federal Rules of Civil Procedure, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), and *In re Bluetooth Headset Products Liability Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011).

15. In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable. To prepare the Plan of Allocation, Lead Plaintiffs engaged Chad Coffman, CFA, a highly experienced economic expert with extensive experience in preparing similar settlement plans of allocation, which have been accepted by numerous courts. Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Class who timely submit valid proofs of claim based on their "Recognized Loss Amount" as calculated pursuant to the Plan of Allocation. As detailed in the Final Approval Memorandum, this methodology is standard in securities fraud class action settlements and has been approved by courts nationwide.

16. Lead Counsel also request an award of attorneys' fees for their extensive efforts and the extraordinary recovery obtained for the benefit of the Class, and an award of their litigation expenses. Lead Counsel litigated this Action on a wholly contingent basis, advancing and incurring litigation expenses, charges, and costs over several years without any guarantee of recovery. The requested fee of 25% of the Settlement Fund is fair, reasonable, and warrants the Court's approval. Indeed, as detailed in the Fee Memorandum, the requested fee is consistent with fee awards regularly awarded by courts in comparable securities class action settlements. The reasonableness of Lead Counsel's request is further supported by a lodestar cross-check, which results in a negative multiplier of 0.88 on Lead Counsel's lodestar through September 15, 2025.

17. Lead Counsel also seek payment of $368,880.02 (plus interest accrued thereon) for expenses, costs, and charges reasonably and necessarily committed to the litigation of this Action

over the last three years.  These expenses, charges, and costs are the type typically incurred by plaintiffs in similar cases (and, indeed, virtually any litigation), including online legal and factual research, e-discovery services, expert witness and consultant fees, travel expenses, and mediation fees.  These expenses were reasonable and necessary in order to achieve the Settlement.

18.     Both the Settlement and Lead Counsel's fee request have been approved by Lead Plaintiffs Oklahoma Police Pension and Retirement System, Sheet Metal Workers Local 19 Pension Fund, Local 353, I.B.E.W. Pension Fund, and Beaumont Firemen's Relief & Retirement Fund, each sophisticated institutional investors with significant financial interests in the outcome of the case.  *See* Exs. A-D (Declaration of Ginger Sigler Filed on Behalf of Oklahoma Police Pension and Retirement System in Support of (I) Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Oklahoma Police Decl."), ¶¶4-5; Declaration of Tom Klingenberg Filed on Behalf of Sheet Metal Workers Local 19 Pension Fund in Support of (I) Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Local 19 Decl."), ¶¶4-5; Declaration of Kim MacPherson in Support of Plaintiffs' Motion for Final Approval of Settlement, filed on behalf of Local 353, I.B.E.W. Pension Fund ("Local 353 Decl."), ¶¶4-5; and Declaration of Luke Skelton in Support of Plaintiffs' Motion for Final Approval of Settlement, filed on behalf of Beaumont Firemen's Relief & Retirement Fund ("Beaumont Fire Decl."), ¶¶4-5).  Because institutional investors are precisely the type of lead plaintiff envisioned by Congress in enacting the PSLRA, Lead Plaintiffs' strong endorsement of the Settlement here is entitled to significant weight by the Court in considering whether to grant final approval of the Settlement and Lead Counsel's requested fee and expense award.

19.     Finally, in accordance with the PSLRA, Lead Plaintiffs seek awards in connection with their representation of the Class.  Collectively, Lead Plaintiffs seek the modest sum of $20,640, in the amounts of $6,300 for Oklahoma Police Pension and Retirement System, $7,500

for Sheet Metal Workers Local 19 Pension Fund, $3,340 for Local 353, I.B.E.W. Pension Fund, and $3,500 for Beaumont Firemen's Relief & Retirement Fund. Lead Plaintiffs together expended considerable time and effort in actively supervising the litigation over a multi-year period, and the requested service awards reflect only a portion of their time and efforts, as detailed in the accompanying declarations. *See* Exs. A-D.

## II.    SUMMARY OF LEAD PLAINTIFFS' CLAIMS

20.    Lead Plaintiffs' claims in the Action are stated in the TAC, which alleges, among other things, that Defendants violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Exchange Act.

21.    The TAC alleges that throughout the Class Period, Defendants made false and misleading statements about CareDx's compliance with federal healthcare laws and about the sources and legitimacy of the Company's revenue, while failing to disclose that it was engaged in improper billing of Medicare for medically unnecessary tests and that it was providing improper kickbacks to prescribing doctors. The TAC further alleges that, when the truth came out gradually through a series of corrective disclosures, CareDx's stock price fell precipitously.

22.    Defendants have denied and continue to deny that they engaged in any wrongdoing or committed any act or omission giving rise to any liability and/or violation of law. Defendants have asserted numerous defenses to liability (which, if the Action proceeded, they would likely raise at class certification, summary judgment, and trial), including, among others, that no material misstatements or omissions were made, that Lead Plaintiffs would not be able to establish that Defendants acted with the requisite scienter, and that the post-Class Period revelations did not cause the loss. Defendants would further assert that Lead Plaintiffs face particularly significant obstacles in proving damages, and would have vigorously opposed class certification.

## III.    RELEVANT PROCEDURAL HISTORY

### A.    Commencement of the Action and Appointment of Lead Plaintiffs

23.    On May 23, 2022, Plumbers & Pipefitters Local Union #295 Pension Fund filed the original securities class action complaint, thereby commencing this Action. ECF 1.

24.     On July 22, 2022, Lead Plaintiffs filed their unopposed motion for an order appointing them as lead plaintiffs in the case and approving their selection of lead counsel.  ECF 31.  On August 25, 2022, the Court granted Lead Plaintiffs' motion, appointing Lead Plaintiffs and approving Robbins Geller and Saxena White as Lead Counsel.  ECF 43.  A few days later, the case was reassigned to this Honorable Court.  ECF 44.

**B.     Lead Counsel's Thorough Investigation Undertaken for Filing the Amended Complaints**

25.     Prior to the filing of the initial complaint, Lead Counsel had begun an exhaustive investigation into the facts underlying the Action.  This investigation continued as the litigation progressed and included a comprehensive review and analysis of: (i) CareDx's public filings with the SEC and materials posted on the Company's website; (ii) press releases and other public statements issued by CareDx, including during earnings calls and conference calls with analysts and investors; (iii) research reports by securities analysts covering CareDx; (iv) publicly available news articles, press releases, documents, and other information regarding CareDx and the broader industry in which CareDx operates; (v) data and other information regarding CareDx securities; (vi) expert economic analyses; (vii) expert accounting analyses; (viii) expert medical analyses; (ix) Michael Olymbios' Complaint and Petition for Declaratory Judgment, in *Olymbios v. CareDx, Inc.*, No. 22-CIV-01582 (Cal. Super. Ct. San Mateo Cnty.), email communications from Dr. Olymbios, and discussions with Dr. Olymbios and his counsel; and (x) the whistleblower complaint in the U.S. District Court for the Eastern District of New York, *U.S. v. CareDx, Inc.*, No. 1:21-cv-0774-AMD-LKE, ECF 1 (E.D.N.Y.).

26.     Lead Counsel also dedicated substantial time and resources to locating and interviewing numerous former CareDx employees with potentially relevant information.  The TAC ultimately included allegations from 21 confidential witnesses interviewed in the course of Lead Counsel's investigation.

**C.     Defendants' Repeated Challenges to the Complaints**

27.     On November 28, 2022, Lead Plaintiffs filed their first amended complaint ("FAC").  ECF 53.  On January 27, 2023, Defendants filed a motion to dismiss and strike portions

of the FAC, accompanied by a request for judicial notice. ECF 58-60. Lead Plaintiffs filed their opposition to the motion to dismiss, the motion to strike, and the request for judicial notice on March 13, 2023. ECF 68-70. Defendants filed their reply briefs on April 13, 2023. ECF 71-73. The Court held a hearing on Defendants' motions on May 16, 2023, and on May 24, 2023, the Court granted Defendants' motions, striking some paragraphs from the FAC and dismissing the FAC entirely, with leave to amend. ECF 75.

28. On June 28, 2023, Plaintiffs filed their second amended complaint ("SAC"). ECF 81. On July 26, 2023, Defendants again moved to dismiss and to strike portions of the SAC with an accompanying request for judicial notice. ECF 89-91. Lead Plaintiffs filed their opposition papers on August 30, 2023 (ECF 96-97), and Defendants filed their reply briefs and another request for judicial notice on September 22, 2023 (ECF 98-100). On September 28, 2023, Defendants filed a motion for leave to file supplemental materials in support of their motions. ECF 101. Lead Plaintiffs opposed that motion on October 5, 2023. ECF 102. The Court denied Defendants' request to file additional materials on October 10, 2023. ECF 103. On October 19, 2023, Lead Plaintiffs submitted a notice of recent decision in connection with the upcoming hearing on the motion to dismiss the SAC. ECF 105. After the hearing on October 31, 2023, both sides filed several notices of recent decision starting on December 18, 2023 and through June 12, 2024 (ECF 112, 113, 117-119).

29. On September 18, 2024, the Court issued an order granting in part and denying in part Defendants' motion to dismiss the SAC and motion to strike portions of the SAC. ECF 123. The Court granted the motion to dismiss the SAC, with leave to amend, having found that scienter was not sufficiently alleged but amendment was not futile. The Court further found that for the claim based on Section 10(b) and Rule 10b-5 claim, Plaintiffs had sufficiently alleged falsity as to statements regarding legal compliance made in CareDx's underwriting agreements and statements regarding testing services revenue and historical RemoTraC data. *Id*. at 43. The Court also found that Plaintiffs had sufficiently alleged loss causation. *Id*.

30. On November 1, 2024, Plaintiffs filed the TAC. ECF 133. On November 15, 2024, Defendants filed a motion to dismiss the TAC, accompanied by a request for judicial notice. ECF

136-137.  Lead Plaintiffs filed their opposition to the motion to dismiss and response to the request for judicial notice on December 13, 2024.  ECF 138-139.  On January 6, 2025, Lead Plaintiffs submitted a statement of recent decision.  ECF 141.  Defendants filed their reply briefs on January 10, 2025, accompanied by another request for judicial notice.  ECF 143-145.  On January 21, 2025, Lead Plaintiffs responded to Defendants' request for judicial notice.  ECF 146.  Defendants responded, filing another brief in support of their request for judicial notice on January 24, 2025.  ECF 147.

31.    Prior to the hearing on the motion to dismiss the TAC, set for January 28, 2025, the Court issued a minute order requesting additional information from the Parties.  ECF 151.  Defendants filed a response to the order on January 27, 2025 (ECF 148), and Lead Plaintiffs submitted a letter to the Court in response on January 28, 2025 before the hearing (ECF 149).  The Court heard oral argument on Defendants' motion to dismiss the TAC on January 28, 2025.  ECF 150.  On February 18, 2025, the Court denied Defendants' motion to dismiss the TAC.  ECF 154.

### D.    Lead Plaintiffs' Discovery and Class Certification Efforts

32.    The Parties thereafter exchanged Initial Disclosures pursuant to Fed. R. Civ. P. 26 and began formal fact discovery and negotiations regarding an ESI Protocol and Protective Order.  Plaintiffs served two sets of Requests for Production of Documents, Interrogatories and several deposition subpoenas and notices, as well as several third-party subpoenas, and Defendants served Interrogatories, Requests for Production of Documents and notices for the depositions of all Plaintiffs.  During this time, Plaintiffs commenced reviewing and analyzing over 2.4 million pages of documents produced by Defendants and third parties.

33.    To facilitate an economical and time-efficient document review process, the majority of documents produced in the litigation were stored and organized in the Relativity electronic database and document review platform.  To identify the most relevant documents efficiently, Lead Counsel leveraged the platform's software and predictive tools whereby machine learning predicted potentially important documents, which were ranked and prioritized for review.  Document reviewers were trained to code documents based on specific issues in the case and their potential relevance to specific deponents.  Lead Counsel also developed and continuously updated

reference resources to aid members of the document review team, including chronologies of significant events, lists of key witnesses, and a glossary of technical terms and acronyms used by CareDx.  Throughout document discovery, senior attorneys monitored the efficiency and quality of the document review, met regularly with more junior and staff attorneys, and discussed key facts uncovered by the review.  In addition, Lead Counsel held weekly calls to discuss the status of discovery and the overall litigation strategy.

34.    On April 18, 2025, Plaintiffs filed their Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel.  ECF 170.  Defendants' opposition to Plaintiffs' motion had not yet been filed at the time of the Settlement.

## IV.    MEDIATION AND SETTLEMENT

35.    The Parties engaged an experienced neutral, third-party mediator, the Hon. Gary A. Feess (Ret.) of Phillips ADR Enterprises, to aid in settlement negotiations.  The Parties participated in an in-person mediation session on April 1, 2025, and exchanged mediation briefs ahead of the mediation session, setting forth their respective arguments concerning liability and damages and their respective views of the merits of the Action.

36.    Though the Parties' initial mediation session was unsuccessful in resolving the case, the Parties continued to have telephonic and email exchanges with Judge Feess regarding a potential resolution.  On April 21, 2025, Judge Feess issued a mediator's proposal to resolve the Action for $20,250,000, which the Parties accepted, subject to the negotiation of the terms of a stipulation of settlement and approval by the Court.

## V.    RISKS FACED BY LEAD PLAINTIFFS IN THE ACTION CONFIRM THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

37.    Based on documents obtained through Lead Counsel's extensive investigation and discovery, and consultation with industry and economic experts, Lead Plaintiffs believe that they have gathered substantial evidence to support their claims and, barring settlement, were preparing to proceed to trial.  Lead Plaintiffs also realized, however, that they faced credible arguments from Defendants, which could have been accepted by the Court at class certification or summary judgment, by a jury after trial, or by an appellate court following Defendants' appeal from a

successful outcome for Plaintiffs on any of these procedural milestones. Likewise, the risk attending CareDx's financial condition, uncertain future, and wasting insurance policies presented a severe collectability risk that further supports approval of the Settlement. In addition, the fact that no regulator or government agency has found that CareDx's conduct was illegal would have remained a significant obstacle to the litigation at summary judgment or trial.

### A. Risks Relating to Class Certification

38. On April 18, 2025, Plaintiffs filed their Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel. ECF 170. The initial motion had already been filed when the Settlement was reached.

39. Defendants were likely to vigorously oppose class certification. For example, Defendants likely would have argued a lack of "price impact" because several of the alleged corrective disclosures did not directly discuss or refer to even the possibility of illegal or improper billing activities. Furthermore, Defendants would likely point out that only one corrective disclosure directly concerned such alleged improper practices, but it merely disclosed the DOJ and SEC investigations, which were later concluded without any action being taken. If Defendants were able to persuade the Court that there was no price impact whatsoever from their statements and disclosures, they would have been able to rebut the so-called "presumption of reliance," thus preventing Plaintiffs from establishing the necessary element of predominance under Rule 23(b)(3) and precluding certification of any class.

### B. Risks Concerning Falsity, Scienter, and Loss Causation/Damages

40. The Court heard three rounds of motions to dismiss and accompanying motions to strike, which were vigorously argued by both sides. Defendants were successful on many of their arguments addressing the FAC and SAC, before Plaintiffs ultimately obtained an entirely favorable ruling on the motion to dismiss the TAC. Indeed, Defendants had already succeeded in dismissing many of the originally alleged false statements, and had twice obtained favorable rulings on scienter before the Court finally upheld Plaintiffs' claims. The Court's detailed rulings on these motions reflected their complexity (ECF 75, 123, and 154).

41. Moreover, even if Plaintiffs were successful in certifying a class, Defendants would have continued to argue at summary judgment and trial that none of their statements were actionably false or misleading, none of their statements were made with fraudulent intent, and none of the corrective disclosures alleged in the TAC were causally connected to the alleged fraud or investors' losses.

42. Specifically, with respect to falsity, Defendants would likely argue that the remaining alleged misstatements – *i.e.*, that CareDx complied with the law, that its testing service revenue was lawfully obtained, and that it had not violated the Stark Law through illegal kickbacks to doctors – cannot be false unless Plaintiffs prove material violations of the underlying applicable statutes, which would be both factually and legally intensive. Defendants would have vigorously maintained that CareDx never violated the False Claims Act, Anti-Kickback Statute, Stark Law, or other healthcare laws, and would have similarly maintained that their revenues were not dependent on any illegal or improper conduct. Compounding this, Defendants would have continued to highlight the fact that multiple regulators who investigated CareDx on similar allegations declined to pursue further action against the Company.

43. Moreover, even if Plaintiffs could prove that any of Defendants' statements were false and misleading when made, Plaintiffs also would have had to prove scienter, *i.e.*, that the statements were knowingly or recklessly false. Defendants would have continued to argue that, even assuming that any of their actions arguably violated any laws, they made good faith attempts to comply with the law and/or had good faith bases to believe their actions were proper under the applicable laws, and did not knowingly or intentionally violate any such laws. Defendants further contended that the CareDx whistleblower (Dr. Olymbios), whose allegations and information helped support Plaintiffs' claims, was not credible and could not sustain a finding that Defendants had intended to engage in the misconduct alleged. Defendants also asserted that they had no motive to commit the alleged fraud.

44. With respect to loss causation, Defendants would continue to argue that the stock drops alleged by Plaintiffs did not reveal any fraud, and that only one of them was even expressly related to the underlying alleged improper conduct. For example, Defendants would have

continued to argue that the October 28, 2021 corrective disclosure revealed only that government investigations were occurring – not that they had found wrongdoing – and thus could not have revealed fraud to the market.  With respect to the other corrective disclosures – which primarily concerned negative financial results and/or executive resignations – Defendants would have continued to argue that the disclosures revealed no information whatsoever that expressly related to any alleged healthcare law violations, and that there was no provable link between the disclosed information and the alleged fraud.

45.    While Plaintiffs believe they had viable counterarguments on all of these points, there is no guarantee that discovery would have ultimately supported Plaintiffs' claims, or that the Court or a jury would have upheld them at summary judgment or trial.

**C.    The Settlement Is Reasonable in Light of the Potential Recovery in the Action**

46.    As elaborated in the Final Approval and Fee Memoranda, the $20.25 million Settlement secures a substantial and immediate monetary recovery.  It is more than double the $10 million median settlement amount in securities class actions in the Ninth Circuit over the past decade.  Additionally, this significant recovery for investors not only captures the entirety of Defendants' remaining available directors and officers insurance funds, but also includes a substantial monetary contribution by Defendant CareDx – an uncommon occurrence in securities litigation that is indicative of the Parties' vigorous negotiations and underscores the fairness and adequacy of the Settlement.

47.    Indeed, this result is particularly notable given that CareDx's limited directors' and officers' liability insurance was rapidly depleting in the ongoing litigation, and given that CareDx had a declining cash position and limited financial resources available at the time of settlement.  As Lead Plaintiffs noted in the Motion for Preliminary Approval of Class Action Settlement, the Company's 10-Q filed on April 30, 2025 showed that CareDx had just $88 million in cash and cash equivalents as of March 31, 2025 – an approximate 23% decline from December 31, 2024.

ECF 177 at 12-13.[2]  Moreover, CareDx has suffered net losses in nearly every quarter for the past five years.  During the proposed Class Period, CareDx's stock price traded at levels exceeding $90 per share, but recently it has been trading at approximately $15 per share – and the stock has traded at similar levels since late 2022.  This tends to show that the market does not believe CareDx will improve its financial condition in the foreseeable future.

48.     Given these circumstances, it is unlikely that continued litigation would have led to a meaningfully larger recovery, and it is highly possible that it would have led to a smaller recovery, or no recovery at all, as Defendants' available insurance and other funds continued to dwindle.

## VI.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER

49.     Pursuant to the Preliminary Approval Order, the Court approved the form and content of the Postcard Notice, Notice, and Summary Notice (collectively, the "Settlement Notices").  The Court also appointed A.B. Data as the Claims Administrator in the Action and instructed it to disseminate copies of the Postcard Notice to all Class Members who can be identified with reasonable effort, as well as to nearly 5,000 brokerage firms, banks, and other entities that regularly act as "nominees" for beneficial purchasers of stock.  A.B. Data was also instructed to post the Notice and Claim Form on the Settlement Website and further to publish Summary Notice in *The Wall Street Journal* and over the *PR Newswire*.

50.     Lead Plaintiffs fully complied with the Court's order.  The Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on August 14, 2025.  Beginning on August 14, 2025, Postcard Notices were emailed or mailed to all known potential Class Members as well as to the institutions on A.B. Data's proprietary database of banks, brokers, and other nominees who hold shares on behalf of beneficial purchasers.  *See generally* Brauns

---

[2] CareDx's financial condition has continued to worsen since the Settlement was reached. CareDx's most recent Form 10-Q filed on August 6, 2025 disclosed that the Company's cash and cash equivalents as of June 30, 2025 had fallen even lower in the most recent quarter, to approximately $68 million. *See* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001217234/ce703000-b920-4d4a-802d-0f634f865580.pdf.

Decl. The letter sent to the entities on A.B. Data's propriety list of nominees notified the nominees of the Settlement and requested that within seven days, they either (i) request additional copies of the Postcard Notice to send to the beneficial owners of the securities (which they would then provide to the beneficial owners within seven days of receipt), or (ii) provide to A.B. Data the names and addresses of such beneficial owners so that A.B. Data could provide the Postcard Notice directly.

51. As of September 30, 2025, A.B. Data has disseminated a total of 31,190 copies of the Postcard Notice to potential Class Members and their nominees. *See id.*, ¶12.

52. The Settlement Website, which allows for Class Members to submit online claim filings, went live on August 14, 2025, and included downloadable copies of the Stipulation, the Preliminary Approval Order, the Notice, the Claim Form, and other relevant documents. *Id.*, ¶¶14-16.

53. The Notice, previously approved by the Court, advises potential Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the Settlement Hearing. The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed Plan of Allocation. As explained in the Final Approval Memorandum and as previously noted by the Court, this notice program is "(i) the best notice practicable; (ii) reasonably calculated, under the circumstances, to apprise the Class members of the proposed [S]ettlement and of their right to object or to exclude themselves as provided in the settlement agreement; (iii) reasonable and constitute due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) meet all applicable requirements of due process and any other applicable requirements under federal law." *See* Preliminary Approval Order at 9.

54. Pursuant to the terms of the Preliminary Approval Order, the deadline for Class Members to submit objections to the Settlement, the Plan of Allocation, or the fee and expense application, or to request exclusion from the Class is October 14, 2025. To date, no objections have been filed and no requests for exclusion have been received. *See* Brauns Decl., ¶¶20-21.

55.     Should any objections to the Settlement or requests for exclusion be received, Lead Plaintiffs will address them in their reply papers, which will be filed on October 28, 2025.

## VII.     PLAN OF ALLOCATION

56.     In the Court-approved Notice, Lead Plaintiffs proposed a plan to allocate the Net Settlement Fund among Class Members who submit valid proofs of claim.  The objective of the proposed Plan of Allocation is to distribute the Settlement proceeds equitably, on a *pro rata* basis, to those members of the Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

57.     The Plan of Allocation is based on the premise that the decrease in the price of CareDx's common stock on the first trading dates after the series of corrective disclosures may be used to measure the alleged artificial inflation of the price of CareDx common stock prior to the disclosures.

58.     Lead Plaintiffs engaged Chad Coffman, CFA to assist in formulating the Plan of Allocation.  Mr. Coffman calculated the amount of estimated artificial inflation in the per share closing price of CareDx common stock that was allegedly proximately caused by Defendants' false and misleading statements.  In so doing, Mr. Coffman considered price changes in CareDx common stock in reaction to the alleged corrective disclosures, adjusting for any price changes attributable to market or industry forces.  Calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

59.     An individual claimant's recovery under the Plan of Allocation will depend on several factors, including when the claimant purchased or acquired CareDx common stock during the Class Period, in what amounts, and if any common stock was sold, when it was sold and in what amounts, as well as the number of valid claims filed by other claimants.

60.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that claimant.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose payments are $10.00 or greater.  In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

61.    The Notice set forth and explained the proposed Plan of Allocation to potential Class Members.  It was prepared in consultation with Lead Plaintiffs' expert, tracks a theory of damages asserted by Lead Plaintiffs, is substantially similar to numerous other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate to the Class as a whole.  To date, there have been no objections to the proposed Plan of Allocation, further underscoring its fairness.

## VIII.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES

62.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees of 25% of the Settlement Fund. Lead Counsel also request an award of expenses that Lead Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $368,880.02, plus interest earned at the same rate as the Settlement Fund.  Finally, Lead Counsel request awards to Lead Plaintiffs in the amounts of $6,300 for Oklahoma Police Pension and Retirement System, $7,500 for Sheet Metal Workers Local 19 Pension Fund, $3,340 for Local 353, I.B.E.W. Pension Fund, and $3,500 for Beaumont Firemen's Relief & Retirement Fund, pursuant to 15 U.S.C. §78u-4(a)(4) in connection with their representation of the Class.  The legal authorities supporting a benchmark 25% fee award and expense award are set forth in the accompanying Fee Memorandum, filed contemporaneously herewith.

### A.    The Requested Attorneys' Fees Are Reasonable

#### 1.    The Exceptional Outcome Is the Result of Significant Time and Labor that Lead Counsel Devoted to the Action

63.    The work undertaken by Lead Counsel in investigating and prosecuting the Action and arriving at the Settlement in the face of substantial risks has been time-consuming and

challenging.  At all times throughout the pendency of the Action, for a period of over three years, Lead Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Class.

64.     Submitted herewith are declarations from Robbins Geller and Saxena White in support of an award of attorneys' fees and litigation expenses.  *See* Declaration of Jason C. Davis Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support for Application of Award of Attorneys' Fees and Expenses ("Robbins Geller Decl.") and Declaration of Joshua H. Saltzman Filed on Behalf of Saxena White P.A. in Support of Application for Award of Attorneys' Fees and Expenses ("Saxena White Decl.").  The declarations show that Lead Counsel have expended more than 8,700 hours in the prosecution of this Action and set forth tables reflecting the lodestar of each individual who worked on this case from its inception and their position, through and including September 15, 2025, a summary of hours by category, and attaches the firm resumes. The tables in the exhibits to the declarations from Robbins Geller and Saxena White were prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel. Time expended in preparing the application for fees and expenses has been excluded.

65.     Accordingly, the recovery obtained for the Class was the result of thorough and diligent investigative efforts, motion practice, extensive discovery efforts, and hard-fought settlement negotiations.  As a result of this Settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or a significantly lower recovery) in the absence of a settlement.

66.     Aside from showing the significant effort involved in reaching this result, the exhibits to Lead Counsel's declarations confirm that a lodestar cross-check fully supports the requested award.

67.     Lead Counsel believe that the time of Lead Counsel attorneys and staff was reasonable, and necessary for the effective and efficient prosecution and resolution of the Action. The prosecution of this case was undertaken with a focus on efficiency and the avoidance of duplication.  Despite the duration of the case and the time-intensive nature of the work, the knowledge and experience of the personnel who worked the most on the matter was utilized to

optimize the outcome for the Class. Additionally, numerous attorneys contributed to the successful prosecution of the case in many significant ways. For example, several senior attorneys at Robbins Geller and Saxena White were intimately involved in litigating, mediating, and ultimately resolving the case. Lead Counsel took steps to avoid duplication of efforts (both as between lawyers at Robbins Geller and Saxena White and internally at each firm).

68. The requested fee of 25% of the Settlement Fund equals $5,062,500 (plus interest earned at the same rate as the Settlement Fund). Lead Counsel collectively spent 8,758.85 hours in connection with the Action (4,275.10 hours from Robbins Geller, *see* Ex. A to Robbins Geller Decl.; 4,483.75 hours from Saxena White, *see* Ex. A to Saxena White Decl.), resulting in a total lodestar of $5,729,546.00. Accordingly, as set forth above and in detail in Lead Counsel's Declarations, the requested fee represents a negative multiplier of 0.88 to Lead Counsel's lodestar.

69. Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with A.B. Data to resolve any issues with Claims submitted by Class Members, will draft and file a submission regarding the status of the notice process and address any objections to the Settlement or requests for exclusions, and will oversee the distribution process. No additional compensation will be sought for this work. Thus, the multiplier will be smaller by the time the case ultimately concludes. As detailed in the Fee Memorandum, this level of multiplier is far below the range of multipliers regularly approved in this Circuit and strongly indicates that the 25% request is fair and reasonable.

### 2.     Lead Plaintiffs Support the Fee Application

70. As set forth in their declarations, Lead Plaintiffs have evaluated the Settlement and concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Class Members, and the risks of the Action. *See* Exs. A-D. Lead Plaintiffs – all institutional investors – have been intimately involved in this case since its earliest stages, and their endorsement of Lead Counsel's fee request supports its reasonableness and should be given weight in the Court's consideration of the fee award.

### 3.    The Unique Complexities of the Litigation

71.    The risks faced by Lead Counsel in prosecuting this Action are highly pertinent to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through class certification, summary judgment, a trial, and the appeals that would likely follow.  As discussed above, Lead Counsel and Lead Plaintiffs faced significant risks to proving Defendants' liability, loss causation, and damages if the Action continued, especially in light of the fact that CareDx has limited insurance and Company funds, and since, to date, no regulator or government agency has found that CareDx's conduct was illegal.

72.    In addition to the case-specific litigation risks discussed above, there are general risks of securities class actions that should be considered, such as the applicable stringent PSLRA requirements and the case law interpreting it, and the fact that the Action was undertaken on a fully contingent basis.  Lead Counsel understood from the outset that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of compensation for their substantial investment of time and their advancement of expenses.  Lead Counsel were required to ensure that sufficient resources (*e.g.*, attorney and support staff time) were dedicated to the prosecution of the Action, and that funds were available to compensate vendors and consultants, and to cover the considerable out-of-pocket costs that a case such as this typically demands.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on ongoing basis.  Lead Counsel have already dedicated over 8,700 hours in prosecuting this Action for the benefit of CareDx investors without compensation for their efforts.

73.    Lead Counsel also bore the risk that no recovery would be achieved (or that a judgment could not be collected, in whole or in part).  Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as here, is never assured.  Lead Counsel are cognizant that the commencement and ongoing prosecution of a class action does not guarantee a settlement.  For example, there are many appellate decisions affirming summary judgments and directed verdicts for defendants showing that even surviving a motion to dismiss is no guarantee

of recovery. Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. Additionally, a plaintiff who succeeds at trial still may find its verdict overturned on appeal. In such cases, despite their efforts, counsel for plaintiffs earned no fee at all – a risk Lead Counsel took on here as they vigorously prosecuted for over three years the claims brought on behalf of CareDx investors.

74. Thus, Lead Counsel's diligent efforts in the face of substantial risks and uncertainties have resulted in a significant and immediate recovery for the benefit of the Class. In circumstances such as these, and in consideration of Lead Counsel's substantial effort and the very favorable result achieved, the requested fee of 25% of the Settlement Fund is reasonable and should be approved. *See generally* Fee Memorandum.

### 4. Standing and Expertise of Lead Counsel

75. The skill and diligence of Lead Counsel also supports the requested fee. Robbins Geller's expertise and experience in securities litigation is set forth in the firm's resume, which is Exhibit G to the Robbins Geller Declaration. The expertise and experience of Saxena White's attorneys are described in its firm resume, attached as Exhibit D to the Saxena White Declaration.

76. Lead Counsel believe their extensive experience in the securities field (and the ability of their attorneys) added valuable leverage during settlement negotiations. Indeed, the substantial result achieved for the Class here reflects the superior quality of Lead Counsel's representation.

77. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of their opposition. Defendants were represented by experienced attorneys from Willkie Farr & Gallagher LLP, a firm with a reputation for vigorous advocacy in the defense of complex civil cases. Despite this formidable opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Class.

### B.    Request for Litigation Expenses

78.    Lead Counsel also seek payment from the Settlement Fund of $368,880.02 in litigation expenses reasonably and necessarily incurred in connection with commencing and prosecuting the Action.

79.    Lead Counsel were aware from the beginning of the Action that they may not recover any of their expenses and, at the very least, would not recover anything unless and until the Action was successfully resolved.  Thus, Lead Counsel took steps to reduce expenses where practicable without jeopardizing the vigorous and efficient prosecution of the case.

80.    Lead Counsel's declarations summarize by category the expenses incurred by Lead Counsel in connection with the prosecution of this Action.  *See* Ex. C to Robbins Geller Decl. and Ex. C to Saxena White Decl.  The expenses are reflected in the books and records maintained by Lead Counsel.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

81.    The expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in complex commercial litigation and routinely paid by non-contingent clients in the private legal marketplace.  Lead Counsel's expenses include court costs and mediation fees, process servers, online legal and factual research, expert and consultant fees, costs related to the document productions and data hosting and analysis on an eDiscovery platform, printing and reproduction, and postage and delivery expenses.

82.    All of these litigation expenses which total $368,880.02, were necessary for the successful prosecution and resolution of the claims against Defendants.  This total expense amount is well below the $450,000 maximum expense amount contained in the Settlement Notices.

### C.    Lead Plaintiffs Should Receive Awards Pursuant to the PSLRA

83.    The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).  Here, as

explained in their declarations, Lead Plaintiffs are seeking the modest aggregate amount of $20,640 (in the amounts of $6,300 for Oklahoma Police Pension and Retirement System, $7,500 for Sheet Metal Workers Local 19 Pension Fund, $3,340 for Local 353, I.B.E.W. Pension Fund, and $3,500 for Beaumont Firemen's Relief & Retirement Fund) related to their active participation in the Action.  *See* Oklahoma Police Decl., ¶7; Local 19 Decl., ¶7; Local 353 Decl., ¶6; and Beaumont Fire Decl., ¶6.

84.    As discussed in the accompanying Fee Memorandum, numerous courts have approved payments to compensate class representatives for their costs and efforts on behalf of a class.

85.    As discussed in the Lead Plaintiffs' supporting declarations, each of the Lead Plaintiffs have been fully committed to pursuing the Class's claims since they became involved in the litigation over three years ago.  Lead Plaintiffs' efforts required their employees to dedicate time and resources to this Action that would have otherwise been devoted to serving the funds and their beneficiaries.  The efforts expended by Lead Plaintiffs' representatives and employees throughout this Action, as detailed in Exhibits A-D hereto, fully support the instant request for a service award under the PSLRA in connection with services rendered in the Action.

**D.    The Reaction to Date of the Class to the Fee and Expense Application**

86.    As mentioned above, consistent with the Preliminary Approval Order, as of September 30, 2025, a total of 31,190 Postcard Notices have been emailed or mailed to potential Class Members and nominees.  *See* Brauns Decl., ¶12.  The Postcard Notice states that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Amount, plus accrued interest, and payment of expenses in an amount not greater than $450,000, plus accrued interest.  Additionally, the Summary Notice was published in *The Wall Street Journal* and transmitted over the internet using the *PR Newswire*.  *Id.*, ¶13.  Since August 14, 2025, the Notice and the Stipulation have been available for download from the Settlement Website.  *Id.*, ¶14.  The Notice further discloses that Lead Plaintiffs may seek awards for Lead Plaintiffs in connection with their representation of the Class in an amount not to exceed $7,500 each.

87.     The deadline for Class Members to object to the requested fees and expenses is October 14, 2025.  Although this deadline has not yet passed, to date, no objections have been filed to the requested fee or to the requested expenses.  Lead Counsel will respond to any objections that may be received subsequently in their reply papers that are due to be filed with the Court on October 28, 2025.

## IX.     COUNCIL OF INSTITUTIONAL INVESTORS

88.     No member of either Lead Counsel firm is on the board of the Council of Institutional Investors and there is no actual conflict or appearance of conflict between Plaintiffs (or their counsel) and the Council of Institutional Investors, as the *cy pres*.

## X.     CONCLUSION

89.     In light of the significant recovery to the Class and the substantial risks of this litigation, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate, and that the Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In light of the significant recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the experience of Lead Counsel, Lead Counsel respectfully request that the Court award attorneys' fees in the amount of 25% of the Settlement Fund and expenses in the amount of $368,880.02, plus the interest earned thereon.  In addition, Lead Counsel respectfully submit that Lead Plaintiffs should be awarded the total sum of $20,640 related to their active participation in the Action.

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this 30th day of September, 2025, in San Francisco, California.

*/s/ Jason C. Davis*
JASON C. DAVIS

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this 30th day of September, 2025, in White Plains, New York.

*/s/ Joshua H. Saltzman*
JOSHUA H. SALTZMAN

**ATTESTATION PURSUANT TO LOCAL RULE 5-1(i)(3)**

I, Jason C. Davis, am the ECF user whose identification and password are being used to file the Joint Declaration of Jason C. Davis and Joshua H. Saltzman in Support of Final Approval of Class Action Settlement; Approval of Plan of Allocation; an Award of Attorneys' Fees and Expenses; and Awards to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4).  Pursuant to Local Rule 5-1(i)(3) and in compliance with General Order No. 45X.B., I hereby attest that Joshua H. Saltzman has concurred in this filing.

*s/ Jason C. Davis*
JASON C. DAVIS
